UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO,<br><br>     Plaintiffs,<br>  v.<br><br>DISH NETWORK, LLC,<br><br>     Defendant. | Case No. 3:09-cv-03073-SEM-BGC |

---

**PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY RESPONSES**

---

Faced with Dish Network LLC's ("Dish") resistance to producing discovery in this case, Plaintiffs must ask the Court again for: (a) an order pursuant to Fed. R. Civ. P. 37(a)(3)(B)(iv) compelling Dish to turn over relevant documents and electronically stored information ("ESI") that Plaintiffs have requested; and (b) an order pursuant to Fed. R. Civ. P. 37(a)(3)(B)(i) and (ii) compelling Dish to provide deposition testimony that Plaintiffs tried unsuccessfully to obtain during three Rule 30(b)(6) depositions of Dish.

This motion seeks four discrete sets of discovery:  (a) documents and deposition testimony relating to whether Dish exchanged telemarketing lead lists with its retailers; (b) accurate and complete call records for its 2002-2007 telemarketing calls; (c) information about specific calling campaigns that it conducted; and (d) complete retailer-related information from its in-house databases, which the Court ordered Dish to produce over a year ago (d/e 80).

Plaintiffs have only recently become aware of the existence of many of the documents and much of the information this motion seeks because of Dish's manipulation of its document productions in this case.  Dish withheld from production until March and April 2012 numerous damaging, highly relevant documents on the topics above—some dating from as early as 2004— for no apparent reason other than to conceal information and to prevent Plaintiffs from using these documents in discovery.

Now that fact discovery is ending, it is clear that Dish does not plan to fulfill its discovery obligations in this case, and that Dish intends to seek dispositive relief based on its own intransigence.  Plaintiffs cannot complete discovery without making an effort to obtain all of the evidence that Dish has wrongfully withheld.  Plaintiffs therefore seek an order requiring Dish to produce everything Plaintiffs have sought *as soon as possible*, not after what Dish considers a "reasonable search" that should have been conducted and completed years ago.  Additionally,

because Plaintiffs have already spent significant time and money traveling to Denver to depose Dish designees whom Dish's lawyers improperly directed not to respond to questions about key issues in the case, Plaintiffs seek an order compelling Dish to produce, at Plaintiffs' lead counsel's office in Washington, D.C., a witness knowledgeable about Dish's practice of exchanging lead lists with third parties.  Finally, should the Court grant relief to Plaintiffs, we ask the Court to order Dish to identify specifically what documents it is producing in response to which portion of the Court's order, so that Plaintiffs can evaluate the completeness of what Dish has produced.

## **FACTUAL AND PROCEDURAL BACKGROUND**

In this action, Plaintiffs allege that Dish committed numerous violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4, the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and various state statutes, by placing telemarketing calls to consumers on the National Do-Not-Call ("DNC") Registry and by making prerecorded and abandoned telemarketing calls to consumers, and by substantially assisting and causing its retailers to commit similar violations.  First Amended Complaint (d/e 5).

The parties met and conferred on May 25, 2012, and were unable to come to an agreement on any of the issues described below.  After the meet and confer, Dish's lawyer sent an email complaining that the call had been "perfunctory" and promising to produce some limited documents in the future.  As the Court will see, Dish's belated promises are inadequate to moot Plaintiffs' motion—which focuses mainly on Dish's stated refusals to provide discovery— in any way.

To explain to the Court the context in which this motion arises, Plaintiffs provide a detailed account of the relevant fact discovery in this case.

1.     **DISH REFUSES TO PROVIDE DISCOVERY ABOUT LEAD LISTS SENT TO OR RECEIVED FROM THIRD PARTIES**

Plaintiffs allege that Dish, among other things, knew or consciously avoided knowing about its retailers' extensive telemarketing activities.  To explore Dish's knowledge, Plaintiffs have sought, among other things, documents and information about Dish's marketing support to its retailers—including, specifically, information on whether Dish has exchanged "lead lists" of telephone numbers with its retailers.

The lead list issue has surfaced repeatedly in the context of telemarketing litigation against Dish.  In the face of numerous private-plaintiff telemarketing lawsuits and telemarketing investigations by state attorneys general over the past decade, Dish has consistently maintained, generally, that it has no idea how its retailers market Dish Network service and, specifically, that it does not share contact information of prospective customers with its retailers.  At least two high-level Dish employees have affirmed under penalty of perjury to two different federal courts in private-plaintiff telemarketing lawsuits that Dish does not supply lead lists to retailers, and both courts used that specific sworn testimony to grant summary judgment to Dish.  Affidavit of Blake Van Emst, ECF No. 33-1, *Charvat v. Echostar Satellite*, 676 F. Supp. 2d 668, 675-76 (S.D. Ohio 2009) (Ex. 1); Affidavit of Bruce Werner, ECF No. 16, *Zhu v. Dish Network*, 808 F. Supp. 2d 815, 817-19 (E.D. Va. 2011) (Ex. 2).  Dish also argued to this Court in 2009 that Plaintiffs' complaint should be dismissed because it did not "allege that DISH Network provided telemarketing scripts or lead lists to its dealers."  Motion to Dismiss (d/e 10 at 5).

a.   December 2010 – September 2011: First 30(b)(6) Dish Deposition Testimony

In December 2010, to test Dish's assertions that it does not supply lead lists to its retailers, Plaintiffs noticed two Rule 30(b)(6) depositions—one about Dish's "lead lists" and the other about Dish's "telemarketing"—that included topics related to whether Dish provided lead

4

lists to or coordinated telemarketing activities with its retailers.  *See* Plaintiffs' Dec. 3, 2010

30(b)(6) Notices (Exs. 3-4).  In response, Dish unilaterally declared that its witnesses would not

answer questions on retailer-related questions, *see* Dish's Responses and Objections to Plaintiffs'

Rule 30(b)(6) Notice (Ex. 5), and when Plaintiffs asked questions that related to Dish's retailers,

Dish's lawyer repeatedly directed its witnesses not to answer, *see* Deposition of Russell Bangert

(Dec. 15, 2010) at 196-98 (Ex. 6); Deposition of Bob Frank Davis (Dec. 16, 2010) at 60 (Ex. 7).

Dish promised that it would designate a witness on the retailer-related topics on the notices, but

never did.

In September 2011, Plaintiffs wrote to Dish signaling Plaintiffs' intent to continue these

depositions to cover topics and time periods in the prior notices for which Dish either did not

designate a witness or about which the designee could not testify competently.  Letter from

Runkle to Boyle et al. (Sept. 9, 2011) (Ex. 8).  These depositions were not scheduled until April

2012.  *See* subparagraph 2.c. *infra*.

b.  <u>March 2012: Dish's Belated Document Discovery</u>

In March 2012, seven years after FTC first sought documents from Dish about marketing

support given to entities selling Dish, and only weeks before the close of discovery, Dish

produced three documents revealing that Dish had, in fact, provided lead lists to its retailers.

Two heavily redacted documents showed that Dish had a regular practice of providing lead lists

to at least one large retailer for telemarketing purposes in 2007 and 2008 and that Dish's legal

department knew of the practice.  Email from Davis to Pastorius (June 6, 2008) (Ex. 9); Email

from Carlson to Pacini et al. (May 30, 2007) (Ex. 10).  Another document showed that Dish gave

unidentified leads to unnamed retailers in 2011.  Email from Dexter to Kuehn and Bangert (June

15, 2011) (Ex. 11).  Still another document, dating from April 2004 but not produced until March

2012, revealed that Dish also obtained many telemarketing leads from its retailers and called on those leads itself.  Email from Binns to Parekh et al. (Aug. 11, 2004) (Ex. 12).

       c.   <u>April 6-12, 2012: Plaintiffs Send Discovery Requests</u>

Dish's eleventh-hour production of documents that contradicted the company's position in numerous pleadings and official proceedings prompted Plaintiffs to redouble their efforts to obtain information on how Dish shared leads with its retailers.  On April 6, 2012, Plaintiffs's Sixth Set of RFPs included RFP 4, which sought "[d]ocuments reflecting or related to Dish's provision to any entity of consumer leads that included phone numbers."  Plaintiffs' Sixth Set of RFPs (Ex. 13).  To obtain the leads that Dish received from its Order Entry ("OE") retailers, RFP 5 sought "[d]ocuments reflecting or related to all 'LTS' consumer leads captured, either directly or through Equifax, from Dish's Order Entry Partner Tool and all records associated with the process by which such leads were captured and dialed by Dish."  *Id.*

On April 12, Plaintiffs also noticed continuations of the depositions from December 2010, re-noticing many topics for the time period from 2003 to the present.  Plaintiffs' Notice of Continuation of 30(B)(6) Deposition (Apr. 12, 2012) (Ex. 14).  For the time period "January 1, 2003, to the present," Plaintiffs noticed the following two topics:

> a. DISH's policies, practices, and written materials relating to the logistical and technical processes for acquiring, creating, assembling, and distributing for use, either by DISH itself or by a DISH vendor, lists of consumer telephone numbers of prospective, actual, or past customers to be called with the goal of selling DISH products and services (hereinafter "lead lists"), including identifying specific types of marketing or sales campaigns that used outbound telephone calls to achieve this goal.
> . . .
> g. The identities and roles of any third party vendors or contractors, including but not limited to PossibleNow, used by DISH to acquire, create, assemble, scrub, distribute, or exchange DISH's lead lists;

*Id*. at 2-3.  Dish did not serve written objections to Plaintiffs' deposition notices, but designated Russell Bangert to testify on the topics in Denver on April 18.  Mr. Bangert was the same witness Dish had designated to speak about lead lists at the December 2010 deposition.  Ex. 5.

      d.   <u>April 18, 2012: Deposition of Russell Bangert</u>

Perhaps not surprisingly, the depositions of Dish's 30(b)(6) designees in Denver in April 2012 offered little or no additional information on the lead list issue.  During the continued deposition on lead lists and telemarketing, Dish's counsel prevented Plaintiffs from obtaining the information they sought by repeatedly directing Mr. Bangert not to answer questions based on Dish's lawyers' unilateral determinations of what time periods and topics the deposition would cover—limitations that the lawyers had not bothered to tell Plaintiffs before the deposition.[1] Deposition of Russell Bangert (April 18, 2012) at 216-18 (Ex. 15).

To date, the only arguably illuminating deposition testimony that Plaintiffs have obtained from Dish witnesses on the topic came from the April 2012 Rule 30(b)(6) deposition about other aspects of Dish's relationships with its retailers, for which Dish designated Bruce Werner to testify.  Mr. Werner had signed an affidavit submitted to the U.S. District Court for the Eastern District of Virginia in a telemarketing lawsuit in 2011.  Ex. 2.  In both the affidavit and his deposition, Mr. Werner stated incorrectly that Dish never gave leads to its retailers, but he also admitted that he did not specifically find out whether that portion of his affidavit was true before he signed it.  Deposition of Bruce Marcel Werner (Apr. 17, 2012) at 340-41 (Ex. 16).

---

[1] For example, Dish's attorneys unilaterally asserted that the deposition was limited to the time period 2003-2005 and instructed Mr. Bangert not to answer questions about later time periods, even though there was no such restriction in the notice, and Mr. Bangert *was the same designee in December 2010 who testified about the later time periods that Dish had now declared off-limits*.  *See* Ex. 15.

   e. <u>April 24, 2012: Another Inexplicably Withheld Document</u>

On April 24, 2012, after the April Rule 30(b)(6) depositions, Dish sent Plaintiffs another supplemental document production.  Letter from Mazzuchetti to Hsiao (Apr. 24, 2012) (Ex. 17). This production included a 2006 Dish internal email revealing that Dish had sent telemarketing lead lists to its retailers since at least 2005, and that senior Dish executives, including Dish co-founder Jim DeFranco and Mr. Bangert's supervisor, Maulik Parekh, knew about this practice at that time.  Email from Carlson to DeFranco et al. (Mar. 20, 2006) (Ex. 18).  The timing, coming after Mr. Bangert's deposition, was even more questionable because Plaintiffs' deposition of the retailer identified in the document, Marketing Guru (now known as Saveology), was scheduled for April 26, 2012, in Florida.  Plaintiffs did not even have time to process and review the document in question before that deposition, much less use it effectively.

   f. <u>May 14, 2012: Dish Refuses to Turn Over Responsive Documents</u>

To date, Dish has failed to produce any additional documents responsive to Plaintiffs' April 6, 2012 RFPs related to retailer lead list sharing.  In response to RFP 4, the request for lead lists sent to retailers, Dish stated that it believes it has already turned over enough information about its retailers, but that it may turn over more responsive documents if it finds them.  Dish's Response to Plaintiffs' Sixth RFPs (Ex. 19) at 12-13.  As to RFP 5, the request for the telemarketing leads Dish acquired from its retailers, Dish refused to turn over any documents, calling the request "incomprehensible" and the documents "irrelevant."  *Id.* at 13.

## 2. **DISH REFUSES TO TURN OVER USABLE CALL RECORDS**

In 2005, the Federal Trade Commission ("FTC") began investigating Dish's telemarketing practices and sent Dish—then known as Echostar Satellite—a civil investigative demand ("CID").  *See* Echostar CID Specifications (Ex. 20).  The CID sought, among other

things, telemarketing call records, all records about marketing support Echostar provided to entities selling Dish Network service, and all records about the company's defenses to potential TSR violations.  *Id*.  Call records are relevant to this case in order to determine whether Dish has made any telemarketing calls to consumers on the National Do-Not-Call ("DNC") Registry or to consumers on Dish's internal DNC list.

  a. September 2005 – September 2007: Dish Produces 2003-2007 Call Records

   Between September 2005 and September 2007, Dish purported to produce selected portions of the telemarketing call records the FTC requested, producing three sets of call records of calls dating from October 2003-September 2005, December 2005-December 2006, and January 2007-August 2007 (together, the "2003-2007 call records").  *See* Letter from Steele to Deitch (Sept. 22, 2005) (Ex. 21); Letter from Blum to Deitch (Aug. 1, 2007) (Ex. 22); Letter from Blum to Deitch (Sept. 10, 2007) (Ex. 23); Fax from Kalani to Menjivar (Sept. 18, 2007) (Ex. 24).  These call records contained dates, times, phone numbers, and disposition codes of outbound calls.  *Id*.  The cover letter from Dish Corporate Counsel Dana Steele accompanying the October 2003-September 2005 records indicated that the call records produced were "telemarketing" calls, and the cover letters accompanying the other sets of records did not disabuse the FTC of the notion that Dish was turning over its telemarketing records.  *Id*.

  b. Summer 2008: Dish Creates Detailed Analyses of Portions of Its 2003-2007 Call Records Using Additional Information Not Provided to the FTC

   During settlement negotiations with the FTC in 2008, Dish created and provided detailed analyses of portions of its 2003-2007 call records aimed at showing that it had a low rate of do-not-call violations.  Dish sent two analyses: one for calls between June and September 2005, and the other for calls during the Aprils and Octobers of the years 2004-2007.  *See* Letter from Rose to Deitch (May 21, 2008) (Ex. 25); Letter from Rose to Deitch (Aug. 14, 2008) (Ex. 26).  These

analyses were based on and included information that Dish had not previously produced in response to the FTC's CID—*i.e.*, the specific marketing campaigns during which a call had been made and whether Dish possessed a valid established business relationship ("EBR") with the recipient of a call.  While these analyses identified thousands of potential violations—what Dish termed "issue calls"—Dish did not identify any concerns about the accuracy or content of the call records themselves.  *See id.*

c.   Summer 2010: Dish Produces 2007-2010 Call Records

After the Court's first discovery scheduling order in this case in March 2010, Plaintiffs requested recent Dish call records.  Responding to Plaintiffs' discovery request in May and June 2010, Dish produced call records from September 2007 through March 2010 (the "2007-2010 call records").  These records described nearly 435 million phone calls.  *See* Declaration of Erez Yoeli ¶ 6, Plaintiffs' Motion for Leave to Amend Ex. 10 (d/e 135-10).  There were two significant differences between the 2007-2010 call records and the 2003-2007 call records Dish had provided in response to the CID:  (a) the 2007-2010 call records contained "campaign codes" that could be used to identify the Dish outbound calling campaign in which a particular call had been made; and (b) about 5 percent of the 2007-2010 call records contained Dish account numbers in the phone number field, rendering those records unusable.[2]  *Compare* Ex. 27 (random sample of Dec. 2005 call records) *with* Ex. 28 (random sample of Dec. 2008 call records).

d.   Fall 2010: Plaintiffs Begin Intensive Analyses of Dish's 2007-2010 Call Records

In November 2010, Dish told Plaintiffs that, among other things, the 2007-2010 call records contained not only Dish's sales calls, but also reflected all of Dish's outbound calling

---

[2] Dish did not fix the call records when the defect was brought to its attention.

activity, whether sales-related or not.  *See* Declaration of Dr. Erez Yoeli ¶ 6, Plaintiffs' Motion

for Leave to Amend Ex. 10 (d/e 135-10).  This revelation led to a lengthy collaborative discovery

process, described in detail in Plaintiffs' recent motion to amend and in Exhibit 10 to that motion

(d/e 135).  Over the following year, Dish and Plaintiffs used the campaign codes associated with

many of the 2007-2010 call records to identify which constituted telemarketing calls, and then

analyzed the telemarketing calls for EBR defenses and internal do-not-call list violations.

Plaintiffs' Motion for Leave to File Second Amended Complaint at 4-7 (d/e 134).

     e.   June 2011 – December 2011: Plaintiffs Propose a Sampling Method for the 2003-2007 Call Records

During the painstaking process of analyzing Dish's 2007-2010 call records, Plaintiffs

urged Dish to help craft a similar—but more efficient—process for analyzing the 2003-2007 call

records that Dish had produced to the FTC.  In informal conversations, Dish's counsel informed

Plaintiffs that the 2003-2007 call records were not exclusively telemarketing records, as Dish had

previously led the FTC to believe.  Despite Plaintiffs' concerns about Dish's change of position,

in a June 2011 email and August 2011 letter, Plaintiffs proposed that the parties conduct

sampling using data from the detailed analyses of Dish's 2003-2007 call records that Dish sent

the FTC during the 2008 settlement negotiations.  Email from Hsiao to Mazzuchetti (June 14,

2011) (Ex. 29); Letter from Runkle to Mazzuchetti (Aug. 11, 2011) (Ex. 30).  This proposal

would have obviated Dish providing campaign code and EBR information for its 2003-2007 call

records, which it had failed to provide in response to the FTC's CID.

Dish did not formally respond to Plaintiffs' August 2011 proposal, but, after repeated

inquiries from Plaintiffs over the next six months, stated that it would consider the proposal after

it had responded to the comprehensive analyses of the 2007-2010 call records that Plaintiffs sent

Dish in December 2011.  Dish has still not responded to Plaintiffs' 2007-2010 call record

analysis, nor has it responded to Plaintiffs' sampling proposal for the 2003-2007 call records.[3]

> f.  March 2012: Dish Produces a 2006 Document Casting Doubts on the Accuracy of Its 2003-2007 Call Records

In March 2012, as part of one of its multiple "supplemental" document productions,

Letter from Mazzuchetti to Runkle (Mar. 14, 2012) (Ex. 31), Dish produced a 2006 document

suggesting that a significant portion of the information in its 2003-2007 call records may be

inaccurate, Email from Robles to Apala (Apr. 21, 2006) (Ex. 32).  The document—an April 2006

email that appears to relate to Dish employees' gathering call records for a telemarketing

investigation by the State of Arkansas—reveals that Dish failed to log the telephone number

called for millions of calls Dish made in 2005 and 2006; instead, Dish logged only the account

number of the customer it called.  *Id*.  The Dish employee who wrote the email, Daniel Robles,

discussed altering the call records to tie each account number to the current telephone number

associated with it, but expressed concern that such an effort would yield inaccurate call record

data, because of the possibility that "many of these customers changed their phone number due

to telemarketing harassment and then put their new phone numbers on the DNC list."  *Id*.

> g.  April – May 2012: Plaintiffs' Request and Dish's Refusal to Provide Call Records

For Plaintiffs, the email described above raised grave concerns about the accuracy of

Dish's 2003-2007 call records, as well as the accuracy of the 2003-2007 call record analyses that

Dish had sent to FTC and that Plaintiffs had proposed to use as a sample for analyzing the calls

from that time period.  None of the records or analyses Plaintiffs possessed for the 2003-2007

---

[3] Given the potential inaccuracies discussed immediately below in 1.f, Plaintiffs' sampling proposal is no longer a viable option.

call records contained account numbers in the telephone number field, suggesting that Dish had, in fact, changed the original call records and analyses it produced to the FTC.  *See* Exs. 25-28.

Plaintiffs then sent a specific discovery request, RFP 1 of Plaintiffs' Sixth Set of RFPs, seeking Dish's complete call record data from January 2002[4] to September 2007, including the campaign code information (to determine whether a call belonged to a telemarketing campaign) and any EBR data Dish plans to assert for those telemarketing calls.  Ex. 13 at 6.  On May 14, 2012, Dish served responses refusing to provide this information.  Ex. 19 at 8-9.  Although the FTC's CID required Dish to provide this same information seven years ago, Dish asserted that Plaintiffs had not requested the information before April 2012.  *Id*.  Dish also suggested that it would take over a year to obtain this data.  *Id*.

### 3.  DISH REFUSES TO TURN OVER COMPLETE INFORMATION ABOUT ITS VIOLATIVE TELEMARKETING CAMPAIGNS

Another major issue in this case is whether Dish's outbound calling department had effective procedures in place to comply with the TSR's and TCPA's provisions forbidding both sales calls to numbers on the DNC Registry and abandoned/prerecorded sales calls.  During Plaintiffs' December 2010 Rule 30(b)(6) deposition on Dish's outbound calling, deponent Bob Davis described a procedure whereby various Dish marketing departments send "outbound request forms" to the outbound department, which processes the forms, gathers information, approves the campaign, and then facilitates the dialing of the campaign by Dish's call centers. *See* Deposition of Bob Frank Davis (Dec. 16, 2010) at 127-33 (Ex. 7).  Mr. Davis also testified about an October 2007 prerecorded "automessage" campaign for international programming that

---

[4] Plaintiffs selected the timeframe for the request as beginning in January 2002 because the Court already found that discovery outside the statute of limitations could be relevant (d/e 80).  Pre-DNC Registry calls could be relevant because, for example, they can be compared with patterns of calls after the DNC Registry took effect.

was halted midstream when Dish determined that the campaign likely violated federal telemarketing laws because it was a prerecorded sales call. *Id*. at 151-55; Email from Davis to Munger (Nov. 9, 2007) (Ex. 33).

Following up on this testimony, in January 2011, Plaintiffs served a document request for "[a]ll documents related to 'outbound request forms' processed by Dish Network's outbound operations group, including all request forms themselves and all documents and communications discussing, analyzing, or approving outbound telemarketing campaigns." Plaintiffs' Third Set of Requests for Production of Documents, Request No. 10 (Ex. 34). After this request and throughout 2011, Dish made several large electronic productions that included some information—mostly internal emails—about its outbound departments' facilitation of telemarketing campaigns. However, due to the volume of Dish's telemarketing, Plaintiffs could not gauge whether Dish had responded fully to Plaintiffs' request for information.

In early 2012, after Plaintiffs completed the first round of their extensive analyses of Dish's 2007-2010 call records, *see* Motion to Amend at 4-7 (d/e 134), Plaintiffs identified several calling campaigns that warranted individual attention and searched Dish's production for additional information about those campaigns. With few exceptions, Plaintiffs found no documents related to any of the calling campaigns—no lists of phone numbers, no outbound request forms, no internal discussions or approvals, and no scripts or recordings.

Plaintiffs' April 6, 2012 document requests therefore sought very specific, complete information about 61 Dish outbound automessage campaigns and 12 Dish outbound live telemarketing campaigns—the combination of which represent a tiny fraction of the over 12,000 outbound campaigns contained in the 2007-2010 call records. For the automessage campaigns, Plaintiffs requested in RFP 2 of their Sixth Set of RFPs (Ex. 13):

> All information associated with the creation, approval, and dialing of each campaign—including but not limited to the script for the campaign, the automated voice message recording played as part of the campaign, all documents associated with the manner in which the calling list was created and transferred among Dish employees and/or vendors, all records indicating the results of individual calls (e.g., whether the automated voice message was played to a live consumer and/or left on voicemail, etc.), and all documents associated with the scrubbing of the campaign calling lists against any do-not-call list.

For the outbound live telemarketing campaigns, Plaintiffs' RFP 3 requested "all information associated with the creation, approval, and dialing of each campaign—including but not limited to the script for each campaign and all documents associated with the scrubbing of the call list for the campaign against any do-not-call list." *Id.*

Dish responded on May 14, 2012. Ex. 19. To RFP 2—the request for the information about the 61 specific prerecorded campaigns—Dish objected to producing information because, according to the unsworn statements of Dish's counsel, the specific prerecorded campaigns Plaintiffs identified were not sales calls, and therefore "are not at issue in this Action." *Id.* at 10-11. Dish then promised it would, at some future time, "produce any scripts or audio recordings regarding these campaigns that it is able to locate after a reasonable search, which will demonstrate that such campaigns were not for telemarketing purposes." *Id.* at 11. To RFP 3—the request for the information about the 12 specific live telemarketing campaigns—Dish made a litany of objections and then stated that it would produce, at some unspecified future time, "any scripts regarding these campaigns that it is able to locate after a reasonable search, as well as documents associated with the scrubbing of any call lists for these campaigns." *Id.* at 11-12.

### 4. <u>DISH REFUSES TO TURN OVER ITS RESPONSIVE DATABASES EVEN AFTER EXTRAORDINARY COOPERATIVE EFFORTS BY PLAINTIFFS</u>

Over 16 months after the Court's January 2011 Order on Plaintiffs' first motion to compel (d/e 80), Dish has still failed to produce one byte of electronically stored retailer-related

15

information in its internal databases that Dish itself identified as responsive to Plaintiffs' First

Set of Interrogatories and Plaintiffs' Second Request for Production of Documents.  Specifically,

in January 2011 Dish represented that its SIEBEL database "track[s] information related to

[Dish's] Retailers" and its Salescomm database contains information regarding Retailer

compensation.  Letter from Boyle to Hsiao (Jan. 31, 2011) (Ex. 35).

Rather than produce the Retailer-related documents per the Court's ruling and the parties'

ESI Agreement, however, Dish complained about the burden of producing the information and

proposed that Plaintiffs travel to Colorado for a supervised viewing of the databases so that the

parties could discuss what information Dish could or would produce from its databases.  *Id*.

Based on Dish's representations, Plaintiffs conferred with Dish over the course of a year to

understand the structure of SIEBEL and Salescomm and to schedule the inspection of the

systems.  *See, e.g.,* Letter from Hsiao to Boyle et al. (Apr. 5, 2011) (Ex. 36).  Finally, in an

additional effort to reduce any potential burden, Plaintiffs identified, in an April 6, 2012 letter, an

initial set of 24 retailers for which Dish could pull all discoverable information from SIEBEL

and Salescomm.  Letter from Runkle to Boyle et al. (Apr. 6, 2012) (Ex. 37).[5]

On April 17, 2012, Plaintiffs' technical consultant, Fred Olsen, accompanied by one of

Plaintiffs' attorneys, visited Dish's Colorado headquarters to attend presentations by Dish's

business personnel regarding the databases.  During the meeting, Plaintiffs viewed the categories

of information contained in SIEBEL, much of which is indeed responsive to Plaintiffs' discovery

requests about Dish's retailers.  *See* Ex. 37.  Dish business personnel provided an overview of

the databases' user interface—*i.e.*, how the SIEBEL and Salescomm programs appear to Dish's

---

[5] Given Dish's failure to produce expeditiously any information even with this limitation, and
given the other circumstances described herein, Plaintiffs withdraw their offer that a limited
production of retailer information from these databases would be acceptable in any way.

business personnel—and asserted that Dish had to use some sort of manual process to produce information responsive to Plaintiffs' discovery requests.  Declaration of Fredrich Olsen ¶¶ 9-14 (Ex. 38).

However, according to Plaintiffs' consultant, Mr. Olsen, who attended the presentation, Dish's representations about the burden of producing information from these systems are not accurate.  *Id.* ¶¶ 15-16.  Mr. Olsen reviewed specific technical details about the architecture and operation of SIEBEL and Salescomm, both of which were developed and are currently maintained internally in Dish's in-house computer servers by company IT personnel.  *Id.* ¶ 13.  Mr. Olsen also confirmed that both SIEBEL and Salescomm are Oracle-based systems.  *Id.*  Accordingly, while there may be limitations placed by design on SIEBEL and Salescomm's front end (*i.e.*, capabilities for Dish's business personnel to see information from their desktop computer interfaces), Mr. Olsen determined that all of the raw data is readily accessible on the back end because it is stored in standardized Oracle tables.  *Id.* ¶¶ 14-15.

On April 30, 2012, Plaintiffs sent a letter to Dish explicitly identifying, based on the terminology used in SIEBEL's user interface, categories of information to be produced from that database.  *See* Letter from Lee to Boyle (Apr. 30, 2012) (Ex. 39).  Plaintiffs also re-identified the responsive Retailer compensation information (as originally identified in Interrogatories 4, 11, and 12) that they sought, whether from Salescomm or another internal Dish source.  *Id.*  Dish has not produced the responsive ESI identified therein.

## LEGAL BACKGROUND

A party is allowed to conduct discovery on "any nonprivileged matter that is relevant to any part's claim or defense . . . ."  Rule 26(b)(1).

Relevance under the discovery rules is far broader than under the Federal Rules of Evidence. *See Goldman v. Checker Taxi Co.*, 325 F.2d 853, 855 (7th Cir. 1963).[6]  Requests for discovery are relevant if there is "any possibility that the information sought may be relevant to the subject matter of the action." *Rubin v. Islamic Republican of Iran*, 349 F. Supp. 2d 1108, 1111 (N.D. Ill. 2004).

"If a party is to resist discovery as unduly burdensome, it must adequately demonstrate the nature and extent of the claimed burden by making a specific showing as to how disclosure of the requested documents and information would be particularly burdensome." *Perry v. City of Gary, Ind.*, No. 08-280, 2009 U.S. Dist. LEXIS 65103, at *4 (N.D. Ind. July 27, 2009).  The fact that responding to discovery requests would be "expensive and would hamper some of the defendants' business operations is not in itself a reason for refusing to order discovery which is otherwise appropriate." *Bd. of Educ. v. Admiral Heating & Ventilating, Inc.*, 104 F.R.D. 23, 29 (N.D. Ill. 1984).

The party objecting to a discovery request must show "why a particular discovery request is improper," *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 235 F.R.D. 447, 449-50 (N.D. Ill. 2006), and must make such a showing with specificity, *Graham v. Casey's General Stores*, 206 F.R.D. 251, 254 (S.D. Ind. 2002).

## ARGUMENT

Plaintiffs can no longer wait for the most relevant evidence in this case to trickle in over the span of years, as it has since 2005.  Nor can Plaintiffs wait for Dish to conduct "reasonable searches" for evidence that is now nine years old and should have been produced long ago.  Given Dish's conduct to date, Plaintiffs cannot trust its representations that it will adequately

---

[6] Internal quotations and citations omitted throughout.

fulfill any discovery obligation in this case.  Plaintiffs therefore request under Rule 37 that the Court order Dish to produce full discovery on the following topics.

### A.     DISH FAILED TO PROVIDE ADEQUATE DISCOVERY ON LEAD LISTS SENT TO AND RECEIVED FROM RETAILERS

As described above, Dish has engaged in an extraordinary charade in which it has misled various federal courts, law-enforcement agencies, consumers, and state attorneys general about the nature of its relationships with its large telemarketing retailers. *Compare* Exs. 1-2 *with* Exs. 9-12.  Documents from four to eight years ago tardily produced during March and April 2012 reveal that Dish sent telemarketing lead lists to its retailers many times, and that Dish had an extensive practice of taking telemarketing leads from its retailers and calling on them itself. *Id.*

Dish's course of conduct strongly suggests an effort to hide this information.  Apart from its lies to other courts, it did not produce these documents until the very end of fact discovery in this case, too late for their use during the depositions of the witnesses who might have testified about them.  In responding to Plaintiffs' document requests, Dish asserted that one of the RFPs on the topic—which uses the wording in the Dish document Bates stamped DISH5-0000066933 (Ex. 12)—is "incomprehensible" and "irrelevant."  Ex. 19 at 13.

For those witnesses who were deposed about the subject, Dish's counsel directed them not to answer based on Dish's unilateral designations of what it preferred its witnesses to testify about, *see* Exs. 6, 7, 15—even though this Court has already ordered Dish to provide information about the telemarketing activities of Dish and all its retailers (d/e 80).  Dish's repeated directions not to answer were improper, as they were not interposed to preserve privilege or for any other permissible purpose.  Fed. R. Civ. P. 30(c)(2); *Redwood v. Dobson*, 476 F.3d 462, 468 (7th Cir. 2007).

Whether Dish gave leads to its retailers or acquired leads from them is highly relevant—in fact, it is the core of the case—and Plaintiffs have spent significant public funds attempting to obtain documents and deposition testimony from Dish about it.  Plaintiffs ask for an order overruling all of Dish's objections and compelling Dish to: (a) provide all Documents reflecting or related to Dish's provision to any entity of consumer leads, or admit that such documents no longer exist; (b) provide all Documents reflecting or related to Dish's acquisition from any entity of consumer leads that included phone numbers, or admit that such documents no longer exist; and (c) produce for deposition, at Plaintiffs' lead counsel's office in Washington, D.C., a witness knowledgeable on topics *a* and *g* on Plaintiffs' April 12, 2012 "Lead List" deposition notice for the entire time period 2003 to the present.

### B.  DISH FAILED TO PROVIDE ACCURATE OUTBOUND CALL RECORDS FOR 2002-2007

As noted above, Dish refuses to produce accurate outbound call records and the attendant campaign code and EBR information for the period 2002-2007.  *See* Ex. 19 at 6-8.  Dish clearly had these records at least as late as 2008, when it provided some of the information in settlement negotiations—although Dish also withheld for six years at least one document showing that those records may have been altered or inaccurate.  *See* Exs. 25, 26, 32.  Dish now claims that pulling complete call records would take a year and would be unduly burdensome.  Ex. 19.

With respect to these call records, Dish has repeatedly shown that its representations cannot be trusted.  Dish produced what it said were "telemarketing" call records in 2005, *see* Ex. 21, but in 2011, it said they were not.  When Plaintiffs then attempted to obtain information about which Dish calls were telemarketing calls, Dish has refused to provide it.  Ex. 19.  Plaintiffs' repeated efforts to reach an agreement whereby the parties would use Dish's own

analysis of its 2003-2007 calls as the basis for a sample violation rate have been met with more stonewalling.

Such misconduct renders frivolous Dish's claims of undue burden—the burden, if any, has been created by Dish's own failure to provide timely and accurate discovery.  Plaintiffs respectfully request that the Court overrule Dish's objections and order Dish to produce full call records from the period January 2002 through September 2007, including, for the calls after October 17, 2003—the effective date of the National Do-Not-Call Registry—documents reflecting Dish's campaign codes and EBR assertions for each such call.  To the extent that such documents no longer exist, Dish must disclose that fact.

### C.   DISH'S FAILURE TO PROVIDE COMPLETE INFORMATION ABOUT ITS CALLING CAMPAIGNS

Plaintiffs also request that the Court order Dish to produce the information requested about the 61 automated calling campaigns and 12 live telemarketing campaigns requested by Plaintiffs' Sixth Set of RFPs.  Ex. 13 at 6-7.  Those RFPs sought very specific information about a limited number of outbound calling campaigns from Dish's 2007-2010 call records, including records about the creation, approval, and dialing of each campaign.  *Id.*

Dish has responded by offering to conduct a "reasonable search" only for telemarketing scripts, scrubbing records, and recordings.  Ex. 19 at 10-12.  This is far less than what Plaintiffs requested and specifically excludes the most relevant documents—the documents reflecting "the creation, approval, and dialing of" the outbound calling campaigns in question.  Dish has also responded by offering its lawyers' unsworn assertions that some of the campaigns were not sales calls—even though Dish's own internal documents suggest otherwise.  *Compare id.* at 11 *with* Ex. 33.

Dish cannot plausibly object on grounds of relevance or undue burden, because these documents reflect its internal telemarketing compliance processes and should have been preserved and produced years ago.  Plaintiffs respectfully request that the Court overrule Dish's objections and order Dish to produce all of the documents that Plaintiffs requested, or state that such documents no longer exist or never existed.

**D.**       **DISH'S FAILURE TO PROVIDE COMPLETE INFORMATION FROM ITS SIEBEL AND SALESCOM DATABASES**

Plaintiffs have been waiting over a year for Dish to comply with the Court's order on Plaintiffs' Motion to Compel (d/e 80) and to produce the information about its retailers: among other things, the retailers' contact information, dates and amounts of payments made to them, each retailers' consumer sales and activations, and a log of the interactions between Dish's employees and the retailers.  Dish has represented that all of this information is available in Dish's SIEBEL and Salescomm databases and is responsive to Plaintiffs' discovery requests. Ex. 35.  The parties' ESI agreement affirmatively calls for Dish to produce electronically-stored information to Plaintiffs, not just to allow inspection.  *See* d/e 80 at 10 ("If . . . Dish . . . keeps these documents in electronic form, then it must make the documents available in electronic form to the Plaintiffs in the manner set forth in the parties' [ESI Agreement]").

Plaintiffs have been sensitive to Dish's cries of burden and have tried to accommodate Dish at every turn.  When Dish asked Plaintiffs to consider narrowing the list of retailers about whom they sought the requested information, Plaintiffs provided a list of 24 retailers— notwithstanding that the Court's holding that the activities of all of Dish's retailers are fair game in discovery.  Ex. 37.  When Dish asked Plaintiffs to visit Colorado to see the databases in action, Plaintiffs hired a technical expert and took the trip.  Ex. 38.  When Dish asked Plaintiffs, post-trip, to identify how they wanted the information from these two databases, Plaintiffs

provided a detailed description and offered to work with Dish on crafting a query that would pull the information from the database tables.  Ex. 39.  Despite all of Plaintiffs' time and effort, the situation has progressed no further than where it was when the Court issued its January 2011 Order:  Rather than respond to any of Plaintiffs' proposals, Dish still complains that Plaintiffs' request for retailer information is too burdensome and refuses to produce the information.

Plaintiffs are entitled to this discovery.  At considerable expense to Plaintiffs, Plaintiffs' technical specialist, Fred Olsen, personally viewed Dish's SIEBEL and Salescomm databases and determined that it was feasible to create an Structured Query Language ("SQL") query that would allow Plaintiffs' to search for and download all of the retailer information in these databases (as opposed to information about only 24 retailers).[7]  Ex. 38 ¶ 15.  Dish's claims to the contrary appear to be one more instance of Dish constructing unnecessary obstacles for itself—or perhaps creating excuses not to produce the information sought—by choosing to use an inefficient and manual process for collecting the responsive data from electronic databases.

The 16-month-long meet and confer on this topic has failed.  Plaintiffs seek an order requiring Dish to allow Plaintiffs' technical specialist supervised access to Dish's systems in order to extract and download all of the information about Dish's retailers contained therein.

---

[7]Structured Query Language ("SQL") is a standardized search protocol that can be run on Dish's back-end data servers to quickly and efficiently extract raw data.  These SQL queries can also specifically exclude personally identifiable information of Dish subscribers, the disclosure of which may implicate 47 U.S.C. § 338(i).  Ex. 38 ¶ 5.  Once the SQL queries are developed and run on the servers, extraction is an automated and computerized process that does not burden Dish's business personnel.  Ex. 38 ¶¶ 13-16; *cf. Daniels v. Spencer Gifts*, LLC, 2012 WL 488099, at * 11 (N.D. Ill. Feb. 14, 2012) (observing that the defendant was able to produce raw data from its in-house database through the use of SQL, which yielded 550,000 rows of data on twelve Excel spreadsheets for one of three sets of data).

## <u>CONCLUSION</u>

WHEREFORE, Plaintiffs respectfully request that the Court order Dish to provide the

discovery mentioned in Sections A-D above.


Dated:  May 25, 2012                                Respectfully,

OF COUNSEL:                                         FOR THE UNITED STATES:

LOIS C. GREISMAN                                    STUART F. DELERY
Associate Director for Marketing Practices          Acting Assistant Attorney General
                                                    MAAME EWUSI-MENSAH FRIMPONG
ROBERTO ANGUIZOLA                                   Acting Deputy Assistant Attorney General
Assistant Director, Marketing Practices

                                                    MICHAEL S. BLUME, Director
RUSSELL DEITCH                                      KENNETH L. JOST, Deputy Director
GARY IVENS
Attorneys                                                    /s/
Federal Trade Commission                           LISA K. HSIAO
600 Pennsylvania Ave. NW, Room 288                 PATRICK R. RUNKLE
Washington, DC  20580                              SANG H. LEE
Telephone: 202-326-2585 (Deitch),                  Trial Attorneys
202-326-2330 (Ivens)                               Consumer Protection Branch
Fax: 202-326-3395                                  U.S. Department of Justice
                                                    PO Box 386
                                                    Washington, DC  20044-0386
                                                    Telephone: 202-532-4892 (Hsiao)
                                                    202-532-4723 (Runkle)
                                                    202-532-4793 (Lee)
                                                    Fax: 202-514-8742
                                                    Lisa.K.Hsiao@usdoj.gov
                                                    Patrick.R.Runkle@usdoj.gov
                                                    Sang.H.Lee@usdoj.gov

                                                    ERIC LONG
                                                    Assistant U.S. Attorney
                                                    U.S. Attorney's Office for the Central District
                                                    of Illinois
                                                    318 S. 6th St.
                                                    Springfield, IL  62701-1806
                                                    Telephone: 217-492-4450
                                                    Fax: 217-492-4512
                                                    Eric.Long@usdoj.gov

FOR THE PEOPLE OF THE STATE OF
CALIFORNIA

KAMALA D. HARRIS
Attorney General of the State of California
ALBERT NORMAN SHELDEN
Deputy Attorney General
Consumer Law Section
Office of the Attorney General
110 W. "A" Street, Suite 1100
San Diego, CA  92101-3702
Telephone: 619-645-2089
Fax: 619-645-2062
albert.shelden@doj.ca.gov

FOR THE PEOPLE OF THE STATE OF
ILLINOIS

LISA MADIGAN
Attorney General of Illinois
ELIZABETH BLACKSTON
Assistant Attorney General; Chief, Consumer
Fraud Bureau

JEFFREY M. FELTMAN
Illinois Bar No. 06237048
Assistant Attorney General
Consumer Fraud Bureau
601 South University Ave., Suite 102
Carbondale, IL  62901
Telephone: 618-529-6418
Fax: 618-529-6403
jfeltman@atg.state.il.us

FOR THE STATE OF OHIO

MIKE DEWINE
Attorney General of Ohio
MICHAEL ZIEGLER
ERIN B. LEAHY Assistant Attorneys General
Consumer Protection Section
Ohio Attorney General's Office
30 E. Broad St., 14th Floor
Columbus, OH  43215-3414
Telephone: 614-466-3980 (Ziegler)
          614-752-4730 (Leahy)
Fax: 866-768-2648
Michael.Ziegler@ohioattorneygeneral.gov
Erin.Leahy@ohioattorneygeneral.gov

FOR THE STATE OF NORTH CAROLINA

ROY COOPER
Attorney General of North Carolina
DAVID N. KIRKMAN
Assistant Attorney General
Consumer Protection Division
North Carolina Department of Justice
114 West Edenton Street
9001 Mail Processing Center
Raleigh, NC  27699-9001
Tel. 919-716-6033
Fax 919-716-6050
dkirkman@ncdoj.gov

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

Pursuant to CDIL-LR 7.1(B)(4)(c), I hereby certify that the above memorandum complies with the type-volume limitation of CDIL-LR 7.1(B)(4)(b).  The memorandum has 6,969 words, exclusive of front matter and signature block, as counted by the word processing system used to prepare the document, Microsoft Word 2010.

Dated:  May 25, 2012

/s Patrick R. Runkle
PATRICK R. RUNKLE
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
PO Box 386
Washington, DC  20044-0386
Telephone: 202-532-4723
Fax: 202-514-8742
patrick.r.runkle@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 25, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s Patrick R. Runkle
PATRICK R. RUNKLE
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
PO Box 386
Washington, DC  20044-0386
Telephone: 202-532-4723
Fax: 202-514-8742
patrick.r.runkle@usdoj.gov

**EXHIBITS TO PLAINTIFFS' THIRD MOTION TO COMPEL**

| Exh. No. | Date | Description |
|---|---|---|
| 1 | 12/14/08 | Affidavit of Blake Van Emst, ECF No. 33-1, *Charvat v. Echostar Satellite*, 676 F. Supp. 2d 668 (S.D. Ohio 2009) |
| 2 | 03/03/11 | Affidavit of Bruce Werner, ECF No. 16, *Zhu v. Dish Network*, 808 F. Supp. 2d 815 (E.D. Va. 2011) |
| 3 | 12/03/10 | Notice of Video Deposition Under Fed. R. Civ. P. 30(b)(6) (Lead List Creation and Distribution) |
| 4 | 12/03/10 | Notice of Video Deposition Under Fed. R. Civ. P. 30(b)(6) (Telemarketing Business Model and Structure) |
| 5 | 12/14/10 | Defendant Dish Network LLC's Objections to Plaintiffs' Notice of Deposition (Lead List Creation and Distribution) |
| 6 | 12/15/10 | Excerpts from Deposition of Russell Bangert |
| 7 | 12/16/10 | Excerpts from Deposition of Bob Frank Davis |
| 8 | 09/09/11 | Letter from Runkle to Boyle et al. |
| 9 | 06/06/08 | Email from Davis to Pastorius, DISH5-0000066604-10 |
| 10 | 05/30/07 | Email from Carlson to Pacini et al. DISH5-0000066657-58 |
| 11 | 06/15/11 | Email from Dexter to Kuehn et al. DISH5-0000074717 |
| 12 | 08/11/04 | Email from Binns to Parekh et al. DISH5-0000066933-41 |
| 13 | 04/06/12 | Plaintiffs' Sixth Set of Requests for Production of Documents |
| 14 | 04/12/12 | Plaintiffs' Notice of Continuation of 30(b)(6) Deposition (Lead List Creation and Distribution) |
| 15 | 04/18/12 | Excerpts from Deposition of Russell Bangert |
| 16 | 04/17/12 | Excerpts from Deposition of Bruce Marcel Werner |
| 17 | 04/24/12 | Letter from Mazzuchetti to Hsiao |
| 18 | 03/20/06 | Email from Carlson to DeFranco et al. DISH5-0000110594-57 |
| 19 | 05/14/12 | Responses of Defendant Dish Network LLC to Plaintiffs' Sixth Request for Production of Documents |
| 20 | 7/21/05 | FTC Civil Investigative Demand issued to EchoStar |
| 21 | 09/22/05 | Letter from Steele to Deitch |

| 22 | 08/01/07 | Letter from Blum to Deitch |
|----|----------|----------------------------|
| 23 | 09/10/07 | Letter from Blum to Deitch |
| 24 | 09/18/07 | Fax from Kalani to Menjivar |
| 25 | 05/21/08 | Letter from Rose to Deitch |
| 26 | 08/14/08 | Letter from Rose to Deitch |
| 27 | 12/2005 | Random sample of Dec. 2005 call records |
| 28 | 12/2008 | Random sample of Dec. 2008 call records |
| 29 | 06/14/11 | Email from Hsiao to Mazzuchetti |
| 30 | 08/11/11 | Letter from Runkle to Mazzuchetti |
| 31 | 03/14/12 | Letter from Mazzuchetti to Runkle |
| 32 | 04/21/06 | Email from Robles to Apala DISH5-0000066487-88 |
| 33 | 11/09/07 | Email from Davis to Munger DISH-00006063-65 |
| 34 | 01/18/11 | Plaintiffs' Third Request for Production of Documents to Dish Network, LLC |
| 35 | 01/31/11 | Letter from Boyle to Hsiao |
| 36 | 04/05/11 | Letter from Hsiao to Boyle et al. |
| 37 | 04/06/12 | Letter from Runkle to Boyle et al. |
| 38 | 05/25/12 | Declaration of Fredrich Olsen |
| 39 | 04/30/12 | Letter from Lee to Boyle |