# EXHIBIT A

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO,<br><br>    Plaintiffs,<br>v.<br><br>DISH NETWORK, LLC,<br><br>    Defendant. | Case No. 3:09-cv-03073-SEM-BGC |

## REPORT OF DR. EREZ YOELI

1. I have been an economist in the Bureau of Economics at the Federal Trade Commission ("''FTC") since September 2009. The Bureau of Economics provides economic analysis and support to antitrust and consumer protection investigations and rulemakings. The Bureau also analyzes the economic impact of government regulation, and provides Congress, the Executive Branch, and the public with policy recommendations relating to competition and consumer protection.

2. In May 2009, I received my PhD in economics from the University of Chicago, where I also received an MBA in 2008. I graduated from Stanford University with an A.B. in economics, with departmental honors, in 2003. My full *curriculum vitae* is attached as Exhibit A to this report.

3. My undergraduate and graduate studies included substantive work in economics, mathematics, computer science, and statistics. I served as a teaching assistant in micro-

1

economics between 2004 and 2009, and also received several fellowships and grants related to economics while at the University of Chicago.

4. In 2010 and 2011, I taught statistics and data analysis to Masters students at Johns Hopkins University's Advanced Academic Programs. In 2011, I taught economics to MBAs at UC San Diego's Rady School of Management. I have also led several internal seminars and classes on statistics and data analysis at the Federal Trade Commission.

5. I have previously served as an expert witness in the cases of *FTC v. Financial Freedom Processing, Inc.*, Case No. 3:10-cv-02446 (N.D. Tex.), and *FTC v. BlueHippo Funding, LLC*, C.A. No. 08 CIV 1819 (S.D.N.Y.).

   a. *Financial Freedom Processing* involved allegations that the defendants violated federal law by advertising that by using the defendants' services, consumers could settle their debts and save 30 or 40 percent of their debt. My expert report and deposition and trial testimony in that case involved analyzing data produced by the defendants to determine whether the consumers who enrolled in defendants' debt relief services were, in fact, out of debt in 18 to 36 months, and whether the defendants' services realized the advertised savings on their enrolleddebt.

   b. In *BlueHippo*, the FTC alleged that the defendants offered to extend credit to consumers to finance purchases of computers and other electronics, but failed to deliver the merchandise or to refund the payments. My expert report and deposition testimony in that case used defendants' records to determine the volume of customers who ordered computers from defendant BlueHippo, how much money the defendant received from these orders, whether the defendant

    delivered a financed computer, and how long it took the defendant to place these orders.

For my work in both cases, I did not receive any compensation beyond my regular FTC salary for my expert testimony. I am not receiving any additional compensation beyond my salary for my expert testimony in this case, nor is my salary in any way contingent on the outcome of the case.

6. As an economist at the FTC Bureau of Economics, I manage a team of analysts whom assist me in performing statistical and data analysis tasks using various computing tools and statistical software packages. Examples of such tools include Python, Stata, and SAS.

7. Since the fall of 2010, I have assisted counsel for the United States in this litigation by reviewing and analyzing data related to the call records produced in this case.

8. In performing my analysis, which is ongoing, I have reviewed numerous documents produced by Dish, including:

    a. Call records produced by Dish Network, LLC ("Dish"), Dish retailers, and various third-parties during the FTC's investigation of Dish and in discovery in this litigation;

    b. Analyses of the foregoing call records performed by the FTC's contractor, InterImage, indicating which calls were "raw hits" – *i.e.*, were made to telephone numbers that had been listed on the National Do-Not-Call ("DNC") Registry over 31 days at the time of the call;

    c. Campaign code, activation date, last payment date, and other information provided by Dish with respect to certain sets of individual call records as part of

the call records described above or produced to DOJ during the spring of 2011 that may be used to determine whether Dish had an Established Business Relationship ("EBR") with a consumer at the time of a particular call;

　　d. The internal Do-Not-Call list maintained by Dish of the telephone numbers of persons who instructed that they did not wish to receive telemarketing calls from Dish; and

　　e. Explanations of the prior documents and information provided to DOJ by Dish's counsel, Kelley, Drye & Warren.

A comprehensive list of all of the information and documents I have reviewed to date is attached to this report as Exhibit B.

9. On November 17, 2010, I and counsel for the United States met with representatives of Dish, including Dish counsel, about whether analyzing the company's 2007-2010 call records would require Dish to review manually each of the approximately 435 million call records dating from 2007-2010 that Dish had produced to Plaintiffs. During that meeting, I confirmed with Dish's attorney, Alysa Hutnik, that Dish had produced records from all outbound telephone calls that it made between 2007-2010, rather than identifying and producing only call records from Dish's outbound sales calls. I also discussed with Ms. Hutnik and Bob Davis and Joey Montano, Dish employees who participated in the meeting by telephone, that most of Dish's 2007-2010 call records included "campaign codes" that typically reflected the purpose for which the call had been made. Dish's representatives claimed that in order to determine which calls represented sales calls, they would have to manually review each such code. During the meeting, I proposed that, in order to help Dish analyze its call records, I would compile a

list of 12,000 unique campaign names as well as a list of naming-patterns that frequently appeared within the 12,000 unique campaign names, and then have DOJ send Dish the resulting lists of unique campaign names and word-patterns so that they could identify which codes were associated with sales, and thus telemarketing, campaigns.

10. In early 2011, after receiving some information that I requested from Dish about the meaning of certain codes that frequently appeared on the call records, *see* Exhibit C, I reviewed sets of Dish Network's call records for the "campaign codes" that identified which campaign each call was associated with, and I created a list of Dish campaign codes that appeared to be sales campaigns. Plaintiffs' counsel sent this list to Dish on January 20, 2011. *See* Exhibit D.

11. In March 2011, Dish verified, based on my analysis, which campaign codes represented telemarketing calls, and sent that information back to me via DOJ. Dish was unable to identify the purpose of some campaigns. *See* Exhibit E.

12. Using the campaign code information from Dish, my team then began to identify which specific DNC Registry "raw hits," as previously identified by FTC, were associated with Dish's telemarketing campaigns.

13. Also during March 2011, I received Dish's internal DNC list, which Dish had produced to Plaintiffs. *See* Exhibit F.

14. Between May 31 and July 6, 2011, Dish sent information for many of the specific "raw hit" calls FTC had identified showing that Dish had an EBR with certain consumers. *See* Exhibits G, H.

15. Using this information, I and my team then identified the calls for which Dish asserted either no EBR or an invalid EBR. I was asked to assume that a call has an invalid EBR if

the call was placed at least 559 calendar days after the last date a consumer made a payment, or if no payment data was provided, at least 94 calendar days after the consumer's activation date.

16. In summer 2011, working under my supervision, my team began processing and analyzing Dish's internal do-not-call list, which came to us in three pieces that together contained over 16 million phone numbers, accompanied by dates and times when Dish placed a consumer on its list. *See* Exh. F.

17. At the end of August 2011, I completed my preliminary analysis of identifying the telemarketing calls that Dish had made between 2007-2010 to people on the DNC Registry and with whom Dish did not assert an EBR or for whom Dish provided an invalid EBR.

18. During November and December 2011, I developed for Plaintiffs' counsel a comprehensive narrative describing my call record analysis process and the information used to complete that analysis, as well as a flowchart depicting the process and inputs, which is attached as Exhibit I. The narrative and flowchart were incorporated into a letter that Plaintiffs' counsel sent to counsel for Dish on December 23, 2011. At the time DOJ sent this information to Dish, the analysis and information reflected therein reflected the discovery and information Plaintiffs had at the time.

19. Below I outline the process used to analyze the call record data Plaintiffs possessed as of December 2010. The various inputs, steps, and conclusions are numbered to reflect the inputs, steps, and conclusions on the flowchart attached as Exhibit I to this Report.

a. Input 1 and Input 1A: Two sets of call records for the 2007-2010 time period that I understand were produced by Dish: (1) DISH call logs reflecting 357,058,136 DISH calls; and (2) PDIALER call logs reflecting 76,026,757 DISH calls.

b. Input 4: DOJ provided back to DISH a list of campaign codes from the two sets of call logs that DISH produced, *see* Para. 10 *supra*.

c. Input 4: In response to the list of campaign codes provided by Plaintiffs in paragraph 19.b., DISH provided a list of known telemarketing and non-telemarketing campaigns and their corresponding codes verifying which campaign codes from paragraph 2 corresponded to outbound telemarketing campaigns. *See* Para. 11, *supra*.

d. DISH was unable to provide information for a small number of campaigns. The calls with no associated campaign code were assumed to be non-telemarketing calls.

e. Step 2 and Step 2A: For each set of call logs, I removed duplicate entries to arrive at: (1) a list of all unique DISH calls; and (2) a list of all unique PDIALER DISH calls.

f. Step 3 and Step 3A: Using the list of telemarketing codes provided by DISH, I identified each call in both lists referenced in paragraph 19.e. as either a telemarketing call, a non-telemarketing call, or an unknown telemarketing call. That identification yielded: (1) a list of 134,047,188 confirmed or unknown telemarketing DISH calls; and (2) a list of 76,026,534 confirmed or unknown telemarketing PDIALER DISH calls.

7

g. Step 4: I combined the two telemarketing call lists referenced in paragraph 19.f. and de-duplicated any calls that appeared on both lists. This combination yielded a master dataset of 134,295,177 unique telemarketing or unknown calls by DISH.

h. Input 3, Input 3A, and Input 3B: DISH produced in discovery three internal DNC lists: (1) INTERNAL_DNC_TELEMARKET_LIST; (2) RETAILER_DNC_TELEMARKET_LIST; and (3) BP_DNC_TELEMARKET_LIST.

i. Step 5: The lists in Paragraph 19.h. were combined to create one master list ("DISH Internal DNC List") that contained 17,762,348 telephone numbers as well as registration and expiration dates provided by DISH as part of the internal DNC lists.

j. Input 2: Input 2 consists of the call record analysis performed by FTC's contractor, InterImage, on DISH's call logs to identify calls made to telephone numbers listed on the National DNC Registry for over 31 days at the time of each call.

k. Step 6: I de-duplicated the National DNC Registry hits provided by InterImage.

l. Step 7: I took the DISH Internal DNC List (Para. 19.i.) and consolidated duplicate entries, which yielded a DISH Internal DNC List of 16,445,946 unique phone numbers. To determine the time frame during which a DISH Internal DNC List entry was valid in situations where one number was associated with multiple requests, I used the earliest date a telephone number was requested to be added to any of the lists in paragraph 19.h. To populate the expiration date field, I gave

    DISH the benefit of the earliest expiration date recorded for any given phone number in the lists in Paragraph 19.h.

m. Input 5: Using the lists referenced in paragraphs 19.g. and 19.k., I identified which National DNC Registry hits were calls made during campaigns on DISH's list of DISH outbound telemarketing campaigns, which resulted in a list of approximately 32.4 million calls (i.e., telemarketing National DNC hits). DISH then provided data to determine if the approximately 32.4 million calls were made to residential customers with whom DISH had an established business relationship ("EBR") at the time of the call. DISH did not provide EBR data for approximately 2.4 million of the calls, which led to the conclusion that DISH had no EBR for those calls. I was asked to assume that an EBR exists for calls placed: (1) within 558 days (eighteen 31-day months) after the phone number's last payment date as provided by DISH; or, (2) when the last payment field was empty (i.e., no payment was ever recorded), within 93 days (three 31-day months) after the phone number's activation date as provided by DISH.

n. Step 8: To reach my conclusions, the data referenced in paragraphs 19.l. (de-duped DISH Internal DNC) and 19.m. (de-duped telemarketing calls to numbers on the National DNC Registry and EBR information) were merged into one master file that can be queried on any combination of the aforementioned attributes (*e.g.*, whether the call was a hit against the National DNC Registry, whether it was a telemarketing call, whether the call was made within the EBR period, etc.). For example, using the EBR data provided by DISH, the approximately 32.4 million DISH telemarketing calls identified in paragraph 12

were queried to determine whether a call was placed outside the applicable EBR periods. In addition, using the DISH Internal DNC List, the 32.4 million telemarketing calls were queried to determine whether a call was made to a number on the DISH Internal DNC List more than 30 days after the phone number was placed on the list.

o. Conclusion 1 and Conclusion 1A: For those National DNC Registry hits for which DISH asserted an EBR, 1,112,125 confirmed telemarketing calls were placed outside DISH's asserted EBR period. For those calls for which DISH provided no EBR data, we found 2,230,290 confirmed telemarketing calls that were also National DNC Registry hits. Adding this figure to the 1,112,125 confirmed telemarketing calls yields a total of 3,342,415 telemarketing calls.

p. Conclusion 2: I queried the master file for calls flagged as being both: (1) National DNC Registry hits; and (2) DISH Internal DNC List hits. My analysis showed that DISH made 3,698,918 confirmed telemarketing calls that fit this description. (EBR was not considered here, as I was asked to assume that EBR is overridden by the customer's request to be on the DISH Internal DNC List). There is possible overlap between these 3.7 million calls and the 3.34 million calls described in paragraph 15.

q. Conclusion 3: In addition, the analysis identified 6,485,211 additional confirmed telemarketing calls made to phone numbers on DISH's Internal DNC List for more than 30 days at the time of the call that were **not** National DNC Registry hits. There is no overlap between these additional 6.5 million calls and the telemarketing calls described in the preceding two paragraphs.

20. To summarize the opinion I reached on as a result of the call record analysis I completed in December 2010—which were based on the information and documents that Dish had provided as of that time—between September 2007 and March 2010, Dish made 3,698,918 telemarketing calls to consumer telephone numbers listed on the National DNC Registry for which Dish had no EBR.

21. Since December 2011, as Plaintiffs continue to receive additional information from Dish in discovery and as Dish reviews and challenges the results of my analysis, I and my team continue to review and refine the earlier analysis DOJ sent to Dish. To date, any changes in these results have been minor. Earlier this month, I received a copy of a letter that Dish sent to Plaintiffs' counsel on July 11, 2012, which indicates that Dish had reviewed my December 2011 call record analysis and, apparently through a manual review process, reached different conclusions about individual call records, substantially reducing the number of DNC Registry "hits" reached by Dish's telemarketing calls. The compact disc attached to Dish's July 11, 2012 letter did not contain any documents or new information supporting Dish's different conclusions about certain calls. Without any additional documents or information, I have no means of determining whether the conclusions set forth in Dish's letter are supported by any evidence that might justify my revising my own conclusion about a specific Dish call record. Dish's letter indicates that its call record analysis is not yet complete.

22. When I receive Dish's final call record analysis and any additional documents or information that Dish produces in this case, I expect to be able to finalize my own call record analysis so that Plaintiffs can provide the information to Dish.

23. In addition to the foregoing analysis, I was asked to review several files containing of call records produced by a company named Guardian Communications ("Guardian"). These call records included specific "disposition codes" in Guardian's call records, and I was asked to quantify the number of call records in each file that featured disposition codes "C," or "D." The results of my analysis follow:

    a. The file Bates numbered FTC003-086847, titled "SearchResults.txt," contains over 6 million calls with the code "WOW_TV," and these records contain only calls with disposition code "C."

    b. FTC305-000133, titled "CDR 2000000024.txt," contains over 43 million calls with disposition code "C," and 77 million calls with disposition code "D." 23,730 calls with disposition code "C" and 27,812 calls with disposition code "D" have the campaign code "DC_430_Fill". The remaining calls all have campaign codes that include the words "Tenaya," "TM," or "T."

24. In July 2012, I also supervised the collection of random, representative samples of temporally contiguous retailer call records and provided them to DOJ with the understanding that they will be provided to and reviewed by another expert witness in this case. After that witness reviews the call records, I may assist in generalizing her findings to the entire database of call records.

Submitted this 19th day of July, 2012.

_____
Dr. Erez Yoeli