**E-FILED**
Thursday, 13 March, 2014  06:17:32 PM
Clerk, U.S. District Court, ILCD

# DX-184

# BCP Consumer Response System and Services

*Proposal for Contract Modification*
*to implement changes to Consumer Sentinel Network*
*to implement a Litigation Hold feature*

*Submitted to:*

**Federal Trade Commission**
Office of Acquisition
600 Pennsylvania Avenue, NW
Room 702
Washington, DC 20580



*Submitted by:*



*We never forget who we're working for®*

**Lockheed Martin Corporation**
2277 Research Boulevard
Rockville, MD 20850-3225
www.lockheedmartin.com

*Reference:*

*Contract No. FTC-07-G-7098; Consumer Information System (CIS), Consumer Response Center (CRC), and National Do Not Call Registry (DNC) Program*

*August 20, 2009*

**Proprietary Data**

This data, furnished in connection with Contract No. FTC-7-G-7098 shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed in whole or in part for any purpose other than for the Government's official use under this contract. This restriction does not limit the Government's right to use information contained in the data if it is obtained from another source without restriction. The data subject to this restriction is contained in sheets marked with data restriction legend.



Revisions

| Version | Primary Author(s) | Description of Version | Date Delivered |
|---------|-------------------|------------------------|----------------|
| Final | JFM | Initial version | August 26, 2009 |

## Table of Contents

Introduction ................................................................................................................... 2
Data Retention Policy .................................................................................................. 2
Litigation Holds ........................................................................................................... 2
Pricing .......................................................................................................................... 3

## Introduction

Per a recent decision from the Federal Trade Commission, the Consumer Sentinel Network (CSN) will implement a new data retention policy for its data records, modifying the CIS SOW requirement section C.5.9.5.2. This policy will apply to all searches of data records, downloads, and FOIA downloads within CSN. A new CSN feature called Litigation Holds is required to implement this policy.

## Data Retention Policy

Currently CSN contains over ten years of CSN complaints and general complaints, DNC Complaints, and IDT Complaints, plus ten years of "other records" including Comments, Informant, Referral, Referral-OCC, RFI, Solicitation, Tape, and Testimony.

With this new policy, only CSN complaints, general complaints, and informant records, DNC Complaints, and IDT Complaints created within the last five years will be retained – all older records including the National Tape Library records will be deleted. The "other" records including Comments, Referral, Referral-OCC, RFI, Solicitation, and Testimony created within the last 18 months will be retained – older records will be deleted.

Normally the older records will be deleted twice a year, on or about June 30, and December 31 of each year. As a one-time exception the first record deletion will occur by August 31. All data deletion will comply with NIST rules and ensure the data cannot practicably be read or reconstructed. Please note if a complaint or informant record was created before the five year cutoff point, but was updated after the five year cutoff, the record will not be deleted until five years after the update. Similarly if an "other" record was created before the 18 month cutoff point, and was updated after the 18 month cutoff, the record will not be deleted until 18 months after the update.

## Litigation Holds

To ensure law enforcement users continue with required access to older complaint records for case work, we'll create a new CSN feature called "litigation hold". Via Advanced Search users can mark up to 1,000 records as required for case work, not to be deleted, and thus marked for "litigation hold". All older records on litigation hold will remain in the database, and will remain in the FAST index and Quick/Advanced Search.

A "Hold for Litigation" link will be added to the blue box on the right hand of the Search Results Page for users with a new privilege named LE-REC-DNL3. When creating a litigation hold, users must provide a useful name, and will be sent a confirmation email. Users won't be limited in the number of litigation holds they're allowed. It is possible and allowed for one user and different users to have multiple litigation holds on the same record. It is possible and allowed for users to extend a hold. The technology used to extend a litigation hold will also be used to extend alerts (alerts will automatically expire after one year unless extended). A full history is required of deleted or expired litigation holds.

Records in litigation holds contribute to users' My Disk Space 100MB limit at the same amount as saved results records (20KB each). If users request a hold on more than 1,000 records, a popup will appear with FTC approved language alerting the user that they are not allowed a litigation hold on more than 1,000 records at a time and to contact the CSN Help Desk for assistance if they need to save more. Records in litigation hold are not identified as such in Search Results or Record Details. When litigation holds are removed or expired, the underlying records are available for deletion in the next every-six-month deletion cycle. Litigation holds will automatically expire after one year, with 30-day, 15-day, and 1-day expiration warning emails. The litigation hold details and underlying records will be available to FTC's data analysts (via ReportingDB).

A new "Litigation Holds" tab will be added to the My Alerts portlet, with similar functionality and user interface as Saved Results. The portlet will include a "You have [x] day(s) left on your litigation hold" countdown message – again litigation holds are good for one year. Users can extend the Litigation Hold for another year (from date of extension) and can view the underlying records using a feature similar to 'Saved Results'. Users can release a hold with a "Delete Litigation Hold" link and confirmation page.

For older records that should be deleted, but exist in current downloads or Save Search Results, a "system" litigation hold will be automatically created to ensure the records are not deleted. Again all litigation holds will expire in one year.

Requests to hold more than 1,000 records at a time must be handled individually and coordinated through the Consumer Sentinel program manager (via the CSN Help Desk). Requests to download an entire update history of a complaint also must be handled manually and coordinated through the program manager.

The help screens and tutorials will be enhanced to explain the litigation holds. The "National Tape Library" links will be removed from Advanced Search.

## Pricing

- Implementation of CSN Litigation Hold:  $60,440

**Confidential - US v Dish**          LM000125777

# DX-185

| From: | Thirukkonda, Murali </o=lmco/ou=Site09/cn=Recipients/cn=RDB343927> |
|---|---|
| Sent: | Wednesday, December 21, 2011 12:42 PM |
| To: | Elluru, Arun <arun.elluru@lmco.com> |
| Cc: | Maples, J Fred <j.fred.maples@lmco.com> |
| Subject: | RE: DNC IVR Registration Batch File Issue - Next Step |

I would think we would load all 20K to be correct and reflect all the re-registrations.  Right?  Please call Kris to clarify this first and make sure you explain this clearly so that she understands to be consistent with how things work normally, even the re-registrations will have to be processed and loaded into the database, but it will not have any impact other than the registration date being updated, which I am guessing is accounted in the DNC PossibleNow monthly registry cleansing process.  So, this may be the reason why we need to load all the transactions.

Murali.

**From:** Elluru, Arun
**Sent:** Wednesday, December 21, 2011 12:34 PM
**To:** Thirukkonda, Murali
**Cc:** Maples, J Fred
**Subject:** RE: DNC IVR Registration Batch File Issue - Next Step

This means that we need to load only 4160 registrations and not 20k? This should be the same for other missing batch files?

**From:** Brandriff, Kristina [mailto:kbrandriff@ftc.gov]
**Sent:** Wednesday, December 21, 2011 12:12 PM
**To:** Thirukkonda, Murali; Elluru, Arun
**Cc:** Dziekan, Ami; French, Kathy; Maples, J Fred
**Subject:** EXTERNAL: DNC IVR Registration Batch File Issue - Next Step

Murali,
Per our call, please have your staff move forward with processing the 4160 registrations using the original registration date of 10/21/11.  We still feel that we need to have some "flag" or indication on the record that this was a registration that experienced technical issues and didn't become effective until today.  Possibly including a statement/text in the Transaction type or source fields.

Let us know what/ how you ultimately choose to indicate which records are affected.

Thanks!
Kris
==============
Kristina Brandriff, PMP
202-326-2039
BCP Management Analyst
600 Pennsylvania Ave NW
Washington, D.C. 20580



# DX-186

| | |
|---|---|
| **From:** | Sanyal, Chiranjib (EXP N-CLSS) </O=LMCO/OU=SITE00/CN=RECIPIENTS/CN=RDB376555> |
| **Sent:** | Monday, March 12, 2012 12:36 PM |
| **To:** | Thirukkonda, Murali <murali.thirukkonda@lmco.com> |
| **Cc:** | Elluru, Arun <arun.elluru@lmco.com>; Maples, J Fred <j.fred.maples@lmco.com> |
| **Subject:** | RE: EXTERNAL: RE: Issue and resolution of DNC consumer web registrations over the weekend |

Murali,

I will complete the DNC test by cob today.

Thanks,
- Chiranjib

**From:** Thirukkonda, Murali
**Sent:** Monday, March 12, 2012 10:36 AM
**To:** Sanyal, Chiranjib (EXP N-CLSS)
**Cc:** Elluru, Arun; Maples, J Fred
**Subject:** FW: EXTERNAL: RE: Issue and resolution of DNC consumer web registrations over the weekend

Chiranjib,

See below thread. I would like you to add this to the list of testing tasks. We need to test and ensure that all DNC services are working correctly as expected given this issue over the weekend. How long will it take for you to do 1 pass and complete testing of all key functions in DNC?

I know we have many things going on that are critical. Can you provide a list of tasks on QA's plate (you and others doing QA) and approximate LOE associated with each task?

Thanks,
Murali.

**From:** Thirukkonda, Murali
**Sent:** Monday, March 12, 2012 9:32 AM
**To:** 'French, Kathy'
**Subject:** RE: EXTERNAL: RE: Issue and resolution of DNC consumer web registrations over the weekend

Understand and will conduct comprehensive testing of DNC systems end to end. However, so that you are aware, we have not made or deployed any changes to DNC consumer services that caused this issue. This issue was caused by a routine database maintenance process that we have been doing normally for all these years without any impact. It is an isolated incident, but we will take it seriously to conduct appropriate root cause analysis and address this issue.

Thanks.

Murali Thirukkonda
Lockheed Martin, Information Systems & Global Services
2277 Research Blvd., Rockville, MD, 20850
Work: (301)-519-6679
Cell: (240)-476-3696
Email: murali.thirukkonda@lmco.com



**Confidential - US v Dish**     LM000135302

NOTE:  This e-mail transmission may contain information that is proprietary, privileged and/or confidential and is intended exclusively for the person(s) to whom it is addressed. Any use, copying, retention or disclosure by any person other than the intended recipient or the intended recipient's designees is strictly prohibited. If you are the intended recipient, you must treat the information in confidence and in accordance with all laws related to the privacy and confidentiality of such information. If you are not the intended recipient or their designee, please notify the sender immediately by return e-mail and delete all copies of this email, including all attachments.

**From:** French, Kathy [mailto:KFRENCH@ftc.gov]
**Sent:** Monday, March 12, 2012 9:14 AM
**To:** Thirukkonda, Murali
**Subject:** FW: EXTERNAL: RE: Issue and resolution of DNC consumer web registrations over the weekend
**Importance:** High

Murali,

I know we will be speaking with you re: this issue shortly however, another reported DNC system failure is, more than troubling.  If there hasn't been a comprehensive testing of 100% of the DNC system functionality – I suggest you do so immediately and report back findings immediately.  The instability of the DNC system has become a sustained issue that cannot continue.

Kathy

**From:** Thirukkonda, Murali [mailto:murali.thirukkonda@lmco.com]
**Sent:** Monday, March 12, 2012 8:51 AM
**To:** Dziekan, Ami; Elluru, Arun; French, Kathy; Brandriff, Kristina
**Cc:** Maples, J Fred; Chanin, Noah; Tulchinskiy, Aleksandr G
**Subject:** RE: EXTERNAL: RE: Issue and resolution of DNC consumer web registrations over the weekend

Ami,

My understanding is that due to this table lock issue between Friday 9pm and Saturday 7am, consumers were unable to submit their DNC Web registration and receive a confirmation page as the transaction failed and they would have instead seen a system unavailable message.  So, basically we did not take any consumer registrations on the Web during that time, the situation was equivalent to system being down .  Given this issue was only impacting consumer web registrations and verifications, I believe there was no impact to telemarketers or law enforcement.

Consumers were still able to submit their phone registrations and complaints via IVR between Friday 9pm and Saturday 7am, as these transactions were batched and subsequently processed after the table lock was released on Saturday 7am.  This issue also did not impact consumers submitting DNC complaints on the Web as the table lock was only impacting the registrations table.

Should we target 9:30am for this call?  Please dial into (888)422-7117 / 621026.

Thanks.

Murali Thirukkonda
Lockheed Martin, Information Systems & Global Services
2277 Research Blvd., Rockville, MD, 20850
Work: (301)-519-6679
Cell: (240)-476-3696
Email: murali.thirukkonda@lmco.com

NOTE:  This e-mail transmission may contain information that is proprietary, privileged and/or confidential and is intended exclusively for the person(s) to whom it is addressed. Any use, copying, retention or disclosure by any person other than the intended recipient or the intended recipient's designees is strictly prohibited. If you are the intended recipient, you

must treat the information in confidence and in accordance with all laws related to the privacy and confidentiality of such information. If you are not the intended recipient or their designee, please notify the sender immediately by return e-mail and delete all copies of this email, including all attachments.

**From:** Dziekan, Ami [mailto:adziekan@ftc.gov]
**Sent:** Monday, March 12, 2012 8:27 AM
**To:** Elluru, Arun; French, Kathy; Brandriff, Kristina
**Cc:** Thirukkonda, Murali; Maples, J Fred; Chanin, Noah
**Subject:** EXTERNAL: RE: Issue and resolution of DNC consumer web registrations over the weekend

Arun,

In particular, be prepared to discuss the consumer experience during this issue and any effect on accuracy or speed of processing information that was available to people looking at this information. Particularly how was the information available to law enforcement or telemarketers affected?

Ami

**From:** Elluru, Arun [mailto:arun.elluru@lmco.com]
**Sent:** Monday, March 12, 2012 12:10 AM
**To:** Elluru, Arun; Dziekan, Ami; French, Kathy; Brandriff, Kristina
**Cc:** Thirukkonda, Murali; Maples, J Fred; Chanin, Noah
**Subject:** RE: Issue and resolution of DNC consumer web registrations over the weekend

Made a minor correction.

**From:** Elluru, Arun
**Sent:** Monday, March 12, 2012 12:07 AM
**To:** 'Dziekan, Ami'; 'French, Kathy'; 'kbrandriff@ftc.gov '
**Cc:** Thirukkonda, Murali; Maples, J Fred; Chanin, Noah
**Subject:** Issue and resolution of DNC consumer web registrations over the weekend

On Sunday March 11, 2012 11:54 am Contact Solutions notified us about an increase in the number of **batched** IVR DNC consumer registration transactions during the weekend. Late Sunday afternoon, we started investigating this and identified that a hung weekly scheduled database index maintenance process had not released a table lock on the DNC registrations table until the job was terminated by Noah on Saturday morning around 7am. As a result of this table lock, unfortunately DNC Consumer web registrations and verifications and IVR deletes were not working from Friday March 9, 20120 9:00 pm to Saturday March 10, 2012 7:00 am. Database index maintenance and associated table locks being an internal process to the database, our monitors did not raise any alarms since the database was still responding and operational. In addition, our web site monitors also did not raise any alarm indicating any problems with DNC consumer Web registrations since the DNC web site was also responding.

When Noah had terminated the database index maintenance job on Saturday morning around 7 am, he did not realize and associate this with the DNC consumer web registration problem until Contact Solutions notified us about increase in batch file transactions over the weekend on Sunday afternoon. His subsequent analysis concluded that the database job he terminated on Saturday morning must have released the table lock and from that point on DNC Consumer web registrations and verifications did work normally.

Despite this issue, DNC IVR phone registrations were not impacted, since they were batched and subsequently processed into the database. DNC IVR and Web complaints were also not affected by this issue as the table lock was limited to the DNC registrations table.

We will be available first thing tomorrow morning to further discuss and explain this issue.

**Confidential - US v Dish**

Thanks,
Arun.

**Confidential - US v Dish**

**LM000135305**

# DX-187

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO,<br>Plaintiffs,<br>v.<br><br>DISH NETWORK L.L.C.,<br>Defendant. | Case No. 3:09-cv-03073 |

## <u>UNITED STATES' RESPONSES TO DISH'S FIRST SET OF INTERROGATORIES DIRECTED TO THE UNITED STATES</u>

Pursuant to Fed. R. Civ. P. 33(b), plaintiff the United States of America (hereinafter, "Plaintiff") responds as follows to defendant Dish Network LLC's First Set of Interrogatories, served March 15, 2010.

1.   General objections:

  a.   Plaintiff objects to Defendant's First Set of Interrogatories to the extent that the Interrogatories therein are overbroad and cumulative.  Plaintiffs further object to the extent that the Interrogatories seek information that is equally available to Defendant from public documents, or from documents which are or have been in the possession, custody, or control of Defendant, and to the extent that they seek information which can be derived from a review of those documents.

  b.   Plaintiff objects to Defendant's First Set of Interrogatories to the extent that the Interrogatories therein seek information that is not yet known to Plaintiff.

2.   Specific objections:

1

a.  Plaintiff objects to Defendant's Instruction 1, which states:

"1.  Sources of Information. As part of each Interrogatory response, identify each person who has knowledge or information relating to the Interrogatory, identify each person who was consulted in preparing the Interrogatory response, and identify each person who contributed responsive information."

Plaintiff objects to this Instruction on the grounds that such information is not discoverable. *See, e.g., United States v. Nat'l Steel Corp.*, 26 F.R.D. 599, 600 (S.D. Tex. 1960). Subject to and without waiving its objection, Plaintiff states that these responses are its governmental response, pursuant to Fed. R. Civ. P. 33(b)(1)(B). Information necessary to prepare these responses has been supplied from a number of sources and these responses have been verified on Plaintiff's behalf by an authorized representative.

**Responses**[1]

1.  **Interrogatory:** Set forth in detail all of the facts that You contend establish Dish Network's violations of the TSR, 16 C.F.R. § 310.4(b)(1) et seq.

**Response and objections:** Plaintiff objects to this interrogatory on the grounds that, under Fed. R. Civ. P. 26(b)(2)(C)(i), it is unreasonably cumulative and duplicative, and in addition, can be

---

[1]As used in these Responses, "Dish Network" and "Dish" refer to Defendant generally, including its corporate predecessor, EchoStar Satellite LLC, and other associated entities.

2

obtained from some other source that is more convenient, less burdensome, or less expensive; on the grounds that, under Rule 26(b)(2)(C)(ii), Dish has had (and in fact has exercised) ample opportunity to obtain the information by other discovery in this action; and under Rule 26(b)(2)(C)(iii), on the grounds that the burden and expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Moreover, the form of Defendant's interrogatory, commonly referred to as a "Contention Interrogatory," see In re Convergent Techs. Sec. Litig., 108 F.R.D. 328, 332 (N.D. Cal. 1985), requires Plaintiffs to commit to a position and give all the factual specifics supporting its claims. Because of the complete nature of the information sought by such requests, the "general policy" of district courts in this Circuit and elsewhere is to allow the answers to Contention Interrogatories to be delayed until discovery is at or near an end. Gregg v. Local 305 IBEW, No. 08-cv-160, 2009 U.S. Dist. LEXIS 40761, at *18-*19 (N.D. Ind. May 13, 2009); Ziemack v. Centel Corp., No. 92-cv-3551, 1995 U.S. Dist. LEXIS 18192 , at *5 (N.D. Ill. Dec. 6, 1995). This policy is designed to promote efficient administration of the discovery process, and provide an equitable outcome for both the requester and respondent. Fischer and Porter Co. v. Tolson, 143 F.R.D. 93, 95 (E.D. Pa. 1992)  Specifically, where discovery is still in its infancy and a substantial amount of documentary and testimonial discovery is yet to be completed, it is appropriate to defer answers to a Contention Interrogatory. In re H&R Block Mortgage Corp.. Prescreening Litig., No. 06-md-230, 2006 U.S. Dist. LEXIS 90270, at *4 (N.D. Ind. Dec. 13, 2006) (noting that "contention interrogatories may not be answered until, at the earliest, after

3

substantial discovery has taken place, or at the latest, at the final pre-trial conference"); Nestle

Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 111 (D.N.J. 1990).  Here, the discovery

process has just begun.  Thus, it would be appropriate for the Court to allow Plaintiffs to defer

their answers to Defendant's Contention Interrogatories.  See Fed. R. Civ. P. 33(a)(2) ("[T]he

court may order that the interrogatory need not be answered until designated discovery is

complete, or until a pretrial conference or some other time.").  With these objections in mind,

Plaintiff provides the following information:

Section 310.4(b) of the TSR provides that it is an abusive telemarketing act or practice,

and a violation of the TSR, for "a telemarketer to engage in, or for a seller to cause a

telemarketer to engage in," several specified forms of misconduct.  Plaintiff contends that Dish

violated this prohibition tens of millions of times (and likely more), both through its own

telemarketing conduct and by causing others to engage in prohibited telemarketing conduct.

        a.      **Much of the information sought in this interrogatory is unreasonably**
             **cumulative and duplicative, unduly inconvenient, burdensome, and**
             **expensive; has already been provided to Dish during the FTC's investigation;**
             **and its likely benefit is outweighed by the burden and expense of the**
             **proposed discovery.**

Massive computer processing is required to identify several forms of TSR violations.

Most notable among these are the TSR's prohibitions against (1) calling persons who have

previously stated they do not wish to receive calls by or on behalf of the seller whose goods or

services are being offered, § 310.4(b)(iii)(A), so-called "entity-specific DNC violations";

(2) calling persons on the National Do Not Call (DNC) Registry, subject to identified exceptions,

§ 310.4(b)(iii)(B), "National DNC violations"; (3) failing to connect consumers to a sales

representative within two seconds of the consumer's complete greeting, subject to identified

4

exceptions, § 310.4(b)(iv), referred to as "abandoned calls," and (4) encompassing most pre-recorded telephone messages; and, as of December 1, 2008, delivering pre-recorded telephone messages to current customers, subject to identified exceptions, § 310.4(b)(v) (2009).

For each of these four categories, the first step to identify violations is to compile call records. In response to a CID (civil investigative demand, a form of administrative subpoena) issued by the FTC in 2005, Dish provided call records in 2005 and 2007, showing on average more than 20 million outbound telephone calls per month—a quarter <u>billion</u> per year—placed by its own telemarketers alone.

> ### i.    Entity-specific DNC violations

The first category of TSR violations that require massive computer processing to identify, entity-specific DNC violations, are identified by comparing call records against a seller's entity-specific DNC list. Dish is uniquely in possession of its own entity-specific DNC list.

> ### ii.    National DNC violations

The second category of TSR violations that require massive computer processing to identify are National DNC violations. These violations are identified by comparing call records against the National DNC Registry. The TSR currently prohibits telemarketing calls to numbers that have been registered on the National DNC Registry for more than 31 days. 16 C.F.R. § 310.4(b)(3)(iv) (2009). The 31-day grace period became effective on January 1, 2005; the TSR Amendments, as promulgated in 2003, provided a 3-month grace period. 68 Fed. Reg. 4580, 4673 (Jan. 29, 2003), <u>codified at</u> 16 C.F.R. § 310.4(b)(3)(iv) (2004).

5

Thus, the first step required to identify National DNC violations is to compare call records against the National DNC Registry, not as it stood on the date of each relevant call, but as it stood three months earlier for calls made on or before January 1, 2005; and as it stood 31 days earlier for calls made after that date.

As part of its investigation, the FTC compared portions of the call records it received from Dish in 2005 and 2007 against the National DNC Registry, and identified tens of millions of "raw hits": outbound telephone calls that were placed to telephone numbers on the National DNC Registry more than three months earlier, or 31 days earlier, as pertinent for the date of each call. The FTC previously shared these analyses with Dish. FTC304-001016 (ltr. dated Dec. 14, 2005, Russell S. Deitch to Dana Steele, transmitting FTC analyses for calls made during June 2005, and advising that "[t]he analysis shows that EchoStar made over two million calls to consumers on the [National DNC] Registry in June 2005"); FTC304-000757 (ltr. dated Oct. 3, 2007, Russell S. Deitch to Lewis Rose, transmitting FTC analyses for Dish calls made from June 1, 2005 through Sept. 18, 2005); FTC304-000117 (ltr. dated May 29, 2008, Russell S. Deitch to Lewis Rose, transmitting FTC analyses for Dish calls made from Jan. 1, 2006, through Dec. 30, 2006, and from Jan. 2, 2007, through Aug. 31, 2007). The results of the FTC's analyses may be summarized as follows:

| N-DISC | N-TARGET | # Call Records | Raw DNC Hits | % Raw Hit Rate |
|--------|----------|---------------|--------------|----------------|
| N136 | ECHOSTAR | 18,140,971 | 2,784,629 | 15.3% |
| N137 | ECHOSTAR | 18,398,923 | 2,575,019 | 14.0% |
| N138 | ECHOSTAR | 30,328,309 | 4,000,815 | 13.2% |
| N218a | ECHOSTAR | 18,503,713 | 1,312,924 | 7.1% |
| N218b | ECHOSTAR | 25,382,506 | 3,457,509 | 13.6% |
| N219 | ECHOSTAR | 30304545 | 7439495 | 24.5% |
| N219a | ECHOSTAR | 30991189 | 5094189 | 16.4% |
| N228 | ECHOSTAR | 31420403 | 6916143 | 22.0% |

6

| N-DISC | N-TARGET | # Call Records | Raw DNC Hits | % Raw Hit Rate |
|--------|----------|---------------|--------------|----------------|
| N229 | ECHOSTAR | 14477981 | 3375472 | 23.3% |
| N230 | ECHOSTAR | 32178915 | 4641828 | 14.4% |
| N231 | ECHOSTAR | 31368431 | 7586596 | 24.2% |
| N232 | ECHOSTAR | 20836297 | 5080115 | 24.4% |
| N233 | ECHOSTAR | 20238913 | 4710270 | 23.3% |
| N234 | ECHOSTAR | 18389496 | 3624432 | 19.7% |
| N235 | ECHOSTAR | 19597026 | 3712816 | 18.9% |
| N236 | ECHOSTAR | 17462891 | 3002123 | 17.2% |
| N238 | ECHOSTAR | 24388302 | 2994525 | 12.3% |
| N239 | ECHOSTAR | 26170553 | 4046178 | 15.5% |
| N240 | ECHOSTAR | 15968120 | 3389113 | 21.2% |
| N241 | ECHOSTAR | 18689378 | 4938258 | 26.4% |
| N242 | ECHOSTAR | 17823512 | 4627426 | 26.0% |
| N243 | ECHOSTAR | 20452928 | 5494133 | 26.9% |

EchoStar Senior Corporate Counsel Dana Steele advised FTC in an April 5, 2006 letter that EchoStar's analysis of the over two million June 2005 DNC Registry "hits" described above indicated that all but 103,411 of the calls were to "existing or former customers," FTC304--001002/1003 at 1002, which, if true, might make them permissible under the TSR's existing business relationship (EBR) exception. Steele indicated that a "final report" from Dish's "IT and Marketing departments" was forthcoming about the other 103,411 calls to numbers on the National DNC Registry. Id. On July 10, 2006, FTC wrote back to Steele and noted that it had still not received the information she had promised three months earlier about these 103,411 calls. FTC304-000998. To date, Dish has still not provided any justification for placing over 100,000 phone calls in just one month alone to phone numbers that it does not dispute were on the DNC Registry for more than 31 days at the time of the call.

As to National DNC violations made by Dish Network acting through its authorized dealers, the FTC subpoenaed call logs from several Dish dealers (and from telephone carriers for

several Dish dealers) during its investigation, and compared the call logs against the National

DNC Registry.  Plaintiffs will be providing the resulting analyses as part of their responses to

Dish's First Request for Production of Documents.  Pursuant to Fed. R. Civ. P. 33(d), Plaintiff

states that the answer to this interrogatory, insofar as it seeks "all facts" concerning plaintiff's

contention that Dish dealers made National DNC violations, the pertinent facts currently known

to Plaintiff may be determined by examining the relevant analyses, and that the burden of

deriving or ascertaining the answer will be substantially the same for either party.

In further response, Plaintiff states that those analyses show National DNC violations

made by Dish dealers as follows:

| N-DISC | N-TARGET | # Call Records | Raw DNC Hits | % Raw Hit Rate |
|---|---|---|---|---|
| N221 | ALLSAT | 715,646 | 5,855 | 0.8% |
| N223 | ALLSAT - TRG | 206,017 | 8,963 | 4.4% |
| N224 | ALLSAT - XPLORE | 4,790,709 | 6,650 | 0.1% |
| N237T2004 | ALLSAT - TRG | 1,589,224 | 130,455 | 8.2% |
| N237T2005 | ALLSAT - TRG | 14,050,284 | 2,780,000 | 19.8% |
| N237T2006 | ALLSAT - TRG | 11,510,966 | 3,440,200 | 29.9% |
| N237T2007 | ALLSAT - TRG | 862 | 9 | 1.0% |
| N174 | DISH DIRECT | 33,187 | 4,849 | 14.6% |
| N147 | DISHTV NOW | 34,493,760 | 276 | 0.0% |
| N148 | DISHTV NOW | 6,788,121 | 2 | 0.0% |
| N170 | DISHTV NOW | 813,724 | 94,510 | 11.6% |
| N247 | E-MANAGEMENT | 4,188,266 | 543,760 | 13.0% |
| N207_RegHits Summ.txt | JSR ENTERPRISES | 12,853,487 | 4,469,447 | 34.8% |
| N207_Small_R egHitsSumm.tx t | JSR ENTERPRISES | 17,400,039 | 2,763,627 | 15.9% |
| N173 | NEW EDGE | 810,988 | 143,509 | 17.7% |
| N189 | NEW EDGE | 223,539 | 19,136 | 8.6% |
| N140 | PLANET EARTH | 231,612 | 20,201 | 8.7% |
| N141 | PLANET EARTH | 532,967 | 64,272 | 12.1% |
| N142 | PLANET EARTH | 357,018 | 59,692 | 16.7% |
| N143 | PLANET EARTH | 230,552 | 47,140 | 20.4% |
| N168 | PLANET EARTH | 727,320 | 202,161 | 27.8% |

8

| N-DISC | N-TARGET | # Call Records | Raw DNC Hits | % Raw Hit Rate |
|--------|----------|---------------|--------------|----------------|
| N171 | STAR SATELLITE | 778,345 | 330 | 0.0% |
| N203 | TEICHERT MKTG | 891,563 | 274,492 | 30.8% |
| N155 | TENAYA | 32,229,522 | 4,590 | 0.0% |
| N156 | TENAYA | 13,926,233 | 437,523 | 3.1% |
| N177 | TENAYA | 4,581,543 | 180 | 0.0% |
| N220A1 | TENAYA | 45,985,238 | 4,174 | 0.0% |
| N220A2 | TENAYA | 45,621,341 | 186 | 0.0% |
| N220A3 | TENAYA | 46,650,558 | 395 | 0.0% |
| N220A4 | TENAYA | 46,583,025 | 163 | 0.0% |
| N220A5 | TENAYA | 45,571,476 | 7 | 0.0% |
| N220a6 | TENAYA | 39,162,093 | 4 | 0.0% |
| N172A | VISION QUEST | 4,390 | 1,339 | 30.5% |
| N172B | VISION QUEST | 17,678 | 5,432 | 30.7% |
| N202 | VISION QUEST | 1,419,998 | 486,855 | 34.3% |

Dish has acknowledged that more than six months after this lawsuit was filed, it placed telephone solicitation calls to a consumer on the National DNC Registry and on a State DNC Registry. On September 29, 2009, California consumer [REDACTED PII] reported to the North Carolina Attorney General's Office, "I continually receive calls from Dish Network (several calls per week) and have repeatedly asked to be taken off the calling list. I am on the Do Not Call Registry as well. I am exceedingly frustrated by the calls. I want this harassment to stop! Please help me, and the others like me and get Dish Network to STOP CALLING ME!" NCA001-000013/0014. In a response dated January 12, 2010, Dish acknowledged to the North Carolina Attorney General's Office that, even though [REDACTED PII] had been on both the National DNC Registry and the California DNC registry since May 28, 2008, Dish "determined that Dish Network has placed a solicitation call to her home." NCA001-000010/000011 at 0010. Dish gave no explanation about why, six months after this lawsuit was filed, it was placing unwanted

9

solicitation calls to a consumer on the National and California DNC Registries in violation of the TSR, the TCPA, and California law. Id.

Additional solicitation calls, seeking to sell Dish Network services, continue to be placed to consumers on the National DNC Registry. On March 10, 2010, Ohio consumer REDACTED PII submitted a complaint to the Ohio Attorney General's Office, reporting that Dish Network kept calling her, even though she was on the National DNC Registry, and even though she kept telling them not to call back. OHO001-0000133/0133.

### iii.    Abandoned-call violations

The third category of TSR violations requiring massive computer processing to identify are so-called "abandoned calls": Seller or telemarketer failures to connect consumers to a sales representative within two seconds of the consumer's completed greeting. Determining which outbound telemarketing calls comply with the TSR's prohibitions against abandoned-call requirements requires computer analysis of call-log information from pertinent sellers and telemarketers.

Delivering prerecorded messages to consumers who answer their phones has been a TSR violation since the 2003 TSR amendments. Initiating prerecorded solicitation messages to residential telephone lines also violates the TCPA and its regulations, 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(B); California Civil Code § 1770(a)(22)(A); North Carolina General Statutes § 75-104; Illinois law, 815 ILCS 305/30(b) (and knowingly doing so also violates 815 ILCS 505/2Z); and the Ohio Consumer Sales Practices Act, Ohio Revised Code 1345.01 et seq.

At least one consumer complaint demonstrates that Dish Network itself has delivered prerecorded solicitation messages in violation of the TSR, the TCPA and its regulations, and

North Carolina law.  On June 30, 2006, North Carolina consumer [REDACTED PII] complained to

the North Carolina Attorney General's office about receiving 12 prerecorded Spanish-language

solicitation messages on her cell phone from Dish Network LLC.  NCA001-001001 at 1001-

1003.  (She also wrote that she had registered for the National DNC list on January 19, 2006, and

identified 8 prerecorded solicitation calls made 31 days or more after that date, 2 made precisely

3 months after that date, and 5 made more than 3 months after that date.  Id.)  David M. Fox of

the North Carolina Attorney General's Office forwarded her complaint to EchoStar Satellite,

LLC on July 7, 2006.  Id. at 1007.

   In a July 18, 2006, response, Dish Network did not dispute placing the calls, and stated,

"We have removed [REDACTED PII] nformation from our predictive caller list."  Id. at 1006.  The

letter did not dispute that Dish Network had been delivering prerecorded solicitation messages to

consumer cell phone numbers.  Id.  (The letter also gave no explanation for calling a consumer

phone number registered on the National DNC Registry.  Id.)

   Dish and/or its dealers continue to use autodialers and prerecorded solicitation messages

to sell Dish Network services.  On April 2, 2009, a week after the present lawsuit was filed, Ohio

consumer (and senior citizen) [REDACTED PII] submitted a complaint to the Ohio Attorney

General's office, reporting that "Dish Network keeps computer calling -- I do not use anything

from Dish Network.  There is no way to make them stop.  I am on the Do-Not-Call list."

OHO001-0000005/0007 at 0006.  Three months later, on July 21, 2009, another Ohio consumer,

[REDACTED PII] submitted a complaint to the Ohio Attorney General's Office, reporting that she

too was receiving repeated prerecorded messages selling Dish Network services, even though

she had "never done business with nor sought the services of Dish Network."  OHO001-

11

0000138/0139 at 0138. Moreover, she reported, "[t]he recording does not offer an opportunity to manually remove myself from the call list; the one time I was able to speak with a human on the other end of the line, the caller hung up on me when I said I wished to be removed from the list." Id. (Hanging up on a consumer who asks not to be called is itself illegal; the TSR prohibits any interference with a person's right to be placed on a Do-Not-Call registry. 16 C.F.R. § 310.4(b)(1)(ii).) REDACTED PII reported that the calls continued despite a Dish Network representative's telling her on July 7, 2009, that "they would help take action on it." Id.

The FTC has analyzed call-log information from a number of Dish dealers to find abandoned-call violations. Plaintiffs are including the resulting analyses in their responses to Dish's First Request for Production of Documents. Pursuant to Fed. R. Civ. P. 33(d), Plaintiff states that, insofar as this interrogatory seeks "all facts" concerning Plaintiff's contention that Dish dealers abandoned calls, the pertinent facts currently known to Plaintiff may be determined by examining the relevant analyses, and that the burden of deriving or ascertaining the answer will be substantially the same for either party.

**b.    Foul-language violations**

Other provisions of the TSR require less computing power to identify violations. One notable area is the TSR's prohibition against any seller or telemarketer's engaging in threats, intimidation, or the use of profane or obscene language. 16 C.F.R. § 310.4(a)(1). Plaintiffs are producing tens of thousands of consumer complaints to Dish. See, e.g., CAL001-0000001/00001 through CAL001-0000031/00032; FTC700-000001/00001; ILL001-0000001/00002 through ILL001-0000549/00549; ILL003-000001/0002 through ILL003-000010/0010; NCA001-000001/00002 through NCA001-001829/1830; NCA002-000199/0200

12

through NCA002-000355/0356; NCA005-000001/0002; and OHO001-0000001/00003 through OHO001-0000140/00141. Pursuant to Fed. R. Civ. P. 33(d), Plaintiff states that, insofar as this interrogatory seeks "all facts" concerning Plaintiff's contention that telemarketers selling Dish Network services have engaged in threats, intimidation, or the use of profane or obscene language, the pertinent facts currently known to Plaintiff may be determined by examining the relevant documents, and that the burden of deriving or ascertaining the answer will be substantially the same for either party. Bearing that in mind, Plaintiffs have identified some specific consumer complaints alleging that telemarketers selling Dish Network services engaged in threats, intimidation, or the use of profane or obscene language.

As examples, three consumers have provided Plaintiffs with sworn declarations that detail specific threatening, intimidating, profane, and obscene Dish Network telemarketing calls. On October 31, 2005, consumer **REDACTED PII** received an outbound telemarketing call selling Dish Network services as she was leaving the house. She said she was not interested, and the telemarketer called back to record this message—transcribed here from a transcription service retained by the FTC—on the family answering machine:

> ANSWERING MACHINE RECORDING: Hi, this is the **REDACTED PII** We're not here right now, but you know the routine. We will call you back as soon as we can. Thank you and have a great day today.

> MESSAGE: Hi, Ma'am, this is David with the Dish Network. I just wanted to let you know that it was uncalled for to be so rude to somebody that has a hard enough time anyways making these phone calls. With that same breath, you could have said something nice like simply I'm not interested and have a nice day. But instead you chose to be a bitch. And it's really revealing of what kind of person you are. You must not be very happy, and I feel sorry for your husband, if you even have one. So, I just wanted to let you know that it's really uncalled for. You're a real cunt, as you know. Have a good day.

13

REDACTED PII Aff., FTC002-006687; Jacob Berger Aff., FTC002-006678 (emphases added).

From the end of 2005 onward, consumer REDACTED PII of Grand Island, NE, received

numerous pre-recorded phone solicitations for Dish Network services; the calls would transfer

him to a live telemarketer, and every time, he asked to be put on Dish's internal DNC list.  In

addition, he registered for the National DNC Registry on January 24, 2006.  Nonetheless, calls

continued at least once or twice per week, and sometimes several per day.  During one

telemarketing call in May 2006, a telemarketer selling Dish Network services told REDACTED PII

that he didn't care if REDACTED PII didn't want to receive calls, and didn't care if REDACTED PII filed

any complaints against Dish.  REDACTED PII hung up, and the telemarketer immediately called him

back and called him a "son of a bitch."  REDACTED PII reports in his affidavit that felt violated by the

abusive call, and reported it to Grand Island, NE, police; the Nebraska Attorney General's

Office; and the FTC.  REDACTED PII Aff., FTC002-006700.

From the end of 2005 onward, consumer REDACTED PII of Portland, OR, received repeated

outbound telemarketing calls selling Dish Network services, despite being on the National DNC

Registry and despite asking the telemarketers each time to stop calling.  REDACTED PII states in his

affidavit that he is of Indian descent, and that the telemarketers spoke with Indian accents and

tried enrolling him for television packages designed for people of Indian descent, because, REDACTED PII

REDACTED PII believes, he is of Indian descent.  REDACTED PII reports, under penalties of perjury, that this

then happened:

> On or about May 23, 2006, I received a call from a telemarketer who claimed to
> be calling from Dish.  I told the Dish telemarketer that I was not interested in
> purchasing anything from Dish.  The Dish telemarketer then began cursing at me
> in Hindi, which is a language that I speak.  The Dish telemarketer said in Hindi,
> "Go fuck your mother, go fuck your sister, come on and suck my dick."  The
> phone that the Dish telemarketer had called was on speaker-phone, so my son and

14

daughter, who also speak Hindi, heard and understood the foul and abusive
language that the Dish telemarketer was saying to me.

[REDACTED PII] Aff., FTC002-006698 (emphasis added).

As another example, on November 4, 2003, Minnesota consumer [REDACTED PII] sent

Dish Network (under its former name of EchoStar Satellite Corp.) a draft complaint for violating

the Telemarketing Consumer Protection Act in a telemarketing call placed on October 28, 2003.

FTC003-072460/2460.  The complaint alleged that the telemarketer refused to identify herself or

the seller, and told [REDACTED PII] You would have to be stupid to not take this deal.  You are

too uptight and paranoid.  Since you don't want this offer, I guess you are stupid." FTC003-

07246/2463 at 2462 ¶¶ 7, 9 (emphasis in original).

And in yet another example, on September 26, 2006, Illinois consumer [REDACTED PII]

submitted a complaint to the Illinois Attorney General's Office, reporting that when his wife

asked a telemarketer selling Dish Network services not to call their home any more, "the agent

proceeded to call my wife 3 nasty words (bitch, slut, whore) Sorry about language! Very upset I

tried to star 69 the call but the number was disconnected." ILL001-0000306/0307 at 0307

(spelling and punctuation regularized).  (Transmitting a false Caller ID number is independently

a violation of the TCPA and the TSR.)  After the Illinois Attorney General's Office forwarded

the complaint, Dish responded with a form letter on November 7, 2006, saying that it had not

made the phone call itself, and that "we share [REDACTED PII] concern regarding these unwanted

calls, and we understand what a nuisance they can be." ILL001-000030/000310 at 0030.  Dish's

letter thus ignored the offensive and foul language—and the bogus Caller ID number—used to

telemarket Dish Network services.

15

c.    "Causing"

Plaintiff alleges that Dish "caused" its dealers to engage in abusive telemarketing acts

and practices in violation of § 310.4(b) through its contractual arrangements and business

practices, as well as by failing adequately to monitor and enforce its dealers' compliance with

the telemarketing laws.  At a general level, Dish Network's marketing system encourages

abusive telemarketing practices.  Dish Network authorizes its dealers to market, promote and

solicit orders for Dish Network using the Dish Network trademark.  Representative is Dish's

Incentivized Retailer Agreement with Dish TV Now.  See FTC003-047319/7346 at 7323-29,

¶¶ 3-5, 7.  In fact, Dish's contracts with its dealers require the dealers to promote Dish Network

services.  See, e.g., id. at 7328, ¶ 7.1 ("Retailer agrees to use its reasonable commercial efforts to

promote and enhance EchoStar's business, reputation and goodwill.").  Dish rewards its top-

performing dealers with all-expense paid vacations to exotic resorts.  Throughout 2006, it

vigorously promoted its "2007 Retailer Incentive Trip" in *Facts Blasts* distributed to its dealers.

Dish encouraged its dealers to compete against one another to become one of the "Top 75

Retailers," defined in a January 26, 2007 *Facts Blast* as the Dish dealers with "the most

activations during the contest period."  FTC304-000342/0359 at 0359.  Dish Network's August

22, 2006, *Facts Blast* is representative of its efforts to reward its top performers based on how

many Dish Network activations they sold:

> The 2007 Retailer Incentive Trip winners will be awarded a trip to Punta Mita,
> Mexico, at The Four Seasons Resort from April 15 - April 20, 2007.  The contest
> period is December 1, 2005, through November 30, 2006.  The top 75 pace is
> 2,075!

FTC003-044756/4767 at 4766.  The promotion went on to highlight the resort's "white-sand

beaches edged by clear blue water," "the best diving and snorkeling along Banderas Bay

coastline," and opportunities for "deep-sea fishing, seasonal whale watching, a round of golf at the Jack Nicklaus ocean-side course, a relaxing afternoon at the spa and a variety of other recreational activities." Id. Dish frequently updated its dealers, through other *Facts Blasts* and regular "Retailer Chats," on how many activations they would need to keep abreast with Dish's top 75 dealers to win an invitation to the Retailer Incentive Trip. See, e.g., March 16, 2006 *Facts Blast*, FTC003-044875/4894 at 4890 ("the top 75 pace is 525!"); June 14, 2006 "Retailer Chat," FTC304-000255/0296 at 0294 ("The top 75 pace for next year's trip is . . . . 1,425") (ellipses in original); October 17, 2006 *Facts Blast*, FTC304-000245/0254 at 0254 ("Currently, the top 75 pace for next year's trip is 2,775 activations!"). The next year's promotion was similar; the "2008 Retailer Incentive Trip" was an eight-day Alaska cruise scheduled for August 10-17, 2008, in a "yacht-like setting" with "an unprecedented standard of ultra-luxury" and where "all accommodations are ocean-view suites." April 16, 2007 *Facts Blast*, FTC304-000360/0367 at 0366.

While Dish bestowed lavish vacations upon its top-selling dealers, its low-selling dealers were subject to automatic termination. See, e.g., Incentivized Retailer Agreement with Dish TV Now, FTC003-047319/7346 at 7331, ¶ 10.4(ix) ("This agreement shall terminate automatically should any of the following occur, unless EchoStar notifies retailer to the contrary in writing: . . . (ix) Retailer fails to activate the applicable minimum number of new subscribers (the 'New Subscriber Minimum') set forth in any applicable Business Rules."). And Dish has in fact terminated low-selling dealers for failing to use their best efforts to sell Dish Network services. "Retailer Termination Review," FTC003-057510/7514 at 7511-7512 (identifying multiple Dish

17

dealers terminated for "Failure to actively promote Dish" or "Obligation to use reasonable commercial efforts to solicit orders").

At the same time that Dish rewards high-performing dealers and punishes dealers who fail to promote its services sufficiently, it maintains all discretion to, inter alia: set the price for all services offered to consumers, including promotions, see, e.g., Incentivized Retailer Agreement with Dish TV Now, FTC003-047319/7346 at 7325, ¶ 5; extensively market Dish Network services itself, see, e.g., id. at 7323, ¶ 3.4(vii)(a); provide technology so that consumers can receive Dish Network programming, see, e.g., id. at 7323, ¶ 2.15; select the programming offered to consumers, see, e.g., id. at 7325, ¶ 4; determine which proposed orders solicited by its dealers will be accepted, see, e.g., id. at 7328-29, ¶ 7.2; and provide services to existing customers, see, e.g., id. See also FTC003-044515/4515 (listing items to be discussed during weekly conference call between Dish and its dealers). Dish does not give its dealers exclusive or specified territories. See, e.g., FTC003-047319/7346 at 7323, ¶ 3.4 ("Non-Exclusivity"). Dish's contracts with its dealers make plain that (unless Dish agreed otherwise in writing) a dealer's authorization "is limited to the solicitation of orders for Programming from, and the marketing, advertising and promotion of Programming to," potential Dish customers. Id. at 7323, ¶ 3.1 ("Appointment"). Under Dish's marketing system, a Dish dealer must market Dish Network services, and that is all it can do. The only way a Dish dealer can make more money is to market Dish Network services more aggressively. In the absence of meaningful monitoring and enforcement of its dealers' compliance with the telemarketing laws, Dish's contractual arrangements and marketing structure thus cause abusive telemarketing practices.

At a more specific level, Dish Network caused its dealers to violate pertinent provisions of the TSR through such conduct as:

>    i.    **Entering into contracts with persons and entities it knew or should have known had violated consumer-protection laws in the past.**

For example, on October 3, 2003, Dish Network entered an "Incentivized Retailer Agreement" with David Allen Hagen, a/k/a David DeFusco, a/k/a David DuFusco, a/k/a Antonio Diez, President of Dish TV Now, a North Carolina company.  FTC003-046635/6662, at 6653-6654.  Dish entered this contract with Hagen a/k/a Defusco even though it was a matter of public record that he had been found liable for a civil penalty in FTC v. David and Annette DeFusco, No. 89-cv-1046 (E.D. Va. filed July 20, 1989); that an injunction was issued in a related matter in FTC v. Outdoor World Corp., Civ. No. 89-1779 (E.D. VA. Aug. 4, 1989), motion for stay and expedited appeal denied, No. 89-1779 (4th Cir. Aug. 30, 1989); and that a Hagen-controlled business entity was involved in misconduct leading to a pair of consent orders in FTC administrative actions, In re Outdoor World Corp., Docket 9229, 113 F.T.C. 70 (consent order entered Jan. 10, 1990) (prohibiting Outdoor World Corp. from falsely representing that any consumer has won a specified prize); In re Outdoor World Corp., Docket 9229, 113 F.T.C. 282 (consent order entered Apr. 2, 1990) (prohibiting Outdoor World Corp. from representing that a consumer will receive a prize, without disclosing immediately following such representation the cost if any that the consumer must pay to receive the prize).  To resolve alleged violations of the April 2, 1990, consent decree, Outdoor World Corp. agreed to pay a $200,000 civil penalty in 1992. United States v. Outdoor World Corp., Civ. No. 92-564-A (E.D. Va. judgment entered Apr. 23, 1992).

In the meantime, it was also a matter of public record that on September 29, 1989, Hagen a/k/a DeFusco was sentenced to five years' imprisonment in the Eastern District of Virginia after pleading guilty to charges of money laundering and of conspiracy to defraud a bankruptcy trustee.  United States v. David Allen Hagen DeFusco, 949 F.2d 114 (4th Cir. 1991) (affirming conviction).  Hagen a/k/a DeFusco's guilty plea to the Eastern District of Virginia charges was tied to his agreeing to plead guilty to separate mail fraud charges in the Western District of Texas, for which he was also sentenced to five years' imprisonment, with 40 months' imprisonment to be concurrent with his Eastern District of Virginia sentence.  United States v. David Allen DeFusco, a/k/a David Allen Hagen, 930 F.2d 413, reh'g en banc denied, 933 F.2d 1006 (5th Cir.1991) (table), cert. denied, 502 U.S. 885 (1991).  Hagen a/k/a DeFusco had an extensive—and public—record of federal felony convictions for fraud and FTC actions related to consumer abuses before Dish signed him as a Dish dealer.

        ii.      **Failing to monitor and enforce telemarketing compliance of its authorized dealers even after being put on notice that they were violating telemarketing laws.**

As examples:

        (1)      **Dish America; Brandon Adams Investments Inc., d/b/a Dish Central, of Texas**

On January 24, 2002, Georgia attorney and consumer **REDACTED PII** filed a pro se lawsuit against Dish Network authorized dealer Dish America, Inc., d/b/a Atlanta Satellite Source ("Dish America"), for illegal telemarketing, including violating Georgia's Do Not Call laws.  A request for production of documents in this suit was served on Dish Network, FTC309-000057/0059, and Dish produced documents, FTC309-000024/0024 through FTC309-000047/0051.  However, Dish Network failed to monitor or enforce compliance by Dish

America after being put on notice that Dish America's campaigns may have violated telemarketing laws.

Dish America is one of five Dish dealers for which Dish received copies of citations issued by the Federal Communications Commission the following year, on August 4, 2003. These dealers were cited for delivering prerecorded telemarketing messages for Dish Network services and other TCPA violations. Beyond Dish America, the other four Dish dealers receiving citations were Brandon Adams Investments Inc., d/b/a Dish Central, of Texas; AV Marketing, Inc. of Maryland; Guardian Communications (Iowa), d/b/a Guardian Satellite, of Iowa; and Smartalk Communications Inc. of Georgia.

Dish took no timely or effective action to monitor or enforce compliance going forward. Dish America, the subject of REDACTED PII lawsuit, apparently remains a Dish Network dealer. See http://www.dishamericacorp.com (last visited May 26, 2010). On June 25, 2007, according to a news article in MediaBiz, Dish Network ended its business relationship with Brandon Adams Investments for violating its telemarketing and lead generation policies. This action came nearly four years after the FCC citation.

(2)     Satellite Solutions

According to an August 12, 2002, article in Multichannel News, a telemarketer identifying itself as Satellite Solutions left pre-recorded messages for Los Angeles-area residents. The article reported that the Los Angeles County Consumer Affairs Department was investigating, and further reported that "EchoStar spokesman Marc Lumpkin said contracts between the direct-broadcast satellite TV provider and its retail partners prohibit the use of pre-recorded marketing messages." The article reported that "Since its launch in 1996, Dish

21

Network has terminated retail partnerships for non-compliance with contract rules, Lumpkin said. But he declined to state how many retailers have faced action by the company."

Despite these representations, Satellite Solutions continued placing violative calls. On June 25, 2004, Satellite Solutions agreed to pay a $5,000 civil penalty and to comply with Oklahoma law, in response to charges filed March 4, 2004, for operating as an unregistered commercial telephone seller, operating an autodial device, and initiating unsolicited telemarketing calls to Oklahomans registered for the state's Do Not Call program.

(3)    **Dish TV Now**

An earlier abusive-language and pre-recorded message complaint submitted to Dish Network and Dish TV Now by consumer ███REDACTED PII███ of Minnesota on November 4, 2003, was discussed above. On July 26, 2004, ███REDACTED PII███ sent Dish Network a further draft court complaint. He alleged that on July 19, 2004, Dish Network violated the TCPA by having its retailer Dish TV Now, on Dish Network's behalf, transmit an illegally pre-recorded solicitation message to him; fail to provide an address or phone number; and transmit a false Caller ID number. His cover letter and draft complaint explained at length why Dish Network was liable under the TCPA for any violations committed "on its behalf." FTC003-072407/2408 at 2407; FTC003-072409/2423 at 2409-10 ¶¶ 5-6.

Dish's one-page response said that it had not made the phone call, and that "[w]hile we regret any inconvenience Dish TV Now's call may have caused, Dish does business with many independent retailers and each retailer is solely responsible for their own actions." FTC003-072390/2390 at 2390. The letter said Dish Network would put ███REDACTED PII███ on its internal DNC list. Id.

22

Dish Network's only substantive action in response [REDACTED PII] July 26, 2004, complaint was to fax its dealer a copy of the complaint and its own September 14, 2004, response, but Dish did not ask Dish TV Now to explain why it was delivering prerecorded telemarketing messages and engaging in other telemarketing violations: "Mr. Yelverton: I am forwarding a recent TCPA issue, as well as our response. Please address at your earliest convenience and feel free to contact me should you have any questions. Thank you for your attention to this matter." FTC003-072397/2399 at 2397.

The violations continued. On March 2, 2005, the Attorney General of Illinois forwarded to Dish Network a consumer's February 5, 2005, e-mail, complaining about pre-recorded messages he had been receiving from Dish TV Now for several weeks. FTC003-049783/9783; FTC003-049784/9784. Dish Network responded on April 7, 2005 with a communique stating that Dish TV Now was an independent retailer, and that Dish Network encouraged the consumer to contact Dish TV Now directly. FTC003-049785/9786.

Sometime after July 2006, over two and a half years after it became aware of Dish TV Now's violations of the law, Dish Network terminated its relationship with Dish TV Now.

(4)      **Star Satellite d/b/a Tenaya Marketing**

On January 25, 2005, consumer [REDACTED PII] of Washington State wrote Dish dealer Star Satellite, LLC, and Dish Network to complain that he had received an unsolicited prerecorded telemarketing call, and advised that such calls violated the TCPA. FTC003-058230/8231. The second page of [REDACTED PII] letter gave the "originating number" for Star Satellite's prerecorded solicitation message as "111-111-1111," putting Dish on notice that its dealer was transmitting a bogus Caller ID while telemarketing Dish Network services. Id. at

23

8231.  Despite receiving this very detailed complaint, Dish Network failed to monitor or police Star Satellite's compliance in any meaningful way.  Its response to [REDACTED PII] stated: "If Star is offering Dish Network services, it is as an independent retailer and is solely responsible for its own actions."  FTC003-058232/8232 (emphasis added).  Dish Network's only apparent substantive response to [REDACTED PII] complaint was to send Star Satellite a copy of his letter— addressed to the same address that his letter showed he had himself already sent his letter.  Id. ("[W]e will forward a copy of your letter to Star at the address provided in your January 25, 2005 letter, so that they will have an opportunity to resolve this issue directly with you.").

Shortly before July 2, 2005, a consumer (who did not wish to identify herself) complained to Dish Network that she was continuing to receive telemarketing calls from Star Satellite selling Dish Network services, despite telling Dish Network and Star Satellite to stop calling.  The consumer also told Dish Network about a website that she said had numerous complaints.  In an internal email to Jeff Medina, dated July 2, 2005, Dish Network Consumer Resolution Specialist Arja Lehn reported that Dish Network manager Joshua Valentine "was shocked to see the number of complaints on this website for Star Satellite."  FTC191-000741.  In her email, Lehn asked another Dish Network official, Russell Bangert, "Please follow up with Star Satellite and make sure they know to remove [sic] her phone [REDACTED PII] from their DO NOT CALL LIST."  Id.

In August 2005, Dish Network Senior Corporate Counsel Dana Steele wrote Daniel Myers of Star Satellite to forward the complaint in a lawsuit filed by South Carolina consumer [REDACTED PII] against Star Satellite and Dish Network.  FTC003-049633/9634.  The letter cited Section 7.1 of Star Satellite's Retailer Agreement as requiring it "among other things, to use

24

your best commercial efforts to further Dish Network's business, reputation and goodwill." Id.
at 9634. It also cited Section 13 of the Agreement as a basis for requesting Star Satellite to
defend and indemnify Dish Network. Id. But the letter said nothing about steps that Dish would
take to ensure that Star Satellite either complied with the telemarketing laws or was fired as a
Dish dealer.

Star Satellite's violations continued, and Dish's monitoring and enforcement mechanisms
continued to be nonexistent or ineffective. Following a constituent complaint from Congressman
Fred Upton, Dish Network contacted Star Satellite, and sent a confirming letter on October 26,
2005, stating that "[y]ou have confirmed that you have halted all telemarketing activities
involving persons named on the National Do-No-Call Registry as necessary to comply with
applicable telemarketing/do-not-call and other laws." FTC003-049635/9636 at 9635.

Despite Dish Network's extensive knowledge throughout the year 2005, Star Satellite
abandoned tens of millions of calls answered by live consumers; after the consumer answered,
Star Satellite's telemarketer Guardian Communications either played a pre-recorded message or
hung up on the consumer. This continued until at least November 2005.

(5)   **Ineffective response to consumer** REDACTED PII

From February through April 2006, Houston, TX, consumer REDACTED PII submitted
numerous complaints to numerous Dish Network personnel, from CEO Charles W. Ergen and
Senior Advisor David Moskowitz on down, to complain that he repeatedly received unwanted
telemarketing calls despite being on the National DNC Registry. An e-mail chain sent April 18,
2006, includes only one response from anyone at Dish Network—an e-mail from Dispute
Resolution Specialist Michael Gutierrez, saying that Dish Network did not place the calls itself,

and that "Dish Network does conduct business with thousands of independent retailers, any one of which may have placed the call in question on its own behalf, without Dish Network's knowledge or approval." FTC002-010890/0893 at 0892. The e-mail said nothing about what steps, if any, Dish Network would take to reduce future violations.

On April 18, 2006, REDACTED PII forwarded a voice recording of a telemarketing call from someone with an Indian accent, claiming to be calling from Dish Network itself, and asserting that even if Dish's "customer relations department" said that it would not call REDACTED PII it was Dish's "sales department" that was calling. FTC002-010894/0894. The telemarketer gave a valid number, 1-800-713-7836, as a callback number, and the voice recording includes REDACTED PII efforts to find out who ran that number. Id. After claiming that the number was "Dish Network," the manager there was unable to say who Dish Network CEO Charlie Ergen was, and then retreated to saying that "we work for" Dish Network. Id. When REDACTED PII asked for a phone number for a Dish Network lawyer to telephone the company, he was put on hold, and then the line went dead. Id.

(6)    **E-Management Group, Infinity Sales, and My Dish Now**

As discussed in detail in response to Interrogatory 5 below, Dish's only response to multiple consumer complaints about telemarketing violations by E-Management Group, Inc., and its affiliates Infinity Sales and My Dish Now during 2007 and 2008 was to send the company letter after letter threatening to take action. Even when the company's responses confirmed, rather than refuted, consumer complaints of persistent, repeated, and harassing calls, Dish took no meaningful steps to monitor or enforce the company's compliance with the law, and continued to accept some 75,000 new activations per year that the company secured through its

26

abusive telemarketing campaigns.  The response to Interrogatory 5 below is incorporated in response to this Interrogatory.

2.     **Interrogatory:** Identify any and all instances when Dish Network engaged in or caused a
       telemarketer to engage in initiating an outbound telephone call to a person's telephone
       number on the National Do Not Call Registry as contended by You, setting forth the date
       and details of each such instance, including but not limited to, the telephone number of
       the person who was called and the telemarketing company that made such call.

**Response and objections:**  Plaintiff objects to this interrogatory on grounds that, under Fed. R. Civ. P. 26(b)(2)(C)(i), it is unreasonably cumulative and duplicative, and in addition, can be obtained from some other source that is more convenient, less burdensome, or less expensive; on grounds that, under Rule 26(b)(2)(C)(ii), Dish has had (and in fact has exercised) ample opportunity to obtain the information by other discovery in this action; and under Rule 26(b)(2)(C)(iii), on grounds that the burden and expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

     Moreover, the form of Defendant's interrogatory, commonly referred to as a "Contention Interrogatory," see In re Convergent Techs. Sec. Litig., 108 F.R.D. 328, 332 (N.D. Cal. 1985), requires Plaintiffs to commit to a position and give all the factual specifics supporting its claims. Because of the complete nature of the information sought by such requests, the "general policy"

of district courts in this Circuit and elsewhere is to allow the answers to Contention

Interrogatories to be delayed until discovery is at or near an end. Gregg v. Local 305 IBEW, No.

08-cv-160, 2009 U.S. Dist. LEXIS 40761, at *18-*19 (N.D. Ind. May 13, 2009); Ziemack v.

Centel Corp., No. 92-cv-3551, 1995 U.S. Dist. LEXIS 18192 , at *5 (N.D. Ill. Dec. 6, 1995).

This policy is designed to promote efficient administration of the discovery process, and provide

an equitable outcome for both the requester and respondent. Fischer and Porter Co. v. Tolson,

143 F.R.D. 93, 95 (E.D. Pa. 1992).  Specifically, where discovery is still in its infancy and a

substantial amount of documentary and testimonial discovery is yet to be completed, it is

appropriate to defer answers to a Contention Interrogatory. In re H&R Block Mortgage Corp.,

Prescreening Litig., No. 06-md-230, 2006 U.S. Dist. LEXIS 90270, at *4 (N.D. Ind. Dec. 13,

2006) (noting that "contention interrogatories may not be answered until, at the earliest, after

substantial discovery has taken place, or at the latest, at the final pre-trial conference"); Nestle

Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 111 (D.N.J. 1990).  Here, the discovery

process has just begun.  Thus, it would be appropriate for the Court to allow Plaintiffs to defer

their answers to Defendant's Contention Interrogatories.  See Fed. R. Civ. P. 33(a)(2) ("[T]he

court may order that the interrogatory need not be answered until designated discovery is

complete, or until a pretrial conference or some other time.").  With these objections in mind,

Plaintiff provides the following information:

Initiating an outbound telephone call, or causing a telemarketer to initiate an outbound

telephone call, to a person's telephone number on the National DNC Registry, is among the

abusive telemarketing acts and practices prohibited by TSR § 310.4 et seq., discussed in

response to Interrogatory 1 above.  Plaintiff hereby incorporates its entire response to Interrogatory 1 into this Interrogatory response.


3.      **Interrogatory:** Identify any and all instances when Dish Network has abandoned or
        caused telemarketers to abandon an outbound telephone call by failing to connect the call
        to a sales representative within two (2) seconds of the completed greeting of the person
        as contended by You, setting forth the date and details of each such instance, including
        but not limited to, the telephone number of the person who was called and the
        telemarketing company that made such call.


**Response and objections:**  Plaintiff objects to this interrogatory on grounds that, under Fed. R. Civ. P. 26(b)(2)(C)(i), it is unreasonably cumulative and duplicative, and in addition, can be obtained from some other source that is more convenient, less burdensome, or less expensive; on grounds that, under Rule 26(b)(2)(C)(ii), Dish has had (and in fact has exercised) ample opportunity to obtain the information by other discovery in this action; and under Rule 26(b)(2)(C)(iii), on grounds that the burden and expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Moreover, the form of Defendant's interrogatory, commonly referred to as a "Contention Interrogatory," see In re Convergent Techs. Sec. Litig., 108 F.R.D. 328, 332 (N.D. Cal. 1985), requires Plaintiffs to commit to a position and give all the factual specifics supporting its claims.

29

Because of the complete nature of the information sought by such requests, the "general policy" of district courts in this Circuit and elsewhere is to allow the answers to Contention Interrogatories to be delayed until discovery is at or near an end. Gregg v. Local 305 IBEW, No. 08-cv-160, 2009 U.S. Dist. LEXIS 40761, at *18-*19 (N.D. Ind. May 13, 2009); Ziemack v. Centel Corp., No. 92-cv-3551, 1995 U.S. Dist. LEXIS 18192 , at *5 (N.D. Ill. Dec. 6, 1995). This policy is designed to promote efficient administration of the discovery process, and provide an equitable outcome for both the requester and respondent. Fischer and Porter Co. v. Tolson, 143 F.R.D. 93, 95 (E.D. Pa. 1992). Specifically, where discovery is still in its infancy and a substantial amount of documentary and testimonial discovery is yet to be completed, it is appropriate to defer answers to a Contention Interrogatory. In re H&R Block Mortgage Corp., Prescreening Litig., No. 06-md-230, 2006 U.S. Dist. LEXIS 90270, at *4 (N.D. Ind. Dec. 13, 2006) (noting that "contention interrogatories may not be answered until, at the earliest, after substantial discovery has taken place, or at the latest, at the final pre-trial conference"); Nestle Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 111 (D.N.J. 1990). Here, the discovery process has just begun. Thus, it would be appropriate for the Court to allow Plaintiffs to defer their answers to Defendant's Contention Interrogatories. See Fed. R. Civ. P. 33(a)(2) ("[T]he court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time."). With these objections in mind, Plaintiff provides the following preliminary response:

Abandoned calls are among the abusive telemarketing acts and practices prohibited by TSR § 310.4 et seq., and were discussed in response to Interrogatory 1 above. Plaintiff hereby incorporates its entire response to Interrogatory 1 into this Interrogatory response.

30

4.     **Interrogatory:** Identify any and all instances when Dish Network has provided

substantial assistance or support to Star Satellite and/or Dish TV Now, or other

Marketing Dealers, even though it knew or consciously avoided knowing that Star

Satellite and/or Dish TV Now abandoned outbound telephone calls in violation of the

TSR as contended by You, setting forth the date and details of each such instance.


**Response and objections:** Plaintiff objects to this interrogatory on grounds that, under Fed. R.

Civ. P. 26(b)(2)(C)(i), it is unreasonably cumulative and duplicative, and in addition, can be

obtained from some other source that is more convenient, less burdensome, or less expensive; on

grounds that, under Rule 26(b)(2)(C)(ii), Dish has had (and in fact has exercised) ample

opportunity to obtain the information by other discovery in this action; and under Rule

26(b)(2)(C)(iii), on grounds that the burden and expense of the proposed discovery outweighs its

likely benefit, considering the needs of the case, the amount in controversy, the parties'

resources, the importance of the issues at stake in the action, and the importance of the discovery

in resolving the issues.

Moreover, the form of Defendant's interrogatory, commonly referred to as a "Contention

Interrogatory," see In re Convergent Techs. Sec. Litig., 108 F.R.D. 328, 332 (N.D. Cal. 1985),

requires Plaintiffs to commit to a position and give all the factual specifics supporting its claims.

Because of the complete nature of the information sought by such requests, the "general policy"

of district courts in this Circuit and elsewhere is to allow the answers to Contention

Interrogatories to be delayed until discovery is at or near an end.  Gregg v. Local 305 IBEW, No.

08-cv-160, 2009 U.S. Dist. LEXIS 40761, at *18-*19 (N.D. Ind. May 13, 2009); Ziemack v.

31

Centel Corp., No. 92-cv-3551, 1995 U.S. Dist. LEXIS 18192 , at *5 (N.D. Ill. Dec. 6, 1995).
This policy is designed to promote efficient administration of the discovery process, and provide
an equitable outcome for both the requester and respondent.  Fischer and Porter Co. v. Tolson,
143 F.R.D. 93, 95 (E.D. Pa. 1992).  Specifically, where discovery is still in its infancy and a
substantial amount of documentary and testimonial discovery is yet to be completed, it is
appropriate to defer answers to a Contention Interrogatory.  In re H&R Block Mortgage Corp.,
Prescreening Litig., No. 06-md-230, 2006 U.S. Dist. LEXIS 90270, at *4 (N.D. Ind. Dec. 13,
2006) (noting that "contention interrogatories may not be answered until, at the earliest, after
substantial discovery has taken place, or at the latest, at the final pre-trial conference"); Nestle
Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 111 (D.N.J. 1990).  Here, the discovery
process has just begun.  Thus, it would be appropriate for the Court to allow Plaintiffs to defer
their answers to Defendant's Contention Interrogatories.  See Fed. R. Civ. P. 33(a)(2) ("[T]he
court may order that the interrogatory need not be answered until designated discovery is
complete, or until a pretrial conference or some other time.").  With these objections in mind,
Plaintiff provides the following information:

  The TSR prohibits any person from providing substantial assistance or support to any
seller or telemarketer, knowing or consciously avoiding knowing that the seller or telemarketer is
engaged in any act or practice that violates specified portions of the TSR.  16 C.F.R. § 310.3(b).
Plaintiff contends that Dish provided such substantial assistance or support to its authorized
dealers, despite knowing or consciously avoiding knowing that they were abandoning outbound
telemarketing calls in violation of the TSR.  At a general level, Dish Network's marketing
system encourages abusive telemarketing practices such as abandoned calls.  Dish Network

authorizes its dealers to market, promote and solicit orders for Dish Network using the Dish

Network trademark.  Representative is Dish's Incentivized Retailer Agreement with Dish TV

Now.  See FTC003-047319/7346 at 7323-29, ¶¶ 3-5, 7.  In fact, Dish's contracts with its dealers

require the dealers to promote Dish Network services.  See, e.g., id. at 7328, ¶ 7.1 ("Retailer

agrees to use its reasonable commercial efforts to promote and enhance EchoStar's business,

reputation and goodwill.").  Dish rewards its top-performing dealers with all-expense paid

vacations to exotic resorts.  Throughout 2006, it vigorously promoted its "2007 Retailer

Incentive Trip" in *Facts Blasts* distributed to its dealers. Dish encouraged its dealers to compete

against one another to become one of the "Top 75 Retailers," defined in a January 26, 2007

*Facts Blast* as the Dish dealers with "the most activations during the contest period."  FTC304-

000342/0359 at 0359.  Dish Network's August 22, 2006, *Facts Blast* is representative of its

efforts to reward its top performers based on how many Dish Network activations they sold:

> The 2007 Retailer Incentive Trip winners will be awarded a trip to Punta Mita,
> Mexico, at The Four Seasons Resort from April 15 - April 20, 2007.  The contest
> period is December 1, 2005, through November 30, 2006.  The top 75 pace is
> 2,075!

FTC003-044756/4767 at 4766.  The promotion went on to highlight the resort's "white-sand

beaches edged by clear blue water," "the best diving and snorkeling along Banderas Bay

coastline," and opportunities for "deep-sea fishing, seasonal whale watching, a round of golf at

the Jack Nicklaus ocean-side course, a relaxing afternoon at the spa and a variety of other

recreational activities."  Id.  Dish frequently updated its dealers, through other *Facts Blasts* and

regular "Retailer Chats," on how many activations they would need to keep abreast with Dish's

top 75 dealers to win an invitation to the Retailer Incentive Trip.  See, e.g., March 16, 2006

*Facts Blast*, FTC003-044875/4894 at 4890 ("the top 75 pace is 525!"); June 14, 2006 "Retailer

33

Chat," FTC304-000255/0296 at 0294 ("The top 75 pace for next year's trip is . . . . 1,425")
(ellipses in original); October 17, 2006 *Facts Blast*, FTC304-000245/0254 at 0254 ("Currently,
the top 75 pace for next year's trip is 2,775 activations!").  The next year's promotion was
similar; the "2008 Retailer Incentive Trip" was an eight-day Alaska cruise scheduled for August
10-17, 2008, in a "yacht-like setting" with "an unprecedented standard of ultra-luxury" and
where "all accommodations are ocean-view suites."  April 16, 2007 *Facts Blast*, FTC304-
000360/0367 at 0366.

While Dish bestowed lavish vacations upon its top-selling dealers, its low-selling dealers
were subject to automatic termination.  See, e.g., Incentivized Retailer Agreement with Dish TV
Now, FTC003-047319/7346 at 7331, ¶ 10.4(ix) ("This agreement shall terminate automatically
should any of the following occur, unless EchoStar notifies retailer to the contrary in writing: . . .
(ix) Retailer fails to activate the applicable minimum number of new subscribers (the 'New
Subscriber Minimum') set forth in any applicable Business Rules.").  And Dish has in fact
terminated low-selling dealers for failing to use their best efforts to sell Dish Network services.
"Retailer Termination Review," FTC003-057510/7514 at 7511-7512 (identifying multiple Dish
dealers terminated for "Failure to actively promote Dish" or "Obligation to use reasonable
commercial efforts to solicit orders").

At the same time that Dish rewards high-performing dealers and punishes dealers who
fail to promote its services sufficiently, it maintains all discretion to, inter alia: set the price for
all services offered to consumers, including promotions, see, e.g., Incentivized Retailer
Agreement with Dish TV Now, FTC003-047319/7346 at 7325, ¶ 5; extensively market Dish
Network services itself, see, e.g., id. at 7323, ¶ 3.4(vii)(a); provide technology so that consumers

can receive Dish Network programming, see, e.g., id. at 7323, ¶ 2.15; select the programming

offered to consumers, see, e.g., id. at 7325, ¶ 4; determine which proposed orders solicited by its

dealers will be accepted, see, e.g., id. at 7328-29, ¶ 7.2; and provide services to existing

customers, see, e.g., id.  See also FTC003-044515/4515 (listing items to be discussed during

weekly conference call between Dish and its dealers).  Dish does not give its dealers exclusive or

specified territories.  See, e.g., FTC003-047319/7346 at 7323, ¶ 3.4 ("Non-Exclusivity").  Dish's

contracts with its dealers make plain that (unless Dish agreed otherwise in writing) a dealer's

authorization "is limited to the solicitation of orders for Programming from, and the marketing,

advertising and promotion of Programming to," potential Dish customers.  Id. at 7323, ¶ 3.1

("Appointment").   Under Dish's marketing system, a Dish dealer must market Dish Network

services, and that is all it can do.  The only way a Dish dealer can make more money is to market

Dish Network services more aggressively.  In the absence of meaningful monitoring and

enforcement of its dealers' compliance with the telemarketing laws, Dish's contractual

arrangements and marketing structure thus provided substantial assistance to entities it knew or

consciously avoided knowing were engaging in abusive telemarketing practices.

On a more specific level, Dish has engaged in the following conduct:

i.     **Entering into contracts with persons and entities it knew or should
       have known had violated consumer-protection laws in the past.**

For example, on October 3, 2003, Dish Network entered an "Incentivized Retailer

Agreement" with David Allen Hagen, a/k/a David DeFusco, a/k/a David DuFusco, a/k/a Antonio

Diez, President of Dish TV Now, a North Carolina company.  FTC003-046635/6662, at 6653-

6654.  Dish entered this contract with Hagen a/k/a Defusco even though it was a matter of public

record that he had been found liable for a civil penalty in FTC v. David and Annette DeFusco,

35

No. 89-cv-1046 (E.D. Va. filed July 20, 1989); that an injunction was issued in a related matter

in FTC v. Outdoor World Corp., Civ. No. 89-1779 (E.D. VA. Aug. 4, 1989), motion for stay and

expedited appeal denied, No. 89-1779 (4th Cir. Aug. 30, 1989); and that a Hagen-controlled

business entity was involved in misconduct leading to a pair of consent orders in FTC

administrative actions, In re Outdoor World Corp., Docket 9229, 113 F.T.C. 70 (consent order

entered Jan. 10, 1990) (prohibiting Outdoor World Corp. from falsely representing that any

consumer has won a specified prize); In re Outdoor World Corp., Docket 9229, 113 F.T.C. 282

(consent order entered Apr. 2, 1990) (prohibiting Outdoor World Corp. from representing that a

consumer will receive a prize, without disclosing immediately following such representation the

cost if any that the consumer must pay to receive the prize).  To resolve alleged violations of the

April 2, 1990, consent decree, Outdoor World Corp. agreed to pay a $200,000 civil penalty in

1992.  United States v. Outdoor World Corp., Civ. No. 92-564-A (E.D. Va. judgment entered

Apr. 23, 1992).

In the meantime, it was also a matter of public record that on September 29, 1989, Hagen

a/k/a DeFusco was sentenced to five years' imprisonment in the Eastern District of Virginia after

pleading guilty to charges of money laundering and of conspiracy to defraud a bankruptcy

trustee.  United States v. David Allen Hagen DeFusco, 949 F.2d 114 (4th Cir. 1991) (affirming

conviction).  Hagen a/k/a DeFusco's guilty plea to the Eastern District of Virginia charges was

tied to his agreeing to plead guilty to separate mail fraud charges in the Western District of

Texas, for which he was also sentenced to five years' imprisonment, with 40 months'

imprisonment to be concurrent with his Eastern District of Virginia sentence.  United States v.

David Allen DeFusco, a/k/a David Allen Hagen, 930 F.2d 413, reh'g en banc denied, 933 F.2d

1006 (5th Cir.1991) (table), cert. denied, 502 U.S. 885 (1991).  Hagen a/k/a DeFusco had an

extensive—and public—record of federal felony convictions for fraud and FTC actions related to

consumer abuses before Dish signed him as a Dish dealer.

> **ii.    Failing to monitor and enforce telemarketing compliance of its authorized dealers even after being put on notice that they were violating telemarketing laws.**

As examples:

> **(1)    Dish America; Brandon Adams Investments Inc., d/b/a Dish Central, of Texas**

On January 24, 2002, Georgia attorney and consumer REDACTED PII filed a pro se

lawsuit against Dish Network authorized dealer Dish America, Inc., d/b/a Atlanta Satellite

Source ("Dish America"), for illegal telemarketing, including violating Georgia's Do Not Call

laws.  A request for production of documents in this suit was served on Dish Network, FTC309-

000057/0059, and Dish produced documents, FTC309-000024/0024 through FTC309-

000047/0051.  However, Dish Network failed to monitor or enforce compliance by Dish

America after being put on notice that Dish America's campaigns may have violated

telemarketing laws.

Dish America is one of five Dish dealers for which Dish received copies of citations

issued by the Federal Communications Commission the following year, on August 4, 2003.

These dealers were cited for delivering prerecorded telemarketing messages for Dish Network

services and other TCPA violations.  Beyond Dish America, the other four Dish dealers

receiving citations were Brandon Adams Investments Inc., d/b/a Dish Central, of Texas; AV

Marketing, Inc. of Maryland; Guardian Communications (Iowa), d/b/a Guardian Satellite, of

Iowa; and Smartalk Communications Inc. of Georgia.

Dish took no timely or effective action to monitor or enforce compliance going forward. Dish America, the subject of [REDACTED PII] awsuit, apparently remains a Dish Network dealer. See http://www.dishamericacorp.com (last visited May 26, 2010). On June 25, 2007, according to a news article in MediaBiz, Dish Network ended its business relationship with Brandon Adams Investments for violating its telemarketing and lead generation policies. This action came nearly four years after the FCC citation.

(2)     **Satellite Solutions**

According to an August 12, 2002, article in Multichannel News, a telemarketer identifying itself as Satellite Solutions left pre-recorded messages for Los Angeles-area residents. The article reported that the Los Angeles County Consumer Affairs Department was investigating, and further reported that "EchoStar spokesman Marc Lumpkin said contracts between the direct-broadcast satellite TV provider and its retail partners prohibit the use of pre-recorded marketing messages." The article reported that "Since its launch in 1996, Dish Network has terminated retail partnerships for non-compliance with contract rules, Lumpkin said. But he declined to state how many retailers have faced action by the company."

Despite these representations, Satellite Solutions continued placing violative calls. On June 25, 2004, Satellite Solutions agreed to pay a $5,000 civil penalty and to comply with Oklahoma law, in response to charges filed March 4, 2004, for operating as an unregistered commercial telephone seller, operating an autodial device, and initiating unsolicited telemarketing calls to Oklahomans registered for the state's Do Not Call program.

(3)    **Dish TV Now**

An earlier abusive-language and pre-recorded message complaint submitted to Dish

Network and Dish TV Now by consumer REDACTED PII of Minnesota on November 4, 2003,

was discussed above.  On July 26, 2004, REDACTED PII sent Dish Network a further draft court

complaint.  He alleged that on July 19, 2004, Dish Network violated the TCPA by having its

retailer Dish TV Now, on Dish Network's behalf, transmit an illegally pre-recorded solicitation

message to him; fail to provide an address or phone number; and transmit a false Caller ID

number.  His cover letter and draft complaint explained at length why Dish Network was liable

under the TCPA for any violations committed "on its behalf."  FTC003-072407/2408 at 2407;

FTC003-072409/2423 at 2409-10 ¶¶ 5-6.

Dish's one-page response said that it had not made the phone call, and that "[w]hile we

regret any inconvenience Dish TV Now's call may have caused, Dish does business with many

independent retailers and each retailer is solely responsible for their own actions."  FTC003-

072390/2390 at 2390. The letter said Dish Network would put REDACTED PII on its internal

DNC list. Id.

Dish Network's only substantive action in response REDACTED PII July 26, 2004,

complaint was to fax its dealer a copy of the complaint and its own September 14, 2004,

response, but Dish did not ask Dish TV Now to explain why it was delivering prerecorded

telemarketing messages and engaging in other telemarketing violations: "Mr. Yelverton: I am

forwarding a recent TCPA issue, as well as our response.  Please address at your earliest

convenience and feel free to contact me should you have any questions.  Thank you for your

attention to this matter."  FTC003-072397/2399 at 2397.

39

The violations continued.  On March 2, 2005, the Attorney General of Illinois forwarded to Dish Network a consumer's February 5, 2005, e-mail, complaining about pre-recorded messages he had been receiving from Dish TV Now for several weeks.  FTC003-049783/9783; FTC003-049784/9784.  Dish Network responded on April 7, 2005 with a communique stating that Dish TV Now was an independent retailer, and that Dish Network encouraged the consumer to contact Dish TV Now directly.  FTC003-049785/9786.

Sometime after July 2006, over two and a half years after it became aware of Dish TV Now's violations of the law, Dish Network terminated its relationship with Dish TV Now.

### (4)    Star Satellite d/b/a Tenaya Marketing

On January 25, 2005, consumer ▇REDACTED PII▇ of Washington State wrote Dish dealer Star Satellite, LLC, and Dish Network to complain that he had received an unsolicited prerecorded telemarketing call, and advised that such calls violated the TCPA.  FTC003-058230/8231.  The second page of ▇REDACTED PII▇ letter gave the "originating number" for Star Satellite's prerecorded solicitation message as "111-111-1111," putting Dish on notice that its dealer was transmitting a bogus Caller ID while telemarketing Dish Network services.  Id. at 8231.  Despite receiving this very detailed complaint, Dish Network failed to monitor or police Star Satellite's compliance in any meaningful way.  Its response to ▇REDACTED PII▇ stated: "If Star is offering Dish Network services, it is as an independent retailer and is solely responsible for its own actions."  FTC003-058232/8232 (emphasis added).  Dish Network's only apparent substantive response to ▇REDACTED PII▇ complaint was to send Star Satellite a copy of his letter— addressed to the same address that his letter showed he had himself already sent his letter.  Id.

("[W]e will forward a copy of your letter to Star at the address provided in your January 25, 2005 letter, so that they will have an opportunity to resolve this issue directly with you.").

Shortly before July 2, 2005, a consumer (who did not wish to identify herself) complained to Dish Network that she was continuing to receive telemarketing calls from Star Satellite selling Dish Network services, despite telling Dish Network and Star Satellite to stop calling. The consumer also told Dish Network about a website that she said had numerous complaints. In an internal email to Jeff Medina, dated July 2, 2005, Dish Network Consumer Resolution Specialist Arja Lehn reported that Dish Network manager Joshua Valentine "was shocked to see the number of complaints on this website for Star Satellite." FTC191-000741. In her email, Lehn asked another Dish Network official, Russell Bangert, "Please follow up with Star Satellite and make sure they know to remove [*sic*] her phone REDACTED PII from their DO NOT CALL LIST." Id.

In August 2005, Dish Network Senior Corporate Counsel Dana Steele wrote Daniel Myers of Star Satellite to forward the complaint in a lawsuit filed by South Carolina consumer REDACTED PII against Star Satellite and Dish Network. FTC003-049633/9634. The letter cited Section 7.1 of Star Satellite's Retailer Agreement as requiring it "among other things, to use your best commercial efforts to further Dish Network's business, reputation and goodwill." Id. at 9634. It also cited Section 13 of the Agreement as a basis for requesting Star Satellite to defend and indemnify Dish Network. Id. But the letter said nothing about steps that Dish would take to ensure that Star Satellite either complied with the telemarketing laws or was fired as a Dish dealer.

41

Star Satellite's violations continued, and Dish's monitoring and enforcement mechanisms continued to be nonexistent or ineffective.  Following a constituent complaint from Congressman Fred Upton, Dish Network contacted Star Satellite, and sent a confirming letter on October 26, 2005, stating that "[y]ou have confirmed that you have halted all telemarketing activities involving persons named on the National Do-No-Call Registry as necessary to comply with applicable telemarketing/do-not-call and other laws."  FTC003-049635/9636 at 9635.

Despite Dish Network's extensive knowledge throughout the year 2005, Star Satellite abandoned tens of millions of calls answered by live consumers; after the consumer answered, Star Satellite's telemarketer Guardian Communications either played a pre-recorded message or hung up on the consumer.  This continued until at least November 2005.

(5)        <strong>Ineffective response to consumer</strong> REDACTED PII

From February through April 2006, Houston, TX, consumer REDACTED PII submitted numerous complaints to numerous Dish Network personnel, from CEO Charles W. Ergen and Senior Advisor David Moskowitz on down, to complain that he repeatedly received unwanted telemarketing calls despite being on the National DNC Registry.  An e-mail chain sent April 18, 2006, includes only one response from anyone at Dish Network—an e-mail from Dispute Resolution Specialist Michael Gutierrez, saying that Dish Network did not place the calls itself, and that "Dish Network does conduct business with thousands of independent retailers, any one of which may have placed the call in question on its own behalf, without Dish Network's knowledge or approval."  FTC002-010890/0893 at 0892.  The e-mail said nothing about what steps, if any, Dish Network would take to reduce future violations.

42

On April 18, 2006, ■REDACTED PII■ forwarded a voice recording of a telemarketing call from someone with an Indian accent, claiming to be calling from Dish Network itself, and asserting that even if Dish's "customer relations department" said that it would not call ■REDACTED PII■ it was Dish's "sales department" that was calling.  FTC002-010894/0894.  The telemarketer gave a valid number, 1-800-713-7836, as a callback number, and the voice recording includes ■REDACTED PII■ efforts to find out who ran that number.  Id.  After claiming that the number was "Dish Network," the manager there was unable to say who Dish Network CEO Charlie Ergen was, and then retreated to saying that "we work for" Dish Network.  Id.  When ■REDACTED PII■ asked for a phone number for a Dish Network lawyer to telephone the company, he was put on hold, and then the line went dead.  Id.

### (6)    E-Management Group, Infinity Sales, and My Dish Now

As discussed in detail in response to Interrogatory 5 below, Dish's only response to multiple consumer complaints about telemarketing violations by E-Management Group, Inc., and its affiliates Infinity Sales and My Dish Now during 2007 and 2008 was to send the company letter after letter threatening to take action.  Even when the company's responses confirmed, rather than refuted, consumer complaints of persistent, repeated, and harassing calls, Dish took no meaningful steps to monitor or enforce the company's compliance with the law, and continued to accept some 75,000 new activations per year that the company secured through its abusive telemarketing campaigns.  The response to Interrogatory 5 below is incorporated in response to this Interrogatory.

43

5.    **Interrogatory:** Set forth in detail, including the date and the basis for any contention by

You that Dish Network had knowledge of the violation, any and all instances when Dish

Network has provided substantial assistance or support to a telemarketer even though

Dish Network knew or consciously avoided knowing that the telemarketer was engaged

in any practice in violation of 16 C.F.R. § 310.4, including the alleged misconduct.


**Response and objections:**  Plaintiff objects to this interrogatory on grounds that, under Fed. R.

Civ. P. 26(b)(2)(C)(i), it is unreasonably cumulative and duplicative, and in addition, can be

obtained from some other source that is more convenient, less burdensome, or less expensive; on

grounds that, under Rule 26(b)(2)(C)(ii), Dish has had (and in fact has exercised) ample

opportunity to obtain the information by other discovery in this action; and under Rule

26(b)(2)(C)(iii), on grounds that the burden and expense of the proposed discovery outweighs its

likely benefit, considering the needs of the case, the amount in controversy, the parties'

resources, the importance of the issues at stake in the action, and the importance of the discovery

in resolving the issues.

Moreover, the form of Defendant's interrogatory, commonly referred to as a "Contention

Interrogatory," see In re Convergent Techs. Sec. Litig., 108 F.R.D. 328, 332 (N.D. Cal. 1985),

requires Plaintiffs to commit to a position and give all the factual specifics supporting its claims.

Because of the complete nature of the information sought by such requests, the "general policy"

of district courts in this Circuit and elsewhere is to allow the answers to Contention

Interrogatories to be delayed until discovery is at or near an end.  Gregg v. Local 305 IBEW, No.

08-cv-160, 2009 U.S. Dist. LEXIS 40761, at *18-*19 (N.D. Ind. May 13, 2009); Ziemack v.

44

Centel Corp., No. 92-cv-3551, 1995 U.S. Dist. LEXIS 18192 , at *5 (N.D. Ill. Dec. 6, 1995). This policy is designed to promote efficient administration of the discovery process, and provide an equitable outcome for both the requester and respondent. Fischer and Porter Co. v. Tolson, 143 F.R.D. 93, 95 (E.D. Pa. 1992). Specifically, where discovery is still in its infancy and a substantial amount of documentary and testimonial discovery is yet to be completed, it is appropriate to defer answers to a Contention Interrogatory. In re H&R Block Mortgage Corp., Prescreening Litig., No. 06-md-230, 2006 U.S. Dist. LEXIS 90270, at *4 (N.D. Ind. Dec. 13, 2006) (noting that "contention interrogatories may not be answered until, at the earliest, after substantial discovery has taken place, or at the latest, at the final pre-trial conference"); Nestle Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 111 (D.N.J. 1990). Here, the discovery process has just begun. Thus, it would be appropriate for the Court to allow Plaintiffs to defer their answers to Defendant's Contention Interrogatories. See Fed. R. Civ. P. 33(a)(2) ("[T]he court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time."). With these objections in mind, Plaintiff provides the following information:

The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer, knowing or consciously avoiding knowing that the seller or telemarketer is engaged in any act or practice that violates specified portions of the TSR. 16 C.F.R. § 310.3(b). Plaintiff contends that Dish provided such substantial assistance or support to its authorized dealers, despite knowing or consciously avoiding knowing that they were engaged in violations of § 310.4.

At a general level, Dish Network's marketing system encourages abusive telemarketing practices. Dish Network authorizes its dealers to market, promote and solicit orders for Dish Network using the Dish Network trademark. Representative is Dish's Incentivized Retailer Agreement with Dish TV Now. See FTC003-047319/7346 at 7323-29, ¶¶ 3-5, 7. In fact, Dish's contracts with its dealers require the dealers to promote Dish Network services. See, e.g., id. at 7328, ¶ 7.1 ("Retailer agrees to use its reasonable commercial efforts to promote and enhance EchoStar's business, reputation and goodwill."). Dish rewards its top-performing dealers with all-expense paid vacations to exotic resorts. Throughout 2006, it vigorously promoted its "2007 Retailer Incentive Trip" in *Facts Blasts* distributed to its dealers. Dish encouraged its dealers to compete against one another to become one of the "Top 75 Retailers," defined in a January 26, 2007 *Facts Blast* as the Dish dealers with "the most activations during the contest period." FTC304-000342/0359 at 0359. Dish Network's August 22, 2006, *Facts Blast* is representative of its efforts to reward its top performers based on how many Dish Network activations they sold:

> The 2007 Retailer Incentive Trip winners will be awarded a trip to Punta Mita, Mexico, at The Four Seasons Resort from April 15 - April 20, 2007. The contest period is December 1, 2005, through November 30, 2006. The top 75 pace is 2,075!

FTC003-044756/4767 at 4766. The promotion went on to highlight the resort's "white-sand beaches edged by clear blue water," "the best diving and snorkeling along Banderas Bay coastline," and opportunities for "deep-sea fishing, seasonal whale watching, a round of golf at the Jack Nicklaus ocean-side course, a relaxing afternoon at the spa and a variety of other recreational activities." Id. Dish frequently updated its dealers, through other *Facts Blasts* and regular "Retailer Chats," on how many activations they would need to keep abreast with Dish's

46

top 75 dealers to win an invitation to the Retailer Incentive Trip.  See, e.g., March 16, 2006 *Facts Blast*, FTC003-044875/4894 at 4890 ("the top 75 pace is 525!"); June 14, 2006 "Retailer Chat," FTC304-000255/0296 at 0294 ("The top 75 pace for next year's trip is . . . . 1,425") (ellipses in original); October 17, 2006 *Facts Blast*, FTC304-000245/0254 at 0254 ("Currently, the top 75 pace for next year's trip is 2,775 activations!").  The next year's promotion was similar; the "2008 Retailer Incentive Trip" was an eight-day Alaska cruise scheduled for August 10-17, 2008, in a "yacht-like setting" with "an unprecedented standard of ultra-luxury" and where "all accommodations are ocean-view suites." April 16, 2007 *Facts Blast*, FTC304-000360/0367 at 0366.

While Dish bestowed lavish vacations upon its top-selling dealers, its low-selling dealers were subject to automatic termination.  See, e.g., Incentivized Retailer Agreement with Dish TV Now, FTC003-047319/7346 at 7331, ¶ 10.4(ix) ("This agreement shall terminate automatically should any of the following occur, unless EchoStar notifies retailer to the contrary in writing: . . . (ix) Retailer fails to activate the applicable minimum number of new subscribers (the 'New Subscriber Minimum') set forth in any applicable Business Rules.").  And Dish has in fact terminated low-selling dealers for failing to use their best efforts to sell Dish Network services.  "Retailer Termination Review," FTC003-057510/7514 at 7511-7512 (identifying multiple Dish dealers terminated for "Failure to actively promote Dish" or "Obligation to use reasonable commercial efforts to solicit orders").

At the same time that Dish rewards high-performing dealers and punishes dealers who fail to promote its services sufficiently, it maintains all discretion to, inter alia: set the price for all services offered to consumers, including promotions, see, e.g., Incentivized Retailer

47

Agreement with Dish TV Now, FTC003-047319/7346 at 7325, ¶ 5; extensively market Dish

Network services itself, see, e.g., id. at 7323, ¶ 3.4(vii)(a); provide technology so that consumers

can receive Dish Network programming, see, e.g., id. at 7323, ¶ 2.15; select the programming

offered to consumers, see, e.g., id. at 7325, ¶ 4; determine which proposed orders solicited by its

dealers will be accepted, see, e.g., id. at 7328-29, ¶ 7.2; and provide services to existing

customers, see, e.g., id. See also FTC003-044515/4515 (listing items to be discussed during

weekly conference call between Dish and its dealers). Dish does not give its dealers exclusive or

specified territories. See, e.g., FTC003-047319/7346 at 7323, ¶ 3.4 ("Non-Exclusivity"). Dish's

contracts with its dealers make plain that (unless Dish agreed otherwise in writing) a dealer's

authorization "is limited to the solicitation of orders for Programming from, and the marketing,

advertising and promotion of Programming to," potential Dish customers. Id. at 7323, ¶ 3.1

("Appointment"). Under Dish's marketing system, a Dish dealer must market Dish Network

services, and that is all it can do. The only way a Dish dealer can make more money is to market

Dish Network services more aggressively. In the absence of meaningful monitoring and

enforcement of its dealers' compliance with the telemarketing laws, Dish's contractual

arrangements and marketing structure thus provided substantial assistance to entities it knew or

consciously avoided knowing were engaging in abusive telemarketing practices.

On a more specific level, Dish engaged in the following conduct:

> i.   **Entering into contracts with persons and entities it knew or should have known had violated consumer-protection laws in the past.**

For example, on October 3, 2003, Dish Network entered an "Incentivized Retailer

Agreement" with David Allen Hagen, a/k/a David DeFusco, a/k/a David DuFusco, a/k/a Antonio

Diez, President of Dish TV Now, a North Carolina company. FTC003-046635/6662, at 6653-

6654. Dish entered this contract with Hagen a/k/a Defusco even though it was a matter of public record that he had been found liable for a civil penalty in FTC v. David and Annette DeFusco, No. 89-cv-1046 (E.D. Va. filed July 20, 1989); that an injunction was issued in a related matter in FTC v. Outdoor World Corp., Civ. No. 89-1779 (E.D. VA. Aug. 4, 1989), motion for stay and expedited appeal denied, No. 89-1779 (4th Cir. Aug. 30, 1989); and that a Hagen-controlled business entity was involved in misconduct leading to a pair of consent orders in FTC administrative actions, In re Outdoor World Corp., Docket 9229, 113 F.T.C. 70 (consent order entered Jan. 10, 1990) (prohibiting Outdoor World Corp. from falsely representing that any consumer has won a specified prize); In re Outdoor World Corp., Docket 9229, 113 F.T.C. 282 (consent order entered Apr. 2, 1990) (prohibiting Outdoor World Corp. from representing that a consumer will receive a prize, without disclosing immediately following such representation the cost if any that the consumer must pay to receive the prize). To resolve alleged violations of the April 2, 1990, consent decree, Outdoor World Corp. agreed to pay a $200,000 civil penalty in 1992. United States v. Outdoor World Corp., Civ. No. 92-564-A (E.D. Va. judgment entered Apr. 23, 1992).

In the meantime, it was also a matter of public record that on September 29, 1989, Hagen a/k/a DeFusco was sentenced to five years' imprisonment in the Eastern District of Virginia after pleading guilty to charges of money laundering and of conspiracy to defraud a bankruptcy trustee. United States v. David Allen Hagen DeFusco, 949 F.2d 114 (4th Cir. 1991) (affirming conviction). Hagen a/k/a DeFusco's guilty plea to the Eastern District of Virginia charges was tied to his agreeing to plead guilty to separate mail fraud charges in the Western District of Texas, for which he was also sentenced to five years' imprisonment, with 40 months'

49

imprisonment to be concurrent with his Eastern District of Virginia sentence.  <u>United States v.</u>
<u>David Allen DeFusco, a/k/a David Allen Hagen</u>, 930 F.2d 413, <u>reh'g en banc denied</u>, 933 F.2d
1006 (5th Cir.1991) (table), <u>cert. denied</u>, 502 U.S. 885 (1991).  Hagen a/k/a DeFusco had an
extensive—and public—record of federal felony convictions for fraud and FTC actions related to
consumer abuses before Dish signed him as a Dish dealer.

    ii.    **Failing to monitor and enforce telemarketing compliance of its**
                 **authorized dealers even after being put on notice that they were**
                 **violating telemarketing laws.**

As examples:

    (1)    **Dish America; Brandon Adams Investments Inc., d/b/a Dish**
               **Central, of Texas**

On January 24, 2002, Georgia attorney and consumer <span style="background:black;color:white">REDACTED PII</span> filed a <u>pro se</u>
lawsuit against Dish Network authorized dealer Dish America, Inc., d/b/a Atlanta Satellite
Source ("Dish America"), for illegal telemarketing, including violating Georgia's Do Not Call
laws.  A request for production of documents in this suit was served on Dish Network, FTC309-
000057/0059, and Dish produced documents, FTC309-000024/0024 through FTC309-
000047/0051.  However, Dish Network failed to monitor or enforce compliance by Dish
America after being put on notice that Dish America's campaigns may have violated
telemarketing laws.

Dish America is one of five Dish dealers for which Dish received copies of citations
issued by the Federal Communications Commission the following year, on August 4, 2003.
These dealers were cited for delivering prerecorded telemarketing messages for Dish Network
services and other TCPA violations.  Beyond Dish America, the other four Dish dealers
receiving citations were Brandon Adams Investments Inc., d/b/a Dish Central, of Texas; AV

Marketing, Inc. of Maryland; Guardian Communications (Iowa), d/b/a Guardian Satellite, of Iowa; and Smartalk Communications Inc. of Georgia.

Dish took no timely or effective action to monitor or enforce compliance going forward. Dish America, the subject of [REDACTED PII] lawsuit, apparently remains a Dish Network dealer. See http://www.dishamericacorp.com (last visited May 26, 2010). On June 25, 2007, according to a news article in MediaBiz, Dish Network ended its business relationship with Brandon Adams Investments for violating its telemarketing and lead generation policies. This action came nearly four years after the FCC citation.

### (2)   Satellite Solutions

According to an August 12, 2002, article in Multichannel News, a telemarketer identifying itself as Satellite Solutions left pre-recorded messages for Los Angeles-area residents. The article reported that the Los Angeles County Consumer Affairs Department was investigating, and further reported that "EchoStar spokesman Marc Lumpkin said contracts between the direct-broadcast satellite TV provider and its retail partners prohibit the use of pre-recorded marketing messages." The article reported that "Since its launch in 1996, Dish Network has terminated retail partnerships for non-compliance with contract rules, Lumpkin said. But he declined to state how many retailers have faced action by the company."

Despite these representations, Satellite Solutions continued placing violative calls. On June 25, 2004, Satellite Solutions agreed to pay a $5,000 civil penalty and to comply with Oklahoma law, in response to charges filed March 4, 2004, for operating as an unregistered commercial telephone seller, operating an autodial device and initiating unsolicited telemarketing calls to Oklahomans registered for the state's Do Not Call program.

51

(3)     **Dish TV Now**

An earlier abusive-language and pre-recorded message complaint submitted to Dish

Network and Dish TV Now by consumer ▉REDACTED PII▉ of Minnesota on November 4, 2003,

was discussed above.  On July 26, 2004, ▉REDACTED PII▉ sent Dish Network a further draft court

complaint.  He alleged that on July 19, 2004, Dish Network violated the TCPA by having its

retailer Dish TV Now, on Dish Network's behalf, transmit an illegally pre-recorded solicitation

message to him; fail to provide an address or phone number; and transmit a false Caller ID

number.  His cover letter and draft complaint explained at length why Dish Network was liable

under the TCPA for any violations committed "on its behalf."  FTC003-072407/2408 at 2407;

FTC003-072409/2423 at 2409-10 ¶¶ 5-6.

Dish's one-page response said that it had not made the phone call, and that "[w]hile we

regret any inconvenience Dish TV Now's call may have caused, Dish does business with many

independent retailers and each retailer is solely responsible for their own actions."  FTC003-

072390/2390 at 2390. The letter said Dish Network would put ▉REDACTED PII▉ on its internal

DNC list.  Id.

Dish Network's only substantive action in response ▉REDACTED PII▉ July 26, 2004,

complaint was to fax its dealer a copy of the complaint and its own September 14, 2004,

response, but Dish did not ask Dish TV Now to explain why it was delivering prerecorded

telemarketing messages and engaging in other telemarketing violations: "Mr. Yelverton: I am

forwarding a recent TCPA issue, as well as our response.  Please address at your earliest

convenience and feel free to contact me should you have any questions.  Thank you for your

attention to this matter."  FTC003-072397/2399 at 2397.

52

The violations continued.  On March 2, 2005, the Attorney General of Illinois forwarded to Dish Network a consumer's February 5, 2005, e-mail, complaining about pre-recorded messages he had been receiving from Dish TV Now for several weeks.  FTC003-049783/9783; FTC003-049784/9784.  Dish Network responded on April 7, 2005 with a communique stating that Dish TV Now was an independent retailer, and that Dish Network encouraged the consumer to contact Dish TV Now directly.  FTC003-049785/9786.

Sometime after July 2006, over two and a half years after it became aware of Dish TV Now's violations of the law, Dish Network terminated its relationship with Dish TV Now.

### (4)    Star Satellite d/b/a Tenaya Marketing

On January 25, 2005, consumer ███REDACTED PII███ of Washington State wrote Dish dealer Star Satellite, LLC, and Dish Network to complain that he had received an unsolicited prerecorded telemarketing call, and advised that such calls violated the TCPA.  FTC003-058230/8231.  The second page of ██REDACTED PII██ letter gave the "originating number" for Star Satellite's prerecorded solicitation message as "111-111-1111," putting Dish on notice that its dealer was transmitting a bogus Caller ID while telemarketing Dish Network services.  Id. at 8231.  Despite receiving this very detailed complaint, Dish Network failed to monitor or police Star Satellite's compliance in any meaningful way.  Its response to ██REDACTED PII██ stated:  "If Star is offering Dish Network services, it is as an independent retailer and is solely responsible for its own actions."  FTC003-058232/8232 (emphasis added).  Dish Network's only apparent substantive response to ██REDACTED PII██ complaint was to send Star Satellite a copy of his letter— addressed to the same address that his letter showed he had himself already sent his letter.  Id.

("[W]e will forward a copy of your letter to Star at the address provided in your January 25, 2005 letter, so that they will have an opportunity to resolve this issue directly with you.").

Shortly before July 2, 2005, a consumer (who did not wish to identify herself) complained to Dish Network that she was continuing to receive telemarketing calls from Star Satellite selling Dish Network services, despite telling Dish Network and Star Satellite to stop calling. The consumer also told Dish Network about a website that she said had numerous complaints. In an internal email to Jeff Medina, dated July 2, 2005, Dish Network Consumer Resolution Specialist Arja Lehn reported that Dish Network manager Joshua Valentine "was shocked to see the number of complaints on this website for Star Satellite." FTC191-000741. In her email, Lehn asked another Dish Network official, Russell Bangert, "Please follow up with Star Satellite and make sure they know to remove [*sic*] her phone REDACTED PII from their DO NOT CALL LIST." Id.

In August 2005, Dish Network Senior Corporate Counsel Dana Steele wrote Daniel Myers of Star Satellite to forward the complaint in a lawsuit filed by South Carolina consumer REDACTED PII against Star Satellite and Dish Network. FTC003-049633/9634. The letter cited Section 7.1 of Star Satellite's Retailer Agreement as requiring it "among other things, to use your best commercial efforts to further Dish Network's business, reputation and goodwill." Id. at 9634. It also cited Section 13 of the Agreement as a basis for requesting Star Satellite to defend and indemnify Dish Network. Id. But the letter said nothing about steps that Dish would take to ensure that Star Satellite either complied with the telemarketing laws or was fired as a Dish dealer.

Star Satellite's violations continued, and Dish's monitoring and enforcement mechanisms continued to be nonexistent or ineffective. Following a constituent complaint from Congressman Fred Upton, Dish Network contacted Star Satellite, and sent a confirming letter on October 26, 2005, stating that "[y]ou have confirmed that you have halted all telemarketing activities involving persons named on the National Do-No-Call Registry as necessary to comply with applicable telemarketing/do-not-call and other laws." FTC003-049635/9636 at 9635.

Despite Dish Network's extensive knowledge throughout the year 2005, Star Satellite abandoned tens of millions of calls answered by live consumers; after the consumer answered, Star Satellite's telemarketer Guardian Communications either played a pre-recorded message or hung up on the consumer. This continued until at least November 2005.

        (5)    **Ineffective response to consumer** REDACTED PII

From February through April 2006, Houston, TX, consumer REDACTED PII submitted numerous complaints to numerous Dish Network personnel, from CEO Charles W. Ergen and Senior Advisor David Moskowitz on down, to complain that he repeatedly received unwanted telemarketing calls despite being on the National DNC Registry. An e-mail chain sent April 18, 2006, includes only one response from anyone at Dish Network—an e-mail from Dispute Resolution Specialist Michael Gutierrez, saying that Dish Network did not place the calls itself, and that "Dish Network does conduct business with thousands of independent retailers, any one of which may have placed the call in question on its own behalf, without Dish Network's knowledge or approval." FTC002-010890/0893 at 0892. The e-mail said nothing about what steps, if any, Dish Network would take to reduce future violations.

55

On April 18, 2006, [REDACTED PII] forwarded a voice recording of a telemarketing call from someone with an Indian accent, claiming to be calling from Dish Network itself, and asserting that even if Dish's "customer relations department" said that it would not call [REDACTED PII] it was Dish's "sales department" that was calling. FTC002-010894/0895. The telemarketer gave a valid number, 1-800-713-7836, as a callback number, and the voice recording includes [REDACTED PII] efforts to find out who ran that number. Id. After claiming that the number was "Dish Network," the manager there was unable to say who Dish Network CEO Charlie Ergen was, and then retreated to saying that "we work for" Dish Network. Id. When [REDACTED PII] asked for a phone number for a Dish Network lawyer to telephone the company, he was put on hold, and then the line went dead. Id.

(6)     **E-Management Group, Infinity Sales, and My Dish Now**

As discussed in detail in response below, Dish's only response to multiple consumer complaints about telemarketing violations by E-Management Group, Inc., and its affiliates Infinity Sales and My Dish Now during 2007 and 2008 was to send the company letter after letter threatening to take action. Even when the company's responses confirmed, rather than refuted, consumer complaints of persistent, repeated, and harassing calls, Dish took no meaningful steps to monitor or enforce the company's compliance with the law, and continued to accept some 75,000 new activations per year that the company secured through its abusive telemarketing campaigns.

a.      **FCC citations of August 4, 2003**

As noted above, on August 4, 2003, the Federal Communications Commission copied David Goodfriend of Dish Network on citations issued to five authorized dealers, for delivering

56

 

prerecorded telemarketing messages for the company's satellite TV services and for other Telemarketing Consumer Protection Act violations.  Dish Network continued to pay these dealers for extensive periods of time after obtaining direct knowledge of their violations of telemarketing laws.

**b.    Dish TV Now**

Dish provided additional substantial assistance to its dealers' telemarketing violations by failing to take effective steps to monitor or enforce their compliance with telemarketing laws. Dish took no action even though it was on notice that Dish TV Now was engaging in telemarketing violations over a period of many months.  As of November 2003, Dish's contract with its authorized dealer Dish TV Now of North Carolina (headed by David Allen Hagen) called for it to pay an "activation fee payment" of $175 for each  new subscription that Dish TV Now entered "through EchoStar's web-based order entry tool" and for which Dish provided the necessary installation.  FTC003-047347/7347.

Dish was on notice that Dish TV Now was engaging in telemarketing violations over the following months.  For example, consumer [REDACTED PII] of Minnesota sent it a draft legal complaint on July 26, 2004, reporting that Dish TV Now had illegally delivered a pre-recorded solicitation message to him; illegally failed to provide an address or phone number; and illegally transmitted a false Caller ID number.  FTC003-072407/2408; FTC003-072409/2423.  [REDACTED] [REDACTED PII] explained at length why Dish was legally liable under the TCPA, observing that "it was Defendant's products and or services that were being solicited upon Plaintiff even though a retailer of Defendant did the solicitation.  Defendant is equally liable as a matter of factual occurrence and as a matter of law.  Clearly, the solicitation was made on behalf of Defendant and

57

Defendant 'bears ultimate responsibility for any violations' made by entities soliciting

Defendant's products and or services." FTC003-072409/2423. at 2409-10 ¶¶ 5-6 (citation

omitted).

Despite being on specific notice that Dish TV Now was violating the law while

telemarketing Dish Network services, Dish took no effective steps in response. Instead, on

August 31, 2004, Dish's executive vice-president James DeFranco signed an amended contract

with Hagen, to increase Dish TV Now's activation fee payment from $175 to $200 for each new

subscription for which Dish installed the necessary equipment. FTC003-047355/7355. Then,

two weeks later, Dish sent [REDACTED PII] one-page response to his July 26, 2004, draft legal

complaint. FTC003-072390/2390 at 2390. Dish did not dispute [REDACTED PII] account of

Dish TV Now's conduct; did not dispute that the conduct described was illegal; did not dispute

[REDACTED PII] explanation of why Dish was liable for the illegal telemarketing conduct of its

authorized dealers; said nothing about Dish's disciplining Dish TV Now; and said nothing about

even asking Dish TV Now for an explanation. Id.

(Dish's only substantive action in response to [REDACTED PII] July 2004 complaint

appears to have been to send Dish TV Now a copy of [REDACTED PII] complaint and Dish's one-

page response. The transmittal said: "I am forwarding a recent TCPA issue, as well as our

response. Please address at your earliest convenience and feel free to contact me should you

have any questions. Thank you for your attention to this matter." FTC003-072397/2399 at

2397.)

Dish maintained its relationship with Dish TV Now over the following months, without

taking effective steps to monitor or enforce its compliance with telemarketing laws, even as it

58

continued to receive additional consumer complaints specifically naming Dish TV Now.  In December 2004, an Ohio consumer sued Dish TV Now for illegally delivering prerecorded solicitation messages.  Charvat v. Dish TV Now, Inc., No. 04-CVH-12-13064 (Ohio Ct. C.P. Franklin County).

On February 5, 2005, Illinois consumer REDACTED PII emailed the Illinois Attorney General's office to complain about receiving prerecorded telephone solicitations from Dish TV Now telemarketing, even though he was on a Do Not Call List—a violation of the TSR's, the TCPA's, and Illinois's prohibitions against abandoned calls, and of the TSR's and the TCPA's National DNC Registry requirements.  FTC003-049784/9784. REDACTED PII stated that the live Dish TV Now telemarketer who eventually came on the line told him that calls would stop only if his number was added to Dish TV Now's entity-specific DNC list.  Id.  On March 2, 2005, the Illinois Attorney General's Office sent Dish a copy of REDACTED PII complaint (mistakenly referring to him as REDACTED PII.  FTC003-049783/9783.

In an April 12, 2005, response, Dish disclaimed any responsibility for the violations.  The response made clear that Dish had no intention of contacting Dish TV Now, and that in fact, so far as Dish was concerned, the burden of attempting to bring Dish's dealer into compliance with the Nation's telemarketing laws rested entirely upon law enforcement officials and victimized consumers:

> In his complaint, REDACTED PII expressed concern about the solicitation phone calls he has received from DISH TV Now, an independent retailer.  Companies that sell DISH Network satellite hardware and programming are independent companies.  They are not affiliates, business partners or franchises of DISH Network and as such set their own policies and business procedures.  The relationship between DISH Network and the company is that of an independent contractor.  For these reasons, we encourage you to contact the company directly.

FTC003-049785/9786 at 9785.

In response to a complaint from California consumer REDACTED PII Dish expressed a similar view that as far as it was concerned, consumers were left to their own devices to avoid unwanted solicitation calls from Dish dealers selling Dish Network services. In a form e-mail, Dish told REDACTED PII that "we share your concern regarding these unwanted calls, and we understand what a nuisance they can be. Dish Network does not condone the practice of making solicitation phone calls to those who have indicated that they do not wish to receive them." CAL001-0000025/0025. But at the same time Dish claimed that it did not "condone the practice," it made clear that it would not even ask its dealers not to make solicitation calls trying to sell Dish Network services to consumers who asked not to receive such calls: "Dish Network does not share our company Do Not Call list with retailers, sales partners or any other affiliates." Id. As REDACTED PII observed in a December 11, 2006, complaint to the California Attorney General's Office, this denial of responsibility was a sleight of hand: "The corporate office of Dish Network told me they can do little since the calls are coming from independent contractors of Dish Network. Does that mean that the corporation is not responsible? Their name is being used to sell the service. Please help." CAL001-0000021/000021.

   c.     **E-Management Group, Infinity Sales Group, and My Dish Now**

   Dish's interactions with Elliot Loewenstern, the CEO of E-Management Group Inc. (sometimes d/b/a My Dish Now and Infinity Sales Group, Inc.), demonstrate Dish's willingness to provide substantial assistance and support to its dealers and collect the revenues generated by the sales made by these dealers despite knowing that the dealers were violating the telemarketing laws. Over sixteen months, Dish sent well over a dozen letters to Loewenstern, each time

60

relaying a specific consumer complaint about persistent and harassing telemarketing calls. Many also identified additional violations, including delivering prerecorded messages, hanging up on consumers who asked the telemarketer to identify the seller whose goods or services were being sold, hanging up on consumers who asked to be placed on entity-specific DNC lists, and continuing to make telemarketing calls to consumers who asked not to be called any more. When E-Management Group responded to Dish's letters, its responses confirmed, rather than refuted, that it was engaging in persistent, repeated, and harassing phone calls (as many as 40 telemarketing calls to the same residential phone number within a span of a few weeks). Its responses suggest that it thought that complying with the National DNC Registry was its only obligation. E-Management Group gave Dish no explanation for delivering prerecorded messages to live consumers; for making persistent, repeated, and harassing calls; for hanging up on consumers who asked to speak to a manager; for hanging up on consumers who asked to be placed on its DNC list; or for hanging up on consumers who asked the telemarketer to identify the company they were calling for. Despite this knowledge, Dish continued to provide E-Management Group and its affiliates substantial assistance and support in exchange for the huge volume of business that the company delivered to Dish: Over 75,000 new subscriptions and activations per year. "About Us," Power Source Marketing, http://www.wemanagemedia.com/aboutus.htm (last visited May 18, 2010).

The letters began on July 30, 2007, when Dish Network Vice-President for Retail Services Robb Origer sent three letters to Loewenstern. Each letter relayed a consumer telemarketing complaint; advised that section 9.1 of Dish's Retailer Agreement required Loewenstern's entities to comply with all applicable laws; and directed, "Please provide, within

61

the next five (5) days, any information relative to this consumer complaint." FTC003-068926,

FTC003-068924, and FTC003-068797.

E-Management Group's responses confirmed that it had made persistent and repeated

calls to the consumers: REDACTED PII was called 13 times in a single week after making a

website inquiry about Dish Network services, FTC003-070609. REDACTED PII had been eager

to subscribe to Dish Network services through E-Management Group Inc.; she called the

company on June 24, 2007, to purchase services (and called a second time a few minutes later,

presumably with a follow-up question). Then on June 27 and July 1, she filled out her contact

information on an E-Management Group website, saying that she was interested in satellite

television services. These expressions of interest led E-Management Group to make 37

outbound telemarketing calls to REDACTED PII between June 28 and July 15: Five times on July

3; four times on three different days [June 29, July 2 and 9]; three on each of two days [July 10

and 12]; twice on each of six days [June 28, July 7, 8, 13, 14, and 15]; and just once on one day

[July 6]. In its response to EchoStar Satellite, E-Management Group blamed REDACTED PII for

entering her information on its website after she was already a customer, and for making a

follow-up phone call to them on June 24; but made no attempt to explain why it continued to

make telemarketing calls to her, instead of putting her on its internal DNC list, in response to her

repeated inbound calls (on July 2, 4, 5, 6, 7, 8, and 10). FTC003-070606.

Another consumer, REDACTED PII submitted a website request for information on July 18,

and was called back the same day. E-Management Group's records showed that it reached an

answering machine, but that REDACTED PII called it back three times over the next five minutes,

with his second call lasting two and a half minutes. E-Management Group's response was silent

62

 

about whether it had looked for or reviewed sound recordings of that call; spoken with the customer service representative who took the call; or had any explanation for REDACTED PII report of "rude" and "obscene" telemarketing conduct.  FTC003-070605.

On June 20, 2008, Dish Network General Manager Bruce M. Werner, and then Compliance Manager Reji J. Musso, initiated a new letter-writing campaign to Loewenstern. Each of their letters advised that yet another consumer had submitted a complaint to Dish about receiving frequent and persistent telemarketing calls (many of the consumers also apparently said "harassing"); advised that the consumer had traced the telemarketing calls to one of Loewnstern's entities; advised that section 9.1 of Dish's Retailer Agreement required Loewenstern's entities to comply with all applicable laws; requested information within five days; and:  "Additional incidences of this nature may result in disciplinary action up to and including termination of your Retailer Agreement without further warning, as deemed appropriate in our sole and absolute discretion."

The 2008 letters began with a June 20, 2008, letter about consumer REDACTED PII with home telephone number in area code REDACTED PII who reported frequent, persistent, harassing calls, and was hung up on after asking for the identity of the retailer or to be added to the DNC"—the latter a violation of the TSR's prohibition against interfering with any person's exercising rights to be placed onto a DNC list, 16 C.F.R. § 310.4(b)(1)(ii).  FTC002-000002/00003.  This letter's statement that "[a]dditional incidences of this nature may result in disciplinary action up to and including termination of your Retailer Agreement without further warning, as deemed appropriate in our sole and absolute discretion," id. at 0002, was repeated many times:

63

 

- July 1, 2008, concerning consumer **REDACTED PII**, with home telephone number in **REDACTED PII** **REDACTED PII** who reported receiving "frequent, persistent, and harassing calls," and who specifically advised that she believed the calls violated the TCPA; letter stated, "[a]dditional incidences of this nature may result in disciplinary action up to and including termination of your Retailer Agreement without further warning, as deemed appropriate in our sole and absolute discretion." FTC002-000015/ 0016.

- July 1, 2008, concerning consumer **REDACTED PII** who reported receiving "frequent and persistent calls," and that the telemarketer for My Dish Now hung up on him when he asked to speak to a manager; letter stated, "[a]dditional incidences of this nature may result in disciplinary action up to and including termination of your Retailer Agreement without further warning, as deemed appropriate in our sole and absolute discretion." FTC002-00021/0022.

- July 31, 2008, concerning consumer **REDACTED PII** with home telephone number in **REDACTED PII** who reported receiving "frequent and persistent calls," identified the company as My Dish Now, and stated that he believed the telephone solicitations violated the TCPA; letter stated, "[a]dditional incidences of this nature may result in disciplinary action up to and including termination of your Retailer Agreement without further warning, as deemed appropriate in our sole and absolute discretion." FTC002-001103/1104.

- August 28, 2008, concerning consumer **REDACTED PII** with home telephone number in **REDACTED PII** who reported receiving "frequent and

64

 

persistent calls," identified the company as My Dish Now, and stated that he believed the telephone solicitations violated the TCPA; letter stated, "[a]dditional incidences of this nature may result in disciplinary action up to and including termination of your Retailer Agreement without further warning, as deemed appropriate in our sole and absolute discretion." FTC002-001096/1097.

- November 12, 2008, concerning consumer **REDACTED PII** with home telephone number in **REDACTED PII** who reported receiving "frequent, persistent calls," that he was hung up on when he asked for the identity of the company (violating the TSR's requirement that telemarketers must "disclose truthfully, promptly, and in a clear and conspicuous manner . . . [t]he identity of the seller," 16 C.F.R. § 310.4(d)(1)), that the Caller ID number was traced back to Infinity Sales Group, and that he believed the telephone solicitations violated the TCPA; letter stated, "[a]dditional incidences of this nature may result in disciplinary action up to and including termination of your Retailer Agreement without further warning, as deemed appropriate in our sole and absolute discretion." FTC002-000005/0006.

As of May 2010, Loewenstern's now-current business venture boasts that while he was CEO of E-Management Group, he grew the company "into the 3rd largest DISH Network Retailer in the United States . . ., activating over 75k satellite television customers a year." "About Us," Power Source Marketing, http://www.wemanagemedia.com/aboutus.htm (last visited May 18, 2010). Dish's treatment of Loewnstern and his entities—E-Management Group, Infinity Sales, and My Dish Now—during 2007 and 2008 demonstrates that even when it had specific knowledge that its dealer was repeatedly violating the Nation's telemarketing laws, Dish did not take meaningful

 

steps to obtain compliance, but instead continued doing business with the dealer.  My Dish Now and Infinity Sales still appear to be authorized Dish Network dealers.  See http://www. mydishnow.com (last visited May 18, 2010); http://www.infinitydish.com/indexnew.html (last visited May 18, 2010).

66

I affirm under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing

responses to interrogatories are true and correct to the best of my knowledge and belief.

Executed this 28th day of May, 2010, at Washington, DC


NICHOLAS MASTROCINQUE, JR.
Staff Attorney
Federal Trade Commission


As to objections:

TONY WEST
Assistant Attorney General

Dated: May 28, 2010

EUGENE M. THIROLF, Director
KENNETH L. JOST, Deputy Director
Office of Consumer Litigation

OF COUNSEL:
LOIS C. GREISMAN,
Associate Director for Marketing Practices

 /s Daniel K. Crane-Hirsch
DANIEL K. CRANE-HIRSCH

LAURA KIM,
Assistant Director, Marketing Practices

 /s Patrick R. Runkle
PATRICK R. RUNKLE
Trial Attorneys

RUSSELL DEITCH
GARY IVENS
Attorneys
Federal Trade Commission
600 Pennsylvania Ave. NW, Room 288
Washington, DC 20580
Telephone: 202-326-2585 (Deitch),
         202-326-2330 (Ivens)
Fax: 202-326-3395

Office of Consumer Litigation
U.S. Department of Justice
PO Box 386
Washington, DC 20044-0386
Telephone: 202-616-8242
Fax: 202-514-8742
daniel.crane-hirsch@usdoj.gov

 

_/s James A. Lewis_____
JAMES A. LEWIS
Civil Division Chief
U.S. Attorney's Office for the Central District
    of Illinois
318 S. 6th St.
Springfield, IL  62701-1806
Telephone: 217-492-4450
Fax: 217-492-4512
Jim.Lewis2@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on May 28, 2010, I served the foregoing on counsel for Defendant Dish Network LLC by Federal Express Overnight, and by e-mail, as follows:

Henry T. Kelly
Kelley Drye & Warren LLP
333 W. Wacker Dr. Suite 2600
Chicago, IL  60606
(*and via e-mail to* hkelly@kelleydrye.com)
Counsel for Defendant Dish Network, LLC

Joseph A. Boyle
Kelley Drye & Warren LLP
200 Kimball Dr.
Parsippany, NJ  07054
(*and via e-mail to* jboyle@kelleydrye.com)
Counsel for Defendant Dish Network, LLC

Albert Norman Shelden
Deputy Attorney General
Consumer Law Section
California Office of the Attorney General
(*via e-mail to* albert.shelden@doj.ca.gov)
Counsel for Plaintiff State of California

Elizabeth Blackston
Chief, Consumer Fraud Bureau, Southern
    Region
Illinois Attorney General's Office
(*via e-mail to* eblackston@atg.state.il.us)
Counsel for Plaintiff State of Illinois

Jeffrey M. Feltman
Assistant Attorney General
Consumer Fraud Bureau
Illinois Attorney General's Office
(*via e-mail to* jfeltman@atg.state.il.us)
Counsel for Plaintiff State of Illinois

Erin B. Leahy
Assistant Attorney General
Consumer Protection Section
Ohio Attorney General's Office
(*via e-mail to* erin.leahy@
    ohioattorneygeneral.gov)
Counsel for Plaintiff State of Ohio

Michael S. Zeigler
Assistant Attorney General
Consumer Protection Section
Ohio Attorney General's Office
(*via e-mail to* michael.ziegler@
    ohioattorneygeneral.gov)
Counsel for Plaintiff State of Ohio

Kevin Anderson
Assistant Attorney General
Consumer Protection Division
North Carolina Office of the Attorney
    General
(*via e-mail to* kander@ncdoj.gov)
Counsel for Plaintiff State of North Carolina



Daniel Kadane Crane-Hirsch
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
(*via e-mail to* daniel.crane-hirsch@usdoj.gov)
Counsel for Plaintiff United States of
America

James A. Lewis
Chief, Civil Division
U.S. Attorney's Office for the Central
District of Illinois
(*via e-mail to* jim.lewis2@usdoj.gov)
Counsel for Plaintiff United States of
America

Patrick R. Runkle
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
(*via e-mail to* Patrick.R.Runkle@usdoj.gov)
Counsel for Plaintiff United States of
America

   /s Daniel K. Crane-Hirsch
DANIEL K. CRANE-HIRSCH
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
PO Box 386
Washington, DC  20044-0386
Telephone: 202-616-8242
Fax: 202-514-8742
daniel.crane-hirsch@usdoj.gov

# DX-188

CONFIDENTIAL

| DISC | SUBJECT | SOURCE | DATE RANGE OF CALLS | TOTAL NUMBER OF CALLS | RAW DNC REGISTRY HITS | CONTAINER NUMBER or BATES RANGE OF ORIGINAL CALL RECORDS | CONTAINER NUMBER or BATES NUMBER OF "REGHITS" FILE |
|---|---|---|---|---|---|---|---|
| N136 | ECHOSTAR | ECHOSTAR | 06/01/2005 to 06/30/2005 | 18,140,971 | 2,784,629 | DISH NETWORK PROVIDED | FTC003-084737 |
| N137 | ECHOSTAR | ECHOSTAR | 07/01/2005 to 07/31/2005 | 18,398,923 | 2,575,019 | DISH NETWORK PROVIDED | FTC003-084749 |
| N138 | ECHOSTAR | ECHOSTAR | 08/01/2005 to 09/18/2005 | 30,328,309 | 4,000,815 | DISH NETWORK PROVIDED | FTC003-084759 |
| N168 | PLANET EARTH | ELECTRIC LIGHTWAVE | 11/30/2004 to 12/29/2005 | 727,320 | 202,161 | FTC003-079062; FTC003-079064, FTC003-079066; FTC003-079068, FTC003-079070; FTC003-079072, FTC003-079074; FTC003-079076, FTC003-079078, FTC003-079080, FTC003-079082; FTC003-079084, FTC003-079086; FTC007-000001 | FTC003-084825 |
| N172 | VISION QUEST | AT&T | 01/01/2006 to 03/01/2006; 07/01/2005 to 12/31/2005 | 22,068 | 6,771 | FTC002-005974; FTC002-006374; FTC002-006515 | FTC003-084857; FTC003-084866 |
| N173 | NEW EDGE | LDMI | 02/18/2005 to 03/18/2006 | 810,988 | 143,509 | FTC327; FTC003-081367 | FTC003-084886 |
| N174 | DISH DIRECT | QWEST | 04/12/2004 to 02/11/2006 | 33,187 | 4,849 | FTC003-079060 | FTC003-084903 |
| N189 | NEW EDGE | LDMI | 02/13/2006 to 09/14/2006 | 223,539 | 19,136 | FTC003-043432; FTC067-000001 | FTC003-084925 |
| N202 | VISION QUEST | MCLEOD USA TELECOM | 07/01/2005 to 03/31/2006 | 1,419,998 | 486,855 | FTC007-000197; FTC007-000199, FTC007-000201; FTC007-000202; FTC007-000204; FTC007-000206; FTC007-000208; FTC007-000210; FTC007-000212; FTC007-000214; FTC007-000216; FTC007-000218; FTC007-000220; FTC007-000222; FTC007-000224; FTC007-000226; FTC007-000228; FTC007-000230; FTC007-000232; FTC007-000234; FTC007-000236; FTC007-000238; FTC007-000240; FTC007-000242; FTC007-000244; FTC007-000246; FTC007-000248; FTC007-000250; FTC007-000252 | FTC003-084932 |
| N203 | TEICHERT MKTG | INTEGRA TELECOM, INC | 01/01/2005 to 01/31/2007 | 891,563 | 274,492 | FTC005-005269; FTC005-005344 | FTC003-084956 |
| N207 | JSR ENTERPRISES | AIRSPRING, INC. | 08/04/2006 to 03/31/2007 | 30,253,526 | 7,233,074 | FTC333 | FTC003-084965 - 84967 |
| N218 | ECHOSTAR | ECHOSTAR | 10/17/2003 to 03/31/2004 | 43,886,219 | 4,770,433 | DISH NETWORK PROVIDED | FTC003-084988, FTC003-085003 |
| N219 | ECHOSTAR | ECHOSTAR | 01/03/2005 to 05/31/2005 | 61,295,734 | 12,533,684 | DISH NETWORK PROVIDED | FTC003-085017, FTC003-085029 |
| N228 | ECHOSTAR | ECHOSTAR | 12/01/2005 to 01/31/2006 | 31,420,403 | 6,916,143 | DISH NETWORK PROVIDED | FTC003-085124 |
| N229 | ECHOSTAR | ECHOSTAR | 02/01/2006 to 02/28/2006 | 14,477,981 | 3,375,472 | DISH NETWORK PROVIDED | FTC003-085134 |
| N230 | ECHOSTAR | ECHOSTAR | 03/01/2006 to 04/30/2006 | 32,178,915 | 4,641,828 | DISH NETWORK PROVIDED | FTC003-085146 |
| N231 | ECHOSTAR | ECHOSTAR | 05/01/2006 to 06/30/2006 | 31,368,431 | 7,386,596 | DISH NETWORK PROVIDED | FTC003-085157 |
| N232 | ECHOSTAR | ECHOSTAR | 07/01/2006 to 08/15/2006 | 20,836,297 | 5,080,115 | DISH NETWORK PROVIDED | FTC003-085168 |
| N233 | ECHOSTAR | ECHOSTAR | 08/16/2006 to 09/30/2006 | 20,238,913 | 4,710,270 | DISH NETWORK PROVIDED | FTC003-085179 |
| N234 | ECHOSTAR | ECHOSTAR | 10/01/2006 to 10/31/2006 | 18,389,496 | 3,624,432 | DISH NETWORK PROVIDED | FTC003-085191 |
| N235 | ECHOSTAR | ECHOSTAR | 11/01/2006 to 11/30/2006 | 19,597,026 | 3,712,816 | DISH NETWORK PROVIDED | FTC003-085207 |

CONFIDENTIAL

| DISC | SUBJECT | SOURCE | DATE RANGE OF CALLS | TOTAL NUMBER OF CALLS | RAW DNC REGISTRY HITS | CONTAINER NUMBER or BATES RANGE OF ORIGINAL CALL RECORDS | CONTAINER NUMBER or BATES NUMBER OF "REGHITS" FILE |
|---|---|---|---|---|---|---|---|
| N236 | ECHOSTAR | ECHOSTAR | 12/01/2006 to 12/30/2006 | 17,462,891 | 3,002,123 | DISH NETWORK PROVIDED | FTC003-085223 |
| N238 | ECHOSTAR | ECHOSTAR | 01/02/2007 to 02/28/2007 | 24,388,302 | 2,994,525 | DISH NETWORK PROVIDED | FTC003-085306 |
| N239 | ECHOSTAR | ECHOSTAR | 03/01/2007 to 04/30/2007 | 26,170,553 | 4,046,178 | DISH NETWORK PROVIDED | FTC003-085336 |
| N240 | ECHOSTAR | ECHOSTAR | 05/01/2007 to 05/31/2007 | 15,968,120 | 3,389,113 | DISH NETWORK PROVIDED | FTC003-085364 |
| N241 | ECHOSTAR | ECHOSTAR | 06/01/2007 to 06/20/2007 | 18,689,378 | 4,938,258 | DISH NETWORK PROVIDED | FTC003-085390 |
| N242 | ECHOSTAR | ECHOSTAR | 07/01/2007 to 07/31/2007 | 17,823,512 | 4,627,426 | DISH NETWORK PROVIDED | FTC003-085419 |
| N243 | ECHOSTAR | ECHOSTAR | 08/01/2007 to 08/31/2007 | 20,452,928 | 5,494,133 | DISH NETWORK PROVIDED | FTC003-085450 |
| N247 | E-MANAGEMENT | ITC DELTACOM | 01/02/2007 to 11/25/2007 | 4,188,266 | 543,760 | FTC338 | FTC003-085464 |
|  |  |  |  |  |  |  | FTC701-000474; FTC701-000475; FTC701-000479 to |
| N275 | DISH NETWORK | DISH NETWORK | 09/01/2007 to 03/12/2010 | 351,476,426 | 113,539,335 | DISH NETWORK PROVIDED | FTC701-000506 |
| N276 | DISH NETWORK | DISH NETWORK | 04/03/2010 to 03/11/2010 | 85,153,857 | 25,354,175 | DISH NETWORK PROVIDED | FTC701-000477 |
| N287 | DEFENDER DIRECT | DEFENDER DIRECT | 01/21/2009 to 06/20/2011 | 3,341,769 | 958,437 | PRODUCED 07/05/2011 | FTC349 |

# DX-189

## Report of Robert N. Fenili, Ph.D.

### I. Summary of Assignment and Findings

1. I was retained by Kelley Drye & Warren LLP, legal counsel to defendant DISH Network, L.L.C., to provide an analysis of the telephone numbers that comprise the National Do Not Call Registry. Specifically, I was asked to:

    a. Review a March 2009 report prepared for the Federal Trade Commission ("FTC ") by PossibleNOW, Inc. ("PossibleNOW") that provided an estimate of the amount of telephone numbers on the National Do Not Call Registry ("DNCR") that fall into the following categories: Business landline, Residential landline, Inactive landline, and Wireless numbers.[1]

    b. Provide an analysis, based on publicly-available information as well as the PossibleNOW report, of the number and percent of telephone numbers on the DNCR in each year from 2003 to 2011 for each of the aforementioned categories.

2. Method: I developed a model that provides estimates of the composition of the DNCR. Using the information from the PossibleNOW report, other publicly available data, and certain assumptions, the model generates the expected composition of the DNCR on a quarterly basis from September 2003 to September 2011.

3. Findings: Tables 1a and 1b summarize the model's estimates of the composition of the DNCR on September 30th of each year from 2003 to 2011. The model estimates that active residential landline numbers have grown over this period from 48.1 million in September 2003 to 59.2 million in September 2011. However, as a percent of total DNCR registrations, active residential landlines have decreased steadily over this period. Active residential landlines accounted for approximately 80.5 percent of the telephone numbers on the DNCR in September 2003 but only 28.2 percent in September 2011.

### II. Qualifications and Compensation

4. I am Assistant Director of the Economic Analysis Division at Georgetown Economic Services ("GES"), an economic consulting firm located in Washington, DC. I have worked at GES for the past 25 years as an economist assisting individuals and organizations in matters pertaining to applied microeconomics, including econometrics and industrial economics.

5. I have been involved in a range of civil litigation, potential litigation, and regulatory matters. I have consulted on matters involving telecommunication regulations, advertising,

---

[1] PossibleNOW analyzed the phone numbers on the DNCR as a sub-contractor to Lockheed Martin. See: PossibleNOW, "Analysis of the Phone Numbers on the National Do Not Call Registry." March 31, 2009. Prepared for Lockheed Martin and the Federal Trade Commission. Confidential – US v Dish 01179-85.



EXHIBIT
Fenili 2
12-13-12 DMB

consumer protection, intellectual property, damages, antitrust and breach of contract. I have served as an economic expert witness in some of these matters.

6.    I received a B.A. from Illinois State University in 1970, an M.S. from Illinois State University in 1971, and a Ph.D. in Economics with a concentration in industrial organization from Virginia Polytechnic Institute and State University in 1975. From 1975 to 1981, I was employed a) by the FTC as an antitrust/industrial organization economist in the Bureau of Economics' Division of Economic Evidence; b) as an energy economist in the Energy and Minerals Division of the General Accounting Office involved in horizontal integration issues of energy companies; and, c) as a senior economist at the Department of Energy ("DOE"). At the DOE I worked first in the initiation of the Financial Reporting System and then with the Office of Competition.

7.    At the Office of Competition at DOE, I co-directed a study assessing competition in the gasoline marketing industry. I spent approximately seven years after leaving the DOE in consulting and conducting studies on the effect of regulations on industry structure and competition. My vitae is attached as Appendix A to this report.

8.    A list of the cases in which I have testified in the last four years is attached as Appendix B to this report.

9.    GES bills my services at $500 per hour. I am assisted by staff at GES whose compensation ranges from $80 to $165 per hour. My fees are not contingent on the outcome of this matter.

## III. Background

10.    A study which made use of the records from the DNCR was conducted by Hal Varian, Fredrik Walenberg, and Glenn Woroch ("Varian et al.") in 2004, approximately one year after the DNCR was established.[2]

11.    While the Varian et al. study focused primarily on the demographics of the consumers who had placed their number on the DNCR, the authors did report, based on their review of actual DNCR telephone numbers and other telephone data sources, that landline exchanges made up 82.4 percent of the numbers on the registry and wireless exchanges accounted for the remaining 17.6 percent as of November 2003.[3]

12.    To put wireless registrations in perspective, in December 2003, landline numbers accounted for only 54 percent of all telephone numbers in the United States. According to the Federal Communications Commission ("FCC"), there were approximately 183.0

---

[2] Hal R. Varian, Fredrik Wallenberg, and Glenn Woroch, "Who Signed Up for the Do-Not-Call List?" Workshop on Economics and Information Security, University of Minnesota, 2004. http://www.dtc.umn.edu/weis2004/varian.pdf.

[3] Varian et al., p. 22.

million landline numbers in 2003 (137.4 million residential landline numbers and 45.6 million business landline numbers).[4]  The Cellular Telecommunications and Internet Association ("CTIA") estimates there were 158.7 million wireless numbers in the United States in December 2003.[5]

13.   Landline numbers made up the vast majority of the initial registrations of the DNCR relative to wireless numbers because there were fewer incentives for wireless users than for landline users to register their numbers.  Even without registering a wireless number on the DNCR, telemarketing calls to cell phone numbers were already restricted by the Telephone Consumer Protection Act ("TCPA").  The TCPA prohibited technology-assisted telemarketing calls to cell phone numbers without sufficient consent.[6]

14.   It is expected that residential landline numbers made up the vast majority of initial DNCR registrations since "The National Do Not Call Registry is only for personal phone numbers. Business-to-business calls and faxes are not covered by the National Do Not Call Registry."[7]

15.   Wireless registrations picked up considerably in late 2004.  Around September 1, 2004, the CTIA announced that its members were creating a "white pages" for mobile numbers.  The CTIA announcement created a stir within the "wireless community."[8]

16.   Several emails circulated widely claiming that telemarketers would shortly have access to this directory. The emails warned that wireless subscribers had only until December 15, 2004 to register for the DNCR and encouraged cell phone users to protect themselves against an onslaught of telemarketing calls by putting their number on the DNCR.

--------------------------------------------------

[4] U.S. Federal Communication Commission, "Trends in Telephone Service." Industry Analysis and Technology Division, Wireline Competition Bureau, September 2010, p.8-6. The FCC report suggests that some (approximately 10%) of the reported residential landlines are actually business landlines.

[5] CTIA, "CTIA's Semi-Annual Wireless Industry Wireless Industry Survey Results." http://www.ctia.org/advocacy/research/index.cfm/aid/10316.

[6] 47 U.S.C. 227 *et seq.*

[7] Federal Trade Commission, Bureau of Consumer Protection, Division of Consumer & Business Education, "*Q&A: The National Do Not Call Registry.*" September 2009. http://www.ftc.gov/bcp/edu/pubs/consumer/alerts/alt107.shtm

[8] Kooser, Amanda C. "In the Book? A 'White Pages' for Mobile Phone Users is on its Way." Entrepreneur Media Inc. 2004 ("Some people guard their mobile numbers like pirate gold. The initial announcement of the directory raised some hackles, but CTIA and participating service providers have since clarified their position. Here's how it will work: The directory won't be available in print form or online. . . . They also promise that the directory will not be sold to third parties or telemarketers. CTIA recommends that anyone concerned about telemarketing on their mobile phone should register with the FTC's Do Not Call list (www.donotcall.gov), which accepts cell numbers as well as landlines.)

3

17.    While the facts and the sign-up deadline included in the e-mail proved to be false, the email was effective in encouraging cell phone users to sign up for the DNCR.

18.    On December 10, 2004 the *Washington Post* reported that the e-mail had a major impact on new DNCR registrations. "'It's driving registration numbers big time,' said Lois Greisman, the Federal Trade Commission official who oversees the anti-telemarketing registry. The list took effect in October 2003, and since the initial flood of registrations, about 200,000 numbers have been added to the list each week, she said. But two weeks ago, close to 1 million numbers were posted to the list; another 2 million were added last week, she said."[9]

19.    The FTC reported that on December 31, 2004, DNCR registrations equaled 82,981,197.[10] In other words, according to the FTC, from September 30, 2004 to December 31, 2004, DNCR registrations increased by 18.7 million, or by 29.1 percent for the three-month period. This amounted to an annual sign-up rate of over 175 percent.

20.    On February 14, 2005, Lois Greisman noted that new registrations were "running at 300,000 to 500,000 a week."[11] She also noted that the rate of increase of the sign-up rate was coming down.[12] Data on new registrations confirm that the sign-up rate slowed down in 2005. Table 2 shows that DNCR registrations increased by 67 percent for the one-year period from September 2004 to September 2005.

21.    The majority of these new registrations were attributed in the popular press to registrations by wireless subscribers.[13] Even as late as July 2010, an FTC press release states: "Consumers do not need to register cell phone or wireless numbers on the National Do Not Call Registry to be protected from most telemarketing calls to those numbers, despite viral e-mail messages saying otherwise."[14]

---

[9] Caroline E. Mayer. "Bogus E-Mail Worries Users of Cell Phones, December 10, 2004 [Correction 12/20/04]." *The Washington Post*. Washington Post Newsweek Interactive.

[10] Prepared Statement of the Federal Trade Commission of the United States of America on the Do Not Call Provisions of the Telemarketing Sales Rule, Before the Committee on Industry, Natural Resources, Science, and Technology of the Canadian Parliament, Ottawa, Ontario, Canada. May 4, 2005. See also: www.ftc.gov/opa/2005/02/2004dncstats.pdf.

[11] "Do-not-call requests now back to routine." *Omaha World-Herald* (Omaha, NE). McClatchy-Tribune Information Services. 2005. *HighBeam Research*. 17 Jul. 2012 <http://www.highbeam.com>.

[12] Id.

[13] Id. ("…government officials suspect that the unexpected increase is due to the e-mails that are being passed around like a national game of telephone tag. 'It's driving registration numbers big time," said Lois Greisman, the Federal Trade Commission official who oversees the anti- telemarketing registry' ")

[14] U.S. Federal Trade Commission, FTC Consumer Alert, "The Truth About Cell Phones and the Do Not Call Registry Despite Viral E-mail, It Is Not Necessary to Register Cell Numbers." July 2010. http://www.ftc.gov/bcp/edu/pubs/consumer/alerts/alt184.shtm.

4

22. With the exception of the Varian et al. paper referenced above and references by the FTC regarding wireless registrations, there are no publicly available studies or reports about the composition of the DNCR, aside from total registrations.

23. It is my understanding that in the course of discovery in this case, defendant was provided a report that suggests that the FTC requested a report to estimate the composition of the DNCR. PossibleNOW, sub-contractor to Lockheed Martin, provided a report for Lockheed Martin and the FTC on the composition of the DNCR. The report is dated March 31, 2009.

24. In its report, PossibleNow estimated that as of March 23, 2009:

   a. 50.55 percent, or approximately 88.8 million of the 175.5 million telephone numbers on the DNCR were landline telephone numbers.

      i. 56.6 million of the landline numbers were residential numbers;

      ii. 22.8 million were business numbers; and,

      iii. 9.4 million were inactive numbers.

   b. 49.45 percent, or 86.7 million numbers listed on the DNCR were wireless telephones.

   c. PossibleNOW did not estimate the number of wireless numbers that were residential, business, or inactive on the DNCR.

   d. PossibleNOW treated voice over internet protocol ("VOIP") numbers as landline numbers.

   e. Possible NOW apparently defined inactive numbers as deactivated numbers that are not currently assigned.

   f. PossibleNOW made no effort to estimate invalid phone numbers. Its CEO, Rick Stauffer, estimated that there were approximately 75,000 invalid numbers in the DNCR in March 2012.[15] This would amount to approximately 0.04% of the DNCR in March 2009.

## IV. Data and Methodology

25. Data on DNCR annual registrations from 2003 to 2011 of each year were taken from the National Do Not Call Registry Data Book FY 2011 ("2011 Data Book"). Data is given in the 2011 Data Book for September of each year, which the FTC designates as the end of its fiscal year.

---

[15] Rick Stauffer Deposition, April 26, 2012, p 258.

26.    Table 2 shows "active registrations" on the DNCR as of September 30th for the years 2003 to 2011.

    a.    In its 2011 Data Book, the FTC states that "'Active registrations' reflect the total number of phone numbers registered on the National Do Not Call Registry as of September 30, 2011."[16]

    b.    In its October 2008 report to Congress on the accuracy of the DNCR, the FTC defines a number as *inactive* only when it has "a high degree of confidence that the telephone number has been disconnected and reassigned to a new customer."[17] Thus, a number that is disconnected and is *not* reassigned is defined as an *active* number by the FTC.

    c.    In that same October 2008 report, the FTC also states that "The total number of phone numbers already purged from the Registry as of July 31, 2008 was 7,907,466, approximately 4.6% of the numbers *currently* registered." (Emphasis added)[18]

    d.    Based on my reading of FTC reports, it is unclear whether purged numbers (those numbers which the FTC agrees are inactive based on their disconnected-and-reassigned methodology) are still included in the FTC's published figures of "active" registrations.

27.    I estimated DNCR registrations for March 31, June 30, and December 31 of each year with four exceptions. DNCR registrations for December 2003, June 2004, and December 2004 were reported in various documents found on the FTC's website, and DNCR registrations for March 2009 were reported in PossibleNOW's report.

28.    I made the following assumptions when estimating the composition of the DNCR:

    a.    From June 2003 to September 2004, 82.4 percent of DNCR registrations were landline numbers and 17.6 percent were wireless numbers. These percentages were taken from the contemporaneous estimation of the compositions of the DNCR as given in Varian et al. These percentages also make intuitive sense, since landline users had a much greater incentive to register then wireless users.

    b.    Based on this assumption, I estimate that of the 64.3 million numbers in the DNCR reported by the FTC in September 2004, 53.0 million are landline numbers and 11.3 million are wireless numbers.

---

[16] Federal Trade Commission, "National Do Not Call Registry: Data Book, FY," November 2011, p 6. fn 1.

[17] Federal Trade Commission, "Do-Not-Call Improvement Act of 2007," Report to Congress: Regarding the Accuracy of the Do Not Call Registry, October 2008, p. 4.

[18] Id. p. 6, fn 7.

c.  After September 2004, wireless registrations grew rapidly in response to the apparently widespread notion that unregistered wireless users would be soon bombarded by telemarketing calls.

d.  With the exception of the PossibleNOW report (dated March 31, 2009), there are no publicly available sources that provide the number of landline and wireless numbers in the DNCR.  Based on its analysis of the DNCR, PossibleNOW reported that on March 23, 2009 there were 175,443,652 numbers on the DNCR, and that 86,754,720 of them were wireless numbers.  Thus, there were 88,688,932 landline numbers on the DNCR on March 23, 2009.

e.  From September 2004 until March 2009, the DNCR increased by 111,155,477 registrations.  Based on my September 2004 estimate of landline numbers in the DNCR and PossibleNOW's estimate for March 2009 report:

   i.  The number of DNCR landline numbers increased by 35.7 million, from 53.0 million in September 2004 to 88.7 million in March 2009.

   ii.  The number of DNCR wireless numbers increased by 75.4 million, from 11.3 million in September 2004 to 86.8 million in March 2009.

   iii.  Thus, landline numbers accounted for 32.1 percent of new DNCR registrations from September 2004 to March 2009 (calculated as 35.7 million / 111.2 million), and wireless numbers accounted for 67.9 percent of new DNCR registrations.

   iv.  I used these percentages (32.1 percent landline, 67.9 wireless) to estimate the landline/wireless composition of new registrations to the DNCR for each quarterly estimate from December 2004 to September 2011.

f.  I assumed that there were no inactive numbers on the DNCR as of September 2003 and calculated that inactive numbers grew at steady rate, so that by March of 2009 the number of inactive numbers on the DNCR grew to approximately 9,400,000, matching the number of inactive given in the March 2009 PossibleNOW report.

   i.  As stated above, it is my understanding that the FTC purges the DNCR periodically to eliminate numbers that are disconnected and reassigned to new customers.

   ii.  If we take the FTC's word that they purged from the DNCR the numbers in which they have a high degree of confidence that the telephone number has been disconnected and reassigned to a new customer, then PossibleNOW's inactive numbers include those numbers on the DNCR that have been disconnected but in which the FTC does not have a high degree of confidence that the numbers have been reassigned to a new customer.

7

g.  I modeled inactive landline numbers such that:

i.  In any quarter, all new registrations to the DNCR were active registrations. Thus, for example, in September 2003 there were no inactive numbers.

ii.  In every subsequent quarter, I assumed that the some of the DNCR listings (except new registrations or listings that were already inactive) would become inactive. That is, some of the listings would be disconnected but not exhibit a high degree of confidence regarding reassignment.

iii.  I estimated a net average disconnect rate such that when applying the logic from i. and ii. above, the number of inactive DNCR listing would match the 9.4 million inactive landline numbers estimated by PossibleNOW in March 2009. This computed net average disconnect rate is 0.66 percent.

h.  PossibleNOW estimates that in March 2009 there were 22.8 million business landline numbers in the DNCR and that these numbers account for 28.8 percent of active landline numbers on the registry.[19] I assumed the number of business landlines in the DNCR grew over time at a constant rate. Following this assumption, I estimate that business landline numbers grew at a rate of about 1 million per quarter (991,304 to be precise). Thus, the number of business landlines is estimated to be 991,304 in September 2003. Business landlines grew such that, as of March 2009, the number of business landlines in my estimation match PossibleNOW's estimate of 22.8 million business landlines in its March 2009 report.[20]

i.  Active residential landline registrations are estimated as total landline registrations less business and inactive landline registrations.[21]

## V.  Results

29.  Table 3 provides estimates of the composition of the DNCR.

30.  Table 4 provides the estimates of the DNCR composition in percentage terms.

31.  Table 3 shows that active residential landline numbers have grown steadily from 48.1 million numbers in September 2003 to a peak of 59.5 in September 2010. Active residential landline registrations are estimated at 59.2 million as of September 2011.

---

[19] Calculated as 22.8 business landline numbers divided by 79.3 million total active landline numbers.

[20] I found no information detailing FTC efforts to purge business numbers from the DNCR.

[21] To the extent that some DNCR numbers are invalid numbers, then active residential and business landline estimates may be overestimated in the model results presented in the next section.

32.   Table 4 shows, however, that as a percent of total DNCR registrations, active residential landlines have decreased steadily from September 2003 to September 2011. Active residential landlines accounted for approximately 80.5 percent of the total numbers on the DNCR in September 2003 but only 28.2 percent of the DNCR numbers in September 2011.

33.   In addition, the tables show that:

   a.   Wireless numbers have grown from 9.1 million registrations in September 2003 to over 110 million in September 2011

   b.   Inactive landline numbers, of which PossibleNOW estimates that there were 9.4 million in the DNCR in March 2009 have likely grown to about 14.9 million in September 2011. PossibleNOW estimated that these inactive landline numbers accounted for 5.4 percent of the DNCR in March 2009. The model results show that 7.1 percent of numbers in the DNCR in September 2011 are inactive landline numbers.

   c.   If the FTC publishes data on DNCR registrations that reflects purges of disconnects and reassignments to new customers, then the figures on inactive landlines reported in Tables 3 and 4 are those inactive landlines where the FTC cannot determine with a high degree of confidence that a disconnected number has been reassigned to a new customer.

   d.   While the FTC states that the DNCR is only for personal phone numbers, according to PossibleNOW, active business landline numbers accounted for 28.8 percent of the active landlines in the DNCR in March 2009. I estimate that that percentage is over 30 percent in September 2011.

   e.   The analysis does not consider invalid numbers. To the extent that invalid numbers are not purged from the DNCR, I would expect they would be distributed in proportion to that of the four categories in Tables 3 and 4.

7/26/2012

9

Table 1a

A Simple Model of DNRC Composition*
Estimates of DNCR Registrations by Type
As of September 30, 2003 - 2011
(in millions)

| Year | DNCR Registrations[1] | Active Residential Landlines | Inactive Landlines | Business Landlines | Total Landlines | Total Wireless |
|------|------|------|------|------|------|------|
| 2003 | 52.0 | 41.8 | 0.0 | 1.0 | 42.8 | 9.1 |
| 2004 | 64.3 | 46.8 | 1.2 | 5.0 | 53.0 | 11.3 |
| 2005 | 107.4 | 55.2 | 2.7 | 8.9 | 66.8 | 40.6 |
| 2006 | 132.2 | 57.4 | 4.5 | 12.9 | 74.8 | 57.4 |
| 2007 | 145.5 | 55.9 | 6.4 | 16.9 | 79.1 | 66.4 |
| 2008 | 172.5 | 58.6 | 8.3 | 20.8 | 87.8 | 84.8 |
| 2009 | 191.5 | 59.2 | 10.5 | 24.1 | 93.8 | 97.6 |
| 2010 | 201.5 | 59.4 | 12.7 | 25.0 | 97.1 | 104.5 |
| 2011 | 209.7 | 59.1 | 14.9 | 25.6 | 99.7 | 110.0 |

Table 1b

A Simple Model of DNRC Composition*
Estimates of DNCR Registrations by Type
As of September 30, 2003 - 2011
(in percent)

| Year | DNCR Registrations | Active Residential Landlines | Inactive Landlines | Business Landlines | Total Landlines | Total Wireless |
|------|------|------|------|------|------|------|
| 2003 | 100.0 | 80.5 | 0.0 | 1.9 | 82.4 | 17.6 |
| 2004 | 100.0 | 72.8 | 1.9 | 7.7 | 82.4 | 17.6 |
| 2005 | 100.0 | 51.4 | 2.5 | 8.3 | 62.2 | 37.8 |
| 2006 | 100.0 | 43.4 | 3.4 | 9.7 | 56.6 | 43.4 |
| 2007 | 100.0 | 38.4 | 4.4 | 11.6 | 54.3 | 45.7 |
| 2008 | 100.0 | 34.0 | 4.8 | 12.1 | 50.9 | 49.1 |
| 2009 | 100.0 | 30.9 | 5.5 | 12.6 | 49.0 | 51.0 |
| 2010 | 100.0 | 29.5 | 6.3 | 12.4 | 48.2 | 51.8 |
| 2011 | 100.0 | 28.2 | 7.1 | 12.2 | 47.5 | 52.5 |

Table 2

DNCR Active Registrations on September 30th
2003 -2011

| Fiscal Year | Number of Active Registrations | Change in Number of Active Registrations | Percent Change |
|---|---|---|---|
| 2003 | 51,968,777 | | |
| 2004 | 64,288,175 | 12,319,398 | 23.7 |
| 2005 | 107,440,316 | 43,152,141 | 67.1 |
| 2006 | 132,219,163 | 24,778,847 | 23.1 |
| 2007 | 145,498,656 | 13,279,493 | 10.0 |
| 2008 | 172,523,449 | 27,024,793 | 18.6 |
| 2009 | 191,453,515 | 18,930,066 | 11.0 |
| 2010 | 201,542,535 | 10,089,020 | 5.3 |
| 2011 | 209,722,924 | 8,180,389 | 4.1 |

Source: Federal Trade Commission, National Do Not Call
Registry Data Book FY 2011, Released November 2011, p.4

11

Table 3

A Simple Model of DNRC Composition
Estimates of DNCR Registrations by Type

| Year | Quarter Ending | DNCR Registrations* | Active Residential Landlines | Active Business Landlines | Inactive Landlines | Total Landlines | Total Wireless |
|------|------|------|------|------|------|------|------|
| 2003 | Sep | 51,968,777 | 41,830,968 | 991,304 | 0 | 42,822,272 | 9,146,505 |
| | Dec | 55,849,898 | 43,755,758 | 1,982,609 | 281,949 | 46,020,316 | 9,829,582 |
| 2004 | Mar | 58,966,622 | 45,031,485 | 2,973,913 | 583,098 | 48,588,496 | 10,378,125 |
| | Jun | 62,083,345 | 46,292,286 | 3,965,217 | 899,173 | 51,156,676 | 10,926,669 |
| | Sep | 64,288,175 | 46,786,858 | 4,956,522 | 1,230,077 | 52,973,456 | 11,314,719 |
| | Dec | 82,981,197 | 51,461,140 | 5,947,826 | 1,570,763 | 58,979,730 | 24,001,467 |
| 2005 | Mar | 91,134,237 | 52,711,507 | 6,939,130 | 1,948,753 | 61,599,391 | 29,534,846 |
| | Jun | 99,287,276 | 53,947,114 | 7,930,435 | 2,341,503 | 64,219,052 | 35,068,224 |
| | Sep | 107,440,316 | 55,168,059 | 8,921,739 | 2,748,915 | 66,838,713 | 40,601,603 |
| | Dec | 113,635,028 | 55,745,206 | 9,913,043 | 3,170,892 | 68,829,142 | 44,805,886 |
| 2006 | Mar | 119,829,740 | 56,312,026 | 10,904,348 | 3,603,197 | 70,819,571 | 49,010,169 |
| | Jun | 126,024,451 | 56,868,587 | 11,895,652 | 4,045,760 | 72,810,000 | 53,214,451 |
| | Sep | 132,219,163 | 57,414,957 | 12,886,957 | 4,498,515 | 74,800,429 | 57,418,734 |
| | Dec | 135,539,036 | 57,027,485 | 13,878,261 | 4,961,395 | 75,867,141 | 59,671,896 |
| 2007 | Mar | 138,858,910 | 56,636,038 | 14,869,565 | 5,428,250 | 76,933,852 | 61,925,057 |
| | Jun | 142,178,783 | 56,240,640 | 15,860,870 | 5,899,054 | 78,000,564 | 64,178,219 |
| | Sep | 145,498,656 | 55,841,320 | 16,852,174 | 6,373,782 | 79,067,276 | 66,431,380 |
| | Dec | 152,254,854 | 56,542,230 | 17,843,478 | 6,852,408 | 81,238,117 | 71,016,738 |
| 2008 | Mar | 159,011,053 | 57,231,999 | 18,834,783 | 7,342,175 | 83,408,957 | 75,602,095 |
| | Jun | 165,767,251 | 57,910,700 | 19,826,087 | 7,843,012 | 85,579,798 | 80,187,453 |
| | Sep | 172,523,449 | 58,578,404 | 20,817,391 | 8,354,843 | 87,750,639 | 84,772,810 |
| | Dec | 173,983,551 | 57,533,492 | 21,808,696 | 8,877,598 | 88,219,785 | 85,763,765 |
| 2009 | Mar | 175,443,652 | 56,488,932 | 22,800,000 | 9,400,000 | 88,688,932 | 86,754,720 |
| | Jun | 183,448,584 | 57,877,730 | 23,461,224 | 9,922,051 | 91,261,004 | 92,187,579 |
| | Sep | 191,453,515 | 59,253,029 | 24,122,448 | 10,457,600 | 93,833,077 | 97,620,438 |
| | Dec | 193,975,770 | 59,306,156 | 24,330,791 | 11,006,558 | 94,643,505 | 99,332,265 |
| 2010 | Mar | 196,498,025 | 59,357,562 | 24,539,135 | 11,557,237 | 95,453,933 | 101,044,092 |
| | Jun | 199,020,280 | 59,407,257 | 24,747,478 | 12,109,626 | 96,264,362 | 102,755,918 |
| | Sep | 201,542,535 | 59,455,253 | 24,955,822 | 12,663,715 | 97,074,790 | 104,467,745 |
| | Dec | 203,587,632 | 59,387,660 | 25,124,751 | 13,219,491 | 97,731,902 | 105,855,730 |
| 2011 | Mar | 205,632,730 | 59,319,399 | 25,293,681 | 13,775,934 | 98,389,014 | 107,243,715 |
| | Jun | 207,677,827 | 59,250,476 | 25,462,610 | 14,333,041 | 99,046,126 | 108,631,700 |
| | Sep | 209,722,924 | 59,180,894 | 25,631,539 | 14,890,805 | 99,703,239 | 110,019,685 |

* Sources
 - for each September from the FTC DNCR Databook FY 2011;
 - for December 2003, FTC website: www.ftc.gov/opa/2004/02/dncstats.pdf;
 - for June 2004, FTC website: www.ftc.gov/opa/2004/06/dncanny.pdf;
 - for December 2004, FTC website: www.ftc.gov/opa/2005/02/2004dncstats.pdf
 (See also: "Appendix to Prepared Statement of the Federal Trade Commission of the United
 States of America on the Do Not Call Provisions of the Telemarketing Sales Rule, Before the
 Committee on Industry, Natural Resources, Science, and Technology of the Canadian
 Parliament," Ottawa, Ontario, Canada. May 4, 2005.):
 - for March 2009, PossibleNOW, "Analysis Of The Phone Numbers On The National Do Not Call
 Registry." March 31, 2009; and,
 - all other months estimated.

12

Table 4

A Simple Model of DNRC Composition*
Estimates of DNCR Registrations by Type
(in percent)

| Year | Quarter Ending | Active Residential Landlines | Inactive Landlines | Business Landlines | Total Landlines | Total Wireless |
|------|------|------|------|------|------|------|
| 2003 | Sep | 80.5 | 0.0 | 1.9 | 82.4 | 17.6 |
|      | Dec | 78.3 | 0.5 | 3.5 | 82.4 | 17.6 |
| 2004 | Mar | 76.4 | 1.0 | 5.0 | 82.4 | 17.6 |
|      | Jun | 74.6 | 1.5 | 6.4 | 82.4 | 17.6 |
|      | Sep | 72.8 | 1.9 | 7.7 | 82.4 | 17.6 |
|      | Dec | 62.0 | 1.9 | 7.2 | 71.1 | 28.9 |
| 2005 | Mar | 57.8 | 2.2 | 7.6 | 67.6 | 32.4 |
|      | Jun | 54.3 | 2.4 | 8.0 | 64.7 | 35.3 |
|      | Sep | 51.3 | 2.6 | 8.3 | 62.2 | 37.8 |
|      | Dec | 49.0 | 2.8 | 8.7 | 60.6 | 39.4 |
| 2006 | Mar | 47.0 | 3.0 | 9.1 | 59.1 | 40.9 |
|      | Jun | 45.1 | 3.2 | 9.4 | 57.8 | 42.2 |
|      | Sep | 43.4 | 3.4 | 9.7 | 56.6 | 43.4 |
|      | Dec | 42.1 | 3.7 | 10.2 | 56.0 | 44.0 |
| 2007 | Mar | 40.8 | 3.9 | 10.7 | 55.4 | 44.6 |
|      | Jun | 39.5 | 4.2 | 11.2 | 54.9 | 45.1 |
|      | Sep | 38.4 | 4.4 | 11.6 | 54.3 | 45.7 |
|      | Dec | 37.1 | 4.5 | 11.7 | 53.4 | 46.6 |
| 2008 | Mar | 36.0 | 4.6 | 11.8 | 52.5 | 47.5 |
|      | Jun | 34.9 | 4.8 | 12.0 | 51.6 | 48.4 |
|      | Sep | 33.9 | 4.9 | 12.1 | 50.9 | 49.1 |
|      | Dec | 33.0 | 5.1 | 12.5 | 50.7 | 49.3 |
| 2009 | Mar | 32.2 | 5.4 | 13.0 | 50.6 | 49.4 |
|      | Jun | 31.5 | 5.4 | 12.8 | 49.7 | 50.3 |
|      | Sep | 30.9 | 5.5 | 12.6 | 49.0 | 51.0 |
|      | Dec | 30.5 | 5.7 | 12.5 | 48.8 | 51.2 |
| 2010 | Mar | 30.2 | 5.9 | 12.5 | 48.6 | 51.4 |
|      | Jun | 29.8 | 6.1 | 12.4 | 48.4 | 51.6 |
|      | Sep | 29.5 | 6.3 | 12.4 | 48.2 | 51.8 |
|      | Dec | 29.1 | 6.5 | 12.3 | 48.0 | 52.0 |
| 2011 | Mar | 28.8 | 6.7 | 12.3 | 47.8 | 52.2 |
|      | Jun | 28.5 | 6.9 | 12.3 | 47.7 | 52.3 |
|      | Sep | 28.2 | 7.1 | 12.2 | 47.5 | 52.5 |

13

# DX-190



PLAINTIFF'S EXHIBIT 24

# PossibleNOW DNC Program for DISH Network Retailers

04/24/12



Activity Tracker (10/02/09)

Month-to-Month New Accounts

☐ OE Accounts     ☐ Other Retailer Accounts

| Summary | |
|---|---|
| Total Retailers Identified by DISH Network | 313 |
| Retailers Contacted by PossibleNOW | 290 |
| Active Accounts | 67 |
| Retailers Engaged in Open Conversations | 0 |
| Retailers that Declined Service | 42 |
| Non-Responsive Retailers | 143 |
| Cancelled Accounts | 38 |

| Closed Accts in September and October 2009 | | | |
|---|---|---|---|
| 1 | Zencom - Bold TV | Zenata Perez | 250K PF | $250 |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |



## Active Accts. As of 10/02/09

| Active Accts. As of 07/24/09 | OE Number | Lead Date | Lead Type | Contact Name | Phone # | Email | Attended Webinar? | Telemkt | Status | Close Date | Products Sold | Monthly Volume | Monthly Revenue | Sent Doc? | Aprvd |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | phone | | | | | No | CLOSED | 10/17/2008 | DNCI | 50k | $125 | N/A | N/A |
| | | 6/23/2008 | phone | | | | | Yes | Closed | 9/25/2008 | DNCI | 50k | $125 | Yes | No |
| | | 11/9/2008 | | | REDACTED PII | REDACTED PII | | No | Closed | 11/12/2008 | DNCI | 50K | $125 | N/A | N/A |
| REDACTED PII | | | Phone | | | | | No | Closed | 10/27/2008 | DNCI | 50K | $125 | N/A | N/A |
| | | | | | | | | Yes | Closed | 10/23/2008 | DNCI | 250K | $225 | Yes | No |
| | | 6/19/2008 | phone | | | | | No | Closed | 10/22/2008 | DNCI | 50K | $125 | N/A | N/A |
| | | | phone | | | | | No | Closed | 10/21/2008 | DNCI | 50K | $125 | N/A | N/A |
| | | | | | | | | Yes | Closed | 7/20/2009 | DNCI | 50K | $125 | No | No |
| | | | | | | | | Yes | Closed | 5/26/2009 | DNCI | 250K | $225 | Yes | No |
| | | | | | | | | No | Closed | 6/15/2009 | DNCI | 50K | $125 | No | No |
| | | 10/27/2008 | Phone | | | | Yes | Yes | closed | 6/27/2008 | DNCI | 250K | $225 | Yes | Yes |
| | | 5.11.07 | phone | | | | | Yes | Closed | 7/21/2008 | DNCI | 50K | $125 | Yes | No |
| | | 10/20/2008 | phone / email | | | | | No | Closed | 11/5/2008 | DNCI | 50K | $125 | N/A | N/A |
| | | | | | | | | Yes | Closed | 7/16/2009 | DNCI | 50K | $125 | No | No |
| | | | | | | | | Yes | Closed | 6/9/2009 | DNCI | 50K | $125 | Yes | No |
| | | 3/17/2008 | phone | | | | | Yes | Closed | 10/28/2009 | DNCI / PF | 50K | $150 | Yes | Yes |

| Active Accts. As of 07/24/09 | OE Number | Lead Date | Lead Type | Contact Name | Phone # | Email | Attended Webinar? | Telemkt | Status | Close Date | Products Sold | Monthly Volume | Monthly Revenue | Sent Doc? | Aprvd |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED PII | | | | REDACTED PII | | | | Yes | Closed | 5/27/2009 | DNCI | 50K | $125 | Yes | No |
| | | | phone | | | | | Yes | CLOSED | 10/17/2008 | DNCI | 500K | $450 | Yes | Yes |
| | | 6/25/2008 | | | | | No | Yes | Closed | 6/28/2008 | DNCI + EBRS | 50K | $200 | Yes | No |
| | | | phone | | | | | No | Closed | 10/17/2008 | DNCI | 50K | $125 | N/A | N/A |
| | | | | | | | | Yes | Closed | 5/1/2009 | DNCI | 50K | $125 | Yes | No |
| | | 1/8/2009 | phone | | | | | Yes | CLOSED | 3/25/2009 | Data/DNCI + PF | 50K | $125 | Yes | No |
| | | 5.16.07 | web | | | | | Yes | Prior Customer | 6/22/2007 | DNCI + PF | 1 million | $660 | Yes | Yes |
| | | 9/24/2008 | phone | | | | | Yes | CLOSED | 9/25/2008 | DNCI | 50k | $125 | Yes | Yes |
| | | 8.22.08 | phone | | | | | Yes | Closed | 8/21/2008 | DNCI+PF | 250K | $250 | Yes | No |
| | | 9/24/2008 | phone | | | | | Yes | CLOSED | 9/25/2008 | DNCI | 50k | $125 | Yes | No |
| | | | phone | | | | | No | CLOSED | 10/17/2008 | DNCI | 50K | $125 | Yes | Yes |
| | | 5.10.07 | phone | | | | | Yes | Prior Customer | 7/13/2007 | DNCI+PF+EBR+Notif | 2.25 million | $1,760 | Yes | No |
| | | 10/20/2008 | phone | | | | | Yes | Closed | 11/6/2008 | DNCI | 500K | $250 | Yes | No |
| | | 5.6.08 | phone | | | | | Yes | Closed; upgraded 4/15/09 | 6/28/2008 | DNCI + PF | 2.25M | $1,050 | Yes | No |
| | | 3.3.08 | email | | | | | Yes | Closed | 10/24/2008 | DNCI + PF + EBR | 50K | $225 | Yes | Yes |
| | | | | | | | | Yes | Closed | 11/25/2008 | DNCI | 50K | $125 | Yes | Yes |
| | | 10/17/2008 | phone | | | | | Yes | CLOSED | 10/20/2008 | DNCI | 50K | $125 | Yes | No |
| | | 2/4/2009 | | | | | | Yes | Closed | 2/9/2009 | DNCI | 50K | $125 | Yes | No |
| | | 2/28/2009 | phone | | | | | | Closed | 4/30/2009 | DNCI | 50K | $125 | No | No |

| Active Accts. As of 07/12/09 | OE Number | Lead Date | Lead Type | Contact Name | Phone # | Email | Attended Webinar? | Telemkt | Status | Close Date | Products Sold | Monthly Volume | Monthly Revenue | Sent Doc? | Aprvd |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED PII | | 10/1/2008 | Phone | | | | no | Yes | closed | 10/29/2008 | DNCI | 50K | $125 | Yes | Yes |
| | | 6/1/2008 | phone | | REDACTED PII | | | Yes | CLOSED | 10/20/2008 | DNCI + EBR | 50K | $200 | Yes | Yes |
| | | 12/1/2008 | | | | | No | Yes | CLOSED | 4/6/2009 | DNCI + PG | 50K | $200 | Yes | No |
| | | | | | | | | Yes | RETURNING CUST | 7/30/2009 | DNCI | 50K | $125 | Yes | No |
| | | | | | | | | No | Closed | 8/21/2009 | DNCI | 50K | $125 | No | No |
| | | 7/22/2008 | phone | | | | | Yes | Closed | 10/21/2008 | DNCI + PF | 500K | $500 | Yes | No |
| | | | | | | | | | | | | | | | |
| | | 10/17/2008 | phone | | | | | No | Closed | 10/21/2008 | DNCI | 50k | $125 | N/A | N/A |
| | | | | | | | Y | Yes | Prior Customer. Submitted Test file: 11/2008 | 12/20/2004 | DNCI+PF+EBR+Ncdf | 50K | $350 | Yes | Yes |
| | | | | | | | | No | Closed | 10/21/2008 | DNCI | 50K | $125 | N/A | N/A |
| | | 8.2.07 | phone | | | | | Yes | Prior Customer | 8/9/2007 | DNCI + PF | 250K | $250 | Yes | Yes |
| | | | | | | | | | Closed | 5/11/2009 | DNCI | 50K | $125 | Yes | No |
| | | | | | | | | Yes | Closed | 10/27/2008 | DNCI | 50K | $125 | Yes | Yes |
| | | | | | | | | Yes | Closed | 6/25/2009 | DNCI | 50K | $125 | No | No |
| | | 10/17/2008 | phone | | | | | No | Closed | 5/18/2009 | DNCI | 50K | $125 | No | No |
| | | | | | | | | Yes | Closed | 8/31/2009 | DNCI | 50K | $125 | No | No |
| | | 10/7/2008 | phone | | | | | No | Closed | 11/4/2008 | DNCI | 50K | $125 | N/A | N/A |

| Active Accts. As of 07/24/09 | OE Number | Lead Date | Lead Type | Contact Name | Phone # | Email | Attended Webinar? | Telemkt | Status | Close Date | Products Sold | Monthly Volume | Monthly Revenue | Sent Doc? | Aprvd |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 9/5/2008 | phone | | | | | Yes | Closed | 10/15/2008 | DNCI + QC | 50K | $125 | Yes | No |
| | | 1/2/2008 | phone | | | | | Yes | Closed | 1/5/2009 | DNCI | 50K | $125 | Yes | No |
| | | | | | | | | No | RETURNING CUST | 10/22/2008 | DNCI | 50K | $125 | Yes | No |
| REDACTED PII | REDACTED PII | 1/7/2009 | phone | REDACTED PII | | | | Yes | Closed | 1/20/2009 | DNCI | 50K | $125 | Yes | No |
| | | 1.25.08 | email | | | | | Yes | Closed | 10/21/2008 | DNCI | 50K | $125 | | |
| | | 5.6.08 | phone | | | | Yes | Yes | Closed | 7/11/2008 | DNCI+PF+EBR+Notf | 50K | $225 | Yes | Yes |
| | | | phone | | | | | No | CLOSED | 10/17/2008 | DNCI | 50K | $125 | N/A | N/A |

## Declined Service

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Attended Webinar? | Telemarket? | Status |
|---|---|---|---|---|---|---|---|---|
| A-1 Satellite of Cokokia | 4.30.08 | web | Greg Narez | 618-337-7674 | gregnarez@a1satelliteonline.com | | | not calling - will never sign up |
| ACTION PAGING CORPORATION | 6/18/2008 | phone | Dave Erkman | 562-320-3400 | ACTIONACE@UREACH.COM;dave erkman@earthlink.net | | | B2B Calling Only, does not need services |
| AMERICAN COMMUNICATIONS OF THE TRIAD INC | 6/25/2008 | Phone | Jess Baker | 336-454-0013 | jbaker@acinmalls.com | | | DECLINED SERVICES |
| ASCENT MARKETING LLC DBA SATELLITE SERVICES | 7/14/2008 | phone | | 425-738-1390 | seatownsatellite@yahoo.com | | | VM 7/14, sent info, DECLINED SERVICES |
| ATLANTIC COMMUNICATIONS AND TRADING INC | 6/18/2008 | phone | Martin | 954-336-2371 | mtako71@yahoo.com | | | VM 6/18, 7/14, DECLINED SERVICES |
| BART LANG DBA NEXT STEP COMMUNICATIONS | 6/19/2008 | phone | Bart Lang | 559.636.1600 973-991-0315 | nextstep@getnextstep.com lecalveo@msn.com | | | spoke with Dish rep, Paul, who said service is optional, DECLINED SERVICES |
| BLUE TOP COMMUNICATIONS INC | 6/19/2008 | phone | Pat Hagan | 317-535-5560 | phagan@bluetopcrv.com | | | DECLINED SERVICES - private cable operator |
| BMTINC INC | 6/19/2008 | phone | Boris | 718-336-4759 | BMTINC1@aol.com | | | DECLINED SERVICES, does not use phone |
| C VSION NETWORK | | | | 631-580-2958 | | | | Private number, business closed |
| CR Communications | 6/24/2008 | phone | Jay Korbadia | 980.939.5636 | jkorbadia@yahoo.com | | | DECLINED SERVICES |
| EAGLE SATELLITE OF BUTTE INC | | | Jerry | 406-782-0674 | esatellite@rwest.net | | | II, VM 8/3, Not Interested, Doesn't telemarket whatsoever, DECLINE SERVICES |
| FORTINO CARRILLO DBA MUSICA LATINA DBA AFFORDABLE SATELLITE DBA ROCKFORD SATELLITE & INTERNET | 3-Sep | phone | Tino | 815-398-5098 | fc122@sbcglobal.net | | | II, DECLINE SERVICES |
| JULIO A RODRIGUEZ DBA OMEGA COMMUNICATIONS | 7/24/2008 | phone | Julio Rodriguez | 316-262-7820 | JULIODISH45@YAHOO.COM | | | II, left message 7/21, DECLINE SERVICES, does not use phone |
| KEITH HANS DBA HANS CEDARDALE SATELLITE CO | 7/30/2008 | phone | Keith Hans | 570-584-5349 | | | | IIIII message 7/28, spoke with Tammy, inbound only, not interested |
| LAKETON TV | 7/24/2008 | phone | Tom | 412-731-1748 | LAKETONTV1@aol.com | | | II, out to 7/28, says he does not use phone at all, DECLINE SERVICES |
| LATINO WIRELESS INC DBA LATINO WIRELESS | 7/30/2008 | phone | Victor | 510-276-5512 | LATINWIRELESS@AOL.COM | | | IIIII, VM 7/22, info 7/29, inbound only, says he does not need service, he will contact us if he does |
| LUILLI A MURGUIA DBA SATELLITE TV OPTIONS | 7/22/2008 | Phone | | 559-324-9647 | serve@aol.com;crouma@aol.com;m onicrou@aol.com | | | I, says he does not call anyone, DECLINE SERVICES |
| LUIS BLANCO DBA HIGH DEFINITION SATELLITE | 7/28/2008 | phone | Luis Blanco | 909-467-0149 | highdefinition05@cs.com | | | III, VM 7/25, does not call, DECLINE SERVICES |
| LUIS MERLAN DBA MERLAN SATELLITES SERVICE | 7/22/2008 | Phone | Irma Merlan | 951-898-2613 | merlansat@sbcglobal.net | | | I, might lose business, can't afford costs, doesn't market, not interested DECLINED SERVICES |
| MARIA E OBREGON DBA PLANET SATELLITE COMMUNICATIONS | 7/28/2008 | phone | Roberto | 623-872-3474 | PLANETSATELLITE@HOTMAIL.CO M | | | III inbound only, DECLINE SERVICES |
| MARIO VASQUEZ DBA MJV SATELLITE CONNECTION | 7/22/2008 | Phone | Mario Vasquez | 919-471-0231 | mjvasquez9@verizon.net | | | I, does not use phone, DECLINE SERVICE |
| Marketing Investors Corp | | | Stephen Lilley | 214-915-7192 | stephen.lilley@usalink.com | | | IIIII, VM 7/22, sent info 7/29, not selling Dish |
| MARKHAM MARKETING GROUP LLC | 7/24/2008 | phone | Kris Kellis | 480-924-1151 | kris_kellis@yahoo.com; dishtechtro@yahoo.com; yuliagulia72985@yahoo.com | | | II, VM 7/22, pulling leads from Sales Genie, does not need service, DECLINED SERVICES, sent info anyway 7/25 |

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Attended Webinar? | Telemarket? | Status |
|---|---|---|---|---|---|---|---|---|
| MAS SATELLITE COMMUNICATIONS LLC DBA MAS SATELLITE COMMUNICATIONS | 7/23/2008 | phone | Jessica | 623-847-2156 | massatellite@yahoo.com | | | I, VM 7/22, 7/23, In standby with Dish, have not sold Dish since March 08 |
| MASTERSAT COMMUNICATIONS INC | 7/22/2008 | Phone | Ryan | 336-855-1838 | NULL | | | I, does not use phone, DECLINE SERVICE |
| METRO DIGITAL ADVANTAGE CO | 7/28/2008 | phone | Ty Tran | 214-762-1526 | TYTRAN4U@NETZERO.NET | | | IIII, VM 7/22, inbound only, DECLINE SERVICES |
| MICHAEL NGHIEM DBA TECHMEDIA GROUP | | | | 713-609-9746 | mnghiem@techmediagroup.net | | | Invalid phone number |
| MUNDO TV SATELLITE SERVICES INC | | | | 770-335-5971 | mundoctvsatelliteservices@yahoo.com | | | non-responsive |
| NAN MARKETING LLC | | | | 801-254-3330 | britechic626@hotmail.com;revisy@mail.com; lcbangel@yahoo.com | | | not available x3; no voicemail; non-responsive |
| NEIZAS ENTERPRISE | | | | 773-522-7777 | neizas-enterprise@bxglobal.net | | | Non-Responsive; difficult to understand |
| ORLANDO VILLATORO DBA EL PROGRESO EXPRESS | | | | 864-201-6937 | elprogreso@charterinternet.com | | | non-responsive |
| QUALITY HOME SATELLITE | 8/7/2008 | phone | Salvador | 787-866-5633 | qhsatellite@yahoo.com | | | Does not call or have VM to return calls after hours, DECLINE SERVICES |
| RIGOBERTO B SANCHEZ DBA RSA | 18-Aug | phone | | 909-872-6464 | RSADISH@YAHOO.COM | | | I, Not Interested |
| SATELLITE CENTRAL INC | 18-Aug | phone | Jesse Brosnan | 712-291-0500 | jessebrosnan@satellitecentralla.com | | | I, DECLINE SERVICES |
| SAUL MARTINEZ DBA ITSS A SATELLITE DEALER | 18-Aug | phone | Saul Martinez | 951-943-4944 | itssatellitei@verizon.net | | | I, DECLINE SERVICES |
| STANECKI INC DBA DON LORS ELECTRONICS | | | | 734-432-9900 | jsranecki@don-lors.com;hezz@don-lors.com;installs@don-lors.com | | | won't sign up - just an instal shop |
| STAR SATELLITE EXPRESS INC | | | spoke with Kim | 864-422-0000 | tech@starddishtv.com | | | gave me new # 864-288-9321 - STRICTLY customer calls - will not sign up |
| THE PROFESSIONALS LLC DBA DISH PROFESSIONALS | | | Jamie | 801-424-3474 | ryan@thedishpros.com; jamie@thedishpros.com | | | vm - he called back - spoke - he said this doesn't apply to anything he does - no detail given |
| TRI STATE INSTALLATION INC | | | | 914-941-3200 | tristateinstalldish@gmail.com | | | just install house - no calls ever |
| VENTURE AURORA INC | | | | 866-397-9600 | VENTUREAURORA@AOL.COM | | | had heard of us - door to door only - will not sign up |
| WILLIAMS FLOWERS DBA FLOWERS ENTERPRISES DBA ADVANCED ELECTRONICS | | | Danny Flowers | 409-898-3626 | dishman77713@yahoo.com; dannyboy312002@yahoo.com; shanshere2003@yahoo.com | | | no telem - mail and and - said they never has any number to add to disc list |
| WORLDLYNK LLC | | | Gloria | 505-292-2909 | gloria@worldlynk.tv; michael@worldlynk.tv | | | just ads flyers newspaper - will possibly call again one day and wanted info |

## Engaged

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Attended Webinar? | Telemkd | Status |
|---|---|---|---|---|---|---|---|---|

## Non-Responsive

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Atnd Webnr | Telemkt | Status |
|---|---|---|---|---|---|---|---|---|
| A & A SATELLITES LLC | 6/17/2008 | Phone | Angela Villareal | 260-422-3023 | adamezr@yahoo.com | | | Left message w/receptionist, VM 6/25, sent info NON-RESPONSIVE |
| A M S INC DBA HOMETECH | 6/17/2008 | phone | Jim Hough | 360-424-5800 | dishras@hotmail.com | | | Sent info, EBR calling, says this is blackmail, message 7/16, sent info NON-RESPONSIVE |
| ACA GROUP | 6/18/2008 | phone | George Aceves | 951-601-2001 | acagroup@yahoo.com | | | Left message 6/23 |
| ACCELERATED BROADBAND LLC | 6/18/2008 | phone | Ari Meltzer | 954-229-0808 | jashighspeed@aol.com | | | Sent info, NON-RESPONSIVE |
| ACTION PAGING CORPORATION | 6/18/2008 | phone | Dave Erkman | 562-320-3400 | ACTIONACE@UREACH.COMdavee rkman@earthlink.net | | | Some B2B calling, CB 6/20  B2B calling only |
| AHA Home Services LLC | | | Barbara Fickett | 203-323-7715 ext 300 or 203-912-7715 (cell) | bfickest@bhahome.com | | | VM 6/23/6/30, sent info NON-RESPONSIVE |
| ALASKA COMMUNICATIONS SYSTEMS | | | | 907-564-8000 | dish_info@accsalaska.com | | | sent info 7/16 |
| ALTERNATIVE ENTERTAINMENT INC | 6/18/2008 | phone | Rick Osweiler | 920-865-2133 | lneuman@aedish.com | | | VM 6/17 Sent Info, VM 7/15 |
| AMELIO DIAZ JR DBA JUNIOR SATELLITE | 6/19/2008 | phone | | 787-403-6369 | juniorsatellite@hotmail.com | | | Does not speak English |
| American Satellite (NC) | 7/8/2008 | | Alberto | 828-290-2479 | satellites@americasgama.com | | | sent paperwork after a second conversation 8.6.08 |
| AMERICAN SATELLITE INC DBA PEORIA SATELLITE CO | 6/18/2008 | phone | Jim Rashid | 309-691-9494 | jrashid9@hotmail.com | | | VM 7/14, sent info 7/15 |
| ANTENAS ENTERPRISE INC | | | Louis Dominguez | 312-604-1006 | dishesup@aol.com | | | Sent info 7/15 |
| ANTENNA STAR SATELLITE INC | | | | 888-999-1622 | returnauth@antestar.com; carlos.gibson@antestar.com; charles.geero@antestar.com | | | Talked to Carlos Gibson and sent info 7/15 |
| ANTENNA STAR SATELLITE INC | 7/15/2008 | phone | Carlos Gibson | 888-999-1622 | returnauth@antestar.com; carlos.gibson@antestar.com; charles.geero@antestar.com | | | Talked to Carlos Gibson and sent info 7/15, VM 8/6 RT |
| Anything Dish | 4/24/2009 | phone | Dave and Michael | 619.223.1022 | | no | yes | referring discussions from HomeyTel; 2 sep opportunities |
| ATLAS SATELLITE INC | | | Ali Lamarra | 888-347-4808 | atlassatellite@yahoo.com | | | VM, sent info NON-RESPONSIVE |
| AUDIO VISIONS INC | 6/18/2008 | phone | Larry Matthews | 928-428-7625 | audiovisions@cableone.net | | | Sent info 7/14, CB 7/17 |
| BASIC COMMUNICATIONS INC | | | | 616-784-5000 | rkirby@basiccom.com | | | VM 6/18, 6/24, sent info 7/15 |
| Beasley Antenna & Satellite | 6/19/2008 | phone | Randall Beasley | 731-642-4077 | beasleyads@beasleywireless.net | | | VM 7/14, sent info 7/15 |
| BEST APPLIANCE & ELECTRONICS INC | | | Jay | 718-482-7495 | admin@mobilefonz.com | | | Left message, sent info 7/15, NON-RESPONSIVE |

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Atnd Webnr | Telemkt | Status |
|---|---|---|---|---|---|---|---|---|
| BIG DOG STORE HOLDINGS LLC | | | | 208-232-5483 | brad@bigdogsatellite.com; kenny@bigdogsatellite.com; courtney@bigdogsatellite.com; annemarie@bigdogsatellite.com; bill@bigdogsatellite.com | | | VM 6/19, 6/24, NON-RESPONSIVE  sent info 7/17 |
| BOHNA DISHWORKS LLC DBA RPM DIRECT | | | Michelle | 817-938-8848 | mcall20@yahoo.com | | | VM 6/24, sent info 7/15 |
| BROADSTAR LLC | | | | 954-369-3034 | christana@broadstar.com | | | sent info 7/15 |
| C T I SATELLITE & SOUND INC | 6/20/2008 | phone | Dwayne | 608-846-5085 | CTISAT156@YAHOO.COM | | | Dwane is contact, VM 6/24, message 8/6 |
| C V PRODUCTIONS | 7/17/2008 | phone | Carlos Valdez | 714-245-9470 | carlos.valdez@dishnetwork-500.com | | | VM 6/20, sent paperwork 7/17 |
| C V PRODUCTIONS | 7/17/2008 | phone | Carlos Valdez | 714-245-9470 | carlos.valdez@dishnetwork-500.com | | | VM 6/20, sent paperwork 7/17 RT |
| C VISION NETWORK | | | | 631-580-2958 | | | | Private number, business closed |
| CAGUAS SATELLITE CORP | | | | 787-743-9393 | caguassatellite2@aol.com | | | No English |
| CAL CITY LAND INVESTMENT | | | | 818-765-4423 | willies04@bcglobal.net | | | message 7/15, sent info |
| CALEB T PEREZ DBA MESILLA VALLEY SATELLITES | | | | 505-524-3474 | mathieub03@msn.com; caltperez@msn.com | | | sent info 7/15 |
| CARLOS LIMON | | | | 336-838-4460 | latino947@hotmail.com | | | non-responsive |
| CECILIA ARGUETA DBA DON SATELLITE | | | | 323-346-0862 | donsatelline@yahoo.com | | | non-responsive |
| CHENGGUI TANG DBA WORLD SATELLITE TV | | | | 626-307-1888 | NULL | | | n/a x4 + v/m |
| CHOICE MARKETING CORP | | | | 509-464-3474 | choicemarketingcorp@gmail.com | | | n/a x4 + v/m |
| COAMO SATELLITE SERVICE | | | | 787-825-5769 | coamosatellite@yahoo.com | | | number didn't connect; sent email; non-responsive |
| COLUMBIA BASIN SATELLITE DBA WALLA WALLA SATELLITE DBA YAKIMA SATELLITE DBA SPOKANE SATELLITE DBA N | | | | 509-737-9196 | columbiabasin@hotmail.com | | | difficult time getting in touch w/ "correct" person; left 2 v/m w/ 2 separate parties and have attempted email contact |
| COMERCIALIZADO GENERAL EN PUERTO RICO INC | | | | 787-960-8855 | cogepur@gmail.com | | | language barrier; couldn't find english speaking contact; sent email |
| COMMUNICATIONS OF FORT SMITH DBA CELLULAR PAGER WA | | | | 877-305-3474 | virginia.kelly@cpwarehouse.com; bill.kibler@cpwarehouse.com; ben.thomas@cpwarehouse.com; ben.cowan@cpwarehouse.comctracy.wright@cpwarehouse.com | | | v/m x2+ email; non-responsive |
| COMPLETE HOME COMMUNICATIONS LLC | | | | 480-567-5572 | joeyn2176@cox.net | | | Spoke with Joey and sent paperwork |
| COSOT SATELLITE INC | | | | 787-809-0011 | cosotsatellite@hotmail.com | | | v/m w/ manager + email |

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Atnd Webnr. | Telemkt | Status |
|---|---|---|---|---|---|---|---|---|
| Creel's Satellite | 1/9/2009 | phone | Michael Creel | 903-235-4383 | creelsdishtv@hotmail.com | | | exchanged another email, mentioned team summit 5-6-09 GC |
| CRS DISTRIBUTORS INC | | | | 787-863-2211 | crdispr@yahoo.com | | | w/m w/ manager; not english + email |
| CRYSTAL CLEAR COMMUNICATIONS INC | | | | 515-440-2881 | joranez@yahoo.com; o_alfonso@yahoo.com; plaza_casandra@yahoo.com | | | spoke w/ receptionist; "not interested." left a message with "boss" |
| CRYSTAL CLEAR SATELLITE INC | | | | 626-282-1829 | phulong@bbcglobal.net | | | multiple vm and email GC |
| CRYSTALVIEW SYSTEMS INC | | | | 954-885-6302 | crystalview@bellsouth.net | | | multiple vm and email GC |
| CUSTOM CELLULAR INC | | | | 314-770-0000 | brian.kenow@customstl.com;rick.fessler@customstl.com;fessl1@netzero.com;mstfolle@netzero.com; randy.vaughan@customstl.com | | | non-responsive |
| DAYLE & SONS INC DBA FALCONS SATELLITE | | | | 303-727-8554 | falconsat@hotmail.com | | | "Dayle" was not available + email |
| DEARBORN SATELLITE & DISH | | | | 313-846-3296 | dbnsatellite@hotmail.com | | | non-responsive |
| DIAMOND ELECTRONICS | | | | 937-242-6319 | jgcoesv@bbcglobal.net | | | Redirected to 3 separate contacts: no progress made; sent email and left v/m |
| DIGITAL BRIDGE COMMUNICATIONS CORP | | | | 208-529-8895 | rsi@retonwireless.com | | | "No Calling" |
| DIGITAL DISH INC | | | | 330-674-7993 | digitaldishra@safe7.com; DAWN@SAFE7.COM | | | n/a + v/mx2; non-responsive |
| DIGITAL ERA LLC | | | | 561-333-8083 | familia.feliz@adelphia.net | | | n/a x3; non-responsive |
| DIGITAL MILLENNIUM SERVICES INC | | | | 301-528-9111 | gbernal@dmsdish.com | | | v/m's + emails |
| DIGITALK COMM CORP | | | | 787-870-1430 | tonygarcia@prtc.net | | | wrong number |
| DIMARS SATELLITE LLC | | | | 770-682-8031 | dimarssatellite@yahoo.com | | | v/m + emails |
| DIRECT BROADCAST LTD | | | | 877-846-0882 | support@DIRECTDSS.COM;glenn@directdss.com | | | Brief phone call and f/u email |
| Direct Promotions | | | | 949-279-3456 or 949-777-3807 | steve@infiltrationpictures.com | | | expressed interest in service and desire to move forward in Nov - voicemails - no contact in a month - GC |
| DISCOUNT DIGITAL | | | Steve Rad | 406-721-3662 | chornstein@eaglesatty.com | | | message + email |
| DISH CARIBBEAN DISTRIBUTORS INC | | | | 787-783-1491 | erickjmuro@dish-caribbean.com | | | voicemail + email |
| Dish Communications | 10/20/2008 | phone | Elizabeth | 616-532-4143 | | | | she called in left me message- we spoke - sent her to web GC 10-20-08 |
| Dish Direct Inc | | | Dan Ratcliff | 972-390-8800 ext 200 or 972-679-6426 | dratcliff@dishdirect.com; mwilson@dishdirect.com | | | Good conversation; sent paperework; left v/m |

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Atnd Webnr | Telemkt | Status |
|---|---|---|---|---|---|---|---|---|
| **DISH DIRECT LLC** | | | | | mikemelton@qwest.net; distdirect1@qwest.net; ndavisdish@qwest.net | | | email - could not get past recording to an operator; non-responsive |
| DISH IT OUT | | | | 480-966-1333 | kirkbrown@kewbinc.com | | | # = Disconnected; Sent email |
| DISH ONE SATELLITE INC | | | | 209-545-6800 | nick@dishone.netdns@dishone.netjana@dishone.netdavidschick@dishone.net | | | Message w/ receptionist + emails |
| DISH PUERTO RICO CORP | | | | 877-207-3474 | DMANGUAL@DISHPUERTORICO.COM | | | voicemail's + email |
| **Dish Satellite TV Inc** | | | Ted Mathia | 787-793-8555 | ted@dishsat.tv | | | Good conversation + emails |
| Dish Zero | | | Mark D'Ambros | 330-298-9280 ext 228 or 330-807-5994 (cell) | mark@eufora.com | | | voicemail + email |
| EBEN EZER NETWORKS INC | 8/13/2008 | phone | Ebers | 480-222-8802 | ebenezer3@msn.com | | | II, sent info 8/13 RT |
| Elite Contracting | 7/16/2008 | phone | Kevin Hammond | 703-371-1130 | eemg@hughes.net | | | VM 6/30, sent info 7/16 |
| | | | | 580-931-0416 | | | | III, left message w/receptionist 8/13, said he does not make calls on 9/3, requested I call Lonnie Roche 800-825-1100 RT |
| F M SATELLITES | | | Francisco | 773-254-7910 | francisco.romero@comcast.net | | | |
| Florida Cellular | 6.20.08 | phone | Oliver | 305-867-2400 | | | Yes | got info off web - should close soon |
| FONECENTRAL INC | | | Janice | 626-280-1888 | info@fonecentral.biz | | | II, VM 8/13, sent info 8/14 RT |
| FREEDOM WIRELESS INC DBA FREEDOM SATELLITE | 8/13/2008 | phone | Renee | 406-655-1788 | renee@usadlg.com; todd1@usadlg.com; travis@usadlg.com | | | II, spoke to Renee, sent info 8/13 RT |
| Go Dish | | | Patrick Gaides | 713-983-2200 ext 275 or 281-808-6255 (cell) | pgaides.smgr@godish.com | | | II, call week of 8/18, VM  9/3 RT |
| GRANDE COMMUNICATIONS NETWORKS INC | | | | 512-878-4000 | diane.wigington@corp.grandecom.com | | | I, supply apartment buildings with TV through Dish, no calling or marketing RT |
| HDTV | 11/7/2008 | phone | Mark Martindale | 303-886-0814 | hdtvsatellite@yahoo.com | | | Kalani told him no call me - spoke about interactive and data 11-10-08 GC |
| HI TECH IT SOLUTIONS INC DBA HI TECH SATELLITE | 9/3/2008 | phone | Mr. Haque | 718-647-6028 | hitechhy@yahoo.com | | | II, spoke and sent  info 9/3 RT |
| HIGH POWER TECHNICAL SERVICES INC | | | Holly Wilhelm | 5022540768 502-254-0768 ext 315 | nickschweitzer@hpts.tv,ra@hpts.tvholly.bennett@hpts.tv | | | III, VM 8/14, message w/receptionist  9/3 RT |
| HOTWIRE COMMUNICATIONS LTD | | | Bill Stein | 888-355-5648 | bstein@hotwiremail.com | | | I, PCO, sent info 8/14 RT |
| IDT | | | Esti Witty | 973-438-4404 | esti.witty@exchange.idt.net | | | VM 6/30, sent info 7/16 |
| IMPACTO LATINO INC | | | Vivian Contrares | 770-875-7766 | DISH@IMPACTOLATINO.NET | | | II, not selling Dish RT |
| Infiniti DBA Dish Direct America | | | Armen Alder | 800-228-7314 or 626-676-7260 (cell) | dishdirect2@aol.com | | | III, sent info 8/12 RT |
| Intertech Digital Entertainment; TS | 11/26/2008 | Phone | Donna | 716.213.1757 | | | | TS - Still speaking with Donna; slowed down since travel |

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Atnd Webnr | Telemkt | Status |
|---|---|---|---|---|---|---|---|---|
| InTouch Communications | 10/29/2008 | phone | Brenda Hughes | 512-389-0044 | Brenda.Hughes@InTouchCommunicationsLLC.com | | | discussed paperwork and data services - exchanged another email 10-30-08 - GC no response in November |
| JACOB ROSE DBA NORTH STAR SATELLITE | 9/3/2008 | phone | Jacob Rose | 509-736-0874 | northstarnotes@yahoo.com | | | II, VM 8/15, sent info 9/3 RT |
| JOE KELLEY DBA KEL TRONICS | 8/15/2008 | phone | Joe Kelley | 936-637-2022 | joe.kelley@eastexas.net | | | II, sent info 8/15 RT |
| JONATHAN THORNTON DBA COMMERCIAL SATELLITE COMMUNICATIONS | 7/24/2008 | phone | Jonathon Thornton | 787-804-0235 | commsatcomm@yahoo.com | | | IIIII, spoke with Gabriel, sent info 7/24, re-sent info 8/6 RT |
| JORGE CHAVEZ DBA M AND J SATELLITE | | | Jorge or Maria | 909-868-6825 | mjsatellite@yahoo.com | | | IIIIII, sent info 7/29, message 7/30, Non Responsive |
| JULIO ENRIGUE SOLANO DBA PAGE WORLD | 7/24/2008 | phone | | 714-719-3135 | dishjulio@bkglobal.net | | | II, left message 7/21, spoke 7/24 did not speak English |
| KEEP WIRELESS COMMUNICATIONS | | | Tony Espinosa | 775-851-7778 | keepwireless@msn.com | | | IIIIII, left message 7/24, sent info 7/28, Non Responsive |
| KMN INVESTMENTS CORP | | | | 800-933-5220 | westcoastsc@yahoo.com | | | IIIIII, VM 7/24, info 7/29, Non Responsive |
| LEO GRAVES DBA GRAVES SATELLITE | 7/24/2008 | phone | Leo Graves | 918-251-6002 | gravessat@hotmail.com; | | | IIII, message 7/22, sent info 7/24 |
| LEONEL GONZALEZ DBA AZTECA SATELLITE | | | | 209-495-7976 | modestosat@univision.com | | | IIIIII, VM/info, 7/29, Non Responsive |
| Liberty Bell Telecom LLC | | | Jay Weber | 720-482-0962 ext 283 | jweber@libertybelltelecom.com | | | IIIII, VM 7/24, info 7/29 |
| Lonewolf Satellite | 2/5/2009 | phone | John Krogan | 260-422-3440 | | | | John called in - potentially starting a small phone room for Dish - GC - 2-5-09 |
| LOPEZ JOAQUIN GUZMAN | | | Sergio | 787-819-1015 | inxecsat@prtc.net | | | II, Puerto Rico, sent info 7/25, boss doesn't speak English |
| LUIS ZEVALLOS DBA ASTRO COMMUNICATIONS | 24-Jul | phone | Monica Zevallos | 713-972-1961 | astrocomm04@yahoo.com | | | IIIIII, VM 7/22, sent info 7/29,Non Responsive |
| M & N SATELLITE SYSTEMS INC DBA ON COM COMMUNICATIONS | | | | 704-309-8293 | NAYLA_BITAR@YAHOO.COM | | | II, does not speak English, hung up |
| MARCUS CORPORATION DBA ANYTHING WIRELESS | | | Eli Hinson | 281-516-3474 | eli.hinson@wwatoz.com; danielx.linares@wwatoz.com; | | | IIIIII, message 7/22, VM/info 7/29, Non Responsive |
| MARRIK DISH CO LLC | 7/25/2008 | phone | Steve | 419-475-4110 | mralston@ndunity.com | | | IIII, VM 7/22, spoke and sent info 7/25 |
| MICHAEL CREEL DBA CREELS THE DISH TV PLACE & FENCE CO | | | | 877-214-7444 | Creelsdishtv@hotmail.com | | | message with receptionist + email |
| MicroCOM | | | Chris Willis | 907-474-3474 ext 0011 or 907-687-3491 (cell) | Amber@sateo.com, jeff@sateo.com, chuck@sateo.com, chris@sateo.com | | | "Not Calling anyone Yet" sent the email; very appreciative for call. No other follow-up necessary |

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Atnd Webnr | Telemkt | Status |
|---|---|---|---|---|---|---|---|---|
| MID AMERICA WIRELESS | | | | 573-659-8700 | cluebbert@midamericawireless.com | | | Transferred to the Director of Sales, Robert, left a v/m; no email |
| MIKE QUINTANA DBA QUINCO | | | | 505-747-2828 | michael.quintana@quintarsat.com | | | Spoke with Mike; They only call EBRs; sent info. Very nice and thankful |
| MS BESTVISION SATELLITE CORP | | | | 787-909-7605 | ms-bestvision@hotmail.com | | | no answer; voicemail + email |
| MUNDO LATINO EXPRESS INC | | | | 610-776-4000 | | | | no email provided; no english either |
| MUZAK-CORPORATE | | | | 800-331-3340 | paul_bechtold@muzak.com | | | quick conversion; sent information |
| Nan Marketing | 1/8/2009 | phone | | 888-391-3474 | nanmktg@yahoo.com | | | possible interest in telefmarketing - was told to tlak to us - gave info 1-8-09 GC |
| NATIONAL SATELLITE STORE INC | | | Tori Walton | 318-397-2900 | freecv@amr.rr.com; 4freecv@amr.rr.com | | | "not sure if we need this"; very vague on their marketing plans; sent information |
| Next Satellite | 4.9.09 | email | Diego Mendigana | 201-440-2310 | nextsatellite@gmail.com | | Yes | emailed then spoke today - DNCI 50K $125 - sent paperwork - GC 4-9-09 |
| NEZELL CO | | | | 773-776-4233 | omarneta@bcglobal.net | | | Very low volume; QC for Dish Opp. |
| NORTHSTAR SATELLITES INC | | | | 715-833-8780 | sales@northstar-satellites.com; kraig@northstar-satellite.com | | | Not available; Voicemail x2 |
| ON SITE SATELLITE EAST LLC | | | | 480-456-4800 | sales@onsitesat.com;m.beaudion@onsitesat.com;m.addo@onsitesat.com | | | Not available; Voicemail x2 |
| Orbit Satellite | | | Buddy Polk | 713-644-3474 or 713-539-2425 (cell) | buddyp@transtate.com | | | spoke to the receptionist; very friendly - hand written note + email |
| Pacific Dish - TS | 11/18/2008 | web | Junior | 919-462-8307 | | | | No progress since Early November; TS |
| PG LATIN SATELLITE INC | | | | | HFPINO@YAHOO.COM | | | very difficult to understand |
| PHOENIX SATELLITE TV U S INC | | | | 626-388-1188 | victor1@phoenixtv-us.com; jingpin@phoenixtv-us.com | | | Spoke briefly regarding the marketing attempts; calling back inbound |
| PLANET VISION INC | | | | 787-733-3303 | carlos@planetvisionsatellite.com | | | No English on recorded message |
| POLSAT INC | 8/7/2008 | phone | Jerry Gimba | 718-609-1119 | | | | Spoke w/receptionist, Jerys Gimba is contact RT |
| POWER COMMUNICATIONS INC | 8/7/2008 | phone | | 815-708-7506 | matthewpowers@att.net | | | Number not in service |
| PRAKASH CHAND DBA RELAX TV | 8/7/2008 | phone | | 916-362-1668 | igtosatellite@yahoo.com | | | Disconnected no longer in service |
| Precision Satellite | 6.9.08 | phone | Edward Kim | 949-892-5368 | edward.pstv@gmail.com | | | starting call center to sell DISH - sent info on program. Said he would attend webinar. |
| PRIME HOME ENTERTAINMENT | 8/7/2008 | phone | Dale | 800-932-6975 | dixie@primehome.net; installs@primehome.net | | | Inbound, left VM for Dale (GM), spoke, sent info to Jeff Camp |
| PT SATELLITES INC | 8/7/2008 | phone | Robert Torres | 323-589-6890 | ptsatellitesinc@sbcglobal.net | | | Robert Torres |
| RADAR SAT INC | | | | 773-527-7628 | RADARSAT@USA.NET | | | RT |
| RAFAEL OLIVER & TIMOTHY LAWREN | 8/7/2008 | phone | | 336-725-6651 | rafaeljoseoliver@gmail.com | | | VM 8/7 RT |

| Company Name | Lead Date | Lead Type | Contact Name | Phone # | Email | Atnd Webnr | Telemkt | Status |
|---|---|---|---|---|---|---|---|---|
| RAFAEL RAMIREZ DBA SATELLITES EXPRESS INSTALLATIONS | | | | 800-471-8640 | satexpresinst@yahoo.com | | | RT |
| RANTENAS LLC | 9/3/2008 | phone | Umberto | 317-388-9800 | rantenas@rantenas.com | | | II, sent info 9/3 RT |
| Remote Satellite Inc | 4.21.08 | web | Brian Gerow - Jill | 989-799-8031 | rs@remotesatellite.tv | | | low vol - call in 5 cities |
| RUFO ALMAZO | 8/18/2008 | phone | Rufo Almazo | 910-827-9961 | ralmazo@nc.rr.com | | | I, sent info 8/18 RT |
| Satellite Enterprise, Inc. | 7/10/2008 | Phone | Angelica | 773.654.1352 | dishlatino67@yahoo.com | No | Yes | Sent info and paperwork RT |
| SATELLITE REVOLUTION LLC | | | Delane | 615-287-3735 | dishretailer@satrev.com | | | I, speaking with Guy RT |
| SATELLITES TODAY INC | 8/18/2008 | phone | Adam | 724-924-2388 | dishes@zoominternet.net; adamdishes@zoominternet.net | | | I, sent info 8/18 RT |
| Smart Connect | | phone | Sherman Feng | 510-783-1283 | sfeng@smartconnectinc.com | | | have signed agreement, brought to summit. Waiting on order form 5-11-09 GC |
| SUN COMM TECHNOLOGIES INC | 7.17.07 | | spoke with Bill - ruben in past | 505-424-7223 | suncomm@knockoutcable.com; jim@knockoutcable.com; ruben@knockoutcable.com mp@knockoutcable.com | | | knows they need it - sent info. Talk wed, called wed - vm. |
| Television Viewers Association LLC | 10/27/2008 | | Michael Hughes | 808-262-4144 | michaelhughes@yahoo.com | | | Called and left messages since lead date. No response thus far. |
| TODAYS TELEVISION | | | | 787-264-2923 | TODAYSTV@COQUI.NET | | No | Spanish - couldn't communicate |
| TV SUR SATELLITE SERVICE INC | | | | 877-887-8722 | | | | Spanish - couldn't communicate |
| Ultimate Digital Service - GC | 10.9.08 | phone | Greg Altemus | 949-623-5130 | galtemus66@gmail.com | | | waiting for OE approval - has paperwork - GC |
| VALLEY SATELLITE SERVICES | | | | 661-873-9538 | valleysatelliteservices@hotmail.com | | | No English - no chance at sign up |
| VEGA VIVECA VELAZQUEZ | | | | 787-290-3474 | mdigital@prtc.net | | | No english - went through 3 people |
| VIA SATELLITE INC | | | | 866-484-272-8206 | vicki.bohen@viasatinc.com | | | number not working in any combination |
| VisionQuest - GC | 6.20.08 | phone | Chad Jenkins Tiffany Palmer (P) Mgr) Sean Conrad | 405-879-0433 | cjenkins@vqnu.net; tpalmer@vqm.net | Yes | | spoke with chad and shawn. They will get moving soon. Havent began campaign yet but will sign up when they do 11-08, still holding 1-6-09 GC |

## Cancelled/Termed

| Company Name | OE# | Contact Name | Phone # | Email | Atnd Wbnr | Telem kt | Status | Close Date | Products Sold | Monthly Volume | Monthly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Yes | Closed, then cancelled 7/22/09 because they will not be calling for approx 3 months - Emil | 5/20/2009 | DNCI | 50k | $125 |
| | | | | | | Yes | Per Reji: "Remove them...I am very aware of their situation - they sell under the name of All Sat, but are owned by DISH now" | | | | |
| | | | | | | Yes | Closed, Per Tim on 3/11/09 - Ceased telemarketing in January, please cancel. | 4/16/2008 | DNCI+PF | 50K | $150 |
| | | | | | no | yes | CLOSED. Per Reji on 1/3: They should not have access to our lists. | 9/28/2008 | DNCI | 50K | $125 |
| | | | | | | Yes | Closed, Then Cancelled 3/27 and per Reji - 3/30, they have been terminated | 10/31/2008 | DNCI | 250K | $225 |
| | | | | | | No | CLOSED Then per Brian on 3/10/09 - No longer performing outbound, please cancel service. | 10/17/2008 | DNCI | 50K | $125 |
| | | | | | | | Closed - Cancelled 5/19/08 "Tammy left a voicemail around 5/19 asking to cancel the account. Per Rick, it is OK to cancel with the voicemail request. Jo Clark (from PNOW's accounting department)" | 9/11/2007 | DNCI + PF | 2.25 million | $1,395 |
| | | | | | | | Closed, then failed to pay three months in a row. Deactivated on 1/6/09 | 6/25/2008 | DNCI | 50K | $125 |
| | | | | | Yes | Yes | no longer calling for DISH | | | | |

REDACTED PII

| Company Name | OE# | Contact Name | Phone # | Email | Atnd Wbnr | Telem kt | Status | Close Date | Products Sold | Monthly Volume | Monthly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | REDACTED PII | | | | | Terrance the company with DBA Direct Dish no longer exists. Signed up under the company with DBA Enjoy Better TV | | | | |
| | | | | | | Yes | Closed Then deactivated for non payment and never reinstated | 7/31/2008 | DNCI | 50K | $125 |
| | | | | | No | Yes | Per Reji on 12/15: Dish Factory Inc has been terminated. They should not have access to our lists or "preferred" pricing. Name change 9/18 | 5/27/2005 | DNCI-PF | 50k | $175 |
| | | | | | | | Closed - Then Cancelled 6/2/08: "We'll no longer be utilizing Possible Now's services any longer. We've canned the dish project... Mickey Gross" | 4/13/2007 | DNCI + PF | 1 million | $825 |
| | | | | | Yes | Yes | Per Reji on 10/10/08: No longer deals Dish | 6/25/2008 | DNCI | 250K | $225 |
| | | | | | | Yes | Closed - Then per Bently on 03/02/09: No longer affiliated with DISH nor in need of our services | 8/1/2008 | DNCI | 50k | $125 |
| | | | | | | No | RE-Returning Customer, then we closed again due to non payment - very overdue in tech and data billing | 6/21/2007 | DNCI | 50K | $125 |
| | | | | | | Yes | Closed - Then per Reji on 02/12/09: Chose to terminate relations with DISH | 10/21/2008 | DNCI + PF + Notif + EBR | 1M | $1,212 |
| | | | | | | | I. No longer deals Dish | | | | |

| Company Name | OE# | Contact Name | Phone # | Email | Atnd Wbnr | Telem kt | Status | Close Date | Products Sold | Monthly Volume | Monthly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Yes | Closed, then cancelled 7/27/09 because they are not using the service at all. | 1/21/2009 | DNCI | 50K | $125 |
| | | | | | | | Client requested to cancel 09/10/08 | 7/29/2008 | DNCI + Notif | 50K | $225 |
| | | REDACTED PII | | | | Yes | CLOSED Per Reji on 08/31/09 - remove all access to our data | 10/3/2008 | DNCI | 50K | $125 |
| | | | | | | Yes | Closed. Then Matt Giles cancelled 3/5/09 - saying they don't call for DISH | 10/15/2008 | DNCI | 250K | $225 |
| | | | | | | Yes | No longer calling for DISH. Still utilizing PNOW services for ADT calls. | 11/20/2008 | DNCI + ADT Audit | 50K | $375 |
| | | | | | | Yes | Closed. Then stated "Out of business" 01/26/09 | 6/18/2008 | DNCI | 50 K | $125 |
| | | | | | No | Yes | Closed Then per Reji 09/01 - they are not a retailer but an affiliate and should not have access to any of our data | 7/1/2009 | DNCI + WSvcs | 250K | $360 |
| | | | | | | No | Closed | 10/17/2008 | DNCI | 50K | $125 |
| | | | | | Yes | Yes | Closed. Then per Reji on 02/17/09; no longer doing business with DISH | 6/6/2008 | DNCI | 500K | $450 |
| | | | | | | Yes | Closed, upgraded 4/16/09. Then per Travis 6/4 - no longer doing business with DISH but retaining account for other business lines. | 3/3/2009 | DNCI + PF | 1M | $600 |

| Company Name | OE# | Contact Name | Phone # | Email | Atnd Wbnr | Telem kt | Status | Close Date | Products Sold | Monthly Volume | Monthly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | No | Yes | Prior Customer. Cancelled 11/11/08 | 6/23/2007 | DNCI + PF | 50K | $150 |
| | | | | | | Yes | Closed - But never paid. Deactivated for non-response and failure to pay on 12/1/2008 | 6/24/2008 | DNCI + PF | 250K | $250 |
| | | REDACTED PII | | | No | Yes | Closed. Upgraded 5/21/09 Per reji 8/31/09 - Remove all access to our data | 6/28/2008 | DNCI | 1M | $600 |
| | | | | | | Yes | CLOSED then cancelled 4/17 per Tony: "Closed my Dish Retailer" | 3/5/2009 | DNCI | 50K | $125 |
| | | | | | | Yes | Closed. Then requested to cancel 5/11/09 | 2/12/2009 | DNCI | 50K | $125 |
| | | | | | | Yes | CLOSED. Then requested to cancel 5/7/09 | 2/24/2009 | DNCI + PF | 250K | $250 |
| | | | | | | Yes | Closed: Then Per Reji 8/4/08: No longer doing business for Dish, remove shared access. | 8/2/2007 | DNCI + PF | 1 million | $500 |
| | | | | | | No | Closed - Then per Reji on 02/12/09: terminated by DISH | 11/12/2008 | DNCI | 50K | $125 |
| | | | | | No | Yes | Closed then cancelled 7/7 because they had not yet obtained OE number | 12/5/2008 | DNCI + PF | 50K | $150 |