**E-FILED**
Wednesday, 04 June, 2014  05:19:22 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO,<br><br>      Plaintiffs,<br><br>      v.<br><br>DISH NETWORK L.L.C.,<br><br>      Defendant. | Case No.: 3:09-cv-03073-SEM-BGC |

**DEFENDANT DISH NETWORK L.L.C.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO PRECLUDE
THE EXPERT TESTIMONY OF DR. YOELI**

Joseph A. Boyle
Kelley Drye & Warren LLP
200 Kimball Drive
Parsippany, New Jersey
Phone (973) 503-5900

Henry T. Kelly
Kelley Drye & Warren LLP
333 W. Wacker Dr.
Chicago, Illinois 60606
Phone (312) 857-2350

*Attorneys for Defendant Dish Network L.L.C.*

Defendant DISH Network L.L.C. ("DISH") respectfully submits this Memorandum of Law in support of its Motion to Strike the expert testimony of Dr. Erez Yoeli, comparing DISH's call records to the raw hits produced by Plaintiffs' vendor, InterImage, because such testimony lacks a reliable foundation, is based on fatally flawed factual assumptions, is irrelevant, and will not assist the trier of fact (the "Motion"). DISH also relies on the Declaration of Lauri Mazzuchetti ("Mazzuchetti Decl.") and its accompanying exhibits.

## INTRODUCTION

Plaintiffs submitted multiple expert reports from Dr. Erez Yoeli purporting to set forth millions of claimed violations of the Telemarketing Sales Rule ("TSR"), the Telephone Consumer Protection Act ("TCPA") and other state laws, by DISH and certain independent, third party retailers. Dr. Yoeli's analysis is merely the comparison of certain call records (here supplied by DISH, independent third party retailers, or a telecommunications provider) with the numbers that were registered on the NDNCR. This analysis, however, rests upon three assumptions made by Dr. Yoeli that are demonstrably wrong – and not seriously disputed.

- Dr. Yoeli makes the assumption that every number on the NDNCR is properly on the NDNCR.

- Dr. Yoeli makes the assumption that each call to a number on the NDNCR was a telemarketing call.

- Dr. Yoeli makes the assumption that each call was placed to a customer residing in the state associated with the area code of the number called.

These assumptions are incorrect because: (i) the NDNCR is replete with numbers that should not be on the NDNCR, and cannot form the basis for a violation of the laws at issue, including numbers that no longer belong to the person who registered them on the NDNCR, business and government numbers; (ii) the calls made to these numbers were not all made for telemarketing purposes, as this Court previously found; and (iii) the FCC and courts have

repeatedly made clear that area codes and telephone numbers cannot be relied upon to prove that a call recipient resided in a particular state at the time of a call.

Moreover, even if these assumptions were appropriate – which they are not – Dr. Yoeli's cursory attempt to address the recognized problems with the NDNCR through sampling is not only unreliable, but does nothing to address the underlying issues.

Because both the foundation of Dr. Yoeli's opinion, and the opinion itself, are unreliable and divorced from reality, the reports and testimony of Dr. Yoeli are unreliable, irrelevant, and will not assist the trier of fact.  Unreliable testimony is inadmissible and is the very testimony that a district court, acting in its gatekeeping role, is charged with excluding.  Dr. Yoeli's reliance on inaccurate and incomplete data, baseless assumptions, and flawed methods render his testimony not simply shaky, but unreliable, and his opinion must be excluded from trial and for use during any other part of this proceeding under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  DISH would be severely prejudiced if this Court permitted the fact finder to hear and consider evidence of millions of alleged violations based on unreliable opinions.

## STATEMENT OF FACTS

## I.    BACKGROUND RELATED TO CALL RECORD ANALYSIS

### A.    DISH's 2007-2010 Call Records

In May and June 2010, DISH produced to Plaintiffs in discovery hundreds of millions of call records related to calls made by DISH and its vended call centers from 2007 through 2010.  (d/e 196-1, Ex. A, Yoeli Initial Report, ¶9.)  This data included all of DISH's outbound call records, which included both telemarketing and non-telemarketing calls.  (*Id.*)  Both parties understood that significant analysis was required because the call records included non-telemarketing calls, calls to existing customers, and calls in response to an inquiry (which

are not violations under some or all of the telemarketing laws at issue).  (d/e 165, pp. 10, 13.)  On May 31, 2011, at Plaintiffs' request, DISH provided an analysis of approximately 385,000,000 total records for the 2007-2010 time period, which included an initial identification sorted by telemarketing campaign IDs, and identified the last payment date and activation date for each record for which such information was available.  (d/e 196-6, Ex. F, May 31, 2011 letter.)

      **B.**    <u>**DISH's 2003-2007 Call Records**</u>

          While the parties engaged in a lengthy, collaborative process with respect to DISH's 2007-2010 call records, no such process was engaged in with respect to DISH's 2003-2007 call records.  (d/e 165, pp. 9-10.)  DISH's 2003-2007 call records were produced prior to the filing of this lawsuit in response to a 2005 Civil Investigative Demand ("CID") served by the FTC seeking records "sufficient to show" outbound telemarketing calls made by DISH.  (*Id.*, p. 9).  The call records produced in the CID phase contained neither information identifying telemarketing vs. non-telemarketing calls, nor information regarding whether DISH had an existing business relationship with call recipients.  (d/e 165, p. 13.)  Plaintiffs thus were aware of the limitations of the 2003-2007 call records before filing this action, and this Court explicitly found that the 2003-2007 data set includes non-telemarketing records.

      **C.**    <u>**Call Records Pertaining To Independent Third Party Retailers**</u>

          As for the call records produced by independent third party retailers, Plaintiffs cannot prove which of the calls within those records were telemarketing.  Moreover, even if Plaintiffs could discern which of these call records are for a telemarketing purpose, Plaintiffs cannot prove that those telemarketing calls were made for a DISH product or service, or for some other company's product or service.  In fact, the FTC's own investigator admitted that some of the third party retailer calls were made to sell something other than a DISH product. (d/e 387-18, DX-162, Mastrocinque Dep. 158:6-159:6.)  In light of the foregoing, it is clear that

3

none of the records produced by any of the Independent Retailers reflects telemarketing records for DISH products and services exclusively.  (*Id.*)

## II.    THE YOELI EXPERT REPORTS AT ISSUE

Plaintiffs submitted four (4) different expert reports by Dr. Yoeli, which purport to describe and set forth the results of the call record analysis that he performed.  On July 27, 2012, Plaintiffs disclosed their Initial Expert Report of Dr. Yoeli pursuant to Rule 26(a)(2) and the Court's May, 23, 2012 Scheduling Order.  (d/e 196-1, Ex. A, Yoeli Initial Report.)  Dr. Yoeli's Initial Report presented his conclusions concerning the number of alleged violative telemarketing calls placed by DISH between 2007 and 2010, which totaled 7,041,333.  (*Id.*, ¶19.)

Plaintiffs provided DISH with Dr. Yoeli's Rebuttal Report on October 16, 2012. (d/e 196-3, Ex. C, Yoeli Rebuttal Report.)  Based on what Dr. Yoeli calls a "reevaluation" of his initial expert report, Dr. Yoeli's more than tripled the number of alleged violations, with a total increase of 15,849,748 calls.  (*Id.*)  The Rebuttal Report included, for the first time, call record analysis pertaining to third party retailers Defender, Tenaya, DISH TV Now and JSR, as well as call record analysis related to DISH's 2003-2007 call records.  (*Id.*, p. 9.)  The Rebuttal Report also broke out call record analysis by the states of California, Illinois, North Carolina and Ohio based solely upon matching call records to area codes.  (*Id.*, p. 10.)  The Rebuttal Report also included sampling analysis of whether call records pertained to calls allegedly made to residential landlines, versus calls made to business or wireless numbers.  (*Id.*, p. 8.)

On December 14, 2012, after his expert deposition concluded, Dr. Yoeli submitted revised versions of both his Initial and Rebuttal Expert Reports.  (d/e 206-6, 206-7.) On October 14, 2013, Plaintiffs served on DISH a Supplemental Expert Report of Dr. Yoeli, expressing opinions on new matters and covering the same opinions rendered in the previous iterations of his report (while also referencing the prior expert reports dated July 19, 2012,

October 15, 2012, and December 14, 2012).  (Mazzuchetti Decl., Ex. A.)

## III. THE NDNCR IS NOT AN ACCURATE OR RELIABLE FOUNDATION FOR DR. YOELI'S EXPERT OPINION OF CALL VIOLATIONS

### A. Since its Inception, the FTC Was Aware The NDNCR Data Would be Unreliable For Enforcement Purposes

The accuracy of the NDNCR is a critical issue in this case and the foundation of Dr. Yoeli's expert testimony.  During the FTC's initial planning for the NDNCR, stakeholders raised issues concerning the FTC's ability to accurately maintain the NDNCR.  (d/e 387-19, DX-175, TSR, 68 Fed. Reg. 4580 (Jan. 29, 2003) (to be codified at 16 C.F.R. pt. 310).)  Among those concerns was using the NDNCR itself to provide proof of a Do Not Call-related violation.  The following exchange took place at an FTC workshop held in 2002 to discuss the implementation of the NDNCR:

> <u>Rex Burlison, on behalf of the National Association of Attorneys General (in relevant part)</u>:  There's going to be inaccuracies.  I don't care how many people that you put on preserving the accuracy of the list, there's going to be problems with the list, and you have to accept that, especially when you go to a national list with millions of numbers, you are going to have a list that is imperfect, and it just doesn't matter until it comes to when someone is trying to enforce a violation.  That's when it matters. Is that person or is that number that you're enforcing against accurately on the list and was it accurately given to the industry to protect the consumer?

(d/e 387-19, DX-176 at 149-50 (FTC Transcript, FTC Rulemaking Workshop, Session 1 (June 5, 2002)http://web.archive.org/web/20130501140905/http://www.ftc.gov/bcp/rulemaking/tsr/02060 5xscript.pdf.).)

As anticipated, accuracy problems with the NDNCR immediately surfaced.  Linda Miller and Robert Rathburn, two AT&T employees that supported AT&T's operation of the NDNCR, notified the FTC in 2003 that, several months after the launch of the NDNCR,

telemarketers were unknowingly downloading incomplete NDNCR data due to a defect in the software code used to support the NDNCR download process:

> Email from Linda Miller (in relevant part):
> A few months after launch in 2003 we detected a defect in the code that created a gap in downloaded information for the telemarketers.
>
> Response from Robert Rathburn (in relevant part):
> Our error shorted the telemarketer ("TM").  Even though we corrected the error we did not make the TM whole.  I believe we have that obligation.  We should have done that in 2003.  It is now 2005.  What circumstances would the TM not want/need to do a full download?  Is the full download on the first time and after that the TM only does "partial downloads" (Updates)?

(d/e 152-1, Boyle 6/15 Decl. ¶6, Ex. E.)

**B.     Those Responsible for the Accuracy of the NDNCR Have Admitted That It Contains Inaccurate Information**

It is undisputed that the FTC's staff "do not monitor and cannot monitor whether or not a precise telephone number was disconnected and reassigned to another telephone number."  (d/e 387-18, DX-163, Torok Dep. 133:5-8.)  Rather, the FTC utilizes contractors for NDNCR maintenance.  In April 2004, the FTC notified AT&T, its contractor at the time, that inactive registrations were not properly removed from the NDNCR.  (d/e 152-1, Boyle 6/15 Decl., ¶3, Ex. B.)  Moreover, AT&T allowed any number – whether valid or invalid, landline, wireless, home, business, or government – to be added to the NDNCR without any validation requirements.  (d/e 387-18, DX-165, Lavenda Dep. 47:23-48:2-10.)   AT&T charged its subcontractor, Targus, with the hygiene NDNCR data, but had only a "very high level knowledge" of how Targus undertook that process.  (*Id.,* 76:17-20.)

Targus's NDNCR hygiene efforts on the NDNCR were initially limited to the analysis of residential landline telephone numbers.  (d/e 387-17, DX-148, Shaffer Dep. 51:10-53:10; d/e 387-20, DX-178, Ex. 4, ¶1.1.)  Targus was not tasked with identifying and removing

government or business numbers from the NDNCR, despite that 5-10% of numbers at that time on the NDNCR were business numbers – a figure that grew during Targus's work on the NDNCR since they were never purged, and because the FTC took no steps to prevent business or government numbers from being placed on the NDNCR.  (d/e 387-17, DX-148, Shaffer Dep. 297:13-17; 298:2-300:21.)  AT&T and Targus took the position that no harm would result from allowing inaccurate or invalid phone numbers to remain on the NDNCR.  (d/e 387-18, DX-165, Lavenda Dep. 193:10-20.)

In 2007, Lockheed Martin replaced AT&T as the FTC's NDNCR contractor.  (d/e 387-17, DX-145, Thirukkonda Dep. 17:18-22.)  Lockheed Martin is paid in part based upon the volume of numbers on the NDNCR regardless of whether those numbers are properly listed telephone numbers subject to enforcement under telemarketing laws, or if they are improperly listed numbers outside the scope of applicable telemarketing laws.  (*Id.*, 287:7-292:20; d/e 387-20, DX-180, LM-10.)  Lockheed Martin's contract with the FTC required it to achieve a 95% accuracy rate in maintaining the NDNCR registration and download functions.  (d/e 387-17, DX-145, Thirukkonda Dep. 103:18-106:2; 117:19-119:22; d/e 387-17, DX-180, LM-10.)  The FTC levied a penalty against Lockheed Martin for not meeting the 95% accuracy rate for November 2008, when its accuracy rate was 43.9% (d/e 387-17, DX-145, Thirukkonda Dep. 106:6-107:23; d/e 387-20, DX-180, LM-10 at 2.)  From the period October 1, 2007 through June of 2012, Lockheed Martin identified problems in the operation of the NDNCR database related to (i) "removing numbers from the registry due to phone number disconnects or reassignments;" (ii) "consumer registrations not getting loaded in to the database in a timely manner;" and (iii) problems "related to telemarketer downloads."  (d/e 387-17, DX-145, Thirukkonda Dep. 33:15-34:23.)

7

PossibleNOW was hired as Lockheed Martin's subcontractor.  (d/e 387-18, DX-167, Stauffer 4/26/12 Dep. 59:12-24.)  PossibleNOW purges certain landline telephone numbers from the NDNCR "only when there is a high degree of confidence that the telephone number has been disconnected and reassigned to a new customer."  (d/e 152-1, Boyle 6/15 Decl. ¶4, Ex. C.) PossibleNOW uses an algorithm to remove numbers from the NDNCR by looking at numbers that become "disconnected" from the subscriber to that number.  (d/e 387-18, DX-167, Stauffer 4/26/12 Dep. 61:6-23; 72:10-15; 74:21-95:23).  This process indisputably creates false negatives (numbers on the NDNCR that should not be there).  (*Id.* 79:8-80:2.)  PossibleNOW also determined that approximately five percent of the landline numbers that were registered prior to December 2007, and were still listed on the NDNCR as of October 2008, were invalid registrations.  (d/e 152-1, Boyle 6/15 Decl. ¶4, Ex. C.)   All of these assumptions cause the NDNCR to be "over inclusive."   (d/e 387-18, DX-167, Stauffer 4/26/12 Dep. 100:6-18.) PossibleNOW concluded that the only way to get to the truth as to whether a number should remain on, or be removed from, the NDNCR is to "track the person down."  (*Id.*, 80:3-10.)

Mr. Stauffer also estimated that approximately half of the NDNCR consisted of wireless numbers (*id.*, 102:8-12) and admitted that there is no process to remove wireless numbers from the NDNCR that have been disconnected and reassigned (*id.,* 101:4-102:7).

### C.     Historical Versions of the NDNCR – Including Those Used in Plaintiffs' "Raw Hits" Analysis – Are Even More Inaccurate

In or around 2009, PossibleNOW was also tasked with performing a one-time massive purge of numbers from the NDNCR.  It examined the *then-current* version of the NDNCR and purged certain numbers.   (d/e 387-18, DX-167, Stauffer 4/26/12 Dep. 152:6-154:23.)  While that purge removed improper numbers from the NDNCR on the day of the purge, PossibleNOW did not go back and purge these numbers off the historical NDNCR records used by InterImage to develop its "raw hits."   (*Id.* 153:2-154:23.)   PossibleNOW summed up these latent incurrences:

> Q.  And with respect to false negatives, if a raw hit analysis was done during this period in time, the -- a number that was -- should have been dropped, i.e., a false negative, would have showed up as being on the National Do Not Call Registry and would have been recorded as a raw hit, correct?
> A. Yes.
> Q.  Is there any way to go back and fix that on the historical database?
> A.  It was fixed.  Oh, it was fixed on December 18.
> Q.  Right.  But did that go back and determine what the list looked like on December 16?
> A.  No.
> Q.  No.  So even today, those false negatives are sitting on the historical copy of the National Do Not Call Registry for that date?
> A.  Oh, yes, because they were on the list on those days.  Yes.
> Q.  Right.
> A.  It reflects what actually took place on those days, yes.
> Q.  And that's true for any number that should have been removed from the list but wasn't?  It's only removed as of the date it's actually purged, and the historical database continues to show it on the National Do Not Call Registry even if it should not have been on there?
> A.  Yes.  But, you know, the only ones we know shouldn't have been on there are the ones for this particular month when we made the error, when we made the known error.
> Q.  Well, you also know that historically there were disconnects and reassigns that were on the Do Not Call Registry that should not have been, correct?
> A.  Yes.

> Q. And there's no process in place to go back and take them off
> the historical record of them being on the National Do Not Call
> Registry when they shouldn't have been, correct?
> A. That's correct.

(*Id.*, 189:20-191:17.)

Moreover, delays in updating the NDNCR introduce additional inaccuracies when using the historical versions of the NDNCR to establish violations. In certain circumstances, for example, Lockheed Martin, in administering voice recorded registrations for the NDNCR, used a process known as batching, which introduces a delay between the date of the registration by the consumers and the date the registrations appears on the NDNCR. (d/e 387-17, DX-145, Thirukkonda Dep. 303:2-310:5; d/e 387-21, DX-186, LM-49.) PossibleNOW has also admitted that there is a certain unavoidable lag time between when a consumer registers their number on the NDNCR and when that number appears on a list downloaded by a telemarketer. (d/e 387-14, DX-143, Stauffer 11/28/12 Dep. 329:17-332:16.) Thus, there is a persistent problem with the discrepancies between the full NDNCR and the refreshed partial list of the NDNCR that telemarketers may upload. (d/e 387-17, DX-145, Thirukkonda Dep. 42:9-45:19.)

## D.      The NDNCR Inaccuracies Are Significant and Material

The NDNCR website maintained by the FTC states that the NDNCR "is only for personal phone numbers" and that business-to-business calls or faxes are not covered by the NDNCR. (http://www.consumer.ftc.gov/articles/0108-national do not call registry (last accessed January 6, 2014.) Wireless numbers are also "outside of the FTC's jurisdiction." (d/e 387-17, DX-155, Dziekan Dep. 99:5-11.) Because of the lack of monitoring by the FTC, the NDNCR improperly includes many wireless numbers, numbers that no longer belong to the person who registered the number on the NDNCR, business (including government) numbers, and VoIP

numbers.  (d/e 152-1, Boyle 6/15 Decl. ¶11, Ex. J; d/e 387-17, DX-155, Dziekan Dep. 100:6-25.)

These inaccuracies are significant.

- As of March 2009, 13% of the phone numbers listed on the NDNCR were business numbers.  (d/e 152-1, Boyle 6/15 Decl. ¶11, Ex. J.)

- As of March 2009, 49.45% of the numbers on the NDNCR were wireless numbers.  (*Id.*)

- As of March 2009, 5.3% of numbers on the NDNCR were inactive.  (*Id.*)

- PossibleNOW determined that approximately five percent of the landline numbers that were registered prior to December 2007, and were still listed on the NDNCR as of October 2008 were invalid registrations.  (*Id.*, ¶4, Ex. C.)

- In December 2011, PossibleNOW estimated that it was missing disconnection and reassignment information for approximately 25 percent of the VoIP numbers in use.  (d/e 387-17, Dziekan Dep., DX-155:10-23; d/e 387-20, DX-183, Ex. 5.)

- There have been instances where the NDNCR consumer registration process did not accurately record the registration of a consumer's number on the NDNCR.  (d/e 387-17, DX-145, Thirukkonda Dep. 149:3-150:24; 192:13-199:12; 274:3-280:9; d/e 387-21, DX-184, LM-12; d/e 387-21, DX-185, LM-41.)

- A significant portion of numbers on the NDNCR – as many as 30% – are simply unidentifiable.  (d/e 387-14, DX-143, Stauffer 11/28/12 Dep. 396:23-397:7.)

Moreover, the FTC does not have the data necessary to properly verify NDNCR accuracy.  The FTC, through its contractors, uses directory assistance data to identify and remove certain disconnected and reassigned numbers that are on the NDNCR.  This data, however, is incomplete and results in inaccurate removal of numbers from the NDNCR.  For example, VoIP service providers are not required by the FCC to share their directory assistance data (d/e 387-18, DX-167, Stauffer 4/26/12 Dep. 96:6-20.)  Nevertheless, the FTC estimates that 75% of the telephone numbers associated with VoIP services are included in the directory assistance data.  (d/e 387-20, DX-183, Biennial Report to Congress, p. 5.)  Thus, the numbers that PossibleNOW "verifies" as "residential" could include a significant percentage of VoIP numbers – some of which are never purged from the NDNCR because the FTC and its

contractors lack the necessary information to know whether a VoIP number has been disconnected and reassigned.  (*Id.*)

IV.  **PLAINTIFFS' "MASSIVE COMPUTER PROCESSING" DOES NOT IDENTIFY THE PURPOSE OF A CALL, AND IS AN UNRELIABLE FOUNDATION FOR DR. YOELI'S EXPERT OPINION**

The FTC employed "massive computer processing" to assess DISH's call records. (d/e 387-21, DX-187, p. 4.)  This involved a government contractor, InterImage, performing a "raw hits" analysis.  (d/e 387-17, DX-155, Dziekan Dep. 229:25-230:2.)  A raw hits analysis is merely a comparison of what exists in the call records with the numbers that are registered on the NDNCR (taking into account the statutory grace period as it existed at the time of the registration).  (*Id.*, 229:16-24.)

Ms. Dziekan, program manager for the FTC's NDNCR (and the FTC's 30(b)(6) representative), gave examples of reasons why a raw hit to the NDNCR might not be a violation, including that the FTC has no ability to determine from a call record the purpose of the call, *i.e.*, if it is a telemarketing call.  (d/e 387-17, DX-155, Dziekan Dep. 237:16-238:17; 241:18-242:10.)  Thus, as explained by Nicholas Mastrocinque, an FTC investigator, a raw hit is an "initial look [at] the data" that represents only a "potential violation[]."  (d/e 387-18, DX-162, Mastrocinque Dep. 129:15-17.)  Thus, a raw hit is not dispositive of whether an unlawful telemarketing call was made.  (d/e 387-17, DX-155, Dziekan Dep. 235:21-238:17, 253:10-16.)

A raw hit does not consider: (1) who dialed a call (d/e 387-17, DX-155, Dziekan Dep. 237:22-238:17, 241:18-242:10; d/e 387-19, DX-174, L. Steele Dep. 85:3-5; (2) if the calls were dialed (d/e 387-19, DX-174, L. Steele Dep. 85:6-8); (3) the purpose of any given call (*id.* 85:9-11); (4) whether the call was made at the request of the called party (*id.* 85:21-86:2); (5) whether an auto-dialer was used to make the call (*id.* 86:3-6); (6) whether the number called was

to a business or residence (*id.* 86:7-10); or (7) whether the call was made to an active in-service number (*id.* 86:11-14).

## ARGUMENT

Plaintiffs' call record analysis setting forth claimed telemarketing violations is unreliable because: (i) a significant percentage of the NDNCR numbers that constitute the universe of raw hits are beyond the FTC's jurisdiction under the TSR, the States' jurisdiction under the TCPA and state laws at issue, and are not properly on the NDNCR; (ii) the calls made were not exclusively telemarketing calls; (iii) Dr. Yoeli's reliance on area codes to determine the state into which a call was placed is flawed; and (iv) Dr. Yoeli's attempt at sampling is also flawed, and its results ignored.  In addition, Dr. Yoeli's testimony should be struck because it is irrelevant and will not assist the trier of fact.  Under *Daubert*, as set forth below, all of Dr. Yoeli's testimony concerning alleged telemarketing Do-Not-Call related violations should be excluded.

## I.     THE STANDARD FOR ADMISSIBILITY OF SCIENTIFIC/TECHNICAL EXPERT TESTIMONY.

The admission of expert evidence is regulated by Federal Rule of Evidence 702 as interpreted by *Daubert v. Merrell Dow Pharmaceuticals* and its progeny.  509 U.S. 579.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Under *Daubert*, trial judges must act as gatekeepers to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.  509 U.S. at 597.

The Seventh Circuit has interpreted *Daubert* and Rule 702 to require a two-step inquiry, where both steps must be met before the testimony is admissible. *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 816 (7th Cir. 2004); *O'Conner v. Commonwealth Edison Co.* 13 F.3d 1090, 1106 (7th Cir. 1993) (citing *Porter v. Whitehall Laboratories. Inc.* 9 F.3d 607, 613 (7th Cir. 1993)).  The court must determine whether the expert's testimony is reliable and relevant.  *Ammons,* 368 F. 3d at 816.  To be admissible, the testimony must assist the trier of fact in understanding the evidence or in determining a fact in issue.  That is, the suggested testimony must fit the issue to which the expert is testifying.  *Id.; see also Deimer v. Cincinnati Sub-Zero Products, Inc.* 58 F.3d 341, 344 (7th Cir. 1995); *Dukes v. Illinois Cent. R.R. Co.* 934 F. Supp. 939, 947-48 (N.D. Ill. 1996).

## II.    DR. YOELI'S EXPERT TESTIMONY IS UNRELIABLE

Proponents of expert evidence must demonstrate by a preponderance of the evidence that the expert's opinions are reliable.  *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 735 (N.D. Ill. 2005); *see, e.g., Schrott v. Bristol-Meyers Squibb Co.*, No. 03 C 1522, 2003 WL 22425009, at *1 (N.D. Ill. Oct. 22, 2003), *aff'd,* 403 F.3d 940 (7th Cir. 2005).  Here, Plaintiffs' expert testimony, through Dr. Yoeli, is based on unreliable data and Dr. Yoeli's method comparing the data sets also is unreliable.  These are proper bases to exclude Dr. Yoeli's testimony as unreliable under *Daubert*.  *See Svindland v. The Nemours Foundation*, Case Nos. 05-417, 05-441, 2009 WL 1407749 (E.D. Pa. May 18, 2009).

### A.    Dr. Yoeli's Assumptions Relating to the NDNCR Data Render His Call Analysis Unreliable

Plaintiffs' expert evidence of alleged Do Not Call violations wrongly assumes all phone numbers on the NDNCR provide proper bases to assert a telemarketing Do Not Call violation.  As shown above, they are not.  As such, Plaintiffs' expert evidence in this regard must

14

be stricken. *Svindland*, for example, involved medical malpractice cases for patients who died at some point after undergoing surgery. 2009 WL 1407749, at *1. The defendants moved to exclude Plaintiffs' expert evidence of a comparison of morbidity and mortality rates of certain patient groups:

> The defendants argue that Dr. Hannan's testimony is inadmissible under *Daubert* [], for three reasons: (1) the DHSC data are unreliable; (2) the Boston data are unreliable; and (3) the method employed by Dr. Hannan to compare these two sets of data is unreliable.

*Id*. at *3. The DHSC data, used by Plaintiffs' expert, was from the Delaware State Health Department medical records. *Id*. at *4. These records utilized an ICD-9 code. *Id*. The primary function of ICD-9 codes was not prediction of outcomes in a particular case but rather to facilitate medical billing. *Id*. Defendants argued that the ICD-9 codes are not assigned by heart surgeons but by billing clerks who had never seen the patients. *Id*. This fact, along with others, created the potential for misclassification of operations and procedures. *Id*. The court noted:

> In contrast to ICD-9 codes, Dr. Jacobs stated that there is another set of codes called the International Pediatric and Congenital Cardiac Code ("IPCCC"). The IPCCC is a clinical-based nomenclature that was created by a multi-institutional, multi-national group of cardiologists and cardiac surgeons. The coding for the IPCCC is done by healthcare professionals that actually take care of the patients. These codes, which are entered into the STS database, are monitored by "database police" who ensure that the database is complete and accurate. On the other hand, the ICD-9 codes contained in the DHSC data have no such verification mechanism in place.

*Id*. Based on these facts, the Court excluded the DHSC data as not scientifically reliable under *Daubert*. *Id*. at *5.

A similar result should apply here. The phone number data from the NDNCR is not reliably gathered or maintained. The FTC fails to take steps to ensure that the phone numbers entered on the NDNCR are ones that could support a violation under the TSR, TCPA,

or state laws at issue in this case.  Persons placing numbers on the NDNCR are free to enter business, government, and wireless numbers, and there is no reliable process to remove such numbers from the NDNCR.  Persons placing phone numbers on the NDNCR are not instructed to seek their removal from NDNCR once they become disassociated with that phone number. Moreover, the algorithmic process to remove such numbers is incomplete or inapplicable to many types of phone numbers (including any wireless phone number and many VoIP numbers), has been subject to significant errors, and is based on estimates and assumptions – not on the actual fact of a person becoming disassociated with a phone number.  Finally, there are glitches with respect to the hygiene performed on the NDNCR and other technological maladies associated with the timing of registrations and the creation of "Delta download" lists.  It is undeniable that all of these problems, and likely others, make the NDNCR an unreliable data set. Plaintiffs ignore these defects, and there is no evidence that Plaintiffs' expert attempted to (let alone could properly) account for these inaccuracies as part of his expert evidence.  *See In re: Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 936, 945 (D. Minn. 2009) ("Peer review and publication mean little if a study is not based on accurate underlying data").

The "Boston data" was a second set of data at issue in *Svindland*.  This data was excluded because it was gleaned from a website that was not created for institutional comparisons of outcomes, but rather to share information with people reading the website.  2009 WL 1407749, at *5.  A similar flaw exists with respect to the NDNCR.  Not only does the FTC fail to ensure that the phone numbers entered on the NDNCR are ones that could support a TSR, TCPA, or state Do Not Call violation, but that might not even be a goal of the FTC.  A significant purpose of the these Do Not Call laws, and the NDNCR, is consumer protection. Thus, the FTC considers over-inclusiveness (which is by definition an inaccuracy) as perfectly

legitimate because it prevents additional telemarketing calls. (d/e 387-17, DX-155, Dziekan Tr. 99:5-100:25.) Thus, like the website in *Svindland* (the purpose of which was different than the purpose used by the expert), because the consumer protection purpose of the NDNCR allows for over-inclusiveness, it is not maintained in a way so as to provide an evidentiary basis for proving mass violations of the TSR, TCPA, and state Do Not Call laws and likewise for the Plaintiffs to seek substantial monetary fines for each such alleged Do Not Call-related violation.

>    **B.    Dr. Yoeli's Assumptions Relating to the Telemarking Purpose of Each Call Render His Analysis Unreliable**

Not only does Plaintiffs' expert evidence of Do Not Call violations wrongly assume all phone numbers on the NDNCR provide a proper basis to assert a TSR, TCPA, and state Do Not Call violation, but they wrongly assume that each call was a telemarketing call. This Court already decided that the 2003-2007 call records contain both telemarketing and non-telemarketing calls:

> In 2008, DISH provided the FTC with the 2008 Analysis that notified the FTC that the 2003-2007 calls included non-telemarketing calls such as collection calls and business calls.… The Plaintiffs, thus, knew these limitations on the 2003-2007 calls before they filed this action. The Plaintiffs elected to focus their discovery efforts on the 2007-2010 calls rather than the earlier data.

(d/e 165, at p. 13.) As admitted by the FTC representative, a raw hit is not dispositive of whether an unlawful telemarketing call was made. (d/e 387-17, DX-155, Dziekan Dep. 237:8-238:17, 253:10-16.) Dr. Yoeli ignores this critical issue, making the inaccurate assumption that each raw hit was a telemarketing call. In making the assumption that each raw hit was a telemarketing call – an assumption which the parties and the Court acknowledge is incorrect – Dr. Yoeli renders his analysis inaccurate, misleading, and therefore unreliable.

>    **C.    Dr. Yoeli's Assumptions Relating to Area Codes Make Dr. Yoeli's Call Analysis Unreliable**

State Plaintiffs also rely on Dr. Yoeli's expert reports. State Plaintiffs can only seek relief for telemarketing calls that are placed to their respective state's residents. Dr. Yoeli did nothing to determine whether the claimed offending telemarketing call was placed to a consumer within the boundaries of California, Illinois, North Carolina, and/or Ohio – *i.e.*, the State Plaintiffs' states. Rather, he relies upon the area codes of the numbers dialed. The FCC and courts repeatedly have made clear that, due to advances in technology, area codes and telephone numbers cannot be relied upon to prove that a call recipient resided or was located in a particular state at the time of the call. Indeed, the FCC acknowledged that "[t]he relationship between numbers and geography—taken for granted when numbers were first assigned to fixed wireline telephones—is evolving as consumers turn increasingly to mobile and nomadic services." *In re: Numbering Policies for Modern Communications, Notice of Proposed Rulemaking, Order and Notice of Inquiry*, 28 FCC Rcd 5842, 5844 (2013).[1]

Three primary technological developments have broken the connection between numbers and geography. *See, e.g., Teltech Sys., Inc. v. Barbour*, 866 F. Supp. 2d 571, 575-576 (S.D. Miss. 2011). First, since 1997, the FCC has required telecommunications carriers to permit consumers to "port" their telephone numbers, *i.e.,* keep their previous telephone number even when they switch to another carrier. Second, over the time period relevant to Plaintiffs' claims, consumers increasingly obtained wireless service and maintained "mobile numbers that [were] associated with an area code other than the one where they live." *Teltech Sys.,* 866 F. Supp. 2d at 575. Third, VoIP service subscriptions, like mobile service subscriptions, have

---

[1]     DISH refers the Court to its Memorandum in Support of Summary Judgment at d/e 348, for examples from State Plaintiffs' own productions wherein the area codes associated with a particular complaint were unrelated to the residence of the subscriber, and for a more detailed recitation of the technological developments that have broken the connection between numbers and geography.

increased greatly between 2003 and 2010, with nearly 32 million VoIP lines in service as of December 2010.[2]   Industry Analysis and Technology Division, Wireline Competition Bureau, Federal Communications Commission, Local Telephone Competition: Status As of December 31, 2010, at p.2 & Fig. 1 (October 2011).[3]

In his deposition, Dr. Yoeli, testified as follows:

Q.      -- did you do anything to determine whether the call recipient was located or resided in the state in question at the time that the call was made?
A.      Yes.
Q.      What did you do?
A.      The -- it only gets coded as a call to a California number if it's a California area code.
Q.      Dr. Yoeli, what area code is your wireless number?
A.      So, that's right.  So, the one thing that, so, the analysis, the analysis doesn't necessarily capture -- here's how I would put it.  For wireless numbers where someone potentially could be living outside of the state where they have a wireless number, for calls to those wireless numbers then you could potentially have a call that's listed to California, but where the person resides somewhere else.  For land lines presumably that's not possible.
Q.      Do you know whether that's not possible for land lines?
(Mr. Taylor left the deposition.)
A.      I don't know.  I don't know.
Q.      There's a lot of new technology.  I'm curious if you know that a land line could never utilize an area code other than the one that would belong to the state in which the number is physically assigned to.

---

[2]      The FCC acknowledged that, in the context of VoIP service, "the NANP number is not necessarily tied to the user's physical location for either assignment or use, in contrast to most wireline circuit-switched [but not wireless] calls."  *In re: Vonage Holdings Corp.*, Order, 19 F.C.C.R. 22404, at *22408 (2004).

[3]      47 C.F.R. § 52.23; *see, e.g., In re: Telephone Number Portability*, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 8352 (1996) (establishing an implementation schedule for telephone number portability); *In re: Telephone Number Portability*, Memorandum Opinion and Order and Further Notice of Proposed Rulemaking, 18 FCC Rcd 23697 (2003) (allowing consumers to port their wireline numbers to a wireless carrier); *In re: Telephone Number Requirements for IP-Enabled Services Provider*, Report and Order, Declaratory Ruling, Order on Remand and Notice of Proposed Rulemaking, 22 FCC Rcd 19531 (2007) (same to VoIP carrier).

> A.     I mean, it's possible.  It's not really within the scope of what I was asked.  I was simply asked to break it down by area code.

(d/e 387-29, DX-211, Yoeli Dep. 215:8-216:17.)

Again Dr. Yoeli simply ignores the critical issue and makes the demonstrably inaccurate assumption that area code data is coextensive with the location of the recipient of each call.  Dr. Yoeli did nothing to analyze the accuracy of this assumption, nor did he discount or make allowances for instances where such an assumption was incorrect.  Instead, Dr. Yoeli ignored the issue and assumed that all calls with a given area code were violations in connection with the state historically associated with that area code. This assumption is incorrect and renders Dr. Yoeli's analysis inaccurate, misleading, and unreliable.

### D.     Dr. Yoeli's Attempt At Sampling Fails to Provide Reliable Evidence

In response to Dr. Fenili's report showing that the composition of the NDNCR is cluttered with wireless, inactive, and business numbers, Dr. Yoeli sampled and analyzed the dispositions of DISH call records.  (d/e 387-12, DX-137, p. 10.)  One of these samples contained 5,013 numbers drawn from the approximately 23 million alleged Do Not Call violations that DISH purportedly called from 2007 to 2010. (d/e 387-13, DX-137, Appendix I.)   Dr. Yoeli reported the results of his analysis in his October 16, 2012 report.  (d/e 387-12, 387-13.)

Dr. Yoeli's sampling methods are flawed.  As DISH's expert Dr. Fenili explained, Dr. Yoeli used a "trust-me" approach with regard to his sampling and analysis.  (Mazzuchetti Decl., Ex. B.)  Dr. Yoeli did not provide any materials that would enable DISH to replicate his samples.  Even if, for argument's sake, one accepts that Dr. Yoeli used accepted sampling techniques, a method must be established to determine whether the disposition of each sampled call falls within the Plaintiffs' enforcement jurisdiction under the TSR, TCPA, and state laws. Dr. Yoeli found that, for approximately 27% of the 5,013 calls sampled, the disposition of the

number called could not be identified.   Unsurprisingly, sampling does nothing to cure the unreliability of the NDNCR data.

Additionally, even accepting that Dr. Yoeli's data and sampling method are correct,  he does not reduce his estimate of DISH's alleged violations to reflect that 31% of the numbers in his sample could not be verified as properly belonging on the NDNCR.  (d/e 387-12, DX-137, Yoeli Rebuttal Report, p. 8.)  Worse, Dr. Yoeli expresses the opinion that, because DISH's calls were made "primarily to residential landlines" that "(t)he proportion of these types of numbers that appear in the Registry in its entirety, . . . are, therefore, inapplicable and irrelevant to the analysis of the violations in this case." (*Id.*, p. 9.)   Thus, in the end Dr. Yoeli rejects (or willfully misinterprets) the findings of his own survey.

## III.   DR. YOELI'S TESTIMONY IS NOT RELEVANT

To be admissible, expert testimony and opinion also must meet the relevance standard.  *Phillips,* 364 F. Supp. 2d at 735.  The Seventh Circuit requires that there be a "fit" between expert testimony and the issue to which it is directed.  *Porter,* 9 F.3d at 616; *Ludwig v. Pilkington North America, Inc.,* No. 03 C 1086, 2004 WL 2387410, at *3. (N.D. Ill. Oct. 25, 2004).  Plaintiffs' entire case rests on the notion that each phone number on the NDNCR is a proper basis for a Do Not Call violation.  As set forth herein, that is decidedly not the case here. The introduction of evidence of millions of calls allegedly made by DISH to numbers that cannot form the basis for a TSR, TCPA, or state law Do Not Call violation is not relevant, and therefore neither is Dr. Yoeli's analysis.

## IV.   DR. YOELI'S TESTIMONY IS INCAPABLE OF ASSISTING THE TRIER OF FACT

The introduction of Dr. Yoeli's analysis of calls that cannot form the basis of any Do Not Call violation will only confuse and mislead the trier of fact about the alleged violations

in this case.  Plaintiffs will present evidence where they have not discerned, and the trier of fact cannot discern, whether the alleged number claimed to support a TSR, TCPA, or state law violation can properly be the basis for such a violation.  This will lead to guilt by association or cause the trier of fact to simply guess as to the number of Do Not Call violations.

As the Seventh Circuit recognized, the district court must "serve[ ] a 'gatekeeping' function to prevent expert testimony from carrying more weight with the jury than it deserves." *U.S. v. Ozuna*, 561 F.3d 728, 736 (7th Cir. 2009), citing *Daubert*, 509 U.S. at 595 ("[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  While "shaky" expert testimony may be admissible and subject to attack on cross-examination (*Daubert*, 509 U.S. at 596), unreliable testimony is inadmissible and "is the very testimony that a district court, acting in its gatekeeping role, is charged with excluding."  *Farmer v. Directstat USA, LLC*, 2013 WL 1195651, *9 (N.D. Ill. 2013), citing *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 818–19 (7th Cir. 2010).

## CONCLUSION

For the foregoing reasons, DISH's motion to strike the expert testimony of Dr. Erez Yoeli should be granted in its entirety.


Dated:  May 28, 2014                    Respectfully submitted,

                                        KELLEY DRYE & WARREN LLP


                                        By: _____/s/ Henry T. Kelly_____
                                        Joseph A. Boyle
                                        200 Kimball Drive
                                        Parsippany, New Jersey
                                        Phone (973) 503-5900

                                        Henry T. Kelly
                                        333 W. Wacker Dr.
                                        Chicago, Illinois 60606
                                        Phone (312) 857-2350

                                        *Attorneys for Defendant Dish Network L.L.C.*

23

### WORD COUNT CERTIFICATION

Henry T. Kelly, an attorney of record in the above captioned matter, hereby certifies that the forgoing memorandum contains 6,993 words and 43,934 characters, in compliance with the Court's type volume limitation as set forth in Local Rule 7.1(B)(4), as calculated by the word count function of the word processing system used to prepare the foregoing memorandum.

By:   s/ Henry T. Kelly
          Henry T. Kelly

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO, | Case No.: 3:09-cv-03073-SEM-BGC |
| Plaintiffs, |  |
| v. |  |
| DISH NETWORK L.L.C., |  |
| Defendant. |  |

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby deposes and states that he caused the foregoing **DEFENDANT DISH NETWORK L.L.C.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO PRECLUDE THE EXPERT TESTIMONY OF DR. YOELI** to be electronically filed with the Clerk of the Court on May 28, 2014 under, using the ECF system, and served on all parties via email.


_____/s/ Henry T. Kelly_____
        Henry T. Kelly