UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO, <br><br> Plaintiffs, <br> v. <br><br> DISH NETWORK, LLC, <br><br> Defendant. | Case No. 3:09-cv-03073-SEM-TSH <br><br> **PLAINTIFFS' OPPOSITION TO DISH'S MOTION TO STRIKE** |

Dish's motion to strike is untimely and moot; the Court would be justified in denying it on these grounds alone. On its merits, Dish's motion relies on incorrect legal and factual premises. Dr. Yoeli's testimony, and specifically the declarations he submitted in connection with the parties' dispositive motions, is not expert opinion evidence, but rather empirical analysis that summarizes voluminous and cumbersome call record data. The Court should deny Dish's motion and find that call counts are admissible as summary evidence under Federal Rule of Evidence 1006. In the alternative, the testimony is also admissible under Rule 702 because Dish has challenged only the factual assumptions Dr. Yoeli made, and the Seventh Circuit has unambiguously rejected *Daubert* challenges that focus only on the "factual underpinnings of the expert's analysis." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

## BACKGROUND

Dr. Erez Yoeli, a University of Chicago-trained economist with the Federal Trade Commission who currently also teaches at MIT, has been creating call counts based on Dish's and its retailers' calling data since 2010. Dish noticed a fact deposition on Plaintiffs' call record

analyses, (Ex. 1), and deposed Dr. Yoeli as a Rule 30(b)(6) fact witness for the United States on

December 10, 2012.  United States Dep. (Yoeli), Dec. 10, 2012 (Ex. 2).  Dish deposed him as an

expert witness on December 11, 2012 and again on December 16, 2013.  As Dish's motion does

not specify which reports and other filings it seeks to strike, Plaintiffs offer a brief overview of

Dr. Yoeli's merits testimony in this case to clarify what is at issue.

I.      <u>Dr. Yoeli's Reports</u>

Relevant to Dish's motion are expert reports by Dr. Yoeli dated:  (1) July 19, 2012 (Ex.

3); (2) October 15, 2012 (Ex. 4); (3) December 14, 2012 revised versions of the July and October

2012 reports (Exs. 5, 6); (4) October 21, 2013 (Ex. 7); and (5) November 6, 2013 (Ex. 8).[1]

<u>July 19, 2012 Report.</u>  Dr. Yoeli's July 19, 2012 expert report, which was disclosed to

Dish on July 27, 2012, describes how Dr. Yoeli met with Dish and obtained information to

analyze Dish's 2007-2010 call records.  Dr. Yoeli explains how he used information provided by

Dish to: (a) calculate how many Dish calls were telemarketing calls based on Dish's campaign

name data; (b) identify and calculate the number of calls for which Dish had asserted an Existing

Business Relationship ("EBR") with the telephone number called; and (c) calculate how many

calls Dish made to phone numbers on Dish's entity-specific do-not-call list at the time of the call.

Ex. 3 at 4-11.  For those Dish calls that were telemarketing calls to numbers with which Dish had

no asserted EBR or to numbers on Dish's internal do-not-call list, Dr. Yoeli calculated how

many of those calls were placed to telephone numbers that were on the National Do-Not-Call

Registry when the call was made—*i.e.,* "hits."  *Id.*  The report also counts the number of calls

---

[1] All eight exhibits to this brief have been filed publicly, with redactions to signatures pursuant to
CDIL-LR 5.11(A).  A small portion of Appendix A to Exhibit 8 has been minimally redacted for
potential consumer phone numbers, but this brief does not rely on that section and it is included
for completeness only.  An unredacted, sealed version will be provided immediately upon
request or order of the Court.

featuring certain disposition codes in several call record files produced by Guardian Communications.  *Id.* at 12.

October 15, 2012 Rebuttal Report.  Dr. Yoeli's October 15, 2012 report responded to the reports submitted by Dish's proffered experts John Taylor, Robert Fenili, and Avery Abernethy, refined Dr. Yoeli's July 2012 calculations of Dish's 2007-2010 call records, and calculated how many calls Dish made during 61 automessage ("AM") campaigns.  Ex. 4 at 1-2, 4-7, 9-11.  The October 2012 report also re-reviewed other sets of call records produced by Dish retailers and third-parties during discovery, setting forth Dr. Yoeli's counts of the number of Registry hits, entity-specific do-not-call list hits, and prerecorded calls reflected by the call records of Guardian Communications (which placed calls for Dish retailers Dish TV Now and Star Satellite/Tenaya) and Dish retailers JSR Enterprises ("JSR") and Defender Security ("Defender").  *Id.* at 2, 11-13. In response to Dr. Fenili's estimates that most of the telephone numbers on the Registry are not residential landline numbers, Dr. Yoeli generated statistically representative samples of Dish's and its retailers' call records, which were then analyzed by PossibleNow, the company that employs John Taylor, to determine whether the phone number was a residential, business, wireless, or "other" type of number.  *Id.* at 8-9.

December 14, 2012 Reports.  Dr. Yoeli's December 14, 2012 reports were revisions of his two prior reports, and made a number of revised calculations and clarifications based on additional information, such as the discovery of an additional set of Dish call records that Dish had omitted from an earlier production.  Ex. 6 at 3-4.

October 21, 2013 Report.  Dr. Yoeli's October 21, 2013 Supplemental Expert Report incorporated much of the information set forth in his October 15, 2012 and December 14, 2012 reports, but offered some additional calculations.  Specifically, for Dish's 2007-2010 call records

and the call records of Dish retailers Defender, JSR, Star Satellite/Tenaya, Five9 (the

telemarketing vendor for Dish retailer Satellite Systems Network ("SSN")), and National

Satellite Systems, Dr. Yoeli calculated the number of calls made by one of these retailers to

telephone numbers that appear either on Dish's entity-specific do-not-call list or on the list of

Dish retailer New Edge Satellite.  Ex. 7 at 2-4.  This report counted the number of Dish calls

made under certain calling campaigns that featured an "AM" code.  *Id.* at 3.  The October 2013

report also organized the calls identified by Dr. Yoeli's December 2012 report as Registry hits

according to the states called, as indicated by the area code of the telephone number, and counted

whether a call occurred before or after certain significant dates.  *Id.* at 2-4.

       November 6, 2013 Report.  The Rebuttal Report submitted by Dr. Yoeli on November 6,

2013 responded to the October 14, 2013 report of Dish-proffered expert John Taylor by

evaluating his methodology and reviewing Mr. Taylor's independent efforts to calculate the

same types of hits identified by Dr. Yoeli.  Ex. 8 at 1.  Dr. Yoeli also summarized some of the

data submitted with Mr. Taylor's files by using charts that displayed violations over time; by

counting hits according to who made the call, the type of call (prerecorded automessage or

Registry hit), and the Plaintiff state associated with the number called; and by counting the Dish

2007-2010 calls identified by Mr. Taylor as Dish internal do-not-call list hits that were also

Registry hits.  *Id.* at 9-12.

## II.      **Dr. Yoeli's Declarations**

       December 18, 2013 Declaration (Pls.' Mot. for Summ. J. Ex. 38 (d/e 342-5)).  This

declaration, submitted in support of Plaintiffs' summary judgment motion, offered some of the

calculations Dr. Yoeli had performed as part of his expert reports in a form admissible for

summary judgment purposes.  Dr. Yoeli also summarized some of the call records by identifying

the individual calls made by Dish and its retailers to phone numbers associated with consumer witnesses in this case, and matched phone calls in the call records to customer complaints that were submitted to FTC.  Finally, Dr. Yoeli identified how many telemarketing calls Dish made to a set of numbers that Dish had marked as "DNC" in its call records, but had not placed on its entity-specific do-not-call list.

March 5, 2014 Declaration (Pls.' Opp. to Dish's Mot. for Summ. J. Ex. 305 (d/e 380-7)). In support of Plaintiffs' opposition to Dish's motion for summary judgment, Dr. Yoeli took the call counts offered by Mr. Taylor and performed further calculations on those counts—splitting them by state, disposition code, and percentage of calls that occurred during certain campaigns or by the retailer that made them—and offering charts of excerpts from those calls for demonstration purposes.

March 14, 2014 Declaration (Pls.' Reply Ex. 423 (d/e 391-19)).  Submitted for Plaintiffs' reply in support of their summary judgment motion, this declaration reviewed and analyzed data from Dish and Dish's retailers and the Registry by counting the number of calls in the call records made to certain telephone numbers of individual consumers, counting calls to residents of Illinois by using area codes, and performing several additional calculations on Mr. Taylor's call counts.

**ARGUMENT**

The Federal Rules of Civil Procedure do not specifically provide for motions to strike discovery documents.  Such motions to strike are, in fact, "disfavored," especially when they are "used as a vehicle to delay proceedings."  *Karraker v. Rent-A-Ctr., Inc.*, 316 F. Supp. 2d 675, 678 (C.D. Ill. 2004), *rev'd in part on other grounds*, 411 F.3d 831 (7th Cir. 2005).  This Court is left to its discretion in deciding whether to consider, and how to rule on, a motion to strike.  *Id*.

I.      **Dish's Motion Is Untimely and Dish Waived Its *Daubert* Arguments by Not Presenting Them During Summary Judgment Briefing**

A party opposing a summary judgment motion must "wheel out all its artillery" to defeat the other party's motion by presenting to the Court all of its facts and legal arguments in its summary judgment briefs. *Swearingen v. Momentive Specialty Chem., Inc.*, 662 F.3d 969, 974 (7th Cir. 2011). A party cannot "sandbag[]" the Court's consideration of summary judgment motions by saving facts and legal arguments for later. *Burney v. Thorn Ams., Inc.*, 970 F. Supp. 668, 671 (E.D. Wis. 1997).

Dish conceded during the June 6 motion conference that its summary judgment briefs had already presented the issues raised by its current motion to strike, and that Dish views this motion as a "separate vehicle" to make additional arguments bearing directly on the appropriateness of summary judgment.[2] *See* Recording of Status/Motion Conference at 9:05-9:42 (June 6, 2014). This is an admission that Dish's motion does exactly what the Seventh Circuit says it cannot—attempt to take multiple bites at the summary judgment apple, after full briefing, by filing additional briefs with new legal arguments as to why summary judgment should be granted or denied. The Court could deny Dish's motion on this basis alone.

Similarly, Dish's motion violates the Court's scheduling orders. Pursuant to the Court's November 7, 2013 Text Order, dispositive motions were due on January 6, 2014. Dish's opposition to Plaintiffs' summary judgment motion was due on February 5, 2014. Jan. 9, 2014 Text Order. Expert discovery concluded in December 2013, so Dish could have filed a timely *Daubert* motion to be considered in parallel with the summary judgment motions. Dish did not do so. In fact, in all of the district court cases Dish cited to support its contention that its motion

---

[2] Dish earlier moved to strike much of the evidence at issue here in November 2012. Dish Mot. to Strike (d/e 192). The Court's March 18, 2013 text order denied that motion.

should be considered now, *see* Dish's Statement of Position (d/e 417), the party seeking to preclude the expert's testimony at the summary judgment phase filed its *Daubert* motion *on the same day* as its summary judgment motion—not five months later, as Dish did.  *See Quirin v. Lorillard Tobacco Co.*, No. 13 C 2633, 2014 WL 786838 (N.D. Ill. Feb. 26, 2014) (ECF Nos. 95, 100, 109, 121); *Myers v. Illinois Cent. R.R. Co.*, No. 08-cv-2220, 679 F. Supp. 2d 903 (C.D. Ill. 2010) (ECF Nos. 78, 82, 84, 86); *Reeves v. Commonwealth Edison Co.*, No. 06 C 5540, 2008 WL 239030 (N.D. Ill. Jan 28, 2008) (ECF Nos. 42, 49); *Svindland v. The Nemours Foundation*, Nos. 05-417, 05-441, 2009 WL 1407749 (E.D. Pa. May 18, 2009) (ECF Nos. 48, 50).

The parties in those cases knew what Dish seemingly ignores—that a party must file summary judgment-related *Daubert* motions by the dispositive motions deadlines because dispositive motions briefing is the "put up or shut up moment" of the litigation, *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), where a party must offer all arguments in its favor.  By contrast, Dish asks the Court to bless its tactic of stringing along Plaintiffs and the Court by filing additional briefs related to fully-briefed summary judgment motions that the Court has been considering for months, thereby causing needless delay, working substantial unfairness, and wasting the resources of the Court and the parties.  Such a situation is far from the "put up or shut up moment" that the Seventh Circuit has ordered summary judgment must be.

With respect to Dr. Yoeli's summary judgment declarations, Dish has also waived its right to contest their admission on *Daubert* grounds.  *See Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289-90 (10th Cir. 2000) ("A party may waive the right to object to evidence on *Kumho*/*Daubert* grounds by failing to make its objection in a timely manner.").  Arguments not presented to the Court in opposition to summary judgment are deemed waived, *Laborers' Int'l*

*Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999), and Dish affirmatively chose not to contest the admissibility of Dr. Yoeli's testimony under Rule 702 in its summary judgment opposition.  That is, despite having dozens of opportunities to do so, Dish never made an expert admissibility challenge to any of the numerous instances where Plaintiffs used Dr. Yoeli's testimony.  Dish Opp. to Pls.' Mot. for Summ. J. at 28-30, 38-42, 46-47, 52, 66, 74, 76-77, 82, 90-93, 95-96, 114, 120, 122-23, 126-27, 129, 130, Feb. 5, 2014 (d/e 369).

Dish's behavior is akin to a party's lawyer sitting silently at counsel table while an opponent moves to admit an important exhibit at trial, and then filing a motion four months later arguing that the exhibit was inadmissible.  Dish has affirmatively waived the right to present these arguments at the summary judgment stage, and the Court should deny the motion as untimely without prejudice to renewal (if necessary) after the Court's consideration of the summary judgment motions.  *See Janes v. Chicago Bd. of Educ.*, 00 C 6128, 2002 WL 31557619, at *5 (N.D. Ill. Nov. 18, 2002) ("[T]he Board's . . . failure to challenge Dr. Sider's . . . opinion during summary judgment does not preclude its objection to Plaintiffs' use of that opinion at trial.").

## II.   Dr. Yoeli's Proposed Summary Testimony and Evidence Are Admissible Under Rule 1006

Even if it were to consider the merits of Dish's arguments, the Court should deny Dish's motion because Dr. Yoeli's call calculations are admissible—and should be admitted—under Federal Rule of Evidence 1006, obviating the need for the Court to consider whether they are admissible under Rule 702.  *United States v. Chhiber*, 741 F.3d 852, 855-56 (7th Cir. 2014).

A.    Dish Waived Its Challenge to the Admission of Dr. Yoeli's Testimony Under
Rule 1006

Although Plaintiffs provided expert reports from Dr. Yoeli in order to preserve their right
to admit this testimony under Rule 702 if necessary, *McCloughan v. City of Springfield*, 208
F.R.D. 236, 241 (C.D. Ill. 2002) (precluding expert testimony where proposed expert did not
submit a report), Rule 702 is not Plaintiffs' primary theory of admissibility for Dr. Yoeli's call
counts.  In November 2012, Plaintiffs told Dish and the Court that they planned to introduce the
call analyses in this case as summary evidence under Rule 1006.  Pls.' Opp. to Dish Mot. to
Strike at 10-11, Nov. 29, 2012 (d/e 200).  Dish apparently agreed by noticing a fact deposition on
the call record analyses and deposing Dr. Yoeli as a Rule 30(b)(6) fact witness in December
2012.  *See* Ex. 1; Ex. 2 at 13:4-15:13.  Plaintiffs maintained the same position during summary
judgment briefing in 2014.  *See* Pls.' Mot. for Summ. J. Ex. 38 (describing calculations and
sorting performed by Dr. Yoeli) (d/e 342-5); Pls. Opp. to Dish Summ. J. Mot. (d/e 378) at 183-
84 (*citing* Fed. R. Evid. 1006); Pls.' Reply at 46 (d/e 391) (same).

Neither Dish's summary judgment briefing nor the current motion to strike challenges the
admissibility under Rule 1006 of Plaintiffs' summary exhibits reflecting Dr. Yoeli's call counts,
thereby waiving all such objections.  *See Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 563 (7th
Cir. 2002).  A party waives objections to the admissibility of summary judgment exhibits that it
does not make.  *See FDIC v. N.H. Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991).  Plaintiffs
respectfully request that the Court admit Dr. Yoeli's call counts and calculations under Rule
1006, deny Dish's current motion, and proceed to consider Plaintiffs' summary judgment filings.

B.    Dr. Yoeli's Call Counts Are Not Expert Opinion At All, But Rather Are
       Admissible As Summary Evidence Under Rule 1006

Should the Court choose *sua sponte* to consider the admissibility of Dr. Yoeli's call

counts under Rule 1006, *see Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998)

(district court may consider *sua sponte* the admissibility of summary judgment evidence), the

standard for admissibility under Rule 1006 is amply satisfied.

To be admitted under Rule 1006, the proponent must make a showing that a piece of

evidence is a "summary, chart, or calculation" that accurately summarizes "the content of

voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006;

*United States v. Driver*, 798 F.2d 248, 252-53 (7th Cir. 1986).[3]  Courts frequently admit data

compilations, even extremely complicated ones, under Rule 1006.  *United States v. Hamaker*,

455 F.3d 1316 (11th Cir. 2006) (affirming the admission under Rules 1006 and 701 of FBI

financial analyst's testimony reviewing and summarizing thousands of financial records,

including Quickbooks records of the defendant construction company, and matching different

parts of those records); *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2001) (ruling

that a financial analyst who "summarized business records and client lists and presented them in

condensed form, a process clearly permitted by Federal Rule of Evidence 1006," was not an

expert witness).

In his work on this case, Dr. Yoeli reviewed voluminous lists of millions of telephone

calls produced by Dish and its retailers and accurately summarized what those lists contained—

*x* calls to numbers that were also on the Registry at the time of the call, *y* calls to numbers that

---

[3] In order for a summary exhibit to be admissible under Rule 1006, the underlying data must
itself also be admissible.  *Driver*, 798 F.2d at 252-53.   Dish has not challenged the admissibility
of the call records in its current motion, but Plaintiffs demonstrated the admissibility of the call
records in their summary judgment filings.  *E.g.*, Pls.' Mot. for Summ. J. at 43 (*See* Plaintiffs'
Undisputed Material Facts 249-50) (d/e 341).

were also on Dish's entity-specific do-not-call list, $z$ calls to numbers that were on both lists, and so on. Dish agrees that Dr. Yoeli's work in creating call-record summaries constituted rote calculation and comparison, and did not involve speculation, extrapolation, or opinion-making. Dish Mot. to Strike ("Dish Mot.") at 1, May 28, 2014 (d/e 400) ("Dr. Yoeli's analysis is merely the comparison of certain call records (here supplied by DISH, independent third party retailers, or a telecommunications provider) with the numbers that were registered on the [Registry]."). And Dish does not challenge the accuracy of Dr. Yoeli's call-counts on their merits. *Id.* at 13 (listing the reasons that the Court should preclude Dr. Yoeli's testimony, but not alleging that any of these calculations were wrong); Dish's Opp. to Pls.' Mot. for Summ. J. at 28-30, 38-42, 46-47, 52, 66, 74, 76-77, 82, 90-93, 95-96, 114, 120, 122-23, 126-27, 129, 130, Feb. 5, 2014 (d/e 369) (failing to challenge the numbers Dr. Yoeli calculated).

Dr. Yoeli's call counts are precisely the type of summary that accurately depicts voluminous underlying data, as envisioned by Rule 1006. *See Chhibber*, 741 F.3d at 855-56. To illustrate: if Dish made only five telemarketing calls, listed on one piece of paper, and there were only five phone numbers on the Registry, listed on another piece of paper, any person could quickly identify and count how many of Dish's five phone calls, if any, were made to any of the five phone numbers on the Registry. Here, by contrast, there are over one billion phone calls in dozens of call-record files in a variety of computer file formats, and there are over 200 million phone numbers on the Registry. This volume is exactly why Dr. Yoeli's testimony is necessary here and why Rule 1006—not Rule 702—applies.

The district court in *FTC v. Washington Data Resources*, No. 09-CV-2309, 2011 WL 2669661, at *3 (M.D. Fla. July 7, 2011), confronting the same dispute the Court faces here, rejected the defendant's *Daubert* challenge and admitted the FTC's summary evidence under

11

Rule 1006 because "[FTC] intends to present a summary of, and calculations based on, business records produced by the defendants in discovery" and because FTC's witnesses did not "proffer an opinion on the meaning of the calculations."  The same is true here.  *See United States v. Petty*, 132 F.3d 373, 378-79 (7th Cir. 1997) (finding that analyst's summary of "cumbersome" telephone bills were admissible under Rule 1006); *United States v. Gaitan-Acevedo*, 148 F.3d 577, 587-88 (6th Cir. 1998) (same).  Dish does not dispute that Dr. Yoeli's testimony and calculations are accurate summaries of the underlying data, and the summaries are "not misrepresented . . . as anything other than what they actually [are]."  *Chhibber*, 741 F.3d at 856. Dish is "free to argue that the numbers lack[] significance," *id*., or that the numbers are not determinative of Plaintiffs' claims for some other reason supported by the relevant law and facts. What Dish cannot do is preclude Plaintiffs from presenting this factual information—the underlying documents which it either generated itself or has possessed for years—by declaring it expert testimony.  *See Viking Yacht Co. v. Composites One LLC*, 610 F. Supp. 2d 333, 340-41 (D.N.J. 2009) (declining to strike "expert" testimony when testimony was not actually expert testimony).

In addition to the fact that Dr. Yoeli's call counts themselves are squarely covered by the text, purpose, and case law of Rule 1006, Dr. Yoeli is further permitted to offer lay testimony about his call counts under Rule 701 because the call counts themselves are not of a speculative nature, they are perfectly capable of being understood by the trier of fact, and they are not themselves based on scientific or technical hypotheses.  *See* Fed. R. Evid. 701; *State Office Systems, Inc. v. Olivetti Corp. of America*, 762 F.2d 843, 845-46 (10th Cir. 1985).  Indeed, the cases Dish cites in its motion further illustrate the differences between summary evidence and expert opinion.  In *Svindland*—the unpublished district court case from another circuit upon

which Dish primarily relies—the medical expert's proffered testimony was his opinion of

whether an obstetrician's infant-mortality rates were "too high."  2009 WL 1407749, at *3.  In *In*

*re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 936, 945 (D. Minn. 2009), the expert's proffered

testimony was an opinion of whether there was a causal link between using Viagra and an optic-

nerve disorder called non-arteritic anterior ischemic optic neuropathy.  Finally, in *Ludwig v.*

*Pilkington North America, Inc.*, No. 03 C 1086, 2004 WL 2387410, at *3 (N.D. Ill. Oct. 25,

2004), the proffered testimony was an expert's opinion, based on site surveys, about whether soil

and groundwater contamination came from the defendant's manufacturing facility.  In stark

contrast to these subjective opinions, Dr. Yoeli's work simplifies the effort of comparing phone

numbers that appear on multiple lists—an analysis that, while cumbersome and voluminous, a

finder of fact could theoretically conduct itself given unlimited time and attention.  Thus, Dr.

Yoeli's call counts are properly admitted as a summary under Rule 1006 and any further

testimony he offers about those counts is admissible under Rule 701.

III.     **Dish's Motion Is Aimed at the Wrong Target and the Issues Were Already Briefed on Summary Judgment**

　　　Many of the arguments in Dish's current motion may appear repetitive to the Court

because every topic has already been briefed on summary judgment.  Again, Dish is incorrect

about these threshold legal issues, the conclusions it draws based on those issues are also

incorrect, and they do not provide a basis to exclude Dr. Yoeli's testimony.

　　　A.     Dr. Yoeli Did Not Offer Any Opinions About the "Accuracy" of the National Do-Not-Call Registry, Which Is Not Relevant to This Litigation in Any Event

　　　Dr. Yoeli's reports and declarations offer no conclusions or opinions about the accuracy

of the Registry, and Dish does not suggest otherwise.  Dish's motion to strike Dr. Yoeli's

testimony is thus an inappropriate vehicle for litigating the accuracy of the Registry.

13

Furthermore, Dish's current motion, like its summary judgment motion, mischaracterizes all of the legal issues surrounding the Registry—from what the laws prohibit, to what types of numbers may be on the Registry, to how numbers may legally be removed.

Even if what Dish says about the maintenance of the Registry were correct (it is not), a count of how many telemarketing calls Dish made to phone numbers on the Registry would still be highly probative on the question of whether Dish violated the laws at issue here, because those laws prohibit Dish from making telemarketing calls to phone numbers on the Registry.  16 C.F.R. § 310.4(b); 47 C.F.R. § 64.1200(c).  In fact, the Telemarketing Sales Rule and the other telemarketing laws at issue in this case created a system of national and entity-specific do-not-call databases specifically so that telemarketers like Dish would stop making telemarketing calls to the numbers on those lists.  *See Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1234 (10th Cir. 2004) ("Commercial telemarketers are generally prohibited from calling phone numbers that have been placed on the do-not-call registry."); 68 Fed. Reg. 44,144, 44,146 (July 25, 2003) ("[T]he only consumer information telemarketers and sellers will receive from the national registry is the registrant's telephone number.  This is the minimum amount of information that can be provided to implement the national registry.").

Dish's conception of do-not-call lists, on the other hand, is that it is permitted to telemarket to millions of people on those lists and then, when it gets caught, assert that there are millions of factual disputes about whether those people's numbers were "properly" on the do-not-call lists.  Dish Mot. at 13.  In other words, Dish's argument—that its millions of telemarketing calls to phone numbers on the Registry are irrelevant to how many violations of the telemarketing laws it committed, when those laws prohibit making telemarketing calls to the Registry—makes no logical sense.

14

Furthermore, as has already been extensively briefed in this case, Dish's assertions about the Registry itself are not correct.  Dish points to no instance where phone numbers were placed on the Registry by some process other than consumers placing them there.  Instead, Dish criticizes the FTC's policies for retaining phone numbers on the Registry, including the requirement that to be removed, a number must be both disconnected and reassigned.  Dish Mot. at 10-11.  Once again, Dish ignores the fact that FTC does only what Congress allows it to do— *i.e.,* remove numbers that have been both disconnected *and* reassigned.  15 U.S.C. § 6155(a).  To put this issue in perspective for the Court, Plaintiffs set forth a brief legislative history:

Congress gave the FTC specific authority to regulate telemarketing in 1994.  15 U.S.C. § 6101.  When the FTC created the Registry as part of its statutory authority in 2003, it directly addressed the issues that Dish raises.  *See* 68 Fed. Reg. 4,580 (Jan. 29, 2003).  That is, in its January 2003 statement of basis and purpose announcing the creation of the Registry, the FTC considered input from both the telemarketing industry and consumers relating to the "accuracy" of the Registry, and then took a number of reasoned actions.  First, responding to industry concerns that third parties could abuse the system by registering phone numbers not belonging to them, the FTC required a verification process that limits how many phone numbers one entity can register.  *Id.* at 4,639.  Second, to address the specific concerns (raised by Dish here) about disconnected phone numbers, FTC directed that phone numbers were to be deleted from the Registry after five years.  *Id.* at 4,640.  To address the issue of disconnected numbers even more robustly, the FTC also implemented a procedure by which the Registry would be checked against national databases to purge disconnected or reassigned phone numbers.  *Id.*

In September 2003, shortly before the Registry rules were to take effect, a district court in Colorado blocked the Registry.  *Mainstream Mktg. Servs., Inc. v. FTC*, 283 F. Supp. 2d 1151,

15

1171 (D. Colo. Sept. 25, 2003).  One argument the telemarketers made in that case was that

Congress had not authorized the creation of the Registry.  *Id*. at 1168-71.  Within days, Congress

and the President responded by enacting Public Law 108-82, which granted FTC authority "to

implement and enforce a national do-not-call registry."  National Do Not Call Registry, Pub. L.

No. 108-82, 117 Stat. 1006 (Sept. 29, 2003).  That act also specifically "ratified" the "do-not-call

registry provision of the Telemarketing Sales Rule."  *Id*.

     The district court's decision blocking the Registry was quickly stayed, 345 F.3d 850

(10th Cir. Oct. 7, 2003), and then reversed, 358 F.3d 1228 (10th Cir. 2004).  The Registry that

Congress authorized and that the Tenth Circuit allowed to take effect soon became "one of the

most popular Federal programs in history."  H.R. Rep. No. 110-485, at 4 (2007).  The system

functioned as expected despite the rush of consumers wishing to avoid unwanted telemarketing

calls.  Pls.' Opp. to Dish's Mot. for Summ. J. Ex. 393 at ¶ 4 (Torok Decl.) (d/e 380-93).  The

number of registrations on the Registry grew from zero to 30 million within 40 days.  *Id*.

     As a result of the dynamic growth of the Registry, the telemarketing industry

subsequently complained to FTC and to Congress that—as Dish argues here—the Registry had

grown too large, that there were phone numbers on the Registry that should not be there, and that

phone numbers should be more efficiently removed from the list.  *Id*. ¶ 5.  Congress reacted by

passing the Do-Not-Call Improvement Act of 2007, which moots most of Dish's arguments

about the Registry.  15 U.S.C. § 6155.  Rather than mollifying the telemarketing industry by

requiring the FTC to remove disconnected numbers—or wireless numbers, or pager numbers—

from the Registry, the new law actually *heightened* the Registry's protections.

     First, the law rejected the telemarketing industry's concerns and directed that all phone

numbers—including all of those that had been registered or would be registered—"shall not be

16

removed" and were to be retained *indefinitely* on the Registry, specifically superseding FTC's

five-year registration period.  15 U.S.C. § 6155(a).

Second, and most relevant here, the law identified three—and only three—categories of

numbers that could be removed from the Registry.  *Id*.  The first category of numbers that

Congress directed could be removed is "disconnected *and* reassigned" numbers, which were to

be removed by the FTC only upon consulting "national or other appropriate databases."  *Id*.

§ 6155(b) (emphasis added).  The second category is "invalid telephone numbers," which the

FTC may remove "at any time."  *Id*.  The third category is numbers that are removed "upon the

request of the individual to whom the telephone number is assigned."  *Id*. § 6155(a).

The Do-Not-Call Improvement Act of 2007 deals a fatal blow to Dish's arguments

because Congress prohibited FTC from removing the very phone numbers to which Dish objects.

In other words, Congress "could have written a statute" requiring removal of the categories of

phone numbers Dish wants removed, "but it did not."  *E.g.*, *Perez v. Wisconsin Dep't of Corrs.*,

182 F.3d 532, 534-35 (7th Cir. 1999) (rejecting an interpretation of a statute that sought to add

requirements that Congress could have included, but did not).  Instead, Congress told FTC to

retain all the numbers on the Registry except the three limited categories that it authorized to be

removed.

Dish also repeatedly asserts that certain types of phone numbers should not be on the

Registry, settling on the incorrect idea that the Registry should contain only residential landline

telephone numbers.  Dish Mot. at 10-11.  These contentions are unmoored both from the law and

from the evidentiary record.  The texts of the Telemarketing Act and the TSR's prohibition on

sales calls to the Registry do not limit the types of phone numbers they cover.  15 U.S.C. § 6101;

16 C.F.R. § 310.4.  In fact, the TSR covers the very types of phone numbers Dish claims should

not be on the Registry. As to wireless numbers—the largest block of phone numbers Dish objects to—the President of the United States, the FTC, and the Federal Communications Commission ("FCC") all stated, even before the Registry's effective date, that wireless numbers were covered by the Registry laws. George W. Bush, Public Papers of the Presidents of the United States: Book I at pp. 702-03, June 27, 2003, *available at* http://www.gpo.gov/fdsys/pkg/PPP-2003-book1/html/PPP-2003-book1-doc-pg702.htm; 68 Fed. Reg. at 44,146-47; 68 Fed. Reg. at 4,632-33. Furthermore, wireless numbers on the Registry are presumed to be "residential" numbers under FCC's rules. *Id*.

Dish also incorrectly contends that business and government phone numbers should not be on the Registry. Although genuine business-to-business calls are exempted from the TSR, the TSR's business exemption—upon which Dish bears the burden of proof in any event—"has never been construed by the Commission to exempt calls to a business to solicit its individual employees to buy products or services for their own use." Notice of Proposed Rulemaking, TSR, 78 Fed. Reg. 41,200, 41,219 (July 9, 2013). Rather, "the Commission has permitted business telephone numbers to be listed in the [Registry] because, among other reasons, telemarketers who seek to circumvent the Registry have solicited employees at their places of business." *Id*.; *FTC v. Publishers Bus. Servs.*, 821 F. Supp. 2d 1205, 1221 (D. Nev. 2010) (holding that the defendant "is not exempted from the TSR's requirements when it solicits consumers at their place of employment simply because [the defendant] is calling a business number").

As the court in *Publishers Business Services* found, allowing telemarketers free rein to call consumers at their place of business in order to sell personal services would eviscerate the rule because "[s]oliciting an individual consumer while they are at work is at least as abusive, if not more so, than when they are at home." *Id*. And there is evidence in this record that Dish

18

telemarketers engaged in this exact practice—calling consumers at their offices and attempting to sell them residential Dish service.  Pls.' Opp. to Dish's Mot. for Summ. J. Ex. 377 at 128:13-20 (Canale Dep.) (d/e 380-77).  Business numbers can and should be placed on the Registry in order to stop unwanted personal telemarketing calls to those numbers.

Dish also mentions VoIP phone numbers and fax numbers as potentially being included on the Registry in error.  Dish Mot. at 10-11.  These contentions are meritless.  VoIP, or "voice over IP," is simply a different way of delivering phone service.  Whether telemarketing calls are delivered over the Internet or over old copper wires has no impact on whether the TSR applies, and Dish does not explain why there should be different rules for telemarketing to such phone numbers.  As to fax numbers, although the TSR does not cover most facsimile transmissions, a voice telemarketing call selling personal service to a phone number on the Registry that happens to be connected to a fax is covered by the TSR.  Dish offers no support for its assertion that the Rule does not apply.  Put simply, if a person has a VoIP line, fax, or pager, and wants to prevent voice telemarketing calls selling goods or services to those numbers, she may put those phone numbers on the Registry for protection under the TSR.  Dish's complaints about Dr. Yoeli counting Registry hits are entirely misplaced.

B.   The Purpose of the Calls in the Call Records Was Addressed by Fact Witnesses and Dish's Admissions, and Dr. Yoeli Did Not Offer Any Opinions on the Topic

Dish asserts that Dr. Yoeli made a flawed assumption that all of the calls he counted were telemarketing calls.  Dish Mot. at 1 ("Dr. Yoeli makes the assumption that each call to a number on the NDNCR was a telemarketing call.").  But Dr. Yoeli neither offered any expert opinions about the purpose of the calls contained in the call records he analyzed—*i.e.*, he did not use his expertise to opine that certain call records reflected telemarketing calls—nor did he assume that all calls he counted were telemarketing calls.  Rather, Dr. Yoeli's reports made various

19

assumptions on the topic at the instruction of Plaintiffs' counsel, based on information provided either by or to Dish in fact discovery.  *See, e.g.*, Ex. 6 at 3; Ex. 7 at 2-4.

For example, for the Dish 2007-2010 call records, Dr. Yoeli's reports counted Dish telemarketing calls based on the campaign names that *Dish* identified as telemarketing campaigns, and excluded from his call counts those calls that were not associated with these names.  *See* Ex. 3 at 79-122 (lengthy spreadsheet from Dish, with cover email, confirming which campaigns in the 2007-2010 were telemarketing campaigns).  He excluded over 220 million calls using this process; the parties do not dispute that these non-telemarketing calls are not currently at issue.  *See* Ex. 5 at 6-8 (reflecting that Dr. Yoeli began with a count of over 357 million Dish calls in the 2007-2010 records, and was left with a count of about 134.3 million calls after eliminating the non-telemarketing calls).  As to the Dish 2003-2007 call records (not at issue in Plaintiffs' summary judgment motion), Dish refused to provide information about which of its calls were non-telemarketing calls, so Plaintiffs' counsel instructed Dr. Yoeli to assume all calls were telemarketing, based on 2005 and 2007 statements by Dish's lawyers that the 2003-2007 call records reflected its "telemarketing" calls.  *See* Pls.' Exs. 317, 318 (d/e 380-19, 380-20).

As to the retailer call records Plaintiffs offered on summary judgment, the factual record—not Dr. Yoeli's expert opinions—compel the conclusion that all the calls in these call records were telemarketing calls, making Dish's challenge to Dr. Yoeli's factual assumption misplaced and inaccurate.

- As to the Satellite Systems Network calls, a representative of the company testified in a deposition that the calls contained in these specific call records were telemarketing calls selling Dish service.  Pls.' Mot. for Summ. J. Exs. 197, 198 (d/e 342-25, 342-26).

- As to the JSR Enterprises calls, one of the owners of the company stated in a sworn affidavit that all of the company's outbound calls were telemarketing calls selling Dish service. Pls.' Mot. for Summ. J. Ex. 261 (d/e 342-33).

- As to the National Satellite Systems "cold calling" files that Dr. Yoeli analyzed, the president of the company stated in a sworn affidavit that calls contained in those files were telemarketing calls selling Dish service. Pls.' Mot. for Summ. J. Ex. 277 (d/e 342-35).

- As to the Guardian Enterprises calls that were placed on behalf of Star Satellite/Tenaya, both the proprietor of Guardian and the proprietor of Star Satellite testified that Star Satellite hired Guardian to place prerecorded telemarketing calls selling Dish service and that Guardian did place such calls. Guardian's proprietor further testified that every call in the "Tenaya" files from Guardian with the disposition code "C" played or attempted to play a prerecorded telemarketing message to a live recipient. Pls.' Mot. for Summ. J. Ex. 92 at 77:04-18, 109:21-110:09, 144:18-20-145:11 (d/e 342-12); Pls.' Mot. for Summ. J. Ex. 158 (d/e 342-19).

- As to the Guardian Enterprises calls that were placed on behalf of Dish TV Now, the proprietor of Guardian testified that Dish TV Now hired Guardian to place prerecorded telemarketing calls selling Dish service and that Guardian did so. Guardian's proprietor further testified that every call in the "WOW TV" files from Guardian with the disposition code "C" played or attempted to play a prerecorded telemarketing message to a live recipient. Pls.' Mot. for Summ. J.

21

Exs. 156, 157, 158 (d/e 342-19); Pls.' Mot. for Summ. J. Ex. 147 at 9:16-11:11, 144:10-147:11 (d/e 342-18).

These factual assumptions are not only appropriate, but are compelled by the record because there is nothing to contradict them.  Certainly Dish has pointed to nothing.  Dr. Yoeli's testimony is not inadmissible on this basis.

C.   Dr. Yoeli Divided Call Counts by Area Code, and Did Not Offer Any Expert Opinions About Where Those Calls Rang, Which Is Irrelevant

Dish asserts that Dr. Yoeli made a flawed assumption that Dish's telemarketing calls to phone numbers with a Plaintiff State's area codes should be categorized as calls to that state. Dish Mot. at 17-20.  But, contrary to Dish's suggestions, Dr. Yoeli did not offer any expert opinions about whether such calls were "placed to a consumer within the boundaries of California, Illinois, North Carolina, and/or Ohio."  *Id.* at 18.  Rather, Dr. Yoeli has been clear since he began his analyses that he uses the area code assignments of the North American Numbering Plan Administration ("NANPA"), the body that assigns area codes to geographic regions, to divide the call counts by state.  Ex. 6 at 10 ("Area codes were matched to states based on maps obtained from http://www.nanpa.com on September 19, 2012.").  Because Dr. Yoeli was simply dividing call counts based on NANPA maps, he was not offering the opinion that Dish describes and Dish's arguments are misplaced.

Apart from the fact that Dr. Yoeli did not offer expert testimony on this topic, Dish's argument is factually and legally erroneous; neither the record of this case nor the law supports its assertions.  First, Dish's expert John Taylor confirmed during his November 2013 deposition that his own per-state call counts—conducted the same way as Dr. Yoeli's, by counting calls to area codes assigned to the Plaintiff States—reflected calls "into California," "into Illinois," "into North Carolina," and "into Ohio."  Pls.' Reply Ex. 421 at 72:18-73:13 (d/e 391-17).  Moreover,

22

Dish's "facts" on this issue are cobbled together from out-of-context statements in FCC orders and cases on other topics, and Dish has not identified one phone call that Dr. Yoeli and Mr. Taylor identified as a call to a Plaintiff State that was not a call to a Plaintiff State.

In fact, all of the facts compiled by the parties over the course of four years of discovery compel a conclusion that the premise of Dish's argument is incorrect. All 41 of the consumers who testified in this case live in the states that their area codes suggest, and the Seventh Circuit specifically allows representative consumer proof in telemarketing cases because it would be impossible to have all the consumer victims testify. Pls.' Opp. to Dish's Mot. for Summ. J. Ex. 399 (d/e 380-99); *FTC v. Amy Travel Serv., Inc.*, No. 87-cv-6776, 1988 U.S. Dist. LEXIS 13371, at *46-49 (N.D. Ill. Feb. 10, 1988) (concluding that "representative proof of injury [is] sufficient in an FTC enforcement action"), *aff'd*, 875 F.2d 564, 576 (7th Cir. 1989) ("The defendants ran a nation-wide telemarketing operation and it would be cumbersome and unnecessarily expensive to bring all the consumers in for live testimony."). Of the more than 1,000 consumer complaints that match violative call records in this case, every person who reported a Plaintiff State area code also reported an address in that state. Pls.' Opp. to Dish's Mot. for Summ. J. Ex. 305 at ¶ 9(a), App. G (d/e 380-7). This representative proof is sufficient to establish on this record that area codes are reliable indicators of calls to the Plaintiff States. 47 U.S.C. § 227(g)(1).

Moreover, Dish's argument is also legally erroneous. When it enacted the TCPA, Congress gave the States specific enforcement authority over telemarketing calls to phone numbers on the Registry that "relate[]" to each state—by forbidding the states from relying on state-specific do-not-call registries that do not include phone numbers on the national Registry that "relate[]" to a state. 47 U.S.C. § 227(f)(2). For example, California adopted as its do-not-call registry all "the California telephone numbers on the national registry," Cal. Bus. & Prof.

23

Code § 17592(a)(2), and the California legislature explained in Bus. & Prof. Code § 17590(c) that "adopting the California telephone numbers on the national 'do not call' registry . . . will mean that California does not have to . . . develop and maintain a California only 'do not call' registry, thus saving California tax payers millions of dollars."

Dish now argues that Congress and the states got it wrong, and that the only way to tell whether a phone number "relates" to a state under the TCPA is if the consumer is located "within the boundaries of" that state when the phone rings. Dish Mot. at 18. But Congress did not enact the system that Dish envisions. Instead, the TCPA and its implementing regulations tell the states that the laws cover "the part of [the Registry]" that "relates" to a state. 47 U.S.C. § 227(f)(2). If Congress had intended a system where the states could only regulate "phone calls" that occur "within the boundaries of" a state, it would have said so.

Next, Dish's interpretation of the TCPA and state statutes also fails to construe the TCPA's system of "detailed, uniform" telemarketing regulations in a way that does not nullify the laws. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 751 (2012). As mentioned above, California's law uses state area codes to enforce its telemarketing laws by defining its do not call list as all "the California telephone numbers on the national registry." Cal. Bus. & Prof. Code § 17592(a)(2). Because the Registry does not collect or maintain any identifying information aside from the phone number itself, Telemarketing Sales Rule, 68 Fed. Reg. 4,580-01, 4,640 (Dec. 18, 2002), to give meaning to the state law, a "California telephone number" on the Registry can only mean a number with a California area code—otherwise it would be impossible to distinguish a California number from a non-California number. *Catholic Mut. Relief Soc. v. Superior Court*, 165 P.3d 154, 162 (Cal. 2007) ("When used in a statute words must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.").

24

Dr. Yoeli's assumption that calls to phone numbers with Illinois area codes are counted as Illinois calls is not only entirely reasonable, it is also legally correct.   Phone numbers assigned to Illinois area codes are covered by Illinois' enforcement authority under the TCPA and Illinois state laws.  Dish's argument to the contrary is meritless and does not provide any basis for precluding Dr. Yoeli's testimony.

**IV.**      **To the Extent It Is Expert Opinion, Dr. Yoeli's Proposed Testimony Is Admissible Under Rule 702**

Dr. Yoeli's testimony is admissible—in the alternative—under the expert discovery rules. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is the "gold standard" for evaluating the reliability of expert testimony and is essentially codified in the current version of Rule 702.  *See Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013).  The principles set forth in *Daubert*, which addressed scientific testimony, apply equally to non-scientific fields. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999).  No matter the nature of the witness's expertise, Rule 702 "establishes a standard of evidentiary reliability," "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility," and mandates that the testimony have "a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.* at 149 (quoting *Daubert*, 509 U.S. at 590, 592).

In its Rule 702 discussion, Dish does not dispute Dr. Yoeli's extensive qualifications as an expert in economics and statistics, nor does Dish dispute that Dr. Yoeli accurately counted, for example, how many calls in a specific set of call records were made to numbers on the Registry.  Dish Mot. at 1 ("Dr. Yoeli's analysis is merely the comparison of certain call records (here supplied by DISH, independent third party retailers, or a telecommunications provider) with the numbers that were registered on the [Registry].").  Dish's complaints, rather, revolve solely around the idea that Dr. Yoeli's call counts are based on data that Dish believes are

inaccurate. *Id*. at 1, 13. And this is ultimately why Dr. Yoeli's testimony is admissible and

Dish's motion is meritless even on its own terms: Rule 702 cannot be used to strike an expert's

testimony just because a party disagrees with the "factual underpinnings" of that testimony.

"The soundness of the factual underpinnings of the expert's analysis and the correctness

of the expert's conclusions based on that analysis are factual matters to be determined by the trier

of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713,

718 (7th Cir. 2000). Reliability "is primarily a question of the validity of the methodology

employed by an expert, not the quality of the data used in applying the methodology or the

conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

Furthermore, "Rule 702's requirement that the district judge determine that the expert used

reliable methods does not ordinarily extend to the reliability of the conclusions those methods

produce—that is, whether the conclusions are unimpeachable." *Stollings v. Ryobi Technologies,

Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). The district court "abuses its discretion" if it "unduly

scrutinizes the quality of the expert's data and conclusions rather than the reliability of the

methodology the expert employed." *Manpower*, 732 F.3d at 806; *Ernst v. City of Chicago*, __ F.

Supp. 2d __, No. 08 C 4370, 2014 WL 1759550, at *2 (N.D. Ill. May 5, 2014) (citing *Stollings*,

725 F.3d at 766; *Smith*, 215 F.3d at 720).

Controlling precedent holds, therefore, that the "quality of the data" the expert uses and

the "factual underpinnings of the expert's analysis" are not part of the Court's *Daubert*

gatekeeping function. Nevertheless, the "quality of the data" and the "factual underpinnings of

the expert's analysis" are literally the only things that Dish challenges under Rule 702 in its

current motion. Dish Mot. at 1, 13 (listing the three factual assumptions Dr. Yoeli made that

Dish challenges); *see also* pp. 13-24 *supra*. Dish also invites the Court to engage in exactly the

26

type of "undu[e] scrutin[y]" of the experts' underlying data that *Manpower* specifically rejected. *Id*.  Dish's challenge to the admissibility of Dr. Yoeli's testimony is therefore entirely foreclosed by controlling precedent that Dish fails to distinguish or discuss.

Instead of citing the relevant controlling precedents that neuter its arguments, Dish cites *Svindland*—an unpublished district court opinion from another circuit—in which the trial judge excluded a proposed medical expert's opinion about a clinic's infant mortality rates that the expert based on billing data, rather than infant mortality data.  2009 WL 1407749, at *7.  Dr. Yoeli's testimony here is nothing like the expert opinion offered *Svinland*, because Dish does not assert that Dr. Yoeli based his call counts of calls to the Registry on some data source other than the Registry.  But even if *Svindland* could carry the weight that Dish places on it, the district court's decision in that case runs headlong into the Seventh Circuit's holdings in *Smith* and *Manpower*.  Those cases teach that if Dish wants to point out to the Court—and if necessary, to the trier of fact—that it disagrees with Dr. Yoeli's factual assumptions, it may do so.[4]  What it may not do is preclude Dr. Yoeli from offering that testimony because it disagrees with the premise.  Because Dish has not challenged Dr. Yoeli's call analyses on any other basis other than their factual underpinnings, his call counts are admissible under Rule 702.

Dish also briefly mentions a sampling method Dr. Yoeli used to determine whether Dish's violative calls were placed to "residential" landline phone numbers.  Again, Dish's statements on the topic are not correct and not supported by admissible evidence.  First, the only evidence Dish offers to challenge Dr. Yoeli's samples is an unsworn expert report provided by

---

[4] Although Dish may offer any argument it wishes to the Court, Plaintiffs do not agree that such arguments would be admissible at a jury trial (if necessary).  For example, because the "accuracy" of the Registry as Dish conceives of it is irrelevant to this case for a variety of reasons, *see* Pls.' Opp. to Dish's Mot. for Summ. J. at 171-81(d/e 378), evidence and arguments on these topics are not only irrelevant under Rule 401, but would confuse the issues and mislead the jury under Rule 403.  But this is a legal dispute for another day.

one of Dish's own proffered experts—who is an employee of Kelley Drye, counsel of record in this case. Dish's own statements generated for the purposes of litigation by its law firm cannot be considered by the Court on summary judgment because they are hearsay and they do not comply with Federal Rule of Civil Procedure 56(c)(4). *Duff v. Lobdell-Emery Mfg. Co.*, 926 F. Supp. 799 (N.D. Ind. 1996) ("[A] party's own statements are hearsay when offered to prove the truth of the matter asserted, and . . . they fall within no recognized hearsay rule.").

Moreover, as explained in Plaintiffs' summary judgment filings, Dr. Yoeli's sampling project was designed to identify known, undisputed landline numbers for purposes of the TCPA and several of the state-law claims that have a "residential" limitation. Contrary to Dish's contentions, Plaintiffs used these samples to reduce the number of violations on which they sought summary judgment. *Compare* Dish Mot. at 21 ("[Dr. Yoeli] does not reduce his estimate of DISH's alleged violations . . ."); *with* Pls.' Mot. for Summ. J. at 165-66 ("Plaintiffs used a statistically significant sample to . . . reduce by 60 percent the total number of Star Satellite prerecorded calls sent into each state."). Plaintiffs did not reduce the call counts in every instance by the "residential" sampling method because: (a) the TSR is not limited to calls to "residential" phone numbers, so the issue is irrelevant to the United States' claims, *see supra* at 17-19; (b) Dish's expert already purported to remove all of the nonresidential calls from some of his call counts, Pls.' Mot. for Summ. J. at 161 (d/e 341); or (c) Dish created some calling campaigns with a filter that dialed only "residential" phone numbers, *id*. at 163-64.

Finally, Dish asserts that Dr. Yoeli's counts of the number of calls Dish made to phone numbers on the Registry are not relevant to this litigation. Dish Mot. at 21-22. How that assertion can possibly be correct—when the statutes at issue require Plaintiffs to prove how many telemarketing calls Dish made to phone numbers on the Registry, 16 C.F.R. § 310.4(b); 47

C.F.R. § 64.1200(c)—is lost on Plaintiffs. Plaintiffs are entitled to present to the Court the evidence of Dish's millions of telemarketing calls to phone numbers on the Registry, and Dish's current motion should be denied.

## **CONCLUSION**

Wherefore, Plaintiffs respectfully request that the Court deny Dish's motion to strike.


Dated: June 26, 2014                        Respectfully,


OF COUNSEL:                                FOR THE UNITED STATES:

LOIS C. GREISMAN                          STUART F. DELERY
Associate Director for Marketing Practices  Assistant Attorney General

ROBERTO ANGUIZOLA                       MICHAEL S. BLUME, Director
Assistant Director, Marketing Practices

                                              _____/s/ Patrick R. Runkle_____
RUSSELL DEITCH                           LISA K. HSIAO
GARY IVENS                               PATRICK R. RUNKLE
Attorneys                                SANG H. LEE
Federal Trade Commission                 Trial Attorneys
600 Pennsylvania Ave. NW, Room 288       Consumer Protection Branch
Washington, DC  20580                    U.S. Department of Justice
Telephone: 202-326-2585 (Deitch),        PO Box 386
202-326-2330 (Ivens)                     Washington, DC  20044-0386
Fax: 202-326-3395                        Telephone: 202-532-4892 (Hsiao)
                                         202-532-4723 (Runkle)
                                         202-532-4793 (Lee)
                                         Fax: 202-514-8742
                                         Lisa.K.Hsiao@usdoj.gov
                                         Patrick.R.Runkle@usdoj.gov
                                         Sang.H.Lee@usdoj.gov

                                         GREG GILMORE
                                         Assistant U.S. Attorney
                                         U.S. Attorney's Office for C.D. Ill.

318 S. 6th St.
Springfield, IL  62701-1806
Telephone: 217-492-4450
Fax: 217-492-4512
Greg.Gilmore@usdoj.gov

FOR THE PEOPLE OF THE STATE OF
CALIFORNIA

KAMALA D. HARRIS
Attorney General of the State of California
JINSOOK OHTA
Deputy Attorney General
Consumer Law Section
Office of the Attorney General
110 W. "A" Street, Suite 1100
San Diego, CA  92101-3702
Telephone: 619-645-2089
Fax: 619-645-2062
jinsook.ohta@doj.ca.gov

FOR THE PEOPLE OF THE STATE OF
ILLINOIS

LISA MADIGAN
Attorney General of Illinois
ELIZABETH BLACKSTON
Assistant Attorney General; Chief, Consumer
Fraud Bureau

PAUL ISSAC
Assistant Attorney General
Consumer Fraud Bureau
601 South University Ave Suite 102
Carbondale, IL 62901
Telephone: 618-529-6418
Fax: 618-529-6403
jfeltman@atg.state.il.us

FOR THE STATE OF OHIO

MIKE DEWINE
Attorney General of Ohio
MICHAEL ZIEGLER
ERIN B. LEAHY
Assistant Attorneys General
Consumer Protection Section
Ohio Attorney General's Office
30 E. Broad St., 14th Floor
Columbus, OH  43215-3414
Telephone: 614-466-3980 (Ziegler)
         614-752-4730 (Leahy)
Fax: 866-768-2648
Michael.Ziegler@ohioattorneygeneral.gov
Erin.Leahy@ohioattorneygeneral.gov

FOR THE STATE OF NORTH CAROLINA

ROY COOPER
Attorney General of North Carolina
DAVID KIRKMAN
Assistant Attorney General
Office of the Attorney General
114 W. Edenton St.
Raleigh, NC  27699-9001
Telephone: 919-716-6000
Fax: 919-716-6050
dkirkman@ncdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiffs' Opposition to Dish's Motion to Strike was served via ECF this 26th day of June 2014, upon each of the persons listed below:

> Joseph A. Boyle
> Lauri A. Mazzuchetti
> jboyle@kelleydrye.com
> lmazzuchetti@kelleydrye.com
>
> Counsel for Dish Network, LLC

> s/ Patrick R. Runkle
> PATRICK R. RUNKLE

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

Pursuant to CDIL-LR 7.1(B)(4)(c), I hereby certify that the above memorandum complies with the type-volume limitation of the Court's June 6, 2014 oral order. The memorandum has 9,136 words, exclusive of front matter and signature block, as counted by the word processing system used to prepare the document, Microsoft Word 2010.

> s/ Patrick R. Runkle
> PATRICK R. RUNKLE