**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO,<br><br>    Plaintiffs,<br><br>    v.<br><br>DISH NETWORK L.L.C.,<br><br>    Defendant. | Case No.: 3:09-cv-03073 |

**DEFENDANT DISH NETWORK L.L.C.'S REPLY IN SUPPORT**
**OF ITS MOTION TO PRECLUDE THE EXPERT TESTIMONY OF DR. YOELI**

Defendant DISH Network L.L.C. ("DISH"), by and through its undersigned counsel, states as follows for its Reply in Support of its Motion to Strike the expert testimony of Dr. Erez Yoeli comparing DISH's call records to the raw hits produced by Plaintiffs' vendor InterImage.

**INTRODUCTION**

Plaintiffs' primary response to DISH's Motion to Strike Dr. Yoeli's testimony is that the Motion should have been filed in conjunction with DISH's opposition to Plaintiffs' Motion for Summary Judgment, but this argument ignores one crucial fact – Plaintiffs' Motion for Summary Judgment did not seek to admit the testimony of Dr. Yoeli. In fact, Plaintiffs specifically disclaimed reliance on Dr. Yoeli's testimony, instead attempting to prove violations by reliance on the testimony of DISH's own expert. Plaintiffs' argument that DISH should have sought to preclude admission of testimony that Plaintiffs themselves did not seek to admit fails on its own terms.

1

Plaintiffs' attempt to re-characterize Dr. Yoeli's testimony as "fact" testimony is similarly flawed. Dr. Yoeli testified at his deposition that while he employed his expertise and expressed an opinion regarding the correct methodology that should be used to analyze the call records at issue, the actual total of supposedly violative calls that resulted from that analysis is not his opinion, but merely "fact." Plaintiffs attempt to parse out Dr. Yoeli's expert opinion from the conclusions reached by using that expertise should be rejected as an obvious attempt to circumvent the requirements of admissibility under *Daubert*. If Plaintiffs' argument is accepted, any expert can apply any methodology, no matter how unsound, and argue that the result is not expert testimony, but is simply a summary of facts. Plaintiffs' argument would eviscerate the court's role as gatekeeper under *Daubert,* and allow the admission of flawed and unsound testimony under the guise of "fact." Plaintiffs' attempt to draw a distinction between Federal Rules of Evidence 1006 and 702 is immaterial because Dr. Yoeli's analysis (and analysis was conducted by Dr. Yoeli) is inadmissible under either theory. *U.S. v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) ("a summary document must be accurate and nonprejudicial"); *see also Rowe Entertainment, Inc. v. William Morris Agency*, No. 98 CIV 8272(RPP), 2003 WL 22124991, at *9 (S.D. N.Y. 2003) (expert testimony should be excluded if it is based on data that is "speculative or conjectural") (*quoting Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

Plaintiffs' Response does not seriously dispute that the National Do Not Call Registry ("NDNCR") contains substantial flaws. Indeed, Plaintiffs skim over the substance of DISH's objections, instead arguing that the NDNCR's inaccuracies are immaterial because the law prohibits calls to any number on the NDNCR, no matter the nature of the number or the call. Such a conclusion is not supported by the law. Dr. Yoeli's reliance on the NDNCR renders his

testimony inaccurate and misleading. Accordingly, Dr. Yoeli's testimony should be stricken, and Dr. Yoeli should be barred from presenting his analysis at trial.

## ARGUMENT

### I. DISH'S MOTION IS TIMELY

A motion *in limine* is a motion made at the outset or threshold of the case, typically prior to the commencement of trial. *U.S. v. Phillips,* No. 12-cr-872, 2014 WL 2801323, at *1 (N.D. Ill. June 12, 2014) (citing Black's Law Dictionary (9th ed. 2009)). The practice of using such rulings has developed under the district court's inherent authority to manage trials. *Id.,* citing *Luce v. U.S*., 469 U.S. 38, 41 n.4 (1984). Plaintiffs incorrectly argue that DISH has waived its Motion to Strike Dr. Yoeli's testimony because it did not file it in conjunction with its Summary Judgment briefing. Plaintiffs argument ignores the summary judgment briefings, the schedule of this case, and the applicable law under Federal Rule of Evidence 702.

DISH expressly argued that Dr. Yoeli's testimony was inadmissible in its Response to Plaintiffs' Motion for Summary Judgment. Indeed, it was Plaintiffs, not DISH, who argued that the Court did not need to consider Dr. Yoeli's testimony on summary judgment. "[While Dr. Yoeli] undertook a lengthy process to analyze those records between late 2010 and late 2013, the Court need not resolve any disputes about that process on summary judgment because Plaintiffs base their motion on the subset of violations that Dish's expert identified in his reports. For purposes of this brief, Plaintiffs treat the raw facts of the call counts Dish's expert generate as true, thereby removing from the summary judgment phase most, if not all, of the factual disputes about the call record analyses." (Plaintiffs' Motion at 89). Plaintiffs expressly stated that they were not relying on Dr. Yoeli's testimony in their Motion for Summary Judgment, yet now complain that the Motion to Strike such testimony has been waived because DISH did not file

3

the Motion in conjunction with its summary judgment response. Plaintiffs' complaint is too clever by half.

Even though Plaintiffs' disclaimed reliance on Dr. Yoeli's testimony, DISH's response to Plaintiffs' Motion for Summary Judgment does argue that Dr. Yoeli's testimony was inadmissible. *See, e.g.,* DISH's Summary Judgment Response at 305-306. DISH's response makes the same arguments that its Motion to Strike makes, that "Dr. Yoeli ignored the FTC's own subcontractor's findings with respect to the proliferation of non-residential landlines on the NDNCR and the flaws in the disconnect/reassign basis." *Id.* at 306. DISH further argued that Dr. Yoeli did not employ scientifically supportable methods to analyze the call records, and noted that Plaintiffs were attempting to avoid this fatal evidentiary defect by relying on the testimony of DISH's own expert, and not that of Dr. Yoeli. Moreover, DISH raised the same concerns regarding reliability of the NDNRC and the use of area codes. *See id.* at 205-306, 352-355.

Second, even if DISH did not address the issue on Summary Judgment, that does not preclude DISH from asserting that Dr. Yoeli's testimony is inadmissible at trial, which is the thrust of DISH's Motion to Strike. *Thompson v. City of Chicago,* 472 F.3d 444, 450 (7th Cir. 2006) (district court granted motion *in limine* made after summary judgment and prior to trial to bar expert testimony). This is particularly true since Plaintiffs did not seek to admit that testimony on summary judgment. Indeed, this Court's local rules require that Motions *in limine* be filed no later than 14 days to the scheduled start of trial. L.R. 16.1(E)(8). Courts often postpone rulings on Motions *in limine* until sometime during trial in order to determine whether the evidence supports the admission of the testimony. Even where a ruling on a motion *in limine* is made prior to trial, the preliminary nature of the motion means that they are subject to revision

based on the introduction of additional evidence. *U.S. v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989), quoting *Luce*, 469 U.S. at 41 ("a ruling [in limine] is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the proffer. Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling.").

Plaintiffs' argument that DISH waived its ability to challenge admission of Dr. Yoeli's testimony pursuant to Federal Rule of Evidence 1006 is similarly without merit. Once again, Plaintiffs did not seek to admit Dr. Yoeli's testimony on the basis of Rule 1006 in their Motion for Summary Judgment. Moreover, Plaintiffs' assertion that DISH "apparently agreed" that Dr. Yoeli was a fact witness because DISH noticed a 30(b)(6) deposition and Plaintiffs produced Dr. Yoeli in response is disingenuous at best. *See* Response at 9. DISH noticed a 30(b)(6) deposition on the call record analyses because Plaintiffs suddenly did an about-face regarding Dr. Yoeli's expert testimony, arguing that it was in fact factual testimony. In order to protect its rights, DISH was entitled to discovery on this new and novel theory, but pursuing discovery on this issue hardly constitutes agreement with Plaintiffs' assertion – to the contrary it suggests that DISH intended to challenge this new theory. Moreover, Plaintiffs' decision to produce Dr. Yoeli in response to the 30(b)(6) notice can hardly be attributable to DISH. DISH has not waived its ability to challenge the admissibility of Dr. Yoeli's testimony, and its Motion to Strike is timely.

**III.  DR. YOELI'S TESTIMONY IS EXPERT TESTIMONY**

Plaintiffs portray Dr. Yoeli's testimony as if he is merely tallying DISH's call records, a simple matter of addition, but Plaintiffs both mischaracterize the scope of Dr. Yoeli's work and the basis for his ultimate conclusions regarding the number of violations. First, it is not true that Dr. Yoeli was simply adding together calls included in the voluminous call records produced by

DISH. As Dr. Yoeli himself explained, there are multiple ways to analyze the voluminous call records provided by DISH. Dr. Yoeli used his expertise to determine what steps should be taken to analyze the call records – in other words Dr. Yoeli developed the methodology used. *See* December 12, 2012 Deposition of Dr. Erez Yoeli, attached hereto as Exhibit 1, at 74:176:3. Indeed, Dr. Yoeli originally admitted at his deposition that the ultimate conclusions regarding the number of violations was his expert opinion. *Id.* at 38:15-21 (Q. What opinions were you asked to express as an expert in this matter? A. I provide counts of violations as defined by the DOJ in Dish Network's call record data of the Do Not Call list or the Do Not Call rules.") (objections omitted). It was only after a break with his attorney that he attempted to clarify that while the methodology used to reach those numbers were his expert opinion, the actual numbers were not, those were simply "facts." *Id.* at 41:7-19 ("Dr. Yoeli: Can I clarify something? Q: Sure. Dr. Yoeli: The previous answer regarding what the scope of my opinions are, scope should be fizec to the opinion is on how to analyze the data, not on the actual counts. So I don't want to lead to any confusion over those two things. Q: Did your counsel just ask you to make that correction on the record? Dr. Yoeli: My counsel, my counsel suggested that I may have created some confusion.").

Plaintiffs' attempts to parse Dr. Yoeli's expert opinions in this case by supposedly expressing opinions regarding the methodology, but not the ultimate conclusions reached by applying that methodology, should be rejected by this Court as an obvious attempt to circumvent the requirements of admissibility for expert testimony. Courts consider expert testimony to be reliable under Rule 702 if the witness is qualified "as an expert by knowledge, skill, experience, training or education" and the expert's **reasoning or methodology** underlying the testimony is scientifically reliable. FRE 702, *Daubert*, 509 U.S. at 592-93 (emphasis added). As the Seventh

6

Circuit instructs, "[t]he focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate." *Winters v. FruCon Inc.*, 498 F.3d 734, 742 (7th Cir. 2007). Plaintiffs do not explain how Dr. Yoeli's conclusions reached by applying his expert methodology to the facts of this case are any less of expert opinions than any expert opinion in any case – indeed this is the essence of expert testimony. *See Adams v. Ameritech Sys., Inc.* 231 F.3d 414, 425 (7th Cir. 2000) ("[T]he question . . . is whether [the conclusions were reached] in a reliable and statistically sound way, such that they contained relevant evidence that a trier of fact would have been entitled to consider.") Put simply, Dr. Yoeli's opinion is that his methodology was the correct one to apply to reach the correct number of violations, but at the same time he disclaims any opinion that the final total reached is correct. This is nonsensicle, and if accepted, would render almost every expert report submitted in any case "fact testimony."

Plaintiffs' statement that Dr. Yoeli simply "summarized" the call records at issue oversimplifies Dr. Yoeli's analysis in this case by an enormous scale. Plaintiffs may as well suggest that, if given enough time, the Court itself could simply review the records at issue, perform its own simple arithmetic, and reach the same totals as Dr. Yoeli did. Nothing could be further from the truth. The records at issue in this case are voluminous and complicated, and require specialized knowledge and expertise to access and query. Even if Dr. Yoeli simply performed queries that resulted in total call numbers he did so by relying on his specialized knowledge and training – the very essences of expert testimony. *See BRC Rubber & Plastics, Inc., v. Continental Carbon Co.,* No. 1:11-cv-190, 2014 WL 554565, at *4 (N.D. Ind., Feb. 11, 2014) ("analysis requiring specialized knowledge . . . . should be the exclusive province of expert testimony.") (quotation omitted); *see also* Advisory Committee's Note, Fed. R. Evid. 702 (Rule

7

702 broadly encompasses not only traditional experts but also "skilled" witnesses.) Yet Dr. Yoeli did much more than simply access the call record and run various queries. Dr. Yoeli made various decisions regarding the proper methodologies to be used in determining the correct number of violative calls, much more than the simple addition Plaintiffs suggest is at issue. This is the very definition of expert testimony. *Fowler v. U.S.¸* No. 08-cv-2785, 2011 WL 1004574, at *7 (N.D. Ill March 18, 2011) ("Experts often are asked to render an opinion based on the application of their specialized knowledge and/or experience to a set of facts, real or hypothetical.")

      That Dr. Yoeli's testimony is expert testimony is made all the more clear by comparing Dr. Yoeli's methodologies and conclusions to those of DISH's expert, John Taylor. Both Dr. Yoeli and Mr. Taylor endeavored to identify which telephone calls were made to which telephone numbers, and whether those telephone numbers appeared in various other databases. Yet they came up with significantly differently totals. The difference is explained by the methodologies employed by these experts. If Dr. Yoeli's testimony was merely tabulation, with no reliance on his expertise in applying methodologies to the call records than Dr. Yoeli and Mr. Taylor would have come up with the same, or at least roughly the same analysis. Much as Plaintiffs complain that the final number arrived at are not Dr. Yoeli's opinion, it is not the final numbers that DISH objects to – rather it is the underlying methodologies and unreliable data that result in the final totals that is unreliable, rendering the final totals inadmissible.

      Nor is otherwise inadmissible expert testimony admissible through Rule 1006. Although Rule 1006 permits a party to introduce in the form of a chart, summary, or calculation "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court," such evidence remains subject to all evidentiary objections. *United States v.*

*Milkiewicz,* 470 F.3d 390, 396 (1st Cir. 2006) ( "Evidence admitted under Rule 1006 must be otherwise admissible and remains subject to the usual objections under the rules of evidence and the Constitution.")  The proponent of evidence to be admitted under Rule 1006 "must lay a proper foundation as to the admissibility of the material that is summarized and show that the summary is accurate." *Needham v. White Laboratories, Inc*., 639 F.2d 394, 403 (7th Cir. 1981). The foundation as to the admissibility of the totals reached by Dr. Yoeli is the reliability and foundation of his methodology in reaching those totals.  In other words, relying on Rule 1006 does not circumvent *Daubert's* requirements regarding admissibility, and Dr. Yoeli's testimony is inadmissible under Rule 1006 for the same reason it is inadmissible under Rule 702 – it is unreliable.  *See Southwire Co v. J.P. Morgan Chase & Co.,* 528 F. Supp. 2d 908, 930 (W.D. Wis. 2007) ("In this case, defendants are challenging the foundation for [the experts'] decision to include the records they did in their summary. Therefore, it is not the summaries themselves, so much as the conclusions being drawn from them, that are the subject of defendants' attack. Because [the experts] are qualified to draw those conclusions only by virtue of their specialized training and experience, defendants' challenge to their testimony falls under Rule 702, not Rule 1006.")

## IV.  DR. YOELI'S TESTIMONY IS INADMISSIBLE

Contrary to Plaintiffs' assertions, the FTC has made it clear that the NDNCR was intended solely to address calls made to ***individual consumer landlines***, stating that the NDNCR "is designed to advance the privacy rights of consumers by providing them with an effective, enforceable means to make known to sellers their wishes not to receive solicitation calls."  68 Fed. Reg. at 4635.  Thus, the NDNCR protects the right of individuals against "unwanted speech

*into their own homes,*" not at their place of business or on their cell phones. *See Mainstream Marketing Services, Inc. v. FTC*, 358 F.3d 1228 (10th Cir. 2004) (emphasis added).)[1]

If the NDNCR were to apply to wireless and business telephone numbers as Plaintiffs now suggest, it would raise substantial questions regarding the Constitutionality of the NDNCR as a whole.[2] In *Mainstream Marketing Services, Inc. v. FTC*, 358 F.3d 1228 (10th Cir. 2004), a consolidated appeal challenging the constitutionality of the TSR under the First Amendment, the Court relied on the NDNCR's limited purpose of protecting consumers from unwanted commercial speech that invades the privacy of their home in finding that the NDNCR does not overly burden the First Amendment's right to freedom of speech. *Id.* at 1233. The Court noted that it is the unique status of the home as a personal sanctuary in our Constitutional jurisprudence that justified the burden on freedom of speech imposed by the NDNCR. *Id.* Indeed, in arguing for the Constitutionality of the NDNCR, the FTC emphasized that the TSR and NDNCR are premised on the government's interests in "protecting the privacy of individuals *in their homes*." *Id.* at 1237 (emphasis added). The FTC emphasized that "[p]erhaps the most striking feature of the do-not-call registry is that it . . . merely allows *individual households* to exercise the right 'to be left alone,' by barring *from their own homes* speech by others they do not wish to hear." (DISH's Summary Judgment Exhibit DX-220) (emphasis added.) The FTC further confirmed that "the do-not-call registry is aimed at an especially important element of *residential privacy*,

---

[1] The FTC also concluded that its National Do Not Call List "[t]his Order establishes a national do-not-call list for those residential telephone subscribers who wish to avoid most unwanted telephone solicitations." FCC, Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991, 68 Fed. Ref. 44,144, 44,175 (July 25, 2003).

[2] Plaintiffs also argue that the NDNCR properly applies to VoIP service. Even if the FTC had jurisdiction over calls made to, or, using VoIP service, the FTC has conceded that it has no effective means of removing VoIP numbers from the NDNCR when the person assigned to the number changes because VoIP providers are not required to report to the databases that the FTC relies upon in an attempt to determine when a telephone number ceases to be used by the Registrant Consumer.

the protection from direct interruption *of **home and family life***." (*Id.* at 31 (emphasis added).) Thus, to support the constitutionality of the NDNCR, the FTC has made clear that, since the NDNCR's inception, the FTC's enforcement jurisdiction only reaches landline, consumer telephone numbers that are properly registered on the NDNCR.

In keeping with the foregoing, the FTC has conceded in this matter that it has no jurisdiction with respect to calls made to wireless telephone numbers. (DISH's Summary Judgment Exhibit DX-155, Dziekan Dep. 99:5-11.) In addition, the TSR specifically does not cover "[t]elephone calls between a telemarketer and any business . . . ." 16 C.F.R. § 310.6(b)(7). Likewise, government phone numbers also do not fit within the TSR's scope. Indeed, this Court specifically noted that under the TSR "[c]onsumers were permitted to register their personal telephone numbers on the Do Not Call List." (d/e 20, Opinion re: DISH Motion to Dismiss, 11/02/2009, at 3.) As such, there can be no TSR violations arising from calls made to business or government lines. In sum, the FTC's enforcement jurisdiction under the TSR is limited to consumer residential landlines. These limitations are not only contained in the text of the statute, they are constitutionally mandated by the First Amendment. *Mainstream Marketing Services,* 358 F.3d at 1233.

And it is these limitations that Dr. Yoeli fails to account for in his analysis, which renders his testimony unreliable. The FTC's contractors have admitted that the NDNCR contains substantial amounts of inaccurate information. The FTC and its contractors from day one have allowed any number, whether an actual telephone number, a wireless number, a business, or a fax number to be registered on the NDNCR without any validation requirements. (DISH's Summary Judgment Exhibit DX-165, Lvaenda Dep. 47:23-48:2-10). Dr. Robert Fenili, DISH's expert witness, estimates that only 28.2% of numbers registered on the NDNCR are

11

properly-registered active residential landlines. (DISH's Summary Judgment Exhibit DX-209 Table 4.) As of September 2011, over 50% of all numbers on the NDNCR are wireless numbers, an estimate consistent with PossibleNOW's analysis in 2009. (DX-165, Lvaenda Dep. 47:23-48:2-10). And historical versions of the NDNCR are even more inaccurate. *See* Motion at 9-10.

It is unquestionable that the NDNCR is comprised mostly of wireless numbers, business and government numbers and VoIP numbers, and Plaintiffs' response does not seriously dispute this fact. Thus, Dr. Yoeli's analysis is based upon a fundamental, but fatally wrong, assumption – that all numbers on the NDNCR are both properly on the NDNCR and are subject to the FTC's jurisdiction. Dr. Yoeli's methodology assumes that all phone numbers on the NDNCR provide a proper basis to assert a telemarketing Do Not Call violation, but this is demonstrably incorrect. To layer assumption on assumption, Dr. Yoeli then also assumes that each call record represents a telemarketing call, despite the fact that there is no factual basis for this assumption. In the final layer, Dr. Yoeli then assumes that calls made to certain area codes were made to the geographic areas assigned to those area codes, an invalid assumption given the high number that no longer operate within their assigned geography. *See, e.g., Teltech Sys. Inc. v. Barbour*, 866 F. Supp. 2d 571, 575-76 (S.D. Miss. 2011).

Rule 702(b) requires that an expert's "testimony [be] based on sufficient facts or data." "[W]here "the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." *Quirin v. Lorillard Tobacco Co.,* No. 13 C 2633, 2014 WL 883548, at *3 (N.D. Ill. March 6, 2014) (quoting *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999)). The court may "exclude expert testimony when it determines that the underlying facts or data cannot support the conclusion— i.e., when the analytical gap between the two is too great to put the conclusion before a jury."

12

*Cunningham v. Masterwear, Inc*., No. 1:04–cv–1616, 2007 WL 1164832, at *2 (S.D.Ind. Apr.19, 2007).  Dr. Yoeli erroneously relies on "massive computer processing" that generates "hits" to the NDNCR, despite the unquestionable weakness of the data contained in the NDNCR.  Dr. Yoeli's exclusive reliance on this faulty data renders his opinions unreliable.  Dr. Yoeli's reliance on unfounded assumptions regarding the NDNCR render his analysis inaccurate, misleading, and unreliable.  Accordingly, this Court should strike Dr. Yoeli's proposed testimony.

## CONCLUSION

Wherefore, Defendant DISH Network L.L.C. respectfully requests that this grant DISH's Motion to Strike the expert testimony of Dr. Erez Yoeli comparing DISH's call records to the raw hits produced by Plaintiffs' vendor, InterImage, and for such other and further relief as the Court deems just.

Dated:  August 5, 2014                                    Respectfully submitted,

KELLEY DRYE & WARREN LLP

By:  s/ Henry T. Kelly

Joseph A. Boyle
Lauri A. Mazzuchetti
200 Kimball Drive
Parsippany, New Jersey
Phone (973) 503-5900

Henry T. Kelly
333 W. Wacker Dr.
Chicago, Illinois 60606
Phone (312) 857-2350
*Attorneys for Defendant
DISH Network L.L.C*.