## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **and the STATES of CALIFORNIA,** | ) | |
| **ILLINOIS, NORTH CAROLINA,** | ) | |
| **and OHIO,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 09-3073** |
| | ) | |
| **DISH NETWORK LLC,** | ) | |
| | ) | |
| **Defendant,** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

This matter comes before the Court on Defendant Dish Network LLC's (Dish) Motion to Preclude the Expert Testimony of Dr. Yoeli (d/e 398) (Motion).  For the reasons set forth below, the Motion is DENIED.

## BACKGROUND

Dish sells satellite television programming and related services.  Dish markets its services in several ways, including telemarketing.  The Plaintiffs allege that Dish violated state and federal laws ("Do-Not-Call" or "DNC" Laws) governing:  (1) outbound telemarketing calls to the telephone numbers of persons who have

indicated that they do not want to receive such calls; and (2) telemarketing calls that convey a prerecorded message. <u>Second Amended Complaint and Demand for Jury Trial (d/e 257) (Second Amended Complaint)</u>.

The Plaintiffs submitted several reports by Dr. Erez Yoeli, Ph.D., to support their claims. Dr. Yoeli is an economist employed by the Federal Trade Commission (FTC). Dr. Yoeli's reports contain analyses and opinions based on telemarketing call records from Dish, Dish's telemarketing vendors, and several of Dish's authorized retailers. Dr. Yoeli's reports relate to all twelve counts in the Second Amended Complaint.

Dish seeks to bar Dr. Yoeli's testimony because Dish argues that his analyses and opinions fail to meet the standard for admissible expert opinion evidence. <u>See</u> Fed. R. Evid. 702; <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). Dish argues that Dr. Yoeli's testimony "lacks a reliable foundation, is based on fatally flawed factual assumptions, is irrelevant, and will not assist the trier of fact." <u>Motion</u>, at 1.

The Plaintiffs argue that the Motion is untimely and should not be considered until after the pending cross-motions for

summary judgment (d/e 341 and 346) are resolved. The Plaintiffs also argue that the Motion should be denied on the merits. The Court agrees that the Motion is untimely for purposes of summary judgment. The Court required Dish to file its motion for summary judgment by January 6, 2014, and its opposition to the Plaintiffs' motion for summary judgment by March 5, 2014. Text Order entered November 7, 2013; Text Order entered February 12, 2014. Dish filed the Motion on March 19, 2014. The Motion should have been filed with Dish's summary judgment motion, or with its opposition to the Plaintiffs' summary judgment motion. See Laborers' Intern. Union of North America v. Caruso, 197 F.3d 1195, 1197 (7th Cir. 1999) (failure to raise an argument in a timely manner waives the right to raise it later to challenge summary judgment); Questar Pipeline Co. v. Grynberg, 201 F.3d 1277, 1289-90 (7th Cir. 2000) (the principle of waiver applies to Daubert challenges.). The Court, however, will address the Motion on the merits because the Motion is timely for purposes of trial.

The Motion depends in large part on Dish's legal arguments regarding the federal Do-Not-Call Laws and the application of those laws to the federal claims in the Second Amended Complaint. The

Court, therefore, will describe the relevant federal laws and regulations, summarize the federal claims, summarize Dr. Yoeli's analyses and opinions, summarize Dish's evidence regarding the National Do-Not-Call Registry (Registry) and telephone area codes, and then address the merits of the Motion.[1]

<u>THE FEDERAL DO-NOT-CALL LAWS AND REGULATIONS</u>

The relevant federal Do-Not-Call Laws are the Telemarketing Consumer Fraud and Abuse Prevention Act (Telemarketing Act) and the Telephone Consumer Protection Act (TCPA). 15 U.S.C. § 6101 et seq.; 47 U.S.C. § 227. The Telemarketing Act authorizes the FTC to regulate telemarketing, and the TCPA authorizes the Federal Communications Commission (FCC) to regulate telemarketing. The FTC promulgated the Telephone Sale Rule promulgated by the FTC (TSR) under the Telemarketing Act, and the FCC promulgated its rule (FCC Rule) under the TCPA. TSR, 16 C.F.R. § 310.1 et seq.; FCC Rule, 47 C.F.R. § 64.1200 et seq.

The resulting overlapping regulations prohibit three types of telemarketing practices relevant here: (1) calling a person who has

---

[1] Some portions of this Opinion are based on this Court's Opinion on the cross-motions for summary judgment entered on the same date as this Opinion.

previously stated that he or she does not wish to be called by or on behalf of the seller whose goods or services are being offered for sale; (2) calling a person whose telephone number is registered on the Registry; and (3) calling and delivering a prerecorded telemarketing message to the recipient of the call (hereinafter referred to as a "prerecorded call"). The Telemarketing Act, the TCPA, and the regulations thereunder address these three issues in slightly different ways.

## I.    The TSR

On August 23, 1995, the FTC issued the TSR.  60 Fed. Reg. 43842 (August 23, 1995).  The 1995 version of the TSR prohibited, among other things, a "telemarketer from initiating, or any seller to cause a telemarketer to initiate, an outbound telephone call to a person when that person previously has stated that he or she does not wish to receive such a call made by or on behalf of the seller whose goods or services are being offered."  See 60 Fed. Reg. at 43854-55.

The 1995 version of the TSR also provided a safe harbor defense for sellers and telemarketers:

The safe harbor states that a seller or telemarketer will not be liable for such violations if: (1) it has established and implemented written procedures to comply with the "do not call provisions"; (2) it has trained its personnel in those procedures; (3) the seller, or the telemarketer acting on behalf of the seller, has maintained and recorded lists of persons who may not be contacted; and (4) any subsequent call is the result of error.

60 Fed. Reg. at 43855. The parties refer to the "lists of persons who may not be contacted" as an "entity-specific do-not-call list" or an "internal do-not-call list."

On January 29, 2003, the FTC amended the TSR. 68 Fed. Reg. 4580 (January 29, 2003). The FTC amended the TSR pursuant to the 2001 amendments to the Telemarketing Act. See National Federation of the Blind v. F.T.C., 420 F.3d 331, 334-35 (4th Cir. 2005).

The amended 2003 TSR established the Registry. 16 C.F.R. § 310.4(b)(1)(iii). Telephone customers who do not wish to be called by sellers or telemarketers generally may place their telephone numbers on the Registry. Sellers and telemarketers may not call a person whose telephone number has been on the Registry for at least 30 days unless the seller or telemarketer has an Established

Business Relationship[2] with the person or has prior written consent.

The Registry opened for registrations in June 2003 and was scheduled to take effect October 1, 2003. 68 Fed. Reg. 16238 (April 3, 2003). Interested parties immediately filed actions to challenge the FTC's authority to establish the Registry; however, on September 29, 2003, Congress resolved the question of the FTC's authority by ratifying the creation of the Registry. Pub. L. 108-82, 117, codified at 15 U.S.C. § 6151; see Mainstream Mktg. Services, Inc. v. F.T.C., 358 F.3d 1228, 1250 (10th Cir. 2004). The Registry became operational in October 2003.

The FTC Statement of Basis and Purpose accompanying the 2003 amendments to the TSR (2003 FTC Statement) stated that the Registry applied to both land lines and wireless or cellular phones:

> The Commission intends that § 310.4(b)(1)(iii) apply to any call placed to a consumer, whether to a residential telephone number or to the consumer's cellular telephone or pager. Consumers are increasingly using cellular telephones in place of regular telephone service, which is borne out by the dramatic increase in cellular phone usage. The Commission believes that it is particularly important to allow consumers an option to reduce unwanted telemarketing calls to cellular

---

[2] The parties refer to an Established Business Relationship exemption as an "EBR.")

telephones or to pagers because some cellular services charge the consumer for incoming calls, thus adding insult to injury when the consumer is charged for the unwanted telemarketing call to the consumer's cellular telephone.

68 FR 4580, at 4632-33 (January 29, 2003) (footnotes omitted).

Section 310.4(b)(1) of the 2003 TSR stated, "It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in the following conduct:" Section 310.4(b)(1) then listed certain specific prohibited acts, including:

(iii) Initiating any outbound telephone call to a person when:

(A) That person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or

(B) That person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller

(i) Has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's

authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person;

(ii) Has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section; or

(iv) Abandoning any outbound telephone call.  An outbound telephone call is "abandoned" under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

16 C.F.R. § 310.4(b)(1)(iii) & (iv) (footnote omitted).

The 2003 TSR retained the prohibition in the original 1995 TSR against assisting and facilitating a violation of the TSR:

(b) Assisting and facilitating.  It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

16 C.F.R. § 310.3(b).

The TSR defined "Established Business Relationship," "person," "seller," "telemarketing," and "telemarketer" in relevant part, as follows:

(o) Established business relationship means a relationship between a seller and a consumer based on:

(1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call; or

(2) the consumer's inquiry or application regarding a product or service offered by the seller, within the three (3) months immediately preceding the date of a telemarketing call.

. . . .

(w) Person means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

. . . .

(aa) Seller means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.

. . . .

(cc) Telemarketer means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.

(dd) Telemarketing means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. . . .

16 C.F.R. § 310.2(o), (w), (aa), (cc), and (dd).  The TSR also

exempted telemarketing calls "between a telemarketer and any

business, except calls to induce the retail sale of nondurable office

or cleaning supplies."  16 C.F.R. § 310.6(b)(7).

Any violation of the TSR constituted an unfair and deceptive

act or practice in or affecting commerce in violation of § 5(a) of the

Federal Trade Commission Act (FTC Act).  15 U.S.C. §§ 45(a),

57a(d)(3), 6102(c).  The FTC may authorize the Attorney General to

bring actions on behalf of the United States against anyone

violating § 5(a) of the FTC Act.  The United States may seek

injunctive relief and, in appropriate cases, civil penalties. 15 U.S.C.

§§ 45(m), 53(b), 56(a)(1).  The United States has brought this action

pursuant to FTC authorization under these provisions.

The 2003 amendments to the TSR also amended the safe

harbor provisions to cover calls to persons whose telephone

numbers are on the Registry or on an internal do-not-call list.[3]  The

2003 TSR safe harbor provisions provided in relevant part:

(3) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(ii) and (iii) if it can demonstrate that, as part of the seller's or telemarketer's routine business practice:

(i) It has established and implemented written procedures to comply with § 310.4(b)(1)(ii) and (iii);

(ii) It has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to § 310.4(b)(3)(i);

(iii) The seller, or a telemarketer or another person acting on behalf of the seller or charitable organization, has maintained and recorded a list of telephone numbers the seller or charitable organization may not contact, in compliance with § 310.4(b)(1)(iii)(A);

(iv) The seller or a telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to § 310.4(b)(3)(iii) or 310.4(b)(1)(iii)(B), employing a version of the "do-not-call" registry obtained from the Commission no more than thirty-one (31) days prior to the date any call is made, and maintains records documenting this process;

(v) The seller or a telemarketer or another person acting on behalf of the seller or charitable organization, monitors and enforces compliance with the procedures established pursuant to § 310.4(b)(3)(i); and

---

[3] The safe harbor provisions refer to the FTC as the "Commission."

(vi) Any subsequent call otherwise violating §
310.4(b)(1)(ii) or (iii) is the result of error.

16 C.F.R. § 310.4(b)(3).  The safe harbor did not apply to violations of the call abandonment provision, § 310.4(b)(1)(iv), or the assisting and facilitating provision, § 310.3(b).

The TSR, as promulgated in 2003, had no provision specifically addressing the use of prerecorded calls.  The use of a recording constituted the abandonment of a call under § 310.4(b)(1)(iv) because the telemarketer only played a prerecorded message, and no human telemarketer came on the line within two seconds of the time that the person called completed his or her greeting.  See F.T.C. v. Asia Pacific Telecom, Inc., 802 F.Supp.2d 925, 929-30 (N.D. Ill. 2011); The Broadcast Team, Inc. v. F.T.C., 429 F.Supp.2d 1292, 1301-02 (M.D. Fla. 2006).

On November 17, 2004, the FTC issued a Notice of Proposed Rulemaking to amend the TSR to add an additional safe harbor provision to allow some use of prerecorded calls under limited circumstances.  69 Fed. Reg. 67287 (November 17, 2004) (2004 Notice).  The proposed safe harbor amendment would have allowed a seller or telemarketer to use a prerecorded call in outbound

telemarketing to a person with whom the seller or telemarketer had an Established Business Relationship and only if the prerecorded message: (1) within two seconds of the person's completed greeting, presented the person with the opportunity to communicate that he or she did not want to be called again (e.g., by pushing a number on the telephone keypad); (2) provided all required disclosures; and (3) otherwise complied with all applicable state and federal laws. 69 Fed. Reg. at 67289.

The FTC further stated in the 2004 Notice that the FTC would forbear from bringing enforcement actions for prerecorded calls that complied with the proposed amendments to the safe harbor provisions:

> Therefore, the Commission has determined that, pending completion of this proceeding, the Commission will forbear from bringing any enforcement action for violation of the TSR's call abandonment prohibition, 16 CFR 310.4(b)(1)(iv), against a seller or telemarketer that places telephone calls to deliver prerecorded telemarketing messages to consumers with whom the seller on whose behalf the telemarketing calls are placed has an established business relationship, as defined in the TSR, provided the seller or telemarketer conducts this activity in conformity with the terms of the proposed amended call abandonment safe harbor.

69 Fed. Reg. at 67290.

On August 29, 2008, the FTC completed the proposed rulemaking and amended the TSR. Final Rule Amendments, 73 Fed. Reg. 51164 (August 29, 2008). The amendment added a specific clause addressing the use of prerecorded calls to the prohibitions in TSR § 310.4(b)(1). The additional provision prohibited using prerecorded telemarketing calls unless the seller or telemarketer had an Established Business Relationship with the recipient of the call and the recipient gave prior written consent to receive such calls. 16 C.F.R. § 310.4(b)(1)(v).[4] The amendments became effective on December 1, 2008. The FTC announced that, as of December 1, 2008, the FTC would end its 2004 policy of forbearing enforcement against certain prerecorded calls. 73 Fed. Reg. at 51164.

On February 15, 2008, Congress passed the Do-Not-Call Improvements Act of 2007 (Improvements Act). Pub. L 110-87, codified at 15 U.S.C § 6155. Congress provided in the Improvements Act that telephone numbers placed on the Registry would stay on the Registry indefinitely unless and until: (1) the individual to whom the number is assigned requested removal; or

---

[4] The amendments also amended the safe harbor provisions in a manner not relevant to this case.

(2) the telephone number had been disconnected and reassigned.

15 U.S.C. § 6155(a) and (b).  Congress directed the FTC to

"periodically check . . . national or other appropriate databases" to

determine whether numbers have been disconnected and

reassigned.  15 U.S.C. § 6155(b).  Section 6155 further stated that

the FTC could "remove invalid telephone numbers from the registry

at any time."  <u>Id.</u>

    II.   <u>The FCC Rule</u>

The TCPA prohibited certain types of telephone calls, including

telephone calls to a residential telephone line "using an artificial or

prerecorded voice to deliver a message without the prior express

consent of the party called . . . ."  47 U.S.C. § 227(b)(1)(B).  The

TCPA also authorized State Attorneys General to bring actions on

behalf of the residents of such states for violations of the TCPA.

Each Attorney General could seek injunctive relief and secure

actual damages or $500 per violation, or both.  The Attorneys

General could also recover treble damages if the defendant willfully

or knowingly violated the TCPA.  47 U.S.C. § 227(g)(1).

The FCC promulgated the FCC Rule to implement the TCPA.

47 C.F.R. § 64.1200 et seq.; <u>see</u> 47 U.S.C. § 227(c).  The FCC

promulgated the original version of the FCC Rule in 1992. 57 Fed.
Reg. 4833-01 (October 23, 1992). The FCC Rule prohibited, among
other things, any person or entity from initiating a telemarketing
telephone call, "to any residential line using an artificial or
prerecorded voice to deliver a message without the prior express
written consent of the called party . . . ." 47 C.F.R. § 64.1200(a)(3).
The original FCC Rule included an Established Business
Relationship exception that allowed such prerecorded calls if the
call "is made to a person with whom the caller has an established
business relationship at the time the call is made." 47 C.F.R. §
64.1200(a)(2)(iv) (version in effect prior to October 16, 2012). The
Established Business Relationship exception was removed by the
2012 amendments to §§ 64.1200(a)(2) and (a)(3). 77 Fed. Reg.
34233, at 13471 (June 11, 2012); 77 Fed. Reg. 66935 (November 8,
2012) (correcting the effective date to October 16, 2012).

 The FCC Rule also required any person making a
telemarketing call to a residential telephone subscriber to maintain
an internal do-not-call list:

> (d) No person or entity shall initiate any call for
> telemarketing purposes to a residential telephone
> subscriber unless such person or entity has instituted

procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

47 C.F.R. § 64.1200(d).  The FCC Rule stated that "the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request."  47 C.F.R. § 64.1200(d)(3).  The FCC Rule also required specific procedures, including having a written policy and providing training for maintaining an internal do-not-call list.  47 C.F.R. § 64.1200(d)(1)-(6).

On July 25, 2003, the FCC amended the FCC Rule to prohibit any person or entity from initiating a telemarketing call to a residential telephone subscriber who registered his or her telephone number on the Registry.  47 C.F.R. § 64.1200(c)(2).  68 Fed. Reg. 44144 (July 25, 2003).  The FCC Rule further provided, "Such do-not-call registrations must be honored for five years."  68 Fed. Reg. at 44177.  The amendment became effective on October 1, 2003. Id. at 44144.  The FCC subsequently amended the FCC Rule on July 14, 2008, to state, "Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database

administrator." 73 Fed. Reg. 40183 (July 14, 2008). The FCC made the change to comport with the Improvements Act.

The FCC Rule contained a safe harbor provision for calls made to residential telephone subscribers on the Registry. 47 C.F.R. § 64.120(c)(2)(i). The safe harbor provision did not apply to calls to numbers on an internal do-not-call list or to prerecorded calls.

The FCC Rule defined a seller as "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of . . . goods, or services, which is transmitted to any person." 47 C.F.R. §64.1200(f)(7).

The FCC Report and Order issued in connection with the 2003 amendments discussed whether a subscriber to a wireless telephone service could be considered a residential telephone subscriber for purposes of the FCC Rule. In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02–278, F.C.C. 03-153 (July 3, 2003) (FCC Report and Order), ¶¶ 34-36. The FCC found that many consumers elect to use a wireless telephone as their residential phone service. Id., at ¶ 35. The FCC determined that these wireless customers should receive the benefits of the protections of

the FCC Rule.  Based on this analysis, the FCC concluded that

wireless customers could register their wireless telephone numbers

on the Registry:

> Therefore, we conclude that wireless subscribers may
> participate in the national do-not-call list.  As a practical
> matter, since determining whether any particular
> wireless subscriber is a "residential subscriber" may be
> more fact-intensive than making the same determination
> for a wireline subscriber, we will presume wireless
> subscribers who ask to be put on the national do-not-call
> list to be "residential subscribers."  Such a presumption,
> however, may require a complaining wireless subscriber
> to provide further proof of the validity of that
> presumption should we need to take enforcement action.

Id., at ¶ 36 (footnote omitted); see also 68 Fed. Reg. at 44147.  The

FCC incorporated by reference into the FCC Rule this analysis from

FCC Report and Order:

> (e) The rules set forth in paragraph (c) and (d) of this
> section are applicable to any person or entity making
> telephone solicitations or telemarketing calls to wireless
> telephone numbers to the extent described in the
> Commission's Report and Order, CG Docket No. 02–278,
> FCC 03–153, "Rules and Regulations Implementing the
> Telephone Consumer Protection Act of 1991."

47 C.F.R. § 64.1200(e).

## THE FEDERAL CLAIMS

Dr. Yoeli's opinions and analyses relate to all of the claims in

the Second Amended Complaint.  The Motion, however, focuses on

the admissibility of Dr. Yoeli's testimony in connection with the federal claims brought under the Telemarketing Act, the TSR, TCPA, and the FCC Rule.

The United States alleges four federal claims for violations of the TSR.  Count I alleges that Dish "engaged in or caused a telemarketer to engage in initiating an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B)." Second Amended Complaint, ¶ 66.

Count II alleges that Dish "engaged in or caused other telemarketers to engage in initiating an outbound telephone call to a person who has previously stated that he or she does not wish to receive such a call made by or on behalf of DISH Network, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A)." Second Amended Complaint, ¶ 67.

Count III alleges that Dish "abandoned or caused telemarketers to abandon an outbound telephone call by failing to connect the call to a sales representative within two (2) seconds of the completed greeting of the person answering the call, in violation

of the TSR, 16 C.F.R. 310.4(b)(1)(iv)." Second Amended Complaint, ¶ 68.

Count IV alleges that Dish "provided substantial assistance or support to Star Satellite and/or Dish TV Now even though Defendant DISH Network knew or consciously avoided knowing Defendant Star Satellite and/or Dish TV Now abandoned outbound telephone calls in violation of § 310.4(b)(1)(iv) of the TSR." Second Amended Complaint, ¶ 69. Star Satellite and Dish TV Now were two authorized retailers of Dish products and services.

The Attorneys General of the Plaintiff States California, Illinois, North Carolina, and Ohio bring claims in Counts V and VI under the TCPA and FCC Rule. Count V alleges that Dish "either directly or indirectly as a result of a third party acting on its behalf," engaged "in a pattern or practice of initiating telephone solicitations to residential telephone subscribers, including subscribers in California, Illinois, North Carolina, and Ohio whose telephone numbers were listed on the National Do Not Call Registry." Second Amended Complaint, ¶ 72.

Count VI alleges that Dish, "either directly or indirectly as a result of a third party acting on its behalf," engaged "in a pattern or

practice of initiating telephone solicitations to residential telephone lines, including lines in California, Illinois, North Carolina, and Ohio, using artificial or prerecorded voices to deliver a message without the prior express consent of the called party . . . ." Second Amended Complaint, ¶ 76.

The remaining six Counts allege supplemental state law claims for violations of the Plaintiff States' Do-Not-Call Laws and other consumer protection statutes. Second Amended Complaint, Counts VII-XII. Dish's arguments regarding the admissibility of Dr. Yoeli's opinions relevant to these claims closely parallel's its arguments regarding the TCPA claims in Counts V and VI.

DR. YOELI'S REPORTS

The Motion raises objections to four reports prepared by Dr. Yoeli dated July 19, 2012; October 15, 2012; December 14, 2012; and October 14, 2013, revised on October 21, 2013. Motion, at 4; Plaintiffs' Opposition to Dish's Motion to Strike (d/e 421) (Opposition), Exhibit 3-7. Dr. Yoeli's Initial Report dated July 19, 2012, analyzed records of approximately 435,000,000 calls made from 2007-2010. Dish produced these records in discovery. These records covered calls made by Dish. The records showed that each

call was part of a particular calling campaign, such as, for example, a sales, service, or collections campaign.  Each call record contained a campaign code that indicated the campaign to which the call belonged.  Dr. Yoeli and his team used the following data to analyze these records:

a. The campaign codes that Dish assigned to the call records;

b. A list of those calls from the 2007-2010 call records that were made to telephone numbers that had been on the Registry for at least 31 days at the time of the call.  Dr. Yoeli referred to these identified calls as "raw hits." July 19, 2012 Report, ¶ 12;

c. A list of the raw hits for which Dish asserted that it had an Established Business Relationship with the recipient of the call at the time of the call;

d. Payment dates and activation dates for the accounts for which Dish asserted an Established Business Relationship; and

e. Dish's internal do-not-call list, including the date and time that the number was placed on the list.

The 435,000,000 records covered all types of calls made by Dish, including telemarketing calls, service calls, collection calls, and others. Dr. Yoeli explained in the Report that he and Dish representatives worked together to identify records of calls that were part of various telemarketing campaigns. The parties identified the calls by campaign codes assigned to the campaigns. Through this method, Dr. Yoeli identified 134,295,177 telemarketing calls. July 19, 2012 Report, ¶ 19(g).

Dr. Yoeli and his team used the payment data and activation data to analyze the Dish Established Business Relationship claims. Dr. Yoeli assumed that an Established Business Relationship claim was invalid if the call was placed at least 559 calendar days after the last date that the consumer made a payment, or if no payment data was provided, at least 94 days after the consumer's activation date. These numbers were selected because the TSR's definition of an Established Business Relationship stated that the Established Business Relationship lasted for 18 months after the consumer's last purchase, or 3 months after the consumer's last inquiry or application. 16 C.F.R. § 310.3(b)(o). The number 559 is one more

day than 18 months of 31 days, and 94 is one more than 3 months of 31 days.  See July 19, 2012 Report, ¶ 19(m).

Dr. Yoeli then identified the telemarketing calls made to numbers on the Registry for which Dish did not claim an Established Business Relationship or for which the Established Business Relationship was invalid under his analysis.  Dr. Yoeli also identified the telemarketing calls made to numbers that had been on Dish's internal do-not-call list for at least 31 days at the time of the call.

Based on this analysis, Dr. Yoeli drew the following conclusions:

Conclusion 1:  1,112,125 telemarketing calls were made to numbers that had been on the Registry for at least 31 days for which the Dish claims of an Established Business Relationship were invalid at the time of the calls;

Conclusion 1A:  2,230,290 telemarketing calls were made to numbers that had been on the Registry for at least 31 days for which the Dish did not claim an Established Business Relationship at the time of the call;

Conclusion 2: 3,698,918 telemarketing calls were made to numbers that had been on the Registry and on the Dish internal-do-not call list for at least 31 days at the time of the call; and

Conclusion 3: 6,485,211 telemarketing calls were made to numbers that were not on the Registry, but had been on the Dish internal-do-not call list for at least 31 days at the time of the call. July 19, 2012 Report, at 10.

On October 15, 2012, Dr. Yoeli issued his first rebuttal report to the reports of Dish's experts John Taylor and Dr. Robert Fenili, Ph.D. Dr. Yoeli made changes and additions to July 19, 2012 Report:

a. He revised some of the calculations for determining whether a Dish Established Business Relationship claim was valid;

b. He added call records from 2003 through 2007 that Dish produced pursuant to an FTC Civil Investigative Demand issued before this case was filed;

c. He added call records from Guardian Communications (Guardian); JSR Enterprises (JSR); and Defender Security (Defender). JSR and Defender were Dish authorized retailers, and Guardian made prerecorded telemarketing calls for Dish

authorized retailers Dish TV Now and Star Satellite (a/k/a Tenaya);

d. He analyzed call records for 61 prerecorded call campaigns ("automessage" or "am" campaigns) that Dish conducted between 2007 and 2010;

e. He calculated the number of relevant calls to numbers with area codes associated with each Plaintiff State;

f. He determined the number of relevant calls that occurred on or before February 9, 2009, and the number that occurred after February 9, 2009 (On February 9, 2009, the maximum civil penalty for each violation of FTC Act § 5(a) increased from $11,000.00 to $16,000.00. 74 Fed. Reg. 857 (January 9, 2009); 16 C.F.R. § 1.98(e)); and

g. He collected a random sample of approximately 5000 call records from each of the following calling records: the Dish 2003-2007 calling records; the Dish 2007-2010 calling records; the Defender calling records; the JSR calling records; the Star Satellite calling records from Guardian; and the Dish TV Now calling records from Guardian. A company called PossibleNOW provided Dr. Yoeli with an analysis of the

samples to determine the type of telephone numbers called, whether wireless, business, residential, or "other." PossibleNOW specializes in compliance with DNC Laws. Both parties have used services from PossibleNOW in this litigation and otherwise.

October 15, 2012 Report, at 1-3.

Dr. Yoeli was told by the Plaintiffs to assume that all of the calls in the 2003-2007 Dish call records were telemarketing calls. He was told to assume that all of the calls on Guardian, JSR, and Defender records were telemarketing calls offering Dish products and services. He was told that Guardian records of a call with a "C" code notation indicated "positive voice" which meant that a person answered the call rather than an answering machine or voicemail.

October 15, 2012 Report, at 1-2.

Based on Dr. Yoeli's revised analysis, Dr. Yoeli revised his initial Conclusions 1, 1A, and 2, as follows:

Revised Conclusion 1: 1,012,333 (previously 1,112,125) telemarketing calls were made to numbers that had been on the Registry for at least 31 days for which Dish's Established Business Relationship claims were invalid;

Revised Conclusion 1A:  17,027,298 (previously 2,230,290) telemarketing calls were made to numbers that had been on the Registry for at least 31 days for which the Dish did not claim an Established Business Relationship at the time of the call; and

Revised Conclusion 2:  4,833,950 (previously 3,342,415) telemarketing calls were made to numbers that had been on the Registry and on the Dish internal-do-not call list for at least 31 days at the time of the call.

October 15, 2012 Report, at 4, Table 1.  Dr. Yoeli did not provide a revision of his Conclusion 3 from his July 19, 2012 Report.

Dr. Yoeli further concluded:

1. Dish made 98,083 prerecorded automessage telemarketing calls which a person answered;

2. Dish made 3,022,355 telemarketing calls from the 2003-2007 records to numbers on the Registry and Dish's internal do-not-call list;

3. Guardian made 6,710,210 prerecorded Dish telemarketing calls for Dish TV Now which a person answered;

4. Guardian made 43,127,469 prerecorded Dish telemarketing calls for Star Satellite which a person answered;

5. JSR made 218,098 Dish telemarketing calls to numbers on the Registry and Dish's internal do-not-call list;

6. Defender made 74,058 Dish telemarketing calls to numbers on the Registry and Dish's internal do-not-call list.

October 15, 2012 Report, at 9-14.

The PossibleNOW analysis of Dr. Yoeli's samples looked at two categories: (1) all telephone numbers in the sample (all numbers); and (2) telephone numbers that could be identified as either wireless, business, or residential (identified numbers). The PossibleNOW analysis showed:

1. In the 2007-2010 sample, 68% of all numbers were residential, and 88% of the identified numbers were residential;

2. In the 2003-2007 sample, 54% of all numbers were residential, and 93% of the identified numbers were residential;

3. In the DishTV Now sample, 51% of all numbers were residential, and 99% of identified numbers were residential;

4. In the Star Satellite sample, 40% of all numbers were residential, and 97% of the identified numbers were residential;

5. In the JSR sample, 91% of all numbers were residential, and 98% of the identified numbers were residential; and

6. In the Defender sample, 60% of all numbers were residential, and 72% of the identified numbers were residential.

October 15, 2012 Report, at 9, Table 3.

The PossibleNOW analysis also found that:

1. The sample of the 5000 calls from the Dish 2003-2007 records included 174 identified wireless calls;

2. The sample of 5,000 calls from the Dish 2007-2010 records included 424 identified wireless calls;

3. The sample of 5,000 calls from the Defender calling records included 1,787 identified wireless calls;

4. The sample of 5,000 calls from the JSR calling records included 3 identified wireless calls;

5. The sample of 5,000 calls from the Star Satellite calling records included 2 identified wireless calls; and

6. The sample of 5,000 calls from Dish TV Now calling records included 1 identified wireless call.

October 15, 2012 Report, attached Declaration of Rick Stauffer, ¶ 10.

On December 14, 2012, Dr. Yoeli issued revised versions of the July 19, 2012 Initial Report and the October 15, 2012 Rebuttal Report. Dr. Yoeli considered some new data and revised some of his calculations. The basic structure of the analysis remained the same.

On October 21, 2013, Dr. Yoeli issued a Revised Supplemental Report. Dr. Yoeli performed some additional calculations. Dr. Yoeli analyzed call records for two additional Dish authorized dealers, Satellite Systems Network and National Satellite Systems. The Satellite Systems Network records were produced by Satellite Systems Network's telephone carrier Five9. Dr. Yoeli was told to assume that all of the calls were Dish telemarketing calls. Dr. Yoeli also determined the number of telemarketing call hits from the Dish 2003-2007 and 2007-2010 call lists that were on the internal do-not-call list of New Edge Satellite, a Dish authorized retailer. October 21, 2013 Report, at 2-4.

<u>THE REGISTRY</u>

Dish has presented evidence about the operation of the Registry and about the composition of the phone numbers on the Registry.  The FTC initially contracted with AT&T Government Solutions, Inc. (AT&T), to operate the Registry.  The Registry started registering phone numbers on June 27, 2003 and began operation on October 1, 2003.  Initially, AT&T had a defect in its software whereby a telemarketer who downloaded the Registry did not receive all of the Registry telephone numbers.  The defect was corrected by the end of 2003, but a telemarketer's lists were not fully corrected until the telemarketer once again fully downloaded a complete copy of the Registry.  <u>Defendant Dish Network LLC's Memorandum of Law in Opposition to Plaintiffs' Third Motion to Compel Discovery Responses (d/e 152)</u>, attached <u>Declaration of Joseph A Boyle (Boyle Declaration)</u>, Exhibit E, <u>Email Thread between FTC General Attorney & Program Manager David Robbins and AT&T Program Manager Linda Miller dated from December 23, 2004 to October 10, 2005</u>.

AT&T contracted with a company called Targus to remove telephone numbers from the Registry.  This process is referred to as

"list hygiene" or "purging." Targus removed telephone numbers that were disconnected and reassigned. Targus used AT&T data on residential landlines to conduct the list hygiene. Dish Supplemental Exhibits (d/e 392), DX 148, Deposition of James Shaffer, at 52, 192-93. Targus did not remove business numbers from the Registry. Id., at 299. Targus personnel determined that five to ten percent of the numbers on the Registry were business numbers. Id.

In 2007, Lockheed Martin took over for AT&T as the FTC's contractor for operating the Registry. Dish Supplemental Summary Judgment Exhibits (d/e 392), DX 145, Deposition of Murali Thirukkonda (Thirukkonda Deposition DX 145), at 17. In 2008, Lockheed Martin hired PossibleNOW as the subcontractor to help maintain the Registry. Dish Initial Summary Judgment Exhibits (d/e 348), DX 167, Deposition of Rick Stauffer dated April 26, 2012 (Stauffer Deposition DX 167), at 59. PossibleNOW has continued in this position since then.

PossibleNOW removed numbers when the number had been both disconnected and reassigned to a new subscriber. PossibleNOW used the National Directory Assistance data base to

make this analysis.  Stauffer Deposition DX 167, at 96.
PossibleNOW waited 30 days after disconnection to see whether the
number remained disconnected, and then waited 90 days after
disconnection to see whether the number was reassigned to a
different person.  If the number was reassigned to a person with the
same last name or person with a different last name at the same
address, PossibleNOW assumed that the number should stay on the
Registry.  Stauffer Deposition DX 167, at 61-62, 72, 73-95.

PossibleNOW representative Rick Stauffer testified in his
deposition that the National Directory Assistance data base used to
conduct the Registry hygiene was very accurate with respect to
landline telephones.  He estimated that this data base included 99
percent of the landline telephones.  Stauffer Deposition DX 167, at
96.  The data base did not include wireless numbers, however.
PossibleNOW did not remove wireless numbers that were
disconnected from the Registry because no directory assistance
data exists for wireless numbers.  Stauffer Deposition DX 167, at
101.  Voice over Internet Protocol (VoIP) telephone service providers
are not required to share directory assistance data. The FTC has
estimated that 25% of the telephone numbers associated with VIOP

services were not included in directory assistance. <u>Biennial Report</u> <u>Congress Under the Do Not Call Registry Free Extension Act of</u> <u>2007, 2011 WL 6935660 *4 (Dec. 1, 2011)</u>; <u>see</u> <u>also</u> <u>Stauffer</u> <u>Deposition DX 167</u>, at 96. As a result, disconnection and reassignment of some VoIP numbers were not included in the PossibleNOW's hygiene process.

In September 2011, Dish's expert Dr. Robert Fenili opined on the composition of the Registry. Dr. Fenili opined that as of 2011, over 50% of the numbers on the Registry were wireless numbers; 12.2% of the numbers were business landline numbers; 7.1% of the numbers were inactive land lines; and 28.2% of the numbers were active residential land lines. <u>Dish Initial Exhibits (d/e 348)</u>, DX 189, <u>Expert Report of Dr. Robert N. Fenili dated July 26, 2012</u>, at 10 Table 1b.

In 2009, PossibleNOW conducted a one-time removal of existing disconnected and reassigned telephone numbers from the Registry. <u>Stauffer Deposition DX 167</u>, at 152-54. PossibleNOW did not remove these numbers from the historical records of the Registry that reflected how the Registry existed on any date before the one-time removal of numbers. <u>Id.</u>

All of the companies that have administered the Registry have experienced some delays in updating the Registry with new phone numbers. Lockheed Martin used a batching process which resulted in a lag between the date that the consumer registered a phone number and the date that the number appeared on the Registry. Thirukkonda Deposition DX 145, at 303-10. This lag may result in a discrepancy between the full Registry list and a partial update list that a telemarketer may use to update its version of the Registry. Thirukkonda Deposition DX 145, at 42-45. PossibleNOW has also experienced a lag between the date of registration and the date that the number appears on the Registry. Stauffer Deposition DX 167, at 329-32.

## AREA CODES

The Plaintiffs' expert Yoeli and Dish's expert Taylor opined on the number of calls made to various area codes associated with the Plaintiff States. Area codes have been assigned based on geography to areas within States under North American Numbering Plan (NANP) by the North American Numbering Plan Administration (NANPA). See www.nanpa.com, viewed August 11, 2014. Dish cites several factors that allow an area code to be assigned to a telephone

that is not physically in the geographic location associated with the area code. Telephone numbers now may be ported from one location to another and from one type of telephone line to another, e.g., from landlines to VoIP lines, and from landlines to wireless lines. See Teltech Sys., Inc. v. Barbour, 866 F.Supp.2d 571, 575-76 (S.D. Miss. 2011). Further, VoIP lines may secure an area code other than the area code associated with the geographic location of the physical telephone. See In re: Vonage Holdings Corp., Order, 19 F.C.C.R. 22404, at *22408 (2004). Moreover, wireless telephones may be carried and used in any geographic location with cellular telephone coverage. See Teltech Sys., 866 F.Supp.2d at 575. Dish has provided no evidence on the number of telephones or the percentage of telephone numbers that are not used in the geographic area associated with the telephone number's area code.

## ANALYSIS

Dish moves to strike all of Dr. Yoeli's testimony reflected in his reports as improper expert testimony. The Plaintiffs argue that Dr. Yoeli's testimony and reports are admissible as summary evidence under Federal Rule of Evidence 1006. Rule 1006 allows parties to introduce "a summary, chart, or calculation to prove the content of

voluminous writings . . . that cannot be conveniently examined in court." Such summary evidence must be a compilation of data without opinion. See FTC v. Washington Data Resources, 2011 WL 2669661, at *3 (M.D. Fla. July 7, 2011). Some of Dr. Yoeli's compilations may fit Rule 1006; however, much of his work is not a neutral compilation without opinion. Dr. Yoeli revised his method of analysis to calculate a valid Established Business Relationship in his October 15, 2012 Report. This revision required some use of his expertise in analyzing large data sets. Dr. Yoeli's collection of random samples from the various call records required him to use his expertise in statistical analysis and was not a mere compilation of data. Dr. Yoeli opined repeatedly that certain calls were "violations" or "violative." See e.g., October 15, 2012 Report, at 1-3; December 14, 2012 Report, at 4, 7, 11; October 14, 2013 Report, revised on October 21, 2013, at 5. These statements express opinions and are not mere compilations of data.[5] In light of these

---

[5] Dr. Yoeli's opinions that calls were "violative" and similar opinions are legal conclusions regarding whether conduct violated the applicable rule or statute. Dish does not object to Dr. Yoeli's reports because of these legal conclusions. The Court, however, will not consider them. Such legal conclusions are not appropriate expert testimony in this context. See Jimenez v. City of Chicago, 732 F.3d 710, 721-22 (7th Cir. 2013).

factors, the Court agrees that his opinions and analyses should meet the requirements of expert opinion evidence.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  This Court must perform a gate-keeping function to determine that expert testimony is reliable and relevant under the principles codified in Rule 702.  See Daubert, 509 U.S. at 597.  In performing this function, the Court must determine the reliability and the relevance of the evidence.  Ammons v. Aramark Uniform Services, Inc., 368 F.3d 809, 816 (7th Cir. 2004).

The Court must, therefore, first evaluate the qualifications of the expert.  In this case, Dr. Yoeli is a Ph.D. economist with

experience in statistical analysis.  Dish does not challenge Dr. Yoeli's qualifications as an expert (or the qualifications of his team) to conduct statistical analyses of large, complicated data sets.

The Court must then determine whether the expert testimony is reliable and relevant and whether his opinions will assist the trier of fact in determining a fact in issue.  See Ammons, 368 F.3d at 816.  The Court must evaluate the reliability of the expert's methodology.  Manpower Inc. v. Ins. Co. of Penn., 732 F.3d 796, 806 (7th Cir. 2013).  The Court, however, does not evaluate the quality of the underlying data or the quality of the expert's conclusions.  "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."  Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000).  The Court must also evaluate whether the expert's opinions are relevant and fit the issue to which the expert is testifying.  See Deimer v. Cincinnati Sub-Zero Prods., Inc., 58 F.3d 341, 344 (7th Cir. 1995).

In this case, the Plaintiffs must show that Dish initiated and caused others to initiate telemarketing calls that violated the TSR,

and was the seller of products that were offered for sale through telemarketing calls that violated the TCPA and the FCC Rule. Each Count alleges a slightly different violation.

<u>Count I</u>

The Plaintiffs allege two claims in Count I: (1) Dish initiated telemarketing calls to one or more persons whose telephone numbers were on the Registry for at least 30 days at the time of the call in violation of the TSR; and (2) Dish caused others to initiate telemarketing calls to one or more persons whose telephone numbers were on the Registry for at least 30 days at the time of the call in violation of the TSR. The Plaintiffs submit Dr. Yoeli's testimony to show that Dish initiated telemarketing calls to numbers on the Registry and Dish authorized dealers initiated calls to numbers on the Registry.

Dr. Yoeli compared sets of data to find the intersections of those sets to identify specific subsets of data. Dr. Yoeli compared the 2007-2010 calling data with the set of calls that contained the calling campaign codes associated with telemarketing calls to identify the calls that were telemarketing calls. He then compared that subset with the raw hits to identify the telemarketing calls to

numbers on the Registry. He then compared that data to the set of data of numbers for which Dish asserted an Established Business Relationship to identify the telemarketing calls to numbers on the Registry for which Dish asserted no Established Business Relationship or an Established Business Relationship that was invalid according to Dr. Yoeli. Dish does not dispute the reliability of the Dr. Yoeli's mathematical process of comparing sets of data to identify the subset of Dish telemarketing calls initiated to telephone numbers on the Registry for the period from 2007-2010.

Dr. Yoeli used the same method to analyze 2003-2007 Dish calling records and the calling records of authorized retailers. He again evaluated sets of data to find the relevant subsets of calls. Dish, again, does not dispute the reliability of this process. Rather, Dish vigorously disputes the underlying factual assumption that all of these calls in these calling records were Dish telemarketing calls. But, this is an issue for the trier of fact. The Plaintiffs have sufficient evidence to support this assumption. See Plaintiff's Opposition to Dish's Motion to Strike, at 20-22 and summary judgment exhibits cited therein. Dish can attack the sufficiency of the Plaintiffs' evidence at summary judgment and at trial. The

Court, however, should not evaluate the quality of the factual underpinnings of an expert's opinions as part of its Rule 702 gatekeeping function: "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." Manpower, Inc., 732 F.3d at 806. Dr. Yoeli's methods in this matter were reliable and tend to prove the fact that these calls were initiated to telephone numbers on the Registry.

Dish asks the Court to follow persuasive authority in Svindland v. Nemours Foundation, 2009 WL 1407749 (E.D. Pa. May 18, 2009), to exclude Yoeli's opinions. The Svindland Court excluded a proposed expert because the expert's data were unreliable and his methodology was unreliable. Id., at *3. The Svindland court's analysis of the underlying data is contrary to the controlling instructions from the Seventh Circuit in Manpower, Inc., and the other cases cited above. Therefore, this Court must follow the Seventh Circuit and let the trier of fact decide on the sufficiency of the Plaintiffs' underlying evidence. Like the Svindland court, this

Court has reviewed the methodology of the proposed expert. In this case, Dr. Yoeli's methodology is reliable.

Dish also relies heavily on the Magistrate Judge's Opinion entered July 20, 2012 (d/e 165) (Opinion 165), to support its position that the 2003-2007 calling records were not all telemarketing calls. However, Opinion 165 did not resolve any ultimate issues of fact in this case. Opinion 165 resolved a discovery motion under Rule 37. The Magistrate Judge made his comments about the 2003-2007 Dish calling records in the context of that Motion. The parties did not request relief under any Rule which would have authorized the Magistrate Judge to enter an order to treat a fact as admitted or to decide that a fact is established for purposes of this case. See e.g., Fed. R. Civ. P. 36(a)(6), 56(g). The Magistrate Judge's observations in Opinion 165 are limited to the procedural posture of the motion that was before him. His statements are not evidence and are not controlling in the context of this Motion. The trier of fact can resolve the sufficiency of the 2003-2007 calling data. Dr. Yoeli's opinions and analyses are based on sufficient facts and his methods are reliable.

The Court must also determine whether Dr. Yoeli's testimony is relevant.  Ammons, 368 F.3d at 816.  Evidence is relevant if "it has a tendency to makes a fact [at issue] more or less probable that it would be without the evidence."  Fed. R. Evid. 401(a).  The evidence, "'need not conclusively decide the ultimate issue in a case, nor make the proposition appear more probable, "but it must in some degree advance the inquiry.""  Thompson v. City of Chicago, 472 F.3d 444, 453 (quoting E.E.O.C. v. Indiana Bell Telephone Co., 256 F.3d 516, 533 (7th Cir. 2001) (quoting 1 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 401.04[2][b])).

Under this standard, Dr. Yoeli's opinions and analyses are relevant.  The TSR states that it is a violation of the Rule to initiate "any outbound telephone call to a person" when "[t]hat person's telephone number is on [the Registry]."  16 C.F.R. § 310.4(b)(1)(iii)(B).  Initiating a telemarketing call to a number on the Registry is equivalent to initiating a call to the person who has that telephone number at the time of the call.  Therefore, Dr. Yoeli's opinions and analyses of the number of telemarketing calls made to numbers on the Registry tends to prove the number of

telemarketing calls made to persons whose numbers were on the Registry at the times of the calls.

Dish argues that the United States must prove that Dish called the person who placed the telephone number on the Registry. Dish argues that proof that Dish called a number on the Registry is not proof that Dish called the person who registered the number with the Registry. Dish argues that registered telephone numbers are not likely to be related to the person who originally registered the number. Dish argues that the Registry's hygiene process does not adequately maintain the accuracy of the Registry. Outdated wireless numbers are not removed at all because no directory exists to provide information about changes in wireless numbers. According to Dish's expert, Dr. Fenili, more than half of the telephone numbers on the Registry were wireless numbers by 2011. Approximately 25 percent of VoIP numbers were not on any directories, so those numbers were not updated when people change telephone numbers. For all these reasons, telephone numbers remain on the Registry when the numbers are no longer associated with the persons who registered them. Therefore, Dish argues that proof of calling a number on the Registry is not proof

that the call was directed to the person who put the number on the Registry. Therefore, Dr. Yoeli's testimony is not relevant and should not be presented to the trier of fact.

Dish's argument is not persuasive. The TSR does not say the call must be initiated to the person who registered the number on the Registry. The TSR states that a violation occurs if the telemarketing call is initiated to a person when the person's telephone number is on the Registry. Consumer protection statutes are remedial in nature and are to be construed liberally to effectuate the goals of protecting consumers. See Ramirez v. Apex Fin. Mgmt, LLC, 567 F.Supp.2d 1035, 1040 (N.D. Ill. 2008). Dish's narrow reading of the Rule violates this principle of construction. The Court's interpretation is consistent with the plain meaning of the language and consistent with the principle of liberal construction. If the call is initiated to a number on the Registry, then the call is initiated to the person who held that telephone number at the time of the call in violation of the Rule.

The Court's interpretation is also consistent with Congress's goals set forth in the Improvements Act. Congress determined in the Improvements Act that telephone numbers should remain on

the Registry indefinitely and should only be removed when the number is both disconnected and reassigned or when the person who registered the number so requests. Congress further directed the FTC to use national data bases to determine when numbers are disconnected and reassigned. Congress' purpose is clear: protect consumers by prohibiting telemarketing calls to numbers on the Registry until it is absolutely clear that the telephone number has been transferred. In light of that principle, a telemarketing call to a number on the Registry is a call to the person who held that number at the time of the call in violation of the TSR. Dr. Yoeli's opinions and analyses of telemarketing calls on the Registry are relevant.

Dish makes a number of additional legal and factual arguments to challenge the relevance of evidence of telemarketing calls to numbers on the Registry. Dish argues that the TSR only applies to residential landlines and does not apply to wireless phone lines and VoIP lines. Nothing in the TSR limits the TSR's coverage to residential landlines or excludes wireless or VoIP lines from coverage. Dish cites no authority for the proposition that VoIP lines are not covered by the TSR. Further, the 2003 FTC Statement,

quoted above, stated that the TSR covered wireless numbers. 68 FR 4580, at 4632-33 (January 29, 2003).

Dish argues that the FTC has no jurisdiction over telemarketing calls to wireless telephones. This is incorrect. The FTC promulgated the TSR pursuant to its authority under the Telemarketing Act. The FTC's jurisdiction under the Telemarketing Act extends to the same extent as the FTC's jurisdiction under the FTC Act. 15 U.S.C. § 6105(b). The FTC's jurisdiction under the FTC Act extends to unfair competition and unfair or deceptive acts or practices in or affecting commerce, subject to exceptions for: certain specified industries regulated by other federal agencies, such as common carriers, banking, and securities; certain non-profit organizations; and the business of insurance to the extent that such business is regulated by the state law. 15 U.S.C. §§ 44, 45(a)(1) and (2), and 1012(b). The business of telemarketing does not fit within any specified exceptions to the FTC's jurisdiction. Therefore, FTC's jurisdiction extends to any unfair or deceptive telemarketing act or practice in or affecting commerce. See F.T.C. v. Bay Area Business Council, Inc., 423 F.3d 627, 634-35 (7th Cir. 2005) (FTC jurisdiction to prohibit unfair or deceptive acts or

practices in or affecting commerce extends to telemarketing violations of the TSR); <u>F.T.C. v. World Media Brokers,</u> 415 F.3d 758, 763 (7th Cir. 2005) (same).

The FTC Act defines "Commerce" as:

> "Commerce" means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation.

15 U.S.C. § 44. Telemarketing calls to wireless telephone numbers are in or affect commerce under this definition. The FTC's jurisdiction extends to those calls.

Dish cites a statement by an FTC official Ami Dziekan in her deposition as proof that the FTC's jurisdiction does not extend to wireless calls. <u>See Dish Supplemental Exhibits to its Motion for Summary Judgment (d/e 392)</u>, DX 155, <u>Deposition of Ami Dziekan</u>, at 99. However, jurisdiction is not a factual issue. Dziekan's inaccurate statement does not change the law. The FTC's jurisdiction under the TSR extends to calls to wireless numbers.

Dish argues that Dr. Yoeli failed to eliminate calls to businesses from his analysis. The TSR exempts calls to business.

16 C.F.R. § 310.6(b)(7).  An exemption, such as § 310.6(b)(7), is treated as an affirmative defense for which Dish bears the burden of proof.  See Shaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 534 (2005) (burden of proof shifts to defendant when element can be fairly characterized as an exemption); Dunkin' Donuts Inc. v. N.A.S.T., Inc., 428 F. Supp. 2d 761, 773 (N. D. Ill. 2005) (same).  Dr. Yoeli's analysis, therefore, is relevant to proving the Plaintiffs' case in chief even if it does not exclude calls to business.  Dish must prove that the exemption applies.  Furthermore, the TSR covers telemarketing calls seeking to sell goods and services to individual consumers who happen to be at work at the time of the call.  See FTC v. Publishers Business Services, Inc., 821 F. Supp. 2d 1205, 1221 (D. Nev. 2010) (telemarketing calls to sell magazine subscriptions to individual consumers who were at work at the time of the calls was covered by the TSR).  The TSR exemption only applies to calls to the business.

Dish also argues that Dr. Yoeli failed to eliminate government telephone numbers from his analysis.  Dish cites no authority for the proposition that government telephone numbers cannot be placed on the Registry.  Dish also has no evidence concerning

government telephone numbers being on the Registry.  As such, this argument is mere speculation.

Dish additionally argues in reply that the Registry violates the First Amendment unless it is limited to residential landlines.  Dish argues that restriction on commercial speech created by the Registry is only justified by the state's interest in protecting privacy in the home.  <u>Defendant Dish Network L.L.C.'s Reply in Support of its Motion to Preclude the Expert Testimony of Dr. Yoeli (d/e 442)</u>, at 10-11.  Dish has waived this argument by not raising it initially.  New arguments may not be raised in reply.  <u>See</u> <u>e.g.</u>, <u>United States v. Boisture</u>, 563 F.3d 295, 299 n.3 (7th Cir. 2009); <u>Wilson v. City of Chicago</u>, 2009 WL 3242300, at *3 n.2 (N.D. Ill. October 7, 2009).

Moreover, the constitutionality of do-not-call legislation is not dependent solely on the limited purpose of protecting privacy in the home.  <u>See</u> <u>Mainstream Mktg. Servs., Inc. v. FTC</u>, 358 F.3d at 1238.  Do-not-call legislation also promotes the state's substantial governmental interest in preventing abusive and coercive sales practices generally.  <u>Mainstream Mktg. Servs., Inc.</u>, 358 F.3d at 1238.  The Registry, "directly advances the government's interests by effectively blocking a significant number of the calls that cause

the problems the government sought to redress." Id.  The

constitutionality of the Registry, therefore, is not dependent on

limiting its scope to residential landlines.

Dr. Yoeli's opinions and analyses meet the standards of Rule

702 and are admissible in connection with Count I as expert

opinion testimony.

Count II

Count II alleges two claims:  (1) Dish initiated telemarketing

calls to one or more persons who previously stated that he or she

did not wish to receive telemarketing calls by or on behalf of Dish;

and (2) Dish caused others to initiate telemarketing calls to one or

more persons who previously stated that he or she did not wish to

receive telemarketing calls by or on behalf of Dish.   The Plaintiffs

submit Dr. Yoeli's testimony to show that Dish initiated

telemarketing calls to numbers on Dish's internal do-not-call lists

and on the internal do-not-call lists of some of Dish's authorized

retailers.

With respect to Count II, Dish complains that the call records

analyzed by Dr. Yoeli were not limited to telemarketing calls.  As

explained earlier, the Plaintiffs have evidence that the call records

were Dish telemarketing calls. The trier of fact will evaluate the sufficiency of this evidence. <u>Manpower, Inc.</u>, 732 F.3d at 806. Dr. Yoeli's opinions and analyses of calls to numbers on internal do-not-call lists are admissible under Rule 702.

Dish also disagrees with the Plaintiffs on the relevance of the calls by authorized retailers and calls by Dish to numbers on an authorized retailer's internal do-not-call list. These arguments depend on the parties' legal arguments regarding Dish's liability for the actions of authorized dealers and evidence concerning the relationship between Dish and its authorized dealers. Dr. Yoeli's opinions do not relate to these issues.

<u>Count III</u>

Count III also alleges two claims: (1) Dish abandoned telemarketing calls by not having a human telemarketer come on the line within two seconds of the call recipient's greeting; and (2) Dish caused telemarketers to abandon telemarketing calls by not having a human telemarketer come on the line within two seconds of the call recipient's greeting. The Plaintiffs' summary judgment evidence indicates that Dish and certain authorized dealers made prerecorded telemarketing calls to sell Dish products and services.

If so, these calls were abandoned calls under the TSR. The Plaintiffs further present evidence that the prerecorded calls did not fit within the FTC's announced enforcement forbearance policy in effect from 2004 to 2008 because the calls did not present the recipient of the call with an opportunity to indicate, by pushing a button or otherwise, that he or she did not wish to receive such calls in the future. Dr. Yoeli calculated the number of calls by Dish and authorized retailers Dish TV Now and Star Satellite.

Dish presents no argument as to the relevance and reliability of Dr. Yoeli's testimony regarding the prerecorded calls that its own employees and Telemarketing Vendors made. Dish in fact concedes in its summary judgment briefings that Dish used prerecorded messages in some campaigns. "There is no dispute that each of the fifteen prerecorded message campaigns at issue, which were dialed between September 2007 and November 2008, were directed to DISH customers who were, at the time of the calls, existing subscribers of DISH service." Defendant Dish Network L.L.C.'s Memorandum of Law in Support of its Motion for Summary Judgment (d/e 349), at 168-69. Dish further makes no argument about the calls from Dish TV Now or Star Satellite other than

challenging the Plaintiffs' evidence that the calls were Dish telemarketing calls. The trier of fact can resolve that factual dispute. Dr. Yoeli's analyses and opinions meet the requirements of Rule 702.

Count IV

Count IV alleges that Dish "provided substantial assistance or support to Star Satellite and/or Dish TV Now even though Defendant DISH Network knew or consciously avoided knowing Defendant Star Satellite and/or Dish TV Now abandoned outbound telephone calls in violation of § 310.4(b)(1)(iv) of the TSR." Dr. Yoeli's opinions and analyses relate to this Count only in providing evidence relevant to the underlying alleged abandoned call claim set forth in Count III. The opinions and analyses are admissible for the reasons discussed in connection with Count III.

Count V

Count V alleges that Dish violated the FCC Rule and the TCPA by initiating telemarketing calls to residential telephone subscribers in the Plaintiff States of California, Illinois, North Carolina and Ohio who placed their telephone numbers on the Registry. Count V includes calls made by Dish as the seller and by any person

(including telemarketer or retailer) acting on behalf of Dish as the seller.  47 C.F.R. §64.1200(f)(7).

Unlike the TSR, the FCC Rule prohibits telemarketing calls to "residential telephone subscribers" who have placed their telephone numbers on the Registry.  47 C.F.R. § 64.1200(c)(2).  The FCC Rule further directs sellers and telemarketers to honor the registration on the Registry until the number is removed by the telephone subscriber or the administrator of the Registry.  Thus, the FCC Rule requires the registrant to be a residential telephone subscriber, and requires the sellers and telemarketers to honor the registration as long as the number remains on the Registry.

As explained above, Dr. Yoeli used reliable methods to determine telemarketing calls made to numbers on the Registry.  In addition, Dr. Yoeli collected random samples from the various sets of call records and supplied those samples to PossibleNOW for analysis.  Dr. Yoeli is an expert in statistical analysis.  He is qualified to collect a random sample from a data set.  The Court finds that the sample was taken in a reliable manner.  Dish complains that Dr. Yoeli did not provide enough information about his sampling technique.  Dish, however, does not question Dr.

Yoeli's qualifications to collect samples. Dish also does not

challenge PossibleNOW ability to analyze the samples. Dish could

examine Dr. Yoeli on his sampling technique at his deposition if it

needed more information. The Court will find that the sampling

methodology is sufficiently reliable under Rule 702.

However, the question remains whether Dr. Yoeli's opinions

and analyses are relevant to prove that the calls he identified were

directed to residential telephone subscribers.

Several factors could lead a trier of fact to find that Dr. Yoeli's

analyses and opinions are relevant to show telemarketing calls to

residential subscribers. Dish's expert Dr. Fenili opined that in 2011

over 50 percent of the numbers on the Registry were wireless

numbers and 28 percent were residential landline numbers.

Evidence presented in connection with summary judgment

indicates that Dish did not initiate telemarketing calls to wireless

numbers. Dish representatives testified in depositions that Dish

scrubbed wireless numbers from the pool of possible telephone

numbers when it formulated lists of numbers to call (calling lists or

call lists). See Davis Deposition DX 170, at 238-39; Dish Initial

Exhibits (d/e 348), DX 217, Deposition of Amy Dexter (Dexter Deposition DX 217), at 50.

Dish's decision to scrub wireless numbers is understandable. The TCPA generally prohibits using autodialing equipment to call wireless telephones.  47 U.S.C. § 227(b)(1)(A)(iii).[6]  Dish used autodialing equipment to make telemarketing calls.  See Plaintiffs' Initial Exhibits (d/e 342), PX 14, Deposition of Joey Montano (Montano Deposition PX 14), at 41, 114.  Thus, Dish was required to remove wireless telephone numbers from its call lists.

Because Dish scrubbed wireless numbers from its calling lists, a trier of fact could conclude that the number of wireless numbers on the Registry was immaterial because Dish did not call those types of numbers.  After excluding wireless numbers, Dr. Fenili opined that residential numbers made up the majority of the remaining numbers on the Registry.  A trier of fact could, therefore, conclude that Dr. Yoeli's calculations of the number of Dish telemarketing calls to numbers on the Registry make it more likely that these calls were directed to residential telephone subscribers.

[6] This section of the TCPA is not at issue in this case.

The PossibleNOW analyses of Dr. Yoeli's samples are consistent with this interpretation of the evidence. PossibleNOW identified less than 10 percent of the sample of Dish 2007-2010 call records as wireless phone numbers, and identified 68 percent of the numbers as residential numbers. The samples from the Dish authorized retailers JSR, Star Satellite, and Dish TV Now showed very few telephone calls to identified wireless numbers. A trier of fact could find that PossibleNOW's analysis of Dr. Yoeli's samples, when viewed in light of the other evidence noted, made it more likely that Dish and its authorized dealers made telemarketing calls to the telephone numbers of residential telephone subscribers whose telephone numbers were on the Registry at the time of the calls.[7]

Dish also argues that Dr. Yoeli's use of area codes to identify calls to the Plaintiff States is not reliable and should not be admitted. The Court again disagrees.

---

[7] The Plaintiffs argue that the FCC created a presumption that wireless numbers on the Registry were numbers of residential telephone subscribers. The Court disagrees. The FCC Report and Order used the word presumption in its discussion of the registration of wireless numbers, but further stated that a "complaining wireless subscriber" would be required to "provide proof of the validity of the presumption." 68 Fed. Reg. at 44147. The FCC did not establish an evidentiary presumption that all registered wireless phones were owned by residential telephone subscribers. At most, the FCC made an administrative presumption that it would recognize the registration without further proof at the time of registration. The FCC still required the complainant to prove the validity of the presumption.

Dish is correct that the Plaintiff States must show that it is more likely than not that the telemarketing calls were made to citizens of each Plaintiff State. The Plaintiffs argue that the Attorneys General can sue on behalf of a holder of a telephone number that is associated with the Plaintiff State, and so, can sue on behalf of any person who has a telephone number with an area code assigned in the State. This is incorrect. A State Attorney General can only sue on behalf of the residents of his or her State. 47 U.S.C. § 227(g)(1). A Colorado resident who has a phone with an area code assigned to California is not a California resident. The Attorney General of California cannot sue on behalf of that person. The Plaintiff States' Attorneys General can only sue on behalf of their own residents. They, therefore, can only recover for illegal telemarketing calls made to the residents of their respective States.

Use of area codes is a relevant method to prove that Dish and its authorized retailers called citizens of the Plaintiff States. Again, evidence is relevant if "it has a tendency to makes a fact [at issue] more or less probable that is would be without the evidence." Fed. R. Evid. 401(a). Under the NANP, area codes are assigned

geographically to each State.[8]  Therefore, the area code of a telephone number has a tendency to make more likely the fact that the telephone is in the assigned geographic area.

Dish cites technological developments that tend to disassociate telephones from an area code's assigned geographic area.  Dish, however, presents no evidence to show the quantitative impact of these technological changes on the connection between area codes and geography.  Dish essentially argues without evidence that these factors are so significant that area codes now have no tendency to show geography.  Such argumentation without evidence is not persuasive.  The use of area codes is a relevant method to show geographic location under Rule of Evidence 401.

In addition, the portability of wireless phones may not be relevant to this case.  The portability of wireless phones is a significant factor that may tend to separate area codes from geography.  Individuals can carry the phones anywhere and keep the same number indefinitely regardless of their travels.  Dish, however, scrubs wireless numbers from its call lists.  A trier of fact

---

[8] Certain area codes such as toll-free "800" numbers are not assigned geographically.  These area codes are not relevant to this case.

could conclude that Dish does not make telemarketing calls to wireless numbers.  In light of this evidence, a trier of fact could conclude that wireless numbers are not relevant, at least with respect to telemarketing calls made by Dish.

If the trier of fact excludes wireless numbers from consideration, then the association between a telephone's area code and its geographic location may be greater, and the area code may have a greater tendency to prove the geographic location of the phone.  Dr. Yoeli's use of area code is a relevant method, and his overall methods are reliable.  The Court will not strike his opinion evidence based on his use of area codes.

Count VI

Count VI alleges that Dish and authorized retailers acting on behalf of Dish made telemarketing prerecorded calls to residential telephone subscribers in the Plaintiff States.  For the reasons stated above, Dr. Yoeli's analyses and opinions of these prerecorded calls is based on reliable methods and is relevant.  Dish's main challenge to these opinions and analyses relate to the use of area codes.  As explained above, area codes are relevant to the geographic location

of a telephone, particularly in light of Dish's practice of scrubbing wireless numbers from its call lists.

Counts VII through XII

These counts are based on the Do-Not-Call Laws and consumer protection laws of each of the Plaintiff States. Dish's objection to Dr. Yoeli's analyses and opinions with respect to these claims focuses on his use of area codes to identify calls to phones in a Plaintiff State. As discussed earlier, area codes are relevant to show that calls are made to particular geographic locations. Dr. Yoeli's opinions and analyses are relevant to these claims.

THEREFORE Defendant Dish Network LLC's Motion to Preclude the Expert Testimony of Dr. Yoeli (d/e 398) is DENIED.

Enter: December 11, 2014

_____/s Sue E. Myerscough_____
UNITED STATES DISTRICT JUDGE