## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>**and the STATES of CALIFORNIA,** )<br>**ILLINOIS, NORTH CAROLINA,** )<br>**and OHIO,** )<br> )<br>   **Plaintiffs,** )<br> )<br>   **v.** )<br> )<br>**DISH NETWORK, L.L.C.,** )<br> )<br>   **Defendant.** ) | **No. 09-3073** |

### OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

This cause is before the Court on Plaintiffs' Motion for
Summary Judgment (d/e 341/402) (Motion 341/402) and
Defendant Dish Network L.L.C.'s (Dish) Motion for Summary
Judgment (d/e 346) (Motion 346) (collectively the Motions).  The
Plaintiffs seek summary judgment on eleven of twelve claims alleged
in the Second Amended Complaint and Demand for Jury Trial (d/e
257) (Second Amended Complaint).  Dish seeks summary judgment
on all claims.

Dish sells satellite television programming and related services.  Dish was known as Echostar Communications Corporation (Echostar) until it changed its name on January 1, 2008.  <u>Motion 341</u>, <u>Statement of Undisputed Fact (PSUF)</u>, ¶ 4.  Dish markets its services in several ways, including telemarketing.  Dish employees engage in telemarketing directly; Dish contracts with two telemarketing vendors eCreek Service Group (eCreek) and EPLDT-Ventus (EPLDT or Libertad) (collectively Telemarketing Vendors) to provide telemarketing services to Dish; and Dish contracts with authorized retailers (Retailers) to market Dish's products and services, and some of these authorized retailers engage in telemarketing to market Dish products and services.  The Plaintiffs allege that Dish violated state and federal laws ("Do-Not-Call" or "DNC" Laws) governing: (1) outbound telemarketing calls to persons who have indicated that they do not want to receive such calls, and (2) outbound telemarketing calls that convey a prerecorded message.

On October 17, 2014, the Court heard oral argument on the Motions.  The Plaintiff United States of America appeared by its attorneys from the U. S. Department of Justice Patrick R. Runkle,

Lisa K. Hsiao, and Sang H. Lee, and, as of counsel, Federal Trade Commission attorney Russell Deitch; the Plaintiff State of California appeared by its attorney from the California Attorney General's Office Jin Ohta; the Plaintiff State of Illinois appeared by its attorney from the Illinois Attorney General's Office Paul A. Isaac; the Plaintiff State of North Carolina by its attorney from the North Carolina's Attorney General's Office David N. Kirkman; and the Plaintiff State of Ohio by its attorney from the Ohio Attorney General's Office Erin B. Leahy.  Dish appeared by its attorneys Joseph Boyle, Henry T. Kelly, Lauri A. Mazzuchetti, and Damon W. Suden.

After careful consideration of the submissions of the parties and the arguments of counsel, the Court finds with respect to each count as follows:

Count I

The Plaintiff United States is entitled to partial summary judgment establishing Dish's liability with respect to the following outbound telemarketing calls for Dish products and services: (1) calls to telephone numbers on the National Do-Not-Call Registry (Registry), (a)1,707,713 calls on the 2007-2010 Dish call records,

and (b) 2,386,386 calls that Dr. Yoeli determined were made to numbers on the Registry which Dish failed to dispute with any evidence; (2) 2,349,031 calls that Dish Retailer JSR Enterprises (JSR) made to numbers on the Registry; and (3) 381,811 calls that Dish Retailer Satellite Systems Network (Satellite Systems or SSN) made to numbers on the Registry.  The United States is further entitled to partial judgment that Dish is not entitled to the safe harbor defense.  Issues of fact preclude summary judgment for either party with respect to remedies for Dish's partial summary judgment liability under Count I or with respect to any other issue related to Count I.

Count II

The Plaintiff United States is entitled to partial summary judgment establishing Dish's liability with respect to the following outbound telemarketing calls for Dish products and services: (1) 903,246 calls to persons whose telephone numbers were on Dish's internal do-not-call list at the time of the call; and (2) 140,349 calls to numbers marked "DNC" by Dish Telemarketing Vendor eCreek. The United States is further entitled to partial judgment that Dish is not entitled to the safe harbor defense under the TSR.  Issues of

fact preclude summary judgment for either party with respect to remedies for Dish's partial summary judgment liability under Count II or with respect to any other issue related to Count II.

Count III

The Plaintiff United States is entitled to partial summary judgment establishing Dish's liability with respect to the following prerecorded outbound telemarketing calls for Dish products and services that constituted illegally abandoned calls: (1) 98,054 prerecorded calls made by Dish; (2) 43,100,876 prerecorded calls made at the direction of Dish Retailer Star Satellite, LLC; (3) 6,637,196 prerecorded calls made at the direction of Dish Retailer Dish TV Now; and (4) the one prerecorded call made by Dish Retailer American Satellite, Inc. (American Satellite).  Issues of fact preclude summary judgment for either party with respect to remedies for Dish's liability under Count III.

Count IV

The Defendant Dish is entitled to partial summary judgment on that portion of Count IV that alleges that Dish provided substantial assistance or support to Retailer Dish TV Now even though dish knew or consciously avoided knowing that Dish TV

Now was making prerecorded calls that constituted abandoned calls.  Issues of fact preclude summary judgment for either party on any other issue related to Count IV.

Count V

The Plaintiff States are entitled to a finding under Federal rule of Civil Procedure 56(g) that: (1) Dish engaged in a pattern or practice of making outbound telemarketing calls for Dish products and services to residents of the Plaintiff States whose telephone numbers were on the Registry as reflected in the 2007-2010 Dish call records; and (2) Dish Retailers:  JSR and Satellite Systems engaged in a pattern or practice of making outbound telemarketing calls for Dish products and services to residents of the Plaintiff States whose telephone numbers were on the Registry.   The Plaintiff States are also entitled to partial summary judgment that Dish is not entitled to a safe harbor defense.  Issues of fact preclude summary judgment for either party on any other issue related to Count V.

Count VI

The Plaintiff States are entitled to findings under Rule 56(g) that: (1) Dish engaged in a pattern or practice of making

prerecorded outbound telemarketing calls for Dish products and services to residents of the Plaintiff states; and (2) Dish Retailers: Dish TV Now and Star Satellite engaged in a pattern or practice of making prerecorded outbound telemarketing calls for Dish products and services to residents of the Plaintiff states.  Issues of fact preclude summary judgment for either party on any other issue related to Count VI.

Count VII

The State of California is entitled to a finding under Rule 56(g) that Dish made outbound telemarketing calls for Dish products and services to telephone numbers of California residents at a time when the numbers were on the Registry as reflected in the 2007-2010 Dish call records.  Issues of fact preclude summary judgment for either party on any other issue related to Count VII.

Count VIII

The State of California is entitled to findings under Rule 56(g) that: (1) Dish made outbound telemarketing calls for Dish products and services to telephone numbers of California residents at a time when the numbers were on the Registry as reflected in the 2007-2010 Dish call records; and (2) Dish made prerecorded outbound

telemarketing calls for Dish products and services to telephone numbers of California residents.  Issues of fact preclude summary judgment for either party on any other issue related to Count VIII.

Count IX

The State of North Carolina is entitled to findings under Rule 56(g) that: (1)  Dish made prerecorded calls using autodialing equipment to residents of North Carolina; and (2) Dish Retailers: Dish TV Now and Star Satellite made prerecorded calls using autodialing equipment to residents of North Carolina.  Issues of fact preclude summary judgment for either party on any other issue related to Count IX.

Count X

The State of North Carolina is entitled a finding under Rule 56(g) that Dish made prerecorded calls using autodialing equipment to residents of North Carolina.  Issues of fact preclude summary judgment for either party on any other issue related to Count X.

Count XI

The State of Illinois is entitled to findings under Rule 56(g) (1) that Dish made prerecorded calls using autodialing equipment to residents of Illinois; and (2) Dish Retailers:  Dish TV Now and Star

Satellite made prerecorded calls using autodialing equipment to residents of North Carolina.  Issues of fact preclude summary judgment for either party on any other issue related to Count XI.

Count XII

Issues of fact preclude Dish's request for summary judgment of Count XII.  The Plaintiffs do not seek summary judgment on Count XII.

The facts in this case are best understood in the context of the regulatory environment.  The Court will describe the relevant federal statutory and regulatory framework first.  The Court will then set forth the undisputed facts for purposes of the Motions.  Each side also objects to evidence presented by the opposing side.  The Court will address evidentiary objections before setting forth the facts.  The Court may cite to a statement of undisputed fact if the statement is undisputed by all parties.  In addition, the Court will cite to the page number on a document if the document has a page number.  Some documents have no page numbers.  If the document has no page number, the Court will cite to the page numbers assigned by the Court's CM/ECF docketing system.

## **FEDERAL FRAMEWORK**

The relevant federal Do-Not-Call Laws are the Telemarketing Consumer Fraud and Abuse Prevention Act (Telemarketing Act) and the Telephone Consumer Protection Act (TCPA).  15 U.S.C. § 6101 et seq.; 47 U.S.C. § 227.  The Telemarketing Act authorizes the FTC to regulate telemarketing, and the TCPA authorizes the Federal Communications Commission (FCC) to regulate telemarketing.  The resulting overlapping regulations prohibit three types of telemarketing practices relevant here:  (1) calling a person who has previously stated that he or she does not wished to be called by or on behalf of the seller whose goods or services are being offered for sale; (2) calling a person who has registered his or her telephone number on the National Do Not Call Registry (Registry); and (3) calling and delivering a prerecorded telemarketing message to the recipient of the call (hereinafter referred to as "prerecorded calls" or "robocalls").  The Telemarketing Act, the TCPA, and the regulations thereunder address these three issues in slightly different ways.

A. <u>THE TELEMARKETING ACT AND THE TSR</u>

The Telemarketing Act directed the FTC to issue regulations to prohibit deceptive and abusive telemarketing acts or practices.

15 U.S.C. § 6102(a)(1).  On August 23, 1995, the FTC complied and issued the TSR.  60 Fed. Reg. 43842 (August 23, 1995).  The 1995 version of the TSR prohibited, among other things, a "telemarketer from initiating, or any seller to cause a telemarketer to initiate, an outbound telephone call to a person when that person previously has stated that he or she does not wish to receive such a call made by or on behalf of the seller whose goods or services are being offered."  16 C.F.R. § 310.4(b)(1)(iii)(A); see 60 Fed. Reg. at 43854-55.  Section 310.4(b)(1)(iii)(A) did not state to whom the person must state that he or she did not wish to be called and did not state who must honor the statement.

The FTC subsequently explained that the do-not-call request under § 310.4(b)(1)(iii)(A) is "company-specific" and is designed to track the approach in the FCC Rule:

> The "do-not-call" provision of the original Rule is company-specific: After a consumer requests not to receive calls from a particular company, that company may not call that consumer. Other companies, however, may lawfully call that same consumer until he or she requests each of them not to call. The effect of this provision is to permit consumers to choose those companies, if any, from which they do not wish to receive telemarketing calls. Each company must maintain its own "do-not-call" list of consumers who have stated that they do not wish to receive telephone calls by or on behalf

of that seller. This seller-specific approach tracks the approach that the FCC adopted pursuant to its mandate under the TCPA.

Notice of Proposed Rulemaking, Amendments to the Telemarketing Sales Rule, 67 FR 4492, 4516 (January 30, 2002) (footnote omitted).

The 1995 version of the TSR also provided a safe harbor defense for sellers and telemarketers.  The FTC explained in the FTC Statement of Basis and Purpose accompanying the 1995 TSR (1995 FTC Statement):

> The safe harbor states that a seller or telemarketer will not be liable for such violations if: (1) it has established and implemented written procedures to comply with the "do not call provisions"; (2) it has trained its personnel in those procedures; (3) the seller, or the telemarketer acting on behalf of the seller, has maintained and recorded lists of persons who may not be contacted; and (4) any subsequent call is the result of error.

60 Fed. Reg. at 43855.  The parties refer to the "lists of persons who may not be contacted" as an "entity-specific do-not-call list" or an "internal do-not-call list."

The 1995 FTC Statement stated that a "rule of reasonableness" should control the application of the safe harbor defense:

> If a company is complying in a reasonable manner with
> the requirements of the safe harbor, any true error
> should be excused. On the other hand, numerous
> purportedly "erroneous" calls to consumers who
> previously had asked not to be called may be a sign that
> the seller's adopted procedures are ineffective, and that
> the safe harbor should no longer be available.

60 Fed. Reg. at 43855.

The 1995 FTC Statement also addressed whether separate divisions of a company would be considered a single seller. The FTC stated that "distinct corporate divisions may be considered separate 'sellers.'" 60 Fed. Reg. at 48344. The FTC explained:

> The determination as to whether distinct divisions of a
> single corporate organization will be treated as separate
> sellers will depend on such factors as: (1) whether there
> exists substantial diversity between the operational
> structure of the corporate organization and the division
> that is selling the goods or services that are the subject of
> the offer, or between that division and the other divisions
> of the corporation; or (2) whether the nature or type of
> goods or services offered by the division are substantially
> different from those offered by other divisions of the
> corporation or the corporate organization as a whole.

60 Fed. Reg. at 43844.

The 1995 version of the TSR also prohibited assisting and facilitating violations of the TSR:

> (b) Assisting and facilitating. It is a deceptive
> telemarketing act or practice and a violation of this Rule
> for a person to provide substantial assistance or support

> to any seller or telemarketer when that person knows or
> consciously avoids knowing that the seller or
> telemarketer is engaged in any act or practice that
> violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

16 C.F.R. § 310.3(b).  In promulgating § 310.3(b), the FTC selected

the "knows or consciously avoids knowing" language over the

alternative language of "knew or should have known."  60 Fed. Reg.

43842, at 48352.  The FTC explained:

> The "conscious avoidance" standard is intended to
> capture the situation where actual knowledge cannot be
> proven, but there are facts and evidence that support an
> inference of deliberate ignorance on the part of a person
> that the seller or telemarketer is engaged in an act or
> practice that violates . . . this Rule.

60 Fed. Reg. at 48352 (footnote omitted).

On January 29, 2003, the FTC amended the TSR.  68 Fed.

Reg. 4580 (January 29, 2003).  The FTC amended the TSR

pursuant to the 2001 amendments to the Telemarketing Act.  See

National Federation of the Blind v. F.T.C., 420 F.3d 331, 334-35 (4th

Cir. 2005).

The amended 2003 TSR established the Registry.  16 C.F.R. §

310.4(b)(1)(iii).  Telephone customers who do not wish to be called

by sellers or telemarketers generally may place their telephone

numbers on the Registry.  Sellers and telemarketers may not call a

person whose telephone number is on the Registry unless the seller or telemarketer has an Established Business Relationship (sometimes called "EBR") with the person or has prior written consent.

The Registry opened for registrations in June 2003 and was scheduled to take effect October 1, 2003.  68 Fed. Reg. 16238 (April 3, 2003).  Interested parties immediately filed actions to challenge the FTC's authority to establish the Registry; however, on September 29, 2003, Congress resolved the question of the FTC's authority by ratifying the creation of the Registry.  Pub. L. 108-82, 117, codified at 15 U.S.C. § 6151; see Mainstream Mktg. Servs., Inc. v. F.T.C., 358 F.3d 1228, 1250 (10th Cir. 2004).  The Registry became operational on October 1, 2003, as scheduled.

The FTC Statement of Basis and Purpose accompanying the 2003 amendments to the TSR (2003 FTC Statement) stated that the Registry applied to both land lines and cellular phones:

> The Commission intends that § 310.4(b)(1)(iii) apply to any call placed to a consumer, whether to a residential telephone number or to the consumer's cellular telephone or pager. Consumers are increasingly using cellular telephones in place of regular telephone service, which is borne out by the dramatic increase in cellular phone usage.  The Commission believes that it is

particularly important to allow consumers an option to reduce unwanted telemarketing calls to cellular telephones or to pagers because some cellular services charge the consumer for incoming calls, thus adding insult to injury when the consumer is charged for the unwanted telemarketing call to the consumer's cellular telephone.

68 FR 4580-01, at 4632-33 (January 29, 2003) (footnotes omitted).

Section 310.4(b)(1) of the 2003 TSR stated, "It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in the following conduct:"  Section 310.4(b)(1) then listed certain specific prohibited acts, including:

> (iii) Initiating any outbound telephone call to a person when:

>> (A) That person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or

>> (B) That person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller

>>> (i) Has obtained the express agreement, in writing, of such person to place calls to

that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person;

(ii) Has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section; or

(iv) Abandoning any outbound telephone call.  An outbound telephone call is "abandoned" under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

16 C.F.R. § 310.4(b)(1)(iii) & (iv) (footnote omitted).  The 2003 TSR

retained the prohibition against assisting and facilitating a violation

of the TSR.  16 C.F.R. § 310.3(b).

The TSR defined "established business relationship," "person,"

"seller," "telemarketing," and "telemarketer" in relevant part, as

follows:

(o) Established business relationship means a relationship between a seller and a consumer based on:

> (1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call; or
>
> (2) the consumer's inquiry or application regarding a product or service offered by the seller, within the three (3) months immediately preceding the date of a telemarketing call.

. . . .

(w) Person means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

. . . .

(aa) Seller means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.

. . . .

(cc) Telemarketer means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.

(dd) Telemarketing means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. . . .

16 C.F.R. § 310.2(o), (w), (aa), (cc), and (dd).  The TSR also

exempted telemarketing calls "between a telemarketer and any

business, except calls to induce the retail sale of nondurable office or cleaning supplies." 16 C.F.R. § 310.6(b)(7).

Any violation of the TSR constituted an unfair and deceptive act or practice in or affecting commerce in violation of § 5(a) of the Federal Trade Commission Act (FTC Act). FTC Act §§ 5(a) and 18(d)(3), codified at 15 U.S.C. §§ 45(a) and 57a(d)(3); Telemarketing Act 15 U.S.C. § 6102(c). The FTC may authorize the Attorney General to bring actions on behalf of the United States against anyone violating § 5(a) of the FTC Act. The United States may seek injunctive relief and, in appropriate cases, civil penalties. FTC Act §§ 5(m), 13(b), and 16(a)(1), codified at 15 U.S.C. §§ 45(m), 53(b), 56(a)(1). The United States has brought this action pursuant to FTC authorization under these provisions.

The 2003 amendments to the TSR also amended the safe harbor provisions to cover calls to persons whose telephone numbers are on the Registry or on an internal do-not-call list.[1] The 2003 TSR safe harbor provisions provided in relevant part:

> (3) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(ii) and (iii) if it can demonstrate

---

[1] The safe harbor provisions refer to the FTC as the "Commission."

that, as part of the seller's or telemarketer's routine
business practice:

(i) It has established and implemented written procedures
to comply with § 310.4(b)(1)(ii) and (iii);

(ii) It has trained its personnel, and any entity assisting
in its compliance, in the procedures established
pursuant to § 310.4(b)(3)(i);

(iii) The seller, or a telemarketer or another person acting
on behalf of the seller or charitable organization, has
maintained and recorded a list of telephone numbers the
seller or charitable organization may not contact, in
compliance with § 310.4(b)(1)(iii)(A);

(iv) The seller or a telemarketer uses a process to prevent
telemarketing to any telephone number on any list
established pursuant to § 310.4(b)(3)(iii) or
310.4(b)(1)(iii)(B), employing a version of the "do-not-call"
registry obtained from the Commission no more than
thirty-one (31) days prior to the date any call is made,
and maintains records documenting this process;

(v) The seller or a telemarketer or another person acting
on behalf of the seller or charitable organization,
monitors and enforces compliance with the procedures
established pursuant to § 310.4(b)(3)(i); and

(vi) Any subsequent call otherwise violating
§ 310.4(b)(1)(ii) or (iii) is the result of error.

16 C.F.R. § 310.4(b)(3).  The safe harbor did not apply to violations

of the call abandonment provision, § 310.4(b)(1)(iv), or the assisting

and facilitating provision, § 310.3(b).

The TSR, as promulgated in 2003, had no provision specifically addressing the use of prerecorded calls. The use of a recording constituted the abandonment of a call under § 310.4(b)(1)(iv) because the telemarketer only played a prerecorded message; no human telemarketer came on the line within two seconds of the time that the person called completed his or her greeting. See F.T.C. v. Asia Pacific Telecom, Inc., 802 F.Supp.2d 925, 929-30 (N.D. Ill. 2011); The Broadcast Team, Inc. v. F.T.C., 429 F.Supp.2d 1292, 1301-02 (M.D. Fla. 2006).

On November 17, 2004, the FTC issued a Notice of Proposed Rulemaking to amend the TSR to add an additional safe harbor provision to allow some use of prerecorded calls under limited circumstances. 69 Fed. Reg. 67287 (November 17, 2004) (2004 Notice). The proposed safe harbor amendment would have allowed a seller or telemarketer to use a prerecorded call in outbound telemarketing to a person with whom the seller or telemarketer had an Established Business Relationship and only if the prerecorded message: (1) within two seconds of the person's completed greeting, presented the person with the opportunity to communicate that he or she did not want to be called again (e.g., by pushing a number on

the telephone keypad); (2) provided all required disclosures; and (3)

otherwise complied with all applicable state and federal laws.  69

Fed. Reg. at 67289.

The FTC further stated in the 2004 Notice that the FTC would

forbear from bringing enforcement actions for prerecorded calls that

complied with the proposed amendments to the safe harbor

provisions:

> Therefore, the Commission has determined that, pending
> completion of this proceeding, the Commission will
> forbear from bringing any enforcement action for
> violation of the TSR's call abandonment prohibition, 16
> CFR 310.4(b)(1)(iv), against a seller or telemarketer that
> places telephone calls to deliver prerecorded
> telemarketing messages to consumers with whom the
> seller on whose behalf the telemarketing calls are placed
> has an established business relationship, as defined in
> the TSR, provided the seller or telemarketer conducts this
> activity in conformity with the terms of the proposed
> amended call abandonment safe harbor.

69 Fed. Reg. at 67290.

On August 29, 2008, the FTC completed the proposed

rulemaking and amended the TSR.  Final Rule Amendments, 73

Fed. Reg. 51164 (August 29, 2008).  The amendment added a

specific clause addressing the use of prerecorded calls to the

prohibitions in § 310.4(b)(1).  The additional provision prohibited

using prerecorded telemarketing calls unless the seller or telemarketer had an Established Business Relationship with the person called and the person called gave prior written consent to receive such calls.  16 C.F.R. § 310.4(b)(1)(v).[2]  The amendments became effective on December 1, 2008.  The FTC announced that, as of December 1, 2008, the FTC would end its 2004 policy of forbearing enforcement against certain prerecorded calls.  73 Fed. Reg. at 51164.

On February 15, 2008, Congress passed the Do-Not-Call Improvements Act of 2007 (Improvements Act).  Pub. L 110-87, codified at 15 U.S.C § 6155.  Congress provided in the Improvements Act that telephone numbers placed on the Registry would stay on the Registry indefinitely unless and until: (1) the individual to whom the number is assigned requested removal; or (2) the telephone number had been disconnected and reassigned.  15 U.S.C. § 6155(a) and (b).  Congress directed the FTC to "periodically check . . . national or other appropriate databases" to determine whether numbers have been disconnected and reassigned.  15 U.S.C. § 6155(b).  Section 6155 further stated that

---

[2] The amendments also amended the safe harbor provisions in a manner not relevant to this case.

the FTC could "remove invalid telephone numbers from the registry at any time."  Id.

B. THE TCPA AND THE FCC RULE

The TCPA prohibited certain types of telephone calls, including telephone calls to a residential telephone line "using an artificial or prerecorded voice to deliver a message without the prior express consent of the party called . . . ."  47 U.S.C. § 227(b)(1)(B).  The TCPA further directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."  47 U.S.C. § 227(c)(1).  The TCPA also authorized State Attorneys General to bring actions on behalf of the residents of such states for violations of the TCPA or the regulations promulgated thereunder.  Each Attorney General could seek injunctive relief and secure actual damages or $500 per violation, or both.  The Attorneys General could also recover treble damages if the defendant willfully or knowingly violated the TCPA.  47 U.S.C. § 227(g).[3]

---

[3] Section 227(g) was originally numbered as § 227(f).  During the pendency of this case, Congress amended the TCPA in 2010 and changed the numbering of the section.  Truth in Caller ID Act of 2009, Pub. L. No. 111-331, 124 Stat. 3572 (December 22, 2010).

The FCC promulgated a rule (FCC Rule) to implement the TCPA.  47 C.F.R. § 64.1200 et seq.; <u>see</u> 47 U.S.C. § 227(c).  The FCC promulgated the original version of the FCC Rule in 1992.  57 Fed. Reg. 4833-01 (October 23, 1992).  The FCC Rule prohibited, among other things, any person or entity from initiating a telemarketing telephone call, "to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party . . . ."  47 C.F.R. § 64.1200(a)(3).  The original FCC Rule included an Established Business Relationship exception that allowed such prerecorded calls if the call "is made to a person with whom the caller has an established business relationship at the time the call is made."  47 C.F.R. § 64.1200(a)(2)(iv) (version in effect prior to October 16, 2012).  The Established Business Relationship exception was removed by the 2012 amendments to §§ 64.1200(a)(2) and (a)(3).  77 Fed. Reg. 34233, at 13471 (June 11, 2012); 77 Fed. Reg. 66935 (November 8, 2012) (correcting the effective date to October 16, 2012).

The FCC Rule also required any person making a telemarketing call to a residential telephone subscriber to maintain an internal do-not-call list:

> (d) No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

47 C.F.R. § 64.1200(d).  The FCC Rule stated that "the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request."  47 C.F.R. § 64.1200(d)(3).  The FCC Rule also required specific procedures, including having a written policy and providing training for maintaining an internal do-not-call list.  47 C.F.R. § 64.1200(d)(1)-(6).

On July 25, 2003, the FCC amended the FCC Rule to prohibit any person or entity from initiating a telemarketing call to a "residential telephone subscriber" who registered his or her telephone number on the Registry.  47 C.F.R. § 64.1200(c)(2).  68 Fed. Reg. 44144 (July 25, 2003).  The FCC Rule further provided, "Such do-not-call registrations must be honored for five years."  68

Fed. Reg. at 44177.  The amendment became effective on October 1,

2003.  Id. at 44144.  The FCC subsequently amended the FCC Rule

on July 14, 2008, to state, "Such do-not-call registrations must be

honored indefinitely, or until the registration is cancelled by the

consumer or the telephone number is removed by the database

administrator."  73 Fed. Reg. 40183 (July 14, 2008).  The FCC

made the change to comport with the Do-Not-Call Improvements

Act of 2007.

The FCC Rule contained a safe harbor provision for calls made

to residential telephone subscribers on the Registry.  The safe

harbor provided:

> (2) . . . Any person or entity making telephone
> solicitations (or on whose behalf telephone solicitations
> are made) will not be liable for violating this requirement
> if:
>
> (i) It can demonstrate that the violation is the result of
> error and that as part of its routine business practice, it
> meets the following standards:
>
>> (A) Written procedures. It has established and
>> implemented written procedures to comply with the
>> national do-not-call rules;
>>
>> (B) Training of personnel. It has trained its
>> personnel, and any entity assisting in its
>> compliance, in procedures established pursuant to
>> the national do-not-call rules;

(C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;

(D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process.

. . . .

(E) Purchasing the national do-not-call database. It uses a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone solicitations to telephone numbers registered on the national database. It purchases access to the relevant do-not-call data from the administrator of the national database and does not participate in any arrangement to share the cost of accessing the national database, including any arrangement with telemarketers who may not divide the costs to access the national database among various client sellers;

47 C.F.R. § 64.1200(c)(2)(i).   The FCC Rule safe harbor did not apply to calls to numbers on an internal do-not-call list or to prerecorded calls.

The FCC Rule defined a seller as "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of . . . goods, or services, which is transmitted to any person." 47 C.F.R. §64.1200(f)(7).

The FCC Report and Order issued in connection with the 2003 amendments discussed whether a subscriber to a wireless telephone service could be considered a residential subscriber for purposes of the FCC Rule.  In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02–278, F.C.C. 03-153 (July 3, 2003) (FCC Report and Order), ¶¶ 34-36.  The FCC found that many consumers elect to use a wireless telephone as their residential phone service.  Id., at ¶ 35. The FCC determined that these wireless customers should receive the benefits of the protections of the FCC Rule.  Based on this analysis, the FCC concluded that wireless customers could register their wireless telephone numbers on the Registry:

> Therefore, we conclude that wireless subscribers may participate in the national do-not-call list.  As a practical matter, since determining whether any particular wireless subscriber is a "residential subscriber" may be more fact-intensive than making the same determination for a wireline subscriber, we will presume wireless subscribers who ask to be put on the national do-not-call

list to be "residential subscribers."  Such a presumption,
however, may require a complaining wireless subscriber
to provide further proof of the validity of that
presumption should we need to take enforcement action.

Id., at ¶ 36 (footnote omitted); see also 68 Fed. Reg. at 44147.  The

FCC incorporated by reference into the FCC Rule this analysis from

FCC Report and Order:

> (e) The rules set forth in paragraph (c) and (d) of this
> section are applicable to any person or entity making
> telephone solicitations or telemarketing calls to wireless
> telephone numbers to the extent described in the
> Commission's Report and Order, CG Docket No. 02–278,
> FCC 03–153, "Rules and Regulations Implementing the
> Telephone Consumer Protection Act of 1991."

47 C.F.R. § 64.1200(e).

During the pendency of this case, this Court directed the

parties to file a joint petition before the FCC to secure a declaratory

ruling on the meaning of the term "on whose behalf," used in the

applicable provisions of the TCPA and the FCC Rule.  Opinion

entered February 4, 2011 (d/e 86), at 10 (McCuskey, J., retired).

The parties complied with the instruction.  On May 9, 2013, the

FCC issued a Declaratory Ruling.   In the Matter of the Joint

Petition Filed by Dish Network LLC, et al. Concerning the Telephone

Consumer Protection Act (TCPA Rules), 28 FCC Rcd. 6574 (May 9,

2013) (FCC May 9, 2013 Order).  The FCC determined that the phrases "on behalf of," "on whose behalf," and similar language in the TCPA imposes vicarious liability on a seller "under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." Id. at 6574.  The FCC further declared that a seller's vicarious liability may be based on "a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." Id., at 6583.[4]

C. STATE DO-NOT-CALL LAWS

Most states enacted their own Do-Not-Call Laws.  The supplemental state law counts in the Complaint are based on the Do-Not-Call Laws and other consumer protection laws of the Plaintiff States.  See Complaint, Counts VI-XII.  The Court will discuss the state laws applicable to the Complaint in the analysis of these Counts.

---

[4] The FCC did not preclude the possibility that it could amend the FCC Rule through a formal notice and comment rulemaking proceeding to provide a broader standard of vicarious liability for sellers under certain circumstances.  The FCC only declared the existing standard of vicarious liability under the current version of the FCC Rule and TCPA. FCC May 9, 2013 Order, 28 FCC Rcd. at 6586.

## EVIDENTIARY ISSUES

The parties challenge much of the opposing parties' evidence presented in connection with the Motions.  The Court will resolve these challenges before setting forth the facts.  The Court addresses the Plaintiffs' challenges first.

A. PLAINTIFFS' EVIDENTIARY OBJECTIONS

1. Montano Declaration

The Plaintiffs object to the Declaration of Joey Montano dated January 6, 2014.  Dish Initial Exhibits (d/e 348), Dish Exhibit (DX) 2, Declaration of Joey Montano (Montano Declaration DX 2); Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (d/e 378) (Plaintiffs' Opposition 378), at 167-68.  The Plaintiffs argue that this declaration is not based on personal knowledge and contains statements concerning Dish's operations before Montano worked for Dish.  See Fed. R. Civ. P. 56(c)(4).  Montano states in his declaration that he is the Resource Manager for Dish.  He states that he is in charge of outbound telephone call operations. Montano Declaration DX 2, at ¶ 2.  Montano states, "I make this declaration based on my personal knowledge of the facts set forth herein, and/or based upon information provided to me in company

documents and/or through communications with company personnel in the ordinary course of my duties and/or at my request." Id. ¶ 1.

A corporate representative can provide a declaration based on personal knowledge even if that personal knowledge is based on a review of the corporation's business records and if the declarant's position within the corporation makes him competent to testify on the matters set forth in the declaration.  See Carson v. Perry, 91 F.3d 138, 1996 WL 400122, at *1 (5th Cir. 1996).  Such a declarant may rely on business records to testify as to matters that occurred before his tenure at the corporation.  See Alloc, Inc., v. Pergo, L.L.C., 2010 WL 3808977, at *8 (E.D. Wis. September 23, 2010). The Court, therefore, will consider the Montano Declaration in connection with the Motions.

Much of the Montano Declaration, however, consists of self-serving conclusions that Dish complied with various aspects of the Do-Not-Call Laws and regulations.  The Court will not consider these self-serving conclusions and opinions.  See Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 887 (7th Cir. 1998). Montano also makes statements about the procedures related to

Dish's preparation of lists of telephone numbers to be called in
telemarketing campaigns ("call lists," "calling lists," or "campaign
lists").  This Court has already barred all such evidence that was
not provided in discovery.  Opinion entered April 24, 2013 (d/e 279)
(Opinion 279), at 43-44.  Montano executed the declaration on
January 6, 2014, long after discovery closed.  See Montano
Declaration DX 2, at 7.  His statements on this topic are, therefore,
barred.

2.  Hearsay Objection to Documents

The Plaintiffs object to many of the documents submitted by
Dish in support of Motion 346 because Dish failed to provide
foundation evidence to demonstrate that the exhibits fit within an
exception to the hearsay rule.[5]  The Court generally agrees with the
Plaintiffs' objection.  Material submitted to support or oppose a
summary judgment motion must be admissible at trial.  Fed. R. Civ.
P. 56(c).  Dish generally does not present or cite any foundational
testimony necessary to establish that the documents on which it
relies are admissible under an exception to the hearsay rule.

---

[5] The Plaintiffs do not dispute the authenticity of the documents.

Dish argues vigorously in its reply brief that the documents all fit within an exception to the hearsay rule.  <u>Defendant Dish Network L.L.C.' S Reply in Support of its Motion for Summary Judgment (d/e 396) (Dish Reply 396)</u>, at 70-73.   In the cases cited by Dish, however, the party submitted an affidavit or other evidence to establish the hearsay exception for the document, or the opposing party waived the objection.  <u>See</u> <u>e.g.</u>, <u>Wheeler v. Sims</u>, 951 F.2d 796, 804-05 (7th Cir. 1992) (objection waived); <u>Dataquill, Ltd. v. Handspring, Inc.</u>, 2002 WL 31870560, at*1-*2 (N. D. Ill. December 23, 2002) (affidavit and deposition testimony established foundation for hearsay exception).  The authorities cited did not simply assume the documents fit within a hearsay exception.  The Court, therefore, will not consider a document to which Plaintiffs object for the truth of the matter asserted unless the document is not hearsay or sufficient evidence has been presented to establish that the document fits within an exception to the hearsay rule.

   3. <u>Opinion 279</u>

This Court sanctioned Dish for failing to produce in discovery documentation about its process for preparing calling lists.  This Court ordered, in relevant part, "Defendant is precluded from using

at summary judgment or at trial any documents or information
about the creation and scrubbing of telemarketing campaign lists
that it did not provide to Plaintiffs in discovery." Opinion 279, at
43-44.  The Plaintiffs object to many of Dish's statements of
undisputed fact on the ground Dish attempts to rely on evidence
that is barred by this sanction.  Some of their objections have merit;
others do not.  For example, the Plaintiffs sometimes object to Dish
relying on deposition testimony.  E.g., Plaintiffs' Opposition 378, at
35 (Response to Dish Statement of Undisputed Fact (DSUF) ¶ 53).
Such testimony clearly was produced in discovery and so is not
barred by Opinion 279.  The Court, however, will not consider
evidence that is submitted in violation of Opinion 279.

    4. Best Evidence Rule

    Plaintiffs object to many of Dish's statements of undisputed
fact on the grounds that Dish is attempting to rely on oral
testimony to prove the contents of a writing in violation of the Best
Evidence Rule, Fed. R. Evid. 1002.  Dish responds that it is
presenting the oral testimony to which the Plaintiffs object only to
prove the declarant or deponent's firsthand knowledge of an event,
not to prove the contents of any writing.  Dish Reply 396, at 74-75.

The Court will consider the evidence submitted by Dish for the limited purposes cited by Dish.  The Court will not consider the evidence to prove the contents of a document.

### 5. John Taylor Declaration dated February 5, 2014, and revised June 12, 2014

The Plaintiffs ask the Court not to consider the last declaration from Dish's expert John Taylor.  Declaration of John Taylor dated February 5, 2014, revised June 12, 2014 (d/e 441) (Taylor Declaration DX 238).  This Court agrees that the Taylor Declaration DX 238 is largely inadmissible.  Dish submits this declaration as expert testimony.  Admissible expert testimony must be based on sufficient facts and data; must be the result of reliable scientific or technical principles and methods; and those principles must be reliably applied to the facts of the case.  The expert must also have scientific, technical, or other specialized knowledge that will help the trier of fact understand the evidence and determine the fact in issue.  Fed. R. Evid. 702.

Paragraphs 1 and 2 of the Taylor Declaration DX 238 contain no opinions.  Taylor describes his background and the materials he reviewed.  Paragraphs 3-10 consist largely of legal opinions

regarding how the Do-Not-Call Laws apply to the facts in this case. Taylor states opinions about how these laws apply to telemarketing calls made to wireless numbers. Taylor states opinions about the applicability of the Do-Not-Call Laws to calls to business numbers. He states opinions about his interpretation of TSR and FCC Rule provisions regarding the Registry and the effect of calls to numbers on the Registry. In addition to the legal opinions, Taylor repeats factual generalizations about telephone area codes found in other authority cited elsewhere by Dish. Such legal opinions and factual generalizations are not the result of reliable scientific or technical principles and methods and will not aid the trier of fact. The Court will not consider them under Rule 702. See Jimenez v. City of Chicago, 732 F.3d 710, 721 (7th Cir. 2013) ("As a general rule, accordingly, an expert may not offer legal opinions.").

Dish agrees that paragraphs 3-10 do not contain any expert opinions. Dish explained that Taylor included the paragraphs as background, "The substance of these paragraphs were not discussed in Mr. Taylor's expert reports because they are not the substance of Mr. Taylor's expert opinion – these paragraphs are predicate information included to give context to Mr. Taylor's

subsequent testimony." <u>Reply in Support of Motion to File Corrected DX-238 (d/e 428)</u>, at 3-4. The Court, therefore, will not consider the first ten paragraphs of Taylor Declaration DX 238 for any purpose other than background. The paragraphs have no probative value to prove or disprove any matter.

Paragraph 11 of Taylor Declaration DX 238 concerns 15 telemarketing campaigns that Dish conducted in which it used prerecorded calls. Taylor disputes whether the Plaintiffs' evidence is sufficient to establish that the calls were directed to residential customers. Dish, however, already conceded that the calls were directed to consumers who purchased Dish programming, "There is no dispute that each of the fifteen prerecorded message campaigns at issue, which were dialed between September 2007 and November 2008, were directed to DISH customers who were, at the time of the calls, existing subscribers of DISH service." <u>Defendant Dish Network L.L.C.'s Memorandum of Law in Support of its Motion for Summary Judgment (d/e 349) (Dish Memorandum 349)</u>, at 168-69. Because identity of the recipients of these phone calls is not in dispute, Taylor's opinions regarding the sufficiency of the Plaintiffs' evidence are immaterial.

Plaintiffs object to paragraphs 17, 20, 29, 30 and 35 of Taylor Declaration DX 238. In these paragraphs, Taylor recites information provided to him by Dish representatives concerning the meaning of the code names of various calling campaigns. Based on information provided by Dish representatives, Taylor states that the code names of the calling campaigns indicate that the calls were made to customers with Established Business Relationships with Dish, or the calls were made for collection or some other non-telemarketing purpose. In each of these paragraphs, Taylor merely recites hearsay information provided to him by Dish employees; he is not rendering an expert opinion that will help the finder of fact. Therefore, the Court will not consider these opinions. See Loeffel Steel Prods., Inc. v. Delta Brands, Inc., 387 F.Supp.2d 794, 808 (N.D. Ill. 2005).

Taylor also recites legal conclusions in several paragraphs of Taylor Declaration DX 238 that certain calls were proper or were not "violative" of any law or Rule. Such legal conclusions are not appropriate expert testimony in this context. See Jimenez, 732 F.3d at 721. The Court will also disregard these paragraphs.

B. DISH'S EVIDENTIARY OBJECTIONS

    1. Dish Employee Statements in Documents Produced by Dish

Dish objects to Plaintiffs' submission of numerous internal Dish documents and emails to support Motion 341.  Dish produced these documents in discovery.  Dish objects on the grounds of hearsay and lack of foundation.  The Court overrules Dish's objections.  The Plaintiffs do not need to present foundation evidence to establish authenticity because Dish produced the documents in discovery.  Documents produced by the opposing party during discovery may be treated as authentic.  Fenje v. Feld, 301 F.Supp.2d 781, 809 (N.D. Ill. 2003).

The Plaintiffs generally cite the documents at issue for statements in the documents made by Dish employees or agents.  A statement made by an employee or agent of Dish within the scope of the employment or agency relationship is not hearsay, but a statement of Dish as a party opponent.  Fed. R. Evid. 801(d)(2)(D).  Such non-hearsay statements do not require further foundation evidence.  See Aliotta v. Nat'l R.R. Passenger Corp., 315 F.3d 756, 761 (7th Cir. 2003).  The Court will consider the statements offered

by the Plaintiffs from these documents to the extent that they are non-hearsay statements of the party opponent.

## 2. The Declaration of Kevin Baker

Dish objects to the Declaration of Kevin Baker as inadmissible hearsay. Dish argues that Baker is available to testify and so his declaration does not fit within the hearsay exceptions in Federal Rule of Evidence 804. Dish's argument does not apply at summary judgment. Affidavits and declarations under penalty of perjury may be used to support or oppose a motion for summary judgment. Fed. R. Civ. P. 56(c)(4); 28 U.S.C. § 1746. The admissibility of the Baker Declaration at trial is not relevant at this time. The Court will consider the Baker Declaration.

## 3. The Declaration of Richard Goodale

Dish objects to the Declaration of Richard Goodale (Goodale Declaration) because Plaintiffs failed to disclose Goodale as a witness in their Rule 26 disclosures. A party must supplement incomplete Rule 26 initial disclosures if the additional information is not otherwise been made known during the discovery process. Fed. R. Civ. P. 26(b)(1)(A). In this case, the Plaintiffs provided a copy of the Goodale Declaration to Dish during the discovery

process.  Plaintiffs' Supplemental Exhibits (d/e 391), Exhibit (PX)
419, Declaration of Vicky H. Chien, ¶ 5, Exhibit A, Letter from Sang
Lee to Lauri A. Mazzuchetti dated June 28, 2012.  Because the
Goodale Declaration was disclosed in discovery, the Plaintiffs were
not required to supplement their Rule 26 disclosures to identify him
as a potential witness.  See  Stolarczyk ex rel Estate of Stolarczyk v.
Senator Intern. Freight Forwarding, LLC, 376 F.Supp.2d 834, 843
(N.D. Ill. 2005) (failure to supplement Rule 26 disclosures was
harmless when information was disclosed during discovery).  The
Court will consider the Goodale Declaration.

    4. The Deposition Testimony of Manuel Castillo

    Dish objects to the deposition testimony of Manuel Castillo on
grounds of hearsay.  Plaintiffs Initial Exhibits (d/e 342), PX 219,
Deposition of Manuel Castillo (Castillo Deposition PX 219), at 26-
29, 74-79; Defendant Dish Network L.L.C.'s Opposition to Plaintiffs'
Motion for Summary Judgment (d/e 374) (Dish Opposition 374), at
100 (Response to PSUF 295).  Castillo was a Dish employee who
later became a manager for a company called American Satellite,
Inc.  American Satellite was an authorized retailer of Dish services.
Castillo testified in his deposition that American Satellite used

prerecorded calls to sell Dish services.  <u>Castillo Deposition PX 219</u>, at 74-79.

Castillo also testified that a Dish area sales manager named Carlos Prado told Castillo that American Satellite used prerecorded calls while Castillo was still working for Dish.  <u>Castillo Deposition PX219</u>, 26-27, 38.  Castillo also testified about other information that Prado told him about American Satellite.  Dish objects that Castillo's testimony is hearsay to the extent that the testimony relies on statements that Prado made to Castillo.  Castillo's testimony is not hearsay because it is based on non-hearsay statements by an employee of Dish made within the scope of his employment.  Fed. R. Evid. 801(d)(2)(D); 805.  Prado was a Dish employee and the statements appear to have been made within the scope of his employment.  The Court, therefore, will consider Castillo's testimony.

   5. <u>Consumer Complaints from FTC Consumer Sentinel</u>

Consumers call the FTC to complain about Do-Not-Call Law violations.  The FTC collects these consumer complaints and stores them on a database called Consumer Sentinel.  The FTC submits approximately 1,000 consumer complaints about telemarketing

calls in which Dish services were offered for sale.  The FTC matched these complaints against call records of Dish and Dish's authorized dealers.  The FTC submits this evidence to show that each complaint was filed within one calendar day of receipt of an alleged illegal telemarketing call reflected on the call records.  Motion 341, PSUF 340 (citing Plaintiffs' Initial Exhibits (d/e 342), PX 1, Declaration of Ami J. Dziekan dated December 13, 2013, ¶ 29; PX 38, Declaration of Dr. Erez Yoeli dated December 18, 2013 (Yoeli Declaration PX 38), ¶ 28, Appendix B.).  Dish objects on grounds of hearsay.  Dish Opposition 374, at 105 (Response to PSUF 340). The Plaintiffs seek to admit these complaints under the residual exception to the hearsay rule.  Fed. R. of Evid. 807 (formerly Rule 803 (24)).

Rule 807 allows the District Court, in its discretion, to consider evidence that does not fit a prescribed exception to the hearsay rule, but certain specified criteria that would allow admissibility, "Under Rule 803(24), a hearsay statement must meet five requirements to be admissible: (1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests

of justice; and (5) notice." United States v. Hall, 165 F.3d 1095,

1110 (7ᵗʰ Cir. 1999).

In determining the circumstantial guarantees of

trustworthiness the Court should consider several factors:

> In determining whether a statement is sufficiently
> reliable for purposes of Rule 803(24), a court should
> examine, among other factors: (1) "the probable
> motivation of the declarant in making the statement;" (2)
> "the circumstances under which it was made;" and (3)
> "the knowledge and qualifications of the declarant." Cook
> v. Hoppin, 783 F.2d 684, 690–91 (7ᵗʰ Cir. 1986) (citation
> omitted). Similarly, in construing Rule 804(b)(5), we have
> identified several additional factors that may be
> considered in determining whether hearsay testimony
> has sufficient "guarantees of trustworthiness." Some of
> these other factors which are relevant to the statements
> in this case include: (1) the character of the declarant for
> "truthfulness and honesty and the availability of evidence
> on the issue;" (2) "whether the testimony was given
> voluntarily, under oath, subject to crossexamination (sic)
> and a penalty for perjury;" (3) "the extent to which the
> witness' testimony reflects his personal knowledge;" (4)
> "whether the witness ever recanted his testimony;" and
> (5) whether the declarant's statement was insufficiently
> corroborated. United States v. Seavoy, 995 F.2d 1414,
> 1418 (7ᵗʰ Cir. 1993) (citation omitted). Although these
> factors are neither exhaustive nor necessary
> prerequisites for admissibility of hearsay under 803(24),
> they shed light on the sort of considerations a district
> court should take into account when evaluating the
> "trustworthiness" of a hearsay statement.

United States v. Hall, 165 F.3d 1095, 1110-11 (7ᵗʰ Cir. 1999).  In

this case, the consumers who complained to the FTC had no

apparent motive to lie.  The consumer complaints were voluntary and unsolicited.  The consumers had firsthand knowledge of the calls.  The large number of similar complaints from unrelated consumers corroborated each other's complaints.  The statements were not made under oath and were not subject to cross-examination.  Weighing all these factors the Court finds that the statements have sufficient guarantees of trustworthiness to meet the requirements of Rule 807.  See F.T.C. v. Figgie Intern., Inc., 994 F2d 595, 608 (9th Cir. 1993)

The consumer complaints are also material and have probative value.  The matching of the consumer complaints to the call records corroborates the accuracy of the call records and that the calls were telemarketing calls for Dish products and services.  The consumer complaints also corroborate that the calls were prerecorded calls. The complaints, therefore, are material and have probative value.

The interest of justice favors allowing this evidence for the purpose of matching the complaints to the call records.  It would be impractical or impossible to depose 1,000 complaining consumers to match the timing of their complaints with the call records.  In light of the costs and burdens on the parties and the consumers to

collect the evidence in another manner, the Court finds that it is in the interest of justice to allow admission of these complaints.  See F.T.C. v. Kuykendall, 312 F.3d 1329, 1343 (10th Cir. 2002); Figgie, Int'l, Inc., 994 F.2d at 608.

Last, the Plaintiffs gave adequate notice to Dish that it intended to seek admission of this evidence under Rule 807. The Plaintiffs produced the consumer complaints in discovery.  The Plaintiffs gave notice to Dish that Plaintiffs would seek admission of these specific complaints under Rule 807.  Plaintiffs' Supplemental Exhibits (d/e 391), PX 427, Letter from Patrick Runkle to Henry Kelly dated August 27, 2013.  The Court, in its discretion, will allow the admission of the approximately 1,000 consumer complaints from the Consumer Sentinel that were made within one calendar day of matching alleged illegal telemarketing calls reflected in call records produced in discovery.

6. Consumer Complaints Received by Dish

The Plaintiffs also rely on consumer complaint letters received by Dish and produced in discovery.  Dish objects to the consumers' statements in these letters as hearsay.  The Plaintiffs state that they submit these complaints for the non-hearsay purposes to show that

Dish was on notice of these complaints and to show the effect of the complaints on Dish.  See United States v. Hanson, 994 F.2d 403, 406 (7th Cir. 1993).  The Court will consider these complaints for these limited non-hearsay purposes.

### 7. Evidence Prior to the Statute of Limitations

Dish objects to evidence of events that occurred prior to the relevant statute of limitations period.  Such evidence is admissible as background and to show knowledge or intent.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002); Davis v. City of Springfield, 2009 WL 2605277, at *2 (C.D. Ill. August 21, 2009).  Knowledge and intent are relevant to the Plaintiff FTC's claim for civil penalties.  See Davis, 2009 WL 2605277, at *2.  The Court will consider such evidence for these limited purposes.

### 8. Claims of Privilege

Dish objects to several exhibits, PX 58, PX 83, PX 84, PX 86, PX 194, PX 195, PX 199, and PX 254, on privilege grounds, either attorney-client privilege or attorney work product.  The Magistrate Judge ruled that these privileges were waived with respect to Dish's in-house counsel's activities related to monitoring and regulating compliance with the Do-Not-Call Laws because those efforts form

part of the basis for Dish's safe harbor defense.  Opinion entered

June 12, 2012 (d/e  151) (Opinion 151) (Cudmore, J. retired).  The

Magistrate Judge ruled,

> Dish's attorneys actively participated in performing
> monitoring and compliance functions. Dish has asserted
> that those monitoring and compliance functions provide
> part of the basis for its Safe Harbor defense.  As such,
> the attorneys' participation in monitoring and compliance
> are part of the defense and cannot be shielded by claims
> of privilege. The privileges are therefore waived with
> respect to evidence relevant to the attorneys' monitoring
> and compliance.

Id.(footnote omitted).  Dish produced PX58 and PX83 in compliance

with Opinion 151.  Dish also did not appeal Opinion 151 to this

Court.

Dish produced PX 84, PX 86, PX 194, PX 195, PX 199, and PX

254 after the Magistrate Judge issued Opinion 151.  Dish

acknowledged that the documents would not be privileged under

Opinion 151, but placed a notation on the documents that stated,

"Produced over Defendant's Privilege Designation Consistent With

Court Order."  Dish now seeks to reassert these claims of privilege.

This Court has carefully reviewed Opinion 151 and the

applicable law and agrees with Opinion 151.  The attorneys'

conduct in monitoring compliance with the Do-Not-Call Laws is

directly at issue to prove that Dish complied with the safe harbor requirements of the TSR and the FCC Rule.  The privileges are waived to the extent the attorneys were engaged in that type of activity.  See Opinion 151, at 6-9, and authority cited therein.  Dish concedes that the claims of privilege would also be waived for the remaining documents PX 84, PX 86, PX 194, PX 195, PX 199, and PX 254 under the holding of Opinion 151.  Because this Court agrees with Opinion 151 on this issue, the privileges are waived, and the Court will consider these documents.

### 9. Settlement Material

#### a. Swanberg Letter

Dish objects to a settlement letter sent by a consumer Ryan Swanberg. Plaintiffs' Initial Exhibits (d/e 342), PX 168, Letter dated July 26, 2004 (PX 168).  In the letter, Swanberg threatened to file a lawsuit for an alleged violation of the TCPA and also offered to settle the claim.  Dish objects to the Plaintiffs' use of this document because it is settlement material.  Evidence of settlements is not admissible to prove or disprove the validity or amount of any disputed claim or to impeach by a prior inconsistent statement or contradiction.  Fed. R.Evid. 408 (a).  Statements made during

settlement negotiations, however, may be admitted for another purpose.  Fed. R. Evid. 408(b).  The Plaintiffs have submitted the settlement letter PX 168 to prove notice to Dish of the consumer complaint, not to prove or disprove the validity of Swanberg's claim. The Court will consider PX 168 for the limited purpose of notice to Dish.[6]

   b. 2008 Analysis

In 2008, Dish and the FTC were involved in settlement negotiations.  Dish had produced calling records from 2003-2007 in response to a 2005 Civil Investigative Demand (sometimes called "CID").  During the course of those negotiations, Dish sent the FTC an analysis of a portion of the 2003-2007 calling records (2008 Analysis).  Plaintiffs' Supplemental Exhibits (d/e 380), PX 319, Letter dated May 21, 2008, from Dish Counsel Lewis Rose to FTC Attorney Russell Deitch ; PX 320, Letter dated August 14, 2008, from Dish Counsel Lewis Rose to Russell Deitch, with enclosures; See Plaintiffs' Third Motion to Compel Discovery Responses (d/e

---

[6] Dish also objects to the Plaintiffs' use of representations in a PowerPoint presentation that Dish presented to the FTC as part of their negotiations during the civil investigative phase of this matter in 2008.  PSUF 224.  Dish, however, also does not dispute the Plaintiffs' statement of undisputed fact PSUF 224 which relies on the PowerPoint presentation.  Dish Opposition 369, at 109.  Dish's objection to the use of the PowerPoint presentation is, therefore, moot.

143), at 9 ("During settlement negotiations with the FTC in 2008,

Dish created and provided detailed analyses of portions of its 2003-

2007 call records . . . ."). Dish argues that the 2008 Analysis is

inadmissible as settlement material under Rule 408(a).

Dish, however, cited the settlement material first to support

Motion 346. Dish stated the following as undisputed facts in

support of Motion 346:

> 405. In 2008, DISH sent the FTC analyses of portions of these records (the "2008 Analysis"). (d/e 165, Opinion re: Plaintiff's Third Motion to Compel Discovery Responses, 7/20/2012 at 9-10. (citing Motion, Exhibit 30, Letter dated August 11, 2011, from Patrick Runkle to Joseph Boyle and Lauri Mazzuchetti, enclosing a copy of the 2008 analysis from PossibleNOW (2008 Analysis).)

> 406. The 2008 Analysis covered the four month period from June through September 2005, and the two months of April and October for the years 2004, 2005, 2006 and 2007. (d/e 165, Opinion re: Plaintiff's Third Motion to Compel Discovery Responses, 7/20/2012, at 10.)

> 407. The 2008 Analysis also notified the FTC that the 2003-2007 calls included nontelemarketing calls such as collection calls and business calls. (d/e 165, Opinion re: Plaintiff's Third Motion to Compel Discovery Responses, 7/20/2012, at 13.)

> 408. The 2008 Analysis further notified the FTC that calls could be associated with calling campaigns and with EBR status of DISH customers. (d/e 165, Opinion re: Plaintiff's Third Motion to Compel Discovery Responses, 7/20/2012 at 13.)

Dish Memorandum 349, DSUF 405-08.  Dish used the 2008

Analysis to prove that the FTC had notice that the 2003-2007 Call

Records included non-telemarketing calls and some of the

recipients of telemarketing calls in the 2003-2007 Call Records had

an Established Business Relationship with Dish.  Dish further cited

the Magistrate Judge's findings in his Opinion entered July 20,

2012 (d/e 165) (Opinion 165) (Cudmore, J., retired), to prove that

the Plaintiffs cannot identify which calls in the 2003-2007 Call

Records were telemarketing calls,

> Plaintiffs have o (sic) evidence that the 2003-2007
> calls on the raw hits list were, in fact, telemarketing calls.
> Plaintiffs are attempting to rely upon 2003-2007 call
> records produced in response to the CID, which this
> Court has already found were not limited to
> telemarketing calls.  As this Court noted:
>
> > In 2008, DISH provided the FTC with the 2008
> > Analysis that notified the FTC that the 2003-
> > 2007 calls included nontelemarketing calls
> > such as collection calls and business calls. The
> > 2008 Analysis further notified the FTC that
> > calls could be associated with calling
> > campaigns and with EBR status of DISH
> > customers.  The Plaintiffs, thus, knew these
> > limitations on the 2003-2007 calls before they
> > filed this action.  The Plaintiffs elected to focus
> > their discovery efforts on the 2007-2010 calls
> > rather than the earlier data.

(d/e 165, Opinion re: Plaintiff's Third Motion to Compel Discovery Responses, 7/20/2012, at 13).

Dish Memorandum 349, at 132-33.  As the quote indicated, Dish argues that the Magistrate Judge "already found" that the 2003-2007 Call Records were not limited to telemarketing calls.  The Magistrate Judge relied on the 2008 Analysis in reaching the conclusion.  Dish, thus, used the 2008 Analysis to prove that the 2003-2007 Call Records were not limited to telemarketing calls in order to support its request for summary judgment.[7]  Once Dish used this evidence to support Motion 346, Dish cannot complain that the Plaintiffs also decided to use the same evidence,

> "When a party opens the door to evidence that would be otherwise inadmissible, that party cannot complain on appeal about the admission of that evidence." Griffin v. Foley, 542 F.3d 209, 219 (7th Cir.2008) (quotations omitted).  And when a party puts evidence at issue, that party must "accept the consequence[s]" of opening the door to that evidence. S.E.C. v. Koenig, 557 F.3d 736, 740–41 (7th Cir.2009).

---

[7] Dish repeatedly cites findings in prior opinions on unrelated preliminary matters as conclusive findings for purposes of summary judgment.  The reference to Opinion 165 is just an example.  The findings in these preliminary opinions are not necessarily binding at summary judgment.  The Magistrate Judge, in deciding Opinion 165, was not deciding whether issues of facts existed under Rule 56(a).  The Magistrate Judge was deciding a discovery motion under Rule 37.  The parties were not obligated to demonstrate the existence or non-existence of an issue of fact under Rule 37.  The parties were not obligated to submit proof that met the requirements of Rule 56(c).  Given the procedural posture of the matters at issue in Opinion 165, the Magistrate Judge's factual findings in Opinion 165 are not determinative at summary judgment.

Estate of Escobedo v. Martin, 702 F.3d 388, 400-01 (7th Cir. 2012).
The Court will allow the Plaintiffs to use the 2008 Analysis.

     10.   Dr. Yoeli's Opinions

     Dish objects to the opinions of the Plaintiffs' expert Dr. Erez
Yoeli.  This issue has been resolved by a separate opinion (Yoeli
Opinion) issued the same day as this Opinion.  The Court will
consider Dr. Yoeli's opinions consistent with Yoeli Opinion.

## STATEMENT OF FACTS

### A. STRUCTURE OF DISH TELEMARKETING

     Dish has engaged in telemarketing for many years.  Dish has
operated call centers in Colorado, Texas, New Jersey, West Virginia,
and the Philippines through which Dish has placed outbound
interstate telemarketing calls.  PSUF ¶ 14.  In addition, Dish has
also engaged outside telemarketing firms to conduct outbound
telemarketing.  Plaintiffs' Initial Exhibits (d/e 342), PX12,
Deposition of Russell Bangert (Bangert Deposition PX 12), at 32-37.
Between 2007 and 2010, Dish employed the Telemarketing Vendors
to conduct outbound telemarketing calls in coordination with Dish's
telemarketing operations.  Id.; Montano Declaration DX 2, ¶ 6.

Dish has also contracted with thousands of other companies to market its products and services.   Plaintiffs' Initial Exhibits, PX 74, Declaration of Reji Musso (Musso Declaration PX 74), ¶ 4.  In August 2010, Dish contracted with approximately 7,500 companies. Id.  By 2013, the number had been reduced to approximately 4,500 companies.  Dish Supplemental Exhibits (d/e 368), DX 224, Declaration of Mike Mills (Mills Declaration DX 224), ¶ 5.  Most of these retailers sold and installed satellite dishes and other equipment, and solicited orders for Dish programming services. Dish referred to these companies as Full Service Retailers or TV Receive Only (sometimes called "TVRO") Retailers.  Plaintiffs' Initial Exhibits, PX 62, Deposition of Michael Mills (Mills Deposition PX 62), at 15-16; PSUF ¶¶ 129-32.

Some retailers solicited orders for Dish programming services but did not sell equipment or perform installation services.  Dish referred to these companies as Order Entry (sometimes called "OE") Retailers, or National Sales Partners.   These retailers used Dish's Order Entry Tool (sometimes called "OE Tool") to enter orders with Dish.  See Mills Deposition PX 62, at 19; Dish Supplemental Exhibits (d/e 368), DX 234, Declaration of Bruce Werner (Werner

Declaration DX 234), ¶¶ 3-4.  Dish developed the Order Entry Tool

when it established an ongoing marketing relationship with AT&T.

The Order Entry Tool allowed AT&T to solicit the customer's order

and arrange for Dish to perform the physical installation and setup

of service.  Plaintiffs Initial Exhibits (d/e 342), PX 88, Deposition of

Amir Ahmed (Ahmed Deposition PX 88), at 20-21.  Dish used the

Order Entry Tool in its marketing relationship with Radio Shack

retail stores.  Id., at 22.  Dish then decided to make the Order Entry

Tool available to certain additional retailers.  The Order Entry Tool

allowed these retailers to conduct sales nationally; the retailers

were not limited to the geographical area in which they could

provide the physical installation and setup services.  Ahmed

Deposition PX 88, at 20-21; see Plaintiffs Initial Exhibits (d/e 342),

PX 92, Deposition of Walter Eric Myers (Myers Deposition PX 92), at

80-83.

Order Entry Retailers accessed the Order Entry Tool on a Dish

web site.  The Order Entry Retailers placed customers' orders with

Dish, arranged for payment directly to Dish, and arranged for Dish

to install the equipment and set up the service.  See Plaintiffs'

Initial Exhibits (d/e 342), PX 61, Letter dated October 7, 2003, from

Amir Ahmed to David Hagen (2003 Letter from Ahmed to Hagen PX
61).  Dish ran any required credit checks, provided the satellite dish
and other equipment, performed the installation, set up the selected
programming services, and received the payment from the
customer.  Dish paid the Order Entry Retailers in accordance with
their contractual agreements.  See Plaintiffs Initial Exhibits (d/e
342), PX 94, Dish Order Entry Tool Instructions Screen Shots, at
CM/ECF 342-13 pages 40-61; Ahmed Deposition PX 88, at 20-21;
2003 Letter from Ahmed to Hagen PX 61; PX 241, Retailer Order
Entry Promotional Program Effective:  July 1, 2006 Through
September 30, 2006.

Some Retailers were both Full Service Retailers and Order
Entry Retailers.  These Retailers sold and installed equipment and
set up Dish services in specific geographic regions; but also used
the Order Entry Tool to market Dish products and services
nationally.  See e.g., Myers Deposition PX 92, at 83-84.

Sometime after this lawsuit was filed, Dish replaced the Order
Entry Tool with a new order entry system called Axiom.  All retailers
now use the Axiom system as the order entry tool.  Mills
Declaration DX 224, ¶ 3.  Dish representative Michael Mills testified

in his deposition that the Axiom tool was functionally "almost identical" to the previous Order Entry Tool.   Plaintiffs Supplemental Exhibits (d/e 391), PX 410, Deposition of Michael Mills (Mills Deposition PX 410), at 216.

Dish entered into a Retailer Agreement with each Dish retailer, whether Full Service or Order Entry Retailer.  The Plaintiffs have submitted several copies of these Retailer Agreements (collectively the Agreements).  E.g., Plaintiffs Initial Exhibits (d/e 342), PXs 121, 152, 180, 200, 238, and PX 274 at CM/ECF 342-25 pages 50-92, Retailer Agreements with Order Entry Retailers Satellite Systems Network (Satellite Systems or SSN); Star Satellite, L.L.C. (a/k/a Tenaya Marketing); American Satellite, Inc.; Jerry Dean Grider d/b/a JSR Enterprises (JSR); and unsigned copies of Retailer Agreements and related documents prepared for Order Entry retailers Dish TV Now, Inc. and National Satellite Systems (National Satellite or NSS).

The Retailer Agreements appointed these Retailers as "Authorized Dealers" for Dish; authorized these Retailers to "market, promote, and solicit" orders for Dish; authorized these Retailers to use Dish trademarks in their marketing; gave Dish

access to each Retailers records with respect to its Dish dealership; and required each Retailer to "take all actions and refrain from taking any action, as requested by EchoStar in connection with the marketing, advertisement, promotion and/or solicitation of order" for Dish programming and related goods and services.  E.g., Plaintiffs' Initial Exhibits (d/e 342), PX 152 Retailer Agreement with Dish TV Now (Retailer Agreement PX 152), at 16 § 7.3.  The Retailer Agreements further authorized Dish to establish Rules for Retailers, and to amend those Rules as it wished.  These Retailers were obligated to comply with those Rules, as amended.  E.g., Retailer Agreement PX 152, at 1, 16 §§ 1.6 and 7.3; see Dish Supplemental Exhibits (d/e 392), DX 150, Deposition of Blake Van Emst (Van Emst Deposition DX 150), at 91 (retailers are required to take all actions and refrain from taking any action as requested by Dish).[8]

The Retailer Agreements stated that Dish was the seller of all programming to subscribers:

> Retailer shall not sell Programming under any circumstances.  All sales of Programming are transactions solely between EchoStar and Dish Network Subscribers.  Retailer shall promptly forward to EchoStar

---

[8] Dish omitted DX 145 to DX 165 from its initial exhibits (d/e 348).  The Court directed Dish to file these omitted exhibits.  Text Order entered March 17, 2014.  Dish complied and filed a supplement with the omitted exhibits on March 21, 2014 (d/e 392).

all orders for Programming in the manner prescribed by
EchoStar from time to time.  Retailer understands that
EchoStar shall have the right, in its sole and absolute
discretion and for any reason or no reason, to accept or
reject, in whole or in part, all orders for Programming.

Retailer Agreement PX 152, at 16 § 7.2.

The Retailer Agreements further required these Retailers to
comply with all state and federal laws and regulations.  Each
Retailer Agreement stated that the Retailer "is solely responsible for
its compliance" with all laws and regulations.  Retailer Agreement
PX 152, at 17 § 9.1; see DX 208, Declaration of Michael Mills (Mills
Declaration DX 208), ¶ 9.  The Retailer Agreements stated that if
the Retailer violated any state or federal laws or regulations, "[t]his
Agreement shall terminate automatically . . . unless EchoStar
notifies the Retailer to the contrary in writing at any time
thereafter."  Retailer Agreement PX 152, at 19 § 10.4.

Each Retailer Agreement also stated that each Retailer was an
independent contractor and could not represent that it was an
agent of Dish or was acting on behalf of Dish:

The relationship of the parties hereto is that of
independent contractors.  Retailer shall conduct its
business as an independent contractor, and all persons
employed in the conduct of such business shall be
Retailer's employees only, and not employees or agents of

EchoStar or its Affiliates.  Retailer . . . (including without limitation its officers; directors, employees and Permitted Subcontractors) shall not, under any circumstances, hold itself out to the public or represent that it is an agent, employee, subcontractor, Affiliate of EchoStar or any EchoStar Affiliate. . . .  [R]etailer has no right or authority to make any representation, promise or agreement or take any action on behalf of EchoStar or any EchoStar Affiliate.

Retailer Agreement PX 152, at 20 § 11; see Mills Declaration DX 208, ¶ 8.

1.  Telemarketing Practices by Dish and Its Telemarketing Vendors

Dish and its Telemarketing Vendors used equipment called "autodialers" to make telemarketing calls and other types of calls to customers.  An autodialer is a computer controlled device capable of making hundreds of thousands of phone calls in a single day. PSUF 15.  Dish and Telemarketing Vendor EPLDT used Dish's autodialer.  The Telemarketing Vendor eCreek used its own autodialer equipment.  Plaintiffs' Initial Exhibits (d/e 342), PX 14, Deposition of Joey Montano (Montano Deposition PX 14), at 41, 114.

Calling lists were created by Dish's marketing department, sales or customer-retention departments, and its compliance

department.  DSUF ¶ 52.  Dish used a software application called

"Predictive Dialer" or "P-Dialer" to generate call lists.[9]  <u>Dish</u>

<u>Supplemental Exhibits (d/e 392)</u>, DX 157, <u>Deposition of Russell</u>

<u>Bangert (Bangert Deposition DX 157)</u>, at 84.  In 2003, Russell

Bangert was the dialer operations manager.  Bangert was in charge

of using the P-Dialer to generate calling lists for Dish.  <u>Id.</u>, at 73.  In

2004 or 2005, he turned those duties over to Monte Faucet.  <u>Id.,</u> at

75.   Montano became the dialer operations manager in 2008.

From 2006 to 2010, Bob Davis managed outbound telemarketing

operations.  Davis supervised the dialer operations manager and

the outbound operations manager.  Amy Dexter was the outbound

operations manager beginning in 2008.  <u>Davis Deposition DX 170</u>,

at 17-19, 21-22, 33, 38.

According to Bangert, the P-Dialer compared telephone

numbers on potential calling lists to the Registry, Dish's internal

do-not-call list, and state do-not-call lists.  <u>Bangert Deposition DX</u>

<u>157</u>, at 84.  Davis testified that the P-Dialer also compared potential

---

[9]Generally, the term predictive dialer refers to a device or software that automatically dials consumers' telephone numbers in a manner that predicts when a consumer will answer the phone and a telemarketer will be available to take the call.  <u>PSUF 217</u>.  Dish, however, apparently used the term Predictive Dialer or P-Dialer to describe the software used to generate calling lists.  See <u>Davis Deposition DX 170</u>, at 261.

calling lists against lists such as wireless telephone numbers.
Davis Deposition DX 170, at 238; see Dish Initial Exhibits (d/e
348), DX 217, Deposition of Amy Dexter (Dexter Deposition DX
217), at 50.  Bangert testified that the P-Dialer then removed from
the calling list any numbers on any of the applicable lists.  This
process of comparing the removing numbers was referred to as
"scrubbing."  See Declaration of Anitha Gogineni (d/e 224), ¶¶ 5-7.
A calling list for a campaign directed at customers with an
Established Business Relationship was only scrubbed against the
Dish internal do-not-call list.  All other telemarketing calling lists
were scrubbed against all of the lists.  Bangert Deposition DX 157,
at 112.  The scrubbed calling lists were then loaded into either
Dish's or eCreek's autodialer to make the calls.  See Davis
Deposition DX 170, at 18-19; DSUF ¶ 63.

   Bangert testified in his deposition that during his tenure Dish
downloaded an updated list of the Registry at least every thirty
days, and often more frequently than thirty days.  Bangert
Deposition DX 157, at 81.  After Bangert left and Faucet took over,
Dish's Dialer Operations Team in its Bluefield call center took over
this process of downloading the Registry.  DSUF ¶ 55.  The FTC's

records of Registry downloads indicate that Dish downloaded the

updated Registry on at least a monthly basis from October 2004 to

February 2008.  Plaintiffs' Initial Exhibits (d/e 342), PX 300,

Declaration of Ami Dziekan (Dziekan Declaration PX 300), ¶ 9,

Exhibit A.  Thereafter, Dish secured updated copies of the Registry

from its contractor PossibleNOW.  Davis Deposition DX 170, at 257.

    Bangert testified that he tested the scrubbing process

regularly.  Bangert Deposition DX 157, at 101-03.  In addition,

Bangert audited the scrubbing process by running queries of the

scrubbed lists to determine whether the scrubbed lists were free

from telephone numbers on the proscribed lists.  Bangert also

manually reviewed lists to see if the scrubbed lists contained

numbers on the Registry.  Bangert took a sample of about ten

numbers from the scrubbed lists and conducted a search to see if

any of the sample numbers were on the proscribed lists.  Bangert

testified that anyone who scrubbed a call list was required to

perform such a sampling audit.  Bangert Deposition DX 157, at

101-03, 149-50.  Bangert testified that he was not aware of a

written policy that required such auditing.  Bangert Deposition DX

157, at 149.

Bangert testified about Dish's training on the use of the P-Dialer as follows:

> Q. . . . Did DISH Network have a training program for users of the P-Dialer?
>
> . . . .
>
> A.     I guess the answer to the question is:  We decided. How it worked is that we worked with legal.  Legal told us which types of scrubs would be applicable, and then those would be the scrubs that would be used.
>
> Q.     I'm asking about a training program.  If the answer is no, that's fine.
>
> A.     I'm not saying the answer is no.
>
> Q.     Okay.
>
> A.     What I'm saying is:  That's how it works.  I learned how to use the system in instruction with IT, reviewing the documents, and learning it.  So yes.  I would say to that regard, there is a training program.
>
> Q.     Okay.  Did other users undergo this—of P-Dialer undergo this training program?
>
> A.     I personally trained everyone on P-Dialer, and, as I said, when I transitioned it to Monte, this was one of the things that I trained him on.

Bangert Deposition DX 157, at 119-20.

Bangert testified about the existence of written procedures and documentation regarding scrubbing and generating calling lists as follows:

> Q.    Were there written policies about the scrubbing process at this time?
>
> A.    There are elements within the do-not-contact database itself that document when scrubs are appropriate to use, and then there are various other ways that legal gave to us. . . .
>
> . . . .
>
> A.    These documents were assembled in coordination with legal.  So some of it would be contributed by them.  Some of it would be contributed by me.
>
> Q.    You mentioned that there was documentation within the P-Dialer system itself?
>
> A.    No.  What I said was:  Documents as it relates to the do-not-contact database.  So there's some like technical diagrams and things like that that make mention of it.  Not of any great length, that I'm aware of.  Most of that would have, again, been conversations between legal and myself.

Bangert Deposition DX 157, at 125-26.  Bangert had copies of this documentation and gave the copies to Monte Faucet when he took over these duties.  Bangert Deposition DX 157, at 126-27.  The only documentation produced in discovery was 116 pages that consisted

of screen shots from the P-Dialer, three screen shots for each campaign.  Opinion 279, at 14.

Dish had several means to place telephone numbers on Dish's internal do-not-call list.  Dish's Corporate Counsel Dana Steele testified in her deposition that if a person wrote a letter, email, or otherwise communicated to Dish that he or she did not want to be called, the message would be forwarded to the person or department in charge of maintaining the internal list to place the person's number on that list.  Dish Supplemental Exhibits (d/e 392), DX 154, Deposition of Dana Steele (Steele Deposition DX 154), at 57-58.  If a consumer told a Dish or EPLDT Customer Service Agent (sometimes called "CSC") during a telemarketing call that the consumer did not want to be called, the Customer Service Agent used a link on an internal website called "CSC Web" to place the consumer's telephone number on the Dish internal list.  Dish Supplemental Exhibits (392), DX 154, Deposition of Serena Snyder, at 74; and DX159, Deposition of Marciedes Metzger (Metzger Deposition DX159), at 157; see Bangert Deposition DX 157, at 141-42.  As a result, the EPLDT do-not-call list was effectively incorporated into the Dish internal do-not-call list.  As discussed

below, the Dish 2002 Policy stated that the Customer Service Agent
would mark the calling account on the Dish dialer.  <u>Dish Initial</u>
<u>Exhibits</u>, <u>DX 5</u>, <u>June 1, 2002 Dish Policy (2002 Dish Policy)</u>, at
CM/ECF 348-1 page 47.

The Plaintiffs' expert Dr. Yoeli, however, reviewed a list of 106
telephone numbers of consumers who contacted Dish to ask to be
put on its internal list.  Dr. Yoeli found that thirty-four of the
numbers were not on the Dish internal list.  <u>Plaintiffs Supplemental</u>
<u>Exhibits (d/e 380)</u>, PX 305, <u>Declaration of Dr. Erez Yoeli dated</u>
<u>March 5, 2014 (Yoeli Declaration PX 305)</u>, ¶ 10.

Telemarketing Vendor eCreek labeled the telephone number of
each person who asked not to be called as "DNC" on eCreek
records.  PSUF ¶ 42.  According to Dish, eCreek was supposed to
communicate the telephone numbers marked "DNC" to Dish on a
daily feedback file that sent the results each night of the previous
day's calling.  <u>Davis Deposition DX 170</u>, at 46.  Bob Davis, however,
testified that Dish did not control the Telemarketing Vendors.
<u>Davis Deposition DX 170</u>, at 44.  Davis testified that on rare
occasions eCreek was up to 30 days late in submitting telephone
numbers marked "DNC."  <u>Davis Deposition DX 170</u>, at 99.  The

accounts marked as "do not call" on the CSC Web and/or the Dish Dialer, and the "DNC" accounts from eCreek were collected and placed on Dish's internal do-not-call list. According to Davis, eCreek also maintained its own internal do-not-call list and scrubbed lists received from Dish against its internal list. Davis Deposition DX 170, at 72.

On or about December 14, 2007, Dish retained a company named PossibleNOW to assist Dish in maintaining its internal do-not-call list, scrubbing calling lists against the Registry, and complying with the Do-Not-Call Laws. DSUF ¶¶ 35, 43. PossibleNOW also maintained the internal do-not-call lists for eCreek. eCreek was required to upload its internal do-not-call list to Dish on a daily basis and to PossibleNOW on a weekly basis. DSUF ¶ 62. PossibleNOW maintained a current version of the Registry, state do-not-call lists, wireless telephone number lists, and the internal do-not-call lists for Dish and eCreek. Davis Deposition DX 170, at 239. After retaining PossibleNOW, Dish secured its updated copies of the Registry on a monthly basis from PossibleNOW rather from the FTC. Davis Deposition DX170, at 257. According to Davis, Dish scrubbed outbound calling lists

internally and then sent the lists to PossibleNOW to repeat the scrubbing process.  Dish and PossibleNOW scrubbed against the same set of lists, except PossibleNOW also scrubbed against wireless numbers.  Dish stopped scrubbing internally against wireless numbers once it hired PossibleNOW.  Davis Deposition DX 170, at 255-56, 263.

Beginning in April 2008, PossibleNOW allowed Dish retailers to upload their internal do-not-call lists onto PossibleNOW's database.  Montano Declaration DX 2, ¶ 25.   As of September 30, 2008, Dish required retailers that made 600 or more calls during the prior calendar year to engage with PossibleNOW so PossibleNOW could forward all do-not-call requests to Dish.  Such retailers were required by contract with Dish to send the telephone numbers of consumer do-not-call requests to PossibleNOW. Montano Declaration DX 2, ¶ 24.  Some retailers, however, did not upload lists until years later.  See Plaintiffs' Initial Exhibits (d/e 342), PX 28, Expert Report of John Taylor dated November 6, 2013 (Taylor November 6, 2013 Report PX 28), at 13, 15 (Order Entry Retailer National Satellite started uploading its internal list in June 2010).

As retailer internal do-not-call lists were collected, PossibleNOW scrubbed Dish's calling lists against the retailer internal do-not-call lists as well as Dish's internal list and eCreek's internal lists. Davis Deposition DX170, at 325. Dish referred to these lists collectively as the Consolidated List. DSUF ¶ 48. Dish retailers were also authorized to have PossibleNOW scrub their calling lists against the Registry, state lists, and the Consolidated List. Montano Declaration DX 2, ¶ 25.

Dish may have also secured retailers' internal do-not-call lists before it hired PossibleNOW in 2008. Davis testified that Dish previously collected retailers' internal do-not-call lists in 2007. Davis Deposition DX 170, at 307-08, 318. The Plaintiffs also cite an email from a Dish "TCPA Agent" Gladys Flores in which she refers to a "Retailers Do Not Telemarket List" that existed in 2003. Plaintiffs Supplemental Exhibits (d/e 380), PX 309, Email from Flores to TCPA dated July 20, 2010, 2:09 pm. This latter reference is ambiguous; the reference could be to a retailer's internal do-not-call list, or the reference could be to a list of complaining customers that Dish transmitted to Retailers.

Beginning as early as 2002, Dish maintained a written "Do-Not-Call Policy" (Dish Policy).  <u>Dish Initial Exhibits</u>, DX 5, <u>June 1, 2002 Dish Policy (2002 Dish Policy DX 5)</u>.   Dish submitted several documents entitled "'Do Not Call' Policy."  <u>Dish Initial Exhibits</u>, DX3-DX6, <u>Do Not Call Policies</u>.  Davis identified DX6, the Do Not Call Policy dated February 24, 2004 (2004 Policy DX 6).  <u>Davis Deposition DX 170</u>, at 338.  The other versions of the Dish Policy, DX3-5, were substantially similar to the 2004 version, DX 6.  Davis' deposition testimony is sufficient to establish that the Dish Policy would be admissible at trial as business records.

The 2002 Dish Policy stated that Dish (then EchoStar) maintained "a list of phone numbers of persons who have indicated that they do not wish to receive solicitation calls."  <u>2002 Dish Policy DX 5</u>, at CM/ECF 348-1 page 46.  The 2002 Dish Policy referred to this list as EchoStar's Do-Not-Call list.  <u>Id.</u>  The 2002 Dish Policy stated that Dish had a policy to obtain all state do-not-call lists and add those numbers to EchoStar's Do-Not-Call list.  The 2002 Dish Policy stated that telephone numbers of individuals who contacted Dish and requested not to be called would be placed on EchoStar's Do-Not-Call List.  In addition, the 2002 Dish Policy stated

Page 74 of 238

employees making outbound calls would mark an account in Dish's dialer system if the recipient of a call tied to that account asked not to be called again.  The 2002 Dish Policy stated that marked accounts would be placed on EchoStar's Do-Not-Call List and would be excluded from any future dialing lists.  Id., at CM/ECF 348-1 page 47.  The 2002 Dish Policy also prohibited the "[u]se of an artificial or prerecorded voice to deliver a message to any residential phone line."  Id., at CM/ECF 348-1 page 48.

The 2004 Dish Policy was revised to address the Registry.  The 2004 Dish Policy stated:  "It is Echostar's policy to obtain state and federal Do-Not-Call list(s), and fully comply with legislation regarding the calling of phone numbers on these lists."  Id., at CM/ECF 348-1 page 51.

The 2004 Dish Policy also modified the provision regarding prerecorded messages.  The revised language prohibited the use of prerecorded messages to residential customers, but stated further that, "we do deliver automated messages to only our existing subscribers for the purpose of customer service reminders such as when a credit card expires and for solicitation for Pay-Per-View events."  Id., CM/ECF 348-1 page 52.

Dish revised its Dish Policy again in 2006.  Dish Initial Exhibits, DX 4, Dish Policy dated February 6, 2006 (2006 Dish Policy DX 4).  The 2006 Dish Policy stated that Dish maintained two lists, the current version of the Registry and an Internal Do-Not-Call List.  The 2006 Policy stated that Dish would not call a person on the Registry unless it had an Established Business Relationship with him or her and would not call a person on the Internal Do-Not-Call List even it Dish had an Established Business Relationship with the person.  The 2006 Policy stated that these policies applied to Dish and its "telemarketing vendor." 2006 Dish Policy DX 4, at 2.

The 2006 Policy revised the Dish policy on the use of prerecorded messages.  The 2006 Policy generally prohibited using prerecorded messages subject to one proviso, "However, EchoStar does deliver automated messages to our existing customers with whom EchoStar has an existing business relationship for the purpose of communicating information such as customer service reminders, credit card expiration reminders, and special programming solicitation." 2006 Dish Policy DX 4, at 3.

Dish revised the Dish Policy again in 2008.  Dish Initial Exhibits, DX 3, Dish Policy dated March 20, 2008 (2008 Dish Policy DX 3).  The 2008 Policy is substantially similar to the 2006 Policy except the 2008 Policy deleted the references to Dish's "telemarketing vendor" and also stated that Dish would deliver prerecorded messages in outbound telephone calls "to only our existing subscribers for the purpose of customer service reminders such as when a credit card expires."  2008 Dish Policy DX 3, at CM/ECF 348-1 page 39.  No version of the Do Not Call Policy included any statement setting forth procedures for compiling and scrubbing calling lists.

Davis testified that the Dish Policy was generally sent to vendors at the time that Dish hired them.  Davis Deposition DX170, at 62-63.  Davis was shown an unidentified document in his deposition that was purported to be a Dish Do-Not-Call policy for vendors; Davis testified that he was not aware of the document and could not identify the document.  Davis Deposition DX170, at 42.

Dish presented evidence regarding training its telemarketing staff about the Do-Not-Call Laws.  Amy Dexter worked with Davis and Montano.  She reviewed calling scripts to determine whether

the campaign was a sales campaign.  <u>Dexter Deposition DX 217</u>, at

49.  Dexter testified that telemarketing staff received training on

Do-Not-Call Laws through viewing a PowerPoint presentation.

Dexter explained that telemarketing staff members viewed the

PowerPoint in a group setting and then discussed the presentation.

<u>Dexter Depostion DX 217</u>, at 16-17.  Dexter stated that

telemarketing staff also received a packet of materials that included

the Dish Policy.  <u>Id.</u>, at 179-80.  She also testified that the Dish

Policy was also available on Dish's website to Dish telemarketing

staff and to telemarketers working for Telemarketing Vendors such

as eCreek.  <u>Id.</u>, at 181.  Dexter did not indicate when training

occurred or how regularly training occurred.  Dish further did not

present evidence of any written training procedures.

Dish maintained a staff to handle consumer complaints,

including complaints about violations of the Do-Not-Call Laws.

Dish customer service centers, staffed with Customer Service

Agents, handled consumer complaints initially.  If a consumer did

not believe that the Customer Service Agent was resolving the

complaint, the Customer Service Agent would transfer the

consumer to a member of the Executive Resolution Team

(sometimes called "ERT").  Transferring a consumer complaint was

called "escalating" the complaint.  <u>See</u> <u>Dish Supplemental Exhibits</u>

<u>(d/e 392)</u>, DX 159, <u>Deposition of Marciedes Metzger (Metzger</u>

<u>Deposition DX 159)</u>, at 25-26.[10]  The Executive Resolution Team

consisted of Customer Resolution Specialists (sometimes called

"CRS") who were supervised by coaches, who in turn, were

supervised by managers.  If a Customer Resolution Specialist could

not resolve a consumer complaint, the complaint could be

"escalated" up the chain of command, to a coach or supervisor.  <u>Id.</u>,

at 29-30.  In 2005, the Executive Resolution Team had about 100 to

150 Customer Resolution Specialists in Thornton, Colorado.  By

2011, that number had grown to about 250 in three locations,

Harlingen, Texas, El Paso, Texas, and Thornton, Colorado.  <u>Id.</u>, at

38-40.

     If a consumer complained about being called in violation of the

Do-Not-Call Laws, the Customer Service Agent would apologize and

offer to put the consumer's number of the Dish internal do-not-call

list.  If the consumer wanted to speak to someone else, the

---

[10] Metzger oversaw the Executive Resolution Team beginning in June 2005.  <u>Metzger Deposition DX</u> <u>159</u>, at 29-30.

Customer Service Agent would escalate the call to a Customer Resolution Specialist in the Executive Resolution Team.  Id., at 49.  Customer Resolution Specialists investigated do-not-call complaints to attempt to determine the source of the call, presumably Dish, a Telemarketing Vendor, or a Retailer.  Id., at 53.  The Executive Resolution Team also maintained a tracker of Do-Not-Call complaints.  Id., at 64.  The Executive Resolution Team tracker was called the TCPA tracker or "Do Not Call" tracker.  Id., at 65.

The Executive Resolution Team also issued suppression lists of telephone numbers.  This was a list of telephone numbers that were not to be called.  The suppression lists were sent to Dish telemarketing personnel and eCreek.  Davis Deposition DX 170, at 332-35.

Dish also started a Dispute Resolution Team (sometimes called "DRT").  The Dispute Resolution Team tracked written Do-Not-Call Law complaints.  The Dispute Resolution Team would investigate Do-Not-Call Laws complaints and write a letter in response to the complaint.  Metzger Deposition DX159, at 66; Dish Supplemental Exhibits (d/e 392), DX 147, Deposition of Robb Origer (Origer Deposition DX 147), at 93.

Beginning in 2006, Dish started a separate a "DNC Investigation Team."  The DNC Investigation Team would try to identify the company making calls that caused complaints.  The Team would trace the number of the calling party with caller ID if possible.  <u>Metzger Deposition DX 159</u>, at 81; <u>see</u> <u>Origer Deposition DX 147</u>, at 112-13.  Some companies used computer software that put out false telephone numbers to the receiving telephone caller ID equipment.  This process is called spoofing.  The false number in this case would often be a Dish telephone number.  <u>Id.</u>, at 82.

The DNC Investigation Team would offer to set up "sting" operations with consumers who complained about unwanted telemarketing calls.  A cooperating consumer would agree to purchase programming if the wrongful caller called again.  The cooperating consumer would use specified identifying information to make the purchase.  Dish would identify the retailer or other party involved in the transaction by this specified information in the purchase order.  <u>Id.</u>, at 83.  In this way, Dish attempted to identify and monitor Retailers that were violating Do-Not-Call Laws.  DSUF ¶ 81.

Dish also had a Retail Services Department (Retail Services). Retail Services included a risk and audit team.  The risk and audit team included a compliance unit.  <u>Van Emst Deposition DX 150</u>, at 28, 42-43, 91.  Reji Musso became Dish's first Retail Services Compliance Manager in August 2006.  <u>Dish Supplemental Exhibits (d/e 392)</u>, DX 164, <u>Deposition of Reji Musso (Musso Deposition DX 164)</u>, at 10, 16.

Musso supervised a team of five people.  <u>Id.</u>, at 14.  Musso stated in her deposition that,

> The function of my team is to support the expectations of the retailer agreement.
>
> . . . .
>
> Oversight for trademark infringement; making sure the customer gets a quality sale through accurate presale disclosures; certainly abiding by federal, state, and local laws; misrepresentation.  That pretty much sums it up.

<u>Id.,</u> at 15-16.

Musso testified that her focus was compliance with the terms of the Retailer Agreement.  She worked with the legal department, primarily a paralegal named Denise Hargan and Corporate Counsel Dana Steele.  Musso testified that she worked primarily with Order Entry Retailers.  <u>Id.</u>, at 19.  Musso was not aware of any written

procedures that governed her team's process. Id., at 79. Musso testified that she did not actually ensure compliance; rather, she offered suggestions to retailers about how to adhere better to the Retailer Agreement. PSUF ¶ 174.

Musso testified that when her team received a consumer complaint about a telemarketing call, the team researched the call to identify the telemarketer that made the call, either Dish, a Telemarketing Vendor, or a retailer. If the call came from a retailer, the team sent a letter to the retailer notifying it of the allegations in the consumer complaint. Id., at 79. The letter usually gave the retailer seven days to respond to the allegations. Id., at 83; see Origer Deposition DX 147, at 204. Musso's team reviewed the response, asked for more information if necessary, and filed the information in the file that her team kept on that retailer. Musso Deposition DX 164, at 83.

Musso's superiors in Retail Services reviewed investigations in conjunction with the sales department and the legal department to determine whether any actions should be taken to discipline any retailer. Origer Deposition DX 147, at 56, 58, 91. Possible disciplinary measures ranged from a letter directing the retailer to

cease and desist from some practice, to a fine, to termination of the Retailer Agreement.  Id., at 92, 116.  Dish provided evidence of fourteen cases in which it took some type of disciplinary action against a Retailer.  DSUF 207.[11]

Musso's team also sent out to Retailers a "POE" list of customers who were very upset with being called and whose complaints had been escalated.[12]  The Retailers were instructed to stop calling the telephone numbers on the POE list and to put those numbers on their internal do not call lists.  Musso Deposition DX 164, at 140-41, 146.  Musso testified that no more than 70 individuals had been placed on the POE list since she became Retail Services Compliance Manager in August 2006 until her deposition in March 2011.  Id., at 141.

---

[11] The Plaintiffs list DSUF 207 as disputed, but the Plaintiffs do not dispute whether the fourteen instances of discipline occurred; rather the Plaintiffs explain that,

> Construed in the light most favorable to Plaintiffs, the record reflects that Dish often failed to take "necessary" action that prevented future violations by specific retailers and, more often than not, did not terminate them for telemarketing violations, even though the Retailer Agreement allowed it. . . .

Plaintiffs' Opposition to Dish Motion for Summary Judgment (d/e 378), at 67.

[12] Musso did not define the meaning of the term "POE" in her deposition.  The Court has been unable to find a definition of the term elsewhere in the record.

2. Telemarketing Practices of Retailers

The Plaintiffs presented evidence in support of Motion 341 regarding the telemarketing operations of six specific Dish Order Entry Retailers and one Full Service Retailer.  In addition, Dish presented evidence in support of Motion 346 about the telemarketing of additional Retailers that were referenced in the pleadings or disclosed in discovery.  The Court will set forth the facts regarding the Retailers referenced in Motion 341 and then discuss the evidence regarding the additional Retailers presented by Dish.

a. Dish TV Now, Inc.

Dish TV Now, Inc. (Dish TV Now) was the first Order Entry Retailer (a/k/a National Sales Partner) to use the Order Entry Tool. On October 7, 2003, Dish's Vice President of Sales and Distribution Amir Ahmed sent a letter to David Hagen, President of a company called Prime TV, LLC (Prime TV).  Plaintiffs Initial Exhibits (d/e 342), PX 61, Letter dated October 7, 2003 (October 2003 Letter PX 61).  Prime TV marketed Direct TV services at the time.  Plaintiffs Initial Exhibits (d/e 342), PX 147, Deposition of David Hagen

(Hagen Deposition PX 147), at 10.  Ahmed discussed in the October

2003 Letter the Order Entry Retailer program.  Ahmed explained:

> The program that we envision PrimeTV utilizing to sell
> DISH Network products and service is our Web Based
> Order Entry (OE) Tool.  The OE Tool will enable your
> Customer Service Representatives (CSR) to sell the
> customer on the DISH Network promotion and hardware
> configuration that best fits their needs, as well as close
> the sale in its entirety.  To elaborate, as the sale is being
> made to the customer, your CSR will be entering the
> customer's information into the OE tool.  With the flow of
> the OE Tool, it will guide your CSR from screen to screen
> allowing them to collect all of the necessary information
> to build the customer's account, and schedule the
> customer's installation.  As you know, some of our
> promotions require a credit score and valid major credit
> card and this program will automatically credit qualify
> the customer in both of those respects.  The OE Tool also
> allows your CSR to collect any amounts due from the
> customer on DISH Network's behalf along with any
> upgrade charges.
>
> Regarding the installation, the OE Tool will give your CSR
> "real time" access to DISH Network's Service
> Corporations (DNSC) installation calendar.  DNSC will
> deliver the equipment to the customer's home, perform
> the installation and take on all ongoing customer
> support. That means NO equipment for you to inventory
> and NO installations for you to perform; DISH Network
> takes care of everything after the sale.

October 2003 Letter PX 61, at CM/ECF 342-9 page 2.  Ahmed

concluded, "This program is the ultimate in convenience not only

for Prime TV but also for your customers."  Id. at CM/ECF 342-9 page 3.

Shortly after receiving the October 2003 Letter PX 61, Hagen formed Dish TV Now.  In November 2003, Dish TV Now became Dish's first Order Entry Retailer.  DSUF ¶ 227; Mills Deposition DX 62, at 19; see Hagen Deposition PX 147, at 27-28.  The unsigned Retailer Agreement form submitted by the Plaintiffs was dated December 31, 2004.  Retailer Agreement PX 152, at CM/ECF 342-19 page 5.  Dish TV Now signed a Retailer Agreement.  DSUF ¶ 231.

Initially, Hagen ran Prime TV out of a 600-seat call center and Dish TV Now out of a 100-seat call center, both located in North Carolina.  Hagen Deposition PX 147, at 29-30.  Prime TV marketed DirectTV, and Dish TV Now marketed Dish Network.  On January 1, 2004, Ahmed sent an internal email in which he stated that Dish TV Now was "selling 300 a day."  Ahmed continued, "We can't afford to lose this business.  They are averaging 1500 [DirectTV] per day and we have an opportunity to get their [DirectTV] business eventually."  Plaintiffs Initial Exhibits (d/e 342), PX 154, Email Thread, at CM/ECF 342-19 page 41.

In 2004, Hagen terminated his relationship with DirectTV and stopped operating Prime TV.  At that point, he moved Dish TV Now to Prime TV's 600-seat call center.  <u>Hagen Deposition PX 147</u>, at 29-30.  Hagen testified that Ahmed and Dish co-founder James DeFranco visited Dish TV Now facilities in 2004 to observe its operations.  <u>Hagen Deposition PX 147</u>, at 25.  Dish provided training to Dish TV Now sales representatives in April and June 2004.  <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 155, <u>Declaration of Frederich Olsen (Olsen Declaration PX 155)</u>, ¶ 28.

In June 2004, Dish TV Now contracted with a company called Guardian Communications (Guardian) to call consumers on lead lists and transmit a prerecorded message to sell Dish products and services.  Guardian used an autodialer that could detect whether a person or an answering machine answered a telephone.  If a person answered the telephone, Guardian played the recorded message. The message gave the recipient of the call an option to press the number 1 on the phone keypad if he or she was interested in Dish products and services.  The recipient was then connected to a Dish TV Now representative at its call center who attempted to sell Dish products and services to the recipient.  <u>Plaintiffs Initial Exhibits</u>

(d/e 342), PX 156, <u>Testimony of Kevin Michael Baker (Baker Testimony PX 156), In Re: Guardian Communications, Inc. Investigative Hearing, FTC No. 052-3166 (June 28, 2006)</u>, at 122-25.

Guardian kept records of its calls for its customers in the ordinary course of its business. Calls for Dish TV Now were noted as WOW TV. <u>Baker Testimony PX 156</u>, at 122. Calls answered by a person rather than a machine were coded with the letter "C." <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 161, <u>Deposition of Kevin M. Baker (Baker Deposition PX 161)</u>, at 83. Guardian records reflect that between May 2004 and August 10, 2004, Guardian placed 6,673,196 prerecorded telemarketing calls for Dish TV Now that were answered by a person and played the prerecorded sales message. <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 157through PX 162, <u>Guardian Call Records</u>; PX 38, <u>Yoeli Declaration Dated December 18, 2013 (Yoeli Declaration PX 38)</u>, ¶ 26(c); <u>DSUF</u> 222. In August 2004, Guardian stopped making calls for Dish TV Now

because Dish TV Now stopped payment on checks to Guardian.

<u>Baker Testimony PX 156</u>, at 123-24.[13]

     In late July or early August 2004, Dish started receiving consumer complaints about the Dish TV Now prerecorded calls. <u>See</u> <u>Plaintiff Initial Exhibits</u>, PX 168, <u>Letter from Ryan Swanberg dated July 26, 2004, and marked received on August 2, 2004 (complaining about a prerecorded call from Dish TV Now on July 19, 2004)</u>.  Dish records indicate that Dish employees were at Dish TV Now on August 23, 2004, and observed Dish TV Now sales staff using a predictive dialer.  <u>Olsen Declaration PX 155</u>, ¶ 28.

     On September 16, 2004, Ahmed sent Hagen the following email:

> David,
>
> This is simple.  Is DISH TV Now telemarketing customers over the phone or are you guys using predictive dialers and leaving messages trying to sell the customer DISH Network.  We are not interested in this type of marketing.  We are receiving complaints on your company doing just this type of marketing.
>
> Please Respond,
>
> Amir

---

[13] The evidence presented does not explain why Dish TV Now stopped payment on the checks.

Plaintiffs Initial Exhibits (d/e 342), PX 119, Email Thread, at

CM/ECF 342-15 pages 37-38.  Hagen responded:

> Amir,
>
> Dish TV Now uses a predictive dialer to make outbound
> calls to consumers who have previously inquired with us
> about satellite TV service or are current Dish TV Now
> Network customers.  The intelligent dialer knows the
> difference between a No Answer, Busy, Answering
> Machine or Live Connect.  The dialer only connects live
> customers to a live Dish TV Now agent.  We do not leave
> messages.  We have a list of over five million past and
> current customers that we scrub against the Do Not Call
> List.  In addition, we maintain a Dish TV Now Do Not Call
> List.  Any customer who wishes to opt out on future
> solicitations is immediately added to the list.  Dish TV
> fully complies with the TCPA.
>
> David

Id.

Dish TV Now continued operating as an Order Entry Retailer

for Dish throughout the rest of 2004 and all of 2005.  Dish records

indicate that it provided training to Dish TV Now several times in

2004 and 2005.  Olsen Declaration PX 155, ¶ 28.  Dish paid for

Hagen and his wife to take a Caribbean cruise in 2004 or 2005.

PSUF ¶ 214.

In February 2005, a consumer named Morton Sill testified in

his deposition that he received at least three prerecorded calls from

Dish TV Now which offered Dish products and services.  <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 164, <u>Deposition of Morton Sill (Sill Deposition PX 164)</u>, at 48.  Sill hung up on the first two calls.  The third time he listened to the recorded message and waited until a sales person came on the line.  He told the person to put him on the do not call list.  He stopped receiving calls after that.  <u>Id.</u>, at 48-49.

Dish representatives told at least some consumers who complained about Dish TV Now that Dish could not help them because Dish TV Now was an independent retailer.  In some cases, Dish representatives told the consumer that Dish would forward the complaint to Dish TV Now.  <u>See</u> <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 166 and PX 167, <u>Letters to Sarah Schackmann and Ryan Swanberg</u>.

In December 2005, Dish TV Now agreed to indemnify Dish and retain counsel to represent Dish in an Ohio TCPA law suit.  That lawyer withdrew because of non-payment.  As of December 2005, Dish TV Now had not yet retained new counsel.  <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 165, <u>Email Thread</u>, at CM/ECF 342-20 page 36.

On January 3, 2006, Dish National Sales Manager Mike Mills
sent a letter to Hagen stating that Dish TV Now had only made five
new sales since November 28, 2005.  Mills also stated that, "your
sales people have indicated that you no longer sell DISH Network."
Plaintiffs Initial Exhibits (d/e 342), PX 172, Letter dated January 3,
2006.  On January 20, 2006, Dish terminated Dish TV Now as an
authorized Dish Network retailer.  Plaintiffs Initial Exhibits (d/e
342), PX 173, Termination Notice.  Dish records stated the reason
for termination was "Non-Activity".  The explanation in the Dish
records stated,

> Explanation:  This retailer's termination is due in part to
> a churn rate greater than 125% of the churn rate
> experienced by EchoStar with respect to DISH Network
> subscribers and failure to actively market and promote
> DISH DBS Systems and/or programming.

Plaintiffs Initial Exhibits (d/e 342), Exhibit 174, OOB Request
form.[14]  In 2004 and 2005, Dish TV Now activated 91,210 new
subscribers for Dish, and Dish paid Dish TV Now $20.61 million
pursuant to its contract.  PSUF 227.[15]

---

[14] The term "DBS" stands for Digital Broadcast Satellite.  See Plaintiffs Initial Exhibits (d/e 342), PX
179, EchoStar Satellite LLC Response to State of Vermont Civil Investigative Demand ("Subpoena")
(VT Subpoena Response PX 179), at 1.
[15] Dish lists PSUF 227 as an undisputed immaterial fact.  Defendant Dish Network L.L.C.'s Corrected
Opposition to Plaintiffs' Motion for Summary Judgment (Dish Opposition) (d/e 374), at 147.  Dish,

In 2007, Dish stated to the FTC that Dish terminated Dish TV Now due to telemarketing violations. PSUF 224; <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 56, <u>PowerPoint Presentation</u>, at CM/ECF 342-8 page 22.  In 2008, Dish Vice President Blake Van Emst submitted an affidavit in the case that alleged TCPA violations, <u>Charvat v. EchoStar Satellite LLC</u>, U.S. Dist. Ct. S. D. Ohio Case No. 07-01000.  Van Emst stated, in part, "EchoStar has no way of knowing who [Dish TV Now was] calling or the referring source of new orders."  <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 171, <u>Affidavit of Blake Van Emst (Van Emst Affidavit PX 171)</u>, ¶ 7.

b. <u>Satellite Systems Network</u>

On March 20, 2001, Satellite Systems Network (Satellite Systems or SSN) became a Dish authorized retailer.  <u>VT Subpoena Response PX 179</u>, at 5.  Satellite Systems also did business as the Vitana Financial Group, Inc.  <u>See</u> <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 186, <u>North Carolina v. Vitana Financial Group, Inc., d/b/a/ Satellite Systems Network, LLC</u>, Wake County, N. C., Superior Court, Case No. 04 CV0 08799, <u>Judgment by Consent and</u>

---

however, also states that the documents cited by the Plaintiffs shows that Dish paid Dish TV Now $17.51 million, not $20.61 million.  Dish, however, does not dispute the $20.61 million figure.

Stipulated Permanent Injunction, entered March 21, 2005.  Dish
and Satellite Systems entered into a Retailer Agreement dated
March 7, 2001.  Plaintiffs Initial Exhibits (d/e 342), PX 180, Retailer
Agreement with SATELLITE SYSTEMS .

On May 32, 2001, Ahmed sent an email to DeFranco
requesting activation bonuses for certain retailers, including
Satellite Systems.  Ahmed stated the following regarding Satellite
Systems:

> 2.     Satellite Systems Network #821970
>            Potential sales Volume up to 1500 per month.
>            Satellite Systems Network uses several
>            marketing companies to purchase new
>            homeowner leads and use telemarketing and
>            direct mail to close the deals.

Plaintiffs Initial Exhibits (d/e 342), PX 183, Email Thread, at
CM/ECF 342-22 page 20.

Beginning in 2002, Dish began receiving complaints about
Satellite Systems' telemarketing.  On June 12, 2002, Dish Director
of Retail Services Mary Davidson sent a letter to Satellite Systems'
President Alex Tehranachi notifying him that Satellite Systems was
in violation of the Retailer Agreement because Satellite Systems was
not complying with state and federal laws and regulations.

Plaintiffs Initial Exhibits (d/e 342), PX 187, June 12, 2002 Letter.
On November 6, 2002, a Dish representative visited Satellite
Systems and raised the issue of Satellite Systems using prerecorded
calls in its telemarketing.  The notes of the visit in Dish files states
that the Dish representative explained that the "entire executive
group is watching close".  Plaintiffs Initial Exhibits (d/e 342), PX
188, Dish Contact Log, at CM/ECF 342-23 page 26.

In November 2004, the State of Florida announced that it
secured a judgment for a permanent injunction and a $25,000 civil
penalty against the Vitana Financial Group, Inc. for calling
numbers on the Florida state do-not-call registry.  Plaintiffs Initial
Exhibits (d/e 342), PX 191, Florida Department of Agriculture and
Consumer Services, Press Release dated November 4, 2004.

On or before December 31, 2004, Satellite Systems became an
Order Entry Retailer.  Plaintiffs Initial Exhibits (d/e 342), PX 192,
Email Thread, at CM/ECF 342-24 page 4; and Exhibit 193, Retailer
Agreement dated December 31, 2004.

In 2005, North Carolina secured a consent judgment against
Satellite Systems for telemarketing violations.  Plaintiffs Initial
Exhibits (d/e 342), PX 186, North Carolina v. Vitana Financial

Group, Inc., d/b/a/ Satellite Systems Network, LLC,  Wake County,
N. C., Superior Court, Case NO. 04 CV0 08799, Judgment by
Consent and Stipulated Permanent Injunction, entered March 21,
2005.

On September 23, 2005, the Indiana Attorney General's Chief
Counsel for Telephone Privacy Enforcement Marguerite M. Sweeney
notified a Dish Corporate Counsel Scott Novak that she personally
received a prerecorded call marketing Dish services.  Dish
representatives determined that Satellite Systems was the source of
the call.  Plaintiffs Initial Exhibits (d/e 342), PX 194, Email Thread,
CM/ECF 342-24, pages 42-43.

On September 26, 2005, Novak sent an email to Ahmed, Mills,
and others regarding Satellite Systems.  Novak wrote:

> We know that SSN is using autodialers and
> automessages.  Terachi been warned time and again (by
> me, by you, by the region, by phone, in writing, in
> person) that these activities could violate the law. . . .

> In the past, we have successfully resisted the argument
> that we are responsible for the conduct of independent
> retailers, however, SSN is a problem because we know
> what he is doing and have cautioned him to stop.  There
> is a risk in continuing to give warnings without a follow-
> through action.  Eventually, someone will try to use that
> against us.

. . . .

> I favor probation, provided that there is unanimous understanding that if EchoStar becomes aware of ANY ONE additional violation, he's terminated.

Id., at CM/ECF 342-24, page 41.  Ahmed responded that he

preferred 30 to 60 day probation.  Id. at CM/ECF 342-24, page 41.

The evidence submitted does not indicate whether Satellite Systems

was in fact put on probation.

On September 22, 2006, Dish responded to an investigative

subpoena from the State of Vermont.  The subpoena asked about

Satellite Systems.  EchoStar responded, in part:

> EchoStar has received complaints alleging "Do Not Call" violations by Satellite Systems Network.  EchoStar investigated this complaint and ultimately determined that based upon representations by Satellite Systems Network after performing an internal investigation, the allegation brought to EchoStar's attention was not traced to Satellite Systems Network.

VT Subpoena Response PX 179, at 6.

In November and December 2006, two consumers, Jeffrey

Mitchell and Gregory Fisher, participated in Dish's sting program.

Stings conducted by Mitchell and Fisher showed that Satellite

Systems was the source of telemarketing about which they

complained.  Plaintiffs Initial Exhibits (d/e 342), PX 137, Dish

<u>Spread Sheet of Consumer Complaints</u>, CM/ECF 342-17 page 26, Line Numbers 1424-27.

As of the time that Plaintiffs filed Motion 341, Satellite Systems was still a Dish Retailer.  Between 2004 and 2010, Satellite Systems activated 46,168 subscribers for Dish, and Dish paid Satellite Systems approximately $12.3 million for these services. PSUF ¶ 257.

### c. <u>Star Satellite/Tenaya Marketing</u>

In 2002, Walter Eric Myers started a Dish Full Service Retailer called Tenaya Marketing.  DSUF ¶ 242.  Tenaya sold Dish products and services door-to-door and also used newspaper and direct mail advertising.  Myers based the company in Utah.  DSUF ¶ 244; <u>Myers Deposition PX 92</u>, at 17-24.  In 2003, Walter Myers' brother Daniel Myers founded Star Satellite, LLC (Star Satellite).  Walter Myers took over Star Satellite after Daniel Myers started it.  DSUF ¶¶ 245-46; <u>Myers Deposition PX 92</u>, at 38-39.  In May 2003, Star Satellite signed a Retailer Agreement with Dish.  By early 2004, Star Satellite was selling Dish products and services door-to-door, primarily in the Los Angeles, California area, and also in the

Phoenix, Sacramento, and San Francisco areas.  <u>Myers Deposition</u>
<u>PX92</u>, at 66-67.

In May 2004, Star Satellite established a business relationship
with Guardian, the same telemarketing prerecorded message
service that Dish TV Now employed.  <u>Myers Deposition PX 92</u>, at 76.
Guardian made automated prerecorded calls for Star Satellite to sell
Dish products and services.  The message instructed the recipient
of the call to press "1" on the phone keypad if he or she wanted to
purchase Dish products or services.  The recipient who pressed "1"
was connected to a Star Satellite sales representative.  <u>Myers</u>
<u>Deposition PX 92</u>, at 77, 109, 144.

Myers testified in his deposition that he did not want Dish to
know how Star Satellite was marketing Dish products.  Myers
explained that Star Satellite had a great deal of competition in
Provo, Utah.  As a result, "I didn't want DISH or anyone for that
matter to kind of know what I was doing that was working because
it was kind of like our trade secret that this was working in some
way."  <u>Myers Deposition DX 168</u>, at 182.   Kevin Baker from
Guardian testified that, on occasion, Guardian would temporarily
stop making prerecorded calls for Star Satellite on instructions from

Myers because Dish representatives were at Star Satellite facilities.

Dish Initial Exhibits (d/e 346), DX 173, Excerpts of Deposition of

Kevin Baker (Baker Deposition DX 173), at 71-72, 177-78.

On January 25, 2005, a consumer, Dennis Caplan, sent a

letter to Star Satellite and Dish complaining about receiving

prerecorded telemarketing calls.  On February 18, 2005, another

customer, David Hyde, contacted Dish regarding Star Satellite

prerecorded telemarketing calls.  PX 203 and PX 204.

In April 2005, Star Satellite became an Order Entry Retailer.

PSUF 268.

On May 25, 2005, Bangert forwarded a complaint about Star

Satellite to Dish employee Mark Duffy.  Bangert said:

> We have a retailer . . . Star Satellite of Provo, Utah that is
> telemarketing using automated messages and our name
> instead of theirs.  I have been getting some complaints
> about this from consumers thinking this is us.

Plaintiffs Initial Exhibits (d/e 342), PX 205, Email Thread, at

CM/ECF 342-27 pages 14-15.  Duffy forwarded this email to Jeff

Medina in the Dish Retail Escalations Department.  Medina

forwarded the email to Margot Williams in Retail Escalations.

Medina wrote in his email, "Are these your boys again?"  Id., at

CM/ECF 342-27 page 14.  Williams responded:

> Jeff,
>
> I forwarded this information to Regina Thomas for further
> investigation.  We have received a few complaints for
> other issues on this retailer that have also been sent to
> her for review and assistance.

Id.

On July 28, 2005, Dish employee Jordan Anderson sent an

email to Walter Eric Myers.  The subject of the email was "Call

Center Training Help."  Anderson included in the body of the four-

page email "some scripts for outbound calling that you may be able

to adapt and work with, if you want."  Plaintiffs Initial Exhibits (d/e

342), PX 205, Email dated July 28, 2005.

From July 30, 2005, to November 26, 2005, Guardian made

43,100,876 such prerecorded calls for Star Satellite selling Dish

products and services which were answered by individuals.

Plaintiffs Initial Exhibits (d/e 342), PX 38, Declaration of Dr. Erez

Yoeli dated December 18, 2013 (Yoeli December 18, 2013,

Declaration PX 38), ¶ 26(e); and PX 158, Declaration of Kevin Baker

(Baker Declaration PX 158), at ¶¶ 15-20.

In August 12, 2005, Dish Corporate Counsel Dana Steele contacted Daniel Myers at Star Satellite to demand that Star Satellite defend and indemnify Dish from claims alleged in a suit filed in small claims court in South Carolina by a consumer, Jay Connor.  Plaintiffs Initial Exhibits (d/e 342), PX 208, Letter dated August 12, 2005.  Connor named Star Satellite and Dish as defendants.  Connor alleged that the defendants sent him a prerecorded telemarketing call on July 5, 2005.  Plaintiffs Initial Exhibits (d/e 342), Exhibit 209, Connor v. Star Satellite, LLC, Charleston County, South Carolina, Court Case No. 05-SC-86-1748, Verified Complaint.  The case was settled.  Dish's in-house counsel reviewed and revised the settlement agreement.  Plaintiffs Initial Exhibits (d/e 342), PX 210, Facsimile Transmission from Amy S. Conley, Paralegal to Eric Myers dated September 29, 2005.

On October 26, 2005, Dish representative Ahmed sent a letter to Myers at Star Satellite.  The letter said, in part:

> EchoStar . . . has received an inquiry from the Offices of Congressman Fred Upton of . . . Michigan . . . concerning telemarketing activities . . . conducted by your company. You have confirmed that you have halted all telemarketing activities involving persons named on the National Do-Not-Call Registry as necessary to comply with applicable telemarketing/do-not-call and other laws.

> Please be advised that your EchoStar Retailer Agreement
> . . . require[s] . . . that you comply with all applicable
> laws (Section 9.1).  Failure to comply with applicable laws
> will result among other things in the termination of the
> Retailer Agreement (Section 10.4) and could result in
> obligation . . . to indemnify and defend EchoStar . . . .

Plaintiffs Initial Exhibits (d/e 342), PX 212, Letter dated October 26, 2005.

On November 2 and 3, 2005, Dish National Sales Manager Mike Mills and Walter Myers exchanged emails regarding sales scripts and disclaimers.  Myers stated, in part, "Let me know if you need me to make any changes to these scripts."  Mills responded, "Here are my comments/changes for the disclaimer.  We are working on the sales script—we'll have something for you by COB tomorrow."  Plaintiffs Initial Exhibits (d/e 342), PX 207, Emails dated November 2 and 3, 2005.[16]

On November 22, 2005, Star Satellite ended its relationship with Guardian.  Walter Myers stated that he ended the relationship because Guardian informed him that it had received a Civil Investigative Demand that included a request for information on Star Satellite.  Myers Deposition PX 92, at 148-49.  Myers testified

---

[16] The Court interprets "COB" to mean close of business.

in his deposition that he did not tell Dish that Star Satellite was

using Guardian to make prerecorded calls.  Dish Initial Exhibits

(d/e 346),DX 168, Excerpts of Deposition of Walter Myers (Myers

Deposition DX 168), at 182.

In 2005, when Star Satellite was an Order Entry Retailer and

was using Guardian's services, Star Satellite activated 18,679

subscribers for Dish services, and Dish paid Star Satellite $3.67

million.  PSUF ¶ 286.  Over the course of their relationship, Dish

also provided an annual incentive vacation trip to Star Satellite.

Myers did not enjoy travelling, but he let his employees take the

annual trips.  Myers Deposition PX 92, at 167-69.  Myers stated in

his deposition that Star Satellite still sells Dish products and

services door-to-door.  Myers Deposition PX 92, at 55-56.

d. American Satellite, Inc.

In 2005, Todd DiRoberto formed American Satellite, Inc.

(American Satellite).  American Satellite was headquartered in San

Diego, California.  Plaintiffs Initial Exhibits (d/e 342), PX 221,

Declaration of Todd DiRoberto (DiRoberto Declaration PX 221), ¶¶

4-5.  In or around September 2005, American Satellite became an

authorized retailer for Dish.  PSUF ¶ 292.  Dish and American

Satellite entered into a Retailer Agreement dated October 19, 2005.
Plaintiffs Initial Exhibits (d/e 342), PX 121, American Satellite
Retailer Agreement.  In 2006, American Satellite became an Order
Entry Retailer for Dish.  DiRoberto Declaration PX 221, ¶ 7.

Manuel Castillo was a manager for American Satellite.  Castillo
also worked for Dish before he worked for American Satellite.
Castillo testified at his deposition that American Satellite used
prerecorded message calls to conduct its telemarketing.  An
autodialer would place the prerecorded calls.  The calls had
prompts that the recipient could follow if he or she wanted to buy
Dish products and services.  The prompts transferred the call to a
call center in the Philippines.[17]  The representatives at the
Philippines call center would determine whether the recipient
actually wanted to purchase Dish products and services.  If so, the
Philippines call center would transfer the call to the American
Satellite call center in San Diego.  Plaintiffs Initial Exhibits (d/e
342), PX 219, Deposition of Manuel Castillo (Castillo Deposition PX
219), at 26-29, 74-79; PSUF ¶¶ 296-98.

---

[17] Castillo did not identify the name of the call center in the Philippines.

In 2005 and 2006, several consumers participated in Dish sting operations that caught American Satellite using prerecorded messages in their telemarketing.  See PSUF ¶¶ 299-300.  In September 2006 consumer Robert Parker participated in a sting operation which identified American Satellite as the source of at least one prerecorded call marketing Dish products and services.  PSUF ¶ 302.

By January 1, 2007, Dish stings had confirmed seven different cases of American Satellite violating Do-Not-Call Laws.  <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 226, <u>Email Thread</u>, <u>Email from Reji Musso, Manager—Compliance Retail Services to Corporate Counsel Dana Steele and Denise Hargan dated January 1, 2007</u>, at CM/ECF 342-29 page 135; <u>see</u> <u>Plaintiffs Initial Exhibits (d/e 342)</u>, PX 228, <u>Email Thread</u>, <u>Email from Dana Steele to David Moskowitz dated September 27, 2006</u>, at CM/ECF 342-29 page 142.

On February 13, 2007, Dish representatives met with American Satellite representatives.  Following the meeting, American Satellite Vice President Tim Pyle sent a letter to Dish confirming that American Satellite terminated its relationships with

any outside marketing companies and services and hired a new

Vice President of Marketing.   Pyle further stated, in part:

> We feel fairly confident that with this individual in full
> charge of all our marketing activities and **the
> tremendous investment of time and money that we
> are currently making to adhere to all rules and
> regulations in our EchoStar Retailer agreement** that
> **<u>we will seriously reduce if not completely eliminate
> any further consumer marketing complaints</u>**.

Plaintiffs Initial Exhibits (d/e 342), PX 230, Letter dated February

22, 2007 (emphasis in the original), at CM/ECF 342-29 pages 150-

51.

On May 2, 2007, Denise Hargan from Dish's legal department

sent an email to Dish's Compliance Retail Services Manager Reji

Musso notifying her of another sting operation implicating American

Satellite.  The email stated, in part:

> Reji:  I wanted to make sure you were aware of the
> growing problem with American Satellite.  AmSat was
> just implicated in the recent Tony Sultan sting last week.
> They are not cooperating with the litigation in which they
> are involved.  You have also sent multiple POE's of Tony
> Sultan's telephone number.  In light of these
> developments perhaps we should discuss AmSat and
> their status at our next Retail Services meeting.

Plaintiffs Initial Exhibits (d/e 342), PX 231, Email Thread, Email

dated May 2, 2007, at CM/ECF 342-30 page 2.

Castillo testified at his deposition that he told Dish employee Bert Eichhorn about American Satellite's use of prerecorded message calls in 2009.  Castillo Deposition PX 219, at 175-77; and Plaintiffs Initial Exhibits (d/e 342), PX 222, Castillo Deposition Exhibit 20, Email form Manuel Castillo to Bert Eichhorn dated January 7, 2009, at CM/ECF 342-29 page 123.

In September 2008, Reji Musso received notice of a consumer complaint that American Satellite was using prerecorded telephone message telemarketing to sell Dish products and services.  Plaintiffs Initial Exhibits (d/e 342), PX 233, Email Thread, Emails dated September 16, 2008, at CM/ECF 342-20 page 4.

In November 2008, Dish representatives contacted American Satellite about a consumer complaint regarding a "TCPA issue." American Satellite responded in April 2009.  A series of emails regarding the encounter indicate that Dish representatives found American Satellite uncooperative.  At the end of the discussion, Reji Musso considered terminating American Satellite as a Dish authorized dealer.  Plaintiffs Initial Exhibits (d/e 342), PX 233, Email Thread, Emails between Dish Personnel including Reji Musso dated April 2-3, 2009, at CM/ECF 342-30 pages 7-11.  On May 7,

2010, Dish terminated American Satellite as an authorized dealer.
Plaintiffs Initial Exhibits (d/e 342), PX 234, Notice of Termination
dated May 7, 2010.

Between 2005 and 2010, American Satellite activated 140,550
subscribers for Dish services and Dish paid American Satellite
approximately $30.32 million.  PSUF ¶ 311.

e. JSR Enterprises

In February 2006, Jerry Grider submitted a proposed business
plan to Dish to become a Dish retailer.  Grider proposed to use
telemarketing print, direct mail, and telemarketing in his
advertising.  Plaintiffs Initial Exhibits (d/e 342), PX 235, Business
Plan.  On April 12, 2006, Dish entered into a Retailer Agreement
with Jerry Dean Grider d/b/a JSR Enterprises (JSR Enterprises or
JSR).  Plaintiffs Initial Exhibits (d/e 342), PX 238, Retailer
Agreement with JSR Enterprises.  JSR Enterprises operated in the
Los Angeles, California, area.

On September 8, 2006, Steven Keller, Regional Sales Manager
for Echosphere LLC, sent Mike Oberbillig, Dish Director of Sales, a
summary of call centers operating in the south Los Angeles area.
Plaintiffs Initial Exhibits (d/e 342), PX 239, Email from Keller to

Oberbillig dated September 8, 2006, with Spread Sheet Attachment.

Echosphere LLC was an affiliate of Dish that sold satellite dishes

and related equipment to retailers.  See e.g., Retailer Agreement

with JSR Enterprises, at 6, § 3.5; PX 241, Retailer Order Entry

Promotional Program, at CM/ECF 342-31 page 2.  Under the

heading, "Primary Marketing", Keller stated that JSR Enterprises

used "Mortgage leads, auto dialers producing nearly one million

connected calls a month."  Id., Spread Sheet Attachment, at

CM/ECF 342-30 page 98.

On August 10, 2006, Mike Oberbillig informed Grider that JSR

Enterprises was authorized to become an Order Entry Retailer for

Dish.  Plaintiffs Initial Exhibits (d/e 342), PX 243, Letter from Mike

Oberbillig dated August 10, 2006.  Oberbillig wrote, in part:

> Based on the information you have provided to
> EchoStar L.L.C. in regards to your company's ability to
> sell DISH Network products and services to consumers in
> the 48 contiguous United States, you have been accepted
> to participate in the Order Entry Tool program.  In
> participating in this program, it is the expectation of
> EchoStar Satellite L.L.C. that you will hold your company
> to the highest of standards when marketing DISH
> Network products and services and submitting new
> customer orders through the Order Entry Tool.

Id.  Dish thereafter provided JSR Enterprises with training on how to sell Dish products and services.  Plaintiffs Initial Exhibits (d/e 342), PX 155, Olsen Declaration PXPX 155, ¶¶ 29-30.

Beginning in September 2006, Dish began receiving consumer complaints about telemarketing calls to telephone numbers on the Registry and prerecorded calls that were ultimately traced to JSR Enterprises.  Plaintiffs Initial Exhibits (d/e 342), PX 246, Email from Dana Steele to Hannah Klein dated September 28, 2006; PX 248, Email from Bonnie Corrigan to TCPA@echostar.com, dated November 15, 2006, at CM/ECF 342-21 page 21.

On December 20, and 21, 2006, Dish National Sales Manager Mike Mills and Dish Compliance Manager Reji Musso exchanged a series of emails about JSR Enterprises.  Musso reported that JSR Enterprises had been caught in a Dish sting committing a Do-Not-Call Law violation.  Plaintiffs Initial Exhibits (d/e 342), PX 253, Email Thread, CM/ECF 342-32 page 10.

On January 10, 2007, Musso engaged in an email exchange with Mills and others about JSR Enterprises.  Musso reported another sting catching JSR Enterprises in a violation.  Musso also reported that Dish had received six other complaints about JSR

Enterprises.  Russo stated, "I don't think we can ignore this disregard for the contractual agreement any longer.  It impacts our credibility."  Bob Origer from Dish Retail Services suggested sending a warning letter.  Plaintiffs Initial Exhibits (d/e 342), PX 254, Email Thread, at CM/ECF 342-32 page 14-15.

On February 8, 2007, Musso sent an email with a press release from Missouri Attorney General dated December 7, 2006. The press release stated that, on December 7, 2006, the State of Missouri obtained a temporary restraining order against JSR Enterprises to enjoin it from calling Missouri residents.  The press release stated that JSR Enterprises had called Missouri residents who had registered their telephone numbers on Missouri's do-not-call registry.  Plaintiffs Initial Exhibits (d/e 342), Exhibit 252, Email from Reji Musso dated February 8, 2007, at CM/ECF 342-32 page 6.

On February 13, 2007, Dish terminated its Retailer Agreement with JSR Enterprises.  EchoStar announced that it terminated JSR Enterprises based on an internal investigation of consumer complaints and the Missouri temporary restraining order.

Plaintiffs Initial Exhibits (d/e 342), PX 259, EchoStar Press Release
dated February 14, 2007.

From August 2006 to February 2007, JSR Enterprises
activated 10,050 Dish customers and Dish paid JSR Enterprises
$1.5 million. PSUF ¶ 353.

     f. New Edge Satellite

New Edge Satellite (New Edge) was a Dish Full Service Retailer
from at least 2003 through 2007.  New Edge conducted outbound
telemarketing calls for Dish products and services from 2003 until
2007.  Dish's affiliate CVS provided equipment to Full Service
Retailers.  CVS representatives knew that New Edge was conducting
telemarketing.  New Edge kept an internal do-not-call list on paper,
either handwritten or printed.  In 2005, New Edge turned over its
internal do-not-call list to the FTC in response to a Civil
Investigative Demand.  Dish did not share its internal do-not-call
list with New Edge and did not ask New Edge for its internal list.
Dish call records showed that Dish made 4,968 telemarketing calls
to consumers who were already on New Edge's internal do-not-call
list at the time of the calls.  PSUF ¶¶ 363-68.

Dish asserted as an undisputed fact that the Plaintiffs abandoned their claims that Dish should be liable for calls made by New Edge because the Plaintiffs' expert report did not analyze such calls.  DSUF ¶ 292.  The Plaintiffs disputed DSUF ¶ 292.  The Plaintiffs state that they presented evidence that New Edge made calls to telephone numbers on the Registry, and that New Edge's principal Derek LaVictor testified in his deposition that New Edge used outbound telemarketing to sell Dish services and products.  Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (d/e 378) (Plaintiffs' Opposition 378), at 81 (citing DX 194 analysis of New Edge call records, and PX 358 Deposition of Derek LaVictor, at 24, 28, 58, 60).

### g. National Satellite Systems

National Satellite Systems (National Satellite or NSS) became a Dish Order Entry Retailer in 2006.  PSUF ¶ 369.  Dish allowed National Satellite to use an offshore call center located in India.  Dish did not generally authorize Order Entry Retailers to use offshore call centers.  Plaintiffs Initial Exhibits (d/e 342), PX 77, Deposition of Reji Musso, at 208-09.  In May 2008, Reji Musso wrote in an email that National Satellite "has broken more TCPA

laws than I care to enumerate." <u>Plaintiffs Initial Exhibits (d/e 342)</u>,

PX 276, <u>Email Thread</u>, at CM/ECF 342-25 page 94.

  h. <u>Additional Retailers</u>

  Dish presented evidence about the following additional

Retailers that were mentioned either in the Complaint or in

discovery:  Vision Quest; Planet Earth Satellite (a.k.a. Teichert

Marketing) (Planet Earth); Dish Direct; E-Management; and

Defender.  Dish asserted as undisputed facts that the Plaintiffs

either abandoned or failed to present expert evidence to support

their claims that Dish should be held liable for calls made by

Retailers Vision Quest, Planet Earth, Dish Direct, and E-

Management.  DSUF ¶¶ 282, 311, 373, 379.  Plaintiffs disputed

each of these statements of undisputed fact.  Plaintiffs cited

evidence that each of these Retailers made calls to telephone

numbers that were on the Registry. <u>Plaintiffs' Opposition 378</u>, at

81, 91, 92, 124.  In addition, Vision Quest's principal testified that

his company made outbound telemarketing calls for Dish products

and services. <u>Id.</u> at 81 (citing PX 357, <u>Deposition of Brian K. Cavett</u>,

at 91).  Plaintiffs also cited evidence of consumer complaints

against Dish Direct and E-Management regarding telemarketing

calls for Dish products and services. Id. at 91, 92 (citing PX 362,

Consumer Sentinel Complaints).

Dish presented expert evidence regarding the Retailer

Defender.  Dish asserted as an undisputed fact that the Plaintiffs

presented no evidence that Defender's outbound telemarketing calls

were placed for the purpose of selling Dish products and services.

DSUF ¶ 386.  The Plaintiffs disputed this statement of undisputed

fact.   Plaintiffs Opposition 378, at 93-94.  The Plaintiffs cite

evidence that Defender produced call records in response to a

subpoena requesting information for calls made to sell Dish

services.  Defender also was a Dish Order Entry Retailer.  PSUF ¶¶

99, 100.  Dr. Yoeli's sample of Defender calling records further

showed that 57% of the sample could be identified as calls to

residential phone numbers.  Declaration of Erez Yoeli (d/e 38),

Exhibit C, October 15, 2012 Rebuttal Report of Dr. Erez Yoeli, at 9.

  B. CALLING DATA

    1. Dish and Telemarketing Vendors

    a. Data from 2003 to 2007

In July 2005, the FTC sent Dish a Civil Investigative Demand.

The FTC sought information regarding possible violations of the

TSR and the FTC Act.  DSUF ¶ 403.  In response, Dish provided

records of calls made from October 2003 through September 2005,

December 2005 through December 2006, and January 2007

through August 2007 (2003-2007 call records).  DSUF ¶ 404.  The

cover letter accompanying the production for the October 2003

through September 2005 records stated, in part,

> Per our prior conversation, please find enclosed the
> following in response to the CID . . . .
>
> 1. 1 DVD with listing of all outbound telemarketing
>    calls made on behalf of EchoStar From October 17,
>    2003 through December 31,
>    2004*(**CONFIDENTIAL**);
>
>    . . . .
>
> *A second DVD with the listing of calls from January 1,
> 2005 to the date of the CID request was damaged during
> copying and will be forwarded to you upon its
> completion.

Plaintiffs' Supplemental Exhibits (d/e 380), PX 317, Letter dated

September 22, 2005, from Dana E. Steele, Corporate Counsel, to

Russell Deitch, Esq., Commission Counsel.

In 2008, Dish provided the FTC with the 2008 Analysis

prepared by PossibleNOW during settlement negotiations.  Plaintiffs'

Supplemental Exhibits (d/e 380), PX 319, Letter dated May 21,

<u>2008, from Dish Counsel Lewis Rose to FTC Attorney Russell Deitch</u>

<u>(May 21, 2008 Letter PX 319)</u> ; PX 320, <u>Letter dated August 14,</u>

<u>2008, from Dish Counsel Lewis Rose to Russell Deitch, with</u>

<u>enclosures (August 14, 2008 Letter PX 320);</u> <u>See</u> Plaintiffs' Third

<u>Motion to Compel Discovery Responses (d/e 143)</u>, at 9 ("During

settlement negotiations with the FTC in 2008, Dish created and

provided detailed analyses of portions of its 2003-2007 call records

. . . .").

    The 2008 Analysis covered the four months from June

through September 2005, and the two months of April and October

for the years 2004, 2005, 2006, and 2007.  DSUF ¶ 406.  Dish

provided some detailed information for the calls covered by the

2008 Analysis, but not for the rest of the 2003-2007 calls.  DSUF ¶

409.  Counsel for Dish stated,

>     Of the total 9,360,464 EchoStar calls during the
> period of June through parts of September 2005, only
> 33,993 calls were potential issue calls, . . . .
>
>     . . . .
>
> Specifically, out of a total of 97,836,722 calls [analyzed
> from the months of April and October 2004, -2007],
> PossibleNOW analyzed the calls and determined that only
> 557,580 were potential issue calls.  Those calls, however,
> had not been analyzed for exempt EBR inquiry calls.

> After EchoStar removed the exempt EBR calls, the
> number of potential issue calls was only 222,156, . . . .

May 21, 2008 Letter PX 319, at 1-2.  Dish's expert John Taylor (who

worked for PossibleNOW) later stated that the term "issue calls"

meant telemarketing calls to telephone numbers on the Registry or

an internal do-not-call list for which Taylor could not find a basis in

information provided by Dish to exclude or exempt the calls from

violating the Do-Not-Call Laws and regulations.  See Plaintiffs'

Exhibits (d/e 341), PX 27, Deposition of John Taylor, at 5-6.

The Plaintiffs' expert Dr. Yoeli rendered opinions regarding the

2003-2007 calling data assuming that all of the calls were

telemarketing calls.  Dr. Yoeli found that 3,022,355 such calls were

made to telephone numbers that were both on the Registry and

Dish's internal do-not-call list. Dish Initial Exhibits,  DX 198,

Rebuttal Report by Dr. Erez Yoeli dated October 16, 2012 (Yoeli

October 16, 2012 Rebuttal Report DX 198), at 11, Table 7.

b. Data from 2007 to 2010

After this case was filed, Dish produced records of

approximately 435,000,000 calls made by its employees and the

Telemarketing Vendors from September 1, 2007 to March 12, 2010.

DSUF ¶ 412.  Many of these calls were telemarketing calls, but others were calls to schedule service appointments, collection calls, calls to announce changes in service, and calls made for various other reasons.  The call records contained notations that recorded information about each call.  From the notations, FTC staff members and Dish representatives identified calls that were part of Dish telemarketing campaigns.  Dish Initial Exhibits, DX 197, Report of Dr. Erez Yoeli dated July 19, 2012 (Yoeli July 19, 2012 Report DX 197), ¶¶ 9-11; DSUF 413, DSUF 414.  The parties also analyzed account data to identify those recipients of calls who had an Established Business Relationship with Dish at the time of the call.  Id., ¶ 13.  Dish also provided its internal Do-Not-Call list to the Plaintiffs.  Id., ¶ 13.

Based on this information, the Plaintiffs' expert Dr. Yoeli opined that from September 2007 to March 2010: Dish and its Telemarketing Vendors:

1. Made 1,112,125 telemarketing calls to phone numbers on the Registry for which Dish had invalid Established Business Relationship claims (Opinion 1);

2. Made 2,230,290 telemarketing calls to phone numbers on the Registry for which Dish did not have an Established Business Relationship claim of any kind (Opinion 1A);

3. Made 3,698,918 telemarketing calls to telephone numbers on both the Registry and the Dish internal Do-Not-Call List (Opinion 2); and

4. Made an additional 6,485,211 calls to telephone numbers on the Dish internal Do-Not-Call List (Opinion 3).

Yoeli July 19, 2012 Report DX 197, ¶¶ 19 (o)-(q), 20.

Dish's expert John Taylor responded to Dr. Yoeli's opinions. Plaintiffs' Initial Exhibits, PX 26, Revised Expert Report of PossibleNOW John Taylor dated September 20, 2012 (Taylor September 20, 2012, Report PX 26).  Taylor analyzed the disposition codes noted in 2007-2010 call records.  Taylor stated that the various disposition codes indicated that:

1. The recipient's telephone never rang because the line was busy, the number was invalid, or other reasons;

2. The call was to a business or was related to a customer payment rather than telemarketing;

3. The particular calling campaign was directed only to current customers;

4. The particular calling campaign consisted of response calls to persons who inquired about Dish services;

5. The calls were intrastate calls;

6. The Established Business Relationship was in fact valid; or

7. The call was directed to a wrong number or to a person who did not speak English.

Taylor September 20, 2012, Report PX 26, at 2-10.  Based on his analysis of these codes, he opined that many of the calls identified by Dr. Yoeli could be excluded from any possible violation of the TSR or TCPA for various reasons.  Taylor opined:

1.  With respect to Yoeli's Opinion 1, that 616,656 of the 1,112,125 calls could be excluded, leaving 495,559 "issue" calls;

2. With respect to Opinion 1A, that 1,960,318 of the 2,230,290 calls could be excluded, leaving 269,972 "issue" calls; and

3. With respect to Opinion 2, that 884,937 of the 3,689,918 calls could be excluded, leaving 2,813,981 "issue" calls.

Taylor September 20, 2012, Report PX 26, at 2-10.

Taylor later analyzed 2007-2010 Call Records for calls on the Registry and Dish internal do-not-call lists.  Taylor also identified the calls to area codes associated with the Plaintiff States.  With respect to telemarketing calls to numbers on the Registry, Taylor opined that Dish and its Telemarketing Vendors made 501,650 "issue" telemarketing calls to numbers on the Registry; and of those calls, 24,096 were made to area codes associated with Illinois, 23,853 to area codes associated with Ohio, 16,005 to area codes associated North Carolina, and 42,019 to area codes associated with California.  Taylor November 6, 2013 Report PX 28, at 10, Table 3a; Plaintiffs' Initial Exhibits (d/e 342), PX 298, Supplemental Rebuttal Expert Report of John T. Taylor dated November 18, 2013, at 3, Table 3b.

Taylor divided calls to telephone numbers on internal do-not-call lists into three categories:  (1) telemarketing calls to numbers on the Dish and Telemarketing Vendor internal do-not-call lists (Dish List); (2) telemarketing calls to numbers on the internal do-not-call lists maintained by Dish's retailers regardless of whether Dish had any access to the retailer lists (Retailer Inaccessible List); and (3) telemarketing calls to numbers on the internal do-not-call

lists maintained by Dish's Retailers that became accessible to Dish after PossibleNOW starting collecting those lists in April 2008 (Retailer Accessible List). Taylor also identified the calls that were made to area codes associated with each Plaintiff State. Taylor opined:

1. With respect to the Dish List, Dish and the Telemarketing Vendors made 903,246 telemarketing "issue" calls to numbers on this List; and 38,623 of these calls were made to area codes associated with Illinois, 36,598 were made to area codes associated with Ohio, 33,860 were made to area codes associated with North Carolina, and 109,322 were made to area codes associated with California.

2. With respect to the Retailer Inaccessible List, Dish and the Telemarketing Vendors made 7,321,163 telemarketing "issue" calls to numbers on this List; and 293,080 of these calls were made to area codes associated with Illinois, 280,030 were made to area codes associated with Ohio, 375,146 were made to area codes associated with North Carolina, and 930,595 were made to area codes associated with California.

3. With respect to the Retailer Accessible List, Dish and the Telemarketing Vendors made 2,211,242 telemarketing "issue" calls to numbers on this List; and 87,879 of these calls were made to area codes associated with Illinois, 103,330 were made to area codes associated with Ohio, 92,370 were made to area codes associated with North Carolina, and 320,662 were made to area codes associated with California.

Taylor November 6, 2013 Report PX 28, at 11, Tables 3b., 3c., and 3d.

The Plaintiffs' expert Dr. Yoeli further analyzed 8,224,409 Dish telemarketing calls from the 2007-2010 call records that Taylor determined were made to persons on internal do-not-call lists of Dish or a Dish Retailer. Dr. Yoeli determined that 2,397,390 of these calls were made to numbers on the Registry. Dr. Yoeli determined that 11,004 of these calls were included in the 501,650 "issue" calls previously identified by Taylor. Based on this analysis, Dr. Yoeli opined that Dish made an additional 2,386,386 telemarketing calls to numbers on the Registry. PSUF ¶ 46. Dish states that PSUF ¶ 46 is disputed, but Dish failed to cite to any evidentiary support for that contention. Defendant Dish Network,

L.L.C.'s Opposition to Plaintiffs' Motion for Summary Judgment

(corrected version) (d/e 374) (Dish Opposition 374), at 29-30.  The

fact is, therefore, undisputed.  Local Rule 7.1(D)(2)(b)(3).

      c.  Prerecorded Calling Campaigns

From 2003 to 2007, Dish initiated outbound prerecorded

telemarketing calls.  Dish used these prerecorded calls in fifteen

campaigns.  The campaigns generally marketed foreign language

programming, including Arabic, Greek, Chinese, Indus, Korean,

Filipino, German, and French programming.  DSUF ¶ 426.  One of

the campaigns marketed a programming package called Zee Sports.

PSUF ¶ 66.  The screenshots from the P-Dialer for these campaigns

indicate that the calls were made to residential customers.

Plaintiffs' Initial Exhibits (d/e 342), PX 47, P-Dialer Screen Shots.

Dish states that these calls were directed to existing Dish

customers, "There is no dispute that each of the fifteen prerecorded

message campaigns at issue, which were dialed between September

2007 and November 2008, were directed to DISH customers who

were, at the time of the calls, existing subscribers of DISH service."

Defendant Dish Network L.L.C.'s Memorandum of Law in Support of

its Motion for Summary Judgment (d/e 349) (Dish Memorandum

349), at 168-69.

Dish's autodialer could detect whether a person answered the

telephone.  Dish records marked the call with the notation DPV, to

indicate "positive voice."  PSUF ¶¶ 57-58.  Dish initiated 98,054

prerecorded outbound telemarketing calls in the fifteen campaigns

with the disposition code DPV (hereinafter "Dish Prerecorded

Calls").  Yoeli Declaration PX 38, ¶ 29(a)(ii).[18]  Dr. Yoeli opined that

Dish Prerecorded Calls were made to area codes associated with the

Plaintiff States were as follows: 5,830 Dish Prerecorded Calls to

area codes associated with Illinois, 1,759 Dish Prerecorded Calls to

area codes associated with Ohio, 2,283 Dish Prerecorded Calls to

area codes associated with North Carolina, and 23,020 Dish

Prerecorded Calls to area codes associated with California. Dish

Initial Exhibits,  DX 198, Rebuttal Report by Dr. Erez Yoeli dated

October 16, 2012, at 10, Table 6.

The Plaintiffs stated that the calls occurred between October

18, 2003 and March 2010.  Dish stated that the calls occurred

---

[18] Dr. Yoeli found 98,083 prerecorded calls in his analysis.  Dish Initial Exhibits,  DX 198, Rebuttal Report by Dr. Erez Yoeli dated October 16, 2012, at 10, Table 6.  Dr. Yoeli states, however, that Dish's expert Taylor found 98,054 such calls.  The United States only seeks summary judgment of the 98,054 figure found by Taylor.

between September 2007 and November 2008.  Dish Memorandum 349, at 168-69; PSUF ¶ 60; Dish Opposition 374, at 51- 52 Response to PSUF ¶ 60.  The translations of the scripts of the prerecorded messages sent in the Dish Prerecorded Calls (Scripts) indicate that the messages were directed to existing Dish customers.  DSUF ¶ 426.  The Scripts did not state that the recipient of the call had an opportunity to indicate that he or she did not wish to receive such calls in the future.  PSUF ¶¶ 66-81; DSUF ¶ 426.   The prerecorded calls provided an 800 number to call.  See Scripts; Davis Deposition DX 170, at 163.

Defendant's expert John Taylor rendered an opinion on the number of Dish Prerecorded Calls made to telephones that had been on internal do-not-call lists for more than thirty days prior to the call.   Taylor again broke down the analysis by area codes associated the Plaintiff States and by the Dish List, the Retailer Inaccessible List, and the Retailer Accessible List.  Taylor opined:

1. With respect to the Dish List, Dish and the Telemarketing Vendors made 68,560 "issue" Dish Prerecorded Calls to numbers on this List; and 5,950 of these calls were made to area codes associated with Illinois, 1,055 were made to area

codes associated with Ohio, 1,408 were made to area codes associated with North Carolina, and 14,933 were made to area codes associated with California.

2. With respect to the Retailer Inaccessible List, Dish and the Telemarketing Vendors made 144,999 "issue" Dish Prerecorded Calls to numbers on this List; and 58,246 of these calls were made to area codes associated with Illinois, 2,585 were made to area codes associated with Ohio, 3,575 were made to area codes associated with North Carolina, and 31,590 were made to area codes associated with California.

3. With respect to the Retailer Accessible List, Dish and the Telemarketing Vendors made 26,169 "issue" Dish Prerecorded Calls to numbers on this List; and 525 of these calls were made to area codes associated with Illinois, 289 were made to area codes associated with Ohio, 1,699 were made to area codes associated with North Carolina, and 4,800 were made to area codes associated with California.

Taylor November 6, 2013 Report PX 28, at 12, Tables 4a, 4b, and 4c.

      d. Calls to eCreek "DNC" Numbers

Plaintiffs' expert Dr. Yoeli conducted a comparison of the 2007-2010 call records and the numbers that eCreek labeled "DNC" to indicate that the person called had asked not to be called.  Dr. Yoeli found that from November 2008 through March 2010, Dish or its Telemarketing Vendor eCreek made 140,349 outbound telemarketing telephone calls to telephone numbers that eCreek labeled "DNC" more than 30 days before each such call.  Yoeli Declaration PX 38, ¶ 27.

### 2. Retailer Calling Data

The plaintiffs also secured calling data from several Order Entry Retailers. The parties' experts analyzed the data as follows.

### a. Dish TV Now

Between May 2004 and August 2004 Guardian placed 6,673,196 prerecorded calls for Dish TV Now that were answered by the recipient of the call which calls played a prerecorded message selling dish services. Plaintiffs Initial Exhibits (d/e 342), PX 159 and PX 162, Guardian Call Records.  Dr. Yoeli determined the number of those calls that were made to area codes associated with the Plaintiff States.  He opined that 155,374 of those calls were made to area codes associated with Illinois, 500,658 were made to area

codes associated with Ohio, 20,181 calls were made to area codes associated with North Carolina, and 1,200,033 calls were made to area codes associated with California. Yoeli October 16, 2012 Rebuttal Report DX 198, at 12 Table 8A.

Defendant's expert John Taylor opined Dish TV Now made prerecorded calls to telephones that had been on internal do-not-call lists for more than thirty days prior to the call.   Taylor again broke down the analysis by area codes associated the Plaintiff States and by the Dish List, the Retailer Inaccessible List, and the Retailer Accessible List.  Taylor opined:

1. With respect to the Dish List, Dish TV Now made 19,785 "issue" prerecorded calls to numbers on this List; and 1,422 of these calls were made to area codes associated with Illinois, 43 were made to area codes associated with Ohio, 190 were made to area codes associated with North Carolina, and 74 were made to area codes associated with California.

2. With respect to the Retailer Inaccessible List, Dish and the Telemarketing Vendors made 8,382 "issue" prerecorded calls to numbers on this List; and none of these calls were made to

area codes associated with Illinois, Ohio, and North Carolina,

and 402 were made to area codes associated with California.

3. Dish TV Now made no "issue" prerecorded calls to numbers on

the Retailer Accessible List.

Dish Initial Exhibits (d/e 342), PX 298, Supplemental Rebuttal

Expert Report of John T. Taylor dated November 18, 2013, Table

2a.

b. Satellite Systems

Dish expert Taylor determined from records provided by

Satellite Systems' outbound dialing service Five9 that in 2010 and

2011, Satellite Systems made 381,811 "issue" telemarketing calls

marketing Dish products to telephone numbers on the Registry in

2010 and 2011. Satellite Systems representative Sophie Tehranchi

stated in her declaration that all of Satellite Systems' calls through

Five9 in 2010 and 2011 were made to market Dish products and

services. Plaintiffs' Initial Exhibits (d/e 342), PX 198, Declaration of

Sophie Tehranchi dated August 19, 2013, ¶ 9. Dish expert Taylor

determined that 17,357 of these calls were made to area codes

associated with Illinois, 22,878 of these calls were made to area

codes associated with Ohio, 13,088 of these calls were made to area

codes associated with North Carolina, and 37,688 of these calls were made to area codes associated with California.  <u>Taylor November 6, 2013 Report PX 28</u>, at 13 Table 5a.

Defendant's expert John Taylor opined on the Satellite Systems telemarketing calls made to telephone numbers on internal do-not-call lists for more than thirty days prior to the call.   Taylor again broke down the analysis by area codes associated with the Plaintiff States and by the Dish List, the Retailer Inaccessible List, and the Retailer Accessible List.  Taylor opined:

1. With respect to the Dish List, Satellite Systems made 22,946 "issue" telemarketing calls to numbers on this List; and 988 of these calls were made to area codes associated with Illinois, 1,466 were made to area codes associated with Ohio, 1,023 were made to area codes associated with North Carolina, and 1,065 were made to area codes associated with California.

2. Satellite Systems did not make any calls in 2010 and 2011 to telephone numbers on the Retailer Inaccessible List because by then the numbers were accessible to Dish through PossibleNOW.

3. With respect to the Accessible List Satellite Systems made 42,990 "issue" telemarketing calls to numbers on this List, and of those calls, 1,750 were made to area codes associated with Illinois, 2,633 were made to area codes associated with Ohio, 2,249 were made to area codes associated with North Carolina, and 32,360 were made to area codes associated with California.

Taylor November 6, 2013 Report PX 28, at 14-15 Tables 5a and 5c.

c. Star Satellite

From July 30, 2005 to November 26, 2005, Guardian made 43,100,876 Star Satellite prerecorded calls for Star Satellite selling Dish products and services.  Dr. Yoeli determined that of those calls, 2,660,066 were made to area codes associated with Illinois, 3,419,175 were made to area codes associated with Ohio, 1,716,457 were made area codes associated with North Carolina, and 5,727,417 were made to area codes associated with California.

Yoeli October 16, 2012 Rebuttal Report DX 198, at 12 Table 8B.

Dish expert Taylor opined on the number of these calls made to telephone numbers on the internal do-not-call lists. Taylor opined that:

1. With respect to the Dish List, Star Satellite made 1,316,915 "issue" prerecorded calls to numbers on this List; and of these calls, 95,318 were made to area codes associated with Illinois, 132,602 were made to area codes associated with Ohio, 54,629 were made to area codes associated with North Carolina, and 111,930 were made to area codes associated with California.

2. With respect to the Retailer Inaccessible List, Dish and the Telemarketing Vendors made 404,655 "issue" prerecorded calls to numbers on this List; and of these calls 23,740 were made to area codes associated with Illinois, 33,729 were made to area codes associated with Ohio, 12,533 were made to area codes associated with North Carolina, and 44,446 were made to area codes associated with California.

3. Star Satellite made no "issue" Prerecorded Calls to numbers on the Retailer Accessible List.

Taylor November 6, 2013 Report PX 28, at 14-15 Tables 9a, 9b and 9c.

      d. JSR

Defendant's expert John Taylor opined on the call records of JSR telemarketing calls made to telephone numbers on the Registry and on internal do-not-call lists for more than thirty days prior to the call.   Taylor again broke down his analysis of JSR calling records by area codes associated the Plaintiff States and by the Dish List, the Retailer Inaccessible List, and the Retailer Accessible List.

Taylor opined:

1. JSR made 5,664,273 "issue" telemarketing calls to telephone numbers on the Registry.  Of these calls, 926,720 were made to area codes associated with Illinois, 467,356 were made to area codes associated with Ohio, 23,186 were made to area codes associated with North Carolina, and 473,152 were made to area codes associated with California.

2. With respect to the Dish List, JSR made 1,186,924 "issue" telemarketing calls to numbers on this List; and 83,069 of these calls were made to area codes associated with Illinois, 20,492 were made to area codes associated with Ohio, 23,597 were made to area codes associated with North Carolina, and 43,933 were made to area codes associated with California.

3.  With respect to the Retailer Inaccessible List, JSR made
    794,395 "issue" telemarketing calls to numbers on this List;
    and 40,608 of those calls were to area codes associated with
    Illinois, 20,124 were to area codes associated with Ohio,
    29,595 were to area codes associated with North Carolina, and
    44,766 were to area codes associated with California.

4.  JSR made no calls to the Retailer Accessible List because it
    did not market Dish products after April 2008 when Possible
    Now started collecting retailer internal do-not-call lists.

<u>Taylor November 6, 2013 Report PX 28</u>, at 14-15 Tables 6a, 6b, 6c,
and 6d.

e.  <u>National Satellite</u>

Defendant's expert John Taylor opined on the call records of
National Satellite telemarketing calls made to telephone numbers
on internal do-not-call lists for more than thirty days prior to the
call.   Taylor again broke down his analysis of National Satellite
calling records by area codes associated the Plaintiff States and by
the Dish List, the Retailer Inaccessible List, and the Retailer
Accessible List.

Taylor opined:

1. With respect to the Dish List, National Satellite made 110,439 "issue" telemarketing calls to numbers on this List; and 22,585 of these calls were made to area codes associated with Illinois, 834 were made to area codes associated with Ohio, 14,045 were made to area codes associated with North Carolina, and 59 were made to area codes associated with California.

2. The records do not list any calls to telephone numbers on the Retailer Inaccessible List.  The records are from 2008 through 2010.  By this time Possible Now had started collecting retailer do-not-call lists. Therefore, the numbers were accessible to National Satellite through PossibleNOW.

3. With respect to the Accessible List Satellite Systems made 112,261 "issue" telemarketing calls to numbers on this List, and of those calls, 18,284 were made to area codes associated with Illinois, 1,040 were made to area codes associated with Ohio, and no calls were made to area codes associated with North Carolina or California.

Taylor November 6, 2013 Report PX 28, at 14-15 Tables 7a and 7b.

C. STRUCTURE AND OPERATION OF THE REGISTRY

Dish has presented evidence about the operation of the Registry and about the composition of the phone numbers on the Registry.  The Plaintiffs responded with evidence concerning the makeup of the numbers on Dish calling lists.

The FTC initially contracted with AT&T Government Solutions, Inc. (AT&T), to operate the Registry.  The Registry started registering phone numbers on June 27, 2003 and began operation on October 1, 2003.  DSUF ¶ 108.  Initially, AT&T had a defect in their software whereby a telemarketer who downloaded the Registry did not receive all of the registry telephone numbers.  The defect was corrected by the end of 2003, but telemarketers' lists were not fully corrected until the telemarketer once again fully downloaded a complete copy of the Registry.  Defendant Dish Network LLC's Memorandum of Law in Opposition to Plaintiffs' Third Motion to Compel Discovery Responses (d/e 152), attached Declaration of Joseph A Boyle (Boyle Declaration), Exhibit E, Email Thread between FTC General Attorney & Program Manager David Robbins and AT&T Program Manager Linda Miller dated from December 23, 2004 to October 10, 2005.

AT&T contracted with a company called Targus to remove telephone numbers from the Registry that should no longer be on the Registry. This process is referred to as "list hygiene" or "purging." Targus used AT&T data on residential landlines to conduct the list hygiene. Targus removed a telephone number if it was disconnected and reassigned. Dish Supplemental Exhibits (d/e 392), DX 148, Deposition of James Shaffer, at 52, 192-93. Targus did not remove business numbers from the Registry. Id., at 299. Targus personnel determined that five to ten percent of the numbers on the Registry were business numbers. Id.

In 2007, Lockheed Martin took over for AT&T as the FTC's contractor for operating the Registry. Dish Supplemental Exhibits (d/e 392), DX 145, Deposition of Murali Thirukonda (Thirukonda Deposition DX 145), at 17. In 2008, Lockheed Martin hired PossibleNOW as the subcontractor to help maintain the Registry. Dish Initial Exhibits (d/e 348), DX 167, Deposition of Rick Stauffer dated April 26, 2012 (Stauffer Deposition DX 167), at 59. PossibleNOW has continued in this position since then. PossibleNOW used its own algorithm to remove numbers when it was clear that the number had both been disconnected and

reassigned to a new subscriber.  PossibleNOW used directory assistance data to make this analysis.  PossibleNOW waited 30 days after disconnection to see if the number remains disconnected, and then waited 90 days after disconnection to see if the number is reassigned to a different person.  If the number was reassigned to a person with the same last name or person with a different last name to the same address, PossibleNOW assumed that the number should stay on the Registry.  Stauffer Deposition DX 167, at 61-62, 72, 73-95.

PossibleNOW representative Rick Stauffer testified in his deposition that the data base used to conduct the Registry hygiene was very accurate with respect to landline telephones.  He estimated that the data base included 99 percent of the landline telephones.  Stauffer Deposition DX 167, at 96.  The data base did not include wireless numbers, however.  PossibleNOW did not remove from the Registry wireless numbers that were disconnected because no directory assistance data exists for wireless numbers.  Stauffer Deposition DX 167, at 101.  Voice over Internet Protocol (VoIP) service providers are not required to share directory assistance data. The FTC has estimated that 25% of the telephone

numbers associated with VoIP services were not included in

directory assistance.  Biennial Report Congress Under the Do Not

Call Registry Free Extension Act of 2007, 2011 WL 6935660 *4

(Dec. 1, 2011); see also Stauffer Deposition DX 167, at 96.  As a

result, disconnection and reassignment of these numbers were also

not included in the PossibleNOW's hygiene process.   In December

2011, PossibleNOW estimated that it was missing disconnection

and reassignment information for approximately 25% of the VoIP

numbers in use. DSUF ¶ 155.

In September 2011 Dish's expert Dr. Robert Fenili estimated

the composition of the Registry.  Dr. Fenili opined that as of 2011,

over 50% of the numbers were wireless numbers; 12.2% of the

numbers were business landline; 7.1% of the numbers were

inactive land lines; and 28.2% of the numbers were active

residential land lines.  Dish Initial Exhibits (d/e 348), DX 189,

Expert Report of Dr. Robert N. Fenili dated July 26, 2012, at 10

Table 1b.

In response, the Plaintiffs' expert Dr. Yoeli conducted an

analysis of the make-up of Dish call records and the call records of

certain Order Entry Retailers.  Dr. Yoeli prepared a sample of the

calling data of Dish and several Order Entry Retailers.  Dr. Yoeli provided that sample to PossibleNOW.  PossibleNOW analyzed the samples to determine the make-up of the types of telephone numbers that Dish and the Retailers called, such as residential landline, business, wireless, or VOIP.  PossibleNOW could not determine the type of lines associated with all telephone numbers. The telephone numbers that could be identified by type were referred to as "Identified Numbers."  PossibleNOW analyzed the data two ways: (1) calls directed to identified residential landlines as a percentage of all calls to all numbers (All Calls); (2) calls directed to identified residential landlines as a percentage of calls to Identified Numbers (Identified Calls).

PossibleNOW determined that for Dish call data from 2003-2007, the calls to identified residential landlines made up 67% of All Calls and 85% of Identified Calls; Dish call data from 2007-2010, the telemarketing calls to identified residential landlines made up 69% of All Calls and 94% of Identified Calls; for Retailer Defender call data, the calls to identified residential landlines made up 50% of All Calls and 57% of Identified Calls; for Retailer Star Satellite/Tenaya call data, the calls to identified residential

landlines made up 40% of All Calls and 97% of Identified Calls; for
Retailer Dish TV Now call data, the calls to identified residential
landlines made up 51% of All Calls and 99% of Identified Calls; and
for Retailer JSR call data, the calls to identified residential landlines
made up 91% of All Calls and 98% of Identified Calls. <u>Yoeli
Declaration PX 38</u>, Appendix C, <u>Revised Rebuttal Report of Dr. Erez
Yoeli, dated December 14, 2012</u>, at 9, Table 3.

   D. <u>AREA CODES</u>

   Yoeli and Dish's expert Taylor opined on the number of calls
made to various area codes associated with the Plaintiff States.
Area codes have been assigned based on geography to areas within
States under North American Numbering Plan (NANP) by the North
American Numbering Plan Administration (NANPA).  <u>See</u>
<u>www.nanpa.com</u>, viewed August 11, 2014.  Dish cites several
factors that allow an area code to be assigned to a telephone that is
not physically in the geographic location associated with the area
code.  Telephone numbers now may be ported from one location to
another and from one type of telephone line to another, e.g., from
landlines to VoIP lines, and from landlines to wireless lines.  <u>See</u>
<u>Teltech Sys., Inc. v. Barbour</u>, 866 F.Supp.2d 571, 575-76 (S.D.

Miss. 2011).  VoIP lines may secure an area code other than the area code associated with the geographic location of the physical telephone.  See In re: Vonage Holdings Corp., Order, 19 F.C.C.R. 22404, at *22408 (2004).  Wireless telephones may be carried and used in any geographic location with cellular telephone coverage. See Teltech Sys., 866 F.Supp.2d at 575.  However, Dish has provided no evidence on the number of telephones or the percentage of telephone numbers that are not used in the geographic area associated with the telephone number's area code.

## ANALYSIS

Plaintiffs and Dish both move for summary judgment.  At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the non-moving party.  Any doubt as to the existence of a genuine issue for trial must be resolved against the movant.    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once a movant has met its burden, the non-moving party must present evidence to show that issues of fact remain with respect to an issue essential to

its case, and on which it will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. at 322; Matsushita Elec. Indus.

Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Dish raises several legal defenses to the claims brought by the

United States in Counts I-IV.  The Court will address these legal

defenses first and then address each Count.

A. LEGAL DEFENSES

1. FTC Jurisdiction

Dish asserts that the TSR does not cover intrastate

telemarketing calls and telemarketing calls to wireless telephones

because the FTC lacks jurisdiction over these calls.  Dish is

incorrect.   The FTC promulgated the TSR pursuant to its authority

under the Telemarketing Act.  The FTC's jurisdiction under the

Telemarketing Act extends to the same extent as the FTC's

jurisdiction under the FTC Act.  15 U.S.C. § 6105(b).  The FTC Act

authorizes the FTC to prohibit unfair competition and unfair and

deceptive acts or practices in or affecting commerce, subject to

exceptions for:  certain specified industries regulated by other

federal agencies, such as common carriers, banking and securities;

certain non-profit organizations; and the business of insurance to

the extent that such business is regulated by the state law.  15

U.S.C. §§ 44, 45(a)(1) and (2), and 1012(b).  The business of

telemarketing does not fit within any specified exceptions to the

FTC's jurisdiction.  Therefore, FTC's jurisdiction extends to any

unfair and deceptive telemarketing act or practice in or affecting

commerce.

> The FTC Act defines "Commerce" as:
>
> "Commerce" means commerce among the several States
> or with foreign nations, or in any Territory of the United
> States or in the District of Columbia, or between any
> such Territory and another, or between any such
> Territory and any State or foreign nation, or between the
> District of Columbia and any State or Territory or foreign
> nation.

15 U.S.C. § 44.  All interstate telemarketing calls, including calls to

wireless telephone numbers, are clearly in commerce.  The FTC's

jurisdiction extends to all those calls.  See  2003 FTC Statement, 68

FR 4580, at 4632-33 (January 29, 2003).

Dish cites a statement by an FTC official Ami Dziekan in her

deposition as proof that the FTC's jurisdiction does not extend to

wireless calls.  See Motion 349, at 46 (DSUF ¶ 142 citing Dish

Supplemental Exhibits (d/e 392), DX 155, Deposition of Ami

Dziekan, at 99.).  However, jurisdiction is not a factual issue.

Moreover, Dziekan's inaccurate statement does not change the law. The FTC's jurisdiction under the TSR extends to calls to wireless numbers.

The FTC's jurisdiction also extends to matters that are "in or affecting commerce."  The "in or affecting commerce" language includes intrastate activities "which, although local in character, affect interstate commerce."  H.R. Rep. No. 93-107, 93d Cong. 2d Sess. 45, 1974 U.S.C.C.A.N. 7726 (1974); see e.g., Burke v. Ford, 389 U.S. 320, 321 (1967) (The Sherman Act, 15 U.S.C. § 1, extended to intrastate distributors of alcoholic beverages because intrastate distribution substantially affected interstate commerce.).

The TSR defines telemarketing as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. . . ."  16 C.F.R. § 310.2(dd).  This definition covers all telemarketing calls, whether interstate or intrastate, that are part of a "plan, program or campaign" that involves "more than one interstate call."  Dish admits that the telemarketing campaigns at issue included interstate telemarketing calls.  See e.g., PSUF ¶ 14

Page 149 of 238

(admitted by Dish at <u>Dish Opposition 369</u>, at 24.).  The
telemarketing campaigns were "telemarketing" under the TSR, and
so, the intrastate calls were part of those campaigns and were
"telemarketing" subject to the TSR.  Furthermore, the intrastate
calls were part of a plan or campaign directed at commerce among
the several states, and so, affected commerce.  The intrastate
telemarketing calls at issue in this case are subject to the FTC's
jurisdiction under the FTC Act, the Telemarketing Act, and the TSR.
Dish's arguments to the contrary are not persuasive.

    2. <u>Statute of Limitations</u>

Dish argues that the statute of limitations is three years for
the Plaintiff United States' claims brought under the TSR.  The
Plaintiffs argue that there is no statute of limitations on the United
States' claims for equitable relief and the statute of limitations on
its claims for civil penalties is five years.  The Plaintiffs are correct.

The United States alleges violations of the TSR in Counts I, II,
III, and IV of the Second Amended Complaint.  A violation of the
TSR constitutes an unfair and deceptive act or practice in violation
of § 5(a) of the FTC Act.  FTC Act §§ 5(a) and 18(d)(3), codified at 15
U.S.C. §§ 45(a) and 57a(d)(3); Telemarketing Act 15 U.S.C.§ 6102(c).

The Plaintiff United States has brought this action pursuant to FTC authorization.  FTC Act § 16(a)(1), codified at 15 U.S.C. §56(a)(1). The Plaintiffs may seek several different remedies for certain violations of the TSR and § 5(a) of the FTC Act, including injunctive relief under § 13(b) of the FTC Act and civil penalties under § 5(m) of the FTC Act.  FTC Act §§ 5(m) and 13(b), codified at 15 U.S.C. §§ 45(m), and 53(b).

Sections 5(m) and 13(b) of the FTC Act contain no express statutes of limitations.  Congress enacted a general five-year statute of limitations for actions for "any civil fine, penalty, or forfeiture." 28 U.S.C. § 2462.   This statute applies to the United States' claim for civil penalties under § 5(m).  See Gavelli v. S.E.C., 133 S.Ct. 1216, 1219 (2013) (recognizing § 2462 as the general federal statute of limitations for actions for civil penalties); United States v. Ancorp Nat. Servs., Inc., 516 F.2d 198, 200 n.5 (2ᵈ Cir. 1975) (applying § 2462 to actions for civil penalties under FTC Act for violations of cease and desist order).  The Plaintiffs' claims for equitable relief under § 13(b) are simply not subject to any statute of limitations. F.T.C. v. Inc21.com Corp., 745 F.Supp.2d 975, 1012 (N.D. Ca. 2010); F.T.C. v. Instant Response Systems, LLC, 2014 WL 558688,

at *3 (E.D.N.Y. February 11, 2014); <u>See also</u> <u>F.T.C. v. Minuteman</u> <u>Press</u>, 53 F.Supp.2d 248, 263 (E.D.N.Y. 1998).

Yet, Dish argues that the three-year statute of limitations in § 19 of the FTC Act applies.  FTC Act § 19, codified at 15 U.S.C. § 57b(d).  Section 19 authorizes the FTC to seek compensatory remedies to redress injuries to consumers and others caused by a violation of an FTC rule or an FTC cease and desist order.  15 U.S.C. § 57b(b).  This compensatory redress remedy is subject to a three-year statute of limitations.  15 U.S.C. § 57b(d).

Section 19(e), however, states:

> Remedies provided in this section are in addition to, and
> not in lieu of, any other remedy or right of action
> provided by State or Federal law. Nothing in this section
> shall be construed to affect any authority of the
> Commission under any other provision of law.

FTC Act § 19(e), codified at 15 U.S.C. § 57b(e).  The three-year statute of limitations in § 19, therefore, does not apply to other available remedies, including civil penalties under § 5(m) or equitable relief under § 13(b).  <u>See</u> <u>F.T.C. v. Dalbey</u>, 2012 WL 1694602, at *3-*4 (D. Colo. May 15, 2012); <u>F.T.C. v. Bonnie & Co.</u> <u>Fashions, Inc.</u>, 1992 WL 314007, at *6 n.8 (D. N. J. September 28, 1992).

Dish correctly notes that the United States alleged that this Court has subject matter jurisdiction under several provisions of the FTC Act, including § 19.  Second Amended Complaint, ¶ 1.  The United States, under the authorization given by the FTC to bring this action, could theoretically seek compensatory redress for consumer injuries under § 19 for violations of the TSR.  Such remedies would be subject to the three-year statute.  The United States, however, has elected to seek civil penalties and equitable relief under FTC Act §§ 5(m) and 13(b).  Section 19 does not affect the remedies under these other sections of the FTC Act.  Therefore, the three-year statute does not apply.  The United States' claim for equitable relief is not subject to any statute of limitations, and the claim for civil penalties is subject to a five-year statute of limitations.

Counts I, III, and IV were filed on March 25, 2009, when the original Complaint was filed.  The limitations period for these claims, therefore, extends back to March 25, 2004.  Count II is deemed to be filed on May 18, 2012, the date that the Plaintiffs filed their Motion for Leave to Amend (d/e 135) (Motion 135).  Opinion entered March 12, 2013 (d/e 258) (Opinion 258), at 20.  The

limitations period for the claims for civil penalties for Count II,
therefore, extends back to May 18, 2007.

3. <u>Res Judicata</u>

Dish argues that Count II of the Complaint is barred by res
judicata.  Count II alleges that Dish violated the TSR by initiating or
causing other telemarketers to initiate outbound telemarketing calls
to persons who have previously stated that they do not wish to
receive such calls made by or on behalf of DISH Network, in
violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).  <u>Second Amended</u>
<u>Complaint</u>, at 15.   The Plaintiffs did not include Count II in the
original Complaint (d/e 1) or the First Amended Complaint and
Demand for Jury Trial (d/e 5) (First Amended Complaint).

On May 18, 2012, the Plaintiffs moved to amend the First
Amended Complaint to add the new Count II.  <u>Motion 135</u>.  The
Magistrate Judge denied Motion 135 because of the undue delay in
seeking to amend.  <u>Opinion entered June 20, 2012 (d/e 155)</u>
<u>(Opinion 155) (Cudmore, J. retired)</u>.  The Magistrate Judge noted,
"If the FTC elects to authorize a new suit then both the United
States and Dish will have a full opportunity to litigate that claim."
<u>Opinion 155</u>, at 16.  The FTC then filed a separate action alleging

the claims set forth in Count II.  Federal Trade Commission v. Dish

Network, LLC, C.D. Ill. Case No. 3:12-cv-03221 (Dish II).  On

September 25, 2012, Dish moved to dismiss Dish II based on res

judicata and the statute of limitations.  Dish Motion to Dismiss for

Failure to State a Claim (Dish II d/e 6).

On January 17, 2013, this Court set a hearing to determine

whether the cases should be consolidated or whether this Court

should grant Plaintiffs leave to amend the First Amended

Complaint.  Text Order entered January 17, 2013.   On March 5,

2013, the Court held the hearing.  After the hearing, this Court

denied Dish's motion to dismiss Dish II, vacated Opinion 155,

allowed Motion 135, directed the Clerk to file the Second Amended

Complaint attached to Motion 135, and dismissed Dish II without

prejudice to Dish raising its res judicata defense in this case.

Opinion 258, at 24.  Dish has now raised that defense.

The doctrine of res judicata bars bringing a second lawsuit to

assert a claim that has already been adjudicated between the

parties.  "Federal res judicata has three elements: (1) the same

parties, either directly or through privity; (2) a dispute arising from

the same operative facts; and (3) a final decision in the first lawsuit.

Page 155 of 238

United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 851

(7th Cir. 2009)."  Opinion 258, at 10-11.  As explained in Opinion

258, the Magistrate's decision Opinion 155 was an interlocutory

order and not a final decision necessary for purposes of res

judicata.  Opinion 258, at 10-14.

In addition, the Magistrate Judge "expressly left open the

possibility of a second action when he denied the motion for leave to

amend . . . ."  Opinion 258, at 13.  Because the Magistrate Judge

stated that the FTC could bring the claim in Count II in a new

action, Dish II was not barred by either res judicata or the doctrine

against claim splitting.  Opinion 258, at 13 (citing Central States,

Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines,

Inc., 296 F.3d 624, 629 (7th Cir. 2002)).  Further, Opinion 155 does

not provide the final decision necessary to invoke res judicata.

The dismissal of Dish II without prejudice also was not a final

decision that would be necessary to raise the res judicata bar.  The

Seventh Circuit determined that the dismissal of Dish II without

prejudice was not a final judgment under these circumstances.

Federal Trade Commission v. Dish Network, L.L.C., Seventh Circuit

Case No. 13-1860, Order entered July 3, 2013.  The Seventh Circuit

decision resolves this issue:  the dismissal of <u>Dish II</u> without

prejudice was not a final decision.  Because no final decision has

been entered in this case or in <u>Dish II</u>, res judicata does not apply.

Therefore, Count II is not barred by res judicata.

    4. <u>First Amendment</u>

      Dish additionally argues in reply that the Registry violates the

First Amendment unless residential landlines are the only

telephone lines that may be properly registered.  Dish argues that

restriction on commercial speech created by the Registry is only

justified by the state's interest in protecting privacy in the home.

<u>Defendant Dish Network L.L.C.'s Memorandum of Law in Support of</u>

<u>its Motion for Summary Judgment (d/e 349)</u>, at 127-28.  The

constitutionality of do-not-call legislation is not dependent solely on

the limited purpose of protecting privacy in the home.  Do-not-call

legislation also promotes the state's substantial governmental

interest in preventing abusive and coercive sales practices

generally.  <u>Mainstream Mktg. Services, Inc.</u>, 358 F.3d at 1238.  The

Registry, "directly advances the government's interests by effectively

blocking a significant number of the calls that cause the problems

the government sought to redress."  <u>Id.</u>  The constitutionality of the

Registry, therefore, is not dependent on limiting its scope to residential landlines.  Other types of telephone lines, such as wireless lines, may constitutionally be registered.

B. <u>SPECIFIC COUNTS</u>

1. <u>Count I</u>

The Plaintiff United States alleges in Count I:

In numerous instances, in connection with telemarketing, Defendant DISH Network engaged in or caused a telemarketer to engage in initiating an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

<u>Second Amended Complaint</u>, ¶ 66.  Count I contains two parts: (1) Dish initiated outbound telemarketing telephone calls to a person's number on the Registry; and (2) Dish caused telemarketers to initiate outbound telemarketing telephone calls to a person's telephone number on the Registry.

a. <u>Calls to Numbers on the Registry by Dish</u>

To establish the first part of Count I, the United States must present evidence that Dish initiated an outbound telemarketing telephone call to a person's number on the Registry.  To establish the second part of Count I, United States must present evidence of

Page 158 of 238

the additional element that Dish caused a telemarketer to initiate an outbound telemarketing telephone call to a person's number on the Registry.  Dish agrees that it is responsible for the actions of its Telemarketing Vendors, eCreek and EPLDT, but denies that Dish caused the actions of any Retailer.

The United States has presented evidence that Dish or its two Telemarketing Vendors made calls to numbers on the Registry. Initiating a telemarketing call to a number on the Registry is equivalent to initiating a call to the person who has that telephone number at the time of the call.  Dish's expert Taylor opined that Dish and its Telemarketing Vendors made 501,650 outbound telemarketing issue calls to telephone numbers on the Registry from 2007 through 2010.[19]  PossibleNOW and Taylor used the term "issue calls" to describe calls that he could not exclude from being violations of the TSR.  Dish, therefore, has presented no evidence that would exempt these calls from the requirements of the TSR.

Dish argues that the United States must prove that Dish called the person who registered the telephone number on the

---

[19]The 2008 Analysis showed that Dish made 222,156 issue calls to telephone numbers on the Registry between 2003-2007.   The United States only seeks partial summary judgment based on the 2007-2010 calling data, however.

Registry.  Proof that Dish called the number on the Registry is not proof that Dish called the person who registered the number.  Dish argues that registered telephone numbers are not likely to be related to the person who originally registered the number.  Dish argues that the Registry's hygiene process does not adequately maintain the accuracy of the Registry.  Outdated wireless numbers are not removed at all because no directory exists to provide information about changes in wireless numbers.  According to Dish's expert Dr. Fenili, more than half of the numbers on the Registry were wireless numbers by 2011.  Approximately 25 percent of VoIP numbers were not on directories, so those numbers were not updated when people changed their telephone numbers.  For all these reasons, telephone numbers remain on the Registry when the numbers are no longer associated with the persons who registered them.  Therefore, Dish argues that proof of calling a number on the Registry is not proof that the call was directed to the person who put the number on the Registry.

Dish's argument is not persuasive.  The TSR does not say the call must be initiated to the person who registered the number on the Registry.  The TSR states that a violation occurs if the

telemarketing call is initiated to a person when the person's telephone number is on the Registry. Consumer protection statutes are remedial in nature and are to be construed liberally to effectuate the goals of protecting consumers. See Ramirez v. Apex Fin. Mgmt., LLC, 567 F.Supp.2d 1035, 1040 (N.D. Ill. 2008). Dish's narrow reading of the Rule violates this principle of construction. If the call is initiated to a number on the Registry, then the call is initiated to the person who held that telephone number at the time of the call. Such a call violates the TSR. The Court's interpretation is consistent with the plain meaning of the language and consistent with the principle of liberal construction.

The Court's interpretation is also consistent with Congress' goals in the Improvements Act. Congress determined in the Improvements Act that telephone numbers should remain on the Registry indefinitely and should only be removed when the number is both disconnected and reassigned or when the person who registered the number so requests. Congress further directed the FTC to use national data bases to determine when numbers are disconnected and reassigned. Congress' purpose is clear: protect consumers by prohibiting telemarketing calls to numbers on the

Registry until it is absolutely clear that the telephone number has
been transferred to another.  In light of that principle, a
telemarketing call to a number on the Registry is a call to the
person who held that number at the time of the call in violation of
the TSR.  The United States has established its prima facie case in
Count I against Dish for outbound telemarketing calls initiated by
Dish and its Telemarketing Vendors persons whose telephone
numbers were on the Registry.

Once the United States has made its prima facie case, Dish
may present evidence to establish available affirmative defenses.
Dish has three possible affirmative defenses:  Dish had an
Established Business Relationship with the recipient of the call; the
call was exempt from the TSR as a telemarketing call to a business;
or Dish complied with the TSR safe harbor provisions.  16 C.F.R. §§
310.4(b)(1)(B)(ii), 310.4(b)(3), and 310(b)(7).  Dish argues that the
United States bears the burden to establish that no Established
Business Relationship exists and that a call was not a call to a
business.  This is incorrect.  The Established Business Relationship
provision and the telemarketing call to business call provisions are
written as exemptions to the general rule.  An exemption from the

general rule is treated as an affirmative defense for which Dish bears the burden of proof.  See Shaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 534 (2005) (burden of proof shifts to defendant when element can be fairly characterized as an exemption); Dunkin' Donuts Inc. v. N.A.S.T., Inc., 428 F. Supp. 2d 761, 773 (N. D. Ill. 2005) (same).

In this case, Taylor already excluded calls based on both the Established Business Relationship defense and the business call exemption.  Dish presents no evidence that would subject the remaining calls to this defense.

Dish also raises the TSR safe harbor defense.  Dish, however, has failed to present evidence that it has complied with the safe harbor defense.  Specifically, the safe harbor defense requires that the seller "has established and implemented written procedures to comply with § 310.4(b)(1)(ii) and (iii)."  Section 310.4(b)(1)(iii) prohibit calls to persons whose numbers are on the Registry.  Dish was required to produce evidence of written procedures that it followed to not call persons whose numbers were on the Registry. Dish has produced no written procedures describing how it selected the telephone numbers to be called or how it eliminated numbers

on the Registry from the numbers it called.  Bangert and Davis described the process used, but neither produced any documents. Bangert referred to the existence of some documents, but Dish did not present evidence of the content of any document.  The various versions of the Dish Policies contained no procedures for selecting the telephone numbers to be called.  Dish has presented no evidence of any written procedures for selecting telephone numbers to be called.  Dish, therefore, has presented no evidence that it had written procedures for compliance with § 310.4(b)(1)(iii) of the TSR.

The TSR safe harbor defense also requires the seller use a "process to prevent telemarketing to any telephone number" on the seller's internal do-not-call list and on the Registry" and to maintain "records documenting this process."  16 C.F.R. §310.4(4(b)(3)(iv). Dish did not maintain any records documenting Dish's process to scrub its calling lists to remove numbers on the Registry or on Dish's internal do-not-call list.  Dish's representatives Bangert and Davis testified concerning Dish's scrubbing process, but Dish did not produce records documenting the process.  Bangert testified that some documentation existed.  <u>Bangert Deposition</u> DX 157, at 125-27.  The documentation described by Bangert was not

produced in discovery, and Dish is not presenting Bangert's

testimony to prove the content of the documents.  <u>Dish Reply 396</u>,

at 74-75.  The only documents that Dish produced were 116 screen

shots, three for each calling campaign.  These screen shots did not

document the process used by Dish to create or scrub its calling

lists.  Dish's expert Dr. Richard C. Cooper further explained that

Dish's P-Dialer did not generate documentation of the scrubbing

process.  Dr. Cooper stated in his declaration, "Plaintiffs have asked

for ESI [electronically stored information] or 'data trails' identifying

how P-Dialer actually created and scrubbed the lists.  That

information simply does not exist."  <u>Declaration of Dr. Richard C.</u>

<u>Cooper (d/e 223)</u>, ¶ 23.[20]  Such documentation was required by the

TSR safe harbor defense.  Dish did not document the scrubbing

process.  Dish has failed to present evidence to establish a right to

the safe harbor defense under the TSR.

Dish argues that it made a good faith effort to comply with the

requirements of the TSR safe harbor defense.  Dish cites no

authority for the proposition that a good faith effort to comply is

---

[20] Dish submitted Dr. Cooper's declaration in support of Defendant Dish Network L.L.C.'s
Memorandum of Law in Opposition to Plaintiffs' Motion for Evidentiary Sanctions Pursuant to Fed.
R. Civ. P. 37 (d/e 219).

sufficient.  The FTC stated that a rule of reasonableness should be used to determine if a seller was protected by the defense, "If a company is complying in a reasonable manner with the requirements of the safe harbor, any true error should be excused." 60 Fed. Reg. at 43855.  A reasonable effort, however, requires evidence that the seller has taken steps to comply with every element of the safe harbor defense.  The safe harbor defense requires written procedures and documentation.  Dish presented no evidence that it took any efforts to comply with these basic requirements.  Even under a rule of reasonableness, Dish would not be entitled to a safe harbor defense.

Dish raises numerous additional arguments challenging the sufficiency of the United States' evidence.  Dish argues that the TSR does not cover intrastate calls or calls to wireless numbers because the FTC lacks jurisdiction over these calls.  As explained above, Dish is incorrect.  The FTC has jurisdiction, and these calls are subject to the TSR.  Dish argues that the United States must prove that the calls were not made to a business.  Dish is again incorrect. Dish bears the burden of proof on this issue.  Dish argues that the United States must prove that Dish did not have an Established

Business Relationship with the recipient of the call. Dish is again incorrect. Dish bears the burden of proof to prove the existence of an Established Business Relationship as a defense.

The Plaintiff United States is entitled to partial summary judgment that it has established liability for violations of Count I with respect to the 501,650 calls on the 2007-2010 call records.

The United States argues that Taylor's opinion establishes that it is entitled to partial summary judgment as to additional calls to numbers on the Registry that Taylor improperly asserted did not violate the TSR. Taylor excluded 873,551 calls because the codes on these calls indicated that they were calls to a person with an Established Business Relationship because the code indicated that the calls were made in response to a consumer inquiry. Taylor excluded 309,931 calls because the calls were not completed. Taylor excluded 12,552 calls because the call was either a wrong number or the recipient of the call was a non-English speaker. Taylor also excluded 10,029 calls that were intrastate calls. Motion 341, at 113.

The Court agrees that the United States is entitled to partial summary judgment that it has made its prima facie case for all of

these additional calls.  The TSR prohibits initiating an improper telemarketing call.  Thus, the fact that a call is not completed is not a defense.  The TSR also covers Dish's intrastate telemarketing calls since they were part of Dish's telemarketing campaign and so affected commerce.  The calls to wrong numbers or to non-English speakers were still initiated as telemarketing calls and were directed to numbers on the Registry.  The undisputed facts show that the United States established its prima facie case that these 332,512 calls violated the TSR prohibition against initiating calls to persons whose numbers are on the Registry.

The United States is entitled to partial summary judgment that it made its prima facie case with respect to the 873,551 calls that Taylor opined were covered by an Established Business Relationship because the record contained a code that the call recipient made an inquiry to Dish.  Taylor was merely reciting hearsay when he stated the meaning of the applicable code.  Dish needed to provide some independent evidence to prove Taylor's assumption regarding the meaning of the code.  Dish did not produce any testimony from Davis or Bangert or anyone else regarding the meaning of these codes.  Dish further did not produce

any consumer leads in discovery and so did not produce any documentation of these inquiries.  Absent some competent evidence to support Taylor's assumption, his opinion is not sufficient to create an issue of fact as to these calls.

The United States further seeks summary judgment on the 2,386,386 additional calls that Dr. Yoeli determined were made to numbers on the Registry as set forth in Plaintiffs' Statement of Undisputed Fact ¶ 46.  Dish failed to cite to any evidence to dispute this paragraph.  Dish Opposition 369, at 29-30.  The Statement is, therefore, undisputed.  Local Rule 7.1(D)(2)(b)(3).  The United States is entitled to partial summary judgment that it has established Dish's liability for these calls to persons whose numbers were on the Registry in violation of the TSR.

Issues of fact exist with respect to whether additional calls made by Dish and the Telemarketing Vendors violate the TSR as alleged in Count I.  Yoeli and Taylor disagree as to whether additional calls from the 2007-2010 call records were improperly made to numbers on the Registry.  Furthermore, the 2008 Analysis identified numerous issue calls in the 2003-2007 call records.  This

evidence precludes Dish's request for summary judgment on the remaining Dish calls in Count I.

### b. Calls to Numbers on the Registry by Retailers

To prevail on the second part of Count I, the Plaintiff United States must establish both that retailers initiated telemarketing calls for Dish products and services to persons' telephone numbers on the Registry and also that Dish caused the retailers to do so.

The United States presented evidence that Dish authorized retailers JSR and Satellite Systems to initiate Dish telemarketing calls to numbers on the Registry. JSR manager Goodale stated in his deposition that all of JSR's telemarketing calls offered Dish products and services. Satellite Systems representative Sophie Tehranchi stated in her declaration that all of Satellite Systems' telemarketing calls in the 2010-2011 Five9 calling data were for Dish products. Dish argues that this evidence is insufficient, but presents no evidence to controvert the Plaintiffs' showing. The Plaintiffs have met their burden that the calls on the JSR and Satellite Systems call records were telemarketing calls for Dish products and services.

Dish's expert Taylor opined that JSR made 2,349,031 issue calls to numbers on the Registry, and Satellite Systems made 381,811 issue telemarketing calls to numbers on the Registry. Again, the term "issue call" means that Taylor has no basis to opine that the call was not a violation of the TSR. This uncontroverted evidence meets the Plaintiffs' burden at summary judgment on this element.

Dish makes the same arguments about requiring more proof than the telemarketing call was initiated to a number on the Registry. The Court rejects those arguments for the same reasons stated above. The Plaintiffs have established that JSR and Satellite Systems violated the TSR by initiating telemarketing calls for Dish products and services to persons' numbers that were on the Registry.

The question is whether issues of fact remain regarding whether Dish caused JSR and Satellite Systems to initiate calls to persons' numbers on the Registry in violation of the TSR. In 2009, this Court adopted the FTC's interpretation of the meaning of "causing" a telemarketer to violate the TSR. The Court held,

Under the FTC interpretation of the TSR, a seller "causes" the telemarketing activity of a telemarketer by retaining the telemarketer and authorizing the telemarketer to market the seller's products and services. According to the Guide, the seller is liable for the telemarketer's violations of the TSR unless the safe harbor provisions apply.

The Court must defer to the FTC interpretation. As explained above, the FTC's position is consistent with the plain meaning of the verb "cause". The FTC interpretation in (sic) also consistent with the statement in the 2002 Notice of Propose (sic) Rulemaking that the safe harbor provisions avoid the problem of strict liability for sellers.

Opinion entered November 4, 2009 (d/e 20) (Scott, J., retired) (Opinion 20), at 14-15.

The Court followed the principle that it must defer to an agency's interpretation of its rules and regulations unless the interpretation is plainly erroneous or inconsistent with the regulation. Opinion 20, at 9 (citing Joseph v. Holder, 579 F.3d 827, 832 (7th Cir. 2009); Clancy v. Office of Foreign Assets Control of United States Dept. of Treasury, 559 F.3d 595, 606 (7th Cir. 2009); Sierra Club v. Franklin County Power of Illinois, LLC, 546 F.3d 918, 931 (7th Cir. 2008)). See Auer v. Robbins, 519 U.S. 452 (1997); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945). The Court hereinafter refers to the principle as Auer deference.

Dish asked this Court to certify the question to the Court of Appeals for interlocutory appeal. This Court denied Dish's request because no substantial grounds for differences of opinion existed regarding the Court's obligation to defer to the FTC's interpretation of its own regulation under the principle of <u>Auer</u> deference. <u>Opinion entered February 4, 2010 (d/e 32) (Scott.J., retired) (Opinion32)</u>, at 7.

After this Court's 2009 decision in Opinion 20, the Supreme Court twice considered the question of <u>Auer</u> deference. <u>Decker v. Northwest Environmental Defense Center</u>, __ U.S. __, 133 S.Ct. 1326 (2013); <u>Christopher v. SmithKline Beecham Corp.</u>, __ U.S. __, 132 S.C.t 2156 (2012). The Supreme Court majority in <u>Decker</u> reaffirmed the principle of <u>Auer</u> deference to an agency interpretation of its own regulations. Chief Justice Roberts, however, stated in his concurrence that several members of the Court are interested in revisiting the issue:

> The opinion concurring in part and dissenting in part raises serious questions about the principle set forth in <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), and <u>Auer v. Robbins</u>, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). It may be appropriate to reconsider that principle in an appropriate case. But this is not that case.

Respondent suggested reconsidering Auer, in one sentence in a footnote, with no argument. See Brief for Respondent 42, n. 12.  Petitioners said don't do it, again in a footnote. See Reply Brief for Petitioners in No. 11–338, p. 4, n. 1; see also Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 223–224, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (declining to decide question that received only "scant argumentation").  Out of 22 amicus briefs, only two—filed by dueling groups of law professors—addressed the issue on the merits.  See Brief for Law Professors as Amici Curiae on the Propriety of Administrative Deference in Support of Respondent; Brief for Law Professors as Amici Curiae in Support of Petitioners; see also FTC v. Phoebe Putney Health System, Inc., 568 U.S. ——, ——, n. 4, 133 S.Ct. 1003, 1010–1011, n. 4, ——L.Ed.2d —— (2013) (declining to consider argument raised only by amicus ).

The issue is a basic one going to the heart of administrative law. Questions of Seminole Rock and Auer deference arise as a matter of course on a regular basis. The bar is now aware that there is some interest in reconsidering those cases, and has available to it a concise statement of the arguments on one side of the issue.

I would await a case in which the issue is properly raised and argued. The present cases should be decided as they have been briefed and argued, under existing precedent.

Decker, 133 S.Ct. at 1338-39 (Roberts, C.J., concurring).  In light of the Chief Justice's comments, this Court directed the parties to submit additional briefing to address the issue of Auer deference in this case.  Order entered July 8, 2014 (d/e 422) (Opinion 422), at 6.

After careful consideration, this Court concludes that this Court must at this point follow the majority in <u>Decker</u> and defer to the FTC interpretation of "cause" as discussed in Opinion 20. The Supreme Court majority in <u>Decker</u> reaffirmed the principle of <u>Auer</u> deference to an agency's interpretation of its own regulations. This Court must follow that instruction from the Supreme Court. <u>See</u> <u>Agostini v. Felton</u>, 521 U.S. 203, 237-38 (1997). At this point, the law has not been changed. Absent a change in the law, this Court must abide by the prior decision of Judge Scott in Opinion 20. <u>See</u> <u>Brengettcy v. Horton</u>, 423 F.3d 674, 680 (7th Cir. 2005) (Successor judge in a case generally should not reconsider decision of previous judge of the same hierarchical level unless a compelling reason); <u>Tice v. American Airlines, Inc.</u>, 373 F.3d 851, 854 (7th Cir. 2004) (Successor judge should follow previous opinions in a case unless there is an intervening change in the law or other special circumstance).

Dish asks the Court to certify the matter for interlocutory appeal if the Court concludes that it must follow Opinion 20. The Court will address the issue of certification of interlocutory appeal at the end of this Opinion.

Under the standard set forth in Opinion 20, the Plaintiff United States must show that (1) Dish retained the Retailers, (2) Dish authorized the Retailers to market Dish products and services, and (3) the Retailers violated the TSR by initiating Dish telemarketing calls to numbers on the Registry.  The undisputed evidence establishes these elements.  Dish contracted with JSR and Satellite Systems to telemarket Dish products and services, and JSR and Satellite Systems initiated Dish telemarketing calls to persons whose numbers were on the Registry.  The United States is entitled to partial summary judgment with respect to the 2,349,031 telemarketing calls that JSR made to numbers on the Registry, and the 381,811 telemarketing calls that Satellite Systems made to numbers on the Registry.

Dish seeks summary judgment on the Plaintiffs' claims with respect to the remaining Retailers.  This request is really asking the Court to make binding findings of fact rather than entry of judgment.  See Fed. R. Civ. P. 56(g).  When viewed favorably to the Plaintiffs, Dish is not entitled to a finding that Dish did not cause the remaining Retailers mentioned to call persons whose numbers were on the Registry.  Like JSR and Satellite Systems, Dish engaged

these companies to perform telemarketing services. The Plaintiffs also have evidence that the remaining telemarketers initiated telemarketing calls to persons whose telephone numbers were on the Registry. In light of this evidence, the Court denies Dish's request for partial summary judgment with respect to the remaining Retailers.

2. Count II

The United States alleges in Count II:

> In numerous instances, in connection with telemarketing, DISH Network has engaged in or caused other telemarketers to engage in initiating an outbound telephone call to a person who has previously stated that he or she does not wish to receive such a call made by or on behalf of DISH Network, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).

Second Amended Complaint, ¶ 67. Count II also contains two parts: (1) Dish initiated outbound telemarketing telephone calls to a person who previously stated that he or she does not wish to receive calls made by or on behalf of Dish; and (2) Dish caused telemarketers to initiate outbound telemarketing telephone calls to a person who previously stated that he or she does not wish to receive calls made by or on behalf of Dish.

Page 177 of 238

To establish the first part of Count II, the United States must present evidence that Dish initiated an outbound telemarketing telephone call to a person who previously stated that he or she did not wish to be called by or on behalf of Dish.  To establish the second part of Count I, United States must present evidence of the additional element that Dish caused a telemarketer to initiate an outbound telemarketing telephone call to a person who previously stated that he or she did not wish to be called by or on behalf of Dish.  Dish again agrees that it is responsible for the actions of its Telemarketing Vendors, eCreek and EPLDT, but denies that it caused the actions of any Retailer.

a. Dish Calls to Persons Who Previously Stated Do Not Call

The United States is entitled to summary judgment with respect to the 903,246 calls that Dish's expert Taylor opined were made to the telephone numbers of persons on the internal do-not-call lists of Dish and the Telemarketing Vendors.  Taylor further opined that he could not find any basis for exemption or exclusion from the application of the TSR based on the information provided to him.  Taylor November 6, 2013 Report PX 28, at 11, Table 3b. Dish has presented no additional evidence to show that these calls

were somehow exempt from the application of the TSR.  The United

States has established its prima facie case with respect to these

calls.

The United States also seeks partial summary judgment on

the 140,349 calls to numbers marked DNC by eCreek.  Motion 341,

at 120, and PSUF ¶ 43.  Dish does not dispute that these calls were

made.  Dish only cites evidence regarding the unreliability of the

Registry to challenge this Statement of Undisputed Fact.  Dish

Opposition 369, at 28-29.  As previously explained, the Plaintiffs

are not required to prove that the calls were made to the person

who registered the number on the Registry.  Furthermore, eCreek

marked numbers "DNC" when the recipient of the call stated that

he or she did not wish to be called again.  Dish's reference to the

reliability of the Registry is not responsive to the Plaintiff United

States' claim in Count II that these calls were made to persons who

previously stated that they did not wish to receive telemarketing

calls on behalf of Dish.  Dish concedes that it is responsible for the

actions of its Telemarketing Vendor eCreek.  Further, the numbers

marked DNC were added to Dish's internal do-not-call list.  The

United States has established Dish's liability for the 140,349 calls.

Dish argues somewhat inconsistently that the United States cannot prove liability under Count II by proving that Dish called numbers on Dish's internal do-not-call list.  Dish argues that proof that Dish called those numbers is not proof that Dish called the person who previously stated that he or she did not want to be called.  Dish Opposition 374, at 333.  Dish, however, elsewhere asserts that its do-not-call list is accurate.  See Dish Memorandum 349, at 21(Dish "recorded, maintained and updated its Internal DNC List.").  Because the Dish internal do-not-call list is an accurate list of the persons who told Dish or its Telemarketing Vendors not to call, then proof that Dish called a number on that list is proof that Dish initiated a telemarketing call to a person who told Dish not to call.  Dish's argument to the contrary is not persuasive.  The United States is entitled to partial summary judgment that it has established its prima facie case with respect to these calls.[21]

---

[21] The Court notes that if Dish now asserts that its internal do-not-call list is not properly maintained and updated, then it is conceding that it is not entitled to the TSR safe harbor defense.  Maintenance of a proper internal do-not-call list is a requirement of the TSR safe harbor defense.  16 C.F.R. § 310.4(b)(3)(iii).  More importantly, Dish is conceding that all of its outbound telemarketing calls violate TCPA and the FCC Rule.  The FCC Rule prohibits any person or entity from initiating a telemarketing call unless the person or entity "has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity."  47 C.F.R. § 64.1200(d).  If Dish now admits that it has not instituted procedures to maintain a proper

The United States also seeks summary judgment on the
telemarketing calls that Dish made to persons on Retailers' internal
do-not-call lists.  These consumers told Retailers that they did not
wish to receive any more telemarketing calls for Dish products and
services.  The United States argues that Dish was obligated to
honor these do-not-call requests even though the requests were
made to the authorized retailers rather than Dish.  Dish disputes
that it is obligated to monitor or honor do-not-call requests made to
authorized retailers.

TSR Section 310.4(b)(1)(iii)(A) states that it is a deceptive
practice in violation of the Rule to initiate, or cause a telemarketer
to initiate, an outbound telemarketing call to a person when, "[t]hat
person previously has stated that he or she does not wish to receive
an outbound telephone call made by or on behalf of the seller whose
goods or services are being offered . . . ."  16 C.F.R. §
310.4(b)(1)(iii)(A).  Section 310.4(b)(1)(iii)(A) does not state to whom

---

internal do-not-call list, then all of the 134,295,177 telemarketing calls identified in the 2007-2010
call records violate TCPA and the FCC Rule.  See Yoeli July 19, 2012 Report DX 197, ¶ 19(g).

the person must state that he or she does not wish to be called and does not state who must honor the statement. [22]

The FTC subsequently explained that the do-not-call request under § 310.4(b)(1)(iii)(A) is "company-specific" and is designed to track the approach in the FCC Rule.  Notice of Proposed Reg. 4492, 4516 (January 30, 2002).  Under the FTC's interpretation, Dish was required to honor a person's statement not to call him or her if Dish was the same company as the telemarketing company to which the person made the statement.  The undisputed evidence shows that the Retailers were separate companies.

The FTC also intended § 310.4(b)(1)(iii)(A) to track the approach of the FCC Rule.  The FCC Rule imposes obligations on the "seller," and defines the seller as: "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of . . . goods, or services, which is transmitted to any person." 47 C.F.R. §64.1200(f)(7).  The FCC has determined that the "on whose behalf" language imposes liability on the seller for the actions of the telemarketer if an agency

---

[22] Section 310.4(b)(1)(iii)(A) also does not state that a seller or telemarketer must maintain an internal do-not-call list; the TSR only requires such a list if the seller or telemarketer wants to comply with the safe harbor defense.  16 C.F.R. § 310.4(b)(3).  The FCC Rule, however, requires telemarketers to maintain internal do-not-call lists.  47 C.F.R. § 64.1200(d).

relationship existed between the seller and the telemarketer.  FCC
May 9, 2013 Order, 28 FCC Rcd. at 6574.  Section 310.4(b)(1)(iii)(A)
contains similar language that refers to calls "made by or on behalf
of" the seller."  Given the similarities in language, and the FTC's
statement that this provision should track the FCC approach, the
Court finds that §310.4(b)(1)(iii)(A) imposes an obligation on a seller
to honor a consumer do-not-call statement if the consumer made
the statement to the seller or to a telemarketer with an agency
relationship with the seller.

     The scope of the application of a person's do-not-call
statement under § 310.4(b)(1)(iii)(A) is distinct from the causation
issue.  A seller may cause a telemarketer to violate the TSR even
though the telemarketer is a separate company and is not in an
agency relationship with the seller.  In such circumstances, the
seller may be liable for the telemarketer's TSR violation.  The same
seller, however, may not be obligated to honor a person's do-not-call
statement made to the separate telemarketer because the
telemarketer was not an agent of the seller.

     The United States argues for a broader scope of a seller's
obligation to honor a person's do-not-call statement.  The United

States relies on a statement by the FCC accompanying the 2003 amendment to the FCC Rule.  The FCC stated at that time that a person's do-not-call statement, "applies to all telemarketing campaigns of the seller and any affiliated entities that the consumer reasonably would expect to be included given the identification of the caller and the product being advertised."  68 Fed. Reg. 44,144, 44,156 (July 25, 2003).  The United States argues that Dish, the Telemarketing Vendors, and all of Dish's Retailers were sufficiently affiliated to obligate all of them to honor a person's do-not-call statement to any of them.

The United States' appeal to the FCC interpretation is consistent with the FTC's statement in 2002 that this provision of the TSR should track the FCC approach.  The problem for the United States is that the FCC subsequently explained that an agency relationship was necessary to impose liability on a seller for the actions of a telemarketer.  Thus, the FCC has determined that the "affiliated entities" in the language quoted by the United States meant entities that were in an agency relationship.  The United States must establish that a telemarketer had an agency

relationship with Dish to show that Dish was obligated to honor a consumer's do-not-call statement to that telemarketer.

Dish agrees that it had an agency relationship with its two Telemarketing Vendors eCreek and EPLDT, and so, was obligated to honor consumers' do-not-call statements made to those entities. The issue is whether an agency relationship existed between Dish and the Retailers. After careful review, the Court finds that issues of fact exist regarding whether an agency relationship existed between Dish and its Retailers.

Federal common law of agency, Illinois law, and the Restatement all agree on general agency legal principles. <u>NECA-IBEW Rockford Local Union 364 Health and Welfare Fund v. A & A Drug Co.</u>, 736 F.3d 1054, 1058 (7th Cir. 2013). The Restatement defines agency as follows:

> Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

<u>Restatement (Third) of Agency</u>, § 1.01 (2006). The Restatement definition contains two key aspects: (1) the principal and agent agree that the agent acts for the principal; and (2) the agent is

subject to the control of the principal.  See also In re Aquilar, 511 B.R. 507, 513 (Bankr. N.D. Ill. 2014).   The principal need only have the right to control the agent; the agency exists even if the principal does not exercise that right.  See Schutz v. Arrow Fin. Servs., LLC, 465 F.Supp.2d 872, 877 (N.D. Ill. 2006).  The determination of whether an agency exists is a factual issue.  See Spitz v. Proven Winners of North America LLC, 759 F.3d 724 (7th Cir. 2014); Chemtool, Inc. v. Lubrication Technologies, Inc., 148 F.3d 742, 746 (7th Cir. 1998).

An agency may also be found under the doctrine of apparent authority and ratification.  The Restatement defines apparent authority as follows:

> Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.

Restatement (Third) Of Agency, § 2.03 (2006).  The third party must reasonably believe the purported agent has the authority to act for the principal and that belief must be traceable to the principal.

The Restatement defines ratification as follows:

(1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.

(2) A person ratifies an act by
- (a) manifesting assent that the act shall affect the person's legal relations, or
- (b) conduct that justifies a reasonable assumption that the person so consents.

Restatement (Third) Of Agency, § 4.01 (2006).  The Restatement further states that ratification does not occur unless "the actor acted or purported to act as an agent on the person's behalf."  Id. § 4.03.

In this case, issues of fact exist concerning whether the retailers were agents of Dish.  Dish's standard Retailer Agreement stated that Retailers were independent contractors and could not hold themselves out to be acting on behalf of Dish.  Generally an independent contractor performs a service for the contracting party, but is not subject to the control of the contracting party.  See Hixon v. Sherwin-Williams Co., 671 F.2d 1005, 1009 (7th Cir. 1982).  The Retailer Agreements further stated that Retailers were not authorized to sell Dish programming services; only Dish could sell its programming services.

The Retailer Agreements, however, also stated that Dish authorized Retailers to "market, promote, and solicit" orders for Dish and to use Dish trademarks in their marketing; gave Dish access to each Retailer's records with respect to its Dish dealership; and required each Retailer to "take all actions and refrain from taking any action, as requested by EchoStar in connection with the marketing, advertisement, promotion and/or solicitation of order" for Dish programming and related goods and services.  E.g., Retailer Agreement PX 152, at 16 § 7.3.  The Retailer Agreements also authorized Dish to establish Rules for Retailers, and to amend those Rules as it wished, and obligated Retailers to comply with those Rules.  E.g., Retailer Agreement PX 152, at 1, 16 §§ 1.6 and 7.3.  These provisions indicate that Dish authorized the Retailers to act on its behalf and that Dish retained the right to exert a level of control over the Retailers.  Given the inconsistencies in these provisions, the Retailer Agreements do not clearly indicate whether the parties intended to establish agency relationships.

In practice, Dish exerted some control over Retailers.  Musso's office monitored Retailers to ensure compliance with the terms of the Retailer Agreements.  She reported violators.  Her superiors

disciplined Retailers who did not comply with the Retailer
Agreements.  Dish, however, did not control all aspects of the
Retailers' activities.  In many cases, Dish did not approve
advertising, telemarketing scripts or calling lists.

Some evidence also indicates that Order Entry Retailers, at
least, could act on behalf of Dish.  Order Entry Retailers were given
access to the Order Entry Tool through which they could place
orders for Dish programming and services and schedule
installations.  Overall, this conflicting evidence shows that an issue
of fact exists regarding whether the authorized retailers were agents
of Dish.

The Plaintiffs argue that even if an express agency did not
exist, the Court can find an agency based on apparent authority or
ratification.  The Plaintiffs have significant problems of proof to
establish agency by apparent authority or ratification.  Apparent
authority turns on what the third party who dealt with the apparent
agent reasonably believed.  Restatement (Third) of Agency, § 4.01.
The Plaintiffs have presented almost no evidence on what the
recipients of the Retailers' telemarketing calls reasonably believed.
The Plaintiffs must also present proof that the call recipients'

reasonable beliefs are traceable to some manifestations by Dish. Restatement (Third) of Agency, § 2.03.

The Plaintiffs' ratification theory also faces problems of proof. Ratification requires proof that Dish affirmed the actions of the Order Entry Retailers. The only obvious actions that Dish may have ratified would be acceptance of completed sales. Most of the telemarketing calls did not result in sales, so ratification would not seem applicable to the majority of the calls. In addition, ratification requires proof that the Retailer represented that it was the agent of Dish. Restatement (Third) of Agency, § 4.03. The Plaintiffs have almost no evidence of the representations that the Retailers made during these telemarketing calls. Absent such proof, the Plaintiffs may not be able to establish ratification. Regardless, issues of fact exist regarding whether the authorized retailers were agents of Dish. Issues of fact, therefore, exist regarding whether Dish was obligated to honor the do-not-call requests that persons made to the authorized retailers.

The United States argues that the Court should follow the FCC's examples of evidence that would be sufficient to prove an implied agency or agency by ratification. The FCC is not an expert

on federal common law of agency and its comments about agency

law in the FCC May 9, 2013, Order are not entitled to deference.

<u>Dish Network, L.L.C. v. F.C.C.</u>, 552 Fed. Appx. 1, 2 (D.C. Cir.

January 22, 2014).  The Court has correctly applied federal

common law principles of agency law.

>   b. <u>Retailers' Calls to Persons Who Previously Stated Do No
>   Call</u>

Count II also alleges that Dish caused its Retailers to call

persons who previously stated not to call them to sell Dish products

and services.  As explained above, issues of fact exist regarding

whether Dish provided the retailers with the means to conduct

telemarketing.  Issues of fact also exist regarding whether the

authorized retailers were required to honor do-not-call requests

made to Dish.  Dish's liability would again turn on whether the

authorized retailers were agents of Dish.  As explained above, issues

of fact exist regarding this issue.

As with Count I, Dish is not entitled to a safe harbor defense

to calls to persons who previously stated that they did not wish to

receive outbound telemarketing calls by or on behalf of Dish.  Dish

failed to present evidence of written procedures to comply with this

aspect of the TSR.  Dish presented no evidence that it had written

procedures to remove such persons from the calling lists that Dish

used.  The Plaintiffs are therefore entitled to partial summary

judgment establishing Dish's liability for the 903,246 calls that it

made to persons whose telephone numbers were on its internal do-

not-call lists.

    3. <u>Count III</u>

    Count III alleges:

> In numerous instances, in connection with
> telemarketing, Defendant DISH Network has abandoned
> or caused telemarketers to abandon an outbound
> telephone call by failing to connect the call to a sales
> representative within two (2) seconds of the completed
> greeting of the person answering the call, in violation of
> the TSR, 16 C.F.R. § 310.4(b)(1)(iv).

<u>Second Amended Complaint</u>, ¶ 68.  Count III also contains two

parts: (1) Dish abandoned outbound telemarketing telephone calls;

and (2) Dish caused telemarketers to abandon outbound

telemarketing telephone calls.  In both cases, the abandonment

occurred because Dish or the telemarketer failed to connect the call

to a sales representative within two seconds of the completed

greeting by the recipient of the call.

### a. Dish Automessage Campaign Calls

The Plaintiffs are entitled to summary judgment on Dish's liability for the 98,054 prerecorded calls that Dish made in 2007 and 2008 in its automessage campaigns.  Dish concedes that these calls were prerecorded telemarketing calls to existing Dish customers.  The recipients of the calls were not transferred to live sales representatives.  The calls were abandoned under the TSR.

Dish argues that at the time of the calls, the FTC allowed prerecorded calls to persons with Established Business Relationships with Dish.  The FTC announced that it would forbear from enforcing the abandonment provision of the TSR during this time for prerecorded calls to persons with whom the seller had an Established Business Relationship if the call gave the call recipient the opportunity to indicate that he or she did not wish to receive such calls.  The Dish automessage calls did not provide this opportunity to the call recipients.  The FTC forbearance does not apply here.

Dish has no other defense.  Dish concedes that these calls were telemarketing calls made to existing customers.  The calls were subject to the TSR.  The TSR safe harbor does not apply to call

abandonment.  The Plaintiffs are entitled to partial summary judgment on liability in Count III for these 98,054 calls.  Dish violated the TSR by abandoning these calls.

     b. <u>Retailer Abandoned Calls</u>

The United States asks for partial summary judgment for liability on the 43,100,876 prerecorded calls by Star Satellite, 6,637,196 prerecorded calls by Dish TV Now, and one prerecorded call by American Satellite.  The United States is entitled to partial summary judgment.  Dish authorized both Star Satellite, Dish TV Now, and American Satellite to telemarket Dish products and services; the Star Satellite and Dish TV Now prerecorded calls were made at their direction; American Satellite made the one prerecorded call caught in the sting by consumer Parker; all these calls were prerecorded calls; these calls marketed Dish products and services; each of these calls was answered by a person; and, with respect to each call, a live sales representative did not come on the line within two second of the call recipient's greetings.  These calls were abandoned under TSR § 310.4(B)(1)(iv), and Dish caused Star Satellite, Dish TV Now, and American Satellite to make the abandoned calls.  The United States is entitled to partial summary

judgment establishing Dish's liability for the 43,100,876 calls, the 6,637,196 calls, and the one call.[23]

4. Count IV

Count IV alleges:

> Defendant DISH Network has provided substantial assistance or support to Star Satellite and/or Dish TV Now even though Defendant DISH Network knew or consciously avoided knowing Defendant Star Satellite and/or Dish TV Now abandoned outbound telephone calls in violation of § 310.4(b)(1)(iv) of the TSR. Defendant DISH Network, therefore, has violated 16 C.F.R. § 310.3(b).

Second Amended Complaint, ¶ 69.  Section 310.3(b) of the TSR prohibits providing substantial assistance or support to telemarketers when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates the TSR.

To establish the claims in Count IV, the United States must show "(1) that the Dealers were violating the TSR; and (2) Dish knew or consciously avoided knowing that the Dealers were violating the TSR, but still kept paying the Dealers to continue the violations."  Opinion 32, at 9 n.1 (citing Opinion 20, at 20) (Scott,

---

[23] The TSR safe harbor defense does not apply to abandoned calls.

J., retired).  The United States limited the claims in Count IV to Dish's relationship with two Retailers, Dish TV Now and Star Satellite, and to one type of illegal activity—making prerecorded telemarketing calls that constituted abandoned calls in violation of the TSR.

The United States seeks partial summary judgment on only part of its claim in Count IV, that illegally Dish provided substantial assistance or support to Star Satellite in violation of TSR § 310.3(b). Motion 341, at 131.  The United States does not seek partial summary judgment on its claim in Count IV that Dish provided substantial assistance or support to Dish TV Now.  Dish seeks summary judgment on all claims in Count IV.  When the evidence is read in the light most favorable to the party opposing summary judgment, issues of fact exist regarding the claim based on Dish's relationship with Star Satellite, but Dish is entitled to partial summary judgment on that part of the Count IV based on Dish's relationship with Dish TV Now.

Dish TV Now had Guardian make on its behalf 6,637,196 prerecorded telemarketing calls for Dish products and services from June to August 10, 2004.  Dish first learned that Dish TV Now was

using prerecorded calls in late July or early August 2004.  The initial complaint Dish received about this practice was dated July 26, 2004, but was marked received on August 2, 2004.  On August 23, 2004, Dish personnel observed Dish TV Now personnel using a predictive dialer.  On September 16, 2004, Dish representative Ahmed warned Dish TV Now owner Hagen about making illegal telemarketing calls.  Hagen assured Ahmed that he was complying with the Do-Not-Call Laws.  Plaintiffs Initial Exhibits (d/e 342), PX 119, Email Thread, at CM/ECF 342-15 pages 37-38.  Dish TV Now did not make any prerecorded calls after this conversation.

The evidence does not support the inference that Dish avoided knowing that Dish TV Now was abandoning calls and does not support the inference that Dish continued to pay Dish TV Now to make abandoned calls.  Dish received notice that Dish TV Now used prerecorded calls, at most, one to two weeks before Dish TV Now stopped the practice on August 10, 2004.  Dish employees visited Dish TV Now facilities in August 2004, and Dish representative Ahmed warned Dish TV Now in September 2004 to comply with the Do-Not-Call Laws.  By then, Dish TV Now had stopped making abandoned calls.  No evidence shows that Dish continued to pay

Dish TV Now knowing (or consciously avoiding knowing) that Dish TV Now was continuing to make abandoned calls.  Dish is entitled to partial summary judgment on the portion of Count IV that is based on Dish TV Now's use of prerecorded, abandoned calls.

Issues of fact, however, exist regarding whether Dish provided substantial assistance or support to Star Satellite in violation of TSR § 310.3(b).  Star Satellite made prerecorded calls for a much longer period that Dish TV Now, and the Plaintiffs' evidence indicates that several employees of Dish were aware of the calls at one time or another.  The evidence also shows that Dish Senior Vice President Amir Ahmed wrote Myers a letter warning Myers about failing to comply with the Do-Not-Call Laws.  Plaintiffs Initial Exhibits (d/e 342), PX 212, Letter dated October 26, 2005.  Ahmed told Myers, "Failure to comply with applicable laws will result among other things in the termination of the Retailer Agreement (Section 10.4) . . . ." Id.  In addition, Myers testified that he did not let Dish know about Star Satellite's use of prerecorded calls.  Baker of Guardian confirmed that Star Satellite sometimes directed Guardian to stop making prerecorded calls for Star Satellite when Dish representatives were visiting.  Given this conflict in the

evidence, the finder of fact at trial should decide whether Dish

provided support to Star Satellite when it knew or consciously

avoided knowing that Star Satellite was using prerecorded,

abandoned telemarketing calls.  Therefore, neither party is entitled

to partial summary judgment on this aspect of Count IV.

> 5. <u>Count V</u>

Count V is the first of two claims brought by the Plaintiff

States for violations of TCPA.  Count V alleges in pertinent part:

> DISH Network, either directly or indirectly as a result of a
> third party acting on its behalf, has violated 47 C.F.R. §
> 64.1200(c)(2) and 47 U.S.C. § 227(c), by engaging in a
> pattern or practice of initiating telephone solicitations to
> residential telephone subscribers, including subscribers
> in California, Illinois, North Carolina, and Ohio whose
> telephone numbers were listed on the National Do Not
> Call Registry.

<u>Second Amended Complaint</u>, ¶ 72.  The Plaintiff States further

allege that Dish's violations were willful and knowing.  <u>Second

Amended Complaint</u>, ¶ 73.  Count V contains two parts: (1) Dish

allegedly engaged in a pattern or practice of making telemarketing

calls to residents of the Plaintiff States who registered their

residential telephone numbers on the Registry; and (2) Retailers

acting on Dish's behalf allegedly engaged in a pattern or practice of

making telemarketing calls to residents of the Plaintiff States who registered their residential telephone numbers on the Registry.[24] Dish again agrees that the Telemarketing Vendors were acting on its behalf.  Dish disputes that the Retailers were acting on its behalf.

### a. Dish and Telemarketing Vendors' Calls

The TCPA and the FCC Rule prohibits telemarketing calls to "residential telephone subscribers" who have placed their telephone numbers on the Registry.  47 C.F.R. § 64.1200(c)(2).  The FCC Rule further directs sellers and telemarketers to honor the registration on the Registry until the number is removed by the telephone subscriber or the administrator of the Registry.  Thus, the FCC Rule requires the registrant to be a residential telephone subscriber, and requires the sellers and telemarketers to honor the registration as long as the number remains on the Registry.

The Plaintiffs have presented evidence that Dish and the Telemarketing Vendors engaged in a pattern or practice of making outbound telemarketing calls for Dish products and services to

---

[24] The Plaintiff States do not seek partial summary judgment on the claims that Dish acted knowingly and willfully.  Motion 341, at 167 n.16.

residents of the Plaintiff States whose telephone numbers were on

the Registry.  Dish and the Telemarketing Vendors engaged in a

nationwide pattern or practice of making outbound telemarketing

calls, and millions of those calls were directed to numbers that were

on the Registry.  Dish is the third largest pay-TV provider in the

United States, with over 14 million subscribers as of December 30,

2012.  <u>DSUF</u> ¶1.  The 2007-2010 call records show that Dish made

approximately 134,295,177 telemarketing calls during that period

throughout the nation.  <u>Yoeli July 19, 2012 Report DX 197</u>, ¶ 19(g).

The nationwide pattern and practice necessarily included calls

directed to residents of the Plaintiff States.   No evidence indicates

that Dish prohibited or restricted its telemarketers or the

Telemarketing Vendors from directing calls to the residents of the

Plaintiff States.[25]

Furthermore, the United States established in Count I that

Dish and the Telemarketing Vendors made millions of outbound

telemarketing calls to telephone numbers on the Registry as part of

this nationwide pattern and practice of telemarketing.  The evidence

---

[25] Some evidence in the record indicates that Dish, on occasion, temporarily avoided directing
telemarketing calls to residents of certain states.  <u>See Bangert Deposition DX 12</u>, at 164.  No evidence
indicates that Dish avoided directing telemarketing calls to residents of the Plaintiff States.

further shows that thousands of those calls were directed to telephone numbers with area codes associated with the Plaintiff States.  Taylor November 6, 2013 Report PX 28, at 10, Table 3a; Plaintiffs' Initial Exhibits (d/e 342), PX 298, Supplemental Rebuttal Report of John T. Taylor dated November 18, 2013, at 3 Table 3b. The Plaintiff States have established for purposes of Count V that Dish and the Telemarketing Vendors engaged in a pattern or practice of nationwide outbound telemarketing to numbers on the Registry, which necessarily included a pattern or practice of making such calls to residents of the Plaintiff States.

Issues of fact, however, exist regarding whether the calls were made to residential subscribers.  Dish's expert Dr. Robert Fenili opined that in 2011 over 50 percent the Registry were wireless numbers and 28 percent were residential landline numbers.  Dish Initial Exhibits (d/e 348), DX 189, Expert Report of Dr. Robert N. Fenili dated July 26, 2012, at 10 Table 1b.  When viewed favorably to Dish, this evidence could indicate that calls at issue to numbers on the Registry were more likely than not made to wireless phones rather than residential subscribers.

Several factors, however, could lead a finder of fact to find that Dish and its Telemarketing Vendors made telemarketing calls to residential telephone subscribers. Dish representatives testified in depositions that Dish scrubbed wireless numbers from the pool of possible telephone numbers when it formulated calling lists. See Davis Deposition DX 170, at 238-39; Dexter Deposition DX 217, at 50.

Dish's decision to scrub wireless numbers is understandable. The TCPA generally prohibits using autodialing equipment to call wireless telephones. 47 U.S.C. § 227(b)(1)(A)(iii).[26] Dish used autodialing equipment to make telemarketing calls. See Montano Deposition PX 14, at 41, 114. Thus, Dish was required to remove wireless telephone numbers from its call lists.

Because Dish scrubbed wireless numbers from its calling lists, a fact finder could conclude that the number of wireless numbers on the Registry was immaterial because Dish did not call those types of numbers. After excluding wireless numbers, Dr. Fenili opined that residential numbers made up the majority of the remaining numbers on the Registry. A fact finder could conclude

---

[26] This section of the TCPA is not at issue in this case.

from this evidence that it was more likely than not that Dish's telemarketing calls to numbers on the Registry were directed to residential telephone subscribers.

The PossibleNOW analyses of samples from the calling records would also support this interpretation of the evidence. PossibleNOW identified less than 10 percent of the sample of Dish 2007-2010 call records as wireless phone numbers, and identified 68 percent of the numbers as residential numbers.

Dish argues that the Plaintiff States cannot use area codes to prove that calls were directed at the residents of that State.  Dish cites technological developments that tend to disassociate telephones from an area code's assigned geographic area, specifically, the portability of numbers, the portability of wireless telephones, and the fact that VoIP numbers may have area codes that are not associated with the physical location of the phone.

Dish's argument is not persuasive. The TCPA authorizes the states to bring actions when a seller engages in a pattern or practice of making calls to state residents that violate TCPA.  47 U.S.C. § 227(g).  It is beyond dispute that Dish and the Telemarketing Vendors engaged in a pattern or practice of placing

calls nationally, including the Plaintiff States.  At a minimum, the Plaintiff States can bring this action to stop the ongoing pattern or practice, assuming they can prove the other elements of their Count V claim.

Dish's argument about area codes is more appropriate in evaluating the issue of damages or civil penalties.  Each Plaintiff State will bear the burden of establishing the appropriate amount of actual damages or civil penalties for calls to each state's residents. Dish's arguments about area codes may be relevant to evaluating the extent to which each Plaintiff State can meet this burden.  The Court notes that Dish presents no evidence of the number of phones or the percentage of phones that are no longer in the geographic area assigned to the number's area code, so the quantitative effect of these technological changes is somewhat speculative at this time.  Also, the portability of wireless phones may be affected by Dish's practice of scrubbing wireless numbers from its calling lists.  Still, the technological changes exist and affect the connection between a telephone number's area code and the geographical location of the phone.  This evidence may be relevant in evaluating the issue of damages or civil penalties.  The

nationwide pattern and practice of Dish's telemarketing campaigns, however, is beyond dispute.  Those practices included calling the residents of the Plaintiff States.  That fact is also beyond dispute.

The Plaintiffs argue Dish's evidence of the effect of technological changes on area codes should not be considered for any purpose.  The Plaintiffs argue that the Plaintiff States' Attorneys General can sue on behalf of a holder of a telephone number that is associated with the Plaintiff State, and so, can sue on behalf of any person who has a telephone number with an area code assigned in the State.  The Court disagrees.  The TCPA authorizes a State Attorney General to sue on behalf of the residents of his or her State.  47 U.S.C. § 227(g)(1).  A Colorado resident who has a phone with an area code assigned to California is not a California resident.  The Attorney General of California cannot sue on behalf of that person.  Each State Plaintiff Attorney General can only sue on behalf of the residents of his or her State.

The Plaintiff States therefore bring this action to stop the pattern or practice of illegal calling, and can recover civil penalties and other appropriate remedies for illegal telemarketing calls made to the residents of their respective States.  Evidence that a phone

number with a given area code sometimes may not be located in the geographical area assigned to that area code, therefore, may be relevant to the issue of remedies.

The Plaintiffs also argue that the FCC established a presumption that calls to wireless phones were calls to residential telephone subscribers.  Thus, any Dish argument about calls to wireless numbers is irrelevant under TCPA.  The Court again disagrees.  The FCC stated in the FCC Report and Order that it would presume that wireless numbers registered on the Registry were registered to residential telephone subscribers.  The FCC, however, also said that "Such a presumption, however, may require a complaining wireless subscriber to provide further proof of the validity of that presumption should we need to take enforcement action."  FCC Report and Order, at ¶36.  The FCC stated that the complainant still bore the burden to prove that the wireless number was used as a residential telephone number.  The FCC did not create an evidentiary presumption.  The FCC created an administrative presumption that would allow wireless phone users to register on the Registry, but the complaining registrant would still need to show that the phone was used for residential purposes.

So it is here.  The Plaintiff States must prove that the calls were directed to residential telephone subscribers.  As explained above, a finder of fact could find Dish directed its calls to residential subscribers, but the evidence that could support that conclusion only creates an issue of fact for trial.

 b. Retailer Calls to Numbers on the Registry

The Order Entry Retailers JSR and Satellite Systems also engaged in a pattern or practice of nationwide telemarketing.  Dish referred to the Order Entry Retailers as "National Sales Partners." The Retailer Agreements authorized Order Entry Retailers to market Dish products and services throughout the nation.  E.g., Retailer Agreement PX 152, § 3.2.  Dish representatives Ahmed and Mills both testified that the Order Entry Tool allowed Retailers to market services nationally.  Walter Myers of Star Satellite explained that Order Entry Retailers sold Dish products and services nationally. Ahmed Deposition PX 88, at 20-21; Mills Deposition DX 156, at 20; Myers Deposition PX 92, at 80-83.  The calling records collected by the Plaintiffs show that Order Entry Retailers made millions of calls throughout the country, and further, show many raw hits to numbers on the Registry.  See Defendants Initial Exhibits (d/e 348),

DX 187, <u>United States' Responses to Dish's First Set of</u>

<u>Interrogatories Directed to the United States, Answer to</u>

<u>Interrogatory 1</u>, at 6-9 (summary of raw hit calls by Dish and Order

Entry Retailers).  The Plaintiffs further have established in Count I

that Satellite Systems made hundreds of thousands and JSR made

millions of Dish telemarketing calls to telephone numbers that were

on the Registry.  As with Dish and the Telemarketing Vendors, the

Order Entry Retailers engaged in a pattern or practice of calling

numbers on the Registry nationwide, which includes the Plaintiff

States.  Dish's argument about area codes, again, may be relevant

to the question of the amount of civil penalties or other remedies,

but not to the question of the pattern or practice of the Order Entry

Retailers' telemarketing calls.

Issues of fact exist with respect to whether the Retailers called

residential telephone subscribers within the Plaintiff States.  Again,

the TCPA prohibits calls to residential subscribers whose telephone

numbers are on the Registry.  Dr. Fenili opined that more than half

of the numbers on the Registry were wireless numbers.

PossibleNOW's analysis of Dr. Yoeli's samples from the Dish

Retailers JSR, Star Satellite, and Dish TV Now showed very few

telephone calls to identified wireless numbers.  A trier of fact could find that PossibleNOW's analysis of the samples, when viewed in light of the other evidence noted, made it more likely that the Order Entry Retailers made telemarketing calls to the telephone numbers of residential telephone subscribers whose telephone numbers were on the Registry at the time of the calls.  A trial is necessary to resolve these factual issues.

In addition, the Plaintiff States must show that the Retailers had an agency relationship with Dish in order to show that the Retailers acted on behalf of Dish.  See May 9, 2013 Order, 28 FCC Rcd. at 6583.  As explained earlier, issues of fact exist regarding whether the authorized retailers were agents of Dish.

c. Safe Harbor Defense

Dish is also not entitled to the safe harbor defense in the FCC Rule.[27]  As with the TSR safe harbor, the FCC safe harbor requires the seller to have written procedures for compliance.   47 C.F.R. § 64.1200(c)(2)(i)(A).  Dish has produced no written procedures for

---

[27] The FCC Rule safe harbor only relates to calls to numbers on the Registry.  47 C.F.R. § 64.1200(c)(2).  The FCC Rule safe harbor is not relevant to any other claim in this case.

how Dish selected the telephone numbers for its calling lists to ensure that it honored the Registry.

The FCC Rule safe harbor also requires the party seeking the safe harbor to purchase access to the Registry "from the administrator of the national database."  47 C.F.R. § 64.1200 (c)(2)(i)(E).  In 2008, Dish stopped acquiring the updated versions of the Registry from the administrator, the FTC.  Dish started acquiring the updated Registry from PossibleNOW, in violation of this requirement of the FCC Rule safe harbor.  Dish is not entitled to a safe harbor defense in Count V.

The Court, therefore, finds pursuant to Federal Rule of Civil Procedure 56(g) that Dish, the Telemarketing Vendors, and the Order Entry Retailers JSR and Satellite Systems engaged in the pattern or practice of making telemarketing calls for Dish products and services to residents of the Plaintiff States whose numbers were on the Registry.  The Court further finds that Dish is not entitled to the safe harbor defense under the FCC Rule and the TCPA.  Summary judgment is otherwise not appropriate on Count V.

6. Count VI

Count VI alleges, in pertinent part:

DISH Network, either directly or indirectly as a result of a third party acting on its behalf, has violated 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(B), by engaging in a pattern or practice of initiating telephone solicitations to residential telephone lines, including lines in California, Illinois, North Carolina, and Ohio, using artificial or prerecorded voices to deliver a message without the prior express consent of the called party and where the call was not initiated for emergency purposes or exempted by rule or order of the Federal Communications Commission under 47 U.S.C. § 227(b)(2)(B).

Second Amended Complaint, ¶ 76. The Plaintiff States further allege that Dish's violations were willful and knowing. Second Amended Complaint, ¶ 77.

The issues of fact that exist in Count V also exist in Count VI: whether the prerecorded calls were directed to residential telephone subscribers; and whether Retailers were agents of Dish. The evidence shows that Dish, the Telemarketing Vendors, and Order Entry Retailers Dish TV Now and Star Satellite engaged in a nationwide pattern or practice of making prerecorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff States. Dish's argument about area codes may again be relevant to the appropriate measure of damages or civil penalties. Dish has no safe harbor defense. The FCC Rule

does not provide a safe harbor defense to making illegal prerecorded calls.  47 C.F.R. § 64.1200(c)(2).

One additional issue of fact arises in Count VI.  Dish made 98,054 prerecorded outbound telemarketing calls as part of 15 automessage campaigns.  The FCC Rule contained an Established Business Relationship exemption at the time that these calls were made.  Dish raises this Established Business Relationship exemption as an affirmative defense to Count VI at least with respect to the Dish automessage campaigns.  Dish does not show that the telephone numbers called in the automessage campaign were on the list of telephone numbers for which Dish had an Established Business Relationship that Dish provided in discovery.  Rather, Dish cites the text of the calls in those campaigns.  The texts of those prerecorded calls indicated that the calls were directed to existing Dish customers.  The apparent discrepancy between the Dish Established Business Relationship list produced in discovery and the text of the prerecorded messages creates an issue of fact regarding whether Dish had an Established Business Relationship with the recipients of these calls.  Given the issues of fact, summary judgment is not appropriate for Count VI.

Page 213 of 238

7. <u>Counts VII Through XII</u>

Counts VII through XII allege separate claims for violations of specific State Do-Not-Call Laws and consumer protection laws.  All of these claims rely on area codes to establish whether the calls were made to residents or telephones in each State.  The nationwide nature of the calling pattern of Dish, the Telemarketing Vendors, and the Order Entry Retailers, along with the area code evidence, establishes that calls at issue were made to residents of the Plaintiff States.  The use of area codes raises the same issues of fact with respect to proof of the appropriate level of damages and civil penalties that exist in Counts V and VI discussed above.  The Court again rejects the Plaintiffs' argument that any phone with an area code assigned to a geographic area within the State makes that telephone subject to that State's Do-Not-Call Laws.  Each law applies to the residents of the particular State.  The Plaintiffs, therefore, are entitled to a finding at summary judgment on these claims that calls at issue were made to residents of the Plaintiff States.  Issues of fact remain regarding the number of calls and the appropriate level of damages or civil penalties.

Dish raises additional grounds for seeking summary judgment on these claims.  The Court addresses Dish's additional arguments for each of these Counts separately below.  All of Dish's arguments for summary judgment fail.

a. Count VII

Count VII alleges a claim under the California Do Not Call Law.  Cal. Bus. & Prof. Code § 17592(c).  Section 17592(c) provides, in relevant part, "no telephone solicitor shall call any telephone number" on the Registry.  Dish first argues that the Plaintiffs must show that Dish called the person who registered the telephone number.  This is incorrect.  The statute prohibits calling the number on the Registry.  The identity of the holder of the number at the time of the call is not an element of the prohibited conduct.

Dish also argues that it is entitled to summary judgment on the safe harbor in the California law.  Section 17593(d) states that, "It shall be an affirmative defense to any action brought under this article that the violation was accidental and in violation of the telephone solicitor's policies and procedures and telemarketer instruction and training."  Cal. Bus. & Prof. Code § 17593(d).  Dish has presented sufficient evidence to raise this defense at trial, but

all of the evidence, when viewed favorably to the Plaintiffs, creates an issue of fact on this defense. Dish called millions of numbers on the Registry, including hundreds of thousands of numbers with California area codes. Dish personnel testified about Dish's procedures to scrub calling lists and to train personnel, but Dish failed to produce any written procedures. Some evidence also indicates that Dish knew that some of its Retailers were violating the Do-Not-Call Laws, but Dish continued to do business with them. This evidence may show that Dish, in fact, did not oppose telemarketing in violation of the Do-Not-Call Laws. This conflicting evidence creates an issue of fact on the California statutory defense.

Dish also argues that California's claim under § 17592 is subject to a one-year statute of limitations. This is incorrect. Section 17592 is in Chapter 1 of the California Business and Professional Code, entitled "Advertising." Section 17536(a) authorizes the state to recover a civil penalty of $2500 for each violation of any provision of Chapter 1. Cal. Bus. & Prof. Code, § 17536(a). California is seeking civil penalties under § 17536(a). Second Amended Complaint, at 26 Prayer for Relief ¶ 9. Actions brought under § 17536 are subject to a three-year statute of

limitations.  Cal. Civ. Proc. Code § 338(h).  Count VII is subject to a

three-year statute of limitations.  The claim extends back to March

25, 2006, three years before this case was filed on March 25, 2009.

      b. Count VIII

Count VIII alleges a claim for unfair competition under the

California Business and Professional Code § 17200.  Section 17200

defines unfair competition as practices that are unlawful, or unfair,

or fraudulent."  Acts that violate some other law are "unlawful" and

so violate § 17200.  See Davis v. HSBS Bank Nevada, N.A., 691 F.3d

1152, 1168 (9th Cir. 2012).  The other statutes violated are referred

to as "borrowed" statutes.  Id.  In this case, the Plaintiffs allege Dish

violated the TCPA as alleged in Counts V and VI, § 17592(a) as

alleged in Count VII, and California Civil Code § 1770(a)(22)(A).

Second Amended Complaint, ¶ 82.  Section 1770(a)(22)(A) prohibits

using prerecorded messages in telephone calls unless a live person

first speaks, identifies the source of the call, and secures consent

from the call recipient to listening to the recording.

Dish raises by reference its arguments challenging Counts V,

VI, and VII.  Those arguments create issues of fact as discussed

earlier.  Dish makes no separate argument for why it is entitled to

summary judgment on the allegations that it made prerecorded calls in violation of § 1770(a)(22)(A).  The Court sees no basis for any such argument, except for the issue of fact regarding the appropriate amount of civil penalties created by the Plaintiffs' reliance on area codes as proof.

Dish also argues that Count VIII is subject to a one-year statute of limitation.  This is incorrect.  California's unfair competition statute contains a four-year statute of limitations.  Cal. Bus. & Prof. Code § 17208.  The California Supreme Court has determined that this four-year statute applies even if claims brought directly under the underlying borrowed statute are subject to a shorter statute of limitations.  Cortez v. Purolator Air Filtration Products Co., 23 Cal. 4th 163, 168, 999 P.2d 706, 716 (Cal. 2000). The claim in Count VIII extends back to March 25, 2005, four years before the filing of the original Complaint in this case.

### c. Count IX

Count IX alleges violations of North Carolina's Do-Not-Call Law that prohibits a telephone solicitor from making a telemarketing call to a telephone subscriber's telephone number that appears on the Registry.  N.C. Gen. Stat. § 75-102(a).  The

term "telephone solicitor" means an individual or entity that makes

telemarketing calls "directly or through salespersons or agents."

N.C. Gen. Stat. § 75-101(10).  The term "telephone subscriber"

means an individual who subscribes for residential telephone

service from a carrier, including a wireless carrier.  N.C. Gen. Stat.

§ 75-101(11).  Section 75-102 also requires telephone solicitors to

implement systems and written procedures to prevent making

telemarketing calls to numbers on the Registry.  N.C. Gen. Stat. §

75-102(d).  Count IX alleges a violation of this provision also.

Dish asserts that its arguments for summary judgment on

Counts V and VI apply here because the Plaintiffs cannot show the

calls were made to the person who placed the number on the

Registry and because the Plaintiffs cannot prove the call recipient

was a residential subscriber.  As the Court explained earlier, the

evidence could support a finding that the telemarketing calls were

made to residential subscribers.  The question of whether the calls

were directed to residential subscribers is an issue of fact.

The Court rejects Dish's argument that the call must be placed

to the person who registered the number.  The statute makes it a

violation to call "a telephone subscriber's telephone number if the

telephone subscriber's number appears on the latest edition" of the Registry.  N.C. Gen. Stat. § 75-102(a).  Calling the number of a person is the violation, not calling the person who registered the number on the Registry.  The Plaintiffs' proof that the calls were made to numbers on the Registry establishes this issue.  The question of whether the calls were made to residential subscribers, however, remains.  Summary judgment on Count IX in not appropriate.

### d. Count X

Count X alleges violations of N.C. Gen Stat. § 75-104 which prohibits any person from using autodialing equipment to make prerecorded calls.  Dish makes the same arguments that it made with respect to Count IX.  The Court's analysis of those arguments applies to Count X, except that the argument that § 75-104 does not impose liability on Dish for the acts of Retailers merits some additional consideration.

Dish argues that § 75-104 does not impose liability for third parties such as the authorized retailers.  Section 75-104 states that "no person may use automatic dialing and recorded message player to make an unsolicited telephone call."  N.C. Gen. Stat. § 75-104(a).

The statute defines "person" as "an individual, business establishment, business, or other legal entity."  N.C. Gen. Stat. § 75-101(7).  Dish argues that § 175-104 only discusses the actions of the "person" and does not impose any duty to control the actions of any third party or any liability for the actions of any third party.

After careful consideration, the Court disagrees with Dish's position.  The enforcement provision of the North Carolina Do-Not-Call Law authorizes a private cause of action for an illegal "solicitation from or on behalf of a telephone solicitor."  N.C. Gen. Stat. § 75-105(b).  This language would allow a private cause of action against Dish for the acts of its agents.  The statute also authorizes the North Carolina Attorney General to bring an enforcement action.  N.C. Gen. Stat. § 75-105(a).  The North Carolina Court of Appeals has ruled in the context of a consumer protection statute that the North Carolina Attorney General can bring an enforcement action against the same parties that a private party could sue.  State ex. rel. Easley v. Rich Food Services Inc., 139 N.C. App. 691, 697-98, 535 S.E.2d 84, 88-89 (N.C. Ct. App. 2000) (attorney general could bring a deceptive business practices case against the assignee of a consumer loan for the deceptive

business practices of the assignor because the consumer borrower could assert such claims under North Carolina law). This reflects the general principle to interpret remedial statutes broadly to promote the purpose of those acts. See O& M Indus. v. Smith Engineering Co., 360 N.D. 263, 268, 624 S.E.2d 345, 348 (N.C. 2006).

In light of the remedial purposes of the North Carolina Do Not Call Law and the principle set forth in the Easley decision, this Court concludes that Dish would be liable under § 75-104 for the acts of its agents, including any Retailers that were its agents. As explained earlier, issues of fact exist regarding whether the Retailers were Dish's agents. Summary judgment is not appropriate in Count X.

e. Count XI

Count XI alleges a violation of the Illinois Automatic Telephone Dialers Act (IATDA), 815 ILCS 305/1 et seq. Section 305/30 states that it is a violation "to play a prerecorded message placed by an autodialer without the consent of the called party." 815 ILCS 305/30(b). The IATDA imposes liability on persons that "make or cause to be made" illegal autodialer calls. See 815 ILCS 305/30(a).

The IATDA contains an Established Business Relationship exemption for "calls made to any person with whom the telephone solicitor has a prior or existing business relationship."  815 ILCS 305/20(a)(2).

Dish asserts an Established Business Relationship defense for all of the automessage campaign calls that it made.  As explained earlier, the texts of the automessage campaigns indicate that the calls were intended for existing Dish customers, but Dish does not claim that the call recipients were on its list produced in discovery of customers with which Dish had an Existing Business Relationship.  This apparent inconsistency in the evidence creates an issue of fact regarding whether the calls were made to customers with which Dish had an Established Business Relationship.

Dish's potential liability for the acts of the Retailers turns on whether Dish caused them to send prerecorded calls through autodialers.  The parties have not fully addressed whether Illinois would adopt the FTC's interpretation of "cause" in the TSR when interpreting the IADTA.  Cf. Laughlin v. Evanston Hosp., 133 Ill.2d 374, 392-93, 550 N.E.2d 986, 994 (Ill. 1990) (Consideration given to FTC interpretation of FTC Act §5(a) when interpreting the Illinois

Consumer Fraud Act.).  The Court, therefore, will not address at this time whether Dish caused Retailers Dish TV Now and Star Satellite to make the prerecorded calls at issue that were directed to Illinois residents as part of these nationwide campaigns.

Dish's arguments regarding area codes again are relevant to the issue of the appropriate monetary remedies.  Given the monetary remedies issues, the issues of fact regarding Dish's Existing Business Relationship defense, and the remaining legal issue on the meaning of cause under the IADTA, summary judgment is not appropriate for Count XI.

f. Count XII

Count XII alleges a violation of the Ohio Consumer Sales Protection Act.  The Ohio Act prohibits unfair, deceptive and unconscionable consumer sales practices.  Ohio Rev. Code §§ 1345.02 and 1345.03.  Dish argues that proof of a violation of the federal Do Not Call Laws is insufficient to prove that Dish committed an unfair, deceptive, and unconscionable consumer sales practice under the Ohio Act.  Dish is incorrect.  Ohio Courts have held that failing to record a do-not-call request on an internal do-not-call list and failing to honor a prior do-not-call request were

unfair and deceptive practices in violation of the Ohio Act.  <u>Charvat v. NMP, LLC.</u>, 656 F.3d 440, 451 (6th Cir. 2011) and cases cited therein.  The Plaintiffs have presented evidence that Dish called numbers nationwide that were on its internal do-not-call list, which would include numbers in Ohio.[28]  In light of this evidence, summary judgment is not appropriate on this Count.

C. <u>REMEDIES</u>

The Plaintiffs ask for an injunction at this time, and the United States asks the Court to find that Dish knowingly violated § 5(a) the FTC Act and is liable for civil penalties.  The United States does not ask the Court to determine the amount of civil penalties.  Motion 341, at 134-38, 151.   The Plaintiff States ask the Court to award statutory damages and injunctive relief under the TCPA in Counts V and VI.  Motion 341, at 167-68.  California, Illinois, and North Carolina also ask for civil penalties and injunctive relief under Counts VII through VI.  Dish asks for summary judgment on all remedies.

---

[28] The Court does not mean to indicate that the claim under the Ohio Act is limited to these calls made by Dish.  The evidence presented at trial may show other violations.  The Court is only deciding that this evidence is enough to preclude summary judgment in favor of Dish.

### a. Liability for Penalties under FTC Act § 5(m)

The Court denies summary judgment on the issue of Dish's liability for civil penalties under FTC Act § 5(m), 45 U.S.C. § 45(m). Section 5(m) authorizes civil penalties for knowing violations of an FTC rule respecting unfair and deceptive acts or practices.  A person commits a knowing violation if, under the circumstances, a reasonable, prudent person would have known of the existence of the rule and that his or her acts or practices violated the rule. United States v. National Financial Services, Inc., 98 F.3d 131, 139-40 (4th Cir. 1996); S. Conf. Rep. 93-1408, 93d Cong., 2d Sess., 7772 (1974).

Issues of fact exist regarding whether a reasonable prudent person would have known that Dish was violating the TSR.  The evidence of Dish's conduct is a hodgepodge of efforts to comply with the TSR and actions to look away and ignore violations.  The Court must view the evidence in the light most favorable to the non-moving party.  Each side can point to evidence to support its position.  Under these circumstances, the Court concludes that the trier of fact should decide the question.

The Court notes that the question of whether Dish acted knowingly also turns on issues of liability that have not been decided.  In particular, the United States must demonstrate an agency relationship between Dish and the Retailers in order to establish Dish's liability for calling telephone numbers on Retailers' internal do-not-call lists, and for the Retailers' calls to telephone numbers on Dish's internal do-not-call lists.  Under these circumstances, the Court will not enter summary judgment on the issue whether Dish knowingly violated the TSR.

### b. Civil Penalties under Counts V through XII

The Plaintiff States and Dish both seek summary judgment on the issue of civil penalties in Counts VII though XI.  Issues of fact in all of these Counts preclude summary judgment on this issue.  The Plaintiff States must prove an agency relationship between Dish and the Retailers to establish Dish's liability for the actions of the Retailers.  In all of these Counts, the issue of technological changes that have reduced the link between area codes and geography must be considered to determine the appropriate amount of civil penalties that the Plaintiff States can prove.  Counts V and VI under the TCPA also allow the Court to treble statutory award of up to $500

per violation if Dish acted knowingly or willfully.  The Plaintiff States do not seek summary judgment on the question of whether Dish acted knowingly.  Other issues of fact in certain of the state law Counts must also be resolved before liability can be established.

Dish also seeks summary judgment on civil penalties in Count XII.  Issues of fact, however, remain regarding liability on Count XII. A ruling on remedies in Count XII, thus, would be premature.  A ruling on civil penalties, or any other monetary remedies, in the Counts V through XII is not appropriate at summary judgment.

c. Injunctive Relief

This Court concludes that a hearing is necessary before the Court will award any injunctive relief.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Court to issue a permanent injunction in the proper case.  The TCPA similarly authorizes the Plaintiff States to seek injunctive relief to stop violations of that act. 47 U.S.C. § 227(g).

To prove a claim for a statutory injunction, the Plaintiffs must demonstrate a violation and "some reasonable likelihood of future violations."  Commodity Futures Trading Commission v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979).  "Past misconduct does not lead

necessarily to the conclusion that there is a likelihood of future misconduct, it is 'highly suggestive of the likelihood of future violations.'" Hunt, 591 F.2d, at 1220 (quoting S.E.C. v. Management Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1977)). This Court "has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 132, 89 S. Ct. 1562, 1581, 23 L. Ed. 2d 129 (1969) (quoting N.L.R.B. v. Express Pub. Co., 312 U.S. 426, 435 (1941).

In this case, issues of fact exist that could affect the scope of any injunctive relief.  Issues of fact exist regarding the scope of Dish's liability.  In particular, issues of fact exist regarding whether Dish had an agency relationship with the Retailers.  Issues of fact also exist regarding whether Dish committed some or all of the violations knowingly.  These issues should be resolved before the Court crafts any equitable relief.

The Plaintiffs also seek a significant mandatory injunction that would affect much of Dish's ongoing business practices.  A hearing

is appropriate to determine the propriety and scope of any such mandatory relief.  The Court will not decide that appropriate equitable relief, if any, at this juncture.

D. CERTIFICATION FOR INTERLOCUTORY APPEAL

This Court is directed to certify an interlocutory order, such as this Opinion, for immediate appeal if this Court is, "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  In this case, the Court believes that the question of whether this Court must follow the principle of Auer deference and defer to the FTC's interpretation of the word "cause" in the TSR is a controlling question of law as to which a substantial ground for difference of opinion now exists.  Judge Scott found that this matter was settled in 2009.  Opinion 32, at 4-6.  The subsequent decisions of the Supreme Court in Christopher and Decker, and in particular, Chief Justice Roberts concurrence in Decker show that the Auer deference doctrine is a question of law as to which substantial

grounds for difference of opinion exists.  See Tice v. American Airlines, Inc., 373 F.3d 851, 854 (7th Cir. 2004).

The Court, however, finds that resolution of this question on interlocutory appeal will not substantially further this litigation. The Court of Appeals is similarly obligated to follow the Supreme Court majority's decision in Decker that reaffirmed Auer deference. Agostini v. Felton, 521 U.S. at 237-38.  An interlocutory appeal to the Seventh Circuit would not resolve the question of the viability of the Auer deference doctrine.  Such an appeal would not substantially further the resolution of the litigation.  This Court, therefore, will not certify this issue for interlocutory appeal.

## CONCLUSION

WHEREFORE Plaintiffs' Motion for Summary Judgment (d/e 341/402) and Defendant Dish Network L.L.C.'s Motion for Summary Judgment (d/e 346) are ALLOWED in part and DENIED in part, as follows:

Count I

The Plaintiff United States is entitled to partial summary judgment establishing Dish's liability with respect to the following outbound telemarketing calls for Dish products and services: (1)

calls to telephone numbers on the National Do-Not-Call Registry, (a)1,707,713 calls on the 2007-2010 Dish call records, and (b) 2,386,386 calls that Dr. Yoeli determined were made to numbers on the Registry which Dish failed to dispute with any evidence; (2) 2,349,031 calls that Dish Retailer JSR made to numbers on the Registry; and (3) 381,811 calls that Dish Retailer Satellite Systems Network made to numbers on the Registry.  The United States is further entitled to partial judgment that Dish is not entitled to the safe harbor defense under the TSR.  Issues of fact preclude summary judgment for either party with respect to remedies for Dish's partial summary judgment liability under Count I or with respect to any other issue related to Count I.

Count II

The Plaintiff United States is entitled to partial summary judgment establishing Dish's liability with respect to the following outbound telemarketing calls for Dish products and services: (1) 903,246 calls to persons whose telephone numbers were on Dish's internal do-not-call list at the time of the call; and (2) 140,349 calls to numbers marked "DNC" by Dish Telemarketing Vendor eCreek. The United States is further entitled to partial judgment that Dish

is not entitled to the safe harbor defense under the TSR.  Issues of
fact preclude summary judgment for either party with respect to
remedies for Dish's partial summary judgment liability under Count
II or with respect to any other issue related to Count II.

Count III

The Plaintiff United States is entitled to partial summary
judgment establishing Dish's liability with respect to the following
prerecorded outbound telemarketing calls for Dish products and
services that constituted abandoned calls under the TSR: (1) 98,054
prerecorded calls made by Dish; (2) 43,100,876 prerecorded calls
made at the direction of Dish Retailer Star Satellite Network; (3)
6,637,196 prerecorded calls made at the direction of Dish Retailer
Dish TV Dish TV Now; and (1) one prerecorded call made by Dish
Retailer American Satellite, Inc.  Issues of fact preclude summary
judgment for either party with respect to remedies for Dish's
liability under Count III.

Count IV

The Defendant Dish is entitled to partial summary judgment
on that portion of Count IV that alleges that Dish provided
substantial assistance or support to Retailer Dish TV Now even

though Dish knew or consciously avoided knowing that Dish TV Now was making prerecorded calls that constituted abandoned calls under the TSR.  Issues of fact preclude summary judgment for either party on any other issue related to Count IV.

Count V

The Plaintiff States are entitled to a finding under Rule 56(g) that: (1) Dish engaged in a pattern or practice of making outbound telemarketing calls for Dish products and services to residents of the Plaintiff States whose telephone numbers were on the Registry as reflected in the 2007-2010 Dish call records; and (2) Dish Retailers:  JSR and Satellite Systems engaged in a pattern or practice of making outbound telemarketing calls for Dish products and services to residents of the Plaintiff States whose telephone numbers were on the Registry.   The Plaintiff States are also entitled to partial summary judgment that Dish is not entitled to a safe harbor defense under the TCPA and FCC Rule.  Issues of fact preclude summary judgment for either party on any other issue related to Count V.

Count VI

The Plaintiff States are entitled to findings under Rule 56(g) that: (1) Dish engaged in a pattern or practice of making prerecorded outbound telemarketing calls for Dish products and services to residents of the Plaintiff states; and (2) Dish Retailers: Dish TV Now and Star Satellite engaged in a pattern or practice of making prerecorded outbound telemarketing calls for Dish products and services to residents of the Plaintiff states.  Issues of fact preclude summary judgment for either party on any other issue related to Count VI.

Counts VII

The State of California is entitled to a finding under Rule 56(g) that Dish made outbound telemarketing calls for Dish products and services to telephone numbers of California residents at a time when the numbers were on the Registry as reflected in the 2007-2010 Dish call records.  Issues of fact preclude summary judgment for either party on any other issue related to Count VII.

Count VIII

The State of California is entitled to findings under Rule 56(g) that: (1) Dish made outbound telemarketing calls for Dish products

and services to telephone numbers of California residents at a time when the numbers were on the Registry as reflected in the 2007-2010 Dish call records; and (2) Dish made prerecorded outbound telemarketing calls for Dish products and services to telephone numbers of California residents.  Issues of fact preclude summary judgment for either party on any other issue related to Count VIII.

Count IX

The State of North Carolina is entitled findings under rule 56(g) that: (1)  Dish made prerecorded calls using autodialing equipment to residents of North Carolina; and (2) Dish Retailers: Dish TV Now and Star Satellite made prerecorded calls using autodialing equipment to residents of North Carolina.  Issues of fact preclude summary judgment for either party on any other issue related to Count IX.

Count X

The State of North Carolina is entitled a finding under rule 56(g) that Dish made prerecorded calls using autodialing equipment to residents of North Carolina.  Issues of fact preclude summary judgment for either party on any other issue related to Count X.

Count XI

The State of Illinois is entitled to findings under Rule 56(g) (1) that Dish made prerecorded calls using autodialing equipment to residents of Illinois; and (2) Dish Retailers: Dish TV Now and Star Satellite made prerecorded calls using autodialing equipment to residents of North Carolina. Issues of fact preclude summary judgment for either party on any other issue related to Count XI.

Count XII

Issues of fact preclude Dish's request for summary judgment of Count XII. The Plaintiffs do not seek summary judgment on Count XII.

Certification for Interlocutory Appeal

Pursuant to 28 U.S.C. § 1292(b), this Court declines Defendant Dish Network L.L.C.'s request for a certification of the question of Auer deference for immediate interlocutory appeal.

Status Conference

The Court sets this matter for a status conference on January 9, 2015, at 10:00 a.m. to set a trial schedule. The parties may appear by telephone at this conference. The Court proposes conducting a bifurcated trial to determine remaining liability issues

first, including any additional liability under Counts I, II, and III for calls for which the Plaintiff United States did not seek partial summary judgment.  The Court would then conduct a separate a trial to determine the appropriate remedies for Dish's partial summary judgment liability under Counts I, II, and III, along with any other liability that may be determined at trial.  The United States is entitled to a jury trial to determine the issue of liability on its claim for civil penalties under FTC Act § 5(m), 15 U.S.C. § 45(m). No jury demand was made for any other issue.  See Opinion entered December 9, 2010 (d/e 66) (Opinion 66), at 1. (Cudmore, J., retired).  All other matters, including the amount of civil penalties, if any, to be awarded under § 5(m), will be tried by the Court.

Enter: December 11, 2014

_____/s Sue E. Myerscough_____
UNITED STATES DISTRICT JUDGE