**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**



FILED

DEC 0 7 2015

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA and the
STATES OF CALIFORNIA, ILLINOIS,
NORTH CAROLINA, and OHIO,

      Plaintiffs,

      v.

DISH NETWORK L.L.C.,

      Defendant.

Case No. 3:09-cv-03073-SEM-TSH

## <u>PRE-TRIAL ORDER</u>

    This matter having come before the Court at a pre-trial conference held pursuant to Rule
16 of the Federal Rules of Civil Procedure and Local Rule 16.1; and

    The following counsel having appeared for the Plaintiffs:

> Lisa K. Hsiao, Patrick R. Runkle, and Sang H. Lee of the United States Department
> of Justice for the United States of America;

> Jinsook Ohta and Jon Worm of the Office of the Attorney General for the State of
> California;

> Elizabeth Blackston, Philip Heimlich, and Paul Isaac of the Office of the Attorney
> General for the State of Illinois;

> David Kirkman of the Office of the Attorney General for the State of North
> Carolina; and

> Erin Leahy and Jeffrey Loeser of the Office of the Attorney General for the State
> of Ohio.

    The following counsel having appeared for the Defendant DISH Network L.L.C.
("DISH"):

Peter A. Bicks, Elyse D. Echtman, and John L. Ewald of Orrick Herrington & Sutcliffe LLP; and

Joseph A. Boyle, Lauri A. Mazzuchetti, and Henry T. Kelly of Kelley Drye &Warren LLP.

The following action was taken:

## I.    NATURE OF ACTION AND JURISDICTION

This is an action for civil penalties, damages, and injunctive relief for violations of telemarketing laws. The jurisdiction of the Court over the federal claims arises under 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355; 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a) and 57b; and 47 U.S.C. § 227(g)(2); and over the state law claims pursuant to 28 U.S.C. § 1367. In DISH's Answer to the Third Amended Complaint, DISH denied that this Court has subject matter jurisdiction over matters for which DISH asserts the Federal Trade Commission ("FTC" or "Commission") has no enforcement jurisdiction and over claims made by the State Plaintiffs that are not brought on behalf of residents of their respective states, *see* d/e 484 at 1-3 (DISH Answer ¶¶ 1, 5-8).

## II.    STATEMENT OF THE CASE AND CLAIMS TO BE TRIED

In this action, Plaintiffs, the United States of America, acting upon notification and authorization to the Attorney General by the FTC, and the States of California, Illinois, North Carolina, and Ohio (collectively the "State Plaintiffs"), allege that DISH, acting on its own or through its retailers, made millions of telemarketing calls that violated two sets of federal telemarketing laws—the Telemarketing Sales Rule ("TSR") of the Federal Trade Commission Act, 16 C.F.R. § 310.4(b)(1)(iii)(A)-(B); § 310.4 (b)(1)(iv); § 310.3(b), and the Telephone Consumer Protection Act, 47 C.F.R. § 64.1200(a)(2), § 64.1200(c)(2) and 47 U.S.C. § 227(b)(1)(B), § 227(c)—as well as telemarketing and unfair competition statutes of each

Plaintiff State. *See* Count VII (Cal. Bus. & Prof. Code §§ 17592(a)(1), 17592(c)(1)); Count VIII

(Cal. Bus. & Prof. Code § 17200); Count IX (N.C. Gen. Stat. § 75-102); Count X (N.C. Gen.

Stat. § 75-104; Count XI (815 ILCS 305/30(b) and 815 ILCS 505/2Z); Count XII (OH Rev. Code

1345.02 and 1345.03). Plaintiffs intend to present evidence at trial on Counts I through XII and

prove the allegations in the Third Amended Complaint.

### III.     JOINT STATEMENT

#### A.     Jurisdiction

It is Plaintiffs' position that the Court has subject matter jurisdiction over the federal

claims in this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355; 15 U.S.C. §§

45(m)(1)(A), 53(b), 56(a) and 57b; and 47 U.S.C. § 227(g)(2); and over the state law claims

pursuant to 28 U.S.C. § 1367. DISH objects to subject matter jurisdiction for the reasons set forth

in its Answer to the Third Amended Complaint.

#### B.     Uncontested Issues of Material Fact

The Uncontested Material Facts agreed upon by the parties appear as Attachment A,

along with the signed stipulation by the parties. Attachment A has also been emailed to the Court

in a native format.

#### C.     Joint Statement of Contested Issues of Material Fact

The United States' Proposed Material Facts that are contested by DISH appear as

Attachment B, and the State plaintiffs' Proposed Material Facts that are contested by DISH appear

as Attachment C. DISH's Proposed Material Facts that are contested by Plaintiffs appear as

Attachment D. Plaintiffs contest DISH's facts as to accuracy and to materiality, particularly as to

those facts that the Court held to be undisputed on summary judgment, and which thus are no

longer material facts that must be adjudicated at trial. DISH objects to Plaintiffs' position on the

statements made by the Court in its summary judgment decision, which were made for the limited

purpose of summary judgment. DISH similarly contests Plaintiffs' facts as to accuracy and to materiality. Both attachments have been emailed to the Court in a native format.

### D. Uncontested Issues of Law

The Uncontested Issues of Law agreed upon by the parties appear as Attachment E and have been emailed to the Court in a native format.

### E. Joint Statement of Contested Issues of Law

Plaintiffs' Proposed Issues of Law that are contested by DISH appear as Attachment F. DISH's Proposed Issues of Law that are contested by Plaintiffs appear as Attachment G. Both exhibits have been emailed to the Court in a native format.

### F. Jury Demand

Plaintiffs have withdrawn their jury demand and the Court has set the matter for a bench trial (d/e 479).

## IV. PLAINTIFFS' ITEMIZED STATEMENTS OF DAMAGES[1]

### A. Counts I-IV: Plaintiff United States TSR Claims

Plaintiff United States is seeking injunctive relief and civil penalties. The factors set forth in the FTC Act, 15 U.S.C. §53(b) and §45(m)(1)(A), 16 C.F.R. §1.92(d) govern whether civil penalties should be awarded and what amount. Based on these factors, the United States intends to seek up to $900 million in civil penalties.

### B. Counts V-VI : All State Plaintiffs –TCPA Claims

In addition to seeking relief under their respective state statutes, *see* below, the States plaintiffs are seeking injunctive relief and damages under the TCPA, 47 U.S.C. §227. The TCPA provides for $500 per violation, and that amount may be tripled if the court finds that the

---

[1] The Statements in Section IV are made solely by Plaintiffs and are not approved in form or substance by DISH.

defendant willfully or knowingly violated the TCPA. Based on the numbers of violations the Plaintiff States expect to prove, the Plaintiff States seek the following damages amounts pursuant to the TCPA:

1. Plaintiff California seeks damages under the TCPA in Counts V and VI. California expects to prove 6,844,794 calls in violation of the TCPA. At the statutory floor of $500 per violation, damages under the TCPA total $3,422,396,790, subject to remittitur on constitutional grounds only. If damages are trebled, the maximum damages under the TCPA total $10,267,190,370.

2. Plaintiff Illinois expects to prove 3,791,430 violations of the TCPA. At the minimum statutory damages amount of $500 per violation, the damages total $1,895,715,000, subject to remittitur by the Court. If the damages are trebled, they total $5,687,145,000, subject to remittitur by the Court.

3. Plaintiff North Carolina expects to prove 1,563,991 violations of the TCPA. At the minimum statutory damages amount of $500 per violation, the North Carolina damages total would be $446,597,000, subject to remittitur by the Court. If the damages are trebled, they would total $1,339,791,000, subject to remittitur by the Court.

4. Plaintiff Ohio expects to prove 4,050,993 violations of the TCPA. At the minimum statutory damages amount of $500 per violation, the damages total $2,025,496,405 subject to remittitur by the Court. If the damages are trebled, they total $6,076,489,215 subject to remittitur by the Court.

### C.    Counts VII-VIII : California State Law Claims

Plaintiff California also seeks injunctive relief and civil penalties for violations of California Business and Professions Code § 17592 ("California Do Not Call Law") in Count VII and § 17200 in Count VIII. Under California Business and Professions Code § 17593(a)(2), the Court may impose penalties for each violation of the California Do Not Call Law of up to $11,000 for violations before February 9, 2009, and up to $16,000 after that date. Under California Business and Professions Code § 17536(b), courts may impose penalties of up to $2500 per violation of the California Do Not Call Law. For violations of California Business and Professions Code § 17200, California Business and Professions Code § 17206 provides that courts shall impose a penalty not to exceed $2500. The penalties under the above provisions are cumulative under California law, and the amount awarded is governed by the factors set forth in 15 U.S.C. § 45(m)(1)(c) and California Business and Professions Code §§ 17536(b) and 17206(b). California expects to prove 13.42 million violations of California law which would allow for maximum penalties in excess of $46 billion. In light of this figure, and under the relevant factors, California seeks a total of $100 million in penalties.

### D.    Counts IX-X : North Carolina State Law Claims

Plaintiff North Carolina, pursuant to the North Carolina Telephone Solicitors Act, N.C. Gen. Stat. § 75-100, *et seq.*, will ask the Court to award it up to $4,465,968,500 in civil penalties subject to remittitur, if the Court finds that DISH is liable for telemarketing and auto-dialed/prerecorded calling practices proscribed by that Act. Plaintiff North Carolina expects to prove at least 893,194 violations of the Act. Under N.C. Gen. Stat. § 75-105(a)(1), civil penalties for violations of the Act can be as much as $500 for the first violation, up to $1,000 for the second violation and up to $5000 for the third and each subsequent violation. Plaintiff North Carolina

will ask, further, that the total award of civil penalties following remittitur be no less than $28.26 million.

### E.  Count XI: Illinois State Law Claim

Pursuant to the Illinois Automatic Telephone Dialers Act, 815 ILCS 305/30(d), and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2Z and 815 ILCS 505/7 the Court may award up to $50,000 in civil penalties if the Court finds DISH engaged in any method, practice, or act declared unlawful under the Illinois Automatic Telephone Dialers Act. Plaintiff Illinois expects to prove at least 5,480 unlawful autodialer calls by DISH. Plaintiff Illinois plans to seek $50,000 in civil penalties.

### F.  Count XII: Ohio State Law Claim

Pursuant to the Ohio Consumer Sales Practices Act, O.R.C. 1345.07(D), the Court may impose up to $25,000 in civil penalties if the Court finds DISH engaged in an act or practice that was previously found to be unfair, deceptive, or unconscionable. The Court may impose multiple civil penalties for multiple violations. *See* States' Proposed Conclusions of Law ¶ 463. Based on those criteria, Plaintiff Ohio expects to show that DISH, its vendors, or retailers made at least 120,809 calls in ways which were previously found to be unfair, deceptive, or unconscionable. Plaintiff Ohio will seek a minimum of $250 as a civil penalty for each of these violations for a total of $30,202,250 in civil penalties.

### V.  **WAIVER OF JURY DEMAND**

Plaintiffs have waived their right to a jury trial on the issue of whether to award civil penalties under the FTC Act (d/e 460).

## VI.    EXHIBITS ATTACHED[2]

The following are attached as exhibits to this order and are made a part hereof:

A.    Stipulation of Uncontested Facts (Attachment A)

B.    United States' Proposed Material Facts (Attachment B)

C.    States' Proposed Material Facts (Attachment C)

D.    DISH's Proposed Material Facts (Attachment D)

E.    Stipulation of Uncontested Issues of Law (Attachment E)

F.    Plaintiffs' Proposed Conclusions of Law (Attachment F)

G.    DISH's Proposed Conclusions of Law (Attachment G)

H.    Plaintiffs' Witness List (Attachment H)

I.    Defendant's Witness List (Attachment I)

J.    Joint Exhibit List (Attachment J)

K.    Plaintiffs' Exhibit List (Attachment K)

L.    Defendant's Exhibit List (Attachment L)

## VII.    GENERAL ADDITIONAL

The following additional action was taken:

The parties conducted their initial meet-and-confer on October 23, 2015. During that conference, the parties agreed to propose to the Court that, for those witnesses who will be testifying by having designated portions of their deposition transcripts read into the record, that the Court order the designated testimony and objections thereto to be incorporated into the trial record without the parties having to read aloud the designations, cross-designations, and

---

2 The parties reserve the right to call any witness listed by the other party, use any exhibit listed by the other party, offer additional objections during trial to the use of any exhibit, offer any witness needed for rebuttal, and offer the custodian of any record or any witnesses needed to lay the foundation for any exhibit.

objections in open court. The parties agree that that incorporating the testimony and objections in this manner will save significant time and resources, and will likely shorten the length of the trial substantially.

IT IS UNDERSTOOD BY THE PARTIES THAT:

Plaintiffs are limited to offering two (2) expert witnesses whose names and qualifications have been disclosed to DISH. DISH is limited to offering five (5) expert witnesses whose names and qualifications have been disclosed to the Plaintiffs.

All Motions in Limine must be filed by November 2, 2015, as directed by the Court, but in no event less than 14 days prior to trial.

A party may supplement a list of witnesses or exhibits only upon good cause shown in a motion filed and served upon the other parties prior to trial; except that, upon the development of testimony fairly shown to be unexpected, any party may, with leave of court, call such contrary witnesses or use such exhibits as may be necessary to counter the unexpected evidence, although not previously listed, and without prior notice to any other party.

Plaintiffs estimate that the length of trial will not exceed 21 full days. At this time, DISH is not in a position to estimate the length of trial, as Plaintiffs bear the burden of proving their claims. However, DISH anticipates that the trial should not exceed two weeks of court time. The case will be listed on the trial calendar to be tried when reached.

Once a final version of this order has been approved by the Court, it may be modified at the trial of the action, or prior thereto, only to prevent manifest injustice. Such modification may be made either on motion of counsel for any party or on the Court's own motion.

IT IS SO ORDERED.

  s/ Sue E. Myerscough *USDC Judge*
_____

Sue E. Myerscough, United States District Judge


ENTERED: December 7, 2015

APPROVED AS TO FORM AND SUBSTANCE:

s/ Lisa K. Hsiao

_____

Attorney for Plaintiff United States

s/ Jon Worm

_____

Attorney for Plaintiff State of California

s/ Paul Isaac

_____

Attorney for Plaintiff State of Illinois

s/ David N. Kirkman

_____

Attorney for Plaintiff State of North Carolina

s/ Erin B. Leahy

_____

Attorney for Plaintiff State of Ohio

s/ Peter A. Bicks

_____

Attorney for DISH Network, LLC

**United States et al. v. Dish Network LLC**  1 of 2
**Case No. 03:09-cv-3073 -- SEM-TSH**

| NO. | UNCONTESTED FACT | DISH'S FACT NUMBER | PLAINTIFFS' FACT NUMBER |
|---|---|---|---|
| 1 | The term "DBS" stands for Digital Broadcast Satellite. | | 690 |
| 2 | As a part of its marketing strategy, Dish has placed outbound telemarketing calls to its current and former customers. | | 16 |
| 3 | Historically, DISH's telemarketing calls largely have fallen into four general categories: (a) up-sell calls to offer existing subscribers additional goods and services; (b) calls to inquiry leads who have recently contacted DISH to inquire about DISH's services; (c) calls to former customers who have voluntarily disconnected DISH's services; and (d) at certain times in the past, cold calls. | 16 | |
| 4 | First, DISH makes telemarketing calls to up-sell its existing customers, which involves encouraging them to add programming or equipment to their subscriptions. These calling campaigns are sometimes referred to as "ARPU" campaigns, because the purpose is to increase the "Average Revenue Per Unit" or average revenue per subscribing household. For example, a calling campaign might encourage non-HBO subscribers to add the HBO premium channel. When a calling campaign involved the promotion of a premium channel, the programmer, such as HBO, Showtime, or Starz, might fund the initiative, by reimbursing DISH for its telemarketing efforts. | 17 | |
| 5 | Fourth, at certain times in the past, DISH made cold calls to non-customers. Cold calls are new acquisition calls to individuals who may not be familiar with DISH's products or services and have not specifically inquired about DISH's products and services. At limited times, DISH has used demographic information or lead lists purchased from Equifax to identify non-customers to include in calling campaigns. | 23 | |
| 6 | DISH previously used a dialer known as Concerto. In or about 2008, DISH began transitioning dialer functions to a Cisco dialer. Today, DISH is fully transitioned to the Cisco dialer. | 31 | |
| 7 | Some of the disposition codes indicating the results of the call are systematically entered by the dialer software, such as when the phone call fails to connect, there is a busy signal, an answering machine picks up or there is no answer. | 34 | |
| 8 | Dish represented that the 2007-2010 call records included both telemarketing and non-telemarketing calls. The individual call records contained campaign codes that recorded information about each call, however. Dish identified for Plaintiffs those codes that corresponded to calls made as part of telemarketing campaigns, and Plaintiffs used Dish's information to identify which call records were telemarketing calls. | | 202 |
| 9 | The National Registry launched in October 2003. | 54 | |
| 10 | At all relevant times, DISH maintained the necessary subscriptions to download the National Registry. | 56 | |
| 11 | InterImage does not do any analysis to determine whether the outbound caller had an Established Business Relationship with the person called, or whether the call was made in response to an inquiry | 137 | |
| 12 | The Retailer Agreement stated that each Retailer was an independent contractor of DISH, and that the Retailer was not permitted, "under any circumstances, [to] hold itself out to the public or represent that it is DISH or an employee, subcontractor, Affiliate, agent or sub- agent of DISH or any DISH Affiliate." | 167 | |
| 13 | DISH had the ability to establish and amend "Business Rules," which set forth standards for participation in DISH's promotional programs, as well as for the Retailer's marketing, advertisement, promotion, and solicitation of orders. | 171 | |
| 14 | Dish's retailer agreement prohibited OE Retailers from using any independent contractors, subcontractors, Affiliates, agents, or sub-agents without Dish's specific, prior written consent. | | 530 |
| 15 | For example, a Facts Blast from November 11, 2006 stated: "Your [DISH] Retailer Agreement prohibits Retailers from violating any applicable laws, including federal and state marketing and telemarketing laws. . . . The Retailer Agreement clearly provides that your relationship with [DISH] is that of an independent contractor. Your outbound and inbound call agents MUST identify the company that they work for. AGENTS MAY NOT SAY THAT THEY WORK FOR DISH NETWORK. . . . . Failure to comply with the obligations in your [DISH] Retailer Agreement, applicable state and federal laws, and the cautionary statements in this document could lead to disciplinary action against you by [DISH], up to and including termination." | 180 | |
| 16 | In 2008, DISH informed Retailers through a series of Facts Blasts that, beginning on September 30, 2008, Retailers that made 600 or more calls during the preceding calendar year were (1) required to sign up with PossibleNOW; (2) begin to upload their internal do not call lists through PossibleNOW; and (3) scrub all telemarketing lists against the consolidated do not call list maintained by PossibleNOW. | 182 | |

**ATTACHMENT A**

| NO. | UNCONTESTED FACT | DISH'S FACT NUMBER | PLAINTIFFS' FACT NUMBER |
|---|---|---|---|
| 17 | In August 2006, Reji Musso was hired as Compliance Manager of the Risk and Audit Team's compliance unit. | 186 | |
| 18 | Ms. Musso testified that no more than 70 individuals had been placed on a POE notice from the time she became Retail Services Compliance Manager in August 2006 until her deposition in March 2011. | 211 | |
| 19 | Dish entered into Retailer Agreements with Order Entry Retailers including Satellite Systems Network (SSN); Star Satellite, L.L.C. (a/k/a Tenaya Marketing); American Satellite, Inc.; Jerry Dean Grider d/b/a JSR Enterprises (JSR); Dish TV Now, Inc.; and National Satellite Systems (NSS). | | 520 |
| 20 | Beginning in 2002, Walter Myers operated a DISH Full Service Retailer called Tenaya Marketing ("Tenaya"), which marketed DISH products and services door-to-door, as well as via newspapers and mailers during the summers. | 225 | |
| 21 | Star Satellite signed a Retailer Agreement with DISH that provided, among other things, that Star Satellite would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement. | 229 | |
| 22 | In April 2005, Star Satellite officially became an OE Retailer. | 242 | |
| 23 | Star Satellite kept its own financial books and records and filed its own taxes. | 245 | |
| 24 | On July 21, 2008, a consent decree was filed in the United States District Court for the District of Nevada between Star Satellite and the United States regarding Star Satellite's illegal telemarketing practices. | | 942 |
| 25 | Dish entered into a Retailer Agreement with Dish TV Now. | | 706 |
| 26 | Dish TV Now signed a Retailer Agreement with DISH that provided, among other things, that Dish TV Now would "market, promote and solicit orders for" DISH programming services subject to the terms of the Agreement. | 266 | |
| 27 | Dish TV Now kept its own financial books and records and filed its own taxes. | 274 | |
| 28 | On September 16, 2004, Ahmed sent Hagen the following email: "David, This is simple. Is Dish TV Now telemarketing customers over the phone or are you guys using predictive dialers and leaving messages trying to sell the customer Dish Network. We are not interested in this type of marketing. We are receiving complaints on your company doing just this type of marketing. Please Respond, Amir." | | 684 |
| 29 | On January 20, 2006, DISH terminated Dish TV Now as a Retailer. | 299 | |
| 30 | JSR signed a Retailer Agreement with DISH that provided, among other things, that JSR would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement. | 301 | |
| 31 | The Court granted the United States partial summary judgment on Count I under TSR 310.4(b)(1)(iii)(B) for 2,349,031 calls that JSR made to numbers on the Registry from August 2006 to December 2006. | 308 | |
| 32 | Kobi Levi formed National Satellite Systems in 2005. | 318 | |
| 33 | National Satellite Systems signed a Retailer Agreement on December 31, 2006, which provided, among other things, that National Satellite Systems would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement. | 320 | |
| 34 | National Satellite Systems was free to market the goods of other companies, including DISH competitors. For instance, National Satellite Systems also marketed DirecTV products and services. | 327 | |
| 35 | On March 20, 2001, SSN became a Retailer. | 352 | |
| 36 | SSN signed a Retailer Agreement with DISH on March 27, 2001 that provided, among other things, that SSN would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement. | 353 | |
| 37 | In 2005, Todd DiRoberto formed American Satellite, Inc., and in September of that year, American Satellite became a Retailer. | 374 | |
| 38 | In October 2005, American Satellite signed a Retailer Agreement with DISH that provided, among other things, that American Satellite would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement. | 375 | |
| 39 | In 2006, American Satellite became an OE Retailer. | 380 | |
| 40 | The Court granted the United States partial summary judgment on Count III under TSR § 310.4(b)(1)(iv) for one prerecorded call American Satellite made to Robert Parker in 2006. | 383 | |
| 41 | In September 2006, DISH sting operations identified American Satellite as the source of a prerecorded call to Robert Parker. | 386 | |

**ATTACHMENT A**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO,<br>    Plaintiffs,<br>  v.<br><br>DISH NETWORK L.L.C.,<br>     Defendant. | Case No. 3:09-cv-03073-SEM-TSH<br><br>**UNITED STATES OF AMERICA'S PROPOSED FINDINGS OF FACT**[1] |

1.  Dish Network LLC (Dish), a wholly-owned subsidiary of Dish Network Corporation (Dish Corp.), is a business entity formed under the laws of Colorado with a principal place of business in Englewood, Colorado.

2.  Until 2008, Dish Corp. was part of a company named EchoStar Corporation. In 2008, the company was split into two separate publically-traded entities: EchoStar Corporation, which retained the original company's technology and set-top box businesses and certain infrastructure assets; and Dish Corp., which retained and continues to offer satellite-based pay-TV and related services through its subsidiaries, including Dish.

3.  Dish Corp., was held in contempt of court for violating a permanent injunction and ordered to pay nearly $90 million in sanctions in the case of *TiVo Inc. v. Dish Network, Corp.*, 655 F. Supp. 2d 661, 666 (E.D. Tex. 2009), *aff'd*, 646 F.3d 869, 876 (Fed. Cir. 2011) (en banc). Dish Corp. eventually settled this case with a payment to TiVo of $500 million.[2]

4.  Between March 27, 2009 and May 31, 2012, Dish Corp.'s stock price more than doubled from approximately $11.00 to $27.00.

5.  On April 26, 2011, Dish Corp. acquired Blockbuster, Inc. for $127 million. In June 2011, Dish Corp. acquired TerreStar Networks, Inc., for $1.375 billion. That same year, Dish Corp. also invested $1.139 billion in DBSD North America.

---

[1] Findings of Fact for the United States that are in Italics have been included in the parties' Stipulation of Uncontested Facts.

[2] In the interest of efficiency and unless otherwise noted, the term "Dish" as used through these proposed findings of fact refers to Dish Network LLC, its corporate predecessor, EchoStar Corporation, and its now-parent company, Dish Network Corp.

**ATTACHMENT B – UNITED STATES' MATERIAL FACTS**

6.      In its annual filings to the SEC, Dish Corp., reported 2011 total revenue of $14.1 billion compared to $11.6 billion in 2009, an increase of 21.6 percent. Net income attributable to Dish satellite-based pay-TV increased 17.0 percent from $635 million in 2009 to $1.5 billion in 2011.

7.      During 2011, Dish activated approximately 2.58 million gross new pay-TV subscribers, and at the end of 2011, had a total of 13.97 million pay-TV subscribers who each generates an average monthly revenue of $76.93.

8.      In 2011, Dish generated approximately $550 million in income each fiscal quarter.

9.      On December 1, 2011, Dish Corp. paid a cash dividend of $2.00 per share, or approximately $893 million.

10.     For the nine-month period between January 1, 2011 and September 30, 2011, Dish Corp. had a earning per share of $2.70.

11.     As of December 31, 2011, Dish Corp., had cash, cash equivalents and current marketable investment securities of approximately $2.041 billion, and total assets of $11.4 billion.

12.     As of December 31, 2011, Dish Corp. has a market capitalization of approximately than $13 billion.

13.     An autodialer is a computer-controlled device capable of making hundreds of thousands of phone calls in a single day.

14.     Since October 2003, Dish has engaged outside telemarketing companies (Telemarketing Vendors), including EPLDT and eCreek, to conduct outbound telemarketing to sell Dish service.

15.     Dish and its Telemarketing Vendors used autodialers to make telemarketing calls and other types of calls to consumers.

16.     *As a part of its marketing strategy, Dish has placed outbound telemarketing calls to its current and former customers.*

17.     The software Dish used to generate calling lists was called Predictive Dialer or P-Dialer.

18.     Dish operated call centers in Colorado, Texas, New Jersey, West Virginia, and the Philippines through which it placed outbound interstate telemarketing calls selling Dish products and services.

19.     By 2002, Dish knew that State and federal laws prohibited certain types of telemarketing calls, including calls to numbers on entity-specific and state do-not-call (DNC) lists and prerecorded message telemarketing.

20. By 2002, Dish knew it had to maintain an entity-specific DNC list and that any telemarketing list it called had to be scrubbed against this list, along with any applicable government DNC registries.

21. By 2002, Dish knew that it could not call States with DNC registries without complying with the relevant statutes and regulations, and specifically considered the laws of the states of California and Illinois.

22. The final amended Telemarketing Sales Rule (TSR), which established the National Do-Not-Call Registry (DNC Registry) and included the prohibition on sellers "causing" telemarketing violations by telemarketers, was published in the Federal Register on January 29, 2003.

23. The National DNC Registry started registering phone numbers on June 28, 2003 and became operational on October 1, 2003.

24. In April 2003, Dish employees responsible for outbound dialing acknowledged that federal and state law required the company to have an effective process to ensure it did not telemarket to people who requested--whether through the National DNC Registry or Dish's entity-specific DNC list--not to be called. One Dish employee confirmed that "contacting prospects or customers that have specifically requested they not be contacted is not acceptable."

25. By April 2003 at the latest, Dish knew that the National DNC Registry would become effective on October 1, 2003.

26. In August 2003, a Dish employee responsible for telemarketing operations stated that the company would "be in hot water," if it telemarketed to numbers on the National DNC Registry.

27. By September 2003, at the latest, Dish knew that the TSR and other laws prohibited telemarketing to phone numbers on the National DNC Registry and Dish's own entity-specific DNC list.

28. By September 2003, before the Registry went into effect, Dish knew that there was a penalty of $11,000 per violation for violating the TSR.

29. In September 2003, Dish did not believe it was legally required to scrub all numbers associated with a customer account if one such numbers was on a DNC list.

30. A Dish telemarketing policy document was revised in 2004 to address the National DNC Registry. This document stated: "It is EchoStar's policy to obtain state and federal Do-Not-Call list(s), and fully comply with legislation regarding the calling of phone numbers on these lists."

31. By 2002, Dish was maintaining an entity-specific DNC list, also known as its Internal DNC List, which recorded a list of phone numbers that it would not call and the dates that persons requested that those numbers not be called by Dish or on its behalf.

32.     Dish's 2002 Internal DNC Policy stated that Dish obtained all state DNC lists and added those numbers to Dish's Internal DNC List.

33.     Dish's 2002 Internal DNC Policy stated that agents would mark on Dish's dialer the calling account of a consumer who asked not to be called.

34.     Dish's 2002 Internal DNC Policy stated that telephone numbers of individuals who contacted Dish and requested not to be called would be placed on Dish's Internal DNC List.

35.     Dish's 2002 Internal DNC Policy stated that agents making outbound calls would mark an account in Dish's dialing system if the recipient of a call tied to that account asked not to be called again.

36.     Dish's 2002 Internal DNC Policy stated that marked accounts would be placed on Dish's Internal DNC List and would be excluded from any future dialing lists.

37.     In May 2002, Dish believed there was a "gap" in its process related to Internal DNC List scrubbing.

38.     In September 2003, weeks before the National DNC Registry was to become effective, Dish's in-house counsel advised that its call centers should not make telemarketing calls if they did not have access to Dish's Internal DNC List, specifically because it would "potentially violate the law."

39.     In April 2006, Dish's policy was to manually set the effective and termination dates for phone numbers on its Internal DNC List.

40.     In April 2006, Dish's database managers recognized that its Internal DNC List had incorrect effective dates, which could result in illegal telemarketing calls to those numbers, and that there had been errors in Dish's load process for National DNC Registry load process in some months, resulting in a bad load of the data.

41.     Dish revised its policy again in 2006. The 2006 Dish Policy stated that Dish maintained two lists, the current version of the National DNC Registry and its Internal DNC List. The 2006 Policy stated that Dish would not call a person on the National DNC Registry unless it had an Established Business Relationship (EBR) with the person, and would not call a person on the Internal DNC List even if Dish had an Established Business Relationship with the person. The 2006 Policy stated that these policies applied to Dish and its "telemarketing vendor."

42.     When a consumer wrote a letter, email, or otherwise communicated to Dish that he or she did not want to be called, the Dish employee receiving the request should have forwarded the message to the department in charge of maintaining Dish's Internal DNC List to place the person's number on the list.

43.     If a consumer told a Dish telesales representative during a telemarketing call that the consumer did not want to be called, the representative should have used a link on an

internal website called "CSC Web" to place the consumer's telephone number on the Dish's Internal DNC List.

44. In early 2008, Dish hired PossibleNow to take over maintenance and management of its Internal DNC List.

45. Dish produced its" Internal Do Not Call lists" to Plaintiffs on March 11, 2011.

46. In May 2002, PJ Weyforth, a Dish employee responsible for its outbound dialing operations, wrote in an email to high-level Dish executives that while the company was engaging in outbound telemarketing, it was "not as versed in all the regulations surrounding telemarketing as [it] should be."

47. In May 2002, Dish's outbound dialing personnel stated that the "down side" to implementing telemarketing compliance measures is "cost and time".

48. In May 2002, a senior Dish executive confirmed that the company used outbound "cold call" telemarketing across the country without complying with the telemarketing laws of each state it called into. For example, Dish "[did] not subscribe to Oregon's no call list, which [Dish was] required to do." The Dish executive observed that "[a]t this point [Oregon] is the only state pursuing an investigation re: our telemarketing practices."

49. Upon realizing that it had been illegally cold calling Oregon phone numbers in May 2002, using area codes, Dish temporarily suppressed all outbound telemarketing calls to select states that it called "hot spots" to avoid violating those states' telemarketing laws. A Dish executive had suggested "stopping all outbound 'cold calls' into any state until we get our arms around this."

50. In late-May 2002, Dish compiled a list of states that did not have DNC registries, and proceeded to dial into those states. Before calling into these States, Dish did not analyze whether other telemarketing rules might apply.

51. In June 2002, Dish decided to stop telemarketing into states with DNC registries.

52. In June 2002, a Dish senior executive participated in a telemarketing compliance meeting to discuss bringing order to Dish's outbound dialing systems. The Dish executive summarized the results of the meeting and noted that Dish would: (a) limit the number of internal departments that could make outbound calls; (b) stop telemarketing calls to numbers on its "internal suppression list"; and (c) subscribe to state DNC lists, registering where required.

53. In June 2002, Dish management, including general counsel David Moskowitz, received an email from its Outbound Operations Department stating that Dish needed "a more stable database solution to hold all the Do Not Call lists" because "[t]oday [Dish] uses an outside firm and an Access database that is not very stable."

54. In April 2003, Dish entered into an Assurance of Voluntary Compliance (AVC) with the State of Indiana to resolve the State Attorney General's investigation into Dish's

telemarketing. Dish agreed to "immediately cease from making or causing to be made Telephone Sales Calls" to numbers on Indiana's "no telephone sales solicitation listing."

55. In April 2003, Dish's Outbound Operations personnel recognized that scrubbing calling lists "manually against Do Not Contact is a process that is prone to human error and will produce violations resulting in legal consequences."

56. In April 2003, Dish considered developing an internal process for DNC list scrubbing and calling list management, recognizing that it was "a huge issue that [Dish] need[ed] to manage well." However, the resources Dish devoted to this process were insufficient, and Dish assigned this process priority Number 22. One Dish employee stated the company had a "huge gap" in resources to deliver a process that worked.

57. In April 2003, Dish employees tasked with creating the company's scrubbing software disagreed about whether DNC scrubbing should be integrated into the customer database from which lists were pulled or whether there should be an "outside work-around process[]."

58. In May 2003, Dish began a programming project in an attempt to integrate DNC coding into its customer and leads databases.

59. By August 2003, the task of creating an integrated DNC solution to Dish's internal database marketing systems was still assigned "priority #22." A Dish employee reiterated that the DNC scrubbing system "should be priority 0, not 22" because a "manual process will fail."

60. By August 2003, a little over a month before the National DNC Registry was to become effective, Dish had not finished integrating DNC scrubbing into its customer database.

61. That same month, August 2003, Missouri sued Dish for making telemarketing calls to residential landline phone numbers on Missouri's state DNC registry. In connection with its lawsuit, Missouri filed a petition for TRO, permanent injunction, and civil penalties against Dish for making violative telemarketing calls into the state.

62. In September 2003, one month before the National DNC Registry went into effect, Dish's then Chief Information Officer stated that "not all applications are offering DNC options consistently."

63. During the relevant time period, Dish's Database Marketing Department, working with the Outbound Operations, Marketing, and Sales Departments, generated consumer lists used by Dish to conduct marketing, including calling lists for Dish's telemarketing operations. During the relevant time period, Outbound Operations was responsible for scrubbing and dialing telemarketing lists.

64. As of September 10, 2003, Dish's Database Marketing Department was still in discussions with Dish's in-house counsel regarding the parameters of the DNC scrubbing system it was developing. Dish's Database Marketing Department was creating a scrubbing system that relied on a manual process whereby individual employees tasked

with creating calling campaigns were required to choose which suppression would run. The justification offered for why the Database Marketing system would not simply "automatically" remove DNC records from any campaign was that Dish wanted the ability to market using other marketing methods (e.g., mail) to phone numbers with associated DNC requests.

65.     On September 11, 2003, while finalizing the structure of Dish's then-developing scrubbing system, Dish's in-house counsel and Database Marketing manager specifically rejected an system that would "automatically select the Do Not Call attribute," thereby allowing campaign call lists to be created that included phone numbers marked on DNC lists.

66.     Less than two weeks before the Registry went into effect, Dish did not have space available in its computer server to perform a complete test of its internal system for scrubbing against the National DNC Registry; instead Dish tested using a partial load of the Registry.

67.     In early October 2003, Dish conducted a test of its system for scrubbing telemarketing leads in Denver against DNC lists, and discovered that the system did not scrub out seven records that it should have. Dish's Database Marketing manager stated that a "match on [the] phone number . . . is a violation of the law."

68.     In February 2004, months after the National DNC Registry became effective, Dish received information that its system for scrubbing was not functioning properly. Specifically, in 2004, Dish repeatedly telemarketed to a consumer who was on the company's Internal DNC List and had been registered on the National DNC Registry since its inception in October 2003.

69.     In May 2004, Dish learned that it telemarketed to another phone number that was already a part of its DNC records.

70.     In June 2004, Dish learned that it had placed 64 telemarketing calls in a span of three and a half days to a phone number who was already on the company's DNC list for more than 30 days at the time of the calls.

71.     In May 2005, in connection with Missouri's August 2003 lawsuit, Dish entered into an AVC with Missouri, that included commitments to change its telemarketing compliance processes to prevent illegal calls into the state and requiring its third party telemarketers to comply with telemarketing laws.

72.     As part of the May 2005 AVC with Missouri, Dish promised to create and maintain "systems and procedures" to ensure compliance with Missouri's DNC laws, "including requiring third party telemarketing agencies with whom [Dish] do[es] business to comply with such laws." Dish did take specific steps to comply with the terms of its AVC with the State of Missouri.

73.     As part of the May 2005 AVC with Missouri, Dish promised to distribute a copy of its telemarketing procedures to "all current and future employees or other persons or entities

conducting telemarketing in to the State of Missouri." Dish did not distribute a copy of its procedures as required by the Missouri AVC.

74. As part of the May 2005 AVC with Missouri, Dish promised to institute a training program in which all employees engaged in telemarketing in Missouri would "receive instruction" in compliance with Missouri's telemarketing laws. Dish did not institute such a training program as required by the Missouri AVC.

75. In December 2005, Dish was aware that its DNC scrubbing process for LTS leads--which are not created using by Dish's calling list generator--"[was] not working."

76. In January 2006, the Public Utility Commission of Texas issued a notice of violation against Dish for making telemarketing calls to consumers on the state's DNC registry and failing to acquire the state's DNC list.

77. In April 2006, Dish senior executive and deputy general counsel, Stanton Dodge, were unaware that Dish had entered into a AVC with Missouri in 2005.

78. In April 2006, Dish's in-house counsel acknowledged that the company settled Missouri's 2003 lawsuit because of "its own actions at the very early stages of implementing DNC processes and procedures."

79. In August 2006, Dish admitted to the Kansas DOJ's Consumer Protection Division that it telemarketed to a phone number nearly three years after the number was placed on the Dish's Internal DNC List.

80. In August 2006, Dish's Executive Resolution Team believed that that there were "a number of systemic problems that are not being addressed" with respect to Dish calling phone numbers on its entity-specific DNC list.

81. In August 2006, Dish's Executive Resolution Team wanted a "better," more effective system for managing its Internal DNC List, but believed the project would be a low priority and would "take months" to be addressed.

82. By October 2006, Dish again received information indicating that its scrubbing process did not remove numbers on its DNC lists, whether internal or as a part of the National DNC Registry. Dish internal systems did not correctly and consistently reflect when telephone numbers were already on its entity-specific DNC list, which resulted in customers receiving telemarketing calls despite being on Dish's DNC list.

83. In an October 2006 presentation regarding the telemarketing consumer complaint system its customer service agents used, Dish demonstrated that it incorrectly taught its agents that "calls to a consumer by a telemarketer do not actually constitute a violation of the Telephone Consumer Protection Act if the consumer does not answer the call." When a consumer DNC complaint came in, Dish trained its customer service agents to ask the consumer if the consumer answered the phone. If the consumer said "no," the Dish employee was required to read the following misstatement: "Calls to a consumer by a

telemarketer do not actually constitute a violation of the Telephone Consumer Protection Act if the consumer does not answer the call."

84.  By January 27, 2007, Dish knew that its internal scrubbing processes did not function properly.  In analyzing a one-month period of its own calling, Dish found that it made thousands of illegal telemarketing calls during to phone numbers that it should not have called.  Specifically, Dish highlighted one telemarketing campaign--"by far the largest source of violations--which was DNC scrubbed but ... the process did not remove all numbers on the DNC list."  Dish's Outbound Operations Department was tasked with "put[ting] processes into place that will prevent any violations of DNC from happening again."  Dish employees identified certain steps that might help improve its scrubbing processes, but Dish did not implement those steps.

85.  On February 1, 2007, Dish confirmed that it had placed illegal telemarketing calls to telephone numbers on the National DNC Registry.  Dish employees accepted that the reasons for these illegal calls were unknowable.

86.  On February 1, 2007, Dish's Database Marketing Department recommended having a "documentation policy" to "document known occurrences" of when Dish made illegal telemarketing calls, and also recommended putting in place IT measures that would "keep better history of data loads, number scrubs, loading errors, etc."  This recommendation was not implemented.

87.  By February 2007, Dish had not updated its internal scrubbing system to reduce the grace period for calling numbers on the National DNC Registry to 30 days, although the law had changed two years earlier, in January 2005.

88.  In August 2007, Dish indicated that it did not maintain the telephone number-specific data, such as inquiry or last transaction date, necessary to evaluate any potential telemarketing EBR.

89.  In March 2004, a Dish manager stated that its call centers were "attacking [calling] lists . . . outside of normal documented business practices."

90.  In June 2005, when Dish employees informed senior management that they could not call nearly 4,000 leads on a 5,000-lead list due to the National DNC Registry, senior management accused these lower-level employees of having "a 'can't do' attitude" and ordered them to "overcome" obstacles such as the telemarketing laws to achieve sales quotas.

91.  In October 2006, Dish's sought to "maximize" the number of telemarketing leads that it could dial and asked the Outbound Operations Department to change its scrub process to stop scrubbing against certain DNC lists.

92.  In May 2007, in connection with the October 2006 request, Dish's telemarketing personnel had a meeting to discuss the decrease in "dialable leads" that were resulting from the DNC scrub process.

93.     In June 2007, Dish's telemarketing compliance personnel acknowledged the Marketing Department tried to "get around [Dish's DNC] rules" because they reduced the number of potential sales leads.

94.     In November 2007, Dish acknowledged that it again had "multiple points of failure" in its telemarketing compliance process. Specifically, while preparing a response to a Colorado Attorney General inquiry, Dish discovered that it had placed prerecorded message telemarketing calls to numbers on its Internal DNC List.

95.     By December 2007, Dish still "lack[ed] an automated and managed solution for scrubbing, auditing and reporting of Do Not Call lists" in the company.

96.     In June 2008, Dish lawyers acknowledged that the company's Marketing Department was not telling the compliance personnel about sales initiatives that may raise telemarketing concerns.

97.     By June 2008, Dish CEO Charlie Ergen was "tired of paying settlements" for telemarketing lawsuits and wanted all of Dish management to "get out in front of these types of things."

98.     In November 2008, Dish representatives that dealt with consumers on TCPA issues believed, incorrectly, that numbers could expire from the National DNC Registry.

99.     In November 2008, Dish telemarketed to a phone number 30 days after it was placed on Dish's Internal DNC List.

100.    On or around 2006, Dish contracted eCreek, a division of Order Entry retailer Dish Factor Direct, as its outbound Telemarketing Vendor. Because eCreek was hired as a Telemarketing Vendor, Dish's Outbound Operations team considered calls from eCreek to be "like us calling" consumers.

101.    In November 2008, Dish terminated Dish Factory Direct as an OE Retailer, because of its high churn and fraudulent behavior, despite the fact that eCreek was still operating as Dish's contracted outbound telemarketing vendor Dish's Retail Services Director noted that Dish's internal call-center operation had not been notified that eCreek was being terminated as a retailer.

102.    A Dish employee stated in an email to the highest levels of Dish management that the fact eCreek was still dialing telemarketing calls for Dish despite having been terminated as a retailer "appears to be a gigantic conflict."

103.    In November 2008, Dish management solicited Dish employees to report on a "complete review" of eCreek's outbound dialing efforts.

104.    In January 2009, when discussing the "call result data" created after outbound calls are placed, Dish employees remarked that they did not "gather data at a disposition or account level with the exception of E-creek, and we don't trust E-Creek's data at this point."

105.    In January 2009, Dish daily sent eCreek a list of phone numbers that it described as "escalated suppressions" that eCreek should suppress from dialing immediately.

106.    Dish has received thousands of complaints from consumers about telemarketing calls selling Dish pay-TV service. The volume of the complaints necessitated the creation of teams--the Executive Resolution Team (ERT) and the DNC Investigation Team--devoted to handling such consumer DNC complaints.

107.    Marciedes Metzger oversaw the ERT beginning in June 2005. The ERT maintained a spreadsheet that tracked DNC complaints it received. The ERT also issued suppression lists of telephone numbers. The suppression lists were sent to Dish telemarketing personnel and eCreek.

108.    The DNC Investigation Team would try to identify the company making the telemarketing calls that caused complaints by trying to trace the number of the calling party with caller ID.

109.    By 2002 at the latest, Dish knew that federal and state laws prohibited prerecorded message telemarketing.

110.    A 2002 Dish document contained an admonition against the "use of an artificial or pre-recorded voice to deliver a message to any residential phone line."

111.    When Dish learned in 2002 that its retailers were using robocalls to sell Dish service, a senior Dish sales executives stated: "[robodialing] has caused a few concerning calls, but seems to be greatly outweighed by the results."

112.    A 2002 Dish policy document modified a prior internal position regarding pre-recorded messages. The revised language prohibited the use of pre-recorded messages to residential customers, but stated further that, "we do deliver automated messages to only our existing subscribers for the purpose of customer service reminders such as when a credit card expires and for solicitation for Pay-Per-View events."

113.    In 2006, Dish permitted automated messages to existing customers with whom Dish had an EBR for the purpose of communicating special programming solicitation and account information.

114.    A 2006 Dish policy document again updated its position on robocalls by generally prohibiting pre-recorded messages with one proviso: "EchoStar does deliver automated messages to our existing customers with whom EchoStar has an existing business relationship for the purpose of communicating information such as customer service reminders, credit card expiration reminders, and special programming solicitation."

115.    In 2008, Dish again revised its internal position regarding prerecorded message telemarketing. The 2008 revision deleted references to Dish's "telemarketing vendor" and also stated that Dish would deliver pre-recorded messages in outbound telephone calls "to only our existing subscribers for the purpose of customer service reminders such as when a credit card expires."

116.    In June 2008, Dish's Legal Department made another attempt to stop "all of the marketing players" from using prerecorded message telemarketing.

117.    Since 2002, Dish's International Programming Department (Int'l Dept.), which was responsible for Dish's foreign language channel programming and marketing, specifically included prerecorded message telemarketing in its marketing plans as a way to increase sales.

118.    Dish's Int'l Dept. also used prerecorded messaging telemarketing to sell upgraded programming packages when it anticipated channels would be removed.

119.    Since 2003, Dish's call center in Pinebrook, New Jersey conducted telemarketing for the Int'l Dept. Dish had telesales agents in Pinebrook that spoke various non-English languages. Dish forwarded telesales leads related to international programming to Pinebrook. As of September 2003, Dish knew that Pinebrook did not have access to Dish's DNC data, and that Pinebrook did not "do any DNC suppression."

120.    In June 2005, Dish was making Italian promotional calls to consumers who were already on Dish's Internal DNC List. To stop these illegal calls, Dish employees had to individually contact other Dish employees responsible for the international dialer and calling lists.

121.    In June 2005, as a result of pressure from Dish executives to increase activation figures, the Int'l Dept. overruled Dish's outbound operations personnel, resulting in calls to 2,908 consumers whose numbers were on the National DNC Registry. The calls at issue were sales calls, but Int'l Dept. personnel made the "argument" that they were non-solicitation calls, and that argument was "accepted."

122.    In December 2005, Dish's Database Marketing Manager suspected that the Int'l Dept. used "QA lists from direct mail" for circulating for telemarketing by manual dialing because "some of these [lists] were dialed erroneously."

123.    In December 2005, Dish's Int'l Dept. used prerecorded message telemarketing to sell Dish programing.

124.    In 2007, Dish's Int'l Dept. used prerecorded message telemarketing to sell Dish programming

125.    In February 2007, Dish's Int'l Dept. placed prerecorded message telemarketing calls. These robocalls were made without scrubbing the calling lists against Dish's Internal DNC List or the National DNC Registry.

126.    In February 2007, Dish's Int'l Dept. conducted telemarketing campaign without oversight by Dish's Outbound Operations Department. Specifically, Dish's Int'l Dept. accessed and generated lists of customers for telemarketing without following Dish's typical outbound policies.

127. Because the Int'l Dept. made its calls outside the Outbound Operations Department's systems, Dish could not gather information about the Int'l Dept.'s telemarketing.

128. By April 2007, Dish's Pinebrook call center was still not integrated into Dish's outbound dialing process.

129. In April 2007, agents at Dish's Pinebrook call center used manual dialing for telemarketing calls to international language customers, and also used autodialers to dial telemarketing lists provided directly from the Int'l Dept.

130. In November 2007, Bob Davis stated that with respect to Dish's internal DNC list, the company did not have a "standard procedure to not scrub auto messages." Because Dish's Int'l Dept. operated outside of Dish's Outbound operations, the content of its prerecorded messages were not screened, which resulted in illegal prerecorded message telemarketing to phone numbers on Dish's internal DNC list.

131. In January 2008, Dish's Int'l Dept. believed prerecorded message telemarketing was still an approved way to telemarket.

132. In February 2008, Dish's compliance personnel was made aware of the Int'l Dept.'s non-compliant operations, and informed the Int'l Dept. that it needed to rewrite proposed prerecorded sales messages to be informational messages only.

133. By early March 2008, when generating telemarketing lists, Dish's Int'l Dept. still did not apply DNC scrubbing.

134. In mid-March 2008, Dish's Int'l Dept. acknowledged it was not in compliance with telemarketing laws and had not follow Dish's internal outbound policies, specifically by generating its own calling lists and providing lead lists directly to its marketing managers for manual dialing and telemarketing.

135. In May 2008, the director of Dish's Int'l Dept. stated that she did not want to stop using prerecorded messaging to advertise programming because it "is a critical tactic" for the department. In response, Dish's compliance personnel stated that the company had to take a conservative approach with prerecorded message telemarketing "until pending litigation is settled."

136. In May 2008, a Dish compliance employee acknowledged that the company had "a lot of issues" with using illegal prerecorded message telemarketing. She told an Int'l Dept. marketing manager that "free preview" automessages, which were frequently used by the department without prior approval by Dish's compliance team, were solicitation messages.

137. By 2008, in a presentation about its operations, Dish's Int'l Dept. acknowledged that it had previously operated without centralized corporate oversight and support for its call center operation at Pinebrook, resulting in "poor results in Quality, customer experience, efficiencies & service levels."

138.    In 2002, despite knowing that prerecorded message telemarketing violated state telemarketing laws, a Dish employee concluded that the results yielded by prerecorded telemarketing "greatly outweighed" the fact that "it has caused a few concerning calls."

139.    In September 2003, Dish's Legal Department observed that "if the most efficient means of ensuring that someone on the Government or EchoStar DNC [lists] is not called is to bar all forms of marketing, I'm not sure I see the harm."

140.    The FTC began investigating Dish and its retailers regarding alleged violations of the telemarketing laws in 2005.  On July 21, 2005, the FTC issued a Civil Investigative Demand requesting information and documents related to the telemarketing practices of it and its retailers.

141.    In late 2007, upon conducting an audit and review of Dish's internal telemarketing systems, PossibleNow concluded that Dish's process for scrubbing its calling lists was "flawed and not operating in a compliant manner."

142.    PossibleNow again told Dish in 2009 that it needed to improve its compliance systems in order to comply with "regulator mandates," but Dish did not buy the product PossibleNow recommended.

143.    In 2008, the principal of Cactus Concepts and former Dish director, Shawn Portela, believed that Dish was inconsistent about enforcing any discipline or control over retailers' marketing tactics.

144.    In November 2008, Dish's Marketing Department was still attempting to use prerecorded message telemarketing, even though Dish's legal department advised against it.

145.    Even after this case was filed, Dish continued to make many calls in violation of telemarketing laws, including as many as 10-20% of calls on certain days in 2009-2010.

146.    In February 2009, a Dish index of telemarketing campaigns demonstrated that it generated calling lists specifically targeting phone numbers of customers that had disconnected more than 18 month prior, which is outside the EBR period.

147.    By February 2009, Dish still had not changed the manual scrubbing system it first implemented in 2003.  Dish's system for generating calling lists, PDialer, still relied on user-selected options for scrubbing parameters, and included an option for ignoring any and all DNC scrubbing.

148.    In March 2009, in an email with the Subject Line:  "TCPA,"  Rob Frankel, Director and Senior Corporate Counsel for Dish, emailed another Dish attorney, Emily Pastorius, and asked her to reach out to Dish employee Jenny Palasz about "what we have done to prevent this conduct from continuing.  We want to make sure we are no longer engaging in risky, violative conduct (and what have we done to minimize our retailers' risky conduct)."

149.    In March 2009, when learning of a potentially illegal call in Indiana, customer service manager Marciedes Metzger remarked that "it is a problem that our legal team was caught unaware of these changes in the law."

150.    When learning of potentially illegal calls, Marciedes Metzger stated that "if [Dish is] in violation it is probably better to own up to it and ask for forgiveness."

151.    As late as April 2009, Dish's Int'l Dept. developed plans for its marketing managers to manually dial disconnected customers each month, a practice that would not allow Dish to track call data or any call dispositions.

152.    In 2009, Dish signed an AVC with 46 states related to its telemarketing practices.

153.    In September 2009, despite having tried to "reduce the final numbers," Dish internally recognized that it dialed 291,000 potential telemarketing violations in a three-month period between October and December 2008.

154.    In October 2009, Dish's Outbound Operations manager believed Dish was responsible for all outbound calls, and that Dish "need[s] to be able to provide a copy of the script to any regulatory authorities should they ask, and more importantly, the script will tell [the Outbound Operations Department] how we need to scrub the list."

155.    In October 2009, in reviewing its outbound dialing from October through December 2008, Dish confirmed that it was responsible for hundreds of thousands of telemarketing violations, including calling numbers on the National DNC Registry during a telemarketing campaign that targeted former customers that disconnected 20 months prior, which is outside the federal EBR period.

156.    On November 5, 2009, Dish telemarketing vendor eCreek telemarketed to a consumer who requested his phone number be placed on Dish's DNC list, with the call dispositioned as "DNC." However, the customer was already on Dish's Internal DNC List, and Dish could not determine why the number still appeared in calling lists.

157.    In January 2010, Dish discovered that its scrubbing system was not functioning as expected because it was not eliminating DNC records from telemarketing lists sent to eCreek. On January 21, 2010, a former Dish customer requested that an eCreek telemarketing agent place his phone number on Dish's Internal DNC List. The customer had already been on the Retailer DNC list since October 27, 2009, and was not placed on Dish's Internal DNC List until January 28, 2010.

158.    In January 2010, eCreek telemarketed to another phone number on a Dish-provided list that appeared on Dish's Internal DNC List, which PossibleNow maintained and which Dish believed it should scrub against. Put another way, Dish telemarketed to a number on its Internal DNC List more than 30 days after the number was added to the list even though it had access and could scrub against the list.

159.    In March 2010, in response to an email from Dish's regional account manager about issues her retailers had with a Pakistani lead generator, who was offering current Dish

customers the ability to change their contract and pay a lower price, Dish's Retail Service TCPA manager Ms. Reji Musso commented "Same ole, same ole."

160. In March 2010, Dish generated and distributed reports of disconnected customers to retailers, which retailers could use to get the customers they had activated to restart Dish service. Dish's Compliance team met to discuss DNC requirements for Dish providing retailers "disconnect reports," because retailer DNC compliance was a "touchy subject" at the moment.

161. In May 2010, eCreek's internal scrubbing process sometimes did not scrub phone numbers on eCreek's entity-specific DNC list.

162. In July 2010, Dish Outbound Operations team joked that it was unlikely that eCreek, Dish's telemarketing vendor, had a DNC process and procedure document.

163. In August 2010, a member of Dish's DNC Investigation team stated that "DNC training isn't as thorough as it used to be."

164. In January 2011, eCreek informed Dish that its telesales agent used incorrect disposition codes indicating no customer contact was made at the end of a series of telemarketing calls, which led to the consumer receiving multiple calls after requesting to be added to Dish's Internal DNC List.

165. In January 2011, based on call durations, Dish believed that eCreek's telesales agents incorrectly used the "answering machine" disposition code "in place of the correct disposition," which led to additional calls to numbers with incorrect dispositions.

166. In January 2011, eCreek informed Dish that its telesales agents could manually dial numbers in connection with outbound telemarketing campaigns.

167. As of 2011, Dish knew that retailer Cascade Callworks was a "strictly outbound telemarketing company" that had sold Dish since 2004, and that retailer Dish One generated five percent of its business, or 40 sales per month, using "outbound sales."

168. In August 2011, Dish's Outbound Operations team advised the Int'l Dept. that it should not dial outside of Dish's established outbound dialing processes and should review scripts review prior to dialing. Dish's Compliance Team also advised the Int'l Dept. against manual dialing. Dish's Compliance team believed that the Int'l Dept. would ignore this advice.

169. Dish's compliance team stated that the company had to follow specific outbound processes at that time "due to the fact that we are currently in litigation. "

170. As predicted, in August 2011, Dish's Int'l Dept. ignored the directions by Dish's compliance team and decided to "go[] around the defined process and []proceed[] with making these calls outside the dialer." Thus, there would be "no record of the dials, time, date, result, etc." Dish's marketing team was warned "multiple times" of "the risk they are taking."

171. As late as 2012, Dish created an initiative to expand the use of the OE Tool and the role of the retailers which included scripts and trainings for retailers.

172. During discovery, Dish did not produce any call records more recent than March 2010.

173. In response to a Civil Investigative Demand from the FTC, Dish provided records of calls it made from October 2003 through September 2005, December 2005 through December 2006, and January 2007 through August 2007 (2003-2007 Dish call records).

174. In its cover letter accompanying the production for the October 2003 through September 2005 records, Dish stated that the contents included a "DVD with a listing of all outbound telemarketing calls made on behalf of EchoStar From October 17, 2003 through December 31, 2004," and that a second DVD with calls from January 1, 2005 to the date of the CID was forthcoming.

175. For its 2003-2007 call records, Dish did not produce any data or evidence that it had Established Business Relationships (EBRs) for specific telephone numbers that it called.

176. For its 2003-2007 call records, Dish did not produce any campaign code or other call-specific evidence that indicates the call was not a telemarketing call.

177. After receiving the 2003-2007 call records for Dish the FTC assigned them the file folder names N136-N138, N218-N219, N228-N236, and N138-N243, as Dish had not Bates Numbered them.

178. The FTC sent the 2003-2007 Dish call records to its contractor, InterImage, which analyzed the calls by identifying how many of them were to telephone numbers that had been on the National Do Not Call Registry more than 31 days at the time of the call.

179. Between January 3, 2005 and May 31, 2005, Dish made 12,533,684 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

180. Between June 1, 2005 and June 30, 2005, Dish made 2,784,629 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

181. Between July 1, 2005 and July 31, 2005, Dish made 2,575,019 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

182. Between August 1, 2005 and September 18, 2005, Dish made 4,000,815 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

183. Between December 1, 2005 and January 31, 2006, Dish made 6,916,143 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

184. Between February 1, 2006 and February 28, 2006, Dish made 3,375,472 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

185. Between March 1, 2006 and April 30, 2006, Dish made 4,641,828 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

186. Between May 1, 2006 and June 30, 2006, Dish made 7,586,596 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

187. Between July 1, 2006 and August 15, 2006, Dish made 5,080,115 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

188. Between August 16, 2006 and September 30, 2006, Dish made 4,710,270 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

189. Between October 1, 2006 and October 31, 2006, Dish made 3,624,432 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

190. Between November 1, 2006 and November 30, 2006, Dish made 3,712,816 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

191. Between December 1, 2006 and December 31, 2006, Dish made 3,002,123 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

192. Between January 2, 2007 and February 28, 2007, Dish made 2,994,525 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

193. Between March 1, 2007 and April 30, 2007, Dish made 4,046,178 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

194. Between May 1, 2007 and May 31, 2007, Dish made 3,389,113 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

195. Between June 1, 2007 and June 30, 2007, Dish made 4,938,258 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

196. Between July 1, 2007 and July 31, 2007, Dish made 4,627,426 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

197. Between August 1, 2007 and August 31, 2007, Dish made 5,494,133 telemarketing calls to telephone numbers that had been on the Registry more than 31 days.

198. Dish's 2003-2007 call records show that Dish made 3,022,355 calls to telephone numbers that were both on the Registry and on Dish's Internal Do Not Call list more than 31 days at the time of the call.

199. For Dish's and its Telemarketing Vendors' outbound calls from September 2007 to March 2010, Dish recorded data about the calls' call records in a computer system, which accurately stored the phone number dialed, the date and time of the call, a name indicating the campaign during which the call was made, and the "disposition code" entered by the Dish employee or agent who handled the call.

200.    Dish produced its September 2007 to March 2010 internal call records (the "2007-2010 call records) in two sets: (1) a hard drive Bates numbered Dish-00000001, containing calls handled by Dish's domestic and Filipino call centers; and (2) two CDs Bates numbered Dish-00000002, containing calls placed by eCreek's dialer. The FTC assigned these sets of calls the folder names N275 and N276.

201.    The FTC sent Dish's 2007-2010 call records to its contractor, InterImage, which analyzed the calls by identifying how many of them were to telephone numbers that had been on the National Do Not Call Registry more than 31 days at the time of the call.

202.    *Dish represented that the 2007-2010 call records included both telemarketing and non-telemarketing calls. The individual call records contained campaign codes that recorded information about each call, however. Dish identified for Plaintiffs those codes that corresponded to calls made as part of telemarketing campaigns, and Plaintiffs used Dish's information to identify which call records were telemarketing calls.*

203.    Dish's campaign names indicate that Dish conducted outbound telemarketing campaigns targeting former customers who disconnected more than 18 months prior, which is outside the federal EBR period.

204.    Plaintiffs used account data that Dish represented as identifying calls with which Dish had an Established Business Relationship at the time of the call.

205.    Dish represented to Plaintiffs that its EBRs with individual telephone numbers called could be determined using the data Dish produced showing last payment dates and activation dates associated with such individual telephone numbers.

206.    The information Dish produced to Plaintiffs to assert EBRs for the numbers to which Dish initiated individual telemarketing calls consisted of last payment dates and activation dates associated with individual telephone numbers.

207.    For Dish's 2007-2010 telemarketing calls, to calculate whether Dish had an EBR claimed for any individual call record, Plaintiffs used the last payment date and activation date produced by Dish to establish the EBR: a call was determined to have occurred outside of the EBR period if it occurred more than 559 days after the last payment date provided by Dish, or more than 94 days after the activation date provided by Dish. The period of 559 days is one day more than 18 months of 31 days each, and the period of 94 days is one day more than three months of 31 days each.

208.    Plaintiffs cross-referenced the telemarketing calls to Registry numbers in Dish's 2007-2010 calls against the numbers on Dish's Internal Do Not call list and identified those telephone numbers that had been both on the Registry and on the Internal Do Not Call list Dish produced in March 2011 at least 31 days at the time of the call.

209.    Plaintiffs' analysis of the Registry reports by InterImage, the telemarketing campaign codes identified by Dish, the Internal Do Not Call List numbers, and the EBR information provided by Dish found that from September 2007 to March 2010, Dish and its Telemarketing Vendors:  (1) Made 1,112,125 telemarketing calls to phone numbers on

the Registry, which took place outside the EBR period claimed by Dish's EBR data (Opinion 1); (2) Made 2,230,290 telemarketing calls to phone numbers on the Registry for which Dish did not provide any EBR data of any kind (Opinion 1A); (3) Made 3,698,918 telemarketing calls to telephone numbers on both the Registry and the Dish Internal Do Not Call list (Opinion 2); and (4) Made an additional 6,485,211 calls to telephone numbers on the Dish Internal Do Not Call list (Opinion 3).

210. Dish reviewed and critiqued Plaintiffs' analysis using the EBR account data produced by Dish.

211. Dish uses the term "issue calls" to mean telemarketing calls to telephone numbers on the Registry or an Internal DNC List for which Dish has not identified any data that excludes or exempts the calls from violating the DNC Laws and regulations.

212. Out of a sample of 106 consumers who asked to have their telephone numbers placed on Dish's internal do not call list, Dish failed to place 34 of these numbers on its internal do not call list.

213. Telemarketing Vendor eCreek labeled the telephone number of each person who asked not to be called as "DNC" on eCreek records.

214. Dish asked Telemarketing Vendor eCreek to communicate the telephone numbers marked "DNC" to Dish on a daily feedback file that sent the results each night of the previous day's calling.

215. From November 2008 through March 2010, Dish or its Telemarketing Vendor eCreek made 140,349 outbound telemarketing telephone calls to telephone numbers that eCreek labeled "DNC" more than 30 days before each such call.

216. Dish designated as the "Retailer Inaccessible List" the Internal DNC List that contains telephone numbers compiled by Dish retailers and to which Dish claimed not to have access.

217. The Dish, BP, and Retailers' portions of Dish's entity-specific DNC list are respectively comprised of the telephone numbers of consumers who stated to Dish, Dish's Telemarketing Vendors, or Dish's retailers that they did not wish to receive calls by or on behalf of Dish.

218. Dish's John Taylor divided calls to telephone numbers on Dish's Internal DNC List into three categories: (1) telemarketing calls to numbers on the Dish and Telemarketing Vendor internal DNC lists (Dish List); (2) telemarketing calls to numbers on the internal do-not- call lists maintained by Dish's retailers regardless of whether Dish had access to the retailer lists (Retailer Inaccessible List); and (3) telemarketing calls to numbers on the internal DNC lists maintained by Dish's Retailers that Dish could access after PossibleNow starting collecting those lists in April 2008 (Retailer Accessible List).

219.     Dish's John Taylor does not have personal knowledge of when the Dish retailer do not call lists uploaded by PossibleNow became accessible to Dish, or when Dish's internal do not call list became accessible to Dish's retailers.

220.     Dish's John Taylor found that Dish's 2007-2010 call records included 8,224,409 Dish telemarketing calls to persons on the entity-specific DNC lists of Dish or a Dish Retailer.

221.     Dish's John Taylor identified the number of Dish 2007-2010 calls to the Dish List, the Retailer Accessible List, and the Retailer Inaccessible List that were made to area codes associated with each Plaintiff State.

222.     For the 2007-2010 calls, Dish and its Telemarketing Vendors made 903,246 telemarketing calls to numbers that were on the Dish List.

223.     For the 2007-2010 calls, of 8,224,409 calls by Dish and the Telemarketing Vendors to telephone numbers on Dish's Internal Do Not Call lists, 3,114,488 were placed to numbers on both the Dish List and the Retailer Accessible List.

224.     Dish and the Telemarketing Vendors made 2,211,242 telemarketing "issue" calls to numbers on the internal do not call lists compiled by retailers to which Dish had access (Retailer Accessible List).

225.     For the 2007-2010 calls, Dish and the Telemarketing Vendors made 7,321,163 telemarketing "issue" calls to numbers on the internal do not call lists compiled by retailers to which Dish claims not to have access (Retailer Inaccessible List).

226.     With respect to Dish's 2007-2010 call records, Dish engaged in a pattern or practice of calling numbers that had been on the Registry more than 31 days nationwide, including to residents of the Plaintiff States.

227.     Dish's expert, John Taylor, excluded from the call counts in his expert reports all calls in Dish's 2007-2010 call records that reached businesses.

228.     Dish's expert, John Taylor, described as "fallacious" the premise that the activation date data Dish provided included information sufficient to show an "inquiry EBR"-- i.e., an EBR created by a consumer inquiry.

229.     Between 2007 and 2010, Dish made 501,650 outbound telemarketing calls to telephone numbers that had been on the Registry more than 31 days, and for which Dish had no evidence of an EBR.

230.     Between 2007 and 2010, Dish made 8,224,409 telemarketing calls to Dish's Internal DNC List, 2,397,390 of which were made to numbers on the Registry.

231.     11,004 of these 8,224,409 Dish 2007-2010 telemarketing calls to the Internal DNC List were included in the 501,650 "issue" calls previously identified by Taylor; when these 11,004 calls are subtracted, Dish made an additional 2,386,386 telemarketing calls to numbers both on the Registry and on Dish's Internal Do Not Call list.

232.    Between 2007 and 2010, Dish made 2,386,386 telemarketing calls to numbers that had been on the Registry more than 31 days and that were also on either Dish's or a Dish retailer's entity-specific DNC list.

233.    Of Dish's 2,386,386 calls to numbers on the Registry between 2007-2010, 71,853 of those calls were also to numbers on the Dish Internal Do Not Call list.

234.    Of Dish's 2,386,386 calls to numbers on the Registry between 2007-2010, 2,314,533 of those calls were to numbers on the Retailer Accessible List or the Retailer Inaccessible List.

235.    Dish made 2,386,386 calls to numbers on the Registry for more than 31 days and that are numbers of persons who stated to Dish or to a Dish retailer that they did not wish to receive outbound telephone calls 30 days or more prior to the call.

236.    From 2007-2010, Dish made 309,931 calls to numbers on the Registry for more than 31 days that were not completed.

237.    Between 2007 and 2010, Dish made 12,552 telemarketing calls to numbers that had been on the Registry more than 31 days that reached a wrong number or a recipient that did not speak English.

238.    From 2007-2010, Dish made 873,551 calls to numbers on the Registry for more than 31 days that Dish claimed were part of "lead" campaigns—i.e., sales initiatives that called groups of consumers who had supposedly inquired about Dish.

239.    Regarding Dish's 2007-2010 873,551 calls to numbers on the Registry more than 31 days that Taylor excluded as having been made pursuant to a supposed consumer inquiry, Dish produced no documents or witnesses with personal knowledge to establish the meaning of the campaign codes associated with these calls.

240.    Dish did not produce any evidence of consumer leads in discovery.

241.    Dish did not produce any documentation of any inquiries made by consumers called as part of its 873,551 telemarketing calls to Registry numbers, the call records for which Dish claimed a campaign code indicating that the calls were made in response to a customer inquiry.

242.    Dish's John Taylor lacks personal knowledge of which Dish campaign codes purportedly reflect customer inquiries, or of the data underlying those purported inquiries.

243.    Between 2007 and 2010, Dish made 873,551 telemarketing calls to numbers that had been on the Registry more than 31 days, the call records for which reflected a campaign code that Dish's John Taylor stated was evidence of a customer inquiry.

244.    Between 2003 and 2008, Dish initiated outbound prerecorded message telemarketing campaigns.

245.  During 2007 and 2008, Dish made 98,054 automessage telemarketing calls that were answered by a live person and played a message that lasted longer than two seconds and did not give the call recipient the opportunity to opt out of future calls.

246.  Between September 2007 and November 2008, Dish initiated pre-recorded telemarketing calls in fifteen campaigns that generally marketed foreign language programming, including Arabic, Greek, Chinese, Indus, Korean, Filipino, German, and French programming.

247.  One of Dish's pre-recorded message campaigns between 2007 and 2008 marketed a programming package called Zee Sports.

248.  Dish's auto dialer could detect whether a person answered the telephone, and Dish records marked the call with the notation DPV, to indicate "positive voice."

249.  Between 2007-2010, Dish initiated 98,054 prerecorded outbound telemarketing calls as part of 15 automessage (AM) with the disposition code DPV (Dish Prerecorded Calls).

250.  The 98,054 Dish Prerecorded Calls were not on the Dish EBR list that Dish provided in discovery.

251.  Beginning in February 2005, the United States (on referral from the Federal Trade Commission) filed a series of public lawsuits seeking to hold sellers liable under the TSR for the activities of their telemarketers, regardless of whether the telemarketers were agents of the seller.  Complaint ¶ 18, *United States v. Flagship Resort Dev. Corp.*, No. 1:05-CV-00981 (D.N.J. filed Feb. 16, 2005) (alleging that seller caused its telemarketer to violate the TSR by agreeing to pay for marketing services); Complaint ¶¶ 35, 42-44, 48-49, *United States v. DIRECTV, Inc.*, No. 8:05-CV-1211 (C.D. Cal. filed Dec. 12, 2005) (alleging that Dish's largest satellite-television competitor, DIRECTV, caused its dealers to violate the TSR, where it entered into contracts with its dealers or paid the dealers to market its services, and the dealers violated the TSR); Complaint ¶¶ 25, 28, 32, *United States v. ADT Sec. Servs., Inc.*, No. 9:07-CV-81051-WJZ (S.D. Fla. filed Nov. 6, 2007) (alleging that alarm-monitoring company caused its dealers to violate the TSR, where it operated national network of dealers, authorized them to solicit customers, and paid them for opening new security system accounts, and they violated the TSR).

252.  By October 6, 2006, at the latest, Dish knew that FTC sued and settled with DirecTV for the TSR violations of DirecTV's retailers.

253.  In February 2007, Dish reiterated internally that DirecTV had been fined "a significant amount of money for not adhering to the laws . . . ."  Dish personnel believed its "focus and preventative measures, like this latest initiative for call monitoring, is meant to help us avoid a similar punitive action for us."

254.  In a September 2008 presentation, Dish's telemarketing compliance vendor reminded Dish that its main competitor, DirecTV, and its retailers, were penalized for violations of telemarketing laws.

255.   Dish and its retailers' telemarketing practices have been the subject of multiple investigations by State Attorneys General offices.

256.   As early as May 2002, Dish believed that complaints to States Attorneys General regarding telemarketing selling Dish service were attributable to its retailers.

257.   In May 2006, the Washington Attorney General informed Dish that it could be responsible for the violations of state autodialer laws by its retailer Regal Satellite.

258.   In November 2006, Dish received a letter from North Carolina's Department of Justice, which highlighted that North Carolina law required Dish "to monitor and enforce compliance by its independent contractors in do not call systems and procedures."

259.   In response to investigations by State Attorneys General offices, Dish claimed it was not legally responsible for its retailers' telemarketing activities.

260.   In September 2003, Dish debated whether, if it pulled and sent lists of phone numbers for one of its "partners" to call, Dish had a legal responsibility to exclude phone numbers from the list that were on the federal and state DNC registries, and it concluded that it should.

261.   In September 2003, Dish believed even if a partner indemnified Dish with regard to the quality of the list of phone numbers, there was (1) "no reason to pass numbers we know to be on the do not call lists;" and (2) even if Dish did not "have to do so as a matter of law, there's no reason to pass numbers of people who have specifically requested that we not call them.  these are bad leads anyway."

262.   By September 2005, a Dish lawyer who dealt with telemarketing compliance counseled high-level senior executives that when the company knew pertinent facts about a retailer's illegal telemarketing activities and failed to take action--such as stopping to accept sales from that retailer--it would be liable for that entities' conduct.

263.   By July 2006, Dish believed that the "stakes are very high" for finding retailers that used illegal telemarketing.

264.   By November 2006, Dish's Retailer Services Director believed that Dish needed "to take some action" against retailers suspected of illegal telemarketing.

265.   By September 2008, Dish believed that it could be sued and subjected to monetary penalties for TCPA violations as a result of its retailers' telemarketing.

266.   By December 2008, Dish believed it "need[ed] to be able to track through automated dialer all outbound activity dialed by Dish or by someone else on behalf of Dish."

267.   In December 2008, Dish's outbound dialing manager believed that if Dish provided legal advice related to telemarketing to an entity, that entity could be viewed as telemarketing on behalf of Dish and Dish could be legally liable for telemarketing violations.

268. In December 2009, when founder Charlie Ergen and others at Dish received information suggesting that an OE retailer, Sat Country, had hired felons who had access to customer information and were coming into customers' homes, Rob Frankel of Dish's Legal Department expressed the view "that we have been put on notice and have some exposure to liability as a result of information brought for recently," that the emails could create for Dish a "duty to further investigate," and that he recommended terminating the relationship with Sat Country.

269. Dish told the FCC that it would be liable under the TCPA: (a) "if [Dish] directs the [third party's] telemarketing activity by providing call lists for telemarketing"; and (b) "if [Dish] knows that a retailer is repeatedly engaging in violative telemarketing when selling [Dish]'s products or services, and [Dish] fails to take reasonable measures to address the unlawful conduct."

270. In July 2004, a consumer notified Dish that it was liable for the telemarketing violations of its retailers.

271. In February 2005, a consumer notified Dish that she believed Dish was responsible for calls selling Dish service, even if Dish claimed the call came from an independent retailer.

272. In April 2005, a consumer alleged Dish or its retailers were making illegal prerecorded telemarketing calls to Washington consumers.

273. In April 2005, a consumer informed Dish that he believed Dish was responsible for calls selling Dish service, even if Dish claimed the call came from an independent retailer.

274. In April 2006, a consumer believed that Dish representatives were conducting illegal telemarketing, and told Dish that it should be responsible for its retailers' telemarketing activities.

275. In December 2008, Dish settled a consumer lawsuit brought under Washington law, requiring Dish to discipline retailers that Dish learns are telemarketing using prerecorded messages into the state of Washington.

276. In response to consumer complaints, Dish claimed it was not legally responsible for its retailers' telemarketing activities.

277. Dish has a policy that its retailers are liable for their independent affiliates' conduct.

278. In October 2006, Dish held retailers responsible for the TCPA violations of the affiliates that were generating sales leads because "the responsibility for [the affiliates'] performance falls on [the retailer's] shoulders."

279. In a November 2006 e-mail, in response to a company blaming another entity for telemarketing violations, Ms. Musso stated "finger pointing means you have THREE pointing back at you."

280. Ms. Musso did not accept "ignorance of the law" as an excuse for telemarketing violations from retailers.

281. In a presentation to OE retailers, Reji Musso, told retailers that they would be responsible for affiliates' violations even if the retailer claimed ignorance.

282. With respect to entities that generated sales leads or activations for retailers, Dish told the retailers that "when all is said and done, they [the affiliates] are you."

283. In June 2008, Dish's Retail Services Department drafted a letter that would be sent to retailers when they tried to blame a telemarketing violation on their own "independent contractor." The draft letter indicated that, even if the retailer claimed no responsibility for the actions of their independent affiliate, Dish considered the retailer liable because the retailer benefited from the affiliate's marketing activities.

284. Dish held its retailers responsible for the telemarketing violations of independent affiliates because "[the retailer] would have gained the remuneration for the sale . . . [and] [e]ven if [the retailer] put the responsibility on [a third party,] [the retailer] is still responsible."

285. Dish held its retailers responsible for the illegal telemarketing of its affiliates because "the retailer will still reap the benefits from the sales that are completed."

286. In notes from an August 13, 2009 meeting involving Russell Barnett, Bruce Werner, Reji Musso and others about retailer LA Activations, Ms. Musso indicated that that with respect to an illegal call, "who made the call is not as important as who derived the benefit."

287. In December 2009, Dish informed a retailer that it approved the affiliate, Cannon Satellite, and that the affiliate could use the OE tool to generate sales if they gave their IP address to Dish, noting "[a]s always, remember that the benefit and the risk is yours and you are fully responsible for the business conducted by this affiliate."

288. Before engaging with third party affiliates, in addition to obtaining Dish's express consent to use them, in April 2011 Dish required retailers to "do your own due diligence on these affiliates i.e. reference checks Google, obtain copies of marketing proposals, etc.", noting that '[w]hile these affiliates appear to be interested in "helping a retailer's business," they actually expose retailers to significant risk.'

289. In July 2011, Dish contacted retailer Portland Marketing Group to remind it that it had to obtain Dish's prior written consent to use "any third parties not employed by you (e.g., independent contractors or subcontractors)" and that if Dish consents to the retailer's use of the third party, "you are responsible for the actions of that third party."

290. By 2011, when Dish's Retail Services Supervisor granted consent to retailers to use the vendors identified in a spreadsheet, it would highlight that "while [Dish] acknowledge[s] your utilization of this vendor, remember that the associated risks and benefits of doing business with any third party are your sole responsibility."

291.  The prevailing industry standard for a robust telemarketing compliance program includes clearly defined processes, policies, and procedures to be followed, which are memorialized in published policy, procedure, and training materials, and also includes a process for continually monitoring and auditing its own performance to ensure compliance.

292.  The prevailing industry standard for a robust telemarketing compliance program includes clear and defined expectations and guidelines describing how violations will be handled and consistent enforcement of these rules.

293.  The prevailing industry standard for a robust telemarketing compliance program includes readily accessible and on-file written policies and related instruction materials, and an organized plan for distributing these materials to all impacted employees, including obtaining affirmations from all such employees that they have read, understood, and will abide by these policies

294.  The prevailing industry standard for a robust telemarketing compliance program ensures that all calling scripts are reviewed for compliance with state and federal rules.

295.  The prevailing industry standard for a robust telemarketing compliance program includes a process by which complaints about the company, whether made to the company or through other channels, such as regulatory body, would be tracked for trend analysis and to ensure that all such complaints are properly addressed.

296.  The prevailing industry standard for a robust telemarketing compliance program includes a regularly scheduled auditing process by which it ensures that its policies and procedures are being followed.

297.  The prevailing industry standard when a third party telemarkets to sell a company's service includes adequate due diligence on the third party, including background, credit, and criminal history checks, and marketing methods.

298.  The prevailing industry standard when a third party telemarkets to sell a company's service includes detailed and comprehensive contractual terms outlining expectations, requirements, and obligations with respect to the telemarketing designed to prevent telemarketing violations.

299.  The prevailing industry standard when a third party telemarkets to sell a company's service includes detailed and comprehensive contractual requirements for record keeping and the ability to obtain call records, such that even if the third party is terminated relevant documents, including call records, are maintained.

300.  The prevailing industry standard when a third party telemarkets to sell a company's service includes procedures to ensure that the third party's telemarketing activities are compliant with applicable laws and regulations, including regular auditing for telemarketing compliance and specific penalties for non-compliance.

301. The prevailing industry standard when a third party telemarkets to sell a company's service includes detailed and comprehensive contractual provision outlining the conditions under which the third party would be disciplined or terminated for telemarketing violations, including suspension, probation, and termination, and procedures for enforcement.

302. The prevailing industry standard when a third party telemarkets to sell a company's service includes a regular audit process to ensure that the third party is observing its obligations.

303. The prevailing industry standard when a third party telemarkets to sell a company's service includes consistent and strict enforcement of contractual obligations regarding telemarketing so that the company does not create an environment such that the third party believes it can violate the law as long as it generates sales.

304. The prevailing industry standard when a third party telemarkets to sell a company's service includes the creation and implementation of policies and procedures for obtaining and exchanging internal do not call lists with the third party.

305. The prevailing industry standard when a third party telemarkets to sell a company's service includes a written process to address complaints received from any source, whether from consumers or regulatory agencies. Both the company and the third party would keep a mutual list of complaints and track the progress of each investigation and resolution, track trends, and deal with recurring issues.

306. The prevailing industry standard when a third party telemarkets to sell a company's service includes specific and comprehensive contractual terms under which the third party will be disciplined or terminated for telemarketing violations, which are consistently and transparently enforced.

307. The prevailing industry standard when a third party telemarkets to sell a company's service includes requires the company, upon receiving a complaint about violative telemarketing by the third party, to suspend the third party's telemarketing activity while the company conducts a thorough investigation and audit of call records to resolve any potential issues.

308. The prevailing industry standard when a third party telemarkets to sell a company's service requires the company to immediately stop doing business with the third party once it learns of a telemarketing violation while it conducts a thorough investigation and audit, and would immediately terminate the third party upon learning of multiple telemarketing violations.

309. The prevailing industry standard when a third party telemarkets to sell a company's service includes specific and comprehensive contractual terms regarding the third party's obligations for telemarketing compliance, and not simply a blanket "follow the law" statement.

310.    The prevailing industry standard when a third party telemarkets to sell a company's service includes specific contractual obligations in place that would permit the company to monitor calls, both recorded and real time to audit the third party's compliance with telemarketing laws.

311.    The prevailing industry standard when a third party telemarkets to sell a company's service includes specific contractual provisions requiring regular monitoring of IVR flows and recording, including review and approval of the IVR design.

312.    In 2003, Dish created a new type of authorized retailer, which it called Order Entry (OE).

313.    OE Retailers solicit orders for Dish pay-TV services, but are not required to buy satellite equipment or perform equipment installation.

314.    In contrast to OE Retailers, Dish's Full Service Retailers or TV Receive Only (also known as TVRO) Retailers sold and installed satellite dishes and other equipment.

315.    Dish pays OE Retailers in accordance with their contractual agreements, generally on a per-activation basis.

316.    One of the hallmarks of an OE Retailer is that Dish provides access to the internet-based sales portal called the OE Tool.  At the time it launched the OE Retailer program, Dish explained that: "The OE Tool will enable your Customer Service Representatives (CSR) to sell the customer on the Dish Network promotion and hardware configuration that best fits their needs, as well as close the sale in its entirety. To elaborate, as the sale is being made to the customer, your CSR will be entering the customer's information into the OE tool. With the flow of the OE Tool, it will guide your CSR from screen to screen allowing them to collect all of the necessary information to build the customer's account, and schedule the customer's installation. As you know, some of our promotions require a credit score and valid major credit card and this program will automatically credit qualify the customer in both of those respects. The OE Tool also allows your CSR to collect any amounts due from the customer on Dish Network's behalf along with any upgrade charges. Regarding the installation, the OE Tool will give your CSR "real time" access to Dish Network's Service Corporations (DNSC) installation calendar. DNSC will deliver the equipment to the customer's home, perform the installation and take on all ongoing customer support. That means NO equipment for you to inventory and NO installations for you to perform; Dish Network takes care of everything after the sale.  Dish promoted the OE Program to one of the earliest OE Retailers as "the ultimate in convenience not only for [the OE Retailer] but also for your customers."

317.    OE retailers complete Dish sales over the telephone.  Put another way, regardless of how it generated the lead, OE Retailers' telesales agents took information from a potential customer telephonically and inputted such information directly into Dish's systems to generate an account.  Dish expected OE Retailers to have sales agents to sell Dish services over the telephone.

318.    Dish, through Field Sales Development Representatives and Account Managers, provided in-person sales training to OE retailers, including on how to use the OE Tool, which

identified available programming and features, equipment, pricing promotions, and requisite disclosures for potential customers.

319. Dish knew the main distinguishing characteristic of OE Retailers is their use of call centers to generate sales.

320. OE Retailers are able to input customer information from a completed sale directly into Dish's systems using the OE Tool. Through the OE Tool, sales can be inputted into Dish's system from multi-location call centers.

321. The OE Tool allows individual telemarketing agents at OE Retailer call centers to sign in using Dish-provided usernames and passwords.

322. When completing a sale, the OE Tool provides specific screen prompts for retailers' telesales agents providing specific scripted disclosures that the telesales agents must read to the consumer word-for-word over the telephone. Dish believed these disclosures are important because they "for customers to understand what they're buying when they get Dish Network." Put another way, Dish mandated OE Retailer convey specific Dish-approved disclosures verbatim to the customer regarding the terms of the contract between the consumer and Dish.

323. Dish alone determined when pricing of its service and whether any pricing promotions would be available for marketing by OE Retailers. For such new sales promotions, Dish provided OE Retailers with mandated disclosures and instructed OE Retailers regarding whether the disclosures needed to be pre-recorded or read live to consumers when consummating a sale.

324. OE Retailers use the OE Tool to place customers' orders for Dish service, to arrange for payment directly to Dish, and to arrange for Dish to install the equipment necessary for service.

325. Dish requires the OE call center agent to obtain a Social Security number and credit card from the prospective customer, in order to perform a credit check for Dish service. Dish provides the credit-qualification service and sets the credit qualification levels. Dish also set specific and strict guidelines on the handling of consumers' payment and personally identifying information.

326. Once an OE Retailers' telesales agent enters a sale into the Dish's system using the OE Tool, Dish displays to that agent an installation calendar, which allows the agent to bind Dish to a date and time when Dish or a Dish agent will install Dish equipment at the customer's home.

327. Dish requires required OE Retailers' telesales agents to take credit-card information from the consumer, and also requires the telesales agent to solicit the prospective customer to give Dish authorization to auto-charge the consumer's credit card every month.

328. Sometime after this lawsuit was filed in 2009, Dish replaced the Order Entry Tool with a new order entry system called Axiom that was functionally "almost identical" to the

previous Order Entry Tool. All retailers now use the Axiom system as the order entry tool.

329. Dish sells nearly 60 percent of its new subscribers through the "indirect sales channel"— the term it uses for sales that come from sources other than Dish's Marketing Department. The Indirect Sales Channel includes Retailers, both OE and TVRO.

330. Within the Indirect Sales Channel, OE Retailers, at certain times over the last 10 years, produced more sales than the entirety of Dish's direct sales organization.

331. As of September 5, 2006, Dish's top 21 retailers represented 93 percent of OE sales activity.

332. As of February 2007, the top 5 OE retailers procured 30% of Dish's yearly activations.

333. As of February 2007, Dish's more than 60 OE retailers had more than 1,000 agents taking calls.

334. As of February 2007, OE retailers generated more than 1 million Dish subscribers a year.

335. In March 2009, to be in the top 75 Dish retailers and win a spot on the 2009 Dish Retailer Incentive Trip--a Mediterranean Cruise on a Silverseas luxury cruise ship--the current pace was 1,800 activations for the year leading up to April 2009.

336. Between 2003 and 2010, Dish's OE retailers averaged more than 20,000 sales per year.

337. Between 2003 and 2010, Dish's top retailers activated 102,822,244 subscribers for Dish.

338. Between 2003 and 2010, Dish paid its top 100 retailers a total of $3.06 billion in incentive payments as shown by year:  2003—$298,905,686;  2004—$296,514,820;  2005—$334,530,314; 2006—$394,219,659; 2007—$483,053,766; 2008—$466,761,417; 2009—$361,945,888; and 2010—$427,493,941.

339. Between 2003 and 2010, Dish paid OE retailers American Satellite, Dish TV Now, JSR Enterprises, National Satellite Systems, Satellite Systems Network, and Star Satellite a total of $93,978,594 in incentive payments.

340. A Dish executive wrote to a retailer, "[w]hen you start selling as an OE ratailer [sic], please really kick the sales in.  [You] will be our first OE Retailer so the pressure is on...."

341. In March 2009, responding to an email from Dish executive vice president Michael Kelly about whether Dish was doing anything to make up gross activations lost by terminating retailers, Steve McElroy indicated that the retailers terminated had not been OE retailers and that for Apex Satellite, an OE retailer whose termination had been recommended for using illegal telemarketing and refusing to change their behavior, they did no "legitimate advertising and as such there is no specific geographic or marketing void to fill."  Dish

expected that when it terminated OE retailers, that Dish's direct sales division would "preserve the gross activations" lost by terminating those retailers.

342. On March 6, 2009, Dish Executive Vice President Michael Kelly expressed concern that the OE retailer channel "under delivered last week by approximately [40,000] subs[cribers]," and noting that Dish was not seeing "any lift in direct sales or direct sales call volume" as a result in the decrease in the OE traffic from 10 OE retailers that Dish had terminated the week before.

343. In March 2009, Dish's Steve McElroy assured Executive Vice President Michael Kelly that with regard to terminating retailers in the future, Dish would work to analyze retailers for which termination is recommended to determine where they are marketing, and then coordinate with Dish's Direct Sales division to fill any void created by the loss of the retailer, noting that "in general, the OE partners we terminated are not the retailers engaged in legitimate marketing . . . [t]hey are partners who are using illegal telemarketing tactics, overseas centers and affiliates."

344. In July 2010, OE Retailers represented 1/3 of all sales and supporting them was deemed critical.

345. In 2011, Dish's National Sales Partners on the OE Tool had achieved 893,662 activations for Dish, and were projected to achieve 990,000 in 2012.

346. In its 2012 budget for the OE Retailers, Dish set weekly targets for each month for the OE retailers, with targets as much as 40,000 activations a week during January 2012

347. In its 2012 budget for the OE retailers, Dish noted past activation numbers and created an activation forecast and plan for each OE retailer, including National Satellite Systems and Satellite Systems Network, noting accounts that could fluctuate.

348. In its 2012 budget for the OE retailers, one of Dish's 2012 goals and objectives was to focus on Satellite Systems Network and select other OE retailers outside the Top 10 "for Marketing and Growth"

349. In August 2009, Dish provided a sales quality report evaluating Dish Direct sales and Indirect sales together in one report, even though neither channel had any "operational influence over the other." Amir Ahmed, Senior VP over Indirect Sales, noted the fact that he "love[d]" the fact that the OE retailer channel was outscoring direct sales, and Ahmed responded, "[Just] win, just win, it's that simple."

350. As of March 2011, Amir Ahmed, Senior VP of Indirect Sales, had 400 employees at Dish working for him and his indirect sales channel was responsible for 2 million activations, over 60 percent of Dish's budget.

351. In March 2011, Mr. Ahmed stated that over the 18 months since he "came back," he had "cleaned up the OE channel," describing how he had terminated retailers such as "Trimarco that accounted for almost 30,000 activations a month" and increased "QA."

352. Dish has a Retail Services Department that had oversight responsibility Dish's retailers. Retail Services includes a Risk and Audit team, which includes a Compliance unit.

353. Certain retailer conduct, such as account duplication or fraudulent accounts, results in Dish paying retailers for non-existent subscribers. When addressing these types of retailer conduct that impacted Dish's financial bottom line, Dish's Retail Services Department had a robust, diligent, and comprehensive program to monitor and control retailer misconduct. This monitoring included regular multilevel management review, granular account analyses, and immediate suspension of payments when misconduct was suspected.

354. In August 2005, Charter Communications, a cable company and Dish competitor, informed Dish that Dish's retailers were using prerecorded message telemarketing to sell Dish service to Charter's customers.

355. In March 2006, an email circulated amongst senior Dish executives from Executive Vice President Erik Carlson, regarding OE retailer Sterling Satellite. Internally, Dish believed certain retailers--either Sterling Satellite or Marketing Guru--were responsible for aggressive and illegal telemarketing from an overseas location. Mr. Carlson specifically observed that Sterling Satellite used outbound telemarketing.

356. In July 2006, Dish employees again reiterated to Dish management knew that OE retailer Sterling Satellite was "an aggressive [outbound telemarketing] retailer with Indian call centers."

357. In mid-July 2006, a Dish National Sales manager discussed outbound telemarketing from Indian call centers with 5 OE retailers (Brandvein, Dish Pronto, Cyberworks, VMC, All Sat) that he knew used this marketing method.

358. By July 2006, a Dish employee estimated that a "majority" of the telemarketing complaints "are caused by our retailers . . . contacting consumers on 'our behalf."' In response, a Dish manager stated that the company's process for addressing illegal telemarketing by its retailers "does not work as currently designed" because "there are no additional efforts to investigate even when we have identified" the retailer.

359. In late July 2006, Dish's ERT Manager proposed instituting a "progressive discipline" policy with respect to telemarketing violations by retailers consisting of "1st and 2nd Notice and Complaint Letters / Termination" and also initiating a sting program to catch the retailers.

360. In early-August 2006, high-level Dish executives received an email from its Retail Services Department stating that multiple OE Retailers used overseas call centers that used illegal telemarketing tactics and that specifically represented themselves as Dish to consumers.

361. In an August 21, 2006, in an e-mail titled "TCPA," a Manager in Dish's Retail Services Department stated that the company had created a "compliance" unit, with Reji Musso as

Manager, in order to "bring[] structure to [Dish's] efforts in complying with Federal, State and internal requirements surrounding marketing."

362. In 2007, Ms. Musso wrote that her job entailed handling "DNC violations."

363. In a televised presentation to its OE Retailers in January 2007, Dish's Executive Vice President Jim DeFranco confessed that he did not want to create the Compliance section with the Retail Services Department.

364. Also in 2007, Ms. Musso wrote that her division's role was "to deflect responsibility away from EchoStar, which [she] agree[d] with."

365. Dish's Retail Services Department believed that the purposes for TCPA compliance was to "minimize corporate financial risk and liabilities."

366. Dish failed to preserve numerous emails that Ms. Musso sent to retailers and others between August 2006 and December 2007.

367. In describing the Retail Service's Compliance unit, Reji Musso wrote "I am fondly (I hope) referred to as the Dish police, but certainly not the enemy."

368. Ms. Musso believed that the retailers were on "the honor system" for telemarketing violations and stated that retailers committing telemarketing violations were judged on a "case by case basis."

369. By September 2006, Dish was compiling information about its retailers' telemarketing violations, complaints, or lawsuits. From this information, Dish generated weekly Risk Summary reports.

370. Between May 1 and Sept. 5, 2006, Dish's vendor inquiries email address had received 594 complaints about individual retailers

371. In the week ending Sept. 5, 2006, Dish had received 60 new complaints about retailers, was planning to send letters seeking additional information to retailers AllSat, Marketing Guru, and i-Dish about additional complaints received, and had received and forwarded to Satellite Systems Now a Notice of Complaint sent to Dish regarding that retailer's violations of the federal telemarketing laws and seeking monetary damages.

372. As of the week of September 5, 2006, Dish planned to terminate retailer United Satellite for TCPA violations, to have retailer Sterling Satellite visited "on site" to address allegations of TCPA violations, and to send retailer Dish Pronto a letter to address the three TCPA violations with which it was associated

373. In early September 2006, weeks after starting her position as Compliance Manager, Ms. Musso wrote that her conversation with OE retailer All Sat revealed the retailers' use of two vendors to make its Dish calls. She observed that "now that we are in that 3rd party thing," and that it was "[o]ne of the next chapters."

374.  By early October 2006, Dish's Retail Services Department believed that there were "current TCPA storms brewing."

375.  By November 2006, Ms. Musso opined that keeping a record of meetings with retailers accused of telemarketing violations would be helpful for responding to State attorneys general that contacted Dish because "it looks good that [Dish is] bringing them in for 'discussions.'"

376.  By November 2006, a Dish paralegal stated that trying to stop illegal telemarketing by Dish retailers was "wearing [her] down."

377.  By November 2006, Ms. Musso and her boss, Robb Origer were still formulating a process for addressing "OE partners" accused of and caught conducting illegal telemarketing.

378.  In November 2006, Dish's Retail Services team considered sending a letter to consumers that would be intended to show victims of illegal telemarketing that it "may NOT have total control over [its] retailers."

379.  By December 2006, Dish's Retail Services Department still did not have a "standard" policy with respect to affiliate use by its retailers.

380.  In February 2007, a Dish Sales Manager had a call with OE Retailers using foreign call centers, and Mike Trimarco of Dish Pronto outlined steps Dish could take to reduce illegal telemarketing, including sharing Dish's Internal DNC List, banning phone sales, creating rules on affiliates, and adequately enforcing those rules.

381.  In May 2007, Dish knew that OE Retailers that used outbound telemarketing as a primary strategy generated approximately 12,000 activations a month. Dish believed that retailers' outbound telemarketing was responsible for about 20,000 activations every month.

382.  In fact, Dish believed that if a retailer was generating more than 150 sales per month, it was using outbound telemarketing to achieve that sales level.

383.  In September 2007, Dish initiated a requirement that OE Retailers with over 150 sales a month to use PossibleNow's telemarketing compliance services.

384.  On or around August 2007, Dish replaced its "three strikes" policy for terminating retailers with telemarketing violations with a policy calling for a "business decision" as to whether to continue the relationship with the retailer in spite of the telemarketing violations.

385.  Musso's superiors in Retail Services reviewed investigations in conjunction with the Sales Department to determine whether any actions should be taken to discipline any retailer. Possible disciplinary measures ranged from a letter directing the retailer to cease and desist from some practice, to a fine, to termination of the Retailer Agreement.

386.  The decision whether to terminate a retailer who had committed telemarketing violations was made on a case by case basis; some retailers who had committed TCPA violations were permitted to continue telemarketing after paying a penalty, while others were terminated.

387.  In July 2008, when dealing with a customer that was the victim of illegal telemarketing, Ms. Musso stated "the best news" was that the consumer "will still be a Dish customer."

388.  By mid-2008, Ms. Musso observed that she had never actually issued a penalty against a retailer, even when Dish nominally penalized a retailer in February 2007 for a TCPA violation.

389.  In June 2008, when handling a consumer complaint about an OE Retailer's illegal telemarketing, Ms. Musso explained that Dish's "responsibility is to report the allegations" to the retailer and the retailer's "requirement is to respond to [Dish] with whatever supporting data you might have to dispel the claim."

390.  In July 2008, Ms. Musso stated that at all times, even if a telemarketing allegation is confirmed, it is ultimately Dish's sales team that will make a "business decision" about consequences for the retailer.

391.  In July 2008, Ms. Musso suggested that Dish not take any action against an OE Retailer, i-Dish, that admitted to using prerecorded message telemarketing because she believed the company "will produce good business - which we obviously need - and stay off the radar."

392.  In fact, by July 2008, Ms. Musso was unsure whether prerecorded message broadcasting, which she knew was being used by some retailers, was illegal.

393.  In late July 2008, PossibleNow's representatives spoke with Dish retailers about compliance requirements, and those retailers resisted meeting those requirements. PossibleNow representative opined to Ms. Musso that "if anything, based on what we've learned from your retailer group over the last 6 weeks, I think [Dish] should be more aggressive...."

394.  In August 2008, the highest levels of Dish senior management recognized that the company was permitting its retailers to use thousands of third-party lead-generation and telemarketing affiliates.  Dish management acknowledged that Dish's policy regarding retailer affiliates was unclear, that retailers rarely requested approval, and that the retailers either didn't understand the policy or chose not to take it seriously.

395.  In October 2008, Dish permitted a retailer to continue using an affiliate suspected of illegal telemarketing for months because terminating access immediately would mean that Dish could not recoup more money from the retailer.

396.  In October 2008, a paralegal of Dish's was praised for convincing law enforcement not to report numerous illegal telemarketing calls to the state attorney general's office selling Dish service.

397.    In March 2009, in response to a question from retailer Dish Pronto's Mike Trimarco about an alleged TCPA violation, Reji Musso advised that she was amazed that more consumers do not realize they should answer the phone and ask not to be called, and that most of Dish's "TCPA issues were for frequent, persistent, harassment, obscene rude and refusal to remove from DNC list.  In other words, customer perception."

398.    In March 2009, Karl Schmeltz of 4 Digital TV, who had been a Dish retailer for over 15 years and had a sales pace of over 12,000 activations per year, sent an email to Dish's Robert Calbert, complaining about having to spend half his week responding to inquiries from the Retail Services Department about telemarketing complaints, stating that at the current rate, she would send him over 100 inquiries per week.  Calbert responded to Schmeltz's email copying Reji Musso and indicating that "most of the responses can be the same as processes and procedures.  Just send us your script and we can store it for you and respond to a number of these without you.  Or if you have the recorded phone call just send us those and that's it, or if you've already taken care of the customer let us know."

399.    In October 2006, OE Retailer Brandvein admitted to Ms. Musso that it was responsible for multiple telemarketing violations by overseas affiliate call centers.  Brandvein's principal stated that many OE retailers used affiliates to generate leads, and that his company used "thousands of affiliates."

400.    In October 2006, Brandvein, an OE Retailer using overseas call centers, wanted to discuss Dish's "current direction" of "pull[ing] in the reigns from a compliance standpoint."

401.    In April 2007, a consumer sued Dish in connection with prerecorded message telemarketing, which Dish believed was tied to Brandvein's company.

402.    In response to a 2007 New York state court lawsuit against Dish by consumer Monte Noble regarding prerecorded message calls selling Dish by retailer Brandvein Companies, d/b/a Discount Communications, Dish wrote a letter to Brandvein demanding that Discount Communications indemnify Dish under the terms of its retailer agreement.

403.    In April 2011, Dish's Brian Neylon requested permission from Dish's Jim DeFranco to terminate retailer Brandvein Communications for identifying itself on sales calls as calling from Dish Network and not identifying themselves in marketing materials as the advertising retailer.  Dish believed it had given Brandvein "ample opportunity to get his business compliant with Dish Network's policies. He has chosen to ignore our requests and repeatedly violated his Dish Network Retailer Agreement."  On April 27, 2011, after Neylon had secured approval by the Legal Department and Vice President Blake Van Emst, DeFranco gave Neylon permission to terminate Brandvein.

404.    In October 2007, Dish considered auditing OE retailer Cactus Concepts, of which former Dish director Shawn Portela was a principal, in part for the use of certain call centers for their marketing.

405.    Cactus Concepts responded to Dish's audit investigation by expressing its willingness to give Dish anything it needed, including logins by agent, caller IDs for all centers, all IP addresses used, uploading calls for Quality Assurance purposes, and by providing the names of their call centers, contacts, locations, status, and the name of their call center's Aggregator, Becky Adler of Call Services LLC.

406.    In August 2008, Dish received multiple complaints that its retailer Cactus Concepts was using prerecorded messages to sell Dish service to consumers. Cactus Concepts confirmed to Dish that it was using a third-party call center, and that it did not use the Dish-mandated PossibleNow's scrubbing service. In response, Ms. Musso contacted Cactus Concepts principal and stated "pre-recorded messages are questionable at best (I stop short of saying illegal)."

407.    Mr. Portela, a former director at Dish, observed that Dish did not uniformly enforce what it referred to as "rules," rendering them mere guidelines. He told Dish that Cactus Concepts had to use illegal telemarketing to match sales figures by other OE Retailers who used the same tactics but whom Dish did not enforce these guidelines.

408.    Ms. Musso distinguished retailers i-Satellite and Cactus Concepts from National Satellite Systems, another OE Retailer being investigated around this time period. Ms. Musso stated "I would like to throw the proverbial book at them, with [the Sales Department's] permission of course, although I'm uncertain as to whether Cactus can pay anything for transgressions beyond what they are in the process of paying now."

409.    By August 2008, Ms. Musso knew, because a Dish investigator confirmed, that a company was using prerecorded message telemarketing to sell Dish service and routing sales through an OE Retailer, i-Satellite.

410.    On September 2, 2008, Dish employees internally recommended terminating i-Satellite "to make an example" due to the "rogue call center" and questionable telemarketing practices Dish knew that i-Satellite was using. Dish's Retailer Services Department worked with i-Satellite "almost every 3rd day encouraging him to clean it up."

411.    In September 2008, Dish had received 76 TCPA complaints about i-Satellite, mostly due to prerecorded message telemarketing and refusal to remove from calling lists; Dish requested indemnification on five lawsuits, including one filed against Dish in Texas. Dish's in-house attorney Lori Kalani visited the retailer and was concerned with its inability to manage the affiliates committing the TCPA violations.

412.    By September 11, 2008, Dish was receiving TCPA complaints about i-Satellite "at a record pace." Dish's compliance personnel told Dish's sales team that even though the complaints are just "allegations," the "sheer numbers indicate that some clean up" of the retailer's process "might need some attention."

413.    Around September 16, 2008, Dish's senior executives discussed i-Satellite. Dish's in-house counsel Lori Kalani personally visited i-Satellite and was "concerned with [i-Satellite's] inability to manage their affiliates performing these TCPA violations," which numbered more than 80, at the time. i-Satellite and Dish were defendants in at least 5

lawsuits related to prerecorded message telemarketing. And despite the large number of TCPA complaints, most of which i-Satellite did not have a defense for, Dish analyzed the activations and revenue generated by i-Satellite before deciding on a plan of action. One Dish manager suggested removing i-Satellite's access to the OE tool, but permitting them to continue making TVRO sales.

414. In September 2008, Dish's Blake Van Emst planned to call i-Satellite to inform them they would no longer have access to the OE tool but warned Dish's Tom Stingley that "cutting them off of the OE tool is a death sentence."

415. In discussing i-Satellite, Mike Mills guessed that i-Satellite was spoofing their caller ID to avoid detection of its illegal telemarketing, to which Reji Musso responded "I'm certain of it."

416. By October 2008, Dish still had not taken action against i-Satellite, although the OE Retailer admitted using affiliates that had previously been associated with illegal telemarketing and had no defense to over 80 complaints of telemarketing violations. Dish considered issuing a penalty because it had to "demonstrate to our governmental entities that there are consequences." There is no evidence that Dish ever issued a fine or penalty against i-Satellite for telemarketing violations.

417. Around October 7, 2008, Mike Mills told i-Satellite that it had to stop working with affiliates that used pre-recorded message telemarketing, and any remaining affiliates would need their own login for the OE tool.

418. On October 7, 2008, Mike Mills wrote to i-Satellite that the reason for instituting controls prohibiting illegal telemarketing was "to ensure good business moving forward."

419. In August 2008, Dish was monitoring Apex Satellite's monthly activations, noting significant jumps in activations, such as an increase from 385 per month in May 2008 to 595 per month in June, a 55% jump, and remarking that Apex "have GOT to engage with" PossibleNow.

420. In response to an email from Apex's Reza Akhavanfard about a sting conducted by consumer Nathan Burdge, that caught Apex making prerecorded message calls, Dish indicated that if Apex wanted to sue Mr. Burdge, that Dish would ask Apex to indemnify it, noting "we did not call him and will not accept any of the responsibility for your having called him regardless of his intent."

421. Dish wanted to make an example of Apex at the end of December 2008 when it discovered that Apex's marketing led to a recorded message that did not promote Dish, but ADT and other products, but noted that Apex was "pacing for over 7k activations this month, so they are becoming a substantial player, and need to be straightened out before it gets out of control (if it isn't already)."

422. In January 2009, Dish knew that retailer Apex was not scrubbing its leads against Dish's Internal DNC List.

423.  Reji Musso took notes of Bruce Werner's March 4, 2009 telephone call with Reza Akhavanfard after Dish placed Apex Satellite on "hold status," during which Werner stated that consumers who filed lawsuits against Apex "get you on the technicality -- pre-recorded messages," and indicated that this practice is deemed unacceptable in South Carolina and Ohio.  The call notes included Reza's disavowal of knowledge that prerecorded messaging was illegal or what spoofing was.

424.  In response to Apex's March 2009 claims that it could not follow the TCPA laws due to Dish's incentive structure, under which Apex could not afford to be compliant, Dish's Retail Services Department insisted that Apex's practices of spoofing could justify termination, noting that "Legal and the FCC would have a field day with Dish if we continued to do business with someone who blatantly violated the law.  The would perceive that as complicity.  Knowing what I know from past TCPA violations and legal -- this is not small potatoes.  The number of complaints I have associated with that vm message is about 200 and another message that is probably his with another 250.  At a minimum of $500 each -- well that's big bucks and because he admitted to it won't be hard to prove intent and then the files can treble.  In another light -- $16,000 a pop for the TCPA violations -- each one -- could reach the millions."

425.  Dish's Director of Retail Services, Robert Calbert, told COO Jim DeFranco that he contacted Dish Sales executives, Steve McElroy and Blake Van Emst, "to determine course of action fearing that no action would make us complicit in his illegal activity."

426.  In March 2009, Reza of Apex Satellite told Dish's Bruce Werner that it did not download Dish's Internal DNC List into Apex's internal do not call list, but used an automated service that puts the DNC numbers from Apex's Press 1 message into Apex's entity-specific DNC list.

427.  In March 2009, Dish reported a sting that led it to identify the retailer harassing the consumer as Apex Satellite, and that when confronted, the retailer "confirmed again that he spoofed numbers and was perplexed that Dish had not let him know he was breaking the law."  The retailer also confirmed that he continued to use "press 1" sales calls.

428.  In March 2009, Reji Musso indicated Reza of retailer Apex had told her that he would use all of his relationships, and that he did so by calling her telephone number at Dish "without scrubbing (and this could get us into trouble too)."  Musso noted that "EBR has specific rules and calling for other products has some specific boundaries.  Another can of violation worms in my opinion."

429.  Dish's March 2009 Executive Summary of OE retailer Apex Satellite noted Apex's failure to comply with federal law regarding spoofing of phone numbers, continuing to make prerecorded calls into states that ban spoofing despite repeated warnings from Dish's sales team to stop, and at least five lawsuits from consumers relating to telemarketing complaints.  The summary indicated that Apex was immediately put on hold and its OE logins were shut down.

430. In March 2009, Reji Musso sent an email to Marc Garitone of Dish distributor RSI Inc. complaining about Apex Satellite's telemarketing violations, and indicating that ignorance was the biggest problem with RSI Inc.'s salesforce and Apex, noting that "that is not a viable excuse especially when blatantly breaking the law."

431. In March 2009, after sending an email expressing frustration to Garitone, Reji Musso drafted an email apologizing for her email criticizing Apex and offering to discuss further how to help Garitone and his salesforce, prefacing it with an email to her boss, Bruce Werner, that stated "my message in retrospect seems a little harsher than I meant it. I get frustrated because nobody wants to take responsibility for the bad stuff."

432. Even after gathering credible corroborative evidence regarding Apex's illegal telemarketing, in March 2009, Dish recommended putting OE retailer Apex Satellite on hold, instead of terminating it, because the retailer indicated it would "run from his charge back in the event of termination." At this point, Dish knew Apex would continue using prerecorded messaging as his primary form of marketing, was representing itself as Dish, and was generating $8,000 to $10,000 per month in lawsuits "as a result of his telemarketing activities."

433. In March 2009, Apex Satellite told Bruce Werner that the 100 TCPA complaints that Dish received about Apex were justified by the 25,000 subscribers it generated for Dish. Apex also indicated that Mike Mills and Josh Slater of Dish had told him that Apex needed to sign up with PossibleNow but did not have to use their services.

434. Al Vi was an OE Retailer.

435. Al Vi Satellites admitted to Dish that it got leads from a website and had no meaningful DNC compliance procedures, but Dish's response was not to terminate Al Vi Satellites, but rather to ask the company to create more "transparency" as to its operations.

436. Patrick Lea is a Cincinnati, Ohio resident who has never purchased or inquired about Dish Network services.

437. Mr. Lea placed his mobile number, (513) 602-7793, and land line number (513) 474-2288, on the Registry on July 2, 2003, and he occasionally checked the FTC website to be sure his number was registered on the Registry.

438. In or around December 2009, Mr. Lea specifically remembers receiving two illegal telemarketing calls on the same day from a man selling Dish Network services.

439. Mr. Lea called Dish directly after hanging up with the original caller to report the improper conversation. Dish responded by assuring Mr. Lea it would do its best to terminate this dealer's franchise. Dish's own records demonstrated that Mr. Lea was called by Al Vi Satellites.

440. In August 2009, Dish retailer LA Activations had been sued by a Texas consumer, Brian Pikkula, for a pre-recorded call in violation of Texas state law, and had been the subject of numerous do not call violations to a Missouri consumer and 38 others; Dish's Bruce

Werner planned to tell LA Activations' principal, Russell Barnett, that any settlement between LA Activations and consumer Pikkula "should be reviewed by our attorneys and releases Dish Network from any liability PRIOR to the settlement," and that he was going to require LA Activation to provide proof it had retained PossibleNow and was actively scrubbing leads.

441.    Regarding LA Activations, Dish's meeting notes summarized that there were "no controls in place to prevent TCPA violations at this time, No sense of urgency or full understanding of the severity of the violations," and that "They offered that they put controls in place since these events."

442.    In September 2008, Dish's Charlie Ergen received a complaint from a consumer about persistent telemarketing and forwarded it Dish's in-house lawyers and others, noting that he was receiving "more and more of these calls lately," and stating "We need to put something that works;" in response, Dish's Marciedes Metzger emailed Dish in-house lawyer Lori Kalani, "Don't forget to tell them we should bring all sales internal."

443.    By September 2008, Dish was obtaining information from its retailers about third-party affiliates, which confirmed that multiple OE retailers were using overseas call centers. Ms. Musso responded that the retailers needed to "nix the Pakis" (i.e., stop working with Pakistani call centers).

444.    In September 2008, Dish's in-house counsel Lori Kalani visited four retailers in Utah and observed that if they were a representative sample, "many of our O/E guys do not have a clue as to who they are using for telemarketing."

445.    In August 2009, former Dish employee Manuel Castillo gave an interview to Dish's Bert Eichhorn, Senior Investigator of Dish's Internal Audit-Fraud Investigations group, that was shared with Reji Musso and others in the Dish organization reporting on how multiple OE retailers used affiliates because it didn't cost them any marketing dollars, how OE retailers used voice broadcasting to get a customer, how affiliates are not distinguishable from the OE retailers on the recorded calls that retailers submit to Dish for its QA program, how OE retailers were letting affiliates log into their servers via proxy, and how when American Satellite was put on hold by Dish then pushed all their sales through Allegro.

446.    In December 2009, Kieran Callaghan, vice president of direct sales, asked about bringing back terminated OE retailers because "they can drive a lot of traffic."

447.    In a presentation to OE retailers, Reji Musso, admitted that retailers were out of control in 2008 and 2009 saw higher consumer compliance because of "retailers who were 'dialing for dollars.'"

448.    Nevertheless, in its 2009 Sales Partner Review, Dish noted that "Compliance/Legal unhappy with Legal Issues as a result of illegal/shady marketing practices"

449.    According to its 2009 Sales Partner Review, Dish had 76 retailers selling through the OE Tool, "All utilizing the same marketing methods pushing the COA higher," which was

driving its retailers to "become creative" with marketing and to seek cheaper acquisition methods, including "Voice Broadcasting;" Dish noted that "No controls or processes were put in place" by the retailers "to reduce risk and close openings for fraud."

450.    In January 2010, reacting to an email from Bold TV, a retailer whose OE access had been disabled, Reji Musso admitted to being 'the "soft touch" in the bunch" who "lean[s] towards forgiveness and a second chance" for retailers.

451.    In response to Musso's concern, Dish's Robert Calbert indicated that the decision to terminate OE access of Bold TV was  necessary to protect other retailers, the "Damon's and Infinity's of the world" and that "I can't risk Damon and Ken losing their business because the channel is viewed a certain way because of a few bad apples."

452.    Dish represented to the Court that it was not aware of retailers performing outbound telemarketing and said that it has so many retailers that it cannot even go through all of its documents to figure out whether they are breaking the telemarketing laws.

453.    In May 2010, Dish received from Jake Robbins of Dish retailer Channel Choice TV information that a potential affiliate, The Satellite Solutions, had "been cold calling for Dish Network from more than 3 years and have been selling the customers to different OE Tool partners and retailers of Dish Network," and that The Satellite Solutions agent was averaging 1 sale a day "even through cold calling on cold leads."

454.    In May 2010, Reji Musso emailed Robbins and observed that '[t]hese "lead generation companies" are hungry - we are making a dent in their business because retailers like you are being careful."

455.    In response to receiving Channel Choice TV's email about The Satellite Solutions, Dish's Mike Oberbillig observed:  "I would say if it sounds too good to be true ...it prob is. Always remember you are responsible for the work your company does.  It's not the cars [sic] fault for going 100 in a 50" and advised Robbins to "delete, and run from this type of offer."

456.    Rob Calbert, Dish's Director of Strategic Sales, sent an angry email to Dish retailer Clearlink about its acceptance of 285 deals generated by a Pakistani call center, stating "You guys need to be smarter than this.  285 deals from a Pakistani call center?  Really? These are all going to end up being fraudulent I'm sure.  It makes it very difficult for me to help you guys out when the FBI and other federal bureaus get involved.  Did we not learn our lesson about Pakistani people sending deals to you?

457.    In August 2010, Dish's Rob Calbert was listening in to Clearlink's call center to a call from an affiliate, and stated that Clearlink's "reps just take all the information and run it."

458.    In August 2010, Dish observed that its retailer Clearlink 'had a rep doing "shady" stuff,' and asserting that it had "no internal process to protect yourself from fraud."

459. Clearlink responded to Calbert's email to indicate that it had no knowledge of the affiliate being a Pakistani call center, and that Clearlink had submitted the affiliate (which by August Clearlink had terminated) to Dish on a spreadsheet in March or April 2010.

460. In October 2010, Bert Eichorn of Dish's Retailer Services Department investigated retailer Texas Wireless and found the retailer to have close ties to Ahmad Bhatty, 'the principal' of a former retailer, 1 Stop Cellular, "that was found guilty of purchasing leads from unauthorized Pakistani call centers" and had a fraud rate of 79%. The OE login numbers for Nadeem Javed, the principal of Texas Wireless, was "Bhatti," and the voices of Bhatty and Javed sounded "identical" to Eichorn when he called Javed's phone number.

461. Chase Ergen, son of Dish CEO Charlie Ergen, was a principal of an OE Retailer called CH Communications. Mike Trimarco, formerly of Dish Pronto was also involved in CH Communications.

462. In February 2011, Dish received a complaint about a call by retailer CH Communications and concluded that CH Communications had been using a third party offshore call center without the necessary authorization by Dish.

463. In February 2011, Dish's Reji Musso realized that a call center working for Dish retailer CH Communications had been caught by Dish's QA process making problematic sales, Musso expressed skepticism about Mike Trimarco's denial that CH Communications did business with this call center, with which Dish had problems in the past, stating 'Notice the reference to Nitin -- and all of the references to the past experiences . . . backed [sic] to the tangled web. It's the "old" team.'

464. In February 2011, Reji Musso and Brian Neylon asked Jim DeFranco, a senior Dish executive, whether CH Communications had been authorized by someone very senior at Dish to use the third-party offshore call center. When DeFranco said he did not know of such approval, they asked permission to email Chase Ergen, CH Communications' principal, warning him that offshore call centers were not authorized by the Retailer Agreement.

465. In February 2011, Dish's Brian Neylon told Jim DeFranco that CH Communications was featuring a link on Dish's homepage. The link led to a call center that Dish knew was operating Pakistani call centers that had been the source of fraud. Neylon requested that DeFranco "click through the links yourself to see the flow and what a potential Dish customer could experience."

466. In March 2011, Dish's Amir Ahmed expressed frustration about Dish's decisions regarding CH Communications stating that "honestly, I don't know what is going on with CH, it seems Chase and Trimarco are making decision [sic] on my OE channel and I feel totally insignificant."

467. In March 2011, Dish learned that CH Communications, had been using a third party vendor, Margae, Inc. that had not been approved by Dish and that "tried and succeed [sic] in sneaking past compliance" several sites.

468.   In April 2011, Chase Ergen, son of Dish CEO Charlie Ergen, requested that CH Communications be closed "swiftly" because of an issue with Trimarco.  Dish executive vice president Thomas Cullen requested that Dish executives responsible for retailers "keep close to the vest."

469.   Dish believes that its OE Retailers are "smart business people" who know where their sales and leads come from.

470.   As Dish internally recognizes, its retailers have become extremely adept at hiding their identities from consumers and regulators when they commit telemarketing violations.

471.   Dish's compliance team  created what it called the "sting" or "merchant identification" process in 2005 or 2006, which involved giving fake ID information to consumers complaining about telemarketing calls, who were told to sign up with the offending caller in order to allow Dish to determine which of its retailers made the sale.

472.   The DNC Investigation Team would offer to set up "sting" operations with consumers who complained about unwanted telemarketing calls. A cooperating consumer would agree to purchase programming if the wrongful caller called again. The cooperating consumer would use specified identifying information to make the purchase. Dish would identify the retailer or other party involved in the transaction by this specified information in the purchase order.

473.   Dish tried to identify and monitor retailers that were violating the DNC Laws using its sting operations.

474.   According to Ms. Musso, a sale generated during the course of a Dish sting was "irrefutable" proof tying a retailer to illegal telemarketing.

475.   Ms. Musso has also compared getting caught by Dish sting program to "getting caught with your hand in the cookie jar."

476.   Dish's sting program found that many OE retailers were using illegal telemarketing to sell Dish Network service.

477.   In September 2005, Dish's sting program confirmed that United Satellite used prerecorded message telemarketing and Dish warned it about its illegal telemarketing.

478.   In November 2005, Dish knew that United Satellite used prerecorded message telemarketing and represented itself as Dish Network on the calls because Dish's OE program manager himself received a prerecorded telemarketing call from United at his office; Dish did not take disciplinary action against United.

479.   By May 2006, Dish retailer Marketing Guru had two confirmed sting violations, confirming that it used illegal telemarketing to generate sales for the OE program.

480.   Also in late July 2006, a Dish employee in the Retail Services Department investigated a telemarketer using an illegal automatic dialer to sell Dish service.  By cross-referencing

the account number of the sale generated by the illegal call, Dish was able to tie to telemarketer to Dish Pronto, an OE Retailer.

481.    In May 2007, Dish wrote to the DMA Teleservices Ethics Committee stating that Dish had, among other things, expended significant resources to pursue retailers who engage in improper telemarketing solicitations--including through an internal sting program.

482.    By August 2007, South Dakota's Public Utilities Commission had informed Dish of, and multiple Dish stings confirmed that Dish OE Retailer, Atoll, was using illegal telemarketing.

483.    In October 2007, Dish's Retail Services Department had "more sting business than [it could] manage at the moment," but did not have a document process to handle the stings and the results of their results.

484.    In June 2008, a consumer sting confirmed that i-Satellite used prerecorded telemarketing to message at least three separate times.

485.    In November 2008, a Dish sting caught Marketing Guru for an illegal telemarketing call to a number on the National DNC Registry.

486.    Dish did not terminate the retailers identified in its sting program, despite having told consumers and regulators that it would do so.

487.    Dish retailers committed more telemarketing violations than the millions identified specifically by the Plaintiffs' call records in this case.

488.    In 2003, Dish also began compiling and maintaining what it called the "Retailer Do Not Telemarket List," which contained phone numbers on some of its retailers' DNC lists.

489.    In 2006, when Dish created an entity-specific DNC process for its retailers, it devised a "three strikes" system wherein a retailer would be terminated if Dish caught it breaking the telemarketing laws three times.

490.    As of November 2006, employees within Dish did not know what the Retailers DNC List was or who added numbers to it

491.    For years, Dish told customers that they should contact thousands of "independent" Retailers if they wished to stop receiving Dish telemarketing calls.

492.    As of January 2007, Dish had a policy of not sharing its Internal DNC List with its retailers.  But Dish did collect some retailers' entity-specific DNC lists.

493.    In May 2007, the Direct Marketing Association (DMA) contacted Dish about received a complaint by consumer Craig Lawson regarding illegal telemarketing by Dish's retailers.  Dish responded that it would further review its retailers' practices and would coordinate entity-specific DNC lists with its retailers.  Dish further indicated that it would "soon be

able to provide access to [Dish's] Internal DNC list" to [Dish's] independent contractor retailers."

494. In August 2007, Dish considered a requirement that its OE retailers, before being launched on the OE tool, must establish a relationship with PossibleNow or another approved Dish vendor 'for the purpose of ''scrubbing" [the retailer's] outbound call lists, uploading [its] internal Do Not Call Registry and downloading the [Dish] Do Not Call Registry.'

495. Beginning around September 2007, Dish required retailers to sign up with PossibleNow to share entity-specific DNC lists.

496. Prior to 2008, Dish's Internal DNC List was comprised exclusively of requests made by consumers to Dish directly or to telemarketing vendors, as Dish did not collect such requests from Retailers.

497. Beginning in April 2008, PossibleNow allowed Dish retailers to upload their entity-specific DNC lists to PossibleNow's server. Dish could then scrub against the uploaded Retailer lists and Retailer could scrub against the DNC lists of Dish and other Retailers.

498. In June 2008, Dish required its OE Retailers, via PossibleNow, to upload their entity-specific DNC lists and scrub any lists against Dish's Internal DNC List.

499. Since June 2008, Dish has required its retailers to use PossibleNow "to help implement the facilitation and sharing of internal 'Do Not Call' lists between Retailers who telemarket and Dish Network, and to facilitate Retailer scrubbing of customer leads against those lists, and Federal and State 'Do Not Call' lists."

500. By August 2008, Dish believed that its OE retailers were prohibited from calling phone numbers on Dish's Internal DNC List.

501. As of September 30, 2008, Dish contractually required retailers that made 600 or more activations during the prior calendar year to engage PossibleNow's services so that PossibleNow could maintain a list of these retailers' individual DNC requests, and scrub any future calling lists against DNC lists, including Dish's Internal DNC List and the National DNC Registry. Beyond providing contact information to PossibleNow, Dish did not take any additional steps to ensure that a retailer signed up with PossibleNow.

502. In September 2008, Dish's business requirements for its retailers included requiring them to scrub their lead files against the Dish Internal DNC List. Dish also required all OE retailers, even those that did not use third party vendors to do outbound telemarketing, to engage PossibleNow under the terms of their retailer agreement, and to submit a form to Dish identifying the third party vendors they used.

503. After requiring its retailers to hire PossibleNow, Dish did not take a role in sharing its entity-specific DNC list with its retailers. Dish does not know if retailers--even those that were contractually required to--actually uploaded their DNC lists to PossibleNow.

504.     Of 313 retailers Dish required to sign up with PossibleNow, within a year of Dish's requirement to engage PossibleNow 143 had not responded to PossibleNow.

505.     Dish and PossibleNow planned to explain to Dish's OE retailers the definition of telemarketing "so they are not confused with 'cold calling' and maintaining a DNC Policy and records and then uploading into the master and scrubbing against our leads.  If the[y] telemarket, it is a requirement, based on business rules published the end of April and posted on the Retailer Care site."

506.     According to Dish, a retailer who uses the telephone to complete a sale, including "returning a call from a voice mail message or initiating a call from a referral . . . . by definition, is telemarketing."

507.     Dish received a report from PossibleNow in September 2008 that showed which Dish Retailers had uploaded files to Dish's Internal DNC List, and the report showed that only two retailers were consistently uploading their entity-specific DNC lists into Dish's Internal DNC List.  The report also showed which Retailer were scrubbing their calling lists against Dish's Internal DNC List.  Dish also received a report from PossibleNow regarding when a Retailer engaged or terminated its relationship with PossibleNow.

508.     Dish does not know whether any retailer has actually complied with its post-2008 policy requiring retailers to upload DNC lists.  Some Retailers did not upload internal do not call requests until sometime in 2010.

509.     As retailers' entity-specific DNC lists were collected, PossibleNow scrubbed Dish's telemarketing lists against the Dish's Internal DNC List.  PossibleNow sometimes referred to the combination of these three sources of entity-specific DNC requests as the Consolidated List.

510.     (BLANK)

511.     The retailers who placed telephone numbers on the Dish's Internal DNC List were Dish's marketing agents.

512.     Dish planned to hold an interactive webinar with PossibleNow and its OE retailers during October 2008 that addressed how to generate marketing leads, how to ensure retailers were not engaging with consumers who are "on lists", and "stressing that states have laws -- sharing the pertinent web sites -- getting good legal advice based on []business models . . . and the recordkeeping for opt in and 'fish bowl' leads."

513.     In July 2009, Ms. Musso, when discussing Dish's requirement for OE Retailers to use PossibleNow to scrub against Dish's Internal DNC List and upload their internal DNC lists, stated that Dish "has been negligent in enforcing this practice."

514.     In September 2009, an affiliate of Dish OE retailer Marketing Guru, a/k/a Saveology/ Elephant Group, requested access to the Dish Internal DNC List maintained by PossibleNow, but Dish's Reji Musso did not believe PossibleNow should give the affiliate access to the list, asking "Do you have any other clients who allow outside

companies to access their internal lists?  What would be the point of that and I've never granted consent for anyone to use this affiliate. . . .  The retailers that they provide leads to should do the scrubbing (in my mind)."

515.  In September 2009, PossibleNow's Sandy Sponsler advised Dish's Reji Musso that "a lot of telemarketers perform scrubbing for their clients, in this case they are required to have their customers' SANs.  They are not required to have their customers' internal DNC list, but I have seen companies do it both ways."

516.  In September 2009, PossibleNow's Sandy Sponsler told Dish's Reji Musso that PossibleNow's clients who are telemarketers "offer full scrubbing responsibility as an added value service to their clientele," and cited OE retailer Dish Pronto as an example of retailer that allows its telemarketer to access Dish Pronto's PossibleNow account directly.

517.  In July 2011, Dish vendor Stream Global Services tried to email DNC requests that it received to Dish's Outbound Operations Resource Manager Amy Dexter.  Dish expected Stream to upload its the DNC requests it received to PossibleNow, stating that Stream needed "to upload their Internal DNC requests to PossibleNow to be incorporated into the Dish Internal DNC list."

518.  Dish's corporate designee asserted that Dish's Internal Do Not call list contains the telephone numbers of consumers who told Dish and its retailers that they did not wish to receive future telemarketing calls.

519.  In April 2011, Dish urged retailers to protect their business by reaching out to PossibleNow to discuss their business models and reminded them that many states had their own DNC lists and rules

520.  *Dish entered into Retailer Agreements with Order Entry Retailers including Satellite Systems Network (SSN); Star Satellite, L.L.C. (a/k/a Tenaya Marketing); American Satellite, Inc.; Jerry Dean Grider d/b/a JSR Enterprises (JSR); Dish TV Now, Inc.; and National Satellite Systems (NSS).*

521.  Dish's Retailer Agreements with SSN, Star Satellite, American Satellite, JSR, DishTVNow, and NSS appointed these Retailers as "Authorized Dealers" for Dish; authorized these Retailers to "market, promote, and solicit" orders for Dish; authorized these Retailers to use Dish trademarks in their marketing; gave access to each Retailers records with respect to its Dish dealership; and required each Retailer to "take all actions and refrain from taking any action, as requested by EchoStar in connection with the marketing, advertisement, promotion and/or solicitation of order" for Dish programming and related goods and services.

522.  As of October 2003, Dish's contracts with its retailers required them to comply with all applicable laws, and that if the retailer had engaged in conduct that resulted in a claim against Dish, the retailer was required to defend and indemnify Dish against any costs incurred in the suit.

523. The Retailer Agreements further authorized Dish to establish what it called "business rules" for Retailers, which permitted Dish to put any "term, requirement, condition precedent, process, or procedure" on Retailers' marketing activities. Dish Retailers were obligated to comply with any business rule, and Dish considered them as contractually binding as the Retailer Agreement. Retailer Agreements further granted Dish the "sole and absolute" authority to "modify any Business Rule at any time and from time to time . . . for any or no reason."

524. Dish deems all Order Entry Retailers bound by "business rules, fact blasts, and documents that are disseminated" by Dish pursuant to the Retailer Agreements.

525. In its Retailer Agreements, Dish retained the sole and absolute authority to accept or reject any order submitted by the Retailer for any reason. Dish also retained the sole and absolute control over the TV programming packages that the Retailer could offer to consumers.

526. The Retailer Agreements required Retailers to "take all actions and refrain from taking any action as requested by [Dish] in connection with the marketing, advertisement, promotion and/or solicitation of order." In effect, Dish had the unrestrained and ultimate right to direct and control any aspect its Retailers' marketing of Dish pay-TV service.

527. When Dish directed and commanded specific OE Retailers to take or cease certain marketing actions, it cited Section 7.3 of the Retailer Agreement--which requires the OE Retailer to "take all actions and refrain from taking any action as requested by [Dish]"--as its authority.

528. The Retailer Agreements stated that if the Retailer violated any state or federal laws or regulations, "[t]his Agreement shall terminate automatically . . . unless EchoStar notifies the Retailer to the contrary in writing at any time thereafter."

529. Dish reserved and exercised contractual authority to force its OE Retailers to disclose all telephone numbers that the retailer used for inbound or outbound calls; to provide information about all retailer marketing programs; to submit sales, disclosures, or other scripts used for inbound or outbound Dish telemarketing; to provide Dish the names and logins of the sales people using the OE tool; and to download the Dish Internal DNC List on a monthly basis and incorporating it into the retailer's own internal DNC list.

530. *Dish's retailer agreement prohibited OE Retailers from using any independent contractors, subcontractors, Affiliates, agents, or sub-agents without Dish's specific, prior written consent.*

531. In July 2002, Dish issued a "Facts Blast" to its retailers reminding them that Dish, through the Retailer Agreement, did not allow its retailers to use affiliates, including "Telemarketers—[that] solicit[s], take[s], or transmits] any orders for Dish Network products or services," without Dish's approval. Dish stated that it would terminate any retailer for "hiring third-party telemarketers . . . to engage in any telemarketing activity concerning or related to Dish Network products or services."

532. In July 2002, Dish informed retailers that it was considering whether to designate certain companies as telemarketers that Dish would permit retailers to use.

533. Dish allowed certain OE retailers to use, in some cases, hundreds of thousands of affiliates, including overseas entities.

534. Dish maintained a no-affiliate policy for its TVRO retailers.

535. By 2007, Dish's Retail Services Department maintained and shared with Retailers a list of foreign telemarketing centers that it would not let Retailers hire because of suspected illegality. In fact, Dish prohibited offshore entities from accessing the online sales tools it created for the OE Retailers. Dish informed OE Retailers that it knew when offshore entities accessed the OE Tool and could trace "hits" to specific retailers.

536. In September 2008, Dish again reminded its OE retailers that it would not authorize use of offshore call centers to generate telephonic leads.

537. Dish claimed that it enforced its Affiliates Business Rule by collecting information from OE Retailers about the identity of their independent contractors, subcontractors, affiliates, agents, or sub-agents.

538. During the relevant time period, Dish representatives recorded notes of their interactions with Dish retailers in the SEIBEL Database.

539. Dish collected and maintained detailed records on the OE Retailers, including those it considered "Strategic Sales Partners," including their primary forms of marketing, whether it used telemarketing, opportunities for them to expand their marketing and sales, and the weaknesses of each retailer.

540. Dish believed that it could be liable if telemarketing retailers identified themselves as Dish, particularly because the retailers were calling to sell Dish programming.

541. Dish learned in May 2008 that retailers like Phoenix-based Metro 25 were repeatedly answering the phone as Dish, telling consumers they were based in Colorado, and offering alternatives to sign up new customers that Dish didn't offer, including an option to help consumers pass the credit check by putting their account under a different name.

542. In August 2008, Dish recognized that callers placing illegal telemarketing calls to sell Dish "usually identif[y] [themselves] as Dish Network."

543. In January 2009, Dish employees received prerecorded message telemarketing highlighting a Dish promotion that led to a telesales agent identifying himself as a Dish representative.

544. In July 2011, Dish compliance personnel Kimberly Berridge advised Amy Dexter, a Outbound Operations Resource manager, that Dish "must not be telling [third parties] how to comply with the law. What if they misunderstand or heaven forbid we tell them something wrong."

545.    In March 2009, Dish "strongly encouraged" its retailers to call PossibleNow to address potential risks caused by retailers' telemarketing

546.    As of at least 2005, Dish's Retail Services and Sales personnel regularly provided comments on and approved sales scripts the Retailers' sales agents would use in selling Dish services.

547.    Dish also provided comments on and approved scripts containing disclaimers and disclosures for OE Retailers' telesales agents to read to consumers when completing a sale.

548.    In January 2010, Dish retailer Better TV emailed Dish its most recent script with recorded disclosures, and Dish reviewed and evaluated it for accuracy and completeness, providing information on all Dish promotions, as well as for disclosures of payment terms.

549.    As of June 2010, Dish had received multiple scripts and disclosures for OE Retailer Metro 25, Call Tracker, and Dish Express, the latter two of which are call centers for Metro 25.  Dish believed that each entity was "doing something a little different (disclosures read first and then scripting, scripts are all different, some disclosures are auto some are not . . . )."

550.    Dish asked Metro 25 to consolidate its scripts and disclosures "into 1 script, 1 call flow and 1 disclosure/autodisclosure for Metro 25."  Dish knew how much time and effort its OE retailer Metro 25 was putting into its scripting and disclosure, and indicated that consolidating those scripts "gets you and Dish a better customer and in return makes you more money over a long run."  Metro 25 took the actions Dish ordered.

551.    In December 2011, Dish terminated its retailer Metro 25 for using an unauthorized third party affiliate in violation of the retailer agreement, and for misrepresenting themselves as Dish and not identifying themselves as a retailer.

552.    In May 2004, Dish gave Retailers access to a customer disconnect notification, which would permit retailers to call customers they activated in an attempt to keep them from terminating their Dish service.

553.    Dish's script for its March 12, 2009 Retailer Chat indicated that, in April 2009, Dish made available to its retailers lists of customers who had voluntarily or involuntarily disconnected their Dish subscriptions, or were "soft-disconnects" whose service was going to be disconnected in 10 days, so that retailers could contact these customers.

554.    Dish gave OE retailers detailed "17734" reports that tracked the OE retailers' sales activities by more than 60 metrics, including internal Dish data that was designed to increase the OE retailers' sales numbers.

555.    In March 2009, Dish wanted to help its retailers "maintain an aggressive marketing strategy without risking fines or complaints from the public."

556.    In March 2009, Dish's Deputy General Counsel Jeff Blum created an action plan that included short term goals of getting scripting/sales/disclosure information from our top five retailers and telco partners "so we can learn what they are doing right," and long term plans of reviewing whether Dish should ban the use of third party affiliates by the retailers or limit affiliates from entering orders directly into the OE tool.

557.    Dish's Lana Luth pressured the account managers responsible for its 22 incentive eligible retailers to strategize with the retailers on marketing and sales so that the indirect sales group would "hit budget."

558.    In December 2011, Dish's Todd Peterson planned to go with Reji Musso to meet with retailer Acceller to "see what they need to run harder," but expressed concerns that Acceller would "end up with 4% fraud like [Marketing] Guru had."  Dish's Mike Mills stated that he needed 1,500 activations out of OE retailer Acceller in January 2012, noting "I know that they can get at least that out of ACN."

559.    Mr. Peterson told Mr. Mills that Acceller had "a lot of back end problems with their corporate office and the call center has very poor discipline and structure.  Sarah Smith was there today and listened to calls and we have a lot of work to do . . . .  Sarah and I can come into the call center and push Dish and how to sell it all day, but if nobody in the organization is pushing from their end we end up with the current situation."

560.    Reji Musso believed that if she learned of an OE retailer's illegal telemarketing, her department could get the calls to stop by directing the OE Retailer to refrain from calling the telephone number.

561.    As of October 2011, Dish expected its Strategic Account Managers to talk with their retailers "daily to understand needs and their strategy to grow their business for October."

562.    Dish's National Account Managers worked closely with Dish's corporate executives to coordinate meetings with their retailers to discuss strategy, retailer performance, and expected sales.

563.    According to the principal of one OE Retailer, he understood that "I am not to go to the bathroom without [his Dish Account Manager] knowing about it."

564.    In September 2008, Dish could track and identify which of its subscribers bought Dish from which retailer, and planned to write to active subscribers of terminated retailers "to notify these subs that their prior retailer no longer represented Dish."

565.    As of November 11, 2011 Dish barred retailers from using lists of current Dish subscribers or subscriber information, regardless of whether the retailer activated the subscriber.

566.    In December 2007, Tracy Thompson-West, the director of Dish's Int'l Dept. wrote a memo to Dish's Vice Chairman regarding the results of an investigation into overseas call centers, including one that identified itself as Dish Promotions, that telemarketed Dish service, often illegally.  Ms. Thompson-West believed, and other Dish departments

confirmed, that these call centers had access to Dish's internal customer database, possibly through the OE Tool.

567. As of October 2007, Dish knew it had "a hole in its OE tool that allows the same [credit card] to be reused."

568. Dish has no regular practice of performing background checks or public records searches on its retailers prior to allowing them to market on Dish's behalf.

569. Dish does not require its retailers to report to Dish when they are investigated by a government agency or sued by a private party related to violations of consumer-protection statutes or criminal conduct.

570. In July 2011, Dish declined to answer a question from Dish contracted call center Stream about what they needed to do to comply with the applicable laws when calling telephone numbers with area codes related to California or Massachusetts.

571. Dish had sole and ultimate control over access to the OE Tool. Because Dish OE retailers' sales were all consummated through telesales agents, removing access to the OE tool would cut off the retailers' ability to make a sale. Dish believed that shutting an OE retailer out of the OE tool would stop its telemarketing activities and telemarketing violations.

572. Dish had a process in place in July 2010 that allowed Retailers to call in sales to Dish when the OE Tool was down.

573. Dish took no action to limit international computer access to its OE tool until 2009.

574. By April 2011, noting that "the biggest risks to [Dish] and frankly to your business come from outside the US," Dish monitored the IP traffic to identify logins from offshore on behalf of a retailer, as well as "hits" traceable to specific retailers, and proactively addressed concerns with the retailers.

575. In September 2003, if Dish pulled a list of phone numbers for a "retailer" partner to call, that list included numbers on the state and federal DNC lists, as well as of people who had specifically requested that Dish not call them.

576. In March 2004, Dish was deciding between two systems that could be used to provide telemarketing lists to retailers.

577. Dish did not have a system for tracking when and which lists were provided to OE Retailers for telemarketing.

578. Prior to March 2006, Dish's Sales Department had sent a cold-call list for telemarketing to one of its OE retailers, Marketing Guru.

579. On November 20, 2006, Dish learned that Marketing Guru, an OE retailer doing business as Satellite Sales, was telemarketing to consumers who specifically requested not to be contacted by that retailer.

580. Dish settled a consumer lawsuit brought against it and Marketing Guru for TCPA violations and required Marketing Guru, an OE retailer, to pay the $5,000 settlement amount.

581. By December 2008, Dish's Outbound Operations Department recognized that it had given outbound telemarketing dialing lists to third parties including Dish's "regional service providers," in the past.

582. Defender Direct was an OE Retailer. In 2007, Dish's Marketing Department's sent Defender a list of leads to telemarket on Dish's behalf, even if Dish acknowledged there could be "legal/DNC/privacy concerns."

583. Dish's 2012 budget for the OE retailers included as a 2012 goal and objective the idea to "implement a Call Center vs. Call Center competition" for Defender.

584. In 2008, Dish sued Airbel Wireless, Inc. (AWI), which was a Dish OE retailer since January 2006.

585. In July 2009, AWI served requests for admissions on Dish that outlined the history of AWI's relationship with Dish.

586. Because AWI "did not have much experience in national satellite marketing, when it agreed to participate in the OE Program in January 2006, it was with the understanding that it would receive substantial assistance directly from the [Dish] Sales and Marketing Team with developing a successful sales and marketing program."

587. Dish gave AWI a list of possible vendors to work with in developing a direct marketing campaign.

588. When AWI asked to retain Trost Consulting, Dish "repeatedly made clear its preference for Lorex;" AWI launched a relationship with Lorex in March 2006.

589. After the direct marketing campaign that AWI conducted, "Dish suggested that AWI, which owned and operated an offshore call center, launch an outbound calling campaign and, at the same time, continue to source additional sales through its local wireless dealer relationships."

590. Dish participated in weekly conference calls with AWI, and Dish local, regional and national representatives made frequent personal visits to AWI to monitor, support, and lend assistance to AWI.

591. Dish's OE program contacts assisted AWI with drafting outbound sales call scripts

592. When Dish approved AWI as an OE retailer in January 2006, it expanded AWI's market to the domestic United States.

593. Dish assured AWI, which did not have substantial national marketing experience, that Dish's Sales and Marketing team would provide AWI with national marketing and program training assistance.

594. After AWI launched a direct mail, direct response program to sell Dish, Dish "suggested that [AWI] launch an outbound calling campaign."

595. AWI instituted and presented, and Dish approved safeguards for "churn" that included AWI's orders being audited and proofed for accuracy, all orders recorded on audio tape, all Dish scripts developed by AWK were sent to Dish "for prior approval and comments prior to implementation."

596. AWI was assured that Dish's OE tool would not allow duplicate customer information to be entered.

597. Both AWI and Dish "routinely" verified compliance with the process of collecting information about the customer, and AWI was under the impression that Dish checked and validated all customer information entered into the OE tool. An expert hired by AWI, Nile Nickel, opined that Dish failed to properly process the information provided by AWI to ensure that duplicate customers were not entered into the system.

598. AWI provided audio files of the customer validation process to Dish upon request.

599. POE means "Partner Order Entry," referring to Dish's OE Retailers.

600. In 2006, because of reports of "repeated violations of [TCPA] regulations," Dish began sending POE notices to all OE Retailers requiring them to remove cell phone numbers from their calling lists and to add the number to their internal DNC lists. Dish issued POE notices when it believed a consumer would sue Dish or the OE Retailer under the TCPA.

601. Dish instructed OE Retailers to stop calling the telephone numbers on the POE list and to put those numbers on their internal do not call lists. Dish used POE Notices to communicate the phone numbers it did not want OE Retailers to call. Musso testified that no more than 70 individuals had been placed on the POE list since she became Retail Services Compliance Manager in August 2006 until her deposition in March 2011.

602. In October 2006, Retail Services did not have a formalized process for when to send POE notices.

603. In October 2006, Marciedes Metzger observed "there is a lot of heat surrounding this right now" with respect to a consumer receiving illegal telemarketing selling Dish Network, and believed sending a POE notice to retailers would help "eliminate as many loose ends as possible."

604.    Around September 2006, Dish implemented a Quality Assurance (QA) system for weekly monitoring and evaluating Retailers' calls with customers.

605.    From the Retail Services side, Ms. Musso was the liaison for the Quality Assurance program.

606.    Dish's QA program monitored OE Retailer phone calls through a combination of remote call monitoring for those Retailers who had systems with recording and uploading capabilities and live/onsite call monitoring for those Retailers who did not.

607.    One of Dish's stated reasons for creating the QA Program was so that it could review the OE retailers' scripts, mandatory disclosures, and sales processes and procedures to "helps the consumer/customer hear consistent and accurate information from all sales entities."

608.    According to Dish, the QA program's monitoring, evaluation and feedback process was to ensure that retailers "shared accurate and complete information on disclosures" and offered "a high quality representation of Dish Network. " It also allowed Dish to "provide feedback to assist [the OE retailers] on how to constantly improve from a sales perspective."

609.    OE Retailers are required to undergo the QA process pursuant to a "business rule" mandated by Dish.

610.    By September 8, 2006, 20 Dish OE retailers who represented 90 percent of the OE tool activity at that time, were participating in Dish's call monitoring program.  The Retail Services Department's "charter" was to make the live call monitoring program part of the OE tool start procedures for 100% of the OE retailers, so that it could "monitor 100% of OE users."

611.    As part of the QA program, Dish sent OE Retailers (1) direct sales scripts to use as a guideline; (2) terms and conditions for specific promotions; (3) the QA form with the metrics used to score sales calls.

612.    Dish Field Sales Development Representatives (FSDRs) are Dish employees who visited Retailers' call centers, listened to calls on site for QA purposes, and trained OE Retailers' telesales personnel on the OE Tool, Dish products, and sales promotions.

613.    FSDR performed call monitoring on site according to the following steps: (1) FSDR Evaluates Live Calls; (2) FSDR Uploads Call Information into Advisor; (3) CSC QA Team aggregates the score; (4) Opportunities Identified by the CSC QA Team; and (5) Address evaluations w/OE Retailer via Conference Calls.

614.    FSDRs evaluated and scored OE Retailers' phone calls according to 17 different criteria, including whether the Retailer: (1) used a "professional open" (greeting) for calls; (2) identified whether they were speaking with a former customer; (3) obtained basic information; (4) asked questions about the consumers current situation; (5) asked about local channels; (6) asked about equipment needs; (7) effectively acknowledged customer needs; (8) delivered the right package based on needs; (9) offered appropriate equipment

solutions; (10) offered a free premium; (11) disclosed all components of offer; (12) followed qualification guidelines; (13) gave all applicable disclosures; (14) followed all non-legal disclosures such as monthly rate, 24 hour right to cancel, and verification of address; (15) completed transaction completely; (16) used appropriate level of customer service and responsiveness; (17) used a "professional close" for the call.

615. FSDRs filled out an evaluation form for compliance with QA criteria.

616. The QA form provided at least 48 different metrics to evaluate calls made by Retailers including questions such as "Did agent ask for the total number of TVs that will have Dish Network service?" . . . "Did agent proactively offer Broadband Services upon completing the sale?" Did the agent disclose that the majority of installations take 2-4 hours after the technician arrives?" Did the agent ask the customer how they connect to the internet?" The purpose of the metrics was to identify areas Dish could improve sales and retention through OE Retailers.

617. Telemarketing law compliance and DNC procedure was not one of the metrics on which the QA Program scored OE retailers.

618. FSDRs and Dish Account Managers discussed QA scores with OE Retailers and provided feedback to help OE Retailers improve their scores and performance when necessary. Dish formulated an action plan for OE Retailers to improve scores, which could include measures such as further call monitoring by Dish, Dish-mandated sales script review and revisions, and strict adherence to a "call flow sales script."

619. If Retailers do not revise or rewrite their scripts to comply with QA purposes, Dish could withhold new promotions from the OE Retailer, preventing them from effectively selling Dish service.

620. Dish enforces this QA monitoring requirement by using measures up to and including termination of the Retailer relationship.

621. If Retailers do not read disclosures as directed by Dish, Dish may disable Retailers' logins to the OE tool and prevent them from submitting their orders to Dish.

622. Dish required the OE Retailers to suspend any OE Retailer telesales agents that consistently failed QA measures until they received additional coaching.

623. In February 2007, Dish expanded the QA live call monitoring program and required the more than 60 Dish OE retailers to participate in it bi-weekly

624. In 2009, Dish changed its QA monitoring process to require all retailers to record, store, and upload calls on a weekly basis, in addition to live monitoring through both scheduled and unscheduled visits by FSD.

625. One OE Retailer noted that from the beginning of it's relationship with Dish, Dish representatives were on the retailer's sales floor "monitoring and jacking into my calls."

626. Dish required OE Retailers to upload a certain number of calls on a weekly basis. Dish randomly selected a certain number of uploaded calls, listened to them, and evaluated them based on the set of QA criteria and generates a report on a weekly basis.

627. In August 2009, when the first wave of loaded calls from Dish's OE retailers came back from QA scoring, Dish's VP of Sales, Brian Neylon, stated "[t]he results are an embarrassment," noting that the things that are wrong included misinformation and inadequate or incorrect disclosures, and threatening that economic penalties could be levied against the retailers continuing at a substandard level. Neylon concluded "We all own this. We all are responsible and accountable. I want and expect each of you to get 110% involved in your handful of OE accounts and drive them to compliance. Failure is not an option. We need to see marked improvement within 14 days. This is your #1 priority."

628. In response to Neylon's email, Amir Ahmed responded that account managers will be held responsible for OE retailers with sub-standard results, concluding "I want results, I want excellence and if you don't believe in what I'm saying, please look for some other work."

629. In August 2011, when he was informed that the OE partners had scored an 88 on the QA program and asked why scores were not improving, Dish's Mike Mills stated "I ripped the team again last week. There are little things contributing."

630. In March 2000, Todd DiRoberto was convicted in the District of Massachusetts for participating in a drug distribution conspiracy and was sentenced to 60 months in federal prison.

631. On October 2, 2003, the Securities and Exchange Commission filed a lawsuit against Todd DiRoberto in connection with his involvement with a fraudulent stock offering scheme that used telemarketing sales tactics.

632. In 2005, Todd DiRoberto formed American Satellite, Inc. American Satellite was headquartered in San Diego, California.

633. Dish was aware that Mr. DiRoberto had "trouble in the past" and that "he had basically made his money in illegal things."

634. In or around September 2005, American Satellite became an authorized retailer for Dish. Dish and American Satellite entered into a Retailer Agreement dated October 19, 2005.

635. In 2006, American Satellite became an Order Entry Retailer for Dish.

636. In May 2007, Dish required American Satellite to indemnify Dish to settle two lawsuits as required by the retailer agreement, and Dish was investigating a possible TCPA violation by American Satellite to consumer Tony Sultan.

637. Dish gave OE retailers whose calls its monitored, such as American Satellite, sales scripts and verification scripts for its customer service agents to use during their telemarketing

calls for Dish, and Dish monitored their calls to ensure that the agent was identifying the retailer company name and telephone number for the customer to call back with questions or concerns.

638. In 2005 and 2006, several consumers participated in Dish sting operations that caught American Satellite using pre-recorded messages in their telemarketing.

639. American Satellite used prerecorded message calls to conduct its telemarketing.

640. In September 2006 consumer Robert Parker complained to Dish and participated in a sting operation which identified American Satellite as the source of at least one pre-recorded call marketing Dish products and services.

641. Mr. Parker told Dish's general counsel that if the calls did not stop, he was going to begin calling Dish executives at 3 a.m., which is when he needed to wake up for his dairy business.

642. In January 2006, a consumer—Gregory Fisher—participated in Dish's sting program, and the results of Mr. Fisher's stings identified American Satellite as the source of at least three separate illegal telemarketing calls between January 2006 and December 2006.

643. American Satellite admitted to Dish that it had placed the illegal call to Mr. Fisher.

644. On May 2, 2007, Denise Hargan from Dish's Legal Department sent an email to Dish's Compliance Retail Services Manager Reji Musso notifying her of another sting operation implicating American Satellite. The email stated, in part: "Reji: I wanted to make sure you were aware of the growing problem with American Satellite. AmSat was just implicated in the recent Tony Sultan sting last week. They are not cooperating with the litigation in which they are involved. You have also sent multiple POE's of Tony Sultan's telephone number. In light of these developments perhaps we should discuss AmSat and their status at our next Retail Services meeting."

645. In December 2005, a consumer—Jeffrey Mitchell—participated in Dish's sting program, and the results of Mr. Mitchell's stings identified American Satellite as the source of at least five separate illegal telemarketing calls between December 2005 and June 2006.

646. In August 2008, Dish attributed a drop in complaints from American Satellite to the fact that they were probably using spoofing to disguise who they were.

647. In September 2008, Reji Musso received notice of a consumer complaint that American Satellite was using pre-recorded telephone message telemarketing to sell Dish products and services. In November 2008, Dish representatives contacted American Satellite about a consumer complaint regarding a "TCPA issue." American Satellite responded in April 2009. A series of emails regarding the encounter indicate that Dish representatives found American Satellite uncooperative. At the end of the discussion, Reji Musso considered terminating American Satellite as a Dish authorized dealer.

648.    On or around September 16, 2008, Dish identified American Satellite as having placed an illegal pre-recorded telemarketing call.

649.    In May 2009, American Satellite was providing "transparency to overseas call center dealings;" Dish noted in an email to American Satellite's Todd DiRoberto and others: "Thus far, we are doing a great job of it and that keeps Compliance at bay."

650.    In May 2009, Dish sent to American Satellite scripts to assist in its sales flow.

651.    In May 2009, Dish encouraged American Satellite to "continue to scrub any leads you are re-contacting against the internal Dish DNC list to prevent any issues and/or DNC complaints"

652.    Manuel Castillo was a manager for American Satellite. Castillo also worked for Dish before he worked for American Satellite.

653.    Castillo told Dish employee Bert Eichhorn about American Satellite's use of prerecorded message calls in 2009.

654.    Dish contracted with American Satellite to market Dish products and services.

655.    Dish authorized American Satellite to telemarket Dish products and services.

656.    Dish caused its retailer American Satellite to abandon at least one pre-recorded telemarketing call.

657.    Between 2005 and 2010, American Satellite activated 140,550 subscribers for Dish services and Dish paid American Satellite approximately $30.32 million.

658.    In or around October 1989, David Hagen, along with his wife Annette Hagen, pleaded guilty to one count of conspiracy (to commit bankruptcy fraud) and one count of money laundering in the Eastern District of Virginia, and Mr. Hagen was sentenced to 60 months in prison.

659.    On November 3, 1989, David Hagen and Annette Hagen were enjoined from a number of deceptive marketing practices in a permanent injunction entered by the United States District Court for the Eastern District of Virginia on November 3, 1989.

660.    In February 1990, David Hagen pleaded guilty to "conspiracy and one substantive count" of mail fraud in the Eastern District of Texas, and was sentenced to 60-months of incarceration.

661.    After David Hagen was released from federal prison, he started a satellite sales business called Prime TV in Southern Pines, North Carolina.

662.    In August 2003, the State of North Carolina opened an investigation into Prime TV's marketing practices, which culminated in a June 2004 consent decree requiring Prime TV to, among other things, honor rebates that it had promised to consumers but never paid.

663.    On October 7, 2003, Dish's Vice President of Sales and Distribution Amir Ahmed sent a letter to David Hagen, President of a company called Prime TV, LLC, that marketed Direct TV services at the time.

664.    Shortly after receiving the October 2003 Letter, Hagen formed Dish TV Now. In November 2003; Dish TV Now's unsigned Dish Retailer Agreement form submitted by the Plaintiffs was dated December 31, 2004

665.    Initially, Hagen ran Prime TV out of a 600-seat call center and Dish TV Now out of a 100-seat call center, both located in North Carolina.

666.    On May 15, 2009, David Hagen was convicted of a number of additional federal felonies, including conspiracy to commit securities fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering.  David Hagen is currently serving a 45-year federal prison term.

667.    Dish cannot say, knowing what it knows now, that it would not have contracted with David Hagen to sell Dish service.

668.    In November 2003, Dish TV Now became Dish's first OE retailer.

669.    Dish TV Now, Inc. (Dish TV Now) was the first Order Entry Retailer (a/k/a National Sales Partner) to use the Order Entry Tool.

670.    Dish did not perform a public records check on David Hagen before contracting him to pilot the OE program.

671.    David and Annette Hagen worked with Dish to improve the OE tool.

672.    Dish provided logins and IDs to Dish TV Now, so that Dish was able to track specific sales made by individual agents in Dish TV Now's call center.

673.    On January 1, 2004, Ahmed sent an internal email in which he stated that Dish TV Now was "selling 300 a day."  Ahmed continued, "We can't afford to lose this business. They are averaging 1500 [DirecTV] per day and we have an opportunity to get their [DirecTV] business eventually."

674.    The sales volume generated by Dish TV Now was important to the most senior of Dish's executives, including Dish co-founder and then-CEO Charles Ergen, and Dish offered Mr. Hagen any support it could give him.

675.    In 2004, Hagen terminated his relationship with DirecTV and stopped operating Prime TV. At that point, he moved Dish TV Now To Prime TV's 600-seat call center.

676.    By 2004, Mr. Hagen's businesses had two adjacent call centers located in a Southern Pines, North Carolina strip mall: the larger call center had seats for 600 telemarketers; the smaller call center had seats for 100 telemarketers.

677.  In 2004, Dish co-founder James DeFranco and VP Ahmed visited Dish TV Now's call centers to observe the company's marketing activities.

678.  On June 14, 2004, David Hagen, Annette Hagen, and Prime TV entered into a consent judgment with the State of North Carolina Attorney General to resolve allegations regarding Prime TV's marketing practices.

679.  In late July or early August 2004, Dish started receiving consumer complaints about Dish TV Now pre-recorded calls.

680.  Dish employees were at Dish TV Now on August 23, 2004, and observed Dish TV Now sales staff using a predictive dialer.

681.  Dish employees provided regular trainings to Dish TV Now call-center agents.

682.  Hagen told Ahmed that Dish TV Now was using a predictive dialer to make outbound calls to consumers who have previously inquired with them about satellite TV service or are current Dish TV Now Network customers, and that the intelligent dialer knows the difference between a No Answer, Busy, Answering Machine or Live Connect and only connects live customers to a live Dish TV Now agent. Hagen also told Ahmed that DishTVNow did not leave messages, that they had a list of over five million past and current customers that they scrubbed against the Do Not Call List, and that they maintained a Dish TV Now Do Not Call List to allow customers who wished to opt out on future solicitations to be immediately added to the list.

683.  Dish representatives told some consumers who complained about Dish TV Now that Dish could not help them because Dish TV Now was an independent retailer. In some cases, Dish representatives told the consumer that Dish would forward the complaint to Dish TV Now.

684.  *On September 16, 2004, Ahmed sent Hagen the following email: "David, This is simple. Is Dish TV Now telemarketing customers over the phone or are you guys using predictive dialers and leaving messages trying to sell the customer Dish Network. We are not interested in this type of marketing. We are receiving complaints on your company doing just this type of marketing. Please Respond, Amir."*

685.  By September 2004, the highest levels of Dish management, including Dish co-founder Jim DeFranco, were aware that the first OE retailer, Dish TV Now, was probably using illegal telemarketing to sell Dish Network service.

686.  Dish Vice President Amir Ahmed testified in 2012 that he did not know whether David Hagen was using pre-recorded messages to sell Dish, despite emails he sent to David Hagen on the topic.

687.  In September 14, 2004, Dish denied responsibility or knowledge of Dish TV Now's telemarketing activities.

688.  In September 16, 2004, in response to an inquiry by Dish executives, Dish TV Now admitted using automated telemarketing.

689.  Dish TV Now continued operating as an Order Entry Retailer for Dish throughout the rest of 2004 and all of 2005. Dish records indicate that it provided training to Dish TV Now several times in 2004 and 2005.

690.  *The term "DBS" stands for Digital Broadcast Satellite.*

691.  On January 3, 2006, Dish National Sales Manager Mike Mills sent a letter to Hagen stating that Dish TV Now had only made five new sales since November 28, 2005. Mills also stated that, "your sales people have indicated that you no longer sell Dish Network."

692.  On January 20, 2006, Dish terminated Dish TV Now as an authorized Dish Network retailer. Dish records stated the reason for termination was "Non-Activity".

693.  The explanation in the Dish records stated, "This retailer's termination is due in part to a churn rate greater than 125% of the churn rate experienced by EchoStar with respect to Dish Network subscribers and failure to actively market and promote Dish DBS Systems and/or programming."

694.  Between 2004 and 2005, Dish TV Now activated 91,210 subscribers for Dish, and Dish paid Dish TV Now $20.61 million for these new activations.

695.  In 2007, Dish stated to the FTC that Dish terminated Dish TV Now due to telemarketing violations. In 2008, Dish Vice President Blake Van Emst submitted an affidavit in the case that alleged TCPA violations, *Charvat v. EchoStar Satellite LLC*, No. 07-v001000 (S.D. Ohio).  Van Emst stated, in part, "EchoStar has no way of knowing who [Dish TV Now was] calling or the referring source of new orders."

696.  Dish stated in an December 2008 affidavit filed in the Southern District of Ohio that Dish "had no way of knowing" how Dish TV Now was marketing Dish service.

697.  In December 2004, a consumer sued Dish TV Now for using illegal prerecorded message telemarketing to sell Dish service.

698.  Illinois consumer Morton Sill received pre-recorded calls from Dish TV Now in February 2005.

699.  Morton Sill, of Chillicothe, Illinois, has landline number (309) 579-3058.

700.  Mr. Sill placed his landline number on the Registry on December 20, 2005.

701.  Mr. Sill filed complaints about the calls with both the State of Illinois and with Dish, naming Dish TV Now as the entity that placed the pre-recorded calls he received.

702.  Dish's response to Mr. Sill—misidentified in Dish's letter as "Bill Morton"—recognized that its "independent retailer" Dish TV Now, see UF 184-227 supra, had called Mr. Sill to

solicit Dish, but disavowed any responsibility for the calls and suggested Mr. Sill contact Dish TV Now directly.

703. Dish told consumers that it could not help them when they complained about Dish TV Now's calls and had no way of finding out if Dish TV Now was making calls.

704. In April 2005, Illinois informed Dish about allegations of prerecorded message telemarketing by Dish TV Now on behalf of Dish network

705. In December 2005, Dish TV Now agreed to indemnify Dish and retain counsel to represent Dish in an Ohio TCPA law suit. That lawyer withdrew because of non-payment. As of December 2005, DishTV Now had not yet retained new counsel.

706. *Dish entered into a Retailer Agreement with Dish TV Now.*

707. Dish contracted with DishTV Now to market Dish products and services.

708. Dish authorized Dish TV Now to telemarket Dish products and services.

709. Between May 2004 and August 2004, 6,673,196 pre-recorded calls selling Dish for Dish TV Now were answered by the recipient of the call for which the calls played a pre-recorded message selling Dish services.

710. DishTVNow prerecorded telemarketing calls were made at Dish's direction, were pre-recorded calls that marketed Dish products and services, were answered by a live person, and no lives sales representative came on the line within two seconds of the recipient answering the phone.

711. Dish caused its retailer DishTV Now to abandon 6,673,196 prerecorded telemarketing calls.

712. Prior to being a Dish retailer, JSR—headed by Jerry Dean Grider and Richard Goodale— was an affiliate of a different OE retailer, Dish Nation, and JSR used autodialing on Dish Nation's behalf in early 2006.

713. In February 2006, Jerry Grider submitted a proposed business plan to Dish to become a retailer. In his application, Grider indicated his company would use telemarketing, print, and direct mail to generate activations. Dish anticipated JSR could produce at leat 500 activations per month if brought on as an OE Retailer.

714. By June 28, 2006, Dish knew that JSR "generat[ed] sales through auto-dialing" and that JSR had a "list of one million plus clients ranges from about $2K to $9K per list depending on the quality. JSR is spending about $2K/mo. and makes about 750K+ dials per week generating around 40 sales a week."

715. On or about August 10, 2006, Dish approved JSR Enterprises as an OE retailer.

716.    Once it received access to the OE Tool, JSR Enterprises immediately began using prerecorded message telemarketing to generate Dish sales that were consummated through the OE Tool.

717.    On September 8, 2006, Steven Keller, Regional Sales Manager for EchoSphere LLC (EchoStar's predecessor), sent Mike Oberbillig, Dish Director of Sales, an email including the information that JSR used "Mortgage leads, autodialers producing nearly one million connected calls a month."

718.    By September 25, 2006, a consumer Hannah Klein, participated in sting--consummating a sale and creating a Dish account during the course of an illegal telemarketing call--to identify the source of the illegal prerecorded message telemarketing to her phone number, which was on the National DNC Registry.  Using Ms. Klein's information, Dish identified JSR as the source of the illegal telemarketing.  Dish counsel Dana Steele told Ms. Klein that it was "initiating a formal investigation of [JSR's] practices, including demanding proof of [JSR's] registrations."

719.    On September 28, 2006, Richard Goodale emailed Dish counsel Dana Steele regarding the Hannah Klein sting.  In a brief email, Mr. Goodale admitted that on August 15, 2006, JSR made an illegal telemarketing call to Ms. Klein's number, which was on the National DNC Registry, due to a scrubbing issue.  Mr. Goodale assured Dish that "no other known DNC violations will occur."  There is no evidence that Dish required any additional or more detailed information from JSR about any remedial measures.

720.    On October 6, 2006, Dish sent a formal letter to JSR regarding the Hannah Klein sting.  In the letter, Retail Services Director Robb Origer confirmed that there were "repeated and unsolicited calls" to a number on the Federal DNC List, and that "an internal [Dish] investigation connected JSR Enterprises to this event."  Dish ordered JSR to add Ms. Klein's number to its Internal DNC List, and to provide "proof of [JSR's] compliance with all outbound telemarketing laws."

721.    In early October 2006, another consumer, Melissa Wallace, complained to Dish about receiving prerecorded message telemarketing.  Ms. Wallace participated in a sting, which again identified JSR as the source of the illegal telemarketing.

722.    On October 19, 2006, consumer Melissa Wallace faxed a letter to JSR Enterprises— copying Dish attorney Dana Steele—regarding JSR Enterprises' prerecorded telemarketing calls that she received.  According to Ms. Wallace, the caller ID for these calls displayed "Dish Direct," but telesales agents identified themselves as JSR enterprises.

723.    In a sworn March 19, 2007 affidavit in response to a South Dakota Public Utilities Commission investigation of Dish's telemarketing practices, Dish counsel Dana Steele stated that Dish believed JSR was the only retailer using the name Dish Direct.

724.    On October 31, 2006, Retailer Services Director Robb Origer sent another letter to Dish in connection with the Wallace sting, informing JSR that "an internal investigation" connected JSR to illegal telemarketing.  Dish also noted that that JSR had not responded

to its October 6, 2006 letter.  Dish again requested "proof of [JSR's] compliance with all outbound telemarketing laws," by forwarding JSR's DNC policy, affiliate list, and scripts.  Dish also told JSR to "completely and thoroughly address the circumstances surrounding the allegation(s) and furnish information relative to specific corrective actions."  Dish warned that "additional incidences of this nature may result in disciplinary action up to and including termination."

725.  On November 6, 2006, Mr. Goodale wrote to Ms. Musso with a response regarding to Dish's October 6, 2006 and October 31, 2006 letters.  Mr. Goodale stated that he already spoke with Dana Steele about the "Hannah Klein matter."  With respect to the Wallace sting, Mr. Goodale provided two one-page documents: 1) a written narrative claiming that prerecorded message telemarketing was permissible and that JSR did not have to honor the 2002 Internal DNC request Ms. Wallace made to Dish; 2) an outbound sales script, which ultimately directed the telesales agent to input consumer information in Dish's OE tool.  After receiving this communication, Dish did not take any further actions against JSR in connection with the Klein and Wallace stings.

726.  On or around November 15, 2006, consumer Linda Chesley participated in Dish's sting program whereby she created an account upon receiving an illegal prerecorded message telemarketing call.  Using the consumer information run through the OE tool, Dish identified the source of the illegal call as JSR.

727.  When she received a call from JSR, Ms. Chesley asked for a supervisor on the JSR call, the call center agent told her that it was actually a "porn shop" and that the supervisor was "f----ing someone on the floor."

728.  In late November 2006, JSR Enterprises informed Dish that it "expanded their outbound telemarketing efforts by adding a dialer and increasing the [number] of employees."  Brian Neylon, VP of Sales, asked a regional sales manager if JSR was "doing voice/message broadcasting."  By this time, multiple internal stings confirmed that JSR used illegal telemarketing.  Nevertheless, Dish did not conduct any further investigation beyond cursory questioning of JSR's principals.  Dish did not exercise the rights it reserved for itself in the Retailer Agreement to order JSR to stop using outbound telemarketing or its new dialer until it investigated further.

729.  While Dish's second confirmed sting of JSR was still being processed, on December 7, 2006, the State of Missouri obtained a temporary restraining order against JSR to cease telemarketing calls to Missouri citizens, based in part on many complaints the state received regarding JSR's telemarketing practices.

730.  On December 20, 2006, Ms. Musso emailed Mr. Goodale about the Chesley sting, informing him that "an internal investigation has linked this attempted sale (11.15.06 - credit card was run 5 times) to your company. . . . this customer is reporting behaviors that are unacceptable and the 'attempted sale' is definitely linked to you."  Ms. Musso further stated "[t]he information provided, while vague, still points to multiple other complaints with a similar 'M.O' over the past several months' . . . ."  Ms. Musso requested "feedback immediately" on this.

731.   On December 20, 2006, Ms. Musso e-mailed Dish National Sales Manager Mike Mills reporting that JSR Enterprises "was just linked to a sting that was actually an affiliate of theirs (they told me they only used their own employees). . . . I suggested he not term until he tries to get the recording."  Mr. Mills responded that "[o]nly affiliate JSR told me they were using was out of the Philippines and they were ending that relationship at the end of this week."

732.   Later that day, Mr. Mills emailed Ms. Musso and stated "JSR just called me.  They are deactivating the logins that Philippines call center is using today.  They also mention that Sterling was using the same center . . . I told them to do whatever Reji asked and do it quickly."

733.   On December 21, 2006, Musso informed Dish Sales executives Brian Neylon and Mike Mills that she "had a lengthy discussion with Richard Goodale yesterday" and that "[t]his latest allegation is probably a violation . . . It was done by a 3rd party call center."  In response, the first question Mr. Neylon asked is "[w]hat is his volume?"  Mr. Mills responded that at the time JSR was brought on as an OE Retailer, JSR indicated it would be doing "outbound out of their office."  Mr. Mills further observed that OE Retailers' use of affiliates "is going to continue until we get something in writing that we enforce."  Ms. Musso responded that JSR was "the least of [Dish's] worries."  Dish decided to allow JSR to continue as an OE Retailer.

734.   In January 2007, Dish's retailer team believed that if Dish continued "pussyfooting" with JSR despite knowledge of multiple confirmed telemarketing violation, it "impact[ed] Dish's credibility."

735.   On January 9, 2006, Ms. Musso wrote to Messers. Mills, Neylon, Origer and Werner that in response to an investigation by the Louisiana Attorney General's office, she identified JSR as the source of pre-recorded message telemarketing.  She also tied JSR Enterprises to "5 other complaints in our tracker."

736.   Finally on January 10, 2007, Dish's Sales director Robb Origer decided Dish should not terminate JSR Enterprises, but instead "consider a formal penalty" and was deciding on an appropriate amount.  Dish did not decide on a fine amount or that it fined JSR at this time.

737.   According to a February 20, 2007 e-mail from Mr. Origer, between August 10, 2006 (when Dish accepted JSR as an OE Retailer), and December 31, 2006, JSR activated 6553 customers for Dish.

738.   On January 17, 2007, Dish wrote JSR regarding five telemarketing complaints implicating JSR.

739.   On January 22, 2007, Mr. Goodale responded to Ms. Musso's January 17, 2007 e-mail.  JSR admitted to Dish that it or its call center affiliates had contacted at least three additional telemarketing violations, including calling consumers whose numbers were found on the National DNC Registry.  There is no further evidence that Dish took further actions against JSR regarding the five complaints.

740.     For the time period between September 2006 and February 6, 2007, Dish was tracking investigations related to 14 different consumers (some with multiple complaints) regarding pre-recorded message telemarketing and telemarketing to numbers on the Registry by JSR.

741.     On February 8, 2007, Ms. Musso sent an email with a press release from Missouri Attorney General dated December 7, 2006 to Messers. Neylon, Origer, Oberbillig, Mills, and Werner. The press release stated that the State of Missouri obtained a TRO against JSR Enterprises to enjoin it from calling Missouri residents. The press release stated that JSR Enterprises had called Missouri residents who had registered their telephone numbers on Missouri's DNC registry.

742.     Upon receiving Ms. Musso's email, that same day, Mr. Neylon emailed Mr. Origer and stated "Assume that our plan would be: … 2) Immediate termination of American and JSR 3) Publicize  Dont [sic] think we will have a chance to bring them to denver and ask them about their business."

743.     On February 9, 2007, Mr. Werner responded to Ms. Musso's February 8, 2007 e-mail to ask "JSR [is] ours?"  Ms. Musso responded "JSR for sure."

744.     On February 13, 2007, Dish sent a letter to JSR terminating its Retailer Agreement.  In its letter, Dish reminded JSR that it could not contact any Dish subscriber to convert them to another service or to use any list of past Dish subscribers for that purpose.

745.     Upon announcing JSR's termination, on February 15, 2007, a Dish Senior Vice President e-mailed other Dish executives to ask "do we have ant [sic] chargeback exposure to the termination of jsr".  Dish executive Erik Carlson responded that Dish's financial position seemed secure because it did not appear JSR was "flipping" its activations to a competitor, and Dish would be clawing back as much money as possible.

746.     After termination, JSR Enterprises continued selling Dish service after signing up as an affiliate of other Dish OE retailers.

747.     In 2008, when sued about JSR's calls in a private TCPA lawsuit, Dish claimed under oath that it had no idea how JSR generated sales.

748.     Dish, through its representative Mike Mills, testified at a 2012 deposition that JSR used online and print advertisements to sell Dish service, and that it did not remember JSR's other marketing methods.

749.     Dish knew that JSR principal Jerry Grider was involved in Dish marketing at OE retailer USA Cable in 2008, but continued to accept sales from USA Cable despite Dish stings tying USA Cable to prerecorded message telemarketing.

750.     USA Cable was still an OE retailer in December 2011.

751.     Dish permitted JSR to market Dish services.  On April 12, 2006, Dish entered into a Retailer Agreement with Jerry Dean Grider d/b/a JSR Enterprises by which: (a) Dish

appointed JSR as an "Authorized Retailer"; (b) Dish authorized JSR to "market, promote, and solicit" orders for Dish service nationally; (c) Dish authorized JSR to use Dish trademarks in marketing; (d) Dish gave itself a right of access to all JSR records in connection with its Dish retailership; (e) Dish required that JSR "shall take all actions and refrain from taking any action, as requested by [Dish] in connection with the marketing, advertisement, promotion and/or solicitation of orders"; and (f) Dish provided that the agreement would be terminated if JSR "fail[ed] to comply with any applicable federal, state or local law or regulation."

752. Dish authorized retailer JSR Enterprises to telemarket Dish products and services.

753. From August 2006 to February 2007, JSR Enterprises activated 10,050 Dish customers and Dish paid JSR Enterprises approximately $1.5 million.

754. Dish gave JSR a typical per-customer activation commission of $175.

755. JSR Enterprises initiated Dish telemarketing calls to persons whose numbers were on the Registry at least 31 days at the time of the call.

756. Between August and December 2006, Dish caused JSR to make 2,349,031 calls to numbers that had been on the Registry at least 31 days.

757. Between 2006-2007, JSR Enterprises made a total of 5,664,273 "issue" telemarketing calls selling Dish to telephone numbers that had been on the Registry at least 31 days at the time of the call.

758. JSR Enterprises initiated 685,667 calls to telephone numbers on the Dish List and the Retailer Inaccessible List.

759. Dish caused JSR Enterprises to initiate 685,667 calls to telephone numbers on Dish's internal do not call list.

760. JSR Enterprises initiated 1,186,924 calls to telephone numbers on the Dish List.

761. JSR Enterprises made 794,395 calls to numbers on the Retailer Inaccessible List.

762. Dish sales employees made frequent visits to JSR's call center and gave JSR geographic areas to focus on for their telemarketing Dish products and services.

763. Dish corporate officers met with JSR employees on multiple occasions in JSR's call center and knew that JSR was engaged in outbound telemarketing.

764. Dish employees reviewed JSR's telemarketing scripts to sell Dish service, and provided feedback.

765. When completing a telesale through Dish OE Tool, JSR was required to recite specific disclosures mandated by Dish regarding the terms and conditions of Dish's agreement with the customer.

766.    Dish had sole and final authority to set the price of Dish pay-TV service that JSR sold.

767.    Dish provided JSR Enterprises with training on how to sell Dish products and services.

768.    In 2006, JSR participated in a Dish promotion, the terms and conditions of which allowed Dish to monitor at its sole discretion all communications between JSR and its employees, agents and contractors and all communications between JSR and consumers.

769.    JSR employed Philippine call centers to engage in "press one" telemarketing (pre-recorded calls that sold Dish service and directed the recipient to "press one" if interested) to American consumers including consumers on the Registry.

770.    JSR used prerecorded message telemarketing to sell Dish Network service and reached hundreds of thousands of live consumers while doing so.

771.    JSR also made live outbound telemarketing calls and attempted to sell Dish service on every outbound call it made.

772.    Dish knew that JSR's only marketing method was outbound telemarketing.

773.    Between 2002 and 2007, Dish retailer JSR was a Dish marketing agent.

774.    National Satellite Systems (National Satellite or NSS) became a Dish Order Entry Retailer in 2006.

775.    Dish considered companies involving former Dish employees to be "friends of the family."

776.    In July 2010, NSS hired its former Sales Department contact at Dish, Nathan Jones, as its Chief Operating Officer.

777.    In May 2008, Reji Musso wrote in an email that National Satellite "has broken more TCPA laws than I care to enumerate." Even after confirming that NSS was guilty of a telemarketing violation, Ms. Musso concluded that Dish's sales team would have to make a "business decision" about whether to take any disciplinary action the retailer. Ms. Musso, recommended removing NSS from the OE tool even though "[Dish] needed the activations."

778.    In June 2008, nearly a month after confirming a telemarketing violation, Dish finally decided to penalize NSS in June 2008, simply because it "needs to demonstrate that [Dish] take[s] these violations/allegations very seriously."

779.    In September 2008, nearly 3 months after confirming a telemarketing violation, Dish decided to penalize National Satellite Systems for only $500 because they are a "good guy" with only four TCPA allegations against them. According to Dish, "the other penalties [Dish levied against retailers] were a result of DNC and were much more flagrant."

780.   Dish decided to fine retailer NSS $500 instead of $2,500 because they were a "good retailer," unlike other retailers who received significant penalties because they "were involved in multiple calls to the same consumers or blatant calls to individuals on the DNC."

781.   In February 2009, Dish's Reji Musso knew that NSS was using an Indian call center to market and was inclined to approve their use of a Philippines call center, even though they did not own it, based on Dish's perceived "need to grow our customer base."

782.   In May 2010, NSS told Dish that all of their TCPA complaints were coming from one "marketing source," and Dish responded by speaking to NSS about the case by the FTC, "the problem with the timing of these complaints, the possibility of some type of penalty based on the interaction, and the fact that they had suspended this effort would be a plus."

783.   In May 2010, Dish's Serena Snyder provided information to NSS about TCPA allegations received from the U.S. Department of Justice, and NSS's Kapil Juneja responded that the consumers had opted in on multiple officers on a "coreg campaign," and that NSS had added the numbers of consumers who asked not to be called again into its internal DNC list.

784.   In May 2010, Dish's Reji Musso asked NSS whether it uploaded the internal DNC requests it received into Dish's DNC list. and was told "Yes, we maintain an Internal DNC list and upload these DNC requests on PossibleNow as well as on our internal DNC."

785.   In June 2010, Dish's Reji Musso noted that NSS was engaged in a campaign that originated offshore that she had not been "brought into the loop for," and told NSS "please understand that I know that you manage the sales process, but I am responsible for the compliance."

786.   In June 2010, Dish's Reji Musso discovered that dating back to January 2008, American Satellite had 64 AG/BBB complaints, compared with NSS's 31 AG/BBB complaints, while American Satellite's ERT complaints dating back to April 2009 were 123, compared with NSS's 149 ERT complaints over the same time frame.

787.   In June 2010, Reji Musso expressed surprise at the complaints about NSS, noting that American Satellite "was supposed to be bad . . ."

788.   In June 2010, "just for grins (same business model)" Dish's Reji Musso compared National Satellite Systems with American Satellite and determined that NSS's "TCPA complaints MUCH lower. Similar in AG/BBB and SP-ERT."

789.   Although Dish decided to fine retailer NSS $500 in 2008, two years later Retail Services could not recall if they ever actually followed through with the penalty. There is no evidence that Dish ever formally fined NSS or collected the money.

790.   In June 2010, Dish detailed a series of meetings it had with retailer NSS since September 2009 regarding "regularly received complaints regarding telemarketing practices," Dish's

concern that "we spend too much time responding to National Satellite issues;" at a June 2010 meeting, Amir Ahmed told NSS: "Going forward there are no more chances," threatening discipline or termination if any instances of problems, including misrepresentation of Dish or its products or services, unauthorized affiliate usage, or additional TCPA complaints occur.

791. National Satellite Systems started uploading its internal list to PossibleNow in June 2010.

792. Dish did not collect entity-specific requests from Dish retailer National Satellite Systems until summer 2010.

793. National Satellite Systems made 112,261 "issue" telemarketing calls to numbers on the Retailer Accessible List.

794. National Satellite Systems had access to the Retailer Accessible List and the Dish List for the 2008-2010 calls reflected in the call records NSS produced.

795. When compared against the numbers on Dish's entity-specific DNC lists, Dish's expert found that during December 2008 and August 2009, NSS placed 222,700 calls to phone numbers of persons who had stated to Dish or a Dish retailer that they did not wish to receive outbound telephone calls 30 days or more prior to the calls at issue.

796. Dish contracted with NSS to market Dish products and services.

797. In May 2008, NSS confirmed to Dish that it was using a call center in India to sell Dish service to conduct outbound telemarketing.

798. Although, Dish did not generally permit Retailers to use offshore call centers, Dish allowed NSS to use an offshore call center located in India that conducted outbound telemarketing.

799. Dish claimed it allowed NSS to do so because NSS owns and operates the call center, although NSS's corporate designee testified that NSS does not, in fact, own it.

800. Dish reviewed, revised, and approved email marketing by retailer National Satellite Systems, d/b/a freedish.com

801. In August 2011, Dish's National QA team in its Retail Services Department reviewed the scripts and disclosures of Dish retailer National Satellite Systems, provided feedback on them, and asked the retailer to inform Dish if they made any changes to the scripts.

802. In October 2011, Dish closely tracked the performance of each "incentive eligible" retailer including National Satellite Systems, to plot the number of activations per month, activation pace, and the growth or decrease in the activations based on the previous month.

803. Dish caused National Satellite Systems to initiate 222,700 telemarketing calls to telephone numbers on Dish's Internal Do Not Call list.

804. New Edge Satellite (New Edge) was a Dish Full Service Retailer from at least 2003 through 2007. New Edge conducted outbound telemarketing calls for Dish products and services from 2003 until 2007.

805. New Edge used outbound telemarketing to sell Dish services and products.

806. New Edge kept an internal DNC list on paper, either handwritten or printed. In 2005, New Edge turned over its internal DNC list to the FTC in response to a Civil Investigative Demand. Dish did not share its Internal DNC List with New Edge and did not ask New Edge for its internal list.

807. Dish's affiliate CVS provided equipment to Full Service Retailers. CVS representatives knew that New Edge was conducting telemarketing.

808. Dish call records showed that Dish made 4,968 telemarketing calls to telephone numbers that were on New Edge's internal DNC list at the time of the calls.

809. Satellite Systems Network (SSN) is a now-shuttered Limited Liability Company based in Aliso Viejo, California.

810. The President of SSN was Alex "Ali" Tehranchi and its Vice President was his sister, Bahar "Sophie" Tehranchi.

811. On or around March 20, 2001, Dish accepted SSN as an authorized retailer. SSN remained a Dish retailer until 2013.

812. On May 31, 2001, Dish Sales VP Amir Ahmed sent an email to EchoStar COO Jim DeFranco requesting increased activation payments for certain OE retailers, including SSN because the company's potential monthly sales volume was up to 1,500. Mr. Ahmed told Mr. DeFranco that SSN "used several marketing companies to purchase new homeowner leads and use telemarketing and direct mail to close the deals."

813. On June 3, 2001, in response to Mr. Ahmed's e-mail, Mr. DeFranco approved the increased remuneration to SSN, increasing the initial payment for each activation from $50 to $75. Dish began paying out the 50% increase for all activations after June 3, 2001.

814. By January 2002, Dish expected SSN to make up to 3,000 to 5,000 new activations per month, and invited SSN to join the Retailer Bonus Program based on its performance.

815. On June 12, 2002, Dish Director of Retail Services Mary Davidson sent a letter to Alex Tehranchi notifying him that SSN was in violation of the Retailer Agreement. The letter reminded SSN to "ensure that all practices pertaining to telemarketing are within the law."

816. On or around September 30, 2002, a Dish representative noted about SSN in Dish's SEIBEL database--Dish's system for tracking interactions with retailers--that Dish would "address issue on leaving pre-recorded messages"

817. Again, on or around November 6, 2002, a Dish representative again noted in SEIBEL "[SSN] issues with voice broadcasting, ensure they are following rules and explain that entire executive group is watching close".

818. According to notes in SEIBEL, beginning in July 2003, Dish's Sales Department, including executive Mike Oberbillig, were in monthly contact with SSN.

819. On or around April 2004, Dish made SSN an OE Retailer and gave it access to the OE Tool.

820. On June 28, 2004, Dish founder and CEO Charles Ergen received a telemarketing call that left a message on the answering machine at one of his residences. Mr. Ergen asked his senior executives to "check them out". Mr. Ahmed responded to Mr. Ergen that SSN was the originating retailer and that it used "message broadcasting" (i.e., prerecorded message telemarketing) as "their primary source" of generating satellite TV service activations. Mr. Ergen then asked "why dont [sic] we just copy their techniques".

821. On July 19, 2004, Mr. Ahmed instructed Mike Oberbillig and Jim Spreitzer to inform SSN that Dish had increased its payments from $150 to $175 for activations on the OE Tool. Just three years earlier, in June 2001, SSN was receiving $75 for TVRO activations. Mr. Ahmed indicated he wanted a minimum of 2500 activations from SSN in August, and indicated he did "not want to lose any more business" to SSN selling DirecTV.

822. On July 29, 2004, Mike Oberbillig e-mailed Mr. Ahmed that he had informed Alex Tehranchi of SSN about increased "economics," but Mr. Tehranchi was concerned about instances where the OE Tool "goes down often and when they call in the deals he claims that they never received credit for them." Mr. Ahmed replied that Mr. Oberbillig needed to "[m]ake sure he does not just give us apartment sales." Mr. Ahmed also noted that he was "hearing alot of complaints on Sat Systems on telemarketing calls to customers."

823. On September 14, 2004, Mr. Ahmed reported to Mr. DeFranco that SSN was averaging 350 activations per month on the OE Tool." Mr. Ahmed noted that if Dish increased SSN's activation payments again "from $175.00 to $200.00 until January 31, 2005," SSN could "get [Dish] incremental 2500-3500 activations per month." Mr. Ahmed noted that the activation payment amount was the "same economics as we provide for other OE Retailers with call centers, including Marketing Guru and Dish Pronto that used illegal telemarketing confirmed through Dish internal stings.

824. In response to Mr. Ahmed's request, Mr. DeFranco approved the increased payments for SSN on September 14, 2004. Approximately, two hours later, Mr. Ahmed told Dish's Jim Speitzer to "go get him. Need activations and please tell Alex that I have worked my ass off to get him additional economics. I have also had to deal with all his issues related to sales... Need incremental activations starting tomorrow."

825. Soon after increasing SSN's activation payments to $200.00, beginning around October 2004, Dish representatives began regularly visiting SSN's facilities, recording their visits

in SEIBEL.  For example, notes entered on or around November 18, 2004, Dish representatives "viewed call center and discussed operations of the center."

826. In November 2004, the State of Florida issued a press release announcing a civil penalty and permanent injunction for illegal telemarketing conducted by Vitana Financial Group, Inc., a California company headed by Alex Tehranchi.  According to the press release, Vitana telemarketed to numbers on the Florida's DNC Registry.

827. In March 2005, North Carolina secured a consent judgment and permanent injunction against SSN for making telemarketing calls to numbers with North Carolina area codes on the National DNC Registry and for conducting prerecorded message telemarketing

828. On or around April 5, 2005, a Dish representative made the following entry into SEIBEL titled "TOP 20 MEETING - SATELLITE SYSTEMS NETWORK:  Met with Alex.  Covered details on the Satellite Market and the Spanish Market.  Went over details on what works with marketing compared to the competitors."

829. On or around April 18, 2005, a Dish representative made the following entry into SEIBEL titled:  "SALESTRAINING - SATELLITE SYSTEMS NETWORK:  Sales Training with Alex Tehranchi and sales managers . . . Covered ways to drive the sales reps on increasing Dish Network sales."

830. On or around May 27, 2005, a Dish representative made the following entry into SEIBEL titled:  "OE:  new call center looks incredible . . . [SSN manager Steve Rad] knows that if he needs anything at all (i.e. support, training, issues, questions, etc.) to contact me directly."

831. On or around June 5, 2005, a Dish representative made the following entry into SEIBEL titled:  "OE:  his new call center is up and running with internet access so they should be ready to rock & roll. everything is running smoothly. he requested that i attempt to get him some updated training materials for his new hires (am working on that) and requested that i get him some "long" brochures, which aren't available anymore (discontinued). i've instructed steve to send me an email with the content that the "long" brochures had on them and i'd just create it for him in photoshop. will follow up."

832. On September 23, 2005, Chief Counsel for Telephone Privacy Enforcement from the Indiana Attorney General's Office e-mailed Dish Counsel Scott Novak and Amy Conley that a colleague received a prerecorded message telemarketing call, which are illegal pursuant to Indiana law.  In response, Mr. Novak, who was responsible for Dish's telemarketing compliance, blamed "some rogue outfit masquerading as us" and stated "to my knowledge we never have used ['push 1 to speak to someone live' outbound telemarketing]."

833. In response to the e-mail from the Indiana AG's office, Mr. Novak e-mailed Mr. Ahmed stating "this may be Alex Teranchi [sic] and Satellite Systems Networks [sic] again.  They used 'satellite Promotions' and I recall them hosting a call center in Wyoming previously. ... if it is SSN again, they are becoming a problem.  You'll recall Charter got an injunction against SSN about six weeks ago."

834. Mr. Ahmed forwarded Mr. Novak's email to Mike Oberbilling and Mike Mills. Mr. Mills confirmed "[y]es - It is Satelte Systems." Mr. Ahmed then stated "OK, apparently we could not convince Alex. Oberbilling, I'm so tired of this bullshit. I will deal with Novak [sic] and let legal handle it." Mr. Oberbilling responded "[w]e have address this with him many times, as recent as last week in person/LA. We stressed that he must follow the line if he wants continued support."

835. Later on September 26, 2005, Novak sent an email to Ahmed, Mills, and others regarding Satellite Systems. Mr. Novak wrote: "We know that SSN is using autodialers and automessages. Tehranchi had been warned time and again (by me, by you, by the region, by phone, in writing, in person) that these activities could violate the law. . . . In the past, we have successfully resisted the argument that we are responsible for the conduct of independent retailers, however, SSN is a problem because we know what he is doing and have cautioned him to stop. There is a risk in continuing to give warnings without a follow through action. Eventually, someone will try to use that against us. . . . I favor probation, provided that there is unanimous understanding that if EchoStar becomes aware of ANY ONE additional violation, he's terminated." Ahmed responded that he preferred 30 to 60 day probation. The evidence submitted does not indicate whether Satellite Systems was in fact put on probation.

836. Even after Mr. Novak's advice, Dish did not terminate its relationship with SSN; instead, Mr. Ahmed told Mr. Novak "I prefer to put [SSN] on 30 or 60 day probation." There is no evidence that further remedial or punitive action was taken against SSN in 2005.

837. On October 27, 2005, Dish's EVP Erik Carlson received information that a Southern California company calling itself Satellite Promotions was using prerecorded message telemarketing and calling numbers on the National DNC Registry. Mr. Carlson forward the information to Mr. Ahmed for further investigation, observing "[l]ooks like we have another retailer using telemarketing and not scrubbing their list." Mr. Carlson further inquired if the Indirect Channel, Mr. Ahmed's division of the Sales Department, had "a process in place for approving telemarketing activity?"

838. On October 27, 2005, in response to Mr. Carlson's request, Mr. Ahmed directed his team to investigate and determine "if it originated from an OE retailer." Leslie Fielder, Account Manager for OE Retailers, reported back that same day that after investigation, she confirmed the OE Retailer responsible for the prerecorded message telemarketing was SSN--"This is Alex's call center." Mr. Ahmed responded "[t]his is Alex's last chance. Fix it or he gets a letter and will lead to termination. It's that simple."

839. Mr. Oberbillig responded to Mr. Ahmed's alleged ultimatum by stating that he would "verify, [b]ut the last time the issue came up it was no ssn- but united." Mr. Ahmed stated "[e]ither way, both accounts are yours and I need it fixed."

840. That same day, October 27, 2005, Mr. Oberbillig reported to Mr. Ahmed that, after speaking with Mr. Tehranchi, SSN admitted to the prerecorded message telemarketing, although SSN claimed to scrub their calling lists. Mr. Oberbillig further reported that he "informed Alex that he must STOP using message broadcasting and leaving messages

even it followed do not call lists, even if he had a prior relationship with that customer."
Mr. Oberbillig further told SSN that it "must follow DishNETWORK guidelines and stop
using this form of mining immediately," noting that "Alex agreed and understood that we
do not allow this."

841.    On November 10, 2005, the Vermont Attorney General's Office contacted Dish about
        telemarketing calls made by an entity calling itself "Satellite Promotions" from California
        on behalf of Dish.

842.    In mid-November 2005, Mr. Mills learned from a Dish colleague that she received a
        prerecorded message telemarketing call at her home selling Dish service. After some
        probing, the Dish employee determined that the call center was SSN, and relayed the
        information to Mr. Mills on November 28, 2005.

843.    On November 29, 2005, in response to Mr. Mills' November 28, 2005 e-mail Mr.
        Oberbillig contacted Mr. Tehranchi about the "second recent complaint stemming from
        your account representing themselves as Dish, and message broadcasting/opt in as a
        source of marketing." Mr. Oberbillig explained that he was "out of golden parachutes to
        battle for you to stay on the OE program." Again, Mr. Oberbillig threatened that the
        telemarketing "ha[s] a chance of causing you to be put on probation or it could lead to
        termination." There is no evidence that Dish took any punitive or corrective action with
        respect to SSN in response to this allegation.

844.    On or around June 28, 2006, the Vermont Attorney General's Office, following up on its
        November 10, 2005 letter, issued a Civil Investigative Subpoena (CIS) requesting about
        SSN and SSN's marketing practices. Dish counsel Dana Steele and paralegal Denise
        Hargen were responsible for responding to the subpoena.

845.    By September 2006, Ms. Hargan was further investigating SSN to prepare a response to
        Vermont's CIS. On September 20, 2006, Denise Hargan e-mailed Ms. Musso to identify
        a retailer tied to complaints about telemarketing from a specific originating phone
        number and associated website.

846.    Dish's Retail Services began researching retailers in response to Ms. Hargan's September
        20, 2005 request. On September 21, 2006, a Retail Services employee identified the
        retailer as SSN. He e-mailed Ms. Musso noting that Alex Tehranchi was "fined
        $25,000.00 by North Carolina in 2004 for TCPA violations."

847.    On September 22, 2006, Dish provided a supplemental response to the Vermont CID.
        Dish responded, in part: "EchoStar has received complaints alleging "Do Not Call"
        violations by Satellite Systems Network. EchoStar investigated this complaint and
        ultimately determined that based upon representations by Satellite Systems Network after
        performing an internal investigation, the allegation brought to EchoStar's attention was
        not traced to Satellite Systems Network."

848.    On November 4, 2006, a consumer Greg Fisher, received a prerecorded message
        telemarketing call to his phone numbers selling Dish service. In order to find the

Retailer, Mr. Fisher completed a sale and generated an account number. Based on that information, Dish was able to "trace" the calls to SSN.

849. On December 28, 2006, Dish Retailer Services Director Robb Origer sent a letter to SSN regarding Mr. Fisher's sting, and requesting the same information and steps found in Dish's standard letter informing retailers of a telemarketing complaint. On January 9, 2007, SSN's lawyers responded to Dish's December 28, 2006 letter requesting additional information. There is no further evidence of communications between Dish and SSN regarding Mr. Fisher's sting.

850. On November 5, 2006, in response to a prerecorded message telemarketing call, consumer Jeffrey Mitchell created a Dish account as part of a sting. Once an account number was created by the sale, Dish identified SSN as the OE Retailer responsible for the voice broadcast message.

851. On January 17, 2007, Dish Retailer Services Director Robb Origer sent a letter to SSN regarding Mr. Mitchell's sting, and requesting the same steps and information found in Dish's standard letter informing retailers of a telemarketing complaint. There is no evidence Dish received a response from SSN or took any further action against SSN in connection with the Mitchell sting.

852. On February 15, 2007, Mr. Origer asked Ms. Musso "what is the detail on the allegations on this account [Satellite Systems Network." Ms. Musso responded "I have gotten only two allegations - Fisher and Mitchell … they include Spafford Lawsuit." Ms. Musso then stated "Brian tells me that [SSN] are doing well and going on the incentive trip...so, once again, this is a business decision. I guess we just need to let the attorney know that as far as we know, [SSN] have 'righted the wrongs.'"

853. On February 20, 2007, Dish wrote to SSN, explaining that it would soon begin monitoring telesales calls, including live on-site monitoring at SSN's locations.

854. On June 21, 2007, Ms. Musso wrote to Alex Tehranchi about the February 20, 2007 letter and "requirement" for on-site call monitoring. Ms. Musso wrote "I have heard from the Field Sales team that you have been reluctant to allow us access to your customer service/call center."

855. Thomas Krakauer has lived in Bahama, North Carolina, since May 1985, is retired from working at the Museum of Life and Science, and now volunteers at the Museum of Durham History.

856. Mr. Krakauer's land line number, (919) 471-9459, has been on the Registry since July 3, 2003.

857. Mr. Krakauer's number has been on Dish's entity-specific DNC list since at least May 9, 2009.

858. Mr. Krakauer remembers receiving a call sometime in 2009 in which the caller offered him savings on his monthly bill if he would switch from DirecTV to Dish.

859.  Dish determined that OE retailer Satellite Systems Network made the May 2009 call.

860.  The caller knew Mr. Krakauer was a longtime DirecTV customer and, after placing him on hold, indicated that certain premiums would soon be expiring and that if he switched to Dish Network, the caller could save him money.

861.  Concerned about a possible privacy breach, Mr. Krakauer contacted both DirecTV and Dish to complain about the call, added a password to his DirecTV account, and went to his bank to change his credit card number.

862.  Mr. Krakauer has never inquired about Dish services or engaged in a transaction with Dish prior to the call he complained about.

863.  Dish conducted an internal investigation which confirmed that Mr. Krakauer was called by Dish retailer SSN in May 2009, and found that the employee had "proceeded to call DirecTV and pretended to be Mr. Krakauer to get info from his account" and even completed a credit check without Mr. Krakauer's knowledge.

864.  When notified of the violation by Dish, SSN admitted that it had called Mr. Krakauer and claimed that it had generated the lead because it sold Mr. Krakauer DirecTV in April 2003.

865.  SSN, using a call center company named Five9, called Mr. Krakauer an additional 10 times during 2010 and 2011 trying to sell Dish service, including two additional calls SSN labeled as "DNC" for "Do Not Call."

866.  Two consumers complained to FTC within one calendar day of having received a violative call as contained in the Five9 call records, reporting SSN's caller ID and stating: "Please make them stop calling; PLEASE!!!!" and "They have called two to three times a day for the last two weeks. When I finally answered they contacted me about satellite dishes. I let them know . . . [I] would like to be taken off their list. They told me to hold while they transferred my call and then hung up on me. I have since received several more calls, twice a day. "

867.  By August 18, 2011, Dish had developed a "standard go after SSN letter" for sending to SSN regarding its illegal telemarketing.

868.  In July 2011, Dish National Account Manager Holly Taber knew that Dish retailer SSN was engaged in outbound calling, and observed that the "outbound calling has decreased effectiveness."

869.  Dish contracted with Satellite Systems Network to market Dish products and services.

870.  Dish entered into a contract with SSN by which: (a) Dish appointed SSN as an "Authorized Retailer"; (b) Dish authorized SSN to "market, promote, and solicit" orders for Dish service nationally; (c) Dish authorized SSN to use Dish trademarks in marketing; (d) Dish gave itself a right of access to all SSN records in connection with its Dish retailership; (e) Dish required that SSN "shall take all actions and refrain from

taking any action, as reasonably requested by [Dish] in connection with the marketing, advertisement, promotion of, or taking of orders"; and (f) Dish provided that the agreement would be terminated if SSN "fail[ed] to comply with any applicable federal, state or local law or regulation."

871.    Dish provided SSN with disclosures related to pricing and promotions and required SSN to read those disclosures verbatim to consumers.

872.    Dish authorized SSN to telemarket Dish products and services. Dish had sole and final control over the pricing of pay-TV service that SSN marketed.

873.    Dish employees often visited SSN's call center, monitored phone calls, provided training materials, trained managers, sales agents and new hires, and provided a bi-weekly marketing update.

874.    Dish required SSN to send recordings of its calls to Dish weekly and Dish scored SSN on these calls each week pursuant to its Retailer Agreement. SSN provided such recordings as mandated by Dish.

875.    In an effort to improve sales performance, Dish representatives regularly visited SSN to advise the Retailer on how it was doing and how it could perform better on sales calls and to go over outbound scripts to SSN.

876.    Dish also reviewed the script for the inbound telemarketing campaign conducted by SSN.

877.    Dish representatives often visited SSN's call center so that they could listen to live and recorded telemarketing  calls, provide marketing support, and train both call center managers and sales agents.

878.    Like with other OE Retailers, Dish's QA program scored SSN on a weekly basis, including on using the correct scripts about billing, and for obtaining consent regarding credit checks and qualifications.

879.    Dish also provided monetary support to SSN for marketing campaigns in amounts of $2500 to $3000 on two or three occasions.

880.    Between 2004 and 2010, SSN activated 46,168 subscribers for Dish service. During that time period, Dish paid SSN approximately $12.3 million for these subscribers.

881.    Between 2004 and 2013, Dish retailer Satellite Systems Network was a Dish marketing agent.

882.    Five9 produced call records of outbound telemarketing calls marketing Dish that Five9 made for Satellite Systems Network during 2010 and 2011.

883.    All of SSN's telemarketing calls in the 2010-2011 Five9 calling data were selling Dish products.

884. There is no evidence that any of SSN's Five9 calls between 2010-2011 were not telemarketing calls selling Dish.

885. Satellite Systems Network initiated Dish telemarketing calls to persons whose numbers were on the Registry at least 31 days at the time of the call.

886. Dish found that during 2010-2011, Satellite Systems Network made 381,811 telemarketing calls selling Dish to numbers that had been on the Registry more than 31 days.

887. Dish caused SSN to make 381,811 calls to numbers that had been on the Registry at least 31 days.

888. For SSN telemarketing calls made to telephone numbers on the Internal DNC List for more than thirty days prior to the call, Dish's John Taylor broke down the analysis by area codes associated with the Plaintiff States and by the Dish List, the Retailer Inaccessible List, and the Retailer Accessible List.

889. Between 2009 and 2011, SSN made at least 65,936 calls to phone numbers of consumers who stated to Dish or a Dish retailer that they did not wish to receive phone calls.

890. Dish caused Satellite Systems Network to make 65,396 calls to phone numbers of consumers who stated to Dish or a Dish retailer that they did not wish to receive phone calls.

891. Between 2009 and 2011, Satellite Systems Network made 22,946 "issue" telemarketing calls selling Dish to numbers on the Dish List.

892. Between 2009 and 2011, Satellite Systems Network made 42,990 telemarketing calls selling Dish to numbers that were on the Retailer Accessible List.

893. In 2002, Walter Eric Myers started a Dish Full Service Retailer called Tenaya Marketing. Tenaya sold Dish products and services door-to-door and also used newspaper and direct mail advertising. Myers based the company in Utah.

894. In 2003, Walter Myers' brother Daniel Myers founded Star Satellite, LLC (Star Satellite). Walter Myers took over Star Satellite after Daniel Myers started it.

895. In May 2003, Star Satellite signed a Retailer Agreement with Dish. By early 2004, Star Satellite was selling Dish products and services door-to-door, primarily in the Los Angeles, California area, and also in the Phoenix, Sacramento, and San Francisco areas.

896. Dish contracted with Star Satellite to market Dish products and services.

897. Dish authorized Star Satellite to telemarket Dish products and services.

898. In May 2004, Star Satellite established a business relationship with Guardian, the same telemarketing prerecorded message service that Dish TV Now employed.

899.    Guardian made automated pre recorded calls for Star Satellite to sell Dish products and services. The message instructed the recipient of the call to press "1" on the phone keypad if he or she wanted to purchase Dish products or services. The recipient who pressed "1" was connected to a Star Satellite sales representative.

900.    In April 2005, Star Satellite became an OE Retailer.

901.    Dish entered into a contract with Star Satellite by which: (a) Dish appointed Star Satellite as an "Authorized Retailer"; (b) Dish authorized Star Satellite to "market, promote, and solicit" orders for Dish service nationally; (c) Dish authorized Star Satellite to use Dish trademarks in marketing; (d) Dish gave itself a right of access to all Star Satellite records in connection with its Dish retailership; (e) Dish required that Star Satellite "shall take all actions and refrain from taking any action, as requested by [Dish] in connection with the marketing, advertisement, promotion and/or solicitation of orders"; and (f) Dish provided that the agreement would be terminated if Star Satellite "fail[ed] to comply with any applicable federal, state or local law or regulation."

902.    On July 28, 2005, Dish employee Jordan Anderson sent an email to Walter Eric Myers that included some scripts for outbound calling for Star Satellite to use in its call center.

903.    From July 30, 2005, to November 26, 2005, Guardian made 43,100,876 pre-recorded calls for Star Satellite selling Dish products and services which were answered by individuals.

904.    The Star Satellite prerecorded telemarketing calls were made at Dish's direction, were pre-recorded calls that marketed Dish products and services, were answered by a live person, and no lives sales representative came on the line within two seconds of the recipient answering the phone.

905.    Star Satellite made pre-recorded calls selling Dish products and services which were answered by individuals.

906.    From July 30, 2005 to November 26, 2005, Star Satellite initiated 43,100,876 pre-recorded calls selling Dish products and services.

907.    Dish caused its retailer Star Satellite to abandon 43,100,876 prerecorded telemarketing calls.

908.    In 2005, when Star Satellite was an Order Entry Retailer and was using Guardian's services, Star Satellite activated 18,679 subscribers for Dish services, and Dish paid Star Satellite $3.67 million.

909.    Dish certainly knew that Star Satellite's monthly activations of Dish subscribers more than doubled after it began telemarketing,

910.    Star Satellite's national robocalling more than doubled Star Satellite's annual Dish sales—from around 6,000 in 2004 to around 12,000 to 15,000 in 2005.

911.   After removal from the OE program, Star Satellite has not made more than 1800
       activations in a year.

912.   In May 2005, Dish noted that "We have a retailer . . . Star Satellite of Provo, Utah that is
       telemarketing using automated messages and our name instead of theirs. I have been
       getting some complaints about this from consumers thinking this is us."

913.   On May 25, 2005, Bangert forwarded a complaint about Star Satellite to Dish employee
       Mark Duffy. Bangert said: "We have a retailer . . . Star Satellite of Provo, Utah that is
       telemarketing using automated messages and our name instead of theirs. I have been
       getting some complaints about this from consumers thinking this is us."  Duffy forwarded
       this email to Jeff Medina in the Dish Retail Escalations Department. Medina forwarded
       the email to Margot Williams in Retail Escalations. Medina wrote in his email, "Are
       these your boys again?" Williams responded: "Jeff, I forwarded this information to
       Regina Thomas for further investigation. We have received a few complaints for other
       issues on this retailer that have also been sent to her for review and assistance."

914.   On July 28, 2005, Dish sent scripts for outbound calling to Star Satellite.

915.   On October 25, 2005, Dish wrote Star Satellite an email stating "I need you to become
       very serious about the business and the methods you are using to market the types of
       customers you are bringing to us."

916.   On October 26, 2005, Dish representative Ahmed sent a letter to Myers at Star Satellite.
       The letter said, in part: EchoStar . . . has received an inquiry from the Offices of
       Congressman Fred Upton of . . . Michigan . . . concerning telemarketing activities . . .
       conducted by your company. You have confirmed that you have halted all telemarketing
       activities involving persons named on the National Do-Not-Call Registry as necessary to
       comply with applicable telemarketing/do-not-call and other laws.  Please be advised that
       your EchoStar Retailer Agreement . . . require[s] . . . that you comply with all applicable
       laws (Section 9.1). Failure to comply with applicable laws will result among other things
       in the termination of the Retailer Agreement (Section 10.4) and could result in obligation
       . . . to indemnify and defend EchoStar .

917.   On November 2 and 3, 2005, Dish and Star Satellite exchanged emails regarding sales
       scripts and disclaimers. Myers for Star Satellite wrote "Let me know if you need me to
       make any changes to these scripts."  Mills responded, "Here are my comments/changes
       for the disclaimer. We are working on the sales script – we'll have something for you by
       COB tomorrow."

918.   On January 25, 2005, a consumer, Dennis Caplan, sent a letter to Star Satellite and Dish
       complaining about receiving pre-recorded telemarketing calls.

919.   On February 18, 2005, another customer, David Hyde, contacted Dish regarding Star
       Satellite prerecorded telemarketing calls.

920.   In August 12, 2005, Dish Corporate Counsel Dana Steele contacted Daniel Myers at Star
       Satellite to demand that Star Satellite defend and indemnify Dish from claims alleged in a

suit filed in small claims court in South Carolina by a consumer, Jay Connor. Connor named Star Satellite and Dish as defendants. Connor alleged that the defendants sent him a pre-recorded telemarketing call on July 5, 2005. The case was settled. Dish's in-house counsel reviewed and revised the settlement agreement.

921. In September 2005, Dish's lawyers edited a settlement agreement by which Dish and Star Satellite settled the claim through a confidential settlement.

922. The call records for Dish retailer Tenaya/Star Satellite show it called consumer Morton Sill's number on September 26, 2005.

923. Laurie Sykes, of New Bern, North Carolina has had her home telephone number (252) 447-2499, since 2001.

924. Mrs. Sykes's number has been on the Registry since May 5, 2006.

925. Mrs. Sykes is a part-time front desk clerk at the Comfort Inn; during 2006, she was a night auditor there.

926. Mrs. Sykes lives with her husband and adult grandson.

927. Telemarketing calls from Dish led Mrs. Sykes to list her number on the Registry.

928. Mrs. Sykes slept during the day, because she worked the night shift at the Comfort Inn from 11 p.m. until 7 a.m. and would not return home until 8 or 9 a.m. the next morning.

929. Mrs. Sykes' elderly husband, Herbert Sykes, has a heart condition and needs to be able to contact her, especially when he is away from home, so Mrs. Sykes could not turn off her home telephone.

930. Mrs. Sykes described how she would get calls selling Dish that were "just constant: three, four, five times a day… [I]t went on all day and most of the evening up to as late as eleven o'clock at night" and prevented her from getting any sleep.

931. Mrs. Sykes was at her "wit's end" and began documenting the calls.

932. Mrs. Sykes testified: "I would be sleeping on the couch with a pen and paper trying to document some of this, and waking up . . . from a sound sleep with this thing, what I did get, I wrote down."

933. The calls started with pre-recorded messages and Mrs. Sykes would try to navigate to a live person, but she was seldom successful.

934. When she did reach a live person, Mrs. Sykes asked to be put on the callers' do not call lists and told them she was not interested, but the telemarketers were rude, "[h]anging up on me, not answering my questions, trying to overtalk me . . . continuing with their sales pitch."

935.    When she did reach a live person, Mrs. Sykes asked to be put on the callers' do not call lists and told them she was not interested, but the telemarketers were rude, "[h]anging up on me, not answering my questions, trying to overtalk me . . . continuing with their sales pitch."

936.    At times, they would fail to hang up and tie up her line.

937.    The call records for Dish retailer Star Satellite show at least five pre-recorded sales calls to Mrs. Sykes' home number between August 30, 2005 through October 3, 2005.

938.    Mrs. Sykes complained about the calls to the Office of the North Carolina Attorney General, which forwarded the complaints to Dish; Dish responded through letters dated June 13, 2006 and June 30, 2006.

939.    Dish's letters responded that though the Skyes' number "likely was previously included on our internal No Call list, in an abundance of caution, Dish Network has submitted it again."

940.    The Sykes telephone number does not appear on any of the entity-specific DNC lists produced by Dish.

941.    In September 2006, a Dish regional director sent information to Brian Neylon that he received from Stampede Marketing about Star Satellite and its ex-manager, BC Smith. The contact at Stampede relayed that BC Smith indicated that Star Satellite used prerecorded message telemarketing while an OE retailer, and that BC Smith was willing to discuss with Dish directly, but Dish did not take the opportunity.

942.    *On July 21, 2008, a consent decree was filed in the United States District Court for the District of Nevada between Star Satellite and the United States regarding Star Satellite's illegal telemarketing practices.*

943.    By September 2008, BC Smith, formerly of Star Satellite, was one of Dish's contact at OE Retailer Vision Satellite.

944.    In November 2008, a sale input in the OE system connected Vision Satellite to a consumer who complained of illegal telemarketing.

945.    In January 2009, Dish received a complaint about pre recorded message by Vision Satellite.

946.    In January 2009, BC Smith of Vision Satellite indicated that it had telemarketed without scrubbing against Dish's Internal Do Not Call managed by PossibleNow.

947.    In January 2009, Vision Satellite admitted to Dish representatives that it was using affiliates that used pre-recorded message telemarketing, but that it would be moving away from that model in a few weeks.

948.     In January 2009, Vision Satellite was sued and settled a TCPA lawsuit with a consumer because of Vision Satellite's pre-recorded message telemarketing, the same illegal marketing tactic used by Star Satellite.

949.     Star Satellite had to obtain approval from Dish retail services for any mailers that it used in the course of its marketing Dish products and services.

950.     Star Satellite also received fax blasts and regular communications from Dish providing training and updates.

951.     Star Satellite also used Dish marketing and training materials which it accessed from a Dish retailer website in selling Dish products and services.

952.     Dish representatives visited Star Satellite to train the telesales agents on how to enter orders on the OE Tool.

953.     Dish also visited Star Satellite frequently, approximately on a weekly basis, to oversee its marketing efforts.

954.     Dish required Star Satellite to use a defined script when telemarketing Dish service and provided recommended scripts to use for Star Satellite's calls.

955.     Dish also provided disclaimers to Star Satellite, required that Star Satellite use these disclaimers, and enforced this requirement by repeated phone calls making sure that the disclaimers were being used.

956.     Dish also informed Star Satellite that it had to be more thorough in communicating disclaimers and worked with Star Satellite salesmen to make sure they were providing the disclaimers thoroughly and accurately.

957.     Star Satellite had frequent phone calls with Dish employees for OE support and troubleshooting and additional training.

958.     Dish evaluated and provided reports focusing on Star Satellite's completion rates.

959.     Star Satellite still sells Dish products and services door-to-door.

960.     Between 2002 and the present, Dish retailer Star Satellite/Tenaya was a Dish marketing agent.

961.     PossibleNow and Dr. Yoeli's 2012 analyses determined that for Retailer Star Satellite/Tenaya's call data, the calls to identified residential landlines made up 40% of All Calls and 97% of Identified Calls.

962.     Between 2003 and December 3, 2013, consumers have filed tens of thousands of complaints with the FTC identifying Dish telemarketing calls—including complaints about Registry violations, entity-specific violations, and pre-recorded messages.

**ATTACHMENT B – UNITED STATES' MATERIAL FACTS**

963. Of the 50,000-plus Dish-related telemarketing complaints FTC received, Plaintiffs' expert identified 1,505 complaints submitted by consumers within one calendar day of receiving an actual violative call as contained in the call records in this case.

964. More than 1,000 people complained to FTC within one day of having received an illegal call reflected in the JSR call records, with many of them reporting JSR or Direct Dish by name.

965. In PX38B, the large number of similar complaints from unrelated consumers corroborated each other's complaints.

966. The consumer complaints in PX38B were voluntary and unsolicited.

967. The consumers who filed the complaints in PX38B had firsthand knowledge of the calls each received.

968. The matching of the consumer complaints to the call records in PX38B corroborates that the calls were pre-recorded calls.

969. The matching of the consumer complaints to the call records in PX38B corroborates the accuracy of the call records and that the calls were telemarketing calls for Dish products and services.

970. The statements in PX38B were not made under oath and were not subject to cross-examination.

971. With regard to PX38B, it would be impractical or impossible to depose 1,000 complaining consumers to match the timing of their complaints with the call records.

972. Betty Carter of Texas, who has the phone number (713) 661-3986 and received an illegal call from Dish on January 20, 2009, stated simply, "Make them stop calling me, Please."

973. Steve McNichols of California, who has the phone number (323) 254-9603, received an illegal call from Dish on June 18, 2009, and wrote to FTC the same day, "This company will not stop calling me no matter how many times I have asked them to stop!"

974. Stephanie Doss of Virginia, who has the phone number (540) 966-3131, received an illegal call from Dish on September 10, 2008, and wrote to FTC the same day, "I have asked them repeatedly to remove me from their call list and not call anymore as there is an 8 month old baby in the house who they are constantly waking up, even talking to a supervisor, but so far, we have not gotten any relief from their numerous phone calls every day! PLEASE HELP."

975. Javed Aslam is a retired pharmaceutical company director living in Libertyville, Illinois.

976. Mr. Aslam has had his landline telephone, (847) 362-8248, since February 1977 when he moved into his home.

977. Mr. Aslam is neither a current nor a former Dish Network customer. Nobody in his household ever inquired about Dish products.

978. Mr. Aslam placed his home number on the Registry on April 12, 2005

979. After he registered his number, Mr. Aslam continued to receive unwanted telephone calls, receiving two calls from Dish retailer JSR Enterprises on February 15, 2007 and March 19, 2007.

980. Frustrated that the calls continued, Mr. Aslam confirmed or reregistered his number in 2006, 2007, 2010 and 2011.

981. On February 23, 2011, Mr. Aslam filed a complaint with the FTC  because he received a telemarketing call from an individual who said he was calling from Dish.

982. Mr. Aslam recalls that the callers sometimes greeted him in his native language and would call him "brother."

983. When Mr. Aslam realized the callers were telemarketers and not his friends or brother, he became very annoyed.

984. Mr. Aslam often picked up the phone because he constantly worried about his daughter who lived in Phoenix and didn't want to miss her calls.

985. Both Mr. Aslam and his wife have asked the callers to remove their number from the calling lists.

986. After each request, the calls continued, although from different caller ID numbers

987. Mr. Aslam has high blood pressure and takes medication to alleviate his condition.

988. He checks his blood pressure every morning and watches his health to prevent a need to increase his medication dosage.

989. He has seen his blood pressure become "pretty high" for a short time after calls because he would get annoyed and said it was "not good to get a temporary jolt in your blood pressure" while on medication.

990. In February 2009, Dish received an increased number of consumer complaints about illegal calls to numbers on do not call lists, and Retail Services reminded Dish's sales team to remind retailers that they "MUST" scrub their calling lists.

991. Brian Sura, of Hickory Hills, IL, has landline number (708) 598-1432 since 1968.

992. Between May 24, 2006 and August 4, 2006, Mr. Sura received 15 calls from Dish.

993. Between September and November 2005, Mr. Sura answered four pre-recorded calls placed by Dish retailer Star Satellite.

994. Mr. Sura placed this number on the Registry in February 2007, because he "would get bombed with sales calls."

995. Dish retailer JSR called Mr. Sura on March 10, 2007.

996. Mr. Sura further testified that in January 2009, he began receiving both automated and live telemarketing calls on his landline number from telemarketers who identified themselves with Dish Network, usually several times per week.

997. Mr. Sura estimated that he asked the telemarketers not to call ten to twelve times.

998. The telemarketing calls from Dish cause a unique inconvenience for Mr. Sura, who testified: "My mother is a diabetic, and she has a propensity in the evening to have a blood sugar crash where she's almost--can't do anything for herself. Doesn't happen frequently, maybe once or twice a week, but you never know when it's going to happy. . . . And when that happens, I have to react quickly, get a glucose in her, and there's another medication that she takes to get her blood sugar back up. And if that happens when the phone rings, you know, what do you do? Do you continue that or let the phone o or--so it's kind of an inconvenience."

999. Lisa Skala is a stay-at-home mother who lives in Midlothian, Illinois.

1000. Mrs. Skala placed her land line number, (708) 389-0244, on the Registry in August 2007.

1001. Mrs. Skala was a Dish Network customer from approximately 2004 to October or November 2008.

1002. On July 14, 2009, Mrs. Skala received a telemarketing call from Dish's EC_VWIN_TRL_05M_ENG campaign while she was marking the one-year anniversary of her mother's death, and she requested not to be called again; Dish's records show that the call was labeled with a contact result code of "DNC."

1003. After her July 2009 do-not-call request, Dish called Ms. Skala at least nine more times.

1004. In early 2010, Mrs. Skala received several sales calls from Dish Network to her land line number—each time she told the caller she was not interested and to please not call again.

1005. These calls led Mrs. Skala to file two complaints in January and February 2010.

1006. Dish continued to call Mrs. Skala and labeled telemarketing calls to her number as "DNC" two more times, on February 3 and March 2, 2010, yet apparently never placed her number on Dish's Internal Do Not Call list.

1007. The telemarketing calls from Dish Network were a nuisance to Mrs. Skala because they interrupted dinner, lunch, and nap time with her four children.

1008. Linda Doucette, of Torrence, CA, is a logistics manager for Brinderson Construction in Costa Mesa, CA.

1009. Mrs. Doucette has had her landline number, (310) 816-3152, since 1994 and her mobile number, 310-650-9165, since 1992.

1010. Mrs. Doucette placed her landline and mobile numbers on the Registry on July 26, 2003, soon after the registry was announced.

1011. Ms. Doucette testified that she registered her numbers on the Registry because if the intent of a caller "is to try to sell me something, and if I'm not buying it, I don't want to be bothered."

1012. Ms. Doucette never responded to any type of free offer from Dish Network.

1013. Ms. Doucette did not conduct internet research on Dish products, services, or offers.

1014. Ms. Doucette never provided her phone number to Dish or contacted Dish on her mobile phone in or around October 2008.

1015. After placing her number on the Registry, Mrs. Doucette recalls receiving telemarketing calls from Dish Network to her mobile number.

1016. Dish's 2007-2010 call records show that between November 7, 2008 to November 13, 2008, Dish placed seven outbound telemarketing calls for the "5639_08w44_LTS_OTM_English_20081030" campaign to Ms. Doucette's number (310) 650-9165.

1017. Ms. Doucette would listen to these pre-recorded calls and messages in her voicemail for 10 to 15 seconds before realizing with irritation that it was a telemarketing call.

1018. Ms. Doucette was annoyed that she received calls from Dish despite being on the Registry, and she described her frustration saying, "I'd received more than one call . . . . I recall seeing the number more than once pop up, and then I recall one voicemail, there probably could have been two, and I just remember being annoyed that I had been on the Do Not Call Registry, yet I was still receiving telemarketing calls from one or any entity so, therefore, I made the complaint."

1019. Frustration about receiving unwanted telemarketing calls selling Dish led Mrs. Doucette to confirm the registration of her numbers in December 2011.

1020. Elizabeth Phillips, a retiree who now breeds horses at her home in Westfield, North Carolina, has had her landline telephone number, (336) 351-5395, since moving into her home in May 2007.

1021. Ms. Phillips' telephone number was first placed on the Registry on June 3, 2007, and re-registered in 2010 and 2012.

1022. Ms. Phillips has never been a Dish customer and she has not contacted Dish to inquire about services by phone or through completing a lead form on the Internet.

1023. Beginning in May 2007, Ms. Phillips began to receive daily automated collection calls from Dish directed to another individual.

1024. The calls were so incessant she tried to contact Dish twice to address the error and stop the calls.

1025. Dish's records confirm that Ms. Phillips's home telephone number was placed on the entity-specific DNC list on or about September 19, 2007.

1026. Between October 25, 2007 and December 6, 2007, Dish called Ms. Phillips' home telephone number six times as part of its HG STZ LATINO, EC PLYINTV NEW(ESP), and EC STZ LATINO 2P telemarketing campaigns.

1027. Between 2008 and 2010, Ms. Phillips continued to receive calls marketing Dish on her 336-351-5395 number, sometimes up to two a day, usually around lunchtime and dinner time, encouraging her to subscribe for Dish; if she did not answer a message would be left urging her to subscribe to Dish.

1028. Ms. Phillips knew it was Dish calling from the phone number displayed and from the message itself, which mentioned Dish Network and "was like listening to a commercial on your telephone."

1029. Ms. Phillips found it "offensive" that Dish called as late as 8:00pm, and was very annoyed by the solicitation calls, testifying: I find phone calls annoying, but I'm outside, I can just ignore them, but most of the time, you know, I find myself running in the house, catching a call and that is what's most annoying is when you think it's something important. I have a mother in a nursing home now. Prior to that she was in a home with Alzheimer's by herself, you know. It's very upsetting to run in and try—just like you answered a phone call because you think your son is having a problem. I have had more problems running for phones.

1030. Mendham, New Jersey resident Parimala Nagendra placed her home landline number, (973) 895-0071, on the Registry on October 26, 2005.

1031. Ms. Nagendra disconnected her Dish service in 2006, and Dish then called her five times between January 2007 and April 2008.

1032. Dish's call records show that during one of two Dish calls on January 5, 2007, the disposition code "SP" was entered into Dish's system, indicating that Ms. Nagendra had asked that her phone number be added to Dish's entity-specific DNC list.

1033. "SP," which stands for "suppression," is used by Dish's internal systems to suppress a particular telephone number and prevent it from being dialed in future telemarketing campaigns or, if entered directly into the dialer, immediately.

1034. Ms. Nagendra recalls always asking callers to "remove my number from their calling list" and hearing her husband do the same.

1035. The calls to Ms. Nagendra's home were inconvenient and annoying because "you say don't call, and they call."

1036. On April 18, 2008, Dish called Ms. Nagendra's telephone number as part of the Hindi-language winback campaign, "PB HIN DROP." Ex. 38 at ¶ 15.

1037. Since ending their Dish Network service, the Nagendra's have not made any inquiries regarding Dish Network products or services.

1038. Bob Wolf, a construction superintendent for a heating, ventilating, and air-conditioning contractor, lives in Plano, Illinois.

1039. He acquired his landline residential phone number, (630) 552-3957, in September 2005.

1040. Mr. Wolf had Dish satellite service from 2003 until September 2005, when he moved into a new home.

1041. In September 2005, Mr. Wolf began receiving telemarketing calls from many entities, including Dish, who called him "at the most inopportune times."

1042. Mr. Wolf registered his landline number on the Registry on July 1, 2006 and re-registered several times thereafter.

1043. Dish's call records show that Dish called Mr. Wolf's number, (630) 552-3957, six times between July 29 and August 7, 2008 as part of its 5475_08W30_LTS_OTM_ENGLISH_20080725 campaign.

1044. On March 30, 2009, Mr. Wolf filed a DNC complaint about another telemarketing call selling Dish that he received.

1045. Dish's calls to Mr. Wolf's home continued until sometime in 2010.

1046. Richard Bersett is a retired and part-time high school teacher who lives with his wife, a dental assistant, in O'Fallon, Illinois.

1047. Mr. Bersett remembers receiving his first telemarketing call from Dish six or seven years ago; he thinks he might have subscribed to Dish for a short time but was not satisfied with his service.

1048. Dish's Call records show that between October 15, 2004 and December 16, 2006, Dish made at least 26 calls to the Bersetts' home telephone number, (618) 277-4854, which they have had for 23 years.

1049. Mr. Bersett recalled he told several callers that he did not wish to receive further Dish telemarketing calls, but he continued to receive calls.

1050. Dish's records reflect that Dish placed Mr. Bersett's number on Dish's entity-specific DNC list on or about December 16, 2006.

1051. Dish's call records show that between November 19, 2007 and September 2, 2008, Dish made 61 more telemarketing calls to Mr. Bersett's telephone number.

1052. Mr. Bersett complained about the Dish marketing calls to the agents that called him and to the FTC; he thinks he might have called Dish too.

1053. Mr. Bersett said that "I just know I was pretty fed up," and described receiving calls as "a negative experience and…as I recalled, it was two or three times that I had been contacted in a way that wasn't very pleasant.

1054. Mr. Bersett testified that he does not like receiving telemarketing calls, stating that they are "intrusive, you get too many of them, and it's usually at dinner time."

1055. Amy Johnson is a stay-at-home mother who, with her husband and four children ages four to ten, lives in Centralia, Illinois.

1056. The Johnsons signed up for Dish service in 2005 or 2006.

1057. After the Johnsons subscribed to Dish, Dish began calling the family's landline, (618) 532-2584, with calls about changing their service plan and special events.

1058. Ms. Johnson testified:  "They would call us quite frequently.  They were a real pain in the butt."

1059. The phone would ring multiple times in a single day when they didn't answer it.

1060. The calls came at inconvenient times, in the afternoon when her children were napping.

1061. Ms. Johnson estimated that she received a "few hundred" calls marketing Dish during the two year period 2005-2007.

1062. She believed the calls were from Dish because the person calling or message would say it was Dish.

1063. Dish's 2003-2007 call records reflect that Dish made 115 calls to the Johnson's telephone number between February 2006 and August 2007, including at least three calls more than 30 days after July 12, 2007, when Dish placed the Johnsons' number on its entity-specific DNC list.

1064. At least one such call, believed by Ms. Johnson to have occurred in April or May 2006, upset Ms. Johnson greatly because it woke her three children, including a colicky newborn, from their naps.

1065. Ms. Johnson recalled that she "screamed" at the caller, and she also recalled telling Dish to stop calling.

1066. The Johnsons registered their landline number on the Registry on November 7, 2007.

1067. Dish's 2007-2010 call records show that during the year between September 2007 and September 2008, Dish made 52 separate telemarketing calls to the Johnsons' landline number as part of the following telemarketing campaigns: TH VOL TRAIL (1MTH), BF VOL TRAIL (2MTH), BF VOL TRAIL (4MTH), TH VOL TRAIL (5MTH), EP VOL TRAIL (6MTH), TH VOL TRAIL (7MTH), EP VOL TRAIL (8MTH), OR VOL TRAIL (9MTH).

1068. Ms. Johnson described her feelings about the Dish telemarketing calls she received during her deposition, noting how she would not pick up the phone but the system would continue dialing and making the phone ring until someone answered—an unpleasant experience for someone with three children under age three.

1069. When she did answer the phone, she noted that she almost always told the caller not to call again.

1070. Ms. Johnson explained that telemarketing calls "are a pain and they wake up children . . . . They interrupt stuff. They a lot of times would call at dinnertime."

1071. The Johnsons canceled their Dish service in mid-2013, and Ms. Johnson testified that Dish started calling her home phone again, once or twice weekly, after they ceased their Dish service.

1072. Patricia Talluri is a homemaker who lives in Mount Airy, North Carolina.

1073. She acquired her home landline number, (336) 786-8385, in October 2006, when she moved into her home.

1074. Ms. Talluri's landline number was placed on Dish's entity-specific DNC list on or about November 2, 2006.

1075. Her landline number was registered on the Registry since at least June 2007.

1076. Ms. Talluri's family had subscribed to Dish satellite television services in 2006, but began having reception issues approximately four to five months after installation.

1077. In 2007, she fought to end her subscription early because the problems persisted despite multiple troubleshooting calls to Dish.

1078. Two or three months after the Ms. Talluri canceled her Dish service, Dish called Ms. Talluri's landline number five or six times asking the family to re-subscribe.

1079. Ms. Talluri would respond, "No, I had terrible service, that was the reason I got rid of it, please do not call me, I will never go back to Dish," id. 44:23-25, and yet, the calls continued every other month or so until Ms. Talluri filed a complaint.

1080. Each time, Ms. Talluri told the callers that she was on the Registry and "don't call me, put me on your do not call because I don't want to be called again."

1081.  Dish's call records from 2003-2007 show she received three calls from Dish on August 15 and 30, 2007 that were dispositioned "AM" for answering machine, "DPV" for positive voice, and "RF" for refusal.

1082.  Dish's call records from 2007-2010 show Dish called Ms. Talluri's number twice on September 22 and 25, 2007 and dispositioned these calls as "RF" for refusal.

1083.  Ronald Pollard of Meridian, Idaho, has had his landline number, (208) 887-6046, continuously since 1992.

1084.  Mr. Pollard placed this number on the Registry on June 29, 2003

1085.  Mr. Pollard does not conduct his drywall business from his home or use the landline for business related calls.

1086.  Mr. Pollard's number was placed on Dish's entity-specific DNC list on January 31, 2003.

1087.  Mr. Pollard subscribed to Dish Network service for approximately seven or eight years starting from the late 90's until sometime in 2006.

1088.  Dish's records show that it called Mr. Pollard's number three times between January 18 and January 21, 2008 during Dish's EC AMEX/DDA AUTOPAY telemarketing campaign.

1089.  In the period leading up to February 2012, Mr. Pollard received multiple calls trying to sell him Dish.

1090.  Though Mr. Pollard asked to not be called, the same number appeared on his caller ID the very next night.

1091.  Mr. Pollard repeatedly told the callers not to call him, requested his number be placed on the entity-specific DNC list, and was told his number would be removed.

1092.  He recalled that "[t]his had gone on for a long time, and I finally got fed up… There were multiple times I said, 'Don't call; don't call; don't call.'"

1093.  Mr. Pollard also contacted Dish several times and spoke with a representative, asking to be placed on Dish's entity-specific DNC list, but the calls continued.

1094.  One call originated from a private number in Colorado, rather than an (800)-type number, and the caller claimed to be calling from Dish and knew Mr. Pollard's name and that he was a former Dish customer.

1095.  On February 8, 2012, Mr. Pollard filed a complaint with the FTC about phone calls he received regarding Dish Network.

1096.  Michael and Karen Robinson of Pinehurst, North Carolina, have had their home landline number, (910) 295-6834, since at least 1991.

1097. Mr. Robinson first registered his landline number on the Registry on July 1, 2003.

1098. The Robinsons were Dish customers from approximately 1995 until January 2007.

1099. The Robinsons' landline number was placed on Dish's entity-specific DNC list on or about January 31, 2003.

1100. Mrs. Robinson regularly asked telemarketers to place her number on their entity-specific DNC list.

1101. While they were still dish customers, Mr. Robinson would receive calls from Dish offering to upgrade their service, and he would ask the callers to stop making telemarketing calls to them.

1102. Dish's records from 2003 to 2007 show it made eight telemarketing calls to the Robinsons' landline between March 2004 and 2006, including a call on March 10, 2004 dispositioned as "RF," indicating a refusal.

1103. Mrs. Robinson recalled that in 2007, after they cancelled their Dish service, they started receiving calls trying to get them to return to Dish.

1104. On December 4, 2012, Mr. Robinsons filed a complaint with the FTC about a Dish call that interrupted him while he was working.

1105. He has had to interrupt international business conference calls on his work line in order to answer Dish telemarketing calls.

1106. The Robinsons have not made any inquiry with Dish since terminating their Dish service in or around January 2007.

1107. Mrs. Robinsons finds the telemarketing calls to be "very distressful" because she must constantly be on the telephone for work, and during her downtime, when she talks with her husband, makes dinner, or watches TV, she prefers "not to be disturbed at all and so, it's very hard for [her] to take calls like that."

1108. Zia Khan resides in Clayton, California and was employed as a compliance consultant for Wells Fargo until May 2011.

1109. Mr. Khan placed his landline number, (925) 672-8184, on the Do Not Call Registry in the mid-2000s.

1110. In 2004 or 2005, Zia Khan started receiving calls on his landline from callers who stated "we are calling from Dish Network."

1111. Khan testified that he received about six calls a month from Dish Network and sometimes received up to 3-4 calls in a day.

1112. Mr. Khan described the caller greetings as "disturbing" and "suspicious" because they began with a Muslim greeting and spoke in Urdu, which led him to believe they were family until they stated "I'm calling from Dish Network."

1113. Mr. Khan testified that he told callers from Dish Network that he was not interested, is on a Do Not Call List and had instructed them not to contact him "time and time again."

1114. Mr. Khan testified that the calls from Dish Network came on weekday evenings and anytime during the weekends.

1115. Several times, Mr. Khan has asked callers from Dish Network to stop calling and asked if they've heard of the Do Not Call List, to which more than one caller has responded that they have not heard of the List.

1116. Judith Lovuolo-Bushan resides in Palo Alto, CA.

1117. Ms. Lovuolo-Bushan serves on various boards of local organizations and is mostly home during the day.

1118. Ms. Lovuolo-Bushan's landline number for the past 27 years is (650) 424-8110.

1119. In 2004, Ms. Lovuolo-Bushan placed her landline number , (650) 424-8110, on the Do Not Call Registry and it was reregistered in 2006 and 2007.

1120. Ms. Lovuolo-Bushan registered her landline on Registry specifically to deal with the calls from Dish Network.

1121. Ms. Lovuolo-Bushan was not a customer of Dish Network LLC nor had she made any inquiries regarding obtaining Dish Network LLC service.

1122. Ms. Lovuolo-Bushan received calls from persons who identified themselves as calling from Dish Network as frequently as 2 to 3 times per day during the day and around dinnertime.

1123. After the first couple of calls, Ms. Lovuolo-Bushan stopped listening to the pitch and asked the callers to stop calling; the callers would continue trying to sell Dish Network services even after she told them the calls are harassing and that she was on the Do Not Call List.

1124. Judith LoVuolo-Bushan filed a complaint with the California Attorney's General office on December 2, 2008 concerning the calls from Dish Network after "being interrupted continuously throughout the day, during meals, and family life was -- we were being annoyed, harassed…."

1125. Some time after the complaint was filed, the calls from Dish Network stopped but then they resumed again.

1126.   Ms. Lovuolo-Bushan stated that within the last 6 months of her deposition, the frequency of calls from Dish Network has slowed down to around once every two weeks or once a month and she has received three calls within the last two or three weeks.

1127.   Lynette Lynde is a military wife who resides in Raeford, NC.

1128.   Ms. Lynde formerly had Dish Network as her television service provider around the year 2000.

1129.   Ms. Lynde's prior residential landline for over ten years was (910) 875-3698, before changing in February or March 2011 to her current landline (910) 875-0329.

1130.   Ms. Lynde testified that she registered her current landline (910) 875-0329 on the Do Not Call Registry the day she received it and registered her prior landline (910) 875-3698 four or five times over the years and would check online to make sure she was still registered.

1131.   In spring 2010, Ms. Lynde began receiving the calls from Dish Network, which increased in frequency from 2 per week to 2 to 3 per day.

1132.   Ms. Lynde testified that she received automated calls from Dish Network, which her caller ID displayed as unknown caller with and without a phone number or with just a phone number, stating "Hello, we're calling to offer you the Dish Network. Please call this number."

1133.   During the time Ms. Lynde received the calls from Dish Network, her husband was deployed in the war zone and military calls came in as "unknown caller," which led Ms. Lynde to answer every call from Dish Network thinking it was her husband calling from the war zone.

1134.   The military notification procedure in place in the event of her husband's death was to call Ms. Lynde first to request entrance through the gate to access her house on an enclosed eight-acre farm.

1135.   Ms. Lynde received calls from Dish Network on the vibrating home phone she kept attached to her hip while tending to her farm to ensure she did not miss any of her husband's sporadic calls from the war zone that she was always waiting for.

1136.   Ms. Lynde experienced a huge amount of stress from the Dish Network calls because each time Dish Network called, she was expecting to hear her husband's voice calling from the war zone or that her husband had been killed.

1137.   In spring or summer 2010, Ms. Lynde contacted Dish Network using a phone number she pulled from their website to request they stop calling her and the customer service representative stated it would take up to thirty days for the system to remove her number.

1138.   Ms. Lynde filed a complaint with the Attorney General of North Carolina following an increase in the number of calls from Dish Network.

1139. Ms. Lynde testified that one of the calls from Dish Network late at night made her "scared out of my wits" because she assumed it was a call regarding her husband and was unable to go back to sleep the rest of the night; Ms. Lynde went on to state, "I'm minding my own business. I've got three gates between me and the outside world, and I've got a frigging robot calling me and putting the fear of death into me, literally."

1140. Ms. Lynde changed her number to stop receiving the calls from Dish Network: "I can say without hesitation that I changed my number solely because of the calls from Dish Network's robo call system."

1141. After Ms. Lynde changed her phone number, her family was unable to reach her by phone when her father suffered a heart attack in September 2011, and by the time she received an email about the heart attack, her father had died; Ms. Lynde testified: "In an effort to protect myself from Dish Network I didn't get to say goodbye. . . . that really showed how the incompetence, greed, unethics, and illegal behavior can rob people of more than what's in their wallet."

1142. Ms. Lynde last received a call from Dish Network on April 2, 2011, which was the first call received from a live caller, after telling the caller she would file a criminal harassment suit if she received another call.

1143. Chandler Sehgal resides in Naperville, Illinois and works as a project manager at Fermi National Accelerator Laboratory.

1144. In 2003, Mr. Sehgal registered his residential landline, (630) 420-7826, on the Do Not Call Registry.

1145. Mr. Sehgal has never been a Dish Network customer, inquired about Dish Network services, or given Dish Network permission to contact him.

1146. Starting in 2009, Ms. Sehgal received 10 calls per month from Dish Network, which increased to 4-5 calls per day as close as 5 minutes apart on the weekend and in 15-20 minute intervals around dinnertime.

1147. Mr. Sehgal testified that the caller would greet him by name and state they were calling for Dish Network with an offer, and Mr. Sehgal would tell them: "Don't call me again. Put me on your Do Not Call list" and hang up.

1148. Ms. Sehgal testified that for the majority of the calls there was no valid caller ID information available.

1149. Mr. Sehgal filed an FTC complaint in October 2010 via the internet.

1150. Mr. Sehgal last received a call from Dish Network during fall 2011.

1151. Sayed Shafi is an education administrator residing in Los Angeles, CA.

1152. Mr. Shafi registered his former San Diego landline number, (619) 294-2994, and Los Angeles landline number, (310) 216-9117 on the Do Not Call Registry in 2005 and 2007 respectively, and last reregistered both numbers in 2010.

1153. Mr. Shafi had his San Diego landline forwarded to his Los Angeles landline from 2007-2010.

1154. Ms. Shafi testified that no one in his household has ever had Dish Network service or inquired about Dish Network service.

1155. Mr. Shafi received calls to his San Diego and Los Angeles landlines from persons who stated they were calling from Dish Network from at least 2007 up until August 2010 when he changed residences and phone numbers.

1156. Mr. Shafi received calls from callers attempting to sell Dish Network services in the evening and occasionally the caller would start off speaking in Urdu.

1157. Mr. Shafi recalled the first call he received from Dish Network: "when I did get the call, I did tell them that I was not interested in their services and to please not call again. I also told them to take my number off their calling list, and I informed them that the number was on the Do Not Call Registry."

1158. Mr. Shafi stated the calls were "incessant, and that I told them every time they called to not call, that the number was on the Do Not Call Registry, that I wanted the number taken off of their calling list, and that I did not want to hear from them again."

1159. Mr. Shafi testified that the calls "have been extremely stressful. They have amounted to harassment. They have amounted to making me feel threatened, especially when they would call multiple times in the same hour." Mr. Shafi's wife was also very stressed and upset especially when the callers spoke with her in a foreign language.

1160. The callers ignored Mr. Shafi when he informed them that he was on the Do Not Call Registry and did not respond when he asked not to be contacted again.

1161. Mr. Shafi testified that he called a number provided during a call or that he found online to get the calls from Dish Network to stop and put in a request on their website to stop the calls.

1162. Between March and June 2010, Mr. Shafi filed seven complaints with the Attorney General of California concerning the calls from Dish Network to his (610) 294-2994 and (310) 216-9117 residential numbers, which did not have any effect on the frequency of the calls.

1163. Mr. Shafi stopped received calls from Dish Network in August 2010 when he switched residences and got a new landline number, (310) 397-8060.

1164. Beverly Shahab, an administrative assistant in a law office, resides in Lombard, Illinois.

1165.    Betty Shahab was a Dish Network LLC customer from 2003 until July 2006.

1166.    Ms. Shahab first registered her residential landline number (630) 268-3857 on the Do Not Call Registry on January 2, 2006.

1167.    Starting in February 2007 through February 2012, Ms. Shahab received calls from Dish Network as frequently as 1-5 calls per month during 2007 and 2008.

1168.    Ms. Shahab testified that she requested callers from Dish Network place her on their internal do not call list, and in February 2008, she registered her landline number on Dish Network's internal do not call list via their website and filed a FTC complaint.

1169.    Ms. Shahab testified that during one call from Dish Network, she asked the caller to place her on the do not call list, to which the caller replied that he liked her voice and asked for her email address and if they could chat on the internet. Shortly after, the caller called again and Ms. Shahab's husband told the caller to take their number off of their calling list.

1170.    David Slaby is a retired software engineer residing in Concord, CA.

1171.    Mr. Slaby initially registered his landline number (925) 672-2266 on the Do Not Call Registry around 2003-2004, and most recently registered on September 23, 2007.

1172.    Mr. Slaby has never been a Dish Network customer or inquired about Dish Network services.

1173.    In 2008, Mr. Slaby began receiving calls from callers who identified themselves with Dish Network.

1174.    Mr. Slaby testified that he usually received calls from Dish Network around dinnertime five times a week, as frequently as twice an evening from live callers speaking Spanish.

1175.    Mr. Slaby testified that he informed the callers he was on the Do Not Call list and wanted them to take his number off of their list, to which the callers responded by hanging up.

1176.    Mr. Slaby testified that the calls caused irritation and described the callers from Dish Network as somewhat aggressive because he was not able to get a word in and had to shout over the phone to tell them to stop calling him.

1177.    Mr. Slaby filed a consumer complaint against Dish Network with the Public Inquiry Unit of the Attorney General's Office on or around August 26, 2008 after getting fed up with receiving calls twice a night for a long period of time.

1178.    Mr. Slaby testified that he stopped receiving calls from Dish Network in 2009.

1179.    Steve Snook, a former marketing executive, retired to Grand Island, Nebraska, and he placed his telephone number, (308) 385-1581, on the Registry on January 24, 2006.

1180.  Mr. Snook was prompted to add his number to the Registry by telemarketing calls from Dish Network, which he started receiving in the fall of 2005.

1181.  The call records for Dish retailer Tenaya/Star Satellite show calls to Mr. Snook's number on September 21 and October 19, 2005.

1182.  In May 2006, Mr. Snook received another telemarketing call selling Dish Network. Mr. Snook told the caller he was registered on the National DNC Registry and that the calls had to stop. The caller said, "We don't care."  When Mr. Snook hung up the phone, it rang again and the telemarketer called him a "son-of-a-bitch" and said, "Don't you ever hang up on me."

1183.  Mr. Snook felt "invaded [and] accosted" by this call."  He contacted the local police and the Nebraska Attorney General's office to file his complaint.

1184.  Mary Vaca resides in Charlotte, NC and works in communications and marketing for Accenture.

1185.  In spring 2006, Ms. Vaca obtained a phone number for Dish Network online and inquired about packaging and pricing while she was comparing satellite providers, but elected to go with another satellite provider.

1186.  In May 2006, Ms. Vaca registered her landline number (704) 541-2100 on the Do Not Call Registry and re-registered in September 2006 because she was still receiving calls.

1187.  During fall 2007, Ms. Vaca received calls from live callers about Dish Network and she would tell the callers she was on the Do Not Call List, not interested, and to remove her number from their internal list, to which the caller responded by hanging up.

1188.  Ms. Vaca filed two complaints with the FTC for her landline number in December 2007 and April 2009 following numerous calls from Dish Network.

1189.  The April 2009 complaint was filed against (866) 668-8047, which was identified as a Dish Network number on Ms. Vaca's caller ID and the callers identified themselves as being from Dish Network.

1190.  Ms. Vaca received 4-5 calls a day on weekdays from the (866) 668-8047 number, and after the caller stated they were calling from Dish Network, Ms. Vaca would inform them she was on the Do Not Call List and asked to be removed from their calling list.

1191.  Andrew Das is a professor at Elmhurst College living in Villa Park, Illinois with his wife and three children.

1192.  Mr. Das registered his residential phone number, (603) 279-4705, which he has had since January 2003, with the National DNC Registry in July 2003. He also called to confirm that his number was registered.

1193.  Mr. Das testified that the largest number of telemarketing calls he received were from people self-identifying as Dish and that they could be "fairly intense," especially for his wife because she was home more often than he was and they did not have Caller-ID until 2007.

1194.  The calls would come very frequently in clusters, as many as three a day, for months at a time starting in 2004 from self-identifying callers. It was very difficult for his wife because it could have been family.

1195.  When called, Mr. Das requested on many occasions not to be called and told them he was on the Registry, reminded them the call was illegal, and asked them to remove them from their calling list. None of this decreased the frequency of calls.

1196.  Around 2006 or 2007 during a period of intense call frequency, Mr. Das found a phone number for Dish's customer service and called to ask them to stop calling. Dish denied earlier attempts to call and claim they were not aware of other entities calling on behalf of Dish. In some instances the salesperson was either argumentative or aggressive, requiring Mr. Das to speak over the caller.

1197.  Ms. Das filed a formal complaint with the Illinois Attorney General's office in 2007 after receiving another call from a self-identifier as Dish Network, and filed 40-50 complaints with the Registry website between 2003 and 2011.

1198.  Prior to 2007, Dish would call 40-50 times over the course of a year. After getting caller ID in 2007, Mr. Das would screen calls if he didn't recognize the number but when he did pick up, 30% of the calls would be a Dish network call.

1199.  Richard Dean is a Director of Professional Services with the Walt Disney Company living in Los Angeles, California with his wife and daughter. Dean and his family have lived in their Los Angeles house since 2003 with a brief gap between 2005 and October 2006 when they rented it out for a year while living in South Austin, Texas.

1200.  Mr. Dean has had his personal cell phone, (213) 428-2173, since 2008 and a residence phone, (323) 663-3655, since 2006.

1201.  Mr. Dean registered his cell phone number with the Registry in either 2007 or 2008 and his home number in August of 2007, both via the FTC website, to "stop all the annoying phone calls on a nightly basis."

1202.  With no established business relationship, Mr. Dean received 3 phone calls at home from someone trying to sell them Dish Network services over the course of 3-4 days in May 2009. Subsequently, Mr. Dean filed a complaint on their website.

1203.  Mr. Dean testified that the first two calls, both in the evening, were unlisted, pre-recorded and asked the caller to "press one" if they wanted to get Dish Network services. The number read 'unknown caller' on their caller ID.

1204.   On the third call, Mr. Dean pressed 'one' to speak to a human and asked where she was calling from, to which she responded "World Communications out of Santa Fe Springs," California.

1205.   Mr. Dean told the woman "I'm on the Do-Not-Call List. You're not allowed to be calling me. You need to take me off your list," to which she responded by saying she would make a note of that and wouldn't call back.

1206.   Following the third call in May 2009, Mr. Dean filed a complaint on the FTC Website and the California Attorney General's Website, after which he never received a call from them again.

1207.   Elizabeth Jain, along with her husband and four children, reside in their home in Peoria, Illinois.

1208.   Ms. Jain has had her home phone number, (309) 243-7707, since April 2004. The home number was added to the Registry on April 11, 2004, and she confirmed her registration on September 21, 2011. the home number has caller ID.

1209.   The Jain family has never had any interaction with the Dish Network prior to these calls when they began in 2009.

1210.   When unknown numbers are detected on the Jain's caller ID, indicated by an 800 or 866 area code, they believe the calls originate from Ms. Jain's relatives in India, as that is how their calls also display on their caller ID.

1211.   Ms. Jain testified that she would receive an average of 25 calls a year, usually between 5pm and 7pm when the family was spending time together. All callers were identified by her as speaking English with an Indian accent.

1212.   In 2009, Ms. Jain first received a call from a caller who stated they were calling on behalf of Dish Network to sell satellite TV services.

1213.   Ms. Jain testified that her overall experience with callers from Dish was "very negative" and that they were "very pushy and very persistent;" Ms. Jain asked the Dish callers to not call again, take her number off their list and told them they were in violation of federal regulations.

1214.   Ms. Jain filed a complaint with the FTC after receiving a call from Dish that was identified by her caller ID as a local number, leading her to believe it was of a personal nature.

1215.   According to Ms. Jain, there has been no decrease in the number of calls coming in from 800 and 866 area codes since the January 10, 2011 complaint, but she admits to only picking up those calls 10% of the time.

1216.   Dr. Aman Dhawan, a physician at Elmhurst Hospital, lives in Elmhurst, Illinois with his wife and son. They have lived in this residence since 2006.

1217. Dr. Dhawan registered his home number, (630) 782-2065, on the National DNC Registry on May 17, 2006, and subsequently re-registered it three more times.

1218. Dr. Dhawan has no transactional history or EBR with Dish prior to the commencement of the solicitation calls.

1219. Dr. Dhawan testified that he began receiving solicitation calls, all from Dish, in 2008 or 2009. 100% of the callers spoke to him with an Indian accent and either greeted him in English or Hindi.

1220. Dr. Dhawan testified that he received approximately 4-5 calls per week from Dish. Occasionally, two calls on the same day would be from the same caller, separated by a few hours.

1221. The solicitors called to sell Dr. Dhawan Dish services, particularly the Indian channels, and would identify themselves as Dish Network when Dr. Dhawan would ask.

1222. Generally, Dr. Dhawan and his wife would decline the offer and always ask them to not call anymore. The callers ignored him, hung up, said 'no' and one in particular said he didn't have to follow America's laws and could continue to call.

1223. Dr. Dhawan testified that the calls were very disruptive, and on one occasion woke up his sleeping son.

1224. Dr. Dhawan filed an online complaint to the DNC Registry on August 21, 2010 to complain about the continued disruptive calls and in particular the caller who said he didn't have to follow American law. The call frequency was not affected by the complaint.

1225. One on occasion, Dr. Dhawan got angry and the caller responded by swearing at him in English and "the native tongue."

1226. Jessi James is an independent contractor living in Uniontown, Ohio with her husband, daughter, son and mother.

1227. Ms. James registered a landline number, (330) 325-____, when she first got the number and re-registered it every year starting on October 18th, 2006 until its cancellation in mid-2011. She could not recall the last four digits.

1228. Ms. James was a Dish customer for a time in her old house and emailed Dish to get a price quote in January of 2009 upon moving into a new home. In her inquiry, she specifically requested to be emailed and not called.

1229. After receiving a quote, declining it and telling them she would contact them if her mind changed, Ms. James began receiving calls from callers identifying themselves as Dish attempting to sell her services or switch providers.

1230. Over the course of Jan-Feb 2009, Dish called multiple times a week. The calls woke up her sleeping son and caused her mother, who has health conditions, to frequently get up to get the phone.

1231. One caller called multiple times a day, refused to give his name and phone number, said he couldn't remove her name from his list, refused to transfer her to his supervisor and threatened to continue calling her because the Registry didn't apply to her due to her price quote request.

1232. Ms. James believed the callers were Dish distributors because they identified themselves as Dish, her number showed up on their list and they knew her name despite her landline number not being listed under her name.

1233. Ms. James filed a complaint with the Ohio Attorney General's office on February 12, 2009 after the call woke up her son from a nap on his birthday. The calls stopped immediately.

1234. Manjit Jutla , a student studying English at Bradley University, has lived in Peoria, Illinois with her husband and son since 1995.

1235. Ms. Jutla had a landline, (309) 693-2972, from 1995 until September 2011, when she cancelled it. It had Caller ID.

1236. Ms. Jutla registered her landline number on July 1, 2007 and confirmed its registration multiple times over the next year.

1237. With no EBR, Ms. Jutla began receiving calls in 2009 from Dish solicitors speaking English with heavy Indian accents. The calls came on weeknights and weekends for months at a time attempting to sell her Indian, Bollywood and Cricket stations.

1238. Ms. Jutla told the callers that she had cable, wasn't interested in Dish's services and that they couldn't call her anymore because she was on the National DNC Registry.

1239. On August 11, 2011, Ms. Jutla received 3-4 calls from a caller named Prakash. After being asked to stop calling, he became "very graphic, very rude, vulgar," told Ms. Jutla to "F off," and threatened to come to her house to "bleep" her.

1240. Immediately following the calls, Ms. Jutla called the police to take a report and filed multiple complaints with the FTC regarding Dish.

1241. Ms. Jutla testified that the calls were disruptive and she was home alone and scared. A few weeks later she changed her phone number.

1242. Ms. Jutla testified that her Caller ID rarely matched the caller's name and number, frequently displaying area codes of different states or 'anonymous.'

1243. David Kitner and his wife have lived in New Philadelphia, Ohio since November, 2011. Prior to that, Mr. Kitner lived alone in New Canton, Ohio from 2005 to 2011.

1244. While living in North Canton, Mr. Kitner had a landline phone (330) 497-3546 that he registered with the National DNC Registry on February 25, 2008.

1245. With no EBR, Mr. Kitner began receiving automated telemarketing calls from "Dave from Dish Network" in July 2008 asking him to 'press one' for learn more.

1246. Mr. Kitner called the Ohio AG's office in September 2011 to get advice on how to stop the calls; he began recording information about each call from there on.

1247. Mr. Kitner received three automated calls where he pressed 'one' to speak to an operator and asked them to take his name off their list spanning from September 20th-October 14th, 2011. The Dish operators agreed to take his name off the list each time.

1248. Mr. Kitner testified that the calls made him mad and aggravated.

1249. On November 20th, 2011, Mr. Kitner called the Ohio AG's office to complain about Dish not removing his name from their list. He provided the phone numbers and names of callers that he recorded.

1250. Following the complaint, the calls stopped. Dish mailed Mr. Kitner a letter and a graph claiming that his number was never called by Dish.

1251. Paul LaRosa, a retired Chicago police officer of 30 years, has lived in Putnam, Illinois since 2004.

1252. Mr. LaRosa registered his landline, (815) 437-2324, with the Registry on or around its inception. He registered his ex-wife's landline number in 2009.

1253. Mr. LaRosa has used Dish for his satellite TV services since 2008; he called Dish on his landline to initiate the relationship.

1254. Since signing up for Dish, Mr. LaRosa testified that he has received calls regarding satellite installation and promotions. He has called them about "two dozen times" regarding reception issues and to inquire about upgrading his service.

1255. Mr. LaRosa filed three email complaints with the Registry, including one on May 16th, 2011 regarding a series of auto-dial calls about his account from Dish over the span of the previous three days.

1256. Mr. LaRosa testified that he told each caller that he was on the National DNC Registry and that they shouldn't be calling. He always hung up before the pitch could begin.

1257. Mr. LaRosa called Dish directly three times between May 14th and 16th, 2011 to complain and was told his calls would be forwarded to the Escalation Team. He never heard from the Escalation team following his calls.

1258. Mr. LaRosa does not enjoy receiving telemarketing calls, did not wish to receive telemarketing calls from Dish, and his ex-wife was very bothered by the calls due to her several strokes.

1259. Khalid Ishaq, a retired professor at UNC, has lived in Chapel Hill, NC with his wife since 1978. His wife passed away in 2008.

1260. Mr. Ishaq's landline, (919) 933-0754, which he has had since the mid to late 1970's, was registered by Mr. Ishaq's late wife on June 29, 2003.

1261. Dish began calling Mr. Ishaq in the early 2000's sometimes as early as 10am but usually late at night between 7pm and 10pm. The calls came roughly once a week.

1262. Mr. Ishaq testified that 100% of the calls from Dish greeted him in Arabic after a 1-2 second gap and were Muslims calling from overseas because of his last name.

1263. Mr. Ishaq believed the callers to be representing Dish Network because they tried to sell him Dish services.

1264. Mr. Ishaq testified that the first few calls he received, he asked to never be called again. Thereafter, upon hearing the Arabic greeting, he immediately hung up.

1265. Mr. Ishaq's late wife filed a complaint with the Consumer Protection Division of North Carolina's Attorney General's office. The calls stopped shortly after the complaint.

1266. Mr. Ishaq described the calls as aggravating.

1267. Consumer Lynette Bowen, of Plainview, Texas, placed her home telephone landline number, 806-296-7310, on the National DNC Registry on January 19, 2004.

1268. Ms. Bowen teaches at a local community college, and lives with her husband and two sons, now 13 and 16 years old.

1269. "On October 31, 2005, Ms. Bowen received a telemarketing call selling Dish Network. Ms. Bowen told the caller, who identified himself as "David," that she was not interested and did not have time to speak with him about the offers. Ms. Bowen then left her home. When she returned, there was a message from David on her answering machine that contained foul language. Ms. Bowen kept the recording of the message, which stated:

1270. ""Hi Ma'am, this is David with the Dish Network. I just wanted to let you know that it was uncalled for to be so rude to somebody that has a hard enough time anyways making these phone calls. With that same breath, you could have said something nice like simply I'm not interested and have a nice day. But instead you chose to be a bitch. And it's really revealing of what kind of person you are. You must not be very happy, and I feel sorry for your husband, if you even have one. So I just wanted to let you know that it's really uncalled for. You're a real cunt, as you know. Have a good day."""

1271. This answering machine message left Ms. Bowen surprised and disbelieving that someone would leave a message like that. Id. at 39:22-40:9.

1272. Consumer Balbir Singh, of Carpentersville, IL, placed his landline number, 224-484-8410, on the National DNC Registry in March, 2009.

1273. Prior to becoming a Dish customer in May 2011, Mr. Singh received approximately two calls per day from telemarketers purporting to sell Dish Network services, led him to file complaints on March 27 and 31, 2010, April, 10, 20, 24 and 25, 2010, May 3, 2010, August 23, 2011.

1274. "Mr. Singh found these calls invasive and harassing because the callers knew his native language and tried to take advantage of his ethnic background.

1275. "It's kind of -- it's kind of invading somebody's home when we have requested them not to call us and somebody just keeps on calling and it's never the same person. Different people call on behalf of the company, and they say they have been given the number by Dish itself, and it's very intrusive. And it is -- it is kind of harassment, especially after you ask them."

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

UNITED STATES OF AMERICA and the
STATES OF CALIFORNIA, ILLINOIS,
NORTH CAROLINA, and OHIO,

        Plaintiffs,

   v.

DISH NETWORK, LLC,

        Defendant.

Case No. 3:09-cv-03073-SEM-TSH

**PLAINTIFFS CALIFORNIA, ILLINOIS, NORTH CAROLINA AND OHIO'S ADDITIONAL PROPOSED FINDINGS OF FACT[1]**

1.     Of Dish's 2003-2007 calls to numbers on the Registry, 327,986 of those calls were directed to telephone numbers with area codes for California.

2.     Dish's 2003-2007 calling records show that Dish made 35,308 telemarketing calls to numbers with California area codes on the Registry for more than 31 days in 2005; 93,584 such calls in 2006 and 172,930 such calls in 2007.

3.     Of Dish's 2003-2007 calls to numbers on the Registry, 141,620 of those calls were directed to telephone numbers with area codes for Illinois.

4.     Dish's 2003-2007 calling records show that Dish made 17,738 telemarketing calls to numbers with IL area codes on the Registry for more than 31 days in 2005; 39,459 such calls in 2006 and 73,310 such calls in 2007.

5.     Of Dish's 2003-2007 calls to numbers on the Registry, 103,061 of those calls were directed to telephone numbers with area codes for North Carolina.

6.     Dish's 2003-2007 calling records show that Dish made 9,558 telemarketing calls to numbers with NC area codes on the Registry for more than 31 days in 2005; 25,169 such calls in 2006 and 59,924 such calls in 2007.

7.     Of Dish's 2003-2007 calls to numbers on the Registry, 121,853 of those calls were directed to telephone numbers with area codes for Ohio.

---

[1] State Plaintiffs incorporate by reference all facts in the United States of America's Proposed Findings of Fact. In an abundance of caution, the State Plaintiffs have included certain rebuttal facts to address issues upon which Dish bears the burden of proof. State Plaintiffs reserve the right to propose additional rebuttal facts depending upon the evidence Dish puts forth at trial.

**ATTACHMENT C – STATES' PROPOSED MATERIAL FACTS**

8.  Dish's 2003-2007 calling records show that Dish made 13,725 telemarketing calls to numbers with OH area codes on the Registry for more than 31 days in 2005; 32,223 such calls in 2006 and 65,984 such calls in 2007.

9.  Of Dish's 903,246 telemarketing calls to the Dish List, 36,598 were made to area codes associated with Ohio.

10. Of Dish's 2,211,242 telemarketing calls to the Retailer Accessible List, 103,330 were made to area codes associated with Ohio.

11. Of Dish's 7,321,163 telemarketing calls to numbers on the Retailer Inaccessible List, 280,030 were made to area codes associated with Ohio.

12. Dish engaged in a pattern or practice of calling numbers that had been on the Registry more than 31 days nationwide, including to residents of the Plaintiff States.

13. Dish's expert, John Taylor, excluded from the call counts in his expert reports all calls in Dish's 2007-2010 call records that reached businesses.

14. Dish's expert, John Taylor, described as "fallacious" the premise that the activation date data Dish provided included information sufficient to show an "inquiry EBR"-- i.e., an EBR created by a consumer inquiry.

15. Between 2007 and 2010, Dish made 501,650 outbound telemarketing calls to telephone numbers that had been on the Registry more than 31 days, and for which Dish had no evidence of an EBR.

16. Dish made outbound telemarketing calls for Dish products and services to telephone numbers of California residents at a time when the numbers were on the Registry for more than 31 days as reflected in the 2007-2010 Dish call records.

17. 53,167 of Dish's 501,650 Registry "issue" calls were to phone numbers with a California area code.

18. 42,019 of Dish's 501,650 Registry "issue" calls were to phone numbers with a California area code using a 90-day Registry grace period.

19. Of Dish's 501,650 telemarketing calls to numbers that had been on the Registry at least 31 days at the time of the call, 24,096 were made to area codes associated with Illinois.

20. Of Dish's 501,650 telemarketing calls to numbers that had been on the Registry at least 31 days at the time of the call, 16,005 were made to area codes associated with North Carolina.

21. Of Dish's 501,650 telemarketing calls to numbers that had been on the Registry at least 31 days at the time of the call, 23,853 were made to area codes associated with Ohio.

22.     302,983 of the 2,386,386 calls to numbers on both the Registry and on Dish's Internal DNC List were to phone numbers with California area codes.

23.     296,640 of the 2,386,386 calls to numbers on both the Registry and on Dish's Internal DNC List were to phone numbers with California area codes using a 93 day Registry grace period.

24.     118,289 of Dish's 2,386,386 calls to numbers on both the Registry and on Dish's Internal DNC List were to phone numbers with Illinois area codes.

25.     97,785 of the 2,386,386 calls to numbers on both the Registry and on Dish's Internal DNC List were to phone numbers with North Carolina area codes.

26.     95,275 of the 2,386,386 calls to numbers on both the Registry and on Dish's Internal DNC List were to phone numbers with Ohio area codes.

27.     Of Dish's 71,853 Registry hits to numbers that were also to the Dish List, 9,783 were to phone numbers with area codes associated with California.

28.     Of Dish's 71,853 calls to numbers on both the Registry and the Dish List, 9,575 were to numbers with area codes associated with California using a 93-day Registry grace period.

29.     Of Dish's 71,853 calls to numbers on both the Registry and the Dish List, 5,311 were to numbers with area codes associated with Illinois.

30.     Of Dish's 71,853 calls to numbers on both the Registry and the Dish List, 1,324 were to numbers with area codes associated with North Carolina.

31.     Of Dish's 71,853 calls to numbers on both the Registry and the Dish List, 1,539 were to numbers with area codes associated with Ohio.

32.     Of Dish's 2,314,533 calls to numbers on both the Registry and the Retailer Lists, 293,200 were to numbers with area codes associated with California.

33.     Of Dish's 2,314,533 calls to numbers on both the Registry and the Retailer Lists, 285,676 were to numbers with area codes associated with California using a 93-day Registry grace period.

34.     Of Dish's 2,314,533 calls to numbers on both the Registry and the Retailer Lists, 112,978 were to numbers with area codes associated with Illinois

35.     Of Dish's 2,314,533 calls to numbers on both the Registry and the Retailer Lists, 96,461 were to numbers with area codes associated with North Carolina.

36.     Of Dish's 2,314, 533 calls to numbers on both the Registry and the Retailer Lists, 93,737 were to numbers with area codes associated with Ohio.

37.     From 2007-2010, Dish made 34,997 calls to numbers with California area codes on the Registry for more than 31 days that were not completed.

38.     From 2007-2010, Dish made 33,970 calls to numbers with California area codes on the Registry for more than 93 days that were not completed.

39.     From 2007-2010, Dish made 15,228 calls to numbers with Illinois area codes on the Registry for more than 31 days that were not completed.

40.     From 2007-2010, Dish made 11,718 calls to numbers with North Carolina area codes on the Registry for more than 31 days that were not completed.

41.     From 2007-2010, Dish made 13,294 calls to numbers with Ohio area codes on the Registry for more than 31 days that were not completed.

42.     From 2007-2010, Dish made 1,723 calls to numbers with California area codes on the Registry for more than 31 days that reached the wrong number or non-English speakers.

43.     From 2007 -2010, Dish made 1,592 calls to numbers with California area codes on the Registry for more than 93 days that reached the wrong number of non-English speakers.

44.     From 2007-2010, Dish made calls to 420 numbers with Illinois area codes on the Registry for more than 31 days that reached the wrong number or non-English speakers.

45.     From 2007-2010, Dish made calls to 391 numbers with North Carolina area codes on the Registry for more than 31 days that reached the wrong number or non-English speakers.

46.     From 2007-2010, Dish made calls to 379 numbers with Ohio area codes on the Registry for more than 31 days that reached the wrong number or non-English speakers.

47.     Dish made 137,164 calls to numbers with California area codes on the Registry for more than 31 days that Dish claimed were part of "lead" or "inquiry" campaigns.

48.     From 2007-2010, Dish made 134,389 calls to numbers with California area codes on the Registry for more than 93 days that Dish claimed were part of "lead" or "inquiry" campaigns.

49.     Dish made 48,240 calls to numbers with Illinois area codes on the Registry for more than 31 days that Dish claimed were part of "lead" or "inquiry" campaigns.

50.     Dish made 43,491 calls to numbers with North Carolina area codes on the Registry for more than 31 days that Dish claimed were part of "lead" or "inquiry" campaigns.

51.     Dish made 44,583 calls to numbers with Ohio area codes on the Registry for more than 31 days that Dish claimed were part of "lead" or "inquiry" campaigns.

52.     Dish's 98,054 Prerecorded AM Calls were directed to residential telephone numbers.

53.     Dish placed 23,020 pre-recorded AM calls to telephone numbers with California area codes.

54.     Dish made pre-recorded outbound telemarketing calls for Dish products and services to telephone numbers of California residents.

55.     Dish and its Telemarketing Vendors engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of California.

56.     Dish made pre-recorded calls using autodialing equipment to residents of Illinois.

57.     Dish and its Telemarketing Vendors engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of Illinois.

58.     Dish placed 5,830 pre-recorded AM calls to telephone numbers with Illinois area codes.

59.     Dish made pre-recorded calls using autodialing equipment to residents of North Carolina.

60.     Dish and its Telemarketing Vendors engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of North Carolina.

61.     Dish placed 2,283 pre-recorded AM calls to telephone numbers with North Carolina area codes.

62.     Dish and its Telemarketing Vendors engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of Ohio.

63.     As part of the 15 Dish automessage campaigns between 2007 and 2008, Dish initiated 3,640 calls to Ohio phone numbers of persons on the Dish List, on the Retailer Accessible List, or on the Retailer Inaccessible List who had stated to Dish or a Dish retailer that they did not wish to receive outbound telephone calls 30 days or more prior to the calls at issue.

64.     Dish made pre-recorded calls using autodialing equipment to residents of Ohio.

65.     Dish placed 1,759 pre-recorded AM calls to telephone numbers with Ohio area codes.

66.     Of Dish and the Telemarketing Vendors' 26,269 "issue" Dish pre-recorded Calls to numbers on the Retailer Accessible List, 289 were made to area codes associated with Ohio.

67.     Of Dish and the Telemarketing Vendors' 144,999 "issue" Dish pre-recorded Calls to numbers on the Retailer Inaccessible List, 2,585 were made to area codes associated with Ohio.

68.     Order Entry Retailer Dish TV Now engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of California.

69.     Of DishTVNow's 6,673,196 pre-recorded calls selling Dish, 1,200,033 calls were made to telephone numbers with area codes associated with California.

70.     Order Entry Retailer Dish TV Now engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of Illinois.

71.     Of DishTVNow's 6,673,196 pre-recorded calls selling Dish, 155,374 of those calls were made to telephone numbers with area codes associated with Illinois

72.     Order Entry Retailer Dish TV Now engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of North Carolina.

73.     Of DishTVNow's 6,673,196 pre-recorded calls selling Dish, 20,181 calls were made to telephone numbers with area codes associated with North Carolina.

74.     Order Entry Retailer Dish TV Now engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of Ohio.

75.     Of DishTVNow's 6,673,196 pre-recorded calls selling Dish, 500,658 were made to telephone numbers with area codes associated with Ohio

76.     PossibleNow's and Dr. Yoeli's 2012 analyses determined that for Retailer JSR's call data, the calls to identified residential landlines made up 91% of All Calls and 98% of Identified Calls.

77.     JSR called only residential consumers to sell residential Dish satellite television service.

78.     Of JSR Enterprises' 5,664,273 "issue" telemarketing calls between 2006-2007 to telephone numbers that had been on the Registry at least 31 days at the time of the call, 473,152 were made to area codes associated with California.

79.     Of JSR's 2,349,031 calls to Registry numbers during 2006, 473,102 were to California phone numbers.

80.     Of JSR's 2,349,031 calls to Registry numbers during 2006, 473,048 were made to area codes associated with California that had been on the Registry at least 93 days at the time of the call.

81.     Of JSR Enterprises' 5,664,273 "issue" telemarketing calls between 2006-2007 to telephone numbers that had been on the Registry at least 31 days at the time of the call, 926,720 were made to area codes associated with Illinois.

**ATTACHMENT C – STATES' PROPOSED MATERIAL FACTS**

82. Of JSR's 2,349,031 calls to Registry numbers during 2006, 369,384 were to Illinois phone numbers.

83. Of JSR Enterprises' 5,664,273 "issue" telemarketing calls between 2006-2007 to telephone numbers that had been on the Registry at least 31 days at the time of the call, 23,186 were made to area codes associated with North Carolina.

84. Of JSR's 2,349,031 calls to Registry numbers during 2006, 18,250 were to North Carolina phone numbers.

85. 11,454 Ohio consumers received more than one call from JSR Enterprises in a 12 month period after the consumer's number had been placed on the Do Not Call Registry.

86. Of JSR Enterprises' 5,664,273 "issue" telemarketing calls between 2006-2007 to telephone numbers that had been on the Registry at least 31 days at the time of the call, 467,356 were made to area codes associated with Ohio

87. Of JSR's 2,349,031 calls to Registry numbers during 2006, 129,004 were to Ohio phone numbers.

88. Of Satellite Systems Network's 381,811 telemarketing calls selling Dish to numbers that had been on the Registry more than 31 days, 37,688 of these calls were made to area codes associated with California.

89. Of Satellite Systems Network's 381,811 telemarketing calls selling Dish to numbers that had been on the Registry more than 31 days, at least 30,000 of these calls were made to area codes associated with California that had been on the Registry more than 93 days.

90. Of Satellite Systems Network's 381,811 telemarketing calls selling Dish to numbers that had been on the Registry more than 31 days, 17,357 of these calls were made to area codes associated with Illinois.

91. Of Satellite Systems Network's 381,811 telemarketing calls selling Dish to numbers that had been on the Registry more than 31 days, 13,088 of these calls were made to area codes associated with North Carolina.

92. 32,082 Ohio consumers received more than one call from Satellite Systems Network in a 12 month period after the consumer's number had been placed on the Do Not Call Registry.

93. Of Satellite Systems Network's 381,811 telemarketing calls selling Dish to numbers that had been on the Registry more than 31 days, 22,878 of these calls were made to area codes associated with Ohio.

94. PossibleNow's and Dr. Yoeli's 2012 analyses determined that for Retailer Star Satellite/Tenaya's call data, the calls to identified residential landlines made up 40% of All Calls and 97% of Identified Calls.

95.     Order Entry Retailer Star Satellite engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of California.

96.     Of Star Satellite's 43,100,876 pre-recorded sales calls, 5,727,417 were made to area codes associated with California.

97.     Order Entry Retailer Star Satellite engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of Illinois

98.     Of Star Satellite's 43,100,876 pre-recorded sales calls, 2,660,066 were made to area codes associated with Illinois.

99.     Order Entry Retailer Star Satellite engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of North Carolina

100.    Dish retailer Star Satellite made pre-recorded calls using autodialing equipment to residents of North Carolina.

101.    Of Star Satellite's 43,100,876 pre-recorded sales calls, 1,716,457 were made to area codes associated with North Carolina.

102.    Order Entry Retailer Star Satellite engaged in a nationwide pattern or practice of making pre-recorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff State of Ohio

103.    Of Star Satellite's 43,100,876 pre-recorded sales calls, 3,419,175 were made to area codes associated with Ohio.

104.    Area codes have been assigned based on geography to areas within States under North American Numbering Plan (NANP) by the North American Numbering Plan Administration (NANPA). See www.nanpa.com, viewed August 11, 2014.

105.    Dish produced no evidence on the number of telephones or the percentage of telephone numbers that are not used in the geographic area associated with the telephone number's area code.

106.    Dish scrubbed its calling lists to remove wireless numbers.

107.    In March 2009, Dish discussed with PossibleNow the possibility of scrubbing its telephone calling lists against the Neustar wireless list, and that penalties for violating the law by calling wireless numbers could be up to $16,000 per violation.

108.    PossibleNOW has access to and uses a database of residential landlines that is 99.97 percent complete.

109. The database of residential landlines that PossibleNOW uses includes the residential address, including the state of residence, associated with each telephone number.

110. Virtually all of the telephone numbers in the residential landline databases reflect residential landlines physically located in the geographic areas assigned to those area codes by NANPA.

111. Plaintiffs' expert Dr. Yoeli, in conducting an analysis of the makeup of Dish call records and the call records of certain Order Entry Retailers, prepared samples of the calling data of Dish and several Order Entry Retailers and provided those samples to PossibleNOW.

112. In 2012, PossibleNow analyzed the samples to determine the makeup of the types of telephone numbers that Dish and the Retailers called, such as residential landline, business, wireless, or VOIP.

113. PossibleNow's analysis yielded a percentage of unknown or unidentified numbers.

114. The unknown numbers identified by PossibleNOW did not include wireless numbers. All wireless numbers can be identified by a number block that is assigned to them.

115. The telephone numbers that could be identified by type were referred to as "Identified Numbers." PossibleNOW and Dr. Yoeli analyzed the data two ways: (1) calls directed to identified residential landlines as a percentage of all calls to all numbers (All Calls); (2) calls directed to identified residential landlines as a percentage of calls to Identified Numbers (Identified Calls).

116. PossibleNow's and Dr. Yoeli's 2012 analyses determined that for Dish call data from 2003- 2007, the calls to identified residential landlines made up 67% of All Calls and 85% of Identified Calls.

117. Based on the analyses by Dr. Yoeli and PossibleNOW, for all call sets applicable to the TCPA and state law claims, the percentage of residential calls is from 77-100%.

118. PossibleNow and Dr. Yoeli's 2012 analyses determined that for Dish call data from 2007-2010, the calls to identified residential landlines made up 69% of All Calls and 94% of Identified Calls.

119. After the court's summary judgment order, Plaintiffs' expert Dr. Yoeli prepared state-specific samples of Dish and Retailer calling data upon which the court had granted summary judgment.

120. Using the database analysis process used to analyze the previous call data in 2012, PossibleNOW analyzed these updated samples to determine the makeup of the types of telephone numbers that Dish and the Retailers called, such as residential landline, business, wireless, or VOIP.

121. As with the previous data sample, some of the phone numbers in the sample analyzed by PossibleNOW were unidentifiable.

**ATTACHMENT C – STATES' PROPOSED MATERIAL FACTS**

122. As with the previous data sample, the unidentifiable numbers did not include wireless numbers because all wireless numbers can be identified by the number block that is assigned to them.

123. As with the previous samples, PossibleNOW and Dr. Yoeli analyzed the updated samples two ways: (1) calls directed to identified residential landlines as a percentage of all calls to all numbers (All Calls); (2) calls directed to identified residential landlines as a percentage of calls to Identified Numbers (Identified Calls).

124. The physical addresses associated with 99.99 percent of all identified residential calls indicated that the calls reached the states indicated by the phone number's area code. The remaining 0.01 percent of residential calls did not indicate a state residence different from that indicated by the assigned area code; the state information was merely missing.

125. PossibleNow's and Dr. Yoeli's 2015 analyses determined that for "uncompleted" calls upon which the Court granted summary judgment, the calls to identified residential landlines in California made up 62% of All Calls and 92% of Identified Calls; the calls to identified residential landlines in Illinois made up 61% of All Calls and 89% of Identified Calls; the calls to identified residential landlines in North Carolina made up 67% of All Calls and 92% of Identified Calls; the calls to identified residential landlines in Ohio made up 67% of All Calls and 93% of Identified Calls.

126. PossibleNow's and Dr. Yoeli's 2015 analyses determined that for Dish's "wrong number" or "no english" calls upon which the Court granted summary judgment, the calls to identified residential landlines in California made up 65% of All Calls and 91% of Identified Calls; the calls to identified residential landlines in Illinois made up 67% of All Calls and 86% of Identified Calls; the calls to identified residential landlines in North Carolina made up 70% of All Calls and 85% of Identified Calls; the calls to identified residential landlines in Ohio made up 67% of All Calls and 90% of Identified Calls.

127. PossibleNow's and Dr. Yoeli's 2015 analyses determined that for Dish calls to numbers on the Registry for more than 31 days and that are also numbers of persons who stated to Dish or to a Dish retailer that they did not wish to receive outbound telephone calls 30 days or more prior to the call, the calls to identified residential landlines in California made up 65% of All Calls and 86% of Identified Calls; the calls to identified residential landlines in Illinois made up 68% of All Calls and 81% of Identified Calls; the calls to identified residential landlines in North Carolina made up 72% of All Calls and 87% of Identified Calls; the calls to identified residential landlines in Ohio made up 70% of All Calls and 86% of Identified Calls.

128. PossibleNow's and Dr. Yoeli's 2015 analyses determined that for the set of 501,650 Dish issue calls upon which the Court granted summary judgment, the calls to identified residential landlines in California made up 67% of All Calls and 93% of Identified Calls; the calls to identified residential landlines in Illinois made up 78% of All Calls and 95% of Identified Calls; the calls to identified residential landlines in North Carolina made up 83% of All Calls and 95% of Identified Calls; the calls to identified residential landlines in Ohio made up 81% of All Calls and 97% of Identified Calls.

129.    PossibleNow's and Dr. Yoeli's 2015 analyses determined that for Dish's "inquiry" or "lead" calls upon which the Court granted summary judgment, the calls to identified residential landlines in California made up 54% of All Calls and 78% of Identified Calls; the calls to identified residential landlines in Illinois made up 58% of All Calls and 75% of Identified Calls; the calls to identified residential landlines in North Carolina made up 66% of All Calls and 82% of Identified Calls; the calls to identified residential landlines in Ohio made up 65% of All Calls and 83% of Identified Calls.

130.    PossibleNow's and Dr. Yoeli's 2015 analyses determined that for the JSR calls upon which the Court granted summary judgment, the calls to identified residential landlines in California made up 93% of All Calls and 100% of Identified Calls; the calls to identified residential landlines in Illinois made up 94% of All Calls and 100% of Identified Calls; the calls to identified residential landlines in North Carolina made up 86% of All Calls and 98% of Identified Calls; the calls to identified residential landlines in Ohio made up 89% of All Calls and 99% of Identified Calls.

131.    PossibleNow's and Dr. Yoeli's 2015 analyses determined that for the Star Satellite calls upon which the Court granted summary judgment, the calls to identified residential landlines in California made up 37% of All Calls and 98% of Identified Calls; the calls to identified residential landlines in Illinois made up 43% of All Calls and 96% of Identified Calls; the calls to identified residential landlines in North Carolina made up 27% of All Calls and 91% of Identified Calls; the calls to identified residential landlines in Ohio made up 39% of All Calls and 97% of Identified Calls.

132.    PossibleNow's and Dr. Yoeli's 2015 analyses determined that for the Satellite Systems Network calls upon which the Court granted summary judgment, the calls to identified residential landlines in California made up 57% of All Calls and 78% of Identified Calls; the calls to identified residential landlines in Illinois made up 67% of All Calls and 89% of Identified Calls; the calls to identified residential landlines in North Carolina made up 71% of All Calls and 92% of Identified Calls; the calls to identified residential landlines in Ohio made up 64% of All Calls and 88% of Identified Calls.

133.    PossibleNow's and Dr. Yoeli's 2015 analyses determined that for those 3,407 DNC calls to Ohio area codes, the calls to identified residential landlines made up 91% of all calls, including those whose status could not be identified, and 99% of calls whose status could be identified.

134.    Amy Dexter, who worked with Bob Davis and who testified regarding training on do not call laws, did not indicate when training occurred or how regularly training occurred.

135.    Dish did not establish written policies for scrubbing its calling lists.

136.    Dish did not maintain any records documenting Dish's process to scrub its calling lists to remove numbers on the Registry or on Dish's internal do-not-call list.

137.    Dish's PDialer does not produce data trails or any other information that would identify how PDialer created and scrubbed calling lists.

138. While Dish produced 116 screen shots from its PDialer, three for each calling campaign, the screen shots did not document the process used by Dish to create or scrub its calling lists.

139. Prior to retaining PossibleNOW in December 2007, Dish did not have any written policies for updating federal, state, and internal do not call lists.

140. Dish did not have a written policy about sending call suppression lists received from the executive resolution team to eCreek.

141. Dish did not have any formal, written guidelines for determining whether a business unit's request for a telephonic survey contained sales language and was a telemarketing call.

142. Dish called millions of numbers on the Registry, including hundreds of thousands of numbers with California area codes.

143. Dish did not have a system or process that could readily identify which of its calls were telemarketing calls.

144. Even after this case was filed, Dish continued to make many calls in violation of telemarketing laws, including as many as 10-20% of calls on certain days in 2009-2010.

145. For years, Dish told customers that they should contact thousands of "independent" Retailers if they wished to stop receiving Dish telemarketing calls.

146. Dish's system for scrubbing numbers that should not be called from its calling lists depended on Dish employees inputting criteria into a number of proprietary data systems.

147. Dish did not scrub its current and former customer telemarketing calling lists against the Registry.

148. Dish did not scrub many of its telemarketing calling lists against its entity specific do-not-call list.

149. Dish did not require all outbound calling campaigns to be vetted for compliance with telemarketing laws.

150. Prior to 2008, Dish's internal DNC list was comprised exclusively of requests made by consumers to Dish directly or to telemarketing vendors, as Dish did not collect such requests from Retailers.

151. In April 2008, Dish first set up functionality to permit Retailers to upload and update their entity-specific do not call lists to a platform that Dish could use to scrub against the Retailer lists and that permitted Retailers to scrub against the DNC lists of Dish and other Retailers.

152. There was a ramp up time of Retailers uploading lists of internal do not call requests to PossibleNow, and some Retailers did not upload internal do not call requests until sometime in 2010.

153. Beyond providing contact information to PossibleNow, Dish did not take any additional steps to ensure that a retailer signed up with PossibleNow.

154. Dish receives a report when a retailer engages with PossibleNow or terminates its contract with PossibleNow.

155. Dish could inquire with PossibleNow to determine whether a retailer has signed up, but it does not do so.

156. Of 313 retailers Dish identified to sign up with PossibleNow, 143 had not responded to PossibleNow within a year of Dish's requirement to engage PossibleNow becoming effective.

157. Retailer National Satellite Systems did not create an account with PossibleNOW until June 20, 2010.

158. The forms that Dish used for its QA program for Order Entry Retailers do not reflect telemarketing compliance issues or do not call information.

159. The decision whether to terminate a retailer who had committed TCPA violations was made on a case by case basis; some retailers who had committed TCPA violations were permitted to continue telemarketing after paying a penalty and others were terminated.

160. Dish's outbound operations department was responsible for scrubbing Dish's calling lists against Dish's internal do not call list.

161. Bob Davis, who served as general manager for Dish's outbound operations from August 2007 to November 2010, had no experience with telemarketing compliance before taking the position, yet his department had responsibility for ensuring that outside telemarketing vendors complied with telemarketing laws.

162. Dish's management or internal legal departments held the power to discipline outside telemarketing vendors for violations of telemarketing laws.

163. According to Dish's designated representative, Dish was not obliged to take any actions with respect to having a process to make sure its retailers did not call numbers on Dish Network's entity-specific do not call list, and Dish did not have to take such steps contractually.

164. According to Dish's designated representative, Dish did not have an obligation to educate its retailers about compliance with the TCPA.

165. Dish did not have a policy of keeping track as to which Order Entry retailers were doing outbound telemarketing.

166.    Dish's department that handled TCPA investigations after it received a complaint never asked for complete call logs for a particular period of time from a retailer.

167.    In August 2006, Dish created a "compliance" department to oversee its OE Retailers with regard to trademark enforcement, presale disclosures, and legal compliance.

168.    In August 2006, Dish brought on Reji Musso to head Dish's new compliance efforts for OE retailers.

169.    QA criteria that Retailer calls are scored on include 1) making required disclosures; 2) "rightsizing" the customer (selling the correct package and programming based on the customers needs); 3) providing disclaimers associated with additional fees and gifts with purchase and placing limits on additional fees that Retailers could charge.

170.    OE Retailers do not have the authority to create their own offers and Dish requires them to accurately represent to consumers the information associated with the Dish offers as dictated by Dish.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

UNITED STATES OF AMERICA and the
STATES OF CALIFORNIA, ILLINOIS,
NORTH CAROLINA, and OHIO,

     Plaintiffs,

     v.

DISH NETWORK L.L.C.,

     Defendant.

Case No.: 3:09-cv-03073-SEM-TSH

## DISH NETWORK L.L.C.'S PROPOSED FINDINGS OF FACT

**TABLE OF CONTENTS**

Page

I.    ABOUT DISH NETWORK L.L.C. .................................................................. 1

      A.    DISH Is an Industry-Leading Innovator Dedicated to Meeting the Needs
            of U.S. Consumers .............................................................................. 2

      B.    Competition in the Pay-TV Industry ................................................... 3

II.   DISH'S OUTBOUND CALLING ................................................................. 4

      A.    Categories of DISH Telemarketing Call Campaigns ........................... 5

      B.    DISH Call Centers and Call Vendors ................................................. 7

      C.    DISH's Dialer Systems ...................................................................... 7

      D.    DISH's Telemarketing Compliance .................................................... 9

III.  DISH'S RELATIONSHIP WITH RETAILERS ........................................... 38

      A.    Background of the Retailer Program ................................................. 38

      B.    DISH's Standard Retailer Agreement and Business Rules Require
            Compliance with All Applicable Laws and Establish That Retailers Are
            Independent Contractors .................................................................. 40

IV.   DISH'S SUPPORT AND DISCIPLINE OF RETAILERS ........................... 43

      A.    DISH's Retail Services Compliance Department ............................... 43

      B.    DISH Investigated Retailers in Response to Consumer Complaints ......... 44

            1.    Responses to Consumer Complaints ........................................ 44

            2.    Responses to Escalated Consumer Complaints ........................ 50

      C.    DISH Provided Retailers with Resources So They Could Meet
            Compliance Obligations ................................................................... 50

            1.    DISH's Efforts to Educate Retailers Regarding Telemarketing
                  Compliance ........................................................................... 50

            2.    DISH's Efforts To Stop Use the of Unauthorized Affiliates ......... 52

V.    INDIVIDUAL RETAILERS AT ISSUE ...................................................... 53

      A.    Star Satellite .................................................................................... 53

            1.    DISH's Relationship with Star Satellite ................................... 53

            2.    DISH Had No Knowledge of Star Satellite's Illegal Telemarketing
                  Practices ............................................................................... 56

      B.    Dish TV Now .................................................................................... 60

            1.    DISH's Relationship with Dish TV Now ................................... 60

            2.    DISH Had No Knowledge of Dish TV Now's Illegal
                  Telemarketing Practices. ......................................................... 61

i

C.    JSR Enterprises ........................................................................................ 64

    1.    DISH's Relationship with JSR Enterprises............................... 64

    2.    DISH Had No Knowledge of JSR's Illegal Telemarketing Practices...... 65

D.    National Satellite Systems ....................................................................... 67

    1.    DISH's Relationship with National Satellite Systems............................ 67

    2.    DISH Had No Knowledge of National Satellite System's Illegal Telemarketing Practices............................................................ 69

E.    Satellite Systems Network ....................................................................... 72

    1.    DISH's Relationship with SSN.............................................. 72

    2.    DISH Had No Knowledge of SSN's Illegal Telemarketing Practices ............................................................................ 73

F.    American Satellite.................................................................................... 74

    1.    DISH's Relationship with American Satellite ......................... 74

    2.    DISH Had No Knowledge of American Satellite's Illegal Telemarketing Practices............................................................ 76

VI.    MONETARY REMEDIES SOUGHT BY PLAINTIFFS ............................................. 77

A.    The Monetary Remedies Sought from DISH Are Disproportionate to Monetary Remedies in Other Cases.................................................... 78

B.    The Remedies Sought by Plaintiffs Threaten DISH's Ability to Remain Competitive........................................................................................ 82

# I.  ABOUT DISH NETWORK L.L.C.[1]

1.      DISH Network L.L.C. ("DISH") is the nation's third largest pay-TV provider.  It

delivers satellite television services, as well as satellite broadband services, to households

throughout the United States, including in rural communities where cable and fiber optic pay-TV

and internet options are limited.

2.      DISH is headquartered in Englewood, Colorado, and it employs approximately

18,000 people in the United States.

3.      In addition, thousands of independent Retailers contract with DISH to market,

solicit orders for, and install DISH products and services.  The employees of these many

Retailers depend, in material part, on revenues derived from DISH.

4.      DISH also indirectly supports the employees of EchoStar Corporation.  EchoStar

Corporation and its subsidiaries design, develop, and manufacture substantially all of DISH's

television set-top-box technology, provide a vast majority of its transponder capacity, provide

digital broadcast operations and other services, and provide the streaming technology for DISH's

over-the-top ("OTT") Internet-based television offerings.  DISH accounted for 57.3% of the total

revenue of EchoStar Corporation and 88.6% of the revenue of EchoStar Technologies L.L.C. (a

subsidiary of EchoStar Corporation) in 2014.  EchoStar Corporation employed approximately

4,400 people in 2014.

---

[1] In proposing Conclusions of Law and Findings of Fact, DISH is complying with the law of the
case doctrine and not seeking to re-litigate issues that have already been decided before trial
(except where DISH will request that the Court reconsider a conclusion or finding).  However,
DISH also preserves its right to contest all findings, decisions, or other actions by the Court—
whether in its December 12, 2014 Summary Judgment Opinion [Dkt. # 445] (the "Summary
Judgment Opinion" or "Opinion 445") or any other previous rulings—through the appropriate
post-trial and appellate procedures.  *See Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008)
("Nothing in the Federal Rules of Civil Procedure, however, tells attorneys that, in order to
preserve issues for appeal, they must insert into the final pre-trial order contentions that have
already been rejected by the judge.") (citing *Calderon v. Witvoet*, 999 F.2d 1101, 1108 (7th Cir.
1993)).

A. **DISH Is an Industry-Leading Innovator Dedicated to Meeting the Needs of U.S. Consumers**

5. DISH is a dynamic, forward-looking organization that is ahead of the curve in serving the needs of its customers in an industry with rapidly changing technology. DISH has won multiple innovation awards for its consumer-friendly products and services.

6. **Sling TV.** In February 2015, DISH launched Sling TV, a live, linear streaming OTT Internet-based television service. Sling TV gives consumers a low-cost alternative to traditional pay-TV subscriptions, which have become increasingly bloated and cost-prohibitive. Sling TV is targeted at consumers, particularly Millennials, who have chosen to forego cable or satellite television (known as "cord-nevers"), cancel their cable or satellite subscriptions (known as "cord-cutters"), or decrease their pay-TV subscription services. The core Sling TV programming package consists of approximately 20 channels offered for a base $20 monthly subscription, with the option to add more channel packs for another $5 per month apiece. DISH expects to continue to expand the programming content offered by Sling TV.

7. **DISH Investment in Wireless Spectrum.** DISH has been making substantial investments in wireless spectrum. If and when DISH is able to commercialize that spectrum, it would bring increased competition to the cellular marketplace. If DISH is successful in commercializing its spectrum licenses, DISH will be competing with companies such as Verizon, AT&T, Sprint and T-Mobile, which have substantial market share and control over the U.S. cellular marketplace, and offering another alternative to U.S. consumers.

8. Between 2008 and 2014, DISH invested over $5 billion to acquire wireless spectrum licenses and related assets. For a variety of reasons, DISH has yet to commercialize that spectrum.

9.     It has been widely reported that, in 2015, DISH made approximately $10 billion in debt and equity investments in certain Designated Entities (or their respective parent companies) that purchased approximately $10 billion in wireless spectrum through an FCC auction process.  That $10 billion investment largely depleted the cash reserves and other liquid assets that DISH had been holding on its balance sheet as of December 31, 2015.

10.     **DISH's Consumer Technology Offerings.**  DISH is a leader in providing consumer technology to its pay-TV customers that gives them the ability to watch television when, where and how they want to watch it, so that they can enjoy their leisure television time on their own terms, and not be tethered to their living rooms and linear programming distribution schedules.  DISH introduced the award-winning Hopper® whole-home DVR in 2012 and has continued to add functionality and simplicity.  The Hopper promotes a suite of integrated features and functionality designed to maximize the convenience and ease of watching TV anytime and anywhere.

## B.     Competition in the Pay-TV Industry

11.     As of June 30, 2015, approximately 13.9 million pay-TV consumers subscribed to DISH pay-TV services.  DISH's subscriber base represents approximately 14% of pay-TV subscribers in the United States.

12.     Pay television is a mature industry with limited growth.  There are a finite number of television households in the United States that subscribe to pay-TV services and the market is not expanding.  There is extensive competition among pay-TV providers to obtain and retain subscribers.  DISH offers competitive prices, a full suite of programming options, state-of-the art consumer technology, and award-winning customer service.  Among other marketing tools, the pay-TV industry is sustained by telemarketing to existing, former and prospective customers.

DISH's major competitor, DirecTV, likewise uses telemarketing to promote its products and services.

13.    DISH makes a substantial investment in acquiring new pay-TV subscribers.  That investment, commonly known as "subscriber acquisition costs," includes the costs associated with promotional incentives, direct sales efforts, installation and acquisition advertising.  As of June 30, 2015, DISH's average subscriber acquisition cost for each new pay-TV subscriber was $854, according to DISH's 10-Q.  DISH wants to retain its customers long term, so that the relationship will become and remain profitable.  It has no interest in alienating its subscribers with unwanted telephone solicitations.

## II.    **DISH'S OUTBOUND CALLING**

14.    In the ordinary course of its business, DISH makes different types of outbound calls for various purposes.  The vast majority of those outbound calls are not telemarketing calls.  For example, DISH calls its customers to schedule the installation of their equipment, and when the satellite dishes on their homes need to be re-pointed to allow them to continue to receive programming.  DISH calls its customers when their accounts are overdue.  DISH calls its customers when the credit card that it has on file for an account has expired.  DISH calls its customers who have volunteered to participate in surveys.  In addition, DISH calls its customers with customer service reminders, to let them know when a technician will be visiting.  DISH makes millions of outbound calls to its customers for non-telemarketing purposes each year.  Currently, approximately 90% of the outbound calls initiated by DISH are non-telemarketing calls.

15.    A smaller percentage of the outbound calls that DISH makes fall within the category of telemarketing calls, which are calls to sell goods or services.  Currently, approximately 10% of the outbound calls initiated by DISH are telemarketing calls.

**A.    Categories of DISH Telemarketing Calling Campaigns**

16.    Historically, DISH's telemarketing calls largely have fallen into four general categories: (a) up-sell calls to offer existing subscribers additional goods and services; (b) calls to inquiry leads who have recently contacted DISH to inquire about DISH's services; (c) calls to former customers who have voluntarily disconnected DISH's services; and (d) at certain times in the past, cold calls.

17.    **Up-sells.**  First, DISH makes telemarketing calls to up-sell its existing customers, which involves encouraging them to add programming or equipment to their subscriptions. These calling campaigns are sometimes referred to as "ARPU" campaigns, because the purpose is to increase the "Average Revenue Per Unit" or average revenue per subscribing household. For example, a calling campaign might encourage non-HBO subscribers to add the HBO premium channel.

18.    These up-sell campaigns were the first type of outbound telemarketing calls that were made at DISH.  DISH began making this type of call to customers in approximately 1998, at the suggestion of programmers who wanted DISH to help them promote customer subscriptions to their channels.

19.    All up-sell calls are directed to existing DISH customers.

20.    **Inquiry Leads.**  Second, DISH makes telemarketing calls to potential customers who have initiated a call to the company to inquire about purchasing its services, or have otherwise inquired about DISH through DISH's website or another marketing avenue. Information on the inquiry leads is entered into DISH's computer system and tracked through DISH's "LTS" or "Lead Tracking System."  This LTS system exclusively tracks inquiry leads. As a matter of practice and policy, DISH makes calls to these potential customers promptly, within 48 hours of an inquiry, to optimize the opportunity for the purchase of DISH's services.

The names of these calling campaigns contain the initials "LTS" and/or "GG," which represent that the phone numbers came through the LTS inquiry lead tracking system. The "GG" calling campaigns contain the inquiry leads that DISH assigns the highest priority, based on the geographic location and credit rating of the person inquiring.

21.      All responsive calls to inquiry leads are directed to individuals who have inquired about DISH's services within the previous ninety days.

22.      **Win-Back Campaigns.**  Third, DISH makes telemarketing calls to former customers who have recently voluntarily disconnected DISH's services in order to try to re-establish them as customers.  DISH refers to this category of telemarketing call as a "win-back" or "voluntary trailing" campaign.  DISH selects a particular disconnect time period to check in on those former customers to improve the likelihood that the former customer might be interested in returning to DISH.  DISH first calls the customer within 48 hours of a disconnection, and then might check in at particular monthly intervals, when it anticipates that the incentives to sign up with another provider might have expired, or the subscriber might be experiencing buyer's remorse with another service.

23.      **Cold Sales Calls.**  Fourth, at certain times in the past, DISH made cold calls to non-customers.  Cold calls are new acquisition calls to individuals who may not be familiar with DISH's products or services and have not specifically inquired about DISH's products and services.  At limited times, DISH has used demographic information or lead lists purchased from Equifax to identify non-customers to include in calling campaigns.

24.      By approximately 2007, DISH began to minimize its use of cold-call campaigns, as the campaigns were not successful or effective in establishing relationships with new customers.

25.     DISH no longer makes cold calls.  In fact, DISH's current policy prohibits cold-call campaigns.

26.     **Compilation of Telemarketing Calling Lists.**  For telemarketing calling campaigns to current customers, inquiring potential customers or former customers, analytics personnel in DISH's IT Department had the responsibility for assembling the calling lists from DISH's databases based upon the criteria established by the business unit requesting the calling campaign.  The calling lists were pulled based upon existing information contained within DISH's data systems on current customers, inquiring potential customers (which was stored in the LTS system), and former customers.

**B.      DISH Call Centers and Call Vendors**

27.     DISH makes some outbound calls from owned-and-operated call centers staffed with its own telecommunications agents.  For some outbound calling campaigns, DISH outsources the work to a vendor.  Before retaining any outside vendors, DISH performs due diligence on those vendors.  In addition, DISH monitors vendor performance to make sure that the vendors are adhering to DISH's standards and requirements.  In the time period at issue, DISH used outside vendors eCreek and EPLDT (now known as SPi).

28.     DISH no longer uses eCreek as a vendor.  DISH still has a relationship with SPi at one call center in Madison, Wisconsin.  Today, DISH also uses a vendor based in Ohio that operates a call center in Central America.

**C.      DISH's Dialer Systems**

29.     DISH's initial outbound telemarketing efforts in 1998 were manually dialed. However, in the time period at issue in this case, DISH used computer-aided dialer systems, known as a "dialer."  The dialer is a computer-controlled device capable of making hundreds of

thousands of phone calls in a single day based on calling lists manually imported into the dialer by operations analysts.

30. The dialer is manually loaded with a dialing list of numbers for a particular calling campaign and readied by operations personnel to initiate phone calls. If a called party picks up the phone after it has been dialed, the call is connected to a live agent who has previously logged into the system to work on that campaign. The dialer gauges how many phone numbers to attempt based on the number of agents staffed at the call center to manage a particular campaign. The agents read written and preapproved scripts to the individuals who answer the call.

31. DISH previously used a dialer known as Concerto. In or about 2008, DISH began transitioning dialer functions to a Cisco dialer. Today, DISH is fully transitioned to the Cisco dialer.

32. It is DISH's strict policy that telemarketing calls must involve live agents using written preapproved scripts. For some types of non-telemarketing calls, DISH uses recorded messages that do not require live agents.

33. DISH maintains records of all outbound calls made by the company and its outbound calling vendors for all telemarketing and non-telemarketing campaigns. Those records document the number called, the date and time of the call, the name of the calling campaign, and a call result code denoting the disposition of the call, among other details.

34. Some of the disposition codes indicating the results of the call are systematically entered by the dialer software, such as when the phone call fails to connect, there is a busy signal, an answering machine picks up or there is no answer.

35.     Other disposition codes are entered by the live agent who handled the call and may have spoken with an individual on the other end of the line.  The agent selects a disposition code from a drop-down menu of options.  An agent is required to input a disposition for each and every call.  DISH maintains a glossary of the available disposition codes and what they mean, which is maintained in the ordinary course of its business.

36.     These records are maintained for both telemarketing and non-telemarketing calls. DISH produced nearly one billion call records to the FTC for the time period spanning from 2003 through 2010, including records for all outbound calls made by DISH and its vendors, whether telemarketing or not.  DISH produced records of approximately 435 million outbound calls made by DISH employees and its vendors from September 1, 2007 to March 12, 2010.

**D.     DISH's Telemarketing Compliance**

37.     DISH complied in good faith with the telemarketing laws in connection with the outbound telemarketing calls that it and its outside vendors placed during the time period at issue in this case, and continues to comply in good faith to the present day.

38.     DISH's telemarketing compliance processes and procedures meet or exceed industry standards.

39.     In May 2010, Ken Sponsler, Vice President and General Manager at CompliancePoint, a PossibleNOW Company, audited DISH's telemarketing compliance efforts and certified in writing his finding that DISH meets U.S. federal and state telemarketing and Do Not Call compliance requirements.

40.     Mr. Sponsler is an expert in telemarketing compliance.  Mr. Sponsler earned certification from the International Association of Privacy Professionals as a Certified Information Privacy Professional and the Project Management Institute as a Project Management Professional.  He is also among the first to earn certification as an American Teleservices

Association Self-Regulatory Organization Auditor. Mr. Sponsler and his team have performed dozens of U.S. federal and state telemarketing and DNC, CAN-SPAM, Junk Fax and Mail compliance assessments and audits. He serves on the National Board of Directors of the Professional Association of Customer Engagement ("PACE"), formerly the American Teleservices Association ("ATA") as well as a member of its federal legislative committee, state legislative committee, DNC implementation committee and the compliance officer's forum. Mr. Sponsler is also a PACE Self-Regulatory Organization trustee.

41. According to Mr. Sponsler, "[o]ur audit of DISH Network's compliance processes, procedures and policies indicates full compliance with relevant federal and state DNC and telemarketing requirements. The company has employed a compliance and legal review capability that manages the campaign life cycle in accordance with requirements. Third parties are monitored and required to submit periodic reports of compliance. DISH appears to be exerting sufficient procedures to remain in full compliance and contractually obligates third-parties to comply as well."

42. DISH provided the CompliancePoint staff with full cooperation and opened its doors to the assessment and auditing process. Mr. Sponsler spent two days at DISH, during which time he interviewed DISH personnel responsible for direct sales, marketing, information technology and compliance. Mr. Sponsler observed firsthand that DISH takes compliance very seriously and has made significant investments in technology and personnel for telemarketing compliance. He found that the relevant DISH employees were well-versed in the telemarketing rules.

43. The 2010 CompliancePoint audit findings include the following:

a. "DISH has employed sufficient policies, procedures and processes to ensure compliance with relevant federal and state telemarketing rules.  The company has employed a compliance department staff at the corporate level that oversees compliance including scripting reviews, campaign life cycle management, DNC suppression and third-party monitoring and oversight.  Managers at lower levels are directed to enforce compliance manages and procedures."

b. "Customer concerns, including DNC complaints are elevated to the Executive Response Team (ERT) for immediate resolution.  An escalation plan is effectively managed at all levels to ensure DISH remains aware of compliance anomalies should they occur."

c. "The vast majority of DISH Network's telesales are through inbound calls.  Our audit reveals that DISH Network has subscribed to and suppresses against all relevant DNC lists in accordance with federal and state requirements.  An audit of DISH Network's current [Subscriber Account Number ("SAN")] reveals a current subscription to all available area codes.  DISH Network accesses their version of the National Registry on a daily basis through their affiliation with their compliance suppression provider, PossibleNOW, Inc."

d. "All outbound campaigns undergo a two-part suppression process utilizing PossibleNOW's services as well as internal suppression technology.  An audit of the suppression parameters being employed indicates compliance with all federal and state DNC and exemption criteria.  Outbound campaign files used internally as well as distributed to third party vendors are active for only 15 days.  At the conclusion of the 15-day life cycle, campaign files are purged from the dialers and

re-suppressed to ensure compliance with DNC requirements. DISH Network performs all DNC suppression processes prior to sending campaign files to third party telemarketers."

e. "Consumer DNC requests are entered directly into the dialer system by agents resulting in suppression from further calls by the following day. DISH provides an intranet solution (CC Web) to enable third party agents to input and access company-specific DNC information. Inbound as well as outbound agents have access to CC Web. Our audit reveals that DISH Network's processes to accept and honor a consumer's request not to be called will not exceed 15 days maximum from the date of the request. Agents are able to send consumers a version of the DISH DNC policy upon request through the CC Web interface."

f. "Agents are trained on federal and state-specific scripting requirements as well as the DISH DNC Policies. Dialer technology employed by DISH and their third party telemarketers support compliance with state specific scripting disclosures as well as call time restrictions."

g. "Call abandonment rate compliance is monitored by the DISH compliance staff on a weekly basis. Third party telemarketers are required to submit weekly call abandonment reports as well. Our audit indicates that call abandonment rates average less than 2% overall. Call abandonment is calculated by the total number of abandoned calls divided by the total number of calls answered by a live person per campaign per 30 day period. Reports of compliance are maintained as required."

h. "Our audit reveals that DISH Network ensures compliance with federal and state EBR allowances by capturing a consumer's inquiry date for inquiry exemptions and last payment date for transaction exemptions. A review of the EBR suppression tables used by DISH reveals full compliance with federal and more restrictive state exemption rules relevant to each campaign type."

i. "Dial attempts per consumer are limited to six attempts per campaign life cycle (15 days). The consumer's number is automatically removed from the dialer after six attempts have been made."

j. "DISH Network and its two third party telemarketers display a toll free number Caller ID on every outbound dial. Telephone service provider technology does not currently allow the display of a name. Consumers calling the toll free number reach DISH Network's IVR [Interactive Voice Response] system where DNC requests may be accepted and processed in accordance with procedures described earlier. The IVR is active 24 hours per day."

k. "Our audit reveals that DISH Network is registered as a telemarketer in States that require registration with two pending approvals in Maine and New Jersey."

l. "Telemarketing agents are monitored for compliance by supervisors randomly. DISH requires that each agent's calls are monitored for quality and compliance minimally twice per month. Reports of call monitoring are maintained. Agent non-conformance is reported to supervisors for enforcement action which includes counseling, retraining or dismissal."

m. "Corporate compliance monitoring is accomplished through periodic report requirements, agent monitoring and QA activities. Records appear to be maintained in accordance with requirements."

44. While Mr. Sponsler recommended that DISH further memorialize its due diligence to more accurately reflect its efforts, he did not find any deficiencies in the actual policies and procedures in place and followed at DISH.

45. There is no foolproof method of avoiding errors in telemarketing compliance. Notwithstanding the use of best practices and sophisticated systems, technology failures or human errors will occur and will lead to mistakes. Notwithstanding that DISH's processes and procedures meet or exceed industry standards, errors occurred in which calls were mistakenly made to numbers on the National Registry or DISH's entity-specific list. Moreover, when mistakes happen in the scrubbing process on a large list, the errors can likewise be large.

46. DISH did not knowingly violate telemarketing rules in connection with its outbound telemarketing efforts.

47. DISH did not act culpably with respect to any outbound telemarketing errors.

48. Data management surrounding the Do Not Call process is daunting. The FTC, through its contractors, made numerous mistakes in the process of maintaining and downloading the National Registry and providing it to telemarketers.

49. The FTC understands that errors will inevitably occur when working with large datasets, such as the National Registry. The FTC allows for a 5% margin of error with respect to management of the National Registry. In addition, the law allows for a 3% margin of error with respect to abandoned calls.

50.     DISH has expended significant efforts in furtherance of telemarketing compliance.  DISH's employees have taken telemarketing compliance very seriously and have worked diligently to do their best to comply with the telemarketing laws, including but not limited to the Do Not Call laws.  It has always been DISH's mission and intent to comply with the telemarketing laws to the best of its ability and its employees have been instructed to use their best efforts toward compliance at all times.

51.     **DISH's History of Telemarketing Compliance Efforts.**  In 1998, the year that DISH first embarked upon outbound telemarketing, it established an internal entity-specific Do Not Call list.

52.     In 1998, DISH internally developed its P-Dialer list processing system, which was used, among other things, to scrub calling campaign lists against Do Not Call lists to eliminate numbers that should not be called.  The P-Dialer application also performed the function of processing calling lists into the proper format to be input into the dialer by an operations analyst, and it was used to store the post-dialing reports on call results.

53.     In 2002, before the National Do Not Call Registry was established, DISH embarked upon a large-scale IT Project to develop a more sophisticated "DNC" database to provide the company with comprehensive functionality to scrub large-scale telemarketing do-not-call lists against all appropriate registries.

54.     The National Registry launched in October 2003.

55.     At all relevant times, it has been DISH's established business practice to scrub telemarketing call lists against the appropriate Do Not Call registries, including DISH's entity-specific list, as well as the National Registry and applicable state registries.

56.     At all relevant times, DISH maintained the necessary subscriptions to download the National Registry.

57.     At all relevant times, DISH downloaded updates to the National Registry within the timeframe required, if not more often.

58.     DISH employees acted diligently in downloading updates to the National Registry.  At some times, because of firewall system challenges, the employees downloaded updates to the National Registry from their homes at night, and uploaded the updates to the DISH systems when they got to work in the morning.

59.     At all relevant times, DISH maintained its own entity-specific Do Not Call or "DNC" list.

60.     At all relevant times, it was DISH's established business practice and policy to add telephone numbers to its entity-specific DNC list upon the request of a consumer.

61.     For any call that an agent entered a disposition indicating a consumer's "do not call" or "suppression" request, the number that had been dialed was automatically added to DISH's entity-specific list nightly.  This automatic process worked within DISH's dialer software and P-Dialer system.

62.     DISH's vendor EPLDT used DISH's dialer to make calls.  The do not call dispositions of EPLDT agents were automatically added to DISH's entity-specific list in the same fashion as described above.

63.     DISH's vendor eCreek used its own dialer.  It was required to send reports on call dispositions to DISH every day for the previous dialing day.  The "do not call" or "suppression" dispositions from eCreek were entered into DISH's CSC Web system and added to DISH's entity-specific list from dispositions on the call reports.

64.     In addition, DISH created a user interface whereby anyone at the company with access to the company's computer network had the ability to add a telephone number to DISH's entity-specific list.  Once the number was input into the web form, it was integrated into DISH's entity-specific list.  A number can also be entered through DISH's public website.

65.     DISH provided training on that internal user interface to all call center agents—whether they handled inbound or outbound calls—that instructed them on the proper processes and procedures with respect to compliance with do not call requests.  A PowerPoint presentation accessible on DISH's internal web-portal provides step by step instructions on how to add a telephone number to DISH's entity-specific DNC list.

66.     Among other things, those procedures required that, if a consumer complained about being called in violation of the do-not-call laws, the agent would apologize and offer to put the consumer's number on DISH's entity-specific DNC list.

67.     Prior to the development of the user interface, if DISH received a letter, email or other communication that a person did not want to be called by DISH, the message would be forwarded to the person or department in charge of maintaining the internal list to place the person's number on that list.

68.     **Call Scrubbing Criteria.**  At all relevant times, DISH maintained appropriate policies and procedures on the scrubbing of telemarketing call lists to remove telephone numbers subject to Do Not Call restrictions.

69.     For example, at all relevant times, it was DISH's policy and procedure that cold-call telemarketing campaigns to non-customers must be scrubbed against the National Registry as well as DISH's entity-specific DNC list.

70.     At all relevant times, it was DISH's policy and procedure that telemarketing campaigns to existing customers, such as up-sell campaigns, must be scrubbed against DISH's entity-specific DNC list.

71.     At all relevant times, it was DISH's policy and procedure that telemarketing campaigns to potential customers who had made inquiries to DISH within the prior ninety days, must be scrubbed against DISH's entity-specific DNC list.

72.     At all relevant times, it was DISH's policy and procedure that win-back telemarketing campaigns to former customers, who had last made a payment to DISH or disconnected DISH service within the prior eighteen months, must be scrubbed against DISH's entity-specific DNC list.

73.     At all relevant times, it was DISH's policy and procedure that win-back telemarketing campaigns to former customers, who had last made a payment to DISH or disconnected DISH service more than eighteen months prior, must be scrubbed against the National Registry and DISH's entity-specific DNC list.

74.     At all relevant times, it was DISH's policy and procedure to scrub telemarketing campaigns against the appropriate lists before sending those campaigns on to a telemarketing vendor for the calls to be made.

75.     In 2003, Russell Bangert was the individual within DISH's outbound call operations with primary responsibility for the scrubbing of telemarketing lists to make sure that Do Not Call numbers were not dialed.

76.     When the new FTC laws were enacted, Mr. Bangert educated himself on the telemarketing laws by reference to materials available on the FTC website.  A new legal and regulatory environment had been created and there was some uncertainty on how it would work

in practice and be applied. Mr. Bangert studied the materials available from the FTC on the application of the rules and read the Federal Register comments on the telemarketing rules. Mr. Bangert maintained a comprehensive folder of materials on telemarketing compliance, which he used to guide his compliance efforts. Mr. Bangert also sought and obtained guidance on telemarketing compliance from DISH's in-house Legal Department.

77. The Legal Department provided legal advice to Mr. Bangert regarding what type of scrubs would be applicable to particular types of telemarketing lists, and those scrubs would be used on the lists.

78. The P-Dialer application had the capability to compare telephone numbers on a potential calling list to the National Registry, DISH's internal DNC list and applicable state DNC lists.

79. A calling list for an outbound telemarketing campaign directed at customers with an Established Business Relationship was only scrubbed against the DISH internal DNC list. All other telemarketing calling lists were scrubbed against all of the lists. Only after a telemarketing list was scrubbed would the remainder of the calling list be manually loaded into the dialer to make the calls.

80. Mr. Bangert regularly tested the scrubbing process. He audited the scrubbing process by running queries of the scrubbed list to determine whether the scrubbed lists were free from telephone numbers on the proscribed lists. He also manually reviewed the lists to see if the scrubbed lists contained numbers on the National Registry. He took a sample of about ten numbers from the scrubbed lists and conducted a search to see if any of the sample numbers were on the proscribed lists. Anyone who scrubbed a call list was required to perform such a sampling audit.

81.     Mr. Bangert assumed the responsibility for teaching and training others at DISH on how to scrub telemarketing lists to ensure that DISH did not make calls in violation of the telemarketing laws.  Mr. Bangert trained the other individuals who worked with him and who shared responsibility for scrubbing calling lists.

82.     In April 2006, Mr. Bangert transitioned his telemarketing compliance responsibilities to Monte Faucett.  In connection with the transition, Mr. Bangert provided Mr. Faucett with his telemarketing compliance materials and trained Mr. Faucett on the relevant processes and procedures for scrubbing telemarketing lists.  Mr. Faucett shadowed Mr. Bangert for at least 30 days before taking on these responsibilities.

83.     **DISH's Outbound Operations Team.**  In 2006, DISH established an outbound telecommunications operations team.  Mr. Faucett was a member of that team, which was originally led by Matt Cohen.

84.     It was the role and responsibility of the outbound operations team to manage and standardize the processes for all outbound calling campaigns, as well as to make sure that any outbound calling campaigns were business appropriate before they were approved for dialing.

85.     Within the outbound operations team, Mr. Cohen originally was responsible for determining the parameters for scrubbing telemarketing calling lists, in consultation with DISH's in-house legal department.  Bob Davis later took over those responsibilities from Mr. Cohen.  The scrubbing parameters for specific campaigns continued to be individually tailored in consultation with DISH's in-house Legal Department.

86.     The outbound operations team was trained in list-scrubbing parameters by Mr. Cohen and later by Mr. Davis with the assistance of in-house legal counsel.

87.     Joey Montano later assumed responsibilities for overseeing the calling list

scrubbing process, as well as other telemarketing compliance activities, working in consultation

with DISH's in-house legal team and compliance vendor PossibleNOW.  Mr. Montano was

originally trained by Mr. Davis, in consultation with DISH's in-house legal department.  Amy

Dexter took over outbound operations from Mr. Davis in November 2010, and Mr. Montano

reported to Ms. Dexter.  Mr. Montano is currently in charge of outbound operations at DISH and

manages telemarketing compliance, among other things.

88.     Mr. Montano is responsible for the training of individuals working with him on

his team on the appropriate scrubbing of telemarketing lists.  He has assigned individuals to the

scrubbing of particular types of lists, so that each person with scrubbing responsibility is

specialized in the type of campaign that he or she will scrub, in order to minimize any scrubbing

mistakes.

89.     Under the direction of Mr. Montano, the outbound operations team memorialized

in writing standard operating procedures ("SOPs") for the processing of telemarketing lists,

which include step-by-step instructions on the scrubbing processes for each list.

90.     **DISH's Retention of PossibleNOW.**  In December 2007, DISH contracted with

PossibleNOW, a telemarketing compliance vendor, for telemarketing compliance services.

DISH retained PossibleNOW to assist DISH in maintaining its internal DNC list, scrubbing

calling lists, and complying with the Do Not Call laws.

91.     PossibleNOW is the industry leader in telemarketing compliance services.  It not

only performs telemarketing compliance services for companies engaged in telemarketing

activities, it is also the federal government's contractor responsible for performing hygiene on

the National Registry.  With respect to the National Registry, PossibleNOW is responsible for

purging numbers if it finds that the number has been disconnected and reassigned to a new name and a new address. On a weekly basis, PossibleNOW performs an analysis of the numbers on the Registry to determine whether any of the numbers should be purged.

92. Among other things, PossibleNOW provides DISH with telemarketing compliance training. DISH staff takes advantage of PossibleNOW webinars. The outbound operations team regularly attends those webinars. In addition, PossibleNOW has come to DISH's offices and DISH events to conduct telemarketing compliance training seminars.

93. PossibleNOW manages DISH's subscriptions to the National Registry and all state registries. Prior to retaining PossibleNOW, DISH managed its subscriptions to Do Not Call lists on its own. PossibleNOW maintains a current version of the National Registry, state Do Not Call lists, wireless telephone number lists and the entity-specific DNC lists for DISH. PossibleNOW maintained the same lists for DISH's vendor, eCreek.

94. Beginning in or about February 2008, it was DISH's policy and practice to scrub outbound telemarketing lists internally and then send the lists to PossibleNOW for a secondary scrubbing process to ensure compliance and minimize risk for errors. DISH and PossibleNOW scrubbed against the same set of lists, except PossibleNOW scrubbed against wireless numbers as well. PossibleNOW began scrubbing DISH calling campaigns on or about February 19, 2008.

95. PossibleNOW also maintained internal entity-specific DNC lists for certain Retailers. DISH obtained copies of the Retailer DNC lists from PossibleNOW and incorporated those lists into its own scrubbing process, in order to further enhance customer satisfaction and ensure that it did not call consumers who had indicated that they did not want to receive calls promoting DISH's products and services. DISH scrubbed against the Retailer lists shared with PossibleNOW for all outbound telemarketing calling campaigns. DISH did not do this scrubbing

based on any legal requirement, as the Retailers are distinct legal entities required to maintain their own lists, but because it made good business sense and was good for consumer relations.

96.     In 2010, the scrubbing process was updated to automate the verification of an Established Business Relationship.  Mr. Montano worked with Anitha Gogineni, a DISH software developer, to update the P-Dialer software.  With this update, the person directing the scrubbing in P-Dialer no longer determined whether an Established Business Relationship might apply to the calling list.  Instead, the P-Dialer software was automated to verify an Existing Business Relationship by reference to an inquiry date or a transaction date, and to determine whether a number on a calling list should be scrubbed against the National Registry and any state registries, in addition to DISH's internal DNC list.

97.     DISH performed scrubbing on telemarketing calling lists before sending any of those lists to a vendor to run a telemarketing calling campaign.  The vendors would also scrub the lists against their own entity-specific do not call lists.

98.     DISH performed quality control checks on the scrubbed lists to make sure that the scrubbing was performed correctly.  Among other things, DISH maintained spreadsheets documenting the size of a telemarketing list before and after the scrubbing process, in order to spot-check that the list had gone through appropriate procedures.  This spot-checking process helped to detect errors in the scrubbing process and to address any errors before a list was loaded into the dialer by an operations analyst for calls to be made to consumers.

99.     In addition, DISH received scrubbing receipts from PossibleNOW that verified that a scrub had been conducted and showed how many telephone numbers had been eliminated from each calling list based on those scrubbing criteria.

100.     **Outbound Operations Team Procedures.**  The outbound operations team instituted a robust set of procedures designed to maintain compliance with the company's obligations under applicable federal and state telemarketing laws and regulations.

101.     When a business unit identifies the need for a new outbound calling campaign, that campaign is subject to a three-part approval process by outbound operations that is designed to (1) document the campaign concept; (2) ensure executive approval of the campaign; and (3) guarantee legal compliance.  Approval and documentation are required at each step of the process.

102.     At the documentation stage, the business unit must submit an Outbound Campaign Request form that conceptualizes the campaign, including its purpose, size, intended customer base and expected outcome.  This documentation includes a draft of the anticipated script and any associated disclosures.

103.     The campaign must receive the written approval of a member of the executive staff, typically at the vice president level or above, of the requesting business unit.

104.     At the third stage, the outbound operations team and in-house legal counsel will review and vet the campaign and corresponding script before granting final launch approval.  Only once final approval has been obtained will the campaign initiation process begin, which includes appropriate scrubbing of any telemarketing lists.

105.     **DISH's Monitoring and Enforcement of Telemarketing Compliance.**  DISH maintained a staff to handle customer complaints, including complaints about possible violations of the Do-Not-Call Laws.  DISH's "Executive Resolution Team," or "ERT," handled customer concerns that were escalated from DISH's regular customer call center agents.  The ERT group includes customer resolution specialists ("CRS's"), who were supervised by coaches, who in turn

were supervised by managers. If a CRS could not resolve a consumer complaint, the complaint could be escalated up the chain of command to a coach or supervisor.

106. In addition to customer service complaints, CRS's investigated Do Not Call complaints to attempt to determine the source of the call, whether it was from DISH, a vendor, a Retailer or some other unauthorized source.

107. Based on escalated complaints, the ERT issued suppression requests of telephone numbers that were not to be called for any reason, whether for a telemarketing or non-telemarketing campaign. Those telephone numbers were then suppressed directly within DISH's dialer, in addition to being added to the entity-specific DNC list, so that the dialer would not call the number even if it might appear on a call list for an informational calling campaign. DISH sent these suppression lists to eCreek for the telephone numbers to be suppressed within eCreek's dialer as well.

108. Consumers often misunderstand the Do Not Call laws and expect that, if they are on any Do Not Call list, that they won't receive outbound calls for any reason. In addition to attempting to educate the customer and provide better customer service, DISH suppressed the numbers of consumers who made it known that they did not want to be called by DISH for any reason.

109. In addition to the ERT, DISH had a team that handled, researched, and responded to written customer complaints, which it referred to as the Dispute Resolution Team, or "DRT." The DRT investigated Do Not Call complaints and wrote a letter in response to each complaint. DISH maintained a written manual for the DNC investigation process, as well as other written procedures. The goal of DNC investigation was to "reduce the number and severity of TCPA violations."

110. In researching these Do Not Call complaints, DISH found that many of the complained-of calls originated from phone numbers that were not associated with DISH or its vendors. DISH discovered that, among other things, unknown third-party entities that had no association with DISH were spoofing DISH's telephone number and caller ID, and/or otherwise identifying themselves as DISH.

111. DISH maintains records of complaints that are registered with DISH through State Attorneys General and Better Business Bureaus.

112. This list includes both complaints about telemarketing calls, as well as complaints concerning other, non-telemarketing issues.

113. DISH maintains a tracker of Do-Not-Call complaints, called the TCPA tracker or "Do Not Call" tracker.

114. During the 2007-2010 period, the number of calls DISH made that the Court found to be violations amounts to only 0.00655% of DISH's total call volume

115. The number of telemarketing related complaints that DISH receives has decreased over time, and has greatly decreased since 2009.

116. **DISH's Written Policies.** At all relevant times, DISH has maintained written policies on its compliance with the telemarketing laws and has made them available both internally and to consumers who have requested copies.

117. **DISH's Written Procedures.** DISH bolstered its written procedures on its compliance with the Do Not Call laws. DISH currently has written standard operating procedures for each standard category of telemarketing campaign (including subsets of those campaigns) that document the procedures followed in the preparation and scrubbing process. In addition, DISH has an overarching written "Process and Procedures" document for Outbound

Operations that describes the steps that it follows to comply with the Do-Not-Call laws, including but not limited to, the training of individuals responsible for scrubbing telemarketing lists. This "DISH Outbound Operations: Summary of Process and Procedures" document is available on DISH's internal portal for reference by any DISH employee.

118. **DISH's Expanded Record-Keeping**. DISH currently maintains records of the scrubbing of outbound telemarketing campaign lists. DISH maintains a copy of versions of the list from before and after the scrubbing process.

119. **DISH's Telemarketing Call Record Audits**. DISH retained CompliancePoint, a PossibleNOW company, to audit its telemarketing call records for the time period of August 1 to September 19, 2015. That audit showed that DISH made 620,342 telemarketing calls. Out of those hundreds of thousands of calls, DISH had only one error. Due to an isolated technical system error, DISH called one number that should have appeared on its internal DNC list. The audit shows an accuracy rate of more than 99.999%. DISH is continuing to have its telemarketing call records audited by CompliancePoint on an ongoing basis.

120. **Prerecorded Calls.** It is DISH's practice and policy that telemarketing calls may not be prerecorded and must involve live agents using written preapproved scripts. DISH has enforced this policy and its outbound operations group has refused to approve telemarketing campaigns involving the use of prerecorded messages.

121. On summary judgment, this Court found that DISH made 98,054 prerecorded telemarketing calls that constituted telemarketing violations in the 2007 time frame. Those calls were made in connection with 15 calling campaigns to existing DISH customers. Those 15 campaigns were isolated instances—anomalies—that were outside of DISH's regular practices and procedures in that time period. The vast majority of those calling campaigns were initiated

by DISH's international programming group and aimed at current foreign language customers of DISH. The primary purpose of the campaigns was to inform customers of international program offerings and to announce free programming previews.

122. Based upon ambiguity in the TSR on the meaning of an "abandoned" call and inconsistencies between the TSR and TCPA on prerecorded calls, it was not clear to DISH at certain times that the TSR prohibited prerecorded telephone calls to existing customers. At certain times, DISH's formal written Do Not Call Policies contemplated the limited use of prerecorded telemarketing calls to current DISH customers. For example, the 2004 DISH Policy stated that DISH may "deliver automated messages to only our existing subscribers for the purpose of . . . solicitation for Pay-Per-View events." The 2006 DISH Policy similarly stated that it "does deliver automated messages to our existing customers . . . for the purposes of communicating . . . special programming solicitation." In 2008, the DISH Policy was revised to reflect that DISH would only deliver prerecorded messages in outbound telephone calls for informational non-telemarketing purposes, "for the purpose of customer service reminders such as when a credit card expires."

123. **Calls to Inquiry Leads on the National Registry.** On summary judgment, the Court found DISH responsible for 873,551 violation calls in connection with inquiry lead campaigns. Those 873,551 calls were made to numbers on the National Registry. It was DISH's reasonable understanding, at the time that those calls were made, that it had the right to call those consumers, because those consumers had made an inquiry to DISH within the prior 90 days. DISH's expert John Taylor opined that the calls were not violations, relying upon a campaign name that indicates that a customer inquiry had preceded those calls. However, the Court found that the information was hearsay, that DISH had not produced testimony in the summary

judgment record on the meaning of the campaign names and had not produced documentation of the specific inquiries.

124. At the time that those 873,551 calls to inquiry leads were made, DISH had a reasonable belief that the calls were authorized under the law and were not unfair or deceptive. The campaign names appearing within those call records, containing the initials "LTS" or "GG," show that the calling lists had come from the LTS system, which tracks consumer inquiries made to DISH. It was DISH's established business practice and procedure to call those inquiring consumers promptly following the inquiry, and at all times within 90 days of the inquiry.

125. **Other Calls to Numbers on the National Registry.** On summary judgment, the Court found DISH responsible for 501,650 violation calls to numbers on the National Registry made by DISH or its vendors that DISH's expert John Taylor conceded to be issue calls. The Court also found DISH responsible for 22,581 violation calls to numbers on the National Registry that involved wrong numbers, non-English speakers, or intrastate calls. In addition, the Court found DISH responsible for 309,951 attempts to call numbers on the National Registry, where the calls never connected. These calls, or call attempts, were the result of reasonable errors in the scrubbing processes and procedures that were applied in the regular course of business at DISH.

126. Approximately 49% of the 501,650 calls were from win-back campaigns directed at customers who had left DISH's service 19, 20 and 22 months prior to the time that the campaign was dialed. The vast majority of those 19, 20 and 22 month win-back campaign violations found by the Court occurred between mid-2008 and mid-2009, after DISH began using the services of PossibleNOW to scrub its telemarketing calling lists. Those particular campaigns involved 4,013,953 total calls and 245,297 violations found by the Court, for a 6.1

percent error rate. By the middle of 2009, DISH had remedied the errors occurring with the scrubbing process for these campaigns.

127. Another 120,519 of the violations in this category of 501,650 calls were associated with calling campaigns with the term "Cold" in the campaign names. These were large scale calling campaigns, in which the number of calls could reach in the millions, but which largely had relatively low violation rates of less than 2%. These campaigns represent approximately 24% of the 501,650 calls.

128. The remaining 27% of the violations found by the Court for those 501,650 calls were spread throughout different campaigns.

129. On summary judgment, the Court found DISH responsible for 309,931 violation calls to numbers on the National Registry for dialing attempts that, based upon the disposition codes, were not completed, and did not connect to a consumer's telephone line. In those instances, DISH did not actually initiate or make a telemarketing call, because no call or connection occurred. For the calls where no connection occurred, there could not have been any harm to consumers related to any violation of the National Registry – no consumers were disturbed by these calls, because the phone never rang at anyone's home. In any event, the calls that were counted in the 309,931 violation found by the Court included calls that were made on non-telemarketing campaigns, or that were made to current or former DISH customers within the 18-month Existing Business Relationship exemption period. In addition, those 309,931 violation calls include 65,446 calls made in connection with inquiry lead campaigns, containing the initials "LTS" or "GG," and were made by DISH within 90 days of receiving a consumer inquiry.

130.     Many of the calls that the Court counted as violations in the category of "Wrong Number/Not English" included calls that were made to current or former DISH customers within the 18-month Existing Business Relationship exemption period.

131.     **Calls to Numbers on DISH's Internal DNC List.**  On summary judgment, the Court found DISH responsible for 903,246 violation calls to numbers on the DISH's internal DNC list made by DISH or its vendors that DISH's expert John Taylor conceded to be issue calls, as well as 140,349 calls to numbers marked DNC by DISH vendor eCreek.  These calls occurred across 901 calling campaigns with fairly low error rates and were the result of reasonable errors in the scrubbing processes and procedures that were applied in the regular course of business at DISH.

132.     **Plaintiffs' Claims of Violations from the 2003 to 2007 Call Records.**  In response to a civil investigative demand from the FTC, DISH produced outbound call records for the 2003 to 2007 time period.  That call record production included all outbound calls made by DISH, whether telemarketing or not, and did not include names for the particular calling campaigns.  Plaintiffs claim that those call records show telemarketing violations, based on "hits" to the National Registry and DISH's internal DNC list; however, Plaintiffs have not demonstrated that any of the "hits" occurred for telemarketing calls, as opposed to informational calling campaigns, which do not need to be scrubbed against any DNC lists.

133.     The FTC has conceded that the first step that it takes, after receiving call records from a producing party such as DISH (whether in response to a civil investigative demand, discovery request or subpoena), is to employ "massive computer processing."  This involves a government contractor (InterImage) performing a "raw hits" analysis.  A raw hits analysis is merely a comparison of what exists in the call records with the numbers that are registered on the

National Registry (taking into account the statutory grace period as it existed at the time of the registration).

134.    Ami Dziekan, program manager for the FTC's Do Not Call Registry (and the FTC's Rule 30(b)(6) representative), gave examples of reasons why a raw hit to the National Registry might not be a violation, including that the FTC has no ability to determine from a call record the purpose of the call, *i.e.*, if it is a telemarketing call. As explained by Nicholas Mastrocinque, an investigator at the FTC, a raw hit is an "initial look [at] the data" that represents a "potential violation[]."

135.    Ms. Dziekan also testified that a "raw hit" means comparing a number called from a "call log of calls made by one of the defendants or somebody at interest" to the National Registry. Performing a "call log analysis" is merely the first step in the process of determining "whether a call is in violation of the Do Not Call Registry." A raw hit does not show whether an unlawful telemarketing call was made. In particular, the fact that there may be a "raw hit" to DISH's internal DNC list does not show that there is a telemarketing violation in the absence of a showing that the "raw hit" involved a telemarketing call.

136.    InterImage performed "raw hit" analyses for Plaintiffs. In performing such analyses, InterImage did not de-duplicate records to eliminate multiple entries for the same call.

137.    InterImage does not do any analysis to determine whether the outbound caller had an Established Business Relationship with the person called, or whether the call was made in response to an inquiry.

138.    **Area Codes Are Unreliable to Show Calls to a Residential Landline in a Particular State.** The State Plaintiffs rely upon area codes as supposed evidence to assume that

a call was made to a residential landline in one of their States. However, area codes are not a reliable basis to show that a call was made to a residential landline in a particular State.

139. For example, Plaintiff North Carolina produced a "Do Not Call Complaint" dated August 8, 2008 for William Gwendalyn Farmer. Mr. Farmer, who identified himself as a resident of Winston-Salem, North Carolina, alleged that he received calls to his phone number with a California area code. While none of the call records at issue in this case actually reflect any of the calls complained about by Mr. Farmer, if they had, the purported calls would have been mistakenly counted as violations recoverable by Plaintiff California, rather than Plaintiff North Carolina, when Plaintiff California has no standing to pursue relief on behalf of another state resident.

140. Similarly, Plaintiff Ohio produced a consumer complaint dated January 8, 2009 for Richard Smith. Mr. Smith, who identified himself as a resident of Columbus, Ohio, indicated that he is the subscriber of two phone numbers that bear a Pennsylvania area code. Again, if calls to Mr. Smith's phone numbers appeared in the call records in this case, State Plaintiffs would have counted such calls as one to a Pennsylvania resident.

141. Three primary technological developments have broken the connection between numbers and geography. First, since 1997, the FCC has required telecommunications carriers to permit consumers to "port" their telephone numbers, *i.e.,* keep their previous telephone number even when they switch to another carrier. In 2003, the FCC allowed consumers to transfer (or "port") their wireline numbers to a wireless carrier. In 2007, the FCC allowed consumers to port their telephone numbers to Voice over Internet-Protocol ("VoIP") services as well, allowing consumers to transition from traditional wireline services to advanced IP-based services. *In re:*

*Telephone Number Requirements for IP-Enabled Services, Report and Order, Declaratory Ruling, Order on Remand and Notice of Proposed Rulemaking*, 22 FCC Rcd 19531 (2007).

142.    Second, over the time period relevant to Plaintiffs' claims, consumers increasingly obtained wireless service and maintained mobile numbers that were associated with an area code other than the one where they live.  Further, unlike historical practices of wireline carriers, wireless carriers have been able to assign telephone numbers without regard to the consumer's place of residence.  As the FCC has acknowledged, "wireless carriers have considerable discretion in assigning telephone numbers," and often do so to minimize their own costs rather than based on the consumer's location.  *Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, 25 FCC Rcd 11407, 11517, n. 520 (2010) (14th Annual Wireless Competition Report, 100 n. 520 (May 20, 2010), *available at* http://www.fcc.gov/reports/mobile-wireless-competition-report-14th-annual (last accessed Oct. 14, 2014)).

143.    Third, during the time period relevant to Plaintiffs' claims, consumers have increasingly selected Internet-protocol-based services, such as VoIP services.  VoIP service subscriptions, like mobile service subscriptions, have increased greatly between 2003 and 2010, with nearly 32 million VoIP lines in service as of December 2010.  Industry Analysis and Technology Division, Wireline Competition Bureau, Federal Communications Commission, Local Telephone Competition: Status As of December 31, 2010, at p. 2 & Fig. 1 (October 2011).  VoIP numbers can be assigned without regard to the consumer's physical location.  For example, a VoIP customer located in Atlanta may choose to have a number traditionally associated with Chicago.  In an Order issued in 2004, the FCC readily acknowledged that, in the context of VoIP service, "the [North American Numbering Plan ("NANP")] number is not necessarily tied to the

user's physical location for either assignment or use, in contrast to most wireline circuit-switched [but not wireless] calls." *Vonage Order*, 19 F.C.C.R. 22404 (2004).

144.    Moreover, FCC Commissioner Jessica Rosenworcel recently stated that "[p]eople now move and take their numbers with them. Case in point: in my office here at the Commission, half of those who work with me have phone numbers with area codes that do not reflect where they live." Numbering Policies for Modern Communications, 28 F.C.C.R. at 5920.

145.    **The National Registry Is Riddled with Errors and Contains Many Numbers That Are Not Properly Registered.**  The National Registry includes many numbers that are not, by law, permitted to be registered, and has an error-ridden history.  First, registered numbers are not likely to be related to the person who registered the number.  The hygiene process currently performed by PossibleNOW does not adequately maintain the accuracy of the Registry. PossibleNOW will purge only directory-listed residential landlines that have been disconnected and reconnected under a different name and different address.  However, approximately half of the National Registry consists of wireless numbers, and those numbers are not purged.  In addition, approximately 25 percent of Voice over IP numbers are not listed on directories, and those numbers will not be purged when they are re-assigned.  Second, the National Registry contains a significant number of wireless numbers that are not properly listed.  Third, the National Registry also includes a significant number of commercial business numbers that are not properly listed.  Finally, the contractors charged with maintaining the National Registry have encountered numerous issues with maintaining it accurately.

146.    Pursuant to a government contract, AT&T was responsible for managing the National Registry.  AT&T allowed any number—whether valid or invalid, landline or wireless, home or business—to be added to the National Registry without any validation requirements.

147.     AT&T charged its subcontractor, Targus, with responsibility for performing

hygiene on the National Registry.  But, Targus was not tasked with identifying and removing

government or business numbers from the National Registry.  Targus had the ability to identify

and remove business numbers, but did not do so, despite the fact that 5-10% of numbers at that

time on the National Registry were business numbers—a figure that grew during Targus's work

on the Registry since they were never purged, and because the FTC took no steps to prevent

business or government numbers from being placed on the National Registry.

148.     In 2007, Lockheed Martin took over from AT&T as the FTC's contractor.

Lockheed Martin did not receive all of the historical data for the National Registry from AT&T.

Lockheed Martin nonetheless went live with the National Registry database on October 1, 2007.

Lockheed Martin is paid, in part, based upon the volume of numbers on the National Registry

regardless of whether those numbers are residential landlines, or if they are other numbers, such

as business, government, or wireless numbers.

149.     Lockheed Martin's contract with the FTC required it to achieve a 95% accuracy

rate in maintaining the National Registry registration and download functions.  For the period of

November 2008, Lockheed Martin's accuracy rate slipped to 43.9%.  The FTC levied a penalty

against Lockheed Martin for not meeting the 95% accuracy rate for November 2008.

150.     From the period October 1, 2007 through June of 2012, Lockheed Martin

identified problems in the operation of the National Registry database related to (i) "removing

numbers from the registry due to phone number disconnects or reassignments;" (ii) "consumer

registrations not getting loaded in to the database in a timely manner;" and (iii) problems "related

to telemarketer downloads."

151.     PossibleNOW was hired as Lockheed Martin's subcontractor to purge certain obsolete landline numbers from the National Registry and to address how hygiene was performed on the National Registry.

152.     In or around 2009, PossibleNOW was also hired to do a one-time massive purge of numbers from the National Registry. It examined the then-existing version of the Registry and purged such numbers from the then-current Registry. However, while that purge removed improper numbers from the National Registry on the day of the purge, PossibleNOW did not go back and purge these numbers off the historical National Registry records used by InterImage to develop its "raw hits." As a result, InterImage may find a "raw hit" for an improper number.

153.     In 2008, based on a single input error by PossibleNOW, about 225,000 numbers were dropped from the National Registry and had to be added back to the Registry. Similar occurrences happened in January and March 2009. In March 2009 the number of improperly dropped numbers was approximately 19,000. This was a result of human error. Moreover, these errors are corrected retroactively, meaning that an improperly dropped number may not have been on the Registry list at the time it was downloaded, but it would later appear as a call to a Registry number after the error is corrected.

154.     As of March 2009, 49.45% of the numbers on the National Registry were wireless numbers, which are outside of the FTC's jurisdiction. As of March 2009, 13% of the phone numbers listed on the National Registry were business numbers, which are not properly on the Registry. As of 2009, 5.3% of numbers on the National Registry were inactive and, thus, could not be called.

155.     In December 2011, PossibleNOW estimated that it was missing disconnection and reassignment information for approximately 25 percent of the VoIP numbers in use. In addition,

a significant portion of numbers on the National Registry —as many as 30%—are simply unidentifiable.

156.    Dr. Robert Fenili, DISH's expert witness, developed a model to estimate the composition of the National Registry as of September 2011. Based on this model, as of September 2011, over 50% of all numbers on the Registry were wireless numbers. This is consistent with PossibleNOW's FTC analysis in 2009. Dr. Fenili further estimated that as of September 2011, 12.2% of numbers on the National Registry were business landlines, roughly the same as in 2009, and 7.1% of numbers on the National Registry were inactive landlines—an increase from 2009. Dr. Fenili estimates that only 28.2% of numbers registered on the National Registry are active residential landlines.

157.    The work performed by PossibleNOW for Plaintiffs in this case to attempt to ascertain whether particular phone numbers are associated with residential landlines confirms that there are wireless, business and inactive telephone numbers on the National Registry.

## III.    DISH'S RELATIONSHIP WITH RETAILERS

### A.    Background of the Retailer Program

158.    Between 2003 and 2010, DISH contracted with more than 7,500 independent retailers ("Retailers") to market and solicit orders for DISH products and services. By 2013, the number had been reduced to approximately 4,500 Retailers.

159.    There are two primary categories of Retailers. Full Service Retailers, or TV Receive Only ("TVRO") Retailers, solicit orders for DISH and install DISH products and equipment. DISH currently has around 3,500 TVRO Retailers.

160.    Order Entry ("OE") Retailers market DISH products and services and use DISH's Order Entry Tool ("OE Tool") to submit customer orders to DISH. After the order is accepted by DISH, DISH or a DISH subcontractor schedules and installs the products and equipment. In

2006, there were over 100 OE Retailers.  Today, there are 16 OE Retailers, which is a result of

DISH's affirmative efforts to reduce the OE Program.  Plaintiffs are seeking to recover civil

penalties at trial based on calls that they attribute to a handful of OE Retailers.

161.    DISH developed its OE Retailer program in order to expand its marketing

outreach and to stay competitive with companies such as DirecTV, which already had programs

in place that obviated the need for retailers to carry large inventories.  DISH first implemented

the OE Tool around 2001 to facilitate its ongoing business relationships with AT&T and

RadioShack, both independent retailers of satellite television that had brick-and-mortar

storefronts across the nation.  AT&T was effective at providing customer service, but required

DISH's installation capabilities to serve customers around the country.  The OE Tool allowed

AT&T to submit a customer's order and arrange for DISH to perform the physical installation

and set-up required to initiate service.

162.    Soon thereafter, DISH introduced the OE Tool in its marketing relationship with

RadioShack retail stores.  This proved to be a mutually beneficial arrangement for both

RadioShack and DISH, prompting DISH to make the OE Tool available to certain additional

Retailers.  The OE Tool allowed these Retailers to solicit orders nationally, as they were no

longer limited to the geographical areas in which they could provide physical installation and

setup services.

163.    The OE Tool is essentially an efficient, centralized channel for Retailers to submit

order information to DISH.

164.    DISH pays Retailers based on activations.  For example, if a Retailer submits a

customer order that is ultimately rejected by DISH, the Retailer does not get paid for that order.

165.    Around 2012, DISH transitioned from the OE Tool to a new order entry system

called Axiom.  Retailers now use the Axiom system to submit orders.

**B.      DISH's Standard Retailer Agreement and Business Rules Require Compliance with All Applicable Laws and Establish That Retailers Are Independent Contractors**

166.    The relationships between DISH and the Retailers at issue in this litigation were

governed by DISH's standard Retailer Agreement (the "Agreement" or "Retailer Agreement").

DISH entered into a Retailer Agreement with each Retailer, including OE Retailers.  All

Retailers were required to sign a Retailer Agreement in order to market and solicit orders DISH

products and services.

167.    The Retailer Agreement stated that each Retailer was an independent contractor

of DISH, and that the Retailer was not permitted, "under any circumstances, [to] hold itself out

to the public or represent that it is DISH or an employee, subcontractor, Affiliate, agent or sub-

agent of DISH or any DISH Affiliate."

168.    Additionally, the Retailer Agreement did not permit DISH to exercise day-to-day

control over the Retailers.

169.    By signing the Retailer Agreement, each Retailer agreed that it was "a non-

exclusive Authorized Retailer to market, promote and solicit orders for Programming, subject to

all of the terms and conditions of this Agreement and all Business Rules."

170.    Each Retailer further agreed "that it may hold itself out to the public as an

Authorized Retailer of [DISH] only after fulfilling, and for so long as it continues to fulfill, all of

the duties, obligations and requirements contained in this Agreement and all Business Rules."

The Retailer Agreement mandated that the Retailer operate under its own company name or a

d/b/a name registered to the Retailer.

171. DISH had the ability to establish and amend "Business Rules," which set forth standards for participation in DISH's promotional programs, as well as for the Retailer's marketing, advertisement, promotion, and solicitation of orders.

172. DISH only contracted directly with Retailers and did not contract with any third parties that Retailers may have used to market or solicit orders for DISH products and services. Indeed, the Retailer Agreement expressly prohibited Retailers from using "any independent contractors, subcontractors, Affiliates, agents or sub-agents to fulfill its obligations hereunder without [DISH]'s specific prior written consent."

173. The Retailer Agreement stated that Retailers were required to follow all applicable laws and regulations, including those applicable to telemarketing. Section 9.1 of the Retailer Agreement ("Compliance with Laws") required Retailers to "comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives, and orders (whether federal, state, municipal or otherwise) and all amendments thereto, now enacted or hereinafter promulgated." Furthermore, each Retailer acknowledged that it was "solely responsible for its compliance with all Laws that apply to its obligation under this Agreement."

174. Additionally, each Retailer agreed that it would indemnify DISH in connection with all "costs, losses, liabilities, damages, lawsuits, judgments, claims, actions, penalties, fines and expenses" relating to "the failure of Retailer to comply with, or any actual or alleged violation of, any applicable laws, statute, ordinance, governmental administrative order, rule or regulation."

175. Retailers that entered into the Retailer Agreement also entered into a Trademark License Agreement. Under the Trademark License Agreement, the Retailer agreed that it would

not hold itself out as DISH Network L.L.C. or as DISH's affiliate, and to that end, would not use any business name or domain name that could be confused with DISH Network L.L.C.

176.    The Retailer Agreement was subject to termination if a Retailer violated any state or federal laws or regulations.

177.    Under the Retailer Agreement, DISH had sole discretion to set retail prices, offer promotional programs, and determine available programming.  Retailers were prohibited from selling programming.

178.    Throughout the time period at issue in this litigation, the terms and provisions of the Retailer Agreement regarding the Retailer's independent contractor status and its obligation to comply with laws, as described above, were contained in each and every Retailer Agreement between DISH and the Retailers, with only slight, non-substantive variations in the precise language of each provision.

179.    In addition to the compliance provisions in the baseline Retailer Agreement, DISH also communicated with Retailers through written communications referred to as "Facts Blasts," "Important Notices," and "Retailer Chats," all of which were incorporated into the Retailer Agreement and Business Rules.

180.    For example, a Facts Blast from November 11, 2006 stated:  "Your [DISH] Retailer Agreement prohibits Retailers from violating any applicable laws, including federal and state marketing and telemarketing laws. . . .  The Retailer Agreement clearly provides that your relationship with [DISH] is that of an independent contractor.  Your outbound and inbound call agents MUST identify the company that they work for.  AGENTS MAY NOT SAY THAT THEY WORK FOR DISH NETWORK. . . . .  Failure to comply with the obligations in your [DISH] Retailer Agreement, applicable state and federal laws, and the cautionary statements in

this document could lead to disciplinary action against you by [DISH], up to and including termination."

181.    That Facts Blast also stated that Retailers who performed telemarketing were required, among other things, to:

> a.    subscribe to applicable federal and state Do Not Call lists;
>
> b.    maintain and keep current an internal Do Not Call list; and
>
> c.    maintain Do Not Call policies and procedures, including written employee training documents.

182.    In 2008, DISH informed Retailers through a series of Facts Blasts that, beginning on September 30, 2008, Retailers that made 600 or more calls during the preceding calendar year were (1) required to sign up with PossibleNOW; (2) begin to upload their internal do not call lists through PossibleNOW; and (3) scrub all telemarketing lists against the consolidated do not call list maintained by PossibleNOW.

## IV.    DISH'S SUPPORT AND DISCIPLINE OF RETAILERS

### A.    DISH's Retail Services Compliance Department

183.    DISH's Retail Services Department ("Retail Services") had a dedicated risk and audit team responsible for helping Retailers adhere to the Retailer Agreement and DISH's Business Rules.

184.    In 2004, Bruce Werner was hired as General Manager of the Retail Services Department Risk and Audit Team.  His job was to create and enforce business rules to identify and mitigate risks associated with new customer activations and incentive payments to Retailers. In 2004, the department was comprised of 5 people, but it has now grown to 22 employees.

185.    The Retail Services Department has an audit unit that conducts background research before DISH accepts any new Retailers.

186.     In August 2006, Reji Musso was hired as Compliance Manager of the Risk and Audit Team's compliance unit.

187.     Ms. Musso's team provided guidance to Retailers concerning their compliance with the terms of the Retailer Agreement and with federal, state, and local laws.  The team also monitored issues concerning Retailers' presale disclosures to customers and their use of DISH trademarks.  Additionally, the team was responsible for managing Retailers' access to the OE Tool by activating approved IP addresses.

188.     Retail Services cooperated with other departments at DISH in the course of managing Retailer compliance.  Ms. Musso's team worked closely with the DNC Investigation Team, the Dispute Resolution Team, the Executive Resolution Team, and the Legal Team to investigate and respond to consumer complaints.  Ms. Musso's team also frequently communicated with the sales department, which, when necessary, disseminated announcements, notices, and other information to all Retailers.  Her team also communicated with the Field Sales Development team, which reviews Retailer activities for quality and fraud.

**B.     DISH Investigated Retailers in Response to Consumer Complaints**

**1.     Responses to Consumer Complaints**

189.     DISH took seriously and investigated telemarketing complaints that were made by consumers.  DISH is in a highly competitive industry in which customer service is paramount.  Accordingly, DISH has every incentive to make sure that Retailers that market its products and services are not engaging in activities that burden or aggravate potential or current customers, and to appropriately penalize any Retailers that engage in such activity, including the possibility of termination.

190.     Whenever DISH received a complaint alleging telemarketing misconduct involving DISH, its DNC Investigation Team promptly investigated the circumstances

surrounding the call at issue.  When the call could not be linked to a DISH call center, the DNC

Investigation Team forwarded the information contained in the complaint to Ms. Musso's team

in order to determine if the call was placed by a Retailer.  Ms. Musso's team would research the

call by comparing it against the caller ID associated with the call, DISH's internal databases,

prior similar allegations, or other information the team could find using public sources.

191.    Many of these complaints did not contain enough information for Ms. Musso's

team to be able to identify the source of the call.  This difficulty was compounded by the

prevalence of third parties that used spoofed numbers or that illegally concealed their numbers

from caller ID.  Nevertheless, Retail Services kept track of every number that generated a

complaint, along with the details of all related complaints, so that if a future investigation

uncovered the responsible entity, DISH would be able to cite all past complaints related to that

entity.

192.    In 2006, DISH developed a "sting" program in an effort to apprehend the callers it

could not identify.  In this program, if a consumer complained about receiving unwanted

telemarketing calls from a caller that could not be linked to a DISH number or any known

Retailer number, the DNC Investigation Team would offer to set up a sting operation with that

consumer.  A cooperating consumer would agree to purchase programming if the wrongful caller

called again, using a credit card provided by DISH.  The consumer would then use fabricated

identifying information provided by DISH to make a purchase from the caller.  This often

allowed DISH to identify the Retailer or other party involved in the transaction by tracing the

specified information in the purchase order.

193.    Around 2008, DISH discovered that some entities were using non-DISH systems

to verify consumers' identifying information, and that the sting operations were not successful on

these types of entities. As a result, DISH developed the merchant identification program. In this program, a complaining consumer would be instructed by DISH to give the caller her real identifying information, and a credit bureau would then locate the entity that ran the consumer's credit.

194. If DISH was able to identify a Retailer as the source of the call through a sting, merchant identification, or other means, Retail Services would send a letter to the Retailer notifying it of the allegations in the consumer complaint. Generally, the letter would give the Retailer seven days to respond to the allegations. The letter requested that the Retailer provide proof of its Do Not Call compliance, details about the circumstances of the call at issue, and a recording of the call, if available.

195. Ms. Musso's team would review the response, ask for more information if necessary, and file the information in the folders that her team kept on that Retailer. Retail Services, the DRT, and/or the ERT recorded the steps of this process through a tool called the TCPA Tracker.

196. Although DISH responded to the consumers that lodged complaints and assisted them in identifying the source of the complaints, Retail Services did not typically contact the consumers on behalf of the Retailers to resolve the complaints because the Retailers are independent contractors. DISH encouraged Retailers to reach out to the consumers to get more information about their allegations, or, if the Retailers had indeed committed a violation, to offer an apology or otherwise rectify the situation.

197. In the course of its investigations, DISH discovered that consumers were not always reliable when they accused Retailers of committing telemarketing violations. For

instance, consumers would frequently misidentify whether a particular call was for telemarketing purposes or forget that they had opted in via an internet website.

198.    Retail Services reviewed the results of the investigation to determine whether any TCPA violation had been committed.  Depending on the type of infraction and the specific circumstances of the case, disciplinary measures ranged from a letter directing the Retailer to cease and desist from a certain practice, to a fine, to termination of the Retailer Agreement. Retail Services would then formally convey this business decision to the Retailer.

199.    Even if DISH did determine that a Retailer had committed a telemarketing violation, immediate termination of the Retailer was not always warranted.  For example, when DISH confronted Retailers with evidence of a violation, Retailers often credibly responded with reasonable explanations, such as a random computer glitch that had since been corrected, or that the offending call was made by a rogue employee who had subsequently been fired.  Absent evidence of bad faith, DISH would not immediately terminate Retailers at the first sign of a telemarketing violation.  The consequences for termination were significant: each Retailer employed many individuals, all of whom might lose their jobs if DISH terminated the relevant Retailer Agreement.  Instead, DISH's first step would be to work with the Retailer to fix the problems that caused the mistake, and to ensure that the Retailer used the proper controls to mitigate risk.  After this measure, DISH had the option of imposing a range of financial penalties on the Retailer, placing the Retailer on probation or hold, or ultimately terminating the Retailer.

200.    Each Retailer had rights under the Retailer Agreement, and DISH had to be certain not to engage in improper termination of the Agreement.  The Retailer Agreement contained a clause that allowed the Retailer to mediate a termination dispute and to demand

arbitration if such a mediation was unsuccessful. In many instances, terminated Retailers vigorously fought the validity of their terminations in arbitration.

201. Therefore, once DISH determined that termination was appropriate, it was important for DISH to create a strong record using all violations of the Retailer Agreement as grounds for termination. For example, the Retailer Agreement stated that a Retailer could be terminated if, by pure mathematical calculation, "the churn rate experienced by . . . Subscribers activated through Retailer is equal to or greater than 125% of the churn rate experienced by [DISH]" during a three-month period. By contrast, Retailers often disputed DISH's determination that their actions violated applicable telemarketing laws, or deflected blame on "rogue employees" or outside vendors. If DISH could include a high churn rate or additional reason as part of its basis for termination, the Retailer would have fewer grounds to dispute termination.

202. As an example, on February 25, 2009, DISH caught Apex Satellite in a sting. Ms. Musso commented that Apex continued to pop up on her radar, and said that if she did not get satisfying answers, she would recommend suspending all activation payments to the Retailers. She believed that she might have enough information to terminate Apex.

203. On March 4, 2009, Joshua Slater emailed Ms. Musso to update her regarding a meeting with Apex, noting that he told Mohammadreza "Reza" Akhavanfard, a principal of Apex, that Mr. Akhavanfard was on DISH's radar and skating on thin ice. At that meeting, Mr. Akhavanfard admitted to spoofing, and stated that he planned to continue to use pre-recorded dialing until that September. Mr. Akhavanfard also stated that he was not using PossibleNOW because PossibleNOW's criteria would hurt Apex's business model. Ms. Musso wrote back, asserting that spoofing was against the law, noting that Apex was failing to check state laws

regarding pre-recorded calls, and stating that Apex was not using PossibleNOW to scrub leads. That evening, Ms. Musso, Mr. Slater, and Robert Calbert discussed the possibility of terminating Apex.

204.   The same day, Mr. Werner spoke to Mr. Akhavanfard and informed him that DISH was suspending payments to Apex pending an investigation, due primarily to Apex's practice of spoofing numbers.  In addition, he noted that Apex had failed to respond to twelve TCPA allegations.

205.   On March 5, 2009, Mr. Calbert and Steve McElroy recommended terminating Apex as a Retailer.  Mr. Slater recommended suspending any payments immediately.  Later that day, Blake Van Emst stated that he had no issue with terminating Apex and that he wanted to put a packet together quickly outlining violations.  Bruce Werner assembled the termination package.

206.   On March 6, 2009, a DISH Executive Summary described Apex's failure to comply with federal telemarketing laws and its Retailer Agreement and Business Rules.  It explained that payments to Apex were suspended, its OE logins shut down, and its IP addresses escalated to IT Security block.  DISH continued to suspend all payments to Apex until it was terminated.

207.   The same day, Ms. Musso emailed with Marc Garitone, of Recreational Sports & Imports, Inc. ("RS&I"), one of DISH's five regional distributors, explaining that Apex's "good activations" did not justify the TCPA complaints that it generated.  On March 11, 2009, Reji followed up with an email softening her tone toward RS&I, but not retracting her concerns about Apex.

208.     On March 17, 2009, Ron Dufault, of DISH, sent the results of his investigation of Apex to Ms. Musso and Bruce Werner.  The information included telemarketing complaints associated with Apex and evidence of an Apex call center.

209.     On March 24, 2009, Mr. Akhavanfard, the CEO of Apex, emailed Jim DeFranco, complaining that Apex's initial suspension—which he believed was only for three days pending an investigation—had now gone on for over twenty days.  He asked for reinstatement of his logins for financial reasons.  Mr. DeFranco responded, "Mr. Akhavan, You should have considered the consequences when you decided to not follow proper procedures," and forwarded the message to Blake Van Emst.  DISH terminated Apex that day.

### 2.     Responses to Escalated Consumer Complaints

210.     Occasionally, under certain circumstances, DISH escalated consumer complaints. In those cases, Ms. Musso would coordinate with the Sales Department to send a Partner Order Entry ("POE") notice to all OE Retailers.  Retailers were instructed to stop calling the telephone numbers on the POE notice and to put those numbers on their internal DNC lists immediately, regardless of whether a Retailer could legally call that number.

211.     Ms. Musso testified that no more than 70 individuals had been placed on a POE notice from the time she became Retail Services Compliance Manager in August 2006 until her deposition in March 2011.

### C.     DISH Provided Retailers with Resources So They Could Meet Compliance Obligations

#### 1.     DISH's Efforts to Educate Retailers Regarding Telemarketing Compliance

212.     DISH frequently reminded Retailers of their obligations under the Retailer Agreement and under state and federal telemarketing laws.

213.     Representatives from DISH's compliance team provided training and education about key terms of the Retailer Agreement at retailer development forums that took place throughout the United States several dozen times a year, as well as regularly occurring webinars.

214.     These retailer development forums were generally sponsored by DISH's Direct Sales group, which set up discussions with groups of Retailers on a variety of topics, including audit and compliance issues.  DISH's compliance team attended six to eight of these types of events a year, providing training on compliance with the Retailer Agreement, including (depending upon what issues were current) "everything from TCPA, trademark license agreement issues, use of third parties, approval for use of third parties, those sort[s] of things."

215.     DISH also suggested that PossibleNOW reach out to Retailers to offer trainings in compliance with federal and state telemarketing laws and explain its product offerings.  DISH encouraged Retailers to use the DNC Solutions tool offered through PossibleNOW, which offered cost savings as compared to Retailers implementing their own internal solutions.  This tool allowed Retailers to easily access the federal and state Do Not Call lists.

216.     In 2009, DISH launched its Quality Assurance ("QA") program, which required Retailers to upload a certain percentage of their calls every week to DISH for quality evaluation. DISH evaluated these recorded calls based on over fifty metrics, including whether the Retailer was properly identifying itself on the call and not representing that it was DISH, and whether the correct disclosures were given.  DISH's internal QA manual also noted the existence of the TCPA and state telemarketing laws, and that Retailers should be familiar and adhere to all applicable laws.  As a cautionary tale, the manual listed the various Retailers that DISH had terminated recently due to telemarketing violations.

217.     Through this program, DISH also interacted with Retailers on-site to observe and evaluate their practices.  DISH used these evaluations to give feedback to the Retailers so that they could ensure that the customers were receiving accurate information.

## 2.     DISH's Efforts to Stop the Use of Unauthorized Third Party Affiliates

218.     The Retailer Agreement prohibited Retailers from using unauthorized affiliates or subagents to market and solicit orders for DISH products and services.

219.     On July 10, 2002, DISH sent Retailers a Facts Blast with an important "clarification" that expressly noted that Retailers were prohibited by their Retailer Agreements from hiring or using third parties, independent contractors, agents, sub-agents, companies, or any other person or entity—including telemarketers—to solicit, take or transmit any orders for DISH products or services.

220.     DISH would remind Retailers of this policy from time to time.  For example, on June 17, 2007, DISH sent Retailers another Facts Blast reminding them that the Retailer Agreement prohibited them from using any independent contractors, affiliates, subagents, or others not employed by the Retailer without DISH's written consent, and that unauthorized use of such third parties constituted a breach of the Agreement that could result in termination.

221.     On September 9, 2008, DISH sent Retailers a Facts Blast regarding the use of foreign-based affiliates, call centers, agents, subcontractors, or other partners to generate leads or market products for DISH Network.  The Facts Blast reminded Retailers that DISH prohibited the use of these foreign-based affiliates and intended to strictly enforce this policy.

222.     Because unauthorized affiliates were often the source of telemarketing violations, DISH made efforts to identify Retailers who used unauthorized affiliates, conditioning access to the OE Tool on Retailers' cooperation in identifying each affiliate used and setting forth standards to govern appropriate affiliate relationships.  DISH kept a record of the affiliates it

consented to Retailers using as well as the affiliates it rejected, to make it more difficult for rejected affiliates to work with a different Retailer. DISH also terminated Retailers based on their use of affiliates that caused telemarketing violations.

223. For example, in 2008, in response to consumer complaints, DISH investigated Retailer i-Satellite for violations of the TCPA, noting that i-Satellite did not have appropriate control over the actions of its affiliates. As part of the investigation, DISH required i-Satellite to submit a list of all the affiliates it employed in the preceding 2 years, strategies to manage affiliate relationships, responses to each TCPA complaint, and strategies to stop such complaints. Following this exchange, i-Satellite stated that it would have all violations eliminated within 45 days, and that it would be the "lead generator" for all of its call centers and have "direct control of all of our offices."

224. In connection with i-Satellite's TCPA violations, in October 2008, DISH fined i-Satellite $21,250. It also invited i-Satellite to a training on TCPA and disclosures. The next month, both Mike Mills and Ms. Musso rejected i-Satellite's attempts to blame a former affiliate for calls generating TCPA complaints, insisting that the onus was on i-Satellite to resolve the issue. In February 2009, following the completion of its full investigation, DISH terminated i-Satellite.

## V. INDIVIDUAL RETAILERS AT ISSUE

### A. Star Satellite

#### 1. DISH's Relationship with Star Satellite

225. Beginning in 2002, Walter Myers operated a DISH Full Service Retailer called Tenaya Marketing ("Tenaya"), which marketed DISH products and services door-to-door, as well as via newspapers and mailers during the summers.

226.     Due to Tenaya's high "churn rate" (cancellations after activation, which resulted in increased costs), Mr. Myers concocted a plan to form a new company through which to market DISH products.

227.     To execute this plan, Daniel Myers, the brother of Walter Myers, formed Star Satellite LLC in 2003 and applied to be a Retailer.  Due to Walter Myers' concern that DISH would not approve any application he submitted because of his previous churn rate with Tenaya, the application did not make any mention of Walter Myers' possible involvement.  Nevertheless, Walter Myers took over the company immediately after its formation.

228.     Star Satellite did not work directly with DISH.  Rather, RS&I managed its account.

229.     Star Satellite signed a Retailer Agreement with DISH that provided, among other things, that Star Satellite would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement.

230.     Pursuant to the terms of the Retailer Agreement, "[t]he relationship of the parties [i.e., Star Satellite and DISH] is that of independent contractors. [Star Satellite] shall conduct its business as an independent contractor, and all persons employed in the conduct of such business shall be [Star Satellite's] employees only, and not employees or agents of [DISH] or its Affiliates."

231.     The Retailer Agreement prohibited Star Satellite from using "any independent contractors, subcontractors, Affiliates, agents, or sub-agents to fulfill its obligations hereunder without [DISH's] specific prior written consent."

232.     The Retailer Agreement required Star Satellite to "prominently state its business name, address and phone number in all communications with the public," and prohibited Star

Satellite from "hold[ing] itself out to the public or represent[ing] that it is an agent, employee, subcontractor or Affiliate" of DISH.

233.    The Agreement also provided that Star Satellite "shall comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives and orders (whether federal, state, municipal, or otherwise) and all amendments thereto, now enacted or hereafter promulgated (hereinafter 'Laws'), and [Star Satellite] is solely responsible for its compliance with all Laws that apply to its obligations under this Agreement."

234.    DISH did not control the manner or means by which Star Satellite marketed or solicited orders for DISH products or services.

235.    When Star Satellite was engaged in door-to-door marketing, DISH did not tell it where to market.

236.    As a Retailer, Star Satellite had extensive autonomy. It was up to Star Satellite, and not DISH, to decide the details of when and how Star Satellite marketed DISH's products and services, regardless of whether such marketing involved door-to-door marketing, or newspaper, radio, or television advertisements, so long as it was legal.

237.    Star Satellite had the sole discretion to decide which mode of marketing to use, so long as it was legal. Under the Retailer Agreement, Star Satellite was not authorized to engage in any illegal marketing activities.

238.    DISH provided Star Satellite with various suggestions regarding inbound scripts and disclaimers, but Mr. Myers rejected most of them because he believed that he was more skilled at marketing than DISH.

239.     When Star Satellite's contractors marketed DISH's products and services, they would always identify themselves as individuals who worked for Star Satellite, as opposed to for DISH.

240.     DISH did not provide any lists of customers or referrals to Star Satellite.

241.     Star Satellite was free to, and did, market the goods and services of other companies, including DISH's competitors.  For instance, Star Satellite also marketed the products and services of DirecTV.

242.     In April 2005, Star Satellite officially became an OE Retailer.

243.     Star Satellite was free to decide how many people on its staff it would utilize to market DISH's products and services.

244.     Star Satellite chose the manner and means by which it compensated and disciplined its employees.

245.     Star Satellite kept its own financial books and records and filed its own taxes.

## 2.     DISH Had No Knowledge of Star Satellite's Illegal Telemarketing Practices

246.     The Court granted the United States partial summary judgment on Count III under TSR 310.4(b)(1)(iv) for 43,100,876 prerecorded calls that Star Satellite placed from July 30, 2005 to November 26, 2005.  The United States claims that all of Star Satellite's violative calls were placed by Guardian Communications ("Guardian").  DISH did not know, nor could it have reasonably known, that these calls were being made.  In fact, Star Satellite actively hid the true nature of its marketing efforts from DISH.

247.     While operating Tenaya, Mr. Myers told Regina Thomson of RS&I that he was marketing DISH products and services door-to-door.  Mr. Myers did not tell Ms. Thomson anything about the possibility of using telemarketing.

248.     Initially, Star Satellite, like Tenaya, primarily marketed DISH products and services door-to-door in Los Angeles, Phoenix, Sacramento, and San Francisco.  As he did during his time with Tenaya, Mr. Myers discussed Star Satellite's primary business of marketing DISH products and services door-to-door with Ms. Thomson.  However, while he was at Star Satellite, Mr. Myers also acknowledged trying to avoid Ms. Thomson's calls because he believed that she was upset with him for concealing his involvement in the creation of Star Satellite.

249.     When Mr. Myers applied for DISH's Order Entry program, DISH asked Mr. Myers to lay out his marketing plan.  Mr. Myers responded that Star Satellite was going to do "some mailers and some phone sales but mostly mailers."  Mr. Myers purposely downplayed the volume of phone calls that Star Satellite planned to engage in because he thought that if DISH knew Star Satellite was conducting extensive telemarketing, DISH would impose additional regulations on Star Satellite.

250.     In May 2004, unbeknownst to and unauthorized by DISH, Star Satellite entered into an agreement with Guardian to make marketing calls by transmitting prerecorded messages. Star Satellite did not have a written contract with Guardian because they had the "kind of relationship" where Guardian "knew [Star Satellite] was going to pay."

251.     Guardian scrubbed its lists against the National Registry, state Do Not Call lists, the cell phone lists, and the National Registry again.  Star Satellite also maintained an internal DNC list, which it compiled and sent to Guardian.

252.     Mr. Myers never disclosed to DISH that Star Satellite was telemarketing its products and services by using prerecorded messages, or that Star Satellite used Guardian to deliver those prerecorded messages.  Mr. Myers kept his marketing methods concealed from

DISH because he thought they constituted a trade secret that distinguished Star Satellite from its competitors. In fact, Mr. Myers regarded DISH itself as one of Star Satellite's competitors.

253. Mr. Myers testified that DISH did not have "any idea that [Star Satellite] was using Guardian or even doing auto dialing," and that DISH "would never have any idea about who Guardian was."

254. After Mr. Myers informed DISH that Star Satellite would be engaging in some phone marketing, DISH asked Star Satellite repeatedly whether it was complying with the Do Not Call list, and Star Satellite assured DISH that it was.

255. DISH representatives visited Star Satellite's call centers on a number of occasions to provide various training and advice. As Mr. Myers testified, an outside observer touring the Star Satellite call center would not have known that Star Satellite was making any outbound calls because, due to its system of prerecorded messages, all the calls appeared as if they were inbound.

256. At the beginning of Guardian's relationship with Star Satellite, Kevin Baker of Guardian informed Mr. Myers that DISH did not allow Retailers to use autodialers—a term he used to mean voice broadcasting. It was "a well-known fact" that DISH could terminate a Retailer relationship if it learned that a Retailer used auto dialing. Mr. Baker, however, was not aware that prerecorded telemarketing messages violated the law. Guardian screened all of its clients' proposed prerecorded messages for illegal content and scrubbed all calling lists against all state and national Do Not Call lists.

257. As a result, on at least two occasions when DISH representatives were scheduled to visit Star Satellite's offices, Mr. Myers contacted Guardian to advise that it was temporarily

ceasing its telemarketing activities because "DISH Network is coming into our office and we can't let them know we're auto dialing."

258.     When DISH asked how Star Satellite's orders increased between 2004 and 2005, Mr. Myers responded that Star Satellite was "doing a lot of phone sales" without disclosing the process to DISH or providing any further details.

259.     Even after Mr. Myers began receiving complaints, he did not want DISH to know how Star Satellite was marketing its products and services.

260.     On October 25, 2005, Amir Ahmed, then DISH's vice president of sales, emailed Star Satellite and cautioned Mr. Myers about "the methods you are using to market the types of customers you are bringing to us."  He emphasized that it was "not all about huge sales but rather quality customers."

261.     On October 25, 2005, Mr. Ahmed faxed a letter to Star Satellite regarding an inquiry DISH received from a Michigan Congressman regarding Star Satellite's telemarketing activities.  Mr. Ahmed stated that "your EchoStar Retailer Agreement . . . . require[s] that you not engage in any activity or business transaction which would be considered unethical or damaging . . . and that you comply with all applicable laws (Section 9.1). Failure to comply with applicable laws will result among other things in the termination of the Retailer Agreements (Section 10.4)."  Mr. Ahmed copied Randy Anderson of RS&I on the fax.

262.     In November 2005, Guardian received a Civil Investigation Demand from the FTC and informed Star Satellite.  Within a few days, Star Satellite shut down its call center and stopped making any telemarketing calls.

263.     On January 20, 2006, DISH terminated Star Satellite's access to the OE Tool.

264.     Star Satellite is no longer a DISH Retailer.

**B.** **Dish TV Now**

     **1.** **DISH's Relationship with Dish TV Now**

265.    In 2003, David Hagen founded Dish TV Now and applied to become a Retailer. In November 2003, Dish TV Now became an OE Retailer.

266.    Dish TV Now signed a Retailer Agreement with DISH that provided, among other things, that Dish TV Now would "market, promote and solicit orders for" DISH programming services subject to the terms of the Agreement.

267.    Pursuant to the terms of the Retailer Agreement, "[t]he relationship of the parties [i.e., Dish TV Now and DISH] is that of independent contractors. [Dish TV Now] shall conduct its business as an independent contractor, and all persons employed in the conduct of such business shall be [Dish TV Now's] employees only, and not employees or agents of [DISH] or its Affiliates."

268.    The Retailer Agreement prohibited Dish TV Now from using "any independent contractors, subcontractors, Affiliates, agents, or sub-agents to fulfill its obligations hereunder without [DISH's] specific prior written consent."

269.    The Retailer Agreement required Dish TV Now to "prominently state its business name, address and phone number in all communications with the public," and was prohibited from "hold[ing] itself out to the public or represent[ing] that it is an agent, employee, subcontractor or Affiliate" of DISH.

270.    The Agreement also provided that Dish TV Now "shall comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives and orders (whether federal, state, municipal, or otherwise) and all amendments thereto, now enacted or hereafter promulgated (hereinafter 'Laws'), and [Dish TV Now] is solely responsible for its compliance with all Laws that apply to its obligations under this Agreement."

271.     DISH did not tell Dish TV Now how to operate on a day-to-day basis.  To the

contrary, Mr. Hagen had decision-making authority over the day-to-day affairs of Dish TV Now.

272.     Dish TV Now chose the manner and means by which it compensated and

disciplined its employees.

273.     Dish TV Now decided on its own, without consulting or receiving authorization

from DISH, whether and when to use a third-party vendor for its marketing.

274.     Dish TV Now kept its own financial books and records and filed its own taxes.

275.     DISH did not instruct Dish TV Now concerning how it should market DISH's

products.

276.     DISH did not provide any lists of customers or referrals to Dish TV Now.

277.     Dish TV Now never advised DISH concerning which consumers Dish TV Now

was going to contact to attempt to market DISH's products and services.

278.     Dish TV Now's agents identified themselves to consumers as representatives of

Dish TV Now, not as representatives of DISH.

279.     Dish TV Now was free to market the goods and services of any other companies

that it chose, including DirecTV.

> **2.     DISH Had No Knowledge of Dish TV Now's Illegal Telemarketing Practices.**

280.     The Court granted the United States partial summary judgment on Count III under

TSR 310.4(b)(1)(iv) for 6,637,196 prerecorded calls that Dish TV Now placed from June 2004 to

August 2004.  DISH did not know, nor could it have reasonably known, that these calls were

being made.

281.     The Court granted DISH partial summary judgment on Count IV under TSR

310.3(b) based on its finding that DISH did not know or avoid knowing that Dish TV Now was

placing prerecorded calls, and DISH did not continue to pay Dish TV Now to make abandoned calls.

282.     At the outset, Dish TV Now represented to DISH that its "primary objective would be for television sales—television advertising." Dish TV Now described its business model to DISH as "essentially a call center utilizing various forms of marketing to generate inbound calls," or "a marketing organization [that] generates calls to a call center."

283.     Dish TV Now ran advertisements on national television networks, radio, and newspapers to market DISH services and products. These marketing methods successfully generated inbound calls to Dish TV Now's call centers.

284.     In 2004, several upper level DISH employees visited Dish TV Now's facilities in North Carolina and were treated to tours showing Dish TV Now's technological capabilities and high-quality commercials. They also observed employees at Dish TV Now's call centers taking inbound calls supposedly generated by these marketing strategies.

285.     DISH did not know which marketing method yielded the DISH customers generated by Dish TV Now. Indeed, Dish TV Now specifically refused to provide DISH with the origin of any customer it submitted because Dish TV Now considered that information proprietary, and considered DISH to be a competitor.

286.     Dish TV Now represented to DISH that Dish TV Now had "a list of over five million past and current customers that we scrub against the Do Not Call List. In addition, we maintain a Dish TV Now Do Not Call List. Any customer who wishes to opt out on future solicitations is immediately added to the list. Dish TV [Now] fully complies with the TCPA."

287.     Dish TV Now had its own subscription to the National Registry.

288.     Dish TV Now maintained a policy for telemarketing compliance, and scrubbed its calling lists against the National Registry and its internal list.

289.     On June 15, 2004, unbeknownst to and unauthorized by DISH, Dish TV Now entered into a "Voice Messaging Agreement" with Guardian to facilitate its marketing plan.

290.     Each week, Dish TV Now generated tens of thousands of phone calls to its call centers through its advertising efforts.  When these consumers called in to express an interest in DISH products, Dish TV Now was able to solicit orders for satellite services from 80% of the consumers during that call.  It would re-contact the remaining 20% to "take another bite at the apple."  Because it had not yet set up its own calling system, it gave this calling list to Guardian.

291.     Although Mr. Hagen was aware that Guardian would place prerecorded calls on behalf of Dish TV Now, he believed that Dish TV Now "had a right to contact [its] customers."

292.     Dish TV Now represented to DISH that Dish TV Now did not leave answering machine messages and that its dialer "only connects live customers to a live DISH TV Now agent."

293.     Guardian made calls for Dish TV Now between June 2004 and August 2004.  All of the Dish TV Now calls identified by Plaintiffs as being violative were placed by Guardian during this time period.  After August 2004, Guardian stopped making calls for Dish TV Now because it stopped receiving payment.

294.     Guardian scrubbed its lists against the National Registry, state Do Not Call lists, the cell phone lists, and the National Registry again.

295.     Guardian was never a Retailer, and never had any relationship whatsoever with DISH.  DISH never contracted with Guardian to place telemarketing calls on its behalf.

296.     DISH did not receive notice that Dish TV Now used prerecorded calls before Dish TV Now stopped the practice on August 10, 2004.  By the time a DISH representative visited Dish TV Now facilities in August 2004 and delivered a warning that it must comply with Do Not Call laws, Dish TV Now had stopped placing prerecorded calls.

297.     On September 16, 2004, DISH informed Dish TV Now that DISH was "not interested in" Dish TV Now engaging in marketing "using predictive dialers and leaving messages" in its marketing of DISH products and services, and that DISH was "receiving complaints on [Dish TV Now] doing just this type of marketing."

298.     In response, Dish TV Now represented to DISH that it used a dialer only to make "outbound calls to consumers who have previously inquired with us about satellite TV service or [who] are current Dish TV Now Network customers."

299.     On January 20, 2006, DISH terminated Dish TV Now as a Retailer.

**C.      JSR Enterprises**

**1.      DISH's Relationship with JSR Enterprises**

300.     JSR Enterprises ("JSR") became a Retailer in April 2006.  In August 2006, JSR officially became an OE Retailer.

301.     JSR signed a Retailer Agreement with DISH that provided, among other things, that JSR would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement.

302.     Pursuant to the terms of the Retailer Agreement, "[t]he relationship of the parties [i.e., JSR and DISH] is that of independent contractors. [JSR] shall conduct its business as an independent contractor, and all persons employed in the conduct of such business shall be [JSR's] employees only, and not employees or agents of [DISH] or its Affiliates."

303.     The Retailer Agreement prohibited JSR from using "any independent contractors, subcontractors, Affiliates, agents, or sub-agents to fulfill its obligations hereunder without [DISH's] specific prior written consent."

304.     The Retailer Agreement required JSR to "prominently state its business name, address and phone number in all communications with the public," and was prohibited from "hold[ing] itself out to the public or represent[ing] that it is an agent, employee, subcontractor or Affiliate" of DISH.

305.     The Agreement also provided that JSR "shall comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives and orders (whether federal, state, municipal, or otherwise) and all amendments thereto, now enacted or hereafter promulgated (hereinafter 'Laws'), and [JSR] is solely responsible for its compliance with all Laws that apply to its obligations under this Agreement."

306.     DISH did not control the manner or means by which JSR marketed or solicited orders for DISH products or services.

307.     JSR frequently confirmed that DISH did not control the manner in which JSR marketed DISH products or services.  JSR also confirmed that because of this, it would indemnify DISH for all claims resulting from those marketing practices.

**2.      DISH Had No Knowledge of JSR's Illegal Telemarketing Practices**

308.     The Court granted the United States partial summary judgment on Count I under TSR 310.4(b)(1)(iii)(B) for 2,349,031 calls that JSR made to numbers on the Registry from August 2006 to December 2006.

309.     Plaintiffs also claim that DISH is liable for causing JSR to abandon an unspecified number of prerecorded calls.

310.    When JSR first started marketing for DISH, its principals stated they would only engage in outbound marketing from JSR's calling center in the United States. They did not disclose the use of any third-party call centers.

311.    This Court found that beginning in September 2006, DISH began receiving consumer complaints about telemarketing calls to telephone numbers on the Registry and about prerecorded calls, both which were ultimately traced to JSR Enterprises.

312.    DISH investigated these complaints and sought to verify their accuracy. In each instance that DISH sought an explanation or justification from JSR, it offered a legitimate explanation or stated that an inadvertent error had occurred that would immediately be rectified.

313.    For instance, between September and December 2006, DISH received a few complaints regarding JSR's telemarketing practices. DISH's investigation determined it was not JSR, but other third-party entities, that were responsible for making those calls.

314.    During the same time period, JSR was implicated in two stings between September and December 2006. Both of these calls—according to DISH's investigation—stemmed from a third-party affiliate call center that JSR hid from DISH. JSR informed DISH that it was not aware of DISH's policy that required it to disclose its third-party call centers. Nevertheless, JSR terminated that third-party call center within a week of speaking with DISH.

315.    In January 2007, the Attorney General of Louisiana notified JSR and DISH of five additional complaints linked to JSR. In response to DISH's and the AG's inquiries, JSR conducted an investigation. JSR consistently maintained that it was taking steps to ensure compliance with the law, and that any complaints were the result of error. Furthermore, JSR provided assurances that it would ensure compliance in the future and acknowledged that it would indemnify DISH for these complaints if needed. JSR also stated that DISH was not

responsible for any telemarketing violations committed by JSR because DISH did not control JSR's operations.

316.    In February 2007, DISH discovered through a press release from the Attorney General of Missouri, dated December 7, 2006, that the State of Missouri had obtained a temporary restraining order against JSR to enjoin it from calling Missouri residents.

317.    DISH terminated JSR's Retailer Agreement days later, on or about February 13, 2007, due to JSR's unlawful telemarketing practices.

**D.       National Satellite Systems**

       **1.       DISH's Relationship With National Satellite Systems**

318.    Kobi Levi formed National Satellite Systems in 2005.

319.    In 2005, National Satellite Systems became a Retailer.  In 2006, National Satellite Systems became an OE Retailer.

320.    National Satellite Systems signed a Retailer Agreement on December 31, 2006, which provided, among other things, that National Satellite Systems would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement.

321.    Pursuant to the terms of the Retailer Agreement, "[t]he relationship of the parties [i.e., National Satellite Systems and DISH] is that of independent contractors. [National Satellite Systems] shall conduct its business as an independent contractor, and all persons employed in the conduct of such business shall be [National Satellite Systems'] employees only, and not employees or agents of [DISH] or its Affiliates."

322.    The Retailer Agreement prohibited National Satellite Systems from using "any independent contractors, subcontractors, Affiliates, agents, or sub-agents to fulfill its obligations hereunder without [DISH's] specific prior written consent."

323.    The Retailer Agreement required National Satellite Systems to "prominently state its business name, address and phone number in all communications with the public," and was prohibited from "hold[ing] itself out to the public or represent[ing] that it is an agent, employee, subcontractor or Affiliate" of DISH.

324.    The Agreement also provided that National Satellite Systems "shall comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives and orders (whether federal, state, municipal, or otherwise) and all amendments thereto, now enacted or hereafter promulgated (hereinafter 'Laws'), and [National Satellite Systems] is solely responsible for its compliance with all Laws that apply to its obligations under this Agreement."

325.    As a general matter, DISH did not authorize OE Retailers to use offshore call centers.  However, DISH allowed National Satellite Systems to use an offshore call center in India based on DISH's belief that National Satellite Systems was the owner-operator of the Indian call center.

326.    National Satellite Systems alone decided, without consulting DISH, what forms of marketing it wanted to use to solicit orders for DISH's products and services.

327.    National Satellite Systems was free to market the goods of other companies, including DISH competitors.  For instance, National Satellite Systems also marketed DirecTV products and services.

328.    DISH did not provide lead lists or dial lists to National Satellite Systems. National Satellite Systems did not have to submit its dial lists to DISH, nor did DISH review those lists before National Satellite Systems reached out to consumers.

329.    Other than prohibiting illegal activities through the Retailer Agreement, DISH did not choose the marketing methods that National Satellite Systems employed.

330.     National Satellite Systems' agents identified themselves to consumers as representatives of National Satellite Systems, not as representatives of DISH.

331.     National Satellite Systems chose the manner and means by which it compensated and disciplined its employees.

332.     National Satellite Systems kept its own financial books and records, filed its own tax returns, and did not share its records with DISH.

333.     DISH did not control National Satellite Systems' phone systems, or its choice of vendors.

### 2.     DISH Had No Knowledge of National Satellite Systems' Illegal Telemarketing Practices

334.     Plaintiffs allege that DISH should be liable on Count II under TSR 310.4(b)(1)(iii)(A) for 222,700 calls that National Satellite Systems made to numbers on DISH's Do Not Call List and the Retailers' Do Not Call List.  DISH did not know, nor could it have reasonably known, during that time period that National Satellite Systems made those calls.

335.     In order to become an OE Retailer, National Satellite Systems sent DISH a business proposal on November 16, 2006.   In its proposal, National Satellite Systems stated that it "prides itself in ensuring adherence to all marketing laws and regulatory requirements. . . . NSS does not engage in any illegal, objectionable, inappropriate or forbidden marketing activities.  NSS complies with all Federal, State, and local laws including DNC lists . . . ."  It also touted its "compliance training," which "integrates state mandated, federally mandated (TCPA) and internal 'do-not-call' procedures.  This training includes the enforcement of a company policy regarding DNC procedures and guidelines."

336.     When it accepted National Satellite Systems as an OE Retailer, DISH did not know that National Satellite Systems would be performing outbound telemarketing calls.  DISH

did approve National Satellite Systems' use of a third-party call center in India, because National Satellite Systems represented to DISH that it owned and operated that call center.

337.     National Satellite Systems had detailed written procedures regarding its Do Not Call policy, including standard operating procedures.

338.     Initially, Mr. Levi conducted telephonic trainings for every agent at the India call center.  After a period of time, however, dedicated trainers performed such training on-site in India.  DISH transmitted some suggested training materials to National Satellite Systems through email.

339.     National Satellite Systems scrubbed its dialing lists against the Registry.

340.     By 2006, National Satellite Systems maintained an entity-specific DNC list. Around 2008, National Satellite Systems began uploading its entity-specific list to PossibleNOW and scrubbing its call lists against the PossibleNOW Do Not Call lists.

341.     National Satellite Systems did not make prerecorded phone calls.  Other than a brief period in 2008, all of the calls were inbound calls to National Satellite Systems or calls placed by National Satellite Systems to consumers who opted in to receive telemarketing calls from its website.

342.     National Satellite Systems also regularly made follow-up calls to consumers for whom it placed orders for DISH products and services, to check in on the installation process and customer satisfaction.

343.     In May 2008, Ms. Musso received information as part of an investigation that National Satellite Systems was tied to a telemarketing complaint attributed to an entity called "Satellite Promotions."  Ms. Musso concluded that "Satellite Promotions" had broken a number of TCPA laws, but she and her team were unable to confirm the link between "Satellite

Promotions" and National Satellite Systems. Nevertheless, Ms. Musso's team authorized imposing a financial penalty on National Satellite Systems, and shifted the burden of proof to National Satellite Systems to prove that any future complaints linked to Satellite Promotions were not caused by National Satellite Systems.

344.     Between 2008 and 2010, as part of its due diligence, National Satellite Systems took a number of steps to improve its compliance and customer service. In November 2008, National Satellite Systems hired a new quality manager to implement improvements in error trends in internet leads and other areas.

345.     In April 2009, National Satellite Systems evaluated its process of calling customers after taking that customer's order to ensure that the customer was satisfied with the service. Even though they were not telemarketing calls, National Satellite Systems recognized that they generated a number of customer complaints. To address this, National Satellite Systems limited the number of calls the customer would receive.

346.     As another example, that same month, National Satellite Systems informed DISH that it was building a "live barging/coaching department" that would listen to calls made by agents and review any customer concerns or complaints.

347.     In June 2009, Ms. Musso reminded National Satellite Systems that it should still scrub call lists generated from internet opt-ins against its entity-specific do not call list. National Satellite System responded that it did scrub all call lists against its entity-specific do not call list.

348.     In 2010, National Satellite Systems confirmed to Ms. Musso that it was uploading its entity-specific do not call list to PossibleNOW. Further inquiry revealed that due to an error, National Satellite Systems was actually uploading its do not call list to its own account, and not to DISH's account.

349.     In response to DISH inquiries, National Satellite Systems immediately provided explanations for the violations and took corrective measures to avoid any future infractions. Often, National Satellite Systems was able to provide screenshot proof that the consumer that it called had opted in through its website to receive those calls.  National Satellite Systems also provided proof that going forward, the consumer would be placed on its internal do not call list.

350.     National Satellite Systems is still an OE Retailer with a small call center staffed with approximately six agents, a decline from over twenty agents in 2010.

E.     **Satellite Systems Network**

1.     **DISH's Relationship with SSN**

351.     Satellite Systems Network ("SSN") was an independent company whose principal was Alex Tehranachi.

352.     On March 20, 2001, SSN became a Retailer.

353.     SSN signed a Retailer Agreement with DISH on March 27, 2001 that provided, among other things, that SSN would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement.

354.     Pursuant to the terms of the Retailer Agreement, "[t]he relationship of the parties [i.e., SSN and DISH] is that of independent contractors. [SSN] shall conduct its business as an independent contractor, and all persons employed in the conduct of such business shall be [SSN's] employees only, and not employees or agents of [DISH] or its Affiliates."

355.     The Retailer Agreement prohibited SSN from using "any independent contractors, subcontractors, Affiliates, agents, or sub-agents to fulfill its obligations hereunder without [DISH's] specific prior written consent."

356.     The Retailer Agreement required SSN to "prominently state its business name, address and phone number in all communications with the public," and was prohibited from

"hold[ing] itself out to the public or represent[ing] that it is an agent, employee, subcontractor or Affiliate" of DISH.

357.    The Agreement also provided that SSN "shall comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives, and orders (whether federal, state, municipal, or otherwise) and all amendments thereto, now enacted or 'hereafter promulgated (hereinafter 'Laws'), and [SSN] is solely responsible for its compliance with all Laws that apply to its obligations under this Agreement."

358.    SSN was free to market the products of other companies, including DISH's competitors.  For instance, it also solicited orders for DirecTV.

359.    On December 31, 2004, SSN became an OE Retailer.

## 2.      DISH Had No Knowledge of SSN's Illegal Telemarketing Practices

360.    The Court granted the United States partial summary judgment on Count I under TSR 16 CFR § 310.4(b)(1)(iii)(B) for 381,811 calls that SSN made to numbers on the Registry. Plaintiffs allege that DISH should be held liable on Count II under TSR 310.4(b)(1)(iii)(A) for 65,936 calls that SSN made to numbers on DISH's DNC list.  DISH did not know, nor could it have reasonably known, during that time period that SSN was making these calls to numbers on the Registry or to DISH's DNC list.   The Court denied the State Plaintiffs summary judgment against DISH on Count V under TCPA 47 USC § 227(c) for calls placed by SSN.

361.    In early 2002, DISH traced a prerecorded call to SSN.  Both DISH and SSN agreed that they did not know of any state or federal law that prohibited prerecorded messages. The call itself was made by Vector Marketing.

362.    In June 2004, SSN told DISH that 20% of its business was comprised of telemarketing, and that this figure would be reduced in the next six months to less than 1%

telemarketing as SSN was moving its marketing channels to TV, newspaper, and direct mail campaigns.

363.    SSN represented to DISH that it used several marketing companies to purchase new homeowner leads, and that it used telemarketing and direct mail to close the leads.

364.    In March 2005, SSN entered into a consent judgment with North Carolina.  As part of the consent judgment, SSN agreed to send regular compliance reports to North Carolina.

365.    On September 26, 2005, Scott Novak, DISH Corporate Counsel, stated his view that SSN's use of "autodialers and automessages . . . could violate the law."  DISH agreed to put SSN on probation.

366.    On November 29, 2005, Mike Oberbillig, DISH Director of Sales, instructed Mr. Tehranachi, "Your team MUST stop representing themselves as DISH Network."

367.    By 2007, overall complaints regarding SSN decreased dramatically.

368.    In 2008, SSN confirmed to DISH that it was using PossibleNOW to scrub its calling lists, and that it did training with PossibleNOW as well.

369.    Subsequently, SSN regularly re-confirmed and presented evidence to DISH that it was using PossibleNOW to scrub its calling lists.

370.    On May 4, 2010, without DISH's knowledge or consent, SSN entered into a contract with Five9, a dialing company, to place outbound calls.

371.    In 2012, SSN terminated its contract with Five9.

372.    SSN is no longer a DISH Retailer.

**F.**    **American Satellite**

      **1.**    **DISH's Relationship with American Satellite**

373.    In 2005, Todd DiRoberto formed American Satellite, Inc., and in September of that year, American Satellite became a Retailer.

374.     In October 2005, American Satellite signed a Retailer Agreement with DISH that provided, among other things, that American Satellite would "market, promote and solicit orders for" DISH programming services, subject to the terms of the Agreement.

375.     Pursuant to the terms of the Retailer Agreement, "[t]he relationship of the parties [i.e., American Satellite and DISH] is that of independent contractors. [American Satellite] shall conduct its business as an independent contractor, and all persons employed in the conduct of such business shall be [American Satellite's] employees only, and not employees or agents of [DISH] or its Affiliates."

376.     The Retailer Agreement prohibited American Satellite from using "any independent contractors, subcontractors, Affiliates, agents, or sub-agents to fulfill its obligations hereunder without [DISH's] specific prior written consent."

377.     The Retailer Agreement required American Satellite to "prominently state its business name, address and phone number in all communications with the public," and was prohibited from "hold[ing] itself out to the public or represent[ing] that it is an agent, employee, subcontractor or Affiliate" of DISH.

378.     The Agreement also provided that American Satellite "shall comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives and orders (whether federal, state, municipal, or otherwise) and all amendments thereto, now enacted or hereafter promulgated (hereinafter 'Laws'), and [American Satellite] is solely responsible for its compliance with all Laws that apply to its obligations under this Agreement."

379.     In 2006, American Satellite became an OE Retailer.

380.     American Satellite used the same system to solicit orders for DirecTV products or services as it did to solicit orders for DISH's products and services.

381.     There is no evidence that DISH controlled the manner or means in which American Satellite marketed or solicited orders for DISH's products or services.

### 2.     DISH Had No Knowledge of American Satellite's Illegal Telemarketing Practices

382.     The Court granted the United States partial summary judgment on Count III under TSR § 310.4(b)(1)(iv) for one prerecorded call American Satellite made to Robert Parker in 2006.

383.     American Satellite hired third parties without DISH's knowledge or consent, in violation of the Retailer Agreement, to screen and pre-qualify any prospective customers.  As part of American Satellite's telemarketing campaign, an autodialer in Canada would place calls to consumers and play a prerecorded message.  If the recipient followed a prompt, the call would be transferred to a call center in the Philippines.  The representatives at the Philippines call center would determine whether the recipient actually wanted to purchase DISH products and services and, if so, the Philippines call center would transfer the calls to the American Satellite call center in San Diego.  If a call recipient followed a prompt in order to complain or ask who was calling, the call center in the Philippines would screen out those recipients.

384.     Due to this complicated system, observers from DISH never witnessed any outbound calls at the American Satellite call center.  Instead, they only ever saw inbound calls from the Philippines, which gave the impression that American Satellite was receiving calls it generated from online marketing or magazine advertising.  Manuel Castillo, a former American Satellite employee, testified that the outbound calling occurred "in secret."  DISH emails from this period reflect DISH's understanding that American Satellite only took inbound calls.

385.     In September 2006, DISH sting operations identified American Satellite as the source of a prerecorded call to Robert Parker.

386.     In response, DISH immediately investigated the entity that provided the lead lists associated with Mr. Parker's number, and the vendor was subsequently suspended.

387.     In 2007, DISH confirmed additional cases of American Satellite violating Do Not Call laws.  On February 13, 2007, DISH representatives met with representatives of American Satellite to discuss telemarketing violations.  A week later, American Satellite sent DISH a letter stating that it had terminated its relationships with outside marketing companies and hired a new Vice President of Marketing.  The letter further stated that this step would "seriously reduce if not completely eliminate any further consumer marketing complaints."

388.     Mr. Castillo, before working at American Satellite, worked as a DISH field sales development representative between 2003 and 2007.  Immediately before Mr. Castillo's departure from DISH, Carlos Prado, a DISH area sales manager, told Mr. Castillo that American Satellite was making prerecorded calls.  He did not tell Mr. Castillo that prerecorded calls were illegal.

389.     In 2008, Mr. Prado recruited Mr. Castillo to join American Satellite to "clean up the house."

390.     Throughout this time period, American Satellite provided responses to the telemarketing complaints Ms. Musso's team was investigating.

391.     On May 7, 2010, DISH terminated American Satellite as a Retailer.  American Satellite, through its attorney, subsequently threatened to sue DISH.

392.     No call records relevant to American Satellite were produced in this action. Plaintiff's expert did not analyze any call records relating to American Satellite in this action. .

VI.     **MONETARY REMEDIES SOUGHT BY PLAINTIFFS**

393.     Plaintiffs have taken the position that they are entitled to approximately $24.4 billion in monetary remedies from DISH in connection with the TSR, TCPA, and state law

violations in this case. DISH does not have the current ability to pay a $24.4 billion award in this case, and an award of that magnitude would necessarily interfere with DISH's ability to remain in business and stay competitive in the marketplace. DISH's total market capitalization is approximately $28 billion, based on a current stock price of $60.88.

A. **The Monetary Remedies Sought from DISH Are Disproportionate to Monetary Remedies in Other Cases.**

394. **FTC Monetary Judgments against the Retailers and Their Subagents Are Far Lower Than The Amounts Plaintiffs Seek From DISH.** The FTC has pursued Retailers and their subagents in connection with TSR violations and reached judgments on penalties far lower than the amounts that Plaintiffs seek from DISH. The monetary remedies that Plaintiffs sought are disproportionate to remedies found appropriate in other cases.

395. On summary judgment, the Court found DISH responsible for 43,100,876 prerecorded telemarketing calls by Star Satellite. In 2008, the FTC brought suit against Star Satellite, alleging that Star Satellite had illegally abandoned outbound telemarketing calls to consumers while marketing Dish Network satellite television programming. *United States v. Star Satellite LLC, et al.*, No. 2:08-cv-00797-RLH-LRL (D. Nevada), Dkt. No. 1 at 4.

396. A consent judgment was entered against Star Satellite in that case, providing for monetary judgment in the amount of $4,374,768. The $4,374,768 judgment against Star Satellite covered the same 43 million prerecorded Star Satellite calls that are at issue in this case. All but $75,000 of the monetary judgment was suspended, contingent upon the accuracy of Star Satellite's financial statements. *Star Satellite LLC*, No. 2:08-cv-00797, Dkt. No. 6 at 9.

397. The statutory penalties recited in the Star Satellite consent judgment were not based upon Star Satellite's ability to pay. Instead, the $75,000 that Star Satellite actually paid was based upon Star Satellite's financial statements and its ability to pay. The $4,374,768 in

statutory penalties was levied as representative of Star Satellite's culpability in connection with making 43 million prerecorded telemarketing calls to consumers. In that case, the amount of penalty per violation that the FTC assessed against the primary wrongdoer in connection with 43 million call violations was approximately $0.10 per call.

398.    Guardian made those 43 million prerecorded calls for Star Satellite and also made prerecorded calls for another Retailer, DISH TV Now. On summary judgment in this case, the Court held DISH responsible for 6,673,196 call violations relating to 6,673,196 prerecorded telemarketing calls by DISH TV Now that had been placed for DISH TV Now by Guardian.

399.    The FTC sued Guardian in 2007, alleging that Guardian had "conducted voice broadcasting telemarketing campaigns causing tens of millions of calls to be abandoned." *United States v. Guardian Communications, Inc., et al.*, No. 07-4070 (C.D. Ill.), Dkt. No. 1 at 6. Pursuant to the court-ordered consent judgment in that case, the FTC was awarded a judgment in the amount of $7,892,242, all but $150,000 of which was suspended, contingent upon the accuracy of Guardian's financial statements. *Guardian Communications*, No. 07-4070, Dkt. No. 2 at 6. Included in the "tens of millions of calls" were the more than 49 million prerecorded calls that Guardian made for Star Satellite and DISH TV Now.

400.    As with the Star Satellite judgment, the civil penalties imposed in the $7.9 million consent judgment were not based on Guardian's ability to pay, but were a determination of the appropriate penalty based on Guardian's culpability for 49 million or more violations of the TSR. The $150,000 that Guardian actually paid was based on its ability to pay. In that case, the amount of penalty per violation, assessed against a primary wrongdoer for 49 million calls or more, was $0.16 per call or less.

401.     The FTC has entered stipulated consent judgments in cases against other Retailers in amounts far less than the Plaintiffs seek against DISH here.  In *United States v. New Edge Satellite, Inc*., No. 2:09-cv-11100-MOB-PJK (E.D. Mich.), Dkt. No. 7, at 8, the FTC obtained a consent judgment for civil penalties of $570,000, the entire amount of which was suspended.  In *United States v. Planet Earth Satellite, Inc*., No. 2:08-cv-1274-PHX-EHC (D. Ariz.), Dkt. No. 6, at 6, the FTC obtained a consent judgment for civil penalties in the amount of $7,094,354, all but $20,000 of which was suspended.  In *United States v. Vision Quest, LLC*, No. 2:09-cv-11102-AJT-VMM (E.D. Mich.), Dkt. No 9, at 8-9, the FTC obtained a consent judgment for civil penalties in the amount of $690,000, the entire amount of which was suspended.

402.     **Other TSR Cases Demonstrate Substantially Lower Penalty Ranges.**  In other cases alleging violations of the TSR, the FTC has entered public, stipulated judgments assessing a range of per-call penalties vastly lower than what Plaintiffs seek against DISH.  In a suit against Caribbean Cruise Line, the FTC alleged that Caribbean Cruise had "engaged in deceptive acts" and "bombarded American consumers with billions of robocalls, an average of 12-15 million calls per day."  *F.T.C. v. Caribbean Cruise Line, Inc*., No. 0:15-cv-60423-WJZ (S.D. Fla.), Dkt. No. 1 at 4-5; Dkt. No. 6-1 at 2.  The FTC subsequently proposed a stipulated judgment with a $7,730,000 civil penalty, all but $500,000 of which would be suspended.  *Caribbean Cruise Line, Inc*., No. 0:15-cv-60423, Dkt. No. 6-1.  This proposed civil penalty award is not based upon Caribbean Cruise's ability to pay—rather, the $7,730,000 is a determination of an appropriate penalty based on Caribbean Cruise's culpability in making *billions* of robocalls to U.S. consumers.

403.     In *United States v. Comcast Corporation*, No. 09-cv-1589 (E.D. Pa), Dkt. No. 1, the FTC sued Comcast for making "more than 900,000 outbound telephone calls to consumers"

in violation of the entity-specific Do Not Call requirements.  In that case, the court entered a stipulated judgment providing for, among other things, $900,000 in civil penalties.  This penalty of $1 per call is far lower than what the United States has demanded from DISH.

404.    In *United States v. DirecTV, Inc*. No. 2:09-cv-02605-DOC-AN (C.D. Cal.), Dkt. No. 1 at 6, the FTC sued DirecTV for violating a court order by making 1,050,000 calls in violation of the TSR's Do Not Call provisions through a retailer.  In a stipulated judgment, DirecTV was ordered to pay $2,310,000 in civil penalties, amounting to a per call penalty of approximately $2.30.  *Direct TV, Inc.*, No. 09-cv-02605, Dkt. No. 7.

405.    In *United States v. The Broadcast Team, Inc.*, No. 05-cv-1920 (M.D. Fla.), Dkt. No. 1 at 9-10, the FTC sued The Broadcast Team for violations of the TSR.  The FTC alleged that The Broadcast Team conducted telemarketing campaigns that "resulted in over 64 million" abandoned calls and calls to over 1 million consumers on the Do Not Call Registry.  In a stipulated judgment, The Broadcast Team was ordered to pay $2,800,000, all but $1,000,000 of which was suspended, amounting to a penalty of $0.04 per violation.  *The Broadcast Team, Inc.*, No. 05-cv-1920, Dkt. No. 55 at 9.

406.    In *United States v. Voice-Mail Broadcasting Corp.*, No. 08-cv-521 (C.D. Cal.), Dkt. No. 1, the FTC sued Voice-Mail Broadcasting for allegedly causing "over 46 million outbound telephone calls to be abandoned" in violation of the TSR.  Pursuant to a stipulated judgment, Voice-Mail Broadcasting was ordered to pay a penalty of $3,000,000, all but $180,000 of which was suspended, amounting to a penalty of $0.07 per violation.  *Voice-Mail Broadcasting Corp.*, No. 08-cv-521, Dkt. No. 3 at 7-8.

407.    Other public stipulated judgments awarded to the FTC demonstrate that judgments for telemarketing and other types of violations against other companies with

significant assets do not come close to the overall scale of the Plaintiffs' demands against DISH. Those judgments include but are not limited to: *United States v. DirecTV, Inc. et al.*, No. 8:05-cv-01211 (C.D. Cal.), Dkt. No. 2 (stipulated judgment and order providing for, among other things, $5,335,000 civil penalty); *United States v. ADT Security Services, Inc.*, No. 07-cv-81051 (S.D. Fla.), at Dkt. No. 3 (consent decree and order providing for, among other things, $2,000,000 in civil penalties); *In the Matter of Sprint Corporation*, FCC File No. EB-TCD-12-00002713 (May 19, 2014) (penalty of $7,500,000 assessed against Sprint for violations of Do Not Call laws)

**B.  The Remedies Sought by Plaintiffs Threaten DISH's Ability to Remain Competitive**

408.  DISH faces intense and increasing competition from established pay-TV and broadband service providers as well as from companies providing video content via the Internet to computers, televisions, and mobile devices.  The imposition of massive monetary remedies would hamper DISH's ability to compete in the marketplace and would have a negative impact on consumers.  An injunction that limits DISH's and the Retailers' ability to engage in telemarketing, and indeed prohibits DISH from accepting orders from Retailers with more than 150 activations a month at all, would severely curtail DISH's ability to do business.  These measures are especially inappropriate when the events took place a long time ago and are no longer a legitimate concern.

409.  DISH competes directly with DirecTV, the largest satellite TV provider in the United States, which had 20.3 million subscribers as of August 6, 2015.  In May of 2014, AT&T announced its pending acquisition of DirecTV, which closed in July 2015, making the combination the largest pay-TV provider overall.  This newly combined company will present an even greater threat to DISH.

410.    DISH also competes with cable television companies, which, combined, provide pay-TV service to more than 54 million subscribers.  These providers are typically able to bundle their video services with broadband Internet access and voice services.

411.    Large telecommunications companies such as AT&T and Verizon also compete with DISH in certain markets.  These companies have upgraded copper wire lines with fiber optic lines that allow them to offer video content with broadband Internet access and voice services.  As of September 30, 2014, AT&T and Verizon combined had approximately 11.6 million fiber optic TV subscribers.

412.    Competition has increased and intensified as the pay-TV industry has matured and these fiber-based services have increasingly infiltrated the market.

413.    New technologies have been and will likely continue to be developed that further increase the number of competitors DISH faces.

414.    DISH may also be required to make substantial additional investments to maintain competitive programming offerings.  In particular, DISH may need to invest in infrastructure to respond to competitive demand to deliver enhanced HD programming and other value-added services.

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 - SEM-TSH**                                    1 of 5

| NO. | UNCONTESTED CONCLUSION OF LAW | NOTE | DISH LAW NO. |
|---|---|---|---|
| 1 | The 1995 FTC Statement also addressed whether separate divisions of a company would be considered a single seller.  The FTC stated that "distinct corporate divisions may be considered separate 'sellers.'"  60 Fed. Reg. 43842, 43844.  The FTC explained:  The determination as to whether distinct divisions of a single corporate organization will be treated as separate sellers will depend on such factors as: (1) whether there exists substantial diversity between the operational structure of the corporate organization and the division that is selling the goods or services that are the subject of the offer, or between that division and the other divisions of the corporation; or (2) whether the nature or type of goods or services offered by the division are substantially different from those offered by other divisions of the corporation or the corporate organization as a whole. 60 Fed. Reg. 43842, 43844; see also Opinion 445 at 13. | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 7 |
| 2 | The 1995 version of the TSR also prohibited assisting and facilitating violations of the TSR:  (b) Assisting and facilitating. It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule. 16 C.F.R. § 310.3(b); see also 60 Fed. Reg. 43842, 43866.  Opinion 445 at 13-14. | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 8 |
| 3 | Section 310.4(b)(1) of the 2003 TSR stated: "It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in the following conduct:" Section 310.4(b)(1) then listed certain specific prohibited acts, including:(iii)  Initiating any outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or (B)  that person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller (i)  has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person; or  (ii) has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section; or (iv) Abandoning any outbound telephone call. An outbound telephone call is "abandoned" under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.  16 C.F.R. § 310.4(b)(1)(iii)-(iv).  The 2003 TSR retained the prohibition against assisting and facilitating a violation of the TSR.  See 16 C.F.R. § 310.3(b); Opinion 445 at 16-17. | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 13 |
| 4 | The 2003 amendments to the TSR also amended the safe harbor provisions to cover calls to individuals whose telephone numbers are on the Registry or on an internal do-not- call list.  The 2003 TSR safe harbor provisions provided in relevant part: (3) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(ii) and (iii) if it can demonstrate that, as part of the seller's or telemarketer's routine business practice: (i) It has established and implemented written procedures to comply with § 310.4(b)(1)(ii) and (iii);  (ii) It has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to § 310.4(b)(3)(i); (iii) The seller, or a telemarketer or another person acting on behalf of the seller or charitable organization, has maintained and recorded a list of telephone numbers the seller or charitable organization may not contact, in compliance with § 310.4(b)(1)(iii)(A); (iv) The seller or a telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to § 310.4(b)(3)(iii) or 310.4(b)(1)(iii)(B), employing a version of the "do-not-call" registry obtained from the Commission no more than  thirty-one (31) days prior to the date any call is made, and maintains records documenting this process; (v) The seller or a telemarketer or another person acting on behalf of the seller or charitable organization, monitors and enforces compliance with the procedures established pursuant to § 310.4(b)(3)(i); and (vi) Any subsequent call otherwise violating § 310.4(b)(1)(ii) or (iii) is the result of error.  16 C.F.R. § 310.4(b)(3).  The safe harbor did not apply to violations of the call abandonment provision, Section 310.4(b)(1)(iv), or the assisting and facilitating provision, Section 310.3(b). See Opinion 445 at 19-20. | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 15 |
| 5 | On November 17, 2004, the FTC issued a Notice of Proposed Rulemaking to amend the TSR to add an additional safe harbor provision to allow some use of prerecorded calls under limited circumstances.  See 69 Fed. Reg. 67287 (November 17, 2004).  The proposed safe harbor amendment would have allowed a seller or telemarketer to use a prerecorded call in outbound telemarketing to a person with whom the seller or telemarketer had an Established Business Relationship and only if the prerecorded message: (1) within two seconds of the person's completed greeting, presented the person with the opportunity to communicate that he or she did not want to be called again (e.g., by pushing a number on the telephone keypad); (2) provided all required disclosures; and (3) otherwise complied with all applicable state and  federal laws.  See 69 Fed. Reg. 67287, 67289; see also Opinion 445 at 21-22. | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 17 |

**ATTACHMENT D**

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 - SEM-TSH**

| NO. | UNCONTESTED CONCLUSION OF LAW | NOTE | DISH LAW NO. |
|---|---|---|---|
| 6 | The FTC further stated in the 2004 Notice that the FTC would not bring enforcement actions for prerecorded calls that complied with the proposed amendments to the safe harbor provisions:  Therefore, the  Commission has determined that,  pending completion of this proceeding, the Commission will forbear from bringing any enforcement action for violation of the TSR's call abandonment prohibition, 16 CFR 310.4(b)(1)(iv), against a seller or telemarketer that places telephone calls to deliver prerecorded telemarketing messages to consumers with whom the seller on whose behalf the telemarketing calls are placed has an established business relationship, as defined in the TSR, provided the seller or telemarketer conducts this activity in conformity with the terms of the proposed amended call abandonment safe harbor.  69 Fed. Reg. 67287, 67290; see also Opinion 445 at 22. | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 18 |
| 7 | In its Summary Judgment Opinion, the Court adhered to an earlier ruling in this litigation deferring to and adopting "the FTC interpretation of the TSR, [wherein] a seller 'causes' the telemarketing activity of a telemarketer by retaining the telemarketer and authorizing the telemarketer to market the seller's products and services."  Opinion 445 at 172-75 (quoting Opinion entered November 4, 2009 [Dkt. # 20] ("Opinion 20") at 14-15). | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 23 |
| 8 | The Court granted the United States partial summary judgment on Count I for certain DISH-initiated calls as well as for certain calls made by Retailers JSR and Satellite Systems Network.2  See Opinion 445 at 231-32.  The Court further held, however, that "[i]ssues of fact preclude summary judgment for either party with respect to remedies for Dish's partial summary judgment liability under Count I or with respect to any other issue related to Count I." Id. at 232. | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 24 |
| 9 | [T]he federal common law of agency . . . and the Restatement of Agency are all in accord on general agency principles.  NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A&A Drug Co., 736 F.3d 1054, 1058 (7th Cir. 2013); see also Opinion at 185 (same). |  | 35 |
| 10 | The Restatement defines agency as follows: Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the  agent manifests assent or  otherwise consents so to the act. Restatement (Third) Of Agency §1.01 (2006). |  | 36 |
| 11 | An agency relationship requires two key components: "(1) the principal and agent agree that the agent acts for the principal; and (2) the agent is subject to the control of the principal."  Opinion at 185-86; see also Rubin v. Islamic Republic of Iran, No. 03 C 9370, 2014 WL 1257947, at *5 (N.D. Ill. Mar. 27, 2014) ("[A] principal-agent relationship is a legal concept founded upon a consensual and fiduciary relationship between two parties. The central question is whether the principal had the right to control the activities of the agent.") (internal citations  and quotation marks omitted). | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 37 |
| 12 | Plaintiffs bear the burden of proving by a preponderance of the evidence that an agency relationship existed between DISH and the Retailers.  See Sphere Drake Ins. Ltd. v. Am. Gen'l Life Ins. Co., 376 F.3d 664, 672 (7th Cir. 2004) ("[T]he party alleging an agency relationship . . . bears the burden of proving its existence by a preponderance of the evidence."); Restatement (Third) Of Agency § 1.02 cmt. d (2006) ("The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence."). |  | 38 |
| 13 | An agency relationship may be established "when the principal explicitly grants the agent the authority to perform a particular act" on its behalf.  Opp v. Wheaton Van Lines, Inc., 231 F.3d 1060, 1064 (7th Cir. 2000) (emphasis added) (internal quotation marks omitted). Thus, "actual authority" exists "when at the time of taking action that has legal consequences for the principal, the agent reasonably believes in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."  Restatement (Third) of Agency § 2.01 (2006). | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 51 |
| 14 | The Restatement further clarifies that with respect to actual authority, "[a] principal may direct an agent to do or refrain from doing a specific act."  Restatement (Third) Of Agency § 2.02 cmt. f (2006) (emphasis added). | STATES DO NOT STIPULATE TO THIS CONCLUSION OF LAW | 54 |
| 15 | In the absence of actual authority, an agency relationship may also be found under the doctrine of apparent authority.  See Opinion 445 at 186; Restatement (Third) Of Agency § 2.03 (2006). |  | 67 |
| 16 | The Seventh Circuit has stated that:  the party asserting the existence of apparent authority . . . must meet a three-part test: (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority.  Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co., 376 F.3d 664, 673 (7th Cir. 2004); see also Spitz v. Proven Winners N. Am., LLC, 759 F.3d 724, 732 (7th Cir. 2014) (same). | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 68 |
| 17 | As further explained in the Restatement: Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations. Restatement (Third) of Agency § 2.03 (2006). |  | 69 |

**ATTACHMENT D**

| NO. | UNCONTESTED CONCLUSION OF LAW | NOTE | DISH LAW NO. |
|---|---|---|---|
| 18 | Absent either actual or apparent authority, a principal-agent relationship may also be established through the doctrine of ratification. See Opinion at 445 186; Restatement (Third) Of Agency § 4.01 (2006). | | 74 |
| 19 | The Court granted the United States partial summary judgment on Count III for certain DISH-initiated calls as well as for certain calls made by Retailers Star Satellite Network, Dish TV Now, and American Satellite, Inc. See Opinion 445 at 233.  The Court further held, however, that "[i]ssues of fact preclude summary judgment for either party with respect to remedies for Dish's partial summary judgment liability under Count III." Id. at 232. | | 82 |
| 20 | The Court granted DISH partial summary judgment with respect to Count IV claims relating to Dish TV Now, and held that issues of fact precluded summary judgment with respect to the Count IV claims implicating Star Satellite.  See Opinion at 198. | | 87 |
| 21 | Under 16 C.F.R. § 310.3(b), it is a violation of the TSR "to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates" a specified provision of the TSR. | | 93 |
| 22 | Furthermore, the United States must prove that DISH provided "substantial assistance or support" to Star Satellite that was "coupled with . . . a relationship to a specified Rule violation." 60 Fed. Reg. 30406, 30414. Thus, the United States must show "some connection between the substantial assistance provided to a deceptive telemarketer and resulting violations of core provisions of the . . . Rule." Id. | | 95 |
| 23 | If the Court determines that civil penalties are warranted, 15 U.S.C. § 45(m)(1)(C) requires the Court, in crafting civil penalties under the TSR, to "take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." | | 116 |
| 24 | Counts V and VI are brought by the State Plaintiffs under the TCPA.  Count V concerns telephone solicitations to residential telephone subscribers who registered their numbers on the Registry.  See 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).  Count VI concerns the    use in a telephone solicitation of "an artificial or prerecorded voice."  47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(2). | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 141 |
| 25 | It is an affirmative defense if the prerecorded calls at issue on Count VI were within the established business relationship exception.  See 47 C.F.R. § 64.1200(f)(5); Opinion 445 at 213. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 151 |
| 26 | In its Summary Judgment Opinion, the Court held that with respect to Counts V through XII, which include all of the state law claims, "[t]he Plaintiff States must prove an agency relationship between Dish and the Retailers to establish Dish's liability for the actions of the Retailers."  Opinion at 445 227. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 180 |
| 27 | On Count VII, Plaintiff California alleges that DISH violated Cal. Bus. & Prof. Code § 17592(c)(1), which provides that "no telephone solicitor shall call any telephone number on the then current 'do not call' list and . . . [s]eek to offer a prize or to rent, sell, exchange, promote, gift, or lease goods or services or documents that can be used to obtain goods or services." | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 189 |
| 28 | It is an affirmative defense to § 17592(c)(1) that "the violation was accidental and in violation of the telephone solicitor's policies and procedures and telemarketer instruction and training."  Cal. Bus. & Prof. Code § 17593(d).  The Court's Summary Judgment Opinion held that "Dish has presented sufficient evidence to raise this defense at trial."  Opinion 445 at 215. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 190 |
| 29 | Cal. Bus. & Prof. Code § 17593(a) states that Plaintiff California may seek the following remedies in connection with violations of Section 17592: (1) An order to enjoin the violation. (2) A civil penalty of up to the penalty amount that the Federal Trade Commission may seek pursuant to subparagraph (A) of paragraph (1) of subsection (m) of Section 45 of Title 15 of the United States Code as specified in Section 1.98 of Title 16 of the Code of Federal Regulations.  (3)  Any other relief that the court deems proper. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 198 |
| 30 | For purposes of the relief set forth in Section 17593(a), the statute of limitations is three years.  See Opinion 445 at 216-17.  Thus, any relief awarded under Section 17593(a) must be based on calls made on or after March 25, 2006.  See id. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 199 |

**ATTACHMENT D**

| NO. | UNCONTESTED CONCLUSION OF LAW | NOTE | DISH LAW NO. |
|---|---|---|---|
| 31 | Inasmuch as Section 17593 provides for the same civil penalty as available under the FTC Act, the analysis of whether to award such a civil penalty and the amount of such civil penalty should be analyzed consistently with the FTC Act. See supra Section II.F.ii. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 200 |
| 32 | Plaintiff California also seeks civil penalties of up to $2,500 per violation pursuant to Section 17536, which authorizes such penalties for violations of Section 17592. Section 17536(b) provides that in assessing such penalties, courts shall consider "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 201 |
| 33 | On Count VIII, Plaintiff California alleges that DISH has engaged in unfair competition in violation of Cal. Bus. & Prof. Code § 17200 (the "UCL"), which defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice." | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 206 |
| 34 | To qualify as "unlawful" under the UCL, an act must typically violate some other law or statute, commonly referred to as "borrowed statutes." Opinion 445 at 217 (citing Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1168 (9th Cir. 2012)). | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 207 |
| 35 | Plaintiff California alleges that DISH violated Section 17200 by violating certain borrowed statutes. In particular, Plaintiff California alleges that DISH violated: (i) the TCPA at 47 U.S.C. § 227(c) and its regulations at 47 C.F.R. § 64.1200(c)(2), by calling California residents whose numbers were on the Registry; (ii) the TCPA at 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(2), by placing prerecorded calls to California residents without permission; (iii) California Business & Professions Code § 17592(c)(1), by making or causing to be made telephone solicitation calls to California telephone numbers listed on the Registry; and (iv) California Civil Code § 1770(a)(22)(A), by making prerecorded calls without complying with the standards set forth in California law. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 209 |
| 36 | Cal. Civ. Code § 1770(a)(22)(A) provides that it constitutes an unfair business practice to: Disseminat[e] an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 212 |
| 37 | Section 1770 "does not apply to a message disseminated to a business associate, customer, or other person having an established relationship with the person or organization making the call, to a call for the purpose of collecting an existing obligation, or to any call generated at the request of the recipient." Cal. Civ. Code § 1770(a)(22)(B) (emphasis added). | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 213 |
| 38 | To the extent that Plaintiff California were able to prove an unfair competition claim, California law provides that the Court should consider the following factors in assessing an appropriate penalty: "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." Cal. Bus. & Prof. Code § 17206(b). | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 221 |
| 39 | A claim for unfair competition in California is subject to a four year statute of limitations. See Cal. Bus. & Prof. Code § 17208; Opinion 445 at 218. Thus, no civil penalty is available on Count VIII for calls occurring prior to March 25, 2005. See id. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 223 |
| 40 | On Count IX, Plaintiff North Carolina alleges that DISH has violated N.C. Gen. Stat. § 75-102, which provides that "[e]xcept as provided in G.S. § 75-103, no telephone solicitor shall make a telephone solicitation to a telephone subscriber's telephone number if the telephone subscriber's telephone number appears in the latest edition of the 'Do Not Call' Registry." N.C. Gen. Stat. § 75-102(a). | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 228 |

**ATTACHMENT D**

| NO. | UNCONTESTED CONCLUSION OF LAW | NOTE | DISH LAW NO. |
|---|---|---|---|
| 41 | N.C. Gen. Stat. § 75-102(d) further provides that: Every telephone solicitor shall implement systems and written procedures to prevent further telephone solicitations to any telephone subscriber who has asked not to be called again at a specific number or numbers or whose telephone number appears in the "Do Not Call" Registry. Every telephone solicitor shall train, monitor, and enforce compliance by its employees and shall monitor and enforce compliance by its independent contractors in those systems and procedures. Every telephone solicitor shall ensure that lists of telephone numbers that may not be contacted by the telephone solicitor are maintained and recorded. Compliance with the time requirements within the Telemarketing Sales Rule for incorporating and complying with updated versions of the "Do Not Call" Registry shall constitute compliance with North Carolina law. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 229 |
| 42 | Under N.C. Gen. Stat. Ann. § 75-16.2, the statute of limitations applicable to Count IX is four years. As Count IX was filed on March 25, 2009, Plaintiff North Carolina cannot recover for violations that occurred before March 25, 2005. | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 230 |
| 43 | On Count X, Plaintiff North Carolina alleges that DISH violated N.C. Gen. Stat. § 75-104, which provides that, subject to a number of exceptions, "no person may use an automatic dialing and recorded message player to make an unsolicited telephone call." | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 246 |
| 44 | On Count XI, Plaintiff Illinois alleges that DISH violated the Illinois Automatic Telephone Dialers Act (the "IATDA"), which is codified at 815 ILCS 305/30(b) and provides that "[i]t is a violation of this Act to play a prerecorded message placed by an autodialer without the consent of the called party." | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 262 |
| 45 | On Count XII, Plaintiff Ohio alleges that DISH has violated the Ohio Consumer Sales Practices Act ("OCSPA"). | UNITED STATES DOES NOT STIPULATE TO THIS CONCLUSION OF LAW | 275 |

**ATTACHMENT D**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

UNITED STATES OF AMERICA and the
STATES OF CALIFORNIA, ILLINOIS,
NORTH CAROLINA, and OHIO,
                                        Plaintiffs,
        v.

DISH NETWORK L.L.C.,
                                        Defendant.

Case No. 3:09-cv-03073-SEM-TSH

**PLAINTIFFS' PROPOSED
CONCLUSIONS OF LAW[1,2]**

## The TSR:  Jurisdiction and Definitions

1.      Under the TSR, "telemarketing" means "a plan, program, or campaign which is

conducted to induce purchases of goods or services . . . by use of one or more telephones and

which involves more than one interstate telephone call."  15 U.S.C. § 6106(4).

2.      The FTC has jurisdiction over all types of telemarketing calls.  Opinion 445 at

148; 15 U.S.C. §§ 44, 45(a)(1) and (2), and 1012(b); 15 U.S.C. § 6105(b); 2003 FTC Statement,

68 Fed. Reg. 4580 at 4632-33 (Jan. 29, 2003).

3.      A violation of the TSR is an unfair and deceptive act or practice in or affecting

commerce in violation of Section 5(a) of the FTC Act.  Opinion 445 at 19.  15 U.S.C. § 45(a);

*see FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925 (N.D. Ill. 2008).

---

[1]  Plaintiffs have not included some conclusions of law that have previously been rejected by the
Court.  Plaintiffs recognize that they have preserved legal issues for appeal that were raised
previously.  *Calderon v. Witvoet*, 999 F.2d 1101, 1108 (7th Cir. 1993) (where the district court
had already ruled against a party on an issue on summary judgment, party did not waive that
issue by failing to include it in a pretrial order).

[2] To the extent any conclusion of law contains an embedded factual finding, Plaintiffs intend it to
be a mixed finding of law and fact or an application of law to fact.  *DeliverMed Holdings, LLC v.
Schaltenbrand*, 734 F.3d 616, 622 (7th Cir. 2013).

# ATTACHMENT F – PLAINTIFFS' CONCLUSIONS OF LAW

4.     The United States is empowered to bring actions on behalf of the FTC to enforce the FTC Act, seeking, *inter alia*, injunctive relief and civil penalties.  15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a) and 57b.

5.     Telemarketing is not limited to activities in which a sale or offer for sale is communicated during a telephone call:  "The definition [of telemarketing] simply states that the call be 'conducted to induce the purchase of goods or services.'"  Telemarketing Sales Rule, Final Rule, 68 Fed. Reg. 4579, 4655-56 (2003).

6.     The TSR also applies to sales calls that combine an informational message with direct or indirect solicitation.  *See* Telemarketing Sales Rule, Final Rule Amendments, 73 Fed. Reg. at 51,173 (2008); Telemarketing Sales Rule ("TSR"), 71 Fed. Reg. 58,716, 58,725 n.107 (Oct. 4, 2006).

7.     The TSR covers the telemarketing activities of both "telemarketers" and "sellers." A seller is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration," 16 C.F.R. § 310.2(aa), while a telemarketer is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor," *id*. § 310.2(cc).

8.     The TSR's restrictions on telemarketing  "apply to any call placed to a consumer, whether to a residential telephone number or to the consumer's cellular telephone or pager."  68 Fed. Reg. 4,580, 4,632-33.

9.     The TSR covers intrastate telemarketing calls as long as the intrastate calls were made as part of a plan, program, or campaign that fits the definition of "telemarketing"--that is, includes at least one interstate phone call.  Opinion 445 at 168.

**ATTACHMENT F – PLAINTIFFS' CONCLUSIONS OF LAW**

**The Meaning of "Cause" Under the TSR**

10.     It is a violation of the TSR for any person to "cause" a telemarketer to violate the Registry, entity-specific, and call-abandonment provisions of the TSR.  16 C.F.R. § 310.4(b)(1)(iii).  Opinion 445 at 171-176.

11.     A seller that causes the violations of a telemarketer is liable for the telemarketer's violations of the TSR unless the safe harbor provisions apply.  Opinion 445 at 172; Opinion 20 at 10-15.

12.     The verb "cause" means "to bring about a consequence": a seller "causes" the telemarketing activity of a telemarketer by retaining the telemarketer and authorizing the telemarketer to market the seller's products and services.  Opinion 445 at 176; Opinion 20 at 10-15.

13.     As used in the TSR, the term "cause" does not connote directness, immediacy, proximity, intent, or motive.  Opinion 20 at 10-15.

14.     An entity "causes" an act when it has actual or constructive notice of the act and possesses the ability to stop it, but fails to do so.  *Scottsdale Indem. Co. v. Vill. of Crestwood*, 673 F.3d 715, 720-21 (7th Cir. 2012).

15.     A seller "causes" the telemarketing activity of a telemarketer by retaining the telemarketer and authorizing the telemarketer to market the seller's products and services.  Opinion 445 at 172 (quoting Opinion 20 at 14-15).

16.     FTC's interpretation of "cause" comports with the plain meaning of the regulation.  Opinion 20.

17.     An agency's interpretation of its own regulations is entitled to deference. *Auer v. Robbins,* 519 U.S. 452 (1997); *Decker v. Northwest Env. Defense Ctr.*, ___ U.S. __, 133 S. Ct. 1326, 1338-39 (2013). Opinion 445 at 175.

18.     To prove that Dish caused its retailers to violate the TSR, the United States must show that (1) Dish retained the Retailers, (2) Dish authorized the Retailers to market Dish products and services, and (3) the Retailers violated the TSR by initiating Dish telemarketing calls to numbers on the Registry for at least 31 days or to numbers on Dish's or its retailers' entity-specific do-not-call lists, or by abandoning telephone calls. Opinion 445 at 176; Opinion 20 at 14-15.

**Count I**

19.     The TSR prohibits a seller from engaging in or causing a telemarketer to engage in initiating an outbound telephone call to a person's telephone number on the National Do-Not-Call Registry. 16 C.F.R. § 310.4(b)(1)(iii)(B); Opinion 445 at 158.

20.     To establish the first part of Count I, the United States must present evidence that Dish initiated an outbound telephone call to a telephone number that was on the Registry for at least 31 days. Opinion 445 at 158.

21.     To establish the second part of Count I, the United States must present evidence that Dish caused a telemarketer to initiate an outbound telephone call to a telephone number that was on the Registry for at least 31 days. Opinion 445 at 158-59.

22.     The general composition of the Registry is irrelevant to the claims in this case, which allege specific calls, at specific points in time, to specific telephone numbers that were on the Registry at least 31 days.

23.     Dish is liable under the TSR for 501,650 outbound telemarketing calls it made between September 2007 and March 2010 to telephone numbers that had been on the Registry more than 31 days.  Opinion 445 at 3, 159.

24.     Dish is liable under the TSR 873,551 telemarketing calls it made between September 2007 and March 2010 to numbers that had been on the Registry more than 31 days, the call records for which reflected a campaign code indicating that the calls were made in response to a customer inquiry, but for which Dish produced no independent, admissible evidence regarding the meaning of these codes.  Opinion 445 at 3, 168.

25.     Dish is liable under the TSR for 309,931 telemarketing calls it made between September 2007 and March 2010 to numbers that had been on the Registry more than 31 days, the call records for which reflect a disposition code indicating that the call was not completed. Opinion 445 at 3, 167.

26.     Dish is liable under the TSR for 12,552 telemarketing calls it made between September 2007 and March 2010 to numbers that had been on the Registry more than 31 days that reached a wrong number or a recipient who did not speak English.  Opinion 445 at 3, 167.

27.     Dish is liable under the TSR for 10,029 telemarketing calls it made between September 2007 and March 2010 that Dish's proffered expert witness, John Taylor, opined he could "exclude" because they were intrastate calls.  Opinion 445 at 3, 167-168.

28.     Dish is liable under the TSR for making 2,864,896 additional telemarketing calls between September 2007 and March 2010 to numbers that were on the Registry more than 31 days and for which Dish provided expired or missing EBR information in discovery.

29.    Dish is liable under the TSR for 71,853 telemarketing calls it made between September 2007 and March 2010 to numbers that had been on the Registry more than 31 days, and which also appeared on the "Internal" portion of Dish's entity-specific do-not-call list.

30.    Dish is liable under the TSR for making 2,314,533 telemarketing calls between 2007-2010 to numbers that had been on the Registry more than 31 days, and which also appeared on the "retailers" portion of its entity-specific do-not-call list.

31.    Dish is liable under the TSR for causing its retailer JSR Enterprises ("JSR") to make 2,349,031 telemarketing calls between August 2006 and December 2006 to phone numbers that were on the Registry more than 31 days.

32.    Dish is also directly liable for JSR's 2,349,031 telemarketing calls between August 2006 and December 2006 to phone numbers that were on the Registry more than 31 days because JSR was Dish's marketing agent.

33.    Dish is liable under the TSR for causing its retailer Satellite Systems Network ("SSN") to make 381,811 telemarketing calls in 2010 and 2011 to phone numbers that were on the Registry more than 31 days.

34.    Dish is also directly liable for SSN's 381,811 telemarketing calls in 2010 and 2011 to phone numbers that were on the Registry more than 31 days because SSN was Dish's marketing agent.

35.    Dish is liable under the TSR for 4,770,433 telemarketing calls it made between October 17, 2003 and March 31, 2004 to telephone numbers that had been on the Registry more than 31 days.

36.     Dish is liable under the TSR for 12,533,684 telemarketing calls it made between January 3, 2005 and May 31, 2005 to telephone numbers that had been on the Registry more than 31 days.

37.     Dish is liable under the TSR for 2,784,629 telemarketing calls it made between June 1, 2005 and June 30, 2005 to telephone numbers that had been on the Registry more than 31 days.

38.     Dish is liable under the TSR for 2,575,019 telemarketing calls it made between July 1, 2005 and July 31, 2005 to telephone numbers that had been on the Registry more than 31 days.

39.     Dish is liable under the TSR for 4,000,815 telemarketing calls it made between August 1, 2005 and September 18, 2005 to telephone numbers that had been on the Registry more than 31 days.

40.     Dish is liable under the TSR for 6,916,143 telemarketing calls it made between December 1, 2005 and January 31, 2006 to telephone numbers that had been on the Registry more than 31 days.

41.     Dish is liable under the TSR for 3,375,472 telemarketing calls it made between February 1, 2006 and February 28, 2006 to telephone numbers that had been on the Registry more than 31 days.

42.     Dish is liable under the TSR for 4,641,828 telemarketing calls it made between March 1, 2006 and April 30, 2006 to telephone numbers that had been on the Registry more than 31 days.

43.     Dish is liable under the TSR for 7,586,596 telemarketing calls it made between May 1, 2006 and June 30, 2006 to telephone numbers that had been on the Registry more than 31 days.

44.     Dish is liable under the TSR for 5,080,115 telemarketing calls it made between July 1, 2006 and August 15, 2006 to telephone numbers that had been on the Registry more than 31 days.

45.     Dish is liable under the TSR for 4,710,270 telemarketing calls it made between August 16, 2006 and September 30, 2006 to telephone numbers that had been on the Registry more than 31 days.

46.     Dish is liable under the TSR for 3,624,432 telemarketing calls it made between October 1, 2006 and October 31, 2006 to telephone numbers that had been on the Registry more than 31 days.

47.     Dish is liable under the TSR for 3,712,816 telemarketing calls it made between November 1, 2006 and November 30, 2006 to telephone numbers that had been on the Registry more than 31 days.

48.     Dish is liable under the TSR for 3,002,123 telemarketing calls it made between December 1, 2006 and December 31, 2006 to telephone numbers that had been on the Registry more than 31 days.

49.     Dish is liable under the TSR for 2,994,525 telemarketing calls it made between January 2, 2007 and February 28, 2007 to telephone numbers that had been on the Registry more than 31 days.

50.     Dish is liable under the TSR for 4,046,178 telemarketing calls it made between March 1, 2007 and April 30, 2007 to telephone numbers that had been on the Registry more than 31 days.

51.     Dish is liable under the TSR for 3,389,113 telemarketing calls it made between May 1, 2007 and May 31, 2007 to telephone numbers that had been on the Registry more than 31 days.

52.     Dish is liable under the TSR for 4,938,258 telemarketing calls it made between June 1, 2007 and June 30, 2007 to telephone numbers that had been on the Registry more than 31 days.

53.     Dish is liable under the TSR for 4,627,426 telemarketing calls it made between July 1, 2007 and July 31, 2007 to telephone numbers that had been on the Registry more than 31 days.

54.     Dish is liable under the TSR for 5,494,133 telemarketing calls it made between August 1, 2007 and August 31, 2007 to telephone numbers that had been on the Registry more than 31 days.

**Count II**

55.     The TSR prohibits "[i]nitiating any outbound telephone call to a person when that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered."  16 C.F.R. § 310.4(b)(1)(iii); *see* Telemarketing Sales Rule, 60 Fed. Reg. 43,842 (Aug. 23, 1995) (adopting the entity-specific do-not-call rule as part of the original TSR and explaining its requirements).

## ATTACHMENT F – PLAINTIFFS' CONCLUSIONS OF LAW

56.     To hold Dish liable for violations of the TSR's entity-specific do-not-call rule, the United States must prove that Dish initiated outbound telemarketing calls to the telephone numbers of persons who previously stated that they do not wish to receive calls made by or on behalf of Dish.  Opinion 445 at 177.

57.     A phone number's presence on any version of a seller's entity-specific do-not-call list is prima facie evidence that the phone number should not be called under the entity-specific rules.

58.     "On behalf of" means "in the interest of" of "for the benefit of."  It does not require an agency relationship between the telemarketer taking the entity-specific do-not-call request and the seller.  FTC announced its interpretation of "on behalf of" prior to the FCC's declaratory order, and FTC's interpretation of "on behalf of" is entitled to deference.

59.     The United States may also hold Dish liable for violations of the TSR's entity-specific do-not-call rule by showing that Dish caused telemarketers to initiate outbound telemarketing calls to the telephone numbers of persons who previously stated that they do not wish to receive calls made by or on behalf of Dish.  Opinion 445 at 177.

60.     Dish is liable for the actions of its Telemarketing Vendors, eCreek and EPLDT. Opinion 445 at 178.

61.     Dish was the "seller" on its OE retailers' telemarketing calls because it, "in connection with [the] telemarketing transaction[s]" of these retailers, "provide[d], offer[ed] to provide, or arrange[d] for others to provide [Dish] goods or services to the customer in exchange for consideration."  16 C.F.R. § 310.2(aa).

62.     A consumer's do-not-call request applies to all telemarketing campaigns of the seller and any affiliated entities that the consumer would reasonably expect to be included given

the identification of the caller and the product being advertised  16 C.F.R. § 310.4(b)(1)(iii)(A);

68 Fed. Reg. 44,144, 44,156 (July 25, 2003).

63.　　Dish was obligated to honor do-not-call requests whether made to a Dish

authorized retailer or to Dish.  16 C.F.R. § 310.4(b)(1)(iii)(A).

64.　　Dish's retailers were obligated to honor the future do-not-call requests of people

who told Dish and other Dish retailers not to call them again.  16 C.F.R. § 310.4(b)(1)(iii)(A).

65.　　Dish is liable under the TSR for 903,246 telemarketing calls it made between

September 2007 and March 2010 to telephone numbers on the entity-specific do-not-call lists of

Dish and its Telemarketing Vendors, eCreek and EPLDT.  Opinion 445 at 178.

66.　　Dish is liable for 140,349 telemarketing calls to numbers that had been marked by

Dish Telemarketing Vendor eCreek as "DNC," meaning that the number should not have been

called again.  Opinion 445 at 5, 179.

67.　　Dish is liable for initiating 7,321,163 calls made to telephone numbers on the

retailer portion of Dish's entity-specific do-not-call list.

68.　　Dish is liable for initiating 4,968 calls to numbers on the entity-specific do-not-

call list maintained by Dish retailer New Edge of the numbers of consumers who stated to New

Edge that they did not wish to receive telemarketing calls by or on behalf of Dish.

**Count III**

69.　　The TSR prohibits abandoning any outbound telemarketing calls or causing

telemarketers to abandon any outbound telemarketing calls.  16 C.F.R. § 310.4(b)(1)(iv);

Opinion 445 at 17, 192.

70.     An outbound telephone call is "abandoned" under the TSR if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.  16 C.F.R. § 310.4(b)(1)(iv); Opinion 445 at 17.

71.     A prerecorded telemarketing call is an abandoned call because it does not connect a call recipient to a live operator within two seconds of the call recipient's completed greeting.

72.     During 2007 and 2008, having an EBR with the recipient of an abandoned call was not a defense under the TSR; but the FTC refrained from enforcing the abandoned call provision for prerecorded sales calls to persons with whom the seller had an EBR, if the message gave the call recipient the opportunity to indicate that he or she did not wish to receive such calls.  Opinion 445 at 193; 69 Fed. Reg. 67,287, 67,290 (Nov. 17, 2004); DAMF426.

73.     Dish is liable under the TSR for abandoning 98,054 prerecorded telemarketing calls during 2007 and 2008 that were answered by live people and marked as "positive voice."  Opinion 445 at 5, 193.

74.     Dish is liable for causing its retailer Dish TV Now to abandon 6,637,196 prerecorded telemarketing calls that were answered by live people.  Opinion 445.

75.     Dish is also directly liable for its retailer Dish TV Now's 6,637,196 abandoned telemarketing calls that were answered by live people because Dish TV Now was Dish's marketing agent.

76.     Dish is liable for causing its retailer Star Satellite to abandon 43,100,876 prerecorded telemarketing calls that were answered by live people.  Opinion 445.

77.     Dish is also liable for its retailer Star Satellite's 43,100,876 abandoned telemarketing calls that were answered by live people because Star Satellite was Dish's marketing agent.

78.     Dish is liable for causing its retailer JSR Enterprises to abandon hundreds of thousands of prerecorded telemarketing calls that were answered by live people.

79.     Dish is also liable for its retailer JSR Enterprises' hundreds of thousands of abandoned telemarketing calls that were answered by live people because JSR was Dish's marketing agent.

80.     Dish is liable for causing its retailer American Satellite to abandon one prerecorded telemarketing call selling Dish that was answered by a live person.   Opinion 445 at 5, 195.

**Count IV**

81.     The TSR prohibits any person from "provid[ing] substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates [the TSR]."  16 C.F.R. § 310.3(b); Opinion 445 at 195.

82.     Substantial assistance requires "a connection between the assistance provided and the resulting violations of the core provisions of the TSR." *FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1114 (D. Kan. 2011) (quoting Opinion 20 at 9).

83.     Substantial assistance under the TSR includes, among many other things, "providing any script, advertising, brochure, promotional material, or direct marketing piece used in telemarketing." *Id.* at 1114-15.

84.     Dish is liable under the TSR for substantially assisting Star Satellite's 43 million illegal abandoned telemarketing calls because Dish knew that Star Satellite was using prerecorded messages to telemarket Dish service, and Dish continued to grant Star Satellite access to Dish's OE telesales portal, pay commissions to Star Satellite, and provide other sales

support such as telemarketing scripts, sales advice, and rewards to Star Satellite—all of which substantially assisted Star Satellite's abandoned calls.

**Dish's Affirmative Defenses**

85.     The TSR prohibits the initiation of telemarketing calls covered by the regulations; it is not a defense to a TSR violation that a telemarketing call was not completed.  Opinion 445 at 168.

86.     It is not a defense to a TSR violation that a telemarketing call reached a wrong number or a non-English speaker.  Opinion 445 at 168.

87.     Once the United States has made its prima facie case on its TSR claims, the burden shifts to Dish to establish available affirmative defenses.  Opinion 445 at 162.

88.     An exemption from the general rule is treated as an affirmative defense for which the defendant bears the burden of proof.  *See Shaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 534 (2005) (burden of proof shifts to defendant when element can be fairly characterized as an exemption); *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 428 F. Supp. 2d 761, 773 (N. D. Ill. 2005) (same).

89.     Dish has three possible affirmative defenses under the TSR:  (a) Dish had an EBR with the recipient of the call; (b) the call was exempt from the TSR as a telemarketing call to a business; or (c) Dish complied with the TSR safe harbor provisions.  Opinion 445 at 162; 16 C.F.R. §§ 310.4(b)(1)(B)(ii), 310.4(b)(3), and 310(b)(7).

90.     Dish is not entitled to the safe harbor defense under the TSR. Opinion 445 at 4-5.

91.     Dish is not entitled to the safe harbor defense under the Registry or entity-specific do-not-call provisions of TSR.  Opinion 445 at 4, 163-66.

92.     A good faith effort to comply with the TSR safe harbor defense is not sufficient for the safe harbor to apply.  Opinion 445 at 165-66.

93.     An Established Business Relationship means a relationship between a seller and a consumer based on: (a) the consumer's purchase, rental or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the 18 months immediately preceding the date of a telemarketing call, or (b) the consumer's inquiry or application regarding a product or service offered by the seller within the three months immediately preceding the date of the telemarketing call.  16 C.F.R. § 310.2(o); Opinion 445 at 18.

94.     Under the TSR, Dish bears the burden of proof to establish the affirmative defense that it had an Established Business Relationship (EBR) with the recipient of a call to a number on the Registry or on Dish's entity-specific do-not-call list.   Opinion 445 at 163.

95.     Under the TSR, an EBR lasts for 18 months after the consumer's last purchase, or for three months after the consumer's last inquiry or application.  16 C.F.R. § 310.3(b)(o); Opinion 444 at 25.

96.     After the respective 18-month or three-month EBR expires, the EBR is no longer valid.

**Injunctive Relief under the TSR**

97.     To obtain a statutory injunction for TSR violations, the United States must demonstrate a violation and some reasonable likelihood of future violations.  Opinion 445 at 228, citing *Commodity Futures Trading Commission v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

98.     The existence of ongoing violations or misconduct is not necessary to obtain injunctive relief; past misconduct is highly suggestive of the likelihood of future violations.  *Id.* at 229, citing *Hunt,* 591 F.2d at 1220.

**ATTACHMENT F – PLAINTIFFS' CONCLUSIONS OF LAW**

99.     To assess whether the injunctive relief sought is reasonably related to the violations committed, the courts look to "(1) the seriousness and deliberateness of the violation; (2) the ease with which the violative claim may be transferred to other products; and (3) whether the respondent has a history of prior violations." *Telebrands Corp. v. FTC,* 457 F.3d 354, 358 (4th Cir. 2006); *Kraft, Inc. v. FTC*, 970 F.2d 311, 326 (7th Cir. 1992)

100.     The Court "has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 132, 89 S. Ct. 1562, 1581, 23 L. Ed. 2d 129 (1969) (quoting *N.L.R.B. v. Express Pub. Co*., 312 U.S. 426, 435 (1941).

101.     The Court has authority to impose any ancillary equitable relief necessary to effectuate the ordered injunction. *FTC v. Febre,* 128 F.3d 530, 534 (7th Cir. 1997); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 571-72 (7th Cir. 1989).

102.     Appropriate equitable relief imposed for violations of the TSR may include enjoining otherwise legal conduct. *United States v. Loew's, Inc.,* 371 U.S. 38, 53 (1962); *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994).

103.     Appropriate equitable relief imposed for violations of the TSR may include imposing recordkeeping and monitoring provisions on the defendant. *FTC v. U.S. Sales Corp.*, 785 F. Supp. 737, 753-54 (N.D. Ill. 1992).

104.     The framing of the scope of injunction should depend on "the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts . . . found to have been committed . . . in the past." *NLRB v. Express Publ'g Co*., 312 U.S. 426, 436-437 (1941).

105.     The United States has proven a likelihood of future violations of the TSR because: (a) Dish committed many millions of TSR violations between 2003 and 2011, averaging thousands of violations every single day; (b) the illegal calls from Dish and its retailers continued long after the government began investigating Dish's conduct and even for years after this litigation commenced; and (c) prior to the close of fact discovery in this case, Dish failed to bring its and its retailers' telemarketing practices into compliance, and certainly not to the extent that there is no reasonable likelihood of future violations.  Injunctive relief is therefore appropriate because there is a reasonable likelihood of future violations.

106.     Fencing-in relief is appropriate against Dish's internal call center operation because it has never offered an explanation for how it came to commit so many violations of the TSR, and the only evidence in the record shows that Dish has known that its internal call center operation has been violating telemarketing laws since at least 2002.  Because Dish provided no details during fact discovery about how its telemarketing system could be improved, the Court must enter a broad order so as to prevent future violations.

107.     Dish Network and Dish-owned, -operated, or -contracted call centers are therefore enjoined from placing any outbound telemarketing calls unless and until Dish hires a third-party consulting organization not involved in this case to perform a top-to-bottom review of its call-center operation, including a complete review of the outbound operations and international departments and a complete review of Dish's internal "database marketing" team that generates calling lists.  The review shall also include a complete evaluation of the software systems Dish uses to accomplish its telemarketing, including the dialing systems, the "no-contact" flags contained in any version of Dish's customer and lead databases, the PDIALER system that is used to process lists, and any other list extraction, list scrubbing, or list processing database.

That third-party organization shall prepare a report to be submitted to the Court and the United States, after which the Court will hold a hearing on the adequacy of the plan. If the Court approves the plan, Dish will be required to implement the plan and verify in writing under the penalty of perjury that it has implemented the plan as written. The Court will then issue an order permitting Dish to resume its internal call center operation.

108. After it resumes its internal telemarketing operation, Dish shall transmit all telemarketing compliance materials to the United States on a quarterly basis for ten years, including: (a) all outbound telemarketing call records; (b) all records of leads, EBRs, and consents-to-call associated with those call records; (c) all telemarketing complaints it received during the prior quarter; (d) all internal emails, internal instant messages, and internal Siebel database entries discussing telemarketing compliance over the prior quarter; and (e) any other relevant telemarketing-compliance related information. Upon receipt and analysis of these records, Plaintiffs have the option of petitioning the Court for further injunctive relief, up to and including a complete telemarketing ban. The Court will decide such a petition on the record only and without allowing additional discovery beyond the records Dish transmitted to Plaintiffs and the parties' analyses of those records.

109. Fencing-in relief is appropriate as to Dish's large retailers because Dish has not taken the steps necessary to ensure its retailers' compliance with the TSR, and evidence shows that Dish has known its retailers have been violating telemarketing laws since at least 2001.

110. Dish is therefore restrained and enjoined from accepting any sale from any retailer averaging 150 activations per month or more unless and until it hires a third-party consulting organization not involved in this case to perform a top-to-bottom review of the telemarketing activities of its retailer base to ensure compliance with the TSR. That third-party organization

shall prepare a report to be submitted to the Court and the United States, after which the Court

will hold a hearing on the adequacy of the plan. After the Court approves the plan, Dish will be

required to implement the plan and verify in writing under the penalty of perjury that it has

implemented the plan as written. The Court will then issue an order permitting Dish to accept

orders from retailers who generate 150 activations or more per month.

111. After it resumes accepting orders from retailers that average more than 150 orders

per month, Dish shall engage the third party who prepared the retailer telemarketing compliance

plan to submit an annual report evaluating progress made on retailer telemarketing compliance

and including all relevant internal Dish documents (including complaints and internal emails)

discussing retailer telemarketing compliance. Upon receipt and analysis of those reports,

Plaintiffs have the option of petitioning the Court for further injunctive relief, up to and including

a complete ban on accepting sales from retailers with 150 or more activations per month.

**Civil Penalties under the TSR**

112. A defendant who violates the FTC Act or a regulation promulgated thereunder

with "actual knowledge or knowledge fairly implied on the basis of objective circumstances"

that its actions are prohibited is subject to civil penalties under the FTC Act. 15 U.S.C. § 45

(m)(1)(A), (C); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573 (2010).

113. The civil penalties provision does not require evaluation of a defendant's

subjective mental state or proof that the defendant acted with willfulness or the specific intent of

violating the FTC Act, *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996),

but only a showing that the defendant knew or should have known about the law and then

violated the law. *Id*. ("A defendant is responsible where a reasonable person under the

circumstances would have known of the existence of the provision and that the action charged violated that provision.").

114.    A person also commits a violation of this provision if, under the circumstances, a reasonable, prudent person would have known of the existence of the rule and that his or her acts or omissions violated the rule.  Opinion 445 at 226.

115.    Dish knew or should have known about the TSR and all of its legal requirements at all relevant times, and subsequently violated the TSR as described in Counts I through IV above; it is therefore liable for civil penalties.

116.    A reasonable, prudent company in Dish's position would have known of the existence of the TSR and its legal requirements.

117.    Dish knew that its internal systems were placing and causing to be placed "issue calls" that violated the telemarketing laws.

118.    Dish knew that if telemarketing calls coming from Dish's, its vendors,' and its agents' dialers violated the TSR, it could be liable for per-call civil penalties under the TSR.

119.    The plain meaning of the word "cause" put Dish on notice since the amended TSR was published in the Federal Register in January 2003 that Dish could be liable under the TSR for its retailers' telemarketing violations.  Opinion 20 at 14-15.

120.    Dish has also been on notice that it could be held liable for its retailers' telemarketing violations from the series of complaints filed, since early 2005, by the United States (on referral from the Federal Trade Commission), alleging that sellers are liable under the TSR for the telemarketing activities of their marketing affiliates, regardless of whether the marketing affiliates are agents of the seller.  Complaint ¶ 18, *United States v. Flagship Resort Dev. Corp.*, No. 1:05-CV-00981 (D.N.J. filed Feb. 16, 2005) (alleging that seller caused its

telemarketer to violate the TSR by agreeing to pay for marketing services); Complaint ¶¶ 35, 42-44, 48-49, *United States v. DIRECTV, Inc.*, No. 8:05-CV-1211 (C.D. Cal. filed Dec. 12, 2005) (alleging that Dish's largest satellite-television competitor, DIRECTV, caused its dealers to violate the TSR, where it entered into contracts with its dealers or paid the dealers to market its services, and the dealers violated the TSR); Complaint ¶¶ 25, 28, 32, *United States v. ADT Sec. Servs., Inc.*, No. 9:07-CV-81051-WJZ (S.D. Fla. filed Nov. 6, 2007) (alleging that alarm-monitoring company caused its dealers to violate the TSR, where it operated national network of dealers, authorized them to solicit customers, and paid them for opening new security system accounts, and they violated the TSR).

121.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 501,650 outbound telemarketing calls Dish made to telephone numbers that had been on the Registry more than 31 days violated the TSR.

122.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 873,551 outbound telemarketing calls it made to numbers that had been on the Registry more than 31 days—the call records for which reflected a campaign code indicating that the calls were made in response to a customer inquiry, but for which Dish produced no independent, admissible evidence regarding the meaning of these codes—violated the TSR.

123.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 309,931 outbound telemarketing calls it made to phone numbers that had been on the Registry more than 31 days—the call records for which reflect a disposition code indicating that the call was not completed—violated the TSR.

124.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 12,552 telemarketing calls it made to numbers that had been on the Registry more than 31 days that reached a wrong number or a recipient that did not speak English violated the TSR.

125.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 10,029 telemarketing calls to numbers on the Registry that John Taylor excluded as "intrastate calls" violated the TSR.

126.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 71,853 telemarketing calls it made to numbers that had been on the Registry more than 31 days, and which also appeared on the "Internal" portion of Dish's entity-specific do-not-call list, violated the TSR.

127.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 2,314,533 telemarketing calls it made to numbers that had been on the Registry more than 31 days, and for which it offered no admissible evidence of any EBR defense, violated the TSR.

128.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 2,864,896 telemarketing calls it made to numbers that had been on the Registry more than 31 days, and for which its EBR defense data were missing or invalid, violated the TSR.

129.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 12,533,684 telemarketing calls it made between January 3, 2005 and May 31, 2005 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

130.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 2,784,629 telemarketing calls it made between June 1, 2005 and June 30, 2005 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

131.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 2,575,019 telemarketing calls it made between July 1, 2005 and July 31, 2005 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

132.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 4,000,815 telemarketing calls it made between August 1, 2005 and September 18, 2005 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

133.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 6,916,143 telemarketing calls it made between December 1, 2005 and January 31, 2006 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

134.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 3,375,472 telemarketing calls it made between February 1, 2006 and February 28, 2006 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

135.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 4,641,828 telemarketing calls it made between March 1,

2006 and April 30, 2006 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

136.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 7,586,596 telemarketing calls it made between May 1, 2006 and June 30, 2006 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

137.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 5,080,115 telemarketing calls it made between July 1, 2006 and August 15, 2006 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

138.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 4,710,270 telemarketing calls it made between August 16, 2006 and September 30, 2006 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

139.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 3,624,432 telemarketing calls it made between October 1, 2006 and October 31, 2006 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

140.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 3,712,816 telemarketing calls it made between November 1, 2006 and November 30, 2006 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

141.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 3,002,123 telemarketing calls it made between December 1, 2006 and December 31, 2006 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

142.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 2,994,525 telemarketing calls it made between January 2, 2007 and February 28, 2007 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

143.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 4,046,178 telemarketing calls it made between March 1, 2007 and April 30, 2007 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

144.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 3,389,113 telemarketing calls it made between May 1, 2007 and May 31, 2007 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

145.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 4,938,258 telemarketing calls it made between June 1, 2007 and June 30, 2007 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

146.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 4,627,426 telemarketing calls it made between July 1, 2007

and July 31, 2007 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

147.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 5,494,133 telemarketing calls it made between August 1, 2007 and August 31, 2007 to telephone numbers that had been on the Registry more than 31 days violated the TSR.

148.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that its causing of 2,349,031 JSR Enterprises telemarketing calls to phone numbers on the Registry at least 31 days violated the TSR.

149.    Dish is also liable for civil penalties for the 2,349,031 JSR Enterprises calls in the preceding paragraph because JSR Enterprises was Dish's agent, the calls are therefore treated as if Dish itself made them, and Dish knew or should have known at the time of the calls that telemarketing to phone numbers on the Registry at least 31 days would subject it to civil penalties.

150.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that its causing of 381,811 SSN telemarketing calls to phone numbers on the Registry at least 31 days between May 2010 to August 2011 violated the TSR.

151.    Between May 2010 and August 2011, while Dish was causing SSN's calls to numbers on the Registry at least 31 days, Dish *knew* that its causing of those calls violated the TSR, because this Court had already ruled that Dish could be liable for its retailers' calls, *United States v. Dish Network*, 667 F. Supp. 2d 952 (C.D. Ill. 2009), and a reasonable, prudent company would have taken steps to stop SSN, a known telemarketing violator for at least nine years, from committing further violations.

152.    Dish is also liable for civil penalties for the 381,811 SSN calls in the preceding paragraph because SSN was Dish's agent, the calls are therefore treated as if Dish itself made them, and Dish knew or should have known at the time of the calls that telemarketing to phone numbers on the National Do-Not-Call Registry would subject it to civil penalties.

153.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that Dish's 903,246 telemarketing calls between 2007-2010 to telephone numbers on the entity-specific do-not-call lists of Dish and its Telemarketing Vendors, eCreek and EPLDT, violated the TSR.  Opinion 445 at 178.

154.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 140,349 telemarketing calls to numbers marked by Dish Telemarketing Vendor eCreek as "DNC" violated the TSR.  Opinion 445 at 5, 179.

155.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 7,321,163 calls it made to telephone numbers on the retailer portion of Dish's entity-specific do-not-call list violated the TSR.  Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 4,968 telemarketing calls it made to numbers on the entity-specific do-not-call list maintained by Dish retailer New Edge of the numbers of consumers who stated to New Edge that they did not wish to receive telemarketing calls violated the TSR.

156.    Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that the 98,054 prerecorded telemarketing calls it made violated the TSR.

157.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that its causing of 43,100,876 Star Satellite prerecorded telemarketing calls violated the TSR.

158.     Dish is also liable for civil penalties for the 43,100,876 Star Satellite prerecorded telemarketing calls in the preceding paragraph because Star Satellite was Dish's agent, the calls are therefore treated as if Dish itself made them, and Dish knew or should have known that placing prerecorded telemarketing messages to live consumers would subject it to civil penalties.

159.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that its causing of 6,637,196 Dish TV Now prerecorded telemarketing calls violated the TSR.

160.     Dish is also liable for civil penalties for the 6,637,196 Dish TV Now prerecorded telemarketing calls in the preceding paragraph because Dish TV Now was Dish's agent, the calls are therefore treated as if Dish itself made them, and Dish knew or should have known that placing prerecorded telemarketing messages to live consumers would subject it to civil penalties.

161.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known that its causing of one American Satellite prerecorded telemarketing call violated the TSR.

162.     Dish is liable for civil penalties because a reasonable, prudent company in Dish's position would have known providing substantial assistance to Star Satellite when Dish knew that Star Satellite was violating the TSR was an act that itself violated the TSR.

163.     The Court may award civil penalties of $11,000 for each violation before February 9, 2009, and $16,000 per violation on or after February 9, 2009.  Federal Civil Penalties Inflation Adjustment Act, 74 Fed. Reg. 857-01 (Jan. 9, 2009).

164.     In setting the civil penalty amount, the FTC Act directs the Court to consider the following factors: "the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require."  15 U.S.C. § 45 (m)(1)(C).

165.     "Other matters as justice may require" in this case includes the strong public interest in seeing telemarketing violators punished.

166.     A civil penalty must actually punish the violator and provide "meaningful deterrence," and cannot be simply a cost of doing business.  *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 231 (1975).

167.     Applying the civil penalties factors to the facts as found by the Court, a $900 million civil penalty is appropriate under the TSR because Dish has a lengthy history of telemarketing violations, its conduct was repeated and willful in that it knew it was violating the law and failed to take corrective actions, its conduct negatively affected large numbers of American consumers, it has failed to take meaningful responsibility for its conduct, it has many billions of dollars in cash reserves and/or marketable assets, a $900 million penalty will not meaningfully affect its ability to do business because it represents about one year of Dish's net profits, and companies in Dish's position must be deterred from engaging in conduct similar to Dish's.

## EVIDENTIARY RULINGS

168.     Evidence that occurred prior to the statute of limitations periods is admissible as background and to show knowledge or intent.  Opinion 445 at 49, *citing Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Davis v. City of Springfield*, 2009 WL 2605277, at *2 (C.D. Ill. August 21, 2009).

169.     Evidence about Dish's preparation of lists of telephone numbers to be called in telemarketing campaigns ("call lists," "calling lists," or "campaign lists") was not provided by Dish in discovery, and is barred by Opinion 279.  Opinion 445 at 34.

170.     Dish is precluded from using any documents or information about the creation and scrubbing of telemarketing campaign lists that it did not produce to Plaintiffs in discovery. Opinion 445 at 36; Opinion 279 at 43-44.

171.     Absent the existence of an exception to the hearsay rule for a particular Dish document, Dish may not seek to admit into evidence its own documents without foundation testimony.  Opinion 445 at 34-35.

172.     Under Fed. R. Evid. 1002, oral testimony about the contents of a document is not admissible to prove the contents of a document.  Opinion 445 at 36-37.

173.     Independent evidence of the meaning of a campaign code, such as testimony by a witness with personal knowledge about the meaning of each code, consumer lead information, or documentation of consumer inquiries, is needed to prove the meaning of a campaign code. Opinion 445 at 168-69.

174.     PX38B (PX38, ¶ 28, App. B), reflecting 1,505 consumer complaints about telemarketing calls in which Dish services were offered for sale, which were filed within one calendar day of the receipt of an allegedly illegal telemarketing call reflected on the call records of Dish or one of its retailers, is admissible under the residual hearsay exception because it meets the five requirements of (1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice.  Opinion 445 at 45-46; Fed. R. Evid. 807 (formerly Fed. R. Evid. 803(24)); *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999).  Opinion 445 at 47.

175.    In light of the costs and burdens on the parties and the consumers of matching the complaints to the call records collect the evidence in another manner, it is in the interests of justice to admit PX38B into evidence.  See *FTC v. Kuykendall*, 312 F.3d 1329, 1343 (10th Cir. 2002); *Figgie, Int'l, Inc*., 994 F.2d at 608.

176.    Representative consumer proof—in which consumers who offer testimony stand in for a larger number of consumers who were subjected to the same or similar conduct—is specifically permitted in telemarketing enforcement actions.  *FTC v. Amy Travel Service*, Inc., No. 87-cv-6776, 1988 U.S. Dist. LEXIS 13371, at *46-49 (N.D. Ill. Feb. 10, 1988) (concluding that "representative proof of injury [is] sufficient in an FTC enforcement action"), *aff'd*, 875 F.2d 564, 576 (7th Cir. 1989) ("The defendants ran a nationwide telemarketing operation and it would be cumbersome and unnecessarily expensive to bring all the consumers in for live testimony.").

177.    Consumer complaint letters and emails received by Dish and produced in discovery (PX79, PX158, PX203, PX247, PX249) are admissible for the non-hearsay purposes of showing that Dish was on notice of these complaints and to show the effect of the complaints on Dish.  Opinion 49 at 237-238; *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993).

178.    With respect to PX58, PX83, PX84, PX86, PX194, PX195, PX199, and PX254, Dish's claims of privilege over its in-house attorneys' conduct in monitoring compliance with the telemarketing laws are waived by Dish's assertion that it meets the safe harbor defense. Opinion 151; Opinion 445 at 49.

179.    With respect to PX58, PX83, PX84, PX86, PX194, PX195, PX199, PX254, Dish's claims of privilege over its in-house attorneys' conduct in monitoring compliance with

the telemarketing laws are waived by Dish's assertion that it meets the safe harbor defense. Opinion 445 at 50.

180.     Statements made during settlement negotiations may be admitted for the limited purpose of proving notice under Fed. R. Evid. 408(b).

181.     PX168 (Swanberg settlement letter to Dish) is admissible to prove notice to Dish of the consumer complaint. Opinion 445 at 52.

182.     Documents produced by the opposing party during discovery may be treated as authentic.  Opinion 445 at 41, citing *Fenje v. Feld*, 301 F.Supp.2d 781, 809 (N.D. Ill. 2003).

183.     A statement by an employee or agent of Dish within the scope of the employment or agency relationship is not hearsay, but a statement of Dish as a party opponent.  Opinion 445 at 41, 44; Fed. R. Evid. 801(d)(2)(D); 805.

184.     Non-hearsay statements by a party opponent do not require further foundation evidence.  Opinion 445 at 41; citing *Aliotta v. Nat'l R.R. Passenger Corp.*,  315 F.3d 756, 761 (7th Cir. 2003).

185.     A failure to supplement Rule 26 disclosures is harmless when the information was disclosed during discovery.  Opinion 445 at 43, citing *Stolarczyk ex rel Estate of Stolarczyk v. Senator Intern. Freight Forwarding, LLC*, 376 F.Supp.2d 834, 843(N.D. Ill. 2005).

186.     A failure to supplement Rule 26 disclosures is not harmless when the discovery record does not disclose that a witness exists, or does not disclose that a witness possesses substantial discoverable information.  Dish is therefore precluded from calling witnesses who were not named in its Rule 26 disclosures or in the discovery record.  Furthermore, under Rule 26 and Opinion 279, Dish witnesses on the topic of Dish's internal processes and procedures

who appear only tangentially in the discovery record are precluded from testifying beyond the scope of the documents in the discovery record.

187.     After the close of discovery, a party cannot selectively "update" the discovery record with a smattering of recently created documents that it believes are helpful to its case without turning over discovery updates that allow the opposing party and the fact-finder to consider the full record of what has occurred since the close of fact discovery.

188.     Dish refused to update its discovery responses and took the position that no updates were required after general fact discovery closed on June 30, 2012.  The only reasonable implication of Dish's position, upon which Plaintiffs relied, is that Dish agreed to have the factual record considered as it existed at the close of discovery, and not after.

189.     Dish later attempted on several occasions to place new information in the record, but only when it believed that information would assist it in its case.  Dish never provided general updates to its discovery responses to Plaintiffs.  Dish's failure was not harmless because it sought to use its failure to update its discovery responses to its unilateral advantage.  Thus, because Dish did not update its discovery responses as envisioned by Rule 26(e), the proper remedy is for the Court to consider the factual record only as it existed on June 30, 2012.

**EXPERT RULINGS**

190.     The Court must determine whether the expert testimony is reliable and relevant and whether an expert's opinions will assist the trier of fact in determining a fact in issue. Opinion 444 at 42; citing *Ammons v. Aramark Uniform Services, Inc*., 368 F.3d 809, 816 (7th Cir. 2004).

191.     The court must perform a gate-keeping function to determine that expert testimony is reliable and relevant under the principles codified in Fed. R. Evid. 702.  *Daubert*, 509 U.S. at 597.

192.     Based on the Court's evaluation of his qualifications, Plaintiffs' proffered expert witness, Dr. Erez Yoeli, is qualified as an expert to conduct statistical analyses of large, complicated data sets.  Opinion 444 at 42; 445 at 41-42.

193.     The Court must evaluate the reliability of the expert's methodology. *Manpower Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013).

194.     "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

195.     The Court must evaluate whether the expert's opinions are relevant and fit the issue to which the expert is testifying. Opinion 444 at 47.  *Ammons,* 368 F.3d at 816; *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995).

196.     Evidence is relevant if "it has a tendency to make a fact more or less probable than it would be without the evidence."  Opinion 444 at 47; Fed. R. Evid. 401(a).

197.     To be relevant, the evidence 'need not conclusively decide the ultimate issue in a case, nor make the proposition appear more probable, but "it must in some degree advance the inquiry."' *Thompson v. City of Chicago*, 472 F.3d 444, 453 (quoting *E.E.O.C. v. Indiana Bell Telephone Co*., 256 F.3d 516, 533 (7th Cir. 2001) (quoting 1 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 401.04[2][b])).

198.    Dr. Yoeli's opinions and analyses meet the standards of Fed. R. Evid. 702 and are admissible in connection with Count I as expert opinion testimony.  Opinion 444 at 55.

199.    Dr. Yoeli's opinions and analyses of calls to numbers on internal do-not-call lists are admissible under Fed. R. Evid. 702.  Opinion 444 at 56.

200.    Dr. Yoeli's opinions and analyses with respect to calculating the number of abandoned calls made by Dish and its retailers Dish TV Now and Star Satellite meet the requirements of Fed. R. Evid. 702.  Opinion 444 at 56-58.

201.    Dr. Yoeli collected random samples from the sets of call records of Dish Network, JSR Enterprises, Defender, Star Satellite, and Dish TV Now and provided them to PossibleNow to analyze as to whether they were residential, wireless, business, or other types of telephone numbers at the time of each call record.  Opinion 444 at 59.

202.    Dr. Yoeli is an expert in statistical analysis, and he is qualified to collect a random sample from a data set.  Opinion 444 at 59.

203.    Dr. Yoeli's sampling methodology for the random samples provided to PossibleNow is sufficiently reliable under Fed. R. Evid. 702.  Opinion 444 at 60.

204.    Dr. Yoeli's analyses and opinions are relevant to show telemarketing calls to residential subscribers in the Plaintiff states.  Opinion 444 at 60-62.

205.    Because Dish uses an autodialer to make telemarketing calls, Dish is required by the TCPA's ban on autodialing to wireless telephones, 47 U.S.C. § 227(b)(1)(A)(iii),  to remove wireless telephone numbers from its calling lists.  Opinion 444 at 61; PX14 at 41, 114.

206.    Dr. Yoeli's use of area codes to identify calls to residents of the Plaintiff States is reliable and should be admitted.  Opinion 444 at 62.

207.     Use of area codes is a relevant method to prove that Dish and its authorized retailers called citizens to the Plaintiff States.  Opinion 444 at 63.

208.     The use of area codes is a relevant method to show geographic location under Fed. R. Evid. 401.  Opinion 444 at 64.

209.     Dr. Yoeli's use of area code is a relevant method, and his overall methods are reliable.  Opinion 44 at 65.

210.     Area codes are relevant to the geographic location of a telephone, particularly in light of Dish's practice of scrubbing wireless numbers from its call lists.  Opinion 444 at 65-66.

211.     Admissible expert testimony must be based on sufficient facts and data, must be the result of reliable scientific or technical principles and methods, and those principles must be reliably applied to the facts of the case.  Opinion 445 at 37, citing Fed. R. Evid. 702.

212.     An expert must have scientific, technical, or other specialized knowledge that will help the trier of fact understand the evidence and determine the fact at issue.  Opinion 445 at 37, citing Fed. R. Evid. 702.

213.     John Taylor's opinions regarding the applicability of the telemarketing laws to calls made to wireless numbers and calls made to business numbers do not qualify as expert testimony under Fed. R. Evid. 702.  Opinion 445 at 38.

214.     John Taylor's opinions interpreting the TSR and TCPA provisions regarding the Registry and the effect of calls to numbers on the Registry do not qualify as expert testimony under Fed. R. Evid. 702.  Opinion 445 at 38.

215.     John Taylor's opinions regarding how the telemarketing laws apply to the facts in this case do not qualify as expert testimony under Fed. R. Evid. 702.  Opinion 445 at 38.

216.     John Taylor's opinions regarding the sufficiency of Plaintiff's evidence to prove that Dish's 98,054 telemarketing automessage calls were to residential customers are immaterial. Opinion 445 at 39.

217.     John Taylor's recitation of information provided to him by Dish representatives concerning the meaning of the code names of various calling campaigns, specifically that the code names of the calling campaigns indicate (a) that certain Dish calls were made to customers with EBRs; or (b) that calls were made for collection or a non-telemarketing purpose, are inadmissible hearsay, and do not qualify as an expert opinion to be considered under Fed. R. Evid. 702.  Opinion 445 at 40, 168-69; citing *Loeffel Steel Prods, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

218.     The proposed testimony of Ken Sponsler, proffered as an expert witness by Dish, is not admissible under Fed. R. Evid. 702 because he has not used a reliable methodology for reaching his conclusions—instead, his conclusions are *ad hoc* justifications for Dish allowing its retailers to break the law based mostly on his personal experiences as a Dish consultant. Furthermore, Mr. Sponsler failed to reliably apply his purported methodology to this case.

219.     The proposed testimony of Avery Abernethy, proffered as an expert witness by Dish, is not admissible under Fed. R. Evid. 702 because there is no defined methodology and his testimony is irrelevant to any question in this case.  He starts from the incorrect legal assumption, provided to him by Dish's lawyers, that the National Do-Not-Call Registry is "inaccurate" because it contains wireless and business telephone numbers.  Furthermore, he has not used a reliable methodology for reaching his conclusions—instead, his conclusions are *ad hoc* justifications for why Dish should be allowed to break the law.  Under Fed. R. Evid. 702, his testimony could not assist the fact-finder.

220.    The proposed testimony of Robert Fenili, proffered as an expert witness by Dish, is not admissible under Fed. R. Evid. 702 because his testimony is irrelevant to any issue in this case.  The general composition of the National Do-Not-Call Registry has nothing to do with the specific calls at issue in this case.  Under Fed. R. Evid. 702, his testimony could not assist the fact-finder.

221.    The proposed testimony of Debra Green, proffered as an expert witness by Plaintiffs, is admissible under Fed. R. Evid. 702 because her conclusions are the product of a reliable methodology that was reliably applied to the facts of this case, and her testimony will assist the fact-finder in determining how professionals in the telemarketing field perform compliance activities.  In the alternative, Debra Green's testimony about typical compliance procedures in the telemarketing industry is admissible under Fed. R. Evid. 701 as lay opinion testimony because it is related to her personal observations and experience during years of working in the telemarketing field.

**TCPA - Authority for States to Sue in Federal Court and Definitions**

222.    Plaintiff states, by and through their attorneys general, are authorized by 47 U.S.C. § 227(f)(1) to file actions in federal district court to enjoin violations and enforce compliance with the Telephone Consumer Protection Act and to obtain actual damages or damages of $500 for each violation and up to treble that amount for each violation committed willfully or knowingly.  Specifically, § 227(f)(1) provides:

> Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section, the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions.  If the court finds the defendant willfully or knowingly violated such regulations, the court may, in

its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the preceding sentence.

**California - Authority to Bring Suit for State Law Claims**

223.     Plaintiff, the People of the State of California, by and through Kamala D. Harris, Attorney General of the State of California, is authorized by California Business & Professions Code §§ 17204 and 17593, and §§ 17206 and 17536, respectively, to obtain injunctive relief to halt acts of unfair competition and enforce compliance with California Business & Professions Code §§ 17200 and 17592 and for civil penalties for each violation of §§ 17200 and 17592.

**North Carolina - Authority to Bring Suit for State Law Claims**

224.     Plaintiff, the State of North Carolina, by and through its Attorney General, Roy Cooper, is authorized under N.C. Gen. Stat. § 75-105(a) to enforce the State's Telephone Solicitations Act,  N.C. Gen. Stat. § 75-100, et seq., and to seek civil penalties, restraining orders and other equitable relief against violators of the Act.

**Illinois - Authority to Bring Suit for State Law Claims**

225.     Plaintiff, the People of the State of Illinois, by and through Lisa Madigan, Attorney General of the State of Illinois, is authorized by 815 Ill. Comp. State 505/1 *et seq*., through 815 Ill. Comp. Stat 305/30(d), to obtain injunctive relief to halt unlawful acts or practices and to recover restitution and civil penalties.

**Ohio - Authority to Bring Suit for State Law Claims**

226.     Plaintiff, the State of Ohio, by and through Attorney General Michael DeWine, is authorized by the Ohio Consumer Sales Practices Act, Ohio Revised Code 1345.01 et seq. to obtain declaratory judgments, enjoin violations and seek orders for consumer damages, civil penalties and other appropriate relief.

**Count V:  TCPA - Prohibition against Calling Numbers on Do Not Call Registry**

**ATTACHMENT F – PLAINTIFFS' CONCLUSIONS OF LAW**

227. The TCPA is codified at 47 U.S.C. § 227. It prohibits certain types of telephone calls to protect residential telephone subscribers and authorizes the FCC to promulgate rules implementing the TCPA.

228. The FCC Rule at 47 C.F.R. § 64.1200(c) provides in relevant part: "(c) No person or entity shall initiate any telephone solicitation, as defined in paragraph (f)(12) of this section, to . . . (2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government."

229. 47 C.F.R. § 64.1200(c) requires the registrant to be a residential telephone subscriber and requires sellers and telemarketers to honor the registration as long as the number remains on the Registry. Opinion 445 at 200.

230. Thus, State Plaintiffs need not prove that the calls were made to the person who registered the number on the Registry. 47 C.F.R. § 64.1200(c); Opinion 445 at 200; see also Opinion 445 at 160-62 (rejecting argument that plaintiffs must prove call to person who registered number on the Registry in connection with TSR; discussing Congress' intent to protect consumers and fact that consumer protection statutes should be construed liberally to protect consumers), 215 (same holding in context of California's Do Not Call Law, Cal. Bus. & Prof. Code § 17592), and 219 (same holding in context of N.C.'s Do Not Call Law, N.C. Gen. Stat. § 75-102(a)).

231. As of July 14, 2008, "do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." 73 Fed. Reg. 40183 (July 14, 2008); Opinion 445 at 27.

232. Wireless customers may register their wireless telephone numbers on the Registry. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, FCC 03-153 (July 3, 2003), 34-36; Opinion 445 at 29-30; 47 C.F.R. § 64.1200(e).

233. The TCPA, 47 U.S.C. § 227(a)(4), and FCC Rule at 47 C.F.R. § 64.1200(f)(14) (formerly subsection (f)(12)) define "telephone solicitation" to mean "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person . . . ."

234. The TCPA's statute of limitations is four years, and the limitations period does not implicate state law. 28 U.S.C. § 1658; *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 561 (7th Cir. 2011).

235. In violation of 47 U.S.C. § 227 and 47 C.F.R. § 64.1200(c)(2), Dish engaged in a pattern or practice of making outbound telemarketing calls for Dish products and services to residents of the Plaintiff States whose telephone numbers were on the Registry as reflected in the 2007-2010 Dish call records. Opinion 445 at 6, 202.

236. No evidence indicates that Dish prohibited or restricted its telemarketers or the Telemarketing Vendors from directing calls to the residents of the Plaintiff States. Opinion 445 at 201.

237. The nationwide pattern and practice of Dish's telemarketing campaigns is beyond dispute. Opinion 445 at 206. Those practices included calling the residents of the Plaintiff States. *Id*.

238. Dish is liable for the actions of its Telemarketing Vendors, eCreek and EPLDT. Opinion 445 at 178.

239.    Dish was required to remove wireless telephone numbers from its calling lists because it used autodialing equipment, Opinion 445 at 203; 47 U.S.C. § 227(b)(1)(A); hence, Dish did not call those types of numbers.  Opinion 445 at 203.

240.    State Plaintiffs have shown that it is more likely than not that all of the calls for which they seek to hold Dish liable went to residential telephone subscribers in their States.

241.    "Use of area codes is a relevant method to prove that Dish and its authorized retailers called citizens of the Plaintiff States."  Opinion 444 at 63.  "The use of area codes is a relevant method to show geographic location under Rule of Evidence 401."  Opinion 444 at 64. "Area codes are relevant to the geographic location of a telephone, particularly in light of Dish's practice of scrubbing wireless numbers from its call lists."  Opinion 444 at 65-66.

242.    State Plaintiffs have shown that it is more likely than not that calls to numbers with area codes associated with their respective States went to residents of those States.  Dish has not presented any admissible evidence tending to show that even one of the calls for which the States seek to hold Dish liable went to a subscriber who did not reside in the State associated with the area code of the telephone number.

243.    Retailers JSR and Satellite Systems engaged in a pattern or practice of making outbound telemarketing calls for Dish products and services to residents of the Plaintiff States whose telephone numbers were on the Registry.  Opinion 445 at 6, 208.

244.    As with Dish and the Telemarketing Vendors, the Order Entry Retailers engaged in a pattern or practice of calling numbers on the Registry nationwide, which includes the Plaintiff States.  Opinion 445 at 209.

245.    Under the TCPA and implementing regulations covering the National Do-Not-Call Registry, 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2), Dish is liable for calls it placed

directly to numbers on the Registry, as well as for calls to numbers on the Registry made "on behalf of" Dish by the Retailers, regardless of any agency relationship between Dish and the Retailers. *See, e.g.*, May 9, 2013 Order, 28 FCC Rcd at 6597 (Pai, A., Commissioner, dissenting in part) ("Instead of incorporating federal common-law agency principles into section 227(c), the Commission should give meaning to "on behalf of" and impose third-party liability for do-not-call violations whenever a telemarketer initiates a call on a seller's behalf, even if that telemarketer is not under the seller's control.").

246.    The May 9, 2013 FCC declaratory ruling stands for the proposition that background agency principles apply to federal statutes, including the TCPA; however, FCC cannot interpret the private right of action in § 227(c)(5) because Congress has delegated to the judiciary the task of interpreting private rights of action. *Adams Fruit Co. v. Barrett*, 494 U.S. 638 (1990); *see Chevron, U.S.A. Inc. v. Nat'l Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1986).

247.    The "on behalf of" language used in § 227(c)(5), the TCPA's private right of action covering Registry violations, has already been interpreted by this Court to extend beyond agency principles to cover calls made in the interest of or for the benefit of Dish Network—such as the calls made by Dish's order entry retailers. *United States v. Dish Network*, 667 F. Supp. 2d 952, 962-63 (C.D. Ill. 2009) (noting that the law does not say "agent" or "at the direction of," but rather says "on behalf of"). The Court's ruling is the law of the case.

248.    Dish may also be liable under the federal common law of agency for Registry violations dialed by its Retailers.

249.    The federal common law of agency is in accord with the Restatement. *See, e.g., Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000); *NECA-IBEW Rockford*

*Local Union 364 Health & Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1058 (7th Cir. 2013).

250.     The determination of whether an agency relationship exists is a factual issue.  *See Spitz v. Proven Winners of North America LLC*, 759 F.3d 724 (7th Cir. 2014); *Chemtool, Inc. v. Lubrication Technologies, Inc.*, 148 F.3d 742, 746 (7th Cir. 1998).

251.     For an agency relationship to exist, the principal need only have the right to control the agent; agency exists even if the principal does not exercise that right.  *See Schutz v. Arrow Fin. Servs., LLC*, 465 F. Supp. 2d 872, 877 (N.D. Ill. 2006).

252.     Agency is a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) of Agency § 1.01 (2006).

253.     "An essential element of agency is the principal's right to control the agent's actions."  Restatement (Third) of Agency § 1.01, cmt. f(1) (2006).

254.     "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents."  Restatement (Third) of Agency § 1.01, cmt. f(1) (2006).

255.     Dish's contract with all of its retailers included what Dish termed an "absolute power" clause that gave Dish the right to control the manner and means of its retailers' marketing, including interim instructions about how to carry out the task of marketing Dish service, rendering the retailers Dish's agents for the purposes of their marketing activities. Whether Dish only partially exercised its right to control the retailers or failed to exercise its

right is irrelevant to the agency analysis, as is whether the retailers may have been independent

companies in other respects.

256. "'Apparent authority holds a principal accountable for the results of third-party

beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable

to a manifestation of the principal.' Restatement (Third) of Agency § 2.03 cmt. c (2006)." *Toney*

*v. Quality Res., Inc.*, No. 13 CV 42, 2014 WL 6757978, at *11 (N.D. Ill. Dec. 1, 2014).

257. Apparent authority does not require that "a principal's manifestation must be

directed to a specific third party in a communication made directly to that person." Restatement

(Third) of Agency § 2.03 cmt. a. (2006). Rather, "a principal may create apparent authority by

appointing a person to a particular position," *id*., and "[r]estrictions on an agent's authority that

are known only to the principal and the agent do not defeat or supersede the consequences of

apparent authority for the principal's legal relations" with others. Id. cmt. c.

258. Dish is also liable under an apparent agency theory for calls placed by its Order

Entry Retailers Satellite Systems Network and JSR Enterprises, because Dish's conduct raised

the reasonable belief in consumers that these Order Entry Retailers had authority to bind Dish in

telemarketing calls with consumers, and that belief was traceable to all of Dish's actions in

providing the Order Entry telesales system to Satellite Systems Network and JSR Enterprises, in

supporting these retailers' marketing activities, and in acquiescing to these retailers' profligate

telemarketing misconduct.

259. "Ratification is the affirmance of a prior act done by another, whereby the act is

given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency

§ 4.01(1) (2006).

260.    A principal "is not bound by a ratification made without knowledge of material facts about the agent's act unless the principal chose to ratify with awareness that such knowledge was lacking." Restatement (Third) of Agency § 4.01 cmt. b. (2006). "[K]nowing acceptance of the benefits of a transaction ratifies the act of entering into the transaction." Restatement (Third) of Agency § 4.01 cmt. d.

261.    "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him. The acts of an agent are imputed to the principal 'if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself.' Even mere acquiescence is sufficient to infer adoption of wrongdoing." *In re S. African Apartheid Litig.*, 633 F. Supp. 2d 117, 121-22 (S.D.N.Y. 2009) (summarizing ratification principles) (citations omitted).

262.    Dish employees knew or should have known that its Order Entry Retailers were calling numbers on the Registry, and, thus, this knowledge is imputed to Dish. This imputation of knowledge is commonplace with corporations, which "do not have brains, but they do have employees. One fundamental rule of agency law is that corporations 'know' what their employees know-at least, what employees know on subjects within the scope of their duties." *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 378-79 (7th Cir. 2010).

263.    In the TCPA context, ratification does not require a specific ratification of each illegal phone call. It is enough that Dish ratified a course of conduct by knowing the pertinent facts about its order entry retailers' patterns of illegal telemarketing calls and continued to accept the successful orders from those retailers, thereby creating an inference of long-term

acquiescence. *See* Findings of Fact and Conclusions of Law at 14, ECF No. 248, *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601 (N.D. Ill. filed Nov. 21, 2014).

264.    Dish ratified the conduct of its Order Entry Retailers Satellite Systems Network and JSR Enterprises, thereby creating an agency relationship by acquiescing in and accepting the benefits of the illegal telemarketing calls of these Order Entry Retailers when Dish knew or should have known that they were telemarketing in violation of the TCPA.

265.    Dish is liable for calls placed by retailers when they committed Registry violations because the calls were made "on behalf of" Dish Network, and also because the retailers were agents of Dish for purposes of the telemarketing calls.

266.    Dish is liable for 1,215,990 telemarketing calls made to California residential phone numbers on the Registry for more than 31 days, in violation of the TCPA.

267.    Dish is liable for 1,234,985 telemarketing calls made to Illinois residential phone numbers on the Registry for more than 31 days, in violation of the TCPA.

268.    Dish is liable for 236,288 telemarketing calls made to North Carolina residential phone numbers on the Registry for more than 31 days, in violation of the TCPA.

269.    Dish is liable for 733,784 telemarketing calls made to Ohio residential phone numbers on the Registry for more than 31 days, in violation of the TCPA.

270.    Dish is not entitled to a safe harbor defense under the FCC Rule and TCPA in Count V.  Opinion 445 at 6, 210-11.

271.    Dish has not proven an "established business relationship" exemption for any of the calls at issue to numbers on the National Registry.

272.    In its definition of "telephone solicitation," the TCPA states that "such term does not include a call or message . . . to any person with whom the caller has an established business relationship. 47 U.S.C. § 227(a)(4).

273.    According to 47 C.F.R. § 64.1200(f)(5), an "established business relationship for purposes of telephone solicitations means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party."

274.    A consumer's do not call request to a seller "terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller." 47 C.F.R. § 64.1200(f)(5)(i).

275.    Dish bears the burden of establishing an established business relationship exemption under the TCPA. *See, e.g.*, Opinion 445 at 162-63 (discussing established business relationship exemption under TSR); *Shaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 534 (2005) (burden of proof shifts to defendant when element can be fairly characterized as an exemption); *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 428 F. Supp. 2d 761, 773 (N.D. Ill. 2005) (same).

**Count VI:  TCPA - Prohibition against Use of Artificial or Prerecorded Voices**

276.    The TCPA, 47 U.S.C. § 227(b)(1)(B), its implementing regulation at 47 C.F.R. § 64.1200(a)(2) provide that it is unlawful for a person to "[i]nitiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the

prior express consent of the called party unless the call . . . [is specifically exempted by rule or order]."

277.    In violation of 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(B), Dish engaged in a pattern or practice of making prerecorded outbound telemarketing calls for Dish products and services to residents of the Plaintiff states.  Opinion 445 at 6-7.

278.    Dish, the Telemarketing Vendors, and Order Entry Retailers Dish TV Now and Star Satellite engaged in a nationwide pattern or practice of making prerecorded telemarketing calls to market Dish products and services, which included calls to residents of the Plaintiff States.  Opinion 445 at 7, 212.

279.    Dish is liable for the actions of its Telemarketing Vendors, eCreek and EPLDT. Opinion 445 at 178.

280.    Dish was required to remove wireless telephone numbers from its calling lists because it used autodialing equipment.  Opinion 445 at 203.  "Because Dish scrubbed wireless numbers from its calling lists, a fact finder could conclude that the number of wireless numbers on the Registry was immaterial because Dish did not call those types of numbers."  Opinion 445 at 203.

281.    State Plaintiffs have shown that it is more likely than not that all of the calls for which they seek to hold Dish liable in Count VI went to residential telephone subscribers in their States.

282.    "Use of area codes is a relevant method to prove that Dish and its authorized retailers called citizens of the Plaintiff States."  Opinion 444 at 63.  "The use of area codes is a relevant method to show geographic location under Rule of Evidence 401."  Opinion 444 at 64.

"Area codes are relevant to the geographic location of a telephone, particularly in light of Dish's practice of scrubbing wireless numbers from its call lists." Opinion 444 at 65-66.

283.    Unlike the Registry portion of the TCPA at § 227(c)(5), the private right of action for prerecorded calls at § 227(b)(3) does not include "on behalf of" language. Hence, background agency principles apply as per the FCC's order.

284.    Under the federal common law of agency as described above in the conclusions of law related to Count V, Dish is liable for calls placed by Star Satellite.

285.    Dish's contract with Star Satellite gave Dish the right to control the manner and means of Star Satellite's marketing, including interim instructions about how to carry out the task of marketing Dish service, and Star Satellite is therefore Dish's agent for the purposes of its marketing activities.

286.    Dish is also liable under an apparent agency theory for calls placed by Star Satellite, because Dish's conduct raised the reasonable belief in consumers that Star Satellite had authority to bind Dish in telemarketing calls with consumers, and that belief was traceable to all of Dish's actions in providing the Order Entry telesales system to Star Satellite, in supporting Star Satellite's marketing activities, and in acquiescing to Star Satellite's profligate telemarketing misconduct.

287.    Dish also ratified the conduct of Star Satellite, thereby creating an agency relationship by acquiescing in and accepting the benefits of the illegal telemarketing calls of Star Satellite when Dish knew or should have known that it was telemarketing in violation of the TCPA.

288.    Dish is liable for 5,634,507 prerecorded telemarketing calls made to residential phone numbers in California, in violation of the TCPA.

289.     Dish is liable for 2,559,143 prerecorded telemarketing calls made to residential phone numbers in Illinois, in violation of the TCPA.

290.     Dish is liable for 1,563,911 prerecorded telemarketing calls made to residential phone numbers in North Carolina, in violation of the TCPA.

291.     Dish is liable for 3,318,253 prerecorded telemarketing calls made to residential phone numbers in Ohio, in violation of the TCPA.

292.     Until October 16, 2012, the FCC rules implementing the TCPA provided an Established Business Relationship exception that allowed otherwise prohibited prerecorded calls if the calls were "made to any person with whom the caller has an established business relationship at the time the call is made."  Opinion 445 at 25; 47 C.F.R. § 64.1200(a)(2)(iv) (in effect prior to October 16, 2012).

293.     "The term established business relationship for purposes of telephone solicitations means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party . . . (i) The subscriber's seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller."  47 C.F.R. § 64.1200(f)(5).

294.     "Dish raises the Established Business Relationship exemption as an affirmative defense to Count VI at least with respect to the Dish automessage campaigns."  Opinion 445 at 213.

295.      "Dish does not show that the telephone numbers called in the automessage campaign were on the list of telephone numbers for which Dish had an Established Business Relationship that Dish provided in discovery."  Opinion 445 at 213.

296.     Dish has not proven that it meets the EBR for any of the violations.  The dialed numbers were not on the list of numbers produced in discovery for which Dish claimed it had an EBR.  The texts of the calling campaigns are insufficient as a matter of law to prove an established business relationship.

297.     Dish has no safe harbor defense for purposes of Count VI.  Opinion 445 at 212. The FCC Rule does not provide a safe harbor defense to making illegal prerecorded calls. Opinion 445 at 212-13; 47 C.F.R § 64.1200(c)(2).

**TCPA Counts V & VI – Damages and Injunctive Relief**

298.     Under the TCPA, Dish is liable to the States for a minimum of $500 in statutory damages for each violation, and, if Dish committed the violations willfully or knowingly, the Court has discretion to increase the damages to a maximum of $1500 per violation.  47 U.S.C. § 227(g)(1); *see also Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013), *reh'g denied* (Sept. 24, 2013), *cert. den'd sub nom. Turza v. Holtzman*, 134 S. Ct. 1318, 188 L. Ed. 2d 306 (2014) (affirming judgment of $4,215,000 for 8,340 illegal faxes under TCPA and stating: "To the extent Turza contends that each recipient must prove that he printed the fax (wasting paper) or otherwise suffered monetary loss, he is wrong on the law. The statute provides a $500 penalty for the annoyance.  47 U.S.C. § 227(b)(3)(B).").

299.     There are no grounds to reduce State Plaintiffs' TCPA damages below $500 per violation to some lower amount per violation.  While statutory damages provisions are not entirely immune to Constitutional limits, none come into play in this case, particularly in light of Dish's ability to pay, the number of violations, and the length of time over which the violations have occurred.  *See, e.g., Pasco v. Protus IP Solutions, Inc.*, 826 F. Supp. 2d 825, 835 (D. Md. 2011) (collecting cases and holding that "[i]n light of the breadth of case law upholding the constitutionality of the TCPA's damages provisions, and the complete non-existence of cases to the contrary, this Court need not dwell overly long on this argument. In short, while statutory damages are not entirely immune to due process challenges, statutory penalties violate due process 'only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'").

300.     "Willfully or knowingly" under the TCPA requires only that the defendant act volitionally or intentionally to make a call.  47 U.S.C. § 227(g)(1).  "'[K]nowingly' simply requires that the act be intentional or volitional, as opposed to inadvertent, and not that defendant must have known that the conduct would violate the statute.  *See Sengenberger v. Credit Control Services, Inc.*, No. 09 C 2796, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010), *adhered to on reconsideration*, 2010 WL 6373008 (N.D. Ill. June 17, 2010).  The Communications Act of 1943, which contains the TCPA, defines acting 'willfully' as a voluntary act, but does not require knowledge that the act violates the statute."  *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *7 (N.D. Ill. Mar. 19, 2013), *reconsideration denied in part*, No. 09 C 5601, 2013 WL 4495221 (N.D. Ill. Aug. 21, 2013).

301.     Interpreting "willfully or knowingly" in 47 U.S.C. § 227 to require willfulness—that is, an intent to break the law—would read "knowingly" out of the statute.  Giving meaning to both words does not produce an absurd reading of the statute.

302.     Dish acted knowingly under the TCPA, as its call records and the call records of its retailers establish that all the calls in this case were made intentionally with the purpose of selling Dish Network products and services.

303.     In light of its conduct in this matter and its history of non-compliance with telemarketing laws, Dish is liable for treble damages of $1500 for each violation.  Courts have referenced prior TCPA claims and judgments against a defendant as supporting an award of treble damages.  *See, e.g., j2 Global Communications, Inc. v. Blue Jay Inc.*, 2009 WL 4572726 (N.D. Cal. Dec. 1, 2009) (on default judgment awarding treble damages in the amount of $42,000 under § 227(b)(3) based on 28 faxes sent in violation of TCPA because deemed admissions established that defendant had been sued under the TCPA several times before and a judgment had been entered against him and therefore treble damages were necessary to accomplish the purpose of the TCPA of deterring future violations).

304.     Under the doctrine of Constitutional avoidance, the total amount of TCPA damages are subject to a Court-ordered remittitur (in an amount to be determined by the Court post-trial) prior to entertaining a due-process challenge.  *Sony BMG Music Entm't v. Tenenbau*m, 660 F.3d 487, 511 (1st Cir. 2011) (reversing district court's decision to entertain constitutional challenge to statutory penalties before remitting the damages award); *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 406 (4th Cir. 2013) (reversing district court order awarding no penalties because potential penalties violated Eighth Amendment, and

explicitly endorsing Plaintiff's ability to voluntarily remit civil penalties award in order to avoid Eighth Amendment challenge).

305.     Under the TCPA, the States are entitled to an injunction prohibiting calls in violation of the TCPA and accompanying regulations.  47 U.S.C. § 227(g)(1).

306.     The State enforcement provision of the TCPA has broad injunctive authority, stating that an injunction should "includ[e] the requirement that the defendant take such action as is necessary to remove the danger of such violation." 47 U.S.C. § 227(g)(2).

307.     The Court adopts the injunctive relief from the TSR section above as the TCPA injunction because the injunctive relief will remove the danger of TCPA violations.

**Count VII:  California Business and Professions Code Section 17592 (California Do Not Call Law)**

308.     Cal. Bus. & Prof. Code § 17592(c) provides that "no telephone solicitor shall call any telephone number on the . . . 'do not call' list" to "offer a prize or to rent, sell, exchange, promote, gift, or lease goods or services."

309.     California's do not call list is defined as "the California telephone numbers" on the National Do Not Call Registry.  Cal. Bus. & Prof. Code § 17592(a)(2).

310.     California need not prove under § 17592 that the phone calls at issue were received by California residents, nor must it prove that the calls were received in the state of California.  Congress specifically authorized the states to regulate in interstate commerce with respect to telemarketing calls and to prohibit calls to phone numbers that "relate" to the state, and phone numbers with California area codes "relate" to the State of California.  47 U.S.C. § 227(f); *Patriotic Veterans v. Indiana*, 736 F.3d 1041 (7th Cir. 2013).

311. "The nationwide nature of the calling pattern of Dish, the Telemarketing Vendors, and the Order Entry Retailers, along with the area code evidence, establishes that calls at issue were made to residents of the Plaintiff States."  Opinion 445 at 214.

312. "A 'do not call' list is current if it was obtained from the Federal Trade Commission no more than three months prior to the date a call is made."  Cal. Bus. & Prof. Code § 17592(a)(2).

313. Count VII is subject to a three-year statute of limitations under Cal. Civ. Code § 338(h).  Opinion 445 at 216–217.  The claim extends back to March 25, 2006, three years before the case was filed.  *Id.*

314. California need not show that Dish called the person who registered the telephone number on the National Do Not Call Registry.  Opinion 445 at 215.  The identity of the holder of the number at the time of the call is not an element of the prohibited conduct.  *Id.*

315. The term "telephone solicitor" means "any person or entity who, on his or her own behalf or through salespersons or agents, announcing devices, or otherwise, makes or causes a telephone call to be made to a California telephone number that . . . seeks to . . . rent, sell, exchange, promote, gift or lease goods or services . . . ."  Cal. Bus. & Prof. Code § 17592(a)(1).

316. Dish made outbound telemarketing calls for Dish products and services to telephone numbers of California residents at a time when the numbers were on the Registry as reflected in the 2007-2010 Dish call records.  Opinion 445 at 7, 214.

317. Dish called millions of numbers on the Registry, including hundreds of thousands of numbers with California area codes.  Opinion 445 at 216.

318. California agency law applies to California's state law claims.

319.     Under California law, an agent is "one who represents another, called the principal, in dealings with third persons." Cal. Civ. Code § 2295. "An agency is either actual or ostensible." Cal. Civ. Code § 2298. "The existence of an agency relationship is a factual question for the trier of fact . . . only when the essential facts are not in conflict will an agency determination be made as a matter of law." *Garlock Sealing Techs, LLC v. NAK Sealing Techs Corp.*, 56 Cal. Rptr. 3d 177 (Cal. 3d Dist. Ct. App. 2007). An agent's authority may be implied from the circumstances of a particular case and may be proved by circumstantial evidence. *See, e.g.*, *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (applying California law).

320.     "An agency is actual when the agent is really employed by the principal." Cal. Civ. Code § 2299.

321.     "An agency is ostensible when the principal intentionally, or by want of care, causes a third person to believe another to be his agent who is not really employed by him." Cal. Civ. Code § 2300. "An agent acting within his apparent or ostensible authority binds the principal where the principal has intentionally or negligently allowed others to believe the agent has authority." *C.A.R. Transp. Brokerage Co.*, 213 F.3d at 479 (summarizing California law).

322.     "While it is true that the ostensible authority of an agent cannot be based solely upon the agent's conduct . . . it is not true that the principal must make explicit representations regarding the agent's authority to the third party before ostensible authority can be found. For example, ostensible authority may be proven through evidence of the principal transacting business solely through the agent, . . . the principal knowing that the agent holds himself out as clothed with certain authority but remaining silent, . . . , the principal's representations to the

public in general, . . ., and the customs and usages of the particular trade in question." *C.A.R.*

*Transp. Brokerage Co.*, 213 F.3d at 480 (summarizing California law) (citations omitted).

323.    "In *Holt v. Kormann*, 2012 WL 2150070 (C.D. Cal. June 12, 2012), cited by

Plaintiff, this Court found that a corporate defendant ("KRR") could be held liable for the

negligent misrepresentations of a man who was an ostensible agent of KRR because 'the

purported agent's use of names and logos and the existence of a business relationship between

the two entities.' *Id.* at *6." *Black v. The Ritz-Carlton Hotel Co., LLC*, 977 F. Supp. 2d 996,

1009 (C.D. Cal. 2013).

324.    An agency relationship may also be created by ratification after the fact. Cal. Civ.

Code § 2307 ("An agency may be created, and an authority may be conferred, by a precedent

authorization or a subsequent ratification."). "Ratification is the voluntary election by a person

to adopt in some manner as his own an act which was purportedly done on his behalf by another

person, the effect of which, as to some or all persons, is to treat the act as if originally authorized

by him." *Rakestraw v. Rodrigues*, 500 P.2d 1401, 1404–05 (Cal. 1972).

325.    Ratification need not be express.  An agent's originally unauthorized act may be

ratified by implication where the only reasonable interpretation of the principal's conduct is

consistent with approval or adoption. *See, e.g., Rakestraw v. Rodrigues*, 500 P.2d 1401 (Cal.

1972).  An employer's failure to discharge an employee after learning of the employee's

misconduct may be evidence of ratification. *See, e.g., Murillo v. Rite Stuff Foods, Inc.*, 77 Cal.

Rptr. 2d 12 (Cal. 2d Dist. Ct. App. 1998).  Ratification has the effect of relating the agent's

authority back to the time when the act was performed. *See, e.g., Rakestraw v. Rodrigues*, 500

P.2d 1401 (Cal. 1972).

326.     For the reasons described in the agency analysis under the TCPA, retailer JSR Enterprises is Dish's agent under California law and made millions of calls to numbers on the Registry.  Opinion 445 at 4, 176.

327.     For the reasons described in the agency analysis under the TCPA, retailer Satellite Systems Network is Dish's agent under California law and made hundreds of thousands of calls to numbers on the Registry.  Opinion 445 at 4, 176.

328.     Dish is liable for 932,299 calls to California telephone numbers on the Registry in violation of Cal. Bus. & Prof. Code § 17592.

329.     To meet California's safe harbor, Dish must prove that the violations were "accidental and in violation of the telephone solicitor's policies and procedures and telemarketer instruction and training."  Cal. Bus. & Prof. Code § 17593(d).  Dish bears the burden of establishing that it meets the safe harbor exemption.

330.     Dish failed to produce any written procedures regarding scrubbing calling lists and training personnel.  Opinion 445 at 216.

331.     As Dish called millions of numbers on the Registry, failed to describe how any of those calls were in violation of its policies and procedures (which it mostly failed to produce or describe), and failed to produce or describe any specific instruction and training provided to its telemarketers, Dish has failed to prove that any of the violations fall within the safe harbor under California's Do Not Call Law.

332.     "Use of area codes is a relevant method to prove that Dish and its authorized retailers called citizens of the Plaintiff States."  Opinion 444 at 63.  "The use of area codes is a relevant method to show geographic location under Rule of Evidence 401."  Opinion 444 at 64.

"Area codes are relevant to the geographic location of a telephone, particularly in light of Dish's practice of scrubbing wireless numbers from its call lists." Opinion 444 at 65-66.

333.    Under Cal. Bus. & Prof. Code § 17593(a)(2), the Court may impose penalties for each violation of California Do Not Call Law of: (1) up to $11,000 for violations before February 9, 2009, and up to $16,000 after that date. Section 17593 refers to penalties in 15 U.S.C. § 45. That section in turn directs courts to consider the following factors when imposing penalties: "the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C).

334.    Under Cal. Bus. & Prof. Code § 17593(a)(1), the Court may enjoin Dish's violations of California's Do Not Call Law.

335.    Courts have broad power to enter injunctions in furtherance of consumer protection statutes. *See generally Barquis v. Merchants Collection Ass'n*, 496 P.2d 817, 829 (Cal. 1972); *see also Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*, 4 Cal. App. 4th 963, 972–73 (Cal. 1st Dist. Ct. App. 1992) (noting extraordinarily broad remedial powers under statutes and entering mandatory injunction requiring affirmative disclosure).

336.    A plaintiff need not show continuing misconduct to obtain injunctive relief; a reasonable probability of the recurrence of wrongful acts is sufficient. *See, e.g., California Serv. Station & Auto. Repair Ass'n v. Union Oil Co.*, 232 Cal. App. 3d 44, 57 (Cal. 1st Dist. Ct. App.) (affirming injunction despite defendant's representations at trial that it had discontinued the wrongful conduct and would follow the law in the future).

337.    Under Cal. Bus. & Prof. Code § 17593(a)(3), the Court may impose any other relief that the Court deems proper.

338.     The remedies under California's Do Not Call Law § 17593 are "in addition to the rights, remedies, or penalties established under other laws."  Cal. Bus. & Prof. Code § 17593(c).

339.     As to injunctive relief under § 17593, the Court imposes the same injunctive relief described above in the TSR injunctive relief section.

340.     In addition to the remedies set forth in § 17593 for violations of California's Do Not Call Law, under Cal. Bus. & Prof. Code e § 17536(b)—which applies to the chapter governing advertising and which includes California's Do Not Call law—courts "shall impose a civil penalty for each violation of this chapter," not to exceed $2,500 per violation.  It is error for the court not to impose penalties in some amount for each violation.  *People v. Custom Craft Carpets*, 206 Cal. Rptr. 12, 18–19 (Cal. 2d Dist. Ct. App. 1984).

341.     In determining the amount of penalties to impose under § 17536(b), "the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth."

342.     The assessment of civil penalties is not akin to a punitive damages award such that the U.S. Supreme Court guidelines set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), apply.  *See People ex rel. Lockyer v. Fremont Life Ins. Co.*, 128 Cal. Rptr. 2d 463, 473 (Cal. 2d Dist. Ct. App. 2002).

343.     The same act by a defendant can amount to multiple violations and multiple penalties.  *See, e.g., People v. Toomey*, 203 Cal. Rptr. 642, 651 (Cal. 1st Dist. Ct. App. 1984).

344. The penalties under each of the California penalty provisions are cumulative. *Toomey*, 203 Cal. Rptr. at 656 (Cal. 1st Dist. Ct. App. 1984).

345. California need not prove reliance or that any of the victims suffered actual damages as a result of the violations. *People v. Toomey*, 203 Cal. Rptr. 642, 652 (Cal. Ct. App. 1984).

**Count VIII: California Business and Professions Code Section 17200**

346. Cal. Bus. & Prof. Code § 17200 broadly prohibits "any unlawful, unfair or fraudulent business act or practice."

347. The "unlawful" prong of Section 17200 borrows violations of other state and federal laws and treats them as independent violations of Section 17200. *See, e.g., Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539–540 (Cal. 1999). A violation of the underlying law results in a per se violation of § 17200.

348. California's § 17200 claim in Count VIII is subject to a four-year statute of limitations, regardless of whether claims brought directly under the underlying borrowed statute are subject to a shorter statute of limitations. Opinion 445 at 218; Cal. Bus. & Prof. Code § 17208; *Cortez v. Purolator Air Filtration Prods. Co.*, 999 P.2d 706, 716 (Cal. 2000). California's § 17200 claims in Count VIII extend back to March 25, 2005, four years before this case was filed. Opinion 445 at 218.

349. As alleged in the Third Amended Complaint, California bases its § 17200 claim on underlying violations of: (1) the TCPA's Do Not Call Provisions in Count V; (2) the TCPA's prohibitions against prerecorded calls in Count VI; (3) California's Do Not Call Law, Cal. Bus. & Prof. Code § 17592 in Count VIII; and (4) Cal. Civ. Code § 1770(a)(22)(A).

350.     Cal. Civ. Code § 1770(a)(22)(A) prohibits "[d]isseminating an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message."

351.     California agency law applies to California's state law claims.

352.     For the reasons described in the agency analysis under the TCPA and California Business and Professions Code § 17592, retailer Star Satellite is Dish's agent under California law and made millions of prerecorded calls to California phone numbers.

353.     California need not prove that the phone calls at issue in Count VIII were received by California residents, nor must it prove that the calls were received in the state of California. Congress specifically authorized the states to regulate in interstate commerce with respect to telemarketing calls and to prohibit calls to phone numbers that "relate" to the state, and phone numbers with California area codes "relate" to the State of California.  47 U.S.C. § 227(f); *Patriotic Veterans v. Indiana*, 736 F.3d 1041 (7th Cir. 2013).

354.     The violations of the TCPA in Counts V are per se violations of Cal. Bus. & Prof. Code § 17200.

355.     The violations of the TCPA in Count VI are per se violations of Cal. Bus. & Prof. Code § 17200.

356.     The violations of Cal. Bus. & Prof. Code § 17592 in Count VII are per se violations of Cal. Bus. & Prof. Code § 17200.

357.    Dish's calls violating the TCPA's prohibitions against prerecorded messages established by California in Count VI also violate the prohibition against prerecorded messages in Cal. Civ. Code § 1770(a)(22)(A).  Each of these is an additional violation of § 17200.

358.    Under Cal. Bus. & Prof. Code § 17200, Dish is liable for 13,417,304 violations of Cal. Bus. & Prof. Code 17200.

359.    Cal. Bus. & Prof. Code § 17203 authorizes the court to enjoin Dish from committing acts of unfair competition as defined in § 17200.

360.    Courts have broad power to fashion injunctive relief for violations of Cal. Bus. & Prof. Code § 17200.  *See generally Barquis v. Merchants Collection Ass'n*, 496 P.2d 817, 829 (Cal. 1972); *see also Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*, 6 Cal. Rptr. 2d 193, 197–199, (Cal. 1st Dist. Ct. App. 1992) (noting extraordinarily broad remedial powers under consumer protection statutes and entering mandatory injunction requiring affirmative disclosure); *Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 667–68  (Cal. 1983).  "The Legislature intended . . . to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur."  *People v. McKale*, 602 P.2d 731, 733–34 (Cal. 1979) (internal quotation omitted).

361.    A plaintiff need not show continuing misconduct to obtain injunctive relief; a reasonable probability of the recurrence of wrongful acts is sufficient.  *See, e.g., California Serv. Station & Auto. Repair Ass'n v. Union Oil Co.*, 283 Cal. Rptr. 279, 285–286 (Cal. 1st Dist. Ct. App. 1991) (affirming injunction despite defendant's representations at trial that it had discontinued the wrongful conduct and would follow the law in the future).

362.    As to injunctive relief under § 17200, the Court imposes the same injunctive relief described above in the TSR injunctive relief section.

363.     Cal. Bus. & Prof. Code § 17206 requires the Court to impose a penalty for each violation of Cal. Bus. & Prof. Code § 17200.

364.     The remedies for violations of § 17200 are cumulative to any other remedies provided by the underlying statutes.  Cal. Bus. & Prof. Code § 17205.

365.     "Use of area codes is a relevant method to prove that Dish and its authorized retailers called citizens of the Plaintiff States."  Opinion 444 at 63.  "The use of area codes is a relevant method to show geographic location under Rule of Evidence 401."  Opinion 444 at 64. "Area codes are relevant to the geographic location of a telephone, particularly in light of Dish's practice of scrubbing wireless numbers from its call lists."  Opinion 444 at 65–66.

366.     According to Cal. Bus. & Prof. Code § 17206(b), penalties are mandatory once a violation is found:  courts "shall impose a civil penalty for each violation of this chapter," not to exceed $2500 per violation.  It is error for the court not to impose penalties in some amount. *People v. Custom Craft Carpets*, 206 Cal. Rptr. 12, 18–19 (Cal. 2d Dist. Ct. App. 1984).  In determining the amount of penalties to impose under § 17206, "the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth."

367.     The assessment of civil penalties is not akin to a punitive damages award such that the U.S. Supreme Court guidelines set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), apply.  *See People ex rel. Lockyer v. Fremont Life Ins. Co.*, 128 Cal. Rptr. 2d 463, 473 (Cal. 2d Dist. Ct. App. 2002).

368.     The same act by a defendant can amount to multiple violations and multiple fines.
*See, e.g., People v. Toomey*, 203 Cal. Rptr. 642, 651 (Cal. 1st Dist. Ct. App. 1984).

369.     The penalties under each of the California penalty provisions are cumulative.
*People v. Toomey*, 203 Cal. Rptr. 642, 656 (Cal. 1st Dist. Ct. App. 1984).

370.     California need not prove that any of the victims actually relied or suffered actual damages as a result of the violations.  *People v. Toomey*, 203 Cal. Rptr. 642, 652 (Cal. 1st Dist. Ct. App. 1984).

371.     Applying the civil penalties factors to the facts as found by the Court, a $100 million civil penalty is appropriate under California's state laws for Counts VII and VIII because Dish has a lengthy history of telemarketing violations, its conduct was repeated and willful in that it knew it and its retailers were violating the law and failed to take adequate corrective actions, its conduct negatively affected large numbers of California and consumers using California telephone numbers, it has failed to take meaningful responsibility for its conduct, it has many billions of dollars in cash reserves, a $100 million penalty will not meaningfully affect its ability to do business, and companies in Dish's position must be deterred from engaging in conduct similar to Dish's.

**Count IX - North Carolina Telephone Solicitations Act**

372.     North Carolina General Statutes § 75-102(a) prohibits telephone solicitors from making a telephone solicitation call to a North Carolina telephone subscriber's phone number if that number appears in the latest edition of the Do Not Call Registry maintained by the Federal Trade Commission.  N.C. Gen. Stat. § 75-101(3).

373.     N.C. Gen. Stat. § 75-102(d) requires telephone solicitors to implement systems and written procedures, and to prevent, among other things, calls to numbers in the Do Not Call Registry.

374.     N.C. Gen. Stat. § 75-102(d) further requires every telephone solicitor to train, monitor, and enforce compliance with the aforesaid systems and procedures by its employees and independent contractors.

375.     N.C. Gen. Stat. § 75-102(d) states further that compliance with the time requirements within the Federal Trade Commission's Telemarketing Sales Rule for incorporating and complying with updated versions of the Do Not Call Registry shall constitute compliance with North Carolina statutory requirements to implement such systems and written procedures.

376.     A "telephone subscriber," for purposes of the Act, is an "individual who subscribes to a residential telephone service from a local exchange company, a competing local provider certified to do business in North Carolina, or a wireless telephone company; or the individuals living or residing with that individual."  N.C. Gen. Stat. § 75-101(11).

377.     A telephone solicitor, for purposes of the Act, is "Any individual, business establishment, business, or other legal entity doing business in (the) State that, directly or through salespersons or agents, makes or attempts to make telephone solicitations or causes telephone solicitations to be made.  § 75-101(10).

378.     A telephone solicitor, for purposes of the Act, also includes any party defined as a "telemarketer" under the Federal Trade Commission's Telemarketing Sales Rule."  § 75-101(10).

379.     A telephone solicitation, for purposes of the Act, is "A voice communication, whether prerecorded, live, or a facsimile, over a telephone line or wireless telephone network or

via a commercial mobile radio service that is made by a telephone solicitor to a telephone

subscriber for the purpose of soliciting or encouraging the purchase or rental of, or investment in,

property, goods, or services, obtaining or providing information that will or may be used for that

purpose…" N.C. Gen. Stat. § 75-101(9).

380. A telephone solicitation, for purposes of the Act, also includes those transactions

defined as "telemarketing" under the Federal Trade Commission's Telemarketing Sales Rule.

N.C. Gen. Stat. § 75-101(9).

381. The statute of limitations period for violations of the Act is four years. § 75-16.2.

382. "Use of area codes is a relevant method to prove that Dish and its authorized

retailers called citizens of the Plaintiff States." Opinion 444 at 63. "The use of area codes is a

relevant method to show geographic location under Rule of Evidence 401." Opinion 444 at 64.

"Area codes are relevant to the geographic location of a telephone, particularly in light of Dish's

practice of scrubbing wireless numbers from its call lists." Opinion 444 at 65–66.

383. North Carolina need not prove that the phone calls at issue in Count IX were

received by North Carolina residents, nor must it prove that the calls were received in the state of

North Carolina. Congress specifically authorized the states to regulate in interstate commerce

with respect to telemarketing calls and to prohibit calls to phone numbers that "relate" to the

state, and phone numbers with North Carolina area codes "relate" to the State of North Carolina.

47 U.S.C. § 227(f); *Patriotic Veterans v. Indiana*, 736 F.3d 1041 (7th Cir. 2013). People who

subscribe to phone numbers with North Carolina area codes are "North Carolina telephone

subscribers."

384. Plaintiffs' proof has established that calls were made to numbers placed in the Do

Not Call Registry by North Carolina telephone subscribers. Opinion 445 at 211, 220

385.     The Court has found that defendant may not avail itself of TCPA and Telemarketing Sales Rule "safe harbor" defenses because it produced no evidence of systems and procedures to prevent calls to numbers in the Do Not Call Registry.  Opinion 445 at 210–211.

386.      N.C. Gen. Stat. § 75-102(d) affirmatively requires telephone solicitors to implement that which is required to establish the "safe harbor" defense under the TCPA and the Telemarketing Sales Rule.

387.     The North Carolina Telephone Solicitations Act creates an exception for calls to telephone subscribers with whom the telephone solicitor has an established business relationship.  N.C. Gen. Stat. § 75-103(a)(3).  The definition of "established business relationship" is the same as that found in the TCPA and the Telemarketing Sales Rule.  N.C. Gen. Stat. § 75-101(5).

388.     Dish, its Telemarketing Vendors and its Order Entry Retailers JSR, Star Satellite, and Satellite Systems engaged in a pattern or practice of making telemarketing calls for Dish products and services to residents or North Carolina and other plaintiff states whose numbers were in the Do Not Call Registry.  Opinion 445 at 211.

389.     Dish has not proven that it possesses an EBR for any of the violations at issue.  The dialed numbers were not on the list of numbers produced in discovery for which Dish claimed it had an EBR.  The texts of the calling campaigns are insufficient as a matter of law to prove an established business relationship.

390.     In North Carolina, agency can be proved by facts or circumstances with which the alleged principal can be connected and having a legitimate tendency to establish that the person in question was his agent for the performance of the act in controversy.  It is not essential that the principal and agent enter into an actual contract, and an agency relationship can be created

informally. *Rodwell v. Chamblee*, 509 S.E.2d 785 (N.C. Ct. App. 1998), rev'd on other grounds, 514 S.E.2nd 90 (N.C. 1999).

391. Under North Carolina agency law, ratification of an unauthorized act may be express or implied, and intent may be inferred from failure to repudiate the act. *Walker v. Sloan*, 529 S.E.2d 236 (N.C. Ct. App. 2000). It can also be inferred from conduct on behalf of the principal that is inconsistent with any other position than intent to adopt the act. *In re Foreclosure of a Deed of Trust of Espinosa v. Martin*, 520 S.E.2d 108 (N.C. Ct. App. 1999).

392. For the reasons described in the agency analysis under the TCPA, Dish's retailers JSR Enterprises, Star Satellite, and Satellite Systems Network were Dish's agents under North Carolina law.

393. Dish is liable for 236,228 telephone solicitations made to telephone numbers no the Registry in North Carolina in violation of § 75-102 of the North Carolina Telephone Solicitations Act.

394. N.C. Gen. Stat. § 75-105(a) authorizes a court to enter equitable orders to restrain a defendant from further violations of the Telephone Solicitations Act. As noted above, the North Carolina Attorney General need not establish the Common Law standards for obtaining injunctive relief. Establishing a violation of the statute is sufficient.

395. N.C. Gen. Stat. § 75-105(a)(1) authorizes a court to award civil penalties as follows for violations of the Telephone Solicitations Act: "Five hundred dollars ($500) for the first violation, one thousand dollars ($1,000) for the second violation, and five thousand dollars ($5,000) for the third and any other violation that occurs within two years of the first violation." N.C. Gen. Stat. § 75-105(a)(2) prescribes a lower penalty amount per call, $100, when the defendant can establish that safe harbor requirements have been met. Defendant has not done so.

Plaintiff State of North Carolina therefore is entitled to civil penalties in the amount of

$1,181,131,500 under Count IX.

**Count X – North Carolina Statute Prohibiting Use of Automatic Dialing and Recorded Message Players**

396.     N.C. Gen. Stat. § 75-104(a) prohibits the use of an automatic dialing and recorded

message player to make an unsolicited phone call.

397.     Subsection (b) of N.C. Gen. Stat. § 75-104 sets forth exceptions to that

prohibition, but none of the exceptions pertain to commercial telephone solicitations.

398.     The prohibitions set forth in N.C. Gen. Stat. § 75-104(a) do not apply solely to

calls placed to residential telephone numbers.

399.     North Carolina need not prove that the phone calls at issue in Count X were

received by North Carolina residents, nor must it prove that the calls were received in the state of

North Carolina.  Congress specifically authorized the states to regulate in interstate commerce

with respect to telemarketing calls and to prohibit calls to phone numbers that "relate" to the

state, and phone numbers with North Carolina area codes "relate" to the State of North Carolina.

47 U.S.C. § 227(f); *Patriotic Veterans v. Indiana*, 736 F.3d 1041 (7th Cir. 2013).  People who

subscribe to phone numbers with North Carolina area codes are "North Carolina telephone

subscribers."

400.     Dish made at least 2,146 prerecorded calls using autodialing equipment to

residents of North Carolina.  Opinion 445 at 8, 236.

401.     Dish Retailer Star Satellite made at least 1,561,765 prerecorded calls using

autodialing equipment to North Carolina residents.  Opinion 445 at 8, 236.

402.     For the reasons described in the agency analysis under the TCPA, Dish's retailer

Star Satellite was Dish's agent under North Carolina law.

**ATTACHMENT F – PLAINTIFFS' CONCLUSIONS OF LAW**

403.     Dish is liable for 1,563,911 unsolicited, prerecorded telephone calls to residential telephone numbers in North Carolina in violation of § 75-104(a) of the North Carolina Telephone Solicitations Act.

404.     N.C. Gen. Stat. § 75-105(a) authorizes a court to enter equitable orders to restrain a defendant from further violations of the Telephone Solicitations Act.

405.     The North Carolina Attorney General need not establish the Common Law standards for obtaining injunctive relief.   Establishing a violation of the statute is sufficient. *State ex rel. Morgan v. Dare to Be Great, Inc.*, 189 S.E. 2d 802 (N.C. Ct. App. 1972); *State ex rel. Edmisten v. Challenge, Inc.*, 284 S.E. 2d 333 (N.C. Ct. App. 1981).

406.     N.C. Gen. Stat. § 75-105(a)(1) authorizes a court to award civil penalties as follows for violations of the Telephone Solicitations Act: "Five hundred dollars ($500) for the first violation, one thousand dollars ($1,000) for the second violation, and five thousand dollars ($5,000) for the third and any other violation that occurs within two years of the first violation." N.C. Gen. Stat. § 75-105(a)(2) prescribes a lower penalty amount per call, $100, when the defendant can establish that safe harbor requirements have been met.  Defendant has not done so. Plaintiff State of North Carolina there is entitled to civil penalties in the amount of $7,819,546,500 under Count X.

407.     North Carolina's statute does not provide a civil penalties range, but instead mandates a specific civil penalties amount per call.  Having proven 1,800,139 violations of the statute, North Carolina is entitled to $9,000,686,500 in civil penalties.  However, that amount should be subject to a Court-ordered remittitur reducing the award to no less than $28.26 million. *Sony BMG Music Entm't v. Tenenbau*m, 660 F.3d 487, 511 (1st Cir. 2011) (reversing district court's decision to entertain constitutional challenge to statutory penalties before remitting the

damages award); *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 406 (4th Cir. 2013) (reversing district court order awarding no penalties because potential penalties violated Eighth Amendment, and explicitly endorsing Plaintiff's ability to voluntarily remit civil penalties award in order to avoid Eighth Amendment challenge).

408.    Injunctive relief under North Carolina's Telephone Solicitations Act is also appropriate, and the terms of the injunction under the North Carolina statutes should be the same as that described in the TSR injunctive relief section above.

**Count XI - Illinois Autodialer Law**

409.    The Illinois Automatic Telephone Dialers Act ("IATDA"), 815 Ill. Comp. Stat. 305/1 et seq. makes it a violation "to play a prerecorded message placed by an autodialer without the consent of the called party." 815 Ill. Comp. Stat. 305/30(b).

410.    The IATDA imposes liability on persons that "make or cause to be made" illegal autodialer calls. 815 Ill. Comp. Stat. 305/30(a).

411.    A violation of the IATDA is an unlawful practice under section 2Z of the Illinois Consumer Fraud Act. 815 Ill. Comp. Stat. 305/30(d).

412.    A knowing violation of the IATDA constitutes an unlawful practice within the meaning of the Consumer Fraud Act. 815 Ill. Comp. Stat. 505/2Z.

413.    The Illinois Consumer Fraud Act authorizes the court to enjoin Dish from committing acts and practices that are found to be violation of the Act. 815 Ill. Comp. Stat. 505/7.

414.    The Illinois Consumer Fraud Act authorizes the court to impose a civil penalty up to $50,000 against anyone found to have violated the Act. 815 Ill. Comp. Stat. 505/7.

415.     Illinois need not prove that the phone calls at issue in Count XI were received by Illinois residents, nor must it prove that the calls were received in the state of Illinois.  Congress specifically authorized the states to regulate in interstate commerce with respect to telemarketing calls and to prohibit calls to phone numbers that "relate" to the state, and phone numbers with Illinois area codes "relate" to the State of Illinois.  47 U.S.C. § 227(f); *Patriotic Veterans v. Indiana*, 736 F.3d 1041 (7th Cir. 2013).

416.     The IATDA contains an Established Business Relationship exemption for "calls made to any person with whom the telephone solicitor has a prior or existing business relationship."  815 Ill. Comp. Stat. 305/20(a)(2).

417.     "Dish does not show that the telephone numbers called in the automessage campaign were on the list of telephone numbers for which Dish had an Established Business Relationship that Dish provided in discovery."  Opinion 445 at 213.

418.     Dish has not proven that it meets the EBR for any of the violations.  The dialed numbers were not on the list of numbers produced in discovery for which Dish claimed it had an EBR.  The texts of the calling campaigns are insufficient as a matter of law to prove an established business relationship.

419.     "Use of area codes is a relevant method to prove that Dish and its authorized retailers called citizens of the Plaintiff States."  Opinion 444 at 63.  "The use of area codes is a relevant method to show geographic location under Rule of Evidence 401."  Opinion 444 at 64.  "Area codes are relevant to the geographic location of a telephone, particularly in light of Dish's practice of scrubbing wireless numbers from its call lists."  Opinion 444 at 65–66.

**ATTACHMENT F – PLAINTIFFS' CONCLUSIONS OF LAW**

420.    Dish's calls violating the TCPA's prohibitions against prerecorded messages established by Illinois in Count VI also violate the prohibition against prerecorded messages of the IATDA.

421.    No case specifically articulates the knowing standard for a violation of the IATDA, but TCPA case law is instructive, particularly here where prohibited conduct under the TCPA constitutes similar violations of the IATDA.  Under the TCPA, a knowing violation means Dish knew it was committing the acts in question, not that it knew the acts were illegal. *See Sengenberger v. Credit Control Services, Inc.*, No. 09 C 2796, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010), *adhered to on reconsideration*, 2010 WL 6373008 (N.D. Ill. June 17, 2010); *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *7 (N.D. Ill. Mar. 19, 2013), *reconsideration denied in part*, No. 09 C 5601, 2013 WL 4495221 (N.D. Ill. Aug. 21, 2013); *see also People ex rel. Daley v. Grady*, 548 N.E.2d 764, 765–766  (Ill. App. Ct. 1st Dist. 1989) (The equivalent of Section 2Z of the Illinois Consumer Fraud Act provides a list of other acts which if violated would automatically violate the Illinois Consumer Fraud Act.).

422.    Dish is liable for 5,480 violations of the Illinois Automatic Telephone Dialers Act.

423.    The Attorney General is not required to prove the common-law requirements for injunctive relief.  A showing of a violation of the Consumer Fraud Act is sufficient.  *People ex rel. Hartigan v. Dynasty System Corp.*, 471 N.E.2d 236 (Ill. App. Ct. 4th Dist. 1984).

424.    The power of the Attorney General to impose a penalty up to $50,000 per violation under 815 Ill. Comp. Stat. 505/7 is civil, not criminal, in nature.  *People ex rel. Fahner v. Walsh*, 461 N.E.2d 78 (Ill. App. Ct. 2d Dist. 1984).

425.    The factors for the court to consider in determining an award of civil penalties under the Illinois Consumer Fraud Act are not specified in the statute or Illinois case law, but the court can look to other state case law interpreting their respective consumer fraud acts for guidance on factors to consider.  *See Hammond v. System Transport, Inc.*, 942 F. Supp. 2d 867 (C.D. Ill. 2013) (other state cases on similar laws are entitled to respect and consideration).  Such factors concerning an award of civil penalties include whether Dish acted in good or bad faith, injury to the public, Dish's ability to pay, and the desire to eliminate the benefits derived from a violation of consumer fraud laws, *see State ex rel. Woodard v. May Dep't. Stores Co.*, 849 P.2d 802 (Colo. Ct. App. 1992), as well as the magnitude and seriousness of the violations, lack of bona fide error, and the need to deter similar schemes, *see Missouri ex rel. Nixon v. Consumer Automotive Resources, Inc*., (Mo. Ct. App. 1994).

426.    Applying the civil penalties factors to the facts as found by the Court, a $50,000 civil penalty is appropriate under Illinois' autodialer law because Dish has a lengthy history of telemarketing violations, its conduct was repeated and willful in that it knew it and its retailers were violating the law and failed to take adequate corrective actions, its conduct negatively affected large numbers of Illinois consumers and consumers using Illinois phone numbers, it has failed to take meaningful responsibility for its conduct, it has many billions of dollars in cash reserves, a $50,000 penalty will not meaningfully affect its ability to do business, and companies in Dish's position must be deterred from engaging in conduct similar to Dish's.

**Count XII - Ohio Consumer Sales Practices Act**

427.    The Ohio Consumer Sales Practices Act ("OCSPA") broadly prohibits unfair, deceptive, and unconscionable acts and practices by suppliers in connection with consumer transactions, and it provides civil remedies to enforce the prohibitions of those acts and practices.

# ATTACHMENT F – PLAINTIFFS' CONCLUSIONS OF LAW

*Celebrezze v. Hughes*, 479 N.E.2d 886, 888–89 n3 (Ohio 1985); *Brown v. Market Development Inc.*, 322 N.E.2d 367, 369 (Ohio C.P. 1974).

428.    The OCSPA, Ohio Rev. Code § 1345.02(A), prohibits a supplier from engaging in an unfair or deceptive act or practice in connection with a consumer transaction and such an act or practice violates the section whether it occurs before, during or after the transaction.

429.    In construing OCSPA, Ohio Rev. Code § 1345.02(A), a court shall give due consideration and great weight to Federal Trade Commission orders, trade regulations rules and guides, and the federal courts' interpretations of subsection 45(a)(1) of the Federal Trade Commission Act, 38 Stat. 717 (1914), 15 U.S.C.A. § 41, as amended.  Ohio Rev. Code § 1345.02(C).

430.    The OCSPA, Ohio Rev. Code § 1345.03(A) broadly prohibits a supplier from engaging in an unconscionable act or practice in connection with a consumer transaction and such an act or practice violates the section whether they occur before, during or after the transaction.

431.    The OCSPA is remedial legislation that must be accorded liberal construction to further its intent and purpose of protecting consumers.  *Einhorn v. Ford Motor Co.*, 548 N.E.2d 933, 935 (Ohio 1990);  *Liggins v. May Co.*, 373 N.E.2d 404, 405 (Ohio C.P. 1977);  *Brown v. Market Development*, 322 N.E.2d 367, 371 (Ohio C.P. 1974);  Ohio Rev. Code § 1.11.

432.    Proof of intent to defraud is not required for a finding of a violation of the OCSPA.  *See Grieselding v. Krischak*, 2007 Ohio App. LEXIS 2489, at *9–11 (Ohio Ct. App. June 1, 2007); *Fletcher v. Don Foss of Cleveland, Inc.*, 638 N.E.2d 60, 62 (Ohio Ct. App. 1993);  *Thomas v. Sun Furniture Co.*, 399 N.E.2d 567, 569 (Ohio Ct. App. 1978);  *State ex rel. Brown v. Bredenbeck*, 1975 Ohio Misc. LEXIS 124 (Ohio C.P. July 24, 1975).

433.     Dish is a "supplier" under OCSPA, which defines "supplier" in Ohio Rev. Code § 1345.01(C), as a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer.

434.     The OCSPA defines a "consumer transaction" in Ohio Rev. Code § 1345.01(A) as a "sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things."

435.     Sales calls selling Dish are "acts or practices . . . in connection with consumer transactions" under the OCSPA.

436.     Ohio's claims for violations of the OCSPA are subject to a two-year statute of limitations from the date of occurrence of the violation. Ohio Rev. Code § 1345.07(E).   Ohio's OCSPA claims against Dish extend back to March 25, 2007, two years prior to the date the case was filed.

437.     Failing to record a do-not-call request on an internal do-not-call list, and failing to honor a prior do-not-call request, are unfair and deceptive practices in violation of the OCSPA. Opinion 445 at 224–225.

438.     Proof of a violation of the federal Do-Not-Call Laws is sufficient to prove that Dish committed an unfair, deceptive, and unconscionable consumer sales practice under the OCSPA. Opinion 445 at 224–225.

439.     The OCSPA, Ohio Rev. Code § 1345.02, does not define "unfair" or "deceptive." This is intentional.  *Cf. Fletcher v. Don Foss of Cleveland, Inc.*, 628 N.E.2d 60, 62 (1993) (declaring that the legislature knew what it was doing when it drafted the OCSPA).

# ATTACHMENT F – PLAINTIFFS' CONCLUSIONS OF LAW

440.    "The boundaries of illegality under the CSPA must remain flexible because it is impossible to list all methods by which a consumer can be misled or deceived." *Fletcher v. Don Foss of Cleveland, Inc.*, 628 N.E.2d 60, 62 (1993). This is why the CSPA does not require a plaintiff to prove that supplier acted with knowledge or intent to establish a violation of R.C. 1345.02. *See id.* (noting that the Ohio Rev. Code § 1345.02(B) laundry list does not include intent or knowledge as an element).

441.    Ohio Rev. Code § 1345.02, prohibiting unfair or deceptive acts or practices in connection with a consumer transaction, is a strict liability provision. *See Moyer Excavating & Trucking v. Lewis*, 1984 Ohio App. LEXIS 11529 (Ohio Ct. App. Nov. 16, 1984); *Fate v. Callendar*, 1986 Ohio App. LEXIS 6878 (Ohio Ct. App. May 23, 1986); *Pomianowski v. Merle Norman Cosmetics*, 507 F. Supp. 435 (S.D. Ohio 1980).

442.    Although Ohio Rev. Code § 1345.03(B) lists several factors that may be taken into consideration when determining whether an act or practice is unconscionable, those factors are not exhaustive. *Brown v. Silzar, Inc.*, 1981 Ohio App. LEXIS 13616, at *4-5 (Ohio Ct. App. Jan. 28, 1981).

443.    The party asserting the existence of a principal/agent relationship has the burden of establishing that the agency exists. *Gardner Plumbing, Inc. v. Cottrill*, 338 N.E.2d 757, 759 (Ohio 1975). To do so, the party must show that "1) the principal held the agent out to the public as possessing the requisite authority to embrace the action in question and/or knowingly allowed the agent to represent they possessed such authority; and 2) the third party interacting with the agent knew of the facts establishing the agent's authority and acted in good faith that the agent did in fact possess such authority." *Wolper v. Hotel Europe*, 552 F. Supp. 2d 687, 692 (N.D. Ohio 2008).

444.     A principal/agent relationship exists when the agent has the power to bind the principal through the agent's actions and the principal has the right to control the actions of the agent, and when those actions are directed to an objective which the principal seeks. *Evans v. Ohio State University*, 680 N.E.2d 161, 174 (Ohio Ct. App. 1996); *Hanson v. Kynast*, 494 N.E.2d 1091, 1093–94 (Ohio 1986).

445.     The principal/agent relationship differs from that of an independent contractor in the degree of control exercised by the principal. *Newcomb v. Dredge*, 152 N.E.2d 801, 804–805 (Ohio Ct. App. 1957).

446.     If the principal retained the right to control the mode and manner of doing the work contracted for, the relationship is that of agent and principal. *City of Cincinnati v. Scheer & Scheer Dev.*, 862 N.E.2d 122, 126 (Ohio Ct. App. 2006).

447.     The degree of control necessary to establish the existence of the principal/agent relationship has not been clearly defined, but some of the factors to be considered are: 1) whether the agent was performing in the course of the principal's business rather than in some ancillary capacity, 2) whether the agent was receiving any compensation from the principal, 3) whether the principal supplied the tools and the place of work in the normal course of the relationship, 4) whether the agent offered his services to the public at large or to one individual at a time, 5) the length of the employment, and 6) the right to terminate the agent at will. *City of Cincinnati v. Scheer & Scheer Dev.*, 862 N.E.2d 122, 126 (Ohio Ct. App. 2006).

448.     The principal/agent relationship does not have to be established by an express contract, as agency may be implied, established by implication from the transaction, or by the principal's ratification of the agent's acts. *McSweeney v. Jackson*, 691 N.E.2d 303, 306 (Ohio Ct. App. 1996) (agency relationship implied); *Cleveland Trust Co. v. Pomeroy*, 177 N.E.2d 410

(Ohio C.P. 1961) (agency implied from the transaction); *Wells Fargo Bank, N.A. v. Byrd*, 897 N.E.2d 722, 725 (Ohio Ct. App. 2008) (principal's ratification of acts of agent).

449.     Where one is seeking to establish that a principal/agent relationship exists outside of an express contract, it is the actions of the principal, not of the agent, that will prove the existence of the relationship. *DeFranco v. Shaker Square of Ohio, LLC*, 814 N.E.2d 93, 96 (Ohio Ct. App. 2004).

450.     Under the theory of agency by estoppel or apparent authority, a principal is estopped from denying that an agent's actions were within the scope of their authority. This theory is triggered when an individual dealing with an agent outside the scope of the agent's authority reasonably believes that the agent's conduct falls within the scope of the agency because of the actions of the principal. *Griffin v. Matthews*, 522 N.E.2d 1100 (Ohio Ct. App. 1987).

451.     The appearance of agency must be created by the principal. *Sponagle v. USAir Group, Inc.*, 612 N.E.2d 395, 396 (Ohio Ct. App. 1992); *Shultz v. Shirley*, 1991 Ohio App. LEXIS 456, at *6–7 (Ohio Ct. App. Jan. 22, 1991) (where lodge president, without a vote of the membership as required by statute, leased part of the lodge's real property, signed permit applications, collected rents, and supervised improvements and the lodge allowed the improvements to go forward and eventually relocated into the improved portion of the building, an agency by estoppel was created); *McSweeney v. Jackson*, 691 N.E.2d 303, 307 (Ohio Ct. App. 1996) (where wife consented to the sale of real property, to her husband showing the property, and to her husband conducting the negotiations, she allowed her husband to act as her agent)

452.     The principle of agency by estoppel is particularly applicable where a principal, by license, allows another to use his business or trade name. When this occurs, the public is

entitled to assume that transactions they undertake are transactions with the entity whose business or trade name is being used. *Agosto v. Leisure World Travel, Inc.*, 304 N.E.2d 910, 913 (Ohio Ct. App. 1973).

453.    A provision in a license agreement that the licensee shall not be an agent does not defeat an agency by apparent authority or by estoppel. *Agosto v. Leisure World Travel, Inc.*, 304 N.E.2d 910, 913 (Ohio Ct. App. 1973).

454.    Ratification occurs where the principal's conduct, with full knowledge of the facts, manifests his intention to ratify the actions of the agent. *Meyer v. Klensch*, 175 N.E.2d 870, 871–872, (Ohio Ct. App. 1961).  The act to be ratified must have been done in the name of the principal, *Wells Fargo*, 897 N.E.2d at 725, and the principal must intend to be bound by the previously unauthorized act which it ratifies. *Solon Chamber of Commerce v. Women's General Hosp.*, 612 N.E.2d 331, 332 (Ohio Ct. App. 1992).

455.    Acceptance of a benefit from an unauthorized act amounts to an "implied" ratification, whether or not the principal intended to ratify the act, if such act is known to the principal. *Dayton Bread Co. v. Montana Flour Mills Co*, 126 F. 2d 257, 262 (6th Cir. 1942); *Orchard Group, Inc. v. Konica Medical Corp.*, 135 F. 3d 421, 426 (6th Cir. 1998) (where defendant's "territory manager" had executed numerous deals over several years with the plaintiff's representative with only plaintiff's oral acceptance of a proposal letter, the "territory manager" had apparent authority to bind defendant to the terms of the proposal letter at issue)

456.    Failure to repudiate the actions of an agent within a reasonable time after notification can constitute a ratification of those actions. *Campbell v. Hospitality Motor Inns, Inc.*, 493 N.E.2d 239, 242 (Ohio 1986); *Pavlovich v. National City Bank*, 435 F. 3d 560, 566 (6th

Cir. 2006); *Ameritrust Co. Nat'l Assoc. v. Hicks Dev. Corp.*, 632 N.E.2d 939, 942 (Ohio Ct. App. 1993).

457.     Apparent authority to receive payment on behalf of a principal can be created by a course of dealing or previous conduct, which leads a person of ordinary prudence to believe that the principal has given the agent authority to receive payment. *Kohne v. Wood*, 129 N.E.2d 865, 866 (Ohio Ct. App. 1954).

458.     Under the OCSPA, Ohio Rev. Code § 1345.07(A)(1), the Court has the authority to grant "a declaratory judgment" specifying that the acts and practices in which the Defendant engaged, as described in Count XII, violate the OCSPA, Ohio Rev. Code § 1345.01 et seq.

459.     Under the OCSPA, Ohio Rev. Code § 1345.07(A)(2), "if the Attorney General shows by a preponderance of the evidence" that Dish "violated [Ohio Rev. Code §] 1345.02 or 1345.03, the Court may issue a... permanent injunction to restrain and prevent" Dish, its successors, agents, representatives, employees, and all persons who act in concert with it, from engaging in unfair, deceptive or unconscionable acts or practices, including the conduct as specified in Count XII.

460.     Under the OCSPA, Ohio Rev. Code § 1345.07(B), the Court "may grant other appropriate relief."

461.     Under the OCSPA, Ohio Rev. Code § 1345.07(D), the Court "may impose a civil penalty of not more than $25,000…" if the violation was "an act or practice that was… determined by a court [in Ohio] to violate section 1345.02, [or] 1345.03, and was committed after the decision containing the court's determination was made available for public inspection" by the Attorney General pursuant to Ohio Rev. Code § 1345.05(A)(3) .

462.     A number of Ohio courts have found a telemarketer's failure to provide its name and telephone number and failing to honor or maintain a record of a request not to be called again are unfair or deceptive practices that violate the OCSPA.  The decisions were made available by the Attorney General for public inspection.  *See Charvat v. NMP, LLC*, 656 F.3d 440, 451 (6th Cir. 2011) (internal citations omitted).

463.     The civil penalties under Ohio Rev. Code § 1345.07(D) are cumulative in nature, and the Court may impose multiple awards of civil penalties.  *State ex rel. DeWine v. Kellie Auto Sales Inc.*, Case No. 11CVH07-9216, slip op at 7 (Ohio C.P. 2015);  *State ex rel. DeWine v. Freedom Equity Savings, LLC*, Case No. 10 CVH 06-9019, slip op. at 8 (Ohio C.P. 2012).

464.     The assessment of civil penalties under Ohio Rev. Code § 1345.07(D), which is analogous to an award of treble damages to a private plaintiff under Ohio Rev. Code § 1345.09(B), is not an award of punitive damages; therefore the guidelines set forth by the Supreme Court in *BMW of North America v. Gore*, 517 U.S. 559 (1996) do not apply.  *Whitaker v. M.T. Auto., Inc.*, 855 N.E.2d 825 (Ohio 2006).

465.     In order to obtain an award of statutory damages for consumers harmed by Defendant's acts, Ohio need not prove reliance or actual damages suffered by the victims.  *State ex rel. Celebrezze v. Hughes*, 479 N.E.2d 886, 889–890 (Ohio 1985).

466.     Ohio need not prove that the phone calls at issue in Count XII were received by Ohio residents, nor must it prove that the calls were received in the state of Ohio.  Congress specifically authorized the states to regulate in interstate commerce with respect to telemarketing calls and to prohibit calls to phone numbers that "relate" to the state, and phone numbers with Ohio area codes "relate" to the State of Ohio.  47 U.S.C. § 227(f); *Patriotic Veterans v. Indiana*, 736 F.3d 1041 (7th Cir. 2013).

467.     Dish, its Telemarketing Vendors and the Order Entry Retailers violated OCSPA, Ohio Rev. Code § 1345.02(A) by engaging in a pattern or practice of initiating telephone solicitations to residential subscribers in Ohio whose telephone numbers were listed on the National Do-Not-Call Registry in violation of the TCPA, 47 U.S.C. § 227(c), and 47 C.F.R. 64.1200(c)(2) and/or in violation of the Telemarketing Sales Rule, 16 C.F.R. 310.4(b)(1)(iii)(B).

468.     Dish, its Telemarketing Vendors and the Order Entry Retailers violated OCSPA, Ohio Rev. Code § 1345.03(A) by engaging in a pattern or practice of initiating telephone solicitations to residential subscribers in Ohio whose telephone numbers were listed on the National Do-Not-Call Registry in violation of the TCPA, 47 U.S.C. § 227(c), and 47 C.F.R. 64.1200(c)(2) and/or in violation of the Telemarketing Sales Rule, 16 C.F.R. 310.4(b)(1)(iii)(B).

469.     Dish, its Telemarketing Vendors and the Order Entry Retailers violated the OCSPA, Ohio Rev. Code § 1345.02(A) by engaging in a pattern or practice of initiating telephone calls to residential telephone lines using artificial or prerecorded voices to deliver a message without the prior express consent of the called party and without falling within specified exemptions delineated within the TCPA in violation of the TCPA, 47 U.S.C. § 227(B)(1)(b) and 47 C.F.R. 64.1200(a)(2).

470.     Dish, its Telemarketing Vendors and the Order Entry Retailers violated the OCSPA, Ohio Rev. Code § 1345.03(A) by engaging in a pattern or practice of initiating telephone calls to residential telephone lines using artificial or prerecorded voices to deliver a message without the prior express consent of the called party and without falling within specified exemptions delineated within the TCPA in violation of the TCPA, 47 U.S.C. § 227(B)(1)(b) and 47 C.F.R. 64.1200(a)(2).

471.     Dish is liable for 120,809 violations of the Ohio Consumer Sales Practices Act for which a civil penalty may be imposed because it called consumers on the Registry as well as consumers who asked not to be called.  These are Dish calls and are not contingent on an agency analysis.

472.     Dish therefore engaged in at least 120,809 acts or practices that subject it to civil penalties pursuant to O.R.C. 1345.07(D).  The court may impose a civil penalty of up to $25,000 for each act or practice, subject to the court's discretion, for a total of $3,020,225,000.

473.     Applying the civil penalties factors to the facts as found by the Court, a $30,202,250 civil penalty is appropriate under the Ohio Consumer Sales Practices Act because Dish has a lengthy history of telemarketing violations, its conduct was repeated and willful in that it knew it and its retailers were violating the law and failed to take adequate corrective actions, its conduct negatively affected large numbers of Ohio consumers and consumers using Ohio phone numbers, it has failed to take meaningful responsibility for its conduct, it has many billions of dollars in cash reserves, a $30,202,250 penalty will not meaningfully affect its ability to do business, and companies in Dish's position must be deterred from engaging in conduct similar to Dish's.

474.     Dish called numbers nationwide that were on its internal do-not-call list, which would include numbers in Ohio. Opinion 445 at 225.

475.     Dish and its Telemarketing Vendors made millions of outbound telemarketing calls to telephone numbers on the Registry as part of a nationwide pattern and practice of telemarketing.  Opinion 445 at 201.

476.     Dish made outbound telemarketing calls for Dish products and services to telephone numbers of Ohio residents at a time when the numbers were on the Registry as reflected in the 2007-2010 Dish call records.  Opinion 445 at 214.

477.     Retailer Satellite Systems Network made hundreds of thousands of calls to numbers on the Registry, including illegal calls to Ohio residents and consumers using Ohio telephone numbers.  Opinion 445 at 4, 176.

478.     For the reasons described in the agency analysis under the TCPA, retailer Satellite Systems Network is Dish's agent under Ohio law.

479.     "The nationwide nature of the calling pattern of Dish, the Telemarketing Vendors, and the Order Entry Retailers, along with the area code evidence, establishes that calls at issue were made to residents of the Plaintiff States."  Opinion 445 at 214.

480.     Dish failed to produce any written procedures regarding scrubbing calling lists and training personnel.  Opinion 445 at 216.

481.     Because Plaintiff State of Ohio has shown by a preponderance of the evidence that Dish has violated the Ohio Consumer Sales Practices Act, pursuant to R.C. 1345.07(A)(2), the court may issue a permanent injunction to prevent Dish from further engaging in these acts or practices.  The terms of the injunction should be as described above the injunctive relief granted under the TSR.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO,<br><br>    Plaintiffs,<br><br>    v.<br><br>DISH NETWORK L.L.C.,<br><br>    Defendant. | Case No.: 3:09-cv-03073-SEM-TSH |

<u>**DISH NETWORK L.L.C.'S**</u>
<u>**PROPOSED CONCLUSIONS OF LAW**</u>

**TABLE OF CONTENTS**

Page

I.   BURDEN OF PROOF ...................................................................................... 1

II.  TSR CLAIMS: COUNTS I-IV .......................................................................... 1

    A.   Background Of The TSR ......................................................................... 1

    B.   Count I: Calls To Numbers In The Registry ........................................... 9

    C.   Count II: Calls To Numbers On Internal Do-Not-Call Lists ............................. 12

        i.    General Agency Principles ........................................................ 13

        ii.   Agency Determinations Under The TCPA .............................. 15

        iii.  Actual Authority And Unauthorized Acts Beyond Scope Of Authority ............................................................................. 18

        iv.   Subagency ................................................................................. 21

        v.    Apparent Authority .................................................................. 23

        vi.   Ratification ................................................................................ 25

    D.   Count III: Abandoned Calls .................................................................. 27

    E.   Count IV: Assisting And Facilitating Star Satellite ............................. 28

        i.    Plaintiffs Cannot Seek Duplicative Recovery On Count IV For The Same Conduct That Gave Rise To Count III ......................................... 28

        ii.   In Any Event, The United States Cannot Prove Liability On Its Remaining Count IV Claims.................................................... 30

    F.   Penalties Under The TSR....................................................................... 31

        i.    Civil Penalties Are Inappropriate Under The TSR Because The United States Cannot Prove That DISH Acted With Actual Or Implied Knowledge.................................................................. 31

        ii.   Appropriate Amount Of Any Civil Penalties Under The TSR ............... 36

            a.   Stipulated Judgments On Comparable Violations Provide Guidance On Appropriate Penalties Under The TSR ................. 37

            b.   Any TSR Penalty Must Comply With The Constitution ............ 41

        iii.  This Court Should Assess Civil Penalties Under The TSR Per Day, And Not Per Call.................................................................... 43

        iv.   The United States Cannot Pursue Violations Subject to Previous Consent Judgments ................................................................. 46

**TABLE OF CONTENTS**
(continued)

III.  TCPA CLAIMS: COUNTS V AND VI .......................................................................... 47

    A.    Count V ............................................................................................................ 47

    B.    Count VI........................................................................................................... 50

    C.    Penalties Under The TCPA.............................................................................. 50

        i.    State Plaintiffs Have Not Proven That DISH Acted "Willfully" Or "Knowingly" Under The TCPA............................................................. 49

        ii.    The Appropriate Amount Of Any Civil Penalties Under The TCPA ...... 51

        iii.    Any TCPA Penalty Must Comply With The Constitution ..................... 52

IV.  THE PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROOF FOR INJUNCTIVE RELIEF UNDER THE TCPA OR THE TSR ........................................ 54

V.  STATE LAW CLAIMS: COUNTS VII-XII ................................................................. 58

    A.    Choice-of-Law Analysis Not Necessary To Determine Agency Law Applicable To State Law Claims ..................................................................... 58

    B.    Cal. Bus. & Prof. Code § 17592(c) (Count VII)................................................. 62

    C.    Cal. Bus. & Prof. Code § 17200 (Count VIII)..................................................... 66

    D.    N.C. Gen. Stat. § 75-102 (Count IX) .................................................................. 70

    E.    N.C. Gen. Stat. § 75-104 (Count X) ................................................................... 73

    F.    Illinois Automatic Telephone Dialers Act (Count XI) ....................................... 76

    G.    Ohio Consumer Sales Practices Act (Count XII) ............................................... 78

# I.    BURDEN OF PROOF[1]

1.    Plaintiffs bear the burden of proof to establish each essential element of their claims at trial.  *See, e.g., Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56-57 (2005); *Auburndale State Bank v. Dairy Farm Leasing Corp.*, 890 F.2d 888, 893 (7th Cir. 1989). Specifically, Plaintiffs must prove each element of liability as well as each element of the relief they seek by a preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S. 279, 286 (1991).

2.    DISH bears the burden of proving its affirmative defenses to these statutory claims by a preponderance of the evidence.  *See, e.g., Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 507 (7th Cir. 2007).

# II.    TSR CLAIMS: COUNTS I-IV

## A.    Background Of The TSR

3.    The regulatory framework in this case involves rules promulgated by both the Federal Trade Commission and the Federal Communications Commission.  The relevant federal Do-No-Call laws are the Telemarketing Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), which authorizes the FTC to regulate telemarketing, and the Telephone Consumer Protection Act (the "TCPA"), which authorizes the FCC to regulate telemarketing.

4.    The resulting overlapping regulations prohibit three types of telemarketing practices that are at issue in this case: (1) placing an outbound telemarketing call to a person who has registered his or her telephone number on the National Do Not Call Registry (the "Registry");

---

[1] In proposing Conclusions of Law and Findings of Fact, DISH is complying with the law of the case doctrine and not seeking to re-litigate issues that have already been decided before trial (except where DISH will request that the Court reconsider a conclusion or finding).  However, DISH also preserves its right to contest all findings, decisions, or other actions by the Court—whether in its December 12, 2014 Summary Judgment Opinion [Dkt. # 445] (the "Summary Judgment Opinion" or "Opinion 445") or any other previous rulings—through the appropriate post-trial and appellate procedures.  *See Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008) ("Nothing in the Federal Rules of Civil Procedure, however, tells attorneys that, in order to preserve issues for appeal, they must insert into the final pre-trial order contentions that have already been rejected by the judge.") (citing *Calderon v. Witvoet*, 999 F.2d 1101, 1108 (7th Cir. 1993)).

(2) placing an outbound telemarketing call to a person who has previously stated that he or she does not wish to be called by or on behalf of the seller whose goods or services are being offered for sale; and (3) delivering a prerecorded telemarketing message to the recipient of a call (hereinafter referred to as "prerecorded calls").

5.      The Telemarketing Act directed the FTC to issue regulations to prohibit deceptive and abusive telemarketing acts or practices. *See* 15 U.S.C. § 6102(a)(1). On August 23, 1995, the FTC issued the Telemarketing Sales Rule (the "TSR") pursuant to this directive. *See* 60 Fed. Reg. 43842 (August 23, 1995). The 1995 version of the TSR prohibited, among other things, a "telemarketer from initiating, or any seller to cause a telemarketer to initiate, an outbound telephone call to a person when that person previously has stated that he or she does not wish to receive such a call made by or on behalf of the seller whose goods or services are being offered." 60 Fed. Reg. 43842, 43854-55. This provision of the TSR, now codified at 16 C.F.R. § 310.4(b)(1)(iii)(A), does not specify to whom the person must state that he or she does not wish to be called, nor does it specify who must honor the statement. *See* Opinion 445 at 11.

6.      The FTC subsequently explained in a January 30, 2002 Notice of Proposed Rulemaking that a do-not-call request under Section 310.4(b)(1)(iii)(A) is "company-specific" and is designed to track the approach in the corresponding FCC rule:

> The "do-not-call" provision of the original Rule is company-specific: After a consumer requests not to receive calls from a particular company, that company may not call that consumer. Other companies, however, may lawfully call that same consumer until he or she requests each of them not to call. The effect of this provision is to permit consumers to choose those companies, if any, from which they do not wish to receive telemarketing calls. Each company must maintain its own "do-not-call" list of consumers who have stated that they do not wish to receive telephone calls by or on behalf of that seller. This seller-specific approach tracks the approach that the FCC adopted pursuant to its mandate under the TCPA.

2

67 Fed. Reg. 4492, 4516 (January 30, 2002); *see also* Opinion 445 at 11-12. The parties refer to

the "lists of persons who may not be contacted" as an "entity-specific do-not-call list" or an

"internal do-not-call list." Opinion 445 at 12.

7.     The 1995 FTC Statement also addressed whether separate divisions of a company

would be considered a single seller. The FTC stated that "distinct corporate divisions may be

considered separate 'sellers.'" 60 Fed. Reg. 43842, 48344. The FTC explained:

> The determination as to whether distinct divisions of a single
> corporate organization will be treated as separate sellers will
> depend on such factors as: (1) whether there exists substantial
> diversity between the operational structure of the corporate
> organization and the division that is selling the goods or services
> that are the subject of the offer, or between that division and the
> other divisions of the corporation; or (2) whether the nature or type
> of goods or services offered by the division are substantially
> different from those offered by other divisions of the corporation
> or the corporate organization as a whole.

60 Fed. Reg. 43842, 43844; *see also* Opinion 445 at 13.

8.     The 1995 version of the TSR also prohibited assisting and facilitating violations

of the TSR:

> (b) Assisting and facilitating. It is a deceptive telemarketing act or
> practice and a violation of this Rule for a person to provide
> substantial assistance or support to any seller or telemarketer when
> that person knows or consciously avoids knowing that the seller or
> telemarketer is engaged in any act or practice that violates §§
> 310.3(a), (c) or (d), or § 310.4 of this Rule.

16 C.F.R. § 310.3(b); *see also* 60 Fed. Reg. 43842, 43866. Opinion 445 at 13-14.

9.     In promulgating Section 310.3(b), the FTC selected the "knows or consciously

avoids knowing" language over the alternative language of "knew or should have known." 60

Fed. Reg. 43842, 48352. The FTC explained:

> The "conscious avoidance" standard is intended to capture the
> situation where actual knowledge cannot be proven, but there are
> facts and evidence that support an inference of deliberate

> ignorance on the part of a person that the seller or telemarketer is
> engaged in an act or practice that violates . . . this Rule.

60 Fed. Reg. 43842, 48352; *see also* Opinion 445 at 14.

10.     On January 29, 2003, the FTC amended the TSR pursuant to the 2001

amendments to the Telemarketing Act. *See* 68 Fed. Reg. 4580 (January 29, 2003); *see also*

*National Federation of the Blind v. F.T.C.*, 420 F.3d 331, 334-35 (4th Cir. 2005); Opinion 445

at 14.

11.     The 1995 version of the TSR also provided a safe harbor defense for sellers and

telemarketers. The FTC explained in the FTC Statement of Basis and Purpose accompanying the

1995 TSR (the "1995 FTC Statement"):

> The safe harbor states that a seller or telemarketer will not be liable
> for such violations if: (1) it has established and implemented
> written procedures to comply with the "do not call provisions"; (2)
> it has trained its personnel in those procedures; (3) the seller, or the
> telemarketer acting on behalf of the seller, has maintained and
> recorded lists of persons who may not be contacted; and (4) any
> subsequent call is the result of error.

60 Fed. Reg. 43842, at 43855. The 1995 FTC Statement stated that a "rule of reasonableness"

should control the application of the safe harbor defense. 60 Fed. Reg. 43842, at 43855.

12.     The amended 2003 TSR established the National Registry. *See* 16 C.F.R.

§ 310.4(b)(1)(iii). Telephone customers who do not wish to be called by sellers or telemarketers

generally may place their telephone numbers on the Registry. Sellers and telemarketers may not

call a person whose telephone number is on the Registry unless the seller or telemarketer has an

Established Business Relationship (or "EBR") with the person or has prior written consent. *See*

Opinion 445 at 14-15. The Registry opened for registrations in June 2003 and was scheduled to

take effect October 1, 2003. *See* 68 Fed. Reg. 16238 (April 3, 2003). The Registry became

operational on October 1, 2003, as scheduled. *See* Opinion 445 at 15.

13.     Section 310.4(b)(1) of the 2003 TSR stated: "It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in the following conduct:"  Section 310.4(b)(1) then listed certain specific prohibited acts, including:

> (iii) Initiating any outbound telephone call to a person when:
>
>> (A) that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or
>>
>> (B) that person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller
>>
>>> (i) has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person; or
>>>
>>> (ii) has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section; or
>
> (iv) Abandoning any outbound telephone call.  An outbound telephone call is "abandoned" under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

16 C.F.R. § 310.4(b)(1)(iii)-(iv).  The 2003 TSR retained the prohibition against assisting and facilitating a violation of the TSR.  *See* 16 C.F.R. § 310.3(b); Opinion 445 at 16-17.

14.     The 2003 TSR defined "established business relationship," "person," "seller," "telemarketing," and "telemarketer" in relevant part, as follows:

> (o) Established business relationship means a relationship between a seller and a consumer based on:
>
>> (1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call; or
>>
>> (2) the consumer's inquiry or application regarding a product or service offered by the seller, within the three (3) months immediately preceding the date of a telemarketing call.
>
> . . .
>
> (w) Person means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.
>
> . . . .
>
> (aa) Seller means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.
>
> . . . .
>
> (bb) Telemarketer means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.
>
> (cc) Telemarketing means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.

16 C.F.R. § 310.2(o), (w), (aa), (bb), and (cc). The 2003 TSR also exempted telemarketing calls "between a telemarketer and any business, except calls to induce the retail sale of nondurable office or cleaning supplies." 16 C.F.R. § 310.6(b)(7); *see also* Opinion at 18-19.

15.     The 2003 amendments to the TSR also amended the safe harbor provisions to cover calls to individuals whose telephone numbers are on the Registry or on an internal do-not-call list.  The 2003 TSR safe harbor provisions provided in relevant part:

> (3) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(ii) and (iii) if it can demonstrate that, as part of the seller's or telemarketer's routine business practice:
>
> (i) It has established and implemented written procedures to comply with § 310.4(b)(1)(ii) and (iii);
>
> (ii) It has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to § 310.4(b)(3)(i);
>
> (iii) The seller, or a telemarketer or another person acting on behalf of the seller or charitable organization, has maintained and recorded a list of telephone numbers the seller or charitable organization may not contact, in compliance with § 310.4(b)(1)(iii)(A);
>
> (iv) The seller or a telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to § 310.4(b)(3)(iii) or 310.4(b)(1)(iii)(B), employing a version of the "do-not-call" registry obtained from the Commission no more than thirty-one (31) days prior to the date any call is made, and maintains records documenting this process;
>
> (v) The seller or a telemarketer or another person acting on behalf of the seller or charitable organization, monitors and enforces compliance with the procedures established pursuant to § 310.4(b)(3)(i); and
>
> (vi) Any subsequent call otherwise violating § 310.4(b)(1)(ii) or (iii) is the result of error.

16 C.F.R. § 310.4(b)(3).  The safe harbor did not apply to violations of the call abandonment provision, Section 310.4(b)(1)(iv), or the assisting and facilitating provision, Section 310.3(b). *See* Opinion 445 at 19-20.

16.     The TSR, as promulgated in 2003, had no provision specifically addressing the use of prerecorded calls.  Following the FTC's interpretation of the rule, district courts have

found that prerecorded calls constitute abandoned calls under Section 310.4(b)(1)(iv) because the telemarketer only plays a prerecorded message, and no live sales representative comes on the line within two seconds of the caller completing his or her greeting. *See* Opinion 445 at 21; *F.T.C. v. Asia Pacific Telecom, Inc.*, 802 F. Supp. 2d 925, 929-30 (N.D. Ill. 2011); *The Broadcast Team, Inc. v. F.T.C.*, 429 F. Supp. 2d 1292, 1300-01 (M.D. Fla. 2006).

17.     On November 17, 2004, the FTC issued a Notice of Proposed Rulemaking to amend the TSR to add an additional safe harbor provision to allow some use of prerecorded calls under limited circumstances. *See* 69 Fed. Reg. 67287 (November 17, 2004). The proposed safe harbor amendment would have allowed a seller or telemarketer to use a prerecorded call in outbound telemarketing to a person with whom the seller or telemarketer had an Established Business Relationship and only if the prerecorded message: (1) within two seconds of the person's completed greeting, presented the person with the opportunity to communicate that he or she did not want to be called again (*e.g.*, by pushing a number on the telephone keypad); (2) provided all required disclosures; and (3) otherwise complied with all applicable state and federal laws. *See* 69 Fed. Reg. 67287, 67289; *see also* Opinion 445 at 21-22.

18.     The FTC further stated in the 2004 Notice that the FTC would not bring enforcement actions for prerecorded calls that complied with the proposed amendments to the safe harbor provisions:

> Therefore, the Commission has determined that, pending completion of this proceeding, the Commission will forbear from bringing any enforcement action for violation of the TSR's call abandonment prohibition, 16 CFR 310.4(b)(1)(iv), against a seller or telemarketer that places telephone calls to deliver prerecorded telemarketing messages to consumers with whom the seller on whose behalf the telemarketing calls are placed has an established business relationship, as defined in the TSR, provided the seller or telemarketer conducts this activity in conformity with the terms of the proposed amended call abandonment safe harbor.

69 Fed. Reg. 67287, 67290; *see also* Opinion 445 at 22.

19.    On August 29, 2008, the FTC made its most current amendment to the TSR. *See* 73 Fed. Reg. 51164 (August 29, 2008). The amendment added a specific clause addressing the use of prerecorded calls to the prohibitions in Section 310.4(b)(1). The new provision explicitly prohibited using prerecorded telemarketing calls unless the seller or telemarketer had an Established Business Relationship with the person called and the person called gave prior written consent to receive such calls. *See* 16 C.F.R. § 310.4(b)(1)(v); 73 Fed. Reg. 51164, 51164. The amendments became effective on December 1, 2008. The FTC announced that, as of December 1, 2008, the FTC would end its 2004 policy of forbearing enforcement against certain prerecorded calls. *See* 73 Fed. Reg. 51164, 51164; *see also* Opinion 445 at 22-23.

20.    On February 15, 2008, Congress passed the Do-Not-Call Improvements Act of 2007 (the "Improvements Act"). *See* 15 U.S.C. § 6155. Congress provided in the Improvements Act that telephone numbers placed on the Registry would stay on the Registry indefinitely unless and until: (1) the individual to whom the number is assigned requested removal; or (2) the telephone number had been disconnected and reassigned. *See* 15 U.S.C. § 6155(a) and (b). Congress directed the FTC to "periodically check . . . national or other appropriate databases" to determine whether numbers have been disconnected and reassigned. 15 U.S.C. § 6155(b). Section 6155 further stated that the FTC "shall remove invalid telephone numbers from the registry at any time." *Id*; *see also* Opinion 445 at 23-24.

**B.    Count I: Calls To Numbers In The Registry**

21.    On Count I, the United States seeks to recover under the TSR for (i) calls that DISH initiated to telephone numbers in the Registry, and (ii) calls that DISH "caused" telemarketers to initiate to telephone numbers in the Registry. *See* Opinion 445 at 158.

22.     The applicable statute of limitations on Count I is five years.  As Count I was filed on March 25, 2009, the United State cannot recover for calls that occurred before March 25, 2004.  *See* Opinion 445 at 153.

23.     In its Summary Judgment Opinion, the Court adhered to an earlier ruling in this litigation deferring to and adopting "the FTC interpretation of the TSR, [wherein] a seller 'causes' the telemarketing activity of a telemarketer by retaining the telemarketer and authorizing the telemarketer to market the seller's products and services."  Opinion 445 at 172-75 (quoting Opinion entered November 4, 2009 [Dkt. # 20] ("Opinion 20") at 14-15).  As far as DISH is aware, that was a novel interpretation of the TSR.

24.     The Court granted the United States partial summary judgment on Count I for certain DISH-initiated calls as well as for certain calls made by Retailers JSR and Satellite Systems Network.[2]  *See* Opinion 445 at 231-32.  The Court further held, however, that "[i]ssues of fact preclude summary judgment for either party with respect to remedies for Dish's partial summary judgment liability under Count I or with respect to any other issue related to Count I."  *Id.* at 232.

25.     The United States has failed to establish liability under the TSR for any additional calls under Count I—beyond those violations found on summary judgment—including any liability stemming from DISH's 2003-2007 call records.  For a call to constitute a violation, DISH must have made the call "to induce the purchase of goods or services."  16 C.F.R. § 310.4(b)(1)(iii)(B); *see also* 16 C.F.R. § 310.2(v) ("Outbound telephone call" is one "initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution").

---

[2] The term "Retailers," as used here, denotes independent entities that contract with DISH to market its products and services to the public.

26.     The United States cannot meet its burden of proof as to any claim related to the 2003-2007 call records because it has not proven that each of the calls for which the FTC claims liability was "initiated . . . to induce the purchase of goods or services."  16 C.F.R. § 310.4(b)(1)(iii)(B); 16 C.F.R. § 310.2(v).  Plaintiffs treat all calls on the 2003-2007 call records as evidence of violations.  However, the call records for 2003-2007 contain both telemarketing and non-telemarketing calls.  "Plaintiffs elected to focus their discovery efforts on the 2007-2010 calls rather than the earlier data" and "[t]he parties engaged in a 'lengthy collaborative discovery process' to analyze these 2007-2010 calls to associate calls with specific marketing campaigns and to determine whether the recipients of calls had EBRs with DISH."  Opinion entered July 20, 2012 [Dkt. # 165] at 11, 13.

27.     The 2003-2007 call records would need to be analyzed in a manner similar to the 2007-2010 call records.  That analysis never took place.  Therefore, there is no way to determine whether any particular calls were telemarketing calls.

28.     Plaintiffs' claims under Count I also fail because the Registry—as maintained— violates the First Amendment.  Restrictions on commercial speech are subject to intermediate scrutiny.  Plaintiffs must show that "(1) there is a substantial interest supporting the restriction, (2) the restriction directly advances that substantial interest, and (3) the restriction is narrowly drawn.'" *F.T.C. v. Trudeau*, 662 F.3d 947, 953 (7th Cir. 2011) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 564–65 (1980)).  Plaintiffs cannot satisfy this standard.  Most notably, they cannot satisfy the third element because the government does not adequately scrub the Registry.  Instead, the Registry contains a high volume of disconnected and reassigned wireless numbers—in addition to other numbers that no longer belong, such as certain landline numbers and disconnected and reassigned VoIP numbers—unjustifiably prohibiting

11

DISH from communicating with individuals who have not opted into the Registry, and unjustifiably penalizing such speech and attempted speech.

**C.** **Count II: Calls To Numbers On Internal Do-Not-Call Lists**

29.     On Count II, the United States seeks to recover under the TSR for (i) calls that DISH initiated to individuals who previously stated that they did not wish to receive calls made by or on behalf of DISH, and (ii) calls that DISH caused telemarketers to initiate to individuals who previously stated that they did not wish to receive calls "made by or on behalf of" DISH. *See* Opinion 445 at 177.

30.     The applicable statute of limitations on Count II is five years.  As Count II was not filed until May 18, 2012, the United States cannot recover for calls that occurred before May 18, 2007.  *See* Opinion 445 at 153-54.

31.     With respect to the second category of Count II calls at issue, the Court explained in its Summary Judgment Opinion, as a matter of first impression, that "[t]he United States must establish that a telemarketer had an agency relationship with Dish to show that Dish was obligated to honor a consumer's do-not-call statement to that telemarketer."  Opinion 445 at 184-85.  This appears to be a novel theory of vicarious liability under the TSR insomuch as it requires a company to honor its purported agents' internal do-not-call lists and vice versa.

32.     While the Court granted the United States partial summary judgment on Count II for certain DISH-initiated calls, it held that "issues of fact exist regarding whether an agency relationship existed between Dish and its Retailers."  Opinion 445 at 185.

33.     The United States cannot meet its burden to demonstrate the existence of an agency relationship between DISH and any of the Retailers.

34.     The United States has also failed to establish liability under the TSR for any additional calls beyond those found on summary judgment, including those stemming from the 2003-2007 call records.

### i.     General Agency Principles

35.     "[T]he federal common law of agency . . . and the Restatement of Agency are all in accord on general agency principles." *NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A&A Drug Co.*, 736 F.3d 1054, 1058 (7th Cir. 2013); *see also* Opinion at 185 (same).

36.     The Restatement defines agency as follows:

> Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to the act.

Restatement (Third) Of Agency §1.01 (2006).

37.     An agency relationship requires two key components: "(1) the principal and agent agree that the agent acts for the principal; and (2) the agent is subject to the control of the principal." Opinion at 185-86; *see also Rubin v. Islamic Republic of Iran*, No. 03 C 9370, 2014 WL 1257947, at *5 (N.D. Ill. Mar. 27, 2014) ("[A] principal-agent relationship is a legal concept founded upon a consensual and fiduciary relationship between two parties. The central question is whether the principal had the right to control the activities of the agent.") (internal citations and quotation marks omitted).

38.     Plaintiffs bear the burden of proving by a preponderance of the evidence that an agency relationship existed between DISH and the Retailers. *See Sphere Drake Ins. Ltd. v. Am. Gen'l Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004) ("[T]he party alleging an agency relationship . . . bears the burden of proving its existence by a preponderance of the evidence.");

Restatement (Third) Of Agency § 1.02 cmt. d (2006) ("The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence.").

39.     A party cannot be held vicariously liable for the actions of an independent contractor.  *See Advanced Cleanroom Technologies v. Newhouse*, No. 00 C 6623, 2002 WL 206960, at *3 (N.D. Ill. Feb. 11, 2002) (citing *Anderson v. Marathon Petroleum Co.,* 801 F.2d 936, 938 (7th Cir. 1986)).

40.     "The determination of whether a particular entity is an 'agent' or an 'independent contractor' is a factually intensive one." *Jackson v. Bank of New York*, No. 11-CV-6410, 2014 WL 3882193, at *7 (N.D. Ill. Aug. 6, 2014).  An agency relationship exists only where the principal has "[t]he right to control the manner in which work is performed." *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 781 (N.D. Ill. 2012).  "Conversely, an independent contractor undertakes to produce a certain result, but is not controlled in regard to how that result is achieved." *Id.*

41.     "The dominant characteristic of the independent contractor is day-to-day control of its own operations." *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 157 (7th Cir. 1988).  Thus, in determining whether an entity is an agent or merely an independent contractor, "[t]he principal's control over the purported agent's day-to-day operations is of paramount importance." *Carlisle v. Deere & Co.*, 576 F.3d 649, 656 (7th Cir. 2009).  "Day-to-day operations could include such things as personnel decisions, bookkeeping and financial matters, and buying and selling inventory and supplies." *Id.*

42.     As stated in the Restatement, merely setting forth guidelines and restrictions in a service contract is not the same as exercising day-to-day control over an agent:

> In many agreements to provide services, the agreement between
> the service provider and the recipient specifies terms and

conditions creating contractual obligations that, if enforceable, prescribe or delimit the choices that the service provider has the right to make. . . . The fact that such an agreement imposes constraints on the service provider does not mean that the service recipient has an interim right to give instructions to the provider. Thus, *setting standards in an agreement for acceptable service quality does not of itself create a right of control*.

Restatement (Third) Of Agency § 1.01 cmt. f(1) (2006) (emphasis added).

43.     In addition to control, another major factor courts consider in determining whether an entity is an agent versus an independent contractor is whether the purported principal furnished the "necessary tools, materials and equipment" to complete the assigned task.  *Phillips*, 855 F. Supp. 2d at 781; *see also Chemtool, Inc. v. Lubrication Tech, Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (service contractor was not supplier's agent where supplier "exercised no control over how [contractor] performed services on [supplier's] behalf" and "*provided no equipment or work space for [contractor]*") (emphasis added).

### ii.     Agency Determinations Under The TCPA

44.     Courts throughout the country have had occasion to apply agency principles to vicarious liability claims arising under the TCPA.  As the TCPA substantially overlaps with the TSR—as evidenced by the fact that Plaintiffs bring claims under both the TSR and TCPA in this case—such TCPA agency analyses are instructive in the TSR context as well.

45.     Courts construing agency principles in the context of the TCPA have held that "the existence of a contract between [a company] and [a telemarketer]—*even one that imposes certain constraints on [the telemarketer]*—does not necessarily mean that [the company] had the power to give 'interim instructions' to [the telemarketer], the hallmark of an agency relationship." *Jackson v. Caribbean Cruise Line, Inc.*, No. 14-CV-2485 ADS AKT, 2015 WL 667862, at *7-8 (E.D.N.Y. Feb. 17, 2015) (emphasis added) (dismissing complaint alleging vicarious liability under TCPA where plaintiff merely pled that defendant "contracted with [the telemarketer] to

15

make text message calls to consumers' cellular telephone numbers" and that "[the telemarketer] sent the text message calls on behalf of, and at the direction of [the defendant]") (internal quotations omitted).

46.     Similarly, in *Mais v. Gulf Coast Collection Bureau, Inc.*, the court found no agency relationship where a contract between a company and its telemarketer required the telemarketer to "do a number of things in a particular way," but was nonetheless "silent as to the manner in which [the telemarketer] would undertake the [commissioned acts]," "did not require [the telemarketer] to use particular equipment (for example, a predictive dialer) to carry out [the acts], and it did not define the particular procedures that [the telemarketer] would follow in communicating with [recipients of telephone calls]." 944 F. Supp. 2d 1226, 1244 (S.D. Fla. 2013) *rev'd in part on other grounds,* 768 F.3d 1110 (11th Cir. 2014). The court explained that where an agreement with a telemarketer is silent on such topics, "the contract [leaves] such matters to [the telemarketer's] judgment and wisdom." *Id.* at 1244.

47.     Courts have also held that a company is not vicariously liable for the activities of a marketer where there is no evidence that the company exercised sufficient control over the marketer's marketing activities. *See Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 981 F. Supp. 2d 1239, 1252-53 (S.D. Fla. 2013) (no vicarious liability under TCPA where defendant never approved or even saw contents of marketing material in question), *vacated on other grounds*, No. 13-14013, 2015 WL 1004234 (11th Cir. Mar. 9, 2015); *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1085 (C.D. Cal. 2012) (no vicarious liability under TCPA where no evidence that defendant "directed or supervised the manner and means of the text message campaign," "created or developed the text message," or "played any role in the decision to distribute the message by way of a blast text"), *aff'd,* 582 F. App'x 678 (9th Cir. 2014); *Mey v. Pinnacle Sec.,*

*LLC*, No. 5:11CV47, 2012 WL 4009718, at *5 (N.D.W. Va. Sept. 12, 2012) (no vicarious

liability under TCPA where defendant "does not even have access to the records and/or the calls

made by its lead generators, let alone control over the same").

48.     Finally, simply requiring a telemarketer to comply with all applicable laws and

regulations does not create an agency relationship. *See Boyle v. RJW Transp., Inc.*, No. 05 C

1082, 2008 WL 4877108, at *9 (N.D. Ill. June 20, 2008) ("Language [in a contract] requiring

compliance with laws and regulations does not render an independent contractor an agent or

employee.").

49.     To the contrary, courts have held that no vicarious liability attaches under the

TCPA where a company's agreement with its telemarketer states that the telemarketer "alone [is]

responsible for compliance with applicable laws," and where the telemarketer "made all of the

key decisions creating liability under the TCPA *all on its own*." *Mais*, 944 F. Supp. 2d at 1245

(emphasis added).

50.     DISH's agreements with the Retailers stated that they were independent

contractors and did not dictate the means or manner in which the Retailers were to conduct their

marketing activities.  Furthermore, the agreements granted DISH no control over the Retailers'

day-to-day operations, such as making personnel decisions, bookkeeping, controlling financial

matters, buying and marketing inventory and supplies, and they required the Retailers to comply

with all applicable laws and regulations, including all applicable telemarketing laws.  In practice,

DISH never provided, authorized, or necessarily even saw the Retailers' outbound calling scripts,

nor did it provide any of the Retailers with any of the equipment, software, or materials

necessary to conduct their marketing activities.  For these reasons, Plaintiffs cannot meet their

burden to prove the existence of an agency relationship as between DISH and the Retailers.

### iii.    Actual Authority And Unauthorized Acts Beyond Scope Of Authority

51.    An agency relationship may be established "when the principal explicitly grants the agent the authority to perform *a particular act*" on its behalf. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) (emphasis added) (internal quotation marks omitted). Thus, "actual authority" exists "when at the time of taking action that has legal consequences for the principal, the agent reasonably believes in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006).

52.    Thus, even if the Retailers were DISH's agents for some purposes, Plaintiffs must present "specific evidence that the [Retailers] were acting within the scope of their authority as agents *when they committed these breaches*." *Cement-Lock v. Gas Tech. Inst.*, 618 F. Supp. 2d 856, 880 (N.D. Ill. 2009) (emphasis added). In other words, the existence of an agency relationship in some contexts does not "create an agency relationship in all contexts." *Id.*

53.    Under the Restatement, a purported agent lacks actual authority where it knew or should have known that its acts were unauthorized, or that its purported principal did not consent to their commission:

> An agent does not have actual authority to do an act if the agent *does not reasonably believe* that the principal has consented to its commission. Whether an agent's belief is reasonable is determined from the viewpoint of a reasonable person in the agent's situation under all of the circumstances of which the agent has notice. Lack of actual authority is established by showing either that the agent *did not believe, or could not reasonably have believed*, that the principal's grant of actual authority encompassed the act in question. This standard requires that the agent's belief be reasonable, an objective standard, and that the agent actually hold the belief, a subjective standard.

Restatement (Third) Of Agency § 2.02 cmt. e (2006) (emphasis added).

54.     The Restatement further clarifies that with respect to actual authority, "[a] principal may direct an agent to do *or refrain from doing a specific act*."  Restatement (Third) Of Agency § 2.02 cmt. f (2006) (emphasis added).

55.     Accordingly, "[a]n agent has no authority to act contrary to the known wishes and instructions of his principal."  *Old Sec. Life Ins. Co. v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago*, 740 F.2d 1384, 1391 (7th Cir. 1984); *see also Obras Civiles, S.A. v. ADM Sec., Inc.*, 32 F. Supp. 2d 1018, 1021 (N.D. Ill. 1999) (defendants could not be held liable for actions taken by purported agent in violation of express prohibitions contained in defendants' manual); *Evanston Bank v. Conticommodity Servs., Inc.*, 623 F. Supp. 1014, 1032 (N.D. Ill. 1985) ("Even an agent with an express grant of authority has no authority to act contrary to the known wishes and instructions of his principal.").

56.     "If an agent exceeds the scope of his authority, he incurs liability on himself, not his principal."  *Roboserve, Inc. v. Kato Kagaku Co.*, 873 F. Supp. 1124, 1134 (N.D. Ill. 1995); *see also Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 273 (7th Cir. 1996) (principal cannot be held liable for actions taken by agent beyond scope of authority).

57.     Where it is clear that a purported marketing agent did not actually believe that its marketing activities were authorized by its principal, the marketer lacked actual authority to conduct those activities on the principal's behalf.  *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1251-52 (10th Cir. 2013) (purported marketing agent lacked actual authority where "record contains undisputed evidence that [he] did not hold the belief that [client] authorized him to publish ads displaying [competitor's] mark in their text"); *Yolton v. El Paso Tennessee Pipeline Co.*, 668 F. Supp. 2d 1023, 1037-38 (E.D. Mich. 2009) (no actual authority where purported agent "did not believe that it possessed the authority to modify Plaintiffs' vested

benefits"); *Playboy Enterprises, Inc. v. Dumas*, 960 F. Supp. 710, 721 (S.D.N.Y. 1997)

(purported agent lacked actual authority where "[t]here is no evidence suggesting that any of the

endorsers believed that it had the authority to bind Nagel to a work for hire agreement. In fact,

what evidence there is shows that the agents believed that such action was outside of the limited

scope of their agency"), *aff'd*, 159 F.3d 1347 (2d Cir. 1998); *FASA Corp. v. Playmates Toys, Inc.*,

892 F. Supp. 1061, 1065 (N.D. Ill. 1995) ("Because [plaintiff] did not confer authority on

[purported agent] to waive its intellectual property rights in BATTLETECH *and because*

*[purported agent] did not believe that he had authority to waive [plaintiff's] intellectual*

*property rights*, the Court finds that [purported agent] did not have actual authority to waive

[plaintiff's] intellectual property rights.") (emphasis added).

58. Thus, under the TCPA, where an agent is only authorized to conduct certain

marketing activities and exceeds this scope by conducting additional, unauthorized activities, the

principal cannot be held liable for the purported agent's actions. *See Bridgeview Health Care*

*Ctr. Ltd. v. Clark*, No. 09 C 5601, 2014 WL 7717584, at *6 (N.D. Ill. Nov. 21, 2014) (finding no

vicarious liability under TCPA where marketing company exceeded scope of authority by

sending facsimiles beyond twenty-mile geographic scope expressly authorized by defendant);

*Avio, Inc. v. Alfoccino, Inc.*, 18 F. Supp. 3d 882, 894 (E.D. Mich. May 9, 2014) (defendant not

liable for marketing companies' violations of TCPA where "[t]he record is absolutely clear that

while Defendants authorized B2B to send facsimiles on their behalf, they only did so based upon

B2B's representation that its list only contained the names of those recipients who consented to

receiving unsolicited facsimiles").

59. Furthermore, where a marketing company knows that its client does not consent

to a particular *method* of marketing, the company lacks actual authority to engage in that

marketing method, and the client cannot be held liable for TCPA violations that result from such unauthorized activities. *See Keating v. Peterson's Nelnet, LLC*, No. 1:11 CV 1775, 2014 WL 1891369, at *5-6 (N.D. Ohio May 12, 2014) (where marketing company "understood that no text messaging was allowed under" its agreement with client, "it is doubtful . . . that any jury could find that [marketer] was authorized to send text messages" such that client could be held vicariously liable for marketer's TCPA violations).

60.     Where a party has made a prima facie showing that it did not authorize a purported agent to carry out certain acts, the other party bears the burden of providing rebuttal evidence specifically demonstrating that such acts *were* expressly authorized. *See Opp*, 231 F.3d at 1064 (7th Cir. 2000) (finding no actual authority where plaintiff testified that she never granted husband authority to enter into agreement and defendant was unable to provide any evidence to rebut this showing).

61.     The Retailers could not have reasonably believed that the actions they took giving rise to liability were authorized by DISH.  As a preliminary matter, the Retailers' agreements with DISH prohibited them from violating any applicable laws, including telemarketing laws, when conducting their marketing campaigns.  Further, several Retailers actively *hid* their violative calls from DISH because they knew that they were contrary to DISH policy.  Such acts were clearly beyond the scope of any authority that DISH may have granted to the Retailers, such that they lacked any actual authority to perform the acts.

### iv.     Subagency

62.     Even if Plaintiffs could meet their burden of proof as to any Retailer, certain Retailers hired separate entities to initiate the telemarketing calls at issue in this case.  For example, Star Satellite and Dish TV Now both employed Guardian Communications; National Satellite Systems employed OPK; and American Satellite employed an unidentified Canadian

company to initiate prerecorded calls that were then transferred to Call Expand, a company located in the Philippines. Plaintiffs cannot hold DISH liable for the calls of those subagents without establishing that the particular Retailer at issue had the authority to hire these entities as subagents.

63.     Pursuant to the Restatement, "[a] subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Restatement (Third) of Agency § 3.15(1).

64.     "An agent may appoint a subagent only if the agent has actual or apparent authority to do so." Restatement (Third) of Agency § 3.15(2). "An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent." *Id.* § 3.15 cmt. c. Similarly, "[a]n agent may have apparent authority to appoint a subagent if the principal has made a manifestation to third parties that the agent has such authority." *Id.*

65.     The DISH retailer agreement expressly prohibited the appointment of subagents without DISH's prior approval. Similarly, Plaintiffs have supplied no evidence that DISH "made a manifestation" to any of the subagents at issue regarding the Retailers' authority to appoint such subagents. Accordingly, none of the Retailers had actual authority from DISH to employ subagents.

66.     For these reasons, DISH cannot be held liable on Count II for calls made by Guardian Communications, OPK, Call Expand, or any other company hired by the Retailers as subagents, nor can it be held liable on Count II for making calls to any individuals who made do-not-call requests to these third parties. *See Smith*, 30 F. Supp. 3d at 777 (telemarketers had no

authority to appoint subagents where "the contract does not state that the insurance agents have authority to appoint additional agents for telemarketing purposes"); *Keating*, 2014 WL 1891369, at *5-6 (no vicarious liability for telemarketing activities of subagent where principal's "contract with [purported agent] prohibited [purported agent] from assigning, transferring, or delegating the agreement or any obligations within the agreement.").

### v. Apparent Authority

67.     In the absence of actual authority, an agency relationship may also be found under the doctrine of apparent authority. *See* Opinion 445 at 186; Restatement (Third) Of Agency § 2.03 (2006).

68.     The Seventh Circuit has stated that:

> the party asserting the existence of apparent authority . . . must meet a three-part test: (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority.

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 673 (7th Cir. 2004); *see also Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 732 (7th Cir. 2014) (same).

69.     As further explained in the Restatement:

> Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.

Restatement (Third) of Agency § 2.03 (2006).

70.     In the context of the TCPA, a finding of apparent authority requires evidence that the recipient of a telemarketing call "reasonably believed that [the telemarketer] called her as [the defendant's] agent." *Toney v. Quality Res., Inc.*, No. 13 CV 42, 2014 WL 6757978, at *11

(N.D. Ill. Dec. 1, 2014) (rejecting plaintiff's apparent authority claim where she failed to plead that she reasonably believed the telemarketer who called her was defendant's agent). Where such belief is unreasonable, no apparent authority attaches. *See Spitz*, 759 F.3d at 732 (no apparent authority where third party's belief regarding agency was unreasonable).

71.     Furthermore, such belief regarding apparent authority must be tied to a manifestation *of the alleged principal*, not the alleged agent. *See Smith v. State Farm Mut. Auto. Ins. Co.*, No. 13-CV-2018, 2014 WL 3906923, at *8 (N.D. Ill. Aug. 11, 2014) ("Plaintiffs' apparent authority theory against [defendant], moreover, fails for the additional reason that Plaintiffs do not trace any belief they may have about an agency relationship between [defendant] and [telemarketer] to a manifestation of [defendant] (the principal), rather than a representation made by [the telemarketer] (the agent)."); *see also Opp*, 231 F.3d at 1064 ("[O]nly the words or conduct of the alleged principal, not the alleged agent, establish the actual or apparent authority of an agent.") (internal brackets and quotation marks omitted); Restatement (Third) Of Agency § 2.03 cmt. c (2006) ("An agent's success in misleading the third party as to the existence of actual authority does not in itself make the principal accountable.").

72.     Finally, apparent authority cannot attach absent evidence of a third party's detrimental reliance. *See Taco Bell Corp.*, 582 F. App'x 679-80 (rejecting apparent authority theory on TCPA claim where plaintiff "has not shown that she reasonably relied, much less to her detriment, on any apparent authority with which [the defendant] allegedly cloaked [its telemarketers]"); *Sanchez v. Boyd Gaming Corp.*, No. 12 C 9214, 2013 WL 3874071, at *3 (N.D. Ill. July 25, 2013) (rejecting apparent authority theory where plaintiffs failed to demonstrate detrimental reliance upon alleged manifestations of principal).

73.     As noted by the Court in its Summary Judgment Opinion, "Plaintiffs have significant problems of proof to establish agency by apparent authority" because they "have presented almost no evidence on what the recipients of the Retailers' telemarketing calls reasonably believed." Opinion 445 at 189. Furthermore, Plaintiffs have no evidence that such beliefs—even if Plaintiffs were able to establish their existence—"are traceable to some manifestations by Dish." *Id.* at 190. Finally, Plaintiffs have presented absolutely no evidence of any detrimental reliance or change in position that occurred as a result of any of the Retailers' telemarketing calls. Accordingly, Plaintiffs' apparent authority theory fails.

### vi.     Ratification

74.     Absent either actual or apparent authority, a principal-agent relationship may also be established through the doctrine of ratification. *See* Opinion 445 at 186; Restatement (Third) Of Agency § 4.01 (2006).

75.     The Restatement defines ratification as follows:

(1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.

(2) A person ratifies an act by

(a) manifesting assent that the act shall affect the person's legal relations, or

(b) conduct that justifies a reasonable assumption that the person so consents.

Restatement (Third) of Agency § 4.01 (2006). The Seventh Circuit has clarified that in order for ratification to apply, "something more than approval is needed." *United States v. Aldridge*, 642 F.3d 537, 541 (7th Cir. 2011).

76.     Ratification does not occur unless "the actor acted or purported to act as an agent on the person's behalf." Restatement (Third) of Agency § 4.03 (2006); *see also id.* § 4.01 cmt. b

("It is necessary that the actor have acted or purported to act on behalf of the ratifier. This limits the range of ratifiable acts to those done by an actor who is an agent or who is not an agent but pretends to be.") (internal citation omitted). Furthermore, "[a] person is not bound by a ratification made without knowledge of material facts involved in the original act when the person was unaware of such lack of knowledge." *Id.* § 4.06. "The burden of establishing that a ratification was made with knowledge is on the party attempting to establish that ratification occurred." *Id.* § 4.06 cmt. b.

77.    In the context of the TCPA, failure to demonstrate that a purported principal "knowingly accepted a benefit from [a telemarketer's] calls" is fatal to a ratification theory of vicarious liability. *State Farm Mut. Auto. Ins. Co.*, 2014 WL 3906923, at *9 ("Plaintiffs' ratification theory also fails against [defendant] because Plaintiffs allege no facts supporting an inference that [defendant] knowingly accepted a benefit from [telemarketer']s calls to Plaintiffs.").

78.    Furthermore, a ratification theory fails under the TCPA where a plaintiff merely alleges that a purported principal accepted benefits of only some—but not all—telemarketing calls made on its behalf. For instance, in *Toney*, the plaintiff alleged that the purported principal ratified its telemarketing agent's misconduct "by knowingly accepting the benefits from tens of thousands of sales of Budget Savers memberships that [the telemarketer] completed, while knowing that [the telemarketer] was using automated dialing to obtain those customers." 2014 WL 6757978, at *12. The court nonetheless rejected the plaintiff's ratification theory, however, because:

> plaintiff does not allege that [defendant] accepted any benefit that
> stemmed from [the telemarketer's] telemarketing [individual] calls
> *to plaintiff*. Indeed, plaintiff fails to allege that she did business

26

with [the purported principal] as a result of [the telemarketer's] calls.

*Id.* (emphasis added).

79.    As noted by the Court's Summary Judgment Opinion, "Plaintiffs' ratification theory also faces problems of proof" because, as in *Toney*, "[m]ost of the telemarketing calls did not result in sales, so ratification would not seem applicable to the majority of the calls." Opinion 445 at 190.  Furthermore, "Plaintiffs have almost no evidence of the representations that the Retailers made during these telemarketing calls."  *Id.*  Because ratification requires evidence that the Retailers "acted or purported to act as an agent on the person's behalf," (Restatement (Third) Of Agency § 4.03 (2006)), "[a]bsent such proof, the Plaintiffs may not be able to establish ratification."  Opinion 445 at 190.

**D.    Count III: Abandoned Calls**

80.    On Count III, the United States seeks recovery under the TSR for (i) telemarketing calls that DISH abandoned and (ii) calls that DISH caused telemarketers to abandon.

81.    The applicable statute of limitations on Count III is five years.  As Count III was filed on March 25, 2009, the United State cannot recover for calls that occurred before March 25, 2004.  *See* Opinion 445 at 153.

82.    The Court granted the United States partial summary judgment on Count III for certain DISH-initiated calls as well as for certain calls made by Retailers Star Satellite Network, Dish TV Now, and American Satellite, Inc.  *See* Opinion 445 at 233.  The Court further held, however, that "[i]ssues of fact preclude summary judgment for either party with respect to remedies for Dish's partial summary judgment liability under Count III."  *Id.* at 232.

83. The United States has failed to establish liability under Count III for any additional calls beyond those found on summary judgment, including calls stemming from the 2003 to 2007 call records.

**E.**     **Count IV: Assisting And Facilitating Star Satellite**

84. On Count IV, the United States seeks to recover under provisions of the TSR that prohibit a person from providing substantial assistance or support to telemarketers "when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates the TSR." Opinion 445 at 195.

85. The applicable statute of limitations on Count IV is five years. As Count IV was filed on March 25, 2009, the United State cannot recover for calls that occurred before March 25, 2004. *See* Opinion 445 at 153.

86. The United States only sought relief with respect to two DISH Retailers, Dish TV Now and Star Satellite, and only with respect to prerecorded calls. *See* Opinion 445 at 196.

87. The Court granted DISH partial summary judgment with respect to Count IV claims relating to Dish TV Now, and held that issues of fact precluded summary judgment with respect to the Count IV claims implicating Star Satellite. *See* Opinion at 198.

**i.**     **Plaintiffs Cannot Seek Duplicative Recovery On Count IV For The Same Conduct That Gave Rise To Count III**

88. Plaintiffs seek to recover on Count IV for the same calls and conduct that give rise to its claims on Count III—namely, prerecorded calls made by Star Satellite. However, courts prohibit plaintiffs from recovering multiple times for the same conduct. It is a "well settled" rule that "an injured plaintiff may receive only one full compensation for his or her injuries." *Illinois Sch. Dist. Agency v. Pac. Ins. Co.*, 571 F.3d 611, 615 (7th Cir. 2009). It "goes without saying that the courts can and should preclude double recovery by an individual." *Gen.*

*Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 333 (1980); *see also Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 639 (7th Cir. 2011) ("[D]ouble recovery for the same injury is not allowed."); *Cange v. Stotler & Co.*, 826 F.2d 581, 585 n.2 (7th Cir. 1987) ("Of course multiple recoveries for the same injury will not be allowed.").

89.     This rule is not limited to compensatory damages but applies equally in the context of statutory penalties for telemarketing violations.  For example, in *Charvat v. GVN Michigan, Inc.*, the Sixth Circuit held that when assessing penalties for violations of the TCPA's "do not call" requirements, the statute did not allow "separate recoveries . . . for multiple violations during the same call."  561 F.3d 623, 631 (6th Cir. 2009).

90.     The Sixth Circuit later confirmed this rule in *Charvat v. NMP, LLC*, 656 F.3d 440, 448 (6th Cir. 2011).  In that case, the plaintiff alleged five counts of violations under the TCPA—one for the use of prerecorded messages, and four for failure to comply with various provisions related to the "do not call" list.  *Id.* at 447.  As an initial matter, the court found that the plaintiff could not recover multiple times for calls "brought pursuant to the regulations requiring certain minimum procedures for maintaining a do-not-call list."  *Id.* at 448.  Consistent with the rule that "multiple recoveries for the same injury will not be allowed" (*Cange*, 826 F.2d at 585 n.2), the court also held that for damages purposes, the violations that related to the prerecorded message subsection of the TCPA were separate from the "do not call" violations. *NMP*, 656 F.3d at 448-49.  The court reasoned, in part, that the damages were separate because "[t]he two subsections . . . target[ed] different harms."  *Id.* at 449.

91.     These findings are consistent with the principle that "double recovery for the same injury is not allowed."  *Duran*, 653 F.3d at 639.  Furthermore, the same rule applies to claims seeking recovery under the FTC Act.  *See F.T.C. v. Leshin*, 719 F.3d 1227, 1232-33 (11th

29

Cir. 2013) (noting that "[r]emedies are inconsistent if they provide double recovery for the same injury" and finding that recovery by the FTC was proper because the remedies "d[id] not allow double recovery").

ii.     In Any Event, The United States Cannot Prove Liability On Its Remaining Count IV Claims

92.     Even if the United States were able to double-recover on Count IV for the same conduct that gave rise to Count III, its remaining Count IV claim as to Star Satellite would nonetheless fail.

93.     Under 16 C.F.R. § 310.3(b), it is a violation of the TSR "to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates" a specified provision of the TSR.

94.     The United States cannot establish liability merely by showing that DISH "should have known" of the alleged violation or failed to investigate a third party's conduct. *See* 60 Fed. Reg. 30406, 30414 (June 8, 1995) (rejecting application of "knew or should have known" standard for Section 310.3(b) because it "may have swept too broadly and exposed those only casually associated with deceptive telemarketing to liability").

95.     Furthermore, the United States must prove that DISH provided "substantial assistance or support" to Star Satellite that was "coupled with . . . a relationship to a specified Rule violation." 60 Fed. Reg. 30406, 30414. Thus, the United States must show "some connection between the substantial assistance provided to a deceptive telemarketer and resulting violations of core provisions of the . . . Rule." *Id.*

96.     The "substantial assistance" element also requires a measure of intent. "[T]he Assisting and Facilitating provision of the TSR contains language that defines both a degree of

connection between the action and the rule violation and the actor's intent." Opinion 20 at 10.

Substantial assistance typically involves intentional acts that are either improper *per se* or enable

the commission of a wrongful act by a third party. *See, e.g.*, *F.T.C. v. Chapman*, 714 F.3d 1211,

1217 (10th Cir. 2013) (creator of fraudulent program for obtaining government grants

substantially assisted telemarketers who sold program to consumers); *F.T.C. v. Global Marketing*

*Group, Inc.*, 594 F. Supp. 2d 1281, 1287-88 (M.D. Fla. 2008) (finding substantial assistance

liability for defendant who caused corporations he controlled to withdraw millions of dollars

from bank accounts of customers who were falsely promised unsecured credit cards and credit

card loss protection services by telemarketers).

     97.    Because the record shows that Star Satellite actively hid its violative calls from

DISH, the United States fails to provide evidence that DISH knew or consciously avoided

knowing of Star Satellite's violations. Accordingly, Count IV fails.

    **F.**    <u>**Penalties Under The TSR**</u>

       **i.**    **Civil Penalties Are Inappropriate Under The TSR Because The United States Cannot Prove That DISH Acted With Actual Or Implied Knowledge**

     98.    Civil penalties are not automatic. Instead, they are a remedy for TSR violations

available only if the United States demonstrates that the defendant's conduct satisfied the

requirements of 15 U.S.C. § 45(m).[3]

     99.    Under 15 U.S.C. § 45(m)(1)(A), a defendant that violates a rule "with actual

knowledge or knowledge fairly implied on the basis of objective circumstances" that the act is

unfair or deceptive and prohibited "shall be liable for a civil penalty of not more than $10,000 for

---

[3] As this Court recognized, "the question of whether Dish acted knowingly also turns on issues of liability that have not been decided. In particular, the United States must demonstrate an agency relationship between Dish and the Retailers in order to establish Dish's liability for calling telephone number on Retailers' internal do-not-call lists, and for the Retailers' calls to telephone numbers on Dish's internal do-not-call lists." Opinion 445 at 227.

each violation."[4]  In contrast, "[i]n the case of a violation through continuing failure to comply with a rule . . . each day of continuance of such failure shall be treated as a separate violation, for purposes of subparagraph[] (A)."  15 U.S.C. § 45(m)(1)(C).  If the "knowing" standard is met, the court assesses penalties for each call violating the TSR, unless those calls are part of a continuing violation, in which case the court assesses a daily penalty for each ongoing violation.

100.    Civil penalties are only available against corporations that violate the TSR "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule."  15 U.S.C. § 45(m)(1)(A).  The United States bears the burden of proof on this issue.  *See* Amended Opinion entered January 10, 2011 [Dkt. # 80] at 8.  It must demonstrate that "under the circumstances, a reasonable, prudent person would have known of the existence of the rule and that his or her acts or practices violated the rule."  Opinion 445 at 226.

101.    To meet this standard, the United States must prove that a reasonable, prudent person would have known of the conduct underlying the violations, and known that such conduct violated the relevant statute.  *See FTC v. Hughes*, 710 F. Supp. 1524, 1529-30 (N.D. Tex. 1989) (defendant liable for civil penalties due to knowledge of a rule, and knowledge of practices violating rule); *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139-40 (4th Cir. 1996) (analyzing both whether defendants were aware of the law and of the nature of the underlying conduct).

102.    Where Section 45(m) imposes a separate statutory penalty for each violation, Plaintiffs must prove that DISH had "actual knowledge or knowledge fairly implied" of the conduct underlying *every* violation.

---

[4] As relevant here, the penalty increased to $11,000 for rule violations committed on or before February 9, 2009, and to $16,000 for violations committed after that date.  *See* 74 Fed. Reg. 857-01, 857-58 (Jan. 9, 2009).

103.    The United States has not proven that a reasonable, prudent company in DISH's position would have known of the conduct underlying each and every violation, or that such a company would have known that every call at issue in Counts I through IV violated the TSR.

104.    When a defendant makes a mistake of law, the court will not impute knowledge of the law to the defendant for civil penalties purposes under the FTC Act. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583-84 (2010). DISH made exactly such a mistake. Starting in 2003, the TSR stated: "An outbound telephone call is 'abandoned' . . . if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting." 16 C.F.R. § 310.4(b)(1)(iv). DISH interpreted the requirement that a telemarketer "connect the call to a sales representative" broadly, to prohibit silence, but to permit prerecorded messages from sales representatives.

105.    DISH's interpretation was reasonable. The Fourth Circuit adopted the same position in 2005, explaining that "'abandoned calls,' by definition, involve no *speech*—they leave the recipient of the call frustrated by *silence* on the other end of the line." *Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 341 (4th Cir. 2005) (emphasis in original) (discussing 16 C.F.R. § 310.4(b)(1)(iv)). The Northern District of Illinois and the Middle District of Florida later disagreed. *See F.T.C. v. Asia Telecom, Inc.*, 802 F. Supp. 2d 925, 929 (N.D. Ill. 2011) (holding that 16 C.F.R. § 310.4(b)(1)(iv) unambiguously establishes that a telemarketer must connect a call recipient to a live person to avoid liability); *The Broad. Team, Inc. v. F.T.C.*, 429 F. Supp. 2d 1292, 1300-01 (M.D. Fla. 2006) (same). However, when different judges interpret the plain language of a law differently, their conflicting opinions serve as persuasive evidence that reasonable minds can differ. *See Smiley v. Citibank*, 517 U.S. 735, 739 (1996) (noting that it

would be "difficult indeed" to find a word unambiguous given a conflict among the courts about its meaning).

106.    Many parties were confused about the regulation's meaning: the FTC received criticism that "the text of the TSR [did] not straightforwardly address recorded message telemarketing."  71 Fed. Reg. 58716, 58726 (Oct. 4, 2006).  Although the FTC asserted that the "plain language of the call abandonment provision itself prohibits calls delivering prerecorded messages when answered by a consumer," it nevertheless amended the rule to "make explicit the prohibition" of most prerecorded messages.  *Id.*

107.    The FTC's enforcement actions did little to clarify the standard.  Prior to this amendment, it brought only one action asserting that prerecorded calls were abandoned calls, and it waited until December 29, 2005 to do so.  *See Asia Pac. Telecom, Inc.*, 802 F. Supp. 2d at 932 & n.3 (citing *United States v. The Broadcast Team*, No. 05–cv–1920 (M.D.Fla. Dec. 29, 2005)).

108.    Further leading to DISH's reasonable confusion was the fact that, before October 16, 2012, it was not a violation under the *TCPA*, a separate but overlapping statute, to make prerecorded calls "to a person with whom the caller has an established business relationship at the time the call is made."  47 C.F.R. § 64.1200(a)(2)(iv) (version in effect prior to October 16, 2012); 77 Fed. Reg. 34233, 34237-38 (June 11, 2012) (amending §§ 64.1200(a)(2) and (a)(3)); 77 Fed. Reg. 66935 (November 8, 2012) (correcting the effective date to October 16, 2012).

109.    Because DISH made a mistake of law in believing that the TSR did not penalize calls delivering prerecorded messages, DISH should not be charged with a knowing violation of the TSR for abandoned calls made during that period.  This includes, but is not limited to, the 43,100,876 prerecorded calls that Star Satellite made between July 30, 2005, and November 26, 2005, the 6,637,196 prerecorded calls that Dish TV Now placed from May 2004 to August 2004,

and the one prerecorded call that American Satellite placed in September 2006. *See* Opinion 445 at 89, 102, 107.

110.   DISH additionally misinterpreted the TSR's vicarious liability standard.  The TSR states, "[i]t is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in," certain conduct, including initiating calls to numbers on the Registry, and abandoning calls in specified circumstances.  16 C.F.R. § 310.4(b)(1)(iii)-(iv).  The regulation does not define "cause."  DISH interpreted "cause" to mean that it would be liable for causing its Retailers' TSR violations only if it had an established agency relationship with those Retailers.  Because DISH outsourced its work to independent contractors, it believed that they were individually responsible for compliance with the statutes and regulations.

111.   Because Section 45(m) of the FTC Act contains a mistake of law defense, DISH is not liable for civil penalties in either of these circumstances.  Imposing civil liability in this context would raise serious Due Process concerns.  *See Matter of Metro-E. Mfg. Co.*, 655 F.2d 805, 810 (7th Cir. 1981).[5]

112.   Furthermore, DISH cannot be imputed with any knowledge held by the Retailers. As a preliminary matter, for the Retailers' knowledge to be imputed to DISH, Plaintiffs would have to demonstrate that an agency relationship existed as between DISH and the Retailers, which they cannot do for the reasons set forth above in Section II.C, *supra*.  *See Schorsch v.*

---

[5] Recent Supreme Court guidance also counsels against imposing penalties—let alone the massive penalties that the government requests—under these circumstances. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1208-09 n.4 & 5 (2015) (indicating that interpretive rules do not necessarily have the "force of law" until they are clearly and authoritatively sanctioned by a court, and noting the government's acknowledgement that enforcement actions may be limited by principles of retroactivity when an agency has interpreted regulations inconsistently).

*Reliance Standard Life Ins. Co.*, 693 F.3d 734, 741-42 (7th Cir. 2012) (no imputation without agency relationship).

113.    Even if Plaintiffs could demonstrate that the Retailers were DISH's agents for some limited purposes, "[k]nowledge of an agent is imputed to her corporate principal only if the agent receives the knowledge while acting within the scope of her authority *and* the knowledge concerns a matter within the scope of that authority." *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (emphasis in original). Thus, "where an agent obtains knowledge while acting outside the scope of his agency, the standard presumption is unfounded, and the court will not impute the agent's knowledge to the corporation." *United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida Cnty., Wis.*, 965 F.2d 311, 316 (7th Cir. 1992). Finally, "[i]t is clear that only *actual* knowledge of an attorney or agent can be imputable to the client or principal." *Wycoff v. Motorola, Inc.*, 502 F. Supp. 77, 93 (N.D. Ill. 1980) (emphasis added). Accordingly, constructive knowledge—or information that a purported agent "should have known"—does not impute from the purported agent to its principal.

114.    Here, the United States has failed to prove the existence of an agency relationship between DISH and the Retailers for the reasons set forth above in Section II.C, *supra*. And even if it had succeeded in doing so, any actual knowledge that the Retailers gained was outside the scope of their authority.

115.    DISH is not liable for civil penalties because DISH did not know—and a reasonable, prudent company in DISH's position would not have known—of the conduct underlying the TSR violations, or known that such conduct violated the law.

ii.    **Appropriate Amount Of Any Civil Penalties Under The TSR**

116.    If the Court nonetheless determines that civil penalties are warranted, 15 U.S.C. § 45(m)(1)(C) requires the Court, in crafting civil penalties under the TSR, to "take into account

the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require."

117.    "Other matters as justice may require" in this case includes the strong public interest in preserving competition within the telecommunications sector.

118.    DISH's culpability is limited where the overwhelming majority of the violations were committed by its Retailers—who ignored its explicit policies and instructions.  It is also limited where DISH made numerous efforts to comply with the regulations as to its own calls, and seized opportunities to improve its policies and procedures.  *See United States v. Prochnow*, No. 07-10273, 2007 WL 3082139, at *4 (11th Cir. Oct. 22, 2007) (affirming district court's award, which ignored a year of violations for civil penalties purposes when defendant made efforts to comply).  Despite the volume of the calls, actual harm to the public was minimal.  *See F.T.C. v. Bonnie & Co. Fashions*, No. 90-4454 (HLS), 1992 WL 314007, at *7 (D.N.J. Sept. 28, 1992) (reducing damages awarded where the amount of damage was minimal compared to the scope of defendant's violations); *see also* Section IV, *infra*.  And the government cannot meet its burden of proving that DISH can pay a larger award.

a.    Stipulated Judgments On Comparable Violations Provide
Guidance On Appropriate Penalties Under The TSR

119.    In the event that the Court decides to impose penalties, it may also consider the penalties imposed in other cases involving telemarketing violations.  In determining the appropriate amount of penalties under a statute, "[t]he penalties imposed in other cases" for "similar violations" are "indeed relevant."  *United States v. Ekco Housewares, Inc.*, 62 F.3d 806, 816 (6th Cir. 1995); *see also Saline River Properties, LLC v. Johnson Controls, Inc.*, No. CIV.A. 10-10507, 2011 WL 6031943, at *4 (E.D. Mich. Dec. 5, 2011) (finding that an expert's testimony regarding penalties in "other, albeit not entirely similar, cases" would be relevant to

the court's determination of an appropriate penalty). Here, the Court may consider, for proportionality purposes, judgments for civil penalties in several cases that involved telemarketing conduct.

120. The FTC has initiated litigation in various federal courts making allegations against telemarketers and retailers concerning those entities' telemarketing activities for DISH. *See United States v. Star Satellite LLC, et al.*, No. 2:08-cv-00797-RLH-LRL (D. Nevada), Dkt. No. 1 at 4 (alleging that "Defendant Star Satellite marketed Dish Network satellite television programming through a variety of methods, including telemarketing"); *United States v. Guardian Communications, Inc., et al.*, No. 07-4070 (C.D. Ill.), at Dkt. No. 1 at 6 (alleging that "[o]n or after October 1, 2003, defendants have conducted voice broadcasting telemarketing campaigns causing tens of millions of calls to be abandoned"); *United States v. New Edge Satellite, Inc.*, No. 2:09-cv-11100-MOB-PJK (E.D. Mich.), Dkt. No. 1 at 4-5 (alleging that "[s]ince on or about October 17, 2003, Defendant New Edge, acting on behalf of DISH Network, has directly, or through intermediaries, placed outbound calls to telephone numbers on the National Do Not Call Registry"); *United States v. Planet Earth Satellite, Inc.*, No. 2:08-cv-1274-PHX-EHC (D. Ariz.), Dkt. No. 1 at 4 (alleging that "[s]ince on or about October 1, 2003, Defendant Planet Earth has engaged in telemarketing on behalf of EchoStar"); *United States v. Vision Quest, LLC*, No. 2:09-cv-11102-AJT-VMM (E.D. Mich.), Dkt. No. 1 at 4-5 (alleging that "[s]ince on or about October 17, 2013, Defendant Vision Quest, acting on behalf of DISH Network, has directly, or through intermediaries, placed outbound calls to telephone numbers on the National Do Not Call Registry"). Some of these lawsuits implicated the very calls at issue in this case.

121.    In each of those cases, the parties entered public, stipulated judgments, which

imposed civil penalties for TSR violations that pale in comparison to the $900 million the United

States seeks from DISH.  For example, Star Satellite entered into a stipulated judgment of

$4,374,768 for approximately 43,000,000 prerecorded calls—**which are the same prerecorded**

**calls that the United States seeks to hold DISH liable for in this case**, and which constitute the

vast majority of total DISH violations found by the Court in its Summary Judgment Opinion.

*See Star Satellite LLC*, No. 2:08-cv-00797, Dkt. No. 1 at 4 (alleging that Star Satellite "marketed

Dish Network satellite television programming through a variety of methods, including

telemarketing"); Opinion 445 at 194.  Similarly, Guardian Communications entered into a

stipulated judgment of $7,892,242 for approximately 49 million violative calls that it made for

Star Satellite and Dish TV Now.  *See Guardian Communications*, No. 07-4070, Dkt. No. 2.

122.    The difference between the penalties the United States obtained in *Star Satellite*

and *Guardian* and what it seeks in this case is particularly striking as Star Satellite and Guardian

were far more culpable for their calls than DISH.  Indeed, they actively *hid* their violative

telemarketing activities from DISH because they knew they were contrary to DISH's internal

policies—again, for the same calls that the United States now seeks to hold DISH liable.

In *Star Satellite*, the United States suspended all but $75,000 of the $4,374,768 penalty levied

against Star Satellite contingent upon the accuracy of Star Satellite's financial disclosures.  The

$4,374,768 penalty was *not* based on Star Satellite's ability to pay but, instead, was determined

to be an appropriate penalty given the nature of the violations.  *See Star Satellite LLC*, No. 2:08-

cv-00797, Dkt. No. 6, at 9 (suspending all but $75,000 of $4,374,768 penalty "[b]ased upon

Defendants Star Satellite's and Walter Eric Myers' sworn representations in financial

statements").  Similarly, in *Guardian*, the United States suspended all but $150,000 of the

$7,892,242 penalty levied against Guardian, showing that the larger $7,892,242 figure was not based on Guardian's ability to pay, but on its culpability. *See Guardian Communications*, No. 07-4070, Dkt. No. 2, at 6 ("Based upon their sworn representations in financial statements, full payment for the foregoing civil penalty [of $7,892,242] is suspended except for One Hundred and Fifty Thousand Dollars ($150,000).").

123.    The FTC has entered into stipulated judgments in other cases, which similarly set the bar for appropriate penalties. For example, the FTC agreed to a penalty of $570,000 from New Edge Satellite, the entire amount of which was suspended. *New Edge Satellite*, No. 2:09-cv-11100, Dkt. No. 7, at 8. In addition, Planet Earth Satellite was ordered to pay $7,094,354, and all but $20,000 of that penalty was suspended. *Planet Earth Satellite*, No. 2:08-cv-1274, Dkt. No. 6, at 6. Finally, in the FTC's case against Vision Quest, the company was penalized $690,000, the entire amount of which was suspended. *Vision Quest*, No. 2:09-cv-11102, Dkt. No. 9, at 8-9.

124.    In other cases alleging violations of the TSR, the FTC has entered public, stipulated judgments assessing penalties vastly lower than what it seeks against DISH. *See F.T.C. v. Caribbean Cruise Line, Inc*., No. 0:15-cv-60423-WJZ (S.D. Fla.), Dkt. No. 6-1 (ordering a civil penalty of $7,730,000, where the plaintiffs alleged that the defendant and third parties acting on its behalf made 12 to 15 million illegal calls per day for a period of 10 months—approximately $0.01 per call); *United States v. Comcast Corp*., No. 2:09-cv-01589-HB (E.D. Pa.), Dkt. No. 3 (ordering a civil penalty of $900,000 pursuant to the FTC Act, where the plaintiff alleged that the defendant made over 900,000 calls in violation of the TSR— approximately $1 per call); *United States v. DirecTV, Inc*. No. 2:09-cv-02605-DOC-AN (C.D. Cal.), Dkt. No. 8 (ordering a civil penalty of $2,310,000 pursuant to the FTC Act, where the

plaintiff alleged that the defendant—a repeat offender who violated a consent judgment—was responsible for 1,050,007 calls in violation of the TSR—approximately $2.20 per call).

125.     These public court records are admissible under the Federal Rule of Evidence 201(b).  "The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records."  *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (quoting Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: Evidence § 5106, at 505 (1st ed. 1977 & Supp. 1997)); *see also Philips Med. Sys. Int'l, B.V. v. Bruetman*, 982 F.2d 211, 215 (7th Cir. 1992) (taking judicial notice of a default judgment in a related case); *In re Cenco Inc. Sec. Litig.*, 601 F. Supp. 336, 340 (N.D. Ill. 1984) amended, No. 75 C 2227/MDL 291, 1985 WL 1500 (N.D. Ill. May 22, 1985) (finding that judicial notice of a settlement from a related case was proper).  The Seventh Circuit has stated that courts have "the power, in fact the obligation, to take judicial notice of the relevant decisions of courts and administrative agencies," and "[d]eterminations to be judicially noticed include proceeding[s] in other courts . . . if the proceedings have a direct relation to matters at issue." *Opoka v. I.N.S.*, 94 F.3d 392, 394–95 (7th Cir. 1996) (citations and internal quotation marks omitted).

b.     <u>Any TSR Penalty Must Comply With The Constitution</u>

126.     Plaintiffs seek civil penalties of $900 million for DISH's alleged violations of the TSR.  Pl. Concl. of Law ¶ 167.  This amount is unconstitutional under both the Eighth Amendment and the Due Process Clause of the Fifth Amendment.

127.     Under the Eighth Amendment, "[e]xcessive bail shall not be required, *nor excessive fines imposed*, nor cruel and unusual punishments inflicted."  U.S. Const., Amdt. 8 (emphasis added).  "[C]ivil sanctions can constitute punishment, and therefore are subject to the limitations of the Excessive Fines Clause, if they serve, at least in part, retributive or deterrent

41

purposes." *Towers v. City of Chicago*, 173 F.3d 619, 624 (7th Cir. 1999). The FTC Act's penalties serve a deterrent purpose and thus qualify. *See, Hughes*, 710 F. Supp. at 1530-31 (penalty appropriate in part because it would deter future rule violations).

128. A civil penalty violates the Eighth Amendment if it is "grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 337 (1998). To evaluate the constitutionality of a statutory civil penalty, the Court considers (1) the gravity of the offense; (2) the level of culpability; and (3) the harm caused. It then compares the amount of fines to the gravity of the offense. *See Towers*, 173 F.3d at 625 (7th Cir. 1999) (evaluating the constitutionality of a city ordinance imposing a fine).[6]

129. The government's requested $900 million penalty award is an unconstitutionally excessive fine under the Eighth Amendment. First, Plaintiffs make no allegation of fraud or deceptive acts by DISH, whose violations were clearly inadvertent. Second, the overwhelming majority of DISH's violations were Retailer violations (for which the government has already collected) that contravened DISH's express policies, limiting DISH's culpability. Further, DISH worked hard to comply with a set of complex and evolving telemarketing regulations, and continues to do so. From 2007 to 2010, its error rate was only .00655% of its total calls. And a 2015 audit revealed only a single error. Third, the harm caused, if any, was not severe for the reasons described above. Finally, although civil penalties are appropriate to deter telemarketing violations, the proposed fine of $900 million is so grossly out of proportion to the gravity of

---

[6] For context, General Motors has been fined $900 million in connection with the defects in its ignition switches—which have caused 124 deaths, 17 physical injuries resulting in quadriplegia, paraplegia, double amputation, permanent brain damage or pervasive burns and 258 physical injuries requiring hospitalization or outpatient medical care. *In re. General Motors LLC Ignition Switch Litigation*, No. 14-05461, Dkt. No. 169; Press release (Sept. 17, 2015), http://www.justice.gov/opa/pr/us-attorney-southern-district-new-york-announces-criminal-charges-against-general-motors-and; Detailed Overall Program Statistics (Aug. 21, 2015), http://www.gmignitioncompensation.com/docs/Program_Statistics_8162015.pdf (last visited Oct. 14, 2015). The gravity of this case, which involves inadvertently-placed, unwelcome telephone calls, pales in comparison.

DISH's conduct—most calls were placed by third party Retailers—and other stipulated judgments that the FTC has entered into, such that it is clearly unconstitutional.

130. A civil penalty of $900 million would also violate DISH's Fifth Amendment due process rights. A penalty violates due process when it "is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919). DISH's violations do not justify a punishment of that extreme magnitude, which would have a significantly material impact on any U.S. business, as well as its shareholders and employees. There is no indication that Congress intended such harsh consequences in its effort to deter the telemarketing conduct at issue.[7]

### iii. This Court Should Assess Any Civil Penalties Under The TSR Per Day, And Not Per Call

131. Under 15 U.S.C. § 45(m)(1)(A), a defendant that violates a rule "with actual knowledge or knowledge fairly implied on the basis of objective circumstances" that the act is unfair or deceptive and prohibited "shall be liable for a civil penalty of not more than $10,000 for each violation."[8] In contrast, "[i]n the case of a violation through *continuing failure* to comply with a rule . . . each day of continuance of such failure shall be treated as a separate violation, for purposes of subparagraph[] (A)." 15 U.S.C. § 45(m)(1)(C) (emphasis added). In other words, a court assesses penalties for each call violating the TSR, unless those calls are part of a continuing violation, in which case the court assesses a daily penalty for each ongoing violation.

---

[7] In *BMW of North America, Inc. v. Gore*, the Supreme Court identified three indicia of a punitive damage award's excessiveness: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. 517 U.S. 559, 575 (1996). To the extent that this Court applied *Gore* to measure the constitutionality of statutory penalties, the result would be the same.

[8] Again, as relevant here, the penalty increased to $11,000 for rule violations committed on or before February 9, 2009, and to $16,000 for violations committed after that date. *See* 74 Fed. Reg. 857-01, 857-58 (Jan. 9, 2009).

132.     DISH's violations were continuing, and if this Court decides to award penalties,

they are subject only to daily civil penalties under subsection (C).  Subsection (C) governs any

"continuing failure to comply with a rule."  15 U.S.C. § 45(m)(1)(C).  It includes scenarios in

which a defendant's act or acts result in a continuing pattern of nearly identical rule violations.

S*ee United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 819-22 (N.D. Tex. 2008)

(assessing civil penalties for payments collected—every one of which independently violated a

statute—as one continual violation under 15 U.S.C. § 45(m)(1)(C)); *see also Prochnow*, 2007

WL 3082139, at *3-4; *Hughes*, 710 F. Supp. at 1529.

133.     DISH is liable for *causing* its Retailers' TSR violations when it commits a single

act: authorizing the Retailer to market its goods.  Opinion at 176.  For example, based solely on

DISH's acts of authorizing four Retailers to market its goods, this Court found DISH liable for

causing 52,468,914 Retailer violations of the TSR.  *See id.* at 4-5.  Because DISH's four

individual acts of Retailer authorization caused a continuing pattern of tens of millions of

identical rule violations, they fit squarely within the continuing violation rubric.  Indeed, if this

Court finds that DISH knew or should have known that the Retailer violations were taking place,

it makes no sense to issue a punitive award based on the precise number of calls at issue: DISH

lacked control over that number, and DISH's culpability is not correlated to it.  Instead, because

of the distinct character and nature of DISH's culpable acts—authorizing four Retailers to

market its goods—DISH would be more appropriately punished by counting the time during

which those Retailers continued to make violative calls.

134.     The Court does not have discretion to choose whether to treat violations as

continuing or discrete.  Section 45(m)(1)(C) states that each day of a continuing failure to

comply with a rule "shall" (not "may") be treated as a separate violation.  Any other

interpretation would contradict the clear text of the statute and raise serious due process concerns.  *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) ("[E]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.") (internal quotation marks omitted); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (the canon of constitutional avoidance dictates against adopting unconstitutional statutory interpretation).

135.    That subsection (C) should govern the analysis of repeated, related rule violations is not a novel position.  The FTC previously embraced it, successfully convincing the Eleventh Circuit to affirm a district court's award of civil penalties for hundreds of thousands of TSR violations by construing that court's award as a daily penalty.  *See* Brief of Appellee United States, *United States v. Prochnow*, No. 07-10273-G, 2007 WL 1231876 (11th Cir. Apr. 6, 2007) (stressing in part that the district court "acknowledge[d] that [the defendant's] violations can correctly be analyzed as continuing in nature"); *Prochnow*, 2007 WL 3082139, at *4 (affirming a district court's civil penalties award because—although the district court treated over 100,000 rule violations as discrete violations under subsection (A)—they could appropriately be treated as daily violations, justifying the same award, under subsection (C)).

136.    In all, Section 45(m) requires that when a defendant's act or acts cause a series of nearly identical rule violations, the Court should treat those violations as continuing violations for civil penalties purposes.  The remaining calls at issue in this case, including DISH's direct violations, are "continuing failure[s] to comply" with the TSR under 15 U.S.C. § 45(m)(1)(C). All were strings of ongoing rule violations caused by DISH's act or acts.  Accordingly, all of

DISH's TSR violations in this case should be assessed as daily violations if the Court determines that civil penalties are appropriate.

137.    Even if this Court were to assess civil penalties on a per-call—rather than per-day—basis, the factors discussed above, governing the Court's discretion, still apply.  Therefore, whether violations were assessed per-call or per-day, DISH believes that the consent judgments in other cases provide appropriate benchmarks here—particularly those regarding the Star Satellite and Guardian calls at issue in this case.[9]

### iv.    The United States Cannot Pursue Violations Subject to Previous Consent Judgments

138.    The doctrine of *res judicata* precludes the United States from pursuing DISH for any call violations that were the subject of consent judgments in favor of the United States against Star Satellite and Guardian.  There are three elements to res judicata: "(1) an identity of the parties or their privies; (2) [an] identity of the cause of action; and (3) a final judgment on the merits."  *Matrix IV, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011).  All three elements are met here to bar claims against DISH.

139.    First, "[a] stipulated judgment is on the merits for *res judicata* purposes." *Graebel/Los Angeles Movers, Inc. v. Johnson*, No. 04 C 8282, 2006 WL 533360, at *3 (N.D. Ill. Mar. 1, 2006); *see also Thresherman's Mut. Ins. Co. v. Wallingford Mut. Ins. Co.*, 26 F.3d 776, 779-780 (7th Cir. 1994).  Second, there is an identity of parties, because the United States is a party to both actions and DISH was in privity with the Retailer defendants.  The privity

---

[9] In addition, DISH is not liable for civil penalties under Counts I through III because only an "unfair or deceptive act or practice" can give rise to the recovery of penalties under 15 U.S.C. § 45(m).  Counts I through III allege violations of 16 C.F.R. § 310.4, which by its own terms regulates only "abusive" telemarketing acts or practices.  In contrast, Count IV alleges violations of 16 C.F.R. § 310.3, which concerns "deceptive" telemarketing acts or practices.  The term "abusive" has been used in a similar statute, and legislative history confirms that this term was specifically chosen in order to "reach forms of misconduct not embraced by the more rigid, cost-benefit standard [of] the terms 'unfair' and 'deceptive.'"  *Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*, No. 1:14-CV-00292-SEB, 2015 WL 1013508, at *18 (S.D. Ind. Mar. 6, 2015).  Accordingly, this Court cannot award civil penalties for the "abusive" telemarketing acts or practices alleged in Counts I through III.

requirement is satisfied where, "by virtue of contract or otherwise identical interests, a claim or defense by one [party] is equivalent to a claim or defense by all." *Manicki v. Zeilmann*, 443 F.3d 922, 926 (7th Cir. 2006). A finding of privity is particularly appropriate to the extent that a plaintiff seeks to hold the defendant in the second action derivatively liable. *Garcia v. Vill. of Mount Prospect*, 360 F.3d 630, 636 (7th Cir. 2004). Third, the causes of action are identical. Courts will find an identity of causes of action where the "claims arise out of the same set of operative facts or the same transaction." *Matrix IV*, 649 F.3d at 547. "[T]wo claims are so closely related that they constitute the same transaction for *res judicata* purposes is if they are based on the same or nearly the same factual allegations." C*ent. States, Se. & Sw. Areas Pension Fund v. D Investments, Inc*., No. 01 C 7824, 2002 WL 1759938, at *3 (N.D. Ill. July 30, 2002) (citation omitted).

### III.    TCPA CLAIMS: COUNTS V AND VI

140.    Counts V and VI are brought by the State Plaintiffs under the TCPA. Count V concerns telephone solicitations to residential telephone subscribers who registered their numbers on the Registry. *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). Count VI concerns the use in a telephone solicitation of "an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(2).

#### A.    Count V

141.    In order to prove violations under Count V, the State Plaintiffs must prove that the recipient of a call was (1) a residential telephone subscriber (2) who resided in California, Illinois, North Carolina, or Ohio—depending on the Plaintiff—at the time the violation occurred. *See* Opinion 445 at 202, 206. As to the first requirement, both 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. §227(b)(1)(B) apply only to residential telephone lines, and not to wireless, business, or government numbers. *See* Opinion 445 at 202, 208. As to the second requirement, each State

Plaintiff may pursue TCPA claims arising only from telemarketing calls made to its state residents.  *See* 47 U.S.C. § 227(g)(1) ("Whenever the attorney general of a State . . . has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions *to residents of that State* . . . the State may bring a civil action *on behalf of its residents*.") (emphasis added); *see also* Opinion 445 at 206 ("Each State Plaintiff Attorney General can only sue on behalf of the residents of his or her State.").

142.    In its Summary Judgment Opinion, the Court held that an area code is not sufficient to prove the state of residence associated with a particular telephone number's owner.  *See* Opinion at 206 ("A Colorado resident who has a phone with an area code assigned to California is not a California resident.  The Attorney General of California cannot sue on behalf of that person."); *id.* at 214 ("The Court again rejects the Plaintiffs' argument that any phone with an area code assigned to a geographic area within the State makes that telephone subject to that State's Do-Not-Call Laws.").

143.    Additionally, in order to prove liability under Count V, the State Plaintiffs must show that DISH directly or indirectly "initiate[d] a telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her number on the [Registry]."  47 C.F.R. § 64.1200(c)(2).  Therefore, for each alleged violation, the State Plaintiffs must show that the number called was listed on the Registry.

144.    For calls initiated by the Retailers, the State Plaintiffs cannot recover on Count V unless they can meet their burden of proving that an agency relationship existed as between DISH and the Retailers at the time such calls were made.  *See* Opinion 445 at 210.  For the reasons set forth above in Section II.C, *supra*, the State Plaintiffs cannot meet this burden.

145.     Finally, Plaintiffs cannot succeed on this claim because the Registry, as maintained, violates the First Amendment.  *See supra* ¶ 28.

146.     Plaintiffs have failed to establish DISH's liability under the TCPA for any calls.

**B.     <u>Count VI</u>**

147.     As with Count V, the State Plaintiffs cannot recover under Count VI unless they can prove that the recipient of a call was (1) a residential telephone subscriber (2) who resided in California, Illinois, North Carolina, or Ohio at the time the violation occurred.  *See* Opinion 445 at 212-13.

148.     As it did on Count V, the Court held that an area code is not sufficient to prove the state of residence associated with a particular telephone number's owner for the purposes of Count VI.  *See* Opinion 445 at 212.

149.     For calls initiated by the Retailers, the State Plaintiffs cannot recover on Count VI unless they can meet their burden of proving that an agency relationship existed as between DISH and the Retailers at the time such calls were made.  *See* Opinion 445 at 212.  For the reasons set forth above in Section II.C, *supra*, the State Plaintiffs cannot meet this burden.

150.     It is an affirmative defense if the prerecorded calls at issue on Count VI were within the established business relationship exception.  *See* 47 C.F.R. § 64.1200(f)(5); Opinion 445 at 213.

151.     DISH's limited number of automessage campaigns meets the terms of the TCPA's established business relationship exception.  Thus, the State Plaintiffs cannot recover on Count VI in connection with these automessage campaigns.

152.     Plaintiffs have failed to establish DISH's liability under the TCPA for any calls.

C. **Penalties Under The TCPA**

    i. **State Plaintiffs Have Not Proven That DISH Acted "Willfully" Or "Knowingly" Under The TCPA**

153.    In the event that civil penalties are appropriate, States may sue companies to recover up to $500 for each TCPA violation. 47 U.S.C. § 227(g)(1); *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 900-01 (W.D. Tex. 2001). The Court has discretion to award treble damages only when a defendant acts "willfully or knowingly." *Id*. Neither the TCPA nor its implementing regulations define these terms.

154.    To act "willfully" or "knowingly," a defendant must know that it was performing conduct that violates a statute—understanding the nature of that conduct—and know that its conduct violates the law. *See Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015) (holding that plaintiff must allege that defendant knew that it was using an automatic dialing system to place a call directed to an emergency line, and not simply that it knew that it was placing a call); *Brown v. NRA Grp., LLC*, No. 6:14-CV-610-ORL-31, 2015 WL 3562740, at *4 (M.D. Fla. June 5, 2015) ("A finding of a willful or knowing violation requires a finding that the defendant knew it was engaging in conduct that violated the statute."); *Gillard v. Receivables Performance Mgmt., LLC*, No. CIV.A. 14-02392, 2015 WL 3456751, at *6 (E.D. Pa. June 1, 2015) (uncertainty of law weighs against finding of willfulness).

155.    Plaintiffs nevertheless assert that this Court may consider a treble damages award if Plaintiffs show that DISH's calls were "intentional or volitional, as opposed to inadvertent." Pl. Concl. of Law ¶ 300. But this is not the law. If the Court interpreted "willfully or knowingly" to require only that defendants engage in a volitional act, and not more, then virtually every violation would be subject to treble damages under the TCPA. *Lary*, 780 F.3d at 1107 ("Such a broad application of willful or knowing would significantly diminish the statute's

distinction between violations that do not require an intent, and those willful and knowing

violations that Congress intended to punish more severely.") (internal alterations and quotation

marks omitted).

156.    Although some courts have adopted Plaintiffs' position, they rely on a

misinterpretation of the TCPA.  For example, in *Sengenberger v. Credit Control Servs., Inc.*, the

district court found that an act committed "willfully" is simply one that is volitional.  2010 WL

1791270, at *6 (N.D.Ill. May 5, 2010).  It relied in part on a definition of "willful" in the

Communications Act of 1934.  *See* 47 U.S.C. § 312.  But the relied-upon definition applies only

to administrative sanctions related to radio communications.  *See* 47 U.S.C. § 312(f) (defining

"willful" only "for purposes of this section").

157.    In sum, the terms "willfully" and "knowingly" each independently require that the

defendant intentionally committed an act—understanding the nature of that act—and knew that

the act was prohibited under the TCPA.

158.    Plaintiffs cannot satisfy this standard, and are thus not entitled to treble damages.

        ii.      **The Appropriate Amount Of Any Civil Penalties Under The TCPA**

159.    If penalties are appropriate, the TCPA provides that states may sue for up to $500

in damages for each violation, and treble damages for willful or knowing violations.  47 U.S.C. §

227(g); *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 900-01 (W.D. Tex. 2001).

160.    The Court will award reduced damages when the statutory penalties would be

"inequitable and unreasonable."  *See Am. Blastfax, Inc.*, 164 F. Supp. 2d at 900-01 (finding that a

total potential award of $2.34 billion satisfied this standard, and interpreting the statute as

"providing for 'up to' $500 per violation," ultimately awarding only seven cents per violative

fax, and 21 cents for each willful or knowing violation).  This decision does not hinge on any

constitutional determination.  Instead, the Court may exercise its discretion to reduce the total

award of penalties under the TCPA even if it does not resolve whether the full statutory penalties available would be unconstitutional. *See Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 466 (D. Md. 2012) aff'd, 729 F.3d 370 (4th Cir. 2013). Awarding the statutory maximum would be inequitable and unreasonable in this case, for the reasons described above.

161.    Courts may also decline to award treble damages at their discretion, regardless of any finding that a defendant acted knowingly or willfully. *See* 47 U.S.C. § 227(g). In this case, treble damages are inappropriate in large part because third parties—and not DISH—made the majority of the violative calls, contrary to DISH's express policies.

162.    Furthermore, Plaintiffs have previously argued that this Court should apply the TSR's discretionary factors in assessing an appropriate penalty for DISH's TCPA violations. *See* Plaintiffs' Motion for Summary Judgment [Dkt. # 402] at 167 ("The State Plaintiffs ask that the Court be guided by the civil penalties discussion offered by the United States [on its TSR claims] in determining the following damages to be appropriate [on the State Plaintiffs' TCPA claims]."). DISH agrees that the Court should apply the TSR's discretionary factors in determining an appropriate civil penalty, if any, under the TCPA.

163.    Plaintiffs cannot recover twice for calls under the TCPA that they have already been compensated for under parallel state or federal statutes.

### iii.    Any TCPA Penalty Must Comply With The Constitution

164.    In addition to the considerations outlined above, this Court cannot grant Plaintiffs' request for $1500 in civil penalties for each of DISH's TCPA violations because such an award would be unconstitutional under both the Due Process Clause and the Eighth Amendment.

165.    First, this penalty—or even a penalty approaching $500 per violation—would be an unconstitutionally excessive fine under the Eighth Amendment, as applied in this case. Civil sanctions serving retributive or deterrent purposes are subject to the limitations of the Excessive

Fines Clause. *See Towers*, 173 F.3d at 624. The TCPA easily satisfies that requirement. *See* H.R. Rep. 102-317 (Nov. 15, 1991), *5-6, *10. Fines are unconstitutionally excessive when they are "grossly disproportional to the gravity of the offense." *See Bajakajian*, 524 U.S. at 337. A $1,500 per penalty fine is grossly disproportional to the gravity of DISH's TCPA violations for the same reasons described above.

166. Second, a $1,500 per call penalty—like a $500 per call penalty—would violate the Due Process Clause in these circumstances. While courts have found that the $500 amount is not itself unconstitutional, this rate may violate due process (or the Eighth Amendment) as applied in an individual case. *Universal Elections*, 862 F. Supp. 2d at 465. That is the case here, where the government's requested penalty is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Williams*, 251 U.S. at 66-67. The TCPA seeks to "protect residential telephone subscriber privacy rights by restricting certain commercial solicitation and advertising uses of the telephone and related telecommunications equipment." H.R. Rep. 102-317, at *5.

167. When the Court decides to impose penalties, but the full award of statutory penalties would raise constitutional problems, the Court must award reduced damages. *C.f. Universal Elections*, 862 F. Supp. 2d at 466 (reducing statutory penalties even without reaching constitutional question). Plaintiffs seek to justify their unprecedented request for TCPA penalties—and to sidestep any constitutional difficulties that it implicates—by arguing that this Court could remit damages post-trial. *See* Pl. Concl. of Law ¶ 304. But this is a bench trial, and it would make no sense for the Court to set one damages figure without considering whether it would violate the constitution, only to hold a separate proceeding to consider whether its prior award raised any practical or constitutional concerns. *See* Black's Law Dictionary (10th ed.

2014) (defining "remittitur" as the "process by which a court requires either that the case be retried, or that the damages awarded by the *jury* be reduced") (emphasis added).

## IV. THE PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROOF FOR INJUNCTIVE RELIEF UNDER THE TCPA OR THE TSR

168.    As acknowledged by the Court in its Summary Judgment Opinion, Plaintiffs "seek a significant mandatory injunction that would affect much of Dish's ongoing business practices." Opinion 445 at 229.

169.    Mandatory injunctions are generally "disfavored." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1261 (10th Cir. 2005).

170.    Section 13(b) of the FTCA authorizes a permanent injunction "in proper cases." 15 U.S.C.A. § 53(b).  Similarly, the TCPA provides that, in lawsuits brought by a state attorney general, "[u]pon a proper showing, a permanent or temporary injunction . . . shall be granted without bond." 47 U.S.C. § 227(g)(2).

171.    Once a violation of these statutes has been proven, the plaintiff must show that "there is some reasonable likelihood of future violations," *C.F.T.C. v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979), which must be "something more than the mere possibility." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).  Past misconduct "does not lead necessarily to the conclusion that future misconduct will occur." *C.F.T.C. v. Collins*, No. 94 C 4375, 1997 WL 106135, at *3 (N.D. Ill. Feb. 10, 1997).  Thus, "injunctive relief is never automatic upon the showing of a statutory violation." *Id.*  Indeed, as some courts have noted, the "general rule" is that "[p]ast wrongs are not enough for the grant of an injunction." *F.T.C. v. Evans Products Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (noting that, as a general rule, past wrongs do not amount to a real and immediate threat of injury necessary for the grant of injunctive relief); *United States v. ACB Sales & Serv., Inc.*,

683 F. Supp. 734, 741 (D. Ariz. 1987) ("Past violations do not fall within the purview of" Section 13(b) of the FTC Act.).  Information on DISH's current practices is thus crucial to this Court's analysis of whether an injunction is appropriate.

172.    Courts considering whether to infer a reasonable likelihood of future violations from past violations may consider: "the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations."  *S.E.C. v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982); *see also S.E.C. v. Fisher*, No. 07 C 4483, 2012 WL 3757375, at *14-15 (N.D. Ill. Aug. 28, 2012) (granting summary judgment as to requested remedy of injunctive relief where "[n]o reasonable court could conclude that there is a reasonable likelihood of future violations in this case").

173.    There is no reasonable likelihood of future violations in this case.  DISH recognized that it needed to improve its practices, and it did so.  It created comprehensive written policies and procedures to govern its Outbound Operations group, including their training and scrubbing.  DISH also improved its record-keeping, and now maintains records of the numbers it has scrubbed.  In 2010, DISH retained an outside auditor, which found that "DISH has employed sufficient policies, procedures and processes to ensure compliance with relevant federal and state telemarketing rules."  DISH subsequently developed written Standard Operating Procedures to memorialize campaign-specific scrubbing instructions.  And in 2015, an outside auditor found only 1 potential DNC violation (involving two calls to the same number) out of over 600,000

calls audited. Given DISH's many improvements, Plaintiffs' sole reliance on past violations—many stemming from over a decade ago—is misplaced.

174.    While "[r]egulatory agencies which bring actions to obtain an injunction pursuant to statute are not required to meet the requirements for an injunction traditionally imposed by equity" (*F.T.C. v. Austin Galleries of Illinois, Inc.*, No. 88 C 3845, 1988 WL 118840, at *1 (N.D. Ill. Nov. 2, 1988)), courts have emphasized that an injunction pursuant to a statute is still "a drastic remedy, not a mild prophylactic." *S.E.C. v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 535-36 (2d Cir. 1984) (quoting *Aaron v. S.E.C.*, 446 U.S. 680, 703 (1980) (Burger, C.J., concurring)). Thus, "[e]ven though the standards of public interest, not the requirements of private litigation[,] measures the propriety and need for injunctive relief in these cases, a District Court is called upon to assess all the considerations of fairness that have been the traditional concern of equity courts." *S.E.C. v. Cenco Inc.*, 436 F. Supp. 193, 199 (N.D. Ill. 1977) (citations and quotation marks omitted); *see also, e.g.*, *Donovan v. Robbins*, 99 F.R.D. 593, 598 (N.D. Ill. 1983) (noting, in considering an injunction under ERISA, that "the traditional equitable considerations are pertinent to the determination whether permanent injunctive relief should be imposed in a particular case"); *S.E.C. v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) ("[The securities laws] hardly evidence a Congressional intent to foreclose equitable considerations by the district court."). A court may therefore consider "the adverse effect of an injunction upon defendants . . . in exercising its discretion." *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972); *see also United States v. Broccolo*, No. 06-CV-2812(KMK), 2006 WL 3690648, at *4 (S.D.N.Y. Dec. 13, 2006).

175.    If a court determines that an injunction is warranted, it must also consider the breadth of that injunction. *See N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 436-37 (1941). "The

breadth of the order, like the injunction of a court, must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the [defendant] in the past." *Id.* In fashioning an injunction, "courts cannot . . . enjoin violations of all the provisions of the statute merely because the violation of one has been found." *Id.*; *see Goans Acquisition, Inc. v. Merch. Solutions, LLC*, No. 12–00539, 2013 WL 5408460, at *4 (W.D. Mo. Sept. 26, 2013) (denying plaintiff's request for injunctive relief under the TCPA because it sought to prohibit all facsimile transmissions and the statute only limited unsolicited facsimile advertisements); *Manfred v. Bennett Law, PLLC*, No. 12–CV–61548, 2012 WL 6102071, at *3 (S.D. Fla. Dec. 7, 2012) (dismissing plaintiff's request for injunctive relief under the TCPA because it sought to prohibit calls to "any person" rather than only to the plaintiff).

176.     Furthermore, a proposed injunction that would restrict commercial speech implicates First Amendment concerns, and the party seeking such a restriction "carries the burden of justifying it." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (citation omitted)). "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 770-71.

177.     In order to support an equitable remedy that restricts commercial speech, the Plaintiffs must show that "(1) there is a substantial interest supporting the restriction, (2) the restriction directly advances that substantial interest, and (3) the restriction is narrowly drawn." *F.T.C. v. Trudeau*, 662 F.3d 947, 953 (7th Cir. 2011) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 564-65 (1980)). This third prong, known as the "tailoring

prong," requires that "a restriction on commercial speech must not be 'more extensive than necessary.'" *Trudeau*, 662 F.3d at 953 (citing *Central Hudson*, 447 U.S. at 566). Plaintiffs satisfy none of these requirements.

178. Indeed, total bans on a specified means of commercial speech have repeatedly been struck down as unconstitutional and violative of the First Amendment. *See, e.g.*, *Edenfield*, 507 U.S. at 763-64, 767 (1993) (striking down a Florida rule prohibiting CPAs from engaging in direct, in-person, uninvited solicitation unless the person to be solicited was already a client of the CPA); *Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) (finding unconstitutional certain provisions of the FDMA that prohibited advertising and promotion of particular compounded drugs); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986) (modifying an overbroad injunction in order to "protect[] [the plaintiff's] First Amendment rights").

179. For the reasons stated above, an injunction is inappropriate with respect to Plaintiffs' claims under the TSR and the TCPA.

## V.   STATE LAW CLAIMS: COUNTS VII-XII

### A.   Choice-of-Law Analysis Not Necessary To Determine Agency Law Applicable To State Law Claims

180. In its Summary Judgment Opinion, the Court held that with respect to Counts V through XII, which include all of the state law claims, "[t]he Plaintiff States must prove an agency relationship between Dish and the Retailers to establish Dish's liability for the actions of the Retailers." Opinion 445 at 227.

181. Plaintiffs offer long recitations of agency principles under California, North Carolina, and Ohio law, apparently because they mistakenly believe that the Court should apply

those states' laws in determining whether an agency relationship existed between DISH and the Retailers for purposes of the State Plaintiffs' state law claims.

182. However, "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." *Barron v. Ford Motor Co. of Canada*, 965 F.2d 195, 197 (7th Cir. 1992); *see also Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994) (choice-of-law analysis only required where disparities in different states' laws "could make a difference in the outcome of [the] case"); *Got Gold LLC v. Temple*, No. 12-2278, 2013 WL 1682862, at *3 (C.D. Ill. Mar. 12, 2013) ("[A] conflict of law determination need only be made if the difference in law will affect the outcome.").

183. Accordingly, where "[n]either party argues that the application of [foreign] law . . . would alter the outcome of the case," courts "will generally apply the law of the forum state." *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007); *see also Gould v. Artisoft, Inc.*, 1 F.3d 544, 550 n.7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, [courts] will apply the law of the forum state."). Here, this is Illinois law, which accords with the Restatement and federal common law on agency principles. *See NECA-IBEW*, 736 F.3d at 1058 ("[T]he federal common law of agency, Illinois agency law, and the Restatement of Agency are all in accord on general agency principles."); *see also* Opinion 445 at 185 (same).

184. Plaintiffs offer no explanation of how the agency principles they set forth under California, North Carolina, or Ohio law differ from those of the Restatement or Illinois and federal common law. Similarly, Plaintiffs make no claim that the ultimate determination of whether an agency relationship existed between DISH and the Retailers would be different under these various states' laws.

185.     In fact, Plaintiffs concede in their Conclusions of Law that agency analyses under

the laws of California, North Carolina, and Ohio are the same as agency analyses conducted

under federal common law governing the TCPA.  *See* Pl. Concl. of Law ¶ 327 (arguing that

Satellite Systems Network was DISH's agent under California law "[f]or the reasons described

in the agency analysis under the TCPA"); *id.* ¶ 392 (arguing that JSR Enterprises and Satellite

Systems Network were DISH's agents under North Carolina law "[f]or the reasons described in

the agency analysis under the TCPA"); *id.* ¶ 402 (arguing that Star Satellite was DISH's agent

under North Carolina law "[f]or the reasons described in the agency analysis under the TCPA");

*id.* ¶ 478 (arguing that Satellite Systems Network was DISH's agent under Ohio law "[f]or the

reasons described in the agency analysis under the TCPA").

186.     Accordingly, Plaintiffs have waived the choice of law issue, and the Court will

simply apply Illinois law in making its agency determination.  *See McCoy v. Iberdrola

Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("The choice of law issue may be waived,

however, if a party fails to assert it.").

187.     In any event, there are no material differences in the agency laws of California,

North Carolina, and Ohio as compared to the law of agency as set forth in the Restatement or

Illinois and federal common law.  Accordingly, a determination of whether the Retailers were

DISH's agents would be the same across these various jurisdictions.  *See Kim v. Sumitomo Bank*,

17 Cal. App. 4th 974, 983 (Cal. Ct. App. 2d Dist. 1993) (agency in California requires that

principal "had the right to control the activities of the alleged agent"; "When the principal only

controls the results of the work and not the means by which it is accomplished, an independent

contractor relationship is established"); *Van't Rood v. Cnty. of Santa Clara*, 113 Cal. App. 4th

549, 573 (2003) ("A principal cannot be held when an actual agent acts beyond the scope of his

actual or ostensible authority."); *Hylton v. Koontz,* 138 N.C. App. 629, 636 (N.C. Ct. App. 2000) (in North Carolina, principal element of agency relationship is "the right of control or superintendence over the contractor or employee as to details"); *Merritt, Flebotte, Wilson, Webb & Caruso, PLLC v. Hemmings*, 196 N.C. App. 600, 607 (N.C. Ct. App. 2009) ("[I]t is axiomatic that a principal is not liable when the agent is about his own business, or is acting beyond the scope and range of his employment.") (internal quotation marks omitted); *Barrett-O'Neill v. Lalo, LLC*, No. 2:14-CV-194, 2014 WL 3895679, at *3 (S.D. Ohio Aug. 8, 2014) ("The central factor under Ohio law in determining whether an agency relationship exists is the right of control vested in the principal."); *Thomas v. Ohio Dep't of Rehab. & Correction*, 48 Ohio App. 3d 86, 89 (Ohio Ct. App. 10th Dist. 1988) (under Ohio law, principal not liable where "an agent is acting outside the scope of his authority").

188.    Similarly, there are no material differences in the principles of apparent authority or ratification that would dictate disparate results in these states. *See Black v. The Ritz-Carlton Hotel Co.*, LLC, 977 F. Supp. 2d 996, 1008 (C.D. Cal. 2013) (apparent authority in California only attaches where principal "causes a third person to believe another to be his agent"); *Hillyer v. Deutsche Bank Nat. Trust Co. as trustee for Hasco 2007-NC1*, No. B225305, 2011 WL 5041960, at *4 (Cal. Ct. App. Oct. 25, 2011) (ratification in California only occurs where purported principal "voluntarily retains benefits with knowledge of the unauthorized nature of the act"); *Barbee v. Johnson*, 190 N.C. App. 349, 356 (N.C. Ct. App. 2008) (ratification under North Carolina law requires that "at the time of the act relied upon, the principal had full knowledge of all material facts relative to the unauthorized transaction, and . . . the principal had signified his assent or his intent to ratify by word or by conduct which was inconsistent with an intent not to ratify); *Young v. Int'l Bhd. of Locomotive Engineers*, 114 Ohio App. 3d 499, 506

(Ohio Ct. App. 8th Dist. 1996) (apparent authority in Ohio requires that principal hold out agent as possessing sufficient authority, and that third party reasonably believe that agent had authority).

**B.**     **Cal. Bus. & Prof. Code § 17592(c) (Count VII)**

189.     On Count VII, Plaintiff California alleges that DISH violated Cal. Bus. & Prof. Code § 17592(c)(1), which provides that "no telephone solicitor shall call any telephone number on the then current 'do not call' list and . . . [s]eek to offer a prize or to rent, sell, exchange, promote, gift, or lease goods or services or documents that can be used to obtain goods or services."

190.     It is an affirmative defense to § 17592(c)(1) that "the violation was accidental and in violation of the telephone solicitor's policies and procedures and telemarketer instruction and training." Cal. Bus. & Prof. Code § 17593(d). The Court's Summary Judgment Opinion held that "Dish has presented sufficient evidence to raise this defense at trial." Opinion 445 at 215.

191.     Plaintiff California has not proven that the telephone number corresponding to each and every call for which it seeks to hold DISH liable was on the "'do not call' list," which is defined by statute as "the *California telephone numbers* on the national 'do not call' registry established and maintained by the Federal Trade Commission, as described in ." Cal. Bus. & Prof. Code § 17592(a)(2) (emphasis added).

192.     This Court held in its Summary Judgment Opinion that the phrase "California telephone numbers" should be interpreted to mean telephone numbers associated with California *residents*, and not merely telephone numbers with area codes assigned to California:

> A Colorado resident who has a phone with an area code assigned to California is not a California resident. The Attorney General of California cannot sue on behalf of that person. Each State Plaintiff Attorney General can only sue on behalf of the residents of his or her State.

Opinion 445 at 206.

193.    Any other interpretation would violate the Commerce Clause, as it would permit Plaintiff California to regulate conduct occurring in other states. *See Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 665 (7th Cir. 2010) (Commerce Clause prohibits states from regulating activities in other states); *see also Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1178 (9th Cir. 2011) ("[T]he Commerce Clause prohibits state legislation regulating commerce that takes place wholly outside of the state's borders, regardless of whether the commerce has effects within the state.").

194.    In its Summary Judgment Opinion, the Court held that an area code is not sufficient to prove the state of residence associated with a particular telephone number's owner. *See* Opinion 445 at 205, 214 ("The Court again rejects the Plaintiffs' argument that any phone with an area code assigned to a geographic area within the State makes that telephone subject to that State's Do-Not-Call Laws."); *see also Nuvio Corp. v. F.C.C.*, 473 F.3d 302, 303 (D.C. Cir. 2006) ("VoIP service allows callers to choose what are called 'non-native' area codes. For example, a customer living in the District of Columbia can use an area code from anywhere in the country."); *Hartman v. United Bank Card Inc.*, No. C11-1753, 2012 WL 4792926, at *2-3 (W.D. Wash. Oct. 9, 2012) (due to technological advances in telecommunications industry, court "simply cannot tell where a mobile telephone was located at the time of the call in question without an evidentiary hearing"); *TelTech Sys. v. Barbour*, 866 F. Supp. 2d 571, 576 (S.D. Miss. 2011) (due to technological advances in telecommunications, it is "impossible" to ascertain physical location of recipient of caller ID spoofing); *In the Matter of Vonage Holdings Corp.*, 19 F.C.C. Rcd. 22404, 22439 (2004) ("[There is] a complete disconnect between the subscriber's

physical location and the ability to use [VoIP] service. A subscriber's physical location is not only unknown in many instances, but also completely irrelevant.").

195.     Plaintiff California also cannot prove that DISH qualified as a "telephone solicitor" for each and every call for which it seeks to hold DISH liable: "A person or entity does not necessarily qualify as a telephone solicitor if the products or services of the person or entity are sold or marketed by an independent contractor whose business practices are not controlled by the person or entity."  Cal. Bus. & Prof. Code § 17592(b).

196.     Thus, with respect to calls made by the Retailers, DISH did not constitute a "telephone solicitor" unless Plaintiff California establishes that DISH had an agency relationship with each Retailer at the time it made a particular call.  For the reasons set forth above in Section II.C, *supra*, Plaintiff California has failed to meet its burden to establish such an agency relationship for calls made by the Retailers.

197.     Plaintiff California has failed to establish DISH's liability for calls alleged under Count VII.

198.     Cal. Bus. & Prof. Code § 17593(a) states that Plaintiff California may seek the following remedies in connection with violations of Section 17592:

> (1) An order to enjoin the violation.
>
> (2) A civil penalty of up to the penalty amount that the Federal Trade Commission may seek pursuant to subparagraph (A) of paragraph (1) of subsection (m) of Section 45 of Title 15 of the United States Code as specified in Section 1.98 of Title 16 of the Code of Federal Regulations.
>
> (3) Any other relief that the court deems proper.

199.    For purposes of the relief set forth in Section 17593(a), the statute of limitations is three years.  *See* Opinion 445 at 216-17.  Thus, any relief awarded under Section 17593(a) must be based on calls made on or after March 25, 2006.  *See id.*

200.    Inasmuch as Section 17593 provides for the same civil penalty as available under the FTC Act, the analysis of whether to award such a civil penalty and the amount of such civil penalty should be analyzed consistently with the FTC Act.  *See supra* Section II.F.ii.

201.    Plaintiff California also seeks civil penalties of up to $2,500 per violation pursuant to Section 17536, which authorizes such penalties for violations of Section 17592. Section 17536(b) provides that in assessing such penalties, courts shall consider "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth."

202.    The Court has "broad discretion to determine the penalty amount" under Section 17536.  *People v. First Federal Credit Corp.*, 104 Cal. App. 4th 721, 731 (Cal. Ct. App. 2d Dist. 2002).  Any imposition of civil penalties must comply with the Due Process Clause and the Eighth Amendment of the United States Constitution. *See supra* Sections II.F.ii.b and III.C.iii.

203.    For the reasons set forth herein, no civil penalty can be awarded on Count VII because Plaintiff California cannot prove that for any violation claimed the call was made to a California resident and no civil penalty has been proven to be appropriate in this case.

204.    Furthermore, Plaintiff California has failed to meet its burden for injunctive relief on Count VII, which is inappropriate in this case for the reasons stated above in Section IV, *supra*.

205.     This claim—in addition to all other state law claims that rely on allegations that DISH or third parties acting on its behalf called numbers on the Registry—also fails because the Registry, as maintained, violates the First Amendment.  *See supra* ¶ 28.

**C.     Cal. Bus. & Prof. Code § 17200 (Count VIII)**

206.     On Count VIII, Plaintiff California alleges that DISH has engaged in unfair competition in violation of Cal. Bus. & Prof. Code § 17200 (the "UCL"), which defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice."

207.     To qualify as "unlawful" under the UCL, an act must typically violate some other law or statute, commonly referred to as "borrowed statutes."  Opinion 445 at 217 (citing *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012)).

208.     Without an underlying statutory violation, "there is no unlawful conduct to serve as the basis for plaintiff's UCL claim."  *Rice v. Sunbeam Prods., Inc.*, No. CV 12-7923-CAS-(AJWx), 2013 WL 146270, at *8 (C.D. Cal. Jan. 7, 2013); *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1091 (S.D. Cal. 2010) (same).

209.     Plaintiff California alleges that DISH violated Section 17200 by violating certain borrowed statutes.  In particular, Plaintiff California alleges that DISH violated: (i) the TCPA at 47 U.S.C. § 227(c) and its regulations at 47 C.F.R. § 64.1200(c)(2), by calling California residents whose numbers were on the Registry; (ii) the TCPA at 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(2), by placing prerecorded calls to California residents without permission; (iii) California Business & Professions Code § 17592(c)(1), by making or causing to be made telephone solicitation calls to California telephone numbers listed on the Registry; and (iv) California Civil Code § 1770(a)(22)(A), by making prerecorded calls without complying with the standards set forth in California law.

210.    The law regarding the TCPA, set out above in Sections III.A and III.B, *supra*, governs DISH's alleged calls to the Registry and internal DNC list violations.  Because Plaintiff California did not prove that DISH violated the TCPA by calling any specific "California residents," Plaintiff California's corresponding claim under the UCL also fails.

211.    The law regarding Cal. Bus. & Prof. Code § 17592 is set out above in Section V.B, *supra*.  Because Plaintiff California cannot establish that DISH violated Section 17592, Plaintiff California's corresponding claim under the UCL also fails.

212.    Cal. Civ. Code § 1770(a)(22)(A) provides that it constitutes an unfair business practice to:

> Disseminat[e] an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message.

213.    Section 1770 "does not apply to a message disseminated to a business associate, *customer*, or *other person having an established relationship with the person or organization making the call*, to a call for the purpose of collecting an existing obligation, or to *any call generated at the request of the recipient*."  Cal. Civ. Code § 1770(a)(22)(B) (emphasis added).

214.    Thus, DISH's limited number of automessage campaigns do not constitute violations because they were made to customers, *i.e.*, people with whom DISH had an "established relationship."

215.    Section 1770(a)(22)(A) does not provide for third party liability, unlike other subdivisions of Section 1770(a) that specifically authorize third party liability.  *See, e.g.*, Cal. Civ. Code § 1770(a)(23) (providing for third party liability for violative home solicitation where agency relationship exists between third party and home solicitor).  Instead, Subsection (a)(22)(A)

only applies to a "person," which is defined by statute as "an individual, partnership, corporation, limited liability company, association, or other group, however organized." Cal. Civ. Code § 1761. As vicarious liability is not provided for by Section 1770(a)(22)(A), DISH cannot be held liable for calls made by the Retailers under this section.

216. Even if Section 1770 did provide for third party liability, DISH would have no such liability because Plaintiff California cannot meet its burden of proof to establish an agency relationship between DISH and each specific Retailer. *See* Section II.C, *supra*.

217. Furthermore, Cal. Civ. Code § 1784 states that it is an affirmative defense to a Section 1770 claim that "such violation was not intentional and resulted from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid any such error." DISH's limited number of automessage campaigns were not intentional violations of Cal Civ. Code § 1770 but resulted from a bona fide error notwithstanding DISH's reasonable procedures adopted to avoid any such error.

218. Plaintiff California must also establish that each telephone call for which it seeks to hold DISH liable was made to a California resident. *See* Opinion 445 at 206 ("Each State Plaintiff Attorney General can only sue on behalf of the residents of his or her State.").

219. An area code is insufficient to prove the state of residence associated with a particular telephone number's owner. *See* Opinion at 205, 214; *see also Nuvio*, 473 F.3d at 303; *Hartman*, 2012 WL 4792926, at *2-3; *TelTech Sys.*, 866 F. Supp. 2d at 575; *In the Matter of Vonage Holdings Corp.*, 19 F.C.C. Rcd. at 22439.

220. Plaintiff California has failed to establish DISH's liability for calls alleged under Count VIII.

221.     To the extent that Plaintiff California were able to prove an unfair competition claim, California law provides that the Court should consider the following factors in assessing an appropriate penalty: "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." Cal. Bus. & Prof. Code § 17206(b).

222.     The maximum penalty for any UCL violation is $2,500.  *See* Cal. Bus. & Prof. Code § 17206(a).

223.     A claim for unfair competition in California is subject to a four year statute of limitations.  *See* Cal. Bus. & Prof. Code § 17208; Opinion 445 at 218.  Thus, no civil penalty is available on Count VIII for calls occurring prior to March 25, 2005.  *See id.*

224.     The court has "broad discretion to determine the penalty amount" under Section 17206.  *See First Federal Credit Corp.*, 104 Cal. App. 4th at 731.  Any imposition of civil penalties must comply with the Due Process Clause and the Eighth Amendment of the United States Constitution.  *See supra* Sections II.F.ii.b and III.C.iii.

225.     Plaintiff California also seeks restitution pursuant to Cal. Bus. & Prof. Code § 17203, which permits the court to "restore to any person in interest any money . . . which may have been acquired by means of such unfair competition."  However, California law is settled that "restitutionary relief is limited to money or property lost by the plaintiff and acquired by the defendant."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1135 (9th Cir. 2014) (awarding no restitutionary relief where plaintiff experienced loss "without any corresponding gain by the defendant").

226. Here, the only "unfair competition" alleged involves telemarketing calls, and the only money DISH could have obtained as a result of those calls is from consumers who purchased DISH products and services. However, Plaintiffs have presented no evidence of what monies any consumers paid to DISH, so their restitutionary damage claim fails.

227. Furthermore, Plaintiff California has failed to meet its burden for injunctive relief on Count VIII, which is inappropriate in this case for the reasons stated above in Section IV, *supra*.

**D.     N.C. Gen. Stat. § 75-102 (Count IX)**

228. On Count IX, Plaintiff North Carolina alleges that DISH has violated N.C. Gen. Stat. § 75-102, which provides that "[e]xcept as provided in G.S. § 75-103, no telephone solicitor shall make a telephone solicitation to a telephone subscriber's telephone number if the telephone subscriber's telephone number appears in the latest edition of the 'Do Not Call' Registry." N.C. Gen. Stat. § 75-102(a).

229. N.C. Gen. Stat. § 75-102(d) further provides that:

> Every telephone solicitor shall implement systems and written procedures to prevent further telephone solicitations to any telephone subscriber who has asked not to be called again at a specific number or numbers or whose telephone number appears in the "Do Not Call" Registry. Every telephone solicitor shall train, monitor, and enforce compliance by its employees and shall monitor and enforce compliance by its independent contractors in those systems and procedures. Every telephone solicitor shall ensure that lists of telephone numbers that may not be contacted by the telephone solicitor are maintained and recorded. Compliance with the time requirements within the Telemarketing Sales Rule for incorporating and complying with updated versions of the "Do Not Call" Registry shall constitute compliance with North Carolina law.

230.     Under N.C. Gen. Stat. Ann. § 75-16.2, the statute of limitations applicable to

Count IX is four years.  As Count IX was filed on March 25, 2009, Plaintiff North Carolina

cannot recover for violations that occurred before March 25, 2005.

231.     Neither § 75-102(a) nor § 75-102(d) applies to any telephone solicitations that are

made "to any telephone subscriber with whom the telephone solicitor has an established business

relationship."  N.C. Gen. Stat. §§ 75-103(a)(2), (b).

232.     An "established business relationship" is defined by statute as:

> A relationship between a seller and a consumer based on: (a) the
> consumer's purchase, rental, or lease of the seller's goods or
> services or a financial transaction between the consumer and the
> seller or one or more of its affiliates within the 18 months
> immediately preceding the date of a telephone solicitation; or (b)
> the consumer's inquiry or application regarding a product or
> service offered by the seller within the three months immediately
> preceding the date of a telephone solicitation.

N.C. Gen. Stat. § 75-101(5).

233.     Plaintiff North Carolina must also establish that each telephone call for which it

seeks to hold DISH liable was made to a North Carolina resident.  *See* Opinion 445 at 206

("Each State Plaintiff Attorney General can only sue on behalf of the residents of his or her

State.").

234.     An area code is insufficient to prove the state of residence associated with a

particular telephone number's owner.  *See* Opinion 445 at 205, 214; *see also Nuvio*, 473 F.3d at

303; *Hartman*, 2012 WL 4792926, at *2-3; *TelTech Sys.*, 866 F. Supp. 2d at 575; *In the Matter of

Vonage Holdings Corp.*, 19 F.C.C. Rcd. at 22439.

235.     Plaintiff North Carolina must establish for each telephone call for which it seeks

to hold DISH liable that the call was made to a "telephone subscriber," which is defined by

statute as "[a]n individual who subscribes to a *residential telephone service* from a local

exchange company, a competing local provider certified to do business in North Carolina, or a wireless telephone company; or the individuals living or residing with that individual." N.C. Gen. Stat. § 75-101(11) (emphasis added).

236. Thus, DISH could only be held liable for telephone calls made to "residential subscribers." *See* Opinion 445 at 220 ("The question of whether the calls were made to residential subscribers, however, remains.").

237. For any calls made to wireless numbers, Plaintiff North Carolina must prove that the call was made to a resident of North Carolina and that the "wireless number was used as a residential telephone number." Opinion 445 at 207 ("[T]he complaining registrant would still need to show that the phone was used for residential purposes.").

238. In order to hold DISH liable for calls made by Retailers, Plaintiff North Carolina would have to prove that an agency relationship existed between DISH and the Retailers. *See* Opinion 445 at 219 (citing N.C. Gen. Stat. § 75-101(10)). Plaintiffs cannot make such a showing, however, for the reasons discussed above in Section II.C, *supra*.

239. Assuming Plaintiff North Carolina could have established all the elements of its cause of action under N.C. Gen. Stat. § 75-102 and that the calls are not exempt under § 75-103, Plaintiff North Carolina may only seek civil penalties for calls that it can prove were made to residents of North Carolina.

240. North Carolina's penalty scheme requires identification of individual violations. *See* N.C. Gen. Stat. § 75-105(a).

241. Plaintiff North Carolina has failed to establish liability for the calls alleged under Count IX.

242.     Pursuant to North Carolina law, Plaintiff North Carolina may only recover a civil penalty in this case if it establishes that DISH's acts or practices "were, when committed, knowingly violative of a statute."  N.C. Gen. Stat. § 75-15.2.

243.     North Carolina law states that in assessing an appropriate civil penalty, the Court should consider: "the extent of the harm caused by the conduct constituting a violation, the nature and persistence of such conduct, the length of time over which the conduct occurred, the assets, liabilities, and net worth of the person, whether corporate or individual, and any corrective action taken by the defendant."  N.C. Gen. Stat. § 75-15.2.

244.     Any imposition of civil penalties must comply with the Due Process Clause and the Eighth Amendment of the United States Constitution.  *See supra* Sections II.F.ii.b and III.C.iii.

245.     Furthermore, Plaintiff North Carolina has failed to meet its burden for injunctive relief on Count IX, which is inappropriate in this case for the reasons stated above in Section IV, *supra*.

**E.        N.C. Gen. Stat. § 75-104 (Count X)**

246.     On Count X, Plaintiff North Carolina alleges that DISH violated N.C. Gen. Stat. § 75-104, which provides that, subject to a number of exceptions, "no person may use an automatic dialing and recorded message player to make an unsolicited telephone call."

247.     Under N.C. Gen. Stat. Ann. § 75-16.2, the statute of limitations applicable to Count X is four years.  As Count X was filed on March 25, 2009, Plaintiff North Carolina cannot recover for violations that occurred before March 25, 2005.

248.     DISH is not liable on Count X for any calls made by the Retailers because Plaintiff North Carolina cannot meet its burden to prove that each such Retailer is an agent of DISH.  *See* Section II.C, *supra*.

249.     As with Count IX, Plaintiff North Carolina must establish that each telephone call for which it seeks to hold DISH liable on Count X was made to a North Carolina resident.  *See* Opinion 445 at 206 ("Each State Plaintiff Attorney General can only sue on behalf of the residents of his or her State.").

250.     An area code is insufficient to prove the state of residence associated with a particular telephone number's owner.  *See* Opinion 445 at 205, 214; *see also Nuvio*, 473 F.3d at 303; *Hartman*, 2012 WL 4792926, at *2-3; *TelTech Sys.*, 866 F. Supp. 2d at 575; *In the Matter of Vonage Holdings Corp.*, 19 F.C.C. Rcd. at 22439.

251.     Plaintiff North Carolina cannot establish for any telephone call for which it seeks to hold DISH liable that the call was an "unsolicited telephone call," which is defined by statute as "[a] voice communication, whether prerecorded, live, or a facsimile, over a telephone line or wireless telephone network or via a commercial mobile radio service that is made by a person to a *telephone subscriber* without prior express invitation or permission."  N.C. Gen. Stat. § 75-101(12) (emphasis added).

252.     Plaintiff North Carolina cannot establish for any telephone call for which it seeks to hold DISH liable that the call was made to a "telephone subscriber," which is defined by statute as "an individual who subscribes to a *residential telephone service* from a local exchange company, a competing local provider certified to do business in North Caroline, or a wireless telephone company; or the individuals living or residing with that individual."  N.C. Gen. Stat. § 75-101(11) (emphasis added).

253.     DISH could only be held liable for telephone calls made to "residential subscribers."  Opinion 445 at 220 ("The question of whether the calls were made to residential subscribers, however, remains.").

254.     As noted, DISH is not liable for telephone calls to wireless numbers because Plaintiff North Carolina cannot meet its "burden to prove that the wireless number was used as a residential telephone number."  Opinion 445 at 207 ("[T]he complaining registrant would still need to show that the phone was used for residential purposes").

255.     Plaintiff North Carolina has failed to establish liability for the calls alleged under Count X.

256.     Assuming Plaintiff North Carolina could establish all the elements of Count X, it could only recover a civil penalty for calls that it can prove were made to a resident of North Carolina.

257.     North Carolina's penalty scheme requires identification of individual violations. Plaintiff North Carolina cannot meet this burden of proof.  *See* N.C. Gen. Stat. § 75-105(a).

258.     Furthermore, Plaintiff North Carolina may only recover a civil penalty in this case if it establishes that DISH's acts or practices "were, when committed, knowingly violative of a statute."  N.C. Gen. Stat. § 75-15.2.

259.     North Carolina law states that in assessing an appropriate civil penalty, the Court should consider: "the extent of the harm caused by the conduct constituting a violation, the nature and persistence of such conduct, the length of time over which the conduct occurred, the assets, liabilities, and net worth of the person, whether corporate or individual, and any corrective action taken by the defendant."  N.C. Gen. Stat. § 75-15.2.

260.     Any imposition of civil penalties must comply with the Due Process Clause and the Eighth Amendment of the United States Constitution.  *See supra* Sections II.F.ii.b and III.C.iii.

261.     Furthermore, Plaintiff North Carolina has failed to meet its burden for injunctive

relief on Count X, which is inappropriate in this case for the reasons stated above in Section IV,

*supra*.

**F.     Illinois Automatic Telephone Dialers Act (Count XI)**

262.     On Count XI, Plaintiff Illinois alleges that DISH violated the Illinois Automatic

Telephone Dialers Act (the "IATDA"), which is codified at 815 ILCS 305/30(b) and provides

that "[i]t is a violation of this Act to play a prerecorded message placed by an autodialer without

the consent of the called party."

263.     Plaintiff Illinois must establish that each telephone call for which it seeks to hold

DISH liable was made to an Illinois resident.  *See* Opinion 445 at 206 ("Each State Plaintiff

Attorney General can only sue on behalf of the residents of his or her State.").

264.     An area code is insufficient to prove the state of residence associated with a

particular telephone number's owner.  *See* Opinion 445 at 205, 214; *see also Nuvio*, 473 F.3d at

303; *Hartman*, 2012 WL 4792926, at *2-3; *TelTech Sys.*, 866 F. Supp. 2d at 575; *In the Matter of

Vonage Holdings Corp.*, 19 F.C.C. Rcd. at 22439.

265.     Under 815 ILCS 305/30(b)—the only subsection at issue on Count XI—it is only

a violation to "*play*" a prerecorded message (emphasis added), meaning that it does not provide

for vicarious liability.  In contrast, 815 ILCS 305/30(a) imposes liability on entities that "make

*or cause to be made* telephone calls utilizing an autodialer to an emergency telephone number,"

or in violation of the standards set forth in 815 ILCS 305/15.  ILCS 305/30(a) (emphasis added).

While the Court cited to ILCS 305/30(a) in stating that "[t]he IATDA imposes liability on

persons that 'make or cause to be made' illegal autodialer calls" (Opinion 445 at 222), Plaintiff

Illinois does not allege any violations of ILCS 305/30(a)—*i.e.* calls to emergency telephone

numbers or in violation of the standards set forth in 815 ILCS 305/15.  Given that 815 ILCS

305/30(b), the only subsection at issue on Count XI, does not provide for similar vicarious liability, DISH cannot be held liable under Illinois law for the acts of the Retailers.

266.    Accordingly, this Court's question as to the meaning of the word "cause" in 815 ILCS 305/30(a) is not relevant because DISH would only be liable—if at all—under 815 ILCS 305/30(b) for prerecorded messages it "play[ed]" itself, and not for those it may have caused others to play.  *See* Opinion 445 at 223 (noting that neither party addressed the issue of whether Illinois courts would adopt the FTC's interpretation of "cause" in the TSR).

267.    Even if this Court were to interpret 815 ILCS 305/30(b) to authorize some form of vicarious liability, there is no basis to import the FTC's unique interpretation of "cause" from the TSR into 815 ILCS 305/30(b), which does not contain the word "cause."  Instead, if the Court permitted any vicarious liability, it should apply traditional agency principles that typically give rise to vicarious liability.  Under such a standard, DISH would not be liable because Plaintiff Illinois cannot prove an agency relationship between DISH and the Retailers at issue.  *See* Section II.C, *supra*.

268.    Furthermore, the IATDA does not apply to telephone calls "made to any person with whom the telephone solicitor has a *prior or existing* business relationship."  815 ILCS 305/20(a)(2) (emphasis added).  There are no time limitations with respect to how long ago the business relationship must have ended.  DISH's limited number of automessage campaigns meet the terms of 815 ILCS 305/20(a)(2).

269.    Without proving that DISH violated 815 ILCS 305/30(b), Plaintiff Illinois certainly cannot prove a "knowing" violation of 815 ILCS 305/30(b), so as to constitute an "unlawful practice" in violation of the Consumer Fraud and Deceptive Business Practices Act. *See* 815 ILCS 505/2Z.

270. Plaintiff Illinois has failed to establish liability for the calls alleged under Count XI.

271. Even if DISH had committed a violation of the Consumer Fraud and Deceptive Business Practices Act, the maximum total penalty allowed by Illinois law would be $50,000. 815 ILCS 505/7(b).

272. While 815 ILCS 505/7(b) provides for larger penalties where a party engages in a proscribed activity "with the intent to defraud," there are no allegations in this case that DISH acted with intent to defraud.

273. Any imposition of civil penalties must comply with the Due Process Clause and the Eighth Amendment of the United States Constitution. *See supra* Sections II.F.ii.b and III.C.iii, *supra*

274. Furthermore, Plaintiff Illinois has failed to meet its burden for injunctive relief on Count XI, which is inappropriate in this case for the reasons stated above in Section IV, *supra*.

**G.** **Ohio Consumer Sales Practices Act (Count XII)**

275. On Count XII, Plaintiff Ohio alleges that DISH has violated the Ohio Consumer Sales Practices Act ("OCSPA").

276. Under Ohio Rev. Code § 1345.07(E), the statute of limitations applicable to Count XII is two years. As Count X was filed on March 25, 2009, Plaintiff North Carolina cannot recover for violations that occurred before March 25, 2007.

277. In order to succeed on Count XII, Plaintiff Ohio must establish that each telephone call for which it seeks to hold DISH liable was made to an Ohio resident. *See* Opinion 445 at 206 ("Each State Plaintiff Attorney General can only sue on behalf of the residents of his or her State.").

278.    An area code is insufficient to prove the state of residence associated with a particular telephone number's owner.  *See* Opinion 445 at 205, 214; *see also Nuvio*, 473 F.3d at 303; *Hartman*, 2012 WL 4792926, at *2-3; *TelTech Sys.*, 866 F. Supp. 2d at 575; *In the Matter of Vonage Holdings Corp.*, 19 F.C.C. Rcd. at 22439.

279.    Ohio Rev. Code § 1345.02(A) provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction."  Ohio Rev. Code § 1345.02(B) enumerates a number of different activities that constitute "deceptive" conduct, but Plaintiff Ohio has made no allegation that DISH has committed any of these acts.  *See* Ohio Rev. Code § 1345.02(B).

280.    Ohio Rev. Code § 1345.03(A) provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction."  Ohio Rev. Code § 1345.03(B) enumerates a number of factors to be considered in determining whether an act or practice is "unconscionable," but none of those factors are present in this case.  *See* Ohio Rev. Code § 1345.03(B).

281.    Plaintiff Ohio must establish for each telephone call for which it seeks to hold DISH liable that DISH committed an unfair, deceptive, or unconscionable act or practice in connection with a "*consumer* transaction" (Ohio Rev. Code §§ 1345.02(A), 1345.03(A)) (emphasis added), which is defined by statute as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things."  Ohio Rev. Code § 1345.01(A).  Thus, transactions involving businesses or other commercial entities do not fall within the definition of "consumer transaction" under the OCSPA.  *See Culbreadth v. Golding Enterp.*, L.L.C., 872 N.E.2d 284, 290 (Ohio 2007).

282.     A violation of the TCPA is not by itself a violation of the OCSPA.  *See NMP*, 656

F.3d at 450 ("We agree that . . . delivering a prerecorded message without prior express consent,

in violation of [the TCPA], is not, by itself, a violation of the OCSPA.") (citing *Culbreadth*, 872

N.E.2d at 291).

283.     Rather, violations of the TCPA can only constitute independent violations of the

OCSPA if the circumstances of those calls violate specific provisions of the OCSPA.  *NMP*, 656

F.3d at 451; *see also Lucas v. Telemarketer Calling From (407) 476-5670*, No. 1:12-cv-630,

2013 WL 2456320, *5 (S.D. Ohio June 6, 2013) (citing *NMP* for proposition that "violations of

the TCPA can constitute independent violations of the OCSPA, so long as the circumstances of

those calls violate specific provisions of the OCSPA"); *Charvat v. DFS Services LLC*, 781 F.

Supp. 2d 588, 594 (S.D. Ohio 2011) (dismissing OCSPA claim on grounds that TCPA violation

by itself cannot give rise to OCSPA claim "absent some allegation of deception").

284.     Thus, Plaintiff Ohio cannot establish a violation of the OCSPA based merely on

DISH's violation of the TCPA.  Plaintiff Ohio must establish that each call at issue was either

deceptive or unconscionable as defined by statute.

285.     This Court has held that "failing to record a do-not-call request on an internal do-

not-call list and failing to honor a prior do-not-call request" may constitute a violation of the

OCSPA.  Opinion 445 at 224-25.

286.     Thus, pursuant to the Court's interpretation of Ohio law, Plaintiff Ohio will have

to establish for each telephone call for which it seeks to hold DISH liable that the call recipient

previously made a do-not-call request to DISH which DISH failed to honor.

287.     In that regard, DISH is not obligated to honor internal do-not-call requests made

to the Retailers unless those Retailers are agents of DISH, and vice versa.  *See* Opinion 445 at

227.  Plaintiff Ohio cannot meet its burden to prove that an agency relationship existed as between DISH and the Retailers at issue.  *See* Section II.C, *supra*.

288.    Plaintiff Ohio is not entitled to civil penalties unless it can establish that DISH's conduct "was declared to be unfair, deceptive, or unconscionable by rule adopted pursuant to division (B)(2) of section 1345.05 of the Revised Code before the consumer transaction on which the action is based occurred" or "was determined by a court of this state to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision . . . was made available for public inspection pursuant to division (A)(3) of section 1345.05 of the Revised Code."  Ohio Rev. Code § 1345.07(D).

289.    Plaintiff Ohio makes no allegation that DISH violated any rule adopted pursuant to Ohio Revised Code § 1345.05(B)(2).  *See* Third Amended Complaint and Demand for Jury Trial dated Feb. 27, 2015 [Dkt. # 483] ("Complaint") ¶¶ 94-96.  Thus, Plaintiff Ohio must establish that DISH's conduct was previously determined by an Ohio state court to be a violation of the OCSPA and that such decision was "made available for public inspection" by the Attorney General of Ohio pursuant to § 1345.05(A)(3).  *Cf. State ex rel. Celebrezze v. Erdil*, No. 88 CV 0624, 1992 WL 792930, at *1-2 (Ohio Ct. Common Pleas Oct. 28, 1992) (awarding civil penalty only after specifically finding that conduct complained of was found to be unfair or deceptive by prior Ohio state court decision which was made available for public inspection).

290.    Ohio alleges that DISH violated Ohio Rev. Code §§ 1345.02-03 by engaging in "a pattern or practice of initiating telephone solicitations to residential telephone subscribers in the State of Ohio, whose telephone numbers were listed on the National Do Not Call Registry in violation of the TCPA . . . and/or in violation of the [TSR]" and by "initiating telephone calls to residential telephone lines using artificial or prerecorded voices to deliver a message without the

prior express consent of the called party and without falling within specified exemptions delineated within the TCPA in violation of the TCPA."  Complaint ¶¶ 95-96.

291.    Plaintiff Ohio has failed to establish liability for the calls alleged under Count XII.

292.    The amount of civil penalties to impose on DISH, if any, are within the discretion of the Court, but may not exceed $25,000 for each category of violation.  *See* Ohio Rev. Code § 1345.07(D); *Erdil*, 1992 WL 792930, at *2-3 (awarding $25,000 total for "selling [cars] to Ohio consumers" with the odometers "rolled back"—rather than $25,000 per car—and awarding $25,000 per type of misrepresentation made to consumers rather than $25,000 per consumer); *see also State ex rel. Fisher v. Gates*, No. 94CVH-04-2874, 1995 WL 901458, at *2 (Ohio Ct. Common Pleas Mar. 21, 1995) (same).

293.    Any imposition of civil penalties must comply with the Due Process Clause and the Eighth Amendment of the United States Constitution.  *See supra* Sections II.F.ii.b and III.C.iii.

294.    Furthermore, Plaintiff Ohio has failed to meet its burden for injunctive relief on Count XII, which is inappropriate in this case for the reasons stated in Section IV, *supra*.

Dated: November 2, 2015

/s/ Peter A. Bicks
Peter A. Bicks
Elyse D. Echtman
John L. Ewald
ORRICK HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
pbicks@orrick.com
eechtman@orrick.com
jewald@orrick.com


Joseph A. Boyle
Lauri A. Mazzuchetti
KELLEY DRYE & WARREN LLP
200 Kimball Drive
Parsippany, New Jersey 07054
Telephone: (973) 503-5900
jboyle@kelleydrye.com
lmazzuchetti@kelleydrye.com

Henry T. Kelly
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, Illinois  60606
Telephone: (312) 857-2350
hkelly@kelleydrye.com

*Attorneys for Defendant DISH Network L.L.C.*

83

# United States et al. v. Dish Network LLC — Page 1 of 3
## No. 3:09-cv-03073 – SEM-TSH

| Witness Name | Address | Expert | Adverse |
|---|---|---|---|
| Ahmed, Amir | | | X |
| Bangert, Russell | | | X |
| Binns, Todd | | | X |
| Davis, Bob | | | X |
| DeFranco, James | | | X |
| Dexter, Amy | | | X |
| Dish (Corporate Entity) | | | X |
| Metzger, Marciedes | | | X |
| Mills, Mike | | | X |
| Montano, Joey | | | X |
| Oberbillig, Mike | | | X |
| Origer, Robb | | | X |
| Picchione, Shannon | | | X |
| Snyder, Serena | | | X |
| Van Emst, Blake | | | X |
| Werner, Bruce | | | X |
| Canale, Steven | | | X |
| Fletcher, Matthew | | | X |
| Musso, Reji | | | X |
| Novak, Scott | | | X |
| Portela, Shawn | | | X |
| Steele, Dana | | | X |
| Sponsler, Kenneth | | | X |
| Stauffer, Rick | | | |
| Taylor, John | | | X |
| Brandvein, Allan | | | |
| Cavett, Brian | | | |
| DiRoberto, Todd | | | |
| Goodale, Richard | | | |
| Hagen, David | | | |
| LaVictor, Derek | | | |
| Levi, Kobi | | | |
| Rahim, Rick | | | |
| Tehranchi. Sophie | | | |
| Teichert, Thomas | | | |
| Tsai, Jason | | | |
| Myers, Walter Eric | | | |
| Castillo, Manuel | | | |
| Jones, Nathan | | | |

# Plaintiffs' Witness List

| Witness Name | Address | Expert | Adverse |
|---|---|---|---|
| Zaruba, Nicole | | | |
| Garner, Grace | | | |
| Green, Debra | | X | |
| Mastrocinque, Nicholas | | | |
| Menjivar, Roberto | | | |
| Yoeli, Erez | | X | |
| Dziekan, Ami | | | |
| Olsen, Fred | | | |
| Steele, Leslie | | | |
| Torok, David | | | |
| Dean, Richard | | | |
| Doucette, Linda | | | |
| Khan, Zia | | | |
| Lovuolo-Bhushan, Judith | | | |
| Shafi, Sayed | | | |
| Slaby, Davi | | | |
| Pollard, Ron | | | |
| Aslam, Javed | | | |
| Bersett, Richard | | | |
| Das, Andrew | | | |
| Dhawan, Aman | | | |
| Jain, Elizabeth | | | |
| Johnson, Amy | | | |
| Jutla, Manjit | | | |
| LaRosa, Paul | | | |
| Sehgal, Chander | | | |
| Shahab, Beverly | | | |
| Sill, Morton | | | |
| Singh, Balbir | | | |
| Skala, Lisa | | | |
| Sura, Brian | | | |
| Wolf, Bob | | | |
| Ishaq, Khalid | | | |
| Krakauer, Thomas | | | |
| Lynde, Lynette | | | |
| Phillips, Elizabeth | | | |
| Robinson, Karen | | | |
| Robinson, Michael | | | |
| Sykes, Laurie | | | |
| Talluri, Patricia | | | |

**Plaintiffs' Witness List**

**United States et al. v. Dish Network LLC**    **Page 3 of 3**
**No. 3:09-cv-03073 – SEM-TSH**

| Witness Name | Address | | Expert | Adverse |
|---|---|---|---|---|
| Vaca, Mary | | | | |
| Snook, Steve | | | | |
| Nagendra, Parmala | | | | |
| James, Jessi | | | | |
| Kitner, David | | | | |
| Lea, Patrick | | | | |
| Bowen, Lynette | | | | |

| Witness Name | Address | | Expert | Adverse |
|---|---|---|---|---|
| Kevin Baker | | | | x |
| Cynthia Diemer | | | | x |
| Russel Deitch | | | | x |
| Ami Rop Dzieken | | | | x |
| Rae Ann Estep | | | | x |
| David Fox | | | | x |
| Kathy French | | | | x |
| Kelly Horne | | | | x |
| John Krebs | | | | x |
| Nicholas Mastrocinque | | | | x |
| Roberto Menjivar | | | | x |
| Linda Lavenda Miller | | | | x |
| James Shaffer | | | | x |
| Rick Stauffer | | | | x |
| Melissa Swart-Weikel | | | | x |
| Murali Thirukonda | | | | x |
| David Torok | | | | x |
| Gayle Weller | | | | x |
| Avery Abernethy | | | x | |
| Amir Ahmed | | | | |
| Joseph Bamira | | | | |
| Russell Bangert | | | | |
| Jeffrey Blum | | | | |
| Matt Cagle | | | | |
| Erik Carlson | | | | |
| Brian Cavett | | | | |
| Krystle Davidson | | | | |
| Bob Davis | | | | |
| James DeFranco | | | | |
| Amy Dexter | | | | |
| Dr. Robert Fenili | | | x | |
| Matthew Fletcher | | | | |
| Gladys Flores | | | | |
| James Flynn | | | | |
| Kevin Gelston | | | | |
| Steve Gniadek | | | | |
| Anitha Gogineni | | | | |
| David Hagen | | | | |
| Nathan Jones | | | | |
| Rebecca Kirk Fair | | | x | |
| David Laslo | | | | |

# Defendant's Witness List

| Witness Name | Address | Expert | Adverse |
|---|---|---|---|
| Derek LaVictor | | | |
| Kobi Levi | | | |
| Charles McKay | | | |
| Marciendes Metzger | | | |
| Walter Myers | | | |
| Michael Mills | | | |
| Joey Montano | | | |
| Reji Musso | | | |
| Brian Neylon | | | |
| Robb Orriger | | | |
| Shawn Portela | | | |
| Rick Rahim | | | |
| Josh Sitko | | | |
| Ken Sponsler | | x | |
| Serena Snyder | | | |
| Dana Steele | | | |
| Leslie Steele | | | |
| Supriya Surender | | | |
| Steven Swain | | | |
| John Taylor | | x | |
| Thomas Teichert | | | |
| Blake Van Emst | | | |
| Melissa Van Vorst | | | |
| Michael Wallace | | | |
| Men Wang | | | |
| Bruce Werner | | | |
| Witnesses Named by Plaintiffs | | | |

| No. | Beginning Bates | Ending Bates | Description | Otherwise Marked |
|---|---|---|---|---|
| JTX-0001 | DISH11-034283 | DISH11-034307 | Echostar Satellite Corporation Incentivized Retail Agreement between Echostar Satellite and Dish TV Now | DTX-251 |
| JTX-0002 | DISH11-034334 | DISH11-034334 | Amendment To Echostar Satellite Corporation Incentivized Retail Agreement between Echostar Satellite and Dish TV Now | DTX-252 |
| JTX-0003 | DISH11-034335 | DISH11-034338 | Amendment No. 2 To Echostar Satellite Corporation Incentivized Retailer Agreement between Echostar Satellite and Dish TV Now | DTX-253 |
| JTX-0004 | DISH11-034340 | DISH11-034342 | Amendment No. 3 To Echostar Satellite Corporation Incentivized Retailer Agreement between Echostar Satellite and Dish TV Now | DTX-254 |
| JTX-0005 | DISH11-034343 | DISH11-034343 | Amendment No. 4 To Echostar Satellite Corporation Incentivized Retailer Agreement between Echostar Satellite and Dish TV Now | DTX-255 |
| JTX-0006 | DISH5-0000007990 | DISH5-0000008021 | Echostar Retailer Agreement between Echostar Satellite and Dish TV Now | DTX-256 |
| JTX-0007 | DISH-Paper-001501 | DISH-Paper- 001535 | Echostar Satellite Corporation Incentivized Retail Agreement between Echostar Star Satellite LLC and Star Satellite LLC | DTX-257 |
| JTX-0008 | NCA003-000065 | NCA003-000096 | Echostar Retailer Agreement between Echostar Satellite and Star Satellite LLC | DTX-258 |
| JTX-0009 | DISH5-0000038421 | DISH5-0000038457 | Echostar Retailer Agreement between Echostar Satellite and National Satellite Systems | DTX-259 |
| JTX-0010 | DISH5-0000038458 | DISH5- 0000038460 | OE Retailer Amendment To Echostar Retailer Agreement between Echostar Satellite Corporation and National Satellite Systems | DTX-260 |
| JTX-0011 | DISH11-017192 | DISH11-017230 | Dish Network Retailer Agreement between Dish Network (formerly Echostar Satellite) and National Satellite Systems | DTX-261 |
| JTX-0012 | DISH11-017072 | DISH11-017110 | Dish Network Retailer Agreement between Dish Network (formerly Echostar Satellite) and ACLB2B Corp DBA National Satellite Systems | DTX-262 |
| JTX-0013 | DISH11-016649 | DISH11-016681 | Dish Network LLC Distributor Retailer Agreement between Dish Network and New | DTX-263 |
| JTX-0014 | DISH-Paper-020111 | DISH-Paper- 020136 | Echostar Satellite LLC Incentivized Retailer Agreement between Echostar Satellite and Planet Earth (Teichert Marketing) | DTX-270 |
| JTX-0015 | FTC008-000173 | FTC008-000194 | Echostar Satellite LLC Non-Incentivized Retailer Agreement between Echostar Satellite and Planet Earth (Teichert Marketing) | DTX-271 |
| JTX-0016 | DISH-Paper-002279 | DISH-Paper- 002287 | Echostar Satellite LLC Corporation Non-Incentivized Retailer Agreement between Echostar Satellite Corporation and Vision Quest | DTX-275 |
| JTX-0017 | DISH5-0000013149 | DISH5-0000013180 | Echostar Retailer Agreement between Echostar Satellite LLC and American Satellite Inc. | DTX-277 |
| JTX-0018 | DISH5-0000013181 | DISH5-0000013217 | Echostar Retailer Agreement between Echostar Satellite LLC and American Satellite Inc. | DTX-278 |
| JTX-0019 | DISH-Paper-011124 | DISH-Paper-011161 | Dish Network Retailer Agreement between Dish Network LLC and American Satellite Inc. | DTX-279 |
| JTX-0020 | DISH5-0000048114 | DISH5-0000048115 | DHPP Amendment To Dish Network Retailer Agreement between Dish Network LLC and American Satellite Inc. | DTX-280 |
| JTX-0021 | DISH5-0000048116 | DISH5-0000048118 | OE Retailer Amendement To Dish Network Retailer Agreement between Dish Network LLC and American Satellite Inc. | DTX-281 |
| JTX-0022 | DISH-Paper-019595 | DISH-Paper-019596 | Amendment To Echostar Satellite Corporation Retailer Agreement between Echostar Satellite Corp. and Satellite Systems Network | DTX-282 |
| JTX-0023 | DISH5-0000012409 | DISH5-0000012440 | Echostar Retailer Agreement between Echostar LLC and Satellite Systems Network | DTX-283 |
| JTX-0024 | DISH5-0000032044 | DISH5-0000032045 | Sirus Amendment To Echostar Retailer Agreement between Echostar Satellite LLC and Satellite Systems Network | DTX-284 |
| JTX-0025 | DISH5-0000032039 | DISH5-0000032043 | Retailer Referral Amendment To Echostar Retailer Agreement between Echostar Satellite LLC and Satellite Systems Network | DTX-285 |
| JTX-0026 | DISH5-0000032050 | DISH5-0000032086 | Echostar Retailer Agreement between Echostar LLC and Satellite Systems Network | DTX-286 |
| JTX-0027 | DISH5-0000032048 | DISH5-0000032049 | DHPP Amendment To Echostar Retailer Agreement between Echostar Satellite LLC and Satellite Systems Network | DTX-287 |

**Revised ATTACHMENT J**

| No. | Beginning Bates | Ending Bates | Description | Otherwise Marked |
|------|------------------|----------------|--------------|-------------------|
| JTX-0028 | DISH5-0000031815 | DISH5-0000031817 | OE Retailer Amendment To Echostar Retailer Agreement between Echostar Satellite LLC and Satellite Systems Network | DTX-288 |
| JTX-0029 | DISH11-016912 | DISH11-016950 | Dish Network Retailer Agreement between Dish Network LLC and Satellite Systems Network | DTX-289 |
| JTX-0030 | No Bates | No Bates | Email from P. Runkle to R. Stauffer et al. Re: Letter And Sample Re: Analysis Project | DTX-561 |
| JTX-0031 | No Bates | No Bates | US DOJ Letter from L. Hsiao to R. Stauffer Re: Project For United States, et al. v. Dish Network LLC, No. 3:09-cv-03073 | DTX-562; PX1308 |
| JTX-0032 | No Bates | No Bates | PossibleNow Letter from R. Stauffer to L. Hsiao Re: Confirming Agreement To Provide Data | DTX-563 |
| JTX-0033 | No Bates | No Bates | Email from D. Webster to L. Hsiao et al. Re: Project Update | DTX-564 |
| JTX-0034 | No Bates | No Bates | DOJ Results Report 10-9-12 Summary | DTX-565 |
| JTX-0035 | No Bates | No Bates | DOJ Report 1015.xls Summary | DTX-568; PX1320 |
| JTX-0036 | Dish-00000001 | Dish-00000001 | Excel spreadsheet | DTX-652; PX0434 |
| JTX-0037 | Dish-00000002 | Dish-0000002 | Excel spreadsheet | DTX-653; PX0435 |
| JTX-0038 | DISH9-0012173 | DISH9-0012175 | | DTX-743; PX0190 |
| JTX-0039 | DISH5-00000031681 | | | DTX-748; PX0420 |
| JTX-0040 | DISH5-0000112489 | DISH5-0000112491 | | DTX-752; PX0251 |
| JTX-0042 | DISH2-0000001108 | DISH2-0000001131 | DISHU - Knowledge Now - Risk Management | DTX-818; PX1281 |
| JTX-0043 | DISH2-0000000912 | | | DTX-824; PX0256 |
| JTX-0044 | DISH5-0000015105 | DISH5-0000015108 | | DTX-826; PX0253 |
| JTX-0045 | Dish-00007863 | Dish-00007866 | | DTX-837; PX0262 |
| JTX-0046 | Dish-00007584 | Dish-00007586 | | DTX-840; PX0459 |
| JTX-0048 | Dish-00006052 | | DNC Policy | DTX-003 |
| JTX-0049 | Dish-00006850 | | DNC Policy | DTX-004 |
| JTX-0050 | Dish-00000449 | | DNC Policy | DTX-005 |

**Revised ATTACHMENT J**

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0001 | | 12/13/2013 | Declaration of Ami Dziekan | | Y | Hearsay |
| PX0005 | | | Press Release | Y | Y | |
| PX0007 | | | Dish stock report | | Y | Relevance |
| PX0008 | DCR001-000357 | 2/15/2011 | Def's Supplemental Responses to Pltf's 1st Interrogatories | Y | Y | |
| PX0009 | DCR001-000011 | | Dish Top 100 Retailers | Y | Y | |
| PX0010 | | 9/4/2009 | Court Order re: Motion for Sanctions, TiVo Inc. v. Dish Network, Corp. | | Y | Relevance |
| PX0015 | | 11/22/2013 | Declaration of Leslie Steele | | Y | Hearsay |
| PX0016 | | 10/14/2013 | John Taylor Expert Report | Y | Y | |
| PX0018 | DISH-00002096 | | Master Services Agreement between EchoStar Satellite and eCreek Services | Y | Y | |
| PX0020 | | 12/9/2011 | Letter from Augustino to Dortch | | Y | Relevance |
| PX0022 | FTC367-000005 | 5/27/2010 | Letter from Korzha to Crane-Hirsch | Y | Y | |
| PX0023 | FTC367-000014 | 6/29/2010 | Letter from Korzha to Crane-Hirsch | Y | Y | |
| PX0024 | DCR001-000126 | 4/27/2010 | Letter from Boyle to Crane-Hirsch, Runkle | Y | Y | |
| PX0025 | DCR001-000134 | 6/28/2010 | Letter from Boyle to Crane-Hirsch, Runkle | Y | Y | |
| PX0026 | | 9/20/2012 | John Taylor Revised Expert Report | Y | Y | |
| PX0028 | | 11/6/2013 | John Taylor Expert Rebuttal Report | Y | Y | |
| PX0029 | | 1/2/2013 | Declaration of Anitha Gogineni | Y | Y | |
| PX0030 | | 1/4/2013 | Declaration of Joey Montano | Y | Y | |
| PX0031 | | 3/11/2011 | Letter from Boyle to Hsiao | Y | Y | |
| PX0033 | DISH8-0004564 | 7/8/2010 | E-mails between Blum, Kitei et al. | Y | Y | |
| PX0034 | DISH12-001134 | 7/25/2007 | E-mails between Sponsler, Hutnik et al. | | Y | Hearsay, Relevance, Prejudicial |
| PX0035 | DISH8-0000392 | 6/17/2008 | E-mails between Musso, Pastorius et al. | Y | Y | |
| PX0037 | DISH-00002086 | | Flow Chart of eCreek DNC Procedure | Y | Y | |
| PX0038 | | 12/18/2013 | Declaration of Erez Yoeli | | Y | Hearsay, reliability |
| PX0038A | | | Consumer Witness Call Record Data-Table of Consumers who Received Violative Calls | | Y | Hearsay |
| PX0038B | | | Consumer Complaints 2004-2010 (entity-specific DNC list) | | Y | Hearsay |
| PX0039 | DISH8-0002506 | | Third Party Vendor List - Calls.xls | Y | Y | |
| PX0040 | DISH5-0000109427 | 1/17/2003 | E-mails between Davidson, LeMar, et al. | Y | Y | |
| PX0042 | | 1/4/2013 | Declaration of Nainesh Ramjee | Y | Y | |
| PX0043 | DISH11-000010 | | Disposition Guidelines | Y | Y | |
| PX0044 | DISH9-0004797 | 3/24/2011 | E-mails between Montano, Gonzalez et al. | Y | Y | |
| PX0045 | DISH5-0000088596 | | Marketing Plan International Programming Chinese Services 2003 | Y | Y | |
| PX0046 | DISH-00006063 | 11/9/2007 | E-mails between Davis, Munger, et al. | Y | Y | |
| PX0047 | DISH9-0012843 | | Screenshots of Dish Predictive Dialer | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0049 | DISH8-0001014 | 5/21/2002 | E-mails between Kuelling, Moskowitz , et al. | | Y | Relevance, Foundation |
| PX0050 | DISH8-0001009 | 5/24/2002 | E-mails between Kuelling, Moskowitz , et al. | | Y | Relevance, Foundation |
| PX0051 | DISH8-0001011 | 5/23/2002 | E-mails between Kuelling, Dodge , et al. | | Y | Hearsay, Relevance, Foundation |
| PX0052 | DISH-00003906 | 8/27/2004 | Ex rel. Nixon v. Echostar Satellite | | Y | Hearsay |
| PX0053 | DISH8-0000933 | 4/19/2006 | E-mails between Steele, Dodge et al. | | Y | Hearsay, Rule 408 |
| PX0054 | DISH5-0000102610 | 10/4/2007 | E-mail between Musso, Origer et al. | | Y | Hearsay |
| PX0055 | DISH5-0000071454 | 7/1/2009 | Assurance of Voluntary Compliance | | Y | Relevance |
| PX0057 | DISH-00008908 | 11/9/2003 | E-mails between Maciejewski, Tran , et al. | Y | Y | |
| PX0058 | DISH5-0000066604 | 6/6/2008 | E-mails between Davis, Pastorius , et al. | Y | Y | |
| PX0059 | DISH2-0000038233 | 1/28/2010 | E-mails between Montano, Davis, et al. | | Y | Hearsay |
| PX0060 | DISH2-0000039259 | 1/28/2010 | E-mails between Bagwell, Montano, et al. | | Y | Hearsay |
| PX0061 | DISH-PAPER-023275 | 10/7/2003 | Letter from Ahmed to Hagen | Y | Y | |
| PX0063 | SSN-000509 | | Important Notice - Quality Assurance Program | Y | Y | |
| PX0064 | DISH-PAPER-009394 | 2/20/2007 | Letter from Origer to Bamira | Y | Y | |
| PX0066 | DISH5-0000093773 | 9/2/2011 | Defender WE 08.9.11.xls | | Y | Hearsay |
| PX0067 | DISH-00007105 | 5/16/2006 | Do Not Call List Escalation Process | Y | Y | |
| PX0068 | DISH5-0000038373 | 8/20/2007 | Do Not Call Process Flow | Y | Y | |
| PX0069 | PN-015346 | | PossibleNOW Notes | | Y | Hearsay |
| PX0070 | DISH2-0000039688 | 10/12/2009 | E-mails between Caldwell, Musso et al. | | Y | Hearsay |
| PX0071 | DISH5-0000034005 | 2/21/2007 | Letter from Romero to Fink | Y | Y | |
| PX0072 | DISH5-0000034086 | 7/14/2006 | Letter from Bappe to Fox | Y | Y | |
| PX0073 | DISH9-0006798 | | DNC tracker template -Direct3.doc | | Y | Relevance |
| PX0074 | | 8/16/2010 | Declaration of Reji Musso | Y | Y | |
| PX0075 | DISH5-0000078111 | | ERT Tracker-TCPA | Y | Y | |
| PX0079 | DISH5-0000038602 | | Active Tracker .xls | | Y | Hearsay |
| PX0080 | DISH5-0000108059 | 3/11/2002 | E-mails between Meyers, Neylon et al. | | Y | Hearsay |
| PX0081 | DISH5-0000089788 | 9/13/2007 | E-mails between Senderovitz, Altahwi, et al. | | Y | Relevance |
| PX0082 | DISH-0004316 | 6/19/2009 | E-mails between Pastorius, Blum et al. | | Y | Relevance, Foundation |
| PX0083 | DISH8-0003536 | 10/13/2008 | E-mails between Davis, Gregg, et al. | Y | Y | |
| PX0084 | DISH9-0002413 | 10/25/2011 | E-mails between Dexter, Kuehn et al. | | Y | Hearsay |
| PX0085 | DISH-0006832 | 3/14/2008 | E-mails between Fletcher, KBSCorpPB@echostar.com et al. | | Y | Hearsay, Foundation |
| PX0086 | DISH9-0002314 | 8/16/2011 | E-mails between Dexter, Walden et al. | Y | Y | |
| PX0087 | | 5/14/2012 | Declaration of Russell Bangert | Y | Y | |
| PX0089 | DISH5-0000090747 | 6/6/2011 | Indirect Sales Powerpoint | Y | Y | |
| PX0090 | DISH5-0000090410 | 9/6/2011 | Dish Network Activations Dashboard | | Y | Relevance |
| PX0091 | DISH-00002557 | | Amendment No. 1 to EchoStar Satellite TVRO | Y | Y | |
| PX0093 | FTC350-003432 | 10/20/1989 | United States v. Defusco | | Y | Relevance, Hearsay |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0094 | IDISH-006483 | 1/27/2006 | E-mails between "POESupport@echostar.com", OE Retailers, et al. | Y | Y | |
| PX0095 | | 11/5/2013 | Declaration of Matthew Lowe | | | Hearsay |
| PX0096 | IDISH-007029 | 3/15/2007 | E-mail from POESupport@echostar.com | Y | Y | |
| PX0097 | DISH-00007028 | 11/18/2008 | E-mails between Metzger, Benigo, et al. | Y | Y | |
| PX0099 | DISH5-0000107208 | 8/6/2007 | Echostar Gross Sales Update | Y | Y | |
| PX0100 | DISH5-0000103675 | 2/2/2012 | E-mails between Mills, Neylon, et al. | Y | Y | |
| PX0101 | DISH5-0000112742 | 2/28/2007 | E-mails between Brown, Arnold et al. | | Y | Relevance |
| PX0102 | DCR001-000009 | | Dish's Supplemental Response to Plfs' Interrogatory No. 11 | Y | Y | |
| PX0103 | DISH5-0000107154 | 7/18/2007 | E-mails between Ballard, Mills et al. | | Y | Hearsay, Relevance |
| PX0104 | DISH5-0000107373 | 8/17/2007 | E-mails between Origer, Musso et al. | | Y | Foundation, Hearsay |
| PX0105 | FTC003-059435 | 7/10/2002 | Facts Blast | Y | Y | |
| PX0106 | DISH5-0000106414 | 7/16/2002 | Facts Blast | Y | Y | |
| PX0107 | DISH5-0000112825 | 10/16/2006 | E-mails between Mills, Neylon et al. | | Y | Hearsay |
| PX0108 | DISH5-0000112659 | 2/7/2007 | E-mails between Mills, Neylon et al. | | Y | Hearsay |
| PX0109 | DISH5-0000110669 | 7/12/2006 | E-mails between Robb Origer, Brian Neylon et al. | | Y | Hearsay |
| PX0110 | DISH-PAPER-017497 | 9/28/2004 | E-mails between Reji Musso, Todd DiRoberto et al. | Y | Y | |
| PX0111 | DISH5-0000006822 | 10/3/2006 | E-mails between Allan Brandvein, Reji Musso et al. | | Y | Hearsay |
| PX0112 | DISH5-0000014138 | 9/2/2009 | Letter from Ahmed to Trimarco | Y | Y | |
| PX0113 | DISH5-0000069296 | 4/19/2011 | E-mails between Musso, Ahmed, et al. | | Y | Hearsay, Foundation |
| PX0114 | DISH5-0000086493 | 9/6/2008 | Facts Blast | Y | Y | |
| PX0115 | DISH5-0000086503 | 6/19/2007 | Facts Blast | Y | Y | |
| PX0117 | DISH5-0000066933 | 8/11/2004 | E-mails between Binns, Parekh et al. | | Y | Hearsay |
| PX0118 | DISH5-0000066967 | 1/13/2005 | E-mails between Pacini, Binns, et al. | | Y | Foundation |
| PX0120 | DISH5-0000111197 | 9/30/2005 | E-mails between Oberbillig, Oberbillig et al. | | Y | Hearsay |
| PX0121 | DISH5-0000013149 | 10/19/2005 | EchoStar Retailer Agreement with American Satellite | Y | Y | |
| PX0122 | DISH5-0000086612 | 8/17/2011 | E-mails between Musso, Werner et al. | | Y | Hearsay, Relevance |
| PX0123 | DISH-PAPER-025090 | 2/4/2007 | E-mails between Musso, Pyle et al. | | Y | Hearsay |
| PX0124 | DISH5-0000112566 | 12/22/2006 | E-mails between Origer, Musso et al. | | Y | Hearsay, Foundation |
| PX0125 | DISH-00009260 | 7/21/2008 | E-mails between Metzger, Laslo, et al. | | Y | Hearsay |
| PX0127 | DCR001-000149 | | Responses of Defendant Dish Network LLC to Plaintiffs' First Set of Interrogatories | Y | Y | |
| PX0128 | DISH5-0000022455 | | Exhibit 342 to the Deposition of Marciedes Metzger | Y | Y | |
| PX0129 | DISH5-0000102726 | 5/17/2007 | E-mails between Mills, Werner, et al. | | Y | Foundation |
| PX0130 | DISH5-0000076387 | 8/21/2006 | E-mails between Werner to Metzger et al. | Y | Y | |
| PX0131 | DISH5-0000065246 | | The Retailer Chat (video file) | | Y | Relevance |
| PX0132 | DISH8-0000555 | 11/6/2007 | E-mails between Musso, Berridge, et al. | | Y | Hearsay, Relevance |
| PX0133 | DISH-00006131 | 3/5/2009 | E-mails between Rukas, Slater et al. | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0134 | DISH9-0006078 | | Dish sting documents | Y | Y | |
| PX0135 | DISH5-0000024315 | | Acknowledgement Form: Do Not Call (DNC) Sting Procedures | Y | Y | |
| PX0136 | DISH5-0000024317 | | Vendor is not Found. What Next? | Y | Y | |
| PX0137 | DISH5-0000038569 | | DatabaseDump All.xls | | | |
| PX0138 | DISH2-0000033882 | 8/6/2008 | Letter from Musso to Cain | | Y | Hearsay |
| PX0139 | DISH5-0000007017 | 8/16/2007 | Letter from Origer to Brandvein | | Y | Hearsay |
| PX0140 | DISH5-0000012400 | 1/17/2007 | E-mails between Musso, Tehranchi, et al. | | Y | Hearsay |
| PX0141 | DISH11-024336 | 12/20/2006 | E-mails between Mills, Musso, et al. | | Y | Hearsay |
| PX0142 | DISH5-0000112701 | 2/13/2007 | E-mails between Werner, Origer et al. | Y | Y | |
| PX0143 | DISH5-0000102875 | 7/22/2008 | E-mails between Musso, Werner, et al. | Y | Y | |
| PX0145 | FTC013-001867 | | Permanent Injunction, FTC v. Defusco | Y | Y | |
| PX0148 | DISH-PAPER-023139 | 10/7/2003 | Letter from David Hagen to Amir Ahmed | Y | Y | |
| PX0149 | FTC350-003651 | 8/29/2003 | Letter from Leonard Green to Richard Yelverton | | Y | Relevance |
| PX0150 | FTC350-003907 | | Consent Judgment, North Carolina v. Prime TV LLC | Y | Y | |
| PX0151 | FTC008-000963 | | Dish TV Now Inc., Articles of Incorporation | | Y | Relevance |
| PX0152 | ESL-0015 | | EchoStar Retailer Agreement with Dish TV Now, Charvat v. EchoStar Satellite, LLC | Y | Y | |
| PX0153 | DISH-PAPER-023166 | 3/10/2004 | E-mails between Yonker, Ahmed et al. | | Y | Hearsay |
| PX0154 | DISH-PAPER-023168 | 1/1/2004 | E-mails between Ahmed, Mills et al. | | Y | Hearsay |
| PX0155 | | 11/21/2013 | Declaration of Fred Olsen | | Y | Hearsay |
| PX0157 | FTC003-065647 | | Voice Messaging Agreement between Guardian Communications Inc. and Dish TV Now | Y | Y | |
| PX0158 | | 3/28/2012 | Declaration of Kevin Baker | | Y | Hearsay |
| PX0159 | FTC003-064421 | | WOW_TV_P 20040521.txt | | N | Authenticity, Foundation, Hearsay |
| PX0160 | FTC002-009417 | | WOW-TV_P05212004213321013.txt | | N | Authenticity, Foundation, Hearsay |
| PX0162 | FTC007-000127 | | DishTVNow spreadsheet.xls | | Y | Hearsay |
| PX0165 | DISH-PAPER-023288 | 12/22/2005 | E-mails between Mills, Ahmed, et al. | | Y | Foundation |
| PX0166 | DISH11-027482 | 4/12/2005 | Letter from Gutierrez to Schackmann | | Y | Hearsay |
| PX0167 | DISH-00004681 | 9/14/2004 | Letter from Steele to Swanberg | | Y | Hearsay |
| PX0168 | DISH-00004688 | 7/26/2004 | Letter from Swanberg to Dish | | Y | Hearsay |
| PX0172 | DISH-PAPER-023290 | 1/3/2006 | Letter from Mills to Hagen | Y | Y | |
| PX0173 | DISH-PAPER-023291 | 1/26/2006 | Letter from Origer to Dish TV Now Inc. | Y | Y | |
| PX0174 | DISH-00002322 | 1/23/2006 | Termination Information for Dish TV Now Exhibit 259 to the Deposition of Dish (Werner) | Y | Y | |
| PX0175 | FTC298-000377 | 5/15/2009 | Verdict, United States v. Hagen, No. 08-cr-93 (W.D.N.C.) | | Y | Relevance |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0176 | FTC298-000209 | 2/19/2009 | Second Superseding Bill of Indictment, United States v. Hagen, No. 08-cr-93 (W.D.N.C.) | | Y | Hearsay, Relevance |
| PX0177 | FTC298-000640 | 11/17/2009 | Judgment, United States v. Hagen, No. 08-cr-93 (W.D.N.C.) | | Y | Relevance |
| PX0178 | FTC298-000580 | 5/15/2009 | Special Verdict, United States v. Hagen, No. 08-cr-93 (W.D.N.C.) | | Y | Relevance |
| PX0179 | DISH5-0000033822 | | EchoStar Satellite LLC's Response to State of Vermont Civil Investigative Subpoena | | Y | Duplicative document, Incomplete Document |
| PX0180 | DISH-PAPER-014676 | | EchoStar Retailer Agreement with Satellite Systems Network | Y | Y | |
| PX0181 | DISH-PAPER-014759 | | EchoStar Retailer Application of Satellite Systems Network | Y | Y | |
| PX0183 | DISH5-0000031887 | 5/31/2001 | E-mails between Ahmed, DeFranco, et al. | Y | Y | |
| PX0184 | DISH5-0000031809 | 12/28/2006 | Letter from Origer to Tehranchi | | Y | Duplicative document, Hearsay |
| PX0185 | FTC350-001881 | 6/25/2004 | Complaint-North Carolina v. SSN | | Y | Relevance, Hearsay |
| PX0186 | | 3/21/2005 | Judgment-North Carolina v. SSN | Y | Y | |
| PX0187 | DISH-PAPER-013141 | 6/12/2002 | Letter from Davidson to Tehranchi | | Y | Hearsay |
| PX0188 | DISH-PAPER-010011 | | SSN Retailer File | | Y | Hearsay |
| PX0189 | DISH11-016912 | 12/31/2010 | Dish Retailer Agreement with Satellite Systems Network | Y | Y | |
| PX0190 | DISH9-0012173 | 1/30/2007 | E-mails between Ahmed, Ergen et al. | Y | Y | |
| PX0191 | DISH5-0000012396 | 11/4/2004 | Bronson Takes Action in Telemarketing Case | | Y | Hearsay |
| PX0192 | DISH8-0002744 | 9/22/2006 | E-mails between Vallejos, Hargan et al. | Y | Y | |
| PX0193 | DISH8-0002747 | | EchoStar Retailer Agreement with Satellite Systems Network | Y | Y | |
| PX0194 | DISH9-0005567 | 9/26/2005 | E-mails between Novak, Ahmed et al. | | Y | Hearsay |
| PX0195 | DISH9-0001320 | 8/28/2006 | E-mails between Steele, Werner, et al. | | Y | Incomplete Document |
| PX0196 | DISH5-0000033875 | 9/22/2006 | Letter from Steele to Burg | Y | Y | |
| PX0197 | FTC359-000332 | 12/21/2012 | Declaration of Tanya Maslennikov, Donaca v. Dish | | Y | Hearsay |
| PX0198 | | 8/19/2013 | Declaration of Sophie Tehranchi, Donaca v. Dish | | Y | Hearsay |
| PX0199 | DISH9-0001824 | 8/18/2011 | E-mails between Berridge, Kitei, et al. | | Y | Hearsay |
| PX0200 | DISH-PAPER-001501 | 5/19/2003 | EchoStar Retailer Agreement with Star Satellite LLC | Y | Y | |
| PX0201 | FTC003-074610 | | Star Satellite Board Meeting Minutes | Y | Y | |
| PX0202 | FTC003-075159 | 3/22/2006 | Statement of Walter Eric Myers | | Y | Hearsay |
| PX0203 | DISH-00004661 | 1/25/2005 | Letter from Caplan to Myers and Moskowitz | | Y | Hearsay |
| PX0204 | DISH-00005130 | 2/18/2005 | E-mails between Hyde, Ergen et al. | | Y | Hearsay, Foundation |
| PX0205 | DISH-00001402 | 3/27/2005 | E-mails between Medina, Williams et al. | | Y | Hearsay, Foundation |
| PX0206 | FTC003-074547 | 7/28/2005 | E-mails between Anderson, Myers et al. | Y | Y | |
| PX0207 | FTC003-074552 | 11/3/2005 | E-mails between Mills, Myers et al. | Y | Y | |
| PX0208 | FTC003-049633 | 8/12/2005 | Letter from Steele to Myers | Y | Y | |
| PX0209 | FTC003-074424 | | Complaint, Connor v. Star Satellite LLC | | Y | Hearsay |
| PX0210 | FTC016-000127 | 9/29/2005 | Facsimile from Amy S. Conley to Walter Eric Myers | Y | Y | |
| PX0211 | FTC003-074459 | 10/25/2005 | E-mails between Ahmed, Myers, et al. | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0212 | FTC306-029715 | 10/26/2005 | Letter from Ahmed to Myers | Y | Y | |
| PX0213 | FTC003-075090 | 11/3/2005 | E-mails between Mills, Myers et al. | | Y | Duplicative document |
| PX0214 | | 10/10/2012 | Declaration of Rick Stauffer | | Y | Hearsay, reliability |
| PX0215 | | | Judgment, US v. Star Satellite | Y | Y | |
| PX0216 | DISH5-0000102839 | 7/16/2008 | E-mails between Dufault, Werner, et al. | | Y | Hearsay, Relevance |
| PX0217 | | 3/16/2000 | Criminal Judgment, US v. DiRoberto | | Y | Relevance, Prejudicial |
| PX0218 | | | Complaint, SEC v. Lee | | Y | Hearsay, Relevance |
| PX0220 | DISH-PAPER-012810 | | Retailer Profile and Notification for American Satellite Inc. | Y | Y | |
| PX0221 | AMSAT-103822 | 12/28/2012 | Declaration of Todd DiRoberto, Donaca v. Dish | | Y | Hearsay |
| PX0222 | | 1/7/2009 | E-mails between Castillo, Eichorn, et al. | | Y | Hearsay, Foundation |
| PX0223 | DISH-PAPER-024979 | 1/17/2007 | Letter from Origer to DiRoberto and Pyle | | Y | Hearsay |
| PX0224 | DISH5-0000013354 | | American Satellite 020907_Tracker info.xls | Y | Y | |
| PX0225 | DISH-PAPER-024990 | 12/28/2006 | Letter from Origer to DiRoberto and Pyle | | Y | Duplicative Document, Hearsay |
| PX0226 | DISH9-0005962 | 1/2/2007 | E-mails between Musso, Hargan et al. | | Y | Hearsay, Foundation |
| PX0227 | DISH9-0000469 | 9/26/2006 | E-mails between Hargan, Metzger et al. | | Y | Hearsay |
| PX0228 | DISH9-0005742 | 9/28/2006 | E-mails between Steele, Moskowitz et al. | | Y | Hearsay |
| PX0229 | DISH9-0002968 | 9/19/2006 | E-mails between Steele, Metzger et al. | | Y | Hearsay |
| PX0230 | DISH9-0012453 | 2/22/2007 | Letter from Pyle to Blum | | Y | Hearsay |
| PX0231 | DISH5-0000031585 | 5/2/2007 | E-mails between Hargan, Musso, et al. | | Y | Hearsay, Incomplete document |
| PX0232 | DISH8-0003035 | 9/16/2008 | E-mails between Berridge, Musso et al. | | Y | Hearsay |
| PX0233 | DISH-00008023 | 4/3/2009 | E-mails between Musso, Calbert et al. | | Y | Hearsay, Foundation, Incomplete document |
| PX0234 | AMSAT-000070 | 5/7/2010 | Letter from Van Ernst to DiRoberto | Y | Y | |
| PX0235 | DISH-PAPER-000490 | | JSR Enterprises Business Plan | | Y | Hearsay, Foundation |
| PX0237 | DISH5-0000111263 | | Pending OE Retailers 08_14_06.xls | Y | Y | |
| PX0238 | ESL-0259 | | EchoStar Retailer Agreement with JSR Enterprises, Charvat v. Echostar Satellite, LLC | Y | Y | |
| PX0239 | DISH5-0000111398 | 9/8/2006 | E-mail between Keller, Neylon, et al. | | Y | Incomplete document, Hearsay |
| PX0241 | DISH5-0000111664 | | Retailer Order Entry Promotional Program | Y | Y | |
| PX0243 | DISH5-0000111042 | 8/10/2006 | Letter from Oberbillig to Grider | Y | Y | |
| PX0244 | DISH5-0000015151 | 2/9/2007 | JSR 020907_allegations.xls | Y | Y | |
| PX0245 | DISH11-026741 | 10/6/2006 | Letter from Origer to Grider | | Y | Hearsay |
| PX0246 | DISH5-0000031680 | 9/28/2006 | E-mails between Steele, Klein, et al. | Y | Y | |
| PX0247 | DISH2-0000036094 | 10/19/2006 | Letter from Wallace to Grider | | Y | Hearsay |
| PX0248 | DISH5-0000000932 | 11/15/2006 | E-mails between Corrigan, "TCPA@echostar.com", et al. | | Y | Hearsay |
| PX0249 | DISH5-0000031765 | 11/1/2006 | Linda Chesley, Do Not Call Investigation Form | | Y | Hearsay, Foundation |
| PX0250 | DISH2-0000000900 | 12/20/2006 | E-mails between Musso, "voice@jsrsatellite.com", et al. | | Y | Hearsay |
| PX0251 | DISH5-0000112489 | 12/5/2006 | E-mails between Fielding, Oberbillig et al. | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0252 | DISH5-0000031646 | 2/8/2007 | E-mails between Musso, Origer et al. | | Y | Hearsay |
| PX0253 | DISH5-0000015105 | 12/20/2006 | E-mails between Mills, Musso et al. | | Y | Hearsay, Foundation |
| PX0254 | DISH9-0000607 | 1/10/2007 | E-mails between Musso, Hargan et al. | | Y | Hearsay, Foundation |
| PX0255 | DISH5-0000112550 | 12/21/2006 | E-mails between Musso, Neylon et al. | | Y | Hearsay, Foundation |
| PX0256 | DISH2-0000000912 | 1/22/2007 | Letter from Goodale to Musso | | Y | Hearsay |
| PX0257 | | 8/27/2013 | Letter from Runkle to Kelly | | Y | Hearsay, Legal Argument |
| PX0258 | DISH5-0000112662 | 2/8/2007 | E-mails between Origer, Neylon et al. | | Y | Hearsay, Foundation |
| PX0260 | DISH3-0000000359 | 2/13/2007 | Letter from Origer to Grider | Y | Y | |
| PX0262 | DISH-00007863 | 2/25/2009 | E-mails between Musso, Walker, et al. | | Y | Hearsay, Foundation |
| PX0263 | DISH5-0000119890 | | Cumulative Report | | Y | Foundation, Hearsay |
| PX0264 | DISH5-0000126371 | 12/3/2011 | E-mails between CET.Analytics@dishnetwork.com, Bernie Han et al. | Y | Y | |
| PX0265 | DISH5-0000112552 | 12/21/2006 | E-mails between Mills, Neylon et al. | | Y | Hearsay, Foundation |
| PX0266 | DISH-00000464 | 1/5/2007 | Letter from Shaw to McFadden | | Y | Hearsay |
| PX0267 | FTC360-000122 | 6/15/2012 | Declaration of Rod Rummelsburg | | Y | Hearsay |
| PX0269 | FTC014-003180 | | Civil Investigative Demand to New Edge Satellite | Y | Y | |
| PX0270 | | | Schedule for Production of Documentary Materials (LaVictor Ex. 1) | Y | Y | |
| PX0271 | FTC/ECHOSTAR (NEW EDGE SAT) 00000200 | | Specifications 2 LDMI Telecommunications Phone Numbers | | Y | Foundation, Hearsay |
| PX0273 | DISH-PAPER-001546 | 12/28/2005 | Letter re Application to become Echostar retailer (Levi Ex. 2) | Y | Y | |
| PX0274 | DISH-PAPER-007743 | 11/16/2006 | National Satellite Systems Proposal presented to EchoStar Communications (Levi Ex. 3) | Y | Y | |
| PX0275 | DISH-00007813 | 5/30/2008 | E-mails between Mills, Musso, et al. | | Y | Hearsay, Foundation |
| PX0276 | DISH2-0000039631 | 7/9/2010 | TCPA Spread Sheet 07 19 10.xls | | Y | Hearsay |
| PX0277 | | 11/20/2013 | Declaration of Kobi Levi | Y | Y | |
| PX0281 | DISH5-0000001342 | 5/19/2009 | E-mails between Vendor Inquiries, Doughtery, et al. | | Y | Hearsay |
| PX0282 | DISH-PAPER-008060 | 5/19/2009 | E-mails between Snyder, Dougherty et al. | | Y | Hearsay |
| PX0283 | DISH-PAPER-007980 | 5/28/2009 | E-mails between Tehranchi, Snyder et al. | | Y | Hearsay |
| PX0285 | DISH5-0000006539 | 12/22/2009 | Letter from Musso to Ajmera | | Y | Hearsay |
| PX0286 | DISH2-0000033598 | 2/12/2010 | E-mails between Colmenares, Snyder et al. | | Y | Hearsay |
| PX0288 | DISH11-000003 | 1/12/2009 | System A Dispostions 1_12_09.doc | Y | Y | |
| PX0290 | | 3/6/2005 | Letter from Sill to Shackmann (Sill Ex. 5) | | Y | Relevance, Hearsay |
| PX0291 | FTC003-049785 | 4/12/2005 | Letter from Gutierrez to Schackmann | | Y | Hearsay |
| PX0294 | | 6/13/2006 | Letter from Grant to Fox (Sykes Ex. 7) | | Y | Hearsay |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0295 | | 12/20/2013 | Declaration of Vicky Chien | | Y | Hearsay |
| PX0296 | | 12/5/2013 | Declaration of Rick Stauffer | | Y | Hearsay |
| PX0297 | SSN-000178 | 12/1/2011 | E-mails between Hutchinson, Lee, et al. | | Y | Incomplete document, Hearsay |
| PX0298 | | 11/18/2013 | John Taylor Expert Supplemental Rebuttal Report | Y | Y | |
| PX0302 | DISH2-0000039281 | 7/28/2010 | E-mails between Dexter, Montano, et al. | | Y | Foundation |
| PX0305 | | 3/5/2014 | Declaration of Erez Yoeli | | Y | Hearsay, Relevance, reliability |
| PX0307 | | 11/8/2013 | Letter from Runkle to Kelly et al. | | Y | Hearsay, Legal Argument, Relevance |
| PX0308 | | 11/12/2013 | Letter from Kelly to Runkle et al. | Y | Y | |
| PX0309 | DISH2-0000005325 | 7/29/2010 | E-mails between Shaffer, Jones, et al. | | Y | Hearsay |
| PX0312 | DISH-00008800 | 12/13/2005 | E-mails between Binns, Santos, et al. | | Y | Hearsay |
| PX0317 | FTC003-061743 | 9/22/2005 | Letter from Steele to Deitch | | Y | Relevance |
| PX0318 | FTC003-050498 | 9/18/2007 | Letter from Kalani to Menjivar | Y | Y | |
| PX0320 | ECHOSTAR-FTC-000556 | 8/14/2008 | Letter from Rose to Deitch (Taylor Ex. 4) | | | Hearsay, Rule 408 |
| PX0328 | SAV-000049 | | Second Amendment to Echostar Retailer Agreement Marketing Guru Agreement | Y | Y | |
| PX0329 | DISH5-0000011526 | 4/25/2007 | TCPA Synopsis_4.25.07.xls | | Y | Hearsay |
| PX0331 | DISH5-0000070807 | 10/28/2011 | E-mails between Callaghan, Luth, et al. | Y | Y | |
| PX0332 | DISH9-0013145 | 9/9/2011 | E-mails between Hambly, Durham, et al. | | Y | Hearsay |
| PX0334 | DISH5-0000106283 | | PowerPoint re: OE program overview | Y | Y | |
| PX0335 | NSS-27102 | 6/3/2009 | E-mails between Jones, Juneja, et al. | | Y | Incomplete document, Relevance |
| PX0336 | IDISH-007551 | 7/28/2008 | E-mail from "POESupport@echostar.com" | | Y | Relevance |
| PX0337 | IDISH-007552 | 7/22/2008 | Hot-Cold Report 07 22 08.xls | | Y | Incomplete document, Relevance |
| PX0339 | FTC016-000265 | 7/28/2005 | E-mails between Anderson, Myers, et al. | Y | Y | |
| PX0340 | DISH-PAPER-012173 | 5/18/2009 | Letter to Snyder | | Y | Hearsay |
| PX0341 | | | Infinity-023776 - AlandeeBrown_ISG_DB_5580_07082013_100139_000043_10.wav | | N | Authenticity, Hearsay, Relevance |
| PX0342 | | | Infinity-023777-kawannadavis_ISG_DB_7599_07082013_100432_000035_5.wav | | N | Authenticity, Hearsay, Relevance |
| PX0344 | DISH5-0000016198 | | TCPA Retail Services List_06 18 07.xls | | Y | Hearsay |
| PX0345 | DISH5-0000067040 | 10/1/2008 | E-mails between Musso, Van Emst, et al. | | Y | Hearsay, Foundation |
| PX0346 | DISH5-0000038547 | 12/14/2006 | Sting 12 14 06_revised.xls | | Y | Hearsay, Incomplete Document |
| PX0347 | DISH8-0035177 | 11/22/2006 | E-mails between Mills, Steele, et al. | Y | Y | |
| PX0348 | DISH-00007719 | 9/16/2008 | E-mails between Van Emst, Werner, et al. | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0349 | DISH5-0000044899 | 2/13/2009 | Executive Summary of I-Satellite, | Y | Y | |
| PX0350 | DISH8-0000913 | 3/6/2009 | E-mails between McElroy, Kelly, et al. | | Y | Incomplete document, Foundation |
| PX0351 | DISH5-0000112548 | 12/21/2006 | E-mails between Musso, Neylon, et al. | | Y | Foundation, Hearsay |
| PX0352 | DISH2-0000038595 | 6/17/2010 | E-mails between Werner, Musso, et al. | | Y | Foundation, Hearsay |
| PX0359 | DISH11-016649 | 1/10/2012 | New Edge Retailer Agreement | Y | Y | |
| PX0360 | DISH11-016682 | | Planet Earth Retailer Agreement | Y | Y | |
| PX0362 | FTC359-007568 | | Consumer Sentinel Complaints--Echostar, Dish And Related Entities.xlsx | | Y | Relevance, Hearsay, Foundation |
| PX0364 | FTC003-079060 | | Qwest, 174611.txt | | Y | Relevance, Hearsay, Foundation |
| PX0365 | FTC008-000843 | | Civil Investigative Demand for Production of Documentary Materials to Qwest Communication Int'l | Y | Y | |
| PX0366 | FTC360-000124 | 3/4/2013 | Declaration of Lavonne Weatherman | | Y | Hearsay |
| PX0367 | FTC013-000963 | | CID to ITC Deltacom | Y | Y | |
| PX0369 | FTC017-000128 | 8/25/2006 | Letter from Robinson to Menjivar | | Y | Hearsay |
| PX0370 | DCR004-000001 | 2/24/2014 | Declaration of Doris Robinson | | Y | Hearsay |
| PX0371 | FTC356-000027 | 5/23/2011 | Letter from Lee to Culluci | Y | Y | |
| PX0372 | FTC364-000031 | 7/23/2013 | Declaration of Scott Lavengood | | Y | Hearsay |
| PX0373 | DISH-PAPER-000191 | 7/15/2004 | Dish Retailer Agreement with Defender Security Co. dba DirectDish SatelliteTV | Y | Y | |
| PX0374 | FTC360-000199 | 9/1/2011 | Declaration of Connie Jo Bell | | Y | Hearsay |
| PX0378 | | 6/10/2010 | E-mails between Crane-Hirsch, Korzha, et al. | | Y | Hearsay, Incomplete Document |
| PX0380 | FTC308-002024 | 4/11/2005 | Tanaya_77304112005215247003.txt | | Y | Relevance, Hearsay, Foundation |
| PX0381 | DISH-00002960 | 3/25/2005 | Dish retailer agreement with Vision Quest Satellite Sales & Service | Y | Y | |
| PX0383 | | 3/30/2011 | Letter from Boyle to Hsiao | Y | Y | |
| PX0384 | | 1/31/2012 | Letter from Hsiao to Boyle & Mazzuchetti | | Y | Hearsay |
| PX0385 | | 2/1/2012 | Letter from Korzha to Hsiao | Y | Y | |
| PX0386 | DISH5-0000111393 | 9/8/2006 | E-mails between Koch, Neylon, et al. | | Y | Hearsay |
| PX0387 | FTC360-000204 | 1/24/2012 | Declaration of Connie Jo Bell | | Y | Hearsay |
| PX0388 | DISH-00002982 | 3/31/2005 | Dish non incentivized retailer agreement with Brian Cavett dba Vision Quest Satellite Sales & Service | Y | Y | |
| PX0389 | FTC360-000187 | 11/10/2011 | Declaration of Wendell North | | Y | Hearsay |
| PX0391 | | | 6007Jake.wav | | N | Authenticity, Hearsay, Relevance |
| PX0393 | | 2/19/2014 | Declaration of David Torok | | Y | Hearsay |
| PX0394 | | 10/14/2010 | Letter from Boyle to Crane-Hirsch | | Y | Relevance |
| PX0395 | | 12/1/2010 | E-mails between Hsiao, Mazzuchetti, et al. | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0396 | DISH5-0000006863 | 11/13/2006 | E-mails between Brandvein, Musso, et al. | | Y | Hearsay, Foundation, Incomplete Document |
| PX0397 | | 5/25/2012 | Declaration of Nicholas Mastrocinque | | Y | Hearsay, Foundation |
| PX0403 | | 3/5/2014 | Declaration of Vicky Chien | | Y | Hearsay, Relevance, Incomplete Document |
| PX0404 | | | 2007 Congressional Report | | Y | Hearsay |
| PX0405 | DISH5-0000011526 | 4/25/2007 | TCPA Synopsis_04.25.07.xls | | Y | Hearsay |
| PX0406 | DISH2-0000039631 | 7/19/2010 | TCPA Spread Sheet 07 19 10.xls | | Y | Hearsay |
| PX0407 | DISH2-0000000599 | | Compilation of Dish's Letters to Retailers | | Y | Hearsay |
| PX0408 | DISH5-0000022145 | | TCPA and DNC Issues March 08 - April 09.xls | | Y | Hearsay |
| PX0409 | DISH5-0000105994 | 1/27/2012 | OE Channel Weekly Update 1-27-12.doc | | Y | Hearsay |
| PX0411 | DISH-0001030 | 9/22/2006 | E-mails between Faucett, Montano, et al. | Y | Y | |
| PX0412 | DISH-00006947 | 8/16/2007 | E-mails between Hargen, Gleason, et al. | Y | Y | |
| PX0413 | DISH-00008861 | 6/13/2002 | E-mails between Kornish, Binns, et al. | Y | Y | |
| PX0419 | | 3/19/2014 | Declaration of Vicky Chien | | Y | Hearsay, Incomplete |
| PX0420 | DISH5-0000031681 | 9/28/2006 | E-mails between Dish, Goodale, et al. | Y | Y | |
| PX0423 | | 3/14/2014 | Declaration of Erez Yoeli | | Y | Hearsay, Relevance, Reliability, Foundation, Incomplete Document |
| PX0425 | DISH5-0000030209 | 12/9/2010 | EchoStar Satellite LLC's Response to the South Dakota Public Utilities Commission Staff First Set of Interrogatories and Request to Produce Documents | Y | Y | |
| PX0430 | | | 1st Amended Complaint-Donaca v. Dish | | Y | Hearsay |
| PX0432 | DISH5-0000071030 | | Direct Sales Budget – 2012 | Y | Y | |
| PX0433 | DEFENDER-04491 | 8/15/2005 | E-mail from "POESupport@echostar.com" | | | Description Not Provided |
| PX0434 | DISH-00000001 | | Dish 07-10 call records | Y | Y | |
| PX0435 | DISH-00000002 | | Dish 07-10 call records | Y | Y | |
| PX0436 | | 5/24/2010 | Record of DNC Complaint from Consumer Jutla | | Y | Hearsay |
| PX0437 | DISH-00001063 | 6/5/2004 | E-mails between Charles, Bangert et al. | | Y | Hearsay |
| PX0438 | DISH-00001100 | 2/12/2004 | E-mails between Murphy, Bangert et al. | | Y | Hearsay, Incomplete document |
| PX0439 | DISH-00001154 | 5/2/2004 | E-mails between Dy, Bangert et al. | | Y | Hearsay |
| PX0440 | DISH-00001553 | 3/16/2004 | E-mails bweteen Sultan, Kondilas et al. | | Y | Hearsay, Incomplete |
| PX0441 | DISH5-0000025639 | | Risk Management and Compliance PowerPoint | Y | Y | |
| PX0442 | DISH-00004619 | 4/28/2005 | Letter from James to Echostar | | Y | Hearsay |
| PX0443 | DISH-00004635 | 4/5/2005 | Letter from Wasson to Dish Network | | Y | Hearsay, Foundation |
| PX0444 | DISH-00004671 | 9/14/2004 | Letter from Steele to Swanberg | | Y | Hearsay |
| PX0445 | DISH-00006182 | 3/27/2007 | E-mails between Beum, Duran, et al. | | Y | Hearsay, Foundation |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0446 | DISH-00005150 | 2/25/2005 | E-mails between "boscospal@sbcglobal.net," "Feedback" et al. | | Y | Hearsay |
| PX0447 | DISH-00008877 | 5/23/2002 | E-mails between Apala, Binns et al. | | Y | Hearsay, Foundation |
| PX0448 | DISH-00006121 | 3/17/2009 | E-mails between Musso, Werner, et al. | | Y | Hearsay, Foundation |
| PX0449 | DISH-00006573 | 9/25/2007 | E-mails between Musso, Origer, et al. | Y | Y | |
| PX0450 | DISH-00006639 | 3/12/2009 | Echostar Script | Y | Y | |
| PX0451 | DISH-00006698 | 3/24/2009 | E-mails between Musso, Van Emst et al. | | Y | Hearsay, Foundation |
| PX0452 | DISH-00008879 | 5/21/2002 | E-mails between Stingley, Binns et al. | | Y | Relevance |
| PX0453 | DISH-00006857 | 1/29/2009 | E-mails between Montano, Srater, et al. | | Y | Hearsay |
| PX0454 | DISH-00006939 | | Internal_DNC_Time_Limit_Expire_Chart.xls | | Y | Relevance, Hearsay, Foundation |
| PX0455 | DISH-00006946 | | DNC_State_Logins.xls | | Y | Relevance, Hearsay, Foundation |
| PX0456 | DISH-00006998 | 2/4/2006 | E-mails between Gogineni, Montano, et al. | Y | Y | |
| PX0457 | DISH-00007505 | 3/4/2009 | E-mails between Musso, Slater et al. | | Y | Foundation |
| PX0458 | DISH-00007546 | 3/4/2009 | E-mails between Musso, Trimarco et al. | | Y | Hearsay, Incomplete document |
| PX0459 | DISH-00007584 | 7/17/2008 | E-mails between Musso, Van Emst, et al. | Y | Y | |
| PX0460 | DISH-00007679 | 10/7/2008 | E-mails between Mills, Borup et al. | Y | Y | |
| PX0461 | DISH-00008883 | 4/25/2002 | E-mails between Weyforth, Binns, et al. | | Y | Relevance |
| PX0462 | DISH-00008908 | 9/10/2003 | E-mails between Richardson, Binns et al. | Y | Y | |
| PX0463 | DISH-00007727 | 9/16/2008 | E-mails between Van Emst, Musso, et al. | | Y | Foundation, Hearsay |
| PX0464 | DISH-00007777 | 6/20/2008 | E-mails between Musso, Garza, et al. | | Y | Hearsay, Foundation |
| PX0465 | DISH-00008948 | 2/25/2003 | E-mails between Binns, Osborne, et al. | | Y | Relevance |
| PX0466 | DISH-00007827 | 5/27/2008 | E-mails between Musso, Taber, et al. | | Y | Foundation, Hearsay |
| PX0467 | DISH-00007908 | 9/5/2008 | E-mails between Musso, Werner, et al. | | Y | Hearsay |
| PX0468 | DISH-00007914 | 8/15/2008 | E-mails between Musso, Portela, et al. | | Y | Hearsay |
| PX0469 | DISH-00008090 | 11/28/2008 | E-mails between Musso, Cain, et al. | | Y | Incomplete document, Hearsay |
| PX0470 | DISH5-0000025852 | 5/10/2010 | Risk Management and Audit Presentation Scripting Team Summit | Y | Y | |
| PX0471 | DISH-00008846 | 12/29/2005 | E-mails between Plumley, Bangert, et al. | Y | Y | |
| PX0472 | DISH-00008855 | 9/8/2003 | E-mails between Peavy, Wise, et al. | | Y | Incomplete document |
| PX0473 | DISH-00008869 | 6/12/2002 | E-mails between Apala, Weyforth, et al. | Y | Y | |
| PX0474 | DISH-00008871 | 6/12/2002 | E-mails between Weyforth, Apala, et al. | Y | Y | |
| PX0475 | DISH-00008873 | 6/6/2002 | E-mails between Binns, Hernandez, et al. | Y | Y | |
| PX0476 | DISH-00008876 | 5/24/2002 | E-mails between Stingley, Firestone, et al. | Y | Y | |
| PX0477 | DISH-00008881 | 5/9/2002 | E-mails between Weyforth, Larson, et al. | | Y | Hearsay, Foundation,Relevance |
| PX0478 | DISH-00008897 | 10/7/2003 | E-mails between Binns, Dimick, et al. | | Y | Relevance, Foundation |
| PX0479 | DISH-00008905 | 9/19/2003 | E-mails between Binns, Kelly, et al. | Y | Y | |
| PX0480 | DISH-00008911 | 8/29/2003 | E-mails between Tran, Richardson, et al. | Y | Y | |
| PX0481 | DISH-00008915 | 5/1/2003 | E-mails between Dimick, Szigethy, et al. | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0482 | DISH-00008933 | 4/17/2003 | E-mails between Osborne, Fox, et al. | | Y | Hearsay, Foundation |
| PX0483 | DISH-00008936 | 4/17/2003 | E-mails between Mason, Fox, et al. | | Y | Hearsay, Foundation |
| PX0484 | DISH11-000001 | | CONFIDENTIAL DISH Telemarketing and Non-Telemarketing Campaign IDs.XLS | Y | Y | |
| PX0485 | DISH11-017723 | 5/28/2004 | Dish Network Facts Blast | Y | Y | |
| PX0486 | DISH11-020383 | | OE Quality Assurance guide | Y | Y | |
| PX0487 | DISH11-021025 | 3/2/2009 | E-mails between Caldwell, Musso, et al. | | Y | Foundation, Hearsay |
| PX0488 | DISH11-021171 | 3/6/2009 | Dish Network Executive Summary of Apex Satellite, Inc. OE #17089408 | Y | Y | |
| PX0489 | DISH11-021526 | 5/15/2009 | E-mails between Rukas, Prado, et al. | Y | Y | |
| PX0490 | DISH11-021545 | 5/25/2010 | E-mails between Musso, Calbert, et al. | | Y | Hearsay |
| PX0491 | DISH11-021777 | 11/7/2008 | E-mails between Musso, Laslo, et al. | | Y | Hearsay, Foundation |
| PX0492 | DISH11-022171 | 6/17/2010 | E-mails between Werner, Musso, et al. | | Y | Hearsay, Foundation, Duplicative document |
| PX0493 | DISH11-022179 | 6/17/2010 | E-mails between Musso, Monasmith, et al. | | Y | Hearsay |
| PX0494 | DISH11-022181 | 6/17/2010 | E-mails between Musso, Calbert, et al. | | Y | Hearsay, Incomplete document |
| PX0495 | DISH11-022183 | 9/1/2009 | E-mails between Sponsler, Musso, et al. | | Y | Hearsay, Foundation |
| PX0496 | DISH11-022214 | 1/6/2010 | E-mails between Calbert, Musso, et al. | | Y | Hearsay, Foundation |
| PX0497 | DISH11-023449 | 12/12/2006 | E-mails between "Vendor Inquiries," Musso, et al. | | Y | Hearsay |
| PX0498 | DISH11-023572 | 9/24/2009 | "Known Meetings" | | Y | Hearsay |
| PX0499 | DISH11-024289 | 3/4/2009 | "Telephone Call Notes following Apex 'Hold' Status" | | Y | Hearsay, Foundation |
| PX0500 | DISH11-025134 | 9/5/2006 | "Echostar Risk Summary Week Ending September 5, 2006" | | Y | Hearsay |
| PX0501 | DISH11-028401 | 3/12/2009 | E-mails between Calbert, DeFranco, et al. | | Y | Hearsay, Foundation |
| PX0502 | DISH11-029615 | 8/11/2011 | E-mails between Snyder, Jones, et al. | | Y | Incomplete document |
| PX0503 | DISH11-029658 | 1/30/2007 | E-mails between Oberbiling, Werner, et al. | | Y | Hearsay |
| PX0504 | DISH11-029661 | 1/30/2007 | E-mails between Oberbiling, Werner, et al. | | Y | Hearsay |
| PX0505 | DISH11-029798 | 7/28/2011 | E-mails between Taber, Mills, et al. | | Y | Hearsay |
| PX0506 | DISH11-029841 | 10/6/2011 | E-mails between King, Luth, et al. | | Y | Hearsay |
| PX0507 | DISH11-033053 | 12/26/2008 | E-mails between Traber, Musso, et al. | Y | Y | |
| PX0508 | DISH11-034008 | 6/18/2001 | E-mails between McCarthy, Ahmed, et al. | | Y | Hearsay, Relevance |
| PX0509 | DISH11-034009 | 6/4/2001 | E-mails between Wargo, "Central File Request," et al. | Y | Y | |
| PX0510 | DISH2-0000000901 | 10/6/2006 | Letter from "Echostar Retail Audit and Risk" to Grider | | Y | Hearsay |
| PX0511 | DISH2-0000000560 | 5/4/2007 | Letter from Echostar to Brandvein | | Y | Hearsay |
| PX0512 | DISH2-0000039288 | 3/6/2008 | E-mails between Montano, Ziani, et al. | Y | Y | |
| PX0513 | DISH2-0000000903 | 10/31/2006 | Letter from "Echostar Retail Audit and Risk" to Goodale | | Y | Hearsay |
| PX0514 | DISH2-0000001058 | 1/19/2009 | Letter from Vision Satellite to Slater | | Y | Hearsay |
| PX0515 | DISH2-000000496 | 8/11/2006 | Letter from "Echostar Retailer Audit and Risk" to Hughes | | Y | Hearsay |
| PX0516 | DISH2-0000015186 | 11/10/2008 | E-mails between "TCPA" et al. | | Y | Hearsay |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0517 | DISH2-0000024969 | 6/3/2010 | E-mails between Jones, Musso, et al. | | Y | Hearsay |
| PX0518 | DISH2-0000025028 | 6/15/2006 | E-mails between Musso, Familant, et al. | | Y | Incomplete document |
| PX0519 | DISH5-0000025904 | | Welcome to Risk Management and Compliance Script | Y | Y | |
| PX0520 | DISH-00008949 | 2/26/2003 | E-mails between Gattone, Binns, et al. | | Y | Incomplete document |
| PX0521 | DISH2-0000038258 | 3/16/2010 | E-mails between Dexter, Davis, et al. | Y | Y | |
| PX0522 | DISH2-0000038285 | 3/26/2010 | E-mails between Montano, Lassen, et al. | | Y | Foundation, Hearsay |
| PX0523 | DISH2-0000038326 | 5/3/2010 | E-mails between Dexter, Davis, et al. | Y | Y | |
| PX0524 | DISH2-0000038347 | 5/26/2010 | E-mails between Dexter, Davis, et al. | Y | Y | |
| PX0525 | DISH2-0000039224 | 1/18/2010 | E-mails Montano, Falkowski et al. | Y | Y | |
| PX0526 | DISH2-0000039291 | 10/2/2009 | E-mails between Callis, Pacini, et al. | Y | Y | |
| PX0527 | DISH5-0000000338 | 1/18/2010 | E-mails between "fredarnett@gmail.com," Peterson, et al. | | Y | Hearsay |
| PX0528 | DISH5-0000001284 | 1/15/2009 | E-mails between Smith, Snyder, et al. | | Y | Hearsay |
| PX0529 | DISH5-0000001291 | 1/14/2009 | E-mails between Smith, Snyder, et al. | | Y | Hearsay |
| PX0530 | DISH5-0000001477 | 7/13/2006 | E-mails between Marciedes, "Vendor Inquiries," et al. | | Y | Hearsay |
| PX0531 | DISH5-0000005199 | 8/18/2010 | E-mails between Shaffer, Olivera, et al. | | Y | Hearsay, Foundation |
| PX0532 | DISH5-0000006818 | 10/16/2006 | E-mails between Brandvein, Musso, et al. | | Y | Incomplete document, Hearsay |
| PX0533 | DISH5-0000013271 | 5/16/2007 | E-mails between Musso, DiRoberto, et al. | | Y | Foundation, Hearsay |
| PX0534 | DISH5-0000013707 | 10/24/2006 | E-mails between Musso, "Briefy00@aol.com," et al. | | Y | Foundation |
| PX0535 | DISH5-0000016070 | 11/28/2006 | E-mails between Mills, Musso, et al. | | Y | Hearsay |
| PX0536 | DISH5-0000025044 | 5/1/2007 | Retail Services Audit and Risk Q4 2006 | Y | Y | |
| PX0537 | DISH5-0000025402 | | "OE Risk Management" | | Y | Foundation |
| PX0538 | DISH5-0000030886 | 1/3/2006 | Letter from Public Utility Commission of Texas to Dish Network | | Y | Hearsay |
| PX0539 | DISH5-0000031469 | 5/23/2006 | Letter from Attorney General of Washington to Dish Network from | | Y | Hearsay |
| PX0540 | DISH5-0000031671 | 11/13/2006 | Letter from JSR Satelitte Enterprises to Echostar Satellite LLC | | Y | Hearsay |
| PX0541 | DISH5-0000086253 | | New Retailer On-boarding-Compliance | Y | Y | |
| PX0542 | DISH5-0000031799 | 9/21/2006 | E-mails between Musso, Dufault, et al. | | Y | Hearsay, Incomplete document |
| PX0543 | DISH5-0000032497 | 11/13/2006 | E-mails between Colin Musso, et al. | | Y | Hearsay |
| PX0544 | DISH5-0000032744 | 5/4/2005 | Petition for Approval of Assurance of Voluntary Compliance, Missouri v. Dish Network | | Y | Incomplete Document |
| PX0545 | DISH5-0000032781 | 8/27/2003 | Petition for Temporary Restraining Order, Missouri v. Dish Network | | Y | Hearsay |
| PX0546 | DISH5-0000033272 | 11/9/2006 | Letter from Anderson to Steele | | Y | Hearsay |
| PX0547 | DISH5-0000033518 | 8/18/2006 | Letter from Steele to Molina | Y | Y | |
| PX0548 | DISH5-0000037812 | 10/24/2006 | "Retail Services Legal TCPA Meeting Agenda" | Y | Y | |
| PX0549 | DISH5-0000038271 | 10/9/2006 | E-mails between Mills, Musso, et al. | Y | Y | |

**20151204 Revised ATTACHMENT K**

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0550 | DISH5-0000038286 | 8/22/2006 | E-mails between Willis, Voorhies, et al. | Y | Y | |
| PX0551 | DISH5-0000066446 | 1/24/2008 | E-mails between Pastorius, Davis, et al. | Y | Y | |
| PX0552 | DISH5-0000066477 | 3/11/2009 | E-mails between Werner, Musso, et al. | | Y | Hearsay, Foundation |
| PX0553 | DISH5-0000086710 | 10/25/2011 | E-mails between Musso, Mason, et al. | Y | Y | |
| PX0554 | DISH-00008953 | 9/14/2002 | E-mails between Kornish, Firestone, et al. | | Y | Incomplete |
| PX0555 | DISH5-0000068751 | 1/21/2009 | E-mails between Langton, Montano, et al. | Y | Y | |
| PX0556 | DISH5-0000068807 | 12/17/2008 | E-mails between Nizami, Davis, et al. | Y | Y | |
| PX0557 | DISH5-0000069381 | 4/6/2011 | E-mails between Cullen, Ahmed, et al. | | Y | Hearsay, Relevance |
| PX0558 | DISH5-0000070107 | 8/10/2009 | E-mails between Ahmed, Musso, et al. | Y | Y | |
| PX0559 | DISH5-0000070131 | 8/13/2009 | E-mails between McGraw, Ahmed, et al. | | Y | Hearsay, Relevance |
| PX0560 | DISH5-0000070449 | 8/18/2009 | E-mails between Ahmed, Neylon, et al. | | Y | Hearsay |
| PX0561 | DISH5-0000071656 | 5/9/2007 | "Meeting Minutes" | Y | Y | |
| PX0562 | DISH5-0000074358 | 7/7/2011 | E-mails between Montano, Dexter, et al. | | Y | Hearsay, Foundation |
| PX0563 | DISH5-0000076321 | 7/19/2006 | E-mails between Origer, Metzger, et al. | | Y | Hearsay, Foundation |
| PX0564 | DISH5-0000076351 | 7/21/2006 | E-mails between Origer, Metzger, et al. | | Y | Incomplete document |
| PX0565 | DISH12-001146 | 8/27/2007 | E-mails between Hargan, Sponsler, et al. | | Y | Hearsay |
| PX0566 | DISH5-0000076499 | 10/2/2006 | E-mails between Greaney, Metzger, et al. | | Y | Hearsay |
| PX0567 | DISH5-0000076524 | 10/4/2006 | E-mails between Musso, Metzger, et al. | Y | Y | |
| PX0568 | DISH5-0000076955 | 11/16/2006 | E-mails between Bowman, Prusiewicz, et al. | Y | Y | |
| PX0569 | DISH5-0000077980 | 10/6/2006 | E-mails between Prusiewicz, Metzger, et al. | | Y | Incomplete document |
| PX0570 | DISH5-0000086499 | 10/10/2007 | Facts Blast | Y | Y | |
| PX0571 | DISH5-0000087244 | 6/4/2008 | E-mails between Musso, Werner, et al. | | Y | Incomplete document |
| PX0572 | DISH5-0000087408 | 6/24/2008 | E-mails between Musso, Hottle, et al. | Y | Y | |
| PX0573 | DISH5-0000087421 | 8/14/2008 | E-mails between Musso, Portela, et al. | | Y | Hearsay, Foundation, Incomplete document |
| PX0574 | DISH5-0000087472 | 7/16/2008 | E-mails between Musso, Metzger, et al. | | Y | Hearsay |
| PX0575 | DISH5-0000087504 | 7/24/2008 | E-mails between Musso, Eichhorn, et al. | | Y | Hearsay |
| PX0576 | DISH5-0000087541 | 5/30/2008 | E-mails between Musso, Taber, et al. | | Y | Incomplete document, Foundation |
| PX0577 | DISH5-0000087654 | 8/28/2008 | E-mails between Musso, Snyder, et al. | | Y | Foundation |
| PX0578 | DISH5-0000087687 | 9/2/2008 | E-mails between Musso, Mills, et al. | | Y | Hearsay |
| PX0579 | DISH5-0000087821 | 9/9/2008 | E-mails between Musso, Slater, et al. | | Y | Hearsay |
| PX0580 | DISH5-0000087843 | 9/9/2008 | E-mails between Musso, Van Emst, et al. | | Y | Hearsay |
| PX0581 | DISH5-0000087869 | 9/11/2008 | E-mails between Musso, Mills, et al. | | Y | Hearsay, Foundation |
| PX0582 | DISH5-0000087880 | 9/11/2008 | E-mails between Musso, O'Sheaf, et al. | | Y | Hearsay |
| PX0583 | DISH5-0000087890 | 9/12/2008 | E-mails between Musso, Mills, et al. | Y | Y | |
| PX0584 | DISH5-0000088056 | 6/23/2008 | E-mails between Musso, Werner, et al. | Y | Y | |
| PX0585 | DISH5-0000088394 | 12/13/2005 | E-mails between Wagner, Moore, et al. | | Y | Relevance, Incomplete document |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0586 | DISH5-0000088577 | 10/15/2002 | "2003 Dish Marketing Plan International Programming Chinese Services" | Y | Y | |
| PX0587 | DISH5-0000089204 | 6/28/2008 | E-mails between Kelly, Moore, et al. | | Y | Hearsay, Foundation |
| PX0588 | DISH5-0000089208 | 6/29/2005 | E-mails between Moore, Thompson, et al. | | Y | Hearsay, Foundation |
| PX0589 | DISH5-0000089238 | 8/3/2007 | E-mails between Melo, Thompson, et al. | | Y | Relevance |
| PX0590 | DISH5-0000089272 | 2/4/2008 | E-mails between Senderovitz, Faucett, et al. | Y | Y | |
| PX0591 | DISH5-0000089279 | 3/7/2008 | E-mails between Mittuch, Yip, et al. | Y | Y | |
| PX0592 | DISH5-0000089507 | | "Q4 2008 International Operations" | Y | Y | |
| PX0593 | DISH5-0000089254 | 10/17/2007 | E-mails between Senderovitz, Thompson, et al. | Y | Y | |
| PX0594 | DISH5-0000089558 | 7/10/2007 | E-mails between ElDanaf, Nikos, et al. | Y | Y | |
| PX0595 | DISH5-0000089940 | | "2003 Dish Marketing Plan International Programming" | Y | Y | |
| PX0596 | DISH5-0000090294 | 5/16/2006 | E-mails between Wagner, Thompson, et al. | | Y | Incomplete Document |
| PX0597 | DISH5-0000092999 | 3/19/2008 | E-mails between Musso, Mills, et al. | | Y | Hearsay, Foundation |
| PX0598 | DISH5-0000093208 | 4/8/2008 | E-mails between Werner, Van Emst, et al. | Y | Y | |
| PX0599 | DISH5-0000093490 | 8/29/2011 | E-mails between Donnelly, Hackfeld, et al. | | Y | Incomplete document |
| PX0600 | DISH5-0000093560 | 7/18/2011 | E-mails between Donnelly, Miller, et al. | | Y | Incomplete document |
| PX0601 | DISH5-0000093659 | 8/31/2011 | E-mails between Donnelly, Brockman, et al. | | Y | Incomplete document |
| PX0602 | DISH5-0000096296 | 11/11/2011 | E-mails between Hernandez, Werner, et al. | Y | Y | |
| PX0603 | DISH5-0000102611 | 10/4/2007 | 10 04 07 Legal and RS Project Report.xls | | Y | Hearsay, Foundation |
| PX0604 | DISH5-0000102662 | 9/11/2007 | E-mails between Mills, Musso, et al. | Y | Y | |
| PX0605 | DISH5-0000102664 | 9/18/2007 | E-mails between Voorhies, Mason, et al. | | Y | Hearsay |
| PX0606 | DISH5-0000086707 | 10/25/2011 | E-mails between Musso, Mason, et al. | | Y | Duplicative document, Hearsay, Foundation |
| PX0607 | DISH5-0000102805 | 1/30/2007 | E-mails between Oberbillig, Werner, et al. | | Y | Hearsay |
| PX0608 | DISH5-0000102811 | 10/4/2007 | E-mails between Werner, Metzger, et al. | | Y | Hearsay |
| PX0609 | DISH5-0000102815 | 9/28/2007 | E-mails between Werner, Peckham, et al. | | Y | Hearsay |
| PX0610 | DISH5-0000006973 | 5/4/2007 | Letter from Pastorius, Brandvein, et al. | | Y | Duplicative document, Hearsay, Incomplete document |
| PX0611 | DISH5-0000102883 | 7/23/2008 | E-mails between Musso, Werner, et al. | | Y | Hearsay |
| PX0612 | DISH5-0000103381 | 9/12/2008 | E-mails between Werner, Raddatz, et al. | | Y | Incomplete document, Relevance |
| PX0613 | DISH5-0000103383 | 9/12/2008 | E-mails between Werner, Lawrence, et al. | | Y | Incomplete document |
| PX0614 | DISH5-0000103794 | 4/27/2011 | E-mails between DeFranco, Neylon, et al. | Y | Y | |
| PX0615 | DISH5-0000103939 | 12/9/2011 | E-mails between Weddle, Van Emst, et al. | Y | Y | |
| PX0616 | DISH5-0000104567 | 8/13/2011 | E-mails between Mills, Neylon, et al. | | Y | Hearsay, foundation |
| PX0617 | DISH5-0000105255 | 12/7/2011 | E-mails between Mills, Peterson, et al. | | Y | Relevance, Hearsay, Foundation |
| PX0618 | DISH5-0000105946 | 1/12/2012 | E-mails between Mills, Peterson, et al. | | Y | Incomplete document |
| PX0619 | DISH5-0000107370 | 8/17/2007 | E-mails between Musso, Origer, et al. | Y | Y | |
| PX0620 | DISH5-0000107374 | 8/17/2007 | E-mails between Musso, Origer, et al. | | Y | Foundation |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0621 | DISH5-0000110594 | 3/20/2006 | E-mails between Carlson, DeFranco, et al. | | Y | Hearsay, Foundation |
| PX0622 | DISH5-0000110698 | 7/18/2006 | E-mails between Mills, Carlson, et al. | | Y | Hearsay, Foundation |
| PX0623 | DISH5-0000111193 | 11/23/2005 | E-mails between Oberbillig, Mills, et al. | | Y | Hearsay, Incomplete document, Foundation |
| PX0624 | DISH5-0000025433 | 10/2/2009 | Compliance with Retailer Agreement | Y | Y | |
| PX0625 | DISH5-0000110645 | | Meeting Agenda | | Y | Foundation, Hearsay |
| PX0626 | DISH5-0000111394 | 9/8/2006 | E-mails between Origer, Neylon, et al. | | Y | Hearsay |
| PX0627 | DISH5-0000111848 | 10/3/2006 | E-mails between Origer, Neylon, et al. | | Y | Incomplete document |
| PX0628 | DISH5-0000112139 | 10/24/2006 | E-mails between Origer, Steele, et al. | | Y | Incomplete document |
| PX0629 | DISH5-0000112428 | 11/19/2006 | E-mails between Musso, Origer, et al. | | Y | Hearsay |
| PX0630 | DISH5-0000115760 | 9/16/2009 | E-mails between Huff, Snyder, et al. | | Y | Incomplete document |
| PX0631 | DISH5-0000114038 | 6/13/2005 | E-mails between Becker, Quattromani, et al. | | Y | Hearsay |
| PX0632 | DISH5-0000114309 | 4/23/2007 | E-mails between Davis, Khan, et al. | Y | Y | |
| PX0633 | DISH5-0000115243 | 5/9/2008 | E-mails between "Vendor Inquiries," Musso, et al. | | Y | Hearsay |
| PX0634 | DISH5-0000115260 | 2/18/2009 | E-mails between Taber, Musso, et al. | | Y | Hearsay |
| PX0635 | DISH5-0000115356 | 10/3/2008 | E-mails between Musso, Van Emst, et al. | | Y | Hearsay |
| PX0636 | DISH5-0000115740 | 1/11/2010 | E-mails between Martinez, Huff, et al. | | Y | Incomplete document |
| PX0637 | DISH5-0000115828 | 3/2/2010 | E-mails between Brilli, Snyder, et al. | | Y | Incomplete document, Hearsay |
| PX0638 | DISH5-0000116294 | 12/18/2009 | E-mails between Musso, Snyder, et al. | Y | Y | |
| PX0639 | DISH5-0000118522 | 12/5/2009 | E-mails between Ransom, Dodge, et al. | | Y | Hearsay, Relevance |
| PX0640 | DISH5-0000118686 | 7/16/2010 | E-mails between Mason, Van Emst, et al. | Y | Y | |
| PX0641 | DISH5-0000119062 | 5/20/2010 | E-mails between Harvey, Davis, et al. | | Y | Relevance |
| PX0642 | DISH5-0000119263 | 6/21/2010 | E-mails between Musso, Werner, et al. | | Y | Relevance |
| PX0643 | DISH5-0000119375 | 3/22/2010 | E-mails between Musso, Eichhorn, et al. | | Y | Hearsay, Foundation |
| PX0644 | DISH5-0000119730 | 8/19/2009 | E-mails between Eichhorn, Werner, et al. | | Y | Incomplete Document, Relevance |
| PX0645 | DISH5-0000119935 | 11/2/2007 | E-mails between Thompson, Krause, et al. | | Y | Relevance |
| PX0646 | DISH5-0000120535 | 5/17/2010 | E-mails between Musso, Voorhies, et al. | Y | Y | |
| PX0647 | DISH5-0000121034 | 11/28/2008 | E-mails between Gonzalez, Carlson, et al. | Y | Y | |
| PX0648 | DISH5-0000121036 | 11/26/2008 | E-mails between Van Emst, Werner, et al. | | Y | Incomplete document |
| PX0649 | DISH5-0000121369 | 10/1/2010 | "New Retailer Summary of Investigation for Nadeem Javed dba Texas Wireless" | | Y | Hearsay |
| PX0650 | DISH5-0000123911 | 8/7/2006 | E-mails between DeFranco, Metzger, et al. | | Y | Hearsay |
| PX0651 | DISH5-0000124282 | 8/31/2010 | E-mails between Musso, Eichhorn, et al. | | Y | Hearsay, Incomplete document |
| PX0652 | DISH5-0000124499 | 3/13/2009 | E-mails between Origer, Rossetti, et al. | Y | Y | |
| PX0653 | DISH5-0000125143 | 10/26/2007 | E-mails between Werner, Voorhies, et al. | | Y | Hearsay, Incomplete Document |
| PX0654 | DISH5-0000125306 | 9/20/2007 | E-mails between Origer, Carlson, et al. | | Y | Hearsay, Relevance |
| PX0655 | DISH5-0000125996 | 9/21/2007 | E-mails between Origer, Werner, et al. | | Y | Hearsay, Foundation, Relevance |
| PX0656 | DISH5-0000126144 | 1/30/2007 | E-mails between Oberbillig, Werner, et al. | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0657 | DISH5-0000126265 | 2/15/2011 | E-mails between Neylon, DeFranco, et al. | | Y | Hearsay, Relevance, Incomplete document |
| PX0658 | DISH5-0000126271 | 3/25/2011 | E-mails between Ahmed, Neylon et al. | Y | Y | |
| PX0659 | DISH5-0000126402 | | 2012 Initiatives Indirect Channel Powerpoint | | Y | Relevance |
| PX0660 | DISH5-0000126540 | | 2012 Initiatives National Sales Partners Powerpoint | | Y | Relevance, Hearsay |
| PX0661 | DISH5-0000088401 | 3/30/2005 | E-mails between Kawkabani, Thompson, et al. | | Y | Relevance |
| PX0662 | DISH8-0000042 | 8/12/2008 | E-mails between Blum, DeFranco, et al. | | Y | Foundation, Incomplete Document |
| PX0663 | DISH8-0000152 | 3/25/2009 | E-mails between Palasz, Pastorius, et al. | Y | Y | |
| PX0664 | DISH8-0000236 | 1/16/2009 | E-mails between Davis, Pastorius, et al. | | Y | Hearsay |
| PX0665 | DISH8-0000238 | 1/8/2009 | E-mails between Tenbrink, Pastorius, et al. | | Y | Hearsay |
| PX0666 | DISH8-0000313 | 9/2/2008 | E-mails between Musso, Blum, et al. | Y | Y | |
| PX0667 | DISH8-0000368 | 7/24/2008 | E-mails between Musso, Blum, et al. | | Y | Foundation |
| PX0668 | DISH8-0000529 | 1/16/2008 | E-mails between Berridge, Pastorius, et al. | Y | Y | |
| PX0669 | DISH8-0000532 | 12/10/2007 | E-mails between Blum, Pastorius, et al. | Y | Y | |
| PX0670 | DISH8-0001059 | 8/17/2007 | E-mails between Hargan, Montano, et al. | | Y | Hearsay |
| PX0671 | DISH8-0000600 | 8/27/2007 | E-mails between Hargan, Pastorius, et al. | Y | Y | |
| PX0672 | DISH8-0000731 | 11/7/2007 | E-mails between Pastorius, Kelly, et al. | | Y | Hearsay |
| PX0673 | DISH8-0000743 | 10/30/2008 | E-mails between Pastorius, Berridge, et al. | | Y | Hearsay, Foundation |
| PX0674 | DISH8-0000876 | 6/10/2008 | E-mails between Pastorius Blum, et al. | Y | Y | |
| PX0675 | DISH8-0000894 | 8/5/2008 | E-mails between Metzger, Blum, et al. | Y | Y | |
| PX0676 | DISH8-0000897 | 5/9/2007 | E-mails between Steele, Blum, et al. | | Y | Foundation |
| PX0677 | DISH8-0000152 | 3/25/2009 | E-mails between Palasz, Pastorius, et al. | Y | Y | |
| PX0678 | DISH5-0000115813 | 6/9/2010 | E-mails between Snyder, Garcia, et al. | Y | Y | |
| PX0679 | DISH5-0000115964 | 4/17/2010 | E-mails between Huff, Snyder, et al. | | Y | Hearsay, Incomplete document |
| PX0680 | DISH8-0001425 | 8/12/2002 | E-mails between Weyforth, Komish, et al. | Y | Y | |
| PX0681 | DISH5-0000094876 | 9/29/2011 | E-mails between Werner, Martinez, et al. | | Y | Incomplete document |
| PX0682 | DISH5-0000096951 | 7/20/2011 | E-mails between Werner, CETOE-Disputes, et al. | | Y | Relevance, Incomplete Document |
| PX0683 | DISH8-0001048 | 12/8/2008 | E-mails between Davis, Strater, et al. | Y | Y | |
| PX0684 | DISH8-0001219 | 9/16/2008 | E-mails between Kalani, Blum, et al. | | Y | Hearsay |
| PX0685 | DISH8-0001306 | 3/24/2009 | E-mails between Metzger, Rudd, et al. | | Y | Hearsay |
| PX0686 | DISH8-0002512 | 9/5/2006 | Letter from Dish to Shahidi | | Y | Hearsay |
| PX0687 | DISH8-0001447 | 9/11/2003 | E-mails between Binns, Dimick, et al. | Y | Y | |
| PX0688 | DISH8-0001449 | 9/10/2003 | E-mails between Novak, Parekh, et al. | Y | Y | |
| PX0689 | DISH8-0001458 | 9/10/2003 | E-mails between Novak, Binns, et al. | Y | Y | |
| PX0690 | DISH8-0001462 | 9/19/2003 | E-mails between Binns, Dimick, et al. | Y | Y | |
| PX0691 | DISH8-0001464 | 2/8/2007 | E-mails between Faucett, Steele, et al. | | Y | Hearsay, Incomplete document |
| PX0692 | DISH8-0001528 | 2/8/2007 | E-mails between Faucett, Steele, et al. | | Y | Hearsay, Incomplete document |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0693 | DISH8-0001591 | 2/8/2007 | E-mails between Binns, Steele, et al. | | Y | Hearsay, Foundation, Incomplete Document |
| PX0694 | DISH8-0001650 | 2/6/2007 | E-mails between Binns, Steele, et al. | | Y | Hearsay |
| PX0695 | DISH8-0001654 | 2/1/2007 | E-mails between Binns, Duran, et al. | Y | Y | |
| PX0696 | DISH8-0001664 | 1/26/2007 | E-mails between Binns, Lanning, et al. | | Y | Hearsay, Incomplete document |
| PX0697 | DISH8-0001697 | 4/10/2006 | E-mails between Bagwell, Bangert, et al. | Y | Y | |
| PX0698 | DISH8-0001702 | 4/10/2006 | E-mails between Bangert, Gattone, et al. | Y | Y | |
| PX0699 | DISH8-0002027 | 9/16/2008 | E-mails between Metzger, Kalani, et al. | Y | Y | |
| PX0700 | DISH8-0034737 | 7/26/2010 | Legal Five Accounts - bruce werner - 7-26-2010.xls | Y | Y | |
| PX0701 | DISH8-0003483 | 4/10/2009 | E-mails between Pastorius, Kuelling, et al. | Y | Y | |
| PX0702 | DISH8-0003574 | | Meeting re: Retailer Do Not Call Requirements for 24-48 Month Disconect Report | Y | Y | |
| PX0703 | DISH8-0003961 | 2/27/2009 | E-mails between Musso, Stragic Account Manager, et al. | Y | Y | |
| PX0704 | DISH8-0034987 | 6/7/2007 | E-mails between Hargan, Pastorius, et al. | | Y | Hearsay, Foundation |
| PX0705 | DISH8-0034996 | 7/24/2007 | E-mails between Blum, Pastorius, et al. | | Y | Hearsay |
| PX0706 | DISH9-0000101 | | Sky High Entertainment TCPA Complaint Notes from Lawrence | | Y | Hearsay |
| PX0707 | DISH9-0000274 | 10/2/2006 | 10 02 06 TCPA Retailer ID Status Chart | Y | Y | |
| PX0708 | DISH9-0000606 | 1/22/2007 | Letter from Goodale to Retail Audit and Risk Attention Reji | | Y | Hearsay |
| PX0709 | DISH5-0000116289 | 11/12/2009 | E-mail from Rukas to Snyder, et al. | | Y | Incomplete document |
| PX0710 | DISH9-0001545 | 11/13/2006 | E-mails between Hargan, Musso, et al. | | Y | Hearsay |
| PX0711 | DISH9-0002048 | 7/22/2011 | E-mails between Simons, Berridge, et al. | Y | Y | |
| PX0712 | DISH9-0002063 | 8/16/2011 | E-mails between Kitei, Berridge, et al. | Y | Y | |
| PX0713 | DISH9-0002297 | 8/16/2011 | E-mails between Dexter, Berridege, et al. | Y | Y | |
| PX0714 | DISH5-0000116290 | 11/16/2009 | E-mails between Martinez, Snyder, et al. | | Y | Hearsay, Incomplete document |
| PX0715 | DISH9-0002568 | 8/25/2006 | E-mails between Holcomb, Metzger, et al. | | Y | Hearsay |
| PX0716 | DISH9-0003939 | 10/5/2006 | E-mails between Musso, Metzger, et al. | | Y | Hearsay |
| PX0717 | DISH9-0004754 | | Telemarketing Disclosure Requirements | | Y | Hearsay, Foundation |
| PX0718 | DISH9-0004925 | 9/22/2011 | E-mails between Montano, Kitei, et al. | | Y | Incomplete document |
| PX0719 | DISH9-0005032 | 9/8/2008 | E-mails between Muenchen, Kalani, et al. | | Y | Hearsay, Incomplete document |
| PX0720 | DISH9-0005136 | | DNC 2003 Timeline | Y | Y | |
| PX0721 | DISH9-0005274 | 5/9/2008 | E-mails between Boyle, Blum, et al. | | Y | Hearsay |
| PX0722 | DISH9-0005283 | 5/21/2008 | E-mails between Pastorius, Mittuch, et.al. | Y | Y | |
| PX0723 | DISH9-0005311 | 12/5/2007 | Memorandum from Thompson to Vogel, et al. | | Y | Hearsay |
| PX0724 | DISH9-0005385 | | Draft Script | | Y | Foundation |
| PX0725 | DISH9-0005850 | 11/8/2006 | E-mails between Origer, Neylon, et al. | Y | Y | |
| PX0726 | DISH9-0011589 | 9/15/2008 | E-mails between Musso, Caldwell, et al. | | Y | Hearsay |
| PX0727 | DISH9-0011551 | 6/25/2008 | Letter from Joseph to Lowenstein | | Y | Hearsay |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0728 | DISH9-0012176 | 1/30/2007 | E-mails between Oberbillig, Werner, et al. | | Y | Hearsay, Rule 408 |
| PX0729 | DISH9-0012377 | 11/14/2006 | E-mails between Musso, Origer, et al. | | Y | Hearsay |
| PX0730 | DISH9-0012646 | | Sales Partner Review 2009 powerpoint | | Y | Foundation |
| PX0731 | DISH9-0012797 | 2/24/2009 | E-mails between Hollida, Davis, et al. | | Y | Incomplete document |
| PX0732 | DISH9-0012803 | 10/28/2009 | Meeting request, Review of the summary for the Q4 2008 Inquiry | | Y | Incomplete document |
| PX0733 | DISH9-0012809 | 1/5/2010 | E-mails between Davis, Pastorius, et al. | | Y | Hearsay, Relevance |
| PX0734 | DISH-PAPER-010388 | 4/29/2010 | E-mails between Hernandez, Fielding, et al. | | Y | Relevance, Incomplete document |
| PX0735 | DISH-PAPER-010862 | 8/21/2009 | E-mails between Werner, Neylon, et al. | | Y | Hearsay, Foundation |
| PX0736 | DISH-PAPER-010894 | 8/13/2009 | Meeting transcript Bangert, Werner, et al. | | Y | Hearsay |
| PX0737 | DISH-PAPER-014300 | 7/28/2009 | Respondent's First Requests for Admission to Claimant Dish Network, LLC | | N | Hearsay, Authenticity, Relevance |
| PX0738 | DISH-PAPER-014336 | 8/21/2009 | Report submitted by Nile L. Nickel | | Y | Hearsay, Relevance |
| PX0739 | DISH-PAPER-014501 | 9/2/2008 | E-mails between Van Emst, Musso, et al. | | Y | Hearsay, Foundation |
| PX0740 | DISH-PAPER-013094 | 7/10/2007 | Satellite Systems Network Post Audit Checklist | Y | Y | |
| PX0741 | DISH-PAPER-023751 | 11/11/2010 | E-mails between Musso, Berridge, et al. | | Y | Hearsay, Foundation |
| PX0742 | DISH-PAPER-024091 | 3/5/2009 | E-mails between Rukas, Slater, et al. | | Y | Hearsay, Foundation |
| PX0743 | DISH-PAPER-013095 | 6/27/2007 | Satellite Systems Network Retailer Audit Notification and Summary | Y | Y | |
| PX0744 | DISH-PAPER-025141 | 10/16/2008 | E-mails between Musso, Olival, et. al. | | Y | Hearsay, Incomplete Document |
| PX0745 | FIVE9-DOJ-000001 | | FIVE9 call records | Y | Y | |
| PX0746 | FIVE9-DOJ-000132 | | FIVE9 call records | Y | Y | |
| PX0747 | FIVE9-DOJ-000133 | | FIVE9 call records | Y | Y | |
| PX0748 | FIVE9-DOJ-000134 | | FIVE9 call records | Y | Y | |
| PX0749 | FIVE9-DOJ-000135 | | FIVE9 call records | Y | Y | |
| PX0750 | FIVE9-DOJ-000136 | | FIVE9 call records | Y | Y | |
| PX0751 | FIVE9-DOJ-000137 | | FIVE9 call records | Y | Y | |
| PX0752 | FIVE9-DOJ-000138 | | FIVE9 call records | Y | Y | |
| PX0753 | FIVE9-DOJ-000139 | | FIVE9 call records | Y | Y | |
| PX0754 | FIVE9-DOJ-000140 | | FIVE9 call records | Y | Y | |
| PX0755 | FIVE9-DOJ-000141 | | FIVE9 call records | Y | Y | |
| PX0756 | FIVE9-DOJ-000142 | | FIVE9 call records | Y | Y | |
| PX0757 | FIVE9-DOJ-000143 | | FIVE9 call records | Y | Y | |
| PX0758 | FIVE9-DOJ-000144 | | FIVE9 call records | Y | Y | |
| PX0759 | FIVE9-DOJ-000145 | | FIVE9 call records | Y | Y | |
| PX0760 | FIVE9-DOJ-000146 | | FIVE9 call records | Y | Y | |
| PX0761 | FTC002-007011 | | 1 B.vox | | Y | Foundation, Relevance, Hearsay |
| PX0762 | FTC002-007012 | | 2 B.vox | | Y | Foundation, Relevance, Hearsay |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0763 | FTC002-007013 | | 6 B.vox | | Y | Foundation, Relevance, Hearsay |
| PX0764 | FTC002-007014 | | 6007 Jake.vox | | Y | Foundation, Relevance, Hearsay |
| PX0765 | FTC002-007015 | | 6007Jake.vox | | Y | Foundation, Relevance, Hearsay |
| PX0766 | FTC002-007016 | | 6007jakeNEW.vox | | Y | Foundation, Relevance, Hearsay |
| PX0767 | FTC002-007018 | | BC 1-19-05.vox | | Y | Foundation, Relevance, Hearsay |
| PX0768 | FTC002-007019 | | bc31.vox | | Y | Foundation, Relevance, Hearsay |
| PX0769 | FTC002-007020 | | bc41.vox | | Y | Foundation, Relevance, Hearsay |
| PX0770 | FTC002-007320 | | 7 B.vox | | Y | Foundation, Relevance, Hearsay |
| PX0771 | FTC003-058326 | 10/29/2003 | Letter from Novak to Church | Y | Y | |
| PX0772 | FTC003-084737 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0773 | FTC003-084749 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0774 | FTC003-084759 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0775 | FTC003-084791 | | DISHTV NOW Reg Calls 06/01/2004 to 08/10/2004 | | Y | Relevance, Foundation, Hearsay |
| PX0776 | FTC003-084839 | | DISHTV NOW Reg Calls 11/23/2004 to 01/06/2006 | Y | Y | |
| PX0777 | FTC003-084848 | | STAR SATELLITE Reg Calls 08/17/2005 to 11/22/2005 | Y | Y | |
| PX0778 | FTC003-084910 | | STAR SATELLITE Reg Calls 01/18/2005 to 07/14/2005 | | Y | Relevance, Foundation, Hearsay |
| PX0779 | FTC003-084965 | | JSR ENTERPRISES Reg Hits | Y | Y | |
| PX0780 | FTC003-084966 | | JSR ENTERPRISES Reg Hits | Y | Y | |
| PX0781 | FTC003-084967 | | JSR ENTERPRISES Reg Hits | Y | Y | |
| PX0782 | FTC003-084988 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0783 | FTC003-085003 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0784 | FTC003-085017 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0785 | FTC003-085029 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0786 | FTC003-085037 | | TENAYA Reg Hits | Y | Y | |
| PX0787 | FTC003-085043 | | TENAYA Reg Hits | Y | Y | |
| PX0788 | FTC003-085051 | | TENAYA Reg Hits | Y | Y | |
| PX0789 | FTC003-085058 | | TENAYA Reg Hits | Y | Y | |
| PX0790 | FTC003-085064 | | TENAYA Reg Hits | | Y | Relevance, Foundation, Hearsay |
| PX0791 | FTC003-085124 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0792 | FTC003-085134 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0793 | FTC003-085146 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0794 | FTC003-085157 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0795 | FTC003-085168 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0796 | FTC003-085179 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0797 | FTC003-085191 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0798 | FTC003-085207 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0799 | FTC003-085223 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0800 | FTC003-085306 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|-----|-----------------|------|-------------|-------------------------|-----------------------|---------------------|
| PX0801 | FTC003-085336 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0802 | FTC003-085364 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0803 | FTC003-085390 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0804 | FTC003-085419 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0805 | FTC003-085450 | | Dish 03-07 call records RegHits | | Y | Relevance, Prejudicial |
| PX0806 | FTC003-086848 | | DISHTV NOW | Y | Y | |
| PX0807 | FTC305-000001 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0808 | FTC305-000002 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0809 | FTC305-000003 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0810 | FTC305-000004 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0811 | FTC305-000005 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0812 | FTC305-000006 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0813 | FTC305-000007 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0814 | FTC305-000008 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0815 | FTC305-000009 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0816 | FTC305-000010 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0817 | FTC305-000011 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0818 | FTC305-000012 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0819 | FTC305-000013 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0820 | FTC305-000014 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0821 | FTC305-000015 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0822 | FTC305-000016 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0823 | FTC305-000017 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0824 | FTC305-000018 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0825 | FTC305-000019 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0826 | FTC305-000020 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0827 | FTC305-000021 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0828 | FTC305-000022 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0829 | FTC305-000023 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0830 | FTC305-000024 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0831 | FTC305-000057 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0832 | FTC305-000058 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0833 | FTC305-000059 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0834 | FTC305-000060 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0835 | FTC305-000061 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0836 | FTC305-000062 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0837 | FTC305-000063 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0838 | FTC305-000064 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |

**20151204 Revised ATTACHMENT K**

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0839 | FTC305-000065 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0840 | FTC305-000066 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0841 | FTC305-000067 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0842 | FTC305-000068 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0843 | FTC305-000069 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0844 | FTC305-000070 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0845 | FTC305-000072 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0846 | FTC305-000073 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0847 | FTC305-000074 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0848 | FTC305-000075 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0849 | FTC305-000076 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0850 | FTC305-000077 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0851 | FTC305-000078 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0852 | FTC305-000079 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0853 | FTC305-000080 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0854 | FTC305-000081 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0855 | FTC305-000082 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0856 | FTC305-000083 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0857 | FTC305-000084 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0858 | FTC305-000085 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0859 | FTC305-000086 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0860 | FTC305-000087 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0861 | FTC305-000088 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0862 | FTC305-000089 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0863 | FTC305-000090 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0864 | FTC305-000091 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0865 | FTC305-000092 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0866 | FTC305-000093 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0867 | FTC305-000094 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0868 | FTC305-000095 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0869 | FTC305-000096 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0870 | FTC305-000097 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0871 | FTC305-000098 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0872 | FTC305-000099 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0873 | FTC305-000100 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0874 | FTC305-000101 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0875 | FTC305-000102 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0876 | FTC305-000103 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0877 | FTC305-000104 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0878 | FTC305-000105 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0879 | FTC305-000106 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0880 | FTC305-000107 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0881 | FTC305-000108 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0882 | FTC305-000109 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0883 | FTC305-000110 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0884 | FTC305-000111 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0885 | FTC305-000112 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0886 | FTC305-000115 | | STAR SATELLITE | | Y | Relevance, Foundation, Hearsay |
| PX0887 | FTC305-000116 | | STAR SATELLITE | | Y | Relevance, Foundation, Hearsay |
| PX0888 | FTC305-000117 | | STAR SATELLITE | | Y | Relevance, Foundation, Hearsay |
| PX0889 | FTC305-000118 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0890 | FTC305-000119 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0891 | FTC305-000120 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0892 | FTC305-000121 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0893 | FTC305-000122 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0894 | FTC305-000123 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0895 | FTC305-000124 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0896 | FTC305-000125 | | Dish 03-07 call records | | Y | Relevance, Prejudicial |
| PX0897 | FTC305-000133 | | TENAYA | Y | Y | |
| PX0898 | FTC305-000169 | | JSR ENTERPRISES | Y | Y | |
| PX0899 | FTC305-000170 | | JSR ENTERPRISES | Y | Y | |
| PX0900 | FTC305-000171 | | JSR ENTERPRISES | Y | Y | |
| PX0901 | FTC305-000172 | | JSR ENTERPRISES | Y | Y | |
| PX0902 | FTC305-000173 | | JSR ENTERPRISES | Y | Y | |
| PX0903 | FTC305-000174 | | JSR ENTERPRISES | | Y | |
| PX0904 | FTC305-000175 | | JSR ENTERPRISES | | Y | Relevance, Prejudicial |
| PX0905 | FTC305-000176 | | JSR ENTERPRISES | | Y | Relevance, Prejudicial |
| PX0906 | FTC306-029787 | 2/7/2005 | Charvat v. DISH TV NOW, INC, et al. Complaint | | Y | Relevance, Foundation, Hearsay |
| PX0907 | FTC306-029863 | 3/2/2005 | Letter from Illinois Attorney General to Dish Network | | Y | Relevance, Foundation, Hearsay |
| PX0908 | FTC306-029885 | 4/15/2003 | Assurance of Voluntary Compliance with Indiana | | Y | Relevance, Foundation, Hearsay |
| PX0909 | FTC341-000001 | | DISHTV NOW | | Y | Relevance, Foundation, Hearsay |
| PX0910 | FTC353-000001 | | Full DNC List from FTC as of March 2012 | | Y | Relevance, Foundation, Hearsay |
| PX0911 | FTC354-000001 | | Full DNC List from FTC | | Y | Relevance, Foundation, Hearsay |
| PX0912 | FTC359-007805 | | FIVE9 call records Reg Hits | | Y | Relevance, Foundation, Hearsay |
| PX0913 | FTC364-000257 | 3/11/2002 | E-mails between Meyers, Neylon, et al. | | Y | Relevance, Foundation, Hearsay |
| PX0914 | FTC701-000474 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation, Hearsay |

**20151204 Revised ATTACHMENT K**

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0915 | FTC701-000475 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation, Hearsay |
| PX0916 | FTC701-000477 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation, Hearsay |
| PX0917 | FTC701-000479 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation, Hearsay |
| PX0918 | FTC701-000480 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation, Hearsay |
| PX0919 | FTC701-000481 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation, Hearsay |
| PX0920 | FTC701-000482 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation, Hearsay |
| PX0921 | FTC701-000483 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0922 | FTC701-000484 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0923 | FTC701-000485 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0924 | FTC701-000486 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0925 | FTC701-000487 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0926 | FTC701-000488 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0927 | FTC701-000489 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0928 | FTC701-000490 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0929 | FTC701-000491 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0930 | FTC701-000492 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0931 | FTC701-000493 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0932 | FTC701-000494 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0933 | FTC701-000495 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0934 | FTC701-000496 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0935 | FTC701-000497 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0936 | FTC701-000498 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0937 | FTC701-000499 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0938 | FTC701-000500 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0939 | FTC701-000501 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0940 | FTC701-000502 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0941 | FTC701-000503 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0942 | FTC701-000504 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0943 | FTC701-000505 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0944 | FTC701-000506 | | Dish 07-10 call records Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0945 | FTC702-000011 | | NATIONAL SATELLITE SYSTEMS Reg Hits | | Y | Relevance, Foundation,  Hearsay |
| PX0946 | NSS-00073 | | NATIONAL SATELLITE SYSTEMS | | Y | Relevance |
| PX0947 | NSS-00075 | | NATIONAL SATELLITE SYSTEMS | | Y | Relevance |
| PX0948 | SAV-000457 | 11/22/2006 | E-mails between Musso, Bamira, et al. | Y | Y | |
| PX0949 | SAV-000499 | 11/20/2006 | E-mails between Musso, Bamira, et al. | | Y | Hearsay |
| PX0950 | | 3/11/2011 | Dish's Internal Do Not Call list produced on March 11, 2011 | Y | Y | |
| PX0951 | | 3/25/2015 | Declaration of Rick Stauffer | | Y | Hearsay, Reliability, Foundation |
| PX0952 | | | dish_fedint_CA_v1 | | Y | Foundation, Hearsay |

20151204 Revised ATTACHMENT K

**United States et al. v. Dish Network LLC**
**Case No.: 3:09-3073 - SEM-TSH**

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0953 | | | dish_fedint_IL_v1 | | Y | Foundation, Hearsay |
| PX0954 | | | dish_fedint_NC_v1 | | Y | Foundation, Hearsay |
| PX0955 | | | dish_fedint_OH_v1 | | Y | Foundation, Hearsay |
| PX0956 | | | dish_ltsgg_IL_v1 | | Y | Foundation, Hearsay |
| PX0957 | | | dish_ltsgg_OH_v1 | | Y | Foundation, Hearsay |
| PX0958 | | | dish_ltsgg_CA_v1 | | Y | Foundation, Hearsay |
| PX0959 | | | dish_ltsgg_NC_v1 | | Y | Foundation, Hearsay |
| PX0960 | | | five9_CA | | Y | Foundation, Hearsay |
| PX0961 | | | five9_OH | | Y | Foundation, Hearsay |
| PX0962 | | | five9_IL | | Y | Foundation, Hearsay |
| PX0963 | | | five9_NC | | Y | Foundation, Hearsay |
| PX0964 | | | jsr_CA | | Y | Foundation, Hearsay |
| PX0965 | | | jsr_CA_v1 | | Y | Foundation, Hearsay |
| PX0966 | | | jsr_IL | | Y | Foundation, Hearsay |
| PX0967 | | | jsr_IL_v1 | | Y | Foundation, Hearsay |
| PX0968 | | | jsr_NC | | Y | Foundation, Hearsay |
| PX0969 | | | jsr_NC_v1 | | Y | Foundation, Hearsay |
| PX0970 | | | jsr_OH | | Y | Foundation, Hearsay |
| PX0971 | | | jsr_OH_v1 | | Y | Foundation, Hearsay |
| PX0972 | | | ndncr_CA | | Y | Foundation, Hearsay |
| PX0973 | | | ndncr_IL | | Y | Foundation, Hearsay |
| PX0974 | | | ndncr_OH | | Y | Foundation, Hearsay |
| PX0975 | | | ndncr_NC | | Y | Foundation, Hearsay |
| PX0976 | | | nocomp_CA | | Y | Foundation, Hearsay |
| PX0977 | | | nocomp_IL | | Y | Foundation, Hearsay |
| PX0978 | | | nocomp_NC | | Y | Foundation, Hearsay |
| PX0979 | | | nocomp_OH | | Y | Foundation, Hearsay |
| PX0980 | | | noeng_CA | | Y | Foundation, Hearsay |
| PX0981 | | | noeng_OH | | Y | Foundation, Hearsay |
| PX0982 | | | noeng_IL | | Y | Foundation, Hearsay |
| PX0983 | | | noeng_NC | | Y | Foundation, Hearsay |
| PX0984 | | | postcrc_OH | | Y | Foundation, Hearsay |
| PX0985 | | | tenaya_IL | | Y | Foundation, Hearsay |
| PX0986 | | | tenaya_NC | | Y | Foundation, Hearsay |
| PX0987 | | | tenaya_OH | | Y | Foundation, Hearsay |
| PX0988 | | | tenaya_CA | | Y | Foundation, Hearsay |
| PX0989 | | | dish_fedint_CA_v1_return | | Y | Foundation, Hearsay |
| PX0990 | | | dish_fedint_IL_v1_return | | Y | Foundation, Hearsay |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX0991 | | | dish_fedint_NC_v1_return | | Y | Foundation, Hearsay |
| PX0992 | | | dish_fedint_OH_v1_return | | Y | Foundation, Hearsay |
| PX0993 | | | dish_ltsgg_IL_v1_return | | Y | Foundation, Hearsay |
| PX0994 | | | dish_ltsgg_OH_v1_return | | Y | Foundation, Hearsay |
| PX0995 | | | dish_ltsgg_CA_v1_return | | Y | Foundation, Hearsay |
| PX0996 | | | dish_ltsgg_NC_v1_return | | Y | Foundation, Hearsay |
| PX0997 | | | five9_CA_return | | Y | Foundation, Hearsay |
| PX0998 | | | five9_OH_return | | Y | Foundation, Hearsay |
| PX0999 | | | five9_IL_return | | Y | Foundation, Hearsay |
| PX1000 | | | five9_NC_return | | Y | Foundation, Hearsay |
| PX1001 | | | jsr_CA_return | | Y | Foundation, Hearsay |
| PX1002 | | | jsr_CA_v1_return | | Y | Foundation, Hearsay |
| PX1003 | | | jsr_IL_return | | Y | Foundation, Hearsay |
| PX1004 | | | jsr_IL_v1_return | | Y | Foundation, Hearsay |
| PX1005 | | | jsr_NC_return | | Y | Foundation, Hearsay |
| PX1006 | | | jsr_NC_v1_return | | Y | Foundation, Hearsay |
| PX1007 | | | jsr_OH_return | | Y | Foundation, Hearsay |
| PX1008 | | | jsr_OH_v1_return | | Y | Foundation, Hearsay |
| PX1009 | | | ndncr_CA_return | | Y | Foundation, Hearsay |
| PX1010 | | | ndncr_IL_return | | Y | Foundation, Hearsay |
| PX1011 | | | ndncr_OH_return | | Y | Foundation, Hearsay |
| PX1012 | | | ndncr_NC_return | | Y | Foundation, Hearsay |
| PX1013 | | | nocomp_CA_return | | Y | Foundation, Hearsay |
| PX1014 | | | nocomp_IL_return | | Y | Foundation, Hearsay |
| PX1015 | | | nocomp_NC_return | | Y | Foundation, Hearsay |
| PX1016 | | | nocomp_OH_return | | Y | Foundation, Hearsay |
| PX1017 | | | noeng_CA_return | | Y | Foundation, Hearsay |
| PX1018 | | | noeng_OH_return | | Y | Foundation, Hearsay |
| PX1019 | | | noeng_IL_return | | Y | Foundation, Hearsay |
| PX1020 | | | noeng_NC_return | | Y | Foundation, Hearsay |
| PX1021 | | | postcrc_OH_return | | Y | Foundation, Hearsay |
| PX1022 | | | tenaya_IL_return | | Y | Foundation, Hearsay |
| PX1023 | | | tenaya_NC_return | | Y | Foundation, Hearsay |
| PX1024 | | | tenaya_OH_return | | Y | Foundation, Hearsay |
| PX1025 | | | tenaya_CA_return | | Y | Foundation, Hearsay |
| PX1026 | | 12/31/2012 | Declaration of Dr. Richard C. Cooper (d/e 223) | | Y | Hearsay |
| PX1032 | | 2/17/2015 | Warnick v. Dish, 12-cv-01952, d/e 274 | | Y | Hearsay, Relevance |
| PX1033 | DISH-PAPER-016330 | 5/11/2007 | Fax from Musso to Brandvein | Y | Y | |

**20151204 Revised ATTACHMENT K**

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1034 | DISH-PAPER-012148 | 5/23/2007 | Fax from EchoStar to Brandvein | | Y | Hearsay |
| PX1035 | DISH5-0000102801 | 1/30/2007 | E-mails between Oberbillig, Werner, et al. | | Y | Hearsay, Foundation |
| PX1036 | DISH5-0000069170 | 12/21/2009 | E-mails between Ahmed, Neylon et al. | | Y | Foundation |
| PX1037 | DISH5-0000069424 | 10/31/2011 | E-mails between Ahmed, Twigg-Lyons et al. | Y | Y | |
| PX1038 | DISH-00009089 | 3/11/2004 | E-mails between Binns, Larson et al. | Y | Y | |
| PX1039 | DISH-PAPER-013099 | 5/22/2006 | SSN Retailer Audit Notification & Summary | Y | Y | |
| PX1040 | DISH5-0000005797 | 11/18/2010 | E-mails between Dansby, "TCPA", et al. | | Y | Hearsay |
| PX1041 | DISH2-0000037044 | 9/25/2006 | E-mails between Musso, Vendor Inquiries, et al. | | | |
| PX1042 | DISH-PAPER-013108 | | SSN Duplicate Accounts | | Y | Relevance |
| PX1043 | DISH5-0000011151 | 8/10/2006 | E-mails between Neylon, Origer, et al. | | Y | Hearsay, Incomplete Document |
| PX1044 | DISH5-0000111653 | 8/14/2006 | E-mails between Neylon, Mills, et al. | | Y | Incomplete Document |
| PX1045 | DISH5-0000111962 | 10/10/2006 | E-mails between Mills, Neylon, et al. | | Y | Incomplete Document, Hearsay |
| PX1046 | DISH5-0000112499 | 12/11/2006 | Summary – Retail Services describing OE Monitoring Review, call uploading, live monitoring, onsite call monitoring, secret shopping | | Y | Hearsay |
| PX1047 | DISH-00000077 | 2/27/2007 | Quality Assurance manual for FSD, describes QA program post JSR termination (early 2007) includes Scoring Definitions; letter sent to all OE Retailers | Y | Y | |
| PX1048 | DISH5-0000022206 | | OE Partner QA Action Plans | | Y | Hearsay |
| PX1049 | DISH-00007937 | 6/30/2008 | E-mails between Musso, Garrow, et al. | | Y | Hearsay |
| PX1050 | DISH5-0000000965 | 7/19/2009 | Letter from Musso to Jones | | Y | Hearsay, Foundation |
| PX1051 | FTC003-044898 | | Facts Blast including prohibition of 3rd party affiliates w/o express consent | Y | Y | |
| PX1052 | DISH5-0000000145 | 10/13/2008 | E-mails between Musso, Mills, et al. | Y | Y | |
| PX1053 | FTC002-006687 | | Declaration of Lynette Bowen | | Y | Hearsay |
| PX1054 | FTC339-000001 | | CD of conversation between consumer Lynette Bowen and Dish | | Y | Relevance, Hearsay, Foundation |
| PX1055 | | | JSR OE Retailer Agreement Amendment (Sponsler Ex. 4) | Y | Y | |
| PX1056 | | 9/28/2012 | DISH SIEBEL Database Produced 09/28/2012 | | Y | Relevance, Foundation, Hearsay |
| PX1057 | DISHNETWORK-FTC-0018567 | | Agreement for Consulting Services between National Satellite & CompliancePoint | Y | Y | |
| PX1058 | DEFENDER-06653 | | Defender Direct Call Center Telemarketing Compliance Assessment | Y | Y | |
| PX1059 | DISH8-0003216 | | Meeting Appointment with Musso, Stanton, et al. | | Y | Incomplete Document |
| PX1060 | | 9/28/2012 | DISH Salescomm Database Produced 09/28/2012 | | Y | Relevance, Foundation, Hearsay |
| PX1061 | DISHNETWORK-FTC-0020013 | 7/8/2010 | E-mails between Blum, Kitei, et al. | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1062 | DISH2-0000001015 | 1/9/2007 | Letter from Samini & Associates to Echostar | | Y | Hearsay |
| PX1063 | | 5/21/2008 | Letter from Rose to Deitch (Taylor Ex. 5) | | Y | Rule 408, Hearsay |
| PX1064 | FTC003-043732 | | Specification 14-New Edge Satellite | | N | Authenticity, Hearsay |
| PX1065 | DISH-PAPER-013137 | 4/11/2003 | Letter from Carlson to Tehranchi | | Y | Hearsay |
| PX1066 | | | Retailer Request to Use Third Party Vendor (Werner Ex. 429) | Y | Y | |
| PX1067 | DISH-PAPER-013167 | | SSN Duplicate Accounts charge back script | | Y | Relevance |
| PX1068 | DISH5-0000006822 | 10/3/2006 | E-mails between Brandvein, Musso, et al. | | Y | Hearsay |
| PX1069 | DISH2-0000036108 | 9/21/2006 | E-mails between Vendor Inquiries, Hargan, et al. | | Y | Incomplete Document |
| PX1070 | DISH3-0000000353 | 2/9/2007 | JSR Incentive Payment Report | | Y | Hearsay |
| PX1071 | DISH5-0000012391 | 9/21/2006 | E-mails between Hargan, Vendor Inquiries, et al. | Y | Y | |
| PX1072 | DISH5-0000030224 | 12/9/2010 | EchoStar Response to South Dakota Public Utilities Commission Staff First Set of Interrogatories and Requests to Produce Documents | | Y | Hearsay, Relevance |
| PX1073 | DISH5-0000031642 | 2/9/2007 | E-mails between Musso, Werner, et al. | | Y | Hearsay |
| PX1074 | DISH5-0000031674 | | Letter from JSR Enterprises to Musso | | Y | Hearsay, Duplicative Document |
| PX1075 | DISH5-0000031684 | 1/17/2007 | Letter from Origer to Goodale | | Y | Hearsay |
| PX1076 | DISH5-0000033838 | 7/27/2006 | Letter from Steele to Vermont Attorney General w/ response to Civil Investigative Subpoena | Y | Y | |
| PX1077 | DISH5-0000033901 | 6/28/2006 | Vermont Attorney Civil Investigative Subpoena | | Y | Hearsay |
| PX1078 | DISH5-0000033911 | 11/10/2005 | Letter from Vermont Attorney General to Echostar Communications Corp. | | Y | Hearsay |
| PX1079 | DISH5-0000074171 | 1/11/2011 | E-mails between Montano, "joey@ecreekgroup.com," et al. | | Y | Hearsay |
| PX1080 | DISH5-0000077658 | 7/28/2006 | E-mails between Holcomb, Metzger, et al. | Y | Y | |
| PX1081 | DISH5-0000102530 | 8/23/2007 | E-mails between Mason, Werner, et al. | | Y | Hearsay |
| PX1082 | DISH5-0000112292 | | TCPA Retailers Report | | Y | Hearsay |
| PX1083 | DISH5-0000112664 | 2/8/2007 | E-mails between Origer, Neylon, et al. | | Y | Hearsay |
| PX1084 | DISH9-0000623 | | Jeffrey Mitchell Account Info | Y | Y | |
| PX1085 | DISH11-026807 | 1/17/2007 | Letter from Origer to Tehranchi | | Y | Hearsay |
| PX1086 | DISH11-030980 | 5/28/2009 | E-mails between "patty@yourdish.tv," Snyder, et al. | | Y | Hearsay |
| PX1088 | | 6/30/2012 | Dish 10-Q for second quarter ending June 30, 2012 | Y | Y | |
| PX1089 | | 3/31/2011 | Dish 10-Q for first quarter ending March 31, 2011 | Y | Y | |
| PX1090 | | 6/30/2011 | Dish 10-Q for second quarter ending June 30, 2011 | Y | Y | |
| PX1091 | | 9/30/2011 | Dish 10-Q for third quarter ending Sept. 30, 2011 | Y | Y | |
| PX1092 | | 12/31/2011 | Dish 10-K for year ending Dec. 31, 2011 | Y | Y | |
| PX1093 | | 12/31/2011 | Dish Annual Report for year ending Dec. 31, 2011 | Y | Y | |
| PX1095 | | 5/23/2010 | Record of DNC Complaint from Consumer Jutla (Jutla Ex. 3) | | Y | Hearsay, Foundation |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1096 | DISH11-024382 | 12/19/2006 | E-mails between Musso, Goodale, et al. | | Y | Incomplete Document |
| PX1097 | DISH5-0000015153 | 12/20/2006 | E-mail from Musso to "voice@jsrsatellite.com" | | Y | Duplicative Document; Hearsay |
| PX1098 | DISH5-0000015166 | 12/20/2006 | E-mails between Musso, "voice@jsrsatellite.com", et al. | | Y | Duplicative Document; Hearsay |
| PX1099 | JSR001-003328 | 12/20/2006 | E-mails between Musso, "voice@jsrsatellite.com", et al. | | Y | Hearsay, Foundation |
| PX1100 | JSR001-003376 | 12/22/2006 | E-mail from POESupport | | Y | Incomplete Document |
| PX1101 | JSR001-003324 | 12/27/2006 | E-mails between Musso, "voice@jsrsatellite.com", et al. | Y | Y | |
| PX1102 | JSR001-003375 | 12/27/2006 | E-mail from POESupport | Y | Y | |
| PX1103 | JSR001-003374 | 12/29/2006 | E-mails between Willis, "escalations@jsrsatellite.com", et al. | | Y | Hearsay |
| PX1104 | JSR001-003323 | 12/29/2006 | E-mails between Musso, "voice@jsrsatellite.com," et al. | Y | Y | |
| PX1105 | DISH5-0000031656 | 1/5/2007 | E-mails between Musso, Mills, et al. | | Y | Hearsay |
| PX1106 | DISH5-0000031659 | 1/4/2007 | E-mails between Musso, Mills, et al. | | Y | Hearsay |
| PX1107 | JSR001-003370 | 1/4/2007 | E-mail from POESupport | Y | Y | |
| PX1108 | JSR001-003355 | 1/8/2007 | E-mails between Tchang, "voice@jsrsatellite.com", et al. | Y | Y | |
| PX1109 | JSR001-003356 | 1/8/2007 | E-mails between Bye, "escalations@jsrsatellite.com", et al. | | Y | Hearsay |
| PX1110 | JSR001-003357 | 1/8/2007 | E-mails between Willis, "voice@jsrsatellite.com", et al. | Y | Y | |
| PX1111 | JSR001-003452 | 1/15/2007 | E-mails between Willis, "escalations@jsrsatellite.com", et al. | | Y | Hearsay |
| PX1112 | JSR001-003448 | 1/16/2007 | E-mails between Henry, "voice@jsrsatellite.com," et al. | | Y | Hearsay |
| PX1113 | DISH2-0000000911 | 1/17/2007 | E-mails between Musso, "voice@jsrsatellite.com", et al. | Y | Y | |
| PX1114 | DISH11-024405 | 1/17/2007 | E-mails between Musso, "voice@jsrsatellite.com", et al. | Y | Y | Duplicative Document |
| PX1115 | DISH11-021212 | 1/17/2007 | E-mails between Musso, "voice@jsrsatellite.com", et al. | Y | Y | Duplicative Document |
| PX1116 | DISH5-0000015177 | 1/17/2007 | E-mails between Musso, "voice@jsrsatellite.com", et al. | Y | Y | Duplicative Document |
| PX1117 | JSR001-003437 | 1/17/2007 | Letter from Origer to Goodale--JSR_L5_1.17.06._LA AG.doc | Y | Y | Duplicative Document |
| PX1118 | JSR001-003405 | 1/23/2007 | E-mails between Bye, "escalations@jsrsatellite.com", et al. | Y | Y | Relevance |
| PX1119 | JSR001-003380 | 1/26/2007 | E-mail from POESupport | Y | Y | |
| PX1120 | JSR001-003382 | 1/26/2007 | E-mail from POESupport | Y | Y | |
| PX1121 | JSR001-003637 | 1/30/2007 | E-mails between Musso, "voice@JSRsatellite.com", et al. | Y | Y | |
| PX1122 | JSR001-003622 | 1/31/2007 | E-mail from POESupport | Y | Y | |
| PX1123 | JSR001-003631 | 1/31/2007 | E-mail from POESupport | Y | Y | |
| PX1124 | JSR001-003618 | 2/1/2007 | E-mail from POESupport | Y | Y | |
| PX1125 | JSR001-003612 | 2/2/2007 | E-mail from POESupport | Y | Y | |
| PX1126 | JSR001-003568 | 2/8/2007 | E-mail from POESupport | Y | Y | |
| PX1127 | JSR001-003561 | 2/12/2007 | E-mails between POESupport, Aerowave, et al. | Y | Y | |
| PX1128 | JSR001-003559 | 2/13/2007 | E-mail from POESupport | Y | Y | |
| PX1129 | JSR001-003558 | 2/14/2007 | E-mail from POESupport | Y | Y | |
| PX1130 | JSR001-003490 | 3/6/2007 | E-mails between Portela, "undisclosed-recipients," et al. | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1131 | | 7/21/2005 | FTC Civil Investigative Demand (Reply to Motion for Sanctions Ex 3A) | | Y | Hearsay |
| PX1132 | DISH5-0000076387 | 8/21/2006 | E-mails between Werner, Metzger, et al. | Y | Y | |
| PX1133 | DISH-PAPER-000482 | | Jerry Dean Grider DBA JSR Enterprises label | Y | Y | |
| PX1134 | DISH-PAPER-014376 | | Jerry Dean Grider DBA JSR Enterprises folder | Y | Y | |
| PX1135 | DISH5-0001012546 | 12/21/2006 | E-mails between Musso, Neylon, et al. | | Y | Hearsay |
| PX1136 | DISH5-0000030771 | 1/29/2007 | Mississippi Public Service Commission v. EchoStar Satellite, LLC Complaint | | Y | Hearsay |
| PX1137 | DISH5-0000038297 | 9/29/2006 | E-mails between Musso, Mills, et al. | Y | Y | |
| PX1138 | DISH5-0000111189 | 8/11/2006 | E-mails between POESupport, Aerowave, et al. | | Y | Hearsay |
| PX1139 | DISH9-0007328 | | Agency T&Cs Q1 2007 Release | Y | Y | |
| PX1140 | DISH-PAPER-023171 | 3/19/2004 | E-mails between Ahmed, Mills, et al. | | Y | Hearsay |
| PX1141 | DISH-PAPER-023162 | 3/25/2004 | E-mails between Ahmed, Novotny, et al. | Y | Y | |
| PX1142 | DISH-PAPER-023172 | 5/27/2004 | E-mails between Ahmed, Mills, et al. | | Y | Hearsay |
| PX1143 | DISH-PAPER-023160 | 7/30/2004 | E-mails between Stallone, Novotny, et al. | Y | Y | |
| PX1144 | DISH-PAPER-023243 | | Retailer Audit Notification & Summary-DISH TV NOW | Y | Y | |
| PX1145 | DISH-PAPER-003806 | 6/17/2004 | E-mails between Kohl, et al. | | Y | Hearsay |
| PX1146 | DISH5-0000011777 | 9/2/2009 | Letter from Ahmed to Levi | Y | Y | |
| PX1147 | DISH-PAPER-014094 | 10/3/2005 | E-mails between Morgan, Irizarry, et al. | | Y | Relevance |
| PX1148 | FTC013-002200 | | Elephant Group website | | Y | Relevance, Hearsay |
| PX1149 | DISH5-0000070270 | 8/18/2009 | E-mails between Calbert, Ahmed, et al. | | Y | Hearsay |
| PX1150 | DISH5-0000010675 | 9/2/2009 | Letter from Ahmed to Aboud | Y | Y | |
| PX1151 | DISH2-0000038635 | 1/8/2010 | E-mails between Musso, Ahmed, et al. | | Y | Hearsay |
| PX1152 | DISH5-0000103682 | 3/27/2010 | E-mails between Ahmed, Neylon, et al. | | Y | Hearsay |
| PX1153 | DISH5-0000069157 | 4/20/2010 | E-mails between Neylon, DeFranco, et al. | | Y | Hearsay |
| PX1154 | DISH5-0000069817 | | Meeting appointment Bahr, Bench, et al. | Y | Y | |
| PX1155 | DISH5-0000069382 | 6/18/2010 | E-mails between Ahmed, Ergen, et al. | Y | Y | |
| PX1156 | DISH5-0000011769 | | Known Meetings Ahmed, Neylon, et al. | | Y | Hearsay |
| PX1157 | DISH5-0000069280 | 3/25/2011 | E-mails between DeFranco, Ahmed, et al. | | Y | Hearsay, Relevance |
| PX1158 | DISH5-0000069389 | 10/10/2011 | E-mails between Luth, Ahmed, et al. | | Y | Relevance |
| PX1159 | DISH5-0000108059 | 3/11/2002 | E-mails between Meyers, Neylon, et al. (Ahmed Ex. 8 (Krakauer v. Dish)) | | Y | Hearsay |
| PX1160 | DISH5-0000102798 | 1/30/2007 | E-mails between Oberbillig, Werner, et al. (Ahmed Ex. 15 (Krakauer v. Dish)) | | Y | Hearsay |
| PX1161 | | 12/15/2010 | Notice for Deposition (Bangert Ex. 101) | | Y | Hearsay |
| PX1162 | | 12/15/2010 | Notice for Deposition (Bangert Ex. 102) | | Y | Hearsay |
| PX1163 | DISH-00006842 | 12/10/2007 | E-mails between Bangert, Davis, et al. | | Y | Incomplete Document |
| PX1164 | DISH-00000735 | | High Level List Processing Flow | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1165 | DISH-00008795 | 6/6/2005 | E-mails between Bangert, Peavy, et al. | Y | Y | |
| PX1166 | DISH-00000691 | | OTM Flows | Y | Y | |
| PX1167 | DISH-00001027 | 6/10/2004 | E-mails between Roman, Bangert, et al. | | Y | Hearsay |
| PX1168 | DISH-00000502 | 4/24/2007 | Letter from Bappe to Hannam (Pennsylvania Attorney General) | Y | Y | |
| PX1169 | DISH-00002144 | | Echostar eCreek Outbound Start Up Business Requirements Document (BRD) | Y | Y | |
| PX1170 | DISH-00000832 | | PossibleNOW Process Insert to Echostar OB Telemarketing DNC Suppression | Y | Y | |
| PX1171 | DISH-00006050 | 2/4/2009 | E-mails between Montano, Davis, et al. | | Y | Incomplete Document |
| PX1172 | DISH-00006055 | 12/16/2008 | E-mails between Davis, Sowers, et al. | | Y | Hearsay |
| PX1173 | DISH-00001361 | 5/13/2005 | E-mails between Bragalone, Benvenuto, et al. | | Y | Hearsay |
| PX1174 | | 4/18/2012 | Notice for Deposition (Bangert Ex. 450) | | Y | Hearsay |
| PX1175 | | 4/18/2012 | Notice for Deposition (Bangert Ex. 451) | | Y | Hearsay |
| PX1176 | DISH5-0000066928 | 9/17/2003 | E-mails between Binns, Richardson, et al. | Y | Y | |
| PX1177 | DISH5-0000066915 | 9/18/2003 | E-mails between Binns, Hays, et al. | Y | Y | |
| PX1178 | DISH5-0000066954 | 10/7/2003 | E-mails between Pacini, Pacini, et al. | Y | Y | |
| PX1179 | DISH5-0000066951 | 10/13/2003 | E-mails between Pacini, Pacini, et al. | Y | Y | |
| PX1180 | DISH5-0000090713 | 8/29/2011 | E-mails between Leleck, Van Emst, et al. | | Y | Hearsay |
| PX1181 | DISH5-0000074725 | 6/15/2011 | E-mails between Dexter, Kuehn, et al. | Y | Y | |
| PX1182 | DISH5-0000066656 | 5/30/2007 | E-mails between Carlson, Pacini, et al. | | Y | Hearsay, Foundation |
| PX1183 | | 12/15/2010 | Notice of Deposition (Davis Ex. 101) | | Y | Hearsay |
| PX1184 | | 12/15/2010 | Notice of Deposition (Davis Ex. 102) | | Y | Hearsay |
| PX1185 | DISH-00006843 | | EchoStar Satellite DNC Telemarketing Vendor Guidelines | Y | Y | |
| PX1186 | DISH-00002092 | | 1st Amendment to Service Agreement between eCreek Services and EchoStar Satellite | Y | Y | |
| PX1187 | DISH2-0000039678 | 9/1/2009 | E-mails between Musso, Davis, et al. | | Y | Hearsay |
| PX1188 | DISH-00002084 | | eCreek Solutions Group "DNC" Policy | Y | Y | |
| PX1189 | DISH-00006049 | 1/20/2009 | E-mails between Hollida, Strater, et al. | | Y | Hearsay |
| PX1190 | DISH2-0000038239 | 3/2/2010 | E-mails between Davis, Walden, et al. | Y | Y | |
| PX1191 | DISH-00000719 | | Flowchart of Technical Solution Overview | Y | Y | |
| PX1192 | DISH-00006188 | 1/4/2008 | E-mails between Downey, Thompson, et al. | Y | Y | |
| PX1193 | DISH-00006770 | 4/3/2009 | E-mails between Laslo, Montano, et al. | | Y | Hearsay |
| PX1194 | DISH-00008737 | 3/31/2009 | E-mails between Montano, Gogineni, et al. | | Y | Hearsay |
| PX1195 | | | DNC listing (Davis Ex. 135) | Y | Y | |
| PX1196 | DISH-00000645 | 8/8/2008 | Letter from Hall to Dobos | Y | Y | |
| PX1197 | DISH-00006060 | 12/15/2008 | E-mails between Davis, Wells, et al. | Y | Y | |
| PX1198 | DISH2-0000038554 | 5/22/2009 | E-mails between Delaney, Davis, et al. | | Y | Hearsay |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1199 | | | Notice of Deposition (Mills Ex. 470) | | Y | Hearsay |
| PX1200 | DISH5-0000111510 | 8/10/2006 | E-mails between Neylon and Origer et al. | | Y | Hearsay |
| PX1201 | DISH5-0000111428 | 9/12/2006 | E-mails between Origer and Neylon et al. | Y | Y | |
| PX1202 | DISH5-0000025361 | | Risk Summary--TCPA/Disclosures | | Y | Hearsay |
| PX1203 | DISH5-0000112407 | 11/17/2006 | E-mails between Henderson and Musso et al. | | Y | Hearsay |
| PX1204 | DISH5-0000112419 | 11/19/2006 | E-mails between Origer and Musso et al. | | Y | Hearsay |
| PX1205 | DISH5-0000107278 | 9/5/2007 | E-mail from Mills to Neylon | | Y | Incomplete Document, Hearsay |
| PX1206 | DISH5-0000102776 | 6/8/2007 | E-mails between Musso and Origer et al. | Y | Y | |
| PX1207 | DISH5-0000107150 | 7/17/2007 | E-mails between Mills and Ballard et al. | | Y | Hearsay |
| PX1208 | FTC003-044564 | | Dish Order Entry Tool | Y | Y | |
| PX1209 | DISH5-0000111663 | | Retailer Name spreadsheet authored by EchoStar | Y | Y | |
| PX1210 | DISH5-0000040857 | | Account Setup spreadsheet authored by Robb Origer | Y | Y | |
| PX1211 | DISH5-0000105450 | | Activations tracking grid | Y | Y | |
| PX1212 | DISH5-0000022147 | | OE retailers spreadsheet | Y | Y | |
| PX1213 | DISH5-0000022303 | | Covard-Schuster spreadsheet authored by Gary Dickinson | Y | Y | |
| PX1214 | DISH5-0000105424 | | Excel spreadsheet authored by Patrick Joyce | Y | Y | |
| PX1215 | DISH5-0000070006 | 8/6/2009 | E-mails between Wicklein, Neylon et al. | Y | Y | |
| PX1216 | DISH-00007655 | 1/19/2009 | E-mails between Musso, Taber, et al. | | Y | Hearsay |
| PX1217 | DISH-00007734 | 9/10/2008 | E-mails from Musso, Mills, et al. | Y | Y | |
| PX1218 | DISH5-0000105673 | 12/21/2011 | E-mails between Werner, Luth et al. | | Y | Hearsay |
| PX1219 | DISH8-0003528 | 11/21/2007 | E-mails between Davis, Pastorius, et al. | Y | Y | |
| PX1220 | DISH5-0000107331 | 7/18/2007 | E-mails between Lindsey, Lindsey et al. | | Y | Hearsay |
| PX1221 | DISH5-0000007210 | 12/16/2009 | Letter from Van Emst to Lindsey | Y | Y | |
| PX1222 | DISH5-0000114541 | 3/7/2009 | E-mails between Pichhione and Calbert et al. | Y | Y | |
| PX1223 | DISH5-0000114544 | 3/7/2009 | E-mails between McElroy and Defranco et al. | Y | Y | |
| PX1224 | DISH5-0000114610 | 3/3/2009 | E-mails between DeFranco and Pardieck et al. | | Y | Hearsay |
| PX1225 | DISH9-0005005 | | Meeting request | Y | Y | |
| PX1226 | DISH5-0000090728 | 9/12/2011 | E-mails between Jessen and Leleck et al. | | Y | Hearsay |
| PX1227 | DISH9-0013048 | 9/19/2011 | E-mails between Slater and Durham et al. | | Y | Hearsay |
| PX1228 | DISH9-0013088 | 9/19/2011 | E-mails between Hambly and Chin et al. | | Y | Hearsay |
| PX1229 | DISH9-0013081 | 9/28/2011 | E-mails from Hambly, Durham, et al. | | Y | Hearsay |
| PX1230 | | | Notice of 30(b)(6) Deposition of Dish Network with attached Exhibit A (Mills Ex. 90 (Donaca v. Dish)) | | Y | Hearsay |
| PX1231 | DISH-00001011 | 1/1/2007 | EchoStar Retailer Agreement with Marketing Guru Inc | Y | Y | |
| PX1232 | DISH-00004187 | 11/11/2006 | Facts Blast | | Y | Hearsay |
| PX1234 | DISH5-000031814 | 7/17/2006 | Letter from Origer to Tehranchi (Mills Ex. 22 (Krakauer v. Dish)) | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1235 | DISH5-0000115401 | 11/20/2009 | E-mails between Musso, "sophie@yourdish.tv," et al. (Mills Ex. 41 (Krakauer v. Dish)) | | Y | Hearsay |
| PX1236 | DISH5-0000126306 | 4/14/2011 | E-mail from Musso to King, et al. (Mills Ex. 62 (Krakauer v. Dish)) | | Y | Hearsay, Foundation; Incomplete Document |
| PX1239 | DISH5-0000104405 | 7/18/2011 | E-mail to Mills from Taber, (Mills Ex. 71 (Krakauer v. Dish)) | | Y | Incomplete Document |
| PX1240 | DISH5-00001040602 | 8/19/2011 | E-mail to Neylon from Mills, (Mills Ex. 73 (Krakauer v. Dish)) | | Y | Relevance |
| PX1243 | | 7/26/2012 | John Taylor Expert Report (Montano Ex. 1) | Y | Y | |
| PX1244 | DISH2-0000039359 | | Calling Time Restrictions Commerical Telephone Calls | | Y | Hearsay |
| PX1245 | DISH2-0000038080 | 7/27/2010 | E-mails between "dncsolution", "CSC-OutboundOperations", et al. | Y | Y | |
| PX1246 | DISH2-0000001321 | 7/26/2010 | E-mails between Flores, "TCPA", et al. | | Y | Hearsay |
| PX1247 | DISH2-0000039300 | 9/21/2006 | E-mails between Faucett, Montano, et al. | | Y | Hearsay, Foundation |
| PX1248 | DISH2-0000038412 | 3/15/2011 | Dish Project Scope Document Project; Adding EBR Scrub Tables to PDIALER | Y | Y | |
| PX1249 | | 9/19/2012 | Letter from Boyle to Hsiao (Montano Ex. 3) | Y | Y | |
| PX1250 | | | Dish Network Interrogatory Responses (Montano Ex. 1 (Warnick v. Dish)) | | Y | Hearsay |
| PX1251 | | | DNC Report (Montano Ex. 3 (Warnick v. Dish)) | Y | Y | |
| PX1252 | | | Automated Number Identification-Inbound call data to Dish IVR (Montano Ex. 6 (Warnick v. Dish)) | Y | Y | |
| PX1253 | | | Screenshot of GUI that returns call result information; Brio/Hyperion system Query by phone number (Montano Ex. 7 (Warnick v. Dish)) | Y | Y | |
| PX1254 | | | Screenshot of Dish promo system (Montano Ex. 8 (Warnick v. Dish)) | Y | Y | |
| PX1255 | | | eCreek Solutions Group DNC request (Montano Ex. 9 (Warnick v. Dish)) | Y | Y | |
| PX1256 | | | Subscriber Agreement (Montano Ex. 12 (Warnick v. Dish)) | Y | Y | |
| PX1257 | | | OnQ campaign manager features (includes page 1657) (Montano Ex. 15 (Warnick v. Dish)) | | Y | Hearsay |
| PX1258 | | | Manual for ERT DNC tracker (Montano Ex. 17 (Warnick v. Dish)) | Y | Y | |
| PX1259 | | | TCPA Process Flowchart (Montano Ex. 18 (Warnick v. Dish)) | | Y | Foundation |
| PX1260 | | | Do Not Call Review (Montano Ex. 19 (Warnick v. Dish)) | Y | Y | |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1261 | | | Do not call uptraining document for CSRs (Montano Ex. 20 (Warnick v. Dish)) | Y | Y | |
| PX1262 | | | Do not contact procedures (Montano Ex. 21 (Warnick v. Dish)) | | Y | Foundation |
| PX1263 | | | OnQ 3.2.2 Administration and Configuration Guide (Montano Ex. 22 (Warnick v. Dish)) | | Y | Hearsay |
| PX1264 | DISH5-0000000062 | 8/27/2008 | E-mails between Punhani, Werner, et al. | | Y | Hearsay |
| PX1265 | DISH2-0000035643 | 6/27/2007 | E-mails between Musso, vendor inquiries, et al. | Y | Y | |
| PX1266 | DISH2-0000036875 | 12/31/2007 | E-mails between Musso, vendor inquiries, et al. | | Y | Hearsay |
| PX1267 | DISH-00007902 | 1/24/2007 | POE Notices Current | Y | Y | |
| PX1268 | DISH-00007501 | 3/11/2009 | E-mail between Musso, Werner et al. | | Y | Hearsay |
| PX1269 | DISH5-0000000103 | 3/12/2009 | E-mails between Musso, Van Emst, et al. | | Y | Hearsay |
| PX1270 | DISH-00006127 | 3/11/2009 | E-mails between Musso, Werner, et al. | | Y | Hearsay |
| PX1271 | DISH5-0000016033 | 3/7/2009 | All Granted Affiliates.xls | | Y | Hearsay |
| PX1272 | DISH5-0000016036 | 3/7/2009 | Master Consent Denied JP Changes.xls | | Y | Hearsay |
| PX1273 | DISH5-0000016038 | 9/20/2007 | Comprehensive WIP.xls | | Y | Hearsay |
| PX1274 | DISH5-0000016019 | 12/13/2007 | Comprehensive Active 12-13-07.xls | | Y | Hearsay |
| PX1275 | DISH5-0000014413 | 1/24/2007 | E-mails between Musso, Trimarco, et al. | | Y | Hearsay |
| PX1276 | DISH5-0000014143 | 4/11/2007 | DP-Synopsis(Hays).xls | | Y | Hearsay |
| PX1277 | NSS-23504 | 1/25/2009 | E-mails between Vimal, Juneja, et al. | | Y | Hearsay |
| PX1278 | DISH5-0000022219 | 3/6/2010 | High Level QA Summary WE 2010.03.05.xls | Y | Y | |
| PX1279 | DISH-00007444 | 10/24/2008 | E-mails between Snyder, Phalen, et al. | | Y | Hearsay |
| PX1280 | DISH5-0000000204 | 8/5/2009 | E-mails between Musso, Jones, et al. | | Y | Hearsay |
| PX1281 | DISH2-0000001108 | 3/2/2010 | Risk Management TS 2010 V11.pptm | Y | Y | |
| PX1282 | | | Musso Ex. 93 (Donaca v. Dish) | Y | Y | |
| PX1283 | | | Musso Ex. 94 (Donaca v. Dish) | Y | Y | |
| PX1284 | DISH-014389 | 7/22/2009 | Musso Ex. 95 (Donaca v. Dish) | | Y | Incomplete Document |
| PX1285 | DISH5-0000087397 | 7/29/2008 | Musso Ex. 96 (Donaca v. Dish) | | Y | Hearsay, Foundation |
| PX1286 | DISH3-0000000495 | 8/7/2009 | Musso Ex. 97 (Donaca v. Dish) | | Y | Hearsay, Foundation |
| PX1287 | DISH-PAPER-024092 | | Musso Ex. 98 (Donaca v. Dish) | | Y | Hearsay |
| PX1288 | DISH-004186 | 3/14/2007 | Musso Ex. 100 (Donaca v. Dish) | Y | Y | |
| PX1289 | DISH2-0000035614 | 7/30/2009 | Musso Ex. 101 (Donaca v. Dish) | | Y | Hearsay |
| PX1290 | DISH-015692 | 3/3/2009 | Musso Ex. 102 (Donaca v. Dish) | | Y | Hearsay |
| PX1293 | DISH5-0000102801 | 1/30/2007 | E-mail from Oberbilling to Werner (Oberbillig Ex. 17 (Krakauer v. Dish)) | | Y | Hearsay |
| PX1294 | DISH5-0000119736 | 2010 | E-mails between Quader, Rukas, et al. (Oberbillig Ex. 60 (Krakauer v. Dish)) | | Y | Hearsay |
| PX1296 | DISH5-0000031652 | 1/10/2007 | E-mails between Musso, Origer, et al. | | Y | Hearsay |

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1297 | FTC003-044542 | 11/8/2004 | E-mail from Portela | Y | Y | |
| PX1298 | DISH5-0000007628 | 6/25/2007 | Letter from Thomas to Dish Network | | Y | Hearsay |
| PX1299 | DISH5-0000038053 | 3/27/2007 | Letter from Austin to Steele | | Y | Hearsay, Foundation |
| PX1300 | DISH-PAPER-016556 | 8/29/2007 | E-mails between Sucharda, Musso, et al. | | Y | Three separate documents |
| PX1301 | DISH-PAPER-021700 | 10/8/2007 | E-mails between Origer, Werner, et al. | | Y | Hearsay, Incomplete Document |
| PX1302 | DISH-PAPER-021701 | 10/10/2007 | E-mails between Shawn, Werner, et al. | | Y | Hearsay |
| PX1303 | DISH-PAPER-014010 | 11/3/2007 | E-mails between Neylon, Origer, et al. | | Y | Hearsay |
| PX1304 | DISH5-0000040354 | 5/15/2008 | Letter Van Emst to Cactus Concepts | Y | Y | |
| PX1305 | DISH5-0000087118 | | Retailer Request to Use Third Party Vendor | | Y | Hearsay |
| PX1306 | DISH5-0000000013 | 9/5/2008 | E-mails between McElroy, Werner, et al. | | Y | Hearsay |
| PX1307 | | 9/28/2012 | E-mails between Runkle, Stauffer, et al. (Stauffer Ex. 50) | Y | Y | |
| PX1308 | | 9/28/2012 | Letter from Hsiao to Stauffer (Stauffer Ex. 51) | Y | Y | |
| PX1309 | | | List of phone numbers (Stauffer Ex. 52) | | Y | Hearsay |
| PX1310 | | 10/1/2012 | Letter from Stauffer to Hsiao (Stauffer Ex. 53) | Y | Y | |
| PX1311 | | 10/9/2012 | E-mails between Webster, Hsiao, et al. (Stauffer Ex. 54) | Y | Y | |
| PX1312 | | | Declaration of Rick Stauffer (Stauffer Ex. 55) | Y | Y | |
| PX1313 | | | QA Report (Stauffer Ex. 56) | Y | Y | |
| PX1314 | | | QA Report (Stauffer Ex. 57) | Y | Y | |
| PX1315 | | 10/9/2012 | DOJ Results Report Summary (Stauffer Ex. 58) | Y | Y | |
| PX1316 | | 10/15/2012 | E-mails between Hsiao, Stauffer, et al. (Stauffer Ex. 59) | Y | Y | |
| PX1317 | | | Declaration of Rick Stauffer (Stauffer Ex. 60) | Y | Y | |
| PX1318 | | | PossibleNow Invoice No. DS3327 (Stauffer Ex. 61) | Y | Y | |
| PX1319 | | 10/16/2012 | Rebuttal Report by Dr. Erez Yoeli (Stauffer Ex. 62) | Y | Y | |
| PX1320 | | | DOJ Report 1015.xlsx Summary (Stauffer Ex. 63) | Y | Y | |
| PX1321 | | | Quality Assurance File (Stauffer Ex. 64) | Y | Y | |
| PX1322 | | | Calls 0710 Sample 1014 APN Results (Stauffer Ex. 65) | Y | Y | |
| PX1323 | | | Wow TV Sample PN Results (Stauffer Ex. 66) | Y | Y | |
| PX1324 | | | Tenaya Sample (Stauffer Ex. 67) | | Y | Hearsay, Relevance |
| PX1325 | | | Sample 03 ATPN Results (Stauffer Ex. 68) | Y | Y | |
| PX1326 | | | Calls 0710 (Stauffer Ex. 69) | Y | Y | |
| PX1327 | DISH5-0000012550 | 5/27/2009 | Letter from Musso to Tehranchi (Tehranchi Ex. 131 (Donaca v. Dish)) | | Y | Hearsay |
| PX1328 | DISH5-0000104159 | 6/7/2011 | E-mails between WC Admin, Taber, et al. (Tehranchi Ex. 134 (Donaca v. Dish)) | Y | Y | |
| PX1329 | | 8/19/2013 | Declaration of Sophie Tehranchi (Tehranchi Ex. 129 (Donaca v. Dish)) | | Y | Hearsay |
| PX1330 | DISH11-030980 | 5/28/2009 | E-mails between patty@yourdish.tv, Snyder, et al. Tehranchi Ex. 150 (Donaca v. Dish) | | Y | Hearsay |

**20151204 Revised ATTACHMENT K**

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1333 | | 8/13/2012 | E-mails between Prado, Paronich, et al. (Tehranchi Ex. 156 (Donaca v. Dish)) | | Y | Hearsay, Incomplete Document |
| PX1334 | | 7/14/2008 | Report of DNC Scrub Session (Tehranchi Ex. 140 (Donaca v. Dish)) | Y | Y | |
| PX1339 | DISH-00006718 | | PossibleNOW Retailer Chat | Y | Y | |
| PX1340 | DISH5-0000033755 | | Documents produced in response to Vermont SDT | | Y | Hearsay |
| PX1341 | DISH2-0000036847 | 6/29/2006 | E-mails between Vendor Inquiries, Werner, et al. | | Y | Hearsay |
| PX1342 | DISH5-0000016058 | 11/8/2006 | E-mails between Werner, Musso, et al. | | Y | Hearsay |
| PX1343 | DISH-00007961 | 4/28/2008 | E-mails between Musso, Garrow, et al. | Y | Y | |
| PX1344 | DISH-00007809 | 9/2/2008 | E-mails between Musso, Van Emst, et al. | | Y | Hearsay |
| PX1345 | DISH-00007910 | 9/4/2008 | E-mails between McElroy, Werner, et al. | | Y | Hearsay |
| PX1346 | DISH-00006629 | 9/9/2008 | E-mails between chart@cvssystems.com and Musso, et al. | Y | Y | |
| PX1347 | DISH-00007714 | 9/16/2008 | E-mails between Musso, Van Emst, et al. | | Y | Incomplete Document |
| PX1348 | DISH-00006172 | | Retail Services Risk Management Powerpoint | Y | Y | |
| PX1349 | DISH-00007974 | 12/19/2008 | E-mails between Nelson, Werner, et al. | Y | Y | |
| PX1350 | DISH5-0000037828 | 11/25/2008 | E-mails between Gonzalez, DeFranco, et al. | Y | Y | |
| PX1351 | DISH2-0000000415 | | Executive Summary of Apex Satellite | | Y | Hearsay, Foundation |
| PX1352 | DISH5-0000000054 | 3/25/2009 | E-mails between Werner, Musso, et al. | Y | Y | |
| PX1353 | DISH2-0000001132 | | OE Risk Management Powerpoint | Y | Y | |
| PX1354 | DISH3-0000000497 | 8/7/2009 | E-mails between Werner, Vallejos, et al. | Y | Y | |
| PX1355 | DISH5-0000047110 | 1/26/2010 | E-mails between Werner, Hernandez, et al. | | Y | Relevance |
| PX1356 | DISH2-0000038604 | 5/19/2010 | E-mails between Werner, Reese, et al. | | Y | Hearsay |
| PX1357 | DISH2-0000038630 | 6/22/2010 | E-mails between Werner, Musso, et al. | Y | Y | |
| PX1358 | | | Notice of Deposition (Werner Ex. 418) | | Y | Hearsay |
| PX1359 | DISH5-0000076348 | 7/21/2006 | E-mails between Werner, Metzger, et al. | Y | Y | |
| PX1360 | DISH5-0000076290 | 7/5/2006 | E-mails between Voorhies, Metzger, et al. | | Y | Hearsay |
| PX1361 | DISH5-0000077566 | 7/19/2006 | E-mails between Stingley, Metzger, et al. | | Y | Hearsay |
| PX1362 | DISH-00001986 | | Dish sting process | Y | Y | |
| PX1363 | DISH5-0000102798 | 1/30/2007 | E-mails between Oberbillig, Werner, et al. | | Y | Hearsay |
| PX1364 | DISH-PAPER-016214 | 4/2/2009 | E-mails between Brandvein, Musso, et al. | | Y | Hearsay, Incomplete Document |
| PX1365 | DISH5-0000011552 | | TCPA Synopsis_12.21.07.xls | Y | Y | |
| PX1366 | DISH3-0000000314 | | Post Audit Checklist for JSR Enterprises | Y | Y | |
| PX1367 | DISH5-0000037627 | | Dish chart created by Reji Musso | Y | Y | |
| PX1368 | DISH5-0000007537 | 9/5/2006 | Letter from Larson to Steele | | Y | Hearsay |
| PX1369 | DISH5-0000021526 | | Excel spreadsheet 10-02-09.xls | | Y | Hearsay |
| PX1370 | DISH5-0000087334 | 7/29/2008 | E-mails between Musso, Muenchen, et al. | | Y | Incomplete Document |
| PX1371 | DISH5-0000076493 | 10/2/2006 | E-mails between Musso, Metzger, et al. | | Y | Incomplete Document |
| PX1372 | | 11/26/2008 | E-mails between Van Emst, Knight et al. (Werner Ex. 447) | | Y | Incomplete Document |

**20151204 Revised ATTACHMENT K**

| NO. | BEGINNING BATES | DATE | DESCRIPTION | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | DISH'S OBJECTION(S) |
|---|---|---|---|---|---|---|
| PX1373 | | 10/29/2006 | E-mails between Weber, Whittemore, et al. (Werner Ex. 448) | | Y | Hearsay |
| PX1374 | | 9/30/2011 | Affidavit of Bruce Werner (Werner Ex. 449) | Y | Y | |
| PX1375 | DISH5-0000094968 | 9/30/2011 | E-mails between "VendorInquiries@DishNetwork.com", Zaruba, et al. | | Y | Hearsay |
| DX030 | | 4/24/2012 | PossibleNOW DNC Program for Dish Network Retailers | | Y | Hearsay |
| DX147 | | 3/3/2011 | MSJ Excerpts from Deposition of Robb Origer | | Y | Depositions are to be designated |
| DX150 | | 3/15/2011 | MSJ Excerpts from Deposition of Blake Van Emst | | Y | Depositions are to be designated |
| DX159 | | 3/17/2011 | MSJ Excerpts from Deposition of Marciedes Metzger | | Y | Depositions are to be designated |
| DX164 | | 3/16/2011 | MSJ Excerpts from Deposition of Reji Musso (filed 01/29/2014) | | Y | Depositions are to be designated |
| DX165 | | 9/6/2012 | MSJ Excerpts from 30(b)(6) Deposition of Linda Miller Lavenda | | Y | Depositions are to be designated |
| DX168 | | 2/24/2012 | MSJ Excerpts from Deposition of Walter Eric Myers | | Y | Depositions are to be designated |
| DX170 | | 12/16/2010 | MSJ Excerpts from 30(b)(6) Deposition of Bob Davis Volumes 1 and 2 | | Y | Depositions are to be designated |
| DX198-1 | | 10/16/2012 | Rebuttal Report by Dr. Erez Yoeli (MSJ Exhibit Part 1) | | Y | Hearsay, Relevance, reliability |
| DX198-2 | | 10/16/2012 | Appendix F continued, Appendices G-H (MSJ Exhibit Part 2) | | Y | Hearsay, Relevance, reliability |
| DX198-3 | | 10/16/2012 | Appendix H continued (MSJ Exhibit Part 3) | | Y | Hearsay, Relevance, reliability, Foundation |
| DX217 | | 3/9/2011 | MSJ Excerpts from Deposition of Amy Dexter (filed 01/29/2014) | | Y | Depositions are to be designated |
| DX221 | | 1/3/2014 | Declaration of Henry Kelly | | Y | Hearsay, Relevance |
| DX224 | | 1/27/2014 | Declaration of Mike Mills | Y | Y | |
| DX234 | | 2/5/2014 | Declaration of Bruce Werner | Y | Y | |
| DX302 | | 11/6/2007 | Complaint, US v. Guardian Communications, Kevin Baker, et al. | | Y | Hearsay |
| DX314 | | 1/15/2009 | Complaint, US v. Central Florida Investments, et al. | Y | Y | |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-1 | No Bates | 2/2/2013 | Dish 10-K portions | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-6 | Dish-00001939 | 6/1/2002 | DNC Policy | | | X | Foundation; Hearsay: FRE 802 |
| DTX-7 | DISH2-0000039282 | 7/28/2010 | Email: joey@ecreekgroup com to  Montano, Re: request for DNC-TCPA Policies and Procedures | | | X | Hearsay: FRE 802 |
| DTX-8 | Dish-00006629 | 9/9/2008 | Email from Hart to Musso et al  Re: Engaging your Account Managers and Staff | | | X | Hearsay: FRE 802 |
| DTX-9 | DISH2-0000038646 | 4/9/2010 | Email: R  Dye to J  Valentine et al Re: DNC Training | | | X | Hearsay: FRE 802 |
| DTX-10 | DISH2-0000038650 | Undated | Investigator Process for DNC | | | X | Hearsay: FRE 802 |
| DTX-11 | DISH2-0000037715 | 12/12/2009 | E-Mail: R  Jubenville to #EODNC Re: DNC Training | | | X | Hearsay: FRE 802 |
| DTX-13 | DISH2-0000038647 | Undated | Inbound DNC Process | | | X | Foundation; Hearsay: FRE 802 |
| DTX-14 | Dish-00000126 | Undated | CSC Do Not Call Requests - Dish Network One and Done Service for Customers and | | | X | Hearsay: FRE 802 |
| DTX-16 | DISH5-0000021689 | 12/9/2008 | Presentation - Compliance Risk in B2B Marketing - Dish Network | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-17 | DISH5-0000021632 | Undated | Presentation - DNC Compliance | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-18 | DISH5-0000021738 | 4/12/2007 | Presentation- Do Not Call Compliance Services Echostar | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-19 | DISH2-0000038251 | | Email: J  Montano to I  Falkowski - RE: Call Abandonment Message | | | X | Hearsay: FRE 802 |
| DTX-20 | | 3/4/2011 | Dish Network, DNC Investigation Team Manual | Laslo 170 | | X | Foundation; Hearsay: FRE 802 |
| DTX-24 | DISH2-0000038412 | 3/15/2011 | Dish Network Project Scope Document - Project; Adding EBR Scrub Tables to PDIALER | Montano 291 | | X | Hearsay: FRE 802 |
| DTX-25 | Dish-00006832 | 12/15/2010 | Email: M  Fletcher to #KBS-Corp PB Minutes from Customer Calls and Direct Mail Meetings | Fletcher 108 | | X | Hearsay: FRE 802 |
| DTX-26 | Dish00000719 | 12/16/2010 | Technical Solution Overview - Flowchart of Echostar DNC Process Documents, Collection | Davis 130 | | X | Foundation; Hearsay: FRE 802 |
| DTX-27 | Dish00000735 | 12/15/2010 | Flowchart - High Level List Processing Flow | Bangert 104 | | X | Foundation; Hearsay: FRE 802 |
| DTX-28 | Dish-00000691 | 12/15/2010 | OTM Flows | Bangert 107 | | X | Foundation; Hearsay: FRE 802 |
| DTX-29 | Dish-00006843 | 12/15/2010 | Echostar Satellite LLC DNC - Telemarketing Vendor Guidelines | B  Davis 118 | | X | Foundation; Hearsay: FRE 802 |
| DTX-31 | Dish-00002092 | 8/24/2012 | 1st Amendment to Service Agreement between eCreek Services LLC and Echostar Satellite | B  Davis 120 | | X | Foundation; Hearsay: FRE 802 |
| DTX-32 | DISH5-0000023325 | 3/17/2011 | Dish Network DNC Investigation Team Manual | Metzger 328 | | X | Hearsay: FRE 802 |
| DTX-34 | DISH5-0000006330 | | Email from R  Musso to D  Laslo Re: Unwanted Phone Calls | Metzger 332 | | X | Foundation; Hearsay: FRE 802 |

**20151204 Revised ATTACHMENT L**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-35 | DISH2-0000032321 | 7/13/2009 | Email from M Metzger to D Laslo Re: Do Not Call Policy | Metzger 333 | | X | Foundation; Hearsay: FRE 802 |
| DTX-36 | DISH2-0000032208 | 6/26/2009 | Email from D Laslo to R Musso Re: Upset Customer | Metzger 334 | | X | Foundation; Hearsay: FRE 802 |
| DTX-37 | Dish-00000471 | 5/24/2007 | Letter from A Gutierrez to D Fox Re: Mrs Mary R Ishaq, File No 0705196 288276 | Metzger 335 | | X | Hearsay: FRE 802 |
| DTX-38 | DISH2-0000029022 | 12/27/2006 | Email from R Musso to M Metzger Re: Kortney Heald - Sterling, Customer Complaint | Metzger 338 | | X | Foundation; Hearsay: FRE 802 |
| DTX-39 | DISH2-0000033702 | 9/18/2006 | Email from M Metzger to K McCoy Re: Acct#8255909471195062 Sales Partner Fraud (Nexus Online) | Metzger 345 | | X | Hearsay: FRE 802 |
| DTX-40 | Dish-00000832 | 12/10/2010 | Tracker Flow Chart - PossibleNow Process Insert to; Echostar Outbound Telemarketing | Bangert 113 | | X | Foundation; Hearsay: FRE 802 |
| DTX-41 | DISH5-0000076630 | 10/9/2010 | Email from K Weber to A Whittemore Re: Telemarketing Complaint | Werner 448 | | X | Hearsay: FRE 802 |
| DTX-42 | DISH5-0000077566 | 7/19/2006 | Email from T Stingley to M Metzger Re: Calls to Existing Dish Network Customers | Werner 423 | | X | Hearsay: FRE 802 |
| DTX-43 | Various | 8/30/2007 | Email from TCPA to TCPA Re: Record #665-Myra H - Not a Customer - Collette | Laslo 176 | | X | Hearsay: FRE 802 |
| DTX-44 | DISH5-0000024285 | 3/18/2008 | Letter from Echostar to Individuals Complaining to Attorney General | Laslo 177 | | X | Foundation; Hearsay: FRE 802 |
| DTX-45 | Dish-00000587 | 9/18/2008 | D Lomax Complaint and Echostar Response | Laslo 181 | | X | Foundation; Hearsay: FRE 802 |
| DTX-46 | DISH5-0000024947 | 2/19/2010 | Dish Network Correspondence Relating to Ashley Lancing | Laslo 189 | | X | Foundation; Hearsay: FRE 802 |
| DTX-49 | Dish-00006573 | 9/25/2007 | Email from R Musso to R Origer Re: Echostar Implementation Meeting Follow Up From POSSIBLENOW | Origer 159 | | X | Hearsay: FRE 802 |
| DTX-52 | DISH5-0000038375 | 3/3/2011 | Flow Chart: Dish Network DNC Complaint Escalation Process | Origer 148 | | X | Foundation; Hearsay: FRE 802 |
| DTX-54 | DISH5-0000006330 | 1/25/2011 | Email from R Musso to D Laslo Re: Unwanted Phone Calls | Laslo 193, Metzger 332 | | X | Foundation; Hearsay: FRE 802 |
| DTX-56 | DISH5-0000077952 | 10/4/2006 | Email from E VanLaethem to M Metzger Re: Unwanted Calls | Steele 409 | | X | Hearsay: FRE 802 |
| DTX-57 | Dish-00004663 | 2/7/2005 | Letter from Steele to D Caplan Re: Your Letter Dated January 25, 2005 | Steele 416 | | X | Hearsay: FRE 802 |
| DTX-58 | FTC003-072390 | 9/14/2004 | Letter from D Steele to R Swanberg Re: Your Letter Dated July 26, 2004 | Steele 417 | | X | Hearsay: FRE 802 |
| DTX-59 | Dish-00006548 | 5/30/2008 | Email from S Snyder to R Musso Re: Bill | Snyder 195 | | X | Hearsay: FRE 802 |
| DTX-60 | DISH2-0000033849 | 6/9/2008 | Email from R Musso to Vendor Inquires Re: TCPA-TCPA-2766927976 Name Ms Spencer | Snyder 197 | | X | Hearsay: FRE 802 |
| DTX-61 | Dish-00007527 | 6/23/2008 | Email from J Kelley to R Musso Re: Talmage DNC Complaints | Snyder 198 | | X | Hearsay: FRE 802 |
| DTX-66 | DISH2-0000034582 | 10/22/2008 | Email from R Musso to Vendor Inquiries Re: TCPA - Channing Clark - NSS | Snyder 207 | | X | Hearsay: FRE 802 |
| DTX-68 | DISH2-0000034683 | 4/2/2009 | Email from K Juneja to S Snyder Re: TCPA Complaint FPRH | Snyder 218 | | X | Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-69 | Dish-00007234 | 4/7/2009 | Email from R Musso to M Barnett Re: American Entertainment Systems L L C -FCC TCPA Complaint Taylor | Snyder 219 | | X | Hearsay: FRE 802 |
| DTX-70 | DISH5-0000016189 | Undated | Email from M Metzger to R Musso Re: TCPA approaches and AG Disclosures | Metzger 339 | | X | Hearsay: FRE 802 |
| DTX-71 | Dish-00006718 | 3/12/2008 | Retailer Chat -Echostar Possible Now | Van Emst 350 | | X | Hearsay: FRE 802 |
| DTX-72 | FTC0003-073400 | 7/10/2002 | Facts Blast Letter to Dish Network Retailer from C Clark | Werner 421 | | X | Hearsay: FRE 802 |
| DTX-74 | DISH2-0000037406 | 6/26/2006 | Email from Vallejos to R Origer Re: Info Customer - Kelso Mark | Origer 150 | | X | Hearsay: FRE 802 |
| DTX-75 | Dish-00007437 | 1/23/2008 | Email from R Musso to R Musso Re: A Sales Call on my Cell Phone…Part2 | Origer 161 | | X | Hearsay: FRE 802 |
| DTX-76 | DISH2-0000035643 | 6/27/2007 | Important Notice - Dosanjh | Musso 297 | | X | Foundation; Hearsay: FRE 802 |
| DTX-77 | DISH2-0000036875 | 12/31/2007 | Email from R Musso to Vendor Inquiries Re: TCPA-TCPA-9285053502 | Musso 298 | | X | Foundation; Hearsay: FRE 802 |
| DTX-79 | DISH5-0000031579 | 5/11/2007 | Email from D Hargan to R Musso Re: Parker, Robert - TCPA; American Satellite | Origer 164 | | X | Hearsay: FRE 802 |
| DTX-83 | DISH5-0001112407 | 11/17/2006 | Email from B Henderson to R Musso Re: Your Investigation | Mills 477 | | X | Foundation; Hearsay: FRE 802 |
| DTX-84 | DISH5-0001112419 | 11/19/2006 | Email from R Origer to R Musso Re: Your Investigation | Mills 478 | | X | Hearsay: FRE 802 |
| DTX-85 | DISH2-0000038267 | 3/19/2010 | Email from A Dexter to M Callis Re: RECORD# DUSTIN HARRISON 8255909483355159 DEBBIE RUMPZA | Dexter 247 | | X | Foundation; Hearsay: FRE 802 |
| DTX-89 | Dish-00001361 | 5/13/2005 | Email From J Bragalone to G Benvenuto Re: No Call Indiana Customer | Bangert 117 | | X | Foundation; Hearsay: FRE 802 |
| DTX-91 | FTC003-044898 | 3/16/2011 | Engage in Telephone Marketing and Sales of Dish Network Products and | Musso 295 | | X | Hearsay: FRE 802 |
| DTX-92 | Dish-000000376 | 12/17/2007 | EchoStar Script - Retailer Chat | Origer 142 | | X | Hearsay: FRE 802 |
| DTX-93 | Dish-00007719 | 9/16/2008 | Email from B Van Ernst to B Werner Re: I Sat Equipment Payments | Werner 269 | | X | Hearsay: FRE 802 |
| DTX-94 | Dish-00007724 | 9/16/2008 | Email from S Snyder to S Ellison Re: I-SAT TCPA Complaints | Snyder 204 | | X | Hearsay: FRE 802 |
| DTX-95 | No Bates Nos | 9/30/2008 | Email from D Adams to B Van Emst Re: | Van Emst 355 | | X | Hearsay: FRE 802 |
| DTX-96 | No Bates Nos | 10/15/2008 | Email from J Borup to B Van Emst | Van Emst 358 | | X | Hearsay: FRE 802 |
| DTX-97 | DISH5-0000000145 | 10/13/2008 | Email from M Mills to R Musso Re: Another Reason I know There is a lot of Telemarketing | Musso 318 | | X | Hearsay: FRE 802 |
| DTX-98 | Dish-00007655 | 1/19/2009 | Email from R Musso to C Taber Re: Summary of Call and Action Items | Mills 495 | | X | Hearsay: FRE 802 |
| DTX-99 | DISH5-0000010542 | 3/3/2011 | Form Notification of Consumer Complaint Letter Sent by Echostar to Independent Retailer | Origer 144 | | X | Foundation; Hearsay: FRE 802 |
| DTX-100 | DISH2-0000000415 | 3/6/2009 | Executive Summary of Apex Satellite | Werner 274 | | X | Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-102 | Dish-0006142 | 3/5/2009 | Email from B  Van Emst to S  McElroy Re: APEX Meeting Recap | Van Emst 352 | | X | Hearsay: FRE 802 |
| DTX-103 | Dish-00007512 | 3/3/2009 | Email from R  Musso to S  Snyder Re: Apex | Snyder 215 | | X | Hearsay: FRE 802 |
| DTX-104 | Dish-00007501 | 3/11/2009 | Email from R  Musso to M  Garitone Re: Apex | Musso 301 | | X | Hearsay: FRE 802 |
| DTX-105 | DISH5-0000000103 | 3/12/2009 | Email from R  Musso to B  Van Emst Re: APEX Meeting-Recap | Musso 302 | | X | Hearsay: FRE 802 |
| DTX-106 | Dish-0006127 | 3/11/2009 | Email from R  Musso to B  Werner Re: Apex | Musso 304 | | X | Hearsay: FRE 802 |
| DTX-107 | Dish-00007505 | 3/4/2009 | Email from R  Musso to J Slater Re: Apex Meeting - Recap | Musso 305 | | X | Hearsay: FRE 802 |
| DTX-108 | DISH5-0000037798 | 8/29/2006 | Legal TCPA Meeting | Origer 151 | | X | Foundation; Hearsay: FRE 802 |
| DTX-109 | DISH5-0000038362 | 3/3/2011 | Dish-DNC- Do Not Call Escalation Flow Chart | Origer 147 | | X | Foundation; Hearsay: FRE 802 |
| DTX-110 | Dish-00001986 | 4/16/2012 | Dish-Sting Operation Process | Werner 424 | | X | Hearsay: FRE 802 |
| DTX-111 | DISH3-0000000314 | 3/30/2007 | Post Audit Check List JSR Enterprises | Werner 431 | | X | Hearsay: FRE 802 |
| DTX-112 | DISH5-0000037627 | 4/17/2012 | Chart of DNC Topics Actions, Dates Results | Werner 432 | | X | Hearsay: FRE 802 |
| DTX-113 | DISH5-0000007537 | 9/5/2006 | Letter from S  Larson to D  Steele Re: Notice of Complaint "Do Not Call" Violation - Amber Nickerson, 701-483-6863 | Werner 433 | | X | Hearsay: FRE 802 |
| DTX-114 | FTC016-000050 | 3/22/2006 | Statement of Walter Eric Myers | | | X | Hearsay: FRE 802 |
| DTX-115 | DISH5-0000000054 | 3/25/2009 | Email from B  Werner to R  Musso Re: E-Mail Attachment/SP-ERT Customer Experience | Werner 277 | | X | Hearsay: FRE 802 |
| DTX-117 | Dish-00007610 | 7/14/2008 | Email from R  Musso to M  Metzger Re: Dish Network is Harassing me | Werner 264 | | X | Hearsay: FRE 802 |
| DTX-118 | Dish00007804 | 2/12/2009 | Email from K  Juneja to R  Musso Re: National Satellite Systems - DNC Violation-Townsend | Snyder 210 | | X | Hearsay: FRE 802 |
| DTX-120 | DISH5-0000011765 | 9/23/2010 | Letter from B  Van Emst to K  Juneja Re: Telemarketing Complaints Pertaining to National Satellite Systems | Van Emst 363 | | X | Hearsay: FRE 802 |
| DTX-121 | DISH2-0000034715 | 4/21/2009 | Email from K  Juneja to R  Musso Re: National Satellite Systems 1 TCPA Smith DNC Wallace | Snyder 221 | | X | Hearsay: FRE 802 |
| DTX-122 | NSS26777 | 5/5/2009 | Email from K  Jeneja to S  Snyder Re: National Satellite Systems - 607-330-5666 - 7 Issues | Snyder 224 | | X | Hearsay: FRE 802 |
| DTX-123 | DISH2-0000034823 | 1/11/2010 | Email from G  Bhasin to S  Snyder Re: NSS Call Center | Snyder 231 | | X | Hearsay: FRE 802 |
| DTX-124 | DISH2-0000024975 | 6/3/2010 | Email from N  Jones to R  Musso Re: NSS Department of Justice TCPA Consumer | Snyder 235 | | X | Hearsay: FRE 802 |
| DTX-125 | Dish-0006276 | 3/1/2009 | Email from R  Musso to E  Pastorius Re: Wireless DNC list | Musso 315 | | X | Foundation; Hearsay: FRE 802 |
| DTX-126 | Dish-00007809 | 9/2/2008 | Email from B  Van Emst to R  Musso Re: National Satellite Systems | Werner 226 | | X | Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-127 | DISH3-0000000497 | 8/7/2009 | Email from B Werner to L Vallejos Re: File Needed | Werner 279 | | X | Hearsay: FRE 802 |
| DTX-128 | DISH5-0000013982 | 10/10/2006 | Letter from R Origer to V Burhanpurkar Re: Notice of Complaint "Do Not Call" Violation | Steele 410 | | X | Hearsay: FRE 802 |
| DTX-129 | No Bates | 9/4/2009 | Email from R Musso to B Van Emst Re: TCPA | Van Emst 359 | | X | Hearsay: FRE 802 |
| DTX-132 | DISH2-0000034403 | 11/9/2009 | Email from S Snyder to J Bamira Re: MG - Allegation of DNC Violation - Hali | Snyder 229 | | X | Hearsay: FRE 802 |
| DTX-133 | DISH5-0000007210 | 12/16/2009 | Letter from B Van Emst to D Lindsey Re: Telemarketing Complaints Against Defender Security dba Direct Dish (hereinafter referred to | Mills 506 | | X | Foundation; Hearsay: FRE 802 |
| DTX-134 | Various | 8/3/2009 | Email from Vendor Inquiries to Nitin@dpentllc com Re: DP Enterprises - DNC | Snyder 226 | | X | Hearsay: FRE 802 |
| DTX-135 | No Bates | 1/11/2007 | Copy of Tenya Marketing LLC#1358333 Account Summary | | | X | Hearsay: FRE 802 |
| DTX-136 | DISH2-0000038665 | 3/4/2011 | Letter from D Laslo Re: Merchant Identification Process | Laslo 172 | | X | Hearsay: FRE 802 |
| DTX-138 | FTC003-074605 | 2/12/2003 | Operating Agreement | Myers 14 | | X | Hearsay: FRE 802 |
| DTX-139 | DISH5-0000032397 | 2/14/2007 | Echostar - Retailer Audit Notification and Summary - Jerry Dean Grider DBA JSR | | | X | Hearsay: FRE 802 |
| DTX-140 | No Bates | 4/6/2012 | Plaintiffs' Supplemental Responses To Dish's Third Set Of Interrogatories | Menjivar 4, Steele, Leslie 4, Yoeli 5 | X | X | |
| DTX-141 | DISH5-0000015181 | 2/13/2007 | Letter from R Ortiger to J Grider Re: Notice of Termination of EchoStar Retailer Agreement | | | X | Hearsay: FRE 802 |
| DTX-142 | No Bates | 3/28/2011 | Plaintiffs' Responses to Dish's Third Set of Interrogatories | Also Ohio 17, Dziekan 10, Mastrocinque 8 | X | X | |
| DTX-144 | Dish-00000738 | 12/14/2007 | Master Services Agreement | | X | X | |
| DTX-176 | No Bates | 6/5/2002 | FTC Rulemaking Workshop transcript | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-177 | No Bates | 6/13/2012 | Subcontract Between AT&T and Targus | Miller 9, Shaffer 4 | | | Foundation; Not relevant: FRE 401 |
| DTX-179 | LM000139846 | 2/8/2012 | Email from M Thirukkonda to A Elluru Re: DNC Phone Re-Registration in the Past 3 | Thirukkonda 45 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-180 | No Bates | 11/00/2008 | Lockheed Martin DNC Monthly Report | Thirukkonda 10, French 3 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-181 | LM000084697 | 11/12/2007 | Email from J Kirchmeier to rm-ftchelp Re: National Do Not Call Registry - Help Deck Case | Thirukkonda 13 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-182 | LM000101805 | 7/11/2011 | Email from rm2ftchelp to cboston1 Re: National Do Not Call Registry - Case Numbers 104919 and 104920 -2ND Reply | Thirukkonda 39 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-183 | No Bates | 12/00/2011 | Biennial Report to Congress - FY 2010 and | Dzickan 5 | | X | Not relevant: FRE 401 |
| DTX-184 | LM000125775 | 8/20/2009 | BCP Consumer Response System and Services | Thirukkonda 12, French 27 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-185 | LM000139858 | 12/21/2011 | Email from M Thirukkonda to A Elluru Re: DNC IVR Registration Batch File Issue - Next Step | Thirukkonda 41 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-186 | LM000135302 | 3/12/2012 | Email from C Sanyal to M Thirukkonda Re: EXTERNAL: Re: Issue and Resolution of DNC Consumer Web Registration over the Weekend | Thirukkonda 49 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-187 | No Bates | 5/28/2010 | United States' Responses to Dish's First Set of Interrogatories Directed to the United States | Also Mastrocinque 7, Menjivar 6 | X | X | |
| DTX-188 | No Bates | 12/14/2012 | Plaintiff's Call Record Chart 12-14-12 | | X | X | |
| DTX-189 | No Bates | 7/26/2012 | Report of Robert N Fenili | Fenili 2 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-192 | No Bates | 1/3/2014 | In Cell-Phone Age, Area Codes No Longer Grounded in a Place | | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-193 | NSS25580 | 5/7/2010 | Email from K Juneja to S Snyder Re: NSS - 5 FCC TCPA Complaints (Miller/Childs/raczkowski/mears/Groblewski) | Snyder 234 | | X | Hearsay: FRE 802 |
| DTX-194 | No Bates | 12/14/2012 | Plaintiff's Supplemental Responses to Dish's Interrogatories | | X | X | |
| DTX-200 | No Bates | 3/6/2007 | Civil Investigative Demand to Airspring Inc | | X | X | |
| DTX-201 | No Bates | 1/1/2006 | Civil Investigative Demand to ITC DeltaCom | | X | X | |
| DTX-202 | No Bates | 3/15/2006 | Civil Investigative Demand to Electric Lightwave | | X | X | |
| DTX-203 | No Bates | 3/15/2006 | Civil Investigative Demand to McLeod Telecom | | X | X | |
| DTX-204 | No Bates | 3/15/2006 | Civil Investigative Demand to LDMI/Talk | | X | X | |
| DTX-205 | No Bates | 3/15/2006 | Civil Investigative Demand to Qwest Communications Int'l, Inc | | X | X | |
| DTX-206 | DISH5-0000037615 | 1/11/2007 | Planet Earth Inc #25294 Account Summary | | | X | Hearsay: FRE 802 |
| DTX-207 | DISH-Paper-023294 | 1/20/2006 | Letter from Origer to Dish TV Now Inc Re: Notice of Termination of Echostar Retailer | | | X | Hearsay: FRE 802 |
| DTX-209 | No Bates | 7/26/2012 | Declaration of R Finili | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-213 | Dish-00006252 | 10/8/2008 | PossibleNow Grace Period Ended September | | | X | Hearsay: FRE 802 |
| DTX-214 | No Bates | 1/6/2014 | Declaration of John Taylor | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-215 | NCA001-000696 | 8/8/2008 | North Carolina Attorney General Consumer | | | X | Not relevant: FRE 401 |
| DTX-216 | OHO001-000116 | 1/8/2009 | Ohio Attorney General Consumer Complaint | | | X | Not relevant: FRE 401 |
| DTX-218 | DISH2-0000038251 | 3/10/2010 | Email from J Montano to I Falkowski Re: Call Abandonment Message | Dexter 244 | | X | Foundation; Hearsay: FRE 802 |
| DTX-220 | No Bates | 10/20/2003 | Consolidated Opening Brief of Appellant Federal Trade Commission, and Respondent- Intervenor United States of America | | | X | Not relevant: FRE 401 |
| DTX-222 | DISH-Paper-023139 | 10/7/2004 | Letter from D Hagen to A Ahmed | Ahmed 365 | | X | Hearsay: FRE 802 |
| DTX-223 | DISH8-0000998 | 9/16/2004 | Email from C Kuelling to S Dodge Re: Telemarketing calls | | | X | Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-225 | DISH-Paper-023286 | 12/16/2005 | Email from M Mills to D Hagen Re: DISH | Hagen 6 | | X | Hearsay: FRE 802; |
| DTX-228 | DISH5-0000031792 | 5/10/2007 | Email from M Oberbilling to B Neylon Re: Teranchi | | | X | Hearsay: FRE 802 |
| DTX-229 | Dish-Paper-008055 | 7/17/2006 | Letter from R Origer to Retail Services re: Customer Experience | | | X | Hearsay: FRE 802 |
| DTX-237 | FTC306-029715 | 10/26/2005 | Letter from Ahmed to Myers Re: EchoStar Retailer Agreement, Non-Incentivized Retailer Agreement and Telemarketing/Do-Not-Call | Myers 7 | | X | Hearsay: FRE 802 |
| DTX-238 | No Bates | 6/12/2014 | Amended Declaration of J Taylor | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-239 | DISH5-0000021300 | 2005 | AG's 2005 Audit Matrix | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-246 | No Bates | 9/19/2012 | J Boyle Letter to L Hsiao Re Expert Report of John Taylor | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-247 | FTC011-000969 | 1/1/2007 | Echostar Retailer Agreement between Echostar Satellite and Saveology/Elephant Group DBA Marketing Guru | | X | X | |
| DTX-248 | SAV-000049 | 8/6/2001 | Second Amendment To Echostar Retailer Agreement between Echostar Satellite and Saveology/Elephant Group | Saveology/Bamira 3 | X | X | |
| DTX-249 | DISH-Paper-001724 | 12/31/2001 | Amendment To Echostar Satellite Corporation Retail Agreement between Echostar Satellite and Dish TV Now | | | X | Foundation; Not relevant: FRE 401; |
| DTX-250 | DISH-Paper-001748 | 4/18/2002 | Echostar Satellite Corporation Retail Agreement between Echostar Satellite and Dish TV Now | | | X | Foundation; Not relevant: FRE 401; |
| DTX-264 | DISH11-030325 | 7/15/2004 | Echostar Satellite LLC Incentivized Retailer Agreement between Echostar Satellite and Defender Security Co DBA Direct Dish Satellite | | X | X | |
| DTX-265 | DISH11-030319 | 7/15/2004 | Commercial Amendment To Echostar Satellite LLC Incentivized Retailer Agreement between Echostar Satellite and Defender Security Co DBA Direct Dish Satellite | | X | X | |
| DTX-266 | DISH11-030430 | 12/31/2004 | Echostar Retailer Agreement between Echostar Satellite LLC and Defender Security Co DBA Direct Dish Satellite | | X | X | |
| DTX-267 | DISH11-030392 | 12/31/2006 | Satellite LLC and Defender Security Co DBA Enjoy Better TV | | X | X | |
| DTX-268 | DISH11-030389 | 12/31/2006 | OE Retailer Amendment To Echostar Retailer Agreement between Echostar Satellite LLC and Defender Security Co DBA Enjoy Better TV | | X | X | |
| DTX-269 | DISH5-0000015776 | 12/31/2004 | Echostar Retailer Agreement between Echostar Satellite LLC and Total Marketing Solutions Inc | | | X | Not relevant: FRE 401 |
| DTX-272 | DISH5-0000012612 | 8/22/2005 | Echostar Retailer Agreement between Echostar LLC and Cais Acquisition II LLC DBA VMC | | X | X | |
| DTX-273 | DISH5-0000012575 | 12/31/2006 | Echostar Retailer Agreement between Echostar LLC and Cais Acquisition II LLC DBA VMC | | X | X | |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-274 | DISH-Paper-025617 | N/A | Simplexity Master Affiliate Program Terms And Conditions DBA VMC Satellite | | | X | Foundation; Not relevant: FRE 401; |
| DTX-276 | DISH-Paper-021652 | 3/8/2007 | Echostar Retailer Agreement between Echostar LLC and Cactus Concepts Inc | | X | X | |
| DTX-290 | DISH5-0000010351 | 12/31/2004 | Echostar Retailer Agreement between Echostar Satellite LLC and Infinity Sales Group DBA E- Management Group Inc | | X | X | |
| DTX-291 | FTC011-000901 | 12/31/2006 | Echostar Retailer Agreement between Echostar Satellite LLC and Infinity Sales Group DBA E- Management Group Inc | | X | X | |
| DTX-292 | FTC011-000898 | 12/31/2006 | OE Retailer Amendment To Echostar Retailer Agreement between Infinity Sales Group DBA E- Management Group Inc | | | X | Not relevant: FRE 401 |
| DTX-293 | DISH13-000235 | 11/6/2007 | Complaint against ADT Security Services, Inc in United States of America v ADT Security Services, Inc , Case No 07-81051, filed in the Southern District of Florida | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-294 | DISH13-000246 | 11/20/2007 | injunction, and other relief, attaching Appendix A in United States of America v ADT Security Services, Inc , Case No 07-81051 | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-295 | DISH13-000454 | 4/15/2009 | Complaint against Comcast in United States of America v Comcast Corporation,Case No 2:09- cv-01589, filed in the Eastern District of | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-296 | DISH13-000461 | 4/16/2009 | Signed Judgment and Order for Permanent Injunction, attaching Appendix A in United States of America v Comcast Corporation,Case | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-297 | DISH13-000544 | 4/15/2009 | Complaint against DirecTV, Inc in United States of America v DirecTV, Inc , et al , Case No 2:09-cv-02605 in the Central District of California, attaching Exhibit A | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-298 | | 4/15/2009 | Continuation of Complaint, Exhibit A | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-299 | | 4/15/2009 | Continuation of Complaint, Exhibit A | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-300 | DISH13-000660 | 4/23/2009 | Signed Judgment and Order for Permanent Injunction against DirecTV, Inc , attaching Appendix A in United States of America v DirecTV, Inc et al ,Case No 2:09-cv-02605 in | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-301 | | 5/14/2009 | Signed Judgment and Order for Permanent Injunction against Voicecast Systems, Inc , Michael Kurtz, and Keyvan Saedi, attaching Appendix A in United States of America v DirecTV, Inc et al ,Case No 2:09-cv-02605 in the United States District Court for the Central | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-302 | DISH13-000747 | 11/6/2007 | Complaint against Guardian Communications in US v Guardian Communication, Inc , et al , Case No 4:07-cv-04070 in the Central District | | | X | Not relevant: FRE 401 |
| DTX-303 | FTC299-000041 | 11/15/2007 | Signed Judgment and Order for Permanent Injunction, attaching Appendix A in US v Guardian Communication, Inc , et al , Case No 4:07-cv-04070 in the United States District Court for Central District of Illinois | | | X | Not relevant: FRE 401; Inadmissible compromise negotiations: FRE 408 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-304 | DISH13-000920 | 3/25/2009 | US v New Edge Satellite, Inc and Derek LaVictor, Case No 2:09-cv-11100 in the United States District Court for the Eastern | | | X | Not relevant: FRE 401 |
| DTX-305 | FTC300-000003 | 8/28/2009 | Signed Judgment and Order for Permanent Injunction, attaching Appendix A in US v New Edge Satellite, Inc and Derek LaVictor, Case No 2:09-cv-11100 in the United States District Court for the Eastern District of Michigan | | | X | Not relevant: FRE 401; Inadmissible compromise negotiations: FRE 408 |
| DTX-306 | DISH13-000928 | 7/10/2008 | Complaint against Planet Earth Satellite, Inc and Thomas Teichert in US v Planet Earth Satellite, et al , Case No 2:08-cv-01274 in the United States District Court for the District of | | | X | Not relevant: FRE 401 |
| DTX-307 | FTC301-000003 | 7/25/2008 | Signed Judgment and Order for Permanent Injunction, attaching Appendix A in US v Planet Earth Satellite, et al , Case No 2:08-cv-01274 in the District of Arizona | | | X | Not relevant: FRE 401; Inadmissible compromise negotiations: FRE 408 |
| DTX-308 | DISH13-000946 | 6/19/2008 | Complaint against Star Satellite, LLC and Myers Irrevocable Trust in US v Star Satellite, LLC, et al , Case No 2:08-cv-00797 in the | | | X | Not relevant: FRE 401 |
| DTX-309 | FTC307-002289 | 7/21/2008 | Signed Judgment and Order for Permanent Injunction in US v Star Satellite, LLC, et al , Case No 2:08-cv-00797 in the District of | | | X | Not relevant: FRE 401; Inadmissible compromise negotiations: FRE 408 |
| DTX-310 | DISH13-001016 | 3/25/2009 | Complaint against Vision Quest, LLC and Brian Cavett in US v Vision Quest, LLC, et al , Case No 2:09-cv-11102 in the Eastern District of | | | X | Not relevant: FRE 401 |
| DTX-311 | FTC303-000003 | 8/10/2009 | Signed Judgment and Order for Permanent Injunction in US v Vision Quest, LLC, et al , Case No 2:09-cv-11102 in the Eastern District | | | X | Not relevant: FRE 401; Inadmissible compromise negotiations: FRE 408 |
| DTX-312 | DISH13-000356 | 12/29/2005 | Complaint against The Broadcast Team, Inc in US v The Broadcast Team, et al , Case No 6:05-cv-01920 in the Middle District of Florida | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-313 | DISH13-000372 | 2/2/2007 | Signed Judgment and Order for Permanent Injunction in US v The Broadcast Team, et al , Case No 6:05-cv-01920 in the Middle District of | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-317 | | 4/19/2011 | Complaint against Electric Mobility Corporation in US v Electric Mobility Corp et al , Case No 1:11-cv-02218 in the District of New Jersey | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-318 | | 5/2/2011 | Signed Judgment and Order for Permanent Injunction attaching Appendix A in US v Electric Mobility, et al , Case No 1:11-cv-02218 in the | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-324 | DISH13-000768 | 7/16/2010 | Signed Judgment and Order for Permanent Injunction in Jak Productions, Inc , et al , Case No 10-cv-2008 in the Northern District of Georgia regarding Jak Productions, Inc | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-325 | DISH13-000798 | 7/16/2010 | Signed Judgment and Order for Permanent Injunction in Jak Productions, Inc , et al , Case No 10-cv-2008 in the Northern District of | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-326 | | 2/23/2012 | Complaint against JGRD, Inc in US v JGRD, Inc et al , Case No 2:12-cv-00945 in the Eastern District of Pennsylvania | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-327 | | 2/24/2012 | Signed Judgment and Order for Permanent Injunction in US v JGRD, Inc et al , Case No 2:12-cv-00945 in the Eastern District of | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-328 | 147 | 8/2/2002 | Amendment Of Solicitation No 29-2-Q-2006 | Miller 4 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-329 | 847 | 8/2/2002 | Amendment Of Solicitation No 29-2-Q-2006 | Miller 6 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-330 | ATT006365 | 10/28/2002 | AT&T-FTC Discussion Guide - Federal Trade Commission's National Do-Not-Call Registry | Miller 5 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-331 | 2022 | 12/10/2002 | AT&T Manual - Federal Trade Commission's National Do-Not-Call Registry System - Solicitation #29-2-Q-0026 | Miller 8 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-332 | No Bates | 1/1/2003 | 2003 Consumer Protection Section Annual | Ohio 3 | | X | Not relevant: FRE 401 |
| DTX-333 | No Bates | 1/1/2003 | Bureau of Consumer Fraud Operations Manual | Diemer 3 | | X | |
| DTX-334 | 506 | 2/28/2003 | FTC Award/Contract No 29-3-L-0010 | Miller 7 | | X | Foundation; Not relevant: FRE 401; |
| DTX-335 | DISH-Paper001493 | 3/11/2003 | Retail Business Questionnaire | Myers 15 | | X | Foundation; Hearsay: FRE 802 |
| DTX-336 | No Bates | 1/1/2004 | 2004 Consumer Protection Section Annual | Ohio 4 | | X | Not relevant: FRE 401 |
| DTX-337 | ATT006169 | 2/4/2004 | AT&T Manual - FTC Do-Not-Call Meeting - AT&T DNC Team Organization & Initiatives | Miller 10 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-338 | 659 | 4/16/2004 | FTC Letter from E  Vogt to C  Brown | Miller 11 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-339 | 805 | 5/18/2004 | Risk Memorandum from Ford to Addeo et al  Re: Risk Presented By Targus Information | | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-340 | 657 | 5/21/2004 | FTC Letter from E  Vogt to C  Brown | Shaffer 8, Miller 13 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-341 | 622 | 6/1/2004 | AT&T Letter from R  Rathburn To FTC (E  Vogt) Re: AT&T's Proposed Process To Remove Disconnected Phone Numbers | Shaffer 9, Miller 14 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-342 | ATT009286 | 8/11/2004 | Email from D  Win to L  Miller Re: Info Covered Today And A Completely Different New | Miller 15 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-343 | FTC003-039565 | 9/19/2004 | Script - Call Placed To 614-895-8940 Received On September 19, 2004 | Menjivar 21 | | X | Foundation; Hearsay: FRE 802 |
| DTX-344 | ATT006444 | 9/23/2004 | Email from S  Vasey to P  Rozelle Re: ECP 2004-178 At Ashburn Test | Miller 16 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-345 | ATT007858 | 11/2/2004 | Email from D  Holiday to L  Miller Re: 10/21 Questions W/Answers | Miller 18 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-346 | ATT009300 | 11/18/2004 | Email from L  Miller to D  Win, K  Garner Re: SCRUB Question: Re-Assignment v | Miller 19 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-347 | No Bates | 00/00/2005 | 2005 Annual Report Consumer Protection | Ohio 12 | | X | Not relevant: FRE 401 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-348 | ATT008464 | 5/24/2005 | Email From L  Miller to D  Robbins Re: Question From The FCC | Miller 21 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-349 | ATT008592 | 8/10/2005 | Email From C  Sutherland to W  Lons, L  Miller and FTC Lead Re: AT&T and FTC OIG July 25, 2005 Meeting Minutes | Miller 22 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-350 | ATT009305 | 8/19/2005 | Email From G  Ramage to C  Sutherland Re: Results Of DNC Disconnects Test | Miller 23 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-351 | FTC350-000025 | 9/2/2005 | Email from L  Miller to D  Robbins Re: Follow Up Questions For AT&T/Targus | Shaffer 10, Miller 24 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-352 | No Bates | 9/30/2005 | Memorandum from H  Sribnick to L  Parnes Re: OIG Audit Survey of the Do Not Call Registry Scrubbing Process | Shaffer 6, Miller 25 | | X | Not relevant: FRE 401 |
| DTX-353 | FTC008-000403 | 11/18/2005 | Civil Investigative Demand to D  Hagen | Mastrocinque 6 | X | X | |
| DTX-354 | FTC009-001064 | 11/21/2005 | N136_RegHitsSumm | Mastrocinque 12 | X | X | |
| DTX-355 | FTC009-001053 | 11/21/2005 | N136_CallSummAcs | Mastrocinque 13 | X | X | |
| DTX-356 | FTC009-001061 | 11/21/2005 | N136_CallSummDates | Mastrocinque 14 | X | X | |
| DTX-357 | FTC009-001043 | 11/28/2005 | N137_ReghitsSumm | Mastrocinque 20 | X | X | |
| DTX-358 | FTC00-001077 | 11/28/2005 | N137_ReghitsSumm | Mastrocinque 21 | X | X | |
| DTX-359 | FTC003-064377 | 12/16/2005 | Demand dated 9/1/05 to Guardian Enterprises LLC Our File No : 1263 | Baker 1 | | X | Hearsay: FRE 802 |
| DTX-360 | ATT007650 | 1/12/2006 | Email from L  Miller to FTC Lead Re: FW: 2006 Forward View | Miller 26 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-361 | LM000127902 | 2/8/2006 | Email from T  Martwinski to M  Thirukkonda Re: DMA Results | French 8 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-362 | FTC003-064415 | 2/23/2006 | Email from H  Lora to R  Deitch Re: C I D  dated 9/1/05 to Guardian Enterprises, LLC | Baker 2 | | X | Hearsay: FRE 802 |
| DTX-363 | FTC0008-000417 | 2/28/2006 | Civil Investigative Demand to Star Satellite, LLC | Mastrocinque 5 | X | X | |
| DTX-364 | FTC009-000929 | 4/26/2006 | SMARKUS Database Report | Steele, Leslie 2 | | X | Hearsay: FRE 802 |
| DTX-365 | FTC350-000032 | 6/12/2006 | Email from L  Miller to J  Krebs Re: Reassigning Telephone Numbers | Miller 27 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-366 | DISH2-0000037037 | 8/14/2006 | Email from C  Nitin to Vendor Inquiries | Brandvein 23 | | X | Foundation; Hearsay: FRE 802 |
| DTX-367 | 1811 | 9/29/2006 | Email from D  Holiday to H  Orberg, D  Leroy Re: FTC-DNCR Monthly Revenue Report | Miller 28 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-368 | ATT007727 | 10/16/2006 | Email from L  Miller to D  Holiday Re: Mass Registration Load | Miller 29 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-369 | FTC007-000144 | 1/29/2007 | EchoStar Retailers xls | Menjivar 12 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-370 | FTC007-000076 | 1/31/2007 | Analysis of Phone Records Disposition C (Live Connect) revised without du | Menjivar 11 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-371 | No Bates | 01/00/2007 | Report to the Governor and the General Assembly on the Operations of the Attorney General Under Chapter 1345 of the Revised | Ohio 5 | | X | Not relevant: FRE 401 |
| DTX-372 | FTC003-081867 | 2/7/2007 | DNC Company Name Detail SatNet xls | Menjivar 19 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-373 | FTC012-000839 | 3/6/2007 | Civil Investigative Demand to JSR Satellite | Mastrocinque 4 | X | X | |
| DTX-374 | LM000077122 | 3/19/2007 | RFQ No : FTC--7-Q-7001 - Proposal No  725CC-06G: BCP Consumer Response Systems And Services Volume II Technical Narrative - Appendix 4: National Do Not Call | Thirukkonda (LM 11) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-375 | FTC304-000768 | 4/5/2007 | Letter from J  Shields to R  Deitch Re: Federal Trade Commission v  Star Satellite, LLC and Walter Eric Myers | Myers 16 | | X | Hearsay: FRE 802 |
| DTX-376 | FTC007-000169 | 4/13/2007 | N168 AC AND N203 AC CALLS xls | Menjivar 14 | | X | Not relevant: FRE 401 |
| DTX-377 | FTC012-001821 | 4/17/2007 | DNC Top Violators Report | Torok 1 | | X | Not relevant: FRE 401 |
| DTX-378 | FTC012-001836 | 4/27/2007 | DNC - Top Violators Report | Mastrocinque 29, Dziekan 11 | | X | Foundation; Not relevant: FRE 401; |
| DTX-379 | FTC007-000117 | 6/4/2007 | DISH NETWORK xls | Menjivar 15 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-380 | FTC003-084965 | 6/12/2007 | N207 RegHits Part1 txt 01 | Menjivar 7 | X | X | |
| DTX-381 | FTC012-000707 | 6/13/2007 | Routing Sheet from D  Nguyen (InterImage Inc ) to J  Fombonne (FTC) Re: Package Contents: Case #207 Original Data | Steele, Leslie 3 | X | X | |
| DTX-382 | LM000142261 | 7/2/2007 | Email from M  Windelberg to N  Chanin Re: DNC Project Schedule -- Data | Thirukkonda (LM 06) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-383 | FTC007-000163 | 7/7/2007 | March 2007 Part 1 xls | Menjivar 13 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-384 | LM000127712 | 7/16/2007 | Email from P  Marek to M  Windelberg, N  Chanin, P  Yan Re: DNC Data Risks - Please Review And Comment | Thirukkonda (LM 05) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-385 | LM000142583 | 7/30/2007 | Email from M  Windelberg to C  Thyes Re: FW: Questions For Targus | Thirukkonda (LM 04), French 4 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-386 | ATT007253 | 8/3/2007 | Email from C  Sutherland to L  Miller Re: Ad Hoc Query Request | Miller 30 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-387 | FTC350-000079 | 8/6/2007 | Email from M  Windelberg to J  Krebs Re: Questions For Targus | Shaffer 12 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-388 | FTC350-000099 | 8/7/2007 | Email from M  Windelberg to J  Krebs RE: FW: Targus Return Codes | Shaffer 13 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-389 | FTC003-085084 | 8/21/2007 | N221 RegHits txt | Menjivar 8 | | X | Not relevant: FRE 401 |
| DTX-390 | FTC007-000101 | 8/31/2007 | Directory Inventory 8 31 07 xls | Menjivar 2 | | X | Not relevant: FRE 401 |
| DTX-391 | FTC350-000135 | 9/7/2007 | Email from V  Morrison to J  Krebs Re: Targus FTC DNC Relationship | French 5 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-392 | FTC350-000138 | 9/7/2007 | Email from J  Krebs to V H  Morrison Re: Targus FTC DNC Relationship | Shaffer 14 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-393 | FTC013-001259 | 9/10/2007 | Civil Investigative Demand to Oyster Solutions | Mastrocinque 9 | | X | Not relevant: FRE 401 |
| DTX-394 | FTC350-000142 | 9/13/2007 | Email from J  Gordon to K  French, J  Krebs, D  Torok Re: FW: FTC Questions | Shaffer 15, French 6 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-395 | No Bates | 9/17/2007 | Federal Trade Commission Do Not Call Registry Project Internal Design Document - Performance Reports | French 2 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-396 | FTC003-085110 | 9/25/2007 | N224 RegHits txt | Menjivar 9 | | X | Not relevant: FRE 401 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-397 | FTC350-000223 | 10/1/2007 | Email from J Krebs to V Morrison Re: Missing Record and Sort Issues | French 13 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-398 | FTC350-000286 | 11/1/2007 | Email from D Torok to K French Re: Update from Targus | French 7 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-399 | LM000114695 | 11/5/2007 | Email from N Chanin to V Morrison Re: DNC Registry Complaint Counts Update | French 14 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-400 | LM000130023 | 11/13/2007 | Email from V Morrison to N Chanin, R A King Re: FW: Targus Service | Shaffer 16 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-401 | No Bates | 11/15/2007 | Stipulated Judgment and Order for Permanent Injunction | Baker 3 | | X | Not relevant: FRE 401 |
| DTX-402 | Dish 001191 | 11/20/2007 | Email from S Frey to S Ingis Re: National DNC List Analysis | Shaffer 20, Stauffer 2, Krebs 4 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-403 | LM000085762 | 11/29/2007 | Email from RM2-FTCHelp to Hhesse@acnpapers com Re: DNC Lists | Thirukkonda (LM 51) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-404 | | 12/6/2007 | Email from R Stauffer to jcerasale@the dma org Re: Signed DNC Director Test | Krebs 2, Stauffer 4 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-405 | FTC003-000422 | 12/7/2007 | 11-29-07 Echostar Results | Mastrocinque 19 | | X | Foundation; Not relevant: FRE 401; |
| DTX-406 | LM000080713 | 12/10/2007 | Email from M Felt to RM2-FTCHelp Re: DNC Download Issue | Thirukkonda (LM 52) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-407 | Dish001194 | 12/10/2007 | Email from S Frey to C Hoover Re: Fw: Scan From Xerox Workcentre Pro | Stauffer 3 (PN 3) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-408 | No Bates | 00/00/2007 | Consumer Protection 2007 Annual Report | Ohio 6 | X | X | Not relevant: FRE 401 |
| DTX-409 | No Bates | 00/00/2008 | Consumer Protection 2008 Annual Report | Ohio 7 | X | X | Not relevant: FRE 401 |
| DTX-410 | LM000127860 | 1/3/2008 | Email from T Martwinski to V Morrison Re: DNC Active Registrations | French 15, Thirukkonda (LM 14) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-411 | LM000139375 | 1/4/2008 | Email from M Thirukkonda to V Morrison Re: DNC Active Registration | French 16, Thirukkonda (LM 53) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-412 | FTC013-002772 | 1/11/2008 | Email from C Detmer to P McCall Re: Cases N232, N233, N234 | Mastrocinque 22 | X | X | |
| DTX-413 | FTC350-000289 | 1/17/2008 | Email from J Krebs to V Morrison Re: Second Samples | French 26 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-414 | LM000143016 | 1/17/2008 | Email from J Xing to N Chanin Re: FW: Request For DNC Data Related To | Thirukkonda (LM 16) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-415 | LM000143384 | 1/17/2008 | Email from P Yan to N Chanin, M Thirukkonda, V Morrison, J Xing, R A King Re: Problems With DNC Data | Thirukkonda (LM 20) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-416 | LM000143455 | 1/18/2008 | Email from P Yan to N Chanin, M Thirukkonda, V Morrison, J Xing, R A King Re: Problems With DNC Data | Thirukkonda (LM 18) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-417 | LM000128975 | 1/18/2008 | Email from V Morrison to J Krebs, M Thirukkonda Re: Problems With DNC Data | Thirukkonda (LM 19) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-418 | LM000137647 | 1/22/2008 | Email from M Thirukkonda to N Chanin, P Yan Re: Update On DNC Data | Thirukkonda (LM 54) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-419 | LM000128953 | 1/24/2008 | Email from V Morrison to K French Re: DNC Registration with Jan 25 2008 Date on Jan 24…g | French 17, Thirukkonda (LM 21) | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-420 | LM000129873 | 1/24/2008 | Email from V Morrison to J Xing Re: DNC Registrations With Jan 25 2008 Date On Jan | Thirukkonda (LM 22) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-421 | No Bates | 1/25/2008 | Email from J Krebs to V Morrison Re: DNC Registrations With Jan 25 2008 date on Jan 24…g | French 18, Thirukkonda (LM 23) | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-422 | LM000117108 | 1/26/2008 | Email from R Dodson to A Tulchinskiy, V Morrison, W Jacobs, T Martwinski, M Thirukkonda Re: DoNotCall Issues | Thirukkonda (LM 15) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-423 | No Bates | 1/28/2008 | Letter from K Levi to Echostar Re: Notice of Complaint "Do Not Call Violation" Dated 1/25/08 | Levi 25 | | X | Hearsay: FRE 802 |
| DTX-424 | LM000083738 | 2/4/2008 | Email from I Platt to RM-FTCHelp Re: National Do Not Call Registry - Help Desk Case Number | Thirukkonda (LM 56) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-425 | LM000127902 | 2/8/2008 | Email from T Martwinski to M Thirukkonda Re: FW: DMA Results | Thirukkonda (LM 02) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-426 | LM000129012 | 2/13/2008 | Email from V Morrison to J Krebs Re: DMA Analysis Updated | French 11, Shaffer 17, Thirukkonda (LM 03) | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-427 | LM000128911 | 2/14/2008 | Email from V Morrison to J Krebs, K French, M Thirukkonda Re: Grace Period Problem In DNC Resolution | Thirukkonda (LM 55) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-428 | FTC003-085421 | 2/28/2008 | N243 bad data txt | Menjivar 10 | | X | Not relevant: FRE 401 |
| DTX-429 | FTC007-000141 | 5/22/2008 | Echostar Data 5 21 08 xls | Menjivar 3 | | X | Not relevant: FRE 401; Best Evidence Rule: FRE 1002 |
| DTX-430 | LM000081036 | 5/27/2008 | Email from P Blunt to RM2-FTCHelp Re: FW: Help Desk Case 86906 | Thirukkonda (LM 57) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-431 | No Bates | 6/00/2008 | Privacy Impact Assessment (PIA) For: Sentinel Network Services (SNS) | Dziekan 4 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-432 | LM000087355 | 6/3/2008 | National Do Not Call Registry - Help Desk Case Number 87192 | Thirukkonda (LM 24) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-433 | LM000140314 | 6/18/2008 | Email from M Thirukkonda to A Frazier Re: Large Variation in DNC Search Results | French 19, Thirukkonda (LM 25) | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-434 | LM000129751 | 6/26/2008 | Email from V Morrison to D Klueter Re: FW: Delivery Of Process Improvement In Sept/Oct Timeframe For Disconnect Process | Thirukkonda (LM 07), French 9 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-435 | LM000129741 | 7/2/2008 | Email from V Morrison to J Fernon, D Klueter, M Thirukkonda Re: DNC Enhancements | Thirukkonda (LM 26) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-436 | LM000122298 | 7/8/2008 | Email from J Krebs to K Horne, M Thirukkonda, N Chanin Re: Potential Problem | Thirukkonda (LM 27) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-437 | LM000134335 | 7/8/2008 | Email from V Patankar to J Xing Re: Do Not Call Website? | Thirukkonda (LM 28) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-438 | LM000134484 | 7/8/2008 | Email from V Patankar to M Thirukkonda Re: DNC Critical Issues Status - Deployment And Issue Resolution | Thirukkonda (LM 29) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-439 | LM000124399 | 7/10/2008 | Email from J F Maples to M Thirukkonda Re: Backlog Of DNC Records | Thirukkonda (LM 30) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-440 | FTC301-000003 | 7/24/2008 | Stipulated Judgment and Order for Permanent Injunction | Teichert 7 | | X | Inadmissible compromise negotiations: FRE 408 |
| DTX-441 | | 7/28/2008 | Stipulated Judgment and Order for Permanent Injunction Against Star Satellite, LLC, Walter Eric Myers, The Myers Irrevocable Trust, Cindy Myers as Trustee, Zachary T, Ball as Trustee, Katie Myers and Mallory Myers as Beneficiaries | Myers 17 | | X | Not relevant: FRE 401; Inadmissible compromise negotiations: FRE 408 |
| DTX-442 | FTC355-000003 | 8/8/2008 | Email from J Krebs to K Horne Re: Delta download Issue and Resolution | French 20 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-443 | Dish000314 | 8/18/2008 | Email from R Stauffer to D Klueter Re: Follow-Up From Our Phone Call | Stauffer 5 (PN 5) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-444 | US v Dish000394 | 8/25/2008 | Email from R Stauffer to david a klueter@imco com Re: Responses to Kelly Horne's Questions for 2pm Call | Horne 1, Stauffer PN 8, Stauffer 6 (PN 6) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-446 | No Bates | 8/25/2008 | Email from R Stauffer to D Klueter Re: Responses To Kelly Horne's Questions For 2 | Stauffer 7 (PN 7) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-447 | US v Dish000318 | 8/28/2008 | Email from K Horne to R Stauffer Re: Follow-up On Open Question from our Call | Horne 2, PN 9 | | X | Not relevant: FRE 401 |
| DTX-448 | US v Dish000319 | 9/5/2008 | Email from K Horne to R Stauffer Re: Follow-up On Open Question from our Call | Horne 10, Krebs 3, Stauffer 12 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-449 | Dish000326 | 9/5/2008 | Email from R Stauffer to K Horne Re: Follow-Up On Open Question From Our Call | Stauffer 11 (PN 11) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-450 | US v Dish000300 | 9/24/2008 | Email from R Stauffer to D, Kuester Re: FTC Report to Congress on the Report to Congress | Horne 11, PN 13 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-451 | Dish000286 | 9/24/2008 | Email from R Stauffer to D Klueter, et al Re: Accuracy Of Information In Report To Congress - FTC Third Party Proprietary Information | Stauffer 10 (PN 10) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-452 | FTC013-000990 | 10/3/2008 | Management Group Attn: Mitchell Hymowitz and/or Elliott Lowenstem | Menjivar 22 | | X | Not relevant: FRE 401 |
| DTX-453 | LM000080945 | 10/4/2008 | Email from B Nelson to RM-FTCHelp Re: National Do Not Call Registry - Help Desk Case | Thirukkonda (LM 59) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-454 | FTC350-001560 | 10/6/2008 | Email from D Torok to K Horne Re: Follow-up to Our Conversation | French 10 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-455 | LM000121608 | 10/6/2008 | Email from D Klueter to K Horne Re: DNC Change List Downloads Problem htm | Thirukkonda (LM 58) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-456 | Dish000280 | 10/27/2008 | Email from R Stauffer to D Klueter Re: 1st Disconnect/Reassign Monthly Process | Stauffer 16 (PN 16) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-457 | Dish000282 | 10/28/2008 | Email from R Stauffer to D Klueter Re: 1st Disconnect/Reassign Monthly Process | Stauffer 17 (PN 17) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-458 | LM000080978 | 10/30/2008 | Email from JCFenech@comerica com to RM2-FTCHelp Re: Question | Thirukkonda (LM 60) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-459 | No Bates | 10/00/2008 | FTC Report - Do-Not Call Improvement Act Of 2007 - Report To Congress: Regarding The Accuracy Of The Do Not Call Registry | 14, Dziekan 6, Krebs 5, Shaffer 19 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-460 | Dish000392 | 11/21/2008 | Email from R Stauffer to D Klueter, et al Re: Release Of Information To FTC Watch | Stauffer 18 (PN 18) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-461 | OHO002-0000158 | 11/22/2008 | Email from M Nixten to ELAINENAWAL Re: Dish Network | Ohio 23 | | X | Hearsay: FRE 802 |
| DTX-462 | LM000123037 | 12/12/2008 | Email from J F Maples to J Velumani, N Chanin Re: 5196: DNC Consumer Address | Thirukkonda (LM 31) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-463 | US v Dish000067 | 12/19/2008 | Email from D Klueter to K Horne Re: Issue With the November Process Run | Stauffer19, Krebs 6 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-464 | Dish000095 | 12/19/2008 | Email from R Stauffer to D Kleuter Re: Issue With The November Process Run | Stauffer 20 (PN 20) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-465 | US v Dish000069 | 12/21/2008 | Email from D Klueter to K Horne Re: Issue with the November Process Run | Horne 4, Stauffer 21, Krebs 7 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-466 | US v Dish000151 | 12/22/2008 | Lockheed Martin November 2008 Process | Horne 13, PN 24 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-467 | Dish000058 | 1/9/2009 | Email from R Stauffer to D Klueter Re: December Drop Analysis | Stauffer 22 (PN 22) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-468 | Dish000135 | 1/12/2009 | Email from D Klueter to S Frey, et al Re: Tuesday Conference Call | Stauffer 23 (PN 23) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-469 | FTC350-001026 | 1/15/2009 | Email from K Horne to V Patankar Re: Issue With the November Process Run | French 21 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-470 | Dish000131 | 1/15/2009 | Email from R Stauffer to D Klueter Re: Research On 860-684-1103 | Stauffer 25 (PN 25) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-471 | US v Dish000062 | 1/16/2009 | Email from D Klueter to K Horne Re: Issue With the November Process Run | Horne 5 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-472 | US v Dish000064 | 1/21/2009 | Email from R Stauffer to D Klueter Re: Issue With the November Process Run | Krebs 8, Stauffer 26 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-473 | US v Dish000092 | 1/21/2009 | Email from D Klueter to K Horne Re: Issue With the November Process Run | Horne 6 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-474 | LM000138168 | 1/21/2009 | Email from K Horne to D Kleuter Re: Case 92312 | Thirukkonda (LM 32) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-475 | US v Dish000137 | 1/26/2009 | Issue Summary November Disconnect/Reassign Analysis on the National | 27 (PN 27) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-476 | Dish000307 | 2/6/2009 | Email from R Stauffer to D Klueter Re: Draft Of QA Write-Up | Stauffer 28 (PN 28) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-477 | Dish000426 | 2/6/2009 | PossibleNow Report - Description Of The Quality Assurance Program For PossibleNow's Disconnect/Reassign Analysis Service | Stauffer 29 (PN 29) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-478 | US v Dish000334 | 2/10/2009 | Email from K Horne to R Stauffer Re: Follow-Up Questions Re Numbers Temporarily Removed from the Registry | Horne 8 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-479 | US v Dish000342 | 3/5/2009 | Email from K Horne to R Stauffer Re: Follow-Up Questions Re Numbers Temporarily Removed from the Registry | Horne 9, Stauffer 30 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-480 | US v Dish000336 | 3/5/2009 | Email from R Stauffer to K Horne Re: Follow-Up Questions Re Numbers Temporarily Removed from Registry | Krebs 9 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-481 | LM000143116 | 3/6/2009 | Email from J Xing to J F Maples, N Chanin, S Chiranjib Re: DNC Issues That Addressing…#1 | Thirukkonda (LM 17) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-482 | FTC355-000076 | 3/9/2009 | Email from D Klueter to F Maples Re: Five DNC Issues That Need Addressing | French 22 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-483 | Dish000284 | 3/10/2009 | Email from R Stauffer to M Thirukkonda et al Re: 408-926-0473 - Need Your Help With Another Phone Number | Stauffer 31 (PN 31) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-484 | LM000123469 LM000124337 | 3/24/2009 | Email from J F Maples to V Patankar, S Chiranjib Re: DNC Incident Report… Four | Thirukkonda (LM 33) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-485 | No Bates | 3/25/2009 | Complaint | Cavett 5 | | X | Not relevant: FRE 401 |
| DTX-486 | Dish 001179 | 3/31/2009 | Possible Now Report - Analysis Of The Phone Numbers On The National Do Not Call Registry | Shaffer 21, Stauffer 32, Krebs 10 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-487 | LM000117161 | 4/15/2009 | Letter to R Shanken (Targus Information Corp ) Re: Nonrenewal Of Services | Shaffer 18 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-488 | LM000090464 | 4/15/2009 | Email from RM2-FTCHelp to D Hoffer Re: National Do Not Call Registry - Help Desk Case | Thirukkonda (LM 61) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-489 | Dish000815 | 4/15/2009 | Email from DNCSolution@possiblenow com to B Neider Re: Scrub Completion Notification From DNCSolution | Stauffer 33 (PN 33) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-490 | FTC350-014175 | 4/23/2009 | Email from K Horne to F Maples Re: Validation that the Data on the April Registry Disk is | French 23 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-491 | LM000090786 | 4/28/2009 | Email from RM2-FTCHelp to Barbara Mackey@freeholdmitsubishi com Re: National Do Not Call Registry - Help Desk Case | Thirukkonda (LM 62) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-492 | NSS27113 | 4/29/2009 | Email from J Kapil to Vendor Licenses Re: 5 IssuesTCPA/DNC 607-330-5666 | Levi 24 | | X | Hearsay: FRE 802 |
| DTX-493 | Dish000291 | 5/11/2009 | Email from R Stauffer to J Maples Re: Another Number That May Have Been Mistakenly | Stauffer 35 (PN 35) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-494 | LM000076820 | 5/19/2009 | Conference Call Report - FTC Weekly Status Meeting | Thirukkonda (LM 63) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-495 | FTC306-036408 | 7/10/2009 | Stipulated Judgment and Order for Permanent Injunction | Cavett 6 | | X | Inadmissible compromise negotiations: FRE 408 |
| DTX-496 | Dish000411 | 8/25/2009 | PossibleNow Report - Overview Of DNCDirector | Stauffer 34 (PN 34) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-497 | US v Dish000301 | 10/7/2009 | Email from R Stauffer to F Maples Re: Data Needed for PossibleNOW for DNC Report | Horne 18, PN 36 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-498 | US v Dish000237 | 10/15/2009 | Email from F Maples to R Stauffer Re: Responses to Kelley Horne's Questions | Horne 19, Stauffer 37 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-499 | LM000126535 | 11/3/2009 | Email from J F Maples to A Elluru, E Davis Re: DNC Valid/Invalid Complaint Issues | Thirukkonda (LM 35), French 24 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-500 | Dish000365 | 11/6/2009 | Email from R Stauffer to J Maples Re: New Area Codes | Stauffer 47 (PN 47) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-501 | Dish000297 | 11/9/2009 | Email from J Maples to R Stauffer Re: Area Code Split Question | Stauffer 48 (PN 48) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-502 | | 11/30/2009 | Order Approving Stipulation of Voluntary | TsaiX1 | | X | Not relevant: FRE 401 |
| DTX-503 | Dish000051 | 12/22/2009 | Lockheed Martin Report - US FTC National Do Not Call (DNC) Registry Statement Of Work For | Stauffer 14 (PN 14) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-504 | Dish000168 | 1/15/2010 | PossibleNow Report - Process Review Disconnect/Reassign Analysis On The National DNC Registry | Stauffer 38 (PN 38) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-505 | LM000115581 | 3/10/2010 | From Cordova Wireless Communications, Inc… DNC Registrations | Thirukkonda (LM 37) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-506 | Dish000177 | 3/31/2010 | PossibleNow Report - Process Review Disconnect/Reassign Analysis On The National DNC Registry (Draft) | Stauffer 41 (PN 41) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-507 | No Bates | 5/27/2010 | Attached Service List Re: Enclosure Of Dish's Supplemental Responses To Plaintiffs' First Request For Production Of Documents | Yoeli 13 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-508 | No Bates | 6/7/2010 | State of Illinois' Responses to Dish's First Set of Interrogatories Directed to the State of Illinois | Diemer 5 | X | X | |
| DTX-509 | No Bates | 6/29/2010 | Attached Service List Re: Enclosure Of Dish's Second Supplemental Responses To Plaintiffs' First Request For Production Of Documents | Yoeli 14 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-510 | Dish001057 | 8/5/2010 | Email from C Hoover to B Neider et al Re: August Purge File | Stauffer 43 (PN 43) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-511 | DISH5-0000016178 | 8/17/2010 | Retailer Request to Use Third Party Vendor | Teichert 8 | | X | Hearsay: FRE 802 |
| DTX-512 | Dish000183 | 9/23/2010 | PossibleNow Report - Process Review Disconnect/Reassign Analysis On The National DNC Registry | Stauffer 39 (PN 39) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-513 | Dish000379 | 9/28/2010 | Email from J Maples to R Stauffer Re: PossibleNow Powerpoint For Today's Call | Stauffer 49 (PN 49) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-514 | Dish000162 | 10/1/2010 | PossibleNow Report - Process Review Disconnect/Reassign Analysis On The National DNC Registry | Stauffer 40 (PN 40) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-515 | No Bates | 12/1/2010 | Email from L Hsiao to L Mazzuchetti Re: Dish Campaign Key Word List | Yoeli 7 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-516 | FTC350-000371 | 12/7/2010 | Email from J Krebs to A Rop Re: FW: Case #61680 - File Discrepancies | Shaffer 11 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-517 | Dish000198 | 12/15/2010 | PossibleNow Report - 2010 Review Meeting | Stauffer 42 (PN 42) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-518 | No Bates | 1/20/2011 | Email from L Hsiao to L Mazzuchetti Re: Campaign Telemarketing Status | Yoeli 8 | | X | Not relevant: FRE 401 |
| DTX-519 | LM000082722 | 2/10/2011 | Email from G Nishinaga to RM-FTCHelp Re: Commercial Phone Numbers In FTC Do Not | Thirukkonda (LM 36) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-520 | No Bates | 2/14/2011 | Plaintiffs' Responses to Dish's Second Set of Interrogatories | Ohio 15, Dziekan 7 | X | X | |
| DTX-521 | LM000116085 | 3/1/2011 | Email from C Donato to J F Maples, J Doherty, T Rudd Re: External Re: DNC Phone Registration Issues - Mar 1 | Thirukkonda (LM 38) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-522 | No Bates | 3/6/2011 | Plaintiffs' Responses To Dish's Third Set Of Interrogatories | Menjivar 5 | X | X | |

**United States et al. v. Dish Network LLC**

**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-523 | Dish000393 | 3/7/2011 | Email from J Maples to D Webster Re: Fw: Remind Me | Stauffer 44 (PN 44) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-524 | No Bates | 3/16/2011 | Plaintiffs' Responses To Dish's Third Set Of Interrogatories | Yoeli 4 | X | X | |
| DTX-525 | No Bates | 8/30/2011 | Caller ID and Spoofing | Kitner B, Dhawan D1, Ishaq D2, Jain D2, Lea D2, Sehgal D1, Khan G, Shahab 7, Slaby E, Wolf 4 | | | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-526 | DISH5-0000094968 | 9/30/2011 | Email from Vendor Inquiries Re: Simplexity Consent to Use | Zaruba 2 | | X | Hearsay: FRE 802 |
| DTX-527 | No Bates | 10/21/2011 | DNC IVR Registrations Batch File Issue | Thirukkonda (LM 40) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-528 | No Bates | 11/30/2011 | Notice To The United States Of America Pursuant To Fed R Civ P | Yoeli 3 | | X | Not relevant: FRE 401 |
| DTX-529 | LM000114882 | 12/21/2011 | Email from N Chanin to J F Maples Re: Back Dating DNC Registrations? | Thirukkonda (LM 08) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-530 | LM000139854 | 12/21/2011 | Email from M Thirukkonda to A Elluru, K Gangavarapu Re: Missing DNC IVR Registrations From 8/15-12/13/11 | Thirukkonda (LM 42) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-531 | LM000138113 | 12/21/2011 | Email from M Thirukkonda to A Elluru, K Gangavarapu, N Chanin Re: DNC IVR Registration Issue - Tasks | Thirukkonda (LM 43) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-532 | LM000116280 | 12/22/2011 | Email from C Donato to M Thirukkonda, A Elluru Re: External: Re: Do Not Call Invoicing Question For Oct 2011 | Thirukkonda (LM 44) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-533 | No Bates | 12/23/2011 | U S DOJ Letter from L Hsiao to L Mazzuchetti and J Boyle Re: Analysis Of Dish's 2007-2010 | Yoeli 9 | | X | Not relevant: FRE 401 |
| DTX-534 | LM000117116 | 12/28/2011 | Email from A Dziekan to A Elluru Re: EXTERNAL: RE: DNC IVR Delayed | French 25 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-535 | No Bates | 2/14/2012 | National Do Not Call Registry | Dziekan 8 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-536 | No Bates | 2/15/2012 | Q&A For Telemarketers & Sellers About DNC Provisions in TSR | Dziekan 12 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-537 | LM000139753 | 2/22/2012 | Email from M Thirukkonda to J F Maples, P Blunt, N Chanin, K Gangavarapu, A Tulchinskiy, G Bytenskiy Re: Telemarketer Call Says DNC Was Down | Thirukkonda (LM 46) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-538 | LM000113022 | 3/6/2012 | Email from N Chanin to A Elluru Re: DNC Purge Delete Process | Thirukkonda (LM 09) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-539 | LM000124477 | 3/9/2012 | Email from J F Maples to M Thirukkonda Re: FW: DNC Case 107606 | Thirukkonda (LM 48) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-540 | LM000117118 | 3/12/2012 | Email from A Dziekan to M Thirukkonda, A Elluru, K French, K Brandriff Re: External: Re: Issue And Resolution Of DNC Consumer Web Registrations Over The Weekend | Thirukkonda (LM 47) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-541 | LM000076869 | 3/20/2012 | Conference Call Report - FTC Weekly Status Meeting | Thirukkonda (LM 50) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-542 | Dish000248 | 3/20/2012 | Email from J Housley to P Newton Re: Fw: Additional Update | Stauffer 45 (PN 45) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-543 | Dish000440 | 3/21/2012 | Email from R Stauffer to J Maples Re: Data Analysis | Stauffer 46 (PN 46) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-544 | No Bates | 4/5/2012 | FTC Request For Information Fact Sheet - Federal Trade Commission's Proposed National Do-Not-Call Registry | Torok 2 | | X | Not relevant: FRE 401 |
| DTX-545 | No Bates | 4/18/2012 | California State Attorney General Office's "Do Not Call" Webpage | Weikel 1 | | X | Not relevant: FRE 401 |
| DTX-546 | FTC356-000334 | 4/19/2012 | Email from C Warren to D Green Re: USDOJ Fully Executed Contract | Green 16 | | X | Not relevant: FRE 401 |
| DTX-547 | FTC356-000286 | 4/24/2012 | Email from J Honora to D Green Re: Synopsis of Relevant Laws | Green 8 | | X | Not relevant: FRE 401 |
| DTX-548 | No Bates | 4/24/2012 | National Do Not Call Registry Website Faq Page | Stauffer 50 (PN 50) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-549 | | 4/25/2012 | Guide Caller ID and Spoofing | NC 20 | | | Foundation; Not relevant: FRE 401; |
| DTX-550 | No Bates | 6/13/2012 | National Do Not Call Registry | Walthall 3 | | X | Not relevant: FRE 401 |
| DTX-551 | No Bates | 6/14/2012 | Email from M Castillo to P Runkle Re: Dish | Castillo 22 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-552 | No Bates | 6/14/2012 | Email from M Castillo to P Runkle Re: Please Give Me a Call | Castillo 23 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-553 | No Bates | 6/14/2012 | Email from M Castillo to P Runkle Re: Please Call About Dish Network | Castillo 24 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-554 | FTC356-000019 | 6/29/2012 | Memorandum from R Williams to K Maddox Re: Expert Witness Bill | Green 4 | | X | Not relevant: FRE 401 |
| DTX-555 | FTC356-000026 | 7/19/2012 | Email from S Lee to D Green Re: Defender | Green 26 | | X | Not relevant: FRE 401 |
| DTX-556 | FTC356-000325 | 7/23/2012 | Email from S Lee to D Green Re: US v Dish - Documents Re Dish's Internal Correspondence | Green 12 | | X | Not relevant: FRE 401 |
| DTX-557 | FTC356-000292 | 7/25/2012 | Email from L Hsiao to D Green Re: TM_Expert_Lengths | Green 10 | | X | Not relevant: FRE 401 |
| DTX-558 | No Bates | 7/26/2012 | Taylor | Yoeli 16 | | X | Hearsay: FRE 802 |
| DTX-559 | FTC356-000162 | 8/2/2012 | Email from D Green to L Haslo Re: Dish Network Case Invoice #2 | Green 5 | | X | Not relevant: FRE 401 |
| DTX-560 | FTC356-000330 | 9/11/2012 | Email from C Warren to D Green Re: USDOJ-Fully Executed Contract Mod 1 | Green 17 | | X | Not relevant: FRE 401 |
| DTX-566 | No Bates | 10/10/2012 | Declaration Of Rick Stauffer | Stauffer 60 (PN 60) (11/28/12) | X | X | |
| DTX-567 | No Bates | 10/15/2012 | Email from L Hsiao to R Stauffer et al Re: Project Update | Stauffer 59 (PN 59) (11/28/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-569 | No Bates | 10/16/2012 | Mazzuchetti, A Hutnik, E Weidman, I Korzha Re: United States v Dish Network LLC | Yoeli 15 | | X | Not relevant: FRE 401 |
| DTX-570 | No Bates | 10/31/2012 | Declaration Of Rick Stauffer (Draft Copy) | Stauffer 55 (PN 55) (11/28/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-571 | FTC356-000357 | 11/2/2012 | Email from L Hsiao to D Green Re: Additional Documents for Your Reply Report | Green 18 | X | X | |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-572 | FTC356-000003 | 11/30/2012 | How Big is the Telemarketing Industry | Green 3 | | X | Hearsay: FRE 802 |
| DTX-573 | No Bates | 12/12/2012 | Telemarketing | Green 20 | | X | Hearsay: FRE 802; |
| DTX-574 | No Bates | 12/12/2012 | Cold Calling | Green 21 | | X | Hearsay: FRE 802; |
| DTX-575 | No Bates | 12/12/2012 | Interactive Voice Response | Green 22 | | X | Hearsay: FRE 802; |
| DTX-576 | No Bates | 12/12/2012 | Contact Center Compliance | Green 23 | | X | Hearsay: FRE 802; |
| DTX-577 | FTC367-000004 | 12/13/2012 | Email from S Lee to E Yoeli Re: Bates Numbers | Yoeli 22 | | X | Not relevant: FRE 401 |
| DTX-578 | No Bates | 12/14/2012 | Plaintiffs' Supplemental Responses To Dish's Interrogatories | Yoeli 26 | X | X | |
| DTX-579 | Infinity-023775 INFINITY-023776 | 8/2/2013 | Email from G Smith to L Miska Re: Lead from Website | Slater 2 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-580 | No Bates | 10/21/2013 | U S DOJ Letter from L Hsiao to H Kelly Re: United States, et al v Dish Network LLC, No 3:09-CV-03073 | Yoeli 25 | | X | Not relevant: FRE 401 |
| DTX-581 | No Bates | 10/10-16/2012 | PossibleNow Invoices #DS3227 & #DS3229 | Stauffer 61 (PN 61) (11/28/12) | | X | Not relevant: FRE 401 |
| DTX-582 | No Bates | 4/1/04 - 9/30/04 | FTC OIG Report #31 - Semiannual Report To Congress | Miller 17, Torok 4, Shaffer 5 | | X | Not relevant: FRE 401 |
| DTX-583 | Dish000056 | Undated | Analysis Of The Potential Input File Issue For The October 2008 National DNC Registry Reassign Process | Stauffer 15 (PN 15) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-584 | 670 | Undated | Performance Work Statement For A National Do-Not-Call Registry | Miller 3 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-585 | LM000136099 | Undated | Targus Disconnected Service on DNC Registry | Shaffer 7 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-586 | No Bates | Undated | National Do Not Call Registry Website | Torok 3 | | X | Not relevant: FRE 401 |
| DTX-587 | No Bates | Undated | Federal Trade Commission First Amended Do Not Call Statement of Work, National Do Not | French 1 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-588 | FTC356-000167 | Undated | Sources Used for Department of Justice Outline | Green 6 | X | X | |
| DTX-589 | FTC356-000168 | Undated | Sources Used for Department of Justice Outline | Green 7 | X | X | |
| DTX-590 | No Bates | Undated | FTC Telemarketing Sales Rule (TSR Rule) | Green 9 | | X | Hearsay: FRE 802 |
| DTX-591 | No Bates | Undated | Summary of Call Records | Green 11 | | X | Hearsay: FRE 802 |
| DTX-592 | No Bates | Undated | Timeline | Green 13 | | X | Hearsay: FRE 802 |
| DTX-593 | No Bates | Undated | Chart | Green 14 | | X | Hearsay: FRE 802 |
| DTX-594 | No Bates | Undated | Chart Compliance FTEs July 1008 | Green 15 | | X | Hearsay: FRE 802 |
| DTX-595 | No Bates | Undated | Expert Report of K Sponsler | Green 24 | | X | Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-596 | No Bates | Undated | DOJ Definitions | Green 27 | | X | Hearsay: FRE 802 |
| DTX-597 | US v Dish000056 | Undated | Analysis of the Potential Input File Issue for the October 2008 National DNC Registry Reassign Process | Horne 12, PN 15 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-598 | No Bates | Undated | Federal Trade Commission Semiannual Report to Congress April 1, 2004-September 30, 2004 | Horne 15, Tozok 4 | | X | Not relevant: FRE 401 |
| DTX-599 | FTC003-084737 | Undated | Metadata for N136_reghits txt_01 | Mastrocinque 11 | | X | Not relevant: FRE 401 |
| DTX-600 | FTC009-001048 | Undated | N136_Intermediate_1 | Mastrocinque 15 | | X | Not relevant: FRE 401 |
| DTX-601 | FTC003-040706 | Undated | Observations in N136 But Not in DNC | Mastrocinque 16 | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-602 | No Bates | Undated | Chart Which Tracks Discs Sent to Interimage | Mastrocinque 17 | | X | Not relevant: FRE 401 |
| DTX-603 | No Bates | Undated | Standard Operating procedures for Do Not Call Training National Satellite Systems | Levi 22 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-604 | No Bates | Undated | ACL B2B Corp DBA National Satellite Systems Compliance Document SAN#: 279645-526364- 07 Do Not Call Guidelines, Parameters & Detailed DNC Policy, DNC Registration with Federal DNC and Possible Now | Levi 23 | | X | Hearsay: FRE 802 |
| DTX-605 | FTC003-073383 | Undated | Civil Investigative Demand Schedule for Production of Documentary Materials | Teichert 5 | X | X | |
| DTX-606 | Various | Undated | Dialer Commands | Teichert 6 | | X | Hearsay: FRE 802 |
| DTX-607 | DISH5-0000006864 | Undated | Facts Blast Your EchoStar Retailer Agreement Prohibits Retailers from Violating Any Applicable Laws, Including Federal and State Marketing and Telemarketing Laws | Brandvein 22 | | X | Hearsay: FRE 802 |
| DTX-609 | No Bates | Undated | Q&A: The National Do Not Call Registry | Krebs 11 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-610 | Ill001-0000327 | Various | Various Complaints | Diemer 4 | | X | Foundation; Hearsay: FRE 802 |
| DTX-611 | FTC308-000019 | | General Procedures for Counting Registry Hits | Dziekan 9, Mastrocinque 3 | | X | Hearsay: FRE 802 |
| DTX-612 | FTC003-084737 | Undated | N136_reghits txt_01 | Mastrocinque 10 | X | X | |
| DTX-613 | FTC003-000422 | | Analysis by the Bureau of Economics | Mastrocinque 18 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-614 | FTC007-000108 | Undated | Collection fo Consumer Complaints in the National Do Not Call Registry | Mastrocinque 24 | | X | Foundation; Not relevant: FRE 401; |
| DTX-615 | FTC007-000102 | Undated | Electronic Document Containing Information from the Consumer Sentinel database | Mastrocinque 25 | | X | Foundation; Not relevant: FRE 401; |
| DTX-616 | FTC007-000103 | Undated | Electronic Document Containing Complaint Information Removed from the Consumer Sentinel Network Database | Mastrocinque 26 | | X | Foundation; Not relevant: FRE 401; |
| DTX-617 | No Bates | Undated | Metadata for Exhibit 26 | Mastrocinque 27 | | X | Foundation; Not relevant: FRE 401; |
| DTX-618 | DISH9-0004652 | Undated | Fraud, Identity Theft, and TCPA training | | | X | Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-619 | No Bates | 4-03-15 | Press Release - FTC and Ten State Attorneys General Take Action Against Political Survey Robocallers Pitching Cruise Line Vacations to | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-620 | No Bates | 4/16/2009 | Press Release - DIRECTV, Comcast to Pay Total of $3 21 Million for Entity-Specific Do Not | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-621 | No Bates | 12/13/2005 | Press Release - DirectTV to Pay $5 3 Million Penalty For Do Not Call Violations | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-622 | No Bates | 11/7/2007 | Press Release - FTC Announces Law Enforcement Crackdown on Do Not Call | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-623 | No Bates | 5/19/2014 | Press Release - Sprint to Pay $7 5 Million for Unwanted Marketing Calls and Texts in Record Do-Not-Call Settlement | | | X | Not relevant: FRE 401 |
| DTX-624 | No Bates | 7/15/2008 | FTC Charges Dish Network Marketers with Do Not Call and Abandoned Call Violations | | | X | Inadmissible compromise negotiations: FRE 408 |
| DTX-625 | No Bates | 9/22/2009 | Dish Network Dealers Settle With FTC Over "Do Not Call" Charges | | | X | Inadmissible compromise negotiations: FRE 408 |
| DTX-626A | No Bates | | Summaries of John Taylor Data Analyses Count I NDNCR All Campaigns Data Summary | | | | Foundation; Hearsay: FRE 802; Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-626B | No Bates | | Summaries of John Taylor Data Analyses Count I NDNCR Month Campaigns Data Summary | | | | Foundation; Hearsay: FRE 802; Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-626C | No Bates | | Summaries of John Taylor Data Analyses Count I No English Data Summary | | | | Foundation; Hearsay: FRE 802; Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-626D | No Bates | | Summaries of John Taylor Data Analyses Count I Not Completed Data Summary | | | | Foundation; Hearsay: FRE 802; Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-626E | No Bates | | Summaries of John Taylor Data Analyses Count II-Internal and eCreek Data Summary | | | | Foundation; Hearsay: FRE 802; Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-627 | DISH12-000026 | | Excel spreadsheet | | X | X | |
| DTX-628 | DISH12-000027 | | Excel spreadsheet | | X | X | |
| DTX-629 | DISH-12-000028 | | Excel spreadsheet | | X | X | |
| DTX-630 | DISH-12 000030 | | Excel spreadsheet | | X | X | |
| DTX-631 | DISH-12 000080 | | Excel spreadsheet | | | | Foundation; Not relevant: FRE401; Hearsay: FRE802; Untimely and prejudicial: FRCPs 26 and 37 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-632 | DISH-12 000081 | | Excel spreadsheet | | | | Foundation; Not relevant: FRE401; Hearsay: FRE802; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-633 | DISH-12 000082 | | Excel spreadsheet | | | | Foundation; Not relevant: FRE401; Hearsay: FRE802; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-634 | DISH-12 000083 | | Excel spreadsheet | | | | Foundation; Not relevant: FRE401; Hearsay: FRE802; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-635 | DISH-12 000084 | | Excel spreadsheet | | | | Foundation; Not relevant: FRE401; Hearsay: FRE802; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-636 | DISH-12 000085 | | Excel spreadsheet | | | | Foundation; Not relevant: FRE401; Hearsay: FRE802; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-637 | DISH-12 000086 | | Excel spreadsheet | | | | Foundation; Not relevant: FRE401; Hearsay: FRE802; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-638 | DISH-12 000087 | | Excel spreadsheet | | | | Foundation; Not relevant: FRE401; Hearsay: FRE802; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-639 | DISH-12 000088 | | Excel spreadsheet | | | | Foundation; Not relevant: FRE401; Hearsay: FRE802; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-640 | No Bates | 9/19/2012 | Letter from J  Taylor to L  Hsiao, Re: Expert Report of John Taylor in US v  DISH | DX-246 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-641 | DISH11-000009 | | Excel spreadsheet | | X | X | |
| DTX-642 | DISH11-000011 | | Excel spreadsheet | | X | X | |
| DTX-643 | DISH11-000012 | | Excel spreadsheet | | X | X | |
| DTX-644 | DISH11-000013 | | Excel spreadsheet | | X | X | |
| DTX-645 | DISH11-000014 | | Excel spreadsheet | | X | X | |
| DTX-646 | DISH11-000001 | | Excel spreadsheet | | X | X | |
| DTX-647 | DISH11-000003 | | Excel spreadsheet | | X | X | |
| DTX-648 | DISH11-000005 | | Excel spreadsheet | | X | X | |
| DTX-649 | DISH11-000007 | | Excel spreadsheet | | X | X | |
| DTX-650 | Dish-00006842 | 12/10/2007 | Email from R  Bangert to B  Davis, Timeline Information | | | X | Foundation; Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-651 | Dish-00002144 | | Echostar eCreek Outbound Start Up Business Requirements Documents (BRD) | | | X | Foundation; Hearsay: FRE 802 |
| DTX-654 | Dish-001138 | | Email from T Cain Re Do Not Call List Requests 6/29/2005 | | | X | Hearsay: FRE 802 |
| DTX-655 | DISH5-000075046 | | Excel spreadsheet | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-656 | DISH2-000038712 | | Excel spreadsheet | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-657 | DISH-00001984 | | Echostar Acknowledgement Form: Do Not Call (DNC) Sting Procedures | | | X | Foundation; Hearsay: FRE 802 |
| DTX-658 | Dish-00001982 | | Investigator Process for DNC | | | X | Foundation; Hearsay: FRE 802 |
| DTX-659 | Dish-00007474 | 9/24/2008 | Email from T Muenchen to R Musso, RE: Possible Now, SAN requirement | | | X | Hearsay: FRE 802 |
| DTX-660 | Dish-00007641 | 10/17/2008 | Email from J Slater to E Loewenstern, FW_PossibleNOW Vendor for Dish Network | | | X | Hearsay: FRE 802 |
| DTX-661 | Dish-00007645 | | PossibleNOW How to Obtain A Subscription Account Number (SAN) Step-by-Step | | | X | Hearsay: FRE 802 |
| DTX-662 | DISH2-000038280 | 3/23/2010 | Email from A Dexter to B Lohmeier RE: Dish Pix updates | Dexter 249 | | X | Hearsay: FRE 802 |
| DTX-663 | DISH2-000038256 | 3/15/2010 | Email from J Sitko to A Dexter RE: NLOS, HWO and DS-HWO list sizes | Dexter 245 | | X | Hearsay: FRE 802 |
| DTX-664 | DISH5-000042937 | 3/24/2009 | Letter from B Van Ernst to T Turner Re: Notice of Automatic Termination of Distributor Retailer Agreement | | | X | Hearsay: FRE 802 |
| DTX-665 | Dish-00007760 | 7/23/2008 | Email from R Musso to M Mills, RE: I Sat and | | | X | Hearsay: FRE 802 |
| DTX-666 | No Bates | | Curriculum Vitae of Kenneth Sponsler | Sponsler 1 | | X | Not relevant: FRE 401 |
| DTX-667 | No Bates | | Expert Report of Ken Sponsler | Sponsler 2 | | X | Hearsay: FRE 802 |
| DTX-668 | DishNetwork-FTC-0020013 | 7/8/2010 | Email J Blum to B Kitei RE: Certficiation Report | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-669 | DISH2-000038412 | | Dish Project Scope Document | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-670 | DISH2-000038842 | 7/1/2010 | Meeting Notes, Overview of Pdialer | | | X | Foundation; Hearsay: FRE 802 |
| DTX-671 | DISH5-000074517 | 3/16/2011 | Email from A Dexter to B Lohmeier, Feedback File Codes xls | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-672 | DISH5-000102804 | 1/30/2007 | Email from M Oberbillig to B Werner, FW:Satellite Systems illegal telemarketing | | | X | Hearsay: FRE 802 |
| DTX-673 | DISH5-000102801 | 1/30/2007 | Email from M Oberbillig to B Werner, FW: Telemarketing | | | X | Hearsay: FRE 802 |
| DTX-674 | No Bates | | | PX259 | | X | Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-675 | FTC003-065647 | | | Hagen 4 | | X | Foundation; Hearsay: FRE 802 |
| DTX-676 | Dish-00000077 | | Dish Quality Assurance packet | Hagen 4 | | X | Foundation; Hearsay: FRE 802 |
| DTX-677 | DISH13-000001 | | Spreadsheet | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-678 | DISH13-000002 | | DISH Network LLC Do-Not-Call Policy | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-679 | DISH13-000006 | | Community Homepage 30-Day News: Do Not Call Escalations Form Work Flow Update | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-680 | DISH13-000007 | | Spreadsheet | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-681 | DISH13-000008 | | Spreadsheet | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-682 | DISH13-000009 | | CompliancePoint Report | | | | Prejudicial: FRE 403 Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37;Best Evidence Rule: FRE 1002 |
| DTX-683 | DISH13-000019 | | DISH Outbound Operations - Summary of Processes and Procedures | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37;Best Evidence Rule: FRE 1002 |
| DTX-684 | DISH13-000031 | | Order - In the Matter of AT&T Mobility LLC - Unauthorized Third-Party Billing Charges | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-685 | DISH13-000045 | | Order - In the Matter of Celleco Partnership d/b/a Verizon Wireless - Unauthorized Third-Party Billing Charges | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-686 | DISH13-000059 | | Order - In the Matter of Sprint Corporation - Unauthorized Third-Party Billing Charges | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-687 | DISH13-000074 | | Order - In the Matter of T-Mobile USA, Inc - Unauthorized Third-Party Billing Charges | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-688 | DISH13-000090 | | WinBack_DV_List_10 | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-689 | DISH13-000093 | | WinBack_DV_List_14 | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-690 | DISH13-000096 | | WinBack_DV_List_06 | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-691 | DISH13-000099 | | WinbackDM_Latino | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-692 | DISH13-000102 | | dd_premium txt | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-693 | DISH13-000107 | | dd_premium txt | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-694 | DISH13-000112 | | dd_mad_satellite | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-695 | DISH13-000119 | | dd_mad_wireline | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-696 | DISH13-000126 | | mad_05m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-697 | DISH13-000134 | | mad_07m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-698 | DISH13-000142 | | mad-09m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-699 | DISH13-000150 | | mad_11m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-700 | DISH13-000158 | | mad_13m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-701 | DISH13-000165 | | mad_15m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-702 | DISH13-000172 | | mad_17m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-703 | DISH13-000179 | | mad_19m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-704 | DISH13-000186 | | mad_21m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-705 | DISH13-000193 | | mad_23m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-706 | DISH13-000200 | | mad_25m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-707 | DISH13-000207 | | mad_27m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-708 | DISH13-000214 | | mad_29m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-709 | DISH13-000221 | | mad_31m | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-710 | DISH13-000228 | | futuredisco | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-711 | DISH13-000231 | | LTS | | | | Foundation; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-712 | DISH13-000289 | | Complaint for Permanent Injunction and Other Equitable Relief against Asia Pacific Telecom, Inc , et al :  10-C-3168 in the Northern District of Illinois (Eastern Division) | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-713 | DISH13-000307 | | Stipulated Final Judgment against Asia Pacific Telecom, Inc , et al :  10-C-3168 in the Northern District of Illinois (Eastern Division) | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-714 | DISH13-000337 | | Complaint for Civil Penalties, Permanent Injunction, and Other Relief against Braglia Marketing Group et al , CV-S-04-1209-DWH-PAL in District of Nevada | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-715 | DISH13-000344 | | Stipulated Judgment and Order for Permanent Injunction Braglia Marketing Group et al , CV-S-04- 1209-DWH-PAL in District of Nevada | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-716 | DISH13-000388 | | Complaint for Civil Penalties, Permanent Injunction, and Other Relief against Caribbean Cruise Line, Inc  et al , 0:15-cv-60423 in Southern District of Florida | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-717 | DISH13-000433 | | Stipulated Order for Permanent Injunction and Civil Penalty Judgment against Caribbean Cruise Line, Inc  et al , 0:15-cv-60423 in Southern District of Florida | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-718 | DISH13-000483 | | Relief against Credit Foundation of America et al , CV06-3654 ABC in Central District of California (Southern Division) | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-719 | DISH13-000503 | | Stupulated Judgment and Order for Permanent Injunction against Credit Foundation of America et al , CV06-3654 ABC in Central District of California (Southern Division) | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-720 | DISH13-000530 | | Complaint for Civil Penalties, Permanent Injunction and Other Relief against DirectTV, Inc  et al , SACV05-1211 in Central District of California (Western Division) | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-721 | DISH13-000605 | | Stipulated Judgment and Order for Permanent Injunction against DirectTV, Inc  et al , SACV05- 1211 in Central District of California (Western Division) | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-722 | DISH13-000694 | | Complaint for Civil Penalties, Permanent Injunction, and Other Relief against Brian Ebersole et al , 3:12-cv-00105 in District of Nevada | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-723 | DISH13-000713 | | against Brian Ebersole et al , 3:12-cv- 00105 in District of Nevada | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-724 | DISH13-000828 | | Complaint for Permanent Injunction and Other Equitable Relief against Mortgage Investors Corp  of Ohio, Inc  et al , 8:13-cv-1647 in Middle District of Florida | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-725 | DISH13-000848 | | Stipulated Final Order for Permanent Injunction and Civil Penalty Injunction against Mortgage Investors Corp  of Ohio, Inc  et al , 8:13-cv-1647 in Middle District of Florida | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-726 | DISH13-000863 | | Complaint for Civil Penalties, Permanent Injunction and Other Equitable Relief against Paul Navestad et al , 09-cv-6329 in Western District of New York | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-727 | DISH13-000879 | | Decision and Order against Paul Navestad et al , 09-cv-6329 in Western District of New York | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-728 | DISH13-000934 | | Order - In the Matter of Sprint Nextel Corporation | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-729 | DISH13-000936 | | Order - In the Matter of Sprint Corporation f/k/a Nextel Corporation - Compliance with the Commission's Company Specific Do Not Call Rules | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-730 | DISH13-000954 | | Complaint for Civil Penalties, Permanent Injunction and Order Equitable Relief against The Talbots, Inc , 10-cv-10698 in District of Massachusetts | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-731 | DISH13-000962 | | against The Talbots, Inc , 10-cv-10698 in District of Massachusetts | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-732 | DISH13-000975 | | Order - In the Matter of T-Mobile USA, Inc - Compliance with the Commission's Rules and Regulations Governing the National Do-Not-Call Registry | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-733 | DISH13-000986 | | Complaint for Civil Penalties, Permanent Injunction, and Other Relief against Versatile Marketing Solutions, Inc and Jasjit Gotra, 1:14-cv- 10612 in District of Massachusetts | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-734 | DISH13-000996 | | Stipulated Final Order for Permanent Injunction and Civil Penalty Judgment against Versatile Marketing Solutions, Inc and Jasjit Gotra, 1:14-cv- 10612 in District of Massachusetts | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-735 | DISH13-001024 | | Complaint for Civil Penalties, Permanent Injunction, and Other Relief against Voice-Mail Broadcasting Corporation and Jesse Crowe, CV08- 00521 in Central District of California | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-736 | DISH13-001033 | | Stipulated Judgment and Order for Permanent Injunction gainst Voice-Mail Broadcasting Corporation and Jesse Crowe, CV08-00521 in Central District of California | | | X | Prejudicial: FRE 403; Not relevant: FRE 401 |
| DTX-737 | DISH5-0000015157 | | Memo to Echostar from JSR Satellite | | | X | Hearsay: FRE 802 |
| DTX-738 | No Bates | 12/19/2008 | Affidavit of B  Van Emst | Van Emst 360 | | X | Hearsay: FRE 802 |
| DTX-739 | FTC363-000015 | | Declaration of Richard Goodale | PX-261 | | X | Hearsay: FRE 802 |
| DTX-740 | DISH-Paper-07995 | | Email from Origer to Musso Re Satellite Systems Network | | | X | Hearsay: FRE 802 |
| DTX-741 | DISH-Paper-07983 | | Email Re Satellite Systems Network | | | X | Hearsay: FRE 802 |
| DTX-742 | No Bates | 8/26/2013 | Deposition of B  Tehranchi from Donaca v  Dish Network LLC, 11-cv-02910-RBJ | | | X | Hearsay: FRE 802 |
| DTX-744 | No Bates | | http://www.DNC com | | | | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-745 | DISH-00001998 | | Dish Network - DNC Investigation Team Manual | | | X | Hearsay: FRE 802 |
| DTX-746 | No Bates | Various | Press Releases Re Dish Network Terminates Retailers | Van Emst 351 | | X | Hearsay: FRE 802 |
| DTX-747 | 15 pages of Bates numbers | Various | PossibleNow Processing Receipts (include Montano 284) | | | X | Not relevant: FRE 401; Hearsay: FRE 802; Untimely and prejudicial: FRCPs 26 and 37; Best Evidence Rule: FRE 1002 |
| DTX-749 | DISH2-000036986 | | Email from JSR to Vendor Inquiries re numbers | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-750 | DISH5-000015156 | | Email from JSR responding to Wallace complaint | | | X | Hearsay: FRE 802 |
| DTX-751 | DISH5-000015159 | | JSR sales script for Wallace complaint | | | X | Foundation; Hearsay: FRE 802 |
| DTX-752 | DISH5-0000112489 | | Email from B  Fielding to B  Neylon re JSR message broadcasting | | X | X | |
| DTX-753 | DISH5-000015160 | | Email from JSR to Musso re Foard complaint | | | X | Hearsay: FRE 802 |
| DTX-754 | DISH5-000112556 | | Emails from R  Musso and M  Mills Re JSR Enterprises | | | X | Hearsay: FRE 802 |
| DTX-755 | DISH9-0001357 | | Emails between R  Musso and M  Mills re JSR Enterprises | | | X | Hearsay: FRE 802 |
| DTX-756 | DISH5-000015178 | | Memo from JSR Re Alleged DNC Violations | | | X | Hearsay: FRE 802 |
| DTX-757 | DISH5-000031649 | | Email from R  Musso re phone number | | | X | Hearsay: FRE 802 |
| DTX-758 | DISH5-000031638 | | Email from R  Musso re phone number | | | X | Hearsay: FRE 802 |
| DTX-759 | DISH5-000103096 | | Email from D  Mason Re JSR | | | X | Hearsay: FRE 802 |
| DTX-760 | Dish-00007833 | | Email from C  Taber to R  Musso Re Satellite Promotions | | | X | Hearsay: FRE 802 |
| DTX-762 | DISH5-000116966 | | Email from R  Musso to S  Snyder Re Hired Quality Manager | | | X | Hearsay: FRE 802 |
| DTX-763 | NSS27545 | | Email from K  Juneja Re IP Approval Request | Levi 8 | | X | Hearsay: FRE 802 |
| DTX-764 | DISH5-000115257 | | Email from R  Musso to R  Calbert Re IP Approval Request | | | X | Hearsay: FRE 802 |
| DTX-765 | Dish-00007800 | | Email from R  Musso to K  Juneja Re Wireless DNC List | | | X | Hearsay: FRE 802 |
| DTX-766 | Dish-00007457 | | Email from PossibleNow to R  Musso | | | X | Hearsay: FRE 802 |
| DTX-767 | NSS26857 | | Email from K  Levi to R  Musso Re PossibleNow | Levi 12 | | X | Hearsay: FRE 802 |
| DTX-768 | NSS25118 | | Email from K  Juneja to R  Musso Re TCPA Consumer Complaints | Levi 16 | | X | Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**                                                                        **32 of 42**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-769 | NSS24951 | | Email from K Levi to A Ahmed Re Update | Levi 19 | | X | Hearsay: FRE 802 |
| DTX-770 | DISH2-000039600 | | Email from R Musso to PossibleNow Re Report | | | X | Hearsay: FRE 802 |
| DTX-771 | DISH2-000034566 | | Email from K Juneja RE TCPA | | | X | Hearsay: FRE 802 |
| DTX-772 | DISH2-000034594 | | Email from K Juneja Re TCPA Allegation | | | X | Hearsay: FRE 802 |
| DTX-773 | DISH2-000034600 | | Email from K Juneja to S Snyder Re TCPA Allegation | | | X | Hearsay: FRE 802 |
| DTX-774 | DISH5-000040865 | | Executive Summary of Airbel Wireless,Inc | | | X | Foundation; Hearsay: FRE 802 |
| DTX-775 | DISH2-000034605 | | Computer Screenshot | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-776 | DISH2-000034608 | | Computer Screenshot DNC Solution | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-777 | DISH2-000024895 | | Email fron K Junja to R Musso Re National Satellite Systems | Levi 7 | | X | Hearsay: FRE 802 |
| DTX-778 | Various | | Email from K Juneja Re TCPA Complaint | Levi 20 | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-779 | DISH2-000034693 | | Email from K Juneja to R Musso Re TCPA | | | X | Hearsay: FRE 802 |
| DTX-780 | DISH2-000034777 | | Email from K Juneja | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-781 | DISH2-000034784 | | Email from R Musso to K Juneja Re National Satellite Systems | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-782 | DISH2-000034794 | | Email from R Musso to K Juneja Re National Satellite Systems | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-783 | DISH2-000034560 | | Email from K Juneja to R Musso Re TPA Allegation | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-784 | DISH2-000022362 | | Email from R Musso to K Juneja Re TCPA Complaints | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-785 | DISH2-000034821 | | Email from R Musso to K Juneja Re National Satellite Systems | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-786 | DISH2-000034831 | | Email from R Musso to K Juneja Re National Satellite Systems | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-787 | DISH2-000034844 | | Email from K Juneja to R Musso Re NSS Allegation of DNC Violation | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-788 | DISH2-000024914 | | Email from K Juneja to S Snyder Re TCPA Allegation | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-789 | Dish-00006853 | | EchoStar Satellite LLC "Do Not Call" Internal Procedures | | | X | Foundation; Hearsay: FRE 802 |
| DTX-790 | No Bates | 5/11/2015 | Dish Network Corp Form 10-Q for the Period Ending 3/31/2015 | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-791 | No Bates | | Fitch Ratings for Dish Network Corp | | | | Prejudicial: FRE 403; Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-792 | DISH2-000024902 | | Email from K  Juneja to R  Musso Re TCPA Issues | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-793 | DISH5-000087241 | | Dish Network Retailer Business Rules | | | X | Hearsay: FRE 802; Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-794 | DISH9-0008845 | | Letter from R  Origer to B  Colin Re DNC Violation | | | X | Foundation; Hearsay: FRE 802 |
| DTX-795 | DISH-Paper-024518 | | Email from Vendor Inquiries Re Atlas Assets | | | X | Hearsay: FRE 802 |
| DTX-796 | DISH-Paper-005618 | | Email from R  Musso to B  Werner Re Altas Assets | | | X | Hearsay: FRE 802 |
| DTX-797 | DISH-Paper-005614 | | Email from R  Musso to B  Werner Re Altas Assets | | | X | Foundation; Hearsay: FRE 802 |
| DTX-798 | DISH-Paper-016590 | | Do-Not-Call List Infor for B  Olive | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-799 | DISH-Paper-005606 | | Letter from R  Origer to S  Briefy Re B  Olive Complaint | | | X | Foundation; Hearsay: FRE 802 |
| DTX-800 | DISH-Paper-024517 | | Email from R  Musso to S  Briefy Re TCPA Issues | | | X | Hearsay: FRE 802 |
| DTX-801 | DISH-Paper-024516 | | Email from S  Briefy to R  Musso Re TCPA Issues with Attachment | | | X | Hearsay: FRE 802 |
| DTX-802 | DISH-Paper-024514 | | Email from B  Colin to R  Musso Re Atlas Assets | | | X | Hearsay: FRE 802 |
| DTX-803 | DISH-Paper-024503 | | Email from R  Musso to B  Colin Re DNC Issues | | | X | Hearsay: FRE 802 |
| DTX-804 | DISH-Paper-024502 | | Email from R  Musso to B  Colin Re Silverbird | | | X | Hearsay: FRE 802 |
| DTX-805 | DISH-Paper-024488 | | Email from B  Colin to R  Musso Re Silverbird | | | X | Hearsay: FRE 802 |
| DTX-806 | DISH-Paper-024487 | | Email from B  Neylon to R  Musso Re Atlas Assets | | | X | Hearsay: FRE 802 |
| DTX-807 | DISH-Paper-024483 | | Email from R  Musso to R  Origer Re Atlas Assets | | | X | Hearsay: FRE 802 |
| DTX-808 | DISH-Paper-024473 | | Email from B  Colin to R  Musso Re Atlas Assets | | | X | Hearsay: FRE 802 |
| DTX-809 | DISH-Paper-24467 | | Email from B  Colin to R  Musso Re Atlas Assets | | | X | Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-810 | DISH-Paper-005620 | | Letter from R  Origer to B  Colin Re Atlas Asset Termination | | | X | Hearsay: FRE 802 |
| DTX-811 | DISH-Paper-024446 | | Email from B  Werner Re Retailer Termination Atlas Assets | | | X | Hearsay: FRE 802 |
| DTX-812 | No Bates | | Spreadsheet | Musso 306 | | X | Hearsay: FRE 802 |
| DTX-813 | No Bates | | Spreadsheet | Musso 308 | | X | Hearsay: FRE 802 |
| DTX-814 | No Bates | | Spreadsheet | Musso 307 | | X | Hearsay: FRE 802 |
| DTX-815 | Dish-00009252 | | Email from R  Musso to T  Muenchen and G  Caldwell Re Account Managers and Staff | | | X | Hearsay: FRE 802 |
| DTX-816 | DISH5-000088000 | | Email from R  Musso to G  Caldwell and T  Muenchen Re Distributors | | | X | Hearsay: FRE 802 |
| DTX-817 | Dish-00007387 | | Email from T  Koch to R  Musso et al  Re Possible Now and Retailers | | | X | Hearsay: FRE 802 |
| DTX-819 | DISH5-000092992 | | Email from R  Musso to T  Lanoie Re Non Disclosure Analysis OE Partners | | | X | Hearsay: FRE 802 |
| DTX-820 | DISH-Paper-017447 | | Email from R  Musso to T  Pyle Re American Satellite, Inc Complaints | | | X | Hearsay: FRE 802 |
| DTX-821 | DISH-Paper-017455 | | Email from B  Neylon to R  Musso Re American Satellite, Inc | | | X | Hearsay: FRE 802 |
| DTX-822 | DISH-Paper-024867 | | Email from A  Olival to R  Musso Re American Satellite, Inc | | | X | Hearsay: FRE 802 |
| DTX-823 | DISH-Paper-024866 | | Email from R  Musso Re PossibleNow | | | X | Hearsay: FRE 802 |
| DTX-825 | DISH-Paper-017434 | | Email from T  Pyle to R  Musso Re TCPA Allegation | | | X | Hearsay: FRE 802 |
| DTX-827 | DISH5-000112680 | | Email from R  Musso to K  Gonzalez Re Atlas Asset Termination | | | X | Hearsay: FRE 802 |
| DTX-828 | Dish-0000438 | | Dish Network Presentation: Do Not Call Regulatory Compliance | DX-12 | | X | Hearsay: FRE 802 |
| DTX-829 | DISH5-000021674 | | Dish Network Presentation: Do Not Call Regulatory Compliance | DX-15 | | X | Hearsay: FRE 802 |
| DTX-830 | DISH12-001138 | | Spreadsheet | | | X | Foundation; Hearsay: FRE 802 |
| DTX-831 | DISH5-000074519 | | Spreadsheet | | | X | Foundation; Hearsay: FRE 802 |
| DTX-832 | DISH5-000016010 | | DNC Escalations Procedures | | | X | Foundation; Hearsay: FRE 802 |
| DTX-833 | Dish-00006855 | | Diagram - "DNC" (Do Not Call) Escalation | | | X | Foundation; Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-834 | No Bates | 9/16/2015 | Forbes Article: "GM Expected to Pay $900 Million in Criminal Penalty for Unsafe Ignition Switches" | | | | Prejudicial: FRE 403; Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-835 | Dish-00006853 | | EchoStar Satellite LLC "Do Not Call" Internal Procedures | | | X | Foundation; Hearsay: FRE 802 |
| DTX-836 | Dish-00006118 | | Email from B  Van Emst to B  Werner Re Apex Satellite | | | X | Hearsay: FRE 802 |
| DTX-838 | Dish-00006119 | | Email from R  Dufault to B, Werner and R  Musso Re Apex Satellite | | | X | Hearsay: FRE 802 |
| DTX-839 | DISH5-000066484 | | Email from B  Wener to B  Van Emst Re Apex Satellite | | | X | Hearsay: FRE 802 |
| DTX-841 | DISH8-0002122 | | Email from R  Musso to L  Kalani Re I-Dish | | | X | Hearsay: FRE 802 |
| DTX-842 | DISH5-000103301 | | Email from B  Werner to S  McElroy Re Cactus Concepts | | | X | Hearsay: FRE 802 |
| DTX-843 | DISH5-000000017 | | Email from B  Werner to B  Van Emst Re Cactus Concepts | | | X | Hearsay: FRE 802 |
| DTX-844 | DISH5-000040372 | | Draft Letter from B  Van Emst yo J  Sucharda Re Cactus Concepts | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-845 | DISH5-000090165 | | Email from M  Mills to Various Re OE Information | | | X | Hearsay: FRE 802 |
| DTX-846 | DISH5-000038260 | | Email from M  Mills to R  Origer, R  Musso and B  Werner Re ERT Complaint Report | | | X | Hearsay: FRE 802 |
| DTX-847 | DISH5-000007379 | | Email from M  Mills to D  Johnson and R  Musso Re Channel Choice Communications | | | X | Hearsay: FRE 802 |
| DTX-848 | DISH5-000093140 | | Email from B  Wener to Various Re Newport | | | X | Hearsay: FRE 802 |
| DTX-849 | DISH5-000000108 | | Email from J  Borup to M  Mills and B  Van Emst Re Account Information | | | X | Hearsay: FRE 802 |
| DTX-850 | DISH5-000069219 | | Email from S  McKean to A Ahmed and M  Mills Re Acceller | | | X | Hearsay: FRE 802 |
| DTX-851 | DISH5-000104053 | | Email from M  Mills to R  Musso Re OE Retailers | | | X | Hearsay: FRE 802 |
| DTX-852 | DISH5-000104186 | | Email from R  Musso to M  Mills and M  Weddle Re Retailer Audit Process | | | X | Hearsay: FRE 802 |
| DTX-853 | DISH5-000086229 | | Email from T  Peterson to R  Musso and M  Mills Re Acceller Call Center | | | X | Hearsay: FRE 802 |
| DTX-854 | DISH5-000086713 | | Email from R  Musso to M  Mills and T  Peterson Re Acceller | | | X | Hearsay: FRE 802 |
| DTX-855 | DISH2-000034401 | | Email from J  Bamira to S  Snyder Re MG Allegation of DNC Violation | | | X | Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-856 | DISH2-000034437 | | Email from S  Snyder to J  Dickstein Re MG Followup DNC Complaints | | | X | Hearsay: FRE 802 |
| DTX-857 | DISH2-000000823 | | Letter from R  Musso to J  Borup Re Notice of Allegation | | | X | Hearsay: FRE 802 |
| DTX-858 | Dish-00007752 | | Email from D  Garza to R  Musso and M  Mills Re I- Sat | | | X | Hearsay: FRE 802 |
| DTX-859 | DISH5-000015052 | | Letter from R  Musso to J  Borup Re Notice of Allegation | | | X | Hearsay: FRE 802 |
| DTX-860 | DISH2-000000828 | | Letter from R  Musso to J  Borup Re Notice of Allegation | | | X | Foundation; Hearsay: FRE 802 |
| DTX-861 | Dish-00007394 | | Email from B  Werner to R  Musso Re Allegations of TCPA | | | X | Hearsay: FRE 802 |
| DTX-862 | Dish-00007673 | | Email from R  Musso to Various Re Allegations of TCPA | | | X | Hearsay: FRE 802 |
| DTX-863 | No Bates | 9/8/2015 | Dismissal in In re: General Motors LLC Ignition Switch Litigation, 14-MD-2543 (JMF) in Southern District of New York | | | X | Prejudicial: FRE 403; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-864 | No Bates | 9/17/2015 | York Announces Criminal Charges Against General Motors and Deferred Prosecution Agreement with $900 Million Forfeiture | | | X | Prejudicial: FRE 403; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-865 | DISH2-000012359 | | Email from TCPA Re M  Collette | | | X | Hearsay: FRE 802 |
| DTX-866 | DISH5-000042586 | | Letter from B  Van Emst to S  Rad Re Direct Promotions, Inc Termination | | | X | Hearsay: FRE 802 |
| DTX-867 | DISH5-000112538 | | Email from R  Musso to M  Mills and B  Neylon Re Satellite Promotions | | | X | Hearsay: FRE 802 |
| DTX-868 | DISH5-000011661 | | Letter from R  Origer to J  Bamira Re Notice of Complaint "Do Not Call" Violations | | | X | Hearsay: FRE 802 |
| DTX-869 | DISH5-000033914 | | Letter from EchoStar Satellite to E  Burg Re Satellite Promotions | | | X | Hearsay: FRE 802 |
| DTX-870 | DISH-Paper-017219 | | Email to S  Bolivar Re Pre-Sale Disclosure Complaints | | | X | Hearsay: FRE 802 |
| DTX-871 | DISH5-000112530 | | Email from R  Musso to B  Neylon Re Satellite Promotions | | | X | Hearsay: FRE 802 |
| DTX-872 | DISH5-000036446 | | Letter from J  Farnsworth to All American Dish Re Pre-recorded Call | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-873 | DISH2-000038663 | | EchoStar Satellite LLC - Acknowledgement Form: DO Not Call (DNC) Sting Procedures | | | X | Foundation; Hearsay: FRE 802 |
| DTX-874 | DISH5-000094299 | | Email from J  martinez to Various Re OE Call Upload Update | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-875 | DISH5-000119578 | | Email from M  Huff to S  Snyder, R  Musso, and B  Werner Re OE Call Upload Update | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-876 | DISH5-000013677 | | Email from M  Mills to R  Musso Re B  Olive | | | X | Hearsay: FRE 802; Best Evidence Rule: FRE 1002 |
| DTX-877 | DISH5-000013714 | | Email from B  Colin to R  Musso Re Atlas Assets | | | X | Hearsay: FRE 802 |
| DTX-878 | DISH2-000036957 | | Email from M  Mills Re Aerowave | | | X | Hearsay: FRE 802 |
| DTX-879 | DISH-Paper-024731 | | Email from M  Metzger to M  Mills and R  Musso Re Atoll Media | | | X | Hearsay: FRE 802 |
| DTX-880 | DISH-Paper-024736 | | Email from R  Musso to B  Werner Re Atoll Media | | | X | Foundation; Hearsay: FRE 802 Best Evidence Rule: FRE 1002 |
| DTX-881 | DISH-Paper-014247 | | Email from R  Musso to C  Voorhies Re Airbel | | | X | Hearsay: FRE 802 |
| DTX-882 | DISH-Paper-014310 | | Stipulation of Voluntary Dismissal in Dish Network LLC v  Airbel Wireless, Case No  77-147 Y 00345 08, for American Arbitration Association | | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-883 | DISH-Paper-014295 | | Letter from C  McGrath to Dish Network and EchoStar Satellite Re Notice of Claim/Arbitration | | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-884 | DISH-Paper-005169 | | Dish Network Memo Re Call to Phil Katz/Airbel Wireless | | | X | Foundation; Hearsay: FRE 802 |
| DTX-885 | DISH-Paper-005149 | | Email from S  Lamba to B  Werner Re Chargebacks | | | X | Hearsay: FRE 802 |
| DTX-886 | DISH-Paper-005110 | | Email from K  Knight to R  Origer and B  Werner Re Airbel | | | X | Hearsay: FRE 802 |
| DTX-887 | DISH5-000107387 | | Pakistani Call Center Ops | | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-888 | DISH5-000013089 | | Memo Re Call to Airbel | | | X | Foundation; Hearsay: FRE 802 |
| DTX-889 | SSN004759 | | DNC Scrub Report | | | | Foundation; Not relevant: FRE 401; Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-890 | DN00011891 | | Email from R  Hutchinson to S  Lee Re Satellite System Network | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-891 | DN00011893 | | Email from R  Hutchinson to S  Lee Re Satellite System Network | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-892 | DN00011991 | | Directv to Dish Script | | | | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-893 | DN00011952 | | Ditectv Script | | | | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-894 | DN00011989 | | Email from R  Hutchinson to S  Lee Re Satellite System Network | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-895 | SSN004755 | | Email from K  Donnelly Re Satellite Systems Network | | | X | Hearsay: FRE 802; Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-896 | SSN000249 | | Fax from S  Tehranchi to R  Hutchinson Re Telemarketing Documents | | | | Foundation; Hearsay: FRE 802 |
| DTX-898 | DISH5-000115401 | | Email from R  Musso to S  Tehranchi Re Satellite Systems Network | | | X | Hearsay: FRE 802 |
| DTX-899 | DISH5-000001358 | | Email from R  Musso Re Satellite Systems Network | | | X | Hearsay: FRE 802 |
| DTX-900 | FTC304-001000 | | Letter from J  Shields to R  Deitch Re Star Satellite | Myers 2 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-901 | DISH5-0000117880 | 8/7/2009 | Email from S  Snyder to jdickstein@saveology com | | | X | Hearsay: FRE 802 |
| DTX-902 | No Bates | | OB Operations Summary of Processes and Procedures | | | | Foundation; Not relevant: FRE 401; Hearsay: FRE 802; Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-903 | No Bates | | 2007-2010 Calling Records NDNCR Analysis_501650 | | | | Foundation; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-904 | No Bates | | areacodes sas7bdat | | | | Foundation; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-905 | No Bates | | Call_Not_Completed_DISH_07_10_309931 | | | | Foundation; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-906 | No Bates | | Five9-NSS NDNCR Hits | | | | Foundation; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-907 | No Bates | | Inquiry Based EBR Conclusion 1A_LTS_873551 (3) | | | | Foundation; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-908 | No Bates | | JSR 2006 NDNCR Hits | | | | Foundation; Untimely and prejudicial: FRCPs 26 and 37 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-909 | No Bates | | No_Solicitation_WN_NE_12552 | | | | Foundation; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-910 | No Bates | | post_crcDNC0710 | | | | Foundation; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-911 | No Bates | | ten_fed_dispc_na_50_na sas7bdat | | | | Foundation; Untimely and prejudicial: FRCPs 26 and 37 |
| DTX-912 | No Bates | | Article" "Presenting the Best of CES 2015 winners!" 1/8/2015 http://www engadget com/2015/01/08/best-of-ces-2015-winners/ | | | | Prejudicial: FRE 403; Foundation; Not relevant: FRE 401; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-913 | No Bates | | Article: "The World's Top 10 Most Innovative Companies of 2015 in Video" 10/26/2015 http://www fastcompany com/3041667/most-innovative-companies-2015/the-worlds-top-10-most-innovative-companies-of-2015-in-video | | | | Prejudicial: FRE 403; Foundation; Not relevant: FRE 401; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-914 | No Bates | | Article: "Best of CES Awards 2014" 10/26/2015 http://www engadget com/best-of-ces-awards-2014/winners/ | | | | Prejudicial: FRE 403; Foundation; Not relevant: FRE 401; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-915 | | | CompliancePointData Analysis Report 10/26/2015 | | | | Prejudicial: FRE 403; Foundation; Not relevant: FRE 401; Hearsay: FRE 802 Untimely and prejudicial: FRCPs 26 and 37; |
| DTX-916 | Dish-00006845 | | EchoStar Satellite, LLC - DO Not Call - Internal Process | | | X | Foundation; Hearsay: FRE 802 |
| DTX-917 | DISH2- 0000008583 | 4/27/2010 | Email from D Laslo to G Santistevn | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-918 | DISH2- 0000031564 | 2/25/2009 | Email from D Laslo to lsees@sbcglobal net | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-919 | DISH2- 0000035647 | 7/13/2007 | Email from D Laslo to Vendor Inquiries | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-920 | DISH2- 0000036846 | 6/1/2009 | Email from D Laslo to S Snyder | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-921 | DISH2- 0000037552 | 6/9/2009 | Email from S Snyder to D Laslo | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-922 | DISH5- 0000075523 | 10/11/2011 | Email from D Laslo to dmworth1@myfairpoint net | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-923 | DISH5- 0000075529 | 10/12/2011 | Email from D  Laslo to M  Metzger | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-924 | DISH5- 0000075534 | 9/16/2010 | Email from D  Laslo to katchmeg@comcast net | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-925 | DISH5- 0000087604 | 8/18/2008 | Email from R  Musso to D  Laslo | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-926 | DISH8-0003426 | 3/10/2010 | Draft Letter from D  Laslo Re Call Intended for Previos Customer | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-927 | Dish-00006770 | 4/3/2009 | Email from D  Laslo to J  Montano | | X | X | |
| DTX-928 | Dish-00006820 | 2/25/2009 | Email from D  Laslo to J  Montano | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-929 | Dish-00007035 | 4/8/2009 | Email from D  Laslo to M  Metzger | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-930 | DISH5-0000087303 | 11/3/2007 | Email from R  Musso to B  Werner | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-931 | DISH5-0000021501 | 1/23/2009 | Spreadsheet Re Closed Acounts | | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-932 | U S  v  Dish001997 | 4/20/2012 | Spreadsheet Re Active Accounts | Stauffer 25 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-933 | DISH-Paper-025173 | 10/13/2006 | Fax from T  Pyle to R  Musso | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-934 | DISH-Paper-017484 | 10/29/2006 | Email from T  Pyle to R  Musso and T  DiRoberto | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-935 | DISH-Paper-017453 | 2/9/2007 | Email from R  Musso to B  Neylon | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-936 | DISH-Paper-017428 | 3/13/2007 | Email from T  Pyle to R  Musso | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-937 | DISH-Paper-012487 | 5/18/2007 | Email from R  Musso to T  Zweig and C  Prado | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-938 | DISH-Paper-012476 | 5/21/2007 | Email from R  Musso to B  Fieding | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-939 | DISH5- 0000087088 | | Email from M  Mills to kschmelz@intertechdigital com | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-940 | U S  v  Dish001299 | | Summary of Fees | Stauffer 18 (PN 18) (4/26/12) | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-941 | DISH5-0000021550 | 1/7/2011 | Active Accounts Spreadsheet | | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-942 | DISH5-0000021525 | 11/1/2015 | PossibleNow DNC Program | | | X | Foundation; Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-943 | FTC304-000133 | | EchoStar List of Terminated Retailers 2006 | | | X | Not relevant: FRE 401; Foundation Hearsay: FRE 802 |

**United States et al. v. Dish Network LLC**
**Case No. 3:09-cv-3073 -- SEM-TSH**

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-944 | FTC304-000192 | 12/7/2006 | EchoStar Takes Action Upon Do-Not-Call Violators | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-945 | FTC304-000255 | 6/14/2006 | EchoStar Script - Retailer Chat | | | X | Not relevant: FRE 401; Foundation Hearsay: FRE 802 |
| DTX-946 | FTC304-000202 | 2/12/2007 | Letter Re: Telemarketing Complaints Against American Satellite | | | X | Not relevant: FRE 401; Foundation Hearsay: FRE 802 |
| DTX-947 | FTC304-000195 | 10/10/2007 | Facts Blast | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-948 | FTC304-000197 | 6/19/2007 | Facts Blast | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-949 | FTC304-000199 | 8/30/2007 | Facts Blast | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-950 | FTC304-000236 | 6/22/2006 | Facts Blast | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-951 | FTC304-000245 | 10/17/206 | Facts Blast | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-952 | FTC304-000297 | 10/10/2006 | EchoStar Script - Retailer Chat | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-953 | FTC304-000342 | 1/26/2007 | Facts Blast | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-954 | FTC304-000360 | 4/16/2007 | Facts Blast | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-955 | FTC304-000368 | 5/18/2007 | Facts Blast | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-956 | | 11/9/2015 | Dish Network Corp  10-Q | | | X | Not relevant: FRE 401; Hearsay: FRE 802 |
| DTX-957 | DISH5-0000037763 | | 2006-2007 TCPA Tracker | | | X | Foundation; Best Evidence Rule: FRE 1002; Hearsay: FRE 802 |
| DTX-958 | FTC304-000605 | 5/9/2007 | EchoStar Script - Retailer Chat | | | X | Not relevant: FRE 401; Foundation; Hearsay: FRE 802 |
| DTX-959 | Dish-00002454 | | Dish Network Retailer Contact Information Form | Hagen 2 | | X | Hearsay: FRE 802 |
| DTX-960 | ATT009290 | 1/27/2005 | Email from D  Win to L  Miller | Miller 20 | | X | Not relevant: FRE 401; Hearsay: FRE 802 |

| EXHIBIT NO. | BEGINNING BATES NUMBER | DATE | DESCRIPTION | OTHERWISE MARKED | ADMIT WITHOUT OBJECTION | AUTHENTICATION WAIVED | PLAINTIFFS' OBJECTION(S) |
|---|---|---|---|---|---|---|---|
| DTX-961 | DISH2-000038236 | 2/17/2010 | Email from A  Dexter to B  Salvatori | Dexter 242 | | X | Best Evidence Rule: FRE 1002; Hearsay: FRE 802 |
| DTX-962 | DISH2-000038258 | 3/16/2010 | Email from A  Dexter to B  Davis and J  Montano | Dexter 246 | X | X | |
| DTX-963 | DISH2-000038379 | 7/28/2010 | Email from J  Montano to B  Davis | Montano 286 | | X | Best Evidence Rule: FRE 1002; Hearsay: FRE 802 |
| DTX-964 | DISH5-000068482 | 11/16/2009 | Outbound Campaign Form | | | X | Best Evidence Rule: FRE 1002; Hearsay: FRE 802 |
| DTX-965 | | 11/18/2015 | Letter from J  Ohta to P  Bicks et al | | X | X | |