UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES OF CALIFORNIA, ILLINOIS, NORTH CAROLINA, and OHIO,<br><br>　　　　　　　Plaintiffs,<br>　v.<br><br>DISH NETWORK, LLC,<br><br>　　　　　　　Defendant. | Case No. 3:09-cv-03073-SEM-TSH<br><br>**PLAINTIFFS' MOTION TO EXCLUDE REBECCA KIRK FAIR'S REVISED RESPONSIVE EXPERT REPORT AND STRIKE RELATED TESTIMONY AS INADMISSIBLE UNDER RULE 702** |

## INTRODUCTION

Pursuant to Federal Rule of Evidence 702, Plaintiffs move this Court to strike Rebecca Kirk Fair's testimony regarding Dr. Yoeli's analysis of Dish's address data and exclude her September 15, 2016 Revised Responsive Report ("Kirk Fair Rpt.") at DTX 1096.

Ms. Kirk Fair opines that several of the sources of address data analyzed by Dr. Yoeli are unreliable for indicating location at the time of the call, and that Dr. Yoeli's failure to consider this information invalidates his analysis. However, Ms. Kirk Fair has no basis in fact from which to draw these conclusions. As she repeatedly testified at trial, all of her factual knowledge regarding the collection, use, and maintenance of Dish's address data comes from Elyse Echtman's June 22, 2016, email to Jin Ohta ("Echtman Email") and from the data themselves. *See, e.g.,* Trial Tr., Oct. 25-28, 2016, 464:15-23, 500:24-501:6, 508:11-24, 527:9-14, 528:3-9 ("Tr."). Neither source could provide Ms. Kirk Fair with the comprehensive contextual information that she insists is necessary for a valid analysis, and neither provides a basis for the many unsupported leaps and inferences she has made in concluding that certain data sources are

1

unreliable. Instead, Ms. Kirk Fair relies on unfounded assumptions and lay speculation, neither of which is helpful to the Court. Ms. Kirk Fair criticizes Dr. Yoeli for not knowing enough about the data to perform a proper analysis, but her testimony and expert opinion make clear that Ms. Kirk Fair did not know enough about the data either. She merely uses the Echtman Email to speculate about what Dish's data may or may not mean and criticizes Dr. Yoeli for not using the same groundless assumptions that underpin her opinion.

Ms. Kirk Fair further opines that Dr. Yoeli failed to take into account the purpose of each call analyzed, which she infers from the campaign name associated with each call record. As she testified, however, Ms. Kirk Fair has no information about the accuracy or validity of the campaign names and therefore no basis for opining that such information provides valuable information.

Ms. Kirk Fair's entire responsive criticism of Dr. Yoeli rests on unsupported conclusions regarding dataset reliability and call purpose, and is not helpful to the Court as a trier of fact. The Court should therefore strike her expert testimony in its entirety and exclude her responsive report from evidence.

## FACTUAL BACKGROUND

Ms. Kirk Fair was tendered in this case as an expert "in the analysis of large data sets." Tr. 450:25-451:14. Unlike Dr. Yoeli, whose methodology takes Dish's address data at face value (PX 1466, Revised Supplemental Report of Dr. Erez Yoeli, Jul. 7, 2016, ¶¶ 12-14 ("Yoeli Rpt."); Tr. 141:23-142:2, 164:10-18), Ms. Kirk Fair proposed an alternative methodology that is dependent on knowledge of the context in which data were collected, used, and maintained (Kirk Fair Rpt. ¶¶ 42-53, 66-10, Ex.11). She asserted to the Court that in order to correctly interpret data, a data scientist must "understand the purposes for which data were collected" (Tr. 474:13-

2

14); "understand the context in which the data are collected" (*id.* at 507:5-11) and "understand the context in which the organizations that created and maintain the data operate" (*id.*). In both her expert report and her testimony, she repeatedly criticized Dr. Yoeli for ignoring this type of contextual information about how Dish uses and maintains its address data. *See, e.g.,* Kirk Fair Rpt. ¶ 17, 19-20, 23, 33; Tr. 490:24-491:5. Without that context, she insisted, a data scientist "can do harm by looking at data." Tr. 507:12-13.

At trial, Ms. Kirk Fair dismissed numerous Dish address data sets as "not reliable for evaluating address at the time of the call," despite having little or no factual knowledge about the collection, use, and maintenance of the data they contained. Tr. 477:5-478:2; Fair Demonstrative 5 (attached hereto as Exhibit 1). The datasets she found to be unreliable included Set 4 (Do Not Mail data); Set 5 (historical marketing data); Set 6 (SALESCOMM data); Set 7 (SIEBEL data); Set 9 (PODS CSG data); and Sets 10 and 11 (Credit Reporting Agency data). Ex. 1 at 5; Appx. D to Yoeli Rpt. ("Ms. Echtman's email," attached hereto as Exhibit 2). Ms. Kirk Fair based her conclusions about the datasets on factual knowledge she obtained from Ms. Echtman's email and from the data themselves, neither of which supports the inferences she drew nor contains the comprehensive contextual information that she criticized Dr. Yoeli for disregarding. Tr. 464:15-23, 500:24-501:6, 508:11-24, 527:9-14, 528:3-9; *see* Ex. 2.

In addition to criticizing Dr. Yoeli's failure to consider the context surrounding each address dataset, Ms. Kirk Fair also criticized his failure to take into account the call purpose indicated by the name of the campaign in which each call was made. Ex. 1 at 3; Tr. 459:24-460:7, 465,14-20, 475:23-476:9; Kirk Fair Rpt. ¶¶ 19-20, 42-53. Ms. Kirk Fair used campaign names as the only indicator of the purpose of a call, basing her interpretation of Dish's campaign names on testimony from Dish witness Joey Montano and an Excel spreadsheet produced by

3

Dish explaining its naming conventions. Tr. 628:5-21; Appx. C to Kirk Fair Rpt. Ms. Kirk Fair had no information regarding the rate of accuracy of those campaign names (i.e., the percentage of calls in each campaign that logically correlated with their stated campaign name) and did not attempt to measure it herself. Tr. 629:15-632:23.

Instead, in the context of her call record grouping analysis, she used what she referred to as a "triangulation" method to count the overall number of calls for which another data source appeared to corroborate the call purpose suggested by the campaign name. Tr. 626:20-627:6, 629:17-632:23; Ex. 11 to Kirk Fair Rpt. However, Ms. Kirk Fair's own call triangulation method revealed that the call campaign names did not correspond with the source of the data at significant rates, which could indicate a high error rate in campaign names. Group E of Ex. 11 to Kirk Fair Rpt. For example, for the EBRN set of calls, Ms. Kirk Fair's own triangulation method revealed that for 998,869 out of 1,112,125 call records, the campaign name was inconsistent with the other data. Id. For the No English calls, 9,370 out of 12,552 campaign names were inconsistent with other address data and for the Taylor calls, 289,454 out of 501,650 calls were inconsistent. Id. Therefore, Ms. Kirk Fair had no support for her conclusion that the campaign names are reliable information that Dr. Yoeli should have factored into his analysis.

## ARGUMENT

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R.

Evid. 702; *Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011), citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). Rule 702 is a conjunctive test, therefore "[f]ailure on any prong is fatal to admissibility." *Jones v. National Council of Young Men's Christian Assns. of United States of America*, 2013 WL 7046374, No. 09-c-6437, at *6 (Sept. 5, 2013 N.D. Ill.).

While the Court has broad discretion to decide whether to admit an expert's testimony, that testimony may not be based on subjective belief or unsupported speculation. *See Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Savings Plan Trust Fund v. Royal International Drywall and Decorating, Inc.*, 493 F.3d 782, 787-788 (7th Cir. 2007). "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000).

Ms. Kirk Fair's opinion regarding the validity of Dr. Yoeli's method is not "based on sufficient facts or data" to warrant admission in this case, and is not helpful to the trier of fact. *See* Fed. R. Evid. 702(a)-(b). At trial, Ms. Kirk Fair testified repeatedly to this Court that her method of analysis requires a deep understanding of the purpose of the data at issue, as well as the means by which they were collected and maintained. Tr. 459:2-11; 474:13-21, 489:24-490:1; 507:4-20; 686:20-22. She insisted at trial and in her report that Dr. Yoeli's analysis was flawed because he treated all data equally, and that if he had taken contextual details about certain datasets into account, he would have concluded that seven of Dish's address datasets were "not reliable for evaluating address at the time of the call." Tr. 477:5-478:2; Ex. 1 at 5; Kirk Fair Rpt. ¶ 23. She purported to base this opinion on her understanding of the context surrounding the data, i.e. how the data were collected, used, and maintained. Tr. 474:13-475:10; 477:9-478:2; 486:8-19; 487:15-21; 490:16-24; 492:6-13; 493:16-496:16; 507:4-20; 631:4-632:11; 633:19-634:6; 729:2-7; Kirk Fair Rpt. ¶¶ 23, 32-41.

5

At trial, however, Ms. Kirk Fair revealed that she did not actually possess that knowledge—nor did she perform any sort of analysis that would have tested whether any of her criticisms were either correct or significant. *See, e.g.*, Tr. 524:8-18 (testifying she did not know how Do Not Mail address data were generated), 529:23-531:6 (testifying she did not know how Dish acquired or used historical marketing data, when they were created or whether they were maintained or updated), 533:6-9 (testifying she did not know how Dish used the SALESCOMM data), 534:21-535:5 (testifying she did not know the purpose for which Dish collected or used SIEBEL data), 536:11-17 (testifying she did not know whether or how PODS CSG data were used), 538:13-18 (testifying she had no information regarding Credit Reporting Agency data-gathering practices besides that available on public websites). She made no attempt to obtain the knowledge from Dish or any other source, despite insisting that contextual information was critical to her own analysis. Tr. 508:12-23, 518:23-519:1, 532:21-533:5, 549:6-11, 549: 24-550:10, 656:23-657:2, 709:12-710:5. Instead, Ms. Kirk Fair simply jumped to the unfounded assumption that data she did not understand or had no context for must be unreliable. *E.g.*, Tr. 526:19-25 (testifying she does not actually need to know whether or how certain data are updated or maintained, because she has already concluded they are unreliable for Dr. Yoeli's purpose), 529:23-531:6 (testifying that she does not know how Dish acquired, used, updated or maintained historical marketing data or when they were created so she gives it very little weight), 536:11-22 (testifying that she doesn't know whether or how PODS billing information was used but it is not accurate), 537:14-18 (testifying that Transunion and Speedeon are less reliable than Dish's data for providing information on the physical location at the time of call).

For example, the only information Ms. Kirk Fair had about Dish's Do Not Mail address data was Ms. Echtman's explanation that the addresses had been pulled from Dish's "Do Not

6

Contact" database; the addresses "may be" associated with customer account numbers cross-referenced to Dish's customer account database; and the addresses were associated with "Effective Dates" and "Expiration Dates" indicating the time period for which their corresponding Do Not Contact entry was effective. Ex. 2 at 1-2; Tr. 523:15-524:7, 524:19-525:3. From this, Ms. Kirk Fair concluded that the addresses from the Do Not Mail database were not a reliable indication of location at the time of call. Kirk Fair Rpt. ¶¶ 34-35. Ms. Kirk Fair testified, however, that she did not know whether the Do Not Mail address data came from customers asking not to be mailed or from Dish's Customer Account Database (which she opines *is* relevant (Ex. 1 at 4)), and testified that she did not know how Dish maintained the data during the effective time period.[1] Tr. 524:8-18, 525:4-527:14

On the basis of these limited facts, therefore, Ms. Kirk Fair could have drawn (or at least left open) any number of possible inferences about the integrity and maintenance of the address information, such as the inference that the Do Not Mail addresses were collected from and simultaneously updated with Dish's Customer Account Database. Or, she could have inferred that Dish gathered its Do Not Mail addresses from customers asking not to receive mail, and that Dish reliably updated this information during the effective time period in order to honor its customers' requests. Instead, lacking any such relevant contextual information, Ms. Kirk Fair jumped straight to the conclusion that the Do Not Mail data is not reliably sourced or updated and therefore cannot reliably indicate location at the time of call. Kirk Fair Rpt. ¶¶ 34-35. She had no factual basis (and points to none in the data) for drawing this conclusion over another. *Id.* Her unsupported inference about the unreliability of the Do Not Mail data was merely unfounded speculation, not expert analysis and opinion.

---

[1] Ms. Kirk Fair's testimony on this point contradicts her expert report, in which she assumed, without support, that "addresses are needed for the daily maintenance of the [Do Not Mail] database." Kirk Fair Rpt. ¶ 34.

7

This pattern of logical fallacy repeats itself throughout Ms. Kirk Fair's report and testimony, revealing that her conclusions about the reliability of Dish's address data are based on her own speculative assumptions rather than actual facts. As she knows nothing whatsoever about the collection, use, or maintenance of Dish's historical marketing data (*see* Tr. 529:19-531:9), Ms. Kirk Fair could have guessed that the data were mirrored to Dish's Customer Account or Lead Tracking System databases, or guessed that they were gathered and maintained in a reliable manner by Dish's Marking Department. Instead, she guessed, with no factual support, that the historical marketing data must not be reliable and concluded that they could not form a valid basis for Dr. Yoeli's conclusions. Ex. 1 at 5; Tr. 477:5-478:2; Kirk Fair Rpt. ¶¶ 31-35. Similarly, Ms. Kirk Fair categorically rejected the SALESCOMM and SIEBEL data generated by Dish retailers as unreliable in spite of having no factual knowledge about how the data were collected or used. Ex. 1 at 5; Tr. 477:5-478:2, 531:17-535:16. She could just as plausibly have concluded that the retailers' customer data were mirrored to Dish's reliable, well-maintained Customer Account Database, or that retailers had the same business incentives to maintain accurate customer information that she assumes Dish has (*see* Kirk Fair Rpt. ¶ 25); either way, her conclusion would have no factual basis beyond her own assumptions.

Ms. Kirk Fair's conclusions regarding PODS CSG and Credit Reporting Agency data also lack a factual foundation. Ms. Kirk Fair concluded that PODS CSG data were not relevant to Dr. Yoeli's analysis because they were captured at a particular point in time. Ex. 1 at 5; Tr. 477:5-478:2. However, she did not know when that point in time was, whether or how the data were collected and used, or offer any estimate of the rate of error she believed the data must contain. Tr. 488:6-14 (testifying she did not know conclusively when the PODS data were captured, but "presume[s]," based on one customer record, that it was prior to 2003), 535:17-

8

537:11. Ms. Kirk Fair also concluded that the Credit Reporting Agency data Dish obtained from TransUnion and Speedeon were not reliable based in part on her assumption that the agencies did not have a business purpose for linking a phone number to an address at a particular point in time. Ex. 1 at 5; Tr. 477:5-478:2, 542:5-13; Kirk Fair Rpt. ¶ 40. Her assumption that the agencies had no such business purpose arose out of her lay understanding—what she referred to as "everyone's understanding"—of credit reporting agencies' business operations, yet she admitted at trial that she did not actually know the full range of business purposes for which the agencies collect and use data. Tr. 542:5-544:16. In fact, to the contrary, she testified that she knew that Dish had purchased address and phone numbers from a credit reporting agency for marketing purposes. Tr. 544:13-16. Based on this information, she could have concluded that credit reporting agencies did have a business purpose for linking phone numbers and addresses because they sold this information for marketing purposes. Again, Ms. Kirk Fair's arbitrary conclusion to the contrary was based on assumption and speculation, not on facts or expertise.

Ms. Kirk Fair also lacks a factual basis for her assumption that call campaign names accurately indicate the purpose of a given call record. Ms. Kirk Fair argues that Dr. Yoeli's analysis fails in part because he ignored campaign name information in his analysis. Kirk Fair Rpt. ¶¶ 62-63; Tr. 459:24-460:7. According to Ms. Kirk Fair, campaign names provide useful information about the purpose of the call—for example, she assumes that a "winback" campaign name indicates a call was part of a mass calling campaign designed to win back former Dish customers, and therefore went to a former Dish customer. Kirk Fair Rpt. ¶¶ 53, 62-63, 78-88; Tr. 485:7-19. She faults Dr. Yoeli for not considering this information in his analysis, yet her testimony revealed that she herself has no factual basis for concluding that campaign names accurately provide this information. She testified that she did not know the extent to which

9

Dish's call campaigns only included the intended recipients, and that she did not ask Dish for any information about the accuracy of the campaign names and performed no independent analysis of the accuracy of the campaign names. Tr. 626:20-630:18, 690:16-691:23. The trial testimony and spreadsheet she relied on were background materials to help her interpret the meaning of various campaign names, but they did not provide any verification of the campaign names' accuracy or validity. Tr. 626:20-630:18. In fact, Ms. Kirk-Fair's own analysis or triangulation method revealed that the campaign data contained millions of instances where the campaign names are inconsistent with the source of the data, at rates as high as 90%, 75% and 58% across the various data sets. Group E of Exhibit 11 to the Kirk Fair Rpt; Tr. 731:1-7. Ms. Kirk Fair had no basis in fact for her assumption that the campaign names are accurate enough to be valid and, as seen in Exhibit 11, her own analysis pointed to the probability that the campaign names had high rates of error. Therefore, she had no valid grounds for concluding that Dr. Yoeli's failure to consider this information rendered his analysis flawed.

 Ms. Kirk Fair peppered her report and testimony with hypothetical scenarios that could theoretically affect the integrity or reliability of Dish's data, but she did not attempt to quantify the likelihood or rate at which such scenarios might arise. *See, e.g.,* Tr. 514:13-518:14 (suggesting Lead Tracking System address data provided by consumers might not be correct because she once inquired with Comcast while moving between permanent addresses), 712:6-713:9 (referencing prior deposition testimony in which she suggested billing address is not a reliable indicator of physical location because she subscribes to cable at her vacation home on Cape Cod (Kirk Fair Dep. Sep. 20, 2016, 28:15-30:9, attached hereto as Exhibit 3)); Kirk Fair Rpt. ¶ 26 (suggesting that service records are not evidence of a link between phone number and location because some customers might order service for college-age children or elderly

10

relatives), ¶ 35 (suggesting Do Not Mail data are "not meaningful" because some customers might have left their residence before the date their Do Not Contact entry expired). Merely pointing to hypotheticals without quantifying whether or how often such a scenario could be expected to occur is not expert testimony; it is lay speculation, and it is not helpful to a trier of fact. As the Seventh Circuit has made clear, when it comes to expert testimony, "relying on intuition" instead of performing a "reality check" simply "won't do." *Zenith Elecs. Corp v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005).

The crux of Kirk Fair's criticism of Dr. Yoeli's analysis rests on her hypothetical proposition that the address data may have been accurate at one point in time, but that the individual at that address may have moved since that time. Ex.1 at 5; Kirk Fair Rpt., ¶¶35, 83, 88, 94, 98, 100; Tr. 711:14-712:16. Ms. Kirk Fair neither quantifies this interstate move rate or takes into account the publicly available census data (the reliability of which she does not question) showing that only 1.1 percent of Americans make an interstate move in any given year. Tr. 713:16-715:12. As such, her testimony on this point is neither based in fact nor helpful to the court; an expert is not needed to point out that people may move out of state. If she cannot quantify what she claims is wrong with the data, her opinion is fundamentally unsupported speculation rather than expert opinion arrived at through a replicable and reliable methodology. As such, Ms. Kirk Fair's opinion and testimony are inadmissible.

## CONCLUSION

Ms. Kirk Fair's critique of Dr. Yoeli's analysis is premised on assumptions and lay speculation about the relative reliability of the various sources of address information and the accuracy of campaign names. Her opinions are not helpful to the court and do not meet the

11

standard of Rule 702. The Court should, therefore, strike her expert testimony and exclude her responsive report from evidence.

Dated: November 7, 2016  Respectfully submitted,

FOR THE PEOPLE OF THE STATE OF ILLINOIS

LISA MADIGAN
Attorney General of Illinois

ELIZABETH BLACKSTON
PHILIP HEIMLICH
PAUL A. ISAAC
Assistant Attorneys General
Consumer Fraud Bureau
500 South Second St.
Springfield, IL 62706
Telephone: 217-782-4436
Fax: 217-782-1097
eblackston@atg.state.il.us
pheimlich@atg.state.il.us
pisaac@atg.state.il.us

FOR THE PEOPLE OF THE STATE OF CALIFORNIA

KAMALA D. HARRIS
Attorney General of the State of California

/s/ **Jinsook Ohta**
JINSOOK OHTA
ADELINA ACUÑA
JON WORM
Deputy Attorneys General
Consumer Law Section
Office of the Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619-645-3182 (Ohta)
            619-645-2067 (Worm)
Fax: 619-645-2271
jinsook.ohta@doj.ca.gov
adelina.acuna@doj.ca.gov
jon.worm@doj.ca.gov

| FOR THE STATE OF OHIO | FOR THE STATE OF NORTH CAROLINA |
|---|---|
| MIKE DEWINE<br>Attorney General of Ohio | ROY COOPER<br>Attorney General of North Carolina |
| ERIN B. LEAHY<br>JEFFREY LOESER<br>Assistant Attorneys General<br>Consumer Protection Section<br>Ohio Attorney General's Office<br>30 E. Broad St., 14th Floor<br>Columbus, OH 43215-3414<br>Telephone: 614-752-4730 (Leahy)<br>              614-728-1172 (Loeser)<br>Fax: 866-768-2648<br>Erin.Leahy@ohioattorneygeneral.gov<br>Jeffrey.Loeser@ohioattorneygeneral.gov | DAVID N. KIRKMAN<br>TERESA TOWNSEND<br>Special Deputy Attorney General<br>Consumer Protection Division<br>Office of the Attorney General<br>114 W. Edenton St.<br>Raleigh, NC 27602-0629<br>Telephone: 919-716-6000<br>Fax: 919-716-6050<br>dkirkman@ncdoj.gov |

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing MOTION TO EXCLUDE REBECCA KIRK FAIR'S REVISED RESPONSIVE EXPERT REPORT AND STRIKE RELATED TESTIMONY AS INADMISSIBLE UNDER RULE 702 was served via ECF on this 7th day of November, 2016, upon the persons listed below:

      Peter A. Bicks
      Elyse D. Echtman
      John L. Ewald
      pbicks@orrick.com
      eechtman@orrick.com
      jewald@orrick.com

      Joseph A. Boyle
      Lauri A. Mazzuchetti
      jboyle@kelleydrye.com
      lmazzuchetti@kelleydrye.com

      Counsel for Dish Network, LLC

      /s/ Jinsook Ohta
      Jinsook Ohta