## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

UNITED STATES OF AMERICA,　　)
and the STATES of CALIFORNIA,　)
ILLINOIS, NORTH CAROLINA,　　)
and OHIO,　　　　　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　)　　　No. 09-3073
　　　　　　　　　　　　　　　)
DISH NETWORK LLC,　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**SUE E. MYERSCOUGH, U.S. District Judge:**

This matter came before the Court on January 19, 2016, for a bench trial. The first phase of the bench trial was completed on February 17, 2016. The trial resumed on October 25, 2016. The Court heard testimony on October 25-27, 2016 and November 2, 2016. The Plaintiff United States appeared by Assistant United States Attorneys Patrick Runkle, Lisa Hsiao, and Sang Lee, and also by Federal Trade Commission Attorney Russell Deitch and Gary Ivens; the Plaintiff State of California appeared by Assistant Attorneys General Jinsook Ohta, Jon Worm, and Adelina Acuna;

Page **1** of **475**

the Plaintiff State of Illinois appeared by Assistant Attorneys General Paul Isaac, Elizabeth Backston, and Philip Heimlich; the Plaintiff State of North Carolina appeared by Assistant Attorney General David Kirkman and Teresa Townsend; and the Plaintiff State of Ohio appeared by Assistant Attorneys General Erin Leahy and Jeff Loeser.  The Defendant Dish Network, LLC (Dish) appeared by attorneys Peter Bicks, Elyse Echtman, John Ewald, Jamie Shookman, Shasha Zou, Louisa Irving, Joseph Boyle, and Lauri Mazzuchetti.[1]  Dish's in-house counsel Stanton Dodge, Larry Katzin, and Brett Kitei also appeared.  On November 2, 2016, the parties and the witness appeared by videoconference, except that Dish in-house counsel Dodge's and Kitei's and California's counsel Ohta and Acuna appeared by telephone.

The Plaintiffs alleged twelve counts against Dish for violations of federal and state laws and regulations prohibiting certain outbound telemarketing calls (Do-Not-Call Laws).  The term "Do-Not-Call" is also sometimes referred to as "DNC."  The Plaintiffs allege that Dish violated the Telemarketing Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. § 6101 et seq.;

---

[1] Not all counsel appeared at every day of trial.

the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227;

the Telephone Sales Rule (TSR) promulgated by the Federal Trade

Commission (FTC) pursuant to the Telemarketing Act, 16 C.F.R.

Part 310; the Rule (FCC Rule) promulgated by the Federal

Communications Commission (FCC) pursuant to the TCPA, 47

C.F.R. 64.1200 et seq.; the California Do-Not-Call Law, Cal. Bus. &

Prof. Code § 17592(c); the California Unfair Competition Law, Cal.

Bus. & Prof. Code § 17200; the North Carolina Do-Not-Call Law,

N.C. Gen. Stat. § 75-102(a); the North Carolina Automatic

Telephone Dialer Law, N.C. Gen. Stat. § 75-104; the Illinois

Automatic Telephone Dialers Act (IATDA), 815 ILCS 305/1 et seq.;

and the Ohio Consumer Sales Protection Act, Ohio Rev. Code §§

1345.02 and 1345.03.  Third Amended Complaint (d/e 483), Count

I-XII.  For a detailed discussion of the applicable statutes and rules,

see Opinion entered December 14, 2014 (d/e 445) (Opinion 445), at

10-32 and 215-25, 75 F.Supp.3d 942, 954-62, 1026-31 (C.D. Ill.

2014), vacated in part on reconsideration, 80 F.Supp.3d 917 (C.D.

Ill. 2015).  The Court entered partial summary judgment on some

the Plaintiffs' claims.  Opinion 445, at 231-38.

For the reasons set forth below, this Court enters judgment in favor of the Plaintiffs United States and the States of California, Illinois, North Carolina, and Ohio and against Defendant Dish on Counts I, II, III, V, VI, VII, VIII, IX, X, and XII of the Third Amended Complaint and judgment in favor of Plaintiff United States and against Defendant Dish on the claim that Defendant provided substantial assistance to Dish Order Entry Retailer Star Satellite as alleged in Count IV of the Third Amended Complaint, and judgment in favor of Defendant Dish and against the United States on the claim that Dish provided substantial assistance to Dish Order Entry Retailer Dish TV Now as alleged in Count IV of the Third Amended Complaint. The Court enters judgment in favor of Defendant Dish and against Plaintiff State of Illinois on Count XI of the Third Amended Complaint.

The Court awards civil penalties and statutory damages in favor of the Plaintiffs United States and the States of California, Illinois, North Carolina, and Ohio and against Defendant Dish in Counts I, II, III, IV, V, VI, VII, VIII, IX, X, and XII of the Third Amended Complaint in the total sum of $280,000,000.00. The

amount awarded in each Count is set forth below in the Conclusion.

The Court also enters a Permanent Injunction in favor of the Plaintiffs and against Defendant Dish Network, L.L.C. in the manner set forth in the separate Permanent Injunction Order filed with this Findings of Fact and Conclusions of Law.

The following constitutes findings of fact and conclusions of law for the issues remaining for trial.  Fed. R. Civ. P. 52(a).

This case is complex and covers years of telemarketing by Dish and numerous related entities.  The Court organizes the findings of fact under various headings.  The organizational structure does not limit any findings to any particular issue.  Unless otherwise indicated, all findings of fact may be relevant to all issues.

## JURISDICTION

This Court has jurisdiction to hear the United States' claims in Counts I-IV pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355; Federal Trade Commission Act (FTC Act), 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a), and 57(b); and the Telemarketing Act, 15 U.S.C. § 6105(a) & (b).  The FTC authorized the Attorney General to commence this action on behalf of the United States pursuant to

FTC Act § 56(a).  This Court has jurisdiction to hear the Plaintiff States' TCPA claims in Counts V & VI pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355; and exclusive jurisdiction pursuant to TCPA, 47 U.S.C. § 227(g)(2).  This Court has supplemental jurisdiction to hear the Plaintiff States' state law claims in Counts VII-XII pursuant to 28 U.S.C. § 1367(a).

Dish argues that the Plaintiff States lack standing to bring the TCPA claims alleged in Counts V and VI.  A lack of standing is jurisdictional.  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 93 (1998).  To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, __U.S.__, 136 S.Ct. 1540, 1547 (2016).

The TCPA § 227(g) authorizes the Plaintiff States to bring this action.  Section 227(g)(1) states that when the State Attorney General, "has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section," then "the State

may bring a civil action on behalf of its residents." 47 U.S.C.A. §
227(g)(1). The Plaintiff States, therefore, are bringing the claims in
Counts V and VI in parens patriae to protect the well-being of each
Plaintiff State's populace. The Plaintiff States must demonstrate
Article III standing. The Plaintiff States must demonstrate some
concrete injury to its residents by Dish that can be redressed by the
claims in Counts V and VI. Alfred L. Snapp & Son, Inc., v. Puerto
Rico ex rel. Barez, 458 U.S. 592, 602-05 (1982). The Congressional
grant of a right to statutory damages in the TCPA § 227(g) is not
sufficient by itself to establish standing. The Plaintiff States must
show some injury in fact from the unwanted telemarketing calls.
Spokeo, 136 S.Ct. at 1543.

Several District Courts have considered whether unwanted
calls made in violation of the TCPA cause concrete injury necessary
to establish standing. Many of these District Courts have found
that the annoyance and distress caused by unwanted calls
established concrete injuries sufficient to establish standing. E.g.,
Krakauer v. Dish Network, L.L.C., 168 F.Supp.3d 843, 845 (M.D.
N.C. 2016); Wilkes v. CareSource Management Group Co., 2016 WL
7179298, at *3 (N.D. Ind. December 9, 2016); Mbazomo v.

Etourandtravel, Inc., 2016 WL 7165693, at *2 (E.D. Cal. December 8, 2016); Griffith v. ContextMedia, Inc., 2016 WL 6092634, at *1-2 (N.D. Ill. October 19, 2016); LaVigne v. First Community Bancshares, Inc., 2016 WL 6305992, at *3 (D. N.M. October 19, 2016); Espejo v. Santander Consumer USA, Inc., 2016 WL 6037625, at *9 n.3 (N.D. Ill. Oct. 14, 2016); Dolemba v. Illinois Farmers Insurance Company, 2016 WL 5720377 (N.D. Ill. September 30, 2016); Juarez v. Citibank, N.A., 2016 WL 4547914, at *3 (N.D. Cal. September 1, 2016); Aranda v. Caribbean Cruise Line, Inc., 2016 WL 4439935, at *5-*7 (N.D. Ill. August 23, 2016); A.D. v. Credit One Bank, N.A., 2016 WL 4417077 (N.D. Ill. August 19, 2016). The Court in Aranda described how unwanted telephone calls cause concrete injuries by invading the privacy of the home:

> In any event, section 227 establishes substantive, not procedural, rights to be free from telemarketing calls consumers have not consented to receive. Both history and the judgment of Congress suggest that violation of this substantive right is sufficient to constitute a concrete, *de facto* injury. As other courts have observed, American and English courts have long heard cases in which plaintiffs alleged that defendants affirmatively directed their conduct at plaintiffs to invade their privacy and disturb their solitude. *See, e.g., Mey v. Got Warranty, Inc.*, —— F.Supp.3d ——, ——, 2016 WL 3645195, at *3 (N.D.W.V.2016) ("[T]he TCPA can be seen as merely liberalizing and codifying the application of [a] common

law tort to a particularly intrusive type of unwanted
telephone call."); *Caudill v. Wells Fargo Home Mort., Inc.*,
No. 5:16–066–DCR, 2016 WL 3820195, at *2 (E.D.Ky.
July 11, 2016) ("[The] alleged harms, such as invasion of
privacy, have traditionally been regarded as providing a
basis for a lawsuit in the United States.").

Aranda, 2016 WL 4439935, at *6. The Aranda Court noted that,

"Congress enacted the TCPA to protect consumers from the

annoyance, irritation, and unwanted nuisance of telemarketing

phone calls, granting protection to consumers' identifiable concrete

interests in preserving their rights to privacy and seclusion." Id.

Each Plaintiff State further presented testimony from residents

who personally suffered injury from unwanted calls by Dish or its

related entities. E.g., Deposition David Slaby, at 6, 52-53, 69-70

(California resident); T 613: 24-26 (Skala (Illinois resident));

T 618:856-66 (Krakauer (North Carolina resident)); T 617: 574

(Kitner (Ohio resident)).[2] The Plaintiff States have demonstrated

that the calls at issue caused concrete injury necessary to establish

standing.

---

[2] The Court references the trial transcript as follows: the letter T, the docket entry number of
the relevant portion of the transcript, the page number, and the last name of the witness in
parentheses. The Court references exhibits by the exhibit number used at trial. The
deposition excerpts cited have been admitted into evidence in lieu of live testimony.

Dish has cited a District Court that found that receipt of unwanted telephone calls did not cause concrete injury necessary to established standing.  Romero v. Department Stores National Bank et al. v. Defendants, 2016 WL 41484099 (S.D. Cal. August 5, 2016).  The Court respectfully disagrees with the reasoning in the Romero decision and agrees with the reasoning in the Aranda decision, the Krakauer decision, and the other cases cited immediately above.  The Plaintiff States therefore have standing to proceed.

FINDINGS OF FACT

I.    Background

In 1980, Charles Ergen and James DeFranco formed Dish's predecessor corporation called Ecosphere Corporation (Ecosphere). Ecosphere sold and distributed large satellite dishes 12 feet in diameter designed to receive television signals.  T 621: 1478-79 (DeFranco); T 625: 2073 (Neylon).  Ecosphere later changed its name to Echostar Communications Corporation (Echostar). Echostar developed a network of local retailers to sell, distribute, and install satellite dishes.  T 621: 1487 (DeFranco).  In 1995, Echostar made an initial public offering of stock.  T 621: 1445

(DeFranco).  As discussed below, in 1996, Echostar started a satellite television service called Dish Network.  In 2008, Echostar reorganized its business structure.  Echostar became the Defendant business entity Defendant Dish Network, LLC.  Dish Network, LLC continued the business of selling and providing Dish Network programming.  A business entity called Echostar continued to exist as a separate corporation.  Both became owned by a holding company, Dish Network Corporation (Dish Corp.).  Echostar currently operates satellites used to transmit Dish Network programming.  See Opinion 445, at 2; PX1093, Dish Annual Report dated December 31, 2011, at 6-7; T 621: 1482 (DeFranco).  The Court hereafter uses the term "Dish" to refer the business entity selling Dish Network programming (Echostar before 2008 and Dish Network, LLC thereafter).

In 1996, upon launching Dish Network, Dish went into direct competition with DirecTV, another provider of residential satellite pay television services.  DirecTV started this type of service two years before Dish.  T 621: 1488 (DeFranco).  Dish also competed with cable television services and over-the-air broadcast services.

T 621: 1488-89 (DeFranco).  By 1999, Dish was offering a 500 channel satellite television service.  T 621: 1442 (DeFranco).

Dish marketed Dish Network programming through various means, including direct outbound telemarketing by Dish employees.  Dish also retained companies to perform outbound telemarketing services for Dish (Telemarketing Vendors).  T 617: 664 (Davis).  Outbound telemarketing means making telephone calls to existing or prospective customers to sell products and services.  Inbound telemarketing involves advertising through various media (e.g., television, radio, print, direct mail) to generate inbound calls from consumers seeking information about the possible purchase of goods and services.  Dish engaged in both inbound and outbound telemarketing.  See T 627: 2517 (Dexter).  The Plaintiffs' claims all relate to outbound telemarketing only.  Unless otherwise indicated, the Court uses the term "telemarketing" to refer to outbound telemarketing.

Dish divided its marketing structure into direct and indirect marketing, sometime referred to as direct and indirect "channels."  The direct channel consisted of Dish in-house, or direct marketing, and marketing by Dish's Telemarketing Vendors.  The

Telemarketing Vendors were telemarketing companies hired by Dish to perform telemarketing services for Dish. The indirect channel consisted of marketing by all other entities authorized by Dish to market Dish Network programming. Within the indirect channel, Dish continued to use its network of retailers, called TVRO or Full Service Retailers, to sell Dish Network programming.[3] TVRO Retailers generally sold, installed, and serviced satellite dishes and related equipment. Some TVRO Retailers engaged in telemarketing. T 626: 2294-95 (Ahmed).

The indirect channel also included national retailers and telecommunications companies that marketed Dish Network programming, such as Radio Shack, Sears, and AT&T. T 625: 2113 (Neylon).[4]

Dish also developed an indirect marketing program called the Order Entry Program. Through this program, Dish authorized marketing businesses to market Dish Network programming nationally. These marketing businesses secured consumers' offers to purchase Dish Network programming. Dish completed the sales

_____

[3] TVRO stands for Television Receive Only. See Opinion 445, at 57.
[4] The national telephone company accounts were also called "Telco" accounts. See e.g., T 625: 2113 (Neylon).

solicited by these businesses. Dish provided and installed the satellite dishes and related equipment, and Dish provided the programming and related services. Dish called these marketing businesses Order Entry Retailers or OE Retailers. See T 626: 2358, 2283, 2296 (Ahmed); T 621: 1632 (Mills).

The Plaintiffs' claims arise from: (1) Dish's direct telemarketing; (2) the telemarketing activities of Dish's Telemarketing Vendors EPLDT (also known as Libertad), and eCreek Solutions Group (eCreek); and (3) telemarketing activities of certain Order Entry Retailers.

II.    Telemarketing by Dish and its Telemarketing Vendors

A. Telemarketing Practices Before 2003

In 1998, Dish began telemarketing Dish Network programming. Dish used an automatic dialer called a predictive dialer to make outbound telemarketing calls. DTX-650, Timeline Email dated December 10, 2007 (Timeline Email). An automatic dialer, or autodialer, can call large numbers of telephone numbers automatically and can distinguish between possible results of each call: either no answer, a busy signal, a response by an answering machine, or an answer by a person. See T 627: 2527-28 (Dexter).

When a person answers the call, the automatic dialer can connect the call recipient either to a prerecorded message or a live sales person.  See T 627: 2655 (Bangert).  Dish direct marketing had a policy to connect answered telemarketing calls to live sales persons and not prerecorded messages.  T 627: 2690-91 (Bangert); T 617: 624 (Davis).

At the time that Dish began telemarketing in 1998, the TSR and FCC Rule prohibited sellers and telemarketers from initiating telemarketing calls to individuals who previously stated that they did not wish to be called (a "Do-Not-Call Request").  The FCC Rule required sellers and telemarketers to maintain an internal, or entity-specific, Do-Not-Call List of the people who previously asked not to be called again ("Internal Do-Not-Call List").  The FCC Rule required telemarketers and sellers to honor a Do-Not-Call Request.  The TSR prohibited making calls to persons who made a Do-Not-Call Request stating that they did not wish to receive telemarketing calls by or on behalf of the seller.  The TSR stated that sellers or telemarketers that wished to comply with the TSR safe harbor

provision had to maintain an Internal Do-Not-Call List.[5]  See Opinion 445, at 11, 26.  The Court refers to calls made to persons who previously made an Internal Do-Not-Call Request as "Internal List Calls."

Dish maintained an Internal Do-Not-Call List.  Individuals could have their telephone numbers placed on Dish's Internal Do-Not-Call List by calling or writing Dish; by telling a Dish telemarketer during a sales call; by telling a Telemarketing Vendor telemarketer during a sales call; by registering on Dish's Internal Do-Not-Call List on Dish's website; or by calling a toll-free number. If the automatic dialer failed to connect a call recipient to a sales person within two seconds of the recipient's answer of the call, the automatic dialer played a prerecorded message that provided the toll-free number.  T 629: 3024-26 (Montano).  Dish eventually developed a PowerPoint presentation to explain how to handle an Internal Do-Not-Call Request. Dish made the PowerPoint presentation available to all employees who came in contact with consumers, including telemarketing employees and customer

---

[5] An Internal Do-Not-Call List is also called an "entity-specific do-not-call list."

service employees.  <u>DTX 14</u>, <u>PowerPoint Presentation</u>; <u>see</u> <u>T 627:</u>
<u>2504-16, 2590 (Dexter)</u>.

The FCC Rule also restricted making outbound telemarketing
calls that played prerecorded sales messages to recipients of
telemarketing calls.  Calls that play prerecorded messages are
called by several different names, including "robocalls,"
"prerecorded calls," "prerecorded messaging," "message
broadcasting," "automated messaging," "automessaging," "AM," and
sometimes "autodialer calls."[6]  The Court refers to such calls as
"Prerecorded Calls."

The FCC Rule allowed Prerecorded Calls to call recipients who
had Established Business Relationships with the seller or
telemarketer making the call, unless the recipient's telephone
number was on the seller or telemarketer's Internal Do-Not-Call
List.  <u>See</u> <u>Opinion 445</u>, at 25-26.[7]  The FCC Rule defined
Established Business Relationship as:

The term established business relationship for purposes
of telephone solicitations means a prior or existing

---

[6] At least one witness used the term "autodialer" calls to refer to prerecorded calls.  <u>See</u> <u>T 622:</u>
<u>1871 (Goodale)</u>.  Most witnesses used the term autodialer call to refer to any call made by
automatic dialing equipment regardless of whether the autodialer played a prerecorded
message or connected the call recipient to a live sales representative.

[7] The FCC amended the FCC Rule in 2012 to eliminate the Established Business Relationship
exception.  <u>See</u> <u>Opinion 445</u>, at 25.

relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(f)(5). Under this provision, a telemarketer had an Established Business Relationship with a call recipient who was a residential telephone subscriber under one of two conditions: (1) the call recipient made a purchase or engaged in a transaction with the seller within 18 months of the date of the call (Transaction-based Established Business Relationship); or (2) the call recipient made an inquiry or application for the seller's good or services within three months of the date of the call (Inquiry-based Established Business Relationship).

In 1987, States began establishing Do-Not-Call registries for state residents. See Telemarketing Sales Rule, Statement of Basis and Pupose, 48 Fed. Reg. 4580, 4629 n. 592 (January 29, 2003) (citing Fla. Stat. Ann. § 501.059) (2003 TSR Statement of Basis and Purpose); Marguerite M. Sweeney, Do Not Call: The History of Do

Not Call and How Telemarketing has Evolved, NAGTRTI J., Vol.1, No. 4 (August 2016) available at http://www.naag.org/publications/nagtri-journal/volume-1-number-4/do-not-call-the-history-of-do-not-call-and-how-telemarketing-has-evolved.php. Residents registered their telephone numbers on the state registry if the residents did not wish to receive unsolicited telemarketing calls. The state laws restricted sellers and telemarketers from making certain telemarketing calls to telephone numbers on the state registries (State Do-Not-Call Lists). Dish began purchasing State Do-Not-Call Lists in 2001. DTX 650, Timeline Email, at 1.

Dish directed almost all of its outbound telemarketing campaigns at residences rather than businesses. T 628: 2810 (Bangert); T 627: 2555, 2639, 2641 (Dexter) (most campaigns to residences, but some directed to businesses); T 617: 633-34 (Davis) (same); see T 614: 450-51 (Yoeli); PX 38, Declaration of Dr. Erez Yoeli dated December 18, 2013, Appendix C, Revised Rebuttal Report of Dr. Erez Yoeli dated December 14, 2012 (Yoeli December 14, 2012 report), at 7-8 (Dish's calling records from September 2007 to March 2010 indicate that .2% of Dish's direct telemarketing

calls which Dr. Yoeli opined were violations of the TSR were answered by businesses.).[8]

Dish organized its telemarketing into different types of calling campaigns, depending on Dish's relationship with the intended recipients of the calls and the purposes of the calls. Campaigns that Dish intended to direct at current customers were called Average Revenue Per Unit (ARPU), Upsell, and Premium Upsell campaigns. These campaigns offered additional or upgraded programming or services to existing customers. See PX 0477, Email dated May 9, 2002; T 628: 2708-09 (Bangert); T 617: 592 (Davis). Through approximately July 2010, Dish presumed that it had a Transaction-based Established Business Relationship with the recipients of these calls. See PX 1248, Project Scope Document dated February 2, 2010, (request by Outbound Operations to modify PDialer to use last payment dates); DTX 972, Email thread dated June 30, 2010 to July 2, 2010 between Dish and PossibleNOW representatives; T 633: 3297-99 (Taylor); DTX 670,

---

[8]Dish employee Joey Montano testified that Dish ran several calling campaigns directed at businesses. T 628: 2960 (Montano). Montano did not testify that Dish directed a significant portion of its telemarketing campaigns at businesses. To the extent that Montano attempted to give the impression that campaigns directed at businesses made up a significant portion of Dish's outbound telemarketing, the Court finds that testimony not to be credible. The overwhelming evidence shows that Dish directed almost all of its outbound telemarketing campaigns at residential households.

PDialer Meeting Minutes dated July 1, 2010, at 2 ¶ 7 (indicating change to last payment date); T 629: 3014-15, 3130-34 (Montano). Dish's calling records from September 2007 through March 2010, however, show that the lists of telephone numbers called (calling lists) in these campaigns included numbers for individuals who had not paid for any programming services from Dish for more than 18 months at the time that Dish called them. The records are discussed in detail below.

Campaigns directed at former customers were called "winback" campaigns. As the name implied, the campaigns sought to win back former customers. The calling lists in winback campaigns were supposed to consist of the telephone numbers of former customers who had their Dish service disconnected on the same day. Dish used disconnect dates to determine when the customer relationship ended. T 633: 3297-99 (Taylor); T 629: 3014-15, 3130-34 (Montano). Dish dialed winback campaign calling lists periodically at certain intervals after the disconnect date, e.g., 48 hours, 30 days, 60 days, 6 months, 12 months, 18 months, and so on up to as long as 61 months after the termination. Dish called winback campaigns "trailing campaigns" because of the periodic

calling process.  T 627: 2637 (Dexter); see DTX 626A through 626D, Summary Table of Dish Campaigns prepared by Dish Expert John Taylor (Taylor Tables).  Until approximately July 2010, Dish presumed that it had a Transaction-based Established Business Relationship with the recipients of these calls if the campaign calls were made 18 or fewer months after the disconnect date for the particular campaign.  See T 628: 2969 and 629: 3130 (Montano); PX 1248, Project Scope Document dated February 2, 2010 (requesting modification of PDialer to use last payment date); DTX 972, Email thread dated June 30, 2010 to July 2, 2010 between Dish and PossibleNOW representatives; DTX 670, PDialer Meeting Minutes dated July 1, 2010.  The calling records from September 2007 to March 2010 discussed below, however, show that winback calling lists included many individuals who had not paid for any programming services from Dish for more than 18 months before the date of the calls.  The call records are discussed in detail below.

Dish also directed calling campaigns at individuals who purchased Dish Network programming, but Dish did not complete installation and activation of the services.  Some of these calling campaigns were called Canceled Work Order (CWO) campaigns.

<u>T 617: 588 (Davis)</u>; <u>T 628:2708 (Bangert)</u>.  Dish conducted Canceled Work Order campaigns to reschedule the canceled work orders in order to complete activation of service.  <u>T 629: 3075-76 (Montano)</u>. Dish employees and former employees sometimes characterized these calling campaigns as telemarketing campaigns and sometimes as non-telemarketing scheduling calls or non-telemarketing calls to collect information.  <u>See</u> <u>T 628: 2708-09 (Bangert)</u>; <u>T 617: 591 (Davis)</u>; <u>T 627: 2522 (Dexter)</u>; <u>T 629: 3075-76 (Montano)</u>.[9]  Dish produced no scripts for any of these campaigns in discovery and presented no scripts at trial.  The limited evidence presented establishes that these calling campaigns were directed at individuals who initially agreed to purchase Dish Network programming, but who canceled the installation. Dish ran Canceled Work Order campaigns to reschedule the canceled work orders and complete the installation of Dish Network programming.

---

[9] During discovery, Montano told Plaintiffs' representatives that Canceled Work Order campaigns were telemarketing campaigns.  Montano testified at trial that he changed his opinion during discovery and decided that the campaigns were not for the purpose of telemarketing.  <u>T 629: 3055-56 (Montano)</u>.  Dish submitted a letter that Dish attorneys wrote to Plaintiffs' attorneys during discovery alerting Plaintiffs' attorneys that Montano had changed his opinion regarding these calls.  <u>DTX 1015</u>, <u>Letter from Mazzuchetti to Hsiao dated November 28, 2012</u>.  The Curt considers the as evidence of notice to Plaintiffs regarding Montano's change in opinion.

Dish also conducted No Line of Sight (NLOS) and Held Work Order (HWO) calling campaigns. No Line of Sight campaigns were directed at individuals who agreed to purchase Dish programming, but the installer could not find a place to install the satellite dish that had a line of sight to receive the signal. Dish ran these calling campaigns to schedule a time for a field service manager to come out and see if he could find a line of sight to complete installation. T 627: 2544 (Dexter). Held Work Order campaigns were directed to an individual who agreed to purchase Dish programming, but whose work order was placed on hold. Dish made Held Work Order calls to reschedule the Work Order to complete activation of service. T 627: 2546-47 (Dexter); T 629: 3075-76 (Montano). Dish employees also sometimes characterized these campaigns as telemarketing campaigns and sometimes as non-telemarketing scheduling calls. Id.

Campaigns directed at individuals who never indicated any interest in Dish programming or services were called "Cold Call" or "Target Marketing" campaigns. See PX 0477, Email dated May 9, 2002; T 628: 2708-09 (Bangert); T 617: 592 (Davis); T 629: 3117 (Montano).

Campaigns called LTS or Lead Tracking System campaigns were directed at individuals who were not Dish customers, but who came into contact with Dish and provided contact information. Dish presented very little competent evidence on how the Lead Tracking System was formulated or how calling lists were derived from the Lead Tracking System. Dish's Database Marketing Department maintained the Lead Tracking System and created the Lead Tracking System (or LTS) calling lists. <u>T. 627: 2680 (Bangert)</u>.[10] Dish presented no testimony from any representative of Database Marketing or anyone else who had personal knowledge of the working of the Lead Tracking System.

Several witnesses summarily testified that Lead Tracking System calling lists were made up of people who inquired about Dish Network programming. Dish presumed that it had an Inquiry-based Established Business Relationship with the recipients of these calls. <u>See</u> <u>T 627: 2681-82 (Bangert)</u>; <u>T 628: 2709-10, 2808 (Bangert)</u>; <u>T 627: 2643-44 (Dexter)</u>; <u>T 617: 590 (Davis)</u>; <u>T 629: 3163-64 (Montano)</u>. Dish failed to establish that any of these witnesses

---

[10] Dish may have changed the name of Database Marketing to Data Analytics or Marketing Analytics. Data Analytics and Marketing Analytics may have also been different departments. The evidence is unclear. The Court refers to this Department as Database Marketing.

had sufficient personal knowledge to testify regarding the operation of the Lead Tracking System or the make-up of the calling lists derived from the Lead Tracking System. None of these witnesses worked in Database Marketing or had any involvement in the formulation of the Lead Tracking System or the Lead Tracking System calling lists.

The only evidence from Database Marketing cited by the parties that discussed the make-up of the Lead Tracking System consisted of two emails from Database Marketing employees in a single email thread from August 2004. PX117, Email thread regarding Dish Taking a DTV Sale dated August 11, 2004, at PX117-001, 005-006. These two emails indicate that the Lead Tracking System collected the contact information of any individuals who came into contact with Dish and provided such information. According to these two emails, the Lead Tracking System included individuals who requested information about Dish Network programming, but also included individuals who already received a telephone sales pitch for Dish programming and services and did not buy, and individuals who began ordering Dish programming online, but did not complete the purchase.

See PX117, Email thread regarding Dish Taking a DTV Sale dated August 11, 2004, at PX117-001, 005-006.  At one point, the Lead Tracking System included contact information for certain individuals that Order Entry Retailers contacted to sell Dish Network programming, but who decided not to buy.  Dish discontinued this latter practice when Order Entry Retailers complained that Dish direct marketing was taking the Order Entry Retailers' leads.  See PX 117, Email thread regarding Dish Taking a DTV Sale dated August 11, 2004; T 629: 2711-12 (Bangert).  The Court finds that Dish failed to prove that the Lead Tracking System consisted of contact information for the individuals who inquired about Dish Network programming.  Rather, the sparse evidence in these two emails seems to indicate that the Lead Tracking System included the contact information for anybody who came in contact with Dish for almost any reason and provided contact information.

By May 2002, Dish had developed a process to scrub certain calling lists.  A calling list (or call list) was a list of numbers to be called for a calling campaign.  The term "scrubbing" or "scrub" referred to removing from a calling list telephone numbers that could not legally be called under the particular circumstances.  In

2002, Dish scrubbed certain calling lists against its Internal Do-Not-Call List and State Do-Not-Call Lists.  See T 627: 2660-61; T 628: 2703-04 (Bangert); DTX 650, Timeline Email, at 1; T 617: 662-63 (Davis).

Dish had some problems with that scrubbing system.  In May 2002, Dish was not scrubbing its calling lists against the Oregon State Do-Not-Call List and was still researching the requirements of the other States.  Dish in-house attorneys knew that Oregon officials were investigating Dish's telemarketing.  Dish in-house attorneys knew that the Oregon statute authorized a $25,000.00 per call penalty on willful violations.  In May 2002, Dish temporarily stopped all telemarketing in Florida, Illinois, Oregon, and Colorado. PX0477, Email from Vice President PJ Weyforth dated May 9, 2002 3:36 p.m.; PX1430, Email dated May 3, 2002, at 004.

In June 2002, Dish limited its outbound telemarketing to residents in 25 states that did not have State Do-Not-Call Lists in effect.  PX0473, Email dated June 12, 2002 3:19 p.m.  Dish employees who conducted the scrubbing process in Dish's Outbound Operations Department testified that Dish could remove telephone numbers of residents of particular states because Dish

maintained residential address information associated with the telephone numbers on its various calling lists.  See T 628: 2740-41 (Bangert); T 629: 3209-10 (Montano); T 627: 2639-40 (Dexter); T 617: 630 (Davis).

B. Dish Telemarketing Practices Beginning in October 2003

In 2001, Congress authorized the FTC to promulgate regulations to establish a National Do-Not-Call Registry (Registry), and to prohibit initiating outbound telemarketing calls to persons whose telephone numbers were registered on the Registry.  TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B); see Opinion 445, at 14, 26-27.  In 2003, the FTC established the Registry.  Individuals registered their telephone numbers on the Registry if they did not wish to receive telemarketing calls.  The FTC and the FCC amended the TSR and FCC Rule to prohibit calling a person whose number was on the Registry (Registry Call).  The prohibition did not apply if the person had an Established Business Relationship with the seller or telemarketer. The TSR defined Established Business Relationship as follows:

(o) Established business relationship means a relationship between a seller and a consumer based on:

> (1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call; or
>
> (2) the consumer's inquiry or application regarding a product or service offered by the seller, within the three (3) months immediately preceding the date of a telemarketing call.

TSR 16 C.F.R. § 310.2(o); see Opinion 445, at 18, 75 F.Supp.3d at 957. Like the FCC Rule, the TSR definition established a Transaction-based Established Business Relationship and an Inquiry-based Established Business Relationship. The TSR definition also used an 18-month time period from the last purchase, rental, lease or financial transaction for the Transaction-based Established Business Relationship and a three-month time period from the last inquiry or application for the Inquiry-based Established Business Relationship.

On September 29, 2003, Congress ratified the establishment of the Registry. Pub. L. 108-82, 117, codified at 15 U.S.C. § 6151. The Registry was scheduled to begin operations on October 1, 2003, but the start of operations was delayed to October 17, 2003. See F.T.C. v. Mainstream Marketing Services, Inc., 345 F.3d 850, 860-

61 (10ᵗʰ Cir. 2003); <u>see</u> <u>also</u> <u>Mainstream Marketing Services, Inc. v.</u>
<u>F.T.C.</u>, 358 F.3d 1228, 1250-51 (10ᵗʰ Cir. 2004).

The TSR and FCC Rule contained safe harbor provisions.
Sellers and telemarketers who followed the safe harbor procedures
would not be liable for certain illegal calls that resulted from errors
or mistakes. The safe harbor provisions required, among other
things, written procedures for implementing the requirement not to
call persons whose telephone numbers were on the Registry, and
maintenance of records documenting the use of a process to
prevent telemarketing to persons whose numbers were on the
Registry. The TSR safe harbor applied to Internal List Calls and
Registry Calls. The FCC Rule safe harbor only applied to Registry
Calls. 16 C.F.R. § 310.4(b)(3); 47 C.F.R. § 64.1200(c)(2)(i); <u>see</u>
<u>Opinion 445</u>, at 164-66, 210-11, 75 F.Supp.3d at 958, 961. Neither
safe harbor provision applied to Prerecorded Calls.

The 2003 amendments to the TSR also prohibited abandoning
calls. An outbound telemarketing call is abandoned if the person
answering a telemarketing call is not connected to a sales
representative within two seconds of the person's completed
greeting. 16 C.F.R. § 310.4(b)(1)(iv). A Prerecorded Call that is

answered by a person is an abandoned call under the TSR because the person receiving the call is not connected to a sales representative, but to a recording.  See Opinion 445, at 21-22.  This Court refers to Prerecorded Calls that are answered by a person as "Abandoned Prerecorded Calls."  The FTC Statement of Basis and Purpose accompanying the final TSR stated that connecting the call recipient to a prerecorded telemarketing message violated the abandonment provisions:

> [Under] the prohibition of abandoned calls, . . . telemarketers must connect calls to a sales representative within two seconds of the consumer's completed greeting to avoid a violation of the Rule. Clearly, telemarketers cannot avoid liability by connecting calls to a recorded solicitation message rather than a sales representative. The Rule distinguishes between calls handled by a sales representative and those handled by an automated dialing-announcing device.  The Rule specifies that telemarketers must connect calls to a sales representative rather than a recorded message.

2003 TSR Statement of Basis and Purpose, 68 Fed. Reg. at 4644.

On November 17, 2004, the FTC issued a Notice of Proposed Rulemaking (2004 Notice) to amend the TSR to add an additional safe harbor provision to allow some Abandoned Prerecorded Calls under limited circumstances. 69 Fed. Reg. 67287 (November 17,

2004). The proposed safe harbor amendment would have allowed a seller or telemarketer to make an Abandoned Prerecorded Call to a person with whom the seller or telemarketer had an Established Business Relationship only if the prerecorded message: (1) presented the person with the opportunity to communicate that he or she did not want to be called again within two seconds of the person's completed greeting (e.g., by pushing a number on the telephone keypad); (2) provided all required disclosures; and (3) otherwise complied with all applicable state and federal laws. 69 Fed. Reg. at 67289; see Opinion 445, at 21-22.

The FTC further stated in the 2004 Notice that the FTC would forbear from bringing enforcement actions for prerecorded calls that resulted in abandoned calls if the telemarketer complied with the proposed amendments to the safe harbor provisions:

> Therefore, the Commission has determined that, pending completion of this proceeding, the Commission will forbear from bringing any enforcement action for violation of the TSR's call abandonment prohibition, 16 CFR 310.4(b)(1)(iv), against a seller or telemarketer that places telephone calls to deliver prerecorded telemarketing messages to consumers with whom the seller on whose behalf the telemarketing calls are placed has an established business relationship, as defined in the TSR, provided the seller or telemarketer conducts this

activity in conformity with the terms of the proposed amended call abandonment safe harbor.

69 Fed. Reg. at 67290. The FTC ultimately amended the TSR to allow Abandoned Prerecorded Calls only to persons with whom the seller had an Established Business Relationship and only with prior written consent. <u>Final Rule Amendments</u>, 73 Fed. Reg. 51164 (August 29, 2008); <u>see</u> <u>Opinion 445</u>, at 22, 75 F.Supp.3d at 958.

Dish witness Russell Bangert opined that the TSR abandonment provisions did not clearly apply to Abandoned Prerecorded Calls. <u>T 627: 2690 (Bangert)</u>. The Court finds this testimony to be of no probative value. Bangert conceded at his deposition that he had only a rudimentary understanding of the federal Do-Not-Call Laws and regulations. <u>T 627: 2686 (Bangert)</u>. Bangert's attempt to embellish his knowledge of these laws and regulations at the trial was not credible. Further, FTC publicly stated the 2003 TSR Statement of Basis and Purpose and the 2004 Notice that the TSR abandonment provision applied to Abandoned Prerecorded Calls. Dish employed highly qualified attorneys internally and externally. These attorneys would have been well

aware that the TSR abandonment provision applied to Abandoned Prerecorded Calls.

In addition, Dish employees understood that Prerecorded Calls were prohibited. T 627, 2565-66, 2625 (Dexter) (Dish had a policy not to make prerecorded telemarketing calls); T 617: 624-25 (Davis) (Dish representatives understood that such calls were illegal.). See also PX523, Email from Dexter to Davis dated May 3, 2010, regarding FTC.gov statement regarding abandonment and safe harbor provisions; DTX 662, Email dated March 23, 2010 from Dexter (prerecorded telemarketing calls prohibited); T 619: 985 (Werner) (same).

In 2002, Dish began planning to adjust its telemarketing practices in light of the upcoming launch of the Registry. T 627: 2658 (Bangert). Dish representatives expected the Registry to increase the volume of telephone numbers affected by the Do-Not-Call Laws. Dish put together a group of individuals from interested departments (Working Group) to develop a process to comply with the new regulations and to deal with the expected increase in the size and scope of the process. See T 627: 2658-61 (Bangert).

In April 2003, Dish entered into a settlement with the state of Indiana for violations of Indiana's Do-Not-Call Law. In connection with that settlement, Dish entered into a court-approved Assurance of Voluntary Compliance (AVC). PX 908, Indiana AVC dated April 11, 2003, and Court Order of Approval dated April 15, 2003. Dish thereafter scrubbed lists to remove calls to Indiana residents from its outbound telemarketing. T 628: 2742 (Bangert).

In August 2003, the state of Missouri filed suit against Dish for violation of the Missouri Do-Not-Call Law. PX 52, Missouri Complaint. The Missouri action was settled in 2005. Dish executed an Assurance of Voluntary Compliance and agreed to pay $50,000.00. PX 544, Missouri ex rel. Nixon v. Echostar Communications Corp., St. Charles County, Mo., Circuit Ct. Case No. 03CV129088, Petition for Approval of Assurance of Voluntary Compliance dated May 4, 2005, attached Assurance of Voluntary Compliance ¶ 16; see PX 53, Email dated April 19, 2006 between Dish Corporate Counsel Steele and Dish SVP Deputy General Counsel Dodge.

In August and September 2003, the Working Group continued to put together a system to comply with the scheduled launch of the

Registry on October 1, 2003. Dish in-house counsel Steve Novak suggested not making any outbound telemarketing calls to any number on the Registry, even if Dish had an Established Business Relationship with the potential call recipient. PX 689, Email dated September 4, 2003 from Steve Novak. The suggestion was not adopted. Another participant suggested automating the process of determining whether to scrub a calling list against a particular restricted list such as the Registry, Dish's internal Do-Not-Call List, or a state Do-Not-Call List. This suggestion was also rejected. PX1176, Email from Dish Employee Brian Pacini dated September 16, 2003; T 627: 2667-68 (Bangert). In September 2003, Novak stated in an email that "no call center disconnected from the DNC list [i.e., the Registry] should be making any outbound calls." PX688, Email September 10, 2003 from Steve Novak.

Dish cited no evidence that the Working Group ever discussed the safe harbor provisions of the TSR or FCC Rule or developed a plan to comply with those provisions.

Ultimately, Dish established two separate systems to address the launch of the Registry and the amended Do-Not-Call Laws generally. The first system addressed calling campaigns aimed at

individuals who had Dish account numbers (Account Number Campaigns). The second system addressed campaigns aimed at individuals who never had an account with Dish, primarily Cold Calls and Lead Tracking System Calls.

1. Account Number Campaigns

The Account Number Campaigns included campaigns to existing Dish customers, such as Average Revenue Per Unit, Upsell, and Premium Upsell; campaigns to former customers, such as Winback; and campaigns to individuals who had agreed to purchase Dish Network programming, but did not complete the installation or activation. The last category included Canceled Work Order, No Line of Sight, and Held Work Order campaigns. See Tr. 627: 2680 (Bangert).

Bangert was in charge of scrubbing Account Number Campaign call lists. In 2006, Account Number Campaign scrubbing operations were organized into the Outbound Operations Department (Outbound Operations). T 628: 2949 (Montano). For simplicity, the Court refers to the Dish personnel who performed scrubbing operations for Account Number Campaigns both before and after 2006 as Outbound Operations. Outbound Operations

scrubbed lists for Dish's call centers in Englewood, Colorado; El Paso, Texas; Pinebrook, New Jersey; and the Philippines; and also for Telemarketing Vendors eCreek and EPLDT. Employees at the Dish call center in Bluefield, West Virginia scrubbed the Account Number Campaign lists for calls made for that call center. Dish employees who scrubbed lists in Bluefield reported to the manager of Outbound Operations. T 617: 647, 680-811 (Davis); T 628: 2949 (Montano). In 2008, Dish moved all Account Number Campaign scrubbing operations to Outbound Operations at Dish corporate headquarters in Englewood, Colorado. T 617: 647, 680-81 (Davis); T 628: 2951 (Montano).[11]

Outbound Operations also operated Dish's automatic telephone dialers in Englewood, Colorado, and Bluefield, West Virginia. T 627: 2499-2500 (Dexter); T 617: 647-48 (Davis); T 628: 2947-49 (Montano). In 2008, Dish also moved all dialing operations to Outbound Operations in Englewood, Colorado. T 617: 680 (Davis); T 628: 2951 (Montano).[12] Outbound Operations also

---

[11] Dish headquarters is sometimes referred to as the Meridian or Englewood campus, or Meridian. T 628: 2952 (Montano). The offices are located on Meridian Boulevard in Englewood, Colorado.
[12] A few campaigns were dialed manually. T 627: 2636 (Dexter); PX 86, email thread dated August 2011 between Dish Latino Marketing Group, Outbound Operations and Dish Legal

maintained current, updated copies of the Registry, Dish's internal Do-Not-Call list, state Do-Not-Call lists, and lists of wireless numbers.  See Tr. 627: 2677-78 (Bangert); T 628: 2948-49 (Montano).

Other Dish departments sent proposed Account Number Campaigns to Outbound Operations with descriptions of the planned calling campaigns, proposed calling lists, and scripts. T 627: 2518-19 (Dexter); T 617: 640-41 (Davis); see e.g., DTX 964, Outbound Campaign Request Form.  Outbound Operations did not develop proposed calling lists or scripts.  Dish's Data Analytics Department developed the calling lists for Account Number Campaigns.  T 627: 2551, 2607, 2610 (Dexter); see T 629: 3021 (Montano).[13]  Dish cited no material evidence to the Court on the process by which Dish departments developed proposed Account Number Campaigns, how departments developed proposed scripts, or how Data Analytics prepared the proposed calling lists.  No employee from the Data Analytics Department testified at trial.

---

Department. The evidence indicates that manually dialed calls were rare aberrations in Dish procedures.

[13] Montano elsewhere referred to the Marketing Analytics Department.  It is unclear whether these were two different departments, or whether the name changed at some point in time.  It is also unclear whether Database Marketing is related to Data Analytics.

Outbound Operations personnel reviewed the campaign descriptions and scripts to determine the type of campaign and the particular scrubbing process to use to remove telephone numbers that could not be called under the particular campaign. See DTX-964, Outbound Campaign Request Form; T 627: 2679 (Bangert); T 627: 2518-21, 2525-26, 2531-32 (Dexter); T 617: 628 (Davis). Outbound Operations consulted with Dish's legal department, if necessary, to determine the appropriate scrubbing process to use. T 627: 2684 (Bangert); T 2533: 2564-65 (Dexter); T 628: 2958 and T 629: 3022-23 (Montano).

At some point, Outbound Operations required two individuals in Outbound Operations to approve a campaign. Outbound Operations instituted this policy because a situation occurred in which a telemarketing campaign was allowed to make Prerecorded Calls. PX46, Email dated November 9, 2007; T 617: 673-75 (Davis); see T 629: 3044 (Montano). Prerecorded Calls were not allowed. T 629: 3045 (Montano). Prerecorded messages could be used in non-telemarketing calling campaigns, such as payment reminders, or informational calls that did not involve the sale of additional services. T 629: 3042 (Montano).

Outbound Operations had no written policies or procedures for scrubbing lists for compliance with Do-Not-Call Laws.  <u>T 628: 2807 (Bangert)</u>; <u>T 627: 2596-97 (Dexter)</u>; <u>see</u> <u>PX0302</u>, <u>Email thread between Joey Montano and Amy Dexter, dated July 28, 2010</u>.  Dish also did not produce in discovery any evidence of written scrubbing procedures or documentation of scrubbing results.  <u>See</u> <u>Opinion 445</u>, at 163-64.  Dish maintained a written Do-Not-Call Policy, but the Policy did not include any procedures for selecting telephone numbers to call in compliance with the TSR and FCC Rule.  <u>See</u> <u>Opinion 445</u>, at 164.

In practice, Outbound Operations used three categories of scrubs: (1) "All DNC" or "All Scrub;" (2) "No DNC" or "No Scrub;" and (3) "Standard Scrub."  The "All DNC" or "All Scrub" scrubbed proposed calling lists against all restricted lists, including Dish's Internal Do-Not-Call List, the Registry, State Do-Not-Call lists, and wireless telephone numbers.  A separate provision of the TCPA not at issue in this case generally prohibited using an autodialer to call wireless telephone numbers without prior written consent.  47 U.S.C. § 227(b)(1)(A)(iii).  Outbound Operations intended to apply the All Scrub to telemarketing campaigns directed to individuals

with whom Dish concluded that it had no Established Business Relationship.

The "No DNC" or "No Scrub" only scrubbed calling lists for wireless numbers. Outbound Operations intended to apply the No Scrub to non-telemarketing campaigns such as collection calls, payment reminder calls, informational calls, or calls to schedule service. T 627: 2638-39, 2648-49 (Dexter); T 617: 633-34 (Davis); T 629: 3096, 3117, 3207 (Montano).

The "Standard Scrub" scrubbed calling lists to remove telephone numbers on the Dish Internal Do-Not-Call List; numbers of residents in states in which the state law did not allow for an Established Business Relationship exception for calls to numbers on State Do-Not-Call Lists; and wireless numbers. Outbound Operations applied the Standard Scrub to telemarketing campaigns directed to current or former customers with whom Dish concluded that it had Transaction-based Established Business Relationships. T 627: 2668-69 (Bangert); T 617: 638, 682-83 (Davis); T 629: 3096 (Montano). Outbound Operations scrubbed Canceled Work Order, No Line of Sight, and Held Work Order campaigns with the Standard Scrub. T 6278: 2546-47 (Dexter).

Dish employees manually reviewed the Dish files to determine whether Dish had a Transaction-based Established Business Relationship with current and former customers whose telephone numbers were listed in Account Number Campaigns. Dish formulated calling campaign lists based on this manual review. Dish employees, however, did not use the last dates that consumers paid for Dish Network programming to calculate the 18 month Established Business Relationship time period. Rather, Dish used "the disconnect date that was associated with the file name" to formulate these lists. T 629: 2969, 3130 (Montano). These lists of former customers then became the basis for the trailing winback campaign calling lists. Dish assumed that a person was a current customer if his or her account did not have a disconnect date regardless of when the person last paid for Dish Network programming. Outbound Operations presumed that Dish had Transaction-based Established Business Relationships with persons whose numbers were on calling lists directed to current customers and trailing winback calling lists until the lists were more than 18 months old. T 629: 3014-15 (Montano); see T 627: 2608-09, 2624 (Dexter); T 617: 596-98 (Davis). Dish used this

manual process until approximately July 2010.  See PX 1248,
Project Scope Document dated February 2, 2010 (requesting
modification of PDialer to use last payment date); DTX 972, Email
thread dated June 30, 2010 to July 2, 2010 between Dish and
PossibleNOW representatives; DTX 670, PDialer Meeting Minutes
dated July 1, 2010, at 2 ¶ 7; T 628: 2969 and T 629: 3130
(Montano).

Dish ran some recurring outbound telemarketing campaigns.
The largest recurring telemarketing campaigns were the trailing
winback campaigns.  Dish also ran recurring Average Revenue Per
Unit campaigns to market premium channels or other additional
services to current customers.  Outbound Operations did not
require detailed script reviews of these recurring campaigns.  T 627:
2637 (Dexter).

Outbound Operations used software called "PDialer" to scrub
Account Number Campaign calling lists.  Tr. 627: 2669-70
(Bangert); T 629: 3010 (Montano).  The PDialer software compared
proposed calling lists to the set of restricted lists included in the
selected scrub (All DNC, No DNC, or Standard Scrub) and removed
from the proposed calling lists numbers that were also on the

applicable restricted lists.  An employee in Outbound Operations manually selected the applicable scrub.  The PDialer also formatted the calling lists so that they could be loaded into the automatic dialer.  T 627: 2670-71 (Bangert).  After completing the scrub, Outbound Operations then either: (1) loaded the scrubbed lists into the automatic dialer, and the automatic dialer made the calls for the various Dish call centers; or (2) sent the scrubbed list to a Dish Telemarketing Vendor such as eCreek.  T 627: 2678-79 (Bangert); T 628: 2969 (Montano); T 627: 2581 (Dexter); T 617: 664-66 (Davis). Telemarketing Vendor eCreek used its own automatic dialer. Telemarketing Vendor EPLDT used Dish's automatic dialer. See T 627: 2602 (Dexter).

Outbound Operations' unwritten practices allowed a scrubbed calling list to be called for a 15-day period from the date of the scrub.  The 15-day limit addressed the possibility that the list would become out-of-date.  A person who had a telephone number on a calling list could register that number on the Registry.  The TSR and FCC Rule safe harbor provisions required a telemarketer to honor a registration on the Registry no later than 31 days after the registration was made.  TSR 16 C.F.R. § 310.4(b)(3); FCC Rule 47

C.F.R. § 64.1200(c)(2)(i). Outbound Operations used a 15-day time limit to decrease the possibility that a telephone number on the scrubbed calling list would have been placed on the Registry more than 31 days before the call. See T 627: 2580 (Dexter).

Outbound Operations checked scrub results manually. Outbound Operations inserted into proposed calling lists numbers that should be scrubbed by the process. Outbound Operations checked the results to confirm that the scrub properly removed those numbers. T 627: 2678-79 (Bangert); see T 627: 2542 (Dexter). Outbound Operations personnel testified that they tried to fix any problems to improve the system. E.g., T 617: 649 (Davis); T 629: 3137 (Montano).

Outbound Operations used disposition codes to keep track of responses to calls such as no answer, busy signal, answering machine, or answered call. See T 627: 2552-53 (Dexter ); DTX 671, Email dated March 16, 2011, attached glossary of response acronyms. The PDialer recorded some disposition codes automatically such as no answer or busy signal. Dish sales representatives (customer service agents) recorded some disposition

codes at the time of the call such as wrong number or business answered.  See T 627: 2554 (Dexter).

Outbound Operations was responsible for reviewing and approving Account Number Campaigns to customers interested in foreign language programming.  Between 2007 and 2010, Dish employees made prerecorded calls to market foreign language programming in 15 Account Number Campaigns.  The telemarketing messages were recorded in the language of the programming offered for sale.  The translations of the message scripts show that the prerecorded messages were directed to existing Dish customers.  The messages offered additional foreign language programming options. A total of 98,054 of these prerecorded calls were answered by individuals and resulted in Abandoned Prerecorded Calls in violation of the TSR. See Opinion 445, at 127, 193-94, 75 F.Supp.3d at 996-97, 1019.[14]

Outbound Operations also monitored eCreek's operations. T 629: 3033 (Montano); see DTX-19, Email thread dated March 9-

---

[14]Outbound Operations had other problems with the departments that conducted foreign language telemarketing.  In March 2008, the foreign language marketing department had to be instructed that all calling lists had to be scrubbed by Outbound Operations.  T 617: 611-12, 614-17 (Davis); PX 85, email dated March 14, 2008 (stating that all calling lists must be scrubbed by Outbound Operations); DTX 626E, Dish Taylor Table, at 2.

10, 2010.[15]  Outbound Operations kept in daily communication with eCreek.  See T 629: 3028, 3205 (Montano).  ECreek performed an additional scrub on the lists it received from Dish.  T 617: 666 (Davis).  ECreek also collected names for its internal Do-Not-Call list and for Dish's internal Do-Not-Call list.  T 627: 2581 (Dexter).  eCreek sent Outbound Operations feedback nightly.  The feedback included a "DNC" notation on those call recipients who wanted to be on Dish's internal Do-Not-Call list.  T 617: 666-67 (Davis); see T 629: 3026-27 (Montano).

Outbound Operations responded to consumer complaints regarding eCreek's telemarketing, but did not otherwise check eCreek for Do-Not-Call Law compliance.  T 627: 2612 (Dexter).  Problems existed with eCreek's Do-Not-Call Law compliance in 2009, 2010, and 2011.  If Outbound Operations became aware of problems in eCreek's telemarketing procedures, Outbound Operations tried to correct the problem.  See T 617: 603 (Davis); T 627: 2617-19 (Dexter); PX59, Email from Montano dated January 28, 2010 regarding eCreek DNC call; PX1079, Email from Montano to eCreek dated January 11, 2011 regarding Call Research.

---

[15] ECreek was operated by a former Dish employee Scott Larson.  Larson had run Dish's call center operations.  T 629: 3034 (Montano).

In July 2010, Outbound Operations asked eCreek for a copy of its Do-Not-Call Law policy and procedures. Outbound Operations employee Dexter sarcastically questioned whether eCreek had policies and procedures. See PX302, Email from Dexter dated July 28, 2010, regarding Request for DNC/TCPA Policies and Procedures; T 627, 2571-72 (Dexter). That same day, eCreek provided a Do-Not-Call Policy consisting of two pages of text and a flow chart. DTX 7, Email from eCreek dated July 28, 2010 regarding Request for DNC/TCPA Policies and Procedures. The two-page document did not include procedures for scrubbing calling lists to comply with the TSR or the FCC Rule.

2. Cold Call and Lead Tracking System Campaigns

Dish's second Do-Not-Call Law compliance system addressed Cold Call campaigns and Lead Tracking System campaigns. Database Marketing was responsible for operating the Do-Not-Call Law compliance system for these campaigns. Database Marketing also formulated the calling lists for these campaigns. Bangert testified Database Marketing incorporated the Do-Not-Call Law compliance process into the process that it used to formulate these calling lists. Tr. 627: 2680 (Bangert).

Neither party presented any meaningful evidence on the process Database Marketing used to comply with the Do-Not-Call Laws.  The scant evidence in the record indicates that Database Marketing may have used a lead management system referred to as CRM or a computer system called a Teradata System to perform these tasks.[16]  No one from Database Marketing testified, and no exhibits cited by the parties or other competent testimony explained how this process worked.  See T 628: 2780 (Bangert) (used CRM to scrub LTS leads); PX 471, Email from Tobias Plumley dated December 29, 2005 (did not use CRM to scrub LTS leads); DTX 650, Timeline Email, at 4; see also PX482, Email from Wade Osborne dated April 17, 2003 regarding DNC Database (DNC scrubbing must be done within CRM tool).  Database Marketing did not use the PDialer to scrub lists; the PDialer could only be used to scrub lists of telephone numbers associated with Dish account numbers.  See DTX 670, PDialer Meeting Minutes dated July 1, 2010, at 5-6 ¶ 29 PDialer Bypass (New contact and lead calling lists bypassed the PDialer because the PDialer deleted any telephone number not associated with an account number).

---

[16] The term CRM apparently means "Customer Relations Management."  See e.g., U2Logic, Inc. v. American Auto Shield, LLC, 2014 WL 4852094, at *1 (D. Colo. September 30, 2014).

Dish witness Russell Bangert testified that Database Marketing used the same scrubbing options as Outbound Operations. Bangert testified that Cold Call campaigns received an ALL DNC scrub and that Lead Tracking System campaigns received a Standard scrub. T 627: 2680-82 (Bangert). Dish failed to establish that Bangert had personal knowledge on which to base these assertions. Bangert worked in Outbound Operations, and so, did not participate in Database Marketing compliance processes. Database Marketing did not use the PDialer because the PDialer required account numbers. The Court finds that Bangert's testimony about the process used by Database Marketing was not based on sufficient personal knowledge and has no probative value. The Court finds an absence of proof on the methods used by Database Marketing to process Lead Tracking System calling lists and Cold Call lists to comply with the TSR, TCPA, FCC Rule, or any other Do-Not-Call Law. As noted above, the Court also found an absence of proof on the methods used to formulate the Lead Tracking System calling lists.

Database Marketing sent the finished Lead Tracking System and Cold Call calling lists to Outbound Operations. Outbound

Operations bypassed scrubbing these files with the PDialer and loaded the lists into the automatic dialer or sent these lists to eCreek.  T 629: 3088 (Montano); see DTX 670, PDialer Meeting Minutes, at 5-6 ¶ 29 PDialer Bypass.   Outbound Operations received Lead Tracking System campaign lists on a daily basis. T 629: 3165 (Montano).  Outbound Operations dialed Lead Tracking System campaign calling lists within 24 to 48 hours of receipt. Dish presumed that it had Inquiry-based Established Business Relationships with the recipients of Lead Tracking System campaigns because the calls were made within 24 to 48 hours of receipt.  T 629:3087-88 (Montano).

C. PossibleNOW

In December 2007, Dish retained a company called PossibleNOW, Inc. (PossibleNOW) to assist it in complying with Do-Not-Call Laws.  T 617: 649-52 (Davis); see Opinion 445, at 71. PossibleNOW operated a number of web-hosted services to sellers and telemarketers to help them comply with the Do-Not-Call Laws. Beginning in early 2008, Outbound Operations used PossibleNOW's scrubbing services.  See DTX 144, Master Services Agreement dated December 14, 2007.  Outbound Operations scrubbed lists with the

PDialer and then sent the scrubbed lists to PossibleNOW for a second scrubbing.  See e.g., T 617: 655 (Davis); T 628: 2967-68 (Montano).[17]  PossibleNOW scrubbed and returned the scrubbed lists, and Outbound Operations loaded the lists into the automatic dialer or sent the list to eCreek.  T 627: 2539 (Dexter); T 617: 652-55 (Davis); T 628: 2967-68, and T 629: 3129 (Montano).

PossibleNOW also maintained Dish's Internal Do-Not-Call List, Dish's copy of the Registry, and Dish's copies of State Do-Not-Call Lists. T 617: 653 (Davis); T. 628: 2966-67, 2972-76 (Montano). PossibleNOW also maintained lists of wireless numbers.  Dish used PossibleNOW's services to scrub against all these lists.  T 617: 634 (Davis); see T 628: 2972 (Montano).

Beginning in April 2008, PossibleNOW began maintaining a combined Internal Do-Not-Call List for Dish, eCreek, and certain Order Entry Retailers.  Dish, eCreek, and participating Order Entry Retailers uploaded Internal Do-Not-Call Lists to PossibleNOW. T 617: 654-55 (Davis); T 627: 2573 (Dexter); T 628: 2975-76, 3027 (Montano); T 622: 1842 (Mills).  Dish required Order Entry Retailers

---

[17] PossibleNOW customers usually used logins and passwords to access PossibleNOW products and services to conduct list scrubbing or other processes.  In rare instances, PossibleNOW performed the scrubbing.  See T 618:746-48 (Stauffer).  Outbound Operations personnel testified that PossibleNOW performed the scrubbing services for Dish.

making 50 activations a month to submit Internal Do-Not-Call Lists to PossibleNOW.  <u>T 619: 1018-19 (Werner)</u>.  PossibleNOW kept an Internal Do-Not-Call List for Dish, an Internal Do-Not-Call List for eCreek, and a combined Internal Do-Not-Call List for all participating Order Entry Retailers.  Dish began scrubbing its own calling lists against all three Lists in 2008.  <u>T 628: 2975-80 (Montano)</u>.  Dish also required Order Entry Retailers with 600 activations a year to use PossibleNOW's scrubbing services.  <u>T 622: 1841-43 (Mills)</u>.

PossibleNOW's scrubbing services also checked calling lists to determine whether telephone numbers were associated with individuals who had Established Business Relationships with Dish. <u>PX-1248</u>, <u>Project Scope Document dated February 2, 2010</u>. PossibleNOW did not use Dish's manually prepared lists of current customers and lists of former customers based on disconnect dates to identify telephone numbers associated with individuals who had Established Business Relationships with Dish.  Instead, PossibleNOW required Dish to add two additional fields to calling lists before conducting scrubs: (1) the last payment date; and (2) the date that a person inquired about Dish programming.  During

the scrubbing process, PossibleNOW identified numbers with whom Dish had: (1) a Transaction-based Established Business Relationship if the last payment date was within 18 months of the campaign calling date, or (2) an Inquiry-based Established Business Relationship if the inquiry date was within three months of the campaign calling date.  Id.[18]

In approximately July 2010, Dish modified the PDialer to also use the last payment date to check for Transaction-based Established Business Relationships.  Dish stopped presuming that it had a Transaction-based Established Business Relationship with all persons whose numbers were on campaigns directed to current customers and winback campaigns that were less than 18 months old.  Dish added a field to its calling lists for a last payment date. Dish modified the PDialer to check for this field in a manner similar to the PossibleNOW process.  T 629: 3011-15 (Montano); see T 633: 3297-99 (Taylor); PX 1248, Project Scope Document dated February 2, 2010 (request by Outbound Operations to modify PDialer to use last payment dates); DTX 972, Email thread dated June 30, 2010 to

---

[18] Some states had shorter time periods for determining Established Business Relationships. PossibleNOW scrubbed for those shorter time periods also, when applicable.  T 628: 2969 (Montano); PX-1248, Project Scope Document dated February 2, 2010.

July 2, 2010 between Dish and PossibleNOW representatives regarding use of last payment dates; DTX 670, PDialer Meeting Minutes dated July 1, 2010, at 2 ¶ 7 (indicating change to last payment date).

Dish did not add a field for inquiry dates to the PDialer. Dish employee Montano testified that one field was added for simplicity. Montano testified that inquiry dates, if applicable, were entered into the Last Payment Date field. T 629: 3015-16 (Montano). The Court finds this testimony not to be credible. The Court finds that Dish only added a Last Payment Date because Dish only used the PDialer to scrub Account Number Campaigns. Account Number Campaigns were addressed to current and former customers, not individuals inquiring about Dish Network programming. Thus, Dish did not need to add a field for inquiry dates to campaigns run through the PDialer. See T 628: 2780 (Bangert); DTX 670 PDialer Meeting Minutes, at 6 ¶ 29.[19]

---

[19] The testimony is also not credible because it makes no sense to enter an inquiry date into a last payment date field. The length of time that Dish had a Transaction-based Established Business Relationship with a former customer was 18 months from the last payment, and the time that Dish had an Inquiry-based Established Business Relationship was only three months from the inquiry. Placing an inquiry date in the field would erroneously indicate that Dish had an Established Business Relationship with the inquiring party for 18 months. Montano's testimony on this point is not credible.

It is unclear whether Dish used PossibleNOW to scrub Lead Tracking System and Cold Call calling list.  Witnesses testified that Outbound Operations scrubbed lists with the PDialer and then sent lists to PossibleNOW for a second scrubbing.  See e.g., T 617:655 (Davis); T628:2967-68 (Montano).  Outbound Operations only scrubbed Account Number Campaign calling lists through the PDialer.  This testimony tends to indicate that Outbound Operations only sent Account Number Calling Lists to PossibleNOW.  PossibleNOW's process, however, included a field for inquiry dates.  PX 1248, Project Scope Document dated February 2, 2010.  Inquiry dates would be used to determine Inquiry-based Established Business Relationships in Lead Tracking System and Cold Call calling campaigns.  Dish, however, never provided any inquiry dates to either its expert Taylor or to the Plaintiffs. See T 633: 3300 (Taylor); T 614: 333-35 (Yoeli) (Dish provided activation dates to Plaintiffs, not inquiry dates).  The Court finds that the scant, ambiguous evidence does not establish whether Dish used PossibleNOW to scrub Lead Tracking System calling lists or Cold Call calling lists.

D. <u>Safe Harbor</u>

The Court found at summary judgment that Dish did not comply with the TSR or FCC Rule safe harbor. <u>Opinion 445</u>, at 163-65, 75 F.Supp.3d at 1008-09. Dish employee Montano testified that Dish met all requirements for compliance with TSR and TCPA safe harbor provisions. <u>T 628: 2962-65 (Montano)</u>. Montano testified that Outbound Operations maintained documentation of its scrubs. <u>T 629: 3183 (Montano)</u>. Dish, however, failed to produce in discovery or at trial written scrubbing procedures or documentation that such scrubbing procedures were followed. Such documentation is required to meet safe harbor requirements. <u>See</u> <u>Opinion 445, at 164-66, 210-11</u>. Dish, in fact, had no written scrubbing procedures. <u>T 628: 2807 (Bangert)</u>; <u>T 627: 2596-97 (Dexter)</u>; <u>see</u> <u>PX0302, Email thread between Joey Montano and Amy Dexter, dated July 28, 2010</u>. Montano's testimony on this point contradicted Dexter's and Davis's testimony and is not credible.

The Court also barred Dish from producing evidence of scrubbing procedures that was not produced in discovery. <u>Opinion entered April 24, 2013 (d/e 279) (Opinion 279)</u>, at 43-44. To the extent that Dish presented Montano's testimony at trial (or any

other witness's testimony not produced in discovery) to prove the Dish maintained documentation to comply with safe harbor procedures, the testimony is barred by Opinion 279.

E.  Notice to Dish of Calls to Numbers on the Registry and Internal Do-Not-Call Lists

Beginning in October 2003, Dish personnel periodically discovered that Dish's direct telemarketing operations made Registry Calls and Internal List Calls.  On October 7, 2003, Dish personnel tested the scrubbing process and discovered the process failed to remove numerous telephone numbers from the test call list that were on the Registry.  PX 478, Email from Todd Binns dated October 7, 2003, regarding Denver DMA DNC Test.

In February and May 2004, Dish personnel investigated consumer complaints and discovered that Dish made Internal List Calls.  PX 438, Email from David Murphy dated February 12, 2004, regarding Consumer Complaint; PX 439, Email from John Dy dated May 2, 2004, regarding Do Not Call Issue.  In March 2004, Dish personnel discovered Dish made an Internal List Call.  PX 440, Email from Leanna Sultan dated March 16, 2004 regarding Telemarketing Calls to Current Subscribers.

In December 2005, Lead Tracking System calling lists were not being scrubbed because whatever process Database Marketing was using was not working.  PX 471, Email from Tobias Plumley dated December 29, 2005, regarding Casper and Cheyenne.

In October 2006, Dish personnel investigated a consumer complaint and discovered Dish made a Registry Call.  PX 566, Email from John Greaney dated October 2, 2006, regarding Telemarketing Complaint.

In November 2007, Dish personnel investigated a consumer complaint and discovered that Dish made an Internal List Call.  The investigators determined that the calling campaign was improperly scrubbed because the campaign was improperly classified as a non-telemarketing campaign.  PX 46, Email from Bob Davis dated November 9, 2007 regarding Tahira Sial.

In 2007, Dish conducted an internal audit of telemarketing calling records.  The 2007 audit showed that Dish made 2,334, 5,324, and 3,405 Registry Calls in June, July, and August 2005 respectively.  The 2007 audit also showed that Database Marketing campaigns "were scrubbed but the DNC records were not removed." PX 695, Email from Todd Binns dated February 1, 2007, regarding

Notes from DNC Meeting, January 30; see T 617: 626-27 (Davis); see PX 696, Email thread dated January 18-26, 2007regarding 2007 audit; PX 1404, Email dated January 23, 2007 regarding 2007 audit.

In 2009, Dish conducted another internal audit of its telemarketing call records. The audit showed that Dish made 291,000 Registry Calls from October to December 2008. PX733, Email thread regarding 2009 Audit dated June 2, 2009 to January 5, 2010.

Outbound Operations also knew that eCreek made illegal Registry and Internal List Calls. Dexter testified that eCreek did a good job, but Outbound Operations personnel knew that eCreek's scrubbing process did not work effectively all the time. T 627: 2618 (Dexter). In January 2010, Dish personnel investigated a consumer complaint and discovered eCreek made a Registry Call. PX 59, Email thread regarding eCreek DNC dated January 25, 2010 to January 28, 2010.[20]

---

[20] In January 2008, an eCreek telemarketer manually called a person who asked not to be called again, and then the eCreek telemarketer who made the call had two other eCreek telemarketers call to the person that same day. PX 1079, Email Thread Regarding eCreek Calling Procedures Dated January 10, 2010 to January 11, 2010.

III.   Dish Order Entry Program

   A. Dish's Relationship with Order Entry Retailers Generally

By 2003, Dish had developed a website interface called the Order Entry (OE) Tool to facilitate the sale of Dish Network products and services by national companies such as Radio Shack and AT&T.[21]  The Order Entry Tool was designed for telephone sales to residential customers and could not be used to open commercial accounts.  Dish controlled the programming packages available for sale through the Order Entry Tool and set the pricing and terms of sale, including all promotions.  T 626: 2225 (Neylon).  Dish controlled access to the Order Entry Tool by issuing specific logins and passwords (collectively logins) to the national companies.

The Order Entry Tool prompted the sales person to ask a series of questions to offer the appropriate programming and services, secure the necessary information, and make the required disclosures to make the sale.  T 626: 2358 (Ahmed); T 621: 1628-32, 1668 and T 622: 1671-73 (Mills); T 626, 2225 (Neylon); PX 1208, Dish Order Entry Tool Instructional Training Guide.  The necessary information included customers' addresses, Social

---

[21] The Order Entry Tool was also called the Partner Order Entry Tool or POET.  See e.g., PX 1294 Email to Werner from YourDish.tv dated June 3, 2010.

Security Numbers, and credit card account numbers.  The disclosures included the terms and conditions of sale and legally required disclosures.  Dish provided the language for all disclosures and terms and conditions of sale. T 621: 1629-30 (Mills).

Once the customer's information was uploaded onto the Order Entry Tool, Dish performed the credit check, approved the sales, supplied all equipment, and performed the installation or arranged for the installation and activation of service.  New customers paid Dish directly.  See T 626: 2293-94 (Ahmed); T 621: 1626, and T 622: 1668-72 (Mills); PX 61, Letter from Ahmed to David Hagen dated October 7, 2003.  The term "activation" referred to activating new service in a residence; the sale was complete when the service was activated.  See T 628:2718 (Bangert); T 629:3052 (Montano).

In 2003, Dish began the Order Entry (OE) program to expand the use of the Order Entry Tool beyond national companies like Radio Shack and AT&T.  Under the Order Entry program, Dish authorized marketing businesses to use the Order Entry Tool to sell Dish Network programming.  T 626: 2283 (Ahmed).  Dish controlled access by issuing logins to the marketing businesses.  T 621: 1627 (Mills).  Dish called these marketing businesses Order Entry

Retailers.[22]  The name Order Entry Retailer was a misnomer.  These businesses were not retailers.  A retailer acquires inventory at wholesale and markets that inventory to the public at retail.  A TVRO Retailer, for example, acquired inventory of satellite dishes, DVRs, cable decoding boxes, and other equipment, and sold or leased that equipment to customers who bought Dish Network programming.  The Order Entry "Retailers" acquired no inventory and sold no product.  Rather, these businesses marketed Dish Network programming for Dish.  The businesses completed the solicitation and provided the customer information to Dish through the Order Entry Tool.  Dish ran the credit check; Dish approved the sale; Dish installed the equipment; Dish sold the programming and services directly to the customer; the customers became Dish subscribers; and the customers paid Dish directly.  The Order Entry "Retailers" were marketing businesses.  Dish engaged these marketing businesses to sell Dish Network programming.[23]  The Court will use the misnomer "Order Entry Retailer" because the

---

[22] Dish also referred to Order Entry Retailers as National Sales Partners.  See Opinion 445, at 57, 75 F.Supp.3d. at 971.

[23] Some Order Entry Retailers were also TVRO Retailers.  Dish, however, completed the sale and installed the equipment for all of the sales these Retailers made through the Order Entry program just like all the other Order Entry Retailers.  See Deposition of Walter Eric Myers, at 80-84. Deposition excerpts cited by the Court were admitted at trial in lieu of live testimony.

term pervades the exhibits and trial testimony, but the businesses were not retailers.

Dish paid the Order Entry Retailers commissions called "incentives" for activations.[24]  Dish established the Order Entry program to compete with DirecTV.  DirecTV had already implemented a similar program, and Dish was trying to catch up. T 626: 2296 (Ahmed); T 621: 1632 (Mills).

Order Entry Retailers could market nationally because Dish installed the satellites and related equipment.  Existing TVRO Retailers could only market in the geographic areas in which the Retailer could deliver and install Dish satellites and related equipment.  See T 626: 2295, 2385 (Ahmed).  Order Entry Retailers also had no inventory costs and no costs related to installation and delivery because Dish provided those services to the customer. T 626: 2295-96 (Ahmed); see Deposition of Walter Eric Myers, at 82.

Dish employees testified that Dish developed the Order Entry program to "leverage . . . entrepreneurial resources . . . in the marketplace."  T 626:2223 (Neylon).  Dish wanted to take advantage

---

[24] Order Entry Retailers were subject to a charge back of the incentive fee if a customer terminated Dish Network within 180 days of subscribing to Dish Network.  T 626: 2380 (Ahmed).

of the expertise of marketing companies to sell products.

See T 626: 2289-90 (Ahmed) ("[Order Entry Retailers] bring specific expertise, just like all the independent satellite dealers do to their specific niche.  And that's why these guys were very valuable, and they still are today."); see also Portela Deposition, at 76 (Dish sought out direct marketers who were good at selling anything.).

The Order Entry program generated large numbers of activations for Dish.  By 2005, Order Entry Retailers passed Dish's direct marketing in producing activations.  By 2007, Order Entry Retailers accounted for 30 percent of all of Dish's activations. PX 486, Dish Quality Assurance Program Presentation, at 7.  As of mid-2007, the Order Entry Retailers were producing 70,000 to 90,000 activations per month.  Dish direct sales were averaging 45,000 to 60,000 activations per month at the same time period. PX 99, Dish Gross Sales Update Report dated August 6, 2007. From 2004 to 2010, 60 percent of new activations came from Retailers, and the lion's share of those came from Order Entry Retailers.  T 618: 899 (Werner); see also Portela Deposition, at 84.

The number of companies in the Order Entry program was always relatively small.  At its peak, Dish had approximately 80

Order Entry Retailers, compared to 8,000 TVRO Retailers at the same time. T 619: 1157 (Werner). By the end of 2009, Dish reduced the number of Order Entry Retailers to 32. PX 730, 2009 Sales Partner Review, at 13; see also T 619: 1157-58 (Werner). In January 2016, Dish about 3,000 TVRO Retailers and 10 to 20 Order Entry Retailers. T 621: 1558 (DeFranco). As of October 2016, Dish had 17 Order Entry Retailers. T 711; 330 (Mills).

The relationship between Dish and Order Entry Retailers was governed by a standard Retail Agreement. All Order Entry Retailers signed a substantially similar form Retailer Agreement. See PX 152, 180, 200, and 238, Retailer Agreements with various Order Entry Retailers. The Retailer Agreements referred to Order Entry Retailers as "Retailers." The Retailer Agreements appointed Order Entry Retailers as "Authorized Dealers" for Dish, and authorized Order Entry Retailers to "market, promote, and solicit" orders for Dish throughout the United States. PX 152, Retailer Agreement with Dish TV Now, §§ 3.1-3.2. The Retailer Agreement authorized Order Entry Retailers to use Dish trademarks in their marketing; and gave Dish access to each Retailer's records with respect to its Dish dealership. Id. § 8.

Sections 7.1, 7.2, and 7.3 provided as follows:

7.1    Retailer agrees to use its best efforts to promote and enhance EchoStar's business, reputation and goodwill. Retailer shall allow only its employees, and shall not use any independent contractors, Affiliates or sub-agents, to fulfill its obligations hereunder without EchoStar's specific prior written consent, which consent may be withheld in EchoStar's sole and absolute discretion for any reason or no reason.  In the event Echostar does grant consent to Retailer to use persons not employed by Retailer to perform activities contemplated hereunder, Retailer shall be responsible for the acts and omissions of such persons under this Agreement to the same extent it is responsible for the acts and omissions of its own employees.

7.2    Retailer shall not sell Programming under any circumstances. All sales of Programming are transactions solely between EchoStar and DISH Network Subscribers. Retailer shall promptly forward to EchoStar all orders for Programming in the manner prescribed by EchoStar from time to time. Retailer understands that EchoStar shall have the right, in its sole and absolute discretion and for any reason or no reason, to accept or reject, in whole or in part, all orders for Programming. Retailer also agrees that it shall not condition, tie or otherwise bundle any purchase of Programming with the purchase of other services or products other than as specifically consented to in writing by EchoStar in advance, which consent may be withheld in EchoStar's sole and absolute discretion for any reason or no reason.

7.3    Retailer shall comply with all Business Rules, including without limitation all Business Rules which govern or are applicable to any Promotional Program in which Retailer participates. Retailer shall disclose to each prospective DISH Network Subscriber the relevant terms of the Promotional Programming which the prospective

DISH Network Subscriber is interested as well as any other terms as set forth in any applicable Business Rule. <u>Furthermore, Retailer shall take all actions and refrain from taking any action, as requested by EchoStar in connection with the marketing, advertisement, promotion and/or solicitation of orders for Programming and the sale of DISH DBS Systems, and Retailer shall cooperate by supplying EchoStar with information relating to those actions as EchoStar reasonably requests</u>. Failure of Retailer to adhere to any Business Rules may result in disciplinary action up to and including termination of this Agreement and/or any Other Agreement in the sole and absolute discretion of EchoStar for any reason or no reason, and the exercise by EchoStar of any other remedy provided in this Agreement, at law, in equity or otherwise.

<u>Id.</u> §§ 7.1, 7.2, and 7.3 (emphasis added). The Retailer Agreement

defined Business Rules as:

1.6 "Business Rule{s}" means any term, requirement, condition, condition precedent, process or procedure associated with a Promotional Program or otherwise identified as a Business Rule by Echostar which is communicated to Retailer by EchoStar or an Affiliate of EchoStar either directly (including e-mail) or through any method of mass communication reasonably directed to EchoStar's retailer base, including, without limitation, a "Charlie Chat", e-mail, facts blast, or posting on EchoStar's retailer web site. Retailer agrees that EchoStar has the right to modify any Business Rule at any time and from time to time in its sole and absolute discretion for any reason or no reason, upon notice to Retailer.

<u>Id.</u> § 1.6.

Section 17.9 of the Retailer Agreement authorized Dish to

audit Retailers on two days' notice:

> 17.9 <u>Records and Audit Rights</u>.  During the Term of this
> Agreement and for a period of three (3) years thereafter,
> Retailer shall keep and maintain at its principal place of
> business complete and accurate records and books of
> account, as well as all documentation of all material
> processes and procedures in connection with: (i) its
> performance under this Agreement. . . . EchoStar shall
> have the right, upon two (2) days prior written notice, to
> review, audit and make copies of Retailer's books, records
> and documentation for the purposes of: (a) determining
> Retailer's compliance with its duties and obligations
> under this Agreement, . . . .  Any audit conducted by
> EchoStar shall be conducted by EchoStar or its
> representative(s) at Retailer's offices during normal
> business hours. . . .

<u>Id.</u> § 17.9.

The Retailer Agreement provided for automatic termination if

an Order Entry Retailer violated the terms of the Retailer Agreement

or "any applicable federal, state or local law or regulation."

 <u>Id.</u> § 10.4.

The Retailer Agreement also contained a provision entitled

Independent Contractor:

> 11.   INDEPENDENT CONTRACTOR. <u>The relationship of
> the parties hereto is that of independent contractors.</u>
> Retailer shall conduct its business as an independent
> contractor, and all persons employed in the conduct of
> such business shall be Retailer's employees only, and not

employees or agents of EchoStar or its Affiliates. Retailer shall prominently state its business name, address and phone number in all communications with the public, including, without limitation, marketing materials, flyers, print ads, television or radio spots, web sites, e-mails, invoices, sales slips, and the like. <u>Notwithstanding anything in this Agreement to the contrary, Retailer (including without limitation its officers, directors, permitted subcontractors, permitted agents and employees) shall not, under any circumstances, hold itself out to the public or represent that it is an agent, employee, subcontractor or Affiliate of EchoStar or any Echostar Affiliate</u>. In furtherance of (and without limiting) the foregoing, in no event shall Retailer use EchoStar's name or the name of any EchoStar Affiliate in any manner which would tend to imply that Retailer is an Affiliate of EchoStar or that Retailer is an agent, subcontractor or employee of EchoStar or one of its Affiliates or that Retailer is acting or is authorized to act on behalf of EchoStar or one of its Affiliates. This Agreement does not constitute any joint venture or partnership. It is further understood and agreed that Retailer has no right or authority to make any representation, promise or agreement or take any action on behalf of EchoStar or an EchoStar Affiliate.

<u>Id.</u> § 11(emphasis added).

Order Entry Retailers represented themselves to the public as Dish authorized Retailers. <u>See</u> <u>T 622: 1821-22 (Mills)</u>. Order Entry Retailers could use the Dish Network logo with the added words "Dish Authorized Retailer." <u>T 625: 2226 (Neylon)</u>; <u>T 620: 1215-16 (Musso)</u>. Some Order Entry Retailers improperly represented themselves to the public to be Dish. <u>See</u> <u>e.g.</u>, <u>PX 120 Email Thread</u>

with Sweeney of Indiana Attorney General's Office regarding Satellite Systems dated September 23-30, 2005 (Order Entry Retailer claims to be Dish); PX 1361, Email thread regarding calls to existing customers, at 8-10; PX 650, Email thread dated August 7, 2006 regarding consumer complaint; T 621: 1474-75 (DeFranco).[25]

Order Entry Retailers set up their own facilities, purchased their own equipment, paid their own rents, hired and fired their own employees, secured their own leads and calling lists, wrote telemarketing scripts, and prepared marketing materials. Some Order Entry Retailers also sold other products, including competing services such as DirecTV programming. See T 626: 2290-91, 2293 (Ahmed); T 619: 1088-94 (Werner); T 622: 1916-19 (Goodale); T 625: 2099-2100 (Neylon); T 622: 1793-94 (Mills); see DTX 737, Letter from JSR Enterprises to Musso, undated; T 620: 1357-58 (Castillo).

Contrary to § 10.4 of the Retailer Agreement, Order Entry Retailers were not automatically terminated when they violated the

---

[25] On one occasion in 2011, Dish could not keep up with the volume of calls it was receiving. Dish representatives discussed diverting some calls to certain Order Entry Retailers. Dish personnel discussed authorizing those Retailers on that occasion to state that they were Dish. PX 331, Email from Dish marketing head Lana Luth dated October 28, 2011. The proposed use of Order Entry Retailers was not implemented. T 622: 1758-60 (Mills).

terms of the Retailer Agreement or applicable law.  E.g., T 625: 2124-25 (Neylon); T 619: 1170-71 (Werner).  Rather, Dish employed an array of disciplinary measures that included warnings, probation, fines, withholding access to the Order Entry Tool (known as putting on hold), and termination.  See T 625: 2136 (Neylon); T 1627 (Mills).

Dish's Sales Department ran the Order Entry program.  T 626: 2301-02 (Ahmed).  The Sales Department was responsible for the indirect marketing channel.  As discussed above, the indirect channel included Order Entry Retailers, TVRO Retailers, and national accounts such as Sears and AT&T (collectively Indirect Marketers).  Dish Vice President of Sales Amir Ahmed developed the Order Entry program.  T 626: 2358 (Ahmed).  In 2005, Ahmed was promoted to Senior Vice President of Sales and Distribution. Ahmed left Dish on January 31, 2006 and went to work for a Dish Order Entry Retailer called Marketing Guru.  T 626: 2283-85 (Ahmed).  Dish Vice President for Sales and Distribution Brian Neylon took over direct responsibility for indirect sales, including

the Order Entry program, after Ahmed left.  <u>T 625: 2075-76, 2112-13 (Neylon)</u>.[26]

The Sales Department looked for companies to become Order Entry Retailers that demonstrated the ability to generate large numbers of activations of new Dish subscribers.  Ahmed solicited the first Order Entry Retailer, Dish TV Now, because its principal David Hagen operated a very large call center that produced thousands of activations for DirecTV.  <u>See</u> <u>T 626: 2304-05 (Ahmed); PX 61</u>, <u>Letter from Ahmed to Hagen dated October 7, 2003</u>; <u>PX 148</u>, <u>Dish TV Now proposal dated October 7, 2003 (Dish TV Proposal) (Hagen's DirecTV Retailer Prime TV generated 27,000 new DirecTV subscribers per month)</u>.  Dish did not perform any background checks on these companies or their principals (such as checking Dunn & Bradstreet Reports or criminal background checks) before making them Order Entry Retailers. <u>E.g.</u>, <u>T 626: 2311, 2361, 2477-78 (Ahmed)</u>; <u>T 625: 2230-31 (Neylon)</u>.  The goal was to find outside companies that could generate activations.

---

[26] Neylon left Dish for a brief period while Ahmed was gone, but returned before Ahmed returned.  <u>T 621: 1690 (Mills)</u>. At the time of trial, Neylon was an Executive Vice President of Dish.

Dish Sales personnel knew that many Order Entry Retailers used outbound telemarketing to generate high volumes of activations.  T 622: 1677-78 (Mills).  Dish Sales personnel assumed that Retailers selling more than 150 activations per month were using outbound telemarketing.  PX 620, Email Thread dated August 17,2007 regarding Retailers.  Dish Sales personnel regularly learned that Order Entry Retailers used telemarketing.  See DTX 223, Email Thread between Ahmed and Hagen dated September 16, 2004 (Ahmed informed that the first Order Entry Retailer Dish TV Now was using outbound telemarketing); PX80, Email thread between Nick Meyers and Neylon and Ahmed, dated March 10-11, 2002 (Dish knew in 2002 that then TVRO Retailer Satellite System used Prerecorded Calls); T 626: 2410-11, 2417 (Ahmed); PX 190, Email thread between Ergen and Ahmed dated June 28, 2004, and PX 656, Email thread regarding Satellite Systems dated September 14-15, 2004; T 627: 2475-76 (Ahmed knew Satellite Systems used Prerecorded Calls to generate sales for DirecTV, and Ahmed made Satellite Systems an Order Entry Retailer); PX 265, Email from Mills to Neylon dated December 21, 2006 (Order Entry Retailer JSR Enterprises principal Richard Goodale told Mills that JSR planned

on using outbound telemarketing when JSR became an Order Entry Retailer); PX 129, Email thread between Mills and Werner dated May 17, 2007 (Order Entry Retailer outbound telemarketing accounted for 12,000 activations per month); PX 598, Email to Van Emst re Secret Shopping dated April 8, 2008 (lists several Order Entry Retailers using outbound telemarketing); PX 1347, TCPA Tracker Report dated September 16, 2008 (identified consumer complaints resulted from Order Entry Retailer Prerecorded Calls); see also Deposition of Shawn Portela, at 81-82 (Dish was actively prospecting for call centers to sell Dish Network programming); T 711: 339-40 (Mills) (Mills knew that 9 of 17 current Order Entry Retailers used outbound telemarketing); T 710: 231 (DeFranco) (about half of Order Entry Retailers in October 2016 used outbound telemarketing).  The testimony of various Dish witnesses that Dish did not know whether particular Order Entry Retailers used outbound telemarketing was not credible.

The Sales Department was divided into two parts, Retail Sales and Retail Services.  Retail Sales worked with Indirect Marketers to facilitate sales.  Michael Mills was Vice President in charge of Retail Sales.  Retail Services handled the payments to Indirect Marketers.

Blake Van Emst was Vice President in charge of Retail Services. Rob Origer was Director of Retail Services.

Retail Sales employed Regional Sales Managers and Area Sales Managers (collectively Sales Managers), Account Managers or Account Representatives (Account Managers), and Field Sales Development Representatives ("Field Representatives" or "FSDRs"), all of whom visited locations that sold Dish through the indirect channel. See T 711: 284-86 (Van Emst). Account Managers and Field Representatives reported to Sales Managers who reported up the chain to Mills in Retail Sales. Initially, Account Managers handled Order Entry Retailers, and Field Representatives handled TVRO Retailers and national accounts. By 2006, Account Managers and Field Representatives both worked with Order Entry Retailers. T 620: 1320-21 (Castillo).

Account Managers and Field Representatives provided training and marketing materials on Dish products and services at Order Entry Retailer facilities. T 621: 1627, 1632 (Mills); T 620: 1302 (Castillo); T621: 1632-34 and T 622: 1703 (Mills); Deposition of Michael Oberbillig, at 68, 83. Account Managers and Field Representatives pitched marketing ideas to Order Entry Retailers.

See Oberbillig Deposition, at 81.  Dish Sales personnel, on occasion, provided sales scripts to Order Entry Retailers and revised Order Entry Retailers' sales scripts.  T 621: 1636 and T 622: 1707 (Mills).  Mills made comments on scripts regularly.  T 621: 1637 (Mills) (quoting deposition testimony).

Dish shared lead lists with Retailers on a few occasions.  T 622: 1767-72 (Mills); PX 704, Email thread between Dish Legal Department and Marketing dated May 31- June 7, 2007; PX 58, Email from Davis to Pastorius dated June 6, 2008; PX 621, Email from Erik Carlson to DeFranco and others dated March 20, 2006; T 621: 1519-20, 1560 (DeFranco); PX 621, Email from DeFranco to Carlson, dated March 20, 2006; PX 1220, Email thread from Defender to Eric Carlson dated June 22- July 18, 2007.[27]

Retail Sales employees' compensation, from Field Representatives and Account Managers up to Vice President Mills, was tied to the number of new activations generated by Indirect Marketers, including Order Entry Retailers.  See e.g., T 622: 1798

---

[27] The Plaintiffs present some evidence about an additional set of leads called Glen Gary leads. Dexter in Outbound Operations had heard that Glen Gary leads were distributed to Order Entry Retailers, but she never confirmed this.  T 627: 2539-41, 2610 (Dexter); PX1181, Email from Dexter dated June 16, 2011 regarding Glen Gary Leads.  Bangert testified that the Glen Gary leads were used in Dish direct marketing.  T 628:2714-15 (Bangert).  The scant evidence fails to establish whether Glen Gary leads were distributed to Order Entry Retailers.

(Mills) (part of annual bonus based on number of new activations);
T 620: 1299, 1303-04, 13-7-09 (Castillo) (Field Representatives and
Account Managers' compensation tied to regional activation goals);
Oberbillig Deposition, at 38-39; see also T 626: 2368 (Ahmed)
("[L]ove to see the activation numbers.").

The Retail Services division of the Sales Department included
a Risk and Audit unit.  T 618: 926 (Werner).  Bruce Werner was in
charge of Risk and Audit.  Risk and Audit audited Indirect
Marketers to look for attempts to defraud Dish.  Risk and Audit also
kept information on "churn."  The term "churn" meant the rate at
which new customers solicited by a particular marketer terminated
their Dish subscriptions.  A high churn rate meant that a large
percentage of the new customers solicited by particular marketer
(either in the direct or indirect channel) terminated their
subscriptions after only a brief period of time.  See T 618: 915
(Werner); Oberbillig Deposition, at 47-48.  High churn rates cost
Dish money.  Dish incurred significant upfront costs with each
activation in the form of equipment costs, installation costs, and
promotional discounts.  Dish recouped the initial investment over
two to three years.  Dish could not recoup these upfront costs if the

customer cancelled after only a short period of time.  As a result,

Dish lost money on activations from Order Entry Retailers with high

churn rates.  See e.g., T 626: 2325-28 (Ahmed); T 621: 1692 (Mills);

T 621: 1486-86 (DeFranco).  Risk and Audit could compare Order

Entry Retailer churn rates to the churn rate of Dish's direct

marketing.  See e.g., PX 1144, Retailer Audit Notification &

Summary dated December 20, 2005 (comparing Dish TV Now churn

rate with Dish direct marketing churn rate).

For the first several years of the Order Entry program, Dish

made little or no effort to monitor or supervise Order Entry

Retailers' sales methods.  Risk and Audit audited Order Entry

Retailers to detect fraud on Dish, and Dish terminated Order Entry

Retailers for fraud.  T 618: 919 and T 619: 1072 (Werner); PX 1355,

Email from Werner dated January 26, 2010.  T 618: 916-19 and

T 619: 1116 (Werner).  Risk and Audit also responded to consumer

complaints, but did not otherwise monitor Order Entry Retailers'

marketing practices.  Sales Managers, Field Representatives, and

Account Managers visited Order Entry Retailer facilities to assist in

marketing, but they did not closely monitor marketing practices.

Some of the Order Entry Retailers took advantage of the situation to engage in corrupt practices. The corrupt practices generated problems in at least six areas: fraud on Dish; deceptive, incomplete, or inaccurate representations made to consumers during telephone solicitations; Do-Not-Call Law violations; unauthorized use of third-party affiliates; high churn; and increasing consumer complaints.

Some Order Entry Retailers used various means to defraud Dish. Order Entry Retailers sometimes opened duplicate accounts for existing Dish customers to secure additional commissions. Order Entry Retailers sometimes closed current accounts and opened new accounts for existing customers to secure additional commissions. Order Entry Retailers sometimes submitted false information on the Order Entry Tool to secure Dish approval of customers who would not otherwise be approved for a Dish subscription. Order Entry Retailers sometimes submitted fake Social Security numbers. At least one Order Entry Retailer, American Satellite, Inc. (American Satellite or Am Sat), sometimes put $1.00 on prepaid debit cards and then falsely submitted numbers from the prepaid cards as the credit card numbers of new

customers who did not have credit cards.  See T 618: 902-14 (Werner); T 621: 1511-12, 1515-17 (DeFranco); PX220, Email Thread dated January 7, 2009 regarding Order Entry Retailers Allegro and American Satellite; see also PX 1306 Email dated September 5, 2008 from Steve McElroy to Bruce Werner and others regarding More Cactus Follow-up.

In addition to defrauding Dish, some Order Entry Retailers made false or misleading statements to consumers during sales presentations.  See e.g., T 621:1511-12, 1515-17, 1589 (DeFranco); DTX 746, Collective Exhibit of Five Press Releases dated October 8, 2008 through March 5, 2009, Announcing Terminations of 40 Retailers.  Some Order Entry Retailers did not provide required disclosures.  Dish incorporated into the Order Entry Tool a set of disclosures that were supposed to be read to purchasers as part of completing the sale.  Some disclosures were required by statute or regulation.  Some were required by settlements that Dish made with state attorneys general.  See e.g., PX 1202, Risk Summary— TCPA/Disclosures for week ending September 12, 2006 (2006 Risk Summary); PX 1044, Letter from Mike Oberbillig to Jerry Grider dated August 10, 2006 (required disclosures enclosed); T 626: 2259

(Neylon).  Some Order Entry Retailers did not give the disclosures.
See e.g., PX 1202, 2006 Risk Summary.

Order Entry Retailers also violated the Do-Not-Call Laws.  Dish
Retail Sales Vice President Mills knew that Order Entry Retailers
could be a source of serious Do-Not-Call Law violations.  T 621:
1678-79 (Mills).  Several Order Entry Retailers initiated Prerecorded
Calls in violation of the TSR and the TCPA.   These included, among
others, Dish TV Now, Satellite Systems, Star Satellite, JSR,
American Satellite, United Satellite, Vision Satellite, LA Activations,
Dish Nation, and Atlas Assets.  See T 625: 2110, 2117, 2170-71
(Neylon); T 620: 2110 (Musso); T 621:1693-95 and T 622: 1728-29
(Mills); T 622: 1883 (Goodale); PX205, Email thread between
Bangert and Dish Retailer Escalations, dated May 25-27 2005;
PX 120, Email thread between Oberbillig, Ahmed and Novak dated
September 26-30, 2005 regarding Dish Network autodialer calls, at
PX 120-001, 003-004; PX 168, Letter from Consumer Ryan
Swanberg, dated July 26, 2004; PX 1299, Letter from attorney Chad
Austin to Dish Senior Corporate Counsel Dana Steele dated March
27, 2007; PX 1298, Letter from North Dakota Assistant Attorney
General James Thomas to Echostar and Dish Nation LLC dated

June 25, 2007, with enclosed North Dakota ex rel. Stenehjem v. Creative Concepts Group, Inc., N.D. Dist. Ct., South Central Judicial Dist., Civ. No. 07C1307, Assurance of Voluntary Compliance Order entered June 21, 2007.  Many of these companies used a type of prerecorded call known as a "press 1" or "p-1" call.  The prerecorded message asked the call recipient to press the number 1 on the telephone number pad if the recipient was interested in the product.  The call recipient who pressed 1 was connected to a live sales person.  See e.g., T 622: 1871-72 (Goodale).

Order Entry Retailers also made Registry Calls and Internal List Calls.  Some Order Entry Retailers did not maintain Internal Do-Not-Call Lists in direct violation of the TCPA.  Some companies hung up on individuals who asked to be put on an Internal Do-Not-Call List and then called the individuals back in direct contravention to the call recipients' requests.  See T 622: 1873 (Goodale); PX 250, Email from Musso dated December 20, 2006 Regarding E-Mail Notice of TCPA Violation.

Some Order Entry Retailers hid their identities through a process called spoofing.  Spoofing means falsifying identifying

information.  Telephone spoofing is a process by which the caller causes false identifying information to appear on the call recipient's Caller ID display and phone records.  See T 620: 1221-22 (Musso). As a result, the call recipient cannot readily determine the source of the illegal call.

Many Order Entry Retailers engaged third-party affiliates without authorization from Dish.  The Retailer Agreement provided that Order Entry Retailers could not use third-party affiliates without prior approval from Dish.  Many Order Entry Retailers disregarded this requirement.  Many provided their Order Entry Tool Logins to individuals and call centers in this country as well as call centers in the Philippines or other countries.  These third parties often made Do-Not-Call Law violations and used misrepresentations to sell Dish Network programming.  See DTX 947, Dish Facts Blast, dated October 10, 2007 (warning Order Entry Retailers about the use of unauthorized affiliates); T 620: 1314 (Castillo) (Order Entry Retailers shared logins with other Retailers); T 622: 1875-76 (Goodale) (worked under other Order

Entry Retailer Logins).[28]  Dish Sales personnel were aware of the use of affiliates by at least some Order Entry Retailers.  See e.g., PX 239, Email from Steven Keller dated September 8, 2006, attached Spread Sheet (September 2006 Spread Sheet); PX 1045, Email from Mills dated October 10, 2006, regarding Affiliate Calls (October 2006 Affiliate Calls Email).

Customers who purchased Dish Network Programming from these unscrupulous Order Entry Retailers often canceled their services.  As a result, many of these Order Entry Retailers had high churn rates.  Dish lost money on activations from Order Entry Retailers with high churn rates because Dish could not recoup over time its initial investment in equipment costs, installation costs, and promotional discounts.  See e.g., T 626: 2325-28 (Ahmed); T 621: 1692 (Mills); T 621: 1486-86 (DeFranco).

The unscrupulous practices of largely unsupervised Order Entry Retailers also generated customer complaints.  Dish had a long-term problem with consumer complaints about Order Entry Retailers.  T 621: 1685 (Mills).  Retail Sales, Retail Services, and Dish's Legal Department worked with Dish's Escalations

---

[28] Dish Exhibit DTX 947 is also admitted as Plaintiffs' Exhibit PX 570.

Department to respond to consumer complaints. See T 620: 1220 (Werner); Deposition of Marciedes Metzger, at 31. The Escalations Department included the Executive Resolution Team (ERT). The Executive Resolution Team handled customer complaints that had been "escalated." The term "escalated" meant that the customer's complaint had not been resolved by the customer service representative who initially received the complaint and so was sent up, or escalated, to the Executive Resolution Team. Metzger Deposition, at 26-27.[29]

Representatives of the Executive Resolution Team investigated complaints to ascertain the source of the call that sparked the complaint and whether the complaining consumer's telephone number was on the Registry. The Executive Resolution Team put the complaining consumer's telephone number on Dish's Internal Do-Not-Call List. If Dish direct marketing did not make the call, the Executive Resolution Team attempted to identify the Order Entry Retailer that made the call. In such instances, the Executive Resolution Team told the complaining customer that Dish did not make the call and told the consumer the identity of the Order Entry

---

[29] Dish's Escalations Department also had a Dispute Resolution Team (DRT). The Dispute Resolution Team handled written complaints. Metzger Deposition, at 31.

Retailer that made the call, if known.  The complaint was then filed and marked resolved. PX 1361, Email from July 11-19, 2006, regarding Calls to Existing Dish Network Customers, at  001-002.

Dish dealt with Order Entry Retailers that generated consumer complaints on an ad-hoc, case-by-case basis.  T 619: 996 (Werner). If Dish identified the Order Entry Retailer that dealt with a complaining consumer, executives in Retail Sales and Retail Services discussed the complaint among themselves and with members of Dish's Legal Department.  A person from either the Legal Department or Retail Sales contacted the Order Entry Retailer.  See Oberbillig Deposition, at 79-80.  The Order Entry Retailer generally gave some explanation, denial, or apology, and the matter was closed.

Dish's basic approach in matters not involving fraud on Dish was to accept the excuse the Order Entry Retailer gave.  For example, Satellite Systems repeatedly violated the Do-Not-Call Laws from 2002 to 2005.  Satellite System's principal Alex Tehranchi repeatedly said he would stop the practice.  Dish repeatedly accepted Tehranchi's excuses even though Tehranchi repeatedly

demonstrated that he would not stop the practice.  PX 120, Email thread, Email from Novak to Ahmed dated September 26, 2005.

In another example, Dish was told several times in the first eight months of 2005 that Order Entry Retailer Star Satellite was making illegal telemarketing calls.  Dish did nothing.  In October 2005, the office of a United States Congressman contacted Ahmed about Star Satellite making Registry Calls.  In response, Ahmed yelled at Star Satellite's principle Walter Eric Myers and told Myers not to do it again.  Ahmed took no other action to stop the illegal calls or to discipline Star Satellite. T 626: 2323-24 (Ahmed); T 622: 1818 (Mills); Myers Deposition, at 138, 184.

Dish witnesses testified that Dish could not discipline an Order Entry Retailer based on isolated consumer complaints.  They testified that Dish had to build a case to terminate an Order Entry Retailer or put an Order Entry Retailer on hold.  See e.g., T 619: 1125 (Werner); see also T 625: 2254 (Neylon) (placing Order Entry Retailer on hold was a last resort because a hold effectively put the Retailer out of business).  Dish may have needed to investigate and verify Order Entry Retailers' excuses and explanations to impose discipline.  Dish, however, did not investigate complaints.  In most

cases, Dish uncritically accepted Order Entry Retailers' explanations, told consumers that Dish was not responsible, marked the complaint resolved, and moved on.  See PX 1361, Email from July 11-19, 2006, regarding Calls to existing Dish Network Customers, at 001-002. (Once the Executive Resolution Team gave the consumer the name of the Order Entry Retailer involved, if known, and told the consumer that Dish was not responsible, the matter was marked resolved).

By mid-2006, the number of consumer complaints generated by Order Entry Retailers increased dramatically.  Werner testified that consumer complaints went "crazy."  T 619: 983 (Werner); see T 625: 2129 (Neylon); T 618: 978 (Werner) (the "car came off the wheels").  See also T 621: 1682-83 (Mills).  The Sales Department decided that Dish needed a more systematic way to address the practices of Order Entry Retailers to try to reduce the number of consumer complaints.

In August 2006, Retail Services added a Compliance Department to deal with problems associated with Order Entry Retailers in a more systematic way. Reji Musso was hired as Dish's Compliance Manager.  Musso reported to Werner in Risk and Audit

within Retail Services. [30]   PX 130, Email dated August 21, 2006 announcing hiring of Compliance Manager Reji Musso.  The Compliance Department sought to monitor Order Entry Retailers' compliance with the standard Retailer Agreement, Dish's rules, and applicable laws and regulations.  T 620: 993-94 (Musso).  The Compliance Department was tasked with ensuring that Order Entry Retailers accurately described the terms and conditions of Dish Network programming packages and made all required disclosures during telephone sales presentations.  T 619: 993-94 (Werner); T 620: 1194 (Musso).   The Compliance Department also handled consumer complaints about Order Entry Retailers.  T 625: 2130 (Neylon); T 619: 983 (Werner.).

In September 2006 the Compliance Department started a Quality Assurance (QA) Program.  T 620: 1204 (Musso).  The Quality Assurance Program was supposed to improve the quality of sales calls by insuring that Order Entry Retailers were making accurate representations and making all required disclosures in their sales presentations.  T 621: 1638 (Mills); T 620: 1205 (Musso); PX 1202, Risk Summary—TCPA/Disclosures for week ending

---

[30] Risk and Audit at some point became known as Risk Management.  See T 620: 1194 (Musso).

September 12, 2006;  PX 1044, Letter from Mike Oberbillig to Jerry Grider dated August 10, 2006 (required disclosures enclosed). Order Entry Retailers were required to participate in the Quality Assurance Program.  T 619: 994 (Werner).

The Quality Assurance program required Order Entry Retailers to allow Field Representatives and Account Managers to listen to sales presentations, either live presentations at the Order Entry Retailer facility or recorded presentations provided by the Order Entry Retailers, and to score the presentations. See T 620: 1310-11 (Castillo); T 620: 1209 (Musso); T 619: 992 (Werner); PX 486, Dish Quality Assurance Field Sales Development document issued on or about March 1, 2007 (2007 Quality Assurance Report), at 9, 17-23.[31]  Field Representatives scored Order Entry sales personnel on whether they identified themselves properly, asked customers about television usage, offered responsive packages of services and programming, made appropriate disclosures, secured necessary information to complete a sale, and made "a polite professional closing on all calls, regardless of if a sale is made." PX 486, 2007 Quality Assurance Report, at 18, 19, 23.

---

[31] PX 486 is undated, but based on its content, the documents seems to have been issued shortly after JSR's termination in February 2007.

The Compliance Department also sent out updated disclosures that Retailers were required to give during sales presentations. See T 620:1242 (Musso); PX 744, Email from Musso dated October 22, 2006. One such update was entitled, "Agency T&Cs – Q1 2007 Release." PX 1139.[32] The term "T&Cs" meant terms and conditions. T 621: 1652 (Mills).

Musso also worked with the Legal Department, the Executive Resolution Team, and Dish's DNC Investigation Team to run a sting program. The sting program sought to identify Order Entry Retailers that generated consumer complaints, but hid their identities by spoofing or otherwise. Upon receiving a consumer complaint, Dish attempted to identify the responsible Order Entry Retailer. If the participating Dish Departments could not identify the Retailer, Dish representatives asked the complaining consumer to participate in the sting program. If the offending telemarketer called again, the participating consumer agreed to purchase Dish Network programming using a credit card provided by Dish along with specified identifying information. When the order came through on the Order Entry Tool, Dish could identify the Order

---

[32] The footer on PX 1139 identified the document as a Microsoft Word document entitled "Retail OE TCs Q1 2007." See T 621: 1652 (Mills).

Entry Retailer involved in the participating consumer's "sting" transaction.  See PX 1362, Outline of Sting Process, undated; T 619: 989 (Werner); T 620: 1246 (Werner).[33]  Through the sting program, Dish identified several Order Entry Retailers that were violating the Do-Not-Call Laws.  T 619: 919 (Werner).  PX 1082, Tracker spreadsheet on stings; T 620: 1234-36, 1386 (Musso).

Musso also established a systematic way to notify Order Entry Retailers about consumer complaints.  The Compliance Department sent a letter explaining the complaint and requesting a response within seven days.  The Compliance Department followed up every week.  The Compliance Department placed the response in its files and forwarded copies to the Legal Department and executives within Retail Services and Retail Sales.  See T 620: 1238-39 (Musso); T 619: 1022-27 (Werner).  Musso kept a tracker spreadsheet of consumer complaints and the results of investigations, and issued weekly TCPA Tracker Reports.  T 619: 1027-31 (Werner); PX 1347, TCPA Tracker Report dated September 16, 2008.

---

[33] The sting program may have predated the establishment of the Compliance Department in 2006.

In 2007, the Compliance Department started the Partner Order Entry (POE) list.  The POE list was a list of complaining consumers whose complaints had been unresolved after being escalated to the highest levels of Dish's consumer complaint resolution system.  Compliance sent the POE list to Outbound Operations and all companies in the indirect channel, including all Order Entry Retailers.  All Dish direct marketing and all entities in the indirect channel were to "suppress" telephone numbers on the POE list.  Suppressing a telephone number meant that the number should not be called at all for any reason.  <u>T 619: 995-96, 1099 (Werner)</u>; <u>T 620: 1213-15 (Musso)</u>; <u>see</u> <u>PX 1107</u>, <u>Email dated January 4, 2007 (example POE Notice)</u>.

The Compliance Department also began supervising the use of third-party affiliates by Order Entry Retailers.  In October 2006, the Sales Department started collecting information from the top eleven Order Entry Retailers on the use of affiliates.  At least four of the top eleven admitted using third-parties to make telemarketing calls.  <u>PX 1045</u>, <u>Email thread between Mills and Neylon dated October 3-10, 2006 regarding Affiliate Calls</u>.  Thereafter, Dish began efforts to enforce the requirement in § 7.2 of the Retailer Agreement that all

affiliates had to be approved by Dish.  On October 10, 2007, Dish

issued a Facts Blast notice to Order Entry Retailers warning against

using affiliates without prior approval from Dish.  DTX 947, Facts

Blast dated October 10, 2007; see also PX 1051, Undated Facts

Blast (also warning against using unapproved affiliates).[34]  Dish

began performing background checks on proposed affiliates and

denied approval of some proposed affiliates.  Musso tracked

information on third-party affiliates used by Order Entry Retailers.

Musso's tracker included information on whether the affiliate had

been approved in the past.  T 620: 1201-03 (Musso); e.g., PX 1271

and PX 1272, Affiliate Tracker Spreadsheets identifying affiliates in

2008-11.  Pursuant to § 7.2 of the Retailer Agreement, Dish took

the position that Order Entry Retailers were liable for the actions of

their third-party affiliates. T 619: 1013-14 (Werner); see PX 724,

April 15, 2011 Draft Script on Risk Management, Audit, and

Compliance, at 1.

The Compliance Department, however, did not audit Order

Entry Retailers with respect to Do-Not-Call compliance.  The

Compliance Department did not review Order Entry Retailer calling

---

[34] The undated Facts Blast, PX 1051, referred to Dish as EchoStar, and so, was distributed
before Dish changed its name to Dish Network in January 2008.

records or calling lists.  T 625: 2252 (Neylon).  The Compliance

Department also did not incorporate into the Quality Assurance

Program any monitoring for Do-Not-Call compliance.  The Quality

Assurance Program focused on the accuracy and completeness of

statements made during telemarketing calls.

The Compliance Department had weekly meetings with Dish's

Legal Department.  The meetings covered all areas of Order Entry

Retailer compliance, including telemarketing.  See; PX 548, Agenda

for Legal TCPA Meeting dated October 2006; PX 536, Retail Services

Audit and Risk Q4 2006 Report.

Even though Musso and the Compliance Department secured

the information more systematically, Dish continued to respond to

Order Entry Retailer misconduct through an ad hoc, case-by-case

approach.  T 620: 1239 (Musso); T 619: 1042 (Werner).  Musso and

Werner could make recommendations to discipline Order Entry

Retailers, but more senior executives in the Sales Department (or

even higher level management in some cases) had to approve

discipline.  T 619: 1032-37 and 1104 (Werner); T 625: 2130-31

(Neylon); T 620: 1260 (Musso); PX 1083, Email thread between

Musso, Neylon, and Origer dated February 8, 2007; PX 492, Email thread between Musso and Van Emst dated September 2, 2008.

In November 2006, Musso suggested using more stings and imposing more fines on Order Entry Retailers. As she put it, "Anything to stop the madness . . . so to speak." PX 72, Email thread between Musso, Werner, Neylon, and Origer dated November 14, 2006. Between August 2006 and February 2007, Dish fined Order Entry Retailers Blu Kiwi, LLC and American Satellite $10,000.00 each, and fined Sterling Satellite $53,901.00. From February 2007 to July 2008, Dish did not impose any fines. In July 2008, Musso reported that the Compliance Department had made two recommendations for fines that were pending. PX 143, Email thread between Musso and Werner dated July 22, 2008. The Court cannot determine whether Dish imposed these two recommended fines.

Dish terminated some Order Entry Retailers after starting the Compliance Department. In February 2007, Dish announced that it had terminated three Order Entry Retailers for Do-Not-Call violations. PX 99, Gross Sales Update Report dated August 6, 2007, at 2 (stating that Dish terminated Order Entry Retailers JSR,

United Satellite, and Atlas Assets for Do-Not-Call violations);
see DTX 674, Press Release dated February 14, 2007 (announcing
JSR's termination).  In early October 2007, two additional Order
Entry Retailers were terminated for using unauthorized third party
affiliates for lead generation.  DTX 947, Facts Blast dated October
10, 2007.  In July 2008, Musso identified two additional Order
Entry Retailers that had been terminated since she started the
Compliance Department and two more that were not renewed but
would have been terminated.  Musso did not state the reasons for
these terminations.  PX 143, Email thread between Musso and
Werner dated July 22, 2008.

As a result of the on-going problems with corrupt practices,
the Order Entry program had a negative reputation within Dish.
PX 658, Email from Ahmed to DeFranco, Thomas Cullen, and
Neylon dated March 24, 2009.  In 2007, Dish legal department
paralegal Denise Hargen asked to be kept informed about Do-Not-
Call violations because the Order Entry Retailers or Dish marketing
personnel tried to get around the Do-Not-Call Laws: "It would really
help to make sure I'm always in the loop on these matters based on
my DNC involvement and knowledge base.  Makes it harder for

these folks to get around the 'rules' – which they try to do – especially marketing☺." PX 704 Email thread dated May 31 – June 7, 2007 between Hargen, Dish in-house counsel Emily Pastorius, and Brian Pacini (emoji in the original). By 2009, the Legal Department complained that Order Entry Retailers were engaging in "shady/illegal activity." Order Entry Retailers continued to make Prerecorded Calls in 2009. PX 730, 2009 Sales Partner Review, at 2, 3.

By 2008, Dish was also the subject of investigations for Do-Not-Call Law violations by the FTC and state consumer protections officials. Dish was also a defendant in several lawsuits brought by both individual consumers and state officials. See e.g., PX 1131, FTC Civil Investigative Demand dated July 21, 2005 (FTC Demand); PX 54, Legal and RS Project Report dated October 7, 2004; T 618: 935-38 (Werner) (listing pending legal investigations and lawsuits); PX 1340, Vermont Attorney General Investigative Subpoena Regarding Order Entry Retailer Satellite Systems Now is sued October 2005; PX 538, Texas Notice of Violation of Texas Do-Not-Call Law dated January 3, 2006; PX 669, December 10, 2007 Email from Dish attorney Jeffrey Blum (referencing ongoing FTC and 31-

state investigation).  The FTC and multi-state investigations culminated in the commencement of this action on March 25, 2009, and the entry of a court approved Assurance of Voluntary Compliance (AVC) on July 16, 2009, between Dish and the forty-six states that are not Plaintiffs in this action.  PX 55, Assurance of Voluntary Compliance dated July 16, 2009.

During this time frame in 2008 and 2009, Dish started to impose more control over the Order Entry program.  Dish required Order Entry Retailers making fifty activations a month to send their Internal Do-Not-Call Lists to PossibleNOW for compilation into a combined Retailer Do-Not-Call List.  See T 619: 1018-21 (Werner). Dish also arranged for Order Entry Retailers to use PossibleNOW scrubbing services.  Dish required some Order Entry Retailers to use PossibleNOW scrubbing services.  T 622: 1841-43 (Mills); see DTX 741, Email thread between Dish Vendor Inquiries and Satellite Systems dated April 8, 2009.  Dish Sales Department maintained information on sales and money spent on advertising on a monthly

basis, as well as monthly updates on each Order Entry Retailer. See PX 409, Monthly Update; T 626, 2265-66 (Neylon).[35]

From October 2008 until March 2009, Dish terminated 40 Retailers, some of which were Order Entry Retailers, for defrauding Dish or for making misrepresentations to consumers. DTX 746, Collective Exhibit of 5 Press Releases dated October 8, 2008 through March 5, 2009, Announcing Terminations of 40 Order Entry Retailers. In 2009, Dish reduced the number of Order Entry Retailers from to 76 to 32. Dish eliminated Order Entry Retailers for fraud and high churn. Dish representatives focused on eliminating fraud and reducing churn rates of the remaining Order Entry Retailers. The result was an increase in monthly activations from 71,000 to 100,000 and a significant reduction in churn rates. PX 730, 2009 Dish Sales Partner Review, at 13.

In May 2009, Ahmed returned to Dish as Senior Vice President of Sales and Distribution. He again had responsibility for the Order Entry Program. Neylon was Vice President in charge of the Order

---

[35] It is unclear from the evidence when this monthly tracking process started.

Entry Program and Mills was Director of the Order Entry program. T 626: 2286-88 (Ahmed).[36]

By 2009, Dish used the Quality Assurance program for both Dish direct telemarketing calls and Order Entry Retailer calls. Dish scored telemarketing calls on 45 criteria. The Quality Assurance criteria focused on accurately describing Dish products and promotions (including any limitations on promotional pricing), and providing complete, accurate disclosures during sales calls. The Quality Assurance criteria also covered "right sizing" customers. Right sizing involved asking questions about the household television watching patterns to accurately evaluate the potential customer's needs in order to offer the appropriate Dish programming packages. The Quality Assurance program also sought to ensure that the sales agents interacted with the consumer in an appropriate, professional manner. T 625: 2137-38, 2175-77, 2182-84, 2226 (Neylon); T 621: 1642 (Mills); T 627: 2473-74 (Ahmed); PX 560, Email thread regarding Quality Assurance scores dated August 18, 2009; PX 1048, QA Action Plan, at 7.

---

[36] In 2013, Ahmed's duties changed. He became in charge of door-to-door sales. T 626: 2288 (Ahmed).

A Dish Business Rule required Order Entry Retailers to participate in the Order Entry Program.  <u>T 620: 1213 (Musso)</u>. Order Entry Retailers were evaluated weekly on their Quality Assurance scores.  Order Entry Retailers were required to modify their practices to conform to the Quality Assurance Program. <u>T 621: 1639-40 and 622: 1701 (Mills)</u>; <u>T 625: 2137-38, 2171-75 (Neylon)</u>; <u>see</u> <u>T 620: 1210 (Musso)</u>; <u>PX 559</u>, <u>Email thread between Neylon, Musso, and Ahmed dated August 13, 2009 (Ahmed wanted "no nonsense from my employees or my Retailers" regarding the Quality Assurance program)</u>; <u>PX 616</u>, <u>Email thread between Neylon and Mills dated August 13, 2011</u>.  Initially, Field Representatives and Account Managers scored calls.  At some point, a separate national team within Dish scored all the recorded calls from both Order Entry Retailers and Dish direct marketing.  <u>T 620: 1211-12 (Musso)</u>.

By August 2009, Ahmed and Neylon wanted the Sales Department to emphasize Order Entry Retailer compliance with Quality Assurance program.  Neylon wanted Field Representatives and Account Managers to be "110%" involved in improving Quality Assurance scores.  Ahmed also stated that he would hold Account

Managers responsible.  Ahmed stated that he would not tolerate high churn or misrepresentations.  PX 559, Email thread between Neylon, Musso, and Ahmed dated August 12, 2009.

Thereafter, Dish Field Representatives, Account Managers, and Sales Managers worked with Order Entry Retailers to get and keep Quality Assurance scores over 90 percent.  Field Representatives and Account Managers visited with Order Entry facilities to ensure compliance.  Field Representatives and Account Managers coached Order Entry Retailers on how to improve Quality Assurance scores.  T 625: 2179 (Neylon).  Field Representatives and Account Managers met with Order Entry Retailer salespersons to discuss sales presentations.  On occasion, Sales Managers required Order Entry sales staff who worked at home to come to the office once a week so that their calls could be monitored.  T 625: 2210 (Neylon); PX 1048, QA Action Plan, at 4.  On occasion, Order Entry Retailer personnel who had consistently had failing Quality Assurance scores were removed from the telephones and fined. PX 1048, QA Action Plan, at 6.

Sales Managers, Field Representatives, and Account Managers reviewed and rewrote scripts and ordered Order Entry Retailers to

change sales procedures to keep scores up.  See T 625: 2177-79 (Neylon); T 6212: 1640 (Mills); PX 1048, QA Action Plan, at 3, 5.  On one occasion, a Dish Sales Manager wrote a call flow for an Order Entry Retailer who did not use a written sales script and required the Order Entry Retailer to follow the call flow.  PX 1048, QA Action Plan, at 4.

Dish could discipline Order Entry Retailers who did not comply with the Quality Assurance Program.  Dish Sales Managers, at least, could withhold promotional offers from non-compliant Order Entry Retailers.  PX 1048, QA Action Plan, at 3.  Mills opined that a Sales Manager's statement in a QA Action Plan (PX 1048) about withholding programming was a flippant comment.  T 621: 1641 (Mills).  Mills' opinion on this matter is not credible.  The QA Action Plan contained a detailed plan of steps to improve an Order Retailer's Quality Assurance score.  The Court sees nothing flippant about anything in the document.   In addition to restricting available programming, Dish could disable Order Entry Retailer logins to restrict access to the Order Entry Tool.  T 625: 2208-09 (Neylon).

One Dish Sales Manager William (Brett) Mason asked Musso for contractual authority for the Quality Assurance Program. Mason quoted Retailer Agreement § 7.3 as a possible source of authority in the email. Section 7.3 required Order Entry Retailers to "take all actions and refrain from taking any action, as requested by [Dish] in connection with the marketing, advertisement, promotion and/or solicitation of orders for" Dish Network programming. Mason then stated that he could use the "absolute power" clause, but it was not his first choice. Musso confirmed that § 7.3 of the Retailer Agreement authorized the Quality Assurance program. PX 553, Email thread between Musso and Mason dated October 25, 2011. See also T 625: 2198-99 (Neylon) (Under Retailer Agreement, Dish personnel could ask Retailers to take any action, or to refrain from taking any action relating to marketing.).

The Plaintiffs suggest that the "absolute power" clause was § 7.3 of the Retailer Agreement. Musso testified that the "absolute power clause" meant that Mason could tell the Retailer, "Because I said so." T. 620: 1289 (Musso). Musso's testimony on this point is consistent with Mason's email. Mason distinguished between Section 7.3 and the "absolute power" clause. Mason quoted 7.3 in

the email, and then said, as an alternative, that he guessed he could invoke the absolute power clause.  Musso's testimony is also consistent with the statement of Dish employee Carlos Prado. Prado told Field Representative Manuel Castillo, "Dish, the way they do things is they have all the power, and then if they – if they want to, they can squash you like a bug."  T 620: 1333 (Castillo).  Prado was in charge of setting up new Order Entry Retailers at the time that he made the statement.  Id.  The Court finds that the "absolute power" clause meant that Dish Sales Managers could direct Order Entry Retailers to act by telling Order Entry Retailers, "Because I said so."

Even with the purge of half of the Order Entry Retailers and the imposition of the revised Quality Assurance Program, Dish retained the ad hoc, case-by-case approach to Do-Not-Call Law violations.  In 2009, a class-action law suit was filed against Dish for Registry Calls made by Order Entry Retailer Satellite Systems. See T 618: 868-69 (Kraukauer).  By 2011, Dish had so many complaints about Satellite Systems that Dish's Legal Department had developed a "standard go after Satellite Systems Network" letter to send complaining consumers.  See PX 199, Email from Dish

litigation paralegal Kimberly Berridge to Dish Corporate Counsel Brett Kitei dated August 18, 2011.  No evidence cited by either party indicates that Dish disciplined Satellite Systems for these calls.  Satellite Systems remained an Order Entry Retailer until 2013.  T 625: 2149-50 (Neylon).

B. Dish's Relationship with Specific Order Entry Retailers

This Court found at summary judgment under Counts I and III that Dish violated the TSR by causing the following illegal calls by Order Entry Retailers:  causing Dish TV Now to make 6,637,196 Abandoned Prerecorded Calls; causing Satellite Systems to make 381,811 Registry Calls; causing Star Satellite to make 43,100,876 Abandoned Prerecorded Calls; causing JSR to make 2,349,031 Registry calls; and causing American Satellite to make one Abandoned Prerecorded Call.  Opinion 445, at 232-33, 75 F.Supp.3d at 1032-33.  At trial, the Plaintiffs presented evidence about these Order Entry Retailers, as well as Order Entry Retailer Dish Nation.[37]  The Court makes findings regarding Dish Nation along with the other five Order Entry Retailers.

---

[37] The Plaintiffs presented evidence at summary judgment about a TVRO retailer named New Edge Satellite and an Order Entry Retailer named National Satellite Systems.  See Opinion 445,

1. <u>Dish TV Now</u>

In late 2003 or early 2004, Dish TV Now became Dish's first Order Entry Retailer.  <u>T 626: 2304 (Ahmed)</u>.  On October 7, 2003, Ahmed contacted the principal of Dish TV Now David Hagen to offer him the opportunity to become an Order Entry Retailer.  <u>PX 61</u>, <u>Letter from Ahmed to Hagen dated October 7, 2003</u>.  At the time, Hagen operated a company called Prime TV that sold DirecTV.

The same day, October 7, 2003, Hagen sent Ahmed a proposal in which he projected that within a year of operation, Dish TV Now would generate 27,000 Dish Network activations per month.  Hagen represented in the proposal that Dish TV Now would use television advertising, direct mail, and online advertising to secure inbound telemarketing calls from interested customers.  <u>PX 148</u>, <u>Dish TV Now Proposal Letter</u>; <u>DTX 959</u>, <u>Retailer Application from Dish TV Now</u>.  Dish did not perform any background checks on Hagen or Dish TV Now.  Ahmed did not learn that Hagen was a convicted felon who had been permanently enjoined from committing deceptive practices in actions brought by the FTC.  <u>See T 626:2359-62 (Ahmed)</u>; <u>PX 145</u>, <u>FTC v. David DeFusco a/k/a David Hagen</u>,

at 114-16.  The Plaintiffs have asked for no findings of fact or conclusions of law regarding the activities of New Edge Satellite or National Satellite Systems at trial.

C.D. Va. Case No 89-1046, <u>Permanent Injunction Order</u>, entered November 3, 1989.  In 2004, Hagen was also enjoined by North Carolina in a separate action.  <u>PX 150</u>, <u>North Carolina v. Prime TV, LLC</u>, N.C. Wake County, North Carolina Superior Court Case No. 04CVS008148, <u>Consent Judgment</u>, entered June 14, 2004.

Dish TV Now hired a company called Guardian Communications (Guardian) to make "press 1" Prerecorded Calls to market Dish Network programming.  From May 2004 to August 10, 2004, Guardian made on behalf of Dish TV Now 6,637,196 Prerecorded Calls that were answered and became Abandoned Prerecorded Calls for which Dish is liable in Count III.  <u>Opinion 445</u>, at 88-89.  Guardian stopped making these calls because Dish TV Now stopped payment on checks to Guardian.  <u>See</u> <u>Opinion 445</u>, at 89-90.

On August 2, 2004, Dish received a consumer complaint about Dish TV Now's prerecorded telemarketing calls.  <u>PX 168</u>, <u>Letter from Consumer Ryan Swanberg, dated July 26, 2004, and marked received August 2, 2004.</u>

On September 16, 2004, Ahmed sent Dish TV Now's principal Hagen an email which said,

David,

This is simple. Is Dish TV Now telemarketing customers over the phone, or are you guys using predictive dialers and leaving messages trying to sell the customers DISH Network. We're not interested in this type of marketing. We're receiving complaints on your department doing just this kind of marketing.

Hagen responded,

Amir,

Dish TV Now uses a predictive dialer to make outbound calls to consumers who have previously inquired with us about satellite TV service or are current Dish TV Now DISH Network customers. The intelligent dialer knows the difference between a No Answer, Busy, Answering Machine, or Live Connect. The dialer only connects live customers to a live Dish TV Now agent. We do not leave messages. We have a list of over 5 million past and current customers that we scrub against the do not call list. In addition, we maintain a Dish TV Now do not call list. Any customer who wishes to opt out on future solicitations is immediately added to the list. Dish TV fully complies with the TCPA.

DTX 223, Email thread between Ahmed and Hagen dated September 16, 2004.

Ahmed learned from the September 16, 2004, email that Dish TV Now engaged in outbound telemarketing. Ahmed further learned that Hagen misrepresented in the original marketing plan the methods that Dish TV Now would use to sell Dish Network

programming.  Dish, however, did not take any disciplinary actions against Dish TV Now.  <u>T 626: 2370-71 (Ahmed)</u>.  Dish allowed Dish TV Now to continue operating as an Order Entry Retailer even though Ahmed knew that Hagen misrepresented his marketing methods.

Ahmed also did not check the accuracy of Hagen's representations about Dish TV Now's telemarketing practices, and so, did not learn that Hagen was lying about the use of Prerecorded Calls.  Hagen told Ahmed that calls answered by a person were connected to a live sales agent.  That was false.  The calls were connected to a prerecorded press 1 message.  Ahmed did nothing to check Hagen's explanation.  He just accepted it and went on.

Dish TV Now continued operating as an Order Entry Retailer until January 2006.  On or about December 20, 2005, Dish put Dish TV Now on hold for failure to promote Dish Network programming.  While on hold, Dish TV Now could not place orders through the Order Entry Tool.  Dish TV Now also had a high churn rate, almost double the Dish direct marketing churn rate.  In January 2006, Dish terminated Dish TV Now as an Order Entry Retailer for high churn and failure to promote Dish Network.  Dish

TV Now produced 485 activations in 2002; 2,765 activations in 2003; 78,339 activations in 2004; and 41,688 activations in 2005. T 626: 2376 (Ahmed); PX 1144, Retailer Audit Notification & Summary dated December 20, 2005;see PX 165, Email from Mills to Ahmed dated December 22, 2005.

2. Satellite Systems Network

In March 2002, Satellite Systems was a TVRO Retailer. Satellite Systems was making Prerecorded Calls. Dish's regional sales director Nick Meyers stated in an email that Satellite Systems' use of Prerecorded Calls "has caused a few concerning calls, but seems to be greatly outweighed by the results." PX80, Email thread between Nick Meyers and Neylon and Ahmed, dated March 10-11, 2002; T 625: 2139 (Neylon); T 626: 2332, 2329 (Ahmed). Meyers made this statement when the TCPA prohibited Prerecorded Calls but before the TSR prohibited abandoned calls. In June 2002, Dish sent Satellite System a notice to comply with telemarketing laws, but took no other action. PX 187, letter dated June 12, 2002.

In June 28, 2004, Dish's co-founder and Chief Executive Officer Charlie Ergen received a Prerecorded Call from Satellite Systems offering DirecTV programming. Ergen contacted Ahmed

about the call.  Ahmed told Ergen that Satellite System was also a Dish Retailer and that Satellite System used "message broadcasting with [DirecTV] as their primary source to generate sales."  At trial, Ahmed denied knowing that Satellite Systems used Prerecorded Calls. T 626: 2337 (Ahmed).  The Court finds that denial to not be credible.  Ahmed's statement in the email was unequivocal.

Ergen asked why Dish could not copy Satellite Systems' technique.  Ahmed directed Dish Regional Sales Manager Mike Oberbillig to contact Satellite Systems to ask for the script.  Satellite Systems' principal Alex Tehranchi refused to give Dish the scripts and denied using Prerecorded Calls.  Tehranchi stated that Satellite Systems was moving away from telemarketing.  PX 190, Email Thread between Ergen, Ahmed, and a Dish West Coast Account Manager Mike Oberbillig, dated June 28-30, 2004.

In July 2004, Satellite System became an Order Entry Retailer.  T 626: 2409-10 (Ahmed).  Satellite System was selling Dish Network and DirecTV.  By the end of July 2004, Ahmed began receiving complaints about Satellite Systems' outbound telemarketing.  PX 503, Email from Ahmed dated July 29, 2004.

In September 2004, Satellite Systems was averaging 9,000 DirecTV activations a month, but only 350 Dish Network activations a month. Ahmed raised the commission paid to Satellite System to increase Dish Network activations. Ahmed stated that Dish needed activations from Satellite Systems. PX 656, Email thread between Ahmed, DeFranco, and Dish Regional Director for West Coast Jim Spritzer, dated September 14-15, 2004.

In November 2004, a Florida state court ordered Satellite Systems to pay $25,500 in civil penalties under its other name Vitana Financial Group, Inc. (Vitana) for violating Florida Do-Not-Call Laws. PX 191, Florida Department of Agriculture and Consumer Services Press Release dated November 4, 2004.

In March 2005, Tehranchi and Vitana agreed to pay $15,000 in civil penalties to North Carolina for violating state Do-Not-Call Laws. PX 186, North Carolina v. Vitana Financial Group and Tehranchi, et al., Wake County, North Carolina Superior Court, Case No. 04-8799, Consent Judgment entered March 21, 2005.

In October 2005, Dish again received notice that Satellite Systems was using Prerecorded Calls. PX 504, Email thread dated October 27, 2005. A month earlier in September 2005, Dish in-

house attorney Novak stated that Satellite Systems had been making Prerecorded Calls for years:

> We know that SSN [Satellite Systems] is using autodialers and automessages. Terachi [sic] been warned time and again (by me, by you, by the region, by phone, in writing, in person) that these activities could violate the law. Last time, Teranchi [sic] blamed a "rogue employee," who he claimed was terminated, but the activities continue. Charter knows he's doing it, and several state AG's know he's doing it as well.
>
> In the past, we have successfully resisted the argument that we are responsible for the conduct of independent Retailers, however, SSN is a problem because we know what he is doing and have cautioned him to stop. There is risk in continuing to give warnings without a follow-through action. Eventually, someone will try to use that against us.
>
> On the range of options, you could give him another written warning, you could put him on probation for a period of time, you could put him on hold and withhold money (presumably to cover "potential fines" running from SSN to us under some agency theory), or you could terminate him now.
>
> I favor probation, provided that there is unanimous understanding that if EchoStar becomes aware of ANY ONE addition (sic) violation, he's terminated.

PX 120, Email thread, Email from Novak to Ahmed dated September 26, 2005 at 1:24 p.m., at PX 120-003-004 (emphasis in original). Novak made this comment in September 2005 in connection with an initial investigation of a different Prerecorded

Call.  The September 2005 call was made by another Order Entry Retailer, United Satellite.  PX 120, Email Thread with Indiana Attorney General's Office dated September 23-30, 2005.  However, a month later, in October 2005, Dish did not follow Novak's recommendation when Satellite Systems was again caught making Prerecorded Calls.  Oberbillig orally told Tehranchi to stop using Prerecorded Calls.  Dish did not impose any other consequences. T 626: 2348-50 (Ahmed); see Oberbillig Deposition, at 78.

On or before September 21, 2006, Dish knew that Satellite Systems had been fined $25,500.00 for Do-Not-Call law violations. PX 1086, Email from Ron Dufault of Retail Services dated September 21, 2006 (at 023 of the collective exhibit).[38]  Dish took no action against Satellite Systems.

In February 2007, two of Dish's stings identified Satellite Systems as violating Do-Not-Call Laws.  PX 1086, Email dated February 7-15, 2007, regarding stings involving consumers Jeffrey Mitchell and Gregory Fisher (at 016-018 of the collective exhibit). Dish took no disciplinary action against Satellite Systems.

---

[38] The email, PX1086 at 023, erroneously stated that North Carolina imposed the $25,500 fine instead of Florida.

In September 2009, Dish's investigation of a consumer complaint showed Satellite Systems was making Registry Calls. PX 282, Email thread dated May 10-19, 2009. The complainant, Dr. Thomas Kraukauer, filed a class action lawsuit against Dish as a result of these calls. T 618:865-66 (Kraukauer).

In 2010 and 2011, Satellite Systems made 381,811 illegal Registry calls. Opinion 445, at 133, 232. Satellite Systems also made 22,946 Internal List Calls to telephone numbers on the Internal Do-Not-Call Lists of Dish and the Telemarketing Vendors. Satellite Systems also made 42,990 Internal List Calls to numbers on the Internal Do-Not-Call Lists of other Order Entry Retailers compiled by PossibleNOW. PX 28, Taylor November 6, 2013 Report, at 13-14d Tables 5b and 5c.

By 2011, Dish had developed a standard letter to send out to consumers complaining about Satellite Systems' violations of Do-Not-Call Laws. The Dish legal department referred to the letter as the "standard go after SSN letter." PX 199, Email from Dish litigation paralegal Kimberly Berridge to Dish Corporate Counsel Brett Kitei dated August 18, 2011. Dish terminated Satellite Systems Network in 2013. T 625: 2149-50 (Neylon).

3. <u>Star Satellite</u>

Star Satellite became a TVRO Retailer in March 2003.  Walter

Eric Myers (Myers) was in charge of Star Satellite.  Myers previously

ran TVRO Retailer called Tenaya Marketing (Tenaya).  Tenaya did

door-to-door sales primarily.  Dish began penalizing Tenaya for high

churn rates, so Myers arranged for his brother to start Star

Satellite.  <u>Deposition of Walter Eric Myers</u>, at 38-40.  Myers ran

Star Satellite.  Star Satellite stated in its application to Dish that it

planned to use newspapers and direct mail advertising.  Star

Satellite did not indicate that it would engage in telemarketing.

<u>DTX 335</u>, <u>Retailer Business Questionnaire dated March 11, 2003</u>.

At some point in time, Dish representatives learned that Star

Satellite was engaged in telemarketing.  Dish representatives sent

Myers parts of a script to use in these sales.  Dish representatives

wanted Retailers to make all of the required disclosures to

consumers.  <u>Myers Deposition</u>, at 42-43.  Myers testified that Star

Satellite called telephone numbers from the phone book.  <u>Myers</u>

<u>Deposition</u>, at 124.

In May 2004, Star Satellite hired Guardian to make

Prerecorded Calls on its behalf to sell Dish Network programming.

Guardian started making prerecorded "press 1" telemarketing calls selling Dish products and services for Star Satellite. Myers used the name Tenaya in Star Satellite's dealings with Guardian. Myers did not tell Dish that Star Satellite used Guardian's services. Myers considered marketing methods to be trade secrets that he did not want to share with any competitor. Myers viewed Dish as a competitor because Dish had its own internal marketing department. Myers believed that he could choose the marketing methods because Star Satellite was a separate business from Dish. Myers Deposition, at 73, 76-77, 106, 141, 174-80, 182-83.[39]

In 2004, Star Satellite applied to be an Order Entry Retailer. Myers testified that he basically begged to be approved for the Order Entry program. Dish personnel asked Myers questions about proposed marketing methods. Myers represented that Star Satellite would primarily use direct mail, with some phone sales. Myers believed telemarketing carried a stigma. He suspected that Dish did not like telephone sales. Myers did not want scrutiny from Dish about whether Myers was complying with Do-Not-Call Laws. Myers

_____

[39] Dish cites the deposition of Guardian's principal Kevin Baker for the proposition that Star Satellite suspended prerecorded calls periodically when Dish personnel were at Star Satellite's offices. See Deposition of Kevin Baker, at 71, 177-78. The testimony is inadmissible hearsay to prove the truth of Baker's assertions.

Deposition, at 92-95.  Guardian's principal Kevin Baker stated that he told Myers a rumor that Dish did not allow Order Entry Retailers to make Prerecorded Calls.  Deposition of Kevin Baker, at 70.[40] Myers, however, believed that Dish became aware of the fact that Star Satellite was using telemarketing.  Myers Deposition, at 181.

Star Satellite became an Order Entry Retailer in late 2004 or early 2005.  Star Satellite set up an office and call center in Provo, Utah.  Star Satellite still engaged in door-to-door sales in the Los Angeles, California area.  T 622: 1815 (Mills); Myers Deposition, at 81, 83, 91.  Star Satellite only sold Dish Network except for a brief period of up to three months in 2005 when Star Satellite also sold DirecTV programming and services.  Even when Star Satellite sold DirecTV, its sales staff offered Dish Network programming first to customers, and then offered DirecTV if the person was not interested in Dish Network or for some reason could not purchase Dish Network.  Myers Deposition, at 143-46.

Dish personnel trained Star Satellite staff on how to use the Order Entry Tool.  Dish personnel provided a recommended script to use for telephone sales.  Dish provided detailed disclosures to be

---

[40] Baker referred to the use of prerecorded calls as autodialing.  Baker Deposition, at 70.

read to customers during telephone sales.  Dish representatives visited Star Satellite's call center in Provo, Utah, weekly.  Michael Mills went to Star Satellite's offices a few times.  Myers Deposition, at 87-90, 93-94.  Mills worked on Star Satellite scripts to include disclosures required by Dish.  PX 207, Email thread between Mills and Walter Eric Myers dated November 2-3, 2005.

Star Satellite had Guardian make 400,000 to 600,000 "press-1" Prerecorded Calls a day.  Myers Deposition, at 103-05, 129-30.  Baker testified that Guardian called published numbers "off a CD-Rom you could buy down at Office Max."  Baker Deposition, at 50.

Star Satellite greatly increased its sales as a result of the Prerecorded Calls.  Myers told Dish personnel, "We're just doing a lot of phone sales and we're having a lot of success."  Myers told Dish personnel that Star Satellite's calling lists were scrubbed for the Registry, but did not give any details on Star Satellite's telemarketing.  Myers relied on Guardian to scrub the calling lists.  Myers Deposition, at 103-05, 129-30.

Dish personnel learned in the first half of 2005 that Star Satellite was using Prerecorded Calls.  On January 25, 2005, Dish received a consumer letter complaining that Star Satellite was using

Prerecorded Calls.  PX 203, Letter from Dennis Caplan, dated January 25, 2007.  On February 18, 2005, Dish received another consumer complaint about Star Satellite Prerecorded Calls. PX 204, Email from David Hyde to DeFranco and others dated February 18, 2005.  The parties presented no evidence that Dish took any action on either complaint.

In May 2005, Dish Outbound Manager Bangert told Dish employee Mark Duffy that an Order Entry Retailer in Provo, Utah, was using "automated messaging."  Bangert asked Duffy to pass the information on to Retail Services.  PX 205, Email thread between Bangert and Dish Retail Escalations, dated May 25-27 2005. Bangert testified that, when he wrote the email, he did not know that Star Satellite was using Prerecorded Calls.  Bangert's testimony in this regard was not credible.  T 628: 2722-23 (Bangert).  The email is unequivocal.  Bangert knew an Order Entry Retailer in Provo, Utah, was making Prerecorded Calls.  Star Satellite was Dish's Order Entry Retailer in Provo, Utah.

Duffy forwarded Bangert's email to Jeff Medina in Dish's Retail Escalations Department.  Medina forwarded the email to Margot

Williams in Retail Escalations.  Medina wrote in his email, "Are these your boys again?"  Williams responded to Medina,

> Jeff,
>
> I forwarded this information to Regina Thomas for further investigation. We have received a few complaints for other issues on this Retailer that have also been sent to her for review and assistance.

PX 205, Email thread between Bangert and Dish Retailer Escalations dated May 25-27 2005.  Dish took no disciplinary action against Star Satellite.

In August 2005, an individual consumer sued Dish and Star Satellite for Star Satellite's use of Prerecorded Calls to sell Dish Network programming.  Dish knew of the suit on August 12, 2005. PX 208, Letter from Dish Counsel Dana Steele to Star Satellite dated August 12, 2005.  Dish took no disciplinary action against Star Satellite.

From July 30, 2005, to November 22, 2005, Star Satellite made 43,100,876 completed Abandoned Prerecorded Calls through Guardian selling Dish Network programming.  The Court found at summary judgment that these calls violated the TSR.  Opinion 445, at 102.

In October 2005, Ahmed received a complaint from Congressman Fred Upton of Michigan about Star Satellite calling numbers on the Registry. Ahmed had a conference call with Star Satellite's principal Myers about this complaint. Ahmed was very upset about receiving a complaint from a Congressman. Ahmed told Myers not to violate the Do-Not-Call Laws. Ahmed used foul language and raised his voice at the meeting. According to Myers, Ahmed told Myers that he would shut Star Satellite down if he received another complaint like this. T 626: 2323-24 (Ahmed); T 622: 1818 (Mills); Myers Deposition, at 138. Ahmed followed up with a letter to Myers. PX 212 (DTX 237), Letter dated October 26, 2005. Dish took no other disciplinary action against Star Satellite. Myers, however, took Ahmed's threat seriously. Myers Deposition, at 184.

Star Satellite stopped using Guardian on November 22, 2005. Myers Deposition, at 76. Star Satellite stopped because Guardian's principal Kevin Baker received a Civil Investigative Demand from the FTC for telemarketing call records. Myers Deposition, at 148-49.

On January 20, 2006, Star Satellite was terminated as Order Entry Retailer, but remained a TVRO Retailer.  T 622: 1820-21 (Mills).  However, in September 8, 2006, Dish was notified by another Order Entry Retailer that Star Satellite was still using Prerecorded Calls.  PX 386, Email thread dated September 8, 2006; see T 622: 1742 (Mills).  Star Satellite remained a TVRO Retailer at least through February 24, 2014, the date of Myer's deposition. Myers Deposition, at 160.

4. JSR Enterprises

In 2006, Jerry Grider, Shaun "Blaze" Gazzara, and Richard Goodale formed JSR Enterprises to sell Dish Network programming. The name JSR came from the initial from each man's first name. T 622: 12877 (Goodale).  Goodale had previously worked for ten days at Dish Order Entry Retailer United Satellite in southern California.  Gazzara had also worked at United Satellite.  T 622: 1874-75 (Goodale).  United Satellite used "press 1" Prerecorded Calls.  T 625: 2117 (Neylon); see PX 120, Email Thread with Indiana Attorney General's Office dated September 23-30, 2005. Goodale testified that Dish Representative Doug Tchang knew that United

Satellite used illegal Prerecorded Calls.  T 622: 1870-74 (Goodale).[41]
Dish terminated United Satellite as an Order Entry Retailer on
August 20, 2006, for making Prerecorded Calls. T 625:2117
(Neylon); see PX 239, Email thread between Neylon and Steven
Keller dated September 8, 2006 regarding United Satellite Closed
Doors.

Goodale asked Tchang how he could start his own company.
Tchang referred Goodale to Shawn Portela.  Portela formerly worked
for Dish. Portela operated two Order Entry Retailers, Dish Nation
and Cactus Concepts.[42]  Tchang told Goodale to set up a call center
and work through one of Portela's companies.  Goodale and his
partners set up JSR and started working through Portela's company
Dish Nation.  T 622: 1870-76 (Goodale); PX 239, September 2006
Spreadsheet..

On August 10, 2006, Dish authorized JSR to be an Order
Entry Retailer.  PX 1044, Letter from Mike Oberbillig to Jerry Grider

---

[41] Based on Goodale's testimony, Tchang was either an Account Manager or a Field
Representative.  Doug Tchang's last name is spelled "Chang" in the trial transcript.  See e.g., T
622: 1875 (Goodale). The United States spelled the name "Tchang" in its proposed Findings of
Facts and Conclusions of Law.  See e.g., United States Amended Proposed Finding of Fact (d/e
667), at 53.  No witness testified about the correct spelling.  The Court adopts the United
States' spelling.
[42] Goodale testified that Portela's companies were called Dish Nation and Cactus Satellite.  T
622: 1875-76 (Goodale).  Cactus Concepts was the correct name.  See e.g., PX 653, Email
thread regarding Cactus Concepts dated October 26, 2007.

dated August 10, 2006. JSR's written application stated that JSR would use print, telemarketing, and direct mail. PX 235, JSR Business Plan dated February 9, 2006. Goodale, however, told Mills that JSR was going to engage in outbound telemarketing. T 622: 1746 (Mills); PX 265, Email from Mills to Neylon dated December 21, 2006; T 622: 1881 (Goodale).

Mills, Oberbillig, Portela, and Tchang came to JSR's offices when it became an Order Entry Retailer. Goodale testified that Mills, Oberbillig, and Tchang all knew that JSR was going to use "press 1" Prerecorded Calls. Goodale testified that Mills and Oberbillig told him not to use the name of Dish Network in the prerecorded message. T 622: 1883 (Goodale). Mills admitted that Goodale told him JSR used outbound telemarketing. T 622: 12746 (Mills).

Once JSR became an Order Entry Retailer, JSR purchased fifteen more autodialers. JSR had over 1,500 phone lines making prerecorded "press 1" telemarketing calls fifteen hours a day. T 622:1882 (Goodale). By September 2006, Dish knew JSR was using automatic dialers to produce 1,000,000 connected calls per month, and knew that JSR "brought along an ex-employee of

United Satellite who has great experience in OE Tool program."

Dish also knew that JSR worked "under Dish Nation's umbrella"

before it became an Order Entry Retailer.  T 622: 1748-50 (Mills);

PX 239, September 2006 Spreadsheet.  JSR was making somewhere

between 2,500,000 to 10,000,000 calls per month to get 1,000,000

connected calls.  See T 622: 1892 (Goodale) (Goodale estimated four

out of ten calls were answered by a live person.); T 633: 3342

(Taylor) (Dish's expert Taylor opined that in his experience one in

ten telemarketing calls are answered).

Based on all the evidence, the Court finds that Dish

Representatives Tchang, Mills, and Oberbillig knew that JSR was

using automatic dialers to make "press 1" prerecorded

telemarketing calls.  Dish knew from the high volume of connected

calls that JSR was using automatic dialers to make outbound

telemarketing calls.  Numerous Dish Order Entry Retailers in

Southern California used Prerecorded Calls, including United

Satellite, Vision Satellite, LA Activations, Dish Nation, and Atlas

Assets.  T 625:2110, 2170-71 (Neylon); T 620:2110 (Musso);

T 621:1693-95 and T 622:1728-29 (Mills); PX 1299, Letter from

attorney Chad Austin to Dish Senior Corporate Counsel Dana

Steele dated March 27, 2007; PX 1298, Letter from North Dakota Assistant Attorney General James Thomas to Echostar and Dish Nation LLC dated June 25, 2007, with enclosed North Dakota ex rel. Stenehjem v. Creative Concepts Group, Inc., N.D. Dist. Ct., South Central Judicial Dist., Civ. No. 07C1307, Assurance of Voluntary Compliance Order entered June 21, 2007.  Tchang was a Dish sales representative in the area, and Oberbillig was the Regional Sales Manager.  Tchang was responsible for knowing what was going on in their region.  Tchang also had an incentive to allow the practice because his compensation was tied to the activations that these Order Entry Retailers produced.  Goodale testified that Tchang knew what was going on at United Satellite.  Tchang told Goodale how to start his own shop.  Goodale testified that Tchang, Mills, and Oberbillig knew JSR was making "press 1" Prerecorded Calls.  The Court finds this aspect of Goodale's testimony to be credible.  These Dish representatives knew from the start that JSR planned to violate the Do-Not-Call Laws by using "press 1" Prerecorded Calls.  Further, their knowledge of JSR's telemarketing practices was gained within the scope of their employment with Dish.  Further, Mills and Oberbillig at least had managerial

authority for Dish when they knew and allowed JSR to engage in illegal Prerecorded Calls. Testimony to the contrary by Mills and Oberbillig was not credible.

JSR's calling lists consisted of all published residential numbers in a selected geographical region. JSR secured copies of white pages in electronic format. JSR used call centers in the Philippines ("off-shore calling") and an automatic dialing facility in Texas to make "press 1" Prerecorded Calls. Goodale at one point testified that he knew JSR was calling numbers on the Registry. T 622: 1879-80, 1887 (Goodale). Goodale later stated that he scrubbed the lists for numbers on the Registry, but his business partners may not have done so. T 622:1906, 1907-08 (Goodale). The Court finds that JSR did not scrub at least some calling lists, and so, made Registry Calls. Goodale further knew that JSR was making Registry Calls and that Registry Calls were illegal.

From September through December 2006, Dish received several consumer complaints that JSR made Prerecorded Calls and Registry Calls. Dish also caught JSR five to seven times in stings violating Do-Not-Call Laws, including Registry Calls. Each time, the Dish Compliance Department or Legal Department notified JSR of

the complaint.  T 619: 991(Werner); PX 510, Letter to Jerry Grider dated October 6, 2006; PX 247, Memorandum from Wallace to Dish demanding payment for TCPA violations dated October 19, 2006; PX 513 Letter dated October 31, 2006, from Origer to JSR; PX 248 Email to Metzger dated November 15, 2006; PX 420 Musso letter to JSR about consumer complaint, dated December 11, 2006; PX 250 Email from Musso to Goodale requesting information on the complaint dated December 20, 2006; PX 420, Letter to JSR dated December 11, 2006.

Goodale, on behalf of JSR, provided an explanation for each complaint to Dish's Compliance Department or Legal Department. PX 420, Email from Goodale to Dana Steele dated September 28, 2006; DTX 737, Letter from Goodale to Musso, undated; DTX 750, Email from JSR to Musso dated November 6, 2011; DTX 753, Letter from Goodale to Musso, undated.  Dish generally did not investigate further after receiving JSR's explanations.  T 625: 2117 (Neylon); see e.g., T 620: 1388 (Musso) (JSR explanation was plausible so Dish accepted it on face value).

Goodale testified that he told Musso in the Compliance Department what she wanted to hear without regard to its

accuracy. He did not consider her to be of any importance at Dish. T 622: 1906-07 (Goodale). Goodale later said that he gave accurate explanations to Musso. T 622: 1912-13 (Goodale). Regardless, Tchang, Mills, and Oberbillig knew that JSR was violating the Do-Not-Call Laws through the use of Prerecorded Calls.

Goodale's explanations to Musso sometimes admitted violations of the Do-Not-Call laws. Goodale sometimes blamed an off-shore affiliate, and sometimes admitted that JSR made an illegal call by mistake. Musso knew that using unauthorized affiliates violated the Retailer Agreement, and also knew that some of Goodale's explanations effectively admitted Do-Not-Call Law violations. On December 21, 2006 Neylon, Mills, and Musso exchanged a series of emails discussing JSR's unauthorized use of off-shore affiliates that were making illegal calls. Neylon asked a series of questions:

> What is his volume? Why would I not just terminate? Where is he located? I assume he was made aware when launched on the OE tool that violations of the telemarketing laws of the United States will not be tolerated????

Mills responded that JSR was producing 1,500 to 2,000 activations per month. Mills also stated that JSR had stopped off-shore calling.

Mills recommended against termination.  PX 265, Email thread between Mills, Neylon, and Musso dated December 21, 2006. Musso stated that Goodale told her that JSR stopped using the offshore calling center and would just use people in his office. PX 255 and PX 1135, Email thread between Musso and Neylon dated December 21, 2006; see PX 253, email between From Mills to Musso dated December 20, 2006 (Goodale told Musso that JSR was deactivating off-shore affiliates' logins to Order Entry Tool).  Dish took no action against JSR in December 2006.

In January 2007, the Louisiana Attorney General's office contacted Dish about repeated telemarketing calls to an individual who had already asked to be put on the telemarketer's Internal Do-Not-Call List.  The individual reported that the telemarketer hung up when she asked to be put an Internal Do-Not-Call List and called back repeatedly.  Musso researched the complaint and determined that JSR had made the calls.  Musso provided JSR contact information to the Louisiana Attorney General's office. T 620:1404 (Musso).  See PX 1113, Transmittal email from Musso to JSR re Louisiana AG complaint dated January 17, 2007.

On January 17, 2007, Musso sent letter to JSR with list of five consumer complaints for Do-Not-Call Law violation.  PX 420, Letter dated January 17, 2007, at exhibit page 015.  On January 22, 2007, Goodale responded.  Goodale said two of the five were not on the Registry.  Goodale said two of the other three calls were from affiliates and the fifth was a mistake.  PX 256 letter from Goodale to Musso dated January 22, 2007.  Musso thought there was reason to be cautious.  T 620: 1406-08 (Musso); see DTX 756, Copy of PX 256 letter from Goodale to Musso with Musso's typed comments.  Dish took no action against JSR in January 2007.

February 8, 2007, Musso sent an email to her superiors which included a copy of a Missouri Attorney General press release.  The press release announced that on December 7, 2006, a Missouri court issued a temporary restraining order (TRO) against JSR and other Dish Retailers.  Upon receiving the email, Neylon directed that JSR be terminated.  Neylon also wanted to publicize the termination to other Retailers to put them on notice.  T 625: 2096-97 (Neylon); T 619: 1129 (Werner); PX 1083, Email thread between Musso, Neylon, and Robb Origer dated February 8, 2007.

JSR was terminated as an Order Entry Retailer on February 14, 2007.  DTX 139, Retailer Audit Notification & Summary dated February 14, 2007.  The Retailer Audit Notification & Summary stated that JSR was terminated due to TCPA violations.  Dish's press release stated that Dish terminated JSR for Do-Not-Call violations.  DTX 674, Press release dated February 14, 2007.[43]

After February 14, 2007, JSR continued to sell Dish Network programming through another Order Entry Retailer.  Goodale did not identify the Order Entry Retailer that JSR worked through at this time.  JSR quit operating in March 2007 when it stopped getting paid, either by Dish or the Order Entry Retailer through whom JSR worked.  T 622: 1894 (Goodale).

From August 2006 through March 2007, JSR made 1,186,924 Internal List Calls to persons who were on Internal Do-Not-Call Lists of either Dish or a Telemarketing Vendor.  Prior to August 10, 2006, JSR placed some of these calls as an affiliate of Dish Nation.  PX 28, Taylor November 6, 2013 Report, at 14, Table 6b; PX 239, September 2006 Spreadsheet.

---

[43] The press release also stated that United Satellite was terminated for Do-Not-Call Law violations.  That termination had occurred in August 2006.

From July to December 2006, JSR made 2,349,031 Registry Calls that the Court found violated TSR at summary judgment. Opinion 445, at 171, 232, 75 F.Supp.3d at 1011, 1032.  Of these Registry Calls, JSR made:

369,384 calls to telephone numbers with area codes associated with Plaintiff Illinois (Illinois area codes);

129,004 calls to telephone numbers with area codes associated with Plaintiff Ohio (Ohio area codes);

18,240 calls to telephone numbers with area codes associated with Plaintiff North Carolina (North Carolina area codes); and

473,102 calls to telephone numbers with area codes associated with Plaintiff California (California area codes).

JSR made some of these calls through Dish Nation prior to becoming an Order Entry Retailer on August 10, 2006.  PX 28, Taylor November 6, 2013 Report, at 14 Table 6a; T 622: 1894 (Goodale).

From January to March 2007, JSR made 3,315,242 Registry Calls.  Of these calls, JSR made:

557,336 calls to Illinois area codes;

338,352 calls to Ohio area codes;

4,936 calls to North Carolina area codes; and

50 calls to California area codes.

JSR made at least some of these calls after February 14, 2007, through an unidentified Order Entry Retailer. PX 28, Taylor November 6, 2013 Report, at 14 Table 6a; T 622: 1894 (Goodale).

5. American Satellite

In September 2006, American Satellite made a Prerecorded Call to consumer Robert Parker at his residence on his home telephone. Parker answered the call while participating in a Dish sting operation. The sting identified American Satellite as the telemarketer making the call. The Court found at summary judgment that when Parker answered the call, the call became an Abandoned Prerecorded Call in violation of the TSR. Opinion 445, at 107, 194, 233, 75 F.Supp.3d at 989, 1019, 1033.

In February 2007, Dish fined American Satellite $10,000 for Do-Not-Call Law violations. T 620: 1409-11 (Musso); DTX 825, Email from Musso to Neylon, Origer, Werner, and Mills Dated February 9, 2007. American Satellite blamed the violations on affiliates. American Satellite promised to terminate all affiliates and

handle all telemarketing in-house.  <u>DTX 825</u>, <u>Email from Tim Pyle to Musso dated February 20, 2007</u>.

In 2008, Manuel Castillo was a Dish Field Representative who visited American Satellite on behalf of Dish.  At that time, Castillo left Dish to work for American Satellite.  Castillo worked at American Satellite for less than a year.  Castillo discovered that American Satellite was using a Philippine call center to make "press 1" Prerecorded Calls.  <u>T 620: 1328-29 (Castillo)</u>.

Castillo discovered that American Satellite also defrauded Dish in various ways.  Dish required a consumer to have a credit card in order to qualify for Dish Network programming.  American Satellite circumvented this requirement to make sales to individuals who did not have credit cards.  American Satellite put $1.00 on prepaid debit cards.  If a customer did not have a credit card, American Satellite sales personnel uploaded the numbers on one of the debit cards onto the Order Entry Tool, misrepresenting the numbers as the credit card number of a new customer.  <u>T 602: 1331 (Castillo)</u>.

Sometime in late 2008, American Satellite fired Castillo.  Within a day or two of being fired, Castillo told Musso about American Satellite's fraudulent and illegal practices.  Musso

referred Castillo to a Dish internal auditor Bert Eichhorn.  Castillo told Eichhorn that American Satellite was making Prerecorded Calls and making a massive number of calls to numbers on the Registry.  Eichhorn, however, was not interested in Castillo's information about Do-Not-Call Law violations.  He was interested in evidence that American Satellite was defrauding Dish.  T 620: 1334-42, 1357 (Castillo); PX 222, Email thread between Castillo and Eichhorn dated January 7, 2009.  Castillo provided Dish with this information because he wanted to go back to work for Dish.  Dish did not rehire Castillo, and eventually Castillo stopped providing information to Dish.  T 620:1345-50 (Castillo).

Castillo testified that when he visited American Satellite as a Dish Field Representative he did not see anything to indicate that American Satellite was engaged in illegal telemarketing.  T 620: 1332-34 (Castillo). Once he went to work for American Satellite, he discovered that American Satellite hid its activities from Dish representatives.  As he put it, American Satellite put on a show for Dish representatives.  T 620: 1334 (Castillo).  Castillo testified that American Satellite went so far as to send Dish fake recorded sales

calls for the Quality Assurance program.  <u>T 620: 1328-36, 1360-61</u>

<u>(Castillo)</u>.

6. <u>Dish Nation</u>

Dish Nation was an Order Entry Retailer operated by a former

Dish employee Shawn Portela.  The Plaintiffs take the position that

Dish caused both JSR and Dish Nation to make all of the calls

reflected in JSR's telephone records.  However, the evidence does

not support this position.  From July 2006 through August 10,

2006, JSR ran its telemarketing calls through Dish Nation.

Thereafter, JSR operated as a separate Order Entry Retailer until

Dish terminated it on February 14, 2007.  After February 14, 2007,

JSR continued to operate through another Order Entry Retailer

until sometime in March 2007.  JSR stopped because it was not

getting paid.

The evidence also shows that Dish Nation made Abandoned

Prerecorded Calls in 2007.  <u>PX 1299</u>, <u>Letter from attorney Chad</u>

<u>Austin to Dish Senior Corporate Counsel Dana Steele dated March</u>

<u>27, 2007</u>; <u>PX 1298</u>, <u>Letter from North Dakota Assistant Attorney</u>

<u>General James Thomas to Echostar and Dish Nation LLC dated</u>

<u>June 25, 2007</u>, with enclosed <u>North Dakota ex rel. Stenehjem v.</u>

<u>Creative Concepts Group, Inc., N.D. Dist. Ct., South Central Judicial Dist., Civ. No. 07C1307, Assurance of Voluntary Compliance Order entered June 21, 2007</u>.

Plaintiffs, however, have not presented any evidence of that JSR made calls after February 14, 2007 through Dish Nation. The evidence only supports a finding that JSR made calls through Dish Nation from July 2006 until August 10, 2006. The evidence does not show that Dish Nation had any connection with the calls that JSR made after it became an Order Entry Retailer on August 10, 2006.

The evidence supports a finding that Dish allowed Dish Nation to use third party affiliates in 2006. Tchang knew that Dish Nation used affiliates. He told Goodale to operate JSR through one of Portela's Order Entry Retailers. The September 2006 Spreadsheet listed JSR and a company called Direct Promotions as Dish Nation affiliates. The September 2006 Spreadsheet said JSR worked under Dish "Nation's umbrella," and Direct Promotions was part of "Dish Nation's affiliate program." <u>PX 239</u>, <u>September 2006 Spreadsheet</u>. Dish had not formally approved JSR as a Dish Nation affiliate, yet the Dish Sales Department knew that JSR was a third-party

affiliate of Dish Nation and allowed the practice.   In addition, Musso told Neylon on December 21, 2006, that Dish Nation was using an off-shore call center in the Philippines.  PX 1135, Email thread between Musso and Neylon dated December 21, 2006.

IV.        Telemarketing Calling Records

The Plaintiffs presented the following telephone call records: (1) calls made by Dish from October 2003 through August 2007 (2003-2007 Calling Records), and from September 2007 through March 10, 2010 (2007-2010 Calling Records); (2) calls made by Guardian on behalf of Star Satellite and Dish TV Now; (3) calls made by JSR through JSR' automatic dialing operation in Texas, and (4) calls made by Satellite Systems.  See PX 745-60, 772-74, 776-77, 779-89, 791-805, 807-14, 817, 820-21, 824, 826, 828, 831-85, 890-902, 914-47, Calling Records.[44]  The Court entered partial summary judgment in favor of the Plaintiff United States finding liability for violations of the TSR on some calls listed in most of these calling records.  The Court further made findings at summary judgment regarding the Plaintiff States' claims, but did not enter judgment on those claims.  Opinion 445, at 231-38.  The

---

[44] Some of the calls on Dish's calling records could have been made by Telemarketing Vendor EPLDT because it made calls through Dish's automatic dialer.

Plaintiffs did not seek summary judgment on any of the calls in the 2003-2007 Calling Records. The Plaintiffs now seek to prove Dish's liability for the 2003-2007 Calling Records and for additional calls in the other records. The Court makes the following findings of fact regarding these call records.

A. <u>2003-2007 Calling Records</u>

In July 2005, the FTC sent Dish a Civil Investigative Demand (FTC Demand). The FTC Demand sought information regarding possible violations of the TSR and the FTC Act. In 2005, Dish was still known as EchoStar. The FTC Demand asked for the following call records:

1. Magnetically recorded documents sufficient to show all telemarketing calls to consumers made by EchoStar relating to the marketing of Dish Network. These documents should include the telephone numbers, and the dates of the calls;

<u>PX 1131</u>, <u>FTC Demand dated July 21, 2005</u>, at 6.

In response to the FTC Demand, Dish provided the 2003-2007 Calling Records, consisting of records of calls made from October 2003 through September 2005, December 2005 through December 2006, and January 2007 through August 2007. The cover letter

accompanying the production for the October 2003 through

September 2005 records stated, in part,

> Per our prior conversation, please find enclosed the
> following in response to the CID . . . .
>
>> 1. 1 DVD with listing of all outbound telemarketing
>> calls made on behalf of EchoStar From October 17,
>> 2003 through December 31,2004*
>> (**CONFIDENTIAL**);
>
> . . . .
>
>> *A second DVD with the listing of calls from January 1,
>> 2005 to the date of the CID request was damaged during
>> copying and will be forwarded to you upon its
>> completion.

PX 317, Letter dated September 22, 2005, from Dana E. Steele,

Corporate Counsel, to Russell Deitch, Esq., FTC Counsel (emphasis

in the original).[45]

The Court finds that the transmittal letter from Dish in-house

counsel Steele constitutes an admission by Dish that the 2003-

2007 calling records produced were records of Dish's outbound

telemarketing calls.  Steele stated in her letter that the records

---

[45] Dish's Vice President and Associate General Counsel Jeffrey Blum wrote the other two
transmittal letters. Blum stated in the second transmittal letter, "[E]nclosed find nine (9) CD-
Rom's (sic) containing EchoStar Call Data" from December, 2005 through December, 2006."
Blum stated in the third transmittal letter, "[E]nclosed find six (6) CDRom's (sic) containing
EchoStar Call Data from January, 2007 through August, 2007." Plaintiffs' Third Motion to
Compel Discover Responses (d/e 143, Exhibits 22 and 23, Letters from Jeffrey Blum to Russell
Deitch dated August 1, 2007, and September 10, 2007.  Attorney Blum's letters do not appear
to be admitted as evidence at trial, and no party cited them.  The Court does not consider them
for purposes of this Findings of Fact and Conclusions of Law.  Blum's letters would not change
the Court's findings or conclusions even if they were considered.

provided with her letter were records of telemarketing calls.  Steele was an agent of Dish at the time she made the statement, and the statement was within the scope of her agency.  The transmittal letter, therefore, constitutes a non-hearsay admission of Dish that the 2003-2007 Calling Records were records of outbound telemarketing calls.  Fed. R. Evid. 801(d)(2)(D).

Furthermore, the FTC Demand asked for records of "telemarketing calls made by EchoStar relating to the marketing of Dish Network."  Dish responded by producing the 2003-2007 Calling Records.  Dish's response implies that the records produced were records of telemarketing calls made by Dish (then known as EchoStar) "relating to the marketing of Dish Network."  PX 1131, FTC Demand, at 6.

Dish argues that the 2003-2007 Calling Records contained records of non-telemarketing calls.  Dish relies on employee Bangert's testimony that he doubted that the 2003-2007 Calling Records were all records of telemarketing calls.  T 628: 2715-18 (Bangert).  Dish also relies on the evidence that the 2007-2010 Calling Records produced in discovery in this case included both

telemarketing and non-telemarketing calls.  The 2007-2010 Calling Records are discussed in detail below.

Bangert's speculation regarding the make-up of the 2003-2007 Calling Records has no probative value.  Bangert had no personal knowledge of the content of the 2003-2007 Calling Records. Additionally, Bangert did not participate in preparing the response to the FTC Demand.  <u>T 628: 2715-18, 2792-94 (Bangert)</u>.

The existence of non-telemarketing calls in the 2007-2010 Calling Records may tend to show the 2003-2007 Calling Records may have included non-telemarketing calls.  However, the probative value is slight.  The two sets of records were produced at different times in response to different document demands.  The 2007-2010 Calling Records also included campaign codes.  The campaign codes indicated the purpose of the calls made during the particular campaign, such as telemarketing, collection, payment notice, scheduling, etc.  <u>See</u> <u>PX 26, Taylor September 20, 2012 Report</u>, at 6.  The 2003-2007 Calling Records did not contain campaign codes. <u>See</u> <u>T 613: 219 (Yoeli)</u>; <u>see</u> <u>e.g.</u>, <u>PX 859 through 861</u>, <u>July 2006 Dish Calling Record</u>.  The 2003-2007 Calling Records, therefore, do not indicate that the records included multiple types of calls.

Dish's expert Taylor stated that he was told by Dish personnel that the 2003-2007 Calling Records included both inbound and outbound telemarketing call records. PX 28, Taylor November 6, 2013 Report, at 7-9. Taylor's recitation of this information is inadmissible hearsay. Taylor may use hearsay as a basis of his opinions under the correct circumstances, but Dish must present competent evidence to prove the truth of the assertion. Fed. R. Evid. 703, 802. Dish has not done so.

In light of the fact that the FTC Demand asked for outbound telemarketing records, Dish attorney Steele stated that the records she sent were records of telemarketing calls, and only minimal competent admissible evidence exists to the contrary, the Court finds that it is more likely than not that the 2003-2007 Calling Records were records of outbound telemarketing calls made by Dish or its Telemarketing Vendors.

The FTC sent the 2003-2007 Calling Records to InterImage, Inc. (InterImage), for processing. InterImage compared each calling record on 2003-2007 Calling Records that had a valid telephone number with the telephone numbers that had been on the Registry for at least 31 days at the date of the call. T 615: 497-500 (L.

Steele).[46]  InterImage referred to each match of a telephone number on the 2003-2007 Calling Records with a number on the Registry as a "Hit" or "Registry Hit."  T 615: 497 (L. Steele).  InterImage's comparison of the 2003-2007 Calling Records with the Registry showed the following:

|  | Total Calls In Record | Hits |
| --- | --- | --- |
| October 17, 2003 – March 31, 2004 | 30,328,309 | 4,770,433 |
| January 3 – May 31, 2005 | 61,295,734 | 12,533,684 |
| June 1 – 30, 2005 | 18,140,971 | 2,784,629 |
| July 1 – 31, 2005 | 18,398,923 | 2,575,019 |
| August 1 – September 18, 2005 | 30,328,309 | 4,000,815 |
| December 1, 2005 – January 31, 2006 | 31,420,403 | 6,916,143 |
| February 1 – 28, 2006 | 14,477,981 | 3,375,472 |
| March 1 – April 30, 2006 | 32,178,915 | 4,641,828 |
| May 1 – June 30, 2006 | 31,368,431 | 7,586,596 |
| July 1 – August 15, 2006 | 20,836,297 | 5,080,115 |

---

[46] The trial witness Leslie Steele was CEO of InterImage.  Dana Steele was a Corporate Counsel for Dish.

| | | |
|---|---|---|
| August 16 – September 30, 2006 | 20,238,913 | 4,710,270 |
| October 1 – 31, 2006 | 18,389,496 | 3,624,432 |
| November 1– 30, 2006 | 19,597,026 | 3,712,816 |
| December 1– 30, 2006 | 17,462,891 | 3,002,123 |
| January 2 – February 28, 2007 | 24,388,302 | 2,994,525 |
| March 1 – April 30, 2007 | 26,170,553 | 4,046,178 |
| May 1 – 31, 2007 | 15,968,120 | 3,389,113 |
| June 1 – 30, 2007 | 18,669,378 | 4,938,258 |
| July 1 – 31, 2007 | 17,823,512 | 4,627,426 |
| August 1 – 31, 2007 | 20,452,928 | 5,494,133 |
| Totals | 501,513,302 | 94,804,008 |

T 615: 501-16 (L. Steele); PX 1417, Summary Chart of InterImage Results.  InterImage did not perform any further analysis of the 94,804,008 Registry Hits.

The InterImage Hits files (Hits Files) from the 2003-2007 Calling Records included at least some duplicate entries in which the same call was included two or more times.  See T 615: 542 (L. Steele); PX 772, June 2005 Hits File.  The June 2005 Hits File contained both the dates and times of the calls.  The June 2005

Hits File showed duplicate entries of the same call on the same date and time.

Most of the InterImage Hits Files from the 2003-2007 Calling Records only identified the dates of calls, but not the times of calls. See e.g., PX 792, February 2006 Hits Files; see also T 613:225-26, 264-65 (Yoeli).  As a result, the Hits Files frequently listed multiple calls to the same number on the same date.  The 2003-2007 Calling Records produced by Dish contained both the dates and the times of the calls.  See e.g., PX 859 through 861, July 2006 Dish Calling Record.

The parties' experts Dr. Yoeli and John Taylor analyzed the Dish calling records for the period.  Plaintiffs' expert Dr. Yoeli analyzed the InterImage Hits Files from the 2003-2007 Calling Records.  Again, most of the Hits Files provided only the dates of the calls, but not the specific times of the calls.  Dr. Yoeli decided to count all calls to the same number on the same date as one call. T 613:225-26, 264-65 (Yoeli).  Dr. Yoeli found that 3,022,355 such calls were both Registry Calls and Internal List Calls made to persons whose telephone numbers were on both the Registry and Dish's Internal Do-Not-Call Lists at the times of the call.  PX 38,

Appendix C, Yoeli December 14, 2012 Report, at PX38-112.  Dr.

Yoeli did not opine on the number of Registry Calls alone even if the

numbers were not on an Internal Do-Not-Call List.  Dr. Yoeli did not

make any comparison of the Hits Files with the Dish 2003-2007

Calling Records to attempt to identify the specific times of the calls

on the Hits Files.

The Plaintiffs did not rely on Dr. Yoeli's opinions with respect

to the 2003-2007 Calling Records to prove their claims at trial.  See

State Plaintiffs' Additional Post-Trial Proposed Findings of Fact, at

8-9 ¶¶ 73-80 (Plaintiff States relying on Taylor); United States

Amended Proposed Findings of Fact (d/e 667), at 5-7 ¶ 16 (Plaintiff

United States relying on Leslie Steele's InterImage analysis).  Dish

inquired on cross-examination of Dr. Yoeli regarding his opinions of

the United States' claims based on the 2003-2007 Calling Records

and cited to his opinions in Dish's proposed Findings of Fact.  See

T 614: 376-77 (Yoeli); Dish Proposed Findings of Fact (d/e 665), at

76 ¶ 276.

Dish's counsel provided its expert Taylor with 581,401,271

calling records from October 17, 2003, to August 31, 2007.   Dish

provided 501,513,302 calling records to the FTC from this period

pursuant to the FTC Demand, which made up the 2003-2007 Calling Records. Taylor removed duplicate entries ("de-duplicated") from the records provided to him. Taylor also removed records with invalid telephone numbers. Taylor eliminated 378,147 calls because the disposition codes indicated calls did not go through due to dialer errors. Taylor eliminated 231,966 calls because he was told that the disposition codes indicated that the calls were inbound telemarketing calls. Taylor eliminated 30,017 calls because the disposition codes indicated that the calls were non-telemarketing calls such as calls for collections or scheduling service. PX 28, Taylor November 6, 2013 Report, at 7-9.

Taylor opined that the remaining 3,220,602 remaining calls were made to persons whose telephone numbers were on the Registry more than 31 days at the time of the call. Taylor opined that of that number, the following calls were made to telephone numbers with area codes associated with the Plaintiff States:

- 327,986 calls to California area codes, of which 93,986 were made in 2006 and 172,930 were made in 2007, for a total of 266,514 in 2006 and 2007;

- 141,620 calls to Illinois area codes, of which 39,459 were made in 2006 and 73,310 were made in 2007, for a total of 112,769 in 2006 and 2007;

- 101,500 calls to North Carolina area codes, of which 25,169 were made in 2006 and 59,924 were made in 2007, for a total of 85,093 in 2006 and 2007; and

- 121,853 calls to Ohio area codes, of which 32,223 were made in 2006 and 65,984 were made in 2007, for a total of 98,207 calls in 2006 and 2007.

PX 28, Taylor November 6, 2013 Report, at 9. The Court finds Taylor analysis of 2003-2007 calls to be probative of the number of Registry calls Dish made from October 2003 thourgh August 2007.

No party presented any evidence regarding whether Dish had either a Transaction-based or Inquiry-based Established Business Relationship with any of the recipients of any of the calls in either the 2003-2007 Calling Records produced to the FTC or the 581,401,271 calling records provided to Taylor.

B. 2007-2010 Calling Records

1. Calls to Numbers on the Registry

Dish produced the 2007-2010 Calling Records in discovery. The 2007-2010 Calling Records included campaign codes with each calling record. The campaign codes indicated the type of calling campaign. Dish representatives and the Plaintiffs' expert Dr. Yoeli worked together to identify the telemarketing campaign codes in the 2007-2010 Calling Records. Dish also provided Dr. Yoeli with the last payment date, if any, associated with each calling record, and the activation date, if any, associated with each calling record. See PX 1418, Yoeli July 19, 2012 Report, at 3-4.

Dr. Yoeli analyzed the 2007-2010 Calling Records to identify the Registry Calls. Dr. Yoeli received the records in two sets, one with 357,058,136 call records and a second with 76,026,757 call records. Dr. Yoeli combined the two sets and removed any duplicates that were on both lists. Dr. Yoeli also removed any records with invalid telephone numbers. Dr. Yoeli then identified the call records that were on calling campaigns with telemarketing campaign codes. This process resulted in 134,295,177 call records with telemarketing calling campaign codes. Dr. Yoeli's report stated

that he included campaigns with telemarketing or unknown campaign codes.  T 613: 163-65 (Yoeli); PX 1418, Yoeli July 19, 2012 Report, at 8; see T 614: 330-31, 334-35 (Yoeli).  Dr. Yoeli testified at trial that the report was in error.  He only included records on campaigns with telemarketing campaign codes.  T 614: 442-43, 472 (Yoeli).  The Court finds Dr. Yoeli's testimony on this point to be credible.

Dr. Yoeli sent the 134,295,177 call records to InterImage to find the total number of Registry Hits.  Dr. Yoeli removed the duplicate records in the Registry Hits provided by InterImage.  The result was 32.4 million Hits.  Dr. Yoeli removed calls made to telephone numbers associated with accounts on which payments were made within 558 days immediately preceding the dates of the calls.  The 558 day period is 18 times 31 days, representing the 18 month period in which a seller has a Transaction-based Established Business Relationship with a customer.  TSR, 16 C.F.R. § 310.2(o); FCC Rule, 47 C.F.R. § 64.1200(f)(5).  Dr. Yoeli also removed calls with no payment records, but with activation dates within 93 days immediately preceding the dates of the calls.  The 93 days is three times 31 days, representing the three-month period in which a

seller has an Inquiry-based Established Business Relationship with a person who made an inquiry about the seller's goods and services. Id. Dr. Yoeli opined as a result that the 2007-2010 Calling Records contained 3,342,415 telemarketing Registry Calls to persons with whom Dish did not have either Transaction-based or Inquiry-based Established Business Relationships (Yoeli July 2012 Call Set). PX 1418, July 19, 2012 Yoeli Report, at 7-10; T 613: 166-71 (Yoeli).

Dish representatives told Dr. Yoeli to use the activation date as an inquiry date. T 614: 330-31, 334-35 (Yoeli). Montano denies this. T 269: 3052-53 (Montano). The Court credits Dr. Yoeli's testimony on this point. Montano's testimony has not been credible on Dish's use of inquiry dates. Montano testified that Dish put inquiry dates in the last payment field in its new procedures adopted in 2010 for scrubbing for Established Business Relationship. T 629: 3015-16 (Montano). This testimony was not credible for the reasons discussed above. Based on the demeanor of the two witnesses and the fact that Montano provided testimony on a related matter that was not credible, the Court credits Dr. Yoeli's testimony in this regard.

Dish's expert John Taylor prepared a rebuttal report to Dr. Yoeli's analysis.  PX 26, Revised Expert Report of John Taylor, dated September 20, 2012 (Taylor September 12, 2012 Report).[47] Taylor examined the results of Dr. Yoeli's analysis.  Taylor opined that certain calls did not violate the TSR or the FCC Rule.  Taylor "eliminated" or subtracted those calls from the total violations found by Dr. Yoeli.

Taylor first looked at disposition codes for calls.  Taylor opined that certain disposition codes indicated that calls did not violate the Do-Not-Call Laws:

- 309,931 calls with disposition codes that indicated that the calls did not go through to ring the recipients' phones (such as busy, no dial tone, etc.) (referred to by Taylor as dialer errors);

- 42,716 calls with disposition codes that indicated that the recipients were businesses or that the call was made for non-telemarketing purposes, such as payment reminders; and

---

[47] Taylor is employed by CompliancePoint, a wholly owned subsidiary of PossibleNOW.

- 12,561 calls with disposition codes of wrong number or no English, indicating that the call recipients did not speak English.

PX 26, Taylor September 20, 2012 Report, at 2-8. Taylor eliminated these types of calls on the instructions of Dish's attorneys. T 633: 3292 (Taylor).

Taylor also eliminated 62,679 calls in which the campaign code indicated that the calls were non-telemarketing calls, such as scheduling or confirming work orders. PX 26, Taylor September 20, 2012 Report, at 2-8.

Taylor then eliminated 1,265,359 calls in which the campaign codes indicated that the calls were made to current customers. Taylor stated that these calling records were associated with valid Dish account numbers and did not have disconnect dates. Taylor opined that Dish had a Transaction-based Established Business Relationship with the call recipients. Taylor did not use the last payment data that Dish provided to Dr. Yoeli because Taylor reviewed the data and found it to be unreliable. Taylor stated that campaign codes were not the preferred way to calculate Transaction-based Established Business Relationships, but that

was all he had.  T 633: 3297-98 (Taylor); PX 26, Taylor September 20, 2012 Report, at 2-8.

Taylor eliminated 873,551 calls on Lead Tracking Systems calling campaigns.  Taylor was informed that the Lead Tracking System contained telephone numbers of people who inquired of information regarding Dish Network programming and that Dish placed these calls within a day or two of each inquiry.  Dish did not provide specific dates of inquiries to Taylor.  T 633: 3300 (Taylor).  Taylor opined that Dish had an Inquiry-based Established Business Relationship with the recipients of these calls.  T 633: 3302-03; PX 26, Taylor September 20, 2012 Report, at 2-8.

Taylor then eliminated 67 calls by applying the 558 day limit to calls with activation dates, but no payment date.  Taylor opined that an activation was a transaction between Dish and a customer, and so, Dish had a Transaction-based Established Business Relationship with these customers for 18 months.  PX 26, Taylor September 20, 2012 Report, at 2-8.

Taylor then eliminated 10,029 intrastate calls.  Taylor testified that he eliminated these calls based on instructions from Dish's counsel.  T 633:3292 (Taylor).

Taylor opined that he could not eliminate 765,531 calls found by Dr. Yoeli to be Registry Calls that Dish did not have either Transaction-based or Inquiry-based Established Business Relationships with the intended call recipients. PX 26, Taylor September 20, 2012 Report, at 2-8.

On December 14, 2012, Dr. Yoeli prepared a revised report. PX 38, Appendix C, Revised Rebuttal Report, dated December 14, 2012 (Yoeli December 14, 2012 Report), at 101-116. Dr. Yoeli had mistakenly failed to include a significant number of call records in his first analysis. He incorrectly believed that one of discs provided in the production of the 2007-2010 Calling Records was a duplicate. Dr. Yoeli performed his same analysis with the additional data. Dr. Yoeli also revised his method of determining whether Dish had an Established Business Relationship with a call recipient. Dr. Yoeli applied the 558 day period if the telephone number had an activation date and a payment date even if the activation date was after the payment date. Dr. Yoeli found that Dish made 18,039,631 Registry Calls to persons with whom: (1) Dish did not have any payment date or activation date information; or (2) the call was more than (a) 558 days after the latter of the last

payment date or activation date associated with the numbers, or (b) more than 93 days after the activation date in those cases in which Dish had an activation date, but no payment date. <u>PX 38</u>, at 105, <u>Yoeli December 14, 2012 Report</u>.

Taylor again prepared a response to Dr. Yoeli's revised report. <u>PX 16</u>, <u>Expert Report of John T. Taylor, dated October 14, 2013 (Taylor October 14, 2013 Report)</u>. This time, Taylor did not critique Dr. Yoeli's results. Rather, Taylor performed his own separate analysis of the Dish's calling records and Telemarketing Vendor eCreek's calling records for the years 2007-2010. Taylor concluded that Dish made 501,650 Registry Calls for which he had no basis to believe that the calls were permitted under the Do-Not-Call Laws. <u>PX 16</u>, <u>Taylor October 14, 2013 Report</u>, at 8. The Court discusses Taylor's analysis in this report in detail below.

The United States moved for partial summary judgment on the 501,650 calls remaining at the end of Taylor's October 14, 2013 analysis. The United States also moved for partial summary judgment on the following calls that Taylor eliminated from Dr. Yoeli's finding of 3,342,415 Registry calls in the Yoeli July 2012 Call Set:

- 873,551 calls Taylor excluded as calls on Lead Tracking Systems calling campaigns;

- 309,931 calls Taylor excluded based on disposition codes that showed that the calls were not completed;

- 12,552 calls to wrong numbers or individuals who did not speak English; and

- 10,029 intrastate calls.

Plaintiffs' Motion for Summary Judgment (d/e 341), at 88-113.

The Court entered partial summary judgment on all these calls. The Court explained that the TSR prohibited initiating telemarketing calls; therefore, dispositions codes showing wrong numbers, no English, or the failure of a phone to ring are not relevant. The violations occurred when the calls were initiated. The Court also explained that the TSR covered intrastate telemarketing calls. The Court also found that Dish failed to present evidence to show that the Lead Tracking System leads were in fact inquiry leads and that the calls were placed within three months of the consumers' inquiries. The Court entered partial summary judgment on 1,707,713 calls made by Dish or its Telemarketing Vendors. See Opinion 445, at 158-70, 231-32.

The portions of the 1,707,713 calls made to telephone numbers with area codes associated with the Plaintiff States (Plaintiff State area codes) are as follows:

- 501,650 Calls from Taylor's Analysis:

  o 53,617 calls made to California area codes, of which 42,019 were made more than 90 days after the numbers were registered on the Registry;

  o 24,096 calls made to Illinois area codes;

  o 1,375 calls made to North Carolina area codes; and

  o 23,853 calls made to Ohio area codes.

T 633: 3323-24 (Taylor); PX 28, Taylor November 6, 2013 Report, at 10.

- 873,551 Lead Tracking System Calls:

  o 126,150 calls made to California area codes;

  o 44,191 calls made to Illinois area codes;

  o 39,413 calls made to North Carolina area codes; and

  o 40,401 calls made to Ohio area codes.

T 613: 209 (Yoeli).

- 309,931 calls that were not completed:

  - 34,997 calls made to California area codes, of which 33,970 were made more than 93 days after the numbers were registered on the Registry;

  - 15,228 calls made to Illinois area codes;

  - 11,718 calls made to North Carolina area codes; and

  - 13,294 calls made to Ohio area codes.

T 613: 209, 211 (Yoeli).

- 12,552 calls made to wrong numbers:

  - 2,103 calls made to California area codes of which 1,955 were made more than 93 days after the numbers were registered on the Registry;

  - 470 calls made to Illinois area codes;

  - 455 calls made to North Carolina area codes; and

  - 443 calls made to Ohio area codes.

T 613: 209-12 (Yoeli).

- Totals of Breakdowns of Summary Judgment Calls by Plaintiff States' Area Codes:

  - 216,867 summary judgment Registry Calls made to California area codes;

- 83,895 summary judgment Registry Calls made to Illinois area codes;

- 52,961 summary judgment Registry Calls made to North Carolina area codes; and

- 77,991 summary judgment Registry Calls made to Ohio area codes.

T 613: 209 (Yoeli). The Plaintiff States did not present evidence identifying intrastate calls made to numbers with area codes associated with them.

The parties stipulated at trial that the United States is seeking liability for a maximum of 1,634,702 additional Registry Calls from the 3,342,415 calls in the Yoeli July 2012 Call Set. The parties calculated the stipulated maximum of 1,634,702 calls by subtracting the 1,707,713 calls which the Court found to be TSR violations at summary judgment from the 3,342,415 calls in the Yoeli July 2012 Call Set. <u>T 614: 426-30 (Yoeli) (attorneys Runkle and Echtman affirming the stipulation)</u>. The Plaintiff States and Dish stipulated to a proportional reduction in the maximum number of calls that the Plaintiff States were seeking liability from Yoeli July 2012 Call Set for illegal Registry Calls beyond those on

which the Court granted the United States partial summary judgment.  <u>T 614: 432 (Yoeli) (attorneys Ohta and Echtman affirming the stipulation)</u>.

The United States originally sought to establish liability for 2,864,896 additional Registry Calls from the Yoeli July 2012 Call Set.  <u>T 614: 313, 425-26 (Yoeli) (attorney Runkle speaking)</u>.  The United States' stipulated maximum of 1,634,702 calls is 57% of the 2,864,896 additional calls in the Yoeli July 2012 Call Set for which the United States was seeking liability.  Pursuant to the stipulation of the parties, the maximum liability that the Plaintiff States are seeking for Registry Calls from the Yoeli July 2012 Calls Set beyond those on which the Court granted the United States partial summary judgment will be proportionally reduced to 57% of the total amount sought.

Taylor testified at trial that all but 167,848 of the United States' stipulated maximum of 1,634,702 calls were either not telemarketing calls or were telemarketing calls to persons with whom Dish had a Transaction-based Established Business Relationship at the time of the call.  Taylor testified that Dr. Yoeli erred in using an activation date as a date that a person inquired

about Dish Network programming.  Taylor opined that an activation date should be considered a customer transaction with Dish.  He opined that the relevant time period in which Dish had a Transaction-based Established Business Relationship with such a customer was 18 months, not three months.  Taylor opined that Dr. Yoeli erroneously included 96,100 calls in his counts due to this error.  The United States conceded that the 96,100 calls should not be included as illegal telemarketing Registry Calls.  T 633: 3281 (Taylor); T 633: 3320 (Taylor) (Attorney Runkle conceding the issue).

Taylor also opined at trial that the 1,265,359 calls to individuals on calling campaigns directed at current customers were calls to persons with Transaction-based Established Business Relationships with Dish.  Taylor relied on the calling campaign name or code to identify calls made to current customers.  Taylor stated that he was told that the intended recipients of these calls had valid Dish account numbers and did not have disconnect dates with Dish.  PX 26, Taylor September 20, 2012 Report, at 4.  Taylor again used the campaign codes to find Transaction-based Established Business Relationships because he concluded that he had nothing else available.  T 633 : 3296-99 (Taylor).

Campaign names and codes based on disconnect dates are not a valid basis to determine Transaction-based Established Business Relationships. The TSR and FCC Rule define Transaction-based Established Business Relationship for customers as 18 months from the last purchase of goods or services. TSR 16 C.F.R. § 310.2(o); FCC Rule 47 C.F.R. § 64.1200(f)(5). Dish's experts Taylor and Kenneth Sponsler both agreed that the proper way to determine whether Dish had a Transaction-based Established Business Relationship with the intended call recipient was to measure from specific data points that would establish the date of the last purchase of goods or services by the intended call recipient. T 633: 3295-96 (Taylor); T 633 : 3454, 3476 (Sponsler).[48] Disconnect dates could easily be long after the last purchase date. Campaign codes based on disconnect dates are not a reliable basis for calculated whether a call recipient had a Transaction-based Established Business Relationship with Dish. Taylor used the campaign codes because he did not have anything else. That justification is not based on his expertise and is insufficient to support his opinion. Taylor's reliance on campaign codes is not sufficient to show that

[48] Sponsler was also employed by CompliancePoint, a wholly owned subsidiary of PossibleNOW.

Dish had Transaction-based Established Business Relationships with Dish.

If Taylor is correct that the date-of-last-payment information that Dish provided to Dr. Yoeli is unreliable, then no evidence presented shows the last dates purchase of goods or services by the intended recipients of Dish's telemarketing calls, and so, no evidence shows that Dish had any Transaction-based Established Business Relationships with any of its call recipients in the 2007-2010 Calling Records.

The Plaintiffs do not argue for such a finding. The Plaintiffs relied on Dr. Yoeli's use of the last payment data supplied by Dish. The Court, therefore, will give Dish the benefit of the doubt and credit the last payment data that Dish supplied in discovery. The Court notes that Taylor actually used the date-of-last-payment information. Taylor started with Dr. Yoeli's conclusions in the July 2012 Report and reduced the number of violations further by his various opinions, including the campaign codes. He therefore started with Dr. Yoeli's figures that were already reduced by the last payment date. See T 633: 3298 (Taylor). Taylor also explicitly used both last-payment-date information in his October 14, 2013 Report.

See PX 16, Report of John Taylor dated October 14, 2013, (Taylor October 14, 2013 Report), at 6. The Court, therefore, will credit last-payment-date information as reliable for purposes of calculating Transaction-based Established Business Relationship exceptions to liability.

Dish's practice of using calling campaign names or disconnect dates, however, was not a reliable method of determining whether Dish had a Transaction-based Established Business Relationship with intended call recipients. Taylor's reliance on this method in his opinions was similarly not reliable was not based on sufficient facts and data. See Fed. R. Evid. 702(b) and (c). Taylor's opinion regarding the 1,265,359 calls has no probative value. His testimony did not establish that Dish had a Transaction-based Established Business Relationship with the intended recipients of these calls.

The Court credits Taylor's opinion to exclude 42,716 calls as non-telemarketing calls based on disposition codes, and his opinion to exclude 62,679 calls as non-telemarketing calls based on campaign codes. The disposition codes cited by Taylor indicate that the 42,716 calls were received by businesses or were made for non-

telemarketing purposes.  Business and non-telemarketing calls are not covered by the TSR and the relevant portions of the TCPA.  The campaign codes on which Taylor relies indicate that the 62,679 calls were made primarily in Held Work Order and Canceled Work Order campaigns.  The testimony from Bangert, Davis, Dexter, and Montano was ambiguous concerning whether some of these calls were telemarketing calls designed to close pending sales or just scheduling calls.  The Plaintiffs have the burden to prove that a call is a telemarketing call.  Given the ambiguity, the Court will credit Taylor's opinion that the calls made in these campaigns were not telemarketing calls.  The Court, therefore, finds that 1,433,207 of the remaining 1,634,702 in the Yoeli July 2012 Call Set were Registry Calls to persons whom Dish has not shown had a Transaction-based or Inquiry-based Established Business Relationships with Dish at the times of the calls.  The figure 1,433,207 is the sum of the 167,848 calls on which Taylor offered no opinions to exclude from liability plus the 1,265,359 calls for which Taylor offered an opinion that had no probative value.

Plaintiffs' expert Dr. Yoeli also presented an opinion at trial regarding the portion of the 3,342,415 calls in the Yoeli July 2012

Call Set that were not ruled on by the Court at summary judgment. Dr. Yoeli compared the 3,342,415 call records in the Yoeli July 20-12 Call Set with a set of 4,075,766 call records that the Plaintiffs provided to him. The Plaintiffs told Dr. Yoeli that the set of 4,075,766 call records were the September 2007 to March 2010 call records analyzed by Taylor and on which the Court granted partial summary judgment. See T 616: 172-73, 282-84 (Yoeli). Plaintiffs' demonstrative exhibit entitled "Yoeli Demonstrative Exhibit 2" described the 4,075,766 calls records as, "Appended and de-duplicated Dish 2007-2010 call records for which Dish was found liable in summary judgment (Taylor's 501K National Registry, 10K Interstate (sic), 12K No English / Wrong Number, 310K Not Completed, 873K Lead)." Y-DEM02-001, Yoeli Demonstrative Exhibit 2, 2007-2010 Violations Not Yet Granted in Summary Judgment. By comparing, or merging, the specific call records in these two sets, Dr. Yoeli determined that 2,475,432 of the call records in the Yoeli July 2012 Call Set were not included in the set of 4,075,766 call records. T 613: 173, 293-94 (Yoeli).

Dr. Yoeli testified that of that of the 2,475,432 calls, the following calls were made to telephone numbers with area codes associated with the Plaintiff States:

- 332,115 calls made California area codes, of which 326,125 were made more than 93 days after the numbers were registered on the Registry;

- 114,234 calls made to Illinois area codes;

- 33,496 calls made to North Carolina area codes; and

- 96,531 calls made to Ohio area codes.

T 613: 205-06 (Yoeli).  Pursuant to the stipulation discussed above, the maximum sought by the Plaintiff States is stipulated to be 57% of these figures.[49]

The Court finds, however, that Dr. Yoeli's opinion about the 2,475,432 Registry Calls in the Yoeli July 2012 Call Set has no probative value.  Dr. Yoeli used a sound methodology to isolate the call records that were not been ruled upon by the Court at summary judgment.  He compared the 4,075,766 calls records with

---

[49] The Court recognizes that the 57% proportionate reduction figure was calculated from a maximum number of 2,864,896 calls for which the United States sought liability, not the 2,475,432 calls to which Dr. Yoeli testified.  The parties, however, based the United States' stipulation with Dish on the 2,864,896 figure, and the Plaintiff States and Dish agreed to a proportionate reduction based on the United States' stipulation with Dish.  The 57% proportionate reduction figure, therefore, is correct.

calls in the Yoeli July 2012 Call Set to identify those that were not in the 4,075,766 calls records. The data Dr. Yoeli used, however, was flawed. The Plaintiffs failed to prove or even adequately explain the source of the set of 4,075,766 call records provided to Dr. Yoeli. Dr. Yoeli's testimony and the quote from Yoeli Demonstrative Exhibit 2 both stated that the source was the calls from the 2007-2010 Calling Records on which the Court granted partial summary judgment. The Court entered partial summary judgment on at total of 1,707,713 call records from 2007-2010, not 4,075,766.[50] Dr. Yoeli's conclusions based on this unproven, unexplained data have no probative value.

2. Internal List Calls to Persons with Telephone Numbers on Dish and Order Entry Internal Do-Not-Call Lists

Dish's expert Taylor compared the 2007-2010 Calling Records with the Internal Do-Not-Call lists of Dish, Dish's Telemarketing Vendor eCreek, and the PossibleNOW combined Internal-Do-Not-Call List for Order Entry Retailers. PossibleNOW had collected

---

[50] The Court initially surmised that the 4,075,766 figure was the sum of the 1,707,713 calls and the additional 2,386,386 on which the Court initially granted partial summary judgment, but vacated on reconsideration. See Opinion 445, at 231-32; Opinion entered February 17, 2015 (d/e 478), at 2-11. These two numbers total 4,094,099, not 4,075,766. The Court cannot tell the source of the set of 4,075,766 call records from the evidence.

these lists beginning in 2008 as part of its services for Dish. PossibleNOW combined all of the Order Entry Retailers' Internal Do-Not-Call Lists into a single combined list. PossibleNOW maintained the Dish Internal Do-Not-Call List and the eCreek Internal Do-Not-Call List separately. Taylor found that Dish made 903,246 Internal List Calls to numbers on the internal do-not-call lists of Dish and eCreek. The Court granted partial summary judgment in Count II for these calls. Opinion 445, at 191-92, 232-33. Taylor also found that Dish made 7,321,163 telemarketing calls to numbers on the Order Entry Retailer combined Internal Do-Not-Call Lists. The number of telemarketing calls to all Internal Do-Not-Call Lists found by Taylor totaled 8,244,409 calls (7,321,163 plus 903,246). T 633: 3284-85 (Taylor); PX 28, Taylor November 6, 2013 Report, at 11.

The Court credits Taylor's opinion that Dish or its Telemarketing Vendors made 8,244,409 Internal List Calls to persons who previously stated that they did not wish to receive telemarketing calls by or on behalf of Dish Network.

Taylor testified that some overlap in the set of 903,246 calls found violations at summary judgment and the set of 7,321,163

calls to numbers on the Order Entry Retailer combined internal do-not-call lists.  T 633: 3285 (Taylor).  Taylor did not explain the nature of the overlap, that basis for this statement, or the number of call records that overlapped.  The Court does not credit this testimony because Taylor did not provide an explanation or basis for this opinion.

Taylor also opined on the number of Internal List Calls that Dish and its Telemarketing Vendors made to telephone numbers with Plaintiff States area codes.  Taylor opined that of the 903,246 Internal List calls on Dish's and eCreek's Internal Do-Not-Call Lists, 36,598 calls were made to telephone numbers with Ohio area codes.  T 633: 3282-83 (Taylor); PX 28, Taylor November 6, 2013 Report, at 11.  The Court credits this opinion of Taylor.

The Court determined at summary judgment that Dish made an additional 140,349 Internal List Calls made to persons who told eCreek that they did not wish to be called by or on behalf of Dish.  Opinion 445, at 179-80.  Dr. Yoeli determined that 5,190 of those calls were directed to telephones with Ohio area codes.  T 613: 214-15 (Yoeli).  The Court credits this opinion of Dr. Yoeli.  A total of

41,788 Internal List Calls were initiated to telephone numbers with Ohio area codes (36,598 calls plus 5,190 calls).

Dr. Yoeli compared the 8,244,409 records of Dish's Internal List Calls with calls in the Calling Records from 2007 to 2010 that Dish provided to Taylor and were not part of the 501,650 calls previously identified by Taylor and on which the Court granted summary judgment.  T 613: 176, T 614: 255-56 (Yoeli); PX 38, Taylor December 13, 2013, Declaration, at 12.  Dr. Yoeli then found the intersection of these two sets.  Dr. Yoeli found that there were 2,386,386 calls to telephone numbers that were both on the internal do-not-call lists and on the Registry and were not found to be in the 501,650 calls.   Dr. Yoeli found that of the 2,386,386 calls, 71,853 were on the Dish internal do-not-call list and 2,314,533 were on the combined Order Entry Retailer internal do-not-call lists.  T 613: 175-76, T 614: 256 (Yoeli); see Y-DEM03-001, Yoeli Demonstrative Exhibit 3.

Dr. Yoeli also found that, of the 2,386,386 calls in this set, the following were made to telephone numbers with area codes associated with the Plaintiff States:

- 302,983 calls made to California area codes, of which 296,640 were more than 93 days after the numbers were registered on the Registry;

- 118,289 calls made to Illinois area codes;

- 97,785 calls made to North Carolina area codes; and

- 95,275 calls made to Ohio area codes.

T 613: 207, 210-11 (Yoeli); Yoeli December 13, 2013 Declaration, at 12.

Dr. Yoeli further broke down the calls to telephone numbers with Plaintiff States' area codes.  Of the 71,853 calls made to numbers on the Dish internal do-not-call list:

- 9,783 calls were made to California numbers;

- 5,311 calls were made to Illinois numbers;

- 1,324 calls were made to North Carolina numbers; and

- 1,538 were made to Ohio numbers.

T 613: 208 (Yoeli).  Of the 2,314,533 call made to numbers on the Order Entry Retailers' internal do-not-call lists:

- 293,200 calls were made to California numbers;

- 112,978 calls were made to Illinois numbers;

- 96,461 calls were made to North Carolina numbers; and

- 93,737 calls were made to Ohio numbers.

T 613: 207-08 (Yoeli).

The Court credits Dr. Yoeli's opinions as demonstrating that Dish made the 2,386,386 telemarketing calls to persons whose numbers were on both Registry Calls and Internal List Calls to numbers on the internal do-not-call lists of Dish, the Telemarketing Vendors, or an Order Entry Retailer and that these calls were not previously found to be part of the 501,650 calls on which the Court granted summary judgment. The Court also credits Dr. Yoeli's opinions of the breakdown of the number of this set of calls made to numbers with area codes associated with the Plaintiff States.

3. Dish Abandoned Calls

The Court entered summary judgment finding that Dish was liable for making 98,054 prerecorded calls that were answered by a person. Such calls were Abandoned Prerecorded Calls in violation of the TSR. See Opinion 445, at 193-94, 233. The TSR abandonment provisions are not subject to the Established Business Relationship exception. The Plaintiffs presented no

evidence at trial regarding additional Abandoned Prerecorded Calls by Dish.

Dr. Yoeli identified the number of these 98,054 Abandoned Prerecorded Calls that Dish made to telephone numbers with Plaintiff States' area codes:

- 23,020 calls made to California area codes;

- 5,830 calls made to Illinois area codes;

- 2,283 calls made to North Carolina area codes; and

- 1,759 calls made to Ohio area codes.

T 613: 204 (Yoeli); <u>PX 38</u> <u>Yoeli December 13, 2013 Declaration</u>, Appendix C, <u>Yoeli December 14, 2012 Report</u>, at 10, Table 6.[51]

The translations of the texts of the prerecorded messages used in the 98,054 calls show Dish's foreign language marketing group intended to direct the calls to existing Dish customers.  Dish

---

[51] Dr. Yoeli also identified the number of all Prerecorded Calls that Dish made through its autodialer system to telephone numbers with Plaintiff States' area codes:
     301,002 calls made to California area codes;
     93,530 calls made to Illinois area codes;
     30,931 calls made to North Carolina area codes; and
     22,919 calls made to Ohio area codes.
<u>PX 38</u> <u>Yoeli December 13, 2013 Declaration</u>, Appendix C, <u>Yoeli December 14, 2012 Report</u>, at 10, Table 6.  The FCC Rule prohibits initiating Prerecorded Calls regardless of whether the calls are answered.  47 C.F.R.§ 64.1200(a)(3).  Dr. Yoeli did not testify regarding the total number of calls, but only the answered calls.  The Plaintiff States also do not seek a finding regarding the total number of calls.  <u>See</u> <u>Plaintiff States' Proposed Findings of Fact (d/e 662)</u>, at 12-13 ¶¶ 122-26.  The Court, therefore, makes no findings regarding the total number of Prerecorded Calls made to numbers with Plaintiff States' area codes.

presented no other evidence to show that the recipients of these calls were current customers of Dish at the times of the calls, and no evidence of the number of months that elapsed between the dates that the recipients of these calls last paid Dish for Dish Network programming and the dates of the calls.

C. <u>Order Entry Retailer Call Records</u>

The Court found at summary judgment that Dish was liable for causing the following Order Entry Retailers to make the following telemarketing calls offering Dish Network programming in violation of the TSR:

- 6,637,196 prerecorded calls by Dish TV Now that were answered by individuals and abandoned;

- 381,811 illegal Registry Calls by Satellite Systems;

- 43,100,876 prerecorded telemarketing calls by Star Satellite that were answered by individuals and abandoned;

- 2,349,031 Registry Calls by JSR made in 2006; and

- one prerecorded call by American Satellite that was answered by a person and abandoned.

<u>Opinion 445</u>, at 176, 194-95, 233.

Dr. Yoeli identified the number of the 43,100,876 Star Satellite calls that were made to telephone numbers with area codes associated with the Plaintiff States:

- 5,727,417 calls made to California area codes;
- 2,660,066 calls made to Illinois area codes;
- 1,716,457 calls made to North Carolina area codes; and
- 3,419,175 calls made to Ohio area codes.

T 613: 203 (Yoeli); PX 38 Yoeli December 13, 2013 Declaration, Appendix C, Yoeli December 14, 2012 Report, at 12, Table 8b.  The Court credits these opinions.

Taylor identified the number of the 381,811 Satellite Systems calls that were made to telephone numbers with area codes associated with the Plaintiff States:

- 37,688 calls made to California area codes;
- 17,357 calls made to Illinois area codes;
- 13,088 calls made to North Carolina area codes; and
- 22,878 calls made to Ohio area codes.

T 633: 3328 (Taylor); PX 28, Taylor November 6, 2013 Report, at 13.

Taylor identified the number of the 2,349,031 JSR Registry calls that were made in 2006 to telephone numbers with Plaintiff States area codes:

- 473,102 calls made to California area codes;

- 369,384 calls made to Illinois area codes;

- 18,250 calls made to North Carolina area codes; and

- 129,004 calls made to Ohio area codes.

T 633: 3329 (Taylor); PX 28, Taylor November 6, 2013 Report, at 13. The Court credits these findings from Taylor's analysis of these call records.

Taylor also found that JSR made 3,315,242 Registry Calls from January through March 2007. PX 28, Taylor November 6, 2013 Report, at 14. This finding in Taylor's analysis is credible.

Taylor identified the number of the 3,315,242 JSR Registry Calls that were made in 2007 to telephone numbers with Plaintiff States area codes:

- 50 calls made to California area codes;

- 557,336 calls made to Illinois area codes;

- 4,936 calls made to North Carolina area codes; and

- 338,352 calls made to Ohio area codes.

PX 28, <u>Taylor November 6, 2013 Report</u>, at 13.

Taylor found that in 2006, JSR made 416,221 telemarketing Internal List Calls to numbers on Dish's Internal Do-Not-Call List and 2,007 telemarketing Internal List Calls to numbers on the Internal Do-Not-Call Lists of Dish's Telemarketing Vendors.  Taylor found that from January to March 2007, JSR made 765,934 Internal List Calls to numbers on Dish's Internal Do-Not-Call list, and 2,762 Internal List Calls to numbers on the Internal Do-Not-Call lists of Dish's Telemarketing Vendors.  PX 28, <u>Taylor November 6, 2013 Report</u>, at 14.

Taylor found that in 2006, JSR made 267,439 Internal List Calls to numbers on other Order Entry Retailers' Internal Do-Not-Call lists.  Taylor found that from January to March 2007, JSR made 526,956 Internal List Calls to numbers on other Order Entry Retailers' Internal Do-Not-Call lists.  PX 28, <u>Taylor November 6, 2013 Report</u>, at 15.  These findings in Taylor's analysis of these records are credible.

Taylor found that the JSR call records consisted of 12,853,478 dials of calls between July 2006 and March 2007 from JSR's autodialer facility in Texas.  PX 28, <u>Taylor November 6, 2013</u>

Report, at 14.  Goodale testified that JSR used "press 1" prerecorded calling exclusively in its telemarketing calls.  T 622:1886-88 (Goodale).  JSR made its telemarketing calls to market Dish Network programming.  See T 622: 1880-81, 1888-90 (Goodale); see also Opinion 445, at 170.  This testimony is credible.  Goodale's partners allowed third parties to make calls using JSR's login.  Goodale was not involved in hiring these third parties.  T 622:1918 (Goodale).  The third parties may or may not have used prerecorded calls.  The call records, however, are JSR's call records from its dialing facility in Texas.  The 12,853,478 dials, therefore, were made by JSR and not a third party.  The Court finds that JSR made "press 1" prerecorded telemarketing calls for Dish Network programming in all of the dials reflected in these call records.  The Court further finds that JSR used its autodialers at its Texas facility to make these calls.

The FCC Rule prohibited prerecorded telemarketing calls unless the seller had an Established Business Relationship with the intended recipient of the call.  47 C.F.R. § 64.1200(a)(2)(iv) (version

in effect prior to October 16, 2012).[52]  Dish presented no evidence to show that Dish or JSR had an Established Business Relationship with any of the intended recipients of the 12,853,478 prerecorded calls dialed by JSR to sell Dish Network programming.

A prerecorded telemarketing call is an Abandoned Prerecorded Call under the TSR if a person answers the call because no live salesperson comes on the line.  TSR 16 C.F.R. § 310.4(b)(1)(iv). Goodale estimated that four out of ten telemarketing calls made by JSR were answered by a person.  T 622: 1982 (Goodale).  Montano estimated that thirty percent of Dish's direct telemarketing calls were answered by a person.  T 629: 3084 (Montano). Dexter estimated that sixteen to seventeen percent of Dish's direct telemarketing calls were answered by a person.  T 627: 2528 (Dexter).  Taylor estimated that one in ten telemarketing calls dialed are answered by a person.  T633 : 3342 (Taylor).  The Court finds that it is more likely than not that the most conservative estimate of ten percent reflects the minimum number of the JSR dialed calls that were answered by a person.  The Court finds that at least

---

[52] The FCC eliminated Established Business Relationship exceptions for prerecorded telemarketing calls in 2012.  Fed. Reg. 34233, at 13741 (June 11, 2012; 77 Fed. Reg. 66935 (November 8, 2012) (correcting the effective date to October 16, 2012); see Opinion 445, at 25.

1,285,379 of the prerecorded calls dialed by JSR were answered by a person.

V.     Make-up of the Registry and Call Recipients

Dish has presented evidence about the operation of the Registry and about the composition of the phone numbers on the Registry.  Plaintiffs responded with evidence concerning the makeup of the numbers on Dish calling lists.

In March 2003, the FTC awarded a contract to AT&T to maintain the Registry.  DTX 352, Memorandum from Lydia Parnes, Director, Bureau of Consumer Protection dated September 30, 2005 (Parnes Memorandum), at 2.  The contract required AT&T to meet a ninety-seven percent performance standard. The FTC did not require AT&T to identify the type of phone numbers that individuals registered on the Registry.  AT&T also did not determine the validity of the number that individuals registered on the Registry. Deposition of Linda Miller Lavenda, at 47, 53, 111.   The FTC does not currently require its contractors to identify the type of phone numbers that individuals register on the Registry.  Deposition of Ami Dziekan, at 100.

AT&T hired a company called Targus as its subcontractor to perform a monthly review of the Registry, which included purging numbers that no longer belonged.  <u>Parnes Memorandum</u>, at 2; <u>Miller Lavenda Deposition</u>, at 34.  The process of purging numbers is sometimes call "list hygiene."  AT&T did not validate whether Targus accurately captured all the telephone number changes.  AT&T personnel had "very high level," knowledge of how Targus undertook this process.  <u>Miller Lavenda Deposition</u>, at 76-77, 148.  Lavenda used the term "very high level" to mean a superficial level rather than a deep level of understanding.  <u>Id.</u>

In December 2003, AT&T experienced what it labeled a "missing day problem."  If a telemarketer downloaded an updated list of newly registered numbers called a "change list," the list did not include numbers that were registered the day of the download.  If a telemarketer downloaded a full, updated Registry list rather than a change list, then the telemarketer did not experience this missing day problem.  AT&T implemented fixes in January 2004 to address the problem.  <u>DTX 348</u>, <u>Email thread dated December 30, 2003 to May 24, 2005</u>, at 2, 4.  The FTC also did not consider

erroneous Registry Calls made because of this missing day problem to be a violation.  <u>T 710: 59 (Torok)</u>.[53]

On February 17, 2004, Targus notified the FTC for the first time that "Land lines are considered disconnected and are deleted and scrubbed from the registry only when the telephone number is reassigned which can occur anywhere from four weeks to over one year from the time the number is disconnected."   <u>DTX 338</u>, <u>Letter from FTC Contract Specialist Eric Vogt to Carol Brown dated April 16, 2004 (Vogt April 2004 Letter)</u>, at 1. Targus also notified the FTC that "No cell phones are being scrubbed. There are approximately 9.7 million wireless phones on the registry." <u>Vogt April 2004 Letter</u>, at 2.   AT&T did not require Targus to remove business or government numbers from the National Registry.  <u>Miller Lavenda Deposition</u>, at 138, 141.

The FTC directed AT&T in the Vogt April 2004 Letter to start scrubbing disconnected numbers from the Registry, including disconnected wireless numbers.  On May 21, 2004, the FTC accepted the methodology of only removing numbers that were both disconnected and reassigned.  <u>DTX 340</u>, <u>Letter from Vogt to Brown</u>

---

[53] The transcript of the trial dates on October 25, 2016 through November 2, 2016, are paginated separately from the trial dates in January 19, 2016 through February 17, 2016.

dated May 21, 2004 (Vogt May 2004 Letter).  AT&T and Targus took

the position that no harm would result from allowing a

disconnected number that had not been reassigned to remain on

the Registry because telemarketers would not want to call

disconnected numbers anyway.  Miller Lavenda Deposition, at 193.

Vogt also noted in the Vogt May 2004 Letter that Targus had a 10

percent error rate in its scrubbing methodology.  Vogt stated that

this error rate was not acceptable.  On June 1, 2004, AT&T

informed the FTC that it had no valid method to scrub for

disconnected wireless numbers.  Miller Lavenda Deposition, at 196,

200-01.

In 2007, Congress enacted the Do-Not-Call Improvement Act.

15  U.S.C. § 6155. The Act mandates that each number on the

National Registry remain indefinitely, unless the individual to whom

the number is assigned requests removal, or unless the FTC

removed the number as follows:

> The Federal Trade Commission shall periodically check
> telephone numbers registered on the national 'do-not-
> call' registry against national or other appropriate
> databases and shall remove from such registry those
> telephone numbers that have been disconnected and
> reassigned. Nothing in this section prohibits the Federal

Trade Commission from removing invalid telephone numbers from the registry at any time.

Id. § 6155(b).

In conjunction with the 2007 legislation, the FTC submitted a report to Congress in 2008 regarding the accuracy of the Registry. As part of this report, the FTC analyzed a sample list of 20,000 numbers submitted by the Direct Marketing Association ("DMA"), which the DMA claimed "had been disconnected and reassigned since the time they had been registered." The FTC concluded that forty-two percent of these numbers should not have been considered as active registrations on the Registry. DTX 459, Do-Not-Call Improvements Act of 2007, Report to Congress: Regarding the Accuracy of the Do Not Call Registry (October 2008) (FTC 2008 Report), at 3-4.

In 2007, Lockheed Martin replaced AT&T as the FTC's contractor responsible for maintaining the Registry. Deposition of John Krebs, at 19; Dziekan Deposition, at 52. The FTC lowered the permissible performance standard from 97 percent to 95 percent performance rating in some categories. Deposition of Kathy French, at 68; DTX 180. DTX 180, Lockheed Martin Do Not Call Registry

Monthly Performance Report for November 2008 (Lockheed Martin November 2008 Report), at 2-4.

In November 2008, Lockheed Martin was rated on 16 performance categories. Lockheed had a 95 percent performance rating or better in 13 of the 16 categories. Lockheed had a 75.54 percent, 71.02 percent, and a 43.9 percent performance rating respectively in the other three categories. DTX 180, Lockheed Martin November 2008 Report, at 8; French Deposition, at 91. This was a one-time event. Lockheed's performance was generally over or very close to the 95 percent performance rating. T 710: 68 (Torok). The FTC monitored Lockheed's performance, but did not terminate its contract with Lockheed for failure to meet the 95 percent performance rating. The FTC imposed a monetary penalty on Lockheed when Lockheed did not meet the required 95 percent performance rating pursuant to the terms of their contract. T. 710: 68 (Torok).

In December 2011, Lockheed Martin delayed adding new registrations to the Registry. The delay occurred because the registrations were "locked in the technical background" of Lockheed Martin's system. As a result, Lockheed Martin took additional steps

and additional time to place new numbers on the Registry.  In February 2012, Lockheed Martin discovered that certain telemarketers did not receive the full version of the Registry upon downloading.  This issue affected a few hundred telemarketers. French Deposition at 70, 74, 76, 163-64.  The FTC did not consider erroneous Registry Calls made because of this delay in putting numbers on the Registry to be violations.  T 710: 60 (Torok).

Lockheed Martin used PossibleNOW as its subcontractor to perform list hygiene on the Registry.  French Deposition, at 53. PossibleNOW estimated that approximately five percent of the landline numbers registered prior to December 2007 were still listed on the Registry as of October 2008, but were no longer valid registrations.  DTX 459, FTC 2008 Report, at 6.  By July 31, 2008, PossibleNOW had removed 7.9 million numbers from the Registry as part of its process of removing inactive numbers.  DTX 459, FTC 2008 Report, at 6 n.12; Krebs Deposition, at 92:9-20.

In 2009, PossibleNOW estimated that thirteen percent of the National Registry is attributed to business landlines. DTX 486, Analysis of The Phone Numbers on the National Do Not Call Registry dated March 31, 2009 (PossibleNOW 2009 Report), at 7.

PossibleNOW made some mistakes in maintaining the Registry.  In one instance, PossibleNOW mistakenly dropped 225,000 numbers from the Registry. PossibleNOW had accidentally populated incorrect dates in the course of updating the disconnect/reassign database.  Richard Stauffer, CEO of PossibleNOW testified that this occurred as a result of human error. In correcting the issue, PossibleNOW missed 2,668 numbers that should have been added to the Registry.  T 618: 761-62 (Stauffer); see French Deposition, at 157-58; DTX 463, Email dated December 19, 2009, re Issue With the November Process Run; DTX 466, PossibleNOW Issue Report Form dated December 22, 2008.  The FTC penalized PossibleNOW for any errors by reducing payments pursuant to the terms of the contract.  T 710: 86 (Torok).

In 2008, PossibleNOW inadvertently left approximately 10,000 numbers on the Registry that should have been removed.  In March 2009, PossibleNOW accidentally dropped 16,000 numbers from the Registry. T 618: 762-63, 764-65 (Stauffer); DTX 583, Analysis of the

<u>Potential Input File Issue for the October 2008 National DNC Registry Reassign Process</u>.[54]

PossibleNOW does not remove disconnected and reassigned wireless numbers from the Registry. <u>DTX 183</u>, <u>Biennial Report to Congress Under the Do Not Call Registry Fee Extension Act of 2007, FY 2010 and 2011 (FTC 2010-2011 Report)</u>, at 4-5. Pursuant to the Do-Not-Call Improvements Act, PossibleNOW relies on the National Directory Assistance database to perform maintenance of the Registry, but the National Directory database does not contain wireless numbers. <u>DTX 486</u>, <u>PossibleNOW 2009 Report</u>, at 3. Wireless service providers are not required to share their directory assistance data with the FCC. <u>DTX 459</u>, <u>FTC 2008 Report</u>, at 6. PossibleNOW estimated that close to 50 percent of the Registry is comprised of wireless numbers. <u>DTX 486</u>, <u>PossibleNOW 2009 Report</u>, at 7.

Voice over Internet Protocol (VoIP) telephone service providers are also not required to share their directory assistance data with the FCC. <u>DTX 183</u>, <u>FTC 2010-2011 Report,</u> at 5. PossibleNOW estimated in 2009 that seventy-five percent of VoIP numbers were

[54] Exhibit DTX 583 is not dated and the author is not does not identified. PossibleNOW personnel appear to have conducted the analysis recorded in the Exhibit.

contained within its national directory assistance data.  DTX 486, PossibleNOW 2009 Report, at 2; DTX 183, FTC 2010-2011 Report, at 5.

Dish's expert Dr. Robert Fenili, Ph.D., opined as to the makeup of the types of telephone numbers on the Registry.  DTX 189, Report of Dr. Robert N. Fenili, Ph.D., dated July 26, 2012 (Fenili Report).  Dr. Fenili opined that in 2011, 28.2 percent of the telephone numbers on the Registry were residential landlines, 7.1 percent were inactive residential landlines, 12.2 percent were business landlines, and 52.5 percent were wireless telephones.   Dr. Fenili further opined that the residential landlines as a percentage of all of the numbers on the Registry was decreasing over time, the similar percentage of wireless numbers was increasing over time, and the similar percentage of business numbers was remaining relatively stable.  DTX 189, Fenili Report, at 8-10; see Deposition of Robert Fenili, at 73-76.

In response, Plaintiffs' expert Dr. Yoeli took samples of calling records to determine the make-up of the types of telephone numbers that Dish and the Order Entry Retailers called.  Dr. Yoeli took samples of the 2003-2007 Calling Records; the 2007-2010

Calling Records; Guardian's records of calls for Star Satellite (identified as Tenaya); Guardian's records of calls for Dish TV Now (identified as WOW TV); and JSR's calling records. Dr. Yoeli sent the sample to Stauffer of PossibleNOW. PossibleNOW maintains historical records of major directories for residential, business, and wireless telephone numbers. <u>T 613: 192-96 (Yoeli)</u>.

Stauffer identified the type of telephone number for each sample as follows:

<u>2003-2007 Calling Records</u>

- 5,002 records in the sample

- 2,708 numbers were listed as residential, of which 1 was also listed as wireless and 5 were also listed as business;

- 29 numbers were listed as business, of which 5 were also listed as residential;

- 174 numbers were listed as wireless, of which 1 was also listed as residential; and

- 2,097 numbers were of unknown type.

## 2007-2010 Calling Records

- 5,001 records in the sample

- 3,434 numbers were listed as residential, of which 11 were also listed as business;

- 43 numbers were listed as business numbers, of which11 were also listed as residential;

- 425 numbers were listed as wireless numbers; and

- 1,110 numbers were of unknown type.

## Star Satellite (Tenaya) Calling Records

- 5,001 records in the sample

- 2,015 numbers were listed as residential, of which 4 were also listed as business;

- 58 numbers were listed as business, of which 4 were also listed as residential;

- 2 numbers were listed as wireless; and

- 2,930 numbers were of unknown type.

Dish TV Now (Wow TV) Calling Records

- 5,001 records in the sample

- 2,550 numbers were listed as residential, of which 7 were also listed as business;

- 20 numbers were listed as business number, of which 7 were also listed as residential;

- 1 number was listed as a wireless; and

- 2,437 numbers were of unknown type

JSR Calling Records

- 5,000 records in the sample

- 4,590 numbers were listed as residential, of which 26 were also listed as business;

- 103 numbers were listed as business, of which 26 were also listed as residential;

- 3 numbers were listed as wireless; and

- 330 numbers were of unknown type.

<u>T 616: 37-39 (Stauffer)</u>; <u>PX 1319</u>, <u>Yoeli Rebuttal Report dated</u>

<u>October 16, 2012</u>, attached <u>Declaration of Rick Stauffer dated</u>

<u>October 16, 2012</u>.[55]

Dr. Yoeli reviewed Stauffer's results and opined as follows:

- The numbers identified as residential in the 2003-
  2007 Call records were 67 percent of all numbers and
  85 percent of the numbers that could be identified as
  residential, business or wireless;

- The numbers identified as residential in the 2007-
  2010 Call records were 69 percent of all numbers and
  94 percent of the numbers that could be identified as
  residential, business, or wireless;

- The numbers identified as residential in the Star
  Satellite records were 40 percent of all numbers and
  97 percent of the numbers that could be identified as
  residential, business, or wireless;

- The numbers identified as residential in the Dish TV
  Now records were 51 percent of all numbers and 99

---

[55] Stauffer's testimony was transcribed separately during the trial. This transcript is paginated separately from the rest of the trial transcript.

percent of the numbers that could be identified as residential, business, or wireless; and

- The numbers identified as residential in the JSR records were 91 percent of all numbers and 98 percent of the numbers that could be identified as residential, business, or wireless.

T 613;195-202 (Yoeli); Y-Dem04, Yoeli Demonstrative Exhibit 4; PX 38, Appendix C, Yoeli December 14, 2012 Report, at 9 (PX 38-110).

The Court finds that Dr. Fenili's opinion about the make-up of the Registry is of little or no probative. Dr. Fenili's opinions are only relevant if Dish and the Order Entry Retailers called a normal distribution of all types of numbers. Dish did not call a normal distribution. Dish called residential telephone numbers. T 628: 2810 (Bangert); T 627: 2555, 2639, 2641 (Dexter); T 617: 633-34 (Davis). Dish knew the address associated with every number called at the time of each call. See T 628: 2740-41 (Bangert); T 629: 3209-10 (Montano); T 627: 2639-40 (Dexter); T 617: 630 (Davis). Dish also scrubbed its lists to remove wireless numbers.

Order Entry Retailers Dish TV Now, JSR and Star Satellite also called residential telephone numbers. JSR called residential

numbers from published white pages telephone directories.  <u>T 622: 1879-80, 1887 (Goodale)</u>.  Star Satellite initially called numbers out of the phone book.  <u>Myers Deposition</u>, at 124.  Star Satellite then used Guardian's services to make prerecorded calls.  Dish TV Now also used Guardian's services.  Guardian called published telephone numbers "off of a CD-Rom you could buy down at Office Max." <u>Deposition of Kevin Baker</u>, at 50.  In addition, Order Entry Retailers were only authorized under the Retailer Agreement to solicit potential customers to purchase residential service.  The Order Entry Tool could only be used to open residential accounts, not commercial accounts.  <u>T 626: 2225 (Neylon)</u>.

Dr. Yoeli's samples show that Dish, Dish TV Now, JSR, and Star Satellite did not call a normal distribution of telephone numbers on the Registry.  Almost none of the calls from any of the samples were made to identified business telephone or wireless numbers.  A very large majority of the identified calls in every set were made to residential numbers.

The Court further finds that the preponderance of the evidence established Dish and the Telemarketing Vendors made telemarketing calls to residential telephone subscribers.  Dish

directed its telemarketing campaigns to sell Dish Network programming to residential customers, whether current, former, or prospective. Dish, further, knew the name and address of every person that Dish and its Telemarketing Vendors called. Dish scrubbed all calling campaigns to remove wireless numbers. The disposition codes in the Calling Records for 2007-2010 showed that approximately .2% of the calls were answered by businesses. See T 3325-27 (Taylor); PX16, Taylor October 13, 2013 Report, at 7 (41,417 out of 17,168,194 calls were to businesses, or .24%); PX 38, Declaration of Dr. Erez Yoeli dated December 18, 2013, Appendix C, Yoeli December 14, 2012 Report, at 7-8 (.2% of calls were answered by businesses). All of this evidence demonstrates that Dish and its Telemarketing Vendors called residential telephone subscribers.

In addition, Taylor used the disposition codes to exclude the Dish calls answered by businesses from the Registry Calls in the Yoeli July 2012 Call Set and in the Registry Calls found by him in his October 13, 2014 Report. Thus, the calling records identified by Taylor on which the Court has found liability excluded calls to businesses.

The evidence also shows that Order Entry Retailers JSR and Star Satellite called residential telephone numbers. The standard Retailer Agreements only authorized Order Entry Retailers to sell Dish Network programming to residential customers. The Order Entry Tool could only be used to submit orders for residential programming packages to Dish. Goodale, Myers, and Baker testified that both JSR and Star Satellite, either directly or through Guardian, called residential telephone numbers in published telephone directories.

Dr. Yoeli's 2012 sampling data corroborates these witnesses' testimony. The 2012 samples show that the vast majority of the identified calls were directed to residential customers:

- 85 percent of identified numbers in the 2003-2007 Calling Records;

- 94 percent of identified numbers in the 2007-2010 Calling Records;

- 97 percent of identified numbers in the Star Satellite Calling Records; and

- 98 percent of identified numbers in the JSR Calling Records.

All of this evidence, taken as a whole, shows by a preponderance that Dish, its Telemarketing Vendors, and Order Entry Retailers JSR and Star Satellite placed the vast majority of their outbound telemarketing calls to residential telephone subscribers. The preponderance of the evidence shows that the telemarketing calls made by Dish, the Telemarketing Vendors, JSR, and Star Satellite at issue in this case were directed to residential telephone subscribers.

The percentage of residential calls to all calls in the samples was smaller.

- 67 percent of all calls in the 2003-2007 Calling Records;

- 69 percent of all calls in the 2007-2010 Calling Record;

- 40 percent of all calls in the Star Satellite/Guardian Calling Records; and

- 91 percent of all calls in the JSR Calling Records.

These percentages would be accurate only if all of the unidentified numbers were not residential telephone numbers. The unidentified numbers, however, included unlisted landline residential numbers and unlisted VoIP residential numbers. Furthermore, numerous Dish witnesses, including Bangert, Dexter, and Davis, testified that

Dish called residential numbers. Goodale, Myers, and Baker testified that JSR and Star Satellite called published residential numbers. Given this testimony, the actual percentage of residential numbers in the call records is far closer to the percentage of identified numbers.

Dish argues that Dr. Yoeli's sampling analysis is not probative because the samples are national samples rather than samples from each of the Plaintiff States. Dr. Yoeli's samples, standing alone, would not establish the number of calls that these telemarketers directed to residential telephone numbers because they are national samples. Dr. Yoeli's sampling, however, corroborates the other evidence, including the testimony of Dish witnesses Bangert, Dexter, and Davis, and others; the testimony of Goodale, Myers, and Baker; the terms of the Retailer Agreements which only authorized sales to residential customers; and the Order Entry Tool could only be used to place residential orders. All of this evidence, without the sampling, would be sufficient to establish that Dish and its Telemarketing Vendors, JSR, and Star Satellite made telemarketing calls to residential telephone numbers. Dr. Yoeli's national sampling corroborates this other evidence. The Court

finds that it is more likely than not that the telemarketing calls made by Dish, the Telemarketing Vendors, JSR, and Star Satellite were directed to residential telephone subscribers.

The Plaintiff States have also established that it is more likely than not that Satellite Systems called residential telephone subscribers. The Retailer Agreement only authorized Satellite Systems sales to residential customers for Dish Network programming. The Order Entry Tool could only be used to place residential orders. Satellite Systems, therefore, only made money by calling residential telephone subscribers. Absent any contradictory evidence, the reasonable inference is that Satellite Systems called residential telephone subscribers. Dish has not presented any evidence showing that Satellite Systems called businesses or other non-residential numbers.

The Plaintiff States have further submitted post-trial the verdict entered January 19, 2017, in the class action suit brought by Plaintiffs' witness Dr. Krakauer. <u>Krakauer v. Dish Network, L.L.C.</u>, M.D. N.C. Case No. 1:14-CV-333. The case concerned 51,166 Registry Calls made by Satellite Systems in 2010 and 2011. Unlike this action, the class action was limited to residential

telephone subscribers who were called twice within a 12-month period after registering their numbers on the Registry. See 47 U.S.C. § 227(c)(5). The jury found that all of the 51,166 calls were made to residential telephone subscribers. See Letter dated January 30, 2017 (d/e 764), attached Verdict Sheets, at 1-2. The Plaintiffs argue that the verdict determination is persuasive evidence that the Satellite Systems directed its telemarketing calls to residential telephone subscribers.[56] Id., at 4.

The Court may take judicial notice of the verdict, transcripts, and filings in a public trial. See Village of DePue, Illinois v. Viacom International, Inc., 632 F.Supp.2d 854, 857, n.1 (C.D. Ill. 2009); Fed. Rule Evid. 201. Dish does not object to the Court's consideration of the verdict and other public record material from the Krakauer case. See Letter dated February 10, 2017 (d/e 767). Dish, however, disputes whether the verdict and the other public record documents submitted by the Plaintiffs are relevant or probative of whether the recipients were residential telephone subscribers. Id., at 5.

---

[56] The Plaintiffs also argue that the verdict in Krakauer establishes under the doctrine of issue preclusion that Satellite Systems was an agent of Dish. The Court already determined that Order Entry Retailers were marketing agents of Dish. The Court does not need to address the question of issue preclusion.

The verdict has some probative value. A jury heard evidence on the issue and determined that the call recipients were residential telephone subscribers. The probative value is limited, however, because the verdict is subject to review by the trial court under Federal Rule of Civil Procedure 59 and by the Court of Appeals. The verdict, however, is consistent with the terms of the Retailer Agreement and the design of the Order Entry Tool, which both limited sales to residential customers.

With or without the verdict in the Krakauer class action, the Court finds that the preponderance of the evidence shows that Satellite Systems called residential telephone subscribers.

VI.    Area Codes and State of Residency

The Plaintiff States alleged that Dish made illegal telemarketing calls directed at residential telephone subscribers residing in the Plaintiff States. Third Amended Complaint, Counts V-XII.

Dr. Yoeli and John Taylor both used telephone area codes to determine whether a call recipient resided in a Plaintiff State. See e.g., Opinion 445, at 124-39. Dish, however, challenged at summary judgment the accuracy of area codes to prove states of

residency of telephone subscribers. <u>Opinion 445</u>, at 204. The Court found that issues of fact existed regarding whether area codes proved the telephone subscribers' states of residence.

The Plaintiff States established at summary judgment that Dish engaged in a pattern and practice of making illegal telemarketing calls in violation of the TCPA to residents of the Plaintiff States. The evidence regarding the accuracy of area codes to prove telephone subscribers' states of residence was relevant to the appropriate amount of statutory damages or civil penalties under the various counts. <u>Opinion 445</u>, at 205-07.

The North American Numbering Plan Administration (NANPA) assigns telephone area codes to geographic areas within each state, Puerto Rico, Canadian province and territory, and participating Caribbean nation or territory. <u>See</u> <u>PX 1405</u>, <u>NANPA 2014 Annual Report</u>; <u>PX 1406</u>, <u>List of NANPA Area Codes Sorted by Location</u>; <u>T 613: 188-89 (Yoeli)</u>. The numbers are assigned to landline, VoIP, and wireless telephone accounts.

Technological changes in telephones allow a telephone customer to have a telephone number with area codes other than the one assigned to their states of residence. Wireless telephone

account holders can either keep the same number if they move to other states, or may provide a wireless telephone for a relative or friend that lives in another state.  Since 2007, the FCC has allowed telephone customers to port, or transfer, a number from one type of telephone account to another, e.g., from a wireless account to a VoIP line.  See In re Telephone Number Requirements for IP-Enabled Services, 22 F.C.C.R. 19531, at 19534-35 (2007); see also T 616: 46 (Stauffer).  VoIP telephone accounts may also elect to have an area code that is not based on the geographic location of the telephone where the telephone is actually located.  See In re Vonage Holdings Corp., 19 F.C.C.R. 22404, at 22408, 22439 (2004); see also In re Numbering Policies for Modern Communications, 28 F.C.C.R. 5842, at 5920 (2013) (FCC Commissioner Jessica Rosenworcel stated, "People now move and take their numbers with them. Case in point: in my office here at the Commission, half of those who work with me have phone numbers with area codes that do not reflect where they live.").  Thus, it is theoretically possible that residential customer's telephone numbers could contain an

area code other than the ones assigned to his or her state of residency.  See Opinion 445, at 145-46.[57]

The mobility of wireless telephones is not relevant in this case because Dish, its Telemarketing Vendors, and Order Entry Retailers Star Satellite, JSR, and Satellite Systems directed their calls to residential telephone subscribers, as discussed above.  Dish also scrubbed calling lists for itself and its Telemarketing Vendors to remove wireless numbers, either directly or through PossibleNOW.

The evidence at the January and February 2016 trial proceedings showed a high correlation between area code and state of residence.  Taylor agreed that prior to November of 2008, that the match between area codes and states of residence for residential landlines was 97 percent.  T 633: 3332-33, 3338 (Taylor).  Dr. Yoeli analyzed a sample of consumer complaints compiled in the FTC's online Sentinel Database.  The state of residency matched the state assigned to the area code of the consumer in every case where the

---

[57] Dish repeatedly states that the Court held at summary judgment that area codes cannot be used to determine state of residency.  See e.g., Dish Network L.L.C.'s Propose Conclusions of Law for the Second Phase of Trial (d/e 737), at 38.  This is incorrect.  The Court only held that area codes did not prove state of residency for purposes of summary judgment. See Opinion 445, at 205-08, 214-25.

consumer provided address information.  T 613: 188-89 (Yoeli); PX 38B, Spreadsheet of FTC Sentinel Database Analysis.[58]

Dish's employees disclosed for the first time at the January and February 2016 trial proceedings that Dish had possession of information that could verify the state of residency of the individuals that it called.  Montano testified that Dish had address information on every intended recipient of the telemarketing calls that made by Dish and its Telemarketing Vendors eCreek and EPLDT (Dish Telemarketing Call Recipients).  T 629: 3209-10 (Montano); see T 628: 2740-41 (Bangert); T 627: 2639-40 (Dexter); T 617: 630 (Davis).

The Court determined that Dish should have produced this address information in discovery.  The Court ordered Dish to produce this address information in supplemental discovery (Supplemental Discovery).  The Court further continued the trial to October 25, 2016, to allow completion of the Supplemental

[58] In March 2015, Dr. Yoeli provided Stauffer with a set of 30,354 Dish call records.  Stauffer compared those numbers with the PossibleNOW databases and determined that the area code matched that state of residence in 30,314, or 99.87 percent of the time.  The 40 that did not match did not include information on state of residence.  T 616: 42-49 (Stauffer). Dish employees further testified that Dish just called residences in almost all of its telemarketing campaigns.  This evidence has limited probative value.  The Plaintiff States did not present sufficient evidence of the source of the 30,054 call records to establish that applicability of these records to Dish's call records generally.  Without proof that the 30,054 call records were a random sample or other representative sample, Stauffer's observation has little probative value.

Discovery.  <u>Opinion entered</u> <u>February 24, 2016 (d/e 624) (Opinion</u> <u>624)</u>, at 5-6.  As noted above, the trial resumed on October 25, 2016, and was completed on November 2, 2016.

During the Supplemental Discovery, Dish produced eleven different sets of data containing address and telephone number information of Dish Telemarketing Call Recipients (Address Data Sets).  On May 26, 2016, Dish's counsel sent an email to Plaintiff California's counsel regarding the production.  One of the Address Data Sets (data set 10) contained data from a credit reporting agency TransUnion and another (data set 11) contained marketing data company Speedeon.  Dish's counsel stated that Dish secured cold call lists from a marketing database operated by credit reporting agency Equifax.  Counsel stated that Equifax sold the relevant database to a company named Epsilon.  Epsilon no longer retained such information prior to 2011.  Dish secured and produced substitute data from TransUnion and Speedeon.  <u>PX 1446</u>, <u>Revised Supplemental Expert Report of Dr. Erez Yoeli for Plaintiff States of California, Illinois, North Carolina & Ohio, dated July 7, 2016 (Yoeli July 2016 Report)</u>, Appendix C, <u>Email from</u>

<u>Dish's Counsel to Plaintiff California's Counsel dated May 26, 2016</u>

<u>(May 26, 2016 Email)</u>.

Counsel for Plaintiff States sent an email to Dish's counsel asking for a description of Address Data Sets 1-9. Plaintiffs' counsel stated that Plaintiffs stated that they understood that the final two Address Data Sets, sets 10 and 11, were data from TransUnion and Speedeon. PX 1446, <u>Yoeli July 2016 Report</u>, Appendix B, <u>Email from Plaintiff States' Counsel to Dish Counsel dated June 9, 2016 (June 9, 2016 Email)</u>, ¶ 1.

Dish's counsel responded by email. PX 1446, <u>Yoeli July 2016 Report</u>, Appendix D, <u>Email from Dish's Counsel to Plaintiff State California's Counsel dated June 22, 2016 (June 22, 2016 Email)</u>. Dish's counsel provided a brief description of each of the 11 Address Data Sets:

> **Sets 1 and 1A** contain Customer Account data. This information was pulled from DISH's Customer Account database within DISH's Teradata environment in DISH's Data Warehouse.
>
> "Location begin date" reflects the date when DISH received the location information. It is the first date when the account was associated with the address.
>
> "Location end date" reflects the last date that the account was associated with the address. If the date is in the

future, such as 2199-12-31, then the address was currently associated with the account at the time that the information was pulled.

Phone "begin" and "end" dates similarly represent the first and last dates that the phone number was associated with the account. If the phone "end" date is in the future, then the phone number was currently associated with the account at the time that the information was pulled.

**Set 2** contains lead data pulled from the Lead Tracking System in use at DISH prior to May 22, 2013.

The "Lead creation" field represents the date the record was generated.

**Set 3** contains lead data pulled from the Lead Tracking System in use at DISH as of May 22, 2013.

The "Lead creation" field represents the date the record was generated.

**Set 4** contains information from DISH's "Do Not Contact" database. This information was pulled from the "Do Not Mail" portion of DISH's "Do Not Contact" database. The mailing addresses in this database may be associated with customer account numbers. DISH cross-referenced account numbers associated with phone numbers in the call records to identify addresses associated with those same account numbers within this database.

The "Effective date" field represents the date when the Do Not Contact information became effective.

The "Expiration date" field represents the date when the Do Not Contact information expired.

**Set 5** contains MKTG_RAID data. This information was pulled from external hard drives associated with DISH's Marketing Department, which contain historical marketing data.

**Set 6** contains SALESCOMM data. This information was pulled from a database containing customer accounts generated by retailers and used to determine retailer compensation. SalesComm is the database of record for all payments that are made to retailers.

. . . .

The "Eff date" field represents the date when the sales commission data became effective.

The "Exp date" field represents the date when the sales commission data expired.

**Set 7** contains data from DISH's Siebel database. This information was pulled from a database containing information on customer accounts generated by order entry retailers.

The "Created date" field represents the effective date of the Siebel data.

The "Last updt date" field represents the latest date when the Siebel data was updated.

**Set 8** contains data pulled from DISH's Production Operational Data System ("PODS") which was DISH's Operational Data store . . . . This specific information came from . . . data tables created . . . for use by the Marketing Department.  Those tables contained an association between phone numbers and account numbers.  For any phone numbers . . . identified by the State Plaintiffs that appeared within these tables, DISH

used the associated account numbers to pull address information from its Customer Account data.

"Location begin date" reflects the date when DISH received the location information. It is the first date when the account was associated with the address.

"Location end date" reflects the last date that the account was associated with the address. If the date is in the future, such as 2199-12-31, then the address was currently associated with the account at the time that the information was pulled.

**Set 9** contains data from DISH's Production Operational Data System ("PODS") (explained above), and specifically from subscriber and address information from DISH's Billing System-CSG that had been imported into this Production Operational Data System.

**Set 10** contains TransUnion data. TransUnion data was only provided for phone numbers that did not have any associated addresses within DISH's records. . . .

**Set 11** contains Speedeon data. Speedeon data was only provided for phone numbers that did not have any associated addresses within DISH's records or within TransUnion's data. . .

According to Speedeon, the "I" date represents the date that the address record was created at Speedeon and the "D" date represents a date as of which Speedeon no longer associated the telephone number with that address.

June 22, 2016 Email, at 1-2 (emphasis in the original).

On July 7, 2016, Plaintiffs' expert Dr. Yoeli issued his report.

Dr. Yoeli relied on the 11 Address Data Sets produced by Dish; the

May 26, 2016 Email, the June 10, 2016 Email, and the June 22, 2016 Email, and the information regarding the list of geographical assignment of telephone area codes by the NANPA.  PX 1466, Yoeli July 7, 2016 Report, at 1; see T 710:99-100 (Yoeli).

Dr. Yoeli made the following assumptions about the time period when address information in any Address Data Set was valid (Valid Address).  If the Address Data Set included a type of beginning date and ending date (e.g., the location_begin date and location_end date in Address Data Set 1), then the association of the telephone number with the address was valid between the two dates.  If the Address Data Set included a beginning date, but no end date, then the address was valid from the beginning date until the present.  If the Address Data Set had no date information, then the address was always valid.  PX 1466, Yoeli July 7, 2016 Report, at 3-4.

Dr. Yoeli did not consider the different descriptions of the beginning and ending dates in the Address Data Sets, such as location_begin and location_end in Sets 1 and 1A, the Eff date and Exp date in Set 6, or the "I" and "D" dates in Set 11.  Dr. Yoeli

testified that those different descriptions were not material to his analysis.  See T 710: 145-48, 152-53, 164 (Yoeli).

Dr. Yoeli also used seven sets of call records admitted at the initial phase of the trial in January and February 2016 (Call Record Sets).  The Call Record Sets contained records of telemarketing calls that Dish made from September of 2007 through March of 2010. The first two Call Record Sets made up the Yoeli July 2012 Call Set. The remaining Call Record Sets were the calls records on which the Court granted partial summary judgment as violations of the TSR. The third, fourth, and fifth Call Record Sets were the No English, Uncompleted, and Inquiry calls records.  The sixth Call Record Set, called Taylor, contained the 501,650 call records identified by Taylor in his October 2013 Report.  The seventh set, called AM Calls, contained Dish's 98,054 Abandoned Prerecorded Calls.

Dr. Yoeli identified the calls in the Call Records made to telephone numbers with area codes assigned to the Plaintiff States by the NANPA (Relevant State Call Records).  PX 1466, Yoeli July 7, 2016 Report, at 4.

Dr. Yoeli compared the telephone numbers in the Relevant State Call Records with the Valid Addresses associated with those

telephone numbers at the times of the calls to determine the extent to which the state of residence in the Address Data Sets agreed with the state assigned to the telephone numbers' area codes by NANPA. Dr. Yoeli identified the times that all Valid Addresses in any of the Address Data Sets matched the NANPA area code geographic assignment (All States Match) and the times that at least one Valid Address in any of the Address Data Sets matched the NANPA area code geographic assignment (Any States Match). The All States Match showed NANPA assigned-state for area codes and state of residency matched 82% to 98% of the time. The Any States Match showed a match 97% to 100% of the time. PX 1466, Yoeli July 7, 2016 Report, Appendix E, Tables 2A-2G.

Dr. Yoeli concluded, "My analysis shows that, for all Call Sets and All Plaintiff States, the percentage of calls to addresses in the Plaintiff State was at least 82%." PX 1466, Yoeli July 7, 2016 Report, at 6; T 710: 100-02, 173-74 (Yoeli). Dr. Yoeli explained the rationale behind his All State Match:

> I looked at address data as is and allowed the address to be used if DISH's own records indicate it should be. And because of the fact there's a variety of different data sets being used and they are verifying each other, then I have a lot of confidence in the fact that it doesn't matter if you

> change a particular assumption, you're going to get very
> similar results. And that these results are conservative.

T 710: 179 (Yoeli).

Dr. Yoeli erroneously failed to analyze the data in Address

Data Set 1A in his Report.  Dr. Yoeli testified that Address Data Set

1A contained about a 10 percent increase in the new data not

already included in the other Address Data Sets.  T 710:128-29

(Yoeli).  Dr. Yoeli assumed that Dish combined Address Data Sets 1

and 1A before providing them to the Plaintiff States.  Yoeli testified

that he subsequently reviewed the information in Address Data Set

1A and concluded that the data did not change his conclusions

materially.   T 710:120-23 (Yoeli).  Yoeli testified that the change in

the analysis was, ".2, .3 percent.  Always less than .5."  T 710: 162

(Yoeli).

Dr. Yoeli also testified that the Address Data Sets contained

multiple addresses for the same telephone number, but the

addresses were generally all in one state, "[T]he bulk of the data are

for people who never move out-of-state."  T 710:149 (Yoeli).  Dr.

Yoeli testified that the percentage of cases in which that data

showed that people moved from one state to another state was 13 percent.  T 710:120 (Yoeli).

The Court credits Dr. Yoeli's All State Match analysis as probative of the connection between area code and states of residence.  The analysis cross-checked states of residency against all the Address Data Sets and only counted as matches those calling records in which the state and area code matched in every Valid Addresses that appeared in all Address Data Sets.  The cross-checking meant that the information in the various Address Data States corroborated each other.  The corroboration confirmed that the match of state of residency and area code was more likely than not accurate.  The All States Match analysis supports Dr. Yoeli's opinion that Call Sets and All Plaintiff States, the percentage of calls to addresses in the Plaintiff State was at least 82%.

The conclusion is further supported by Dr. Yoeli's observation that almost all of the consumers who had the telephone numbers in the Call Sets simply did not change states of residence.  Only 13 percent of them changed states of residence.  Dr. Yoeli's observation is further supported by U.S. Census data that 5.6 percent of the American population moved to a different state during the five-year

period from 2005 to 2010, an average of 1.1 percent per year.  PX 2093, U.S. Census, Geographic Mobility: 2005 to 2010, at 2 (December 2012). The vast majority of consumers did not port their telephone numbers across state lines because they did not move out of state.  This fact further supports the inference that area codes agreed with a call recipient's state of residence at least 82 percent of the time.

Dish presented the expert opinions of Rebecca Kirk Fair.  Kirk Fair holds an MBA in finance and applied economics.  She is an expert with more than 20 years of experience in analyzing large data sets.  She opined that Dr. Yoeli should have considered the purpose for which the address data was collected and maintained in each of the 11 Address Data Sets, the purpose of the dates in the Address Data Sets, and the purpose of the calls made to numbers in the various Call Record Sets.  She opined that Dr. Yoeli's analysis was unreasonable and unreliable because of these failings.  See T 711: 456-65, 494-97 (Kirk Fair); DTX 1096, Revised Responsive Expert Report of Rebecca Kirk Fair (Kirk Fair Report), at 5-6, 44-45. Kirk Fair did not quantify her opinion of the extent to which Dr.

Yoeli's errors affected the validity of his opinions.  See T 711: 511, 528 (Kirk Fair).

Much of Kirk Fair's opinions are speculative and not based on her expertise in analyzing large data sets.  She based much of her opinions on the relative reliability of the address information in the 11 Address Data Sets.  Kirk Fair opined on the reliability of each Address Data Set based on the descriptions in the June 22, 2016 Email.  See Kirk Fair Report, at 9-13.  Kirk Fair is not an expert in the relative reliability of customer account records, billing data, marketing data from marketing companies such as Speedeon, or any of the other types of information in the Address Data Sets.  See T 711: 530, 519-20, 527, 533-35 (Kirk Fair) (no knowledge of the purpose of the various Address Data Sets, and no knowledge of whether information in various Address Data Sets was maintained or kept current).  Her speculation of the relative reliability of these different sets of data is not an expert opinion and has no probative value.

Kirk Fair also criticized Dr. Yoeli's use of dates in the Address Data Sets to decide when the address information in a particular call record was valid.  Her criticisms have some validity.  In

particular, Kirk Fair is correct to question Dr. Yoeli's assumption that addresses are valid indefinitely if the Address Data set has no end date of any kind. <u>See</u> <u>T 711: 484-85 (Kirk Fair)</u>; <u>Kirk Fair Report</u>, at 8-14. The Court, however, finds that the All State Match accommodates for this weakness in Dr. Yoeli's analysis by requiring that the area code and state of residency must match in all Address Data Sets in which it appears at the time of the call.

Kirk Fair also criticized Dr. Yoeli for failing to consider the types of calls and their relationships to data sets. <u>See</u> <u>T 711:465 (Kirk Fair)</u>. Kirk Fair relied on Dish witness Joey Montano's trial testimony regarding the types of calling campaigns, including the purposes of the campaigns and the intended call recipients. Kirk Fair opined that "the purpose and date of the call can be used together to assess the relevance and reliability of the addresses" found in particular data sets. For example, she opined that the addresses in current account Address Data Sets 1A should be more relevant and reliable for calls the Dish intended to direct to current customers. <u>Kirk Fair Report</u>, at 17-19; T 711:465 (Kirk Fair). Kirk Fair's observation makes some sense, but depends on her underlying assumption about the relative reliability of the address

information in the Address Data Sets. If the Address Data Sets were equally reliable, then the relationship between the type of call and the type of Address Data Set would not matter significantly. Kirk Fair is not qualified to opine on the relative reliability of the Address Data Sets.

Kirk Fair offered her own alternative analysis of the data. She used a method she called "triangulation." Kirk Fair "triangulated" or looked for logical consistencies and inconsistencies between the data in light of her opinions of the purpose and reliability of the data collection and the purpose of the calling campaigns. For example, if a call to a prospective customer in the Inquiry Call Record was followed shortly by the placement of the call recipient in the active accounts (Address Data Set 1A), Kirk Fair inferred that the call recipient decided to purchase Dish Network programming. If the addresses in the Lead Tracking System Address Data Sets 2 and 3 and the active account Address Data Set 1A agreed, then Kirk Fair opined that such a match was a good indication that the address was the call recipient's address at the time of the call. Kirk Fair opined that such consistencies between the purpose of the calls and the relevant types of data sets corroborated the address

information in the Address Data Sets.  See  T 711: 490-96 (Kirk Fair).

Kirk Fair prepared an alternative analysis of the address data and call records using her triangulation method.  Kirk Fair Report, 24-32 and Exhibit 11.  Kirk Fair divided the calls into ten categories with differing degrees of reliability based on her triangulation method.  She also broke the call record data into the seven different Call Records that Dr. Yoeli used in his analysis.  Kirk Fair's triangulation method, like her other opinions, is dependent on her assumptions about the reliability of the Address Data Sets.  That opinion has no probative value, so the triangulation analysis is not helpful.  Kirk Fair also did not offer any quantitative analysis or any conclusions on the question at issue, whether it is more likely than not that an area code indicates that state of residency of the telephone subscriber with that number.

One aspect of Kirk Fair's triangulation analysis, however, was helpful to the Court as the finder of fact.  Kirk Fair's triangulation analysis showed only one state of residence associated with a telephone anywhere from 69 to 99 percent of the time, depending on the Call Record.  See T 712: 638-52 (Kirk Fair); Kirk Fair Report,

<u>Revised Exhibit Table 11</u>.[59]  This analysis did not consider the call records for which the only address data were from TransUnion and Speedeon.  <u>Kirk Fair Report</u>, 31-32, <u>Revised Table 11 Group I</u>.

Kirk Fair agreed that when a person initially received a residential telephone number, the NANPA geographic assignment of the area code in the number would agree with the subscriber's residency.  <u>T 712: 712 (Kirk Fair)</u>.  Her triangulation analysis showed that the owners of the telephone numbers in the Address Data Sets rarely changed the state of residency.  All the addresses were in one state 69 to 99 percent of the time.  This finding is consistent with Dr. Yoeli's finding that only 13 percent of the telephone numbers in the Call Records had more than one state of residency.  These two findings are also consistent with the U.S. Census data that showed that people changed states of residency at a low rate of 1.1 percent per year.  Together, this evidence proves that it is more likely than not that an area code of residential telephone subscribers indicates state of residency of the intended

---

[59] In these instances, Kirk Fair stated that one or more of her Groups of Dish internal Address Data Sets in her triangulation method showed an address associated with the phone number "with no contradictory state information in other sources." <u>Kirk Fair Report</u>, <u>Revised Exhibit Table</u> 11, n. 4-7.  Kirk Fair testified that her Groups A, B, and C in her triangulation method had only one state of residence associated with the phone number.  <u>T 712: 638-41 (Kirk Fair)</u>.

recipients of telemarketing calls by Dish and the Telemarketing
Vendors.

The preponderance of the evidence also proves that area codes
indicate the states of residency of the residential telephone
subscribers to whom Order Entry Retailers Star Satellite and JSR
initiated illegal calls at issue in this case. Dish's expert Taylor
agreed that prior to November 2008 area codes accurately indicated
the states of residency 97 percent of the time. Star Satellite and
JSR made all of their illegal calls before 2008. Star Satellite made
its calls in 2005, and JSR made its calls in 2006 and 2007. Star
Satellite and JSR also did not call wireless numbers; rather, both of
these telemarketers called residential numbers in published white
pages directories. Published telephone directories contain highly
accurate address information about the numbers included in the
directories. See T 616: 20-21 (Stauffer). The preponderance of the
evidence shows that area codes establish the state of residence of
JSR and Star Satellite's intended call recipients.

The Plaintiff States also argue area codes show the residency
of the intended recipients of Satellite Systems telemarketing calls at
issue in this case. The Plaintiff States rely on Taylor's spreadsheet

of the 381,811 illegal Registry Calls initiated by Order Entry Retailer Satellite Systems.  DTX 906, Taylor Satellite Systems Spreadsheet.  The Taylor Satellite Systems Spreadsheet contained addresses including state of residency and area code data in 214,376 of the 381,811 call records.  Of the 214,376 call records:

- 24,243 call records had California area codes;

- 10,145 had Illinois area codes;

- 7,414 had North Carolina area codes; and

- 12,900 had Ohio area codes.

Almost all of these records had corresponding addresses in the respective Plaintiff States addresses:

- 24,100 of the 24,243 call records with California area codes also had California addresses, or 99.4%;

- 10,048 of the 10,145 call records with Illinois area codes had Illinois addresses, or 99%;

- 7,290 of the 7,414 call records with North Carolina area codes had North Carolina addresses, or 98.3%; and

- 12,803 of the 12,900 call records with Ohio area codes had Ohio addresses, or 99.2%.

The Court finds that the Plaintiff States have failed to show that this calculation can be applied to remaining calls in the 381,811 call records. The Plaintiff States presented no evidence that the 214,376 call records that had addresses were either a random sample or otherwise representative sample of the 381,811 call records. The Plaintiff States needed expert testimony or some other competent evidence to show that the information about the 214,376 call records could be applied generally to all of the 381,811 call records.

The address information in the Taylor Satellite Systems Spreadsheet is sufficient to establish by a preponderance of the evidence the states of residency for holders of the telephone numbers with specific records that included addresses. The Plaintiffs have failed to present necessary to show that anything more can be drawn from this information.

VII.    Taylor Analyses Related to Civil Penalties

Dish presented testimony by Taylor regarding the 1,707,713 Dish telemarketing calls from 2007-2010 on which the Court granted partial summary judgment. Dish presented this testimony for the limited purpose of addressing the appropriate amount of

civil penalties. Dish's culpability is a relevant factor in awarding civil penalties under at least the TSR. <u>See</u> FTC Act § 5(m) (1)(C), 15 U.S.C. § 45(m)(1)(C).[60] The Court makes the following findings regarding Taylor's trial testimony for the limited purpose of addressing the appropriate amount of monetary remedies. The Court also makes additional findings regarding Taylor October 14, 2013 Report because the Report contains significant additional information relevant to Dish's culpability. The Court addresses the October 14, 2013 Report first because the findings about this Report provides useful background for the findings related to Taylor's testimony.

A. <u>Taylor October 14, 2013 Report</u>

Taylor prepared the October 14, 2013 Report in response to Dr. Yoeli's December 14, 2012 Revised Report. <u>PX 16, (Taylor October 2013 Report)</u>. Taylor performed his own separate analysis of Dish's calling records and Telemarketing Vendor eCreek's calling records for the years 2007-2010. Dish provided Taylor with 371,161,704 Dish call records and 85,144,857 eCreek call records

---

[60] The Court addresses the applicability of equitable factors in assessing the appropriate amount of statutory damage under the TCPA and applicable state laws later in Conclusions of Law.

for the period from 2007 to 2010. Taylor removed duplicate records and records with invalid telephone numbers, which resulted in a net total of 406,831,605 call records. Taylor eliminated records associated with non-telemarketing calling campaigns. Taylor then compared the remaining calls against the Registry historic database. Taylor found 52,190,030 Registry Calls to numbers that were on the Registry for at least 31 days at the time of the calls. Taylor eliminated 1,317,872 Dish prerecorded telemarketing calls which were not answered by the call recipients. The result was 50,872,178 Registry Calls. Taylor October 2013 Report, at 6.

Taylor then eliminated calls that were made within 558 days of the latter of the last payment date or the activation date. A total of 18,643,695 Registry calls remained. Taylor found that with respect to these calls: (1) Dish had no record of any payments or activations associated with the intended recipients of these calls; or (2) Dish's records showed that the last payments (or activations if Dish had no subsequent payment records) were more than 558 days before the dates of these calls. Taylor October 2013 Report, at 6.

Taylor then eliminated 943,240 calls that were on Lead Tracking System calling campaigns. Taylor again relied on

representations from Dish personnel that the Lead Tracking System calling campaigns were calls to inquiry leads made within a day or two of the inquiry.  See T 633: 3258 (Taylor).  The remaining Registry calls totaled 17,700,455.  Taylor October 2013 Report, at 6-7.

Taylor then eliminated 532,261 calls because the disposition codes indicated that the telephones of the intended recipients did not ring.  The remaining Registry calls totaled 17,168,194.  Taylor October 2013 Report, at 7.

Taylor then eliminated 41,417 calls because the disposition codes indicated that the calls were calls to businesses or were non-telemarketing calls, such as related to payment reminders.  The remaining Registry Calls totaled 17,126,777.  Taylor October 2013 Report, at 7.

Taylor then eliminated 76,740 calls because the disposition codes stated wrong number or no English.  The remaining Registry Calls totaled 17,050,037.  Taylor October 2013 Report, at 7.

Taylor then eliminated 13,792,511 calls because the campaigns "were only dialed to current customers or former customers within 558 days after their last transaction with DISH."

Taylor did not rely on records of transactions to make this statement in the October 2013 Report. He had already eliminated calls based on transaction data to reduce the number of possible violations from 50,872,178 Registry Calls to 18,643,695 Registry Calls. Taylor relied on a spreadsheet containing a list of calling campaigns to identify by campaign name or code the campaigns that Dish intended to direct to current and former customers with disconnect dates within 18 months of the date of the calls. Taylor October 14, 2013 Report, at 7; see T 633: 3298-99 (Taylor). After eliminating 13,792,511 calls on this basis, the remaining Registry Calls totaled 3,257,526.

Taylor then eliminated 2,755,876 calls because "Quality Assurance testing" found that the calls were part of non-telemarketing campaigns. The resulting Registry calls totaled 501,650. Taylor opined that he had no basis that these 501,650 Registry Calls were permitted under the Do-Not-Call Laws. The Court granted partial summary judgment on the 501,650 Registry Calls from Taylor's analysis in this October 2013 Report. Opinion 445, at 158-67, 231-32.

A number of Taylor's opinions for excluding calls from the set of calls that violated the Do-Not-Call Laws are legally incorrect or are not supported by any evidence in the record. Taylor excluded 532,261 calls which did not ring the intended recipients' phones, and 76,740 calls that were wrong numbers or to individuals who did not speak English. The Court rejected similar opinions by Taylor at summary judgment. See Opinion 445, at 167-168. The TSR and FCC Rule prohibit initiating Registry Calls regardless of whether the calls go through. TSR 16 C.F.R. § 310.4(b)(1)(iii); 47 C.F.R. § 64.1200(c)(2). The 532,261 calls and the 76,740 calls were initiated as telemarketing calls, Taylors' opinions regarding these calls have no probative value.

Taylor excluded 943,240 calls on Lead Tracking System calling campaigns. This opinion is premised on Dish's representations to Taylor that Lead Tracking System calling campaigns are calls to inquiry leads within a day or two of the inquiry. See T 633: 3258 (Taylor). As the Court discussed above, Dish has failed to present competent evidence regarding the make-up of the Lead Tracking System. Dish, therefore, failed to show that the Lead Tracking System in fact consisted of contact information of individuals who

inquired about Dish Network programming. Taylor's opinion regarding the Lead Tracking System calls is not supported by competent evidence. The opinion has no probative value.

Taylor excluded 13,792,511calls because those calls were part of Dish calling campaigns with codes that indicated that the campaigns directed toward current customers or customers who made a payment within 18 months (558 days) of the dates of the calls. As the Court has already explained, calling campaign codes and names are not a reliable method of determining whether Dish had a Transaction-based Established Business Relationship with a customer. Taylor's October 2013 Report demonstrates the lack of reliability of calling campaign names. Taylor identified 18,643,695 telemarketing calls directed to individuals for whom Dish had either: (1) no records of activations or payments, or (2) Dish's records showed that the last payments or activations associated with those records were more than 558 days (or 18 months) before the dates of the calls. Taylor October 2013 Report, at 6. The 13,792,511 calls were a subset of those 18,643,695 calls. Thus, Dish had no record that any of the intended recipients of the 13,792,511 calls either activated Dish Network programming or

paid for Dish Network programming for at least 18 months before the date of the calls. Taylor's opinion that Dish had Transaction-based Established Business Relationships with the intended calls recipients based on calling campaign names has no probative value.

After eliminating Taylor's opinions that have no probative value, Taylor's October 2013 Report supports the finding that from 2007 to 2010, Dish made at least 15,846,402 Registry Calls to individuals with whom Dish had not shown that the calls were made either within three months of inquiries about Dish Network programming, or within 18 months of the intended recipients' last transactions with Dish.[61] Dish, therefore, did not show that it had an Established Business Relationship with the intended recipients of an additional 15,846,402 Registry Calls from 2007-2010. The Court notes that this conclusion has some similarity to Dr. Yoeli's finding in his December 14, 2012 Report that 2007-2010 Calling

---

[61] The Court does not address the 1,317,872 prerecorded calls that were not answered or the 2,755,876 calls that were excluded by an undefined "Quality Assurance" process. The 1,317,872 calls were still initiated to numbers on the Registry even if they were not answered by a person. The answering requirement only relates to call abandonment. The Court does not include them because Taylor eliminated them before he analyzed whether call recipients paid Dish for programming and services within 18 months of the call. These calls, therefore, might be subject to an Established Business Relationship exception. The Court did not include the 2,755,876 calls because the parties presented no evidence on the Quality Assurance process cited by Taylor, and the purpose of these findings is limited to weighing the factors related to the appropriate amount of monetary relief, rather than the number of calls for which Dish should be held liable.

Records contained 18,039,631 Registry Calls.[62]  The Court will not impose liability for these calls because the Plaintiffs do not seek liability for these calls.  The Court will only consider this finding with respect to factors used to determine appropriate monetary relief.

B. Taylor Trial Testimony

1. Taylor's Revised Opinions

At trial, Taylor revised his opinions from the September 20, 2012 Report (PX 26).  The Plaintiffs submitted Taylor's opinions to the Court at summary judgment, and the Court relied on those opinions when it entered partial summary judgment against Dish on 1,707,713 calls in the records of Dish's telemarketing calls in the years 2007- 2010.  See Opinion 445, at 167, 75 F.Supp.3d at 1010.

Taylor opined in the September 20, 2012 Report that certain of the 3,342,415 calls that Dr. Yoeli found to illegal Registry Calls were not violations for various reasons.  When Taylor opined that a portion of the 3,342,415 calls were not illegal Registry Calls for a particular reason, he removed or "eliminated" them from the total.

---

[62] Taylor's calculations would actually exceed Dr. Yoeli's findings if the Court included the 1,317,872 prerecorded calls that were not answered or the 2,755,876 calls that were excluded by an undefined "Quality Assurance" process.

Taylor testified that he used a "waterfall" analysis in his assessment. Taylor testified that the waterfall method meant that when he eliminated a set of calls for one reason, he subtracted those calls from the total calls before he considered other reasons for eliminating calls. In this case, Taylor eliminated 309,931 calls because the phones of the intended recipients of the calls did not ring. He subtracted the 309,931 calls from the 3,342,415 calls in the Yoeli July 2012 Call Set to produce a remainder of 3,032,484 calls. He followed this method with each reason on which he opined that calls should be excluded. He subtracted from the 3,032,484 calls the 12,552 calls that were to wrong numbers or because the call recipient did not speak English. This left a remainder of 3,019,932 calls. He continued this waterfall method of subtraction and evaluation of the remainder of calls until he found 765,531 calls for which he could not find a basis to say that the calls did not violate the TSR or the TCPA. T 633: 3253-59 (Taylor); see PX 26, September 20, 2012 Report, at 3-8.

Taylor did not consider whether a call could be eliminated for more than one reason. The Court rejected Taylor's opinions that telemarketing calls were not illegal Registry Calls if the intended

recipients' telephones did not ring, if the recipient of the call did not speak English, if the call was intrastate, or if call was part of a Lead Tracking System campaign (collectively Rejected Reasons). See Opinion 445, at 167-68, 75 F.Supp.3d at 1010. Taylor testified at trial that some calls that were eliminated in early parts of the waterfall analysis for these Rejected Reasons should have been eliminated at later points in the analysis for other valid reasons. See T 633: 3255, 3266-67 (Taylor).

Taylor testified that if he had considered multiple reasons for excluding calls, many more calls would have been eliminated. Taylor opined at trial that the following numbers of calls that he eliminated for Rejected Reasons would also have been eliminated for alternative reasons:

- 65,451 calls were Lead Tracking System calls;

- 26,077 calls were directed to individuals who opted to receive information about home services on a website called EP Homes (Dish witness Montano testified Dish received lead from the EP Homes website. T 629: 3120-21 (Montano));

- 16,107 calls were non-telemarketing work orders based on the calling campaign codes (These campaign codes were codes that Montano initially identified as telemarketing campaigns, but later changed his opinion.);

- 4,280 calls that were non-telemarketing calls based on the calling campaign code (These campaign codes were codes that Montano initially identified as telemarketing campaigns, but later changed his opinion.);

- 106,781 calls were calls to current customers based on calling campaign codes;

- 3,559 were calls to current customers to convince them not to terminate service, based again on campaign codes; and

- 78,947 calls were calls to former customers within 18 months of disconnection based on campaign codes.

T 633: 3269-73 (Taylor).

Taylor's opinions regarding the 16,107 calls for work orders and the 4,280 calls for other non-telemarketing reasons may have some merit. Montano's trial testimony that he changed his mind

may provide some basis to consider a lesser degree of culpability by Dish for these calls. Dish did not present Montano's revision of his opinions regarding calling codes at summary judgment, however, so any argument to avoid liability based on Montano's trial testimony is waived.

Taylor's other revised opinions have no probative value. Dish failed to present competent evidence regarding the formation and scrubbing of the Lead Tracking System calling lists. Dish, therefore, failed to present any evidence to show an Inquiry-based Established Business Relationship with any of the recipients of these calls.

The evidence regarding 26,077 calls to leads Dish received from the EP Homes website does not establish the dates that consumers made any inquiries or opt-ins on the EP Homes website. The evidence, therefore, does not show that the telemarketing calls were within three months of the inquiries.

Taylor opined that the recipients of the remaining sets of 106,708 calls, 3,559 calls, and 78,947 calls all had Transaction-based Established Business Relationships with Dish because the calls were part of certain calling campaigns. As discussed above,

Dish calling campaign names were not a reliable indicator a Transaction-based Established Business Relationship. Taylor's October 2013 Report showed that Dish made at least 13,792,511 calls to people who had not purchased Dish Network programming for at least 18 months, but who were erroneously included in calling campaigns with names that indicated that Dish had Transaction-based Established Business Relationships with them.[63] Taylor's opinions of Dish's Established Business Relationships with intended call recipients of these calls have no probative value.

Taylor also again offered at trial his opinion that 873,551 of the calls from the 2007-2010 calls for which Dish was liable at summary judgment were not illegal because the calls were made as part of Lead Tracking System calling campaigns. T 633: 3268-69 (Taylor). Dish presented no competent evidence of the makeup of the Lead Tracking System or the process to scrub calling lists derived from that system. Dish, therefore, presented no competent evidence that it had Inquiry-based Established Business Relationships with the intended recipients of these calls. Taylor's

---

[63] The 13,792,511 figure does not include the 1,317,872 prerecorded calls that were not answered or the 2,755,876 calls that were excluded by an undefined "Quality Assurance" process.

opinions regarding these calls still lack a factual basis and still have
no probative value.

Taylor's opinions about the effect of his waterfall analysis
technique and his use of Rejected Reasons, at best, show that the
1,707,713 Registry calls for which Dish was found liable may have
included 16,107 work order calls and 4,280 non-telemarketing
calls. Taylor's waterfall analysis did not affect the accuracy of his
conclusions with respect to the remaining 1,687,326 calls. The
Court will only consider this analysis for purposes of determining
the appropriate amount of monetary relief.

2. <u>Taylor's Additional Opinions that Relate to Culpability</u>

Taylor also testified about a detailed analysis of the 501,650
illegal Registry Calls found at summary judgment based on his
October 2013 Report. Dish provided Taylor with the calls records of
all the campaigns in which the 501,650 calls were made. Taylor
broke down the 501,650 illegal Registry Calls into the number made
in each specific campaign. Taylor calculated the percentage of the
calls in each campaign that were found to be part of the 501,650
illegal calls. <u>T 633: 3262-66 (Taylor)</u>; <u>DTX 626A, 626B, 626C, and</u>

626D, Summary of Campaigns with Violations (Taylor's Tables).

Taylor testified that this analysis showed:

- 334,836 of the 501,650 calls were Registry Calls to persons who had not done business with Dish for at least 18 months before the dates of the calls;

- 125,838 of the 501,650 calls were made in cold calling campaigns and comprised less than 5% of all calls made in those campaigns; and

- 14,579 of the 501,650 calls were made in other campaigns and comprised less than 5% of all calls made in those campaigns.

T 633: 3276-78 (Taylor).[64]  Taylor opined that if the percentage of violations from a particular calling campaign list was less than 5%, then that list was scrubbed to remove numbers on the Registry.

T 633:3277 (Taylor).

Taylor's Tables have no probative value.  Taylor's Tables only considered the 501,650 calls from his October 2013 Report found to be violations at summary judgment.  Taylor did not include in his

---

[64] Taylor offered no opinions regarding 57,707 of the illegal Registry Calls found at summary judgment.

calculations the 15,846,402 Registry Calls in his October 2013 Report that he erroneously excluded. Taylor's Tables, therefore, are not probative of the percentage of Registry Calls in any particular campaign.

VIII.    Dish Financial Evidence

Dish's financial condition is relevant to the determination of appropriate monetary relief. The Court must consider Dish's ability to pay and its ability to continue operating when determining an appropriate civil penalty under § 5 of the FTC Act in Counts I-IV. 15 U.S.C. § 45(m)(1) (C). The Court must further consider whether an award would be excessive in violation of due process. See St. Louis I.M. & S. Ry. Co. v. Williams, 251 U.S. 63, 66-67 (1919).[65] The Court, therefore, finds the following facts about Dish's financial situation.[66]

Dish's Annual Report for the period ending December 31, 2016, shows that Dish's parent holding company, Dish Network

---

[65] The Court will address the specific applicability of Dish's financial information to each claim in the Conclusions of Law below.

[66] Counsel for the United States stated at one point in the trial, "I just want to point out that we don't agree that the ability to pay in the statute necessarily means current day ability to pay. And that the Court could actually look at different time periods ability to pay to calculate the civil penalties figure. But for the purposes of today I don't think that matters." T 621: 1458 (DeFranco) (Attorney Runkle speaking). The United States has not developed this argument or identified a different relevant period of time. The argument, therefore, is waived. The United States also relied on Dish's most recent public filing regarding its financial situation.

Corporation (Dish Corp.) had a net worth of approximately $28 billion ($28,091,847,000.00); and for 2016, Dish Corp. had total gross revenues of approximately $15 billion ($15,094,562,000.00) and net after-tax income of approximately $1.4 billion ($1,449,853,000.00), or $3.12 per share.  DTX 1109, Form 10-K Annual Report Filed February 22, 2017 for the Period Ending December 31, 2016 (2016 10K), at F-3, F-4.

Dish Corp. also had cash and cash equivalents (cash) of approximately $5.3 billion ($5,323,7255,000.00) as of December 31, 2016.  2016 10K, at F-3.  On June 13, 2016, Dish Corp. secured $2 billion ($2,000,000,000.00) from a bond issue made by a wholly owned subsidiary of Dish Corp. called Dish DBS Corp. The bonds are unsecured, are due in June 2026, and carry an interest rate of 7.75 %.  Id. at F-36, 38, Note 9, Long Term Debt.

On August 8, 2016, Dish Corp. completed a private unregistered offering of $3 billion ($3,000,000,000.00) of convertible notes due in 2026.  The notes carry an interest rate of 3.375%. DTX 1085, Form 8-K dated August 8, 2016.  Dish Corp. received net proceeds of approximately $2.7 billion ($2,723,000,000.00) from this transaction.  Dish Corp. stated in the notice of this private

offering that the proceeds would be used for "strategic transactions, which may include wireless and spectrum-related strategic transactions, and for other general corporate purposes." Id.

As of December 31, 2015, Dish Corp. had a net worth of approximately $22.9 billion ($22,886,710,000.00), and had total revenues for 2015 of approximately $15 billion ($15,068,901,000.00) and net after-tax income of approximately $747 million ($747,092,000.00). PX 1440, Dish Corp. Annual Report Form 10K filed February 18, 2016 for the Period ending December 31, 2015 (2015 10K), at F-3, F-4. Dish Corp. had approximately $1 billion ($1,053,158,000.00) in cash as of the end of 2015. 2015 10K, at F-3.

The 2015 annual income reflected a payment of a penalty of approximately $516 million ($515,555,000.00) to the FCC because two affiliates of Dish Corp., Northstar Wireless and SNR Wireless, failed to complete the purchase of a portion of wireless spectrum for which the two affiliates were the successful bidders at an FCC auction. Dish Corp. owned an 85% interest in Northstar Wireless and SNR Wireless. 2015 10K, at F-4 ("FCC auction expense"), and at F-50 through F-53 (Note 15, Commitments and Contingencies);

see T 621: 1462-64 (DeFranco).  Dish's annual after-tax income would have been approximately $1.2 billion ($1,262,647,000.00), but for this one-time payment for the affiliates' failure to perform on their bids with the FCC.

Dish had net after-tax income of approximately $1.5 billion ($1,515,907,000.00) in 2011; $945 million ($944,693,000.00) in 2013; and $807 million ($807,492,000.00) in 2014.  PX 1092, Dish Corp. Annual Report Form 10K filed February 23, 2012 for the Period ending December 31, 2011 (2011 10K), at F-5; 2015 10K, at F-4.  For the first six months of 2012, Dish had net after-tax income of approximately $586 million ($586,042,000.00).  PX 1088, Dish Corp. Form 10Q Quarterly Report, filed August 8, 2012, for the period ending June 30, 2012 (June 2012 10Q), at 2.  The evidence does not show Dish Corp.'s annual net after-tax income for 2012.

As of the time of trial, Dish had approximately $1 billion ($1,000,000,000.00) per month in operating expenses.  T 621: 1539-40 (DeFranco); see 2016 10K, at F-4 (total costs and expenses for 2016 were approximately $12.9 billion ($12,883,453,000.00),

including approximately $950 million ($953,146,000.00) in depreciation and amortization.).

Dish made several large one-time payments in the last five years. In 2015, Dish paid $515,555,000.00 to the FCC discussed above. In 2012, Dish paid $700 million ($700,000,000.00) to a company called Voom HD Holding, LLC (Voom), to settle a contract dispute. PX 1440, 2015 10K, at 93 ¶10.47 (referencing Confidential Settlement Agreement and release dated October 21, 2012); T 621: 1455 (DeFranco). In 2011, Dish agreed to pay TiVo, Inc., a total of $500 million ($500,000,000.00), to settle a patent dispute. Dish agreed to make an initial payment of $300 million ($300,000,000.00) in 2011 and to pay the remaining $200 million ($200,000,000.00) in six equal annual installments in 2012 through 2017. PX 1440, 2015 10K, at F-78.

IX.    Injunctive Relief

The Court bifurcated the trial in this proceeding. The Court continued the trial on issues regarding injunctive relief to the October and November 2016 trial dates. Both parties attempted to present evidence regarding Dish's current operations. Dish attempted to submit evidence of its current practices to show that it

is complying with the Do-Not-Call Laws.  The Court excluded this evidence because Dish did not properly disclose the evidence in discovery.  The Court gave Dish the option of using the new evidence at trial if it agreed to reopen discovery at its expense.  See Opinion entered January 4, 2006 (d/e 575).  Dish decided not to reopen discovery.  Notice of Defendant Dish Network L.L.C. Declining Additional Discovery (d/e 650).  The Court prohibited all parties from submitting new evidence not produced in discovery without leave of court.  See Opinion entered October 12, 2016, (d/e 697), at 7-9.

The Plaintiffs sought to produce evidence of new consumer complaints.  The Court barred this evidence because the Plaintiffs did not seek leave of Court and the prejudice to Dish from the late disclosure.

The Plaintiffs presented the testimony of David Torok.  At the time of trial, Torok had recently retired from the FTC.  Before his retirement, Torok was an Associate Director of the FTC's Bureau of Consumer Protection.  Torok participated in the launch of the Registry and in the original TSR rulemaking proceeding.  Torok

later managed the division that ran the Registry and the Consumer Sentinel database of consumer complaints. <u>T 710: 21-23 (Torok)</u>.

Torok testified that prior to the launch of the Registry, consumers were clamoring for help because of unwanted telemarketing calls. Internal Do-Not-Call Lists did not work because even if consumers told one telemarketer not to call, another would. State registries were uneven in their effectiveness. <u>T 710: 35 (Torok)</u>.

The FTC staff was surprised by consumer response to the launch of the Registry in 2003. Fifteen million consumers registered telephone numbers in the first five days. Within two months of the launch, 40 million consumers had registered their telephone numbers. Currently, 226 million numbers are registered on the Registry. The number of registered telephone numbers has grown every month. About 100 consumers per month remove their telephone numbers from the Registry. <u>T 710: 35-37 (Torok)</u>.

The FTC continues to receive complaints about illegal telemarketing calls. The FTC receives 200,000 to 300,000 complaints on the Registry complaint system every month. Torok opined that these complaints are the just tip of the iceberg, that the

total violations are much higher. Torok testified that consumers are particularly upset about the proliferation of Prerecorded Calls, which he called robocalls. T 710: 38-42 (Torok).

Torok opined that Registry enforcement, including injunctive relief, was critical. Torok opined that enforcement actions stopped the violator, sent a message to other violators to deter similar practices, and sent a message to consumers that the government was responsive to their complaints and problems. Torok opined that failure to grant injunctive relief would defeat these law enforcement goals and send a bad message to consumers. T 701: 44-47 (Torok).

Dish witnesses opined on the likely impact of the Plaintiffs' proposed injunction on Dish and its Retailers. The Plaintiff United States submitted a proposed injunction in its pretrial submissions. DTX 1097, [Proposed] Judgment and Order for Permanent Injunction filed October 3, 2016 (Proposed Injunction). The Dish witnesses gave lay opinions on the effect of five provisions of the Proposed Injunction: (1) a five-year ban on outbound telemarketing by Dish or any Retailer (Proposed Injunction, § I); (2) a ban on taking orders from any Retailer that was authorized to place order

on the Order Entry Tool or a successor system at any time from 2003 to the present (Proposed Injunction § II); (3) a requirement that Dish must terminate any Retailer who violated the Do-Not-Call Laws (Proposed Injunction § V); (4) a requirement that Plaintiffs could perform unannounced inspections of Dish and its Retailers at any time without prior notice (Proposed Injunction § III); and (5) an order directing Dish to hire a telemarketing a compliance expert that had no prior role with Dish or involvement in this case to perform the following tasks: (a) prepare a compliance plan to be implemented once the 5-year ban was over, (b) monitor compliance, and (c) provide regular status reports on compliance (Proposed Injunction, § II A. and B). The last provision would mean that PossibleNOW could not be the compliance expert because of its prior role with Dish and its involvement in this case.

The Dish employees opined that these proposed injunctive provisions would cause Dish to lose all of its Retailers and many customers and would impair Dish's ability to get new customers. Under Proposed Injunction § II, Dish could not take any orders from any Retailer because all TVRO and Order Entry Retailers have for several years used the same computer system called Axiom to place

orders.  E.g., T 710: 195 (DeFranco); T 711: 353 (Mills); see Opinion 445, at 59 ("All retailers now use the Axiom system as the order entry tool.").

Also, several Dish witnesses testified the ban on telemarketing in Proposed Injunction § I would harm all Retailers, not just Order Entry Retailers.  These witnesses testified that TVRO Retailers commonly call customers on the phone.  TVRO Retailers return messages from existing and prospective customers inquiring about Dish Network programming.  Existing customers contact TVRO Retailers about upgrades or changes in service.  Prospective customers leave messages about purchasing Dish Network programming.  The ban on all telemarketing would prohibit TVRO Retailers from calling these people back.  The Dish witnesses testified that the ban on telemarketing would harm these TVRO Retailers' ability to maintain and develop customers.  Several Dish employees opined that the TVRO Retailers would stop selling Dish Network programming and might go out of business, depending on whether the companies could stay in business marketing other products and services.  See e.g., T 710: 203-04 (DeFranco); T 711: 289-93 (Van Emst).

Dish employees testified that the Order Entry Retailers would stop selling Dish Network programming if the telemarketing ban went into effect. Dish employees opined that many of those Order Entry Retailers would go out of business. <u>E.g.</u>, <u>T 711: 329-30, 334-35 (Mills)</u>.

Joshua Slater, a senior vice president of an Order Entry Retailer, Infinity Sales Group, testified that the proposed injunction would put Infinity Sales Group out of business. He testified that Dish sales were 85 percent of Infinity Sales Group's business. He testified that 400 people at Infinity Sales Group would lose their jobs. <u>T 712: 567 (Slater)</u>.

Slater said that Infinity Sales Group would be affected by a ban on telemarketing even though Infinity Sales Group engaged inbound telemarketing. Customers may call to inquire about Dish Network, but want to think about the available programming before making a decision. Customers may also call and leave a message requesting a callback. Slater testified that inbound telemarketers, such as Infinity Sales Group, need to be able to call the prospective customer back. Such calls would be telemarketing calls. <u>T 712: 570-71 (Slater)</u>.

Dish employees also opined that Proposed Injunction § V would unfairly force Dish to fire a Retailer if it made one mistake that violated a Do-Not-Call Law. Dish employees opined that Retailers would again not work with Dish under those conditions. E.g., T 711: 302-03 (Van Emst); T 711: 344 (Mills).

Dish employees further opined that Retailers would not work with Dish if they were subject to unannounced inspections by federal government officials pursuant to Proposed Injunction § III. Dish employees opined that such inspections would be intimidating and would hurt the reputation of the business under inspection. E.g., T 711: 302 (Van Emst); T 711: 343 (Mills);

Dish employees opined that large numbers of people would lose their jobs if these provisions of the Proposed Injunction were put in effect. Dish employees estimated that TVRO Retailers accounted for 20 percent of Dish's business, and Order Entry Retailers accounted for 25 percent of Dish's activations. T 710: 197-200 (DeFranco); T 711: 288 (Van Emst); T 711: 331 (Mills). Dish employees opined that many Retailer employees would lose their jobs. Dish employees opined that many Dish employees would also lose their jobs, including those directly involved in

telemarketing and those who would be terminated because Dish lost business generally.  See e.g., T 710: 188, 201 (DeFranco). Consumers would be injured because Dish could not offer the same level of services and products if it lost such a large percentage of its business and retail outlets.  T 710: 208-09 (DeFranco); T 711: 300 (Van Emst); T 711: 335-37 (Mills); T 711: 404-05 (Montano).

Finally, CompliancePoint Senior Vice President and General Manager Kenneth Sponsler testified that PossibleNOW and its wholly-owned subsidiary CompliancePoint could perform these telemarketing compliance expert services called for in Proposed Injunction § II A. and B.  Sponsler testified that he felt that provision sought to punish PossibleNOW for some reason.  He testified that another company would need to invest large amounts of time gaining the necessary expertise to perform the services called for in the Proposed Injunction.  See T 715: 77-84 (Sponsler). On questioning by the Plaintiff United States, Sponsler agreed that under the terms of the Proposed Injunction, PossibleNOW could perform the expert services as a subcontractor of some other provider that acted as the telemarketing compliance expert.  T 715; 803-04 (Sponsler).

The testimony from the Dish witnesses regarding the possible effects of the Proposed Injunction was speculative, and the witnesses had some bias.  Most of the witnesses are Dish employees involved in marketing or Outbound Operations.  Witness DeFranco is the co-founder and currently Director and Executive Vice President and, so, has a personal interest the protecting Dish from any restrictive injunction.

Still, some of the Dish witnesses' testimony has some merit.  A total telemarketing ban would prohibit anyone in Dish or a Retailer from returning phone calls about purchasing or upgrading Dish Network programming.  The ban on taking orders from any Retailer that used the Order Entry Tool's successor Axiom would effectively terminate all Dish Retailers.  The requirement to fire any Retailer that made on violation of any Do-Not-Call Laws could be harsh in some circumstances.

Dish witnesses DeFranco and Montano also testified about their attitudes toward illegal telemarketing and the effect on consumers.  DeFranco testified that Dish understood the importance of complying with the Do-Not-Call Laws:

Q. There's been a claim here, Mr. DeFranco, the Government's put in papers to the Court, stating that DISH doesn't get it, that DISH is indifferent to the telemarketing laws. Much of your life has been devoted to DISH. Can you address this for the Court, please?

A. DISH definitely gets it. This has been a very -- a very serious thing both to the senior management of DISH, and we've communicated that down through the ranks to anybody that has anything to do with telemarketing. We take it very seriously.  You know, many of these violations -- we have made mistakes. The retailers made mistakes. Many of these violations occurred ten years ago. They were hidden from us by certain retailers. When we discovered it, we terminated those retailers.  And the people at DISH, the men and women who work at DISH, are good people. We want to do the right thing. We're trying to continually improve, we have improved over the years, and we expect to improve on a going forward basis.

T 710: 226-27 (DeFranco).

Dish's Outbound Operations Manager Montano, however,

testified that illegal telemarketing calls in violation of the Do-Not-

Call Laws do not harm consumers:

Q. . . . . Now, you talked about how there – how consumers or customers get a benefit from receiving win-back and up-sales; correct?

A. Yes. There's a potential up side for the consumer.

Q. But there's also a group of people who are harmed by these calls. Namely, those consumers who don't want them and have asked the national government as well as DISH Network not to call?

A. I wouldn't say that they are harmed. Certainly, if any consumer, regardless of whether it's a current DISH customer or former DISH customer, communicates to DISH that they don't want to receive calls from our organization, we'll absolutely do everything in our power to abide by that.

Q. But DISH has, in fact, made millions of calls to these consumers, some who have repeatedly told DISH Network not to call them. You would say those consumers weren't harmed?

A. So we talked about that in great detail the last time I was here.

Q. I know we did. My question is are they not harmed?

. . . .

A. I don't know whether they were harmed or not. All I can say, once again, is I apologize for any inconvenience that may have been caused to the consumer. Certainly, it is not our intention to call any consumer that does not wish to receive a phone call from DISH Network.

T 712: 432-34 (Montano).  The Court finds that Dish management

in 2017 takes Do-Not-Call Law violations seriously as a result of the

multistate investigations leading to this action and the July 2009

Assurance of Voluntary Compliance with 46 states, as well as other

private lawsuits.  The Court also finds that at least some Dish

managers involved in telemarketing, such as Outbound Operations

Manager Montano, believe that millions and millions of illegal telephone calls may have caused some inconvenience, but no real harm to anyone.

X.      Additional Expert Testimony

The parties presented the testimony of three additional experts, Kenneth Sponsler, Debra Green, and Dr. Avery Abernethy, Ph.D.  The Court makes the following findings regarding these opinions.

A. Debra Green

Green opined that Dish's practices did not meet industry standards with respect to Dish's handling of consumer complaints about Order Entry Retailers.  T 625: 1978 (Green).  The Court finds that Green is qualified to render expert opinions on operating call centers.  T 625: 1940 (Green).  She is not an expert in compliance with Do-Not-Call Laws.  The Court finds that her opinions regarding Dish's handling of Order Entry Retailers represented her opinion based on her general experience.  See e.g., T 625: `980-88 (Green). Green did not rely on any empirical research or any recognized or published set of industry standards.  Green did not opine on whether Dish complied with the Do-Not-Call Laws, but only

whether Dish's practices complied with industry standards. Her opinions about whether Dish's practices meet industry standards have limited probative value. The issue is whether Dish violated the Do-Not-Call Laws.

B. <u>Kenneth Sponsler</u>

In addition to testifying as a fact witness in the injunctive phase of the trial, Kenneth Sponsler also testified as an expert witness. Sponsler is an expert on the telemarketing industry standards.[67] Sponsler opined that Dish acted reasonably in its handling of Order Entry Retailers. <u>T 633: 3400-06, 3419, 3223-25, 3429-32, 3452, 3481, 3502-04 (Sponsler)</u>. Like Green, Sponsler's opinions were based on his general experience and not on any empirical research or recognized or published industry standards. Like Green, Sponsler did not opine on whether Dish complied with the Do-Not-Call Laws, but only whether Dish acted reasonably. Like Green, his opinions about Dish's practices with respect to Order Entry Retailers have limited probative value. Again, the issue is not whether Dish complied with industry standards. The issue is whether Dish violated the law.

---

[67] Sponsler is an employee of CompliancePoint, a wholly owned subsidiary of PossibleNOW.

Sponsler also testified about an audit he conducted of Dish's direct marketing practices in May 2010. Dish did not disclose any expert opinions of Sponsler regarding this audit in discovery. The audit itself, however, was admitted into evidence at trial without objection. PX 33, Email from Sponsler to Dish Corporate Counsel Brett Kitei dated July 8, 2010, attached Compliance Certification Audit dated July 8, 2010 (2010 Audit). Sponsler visited Dish for two days on May 3-4, 2010 in order to prepare the audit. PX 33, 2010 Audit, at 1. Sponsler's findings in the audit were limited to Dish's practices at the time of the audit in May 2010. T 633: 3452 (Sponsler). The audit says nothing about Dish's practices before May 2010. Dish's telemarketing calls at issue were all made before March 12, 2010.

Sponsler's audit may say something about Dish's practices after May 2010. The audit, however, was superficial and was based in large part on hearsay interviews with Dish employees. T 633: 3371, 3379 (Sponsler). Sponsler did not review or audit any call records. As such, Sponsler's conclusions have very little factual support. His opinions in this audit have little probative value.

Sponsler also mentioned in his testimony that some sellers who currently engage telemarketing firms are limiting their monitoring or supervising of telemarketers to avoid findings that the telemarketers are the sellers' agents.  T 715:817 (Sponsler); see T 715: 815-20 (Sponsler).  This testimony is credible.  Sponsler is knowledgeable of developments in the telemarketing industry generally.

C. Dr. Avery Abernethy, Ph.D.

Dr. Abernethy is an economist who has studied the telemarketing industry and the impact of Do-Not-Call Laws on that industry.  Dr. Abernethy opined that the Registry is over-inclusive because the FTC Improvements Act of 2007 required the FTC to keep telephone numbers on the Registry until the numbers are both disconnected and reassigned.  T 628: 2844-48 (Abernethy).  Dr. Abernethy opined that this over-inclusiveness resulted in injury to consumers who would have benefited from receiving telemarketing calls, but who do not receive the calls.  Telemarketers did not call these consumers because these consumers' numbers were improperly required to remain on the Registry too long.  T 628: 2859-60 (Abernethy).

The Court finds that Dr. Abernethy's opinion is of little or no probative value. The portion of this case related to the Registry is concerns calls made to persons whose numbers were on the Registry. Dr. Abernethy did not offer any opinion at trial regarding telemarketing calls made to persons whose numbers are on the Registry; he only opined on the injury that may result from calls that were not made.[68]

## CONCLUSIONS OF LAW

The Plaintiffs allege twelve Counts against Dish. The Court first makes conclusions of law regarding liability for each Count. The Court then makes conclusions of law regarding Dish's liability for monetary relief. The Court finally makes conclusions of law regarding the Plaintiffs' requests for a permanent injunction.

---

[68] Dr. Abernethy's opinion is also purely qualitative. He did not opine on the magnitude of any injury to people who want to be called by telemarketers, but are not being called because of the statutory requirement to keep numbers on the Registry until the numbers are both disconnected and reconnected.

I. <u>Liability</u>

A. <u>Count I</u>

The Plaintiff United States alleges in Count I:

In numerous instances, in connection with
telemarketing, Defendant DISH Network engaged in or
caused a telemarketer to engage in initiating an
outbound telephone call to a person's telephone number
on the National Do Not Call Registry in violation of the
TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

<u>Third Amended Complaint</u>, ¶ 66.  Count I contains two parts: (1)

Dish initiated outbound telemarketing telephone calls to persons

whose numbers were on the Registry; and (2) Dish caused

telemarketers to initiate outbound telemarketing telephone calls to

persons whose telephone numbers were on the Registry.

1. <u>First Amendment Challenge</u>

Dish asserts that all claims based on the Registry are

unenforceable because "the Registry violates the First Amendment,

both facially, and as applied to Dish."  <u>Dish Network, L.L.C.'s</u>

<u>Proposed Post-Trial Conclusions of Law (d/e 666) (Dish Conclusions</u>

<u>of Law)</u>, at 44 ¶ 144.  Dish cannot make a facial challenge because

the Registry only affects commercial speech.  Dish may only make

an as-applied challenge.  <u>Commodity Trend Services, Inc. v.</u>

Commodity Futures Trading Comm'n, 149 F.3d 679, 683 (7th Cir. 1998).

The Seventh Circuit has held that Do-Not-Call Registry laws do not violate the First Amendment. National Coalition of Prayer, Inc. v Carter, 455 F.3d 783, 792 (7th Cir. 2006). The Seventh Circuit ruled on the validity of the Indiana Telephone Privacy Act (Indiana Act). The Indiana Act established a state Do-Not-Call List that is substantially similar to the Registry. The Indiana Act prohibited making telemarketing calls to persons who registered their telephone numbers with the state of Indiana. The Seventh Circuit held that such registry laws did not violate the First Amendment. The Court finds the holding in National Coalition of Prayer is controlling in this case. Should this matter be appealed, Dish may ask the Seven Circuit to reconsider, but this Court will follow the Seventh Circuit's instructions that Do-Not-Call registries do not violate the First Amendment. See also, Patriotic Veterans, Inc. v. Zoeller, 845 F.3d 303, 306 (7th Cir. 2017) (Registry has been "sustained against constitutional challenge.") (citing Mainstream Marketing Services, Inc. v. FTC, 358 F.3d 1228 (10th Cir. 2004)).

Dish argues that the Seventh Circuit did not consider the gist of Dish's First Amendment as-applied challenge. Dish argues that its First Amendment rights were violated because "the Registry was not effectively cleaned." Dish Conclusions of Law, at 46 ¶ 189. The FTC Improvements Act of 2007 directed the FTC to check national databases and remove numbers from the Registry that have been disconnected and reassigned:

> The Federal Trade Commission shall periodically check telephone numbers registered on the national "do-not-call" registry against national or other appropriate databases and shall remove from such registry those telephone numbers that have been disconnected and reassigned. Nothing in this section prohibits the Federal Trade Commission from removing invalid telephone numbers from the registry at any time.

15 U.S.C. § 6155. Dish argues that the FTC's subcontractor PossibleNOW is not removing from the Registry disconnected and reassigned wireless numbers because the national databases do not include directory information about wireless numbers.

Furthermore, Dish argues that the national databases do not include directory information for 25 percent or more of the VoIP telephone lines. As a result, PossibleNOW is not removing from the

Registry many disconnected and reassigned VoIP telephone numbers.

Dish argues that, "the Registry and its implementing regulations are not narrowly tailored because the Registry was not properly cleaned of numbers that DISH and other commercial entities had a right to contact." <u>Dish Conclusions of Law</u>, at 46 ¶ 190. Dish concludes that "the Registry is overbroad." <u>Id.</u> ¶ 191.

The Court still concludes that the Seventh Circuit's decision in <u>National Coalition of Prayer</u> and is controlling even in the face of Dish's new argument. The Seventh Circuit found that Do-Not-Call registries are constitutional. The Seventh Circuit specifically noted in <u>Patriotic Veterans</u> that the Tenth Circuit found that the Registry was constitutional. The Court will follow the Seventh Circuit.

Moreover, even assuming that <u>National Coalition of Prayer</u> and <u>Patriotic Veterans</u> were not controlling, Dish failed to demonstrate a violation of the First Amendment as applied to Dish. Dish must show that the Registry was unconstitutionally applied to Dish to prevail in an as-applied challenge. See <u>e.g.</u>, <u>United States v. Phillips</u>, 645 F.3d 859, 863 (7th Cir. 2011). Dish did not present any evidence that any call at issue was made to a telephone

number that was improperly on the Registry at the time of the call. As a result, Dish's as-applied First Amendment argument fails for a lack of evidence even if National Coalition of Prayer and Patriotic Veterans were not controlling. The statutes and regulations establishing and implementing the Registry do not violate the First Amendment, and the FTC's maintenance of the Registry did not violate Dish's First Amendment rights to commercial speech.

2. Registry Calls by Dish

To establish the first claim in Count I, the United States must prove that Dish initiated outbound telemarketing Registry Calls. To establish the second claim in Count I, the United States must prove the additional element that Dish caused a telemarketer to initiate outbound Registry Calls. Dish agrees that it is responsible for the actions of its Telemarketing Vendors eCreek and EPLDT, but denies that Dish caused the actions of any Retailer.

The Court determined at summary judgment that the undisputed facts established that Dish and its Telemarketing Vendors made 1,707,713 illegal Registry Calls reflected in the 2007-2010 Calling Records. Opinion 445, at 231-32, 75 F.Supp.3d at 1032. At trial, the United States presented evidence to prove Dish's

liability for additional calls made by Dish and its Telemarketing Vendors. The United States sought to prove liability for Registry Calls recorded in the 2003-2007 Calling Records, and additional calls recorded in the 2007-2010 Calling Records.

a. The 2003-2007 Calling Records

The Plaintiffs presented evidence at trial that Dish made millions of calls to persons whose telephone numbers were on the Registry from October 2003 to September 2007. The 2003-2007 Calling Records contain 501,513,302 telemarketing call records, and 94,804,008 of the telemarketing calls reflected in those records were made to persons whose numbers were on the Registry for at least 31 days at the times of the calls. The statute of limitations for the United States' claims is five years. The case was filed on March 25, 2009, so the statute extends back to March 25, 2004. Opinion 445, at 153. Of the 94,804,008 call records, 90,033,575 of the records show telemarketing calls were made to persons whose numbers were on the Registry within the five-year statute.

Dish argues that the 2003-2007 Calling Records do not accurately indicate the total number of calls because the 2003-2007 Calling Records contain duplicate records of the same calls. The

Court agrees.  The June 2005 InterImage Hits Files contained duplicate records of the same call to the same number on the same day at the same time.  T 615: 542 (L. Steele); PX 772, June 2005 Hits File.

The June 2005 Hits File showed duplicates because that particular Hits File showed the date and times of the calls.  Most of the InterImage Hits Files included the dates of the calls, but did not include the times.  The InterImage Hits Files contained many instances of multiple calls to the same number on the same date. See e.g., PX 792, February 2006 Hits File; PX 793, March-April 2006 Hits List; PX 794, May 2006 Hits List; PX 799, December 2006 Hits Files.  The multiple call records on the same day in the InterImage Hits Files could indicate several calls on the same day to the same number or duplicate records of the same call.  The 2003-2007 Calling Records contained the dates and the times of the calls. The United States did not direct Dr. Yoeli to compare the InterImage Hits Files with the 2003-2007 Calling Records to identify hits that were duplicate records of the same call.  Instead, Dr. Yoeli treated multiple hits to the same number on the same day as one violation, or one call.  The Court finds that Dr. Yoeli's assumption meets the

United States' burden of proof. The assumption probably undercounts the number of violations, but the calls counted under this assumption are more likely than not Registry Calls.

Dr. Yoeli, however, did not opine on the number of calls in the InterImage Hits Files when counted under the assumption that all hits on one day to the same number were one violation. Dr. Yoeli opined on the number of calls that were both hits in the InterImage His files and hits on Dish's internal do-not-call lists. Dr. Yoeli opined that there were 3,022,355 such calls on both the Registry and Dish's Internal Do-Not-Call Lists. Dr. Yoeli opined that 2,919,321 of those calls occurred within the statute of limitations after March 25, 2004. <u>PX 38</u>, <u>Yoeli Declaration</u>, Appendix D, <u>Yoeli October 14, 2013 Report</u>, Appendix A, at PX 0038-125. Dr. Yoeli was not offering any opinions at trial regarding the 2003-2007 Calling Records. <u>T 614: 376-77 (Yoeli)</u>. The United States relied on the InterImage analysis, and the Plaintiff States relied on Taylor's analysis, discussed below. <u>See</u> <u>State Plaintiffs' Additional Post-Trial Proposed Findings of Fact</u>, at 8-9 ¶¶ 73-80 (Plaintiff States relying on Taylor); <u>United States Amended Proposed Findings of Fact (d/e</u>

667), at 5-7 ¶ 16 (Plaintiff United States relying on Leslie Steele's InterImage analysis).

Taylor opined that from March 2004 to August 2007 Dish made 3,632,468 calls were made to persons whose numbers were on the Registry after disregarding his opinions that had no probative value. Taylor worked from a slightly different call set than the 2003-2007 Call Records produced in response to the FTC Demand. Taylor also did not identify the number of calls after March 25, 2004, to persons on the Registry.

Dish did not present any evidence to show that it had an Established Business Relationship with any of the call recipients from October 2003 to September 2007. The Established Business Relationship exception is an affirmative defense, and Dish has the burden of proof on this issue. Opinion 445, at 162-63.

The Court concludes that it is more likely than not that from March 25, 2004 to August 31, 2007, Dish made millions illegal Registry Calls in violation of the TSR, but the United States failed to prove the number of calls with sufficient certainty to impose an civil penalties for specific calls. Dish did not prove that it had an

Established Business Relationship with the recipients of any of these calls.

b. <u>The 2007-2010 Calling Records</u>

The 2007-2010 Calling Records show that, in addition to the 1,707,713 illegal calls determined at summary judgment, Dish made an additional 1,433,207 illegal Registry Calls in violation of the TSR.  Dr. Yoeli opined that the Yoeli July 2012 Call Set of 3,342,415 calls in the 2007-2010 Calling Records were Registry Calls to persons who did not have an Established Business Relationship with Dish.  The Court entered summary judgment on 1,707,713 calls made by Dish and its Telemarketing Vendors from September 2007 to March 2010.  The United States stipulated that the maximum number of additional violations in Count I for this time period was 1,634,702.  The stipulated number of 1,634,702 calls was the remaining calls after subtracting the 1,707,713 calls from the Yoeli July 2012 Call Set of 3,342,415 calls.

The United States conceded that 96,100 of the 1,634,702 calls were made to persons who activated service with Dish within 18 months of the dates of the calls.  As such, Dish had an Established

Business Relationship with these call recipients.  These calls were not violations.

Dr. Yoeli opined that the remaining 1,538,602 calls were all telemarketing calls made to persons whose numbers were on the Registry.  Dish presented evidence that 105,395 of the 1,538,602 calls were non-telemarketing calls.  The calling campaign codes or the disposition codes showed that these calls were calls to businesses, collection calls, scheduling calls, or informational calls.  In light of this evidence, the United States failed to prove that the 105,395 calls were telemarketing calls.

Dr. Yoeli opined that the remaining 1,433,207 were all telemarketing calls made to persons whose numbers were on the Registry.   Dish presented no evidence to contradict Dr. Yoeli's opinion with respect to these calls.  Therefore, the 1,433,207 calls were illegal Registry Calls in violation of the TSR.

Dish attempted to prove that 1,265,359 of these calls were made to persons who had an Established Business Relationship with Dish.  Dish failed to meet its burden on this defense.  Taylor opined that Dish had a Transaction-based Established Business Relationship with these calls recipients because the calls were on

current customer calling campaigns or because Dish had no disconnect date.  These factors are not reliable evidence of a Transaction-based Established Business Relationship for the reasons stated in the Findings of Fact.  Dish had the burden to prove the Established Business Relationship exception.  <u>Opinion 445</u>, at 162-63.  Dish did not meet its burden of proof.  The United States proved that the 1,433,207 calls violated the TSR as calls to persons whose numbers were on the Registry at the time of the calls.  Dish is liable for making these illegal Registry Calls.

The United States presented evidence that Dish made an additional 2,386,386 illegal calls to numbers in the 2007-2010 Calling Records because the call recipients' telephone numbers were also on the Internal Do-Not-Call Lists of Dish, its Telemarketing Vendors, or one of its Order Entry Retailers.  A seller or telemarketer may not call a person who has stated that he did not wish to be called even if the seller or telemarketer has an Established Business Relationship with the person.  TSR 16 C.F.R. §§ 310.4(iii)(A) and (B).  The 2,386,386 calls are also included in Count II because the calls violated both the probation against Registry Calls and Internal List Calls.  See <u>Lary v. Trinity Physician</u>

<u>Financial & Insurance Services</u>, 780 F.3d 1101, 1105 (11th Cir. 2015) (A single action can constitute two separate violations if the action violates more than one part of a regulation (in <u>Lary</u>, the TCPA)).

Dish is liable for a total of 5,527,306 telemarketing calls (1,707,713 plus 1,433,207 plus 2,386,386) to persons whose numbers were on the Registry at the times of the calls in violation of the TSR from September 1, 2007 to March 12, 2010. The 2,386,386 calls also are included in Count II totals below. The court in its equitable discretion, will not impose a double recovery of civil penalties for violation of the TSR in Counts I and II for the 2,386,386 calls.

### 3. Registry Calls by Order Entry Retailers

The United States must show that the Order Entry Retailers made telemarketing Registry Calls and that Dish caused the Order Entry Retailers to make those calls. To prove the latter element, the United States must show that (1) Dish retained the Order Entry Retailers, (2) Dish authorized the Order Entry Retailers to market Dish products and services, and (3) the Order Entry Retailers violated the TSR by initiating Dish telemarketing calls to numbers

on the Registry. <u>Opinion 445</u>, at 176; <u>see</u> <u>Opinion entered</u> <u>November 4, 2009 (Opinion 20)</u>, at 15, <u>United States v. Dish</u> <u>Network, LLC</u>, 667 F.Supp.2d 952, 959-60 (C.D. Ill. 2009) (Scott, J., retired).

The Court found at summary judgment that the undisputed evidence showed that Dish was liable for causing JSR to make 2,349,031 Registry Calls, and for causing Satellite Systems to make 381,811 Registry Calls. <u>Opinion 445</u>, at 176, 232.

The Court finds that Dish caused JSR to make 3,315,242 additional Registry Calls in violation of the TSR. Taylor's analysis of the call records show that JSR made these calls from January 2007 through March 2007. The evidence shows that JSR made these calls as an Order Entry Retailer until Dish terminated JSR on February 14, 2007. Thereafter JSR made these calls as an affiliate of another Order Entry Retailer. Goodale testified that JSR continued to operate after February 14, 2007 by using the login of another Order Entry Retailer. Goodale did not identify the other Order Entry Retailer. <u>T 622:1893-94 (Goodale)</u>. Regardless, Dish caused the Order Entry Retailer through which JSR worked to make telemarketing calls for Dish. The Order Entry Retailer

authorized JSR to market Dish Network programming.  The call records show that JSR made the calls.  Goodale testified that the calls were made to market Dish Network programming.  The Court finds that Dish thereby caused JSR to make the calls after February 14, 2007 for purposes of the TSR.  Dish is liable for causing JSR to make a total of 5,664,273 (2,349,031 plus 3,315,242) Registry Calls in violation of the TSR.

The United States claims that Dish is liable for causing Order Entry Retailer Dish Nation to make the same 5,664,273 calls that Dish caused JSR to make.  However, the United States failed to show that Dish Nation caused all of these calls.   The evidence shows that JSR worked through Dish Nation before August 10, 2006, when JSR became an Order Entry Retailer.  PX 239, September 2006 Spreadsheet.  The fact that JSR worked through Dish Nation before becoming an Order Entry Retailer in August 2006 does not prove that JSR worked through Dish Nation thereafter.  Dish terminated JSR on February 14, 2007.  Goodale did not identify the Order Entry Retailer through which JSR worked after February 14, 2007, and no other evidence identifies the Order Entry Retailer that JSR worked through at that time.  Yet, the

United States has established Dish caused Dish Nation to make illegal Registry Calls through JSR in July through August 10, 2006. The United States, nonetheless, did not present evidence of the number of illegal Registry Calls that Dish Nation and JSR made before August 10, 2006.

4. Summary

In summary, Dish is liable for the following violations of the TSR in Count I:

| | |
|---|---|
| 2003-2007: | Millions of calls, but specific number was unproven |
| September 1, 2007, to March 12, 2010 | 5,527,306 calls |
| JSR calls caused by Dish | 5,664,273 calls |
| Satellite System Calls caused by Dish | 381,811 calls |
| Total | 11,573,390 calls |

As noted above, the Court, in its discretion, will not impose a double penalty under the TSR in Counts I and II for 2,386,386 of the calls that are subject to liability in both Counts.

B. Count II

The United States alleges in Count II:

In numerous instances, in connection with
telemarketing, DISH Network has engaged in or caused
other telemarketers to engage in initiating an outbound
telephone call to a person who has previously stated that
he or she does not wish to receive such a call made by or
on behalf of DISH Network, in violation of the TSR, 16
C.F.R § 310.4(b)(1)(iii)(A).

Third Amended Complaint, ¶ 67. Count II also contains two parts:

(1) Dish initiated outbound Internal List Calls to a person who

previously stated that he or she does not wish to receive calls made

by or on behalf of Dish; and (2) Dish caused Order Entry Retailers

to initiate outbound Internal List calls to persons who previously

stated that they did not wish to receive calls made by or on behalf of

Dish.

1. Dish Internal Calls

To establish the first claim in Count II, the United States must

prove that Dish initiated outbound telemarketing telephone calls to

persons who previously stated that they did not wish to be called by

or on behalf of Dish.  To establish the second claim in Count II,

United States must prove that Dish caused an Order Entry Retailer

to initiate an outbound telemarketing telephone call to persons who

previously stated that they did not wish to be called by or on behalf of Dish. Dish again agrees that it is responsible for the actions of its Telemarketing Vendors eCreek and EPLDT.

The undisputed evidence at summary judgment showed that Dish made 903,246 Internal List Calls to persons who told Dish or its Telemarketing Vendors that they did not wish to be called by or on behalf of Dish. The Court further found that the undisputed evidence showed that Dish was liable for 140,349 Internal List Calls made to persons who told eCreek that they did not wish to be called by or on behalf of Dish. Opinion 445, at 232.

The United States seeks to prove that Dish is liable for 7,321,163 additional Internal List Calls that Dish made to persons who told one or more Order Entry Retailers that they did not wish to be called by or on behalf of Dish. The Court found at summary judgment that the United States needed to show that Dish had an agency relationship with the Order Entry Retailers in order to establish liability for these calls. The Court found that issues of fact remained on this issue. Opinion 445, at 181-84.

The United States asks for reconsideration of the Court's determination that the United States must show an agency

relationship with the Order Entry Retailers in this Count.  The Court denies that request.  The TSR states that the seller is liable for a call made to a person when, "[t]hat person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered . . . ." 16 C.F.R. § 310.4(b)(1)(iii)(A). The TSR does not define to whom the statement must be made.  The FTC, however, stated that a do-not-call request was "company-specific" and that the FTC intended § 310.4(b)(1)(iii)(A) to track the approach of the FCC Rule.  <u>Opinion 445</u>, at 182 (citing <u>Notice of Proposed Rule Making, Amendments to the Telemarketing Sales Rule</u>, 67 Fed. Reg. 4492, 4516 (January 30, 2002)).  The FCC held that the similar "on behalf of" language in the FCC Rule required finding an agency relationship.  <u>FCC May 9, 2013 Order</u>, 28 FCC Rcd. at 6574.  This Court found that this interpretation should apply here given the FTC's explanation in the 2002 Notice of Proposed Rulemaking.  <u>Opinion 445</u>, at 183.

The Court further noted at summary judgment that the United States relied on an FCC interpretation of the "on behalf of" language to support its interpretation of § 310.4(b)(1)(iii)(A).  <u>Opinion 445</u>, at

183-84; see Plaintiffs' Motion for Summary Judgment (d/e 341), at 91-92(citing Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991, 68 Fed. Reg. 44,144, 44,156 (July 25, 2003) (2003 FCC Statement); Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (d/e 378), at 196-97 (citing 2003 FCC Statement); Plaintiffs' Reply in Support of Their Motion for Summary Judgment (d/e 389), at 61 (citing 2003 FCC Statement).

The United States no longer relies on the 2003 FCC Statement, but it now asserts a new interpretation of § 310.4(b)(1)(iii)(A) based on complaints filed in four cases, including this one. United States Proposed Conclusions of Law (d/e 668), at 14-16. The United States argues that this interpretation is entitled to deference under Auer v. Robbins, 519 U.S. 452 (1997). The United States made this change in position for purposes of litigation. As such, the interpretation is not entitled to deference. Christopher v. SmithKline Beecham Corp., 567 U.S.142, 132 S.Ct. 2156, 2166-67 (2012). The January 30, 2002 FTC statement that do-not-call requests are company-specific and that the interpretation of this section should track the FCC approach is a far more accurate

representation of the FTC interpretation of this section.  The Court will not reconsider its interpretation of §310.4(b)(iii)(A).

The United States has proven that Dish had an agency relationship with the Order Entry Retailers to telemarket Dish Network programming.  The Court discussed agency principles in the summary judgment opinion.  See Opinion 445, at 185-91.  As this Court noted, "Federal law, Illinois law, and the Restatement all agree on general agency legal principles.  NECA-IBEW Rockford Local Union 364 Health and Welfare Fund v. A & A Drug Co., 736 F.3d 1054, 1058 (7th Cir. 2013)."  Opinion 445, at 185.

This Court set forth the applicable legal principles of express agency:

> The Restatement defines agency as follows:
>
> Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.
>
> Restatement (Third) of Agency, § 1.01 (2006). The Restatement definition contains two key aspects: (1) the principal and agent agree that the agent acts for the principal; and (2) the agent is subject to the control of the principal. See also In re Aguilar, 511 B.R. 507, 513 (Bankr. N.D. Ill. 2014). The principal need only have the

> right to control the agent; the agency exists even if the principal does not exercise that right. See Schutz v. Arrow Fin. Servs., LLC, 465 F.Supp.2d 872, 877 (N.D. Ill. 2006). The determination of whether an agency exists is a factual issue. See Spitz v. Proven Winners of North America LLC, 759 F.3d 724 (7th Cir. 2014); Chemtool, Inc. v. Lubrication Technologies, Inc., 148 F.3d 742, 746 (7th Cir. 1998).

Opinion 445, at 185-86.  Both written agreements and the actual practices of the parties are relevant to determine whether an agency exists.  See M&J Partners Restaurant Ltd. Partnership v. Zadikoff, 10 F.Supp.2d 922, 932 (N.D. Ill. 1998).

In this case, Dish and the Order Entry Retailers agreed that the Order Entry Retailers would act for Dish to market Dish Network programming nationwide.  The standard Retailer Agreement authorized Order Entry Retailers to market Dish Network programming and present offers to purchase to Dish for Dish's approval.  PX 152, Retailer Agreement §§ 3.1, 3.2, 7.2.  The Order Entry Retailers marketed Dish Network programming and submitted customer offers to purchase on the Order Entry Tool, and Dish reviewed and decided whether to approve the sale.  The Order Entry Retailers used Dish's logo with the added phrase "authorized dealer."  Dish and Order Entry Retailers agreed that the

Order Entry Retailers acted for Dish to market Dish Network programming.

Dish also retained extensive authority to control the marketing of its programming and services by Order Entry Retailers. Section 7.3 of the Retailer Agreement gave Dish the authority to control all aspects of marketing of Dish Network programming.

Dish began exerting that control in 2008 and 2009. Dish required Order Entry Retailers to provide their Internal Do-Not-Call Lists to PossibleNOW to be included in a combined Order Entry Retailer Internal Do-Not-Call List. Dish also required certain Order Entry Retailers to use PossibleNOW's scrubbing services. In later part of 2008 and the first part of 2009, Dish fired 40 Retailers for fraud and making misrepresentations to customers. In 2009, Dish fired over half of the Order Entry Retailers for fraud and high churn and required the rest to comply with the more extensive Quality Assurance program or be terminated. Dish's Compliance Manager Musso stated that the Quality Assurance program was authorized by § 7.3 of the Retailer Agreement. PX 553, Email thread between Musso and Sales Manager Mason dated October 25, 2011.

Thereafter, Dish increased the monitoring and control of Order Entry telemarketing. Field Representatives and Account Managers visited Order Entry Retailers on a weekly basis and monitored telemarketing calls. Dish scored Order Entry Retailer telemarketing calls on 45 criteria. The criteria included "right sizing" questions to determine the Dish Network programming that they were to offer the customer. Dish Field Representatives, Account Managers, and Sales Managers required Order Entry Retailers to change their telemarketing practices to increase the Order Entry Retailers' scores for the Quality Assurance program.

Sales Managers on occasion: (1) coached Order Entry Retailers on how to increase scores, (2) changed Order Entry Retailer sales procedures, (3) revised sales scripts, and (3) prescribed the work flow of an Order Entry Retailers that did not use a formal telemarketing script. Sales Managers could discipline Order Entry Retailers that did not comply. Sales Managers could withhold Dish programming offers and could restrict access to the Order Entry Tool.

Finally, Dish Sales Managers had the authority to use the "absolute power" clause. That is, Dish Sales Managers had the

authority to tell Order Entry Retailers what to do simply, "because I said so." PX 553, Email thread between Musso and Sales Manager Mason dated October 25, 2011; T. 620: 1289 (Musso). The Court concludes under all the evidence that Dish had the authority to exert control over the marketing of Dish Network programming conducted by Order Entry Retailers. The Court concludes that Dish had an agency relationship with the Order Entry Retailers with respect to marketing Dish Network programming.

Dish argues that Dish did not control marketing methods by Order Entry Retailers because Order Entry Retailers wrote their own scripts and secured their own leads. The evidence shows, however, that Dish representatives revised scripts and required Order Entry Retailers to follow the revisions. Dish also on rare occasions provided scripts and also provided lead lists to Order Entry Retailers. This evidence shows that Dish had the authority to provide leads and to provide scripts. The fact that Dish may rarely have exercised these indicia of authority to control does not matter. The issue for purposes of agency analysis is the existence of the authority, not the actual use of the authority. Schultz v. Arrow

<u>Financial Services, LLC</u>, 465 F.Supp.2d 465, 477 (N.D. Ill. 2006) (citing <u>Restatement (Third) of Agency</u> § 1.01 comment c).

Dish argues that § 7.3 of the Retailer Agreement did not give Dish the authority to control the Order Entry Retailers' marketing of Dish Network programming. The Court disagrees. Section 7.3 states that Order Entry Retailers "shall take all actions and refrain from taking any action, as requested by EchoStar in connection with the marketing, advertisement, promotion and/or solicitation of orders for Programming and the sale of DISH DBS Systems." Musso cited § 7.3 as authority for the Quality Assurance program. Dish exerted extensive control over Order Entry Retailers through the Quality Assurance program. The plain language of § 7.3 and the Dish's actions beginning in September 2006 and especially after 2008 show that Dish had extensive authority to control the Order Entry Retailers' marketing of Dish Network programming. The after-the-fact, self-serving testimony by several Dish witnesses to the contrary is not credible and does not disprove the actual control exerted by Dish.

Dish also argues that Order Entry Retailers were completely separate companies and as such were independent contractors.

Dish cites § 11 of the Retailer Agreement that stated that Order Entry Retailers were independent contractors. Dish also relies on numerous statements by Dish employee witnesses and principles of Order Entry Retailers such as Goodale and Myers to show that Order Entry Retailers ran their own businesses independently from Dish.

The Court agrees that the Order Entry Retailers were separate, independent companies. An independent company, however, can be an agent with respect to work performed for a principal. See Bridgeview Health Care Center, Ltd. v. Clark, 816 F.3d 935, 938-39 (7th Cir. 2016); Lawlor v. North American Corp. of Illinois, 2012 IL. 112530, ¶43, 983 N.E.2d 414, 427 (Ill. 2012). Telemarketing Vendor eCreek was a separate independent business, yet Dish concedes that eCreek was its agent for telemarketing. Dish's authorization to Order Entry Retailers to sell Dish Network programming and Dish's authority to control the marketing of Dish Network programming by Order Entry Retailers are the relevant questions. Dish authorized Order Entry Retailers to market Dish Network programming nationwide. Dish had the authority to control the Order Entry Retailers' marketing of Dish Network

programming.  The Order Entry Retailers were marketing agents of Dish.  Dish, therefore, was obligated to honor the Do-Not-Call requests made to Order Entry Retailers, just as it was obligated to honor such requests made to Dish's telemarketing agent eCreek.

Dish argues that even if the Order Entry Retailers were marketing agents, their illegal telemarketing practices were not within the scope of their authority.  The Court again disagrees.  The concept of scope of authority is broad.  An agent has authority to act to further the principal's objectives, "as the agent reasonably understands the principal's manifestations and objectives." Restatement (Third) of Agency, § 2.02(1).  The principal is liable for the acts of the agent to further the principal's purposes unless the agent acts entirely for the agent's benefit only.  Hartmann v. Prudential Insurance Co. of America, 9 F.3d 1207, 1210 (7th Cir. 1993).  The Order Entry Retailers marketed Dish Network programming.  They acted at least partially for Dish's benefit.  They did not act entirely for their own benefit.

Dish cites Bridgeview Care Center for the proposition that Dish is not liable for unauthorized marketing activities.  In Bridgeview Care Center, a hearing aid company authorized a

telemarketer to send 100 faxed advertisements within a 20 mile radius of Terre Haute, Indiana. The telemarketer sent almost 5,000 faxed advertisements across Indiana, Illinois, and Ohio. The Seventh Circuit determined that the hearing aid company was liable under the TCPA for the 100 faxes it authorized, but not the others. Bridgeview Care Center, 816 F.3d at 937, 939. In this case, Dish authorized the Order Entry Retailers to market Dish Network programming nationally through outbound telemarketing. The telemarketing was done to benefit Dish. The acts were within the scope of authority.

Dish argues that it could not have honored the Order Entry Retailers' Internal Do-Not-Call Lists because it did not have the lists until 2008 when it began requiring certain Order Entry Retailers to give their Internal Do-Not-Call Lists to PossibleNOW. This argument proves too much. If Dish had the authority to require Order Entry Retailers to give Dish access to their Internal Do-Not-Call Lists in 2008, then Dish had the authority to secure access to the Lists in 2003 and 2004 when the Order Entry program began. Dish should have done so. Dish's failure to secure the Internal Do-Not-Call Lists before 2008 does not absolve Dish from

responsibility. The Court finds that Dish is liable for 7,321,163 illegal Internal List Calls made to persons who told Order Entry Retailers that they did not wish to receive telemarketing calls on behalf of Dish.

Dish's expert Taylor testified that the set of 7,321,163 Internal List calls overlapped with the 903,246 Internal List calls for which the Court found Dish liable at summary judgment. Taylor provided no explanation of the evidentiary basis of this comment regarding a claimed overlap. Further, Dish does not point to any portion of any of Taylor's reports that mentioned or discussed this claimed overlap. As such, Taylor's comment on the stand about an overlap is unexplained and unsupported by the evidence. The statement has no probative value. Dish is liable for both the 7,321,163 Internal List Calls and the 903,246 Internal List Calls found at summary judgment.

    2. <u>Order Entry Retailer Internal List Calls</u>

        a. <u>Internal List Calls By JSR to Persons Who Stated to Dish or a Telemarketing Vendor that They Did Not Wish to be Called by or on Behalf of Dish</u>

From August 2006 through December 2006, JSR made 418,228 Internal List Calls to persons who stated to Dish or the Telemarketing Vendors that they did not wish to receive telemarketing calls by or on behalf of Dish. From January through March 2007, JSR made 768,696 Internal List Calls to persons who stated to Dish or the Telemarketing Vendors that they did not wish to receive telemarketing calls by or on behalf of Dish. The United States proved that Dish caused these calls to be made. JSR made the calls before August 10, 2006, through Order Entry Retailer Dish Nation. JSR made the calls as an Order Entry Retailer from August 10, 2006, until Dish terminated JSR on February 14, 2007. Thereafter, JSR made the calls through another Order Entry Retailer authorized by Dish to market Dish Network programming.

JSR made some of these calls as an agent of Dish. JSR was an agent of Dish as an Order Entry Retailer from August 10, 2006, until Dish terminated JSR on February 14, 2007. Prior to August 10, 2006, JSR made the calls through Dish Nation. JSR acted as a subagent of a Dish Order Entry Retailer when it made the calls prior to August 10, 2006. Dish can be held liable for the acts of a subagent. See Lawlor, 983 N.E.2d at 427-28.

However, Dish disputes that JSR was a subagent of Dish. The Retailer Agreement, § 7.2, did not allow Order Entry Retailers to use third party affiliates or subagents without Dish's prior approval. Dish personnel, however, knew that JSR worked through Dish Nation before becoming an Order Entry Retailer. Dish was also aware that Dish Nation used third-party affiliates. Dish personnel referred to "Dish Nation's affiliate program" and to JSR working under "Dish Nation's umbrella." PX 239, September 2006 Spreadsheet. Under these facts, Dish Nation reasonably believed that it had Dish's permission to use third party affiliates as subagents despite the language in § 7.2 of the Retailer Agreement. "An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of the subagent." Restatement (Third) of Agency, § 3.15(2). The Court finds that Dish Nation had actual authority to retain JSR as a subagent prior to August 10, 2006. Dish is therefore liable for 418,228 Internal List Calls that JSR made from August through December 2006 to persons who stated to Dish or a Telemarketing

Vendor that they did not wish to receive telemarketing calls by or on behalf of Dish.

The evidence does not establish that Dish allowed JSR to work as subagent from February 14, 2007 through March 2007. Dish terminated JSR on February 14, 2007. JSR thereafter worked for an unidentified Order Entry Retailer into March 2007. By February 2007, Dish began taking steps to discourage Order Entry Retailers' use of third-party affiliates. In October 2006, Dish surveyed the 11 biggest Order Entry Retailers to see how many used affiliates. In November and December 2006, Dish told JSR to stop using affiliates in the Philippines. At some point, Musso started requiring Order Entry Retailer to secure prior approval before hiring affiliates. In light of this evidence, it is not clear that, in 2007, Dish generally allowed Order Entry Retailers to use affiliates without prior authorization. As such, it is not clear that Dish authorized the unidentified Order Entry Retailer to use JSR as a subagent after February 14, 2007. The United States has failed to prove that JSR worked as a subagent of Dish after February 14, 2007. The United States has also failed to prove how many of the 768,696 Internal List Calls in 2007 were made before Dish terminated JSR on

February 14, 2007.  While Dish is liable for causing JSR to make hundreds of thousands of Internal List Calls in 2007, the number of such calls has not been proven.

    b. <u>Internal List Calls By JSR to People Who Stated to</u>
      <u>other Order Entry Retailers that They Did Not Wish to</u>
      <u>be Called by or on Behalf of Dish</u>

  Dish is liable for calls made by Dish or its agents to persons who previously told Dish or its agents that they did not wish to receive such calls.  <u>Opinion 445</u>, at 183.  From August 2006 through December 2006, JSR made 267,439 Internal List Calls to persons who previously told another Dish Order Entry Retailer that they did not wish to receive such calls.  JSR was an agent or subagent of Dish during this time period, and the other Order Entry Retailers were also agents of Dish.  Dish is liable for these illegal Internal List Calls.  From January through March 2007, JSR made 526,956 Internal List Calls to persons who previously told another Dish Order Entry Retailer that they did not wish to receive such calls.  The United States did not prove the number of these calls that were made from January through February 14, 2007, when the United States proved that JSR acted as Dish's agent or subagent.

As such, the United States proved that Dish caused JSR to make hundreds of thousands of Internal List Calls in 2007 to persons who previously told another Dish Order Entry Retailer that they did not wish to receive such calls, but the United States did not prove the specific number of violations.

c. Calls by Satellite Systems

In 2010 and 2011, Satellite Systems made 22,946 Internal List Calls to persons who previously told Dish that they did not wish to receive such calls. Satellite Systems was Dish's agent for purposes of marketing Dish Network programming at the time. Dish is liable for causing Satellite Systems to make these calls in violation of the TSR.

In 2010 and 2011, Satellite Systems made 42,990 Internal List Calls to persons who previously told an Order Entry Retailer that they did not wish to receive such calls. Satellite Systems and the other Order Entry Retailers were Dish's agents for purposes of marketing Dish Network programming at the time. Dish is liable for causing Satellite Systems to make these calls in violation of the TSR.

3. <u>Summary</u>

In summary, Dish is liable for Dish is liable for the following violations of the TSR in Count II:

| | |
|---|---:|
| Dish Calls on Dish Internal List | 903,246 calls |
| Dish Calls on eCreek DNC List | 140,349 calls |
| Dish Calls on Order Entry Lists | 7,321,163 calls |
| JSR 2006 Calls on Dish Internal List | 418,228 calls |
| JSR 2006 Calls on Order Entry Lists | 267,439 calls |
| Satellite Systems Calls on Dish Internal List | 22,946 calls |
| <u>Satellite Systems Calls on Order Entry Lists</u> | <u>42,990 calls</u> |
| Total | 9,116,361 calls |

Dish is also liable for a portion of the 1,295,652 (768,696 plus 526,956) Internal List calls that JSR made in 2007, but the Plaintiffs did not prove the number of those calls made before February 14, 2007, while JSR was an agent of Dish. In addition, the Court, in its discretion, will not impose a double penalty under the TSR in Counts I and II for the 2,386,386 calls that are subject to liability in both Counts. The total violations are so large and the amount of the potential civil penalty is so high that the Court finds that one penalty for each call is sufficient in this case.

C. <u>Count III</u>

Count III alleges:

> In numerous instances, in connection with telemarketing, Defendant DISH Network has abandoned or caused telemarketers to abandon an outbound telephone call by failing to connect the call to a sales representative within two (2) seconds of the completed greeting of the person answering the call, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iv).

<u>Third Amended Complaint</u>, ¶ 68. Count III contains two claims: (1) Dish abandoned outbound telemarketing telephone calls; and (2) Dish caused Order Entry Retailers to abandon outbound telemarketing telephone calls.  In both cases, the abandonment occurred because Dish or the telemarketer made Abandoned Prerecorded Calls.  The calls became abandoned because Dish or the telemarketer failed to connect the Prerecorded Call to a sales representative within two seconds of the completed greeting by the recipient of the call.

1. <u>Calls Abandoned by Dish</u>

The Court found at summary judgment that Dish was liable for making 98,054 Abandoned Prerecorded Calls in violation of the TSR.  <u>Opinion 445</u>, at 193-94.   The United States did not seek to

prove that Dish made any additional abandoned telemarketing calls at trial.

## 2. Calls Abandoned by Order Entry Retailers

The Court found at summary judgment that Dish was liable for causing:  (1) Star Satellite to make 43,100,876 Abandoned Prerecorded Calls in violation of the TSR; (2) Dish TV Now to make 6,637,196 Abandoned Prerecorded Calls in violation of the TSR; and (3) American Satellite for making one Abandoned Prerecorded Call in violation of the TSR.  Opinion 445, at 193-95.

The United States has also proven that JSR initiated 12,853,478 Prerecorded Calls.  These calls only became abandoned calls in violation of the TSR if a person answered and was not connected to a live representative within two seconds of answering. 16 C.F.R. § 310.4(b)(1)(iv).  Goodale estimated that 4 out of 10 calls were answered.  Dexter estimated that a person answered 16 to 17 percent of Dish's telemarketing calls.  Montano estimated that a person answered 30 percent of Dish's telemarketing calls.  Taylor opined that 1 in 10 telemarketing calls are answered by individuals. Given all this evidence, the Court finds that it is more likely than not that at least 10 percent of JSR's prerecorded telemarketing calls

were answered by individuals and became Abandoned Prerecorded Calls.

Dish caused JSR to make these Abandoned Prerecorded Calls for the same reasons Dish caused JSR to make the Registry Calls proven in Count I. The United States is not required to prove an agency relationship to establish liability for abandoned calls. The United States must only prove that Dish caused JSR to make the abandoned calls. TSR 16 C.F.R. § 310.4(b)(iv). Dish authorized Dish Nation to make calls and to use JSR to make calls before August 10, 2006. Dish authorized JSR to make calls from August 10, 2006 until February 14, 2007. Dish authorized the unidentified Order Entry Retailer to make calls and thereby to use JSR to make these abandoned calls from February 14, 2007, until JSR stopped operating in March 2007. The Court finds that Dish is liable for causing JSR to make 1,285,379 abandoned calls in violation of the TSR.

The United States argues that Goodale's estimate supports liability for 5,141,391 Abandoned Prerecorded Calls. However, the testimony from Montano, Dexter and Taylor, however, indicates that Goodale's estimate may overstate the number of completed calls.

Given the disagreement, the Court finds that the most conservative estimate meets the preponderance standard on this issue. All four witnesses agreed that at least 10 percent of the calls would have been answered. The Court, therefore, finds that Dish is liable for the conservative number of 1,285,379 Abandoned Prerecorded Calls.

The United States also seeks to prove that Dish caused Order Entry Retailer Dish Nation to make the same 1,285,379 abandoned calls that JSR made. The United States has proven that Order Entry Retailer Dish Nation acted with JSR to make the abandoned calls before August 10, 2006. JSR made calls through Dish Nation before JSR became an Order Entry Retailer. The United States failed to prove that JSR continued to work through Dish Nation after it became an Order Entry Retailer or after February 14, 2007, when Dish terminated JSR's Retailer Agreement. The United States has established that Dish caused Dish Nation to make many abandoned calls through JSR. The United States, however, has not proven the number of abandoned calls Dish caused Dish Nation to make through JSR before August 10, 2006.

The United States proved at summary judgment that Dish caused American Satellite to make one Abandoned Prerecorded Call.  Opinion 445, at 194-95, 233.  The United States also proved that Dish caused American Satellite to make many Abandoned Prerecorded Calls in violation of the TSR.  The testimony of Manuel Castillo established this fact.  He operated American Satellites' automatic dialer that made the Prerecorded Calls.  Castillo also informed Dish personnel of American Satellite's practices.  Dish's investigator was interested in American Satellite's practices that defrauded Dish, but he had little interest in Do-Not-Call Law violations.  Dish is liable for causing American Satellite to make many prerecorded calls that were abandoned in violation of the TSR.

3. Summary

In summary, Dish is liable for the following abandoned calls in violation of the TSR:

| | |
|---|---|
| Dish AM calls | 98,054 calls |
| Star Satellite calls | 43,100,876 calls |
| Dish TV Now calls | 6,637,196 calls |

| | |
|---|---|
| American Satellite call | 1 call |
| JSR calls | 1,285,379 calls |
| Total | 51,121,506 calls |

In addition, Dish caused American Satellite to make more abandoned calls, but the number of such calls has not been proven. The 43,100,876 Star Satellite calls also are subject to liability under the TSR in Count IV. The Court, in its discretion, will not impose a double penalty under the TSR in Counts III and IV for these calls. The total violations are so large and the amount of the potential civil penalty is so high that the Court finds that one penalty for each call is sufficient in this case.

D. Count IV

Count IV alleges:

> Defendant DISH Network has provided substantial assistance or support to Star Satellite and/or Dish TV Now even though Defendant DISH Network knew or consciously avoided knowing Defendant Star Satellite and/or Dish TV Now abandoned outbound telephone calls in violation of § 310.4(b)(1)(iv) of the TSR. Defendant DISH Network, therefore, has violated 16 C.F.R. § 310.3(b).

Third Amended Complaint, ¶ 69. Section 310.3(b) of the TSR prohibits providing substantial assistance or support to

telemarketers when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates the TSR.

To establish the claims in Count IV, the United States must prove "(1) that the [Order Entry Retailers] were violating the TSR; and (2) Dish knew or consciously avoided knowing that the [Order Entry Retailers] were violating the TSR, but still kept paying the Dealers to continue the violations." Opinion entered February 4, 2010 (d/e 32) (Opinion 32), at 9 n.1, 2010 WL 376774, at *3 (citing Opinion 20, at 20, 667 F.Supp.2d, at 961) (Scott, J. retired).

The Court entered partial summary judgment in favor of Dish on the United States' claim that Dish provided substantial assistance to Dish TV Now. Opinion 445, at 195-99. The claim against Dish for providing substantial assistance to Star Satellite remained for trial.

The United States has established that Star Satellite violated the TSR by making prerecorded calls that were answered and abandoned in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iv). The evidence also proves that it is more likely than not that Dish knew about Star Satellite's use of prerecorded calls, or consciously

avoided knowing about such use, and kept paying Star Satellite to continue the violations.

Dish was repeatedly put on notice that Star Satellite was making prerecorded telemarketing calls. The most telling evidence is that Dish's Outbound Operations' Manager Bangert knew about Star Satellite's prerecorded calls. Bangert relayed the message through Dish employee Mark Duffy to the Retail Services Escalations Department. Jeff Medina of the Retail Services Escalations Department commented to Margot Williams of Retail Services Escalations, "Are these your boys again?" Retail Services Escalations did nothing. The activations kept coming, and Dish Sales Department employees kept meeting their quotas and getting their bonuses, and Dish kept paying Star Satellite to keep making prerecorded calls that were abandoned when answered. The Court finds that the United States has proven that Dish violated TSR § 310.3(b) by providing substantial assistance to Star Satellite even though Dish knew or consciously avoided knowing that Star Satellite was making abandoned telemarketing calls in violation of TSR § 310.4(b)(1)(iv).

Dish argues that Star Satellite hid its use of prerecorded calls from Dish. The evidence shows that Star Satellite's principal Myers tried to hide Star Satellite's use of prerecorded calls. Myer, however, believed that Dish knew about the use of prerecorded calls. The evidence also shows that Dish knew of the practice anyway and did nothing about it.

Dish argues that the United States improperly seeks to impose liability on Dish in Count IV for the same 43,100,876 calls for which the Court found Dish liable in Count III at summary judgment. The Court disagrees. Dish's actions violated both sections of the TSR, and the United States is entitled to bring claims under both sections. See Lary, 780 F.3d at 1105 (11th Cir. 2015). The Court, in the exercise of its equitable authority, will limit the United States to one possible civil penalty award for each of these 43,100,876 abandoned calls under the circumstances of this case. Dish's double recovery argument, however, is not a defense to liability.

E. Dish's Liability for Civil Penalties to the United States

The United States asks the Court to impose civil penalties for Dish's violations of the TSR. Dish's violations of the TSR are treated

as violations of a rule promulgated under the FTC Act regarding unfair or deceptive acts or practices. 15 U.S.C. § 6102(c)(1). A violation of such a rule promulgated under the FTC Act is considered an unfair or deceptive act or practice in violation of § 5 of the FTC Act. 15 U.S.C. §§ 45(a) and 57a(1)(B). The United States is entitled to seek civil penalties for violation of such a rule committed "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." FTC Act § 5(m)(1)(A), 15 U.S.C. § 45(m)(1)(A).

This Court previously stated, "A person also commits a knowing violation if, under the circumstances, a reasonable, prudent person would have known of the existence of the rule and that his or her acts or omissions violated the rule." Opinion 445, at 226 (citing United States v. National Financial Services, Inc., 98 F.3d 131, 139 (4th Cir. 1996) ("A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision."); and S. Conf. Rep. 93-1408, 93d Cong., 2d Sess., 7772 (1974)). The United States must show "knowledge fairly

implied on the basis of objective circumstances' that the conduct was prohibited." <u>Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, LPA</u>, 559 U.S. 573, 584 (2010).

To establish actual knowledge or knowledge fairly implied, the United States must show that, "the defendant or its agent have some knowledge, actual or constructive, of the requirements of the [rule] such that it can be concluded that the defendant or its agent knew or should have known that his conduct was unlawful." <u>United States v. ACB Sales & Service, Inc.</u>, 590 F. Supp. 561, 575 n.11 (D. Ariz. 1984); <u>see</u> <u>FTC v. Bonnie & Co. Fashions, Inc.</u>, No. 90-4454, 1992 WL 314007, at *7 (D.N.J. 1992).

The maximum civil penalty is $11,000 for each violation before February 9, 2009, and $16,000 for each violation after that date. <u>Federal Civil Penalties Inflation Adjustment Act</u>, 28 U.S.C. § 2461 note, 74 Fed. Reg. 857-01 (January 9, 2009). The evidence that Dish acted with knowledge or knowledge fairly implied is specific to the particular calls at issue.

1. Count I

    a. Registry Calls by Dish

        i.    Dish Direct Telemarketing

Dish personnel knew that the Registry and the TSR prohibited Registry Calls unless Dish had Established Business Relationships with the intended call recipients.  Dish went to great lengths to prepare for the launch of the Registry.  Dish developed a scrubbing process for Account Number Campaigns to limit Registry Calls.

Dish personnel also knew from as early as 2004 that Dish direct telemarketing was making illegal Registry Calls.  Beginning in 2004, Dish received numerous consumer complaints about illegal Registry Calls.  Dish conducted audits in 2007 and 2009 and found in three-month periods in 2005 and 2008, Dish made thousands of illegal Registry Calls.  Dish personnel further knew that eCreek's scrubbing process did not work correctly sometimes.  Dish, therefore, knew that Registry Calls were generally prohibited by the TSR and knew that its outbound telemarketing procedures resulted in Registry Calls in violation of the TSR.

In addition, Dish used ineffective methods to determine whether it had a Transaction-based Established Business

Relationship with current and former customers.  Dish knew that the TSR provided that a Transaction-based Established Business Relationship existed if the call recipient purchased goods or services from Dish within the 18 months immediately preceding the date of the call. 16 C.F.R. § 310.2(o).  Dish personnel did not follow the clear language of the TSR.  Dish personnel did not check the dates that intended call recipients paid Dish for Dish Network programming to determine if Dish had Transaction-based Established Business Relationships.  Dish personnel looked to lists of current customers and disconnect dates.  According to Taylor's analysis of Dish's calling records from 2007-2010, Dish thereby made over 15 million illegal Registry Calls to persons who had not paid Dish for more than 18 months.  Dish did not have Transaction-based Established Business Relationships with these individuals.

Dish is a sophisticated multi-billion dollar business operation. Dish personnel knew the TSR definition of an Established Business Relationship.  The definition set the 18-month period from the date of the last purchase or financial transaction.  Such an enterprise would have known to determine whether a call recipient purchased

goods or services from it within the last 18 months by checking the last date a call recipient paid for goods or services. Dish, however, did not. An enterprise in Dish's position would have known that it was improperly calculating whether it had Transaction-based Established Business Relationships with current and former customers. Such an enterprise under the circumstances would have known that improperly determining the existence of Established Business Relationships would result in making illegal telemarketing calls to persons whose numbers were on the Registry. Dish, therefore, acted with knowledge fairly implied when it made these illegal calls.

Dish personnel also knew that Dish could not call persons on the Lead Tracking System if the telephone number was on the Registry. Dish had the burden to show that it had an Inquiry-based Established Business Relationship to avoid liability. Dish failed to meet its burden of proof. Dish failed to present competent evidence of how it formulated the Lead Tracking System calling campaigns.

Moreover, the scant evidence about the Lead Tracking System indicates that the Lead Tracking System included contact information for any persons who provided such information to Dish

for almost any reason.  PX117, Email thread regarding Dish Taking a DTV Sale dated August 11, 2004, at PX117-001, 005-006.  The Lead Tracking System apparently included contact information for people who started to buy online but did not, and people who already received a telemarketing call but decided not to buy.  Id. The TSR stated that an Inquiry-based Established Business Relationship is with individuals who inquired or applied for a product or service offered by the seller within three months of the date of the telemarketing call.  16 C.F.R. § 310.2(o).  People who decided not to buy Dish Network programming did not inquire about Dish Network programming.  Dish failed to meet its burden of proof for the Established Business Relationship exception for the Lead Tracking System calls.  Dish is liable for civil penalties for making the Lead Tracking System Registry Calls.

Dish, therefore, made the millions of illegal Registry Calls from March 25, 2004 to September 2007, and 3,140,920 illegal Registry Calls recorded from September 2007 to March 2010 with knowledge or knowledge fairly implied that it was making calls in violation of the TSR.  Dish made an additional 2,386,386 Registry Calls that

were also illegal Internal List Calls.  The Court will discuss liability for these calls in connection with Count II.

Dish presented numerous witnesses who testified that Dish acted in good faith and never intentionally made an illegal call. Dish's expert Kenneth Sponsler further opined that Dish met industry standards.  Neither good faith nor compliance with industry standard is a defense.  The issue is whether Dish knew the requirements of the TSR and knew or should have known that its outbound telemarketing practices resulted in illegal Registry Calls. The evidence shows that Dish knew the terms of the TSR and knew or should have known that their outbound calling procedures resulted in Registry Calls to persons who did not have Established Business Relationships with Dish.  The fact that Dish employees acted in good faith when they knowingly made such calls or that industry standards would allow such illegal calls is not a defense.

The only applicable defense is the TSR safe harbor defense. Dish's expert Sponsler acknowledged as much in his testimony. See T 633:3451, 3507-08 (Sponsler).  Dish did not comply with the TSR safe harbor provisions.  Dish did not have written procedures to prevent calling persons whose numbers were on the Registry in

Account Number Campaigns.  Dish did not maintain records to document the use of such a process.  Dish further did not present competent material evidence concerning any procedures, written or unwritten, that Database Marketing may have used to ensure that the Lead Tracking System and Cold Call calling campaigns complied with the TSR.  16 C.F.R. § 310.4(b)(1)(iii); <u>Opinion 445</u>, at 163-65 75.  Dish knew that some of its calls were illegally made to numbers on the Registry, and Dish did not comply with the safe harbor provisions to avoid liability for such calls.  Dish made millions of Registry Calls in the 2003-2007 Calling Records from March 25, 2004 to August 2007, and 3,140,920 Registry Calls from September 2007 to March 2010 with knowledge or knowledge fairly implied that it was making calls in violation of the TSR.  Dish is liable for civil penalties for these calls.

      ii.     <u>Calls by Order Entry Retailers to Persons Whose Numbers Were on the Registry</u>

Dish knew the TSR prohibited causing telemarketers to make Registry Calls, Internal List Calls, and abandoned calls.  16 C.F.R. §310.4(b)(1).  Dish also had knowledge fairly implied under objective circumstances it could be held liable under the TSR for causing the

actions of telemarketers that it authorized to sell its programming and services through telemarketing.  Dish was a sophisticated enterprise with knowledgeable counsel.  Dish put together the Working Group a year ahead of time to prepare for the TSR.  Under these objective circumstances, Dish would have known that it would be liable for telemarketers' actions.  In 2004, the FTC published a Guide for complying with the TSR which alerted Dish to its responsibility for its Order Entry Retailers:

> The FTC published a guide to help sellers comply with the TSR. Plaintiffs' Response, (Guide). The Guide discussed the seller's liability for the telemarketer's actions:
>
> **What happens if a consumer is called after he or she has asked not to be called?** If a seller or telemarketer calls a consumer who has:
>
> •   placed his number on the National Registry [the List]
>
> •   not given written and signed permission to call
>
> •   either no established business relationship with the seller, or has asked to get no more calls from or on behalf of that seller . . .
>
> the seller and telemarketer may be liable for a Rule violation. If an investigation reveals that neither the seller nor the telemarketer had written Do Not Call procedures in place, both will be liable for the Rule violation. If the

seller had written Do Not Call procedures, but the telemarketer ignored them, the telemarketer will be liable for the Rule violation; the seller also might be liable, unless it could demonstrate that it monitored and enforced Do Not Call compliance and otherwise implemented its written procedures. Ultimately, a seller is responsible for keeping a current entity-specific Do Not Call list, either through a telemarketing service it hires or its own efforts.

Under the FTC interpretation of the TSR, a seller "causes" the telemarketing activity of a telemarketer by retaining the telemarketer and authorizing the telemarketer to market the seller's products and services. According to the Guide, the seller is liable for the telemarketer's violations of the TSR unless the safe harbor provisions apply.

Opinion 20, at 13-15, (quoting excerpts from FTC Guide, Complying with the Telemarketing Sales Rule (January 2004) (FTC Guide) (emphasis in the original)).

A sophisticated enterprise in Dish's position with Dish's legal staff would have known that the FTC Guide stated that the seller was ultimately responsible for the actions of its telemarketers, "unless it could demonstrate that it monitored and enforced Do Not Call compliance and otherwise implemented its written procedures." FTC Guide.  Dish knew that it did not enforce Do-Not-Call compliance on its Order Entry Retailers and did not require Order

Entry Retailers to implement any written procedures. Dish's only written procedures, the Quality Assurance Program, did not concern or monitor Do-Not-Call Law compliance. Under these circumstances, a person in Dish's position would have known that it was responsible for causing the Order Entry Retailers' violations.

Dish argues that it should not be held vicariously liable for actions of Order Entry Retailers because they were independent contractors. However, Dish's liability for causing the acts of its Order Entry Retailers is not vicarious liability. Rather, sellers cause telemarketers to make Registry Calls, Internal List Calls, and abandoned calls by retaining and authorizing Retailers to market the sellers' products. Opinion 20, at 13-15. Sellers that employ telemarketers direct liability for causing the telemarketers' illegal Registry Calls, Internal List Calls, and abandoned calls.

Vicarious liability, however, may be an alternate basis for imposing liability on sellers such as Dish for the acts of agents. See ACB Sales & Service, Inc., 590 F. Supp. at 575 n.11 (principal may be liable if agent had knowledge of the law and knowledge that the acts violated the law). Dish, for example, has conceded that it is responsible under the TSR for the acts its agents, Telemarketing

Vendors eCreek and EPLDT. Dish is similarly responsible for the actions of the Order Entry Retailers that were also its agents. As discussed above, the Order Entry Retailers were acting within the scope of their agency when they made the illegal Registry Calls, Internal List Calls, and Abandoned Prerecorded Calls.

The TSR civil penalty provisions require not only proof of the illegal acts, but proof of knowledge or knowledge fairly implied under objective circumstances that the acts violated the TSR. The knowledge of the agent about a matter material to an agent's duties is imputed to the principal unless the agent is acting adversely to the principal. National Product Workers Union Insurance Trust v. Cigna Corporation, 665 F.3d 897, 903 (7th Cir. 2011); Pekin Life Insurance Co. v. Schmid Family Irrevocable Trust, 359 Ill. App. 3d 674, 681, 834 N.E.2d 531, 536-37 (Ill. App. 1st Dist. 2005); Restatement (Third) of Agency, § 5.03. An agent acts adversely to the principal when the agent intends to act solely for the agent's own purposes or those of another person. Restatement (Third) of Agency, § 5.04; see Hartman v. Prudential Ins. Co. of America, 9 F.3d 1207, 1210 (7th Cir. 1993). In this case, the Order Entry Retailers were Dish's agents authorized to market Dish Network

programming.  The manner in which they conducted telemarketing was material to their duties as marketing agents.  The Order Entry Retailers' knowledge of telemarketing activities is therefore imputed to Dish.

Dish argues that the Order Entry Retailers were acting adversely to Dish because they were using illegal methods and because they had high churn rates.  See Dish Network, L.L.C.'s Proposed Post-Trial Conclusions of Law (d/e 666), at 31 (citing United States v. One Parcel of Land Located at 7326 Highway 45 North, Three Lakes, Onieda County, Wis., 965 F.2d 311, 317 (7th Cir. 1992)).  The Court disagrees.  In the case cited by Dish, One Parcel of Land, the agent acted adversely because he sold illegal drugs on the principal's property solely for his own benefit.  Id.  The Order Entry Retailers were acting at least in part for the benefit of Dish because they were selling Dish Network programming.  The Order Entry Retailers may have used illegal means and may or may not have been effective, but they were not acting solely for their own benefit.  The knowledge of the Order Entry Retailers about the conduct of telemarketing is imputed to Dish.

Dish also cites a case involving an employer-employee relationship to argue that the United States must prove that Order Entry Retailers received the knowledge of their illegal acts while acting within the scope of authority and that they had a duty to speak to Dish.  <u>Dish Conclusions of Law (d/e 666)</u>, at 31(citing <u>Juarez v. Ameritech Mobile Communications, Inc.</u>, 957 F.2d 317, 321 (7th Cir. 1992).  The <u>Juarez</u> opinion described principles of imputed knowledge in employer-employee relationships.  This case does not involve employment relationships.  The general principles of agency apply.  Under general agency principles, the knowledge of Order Entry Retailers about the subject of the agency, the marketing of Dish Network programming, is imputed to Dish.

General agency principles do not apply to impose vicarious liability for punitive damages on the principal for the acts of its agents done within the scope of the agency.  Under the agency law of the United States and the Plaintiff States, a principal is vicariously liable for punitive damages awarded for the actions of its agents if the principal or a manager of a corporate principal knew of the actions or later ratified the actions.  <u>See</u> <u>City of Chicago v. Matchmaker Real Estate Sales Center, Inc.</u>, 982 F.2d 1086, 100 (7th

Cir. 1992) (applying federal law); accord Jannotta v. Subway Sandwich Shops, Inc., 125 F.3d 503, 514 (7th Cir. 1997) (applying Illinois law); Cal. Civ. Code § 3294(b); N.C. Gen. Stat. § 1D-15(c)) Ohio Rev. Code Ann. § 2315.21(C)(1); Restatement (Third) of Agency, § 7.03 comment e (2006) (citing with approval Restatement (Second) of Torts, § 909).

Restatement (Third) of Agency § 7.03 comment e states that with respect to a statute that authorizes a penalty, "unless the language of the statute itself resolves the question, the determination should reflect the purpose of the statute." The Court directed the parties to submit supplemental briefing to address whether agency law regarding a principal's liability for punitive damages for the actions applied to the claims for monetary relief in this action. Opinion entered February 9, 2017 (d/e 766) (Opinion 766).

Upon careful consideration of the parties' supplemental submissions on this issue and the Court's research, the Court concludes that, in light of the purpose of the FTC Act, the special agency rules for punitive damages do not apply to liability for civil penalties under § 5(m) of the FTC Act. The FTC Act serves a

markedly different purpose than punitive damages. Punitive damages punish egregious or outrageous conduct done with evil motive or reckless disregard for the rights or interest of others. <u>See</u> <u>Restatement (Second) of Torts</u>, § 908 (1979). Congress authorized FTC Act civil penalties as part of an array of remedial tools to effectuate the purposes of the FTC Act, not to punish outrageous or egregious conduct.

Congress enacted the FTC Act to establish an expert administrative body to stop unfair and deceptive practices in the marketplace. Section 5 of the FTC Act originally prohibited unfair methods of competition and authorized the FTC to issue orders to cease and desist such practices. <u>See</u> FTC Act, § 5, 38 Stat. 717, 719, codified at 15 U.S.C. § 5; H.R. CONF. REP. NO. 1142, 63d Cong., 2d Sess. 19 (1914). In 1938, Congress amended Section 5 the FTC Act to also prohibit unfair and deceptive acts and practices. <u>See</u> Act of March 21, 1938, ch. 49 § 3, 52 Stat. at 111-12 (Wheeler-Lea Amendments) (amending FTC Act, § 5(a)). Congress also authorized civil penalties for violations of cease and desist orders. Wheeler-Lea Amendments § 5(l), 52 Stat. 111, 114, codified as 15 U.S.C. § 45(l). Congress subsequently authorized civil penalties for

violations of FTC rules done "with actual knowledge or knowledge fairly implied on the basis of objective circumstances" that the acts violated the rule.  Magnuson-Moss Warranty—Federal Trade Commission Improvement Act of 1975, Pub. L. No. 93-637, tit. II § 205, 88 Stat. 2183, 2193, codified at 15 U.S.C. § 45(m).

Congress added civil penalties to ensure compliance with FTC cease and desist orders and FTC regulations, not to punish egregious or outrageous conduct.  Section 5(m) does not require proof of outrageous or egregious violations. That section only requires knowledge or knowledge fairly implied under objective circumstances that the acts in question violated the applicable rule. Congress made culpability a factor in determining the amount of penalties, but not to determining liability for penalties.

Applying agency punitive damages principles to FTC Act § 5(m) civil penalties would interfere with the Congressional goals of effective enforcement.  Sellers would have incentives to avoid monitoring telemarketers so that they could assert a defense of no actual knowledge to TSR and FTC Act claims for civil penalties.  The TCPA requirement to show an agency relationship between seller and telemarketer has already discouraged some sellers from

monitoring telemarketers.  These sellers have avoided implementing Do-Not-Call monitoring or enforcement procedures over telemarketers in order to assert a defense of no agency to TCPA claims.  T 715: 817 (Sponsler).   Applying punitive damages principles to TSR civil penalties would create additional incentives to avoid implementing Do-Not-Call Law compliance policies and procedures for telemarketers.  This result is directly contrary to Congressional purposes of FTC Act § 5(m) civil penalties.  The civil penalties exist to enforce compliance with the TSR, not discourage compliance.

The Supreme Court has determined in the context of Title VII of the Civil Rights Act of 1964 that agency law principles do not apply to statutory claims when the agency law would frustrate Congressional purposes.  The Supreme Court stated that applying common law agency principles in Title VII punitive damages "would reduce incentives for employers to implement antidiscrimination programs. . . .  Dissuading employers from implementing programs or policies to prevent discrimination in the workplace is directly contrary to the purposes underlying Title VII.").  Kolstad v. American Dental Association, 527 U.S. 526, 544-46 (1999).

Similarly here, applying agency rules for punitive damages to FTC Act § 5(m) civil penalties would frustrate the purpose of the FTC Act. <u>See</u> <u>Id.</u>; <u>Restatement (Third) of Agency</u> § 7.03 comment e, (The applicability of the punitive damages rules to statutory penalties "should reflect the purposes of the statute."). The agency principles for vicarious liability for punitive damages, therefore, do not apply to FTC Act § 5(m) civil penalties.

Dish may be liable for civil penalties directly for causing Order Entry Retailers to make Registry Calls, Internal List Calls, and Abandoned Prerecorded Calls; and, alternatively, may be liable vicariously for civil penalties for the actions of their agents done within the scope of the agency, including the Order Entry Retailers who violated the TSR by making Registry Calls, Internal List Calls, and Abandoned Prerecorded Calls, when done with the requisite knowledge or knowledge fairly implied under objective circumstances.

Pursuant to these legal principles, Dish acted with knowledge fairly implied when it caused JSR to make 2,349,031 illegal Registry Calls in 2006. Dish retained JSR as an Order Entry Retailer to market Dish Network programming. Dish authorized JSR to

conduct telemarketing.  Under the objective circumstances of this case, Dish knew or should have known that it was liable under the TSR for causing JSR's illegal Registry Calls.  Dish did not provide JSR with written Do-Not-Call compliance procedures.  Dish is liable for civil penalties for causing JSR to make these illegal Registry Calls.

Alternatively, Dish is liable because JSR was Dish's agent or subagent for telemarketing Dish Network programming in 2006. Dish was liable for JSR's actions within the scope of the agency. JSR's Registry Calls were within the scope of the agency.  Dish and JSR knew that making telemarketing calls to persons whose numbers were on the Registry violated the TSR.  One of JSR's partners, Goodale, knew JSR was making illegal Registry Calls. Goodale knew that his partners did not scrub calling lists to remove numbers on the Registry.  This knowledge is imputed to Dish. Furthermore, Dish received consumer complaints that JSR was making Registry Calls.  Dish acted with knowledge fairly implied under objective circumstances when its agent JSR made 2,349,031 illegal Registry Calls in 2006.

Dish acted with knowledge fairly implied when it caused JSR to make 3,315,242 illegal Registry Calls in 2007. Dish retained JSR as an Order Entry Retailer to market Dish Network programming. Dish authorized JSR to conduct telemarketing through February 14, 2007. Dish retained the other Order Entry Retailer through which JSR conducted telemarketing after February 15 and March 2007. Under the objective circumstances of this, case Dish knew or should have known that it was liable under the TSR for causing JSR's illegal Registry Calls either directly as an Order Entry Retailer or through the other Order Entry Retailer. Dish did not provide any Order Entry Retailer with written Do-Not-Call compliance procedures. Dish is liable for civil penalties for causing JSR to make these illegal Registry Calls.

Dish is vicariously liable for the millions of calls that JSR made as Dish's agent until Dish terminated JSR as an Order Entry Retailer on February 14, 2007. JSR knew it was making Registry Calls and that such calls were illegal. This knowledge is imputed to Dish. Thereafter, JSR made the calls through March 2007 through an Order Entry Retailer. The United States has not shown that Dish had knowledge of these calls or authorized JSR to act as a sub

agent when it made these calls.  The United States has proven that Dish vicariously liable under agency principles when it acted with knowledge fairly implied through its agent JSR to make millions of Registry calls in 2007, but the United States has not proven the number of calls.

Dish acted with actual knowledge or knowledge fairly implied when it caused Satellite Systems to make 381,811 Registry Calls between May 2010 and August 2011.  Dish retained Satellite Systems as an Order Entry Retailer to market Dish Network programming.  Dish authorized Satellite Systems to conduct telemarketing.  Under the objective circumstances of this, case Dish knew or should have known that it was liable under the Satellite Systems for causing Satellite Systems' illegal Registry Calls.  Dish did not provide Satellite Systems with written Do-Not-Call compliance procedures.  Moreover, Dish personnel knew that Satellite Systems was making Registry Calls. Dish was receiving so many complaints about these calls that Dish's legal department had developed a standard "go after Satellite Systems" letter to send to complaining individuals.  The evidence shows that Dish knew about these calls and decided to keep Satellite Systems as an Order Entry

Retailer.  Dish knew that it was causing Satellite Systems to make these 381,811 Registry Calls.  Dish is liable for civil penalties for these calls.

Alternatively, Dish is vicariously liable for its agent Satellite Systems' 381,811 illegal Registry Calls.  Dish knew Registry Calls violated the TSR.  Dish further knew that Satellite Systems was making these illegal calls.  Dish consciously decided to do nothing about it.   Dish told injured consumers to go after Satellite Systems. Dish therefore is liable for civil penalties for these calls.

2. Count II

a. Internal List Calls to Persons Who Stated to Dish and the Telemarketing Vendors That They did not Wish to Receive Calls by or on Behalf of Dish

Dish acted with knowledge or knowledge fairly implied under objective circumstances when Dish and its Telemarketing Vendors made 903,246 Internal List Calls between September 2007 and March 2010 to persons who previously stated to Dish or one of the Telemarketing Vendors that they did not wish to receive telemarketing calls by or on behalf of Dish.  Dish personnel clearly knew that it was not supposed to call individuals who told Dish or

its Telemarketing Vendor that they did not wish to receive telemarketing calls by or on behalf of Dish. Dish has maintained an Internal Do-Not-Call List since 1998. Dish further required its Telemarketing Vendor eCreek provide Dish with its Do-Not-Call requests. Telemarketing Vendor EPLDT used Dish's dialers and put its Do-Not-Call requests onto Dish's Internal Do-Not-Call List directly. Dish personnel also knew from its investigations of consumer complaints and its internal audits that it made calls to persons on Internal Do-Not-Call Lists. The Court finds that a person in Dish's position would have known that it was making these illegal calls.

Dish acted with knowledge or knowledge fairly implied under objective circumstances when Dish made 140,349 Internal List Calls between September 2007 and March 2010 to persons who previously stated to Dish's Telemarketing Vendor eCreek that they did not wish to receive telemarketing calls by or on behalf of Dish. Again, Dish personnel knew that Dish was not supposed to call individuals who told its Telemarketing Vendor that he or she did not wish to receive telemarketing calls by or on behalf of Dish. Dish further had eCreek provide Dish with Do-Not-Call requests made to

eCreek.   Dish personnel also knew from its investigations of consumer complaints that it made calls to persons on Internal Do-Not-Call Lists.  The Court finds that a person in Dish's position would have known that it was making these calls.

Dish acted with knowledge or knowledge fairly implied under objective circumstances when Dish and the Telemarketing Vendors made 7,321,163 Internal List Calls between September 2007 and March 2010 to persons who previously stated to Dish Order Entry Retailers that they did not wish to receive telemarketing calls by or on behalf of Dish.  Dish knew that it was required to honor do-not-call requests made to its marketing agents.  Dish, in fact, honored the do-not-call requests made to eCreek and EPLDT.  The Order Entry Retailers were Dish's marketing agents.  Under these objective circumstances, a person in Dish's position would have known to honor do-not-call requests made to Order Entry Retailers. Dish made no attempt to honor do-not-call requests to Order Entry Retailers prior to April 2008.  Dish did not collect Order Entry Retailers' Internal Do-Not-Call Lists until April 2008.  Thereafter, Dish made the illegal calls even with access to some of the Order Entry Retailers' Internal Do-Not-Call Lists.  Dish's investigation of

consumer complaints showed that it was making calls to people on Internal Do-Not-Call Lists. The Court finds that under the objective circumstances in this case, a person in Dish's position would have known the requirements of the TSR and known that these calls violated those requirements.

Dish argues that it should not be subject to civil penalties for these calls because Dish could not have known that this Court would find that it was obligated to honor do-not-call requests made to Order Entry Retailers. Dish argues that the question of whether it had to honor do-not-call requests to Order Entry Retailers was undecided until the Court made these findings of fact and conclusions of law. Dish argues that the fact that Plaintiffs had to prove an agency relationship with Order Entry Retailers was unknown until the Court entered partial summary judgment. Dish argues that a person in its position in 2004 to 2010 would not have known that it had to honor do-not-call requests to Order Entry Retailers.

The Court disagrees. Dish knew that it had to honor do-not-call requests made to its telemarketing agents. Dish set up procedures to honor Do-Not-Call requests made to its agents eCreek

and EPLDT.  The Court's conclusion that Order Entry Retailers were Dish's marketing agents was based on well-established principles of agency law.  Under the objective circumstances of this case, a reasonable person in Dish's position would have known that Order Entry Retailers were marketing agents.  Such a person would have known not to call people who told Order Entry Retailers not to make telemarketing calls by or on behalf of Dish.  Dish is liable for civil penalties on these 7,321,163 calls.

### b. Internal List Calls by Order Entry Retailers

Dish acted with knowledge or knowledge fairly implied when Dish caused JSR to make 418,228 Internal List Calls in 2006 to persons who stated to Dish or the Telemarketing Vendors that they did not wish to receive telemarketing calls by or on behalf of Dish.  JSR was Dish's agent or subagent for telemarketing Dish Network programming in 2006.  Dish knew that making telemarketing calls to persons who stated that they did not wish to be called by or on behalf of Dish violated the TSR.  Dish further knew that its agents had to honor Do-Not-Call requests made to Dish.

Dish acted with knowledge or knowledge fairly implied when Dish caused JSR to make hundreds of thousands of Internal List

Calls from January through February 14, 2007, to persons who stated to Dish or the Telemarketing Vendors that they did not wish to receive telemarketing calls by or on behalf of Dish. JSR was Dish's agent or subagent for telemarketing Dish Network programming. Dish knew that making telemarketing calls to persons who stated that they did not wish to be called by or on behalf of Dish violated the TSR. Dish further knew that its agents had to honor Do-Not-Call requests made to Dish. The United States proved that JSR made 768,696 such calls from January through March 2007, but did not prove the number made while JSR was an agent of Dish prior to February 14, 2007.

Dish acted with knowledge or knowledge fairly implied when Dish caused JSR to make 267,439 Internal List Calls in 2006 to persons who stated to Order Entry Retailers that they did not wish to receive telemarketing calls by or on behalf of Dish. JSR was Dish's agent or subagent for telemarketing Dish Network programming from July 2006 to February 14, 2007. The other Order Entry Retailers were also Dish's marketing agents. Dish knew that making telemarketing calls to persons who stated that they did not wish to be called by or on behalf of Dish violated the

TSR.  Dish further knew that its agents had to honor Do-Not-Call requests made to Dish or its other agents.

Dish acted with knowledge or knowledge fairly implied when Dish caused JSR to make hundreds of thousands of Internal List Calls from January through February 14, 2007, to persons who stated to Order Entry Retailers that they did not wish to receive telemarketing calls by or on behalf of Dish.  JSR was Dish's agent or subagent for telemarketing Dish Network programming from July 2006 to February 14, 2007.  Dish knew that making telemarketing calls to persons who stated that they did not wish to be called by or on behalf of Dish violated the TSR.  Dish further knew that its agents had to honor do-not-call requests made to Dish or its other agents.  The United States proved that JSR made 526,956 such calls from January through March 2007, but the United States did not prove the number made while JSR was an agent of Dish prior to February 14, 2007.

Dish acted with knowledge or knowledge fairly implied when Dish caused Satellite Systems to make 22,946 telemarketing calls to persons who stated to Dish that they did not wish to receive telemarketing calls by or on behalf of Dish.  Satellite Systems was

Dish's agent for telemarketing Dish Network programming. Dish knew that making telemarketing calls to persons who stated that they did not wish to be called by or on behalf of Dish violated the TSR. Dish further knew that its agents had to honor do-not-call requests made to Dish or its other agents.

Dish acted with knowledge or knowledge fairly implied when Dish caused Satellite Systems to make 42,990 telemarketing calls to persons who stated to Dish that they did not wish to receive telemarketing calls by or on behalf of Dish. Satellite Systems was Dish's agent for telemarketing Dish Network programming. Dish knew that making telemarketing calls to persons who stated that they did not wish to be called by or on behalf of Dish violated the TSR. Dish further knew that its agents had to honor do-not-call requests made to Dish or its other agents.

3. <u>Count III</u>

   a. <u>Prerecorded Abandoned Calls Made by Dish</u>

Dish acted with knowledge or knowledge fairly implied when it made 98,054 Abandoned Prerecorded Calls that were answered by a person and abandoned those calls in violation of TSR 16 C.F.R. § 310.4(b)(4)(iv) Dish personnel knew that Prerecorded Calls were

illegal.  The FTC stated in 2003 and 2004 that Prerecorded Calls that were answered by a person were abandoned calls in violation of the TSR.  2003 TSR Statement of Basis and Purpose, 68 Fed. Reg. 4580, 4644 (January 29, 2003); 2004 Notice, 69 Fed. Reg. 67287 (November 17, 2004); see Opinion 445, at 21-23.  The courts that have addressed this issue all agreed that Prerecorded Calls were abandoned calls.  The Broadcast Team, Inc. v. F.T.C., 429 F.Supp.2d 1292, 1300-01 (M.D. Fla. 2006); F.T.C. v. Asia Pacific Telecom, Inc., 802 F.Supp.2d 925, 929 (N.D. Ill. 2011).

Dish argues that courts disagree on this issue. Dish cites National Federation of the Blind v. F.T.C., 420 F.3d 331, 341 (4th Cir. 2005).  The National Federation of the Blind case addressed the effect of the abandonment provision on First Amendment rights.  The case did not mention Prerecorded Calls.  The cases that address Prerecorded Calls are not in conflict.  Prerecorded Calls that are answered are abandoned calls that violate the TSR.

Dish also notes that the FTC stated in 2006 that some individuals criticized the abandonment provision as ambiguous. Telemarketing Sales Rule, Denial of Petition for Proposed Rulemaking, 71 Fed. Reg. 58716, 58726 (October 4, 2006).  The

FTC stated, however, that the provision was not ambiguous and clearly covered Prerecorded Calls. "The Commission continues to think that the plain language of the call abandonment provision itself prohibits calls delivering prerecorded messages when answered by a consumer, a position it has repeatedly stated, and that has been accepted by at least one court."(Footnotes omitted). Id. The FTC has consistently interpreted § 310.4(b)(4)(iv) to cover Prerecorded Calls that are answered.

A sophisticated business enterprise in Dish's situation with both in-house and outside counsel would have known that Prerecorded Calls that were answered were Abandoned Prerecorded Calls that violated the TSR. The evidence also proves that Dish personnel in fact knew that Prerecorded Calls were illegal. Dish's arguments to the contrary are not persuasive.

With this knowledge, Dish made the Prerecorded Calls, and 98,054 of the calls were answered. A person in Dish's position would have known that these calls violated the TSR. Dish Outbound Operations personnel knew such calls were prohibited. Dish is liable for civil penalties for these calls. Dish acted with

knowledge and knowledge fairly implied under objective circumstances.

      b. <u>Abandoned Prerecorded Calls Made by Order Entry Retailers</u>

Dish acted with knowledge or knowledge fairly implied based on objective circumstances when it caused Dish TV Now to make 6,637,196 Abandoned Prerecorded Calls that were answered by a person and abandoned in violation of the TSR. Dish TV Now was an Order Entry Retailer. Dish caused Dish TV Now to engage in telemarketing because Dish retained Dish TV Now as an Order Entry Retailers and authorized Dish TV Now to engage in telemarketing Dish Network programming. Dish took no step to enforce or monitor Do-Not-Call compliance. Under the objective circumstances in this case, a person in Dish's position knew or should have known that Prerecorded Calls that were answered by a person were abandoned calls in violation of the TSR. Dish is liable for civil penalties for these calls. Dish is, therefore, liable for civil penalties for causing Dish TV Now to make these illegal Abandoned Prerecorded Calls.

Alternatively, Dish is liable for civil penalties for the actions of its agent Dish TV Now. Dish's agent Dish TV Now made these Abandoned Prerecorded Calls through Guardian. Dish TV Now's knowledge of these Abandoned Prerecorded Calls is imputed to Dish. Under these circumstances Dish is alternatively liable for its agents' illegal calls.

Dish acted with actual knowledge when it caused Star Satellite to make 43,100,876 Abandoned Prerecorded Calls that were answered by a person and abandoned in violation of the TSR. Dish caused Star Satellite to engage in telemarketing because Dish retained Star Satellite as an Order Entry Retailers and authorized Star Satellite to engage in telemarketing Dish Network programming. Dish had actual knowledge that Star Satellite was making Prerecorded Calls. Dish received repeated consumer complaints beginning in late 2004 or early 2005 that Star Satellite was making Prerecorded Calls. Dish Outbound Operations Manager Bangert further knew that Star Satellite was making prerecorded calls. Bangert sent notice of Star Satellite's practices to Dish's Retail Escalations Department. Dish personnel did nothing about Star Satellite's Prerecorded Calls. Under the objective

circumstances, a person in Dish's position would have known that Star Satellite was making Prerecorded Calls to sell Dish Network programming and, that when individuals answered such calls, the calls would become Abandoned Prerecorded Calls in violation of the TSR.

Alternatively Dish is liable for civil penalties for the actions of its agent Star Satellite. Star Satellite was an agent of Dish when it had Guardian make these Prerecorded Calls. As Dish's agent, Star Satellite knew that Guardian was making Prerecorded Calls on its behalf. Dish also knew that Star Satellite made these Prerecorded Calls. Dish knew or reasonably should have known that Prerecorded Calls that were answered by a person were abandoned calls in violation of the TSR. Dish is, alternatively, liable for civil penalties for these actions of its agent Star Satellite.

Dish acted with actual knowledge or knowledge fairly implied when it caused JSR to make 1,285,379 Prerecorded Calls that were answered by a person and Abandoned Prerecorded Calls in violation of the TSR. Dish caused JSR and the other Order Entry Retailers through which JSR worked to engage in telemarketing because Dish retained them as Order Entry Retailers and authorized them

to engage in telemarketing Dish Network programming. Dish had actual knowledge that Star Satellite was making Prerecorded Calls. Vice President Mills, Regional Sales Manager Oberbillig, and Dish Representative Tchang knew from the beginning that JSR was making "press 1" prerecorded telemarketing calls. Dish, therefore, knew that JSR was making Prerecorded Calls to sell Dish Network programming. A person in Dish's position would have known that when individuals answered those calls, the calls would become Abandoned Prerecorded Calls in violation of the TSR. Dish is liable for civil penalties for these calls.

Alternatively, Dish is liable for the Abandoned Prerecorded Calls that JSR made as Dish's agent. JSR was an agent or subagent of Dish when it made many of these Prerecorded Calls prior to February 14, 2007. Dish personnel knew its agent JSR was making Prerecorded Calls. Dish knew or reasonably should have known that Prerecorded Calls that were answered by a person were Abandoned Prerecorded Calls in violation of the TSR. The United States, however, did not prove the number of calls that were made before February 14, 2007. Under the agency analysis, Dish is liable for penalties for these Abandoned Prerecorded Calls, but the

number of calls that JSR made while Dish's agent has not been proven.

Dish acted with knowledge or knowledge fairly implied when it caused American Satellite to make the one Abandoned Prerecorded Call proven at summary judgment, and also, many more Abandoned Prerecorded Calls that were answered and abandoned in violation of the TSR. American Satellite was an Order Entry Retailer. Dish caused American Satellite to engage in telemarketing because Dish retained American Satellite as an Order Entry Retailer and authorized American Satellite to engage in telemarketing Dish Network programming. Under the objective circumstances in this case, a person in Dish's position knew or should have known that Prerecorded Calls that were answered by a person were abandoned calls in violation of the TSR. Dish is liable for civil penalties for the one call.

Dish also acted with actual knowledge when it caused American Satellite to make many more Abandoned Prerecorded Calls. Castillo told Musso and Eichhorn that American Satellite was making Prerecorded Calls. Dish knew or reasonably should have known that Prerecorded Calls that were answered by a person

were Abandoned Prerecorded Calls in violation of the TSR. The United States has not proven the number of such Abandoned Prerecorded Calls that it caused American Satellite to make.

Alternatively, Dish is liable for civil penalties for the actions of its agent American Satellite. American Satellite was an Order Entry Retailer and, so, an agent of Dish. As Dish's agent, American Satellite knew that it was making Prerecorded Calls, including the one call proven at summary judgment. This knowledge is imputed to Dish. Under the objective circumstances, a person in Dish's position knew or should have known that the call was an Abandoned Prerecorded Call in violation of the TSR. Dish is liable for civil penalties for this action of its agent American Satellite. Dish is also liable for civil penalties for the many more abandoned calls that American Satellite made, but the number of such calls has not been proven.

4. Count IV

Dish acted with knowledge when it provided substantial assistance to Star Satellite after it knew that Star Satellite was using Prerecorded Abandoned Calls to sell Dish Network programming and continued to pay them and do business with

them as an Order Entry Retailer.  Dish is liable for civil penalties for providing substantial assistance to Star Satellite to make the 43,100,876 Abandoned Prerecorded Calls in violation of the TSR 16 C.F.R. § 310.3(b).  The Court, however, determines that it will impose only one civil penalty for these calls even though the United States proved liability in both Count III and Count IV.  The total violations are so large and the amount of the potential civil penalty is so high that the Court finds that one penalty for each call is sufficient in this case.

5. <u>Continual Violations</u>

Dish argues, alternatively, that the violations should be counted as one continual refusal to comply with the TSR rather than separate violations for each call.  In cases of a continual refusal to comply with an FTC rule, the FTC Act authorizes a penalty of up to $11,000.00 per day before February 9, 2009, and $16,000.00 per day thereafter.  15 U.S.C. § 45(m)(1)(C).  The continual violation provision may apply when a party continues to violate the FTC Rule but the number of violations is unclear.  <u>See</u> <u>F.T.C. v. Hughes</u>, 710 F.Supp. at 1529.  The FTC Act, however, also authorizes a penalty of up to $11,000.00 before February 9, 2009,

and $16,000.00 thereafter for each violation of an FTC rule. 15 U.S.C. § 45(m)(1)(A). The TSR, states that causing an illegal call is a violation. TSR 16 C.F.R. § 310.4(b). The United States has proven millions of calls. Each call proven is a separate violation and, so, Dish may be liable for a separate penalty for each such call. A per violation approach is appropriate in this case for the number of proven illegal calls that Dish caused with knowledge or knowledge fairly implied.

The daily penalty may be appropriate for the millions of illegal calls that Dish made or caused with knowledge or knowledge fairly implied under objective circumstances of this case, but the number of which the United States did not prove with sufficient certainty. The United States, however, did not ask for such an additional penalty so the Court will not award such a sum. The maximum possible penalty for the proven calls is so large that an additional daily penalty is not necessary to serve the interests of justice.

The FTC Act directs the Court to consider several factors when determining the appropriate penalty, including the ability to pay and to continue to do business. 15 U.S.C. § 45(m)(1)(C). Dish's ability to pay and to continue to do business will depend, in part,

on the amount of penalties and statutory damages that are appropriate under the other Counts in this case. The Court determines the appropriate amount of the penalties or statutory damages for all Counts below after determining liability generally and liability for penalties or statutory damages in the remaining Counts.

    F. <u>Counts V and VI Plaintiff States TCPA Claims</u>

       1.<u> Count V</u>

Count V is the first of two claims brought by the Plaintiff States for violations of TCPA. Count V alleges in pertinent part:

> DISH Network, either directly or indirectly as a result of a third party acting on its behalf, has violated 47 C.F.R. § 64.1200(c)(2) and 47 U.S.C. § 227(c), by engaging in a pattern or practice of initiating telephone solicitations to residential telephone subscribers, including subscribers in California, Illinois, North Carolina, and Ohio whose telephone numbers were listed on the National Do Not Call Registry.

<u>Third Amended Complaint</u>, ¶ 72. The Plaintiff States further allege that Dish's violations were willful and knowing. <u>Third Amended Complaint</u>, ¶ 73.

Count V contains two parts: (1) Dish allegedly engaged in a pattern or practice of making telemarketing calls to residents of the

Plaintiff States who registered their residential telephone numbers on the Registry; and (2) Retailers acting on Dish's behalf allegedly engaged in a pattern or practice of making telemarketing calls to residents of the Plaintiff States who registered their residential telephone numbers on the Registry. The statute of limitations is four years under the TCPA, and so, the period of liability extends back to March 25, 2005. 28 U.S.C. § 1658; Sawyer v. Atlas Heating & Sheet Metal Works, Inc., 642 F.3d 560, 561 (7th Cir. 2011).

Dish again agrees that the Telemarketing Vendors were acting on its behalf. Dish disputes that the Order Entry Retailers were acting on its behalf.

a. The 2003-2007 Calling Records

In 2006 and 2007, Dish made the following Registry Calls to telephone numbers with area codes associated with the Plaintiff States:

- 266,514 calls to California area codes;

- 112,769 calls to Illinois area codes;

- 85,093 calls to North Carolina area codes; and

- 98,207 calls to Ohio area codes.

The Plaintiff States rely on Taylor's analysis for these numbers. The numbers are less than the numbers of Registry Calls Dr. Yoeli found were made to numbers with Plaintiff States' area codes after March 25, 2005.  See PX 38, Yoeli Declaration, Appendix D, Yoeli October 14, 2013 Report, Appendix A, at PX 0038-125.   Based on all this evidence, it is more likely than not that Dish made at least the number of Registry Calls to Plaintiff States area codes set forth above within the statute of limitations.

The preponderance of the evidence established that the intended call recipients Registry Calls were residential telephone subscribers and residents of the respective Plaintiff States associated with the respective area codes.  Dish is liable for these Registry Calls in Count V for violation of the FCC Rule and the TCPA.

### b. The 2007-2010 Calling Records

### i. 1,707,713 Summary Judgment Calls

The Court found at summary judgment that Dish was liable for making 1,707,713 Registry Calls for which Dish did not prove an Established Business Relationship exception.  The portion of the

1,707,713 calls made to telephone numbers associated with the Plaintiff States were:

- 216,867 calls to California area codes;

- 83,895 calls to Illinois area codes;

- 52,961 calls to North Carolina area codes; and

- 77,991 calls to Ohio area codes.

The preponderance of the evidence established that the intended call recipients Registry Calls were residential telephone subscribers and residents of the respective Plaintiff States associated with the respective area codes. Dish is liable for these Registry Calls in Count V for violation of the FCC Rule and the TCPA.

ii. <u>2,386,382 Registry Calls and Internal List Calls</u>

The Court found in Count I above that Dish made an additional 2,386,386 Registry Calls that were also Internal List Calls. As explained above, the Order Entry Retailers were agents of Dish for telemarketing purposes. Dish, therefore, is liable for failing to honor the Internal Lists of the Order Entry Retailers as well as its own Internal List and eCreek's Internal List. As a result, Dish could

not have an Established Business Relationship exception for any of these Registry Calls.  The portion of the 2,386,386 calls made to Plaintiff States area codes were:

- 302,983 calls to California area codes;

- 118,289 calls to Illinois area codes;

- 97,785 calls to North Carolina area codes; and

- 95,275 calls to Ohio area codes.

The preponderance of the evidence established that the intended call recipients Registry Calls were residential telephone subscribers and residents of the respective Plaintiff States associated with the respective area codes.  These Registry Calls violated the FCC Rule and the TCPA and Dish is liable for them as alleged in Count V.

The Plaintiff States, unlike the United States, do not seek to impose liability for these calls separately as Internal List Calls.  The Court therefore will award statutory damages for these violations in this Count because the award would not result in a double recovery by the Plaintiff States for these calls under the FCC Rule and the TCPA.

### iii.  2,475,432 Calls found by Dr. Yoeli

The Plaintiff States failed to prove the source of the set of 4,075,766 calls records which they provided Dr. Yoeli to perform his analysis on this point. The Plaintiff States failed to prove that Dish was liable for those calls in the 2,475,432 call records made to Plaintiff States' area codes.  This set of calls was subject to the parties' stipulation to proportionately reduce the number of calls for which Dish would be liable from the Yoeli July 2012 Call Set. Because no calls were proven, the proportional reduction issue is moot.

### c. Order Entry Retailer Registry Calls

### i.  JSR

This Court entered partial summary judgment that Dish caused JSR made 2,349,031 Registry Calls in 2006 in violation of the TSR.  Opinion 445, at 176.  The portions of the 2,349,031 calls made to telephone numbers with Plaintiff States' area codes were:

- 473,102 calls to California area codes;

- 369,384 calls to Illinois area codes;

- 18,250 calls to North Carolina area codes; and

- 129,004 calls to Ohio area codes.

PX 28, Taylor November 6, 2013 Report, at 13.  For the reasons stated above, JSR was Dish's agent or subagent when it made these calls.  The preponderance of the evidence also establishes that the intended call recipients were residential telephone subscribers and residents of the Plaintiff States associated with each call recipient's area code.  These Registry Calls violated the FCC Rule and the TCPA, and Dish is liable for them as alleged in Count V.

JSR also made 3,315,242 Registry Calls from January through March 2007.  For the reasons stated above, the Plaintiffs failed to show that JSR was an agent or subagent of Dish after Dish terminated JSR on February 14, 2007, and failed to prove the number of Registry calls made before February 14, 2007.  The Plaintiff States, therefore, proved that JSR made illegal Registry Calls as an agent of Dish in 2007, and made some of those calls to residential telephone subscribers in the Plaintiff States, but they failed to prove the number of violations for which Dish would be liable.

ii.  Satellite Systems

This Court entered partial summary judgment that Dish caused Satellite Systems made 381,811 Registry Calls in 2010 and

2011 in violation of the TSR.  <u>Opinion 445</u>, at 176.  The portions of these 381,811 calls proven to be made to residents of the Plaintiff States were:

- 24,100 calls made to California area codes;

- 10,048 calls made to Illinois area codes;

- 7,290 calls made to North Carolina area codes; and

- 12,803 calls made to Ohio area codes.

The preponderance of the evidence showed that of these calls the number of calls made to residential telephone subscribers of the respective Plaintiff States.

d.  <u>Summary</u>

In summary, Dish is liable to the Plaintiff States for Registry Calls in violations of the FCC Rule and TCPA in Count V as follows:

<u>California</u>

| | |
|---|---|
| 2003-2007 Calling Records | 266,514 calls |
| 1,707,713 TSR Summary Judgment Calls | 216,867 calls |
| 2,386,386 Registry and Internal List Calls | 302,983 calls |
| JSR Calls | 473,102 calls |
| <u>Satellite Systems Calls</u> | <u>24,100 calls</u> |
| Total | 1,283,566 calls |

## Illinois

| | |
|---|---|
| 2003-2007 Calling Records | 112,116 calls |
| 1,707,713 TSR Summary Judgment Calls | 83,895 calls |
| 2,386,386 Registry and Internal List Calls | 118,289 calls |
| JSR Calls | 369,384 calls |
| Satellite Systems Calls | 10,048 calls |
| Total | 693,732 calls |

## North Carolina

| | |
|---|---|
| 2003-2007 Calling Records | 85,093 calls |
| 1,707,713 TSR Summary Judgment Calls | 52,961 calls |
| 2,386,386 Registry and Internal List Calls | 97,785 calls |
| JSR Calls | 18,250 calls |
| Satellite Systems Calls | 7,290 calls |
| Total | 261,379 calls |

## Ohio

| | |
|---|---|
| 2003-2007 Calling Records | 98,207 calls |
| 1,707,713 TSR Summary Judgment Calls | 77,991 calls |
| 2,386,386 Registry and Internal List Calls | 95,275 calls |
| JSR Calls | 129,004 calls |
| Satellite Systems Calls | 12,803 calls |

| Total | 413,280 calls |
|---|---|

Grand Total for all Registry Call Violations in Count V

| California | 1,283,566 calls |
|---|---|
| Illinois | 693,732 calls |
| North Carolina | 261,379 calls |
| Ohio | 413,280 calls |
| Grand Total for Count V | 2,651,957 calls |

2. Count VI

Count VI alleges, in pertinent part:

DISH Network, either directly or indirectly as a result of a third party acting on its behalf, has violated 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(B), by engaging in a pattern or practice of initiating telephone solicitations to residential telephone lines, including lines in California, Illinois, North Carolina, and Ohio, using artificial or prerecorded voices to deliver a message without the prior express consent of the called party and where the call was not initiated for emergency purposes or exempted by rule or order of the Federal Communications Commission under 47 U.S.C. § 227(b)(2)(B).

Third Amended Complaint, ¶ 76. The Plaintiff States further alleged

that Dish's violations were willful and knowing. Third Amended

Complaint, ¶ 77.  Count VI contains two parts: (1) Dish allegedly

engaged in a pattern or practice of making Prerecorded Calls to

residents of the Plaintiff States; and (2) Order Entry Retailers acting on Dish's behalf allegedly engaged in a pattern or practice of making Prerecorded Calls to residents of the Plaintiff States. The statute of limitations is four years under the TCPA, and, so, the period of liability extends back to March 25, 2005. All of the prerecorded calls at issue were placed after March 25, 2005.

### a. Dish and the Telemarketing Vendors

The Court entered partial summary judgment that Dish and its Telemarketing Vendors made 98,054 Abandoned Prerecorded Calls in that were answered by persons, and so, were abandoned calls in violation of the TSR. See Opinion 445, at 193-94, 233. The portion of the 98,054 calls made to telephone numbers with Plaintiff States area codes were:

- 23,020 calls made to California area codes;

- 5,830 calls made to Illinois area codes;

- 2,283 calls made to North Carolina area codes; and

- 1,759 calls made to Ohio area codes.

These were Prerecorded Calls and the preponderance of the evidence shows that the intended recipients were residential telephone subscribers of the respective Plaintiff States. The Plaintiff

States have established a prima facie case for liability for these calls for violation of the FCC Rule and TCPA as alleged in Count VI.

Dish asserts that the Prerecorded Calls did not violate the FCC Rule or TCPA because Dish had a Transaction-based Established Business Relationship with the intended recipients. Dish has the burden to prove this exception to liability. Dish's only evidence is the translations of the transcripts of the recorded messages. The prerecorded messages were all in different foreign languages. The translations show that the prerecorded messages were directed to Dish customers. Dish, however, must show that the intended recipient purchased goods or services from Dish within 18 months of the call to establish a Transaction-based Established Business Relationship. FCC Rule 47 C.F.R. § 64.1200(f)(5). The translations of the messages do not provide any evidence of last dates of purchase of Dish Network programming. The translations, therefore, do not prove the Transaction-based Established Business Relationship exception. Dish is liable for these calls for violation of the FCC Rule and TCPA as alleged in Count VI.

## b. Order Entry Retailers Star Satellite and JSR

The Court entered partial summary judgment that Dish was liable for causing Order Entry Retailers Dish TV Now, Star Satellite, JSR, and American Satellite to make Abandoned Prerecorded Calls that were answered and became abandoned calls in violation of the TSR.  See Opinion 445, at 176, 194-95, 233.  The Plaintiff States presented evidence of the number of Prerecorded Calls Star Satellite made to Plaintiff States area codes, but not Dish TV Now or American Satellite.  The Plaintiff States proved that Dish TV Now and JSR made millions of prerecorded calls nationwide, some of which were directed to residential telephone subscribers in the Plaintiff States; however, the Plaintiff States have not presented evidence of the number of calls made to residents of the Plaintiff States either by number of calls to Plaintiff States area codes or otherwise.  The Plaintiff States also proved that American Satellite made numerous prerecorded telephone calls, but the Plaintiff States did not present evidence of the number of calls made.  The Plaintiffs proved American Satellite made one prerecorded call during a Dish sting operation, but the call recipient did not reside in a Plaintiff State.

The Court found at summary judgment that Dish caused Star Satellite to make 43,100,876 Abandoned Prerecorded Calls between July and November 2005. The portion of the 43,100,876 calls that Star Satellite made to telephone numbers with Plaintiff States area codes were:

- 5,727,417 calls made to California area codes;

- 2,660,066 calls made to Illinois area codes;

- 1,716,457 calls made to North Carolina area codes; and

- 3,419,175 calls made to Ohio area codes.

For the reasons stated above, the preponderance of the evidence shows that Star Satellite was Dish's agent for telemarketing when it made these calls, the intended recipients of the calls were residential telephone subscribers, and the intended recipients resided in the Plaintiff States associated with the recipients' respective area codes. Dish is liable for these calls made in violation of the FCC Rule and the TCPA, as alleged in Count VI.

c. <u>Summary</u>

Dish is liable for Prerecorded Calls made in violation of the FCC Rule and TCPA in Count VI as follows:

## California

| | |
|---|---|
| Dish and Telemarketing Vendor Calls | 23,020 calls |
| Star Satellite Calls | 5,727,417 calls |
| Total | 5,750,437 calls |

## Illinois

| | |
|---|---|
| Dish and Telemarketing Vendor Calls | 5,830 calls |
| Star Satellite Calls | 2,660,066 calls |
| Total | 2,665,896 calls |

## North Carolina

| | |
|---|---|
| Dish and Telemarketing Vendor Calls | 2,283 calls |
| Star Satellite Calls | 1,716,457 calls |
| Total | 1,718,740 calls |

## Ohio

| | |
|---|---|
| Dish and Telemarketing Vendor Calls | 1,759 calls |
| Star Satellite Calls | 3,419,175 calls |
| Total | 3,420,934 calls |

Grand Total for violations in Count VI

| | |
|---|---|
| California | 5,750,437 calls |
| Illinois | 2,665,896 calls |
| North Carolina | 1,718,740 calls |

| Ohio | 3,420,934 calls |
|---|---|
| Grand Total | 13,556,007 calls |

### 3. Liability for Statutory Damages for TCPA Violations

The TCPA authorizes the Plaintiff States to recover $500 per violation. 227 U.S.C. § 227(g). Each illegal call is a separate violation, and if a call violates two or more subsections of the TCPA, the call constitutes two or more violations, one for each subsection violated. Charvat v. NMP, LLC, 656 F.3d 440, 448-49 (6th Cir. 2011). The $500 amount is a compensatory award fixed by Congress and does not require proof of intent or motive. See Alea London Ltd. v. American Home Services, Inc., 638 F.3d 768, 776 (11th Cir. 2011); Penzer v. Transportation Insurance Co., 545 F.3d 1303, 1311 (5th Cir. 2008); Universal Underwriters Ins. Co. Lou Fusz Auto. Network, Inc., 401 F.3d 876, 881 (8th Cir. 2005); see also Ira Holtzman, C.P.A. v. Turza, 728 F.3d 682, 684 (7th Cir. 2013). Dish argues that the award is punitive. The Court disagrees. The $500 is much more in the nature of a liquidated damage amount in circumstances where the actual harm would be hard to calculate. See Universal Underwriters, 401 F.3d at 881. As a result, the special agency rules regarding punitive damages awards for the acts

of agents is not relevant to the $500 per violation awards under the TCPA.

Dish argues that the Court should interpret the TCPA to allow an award "up to" $500 per violation the Plaintiff States. At least one district court has accepted this argument. <u>Texas v. American Blastfax, Inc.</u>, 164 F.Supp.2d 892, 900-01 (W.D. Tex. 2001). This Court respectfully disagrees. The statute authorizes actions to recover of "actual monetary loss or $500 in damages for each violation, or both such actions." 47 U.S.C. § 227(g)(1). Congress authorized private parties to sue under the TCPA for actual monetary loss or damages "up to $500," whichever is greater. 47 U.S.C. §§ 227(c)(5)(B). Congress also did not include the "up to" language in the statutory damages that states could recover. Congress distinguished between awards for various violations and between awards to private individuals and awards to the states. The Court must honor this language.

The Plaintiff States have proven the following TCPA violations by Dish and its agents Star Satellite and JSR for each Plaintiff

State:

California:          1,283,566 illegal calls in Count V

                     5,750,437 illegal calls in Count VI

Illinois:              693,732 illegal calls in Count V

                     2,665,896 illegal calls in Count VI

North Carolina:        261,379 illegal calls in Count V

                     1,718,740 illegal calls in Count VI

Ohio:                  413,280 illegal calls in Count V

                     3,420,934 illegal calls in Count VI

Total:              16,207,964 illegal calls in Count VI

At $500 per call, the award would be approximately $8.1 billion ($8,103,982,000.00).

An award of $8.1 billion would be excessive and in violation of due process. A statutory award violates due process "only where the penalty prescribed is so severe and oppressive at to be wholly disproportioned to the offense and obviously unreasonable." St. Louis I.M. & S. Ry. Co. v. Williams, 251 U.S. 63, 66-67, (1919); see Maryland v. Universal Elections, Inc., 826 F.Supp.2d 457, 465-66 (D. Md. 2012); Pasco v. Protus IP Solutions, Inc., 865 F.Supp.2d 825, 834 (D. Md. 2011). An $8.1 billion award would represent

more than 25 percent of Dish's capital value and more than five years' net after tax profits. That amount is wholly disproportionate to the offense and obviously unreasonable and might put Dish out of business. That award also does not consider the effect of any monetary awards to the United States in Counts I-IV or to the Plaintiff States in the Counts VII-XII. The Court will exercise its discretion and reduce the award to an amount that is proportionate and reasonable under the circumstances. See Universal Elections, 862 F.Supp.2d at 466. The proportionate and reasonable amount depends on the awards in the other Counts. The Court will address the appropriate amount in light of all the Counts after discussing liability for civil penalties in the remaining Counts.

The Plaintiff States argue that the Court should order a remittitur prior to entertaining a due process challenge. The Court disagrees. A remittitur is a procedure used in jury trials. The remittitur offers the plaintiff the choice of accepting a lower damage amount that the one awarded by a jury or a new trial on damages. See Sony BMG Music Entertainment v. Tenenbaum, 660 F.3d 487, 511 (1St Cir. 2011). This is a bench trial, not a jury trial. Moreover, the damages are a straightforward calculation of $500 per violation.

A new trial on damages would not change that number.  A remittitur is not appropriate in this case.

The Plaintiff States argue in the alternative that the Court should first entertain the Plaintiff States' voluntary offer to remit the damages award before entertaining the constitutional issues. The case cited by the Plaintiff States involved a situation in which the district court erred by ordering no civil penalties in the circumstances in which the statutory amount was excessive. United States ex rel. Bunk v. Gosselin World Wide Moving, N.V., 741 F.3d 390, 406 (4th Cir. 2013).  The Fourth Circuit stated that the district court should have entertained the plaintiff's offer to remit the penalty.  The primary error, though, was awarding no penalty at all.

Furthermore, the Fourth Circuit did not address a situation in which the plaintiff did not offer to remit the statutory amount.  The Plaintiff States have not offered to remit the statutory damage award in Counts V and VI.  Plaintiffs North Carolina offered to remit the amounts in Counts IX and X.  State Plaintiffs' Post-Trial Proposed Conclusions of Law (664), at 39-40.  No such offer is included in the Plaintiff States' proposed conclusions of Law for

Counts V and VI.  The Plaintiff States mentioned the figure of $1 billion in their closing statement, but did not offer to remit any damage award to a specific amount.  See State Plaintiffs' Closing Statement (d/e 639), at 20 ("In light of Dish's ability to pay . . . , the millions of violations, and the extended period over which the violations continued to occur, any damages award less than one billion dollars would not raise constitutional concerns.").  The question of a voluntary remittance of the damage award is, therefore, moot.

In this case, the statutory damages calculation in Counts V and VI exceeds $8.1billion.  That is "wholly disproportionate to the offense and obviously unreasonable."  Williams, 251 U.S. at 66-67. No offer to remit that amount has been made.  The Court will exercise its discretion to award an amount that is proportionate and reasonable under the facts and circumstances of this case.  See Universal Elections, 862 F.Supp.2d at 466

The TCPA provides that the Court may increase the damage award up to $1,500 per violation for a knowing violation.  47 U.S.C. § 227(g)(1).  Because the award in excess of $8.1 billion violates due process, the Court will not exercise its discretionary authority to

increase the award. The Court, therefore, will not address the split of authority on the requirements to prove knowing violations (<u>see e.g.</u>, <u>Lary v. Trinity Physician Financial & Insurance Services</u>, 780 F.3d 1101, 1106-07 (11th Cir. 2015) (must prove actual knowledge that the act violated the TCPA); <u>contra e.g.</u>, <u>Sengenberger v. Credit Control Services, Inc.</u>, 2010 WL 1791270, at *6 (N.D. Ill. May, 2010) (must only prove the act was intentional, not accidental)) or whether the enhanced award would constitute punitive damages (<u>see Alea London Ltd. v. American Home Services, Inc.</u>, 638 F.3d 768, 778 (11th Cir. 2011) (enhanced awards up to $1,500 under the TCPA were more compensatory than punitive).

G.  <u>Counts VII and VII California Claims</u>

1. <u>Count VII</u>

Count VII alleges a claim under the California Do Not Call Law. Cal. Bus. & Prof. Code § 17592(c). Section 17592(c) provides, in relevant part, "no telephone solicitor shall call any telephone number" on the California do-not-call list. The California Do-Not-Call List consists of the California numbers on the Registry. A copy of the California Do-Not-Call List is current if it was obtained from the FTC no more than three months prior to the date of the call.

Cal. Bus. & Prof. Code §17592(a)(2). California's Established Business Relationship exception tracks the TSR and FCC Rule's requirement that such relationships exist for 18 months after the last purchase. Cal. Bus. & Prof. Code § 17592(e)(4). Count VII alleges in pertinent part:

> DISH Network, either directly or indirectly as a result of a third party acting on its behalf, is a telephone solicitor pursuant to California Business & Professions Code section 17592(a)(1), and has violated Section 17592(c)(1) by making or causing to be made telephone calls to California telephone numbers listed on the National Do Not Call Registry and seeking to rent, sell, promote, or lease goods or services during those calls.

Third Amended Complaint, ¶ 80. The statute of limitations for Count VII is three years. Cal. Civ. Code § 338(h); see Opinion 445, at 216-17. The claims in Count VII extend back to calls made on or after March 25, 2006, three years before the case was filed.

Dish argues that this claim, and any claim brought by the Plaintiff States that relies on calls made to numbers on the Registry, fails because the Registry violates the First Amendment for the reasons Dish raised in connection with the United States' claims in Count I. The Court rejects this argument for the reasons given above in connection with Count I.

Dish and its Telemarketing Vendors made the following illegal Registry Calls to telephone numbers with California area codes more than 93 days (i.e. more than three months) after registration on the Registry:

2007-2010 Calls:

| | |
|---|---:|
| Yoeli set of 2,386,386 calls; | 296,640 calls |
| Taylor's set of 501,650 calls; | 42,019 calls |
| Taylor's set of not completed calls; | 33,970 calls |
| Taylor's set of wrong number, no English calls; | 1,955 calls |
| Total | 374,584 calls |

The "not completed calls" and "wrong number, no English calls" are the calls with California area codes that Taylor erroneously eliminated from the Yoeli July 2012 Call Set.

The preponderance of the evidence shows that the intended recipients of these calls were California residents. Dish is liable for making 374,584 Registry Calls in violation of Cal. Bus. & Prof. Code § 17592(c) as alleged in Count VII.

The Plaintiff States did not present evidence on the number of Registry Calls made by Order Entry Retailers JSR and Satellite Systems that were more than three months after the telephone

numbers with California area codes were registered on the Registry. The Plaintiffs, therefore, did not prove the number of calls made by JSR and Satellite Systems for which Dish would be liable under Count VII.

California law provides a safe harbor affirmative defense:

> It shall be an affirmative defense to any action brought under this article that the violation was accidental and in violation of the telephone solicitor's policies and procedures and telemarketer instruction and training.

Cal. Bus. & Prof. Code § 17593(d). Dish failed to prove this affirmative defense. Dish failed to present sufficient competent evidence of the procedures used to formulate or scrub Lead Tracking System calling lists and, so, failed to show any illegal Registry calls were accidental or violated procedures. Furthermore, Dish failed to use the last dates of purchase to calculate Transaction-based Established Business Relationships for the Account Number Campaigns. As a result, Dish did not use proper procedures to formulate these calling lists and called millions of numbers on the Registry illegally. Those illegal calls were not accidental. Finally, Dish failed to identify any particular calls that were accidentally made. Some Dish witnesses testified in

generalities that accidents happen, and some witnesses indicated that some problems arose when Dish transferred all Account Number Campaign scrubbing to its headquarters in Colorado, but no witness testified that certain calls were accidentally made. Dish failed to prove this affirmative defense. Dish is liable for at least 374,584 calls that violated § 17952 of the California Business & Professions Code.

   2. Count VIII

   Count VIII alleges a claim for unfair competition under California Business and Professions Code § 17200,

> Section 17200 defines unfair competition as practices that are "unlawful, or unfair, or fraudulent." Acts that violate some other law are "unlawful" and so violate § 17200. See Davis v. HSBS Bank Nevada, N.A., 691 F.3d 1152, 1168 (9th Cir. 2012). The other statutes violated are referred to as "borrowed" statutes. Id."

Opinion 445, at 217. The California Attorney General can bring an action for civil penalties for violations of § 17200. Cal. Bus. & Prof. Code § 17206. The penalties available under § 17206, "are cumulative to each other and to the remedies or penalties available under all other laws of this state." Cal. Bus. & Prof. Code § 17205. Thus, if an act that violates two borrowed statutes, that act

constitutes two violations of § 17200 and is subject to two civil penalties.

In this case, Plaintiff California borrowed from the TCPA violations in Counts V and VI, the violations of § 17592(c) in Count VIII, and also violations of California Civil Code § 1770(a)(22)(A). Section 1770(a)(22)(A) prohibits making Prerecorded Calls "without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message."

> Count VII alleges, in pertinent part:
>
> Beginning at an exact date unknown to plaintiff and continuing to the present, Defendant DISH Network has engaged in and continues to engage in unfair competition as defined in California Business & Professions Code section 17200. Defendant's acts of unfair competition include, but are not limited to, the following:
>
> (a) DISH Network, either directly or indirectly as a result of a third party acting on its behalf, has violated the TCPA at 47 U.S.C. § 227(c) and its regulations at 47 C.F.R. § 64.1200(c)(2), by engaging in a pattern or practice of initiating telephone solicitations to residential telephone subscribers, including subscribers in California, whose telephone numbers were listed on the National Do Not Call Registry.

(b) DISH Network, either directly or indirectly as a result of a third party acting on its behalf, has violated 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(B), by engaging in a pattern or practice of initiating telephone solicitations to residential telephone lines, including lines in California, using artificial or prerecorded voices to deliver a message without the prior express consent of the called party and where the call was not initiated for emergency purposes or exempted by rule or order of the Federal Communications Commission under 47 U.S.C. § 227(b)(2)(B).

(c) DISH Network, either directly or indirectly as a result of a third party acting on its behalf, has violated California Business & Professions Code section 17592(c)(1) by making or causing to be made telephone calls to California telephone numbers listed on the National Do Not Call Registry and seeking to rent, sell, promote, or lease goods or services during those calls.

(d) DISH Network, either directly or indirectly as a result of a third party acting on its behalf, has violated California Civil Code section 1770(a)(22)(A), which makes it an unfair method of competition and unfair or deceptive act or practice to disseminate an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message.

Third Amended Complaint, ¶ 82. The statute of limitations is four

years. Cal. Bus. & Prof. Code § 17208; see Opinion 445, at 218.

The claim in Count VIII extends back to March 25, 2005, four years before the filing of the Complaint.

Dish is liable for making, either directly or through its agents the Telemarketing Vendors and JSR, 1,283,566 Registry Calls in violation of the TCPA, as proven in Count V. Dish is liable for making, either directly or through its agents the Telemarketing Vendors and Star Satellite, 5,750,437 prerecorded telemarketing calls in violation of the TCPA, as proven in Count VI. Dish is liable for making, either directly or through its agents Telemarketing Vendors, 374,584 Registry Calls as proven in Count VII.

Dish is also liable under § 17200 for the violations of § 1770(a)(22)(A). California proved that Dish or its agents Telemarketing Vendors eCreek and EPLDT and Order Entry Retailers Star Satellite and JSR made these Prerecorded Calls in violation of § 1770(a)(22)(A). The penalties for violation § 17200 are cumulative to each other. Thus, Dish may be liable twice under § 17200 for Prerecorded Calls if the calls violated both § 1770(a)(22)(A) and the TCPA and FCC Rule.

Dish argues that § 1770(a)(22)(A) does not impose liability for the acts of Order Entry Retailers. Dish argues that § 1770(a)(23)

specifically authorizes liability for third parties, but § 1770(a)(22)(A)

does not.  Dish argues that § 1770(a)(22)(A), therefore, is limited to

Dish's actions.  The Court disagrees.  Section 1770(a)(23)(B)

establishes an affirmative defense for a third party unless the

person who violated § 1770(a)(23)(A) was an agent of the third party

or the third party knew of the illegal act.  Section 1770(a)(22)

contains no similar defense to third party liability.  Businesses are

liable for the unlawful acts of their agents.  See Ford Dealers

Association v. Department of Motor Vehicles, 650 P.2d 328, 336

(Cal. 1982); People v. Toomey, 203 Cal.Rptr. 642, 650-51 (Cal. App.

1984).

Dish argues that it is entitled to an Established Business

Relationship defense under § 1770(a)(22) for the 23,020 calls that it

made directly or through the Telemarketing Vendors.  Section

1770(a)(22)(B) provides for such a defense:

> (B) This subdivision does not apply to a message
> disseminated to a business associate, customer, or other
> person having an established relationship with the
> person or organization making the call . . . .

Cal. Civ. Code § 1770(a)(22)(B).  This defense requires proof that the

intended call recipient was a customer or had an established

relationship with Dish.  This portion of the California Civil Code does not define either "customer" or "established relationship."  See Cal. Civ. Code § 1761, Definitions.  The statute does not require proof of a purchase within 18 months of the call like the TSR and the FCC Rule.

Dish argues that the translations of the sales scripts show that the intended recipients were customers.  The translations show that the calls offered new foreign language programming packages to existing customers.  This evidence tends to show that the calls were made to individuals who were at some time customers of Dish.  That evidence was not sufficient proof under Count VI because the FCC Rule requires a call to be within 18 months of the last purchase, and the script text did not prove the last purchase date.  California section 1761 does not require that the call to be within any certain time period since the last transaction, only that the person be a customer.  Given the language of § 1761, the Court finds that Dish has a valid defense under § 1770(a)(22)(B) for these 23,020 calls.[69]  Dish, however, is liable under § 17200 for the

[69] Dish also argues that it is entitled to an unintentional bona fide error defense for the 23,020 calls under California Civil Code § 1784.  Dish's foreign language marketing division intended to place these Prerecorded Calls.  This division of Dish did not unintentionally record sales

5,727,417 calls that Dish's agent Star Satellite made in violation of § 1770(a)(22)(A).

In summary, Dish is liable for unfair competition by committing the following illegal calls in violation of California Business & Professions Code section 17200:

| | |
|---|---|
| Violation of TCPA proven in Count V | 1,283,566 calls |
| Violation of TCPA proven in Count VI | 5,750,437 calls |
| Violation of Cal. Bus. & Prof. Code § 17592(c) proven in Count VII | 374,584 calls |
| <u>Violation of Cal. Civ. Code § § 1770(a)(22)(A)</u> | <u>5,727,417 calls</u> |
| Total | 13,136,004 calls |

Dish is liable for making directly or through its agents 13,136,004 calls in violation of § 17200 in Count VIII.

3. <u>Civil Penalties under California State Claims in Counts VII and VIII</u>

Pursuant to California Business & Professions Code § 17593(a)(2), California may recover for each violation proven under Count VII a civil penalty up to the penalties available under § 5(m) of the FTC Act, up to a maximum of $11,000 per violation for each

pitches or prepare calling lists for these campaigns. The defense does not apply. Dish, however, proved the other affirmative defense under § 1770(a)(22)(B).

Page **388** of **475**

violation before February 9, 2009, and $16,000 for each violation thereafter.  In addition, California may recover a separate penalty of up to $2,500.00 for each violation. Cal. Bus. & Prof. Code §§ 17200, 17536(b).  California may recover for each violation proven under Count VIII a civil penalty of up to $2,500.00. Cal. Bus. & Prof. Code § 17206(b).  The penalties are cumulative.  Cal. Bus. & Prof. Code §§ 17205 and 1734.5.  A defendant is subject to multiple penalties if he or she violates multiple statutes that authorize such penalties.  See People v. Toomey, 203 Cal.Rptr. 642, 656 (Cal. Ct. App. 1984).  Dish erroneously refers to some or all of the civil penalties authorized under these statutes as damages.  See e.g., Dish Network L.L.C.'s Proposed Post-Trial Conclusions of Law (d/e 666), at 94-95.  Dish is incorrect.  These statutes authorize civil penalties.

These statutes also impose strict liability without any proof of intent.  Community Assisting Recovery, Inc. v. Aegis Security Ins. Co., 112 Cal.Rptr.2d 304, 308 (Cal. Ct. App. 2001).  Issues related to culpability are relevant to the amount of the penalty, but not to liability for a penalty.  See Cal. Bus. & Prof. Code §§ 17206 and 17536 (willfulness a factor in the amount of the penalty), and §

17593(a) (civil penalties subject to the same considerations as those set forth in FCT Act § 5(m)).

California courts have determined that these civil penalties are not akin to punitive damages.  People v. Fremont Life Ins. Co., 128 Cal. Rptr.2d 463, 473-74 (Ct. App. 2002).  Moreover, the Supreme Court of California has held in other contexts that civil penalties are not akin to punitive damages under California law.  Kizer v. County of San Mateo, 806 P.2d 1353, 1356-60 (Cal. 1991).  The California Supreme Court explained that civil penalties are "designed to ensure compliance with a detailed regulatory scheme" and are not akin to punitive damages "even though they may have a punitive effect."  Id. at 1357.  In addition, civil penalties do not require a showing of actual harm and are "imposed without regard to motive and require no showing of malfeasance or intent to injure."  Like the FTC Act § 5(m) penalties, the primary purpose of California civil penalties are to enforce regulations.  Id. at 1358.

In light of the Fremont decision and the California Supreme Court's discussion of civil penalties in Kizer, the Court finds under California law that the civil penalties at issue in this case are not akin to punitive damages.  The special rules of agency law limiting a

principal's liability for punitive damages for the acts of its agent simply do not apply.

California has proven 374,584 violations of Count VII and 13,136,004 violations of Count VIII. The maximum possible penalties for Count VII would be $11,000 per violation prior to February 9, 2009, and $16,000 thereafter; plus $2,500 per violation. The maximum possible penalties for Count VIII would be $2,500 per violation. The total maximum possible civil penalty exceeds $37.8 billion ($37,896,894,000.00).[70] California suggests a civil penalty of $100 million ($100,000,000.00). State Plaintiffs' Post-Trial Proposed Conclusions of Law (d/e 664), at 33. The Court will address the appropriate amount to impose below in conjunction with the amounts to be awarded for all of the claims for monetary relief.[71]

---

[70] (374,584 x $11,000) + (374,584 x $2,500) + (13,136,004 x $2,500) = $37,896,894,000.00. This calculation assumes $11,000 as the maximum possible penalty for the violations proven under §17593.

[71] Dish states that California sought restitution in its proposed conclusions of law in the Final Pretrial Order. Dish Network L.L.C.'s Proposed Post-Trial Conclusions of Law (d/e 666), at 99-100. The Court could not find such a claim for restitution. See Final Pretrial Order (d/e 564), at 6, and Attachment F, Plaintiffs Proposed Conclusions of Law, ¶¶ 359-71. Regardless, California did not pursue restitution at trial. Restitution is not an issue.

H.  Counts IX and X North Carolina Claims

1. Count IX

Plaintiff North Carolina alleges violations of the North Carolina Do-Not-Call Law that prohibits Registry Calls to North Carolina residents whose telephone numbers were on the Registry.  Count IX alleges in part:

> 85. DISH Network, and/or third parties acting on DISH Network's behalf, has violated N.C. Gen. Stat. § 75-102(a) by making telephone solicitations to the telephone numbers of North Carolina telephone subscribers when those numbers were in the pertinent edition of the National Do Not Call Registry.

> 86. DISH Network also violated N.C. Gen. Stat. § 75-102(d) by failing to monitor and enforce compliance by its employees, agents, and independent contractors in that, as set forth above, those persons made numerous telephone solicitations to the telephone numbers of North Carolina telephone subscribers when those numbers were in the pertinent edition of the National Do Not Call Registry.

> 87. DISH Network willfully engaged in the actions and practices described above.

Third Amended Complaint, ¶¶ 85-87.

The Court previously explained the structure of the North Carolina statute,

> North Carolina's Do–Not–Call Law . . . prohibits a telephone solicitor from making a telemarketing call to a

telephone subscriber's telephone number that appears on the Registry. N.C. Gen.Stat. § 75–102(a). The term "telephone solicitor" means an individual or entity that makes telemarketing calls "directly or through salespersons or agents." N.C. Gen.Stat. § 75–101(10). The term "telephone subscriber" means an individual who subscribes for residential telephone service from a carrier, including a wireless carrier. N.C. Gen.Stat. § 75–101(11). Section 75–102 also requires telephone solicitors to implement systems and written procedures to prevent making telemarketing calls to numbers on the Registry. N.C. Gen.Stat. § 75–102(d). Count IX alleges a violation of this provision also.

Opinion 445, at 218-19.  Thus, North Carolina must show that Dish or its agents made Registry Calls to North Carolina residents who were residential telephone subscribers.  The statute of limitations on claims under § 75-102 is four years, and extends back to calls made after March 25, 2005.  N.C. Gen. Stat. § 75-16.2.  The four-year statute is that same as the limitations period under the TCPA.

For the reasons stated in the Court's discussion of Count V, North Carolina proved that Dish and its agents JSR and Satellite Systems made 261,379 Registry Calls to numbers with North Carolina area codes after March 25, 2005.  The preponderance of the evidence further establishes that intended recipients were

residential telephone subscribers and residents North Carolina. The 261,379 calls violated § 75-102.

Section 75-102(d) also requires telemarketers to "implement systems and written procedures to prevent further telephone solicitations to any telephone subscriber . . . whose telephone number appears in the "Do Not Call" Registry." Dish did not have written procedures for scrubbing Account Number Campaigns to remove from its calling lists telephone numbers on the Registry. Dish, therefore, also violated § 75-102(d).[72]

Dish argues that it is entitled to Transaction-based and Inquiry-based Established Business Relationship defenses to these calls. The North Carolina uses the same definitions of Transaction-based and Inquiry-based Established Business Relationships as the TCPA and TSR, with the same 18-month and three month time periods respectively. N.C. Gen. Stat. § 75-101(5). The analysis in the Count V TCPA Registry call claims, therefore, applies here, and Dish is not entitled to either Established Business Relationship defense for any of these 261,379 Registry Calls.

---

[72] The parties presented no competent evidence of Dish's procedures, written or otherwise, used to process its Lead Tracking System calling lists or Cold Call calling lists.

## 2. Count X

North Carolina alleges a claim in Count X for violation of it Do-Not-Call Law that prohibits use of an automatic dialer to place unsolicited prerecorded calls. N.C. Gen. Stat. § 75-104. Count X alleges in part:

> 89. DISH Network, and/or third parties acting on DISH Network's behalf, has violated N.C. Gen. Stat. § 75-104 by using automatic dialing and recorded message players to make unsolicited telephone calls to North Carolina telephone subscribers without first having live operators inform the telephone subscribers of the nature and length of the recorded message and asking for and obtaining permission to play the message from the person receiving the call, and otherwise not complying with any of the exceptions set forth in N.C. Gen. Stat. § 75-104.

> 90. DISH Network willfully engaged in the practices described above.

Third Amended Complaint, ¶¶ 89-90. Liability under § 75-104 extends to calls made by agents. Opinion 445, at 220-22. The intended recipients must be residential telephone subscribers because the North Carolina statute defines the term "telephone subscriber" to mean residential telephone subscriber. Opinion 445, at 220; N.C. Gen. Stat. § 75-101(11). The statute of limitation is

four years, extending back to calls made after March 25, 2005. N.C. Gen. Stat. § 75-16.2.

For the reasons stated in the Court's discussion of Count VI, North Carolina proved that Dish and its agent Star Satellite made 1,718,740 Prerecorded Calls to numbers with North Carolina area codes. The preponderance of the evidence further establishes that the intended recipients were residential telephone subscribers and residents North Carolina. The 1,718,740 calls violated § 75-104.

### 3. Civil Penalties for North Carolina under Counts IX and X

North Carolina authorizes civil penalties for the violations in Counts IX and X as follows: "Five hundred dollars ($500) for the first violation, one thousand dollars ($1,000) for the second violation, and five thousand dollars ($5,000) for the third and any other violation that occurs within two years of the first violation." N.C. Gen. Stat. § 75-105(a)(2). North Carolina established that Dish is liable for 261,379 Registry Calls in violation of N.C. Gen. Stats § 75-102 in Count IX, and 1,718,740 Prerecorded Calls in violation of N.C. Gen. Stat. § 75-104 in Count X. Under § 75-

105(a)(2), the statutory penalty applies to violations that occurred within two years of the first violation.

In Count IX, the Registry Calls in the 2003-2007 Calling Records would be subject to civil penalties if the calls were made within the first two years within the statute of limitations, from March 25, 2005 to no later than March 24, 2007. North Carolina used Taylor's analysis to show that Dish made 85,093 calls between January 2006 and August 2007. These calls are within the two-year window for civil penalties authorized by the § 75-105. This number does not include the Dish direct marketing Registry Calls made during the remainder of 2007, but this is the only number proven with reasonable certainty. North Carolina is also entitled to recover civil penalties on the 18,250 Registry Calls that Dish's agent JSR made to North Carolina residents in 2006 and 2007. These calls were also within the two-year window for civil penalties. North Carolina is entitled to recover civil penalties on 103,343 Registry Calls in Count IX.

All of the Star Satellite 1,716,457 Prerecorded Calls to North Carolina residents were made from July to November 2005. All of these calls were within the statute of limitations and within two

years of each other. North Carolina is entitled to recover civil penalties on all these calls. Dish presented evidence at summary judgment that Dish's Prerecorded Calls to North Carolina area codes occurred between September 2007 and March 2008. See Opinion 445, at 127-28; see Defendant Dish Network L.L.C.'s Memorandum of Law in Support of its Motion for Summary Judgment (d/e 349), at 168-69; Defendant Dish Network L.L.C.'s Opposition to Plaintiffs' Motion for Summary Judgment (d/e 374), at 50-51. North Carolina has failed to establish that it is entitled to recover civil penalties on the 2,283 Dish Prerecorded Calls to North Carolina residents.

Section 75-105 states that the penalty would be reduced to $100.00 for each violation within two years of the first violation if Dish "can show that that the violations are the result of a mistake and . . . [Dish] complied with" § 75-102(d). Section 75-102(d) requires telephone solicitors to implement "systems and written procedures" to prevent Registry Calls and Internal List Calls, to train its own sales staff, to monitor and enforce compliance by its own sales staff and by independent contractors, to record consumers' do-not-call requests, and to maintain Internal Do-Not-

Call Lists.  N.C. Gen. Stat. 75-102(d).  Dish did not have written procedures to scrub Account Number Campaign calling lists to prevent Registry Calls or Internal List Calls.  Dish presented no competent evidence on the procedures Dish's Database Marketing used to scrub Lead Tracking System and Cold Call calling lists. Dish, therefore, is not entitled to this reduction in the penalty under § 75-102(d).

Section 75-105 imposes the penalty on telephone solicitors. The definition of telephone solicitor means:

> Any individual, business establishment, business, or other legal entity doing business in this State that, directly or through salespersons or agents, makes or attempts to make telephone solicitations or causes telephone solicitations to be made. "Telephone solicitor" also includes any party defined as a "telemarketer" under the Telemarketing Sales Rule.

N.C. Gen. Stat. Ann. § 75-101(10).  Dish's liability as a telephone solicitor extends by this definition to telemarketing performed by its agents.  Because the statute extends liability to the actions of agents, special rules limiting a principal's liability for punitive damages do not apply.  See Restatement (Third) of Agency § 7.03 comment e (liability for statutory penalty first depends on the language of the statute).

The calculated amount of civil penalties under § 75-105(a)(1) is $516.7 million ($516,706,500.00) for Count IX and $8.6 billion ($8,582,276,500.00) for Count X, for a total of $9.1 billion ($9,098,938,500.00).[73] Civil penalties of $9.1 billion are "wholly disproportionate to the offense and obviously unreasonable" for the same reasons discussed in regarding that calculated $8.1 billion statutory damages in Counts V and VI above. See Williams, 251 U.S. at 66-67. Recognizing this fact, North Carolina has offered to remit its claim for civil penalties to $100 per call. State Plaintiffs' Post-trial Proposed Conclusions of Law (d/e 664), at 39, 42; see Gosselin World Wide Moving, N.V., 741 F.3d at 406. The offer to remit would reduce the civil penalties to approximately $182 million ($181,980,000.00).[74] North Carolina's offer to remit still fails to meet the due process requirements of Williams. A $182 million penalty for the North Carolina state law violations is disproportionate and unreasonable in light of the violations in North Carolina and Dish's total liability in all of the Counts. The

---

[73] The calculated civil penalties for Count IX are $500 + $1,000 + (103,341 X $5,000) = $516,706,500.00. The calculated civil penalties for Count X are $500 + $1,000 + (1,716,455 X $5,000) = $8,582,276,500.00. The total calculated civil penalties for these two Counts are $516,706,500.00 + $8,582,276,500.00 = $9,098,938,500.00.
[74] (103,343 + 1,716,457) X $100 = $181,980,000.00.

Court will determine a reasonable and appropriate penalty for Counts IX and X below in conjunction with the amounts to be awarded for all of the claims for monetary relief.

I. Count XI Illinois Claim

Plaintiff Illinois alleges a claim for violation of the Illinois Automatic Telephone Dialers Act (IATDA), 815 ILCS 505/2Z.  Count XI alleges in part:

> 93. The Defendant, and/or third parties acting on its behalf, has violated 815 ILCS 305/30(b) and 815 ILCS 505/2Z by knowingly playing or causing to be played prerecorded messages placed by an autodialer without the consent of the called party.

Third Amended Complaint, ¶ 93.

Section 505/2Z prohibits playing or causing to be played a prerecorded message by an autodailer without prior consent. Illinois only seeks liability for the 5,830 Prerecorded Calls that Dish or its Telemarketing Vendors placed to telephone numbers with Illinois area codes.  Dish concedes that it is responsible for calls made by Telemarketing Vendors.  The Court, therefore, does not need to decide the meaning of "cause" under the IATDA.

For the reasons stated in Count VI above, Illinois proved a prima facie case that 5,830 prerecorded telemarketing calls to

numbers with Illinois area codes. The preponderance of the evidence further establishes that intended recipients were residential telephone subscribers and residents Illinois.

The IATDA contains an Established Business Relationship exception. The prohibition against autodialer Prerecorded Calls "shall not apply" to "calls made to any person with whom the telephone solicitor has a prior or existing business relationship." 815 ILCS 305/20(a)(2). The IATDA does not define the term "existing business relationship." See 815 ILCS 305/5 Definitions. The Court gives the exception its ordinary meaning. The exception contains no time limit, such as the 18-month limit in the TSR and the TCPA and FCC Rule. The IATDA exception would apply to any current Dish customer or any prior Dish customer no matter when the person was a customer.

Dish argues that the translations of the sales scripts show that the intended recipients were Dish customers. The translations show that the calls offered new foreign language programming packages to existing customers. This evidence tends to show that the calls were made to individuals who were at some time customers of Dish. The evidence was not sufficient proof under

Count VI because the FCC Rule requires a call to be within 18 months of the last purchase and the script text did not prove the last purchase date. The IATDA defense in § 305/20(a)(2) does not require that the call to be within any certain time period since the last transaction, only that the person be a customer or have a relationship. Given the language of § 305/20(a)(2), the Court finds that Dish has a valid defense for these 5,830 calls under 815 ILCS 305/20(a)(2) of the IATDA. Dish is entitled to judgment on Illinois's claims in Count XI.

### J. Count XII

#### 1. Liability for Violations

Plaintiff Ohio alleges a claim in Count XII under the Ohio Consumer Sales Practice Act (OCSPA), Ohio Rev. Code § 1345.01 et seq. Count XII alleges in part:

> 95. Defendant, either directly or as a result of a third party acting on its behalf, violated Ohio Revised Code Sections 1345.02(A) and 1345.03(A) by engaging in a pattern or practice of initiating telephone solicitations to residential telephone subscribers in the State of Ohio, whose telephone numbers were listed on the National Do Not Call Registry in violation of the TCPA, 47 U.S.C. § 227(c), and 47 C.F.R. 64.1200(c)(2) and/or in violation of the Telemarketing Sales Rule, 16 C.F.R. § 310.4(b)(1)(iii)(B).

96. Defendant, either directly or indirectly as a result of a third party acting on its behalf, violated Ohio Revised Code Sections 1345.02(A) and 1345.03(A) by engaging in a pattern or practice of initiating telephone calls to residential telephone lines using artificial or prerecorded voices to deliver a message without the prior express consent of the called party and without falling within specified exemptions delineated within the TCPA in violation of the TCPA, 47 U.S.C. 227(B)(1)(b) and 47 C.F.R. 64.1200(a)(2).

Third Amended Complaint, ¶¶ 95-96.

In addition, the Final Pretrial Order provides that Ohio also

alleges:

437. Failing to record a do-not-call request on an internal do-not-call list, and failing to honor a prior do-not-call request, are unfair and deceptive practices in violation of the OCSPA. Opinion 445 at 224–225.

. . . .

471. Dish is liable for 120,809 violations of the Ohio Consumer Sales Practices Act for which a civil penalty may be imposed because it called consumers on the Registry as well as consumers who asked not to be called. These are Dish calls and are not contingent on an agency analysis.

Final Pretrial Order (d/e 564), Attachment F, Plaintiffs' Conclusions

of Law, ¶¶ 437, 471. Ohio referenced Opinion 445 in which the

Court stated:

Ohio Courts have held that failing to record a do-not-call request on an internal do-not-call list and failing to honor

a prior do-not-call request were unfair and deceptive practices in violation of the Ohio Act. <u>Charvat v. NMP, LLC.</u>, 656 F.3d 440, 451 (6th Cir. 2011) and cases cited therein.

<u>Opinion 445</u>, at 224-25.

Dish did not challenge in the Final Pretrial Order Ohio's additional claim based on Internal List Calls on the grounds that the theory was beyond the matters alleged in the Third Amended Complaint. Rather, Dish addressed the substance of the additional basis for the claim:

285. This Court has held that "failing to record a do-not-call request on an internal do-not-call list and failing to honor a prior do-not call request" may constitute a violation of the OCSPA. Opinion 445 at 224-25.

286. Thus, pursuant to the Court's interpretation of Ohio law, Plaintiff Ohio will have to establish for each telephone call for which it seeks to hold DISH liable that the call recipient previously made a do-not-call request to DISH which DISH failed to honor.

287. In that regard, DISH is not obligated to honor internal do-not-call requests made to the Retailers unless those Retailers are agents of DISH, and vice versa. *See* Opinion 445 at 227. Plaintiff Ohio cannot meet its burden to prove that an agency relationship existed as between DISH and the Retailers at issue.

<u>Final Pretrial Order</u>, Attachment G, <u>Dish's Conclusions of Law</u>, ¶¶ 285-87. The Final Pretrial Order controls the claims at issue at

trial.  Fed. R. Civ. P. 16(d); <u>Gorlikowski v. Tolbert</u>, 52 F.3d 1439, 1443-44 (7th Cir. 1995).  Both parties addressed the substance of Ohio's claims based on Internal List Calls even though Ohio did not allege Internal List Calls as a basis for its claim in Count XII in the Third Amended Complaint.  Ohio may proceed on the Internal List Calls in Count XII, as well as the Registry Calls and the prerecorded calls.

The OCSPA prohibits unfair and deceptive practices in consumer transactions:

> No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

Ohio Rev. Code § 1345.02(A).  The OCSPA also prohibits unconscionable acts or practices in consumer transactions:

> No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

Ohio Rev. Code § 1345.03(A).  The statute of limitations is two years, and so, extends back to calls made after March 25, 2007.

The OCSPA uses the terms "supplier" and "consumer transaction." A "consumer transaction" includes both the solicitation and the sale of goods or services "to an individual for purposes that are primarily personal, family, or household . . . ." Ohio Rev. Code § 1345.01(A). The Retailers Agreements only authorized Order Entry Retailers to sell Dish Network programming to residential customers, and the Order Entry Tool only could be used to place orders for residential service. Further, Dish and its Telemarketing Vendors almost always used outbound telemarketing to sell Dish programming to residential customers. Therefore, the solicitation and sale of Dish Network programming by Dish, its Telemarketing Vendors, and the Order Entry Retailers were consumer transactions to Ohio residents were consumer transactions under the OCSPA.

A "supplier" includes a person "in the business of effecting or soliciting consumer transactions." Ohio Rev. Code § 1345.01(C). Dish, the Telemarketing Vendors, and the Order Entry Retailers were suppliers under the OCSPA when they made outbound telemarketing calls to sell Dish Network programming to Ohio residents.

Courts have held that failing to record a Do-Not-Call request on an internal do-not-call list and failing to honor a prior Do-Not Call request constitutes an unfair or deceptive practice in violation of the OCSPA. <u>Charvat v. NMP</u>, 656 F.3d 440, 451 (6th Cir. 2011) (citing <u>Charvat v. Continental Mortg. Services, Inc.</u>, No. 99CVH12-10225, 2002 WL 1270183, at *5 (Ohio Ct. C.P. June 1, 2000) (Ohio Attorney General Public Information File (PIF) no. 1882)).  The Court finds that these decisions are an accurate statement of Ohio law.  Pursuant to these holdings, Internal List Calls made by Dish to persons who told Dish and its Telemarketing Vendors that they did not want to receive such calls violated the OCSPA.  Dish made 41,788 such calls to telephone numbers with Ohio area codes reflected in the 2007-2010 Calling Records.  <u>T 633: 3282-83 (Taylor)</u>; <u>PX 28</u>, <u>Taylor November 6, 2013 Report</u>, at 11; <u>T 613: 214-15 (Yoeli)</u>.[75]  The 2007-2010 Calling records contain calls beginning in September 2007.  The 41,788 calls were made after March 25, 2007, and so, within the statute of limitations.

---

[75] The 41,788 calls consist of the 36,598 Internal List Calls to Ohio area codes from the 903,246 calls found by Taylor, plus 5,190 Internal List Calls to Ohio area codes from the 140,349 Internal List Calls made to numbers marked DNC by eCreek, as determined by Dr. Yoeli.  <u>T 633: 3282-83 (Taylor)</u>; <u>PX 28</u>, <u>Taylor November 6, 2013 Report</u>, at 11; <u>T 613: 214-15 (Yoeli)</u>.  The sum of 36,598 plus 5,190 equals 41,788.

For the reasons stated in Counts V and VI, the preponderance of the evidence shows that the intended recipients of 41,788 Internal List Calls were Ohio residents and were residential telephone subscribers. Dish is liable for these illegal calls under Count XII in violation of the OCSPA.

Ohio also asks the Court to find that the 77,991 Registry Calls and 1,759 Prerecorded Calls made by Dish and its Telemarketing Vendors to telephones with Ohio area codes also were unfair, deceptive, or unconscionable acts and practices in violation of the OCSPA. Ohio only asks for a judgment on the Registry Calls to Ohio residents that were included in the 1,707,713 calls that the Court found violated the TSR at summary judgment. Ohio does not seek relief for any other calls made by Dish or any calls made by Order Entry Retailers in Count XII. No issues related to Dish's liability for the acts of Order Entry Retailers exist in Count XII.

A violation of the TCPA is not by itself proof of a violation of the OCSPA. See NMP, 656 F.3d at 450; Culbreath v. Golding Enterprises, L.L.C., 114 Ohio St.3d 357, 872 N.E.2d 284, 291 (Ohio 2007). Ohio must establish that the Registry Calls and Prerecorded

Calls made Dish or its agents were unfair, deceptive, or unconscionable.

The OCSPA does not define "unfair," "deceptive," or "unconscionable." The OCSPA includes a list of acts that are deceptive but the list is not exhaustive or exclusive. Ohio Rev. Code § 1345.02(B). The acts on the non-exhaustive list involve situations in which the consumer believes material facts about the transaction are true, when in fact, they are not. E.g., Ohio Rev. Code § 1345.02(B)(1) ("the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have.").

The scope of deceptive acts covered by the OCSPA is broader than the non-exhaustive list. "The boundaries of illegality under OCSPA must remain flexible because it is impossible to list all methods by which a consumer can be misled or deceived." Fletcher v. Don Foss of Cleveland, Inc., 90 Ohio App. 3d 82, 86, 628 N.E.2d 60, 62 (1993).

The OCSPA does not contain a list of acts that are unfair. The OSCPA, however, directs the Court to look to the FTC Act for

guidance in interpreting § 1345.02(A) prohibition against unfair and deceptive acts:

> (C) In construing division (A) of this section, the court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45 (a)(1) of the "Federal Trade Commission Act," 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended.

Ohio Rev. Code Ann. § 1345.02(C).

The FTC Act provides that an act is not unfair unless "[the act] is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n); see FTC v. Wyndham Worldwide, Inc., 799 F.3d 236, 243 (3d Cir. 2015). The central focus of unfairness analysis is consumer injury. Substantial consumer injury can be established by "showing a small amount of harm to a large number of people." In the Matter of LabMD, Inc., 2016-2 Trade Cases P 79708 (F.T.C.), 2016 WL 4128215 (July 28, 2016), at *8; see Wyndham Worldwide, Inc., at 243. Unfair and deceptive acts do not require proof of intent. Fletcher v. Don Foss of Cleveland, Inc., 90 Ohio App. 3d 82, 86, 628 N.E.2d 60, 62 (1993).

The OCSPA includes a list of unconscionable acts, but again, the list is not exhaustive or exclusive. Ohio Rev. Code § 1345.03(B). The listed acts cover situations in which the supplier has a marked advantage over the consumer and takes advantage of that unequal position to the consumer's detriment. E.g., Ohio Rev. Code § 1345.03(B)(1) ("[T]he supplier has knowingly taken advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement.").

The listed unconscionable acts all must be done knowingly. The implication is that a supplier must act knowingly to commit an unconscionable act under the OCSPA. To act knowingly, the supplier must know the impact of his behavior on the consumer, or know that his behavior was proscribed. Clayton v. McCary, 426 F.Supp. 248, 261 (N.D. Ohio 1976).

After careful review of the facts and applicable law, the Court Concludes that Dish's Registry Calls were unfair acts. Registry Calls injure consumers because the supplier calls a consumer who registered his or her telephone number specifically because he or

she did not want such calls, and the seller is on notice from the Registry that the consumer does not want the call, but calls anyway.  Every such unwanted call causes some injury, "Every call uses some of the phone owner's time and mental energy, both of which are precious."  Patriotic Veterans, Inc., v. Zoeller, 845 F.3d 303, 305-06 (7th Cir. 2017).  The consumer cannot reasonably avoid the injury because the supplier controls whether to place the call.  There is no countervailing economic benefit because the consumer did not want the call.  Numerous Dish witnesses testified that it made no business sense to call people who did not want to be called.

The Court also concludes that the 1,759 Prerecorded Calls made by Dish and the Telemarketing Vendors were unfair.  Prerecorded telemarketing calls injure consumers because there is no live person on the other end of the line:

> [M]any recipients find [prerecorded telemarketing calls] obnoxious because there's no live person at the other end of the line. The lack of a live person makes the call frustrating for the recipient but cheap for the caller, which multiplies the number of these aggravating calls in the absence of legal controls.

Patriotic Veterans, Inc. v. Zoeller, 845 F.3d at 306. Torok's testimony confirms the accuracy of the Seventh Circuit's observation in Patriotic Veterans. Prerecorded calls currently are the primary cause of consumer frustration with telemarketing. Prerecorded Calls generate large numbers of Do-Not-Call complaints to the FTC. T 710: 39 (Torok). The FTC is actively working to come up with a solution that would stop unwanted Prerecorded Calls. T 710: 80-83 (Torok).

The consumers could not reasonably avoid the injury in this case because Dish controlled whether to place the calls. The evidence before the Court shows no countervailing economic benefit. Dish witness Ahmed testified that these types of sales tactics did not produce good customers and led to high churn rates that cost Dish money. See T 626: 2323-28, 2333-34, 2418-19 (Ahmed). In this case, at least, Prerecorded Calls were unfair.

Dish is liable for the 41,788 Internal List Calls, 77,991 Registry Calls, and 1,759 Prerecorded Calls that Dish or its agents made to Ohio residents in violation of the OCSPA.

## 2. Civil Penalties for Ohio under Count XII

Ohio has established that Dish violated the OCSPA when it made 41,788 Internal Calls from September 2007 to March 2010. Each call was a separate violation.

Under the OCSPA, the Court may assess civil penalties as follows:

> [I]f the violation is an act or practice that was . . . determined by a court of this state to violate section 1345.02 [or] 1345.03 of the Revised Code and committed after the decision containing the court's determination was made available for public inspection pursuant to division (A)(3) of section 1345.05 of the Revised Code, the attorney general may request and the court may impose a civil penalty of not more than twenty-five thousand dollars against the supplier.

Ohio Rev. Code § 1345.07(D). Section 1345.05(A)(3) provides:

> (A) The attorney general shall:

> (3) Make available for public inspection all rules and all other written statements of policy or interpretations adopted or used by the attorney general in the discharge of the attorney general's functions, together with all judgments, including supporting opinions, by courts of this state that determine the rights of the parties and concerning which appellate remedies have been exhausted, or lost by the expiration of the time for appeal, determining that specific acts or practices violate section 1345.02, 1345.03, or 1345.031 of the Revised Code;

Ohio Rev. Code § 1345.05.

The Attorney General made judgments available as early as 2000 that stated that making calls to people who previously stated that they did not want to receive such calls was unfair and deceptive in violation of Ohio Revised Code § 1345.02. <u>Charvat v. Cont'l Mortg. Servs,, Inc.</u>, No. 99CVH12-10225, 2002 WL 1270183, at *5 (Ohio Ct. C.P. June 1, 2000) (PIF no. 1882); see <u>Burdge v. Satellite Sys. Network, LLC.</u>, No. 2006 CV F 01279, at 3 (Fairfield, Ohio Mun. Ct. March 2, 2007) (PIF No. 2535.); <u>Ohio ex rel. Petro v. Craftmatic Ord., Inc.</u>, No 05-CVH-06-06060, at 13 (Ohio Ct. C.P. July 25, 2005) (PIF No. 2347); <u>Burdge v. Satellite Sys. Network, LLC.</u>, No. 2005 CV F 00243, at 2 (Fairfield, Ohio Mun. Ct. May 11, 2005) (PIF No. 2344.) <u>Ohio ex rel. Fisher v. Wykle</u>, No. 90-1395, at 4 (Ohio Ct. C.P. Apr 8, 1992) (PIF No. 1141). Ohio is entitled to recover civil penalties for the 41,788 Internal List Calls that Dish and its Telemarketing Vendors made from 2007 to September 2010. The maximum civil penalty exceeds $1 billion (41,788 x $25,000.00 = $1,044,700,000.00). Ohio suggests that 1 percent of this figure, or $10,447,000.00, would be an appropriate penalty.

Dish claims that it is entitled to an affirmative defense to civil penalties under Ohio Rev. Code § 1345.11. Section 1345.11 states

that "no civil penalties shall be imposed" if "a supplier shows by a preponderance of the evidence that a violation resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error." Ohio Rev. Code § 1345.11(A). Ohio objects to Dish raising this affirmative defense. Plaintiffs' Proposed Responsive Conclusions of Law (d/e 682), at 5. Ohio objects because Dish did not raise the defense in its Answer or in its proposed conclusions of law in the Final Pretrial Order. Answer to Third Amended Complaint and Affirmative Defenses (d/e 484), at 19-22, Defenses; Final Pretrial Order (d/e 564), Attachment G, Dish Network L.L.C.'s Proposed Conclusions of Law, at 78-82.

The pretrial conference and pretrial order "are vital parts of the procedural scheme created by the Federal Rules of Civil Procedure." SNA Nut Company v. The Haagen-Dazs Company, Inc., 302 F.3d 725, 732 (7th Cir. 2002). As a result, "a defense not raised in the pretrial order is deemed waived." Id. Dish's possible affirmative defense under § 1345.11(A) is waived.

Dish also argues that Ohio is only entitled to a maximum penalty of $25,000.00. Dish cites two opinions from the Ohio Courts of Common Pleas in which the courts assessed penalties on

companies that engaged in years of unfair and deceptive practices. These courts assessed one penalty of $25,000.00 for each type of unlawful practice.  State ex rel. Fisher v. Gates, 1995 WL 901458, at *2 (Ohio Ct. Common Pleas Mar. 21, 1995); State ex rel. Celebrezze v. Erdil, 1992 WL 792930, at *1-2 (Ohio Ct. Common Pleas Oct. 28, 1992).  Section 1345.07(D) authorizes a penalty for "an act or practice."

The OSCPA "is a remedial law designed to provide various civil remedies to aggrieved consumers and must be read liberally." State ex rel. Celebrezze v. Hughes, 569 N.E.2d 1059, 1062 (Ohio 1991); see Motzer Dodge Jeep Eagle, Inc. v. Ohio Attorney General, 642 N.E.2d 20, 25 (Ohio App. 1994).  Read liberally, § 1345.07(D) authorizes a penalty for either an act or a practice.  The Ohio Attorney General in Erdil and Gates proved illegal practices, not a specific number of illegal acts, and so, secured one penalty each practice.  In this case, Ohio proved a specific 41,788 unfair acts. Ohio is entitled under § 1345.07(D) to secure a penalty for each act. The maximum penalty proven under Count XI is not limited to $25,000.00.  The Court will address the appropriate amount to

impose below in conjunction with the amounts to be awarded for all of the claims for monetary relief.

K. <u>Summary</u>

In summary, Dish is liable for the calls set forth in the tables below.  The tables also list the number of calls for which Dish is liable for monetary relief, either civil penalties or statutory damages.

Table I: <u>Count I: TSR Registry Calls</u>

| | |
|---|---|
| Calls by Dish from March 25, 2004 through August 31, 2007 | Millions of calls, but specific number unproven |
| Calls by Dish from September 1, 2007 through March 12, 2010 | 3,140,920 |
| Calls by Dish Order Entry Retailer and agent JSR in 2006 | 2,349,031 |
| Additional Calls by Dish Order Entry Retailer and agent JSR from January 1, 2007 to February 14, 2007 | Millions of calls, but specific number unproven |
| Calls by Dish Order Entry Retailer and agent Satellite Systems | 381,811 |

Table II: <u>Count II: TSR Internal List Calls</u>

| | |
|---|---|
| Calls by Dish to persons on Dish's internal do-not-call list | 903,246 |
| Calls by Dish to persons on eCreek's internal do-not-call list | 140,349 |
| | |

| | |
|---|---|
| Calls by Dish to persons on Order Entry Retailers' do-not-call lists | 7,321,163 |
| Calls by Dish Order Entry Retailer and agent JSR in 2006 to persons on Dish's internal do-not-call list | 418,228 |
| Calls by Dish Order Entry Retailer and agent JSR from January through February 14, 2007, to persons on Dish's internal do-not-call list | Millions of calls, but specific number unproven |
| Calls by Dish Order Entry Retailer and agent JSR in 2006 to persons on Order Entry Retailers' internal do-not-call lists | 267,439 |
| Calls by Dish Order Entry Retailer and agent JSR from January through February 14, 2007 to persons on Order Entry Retailers' internal do-not-call lists | Thousands of calls, but specific number unproven |
| Calls by Dish Order Entry Retailer and agent Satellite Systems to persons on Dish's internal do-not-call list | 22,946 |
| Calls by Dish Order Entry Retailer and agent Satellite Systems to persons on Order Entry Retailers' internal do-not-call lists | 42,990 |
| Calls by Dish Order Entry Retailer and agent Dish Nation | Included in JSR calls |

Table III: Count III: TSR Abandoned Calls

| | |
|---|---|
| Abandoned calls by Dish | 98,054 |
| Abandoned calls by Dish Order Entry Retailer and agent Dish TV Now | 6,637,196 |
| Abandoned calls by Dish Order Entry Retailer and agent Star Satellite (calls counted once for civil penalties) | 43,100,876 |
| Abandoned calls by Dish Order Entry Retailer and agent JSR | 1,285,379 |
| Abandoned call by Dish Order Entry Retailer and agent American Satellite | 1 |

| | |
|---|---|
| Additional abandoned calls by Dish Order Entry Retailer and agent American Satellite | Many, but specific number unproven |
| Abandoned calls by Dish Order Entry Retailer and agent Dish Nation | Included in JSR calls |

Table IV: Count IV: TSR Substantial Assistance

| | |
|---|---|
| Calls by Dish Order Entry Retailer and agent Star Satellite (calls counted once for civil penalties) | 43,100,876 |

Total TSR Violations subject to monetary relief:[76]    66,109,628 calls

At $11,000.00 per violation, the maximum amount of civil penalties would be over $727 billion ($ 727,205,908,000.00).   The actual maximum penalty is higher than this figure because some of the violations occurred after February 9, 2009, when the maximum penalty per violation was $16,000.00.[77]

---

[76] The total includes the 43,100,876 calls that Dish caused Star Satellite to make only once, and the 2,386,386 calls that Dish made from September 2007 to March 2010 only once.

[77] Even if the Court disregarded the Order Entry Retailers' activities (including Dish's calls to persons on the Order Entry Retailers' Internal Do-Not-Call Lists), Dish and its Telemarketing Vendors made a total of 4,282,569 illegal calls in violation of the TSR.  At $11,000.00 per violation, the maximum amount of civil penalties would still be over $47 billion ($47,108,259,000.00).  This amount does not include the millions of illegal calls made from March 25, 2004 through August 2007.

## Table V: Count V: TCPA Registry Calls

### California

| | |
|---|---|
| California calls in 2003-2007 Registry Calls | 266,514 |
| California calls in 1,707,713 TSR Summary Judgment Registry Calls | 216,867 |
| California calls in 2,386,386 Registry and Internal List Calls | 302,983 |
| California calls in JSR Registry Calls | 473,102 |
| California calls in Satellite Systems Registry Calls | 24,100 |
| California Total | 1,283,566 |

### Illinois

| | |
|---|---|
| Illinois calls in 2003-2007 Registry Calls | 112,116 |
| Illinois calls in 1,707,713 TSR Summary Judgment Registry Calls | 83,895 |
| Illinois calls in 2,386,386 Registry and Internal List Calls | 118,289 |
| Illinois calls in JSR Registry Calls | 369,384 |
| Illinois calls in Satellite Systems Registry Calls | 10,048 |
| Illinois Total | 693,732 |

### North Carolina

| | |
|---|---|
| North Carolina calls in 2003-2007 Registry Calls | 85,093 |
| North Carolina calls in 1,707,713 TSR Summary Judgment Registry Calls | 52,961 |
| North Carolina Calls in 2,386,386 Registry and Internal List Calls | 97,785 |
| North Carolina calls in JSR Registry Calls | 18,250 |
| North Carolina calls in Satellite Systems Registry Calls | 7,290 |
| North Carolina Total | 261,379 |

### Ohio

| Ohio calls in 2003-2007 Registry Calls | 98,207 |
|---|---|
| Ohio calls in 1,707,714 TSR Summary Judgment Registry Calls | 77,991 |
| Ohio calls in 2,386,386 Registry and Internal List Calls | 95,275 |
| Ohio calls in JSR Registry Calls | 129,004 |
| Ohio calls in Satellite Systems Registry Calls | 12,803 |
| Ohio Total | 413,280 |

### Grand Total for Count V

| California | 1,283,566 |
|---|---|
| Illinois | 693,732 |
| North Carolina | 261,379 |
| Ohio | 413,280 |
| Grand Total of Violations in Count V | 2,651,957 |

### Table VI: Count VI: TCPA Prerecorded Calls

#### California

| California calls in Dish and Telemarketing Vendor Prerecorded Calls | 23,020 |
|---|---|
| California calls in Star Satellite Prerecorded Calls | 5,727,417 |
| California Total | 5,750,437 |

#### Illinois

| Illinois calls in Dish and Telemarketing Vendor Prerecorded Calls | 5,830 |
|---|---|
| Illinois calls in Star Satellite Calls | 2,660,066 |
| Illinois Total | 2,665,896 |

### North Carolina

| | |
|---|---:|
| North Carolina calls in Dish and Telemarketing Vendor Prerecorded Calls | 2,283 |
| North Carolina calls in Star Satellite Calls | 1,716,457 |
| North Carolina Total | 1,718,740 |

### Ohio

| | |
|---|---:|
| Ohio calls in Dish and Telemarketing Vendor Prerecorded Calls | 1,759 |
| Ohio calls in Star Satellite Calls | 3,419,175 |
| Ohio Total | 3,420,934 |

### Grand Total for Count VI

| | |
|---|---:|
| California | 5,750,437 |
| Illinois | 2,665,896 |
| North Carolina | 1,718,740 |
| Ohio | 3,420,934 |
| Grand Total for Count VI Violations | 13,556,007 |

Total TCPA Violations:     16,207,964

At \$500.00 in statutory damages per violation for knowing violations, the maximum statutory damages award would be approximately \$8.1 billion (\$8,103,982,000.00).

### Table VII: Violations of Cal. Bus. & Prof. Code § 17592(c)

| | |
|---|---:|
| 2007-2010: Yoeli Set of 2,386,386 Registry Calls | 296,640 |
| 2007-2010: Taylor's Set of 501,650 Registry Calls | 42,019 |
| | |

| | |
|---|---:|
| 2007-2010: Taylor's Set of Not Completed Registry Calls | 33,970 |
| 2007-2010: Taylor's Set of Wrong Number, No English Registry Calls | 1,955 |
| Total | 374,584 |

Table VIII: Violations of Cal. Bus. & Prof. Code § 17200

| | |
|---|---:|
| Violations of TCPA Proven in Count V | 1,283,566 |
| Violations of TCPA Proven in Count VI | 5,750,437 |
| Violations of Cal. Bus. & Prof. Code § 17592(c) | 374,584 |
| Violations of Cal. Civ. Code § 1770(a)(22)(A) | 5,727,417 |
| Total | 13,136,004 |

The maximum possible penalties for Count VII would be $11,000 per violation prior to February 9, 2009, and $16,000 thereafter; plus $2,500 per violation. The maximum possible penalties for Count VIII would be $2,500 per violation. The total maximum possible civil penalty for California's claims in Counts VII and VIII exceeds $37.8 billion ($37,896,894,000.00).[78] California suggests a penalty of $100 million ($100,000,000.00).

---

[78] (374,584 x $11,000) + (374,584 x $2,500) + (13,136,004 x $2,500) = $37,896,894,000.00. This calculation assumes $11,000 as the maximum possible penalty for the violations proven under §17593.

Table IX:   Violations of N.C. Gen. Stat. § 75-102

| North Carolina Registry Calls within 2 years of the first violation proven | 103,343 Registry Calls subject to civil penalties |
|---|---|

Table X:   Violations of N.C. Gen. Stat. §75-104

| North Carolina Prerecorded Calls within 2 years of the first violation proven | 1,716,457 Prerecorded Calls subject to civil penalties |
|---|---|

The civil penalties for the violations in Counts IX and X are $500 for the first violation, $1,000 for the second violation, and $5,000 for the third and any other violation that occurs within two years of the first violation.  The calculated penalty would be approximately $9.1 billion ($9,098,938,000.00).  North Carolina has offered to voluntarily remit the penalty to $100 per violation or approximately $182 million ($182,980,000.00).

Table XI:  Violations of Illinois Automatic Telephone Dialers

Act (IATDA), 815 ILCS 505/2Z

| | |
|---|---|
| No Violations Proven | 0 |

Table XII:  Violations of Ohio Consumer Sales Practice Act,

Ohio Rev. Stat. Ohio Rev. Code § 1345.02(A)

| | |
|---|---|
| Ohio Internal List Calls by Dish and Telemarketing Vendors | 41,788 Violations subject to civil penalties. |

The maximum civil penalty is $25,000.00 per violation.  The total possible penalty in Count XII exceeds $1 billion (41,788 x $25,000.00 = $1,044,700,000.00).  Ohio suggests 1 percent of the maximum, or $10.4 million ($10,447,000.00), as an appropriate penalty.

Table XIII:  Total Maximum Possible Monetary Liability

| | |
|---|---|
| Counts I-IV TSR Maximum Civil Penalties | $ 727,205,908,000.00 |
| Counts V-VI TCPA Calculated Statutory Damages | 8,103,982,000.00 |
| Counts VII-VIII Maximum Civil Penalties | 37,896,894,000.00 |
| Counts IX-X Calculated Civil Penalties | 9,098,938,000.00 |
| Count XI No Violations | 0.00 |
| Count XII Maximum Civil Penalties | 1,044,700,000.00 |
| Total Maximum Possible Penalties and Statutory Damages | $ 783,350,422,000.00 |

**Table XIV:**  Plaintiffs' Suggested Monetary Liability

| | |
|---|---|
| United States' Suggested Penalty for TSR Counts I-IV | $     900,000,000.00 |
| Plaintiff States' Suggested Statutory Damages for TCPA Counts V-VI | 1,000,000,000.00 |
| California's Suggested Penalty for Counts VII-VIII | 100,000,000.00 |
| North Carolina's Suggested Penalty for Counts IX-X | 182,980,000.00 |
| Ohio's Suggested Penalty for Count XII | 10,447,000.00 |
| Total Suggested Penalties and Statutory Damages | $   2,193,427,000.00 |

**Table XV:**  Defendant's Testimony Regarding Penalties

| | |
|---|---|
| DeFranco's testimony that a $20 million penalty would "be a lot of money" and "more than a slap on the wrist." T 621:1548 (DeFranco). | $     20,000,000.00 |

## II.    The Appropriate Amount of Monetary Relief

The appropriate amount of monetary relief in each Count depends, in part, on the relief awarded in the other Counts.  The Court will address the factors for determining the amount of relief in the Counts I-X and XII and then determine the appropriate amount of monetary relief for these Count.

A. <u>Factors for TSR Violations in Counts I-IV</u>

The FTC Act sets forth factors the Court must consider in setting the appropriate amount of civil penalties within the statutory maximum:

> In determining the amount of such a civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.

15 U.S.C. § 45(m)(1)(C). The Court considers these factors in order.

1. <u>Culpability</u>

Dish's culpability is significant. Dish has some level of culpability for its direct marketing and a significantly higher level of culpability for the illegal calls made through its Order Entry program.

a. <u>Dish Direct Marketing</u>

Dish made efforts to follow the Do-Not-Call Laws in its Account Number Campaigns. Dish set up a system to scrub Account Number Campaigns through the PDialer. In 2008, Dish started using PossibleNOW's services and software to provide an additional scrub. These efforts weigh in favor of finding that Dish

had limited culpability for the calls made in its Account Number Campaigns.

Dish, however, failed to prove that it made similar efforts with its Lead Tracking System and Cold Call campaigns. Dish claimed that it had an Inquiry-based Established Business Relationship with the persons whose numbers were on Lead Tracking System campaigns because these individuals inquired about Dish Network programming. Dish had the burden to prove Established Business Relationship exceptions. Dish failed to demonstrate that the Lead Tracking System was limited to people who inquired about Dish Network programming. Dish presented almost no competent evidence regarding how Lead Tracking System calling lists were formulated. Dish failed to show that it had Established Business Relationships with the persons on the Lead Tracking System.

Dish also failed to present competent evidence to show how Lead Tracking System and Cold Call calling lists were scrubbed. The lack of evidence leaves the Court with no basis to conclude that Dish made any efforts to remove numbers that were on the Registry or on Internal Do-Not-Call Lists from the Lead Tracking System and Cold Call calling lists. The failure of Dish to present competent

evidence to show effort to make its Lead Tracking System and Cold Call campaigns comply with the TSR weigh in favor of finding culpability for the illegal calls in these campaigns.

In addition, Dish made millions of illegal calls in Account Number Campaigns because Dish used an unreliable method to determine whether it had Transaction-based Established Business Relationships with current and former customers.  The TSR definitions stated that a Transaction-based Established Business Relationship existed for 18 months immediately after the customer's last payment or financial transaction.  Dish's expert Sponsler testified that a Transaction-based Established Business Relationship with a current or former customer had to be calculated from the date of the last transaction.  Dish did not start using transaction dates until approximately July 2010, after all the calls at issue were made.

Dish's failure to read and properly apply the TSR definitions for Established Business Relationships was a serious error that should have been avoided.  This error resulted in millions and millions of illegal calls.  Dish's inability to read and follow the TSR demonstrates a lack of care that weighs in favor of finding some

level of culpability for the Account Number Campaign calls made by Dish and its Telemarketing Vendors.

Dish presented Taylor's testimony at trial in an attempt to show that it had little culpability for the 1,707,713 calls that the Court found were illegal calls to numbers on the Registry at summary judgment. As explained in the Finding of Facts, the vast majority of these calls were violations. Taylor showed that, at best, 20,387 canceled work order and other non-telemarketing calls may not have been violations.

In addition, Dish made many more illegal calls than those on which the United States has sought liability. Taylor concluded in his October 14, 2013 Report, PX 16, that Dish made 501,650 Registry calls for which Taylor could not find a basis to exclude from liability. The United States asked, and the Court found liability for these calls. Taylor, however, erroneously eliminated at least 15,846,402 calls from liability for reasons that were not supported by the evidence. These 15,846,402 illegal calls show that Dish's errors caused many more illegal calls than those on which the United States secured a finding of liability. The actual

magnitude of the illegal conduct speaks to more a significant level of culpability.

Dish further argues that violations as percentage of all of Dish's calls was very small. Dish relies on Taylor's Tables, DTX 626A through 626D, to show that the vast majority of Dish's calling campaigns had very few illegal calls. Dish also relies on Taylor's opinion that an error rate of 5% or less indicated that the calling list was properly scrubbed to remove numbers that should not be called. Taylor's Tables, however, are only based on the 501,650 calls from his October 14, 2013 Report on which the Court granted summary judgment. Taylor's Tables do not take into account the 15,846,402 additional calls in those calling campaigns that violated the TSR. In light of all these additional violations, Taylor's Tables tell the Court little or nothing about the percentage of all of Dish's calls that violated the TSR.

Dish also relies extensively on Sponsler's 2010 audit. The audit says nothing about Dish's culpability. The violations occurred from March 2004 to March 2010. Sponsler only made findings in the audit about Dish's practices in May 2010. The audit also says nothing about the process Database Marketing used to

process Lead Tracking System and Cold Call calling lists to comply with the Do-Not-Call Laws. The audit was also at a "high," i.e. superficial, level. Sponsler did not audit calling records to see the rate of errors in Dish's calling processes. The audit is not probative of Dish's culpability for the calls for which Dish is liable.

The Court concludes that Dish's handling of its direct telemarketing requires a finding of some culpability. Outbound Operations Department took many steps to scrub Account Number Campaign calling lists, but Dish failed to properly determine whether Dish had Transaction-based Established Business Relationships with current and former customers. Dish presented no competent evidence of Dish's efforts to ensure that the Lead Tracking System and Cold Call calling campaigns complied with the TSR or other Do-Not-Call Laws. On balance, the failure to read and apply the TSR Established Business Relationship definition and the lack of evidence on the formation and processing of Lead Tracking Systems calling lists merits a finding of culpability for Dish's direct marketing.

### b. Order Entry Program

Dish bears significant culpability for the reckless manner in which Dish operated the Order Entry Program before August of 2006, and to a lesser extent thereafter. Dish initially hired Order Entry Retailers based on one factor, the ability to generate activations. Dish cared about very little else. As a result, Dish created a situation in which unscrupulous sales persons used illegal practices to sell Dish Network programming any way they could. By 2006, Dish admitted it was overwhelmed with consumer complaints about these operators. Dish started to address the mess in the second half of 2006, but by 2009, Dish's own legal department still viewed the Order Entry program as fraught with illegal and shady practices. In late 2008 and early 2009, Dish fired 40 Retailers for defrauding Dish and lying to potential customers over the phone. As part of this purge, in 2009, Dish cut the number of Order Entry Retailers from 76 to 32. Dish sowed the wind and reaped the whirlwind when it decided to hire anybody that could get on the phone and bring in activations by whatever means possible.

Part of that whirlwind was the millions and millions of illegal calls in violation of the TSR.   The United States has proven that Dish TV Now, Star Satellite, JSR, Satellite Systems, and American Satellite made 54,505,896 illegal calls in violation of the Do-Not-Call Law, including the TSR.  The United States has also proven that Order Entry Retailers JSR, American Satellite, Dish Nation, United Satellite, Vision Satellite, LA Activations, and Atlas Assets made many more illegal "press 1" prerecorded telemarketing calls to sell Dish Network programming.  Based on the volume of Abandoned Prerecorded Calls made by Star Satellite, Dish TV Now, and JSR, the Court finds it more likely than not that these other operators made hundreds of millions more.  Dish's reckless decision to use anyone with a call center without any vetting or meaningful supervision demonstrates a disregard for the consuming public.

2. <u>History of Prior Conduct</u>

The evidence shows some history of Do-Not-Call Law violations before March 25, 2004.  Dish made calls to Oregon residents without scrubbing against the Oregon state Do-Not-Call list.  In 2003, Dish entered into an Assurance of Voluntary Compliance with Indiana to comply with Indiana Do-Not-Call Laws, and Dish

was sued by Missouri for Do-Not-Call Law violations.  The history shows that Dish had on-going problems complying with Do-Not-Call Laws even before the Registry launched.   The history also shows that Dish understood the potential penalties for Do-Not-Call Law violations could be substantial.

### 3. Ability to Pay

The evidence also shows that Dish has a significant ability to pay a penalty.  Dish is worth $28 billion.  Dish's net after tax income, or profits, for 2016 was approximately $1.4 billion.  Dish also has consistently made net after tax income between $700 million and $1.5 billion since 2011.  Dish has the ability to pay a significant percentage of its annual profits as a penalty.

### 4. Ability to Continue Business

Dish would be able to pay a significant percentage of its net after-tax income as a penalty and continue operating.  Dish has repeatedly demonstrated an ability to make large one-time payments and still maintain operations.  In 2015, Dish paid over $515 million to the FCC because its affiliates bid on the wireless spectrum, but they failed to complete the purchase of some spectrum on which they bid.  In 2011, Dish agreed to pay TiVo

$500 million in settlement of a patent suit. Dish paid a lump sum of $300 million to TiVo as an initial payment on this settlement. In 2012, Dish paid $700 million to Voom to settle a contract dispute. Dish continued to operate and continued to increase its profits while making these payments. In light of this evidence, Dish can pay a penalty of a significant percentage of its profits and still continue operating.

Dish claims that it is cash-poor because it has invested large portions of its net after tax profits in wireless spectrum to keep the company competitive. Dish's plea of poverty borders on the preposterous. Dish has made net after tax profits of $700 million to 1.5 billion annually for the past several years, and it has had no problems paying the substantial penalties and settlements discussed above. Dish cannot avoid liability because its current business plan calls for buying illiquid assets in the form of broadband spectrum. Dish has the assets and ability to pay the appropriate penalty for its illegal conduct.

5. <u>Other Matters that Justice May Require</u>

Dish has presented evidence that the United States, either directly or through FTC, entered into numerous civil penalty

settlements with various companies for violations of the TSR. The United States entered into a stipulated judgment against Star Satellite in the amount of $4,373,768 for the same 43,100,876 calls at issue here. The United States entered into a stipulated judgment with Guardian for $7,892,242 for the approximately 49,000,000 calls it made for Star Satellite and Dish TV Now at issue here. The terms of the stipulated judgment against Star Satellite suspended all but $75,000 of the penalties. The terms of the stipulated judgment against Guardian suspended all but $150,000 of the penalties.

The FTC entered into a stipulated judgment against Dish TVRO Retailer New Edge Satellite for $570,000 in civil penalties, but suspended all of the penalties. The FTC entered into a stipulated judgment against Order Entry Retailer Planet Earth Satellite in the amount of $7,094,354 but suspended all but $20,000 of the penalties. The FTC entered into a stipulated judgment against Caribbean Cruise Line, Inc., for $7,730,000 in civil penalties for making 12 to 15 million illegal calls. The United States entered into a stipulated judgment against Comcast Corporation in the amount of $900,000 in civil penalties for TSR

violations.  The United States alleged that Comcast Corporation made over 900,000 illegal calls.  The United States entered into a stipulated judgment against DirecTV for $2,310,000.00 in civil penalties for TSR violations.  The United States alleged that DirecTV was responsible for 1,050,007 calls.  Dish argues that fairness requires a penalty commensurate with the penalties awarded in these cases.

These settlements are worth little or no consideration in the calculations of civil penalties in this case.  Parties who settle negotiate a settlement sum to avoid the time and costs of litigation. The parties also negotiate a settlement to avoid the risk of a judgment in a fully litigated matter.  The plaintiff avoids the risk of a judgment in favor of the defendant, and the defendant avoids the risk of liability from a large judgment in favor of the plaintiff. Settling parties "forego the possibility of fully vindicating their positions."  United States v. Phelps Dodge Industries, Inc., 589 F.Supp. 1340, 1367 (S.D. N.Y. 1984).  The settlements, therefore, say little or nothing about the amount a court would have entered in judgment if the matters had been fully litigated.  As a result, the

settlements have little probative value on the appropriate monetary relief in this fully litigated case.

Assuming arguendo that settlements have some probative value, the parties have not admitted any details about the activities of any of the defendants in these settled matters except Star Satellite and Guardian. The Court, therefore, has no basis to compare those cases to this one.

The parties have presented evidence about Star Satellite and Guardian. Dish argues that Star Satellite and Guardian were more culpable that Dish. The Court disagrees. Dish created the situation that allowed Star Satellite and Guardian to act. If Dish had not started the Order Entry program, or if Dish had adequately monitored and supervised the Order Entry program, Star Satellite and Guardian would have never made millions and millions of illegal calls to sell Dish Network programming. Dish's creation of the largely unsupervised Order Entry program and its indifference to the consequences of its actions makes Dish more culpable than either Star Satellite or Guardian.

Dish also presents no evidence about Star Satellite or Guardian's ability to pay a penalty. The ability to pay is a statutory

factor that the Court must consider. Dish, thereby, failed to present the necessary evidence to compare these cases.

Dish notes that the FTC issued statements in several of these cases indicating that the settlement amount of civil penalties was the proper penalty under the circumstances. However, the opinion of a party in a case, even the FTC, is not controlling and does not indicate the amount of penalties that a court would have entered if the case had been fully litigated.

Dish argues that it will be punished for exercising its right to trial if the penalties exceed an amount that is consistent with these settlements. This is incorrect. Parties settle to avoid the possible results of full litigation. The parties did not settle here. As a result, the Court must give both parties the right to try the case to a fully litigated judgment. Dish is not being punished for trying the case rather than settling.

6. Res Judicata

Dish argues that an award of civil penalties for the 43,100,876 Prerecorded Calls by Star Satellite and the 6,637,196 Prerecorded Calls by Dish TV Now is barred by the doctrine of res judicata. The doctrine of res judicata holds that once a party has fully litigated a

claim, the party cannot litigate the claim again against the same party or their privies. Res judicata, however, does not bar separate actions against joint wrongdoers. The claim against each wrongdoer is a separate and distinct claim for purposes of res judicata. See Minix v. Canarecci, 597 F.3d 824, 829-30 (7th Cir. 2010) (citing Restatement (Second) of Judgments § 49 (1982) ("A judgment against one person liable for a loss does not terminate a claim that the injured party may have against another person who may be liable therefor."))[79] The claim of the United States against Dish for these illegal calls is separate from its claims against Star Satellite and Guardian for purposes of res judicata. The United States' claim against Dish is not barred by res judicata.

B. The TCPA Violations in Counts V and VI

The calculated amount of more than $8.1 billion in statutory damages under the TCPA is "wholly disproportioned to the offense and obviously unreasonable." St. Louis I.M. & S. Ry. Co. v. Williams, 251 U.S. at 66-67. The TCPA does not list factors for reducing this amount. The parties have at times suggested

---

[79] The Illinois Supreme Court has agreed with the Restatement (Second) of Judgments approach to res judicata. See River Park, Inc. v. City of Highland Park, 184 Ill.2d 290, 311-12, 703 N.E.2d 883, 893 (Ill. 1998).

applying the statutory factors in the FTC Act § 5(m) discussed above.  See Plaintiffs' Motion for Summary Judgment (d/e 402), at 167; Dish Network, L.L.C.'s Proposed Post-Trial Conclusions of Law (d/e 666), at 82.  The Court agrees that these factors provide a framework for assessing a proportionate and reasonable penalty that would consistent with the requirements of due process.  Therefore, The Plaintiff States are entitled to significant amount of statutory damages for the reasons discussed with respect to Counts I-IV.

Dish renews its arguments that one call may not be subject to multiple statutory damages and penalties even if the call violates multiple statutes and rules.  Dish is again incorrect.  An act that violates multiple statutes may be liable for multiple awards of statutory damages and penalties.  Lary, 780 F.3d at 1105-06.

The Plaintiff States again argue for a remittitur or a voluntary reduction by them.  As discussed above a remittitur is not appropriate because this is not a jury trial, and the Plaintiff States did not offer a voluntary reduction.  The relevant factors used in the FTC Act § 5(m) support the awarding of a significant penalty.

## C. California Civil Penalties in Counts VII and VIII

The amount of civil penalties for Count VII is governed by California Business and Professions Code §§ 17536 and 17592(c). The amount of civil penalties for Count VIII is governed by California Business and Professions Code § 17206.  Section 17592(c) states that the amount civil penalties under that provision is governed by the same factors as the penalties under FTC Act § 5(m) discussed in Counts I-IV above.  The California Business and Professions Code §§ 17536 and 17206 set forth the same factors for setting the appropriate penalties:

> (b) The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

Cal. Bus. & Prof. Code §§ 17206(b) and 17536(b) (statutory language is identical in each).

The statutory factors in §§ 17206(b) and 17536(b) weigh in favor of a significant penalty.  Dish's persistent misconduct was

serious, and the number of violations in California was enormous. From 2003 to 2010, Dish called hundreds of thousands of California consumers who registered their phones on the Registry. The message was clear: these consumers did not want to be annoyed and bothered by incessant telemarketing calls, but Dish made over hundreds of thousands of such calls anyway. The cumulative injury of hundreds of thousands of calls over a seven-year period was substantial.

Dish also hired Star Satellite as its telemarketing agent. Star Satellite bombarded California households with over 5.7 million Prerecorded Calls "that many recipients find obnoxious because there's no live person at the other end of the line." Patriotic Veterans, Inc. v. Zoeller, 845 F.3d at 306.[80] The cumulative injury caused by millions of illegal telemarketing calls also weighs in favor of a significant penalty.

Dish's disregard for Star Satellite's telemarketing practices also contributed to the millions of illegal calls. By spring 2005,

---

[80] The actual number of Prerecorded Calls made to California residents was much larger. Many of Dish's agents made press 1 Prerecorded Calls, including Dish TV Now, Star Satellite, JSR, Satellite Systems, American Satellite, United Satellite, Vision Satellite, LA Activations, Atlas Assets, and Dish Nation. The combination of autodialers and recorded messaging enabled each of these telemarketers to make hundreds of thousands of calls a day to consumers nationally.

Dish knew that Star Satellite was making Prerecorded Calls to market Dish Network programming. Several consumers complained about these calls. Dish's dialing operations manager Bangert knew. He reported the matter to Retail Services. Jeff Medina in Dish's Retail Escalations forwarded the email to Margot Williams in Retail Escalations. Medina joked, "Are these your boys again?" Retail Services was already well aware of Star Satellite's practices. Dish did nothing to stop the practice. In August 2005, Dish was sued because of Star Satellite's Prerecorded Calls. Dish did nothing. Dish could have prevented millions of illegal calls, but did nothing. This failure to act demonstrates a disregard consumers and the law that merits a significant penalty.

Finally, Dish has significant net worth in excess of $28 billion, and net after tax profits of more than $1.4 billion in 2016. Dish has a track record of net after tax profits in this range. Dish's pleas of being cash poor are not persuasive. A significant penalty is appropriate under the statutory factors in §§ 17206 and 17536. Dish's arguments to the contrary are not persuasive.

D. North Carolina Civil Penalties in Counts IX and X

North Carolina also does not set forth statutory factors for setting the level of civil penalties. The amount of civil penalties under the statutory calculations is approximately $9.1 billion. As explained above this amount is wholly "disproportioned and obviously unreasonable" under the circumstances in violation of due process. Williams, 251 U.S. at 66-67. North Carolina offers to reduce the penalty to $100 per violation, or $175,967,600.00.

The Court will again apply the statutory factors for civil penalties under the FTC Act § 5(m) as a meaningful framework for assessing penalties in these Counts. For the reasons stated above regarding these factors in Counts I-IV, a significant penalty is appropriate. The amount of the penalty will be set below along with the other claims.

E. Ohio Civil Penalties in Count XII

Ohio does not set forth statutory factors for determining the amount of civil penalties. See Ohio Rev. Code § 1345.07(D). The Court will apply the statutory factors for penalties under FTC Act § 5(m). Again, for the reasons stated above regarding these factors in Counts I-IV, a significant penalty is appropriate.

II.  <u>Amount of Statutory Damages and Penalties</u>

After careful consideration of all the relevant factors, a total award of civil penalties and statutory damages of $280,000,000.00, representing approximately 20 percent of Dish's 2016 after-tax profits of $1.4 billion, is appropriate and constitutionally proportionate, reasonable, and consistent with due process.

The amount represents a significant penalty for the millions and millions of Do-Not-Call Law violations caused by Dish over years and years of careless and reckless conduct.  The amount reflects Dish's culpability for failing to read and follow the TSR and TCPA in its direct telemarketing and for enabling unscrupulous telemarketers in its Order Entry program to violate Do-Not-Call Laws on a massive scale and injure enormous numbers of consumers.

A total award of 20 percent of Dish's annual 2016 profits, is a small percentage of the $2.1 billion requested by the Plaintiffs and a miniscule fraction of maximum possible penalties and damages. The Court limited the monetary relief because Dish made some efforts to avoid violations in its direct marketing and took some actions after mid-2006, and particularly in 2009 when this suit was

filed, to monitor its Order Entry Retailers,. The $280,000,000.00 award is consistent with all the relevant circumstances.

The total award is not onerous. Payment of the award will not unreasonably affect Dish's ability to operate. Dish pays operating expenses approximately $1 billion a month, $12 billion annually. The award of $280,000,000.00 will constitute a one-time 2.3 percent increase in those annual expenses. Dish also will retain 80 percent of its annual profits for payment of principal of any indebtedness or for investment into its ongoing operations. As noted above, Dish paid substantially higher penalties and settlements in the recent past, including more than $515 million to the FCC in 2015. Dish has been able to pay such sums and maintain operations. Dish's pleas of poverty and lack of cash are unpersuasive in light of these facts.

The Plaintiffs ask for $2.1 billion in penalties and statutory damages, or approximately 150 percent of Dish's annual profits. This amount could materially affect Dish's ability to continue operations. Such an award would not put Dish out of business, but could adversely affect the many individuals who work for Dish and other companies that do business with Dish.

A total monetary award of $280,000,000.00 is also appropriate in light of other matters that justice may require. Dish caused millions and millions of violations of the Do-Not-Call Laws, and Dish has minimized the significance of its own errors in direct telemarketing and steadfastly denied any responsibility for the actions of its Order Entry Retailers. The injury to consumers, the disregard for the law, and the steadfast refusal to accept responsibility require a significant and substantial monetary award. The total award of $280,000,000.00 meets these requirements.

The Court hereby imposes penalties against Dish and in favor of the Plaintiffs United States, California, and Ohio; and awards statutory damages to Plaintiffs States and North Carolina and against Dish, as follows: 60 percent of the total monetary award, or $168,000,000.00, to the United States as civil penalties in Counts I-IV; 30 percent, or $84,000,000.00, to the Plaintiff States as proportionate and reasonable statutory damages in Counts V and VI; 6 percent, or $16,800,000.00, to California as civil penalties in Counts VII and VIII; 3 percent, or $8,400,000.00, to North Carolina as proportionate and reasonable statutory damages in Counts IX and X; and 1 percent, or $2,800,000.00, to Ohio as civil penalties in

Count XII.  The Court apportioned the majority of the award to the United States because the United States' claims address the injuries to consumers nationally.  The Court apportioned the second largest award to the TCPA claims because of the large number of illegal calls proven in those claims and to vindicate federal law and to recognize the joint effort of all the Plaintiff States to bring this action.  The Court apportioned the remaining portions to California, North Carolina, and Ohio to reflect the different numbers of illegal calls for which each state sought monetary relief.

Dish is jointly and severally liable to the Plaintiff States for the reasonable and proportionate statutory damages of $84,000,000.00 in Counts V and VI.  The Plaintiff States shall divide the statutory damages in Counts V and VI proportionately to the number of violations in each state: 43.4 percent or $36,456,000.00 to California; 20.7 percent or $17,388,000.00 to Illinois; 12.2 percent or $10,248,000.00 to North Carolina; and 23.7 percent or $19,908,000.00 to Ohio.

III.    Injunctive Relief

The Plaintiffs asks for a permanent injunction pursuant to FTC Act § 13(b), 15 U.S.C. § 53(b), TCPA 47 U.S.C. § 227(g)(2); Cal

Bus. & Prof. Code §§ 17204 and 17593; N.C. Gen. Stat. § 75-105(a) and 7-14; and OCSPA Ohio Rev. Code § 1345.07(A)(2). The parties focus their arguments primarily on whether the United States is entitled to a permanent injunction.

The United States seeks an injunction pursuant to the proviso in the FTC Act § 13(b) which states: "*Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." FTC Act § 13(b),15 U.S.C. § 53(b) (emphasis in the original) (Permanent Injunction Proviso). Violations of the TSR are considered violations of a rule promulgated under the FTC Act. Violations of such rules are unfair and deceptive acts or practices in violation of FTC Act § 5(a). 15 U.S.C. §§ 45(a), 57a(1)(B) and 6102(c)(1). The United States may pursue the remedies available under the FTC Act for these violations, including injunctive relief under the Permanent Injunction Proviso. See F.T.C. v. World Media Brokers, Inc., 415 F.3d 758, 764-66 (7th Cir. 2005).

The Permanent Injunction Proviso authorizes the Court to issue a permanent injunction in a "proper case." United States v. JS & A Group, Inc., 716 F.2d 451, 455-57 (7th Cir. 1983). A proper

case "is a straightforward violation of section 5 [of the FTC Act] that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings." F.T.C. v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1028 (7th Cir. 1988). Dish's TSR violations are straightforward and do not present a novel regulatory issue that required FTC expertise. This is a proper case under the Permanent Injunction Proviso.

To establish a right to a permanent injunction, the United States must meet the "public interest" test for injunctive relief. This standard applies to actions by the federal government to enjoin violations of federal statutes in the public interest. World Travel Vacation Brokers, 861 F.2d at 1028-29. To meet the public interest test for a permanent injunction, the FTC must prove a violation of the TSR and a reasonable likelihood of future violations. Commodity Futures Trading Commission v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979). The Court must also consider a balance of the equities; however, "public equities must receive far greater weight." World Vacation Brokers, 861 F.2d at 1029.

Factors that indicate a likelihood of future violations include "the gravity of harm caused by the offense; the extent of the

defendant's participation . . . ; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations." S.E.C. v. Holschuh, 694 F.2d 130, 144 (7th Cir. 1982). Proof of past misconduct is "highly suggestive of the likelihood of future violations." Hunt, 591 F.2d at 1220 (quoting S.E.C. v. Management Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975). Evidence that the violator "continued to maintain that his conduct was blameless" has been considered indicative of a need for an injunction to prevent future violations. Hunt, 591 F.2d at 1220.

Dish argues that the Plaintiffs also must prove scienter in order to secure an injunction. The Holschuh opinion mentioned scienter as a factor. Holschuh, 694 F.2d at 144. The Holschuh case was a securities fraud case. Securities laws require proof of scienter to secure an injunction. Aaron v. S.E.C., 446 U.S. 680, 701 (1980). Scienter is not an element for establishing liability in the applicable Do-Not-Call Laws.

Dish argues that the traditional four-part test for injunctive relief in private actions of irreparable harm, no adequate remedy at law, success on the merits, and a balance of the equities applies to the United States' claim for a permanent injunction.  This is incorrect.  The Seventh Circuit specifically held in <u>World Travel Vacation Brokers</u> that the public interest test applies to actions for injunctive relief under the Permanent Injunction Proviso.

Dish appeals to other language in FTC Act § 13(b) which authorizes temporary injunctive relief during pending administrative proceedings.  The temporary injunctive relief provision in § 13(b) does not apply because the Permanent Injunction Proviso is a separate and distinct authorization for permanent injunctive that is independent of the temporary relief provisions.  <u>JS & A Group, Inc.</u>, 716 F.2d at 456-57; <u>see</u> <u>World Travel Vacation Brokers</u>, 861 F.2d at 1025-26.

Dish also cites <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 313-14 (1982) for the proposition that the Court should apply the traditional four-part test for private injunction actions.  However, the <u>Weinberger v. Romero-Barcelo</u> decision did not concern an action brought by the federal government to enforce a federal

statute.  In this case, Congress determined that the FTC should be able to secure injunctive relief for clear violations of the FTC Act without should be subject to "the requirements imposed by the traditional equity standard which common law applies to private litigants."  H.R. Conf. Rept. No. 624, 93d Cong., 1st Sess., reprinted in 1973 U.S. Code Cong. & Admin News, at 2533.  See <u>FTC v. Warner Communications, Inc.</u>, 724 F.2d 1156, 1159 (9th Cir. 1984); <u>FTC v. Weyehauser Co.</u>, 665 F.2d 1072, 1082 (D.C. Cir. 1981).  The <u>Weinberger v. Romero-Barcelo</u> decision therefore does not apply.  In addition, the Seventh Circuit decided <u>World Travel Vacation Brokers</u> in 1988, six years after the <u>Romero-Barcelo</u> decision.  This Seventh Circuit was aware of <u>Romero-Barcelo</u> when it made its decision in <u>World Travel Vacation Brokers</u>.  The Seventh Circuit agreed with the other Circuit's decision in <u>Warner Communications</u> and <u>Weyehauser Co.</u> that the public interest test should apply. <u>World Travel Vacation Brokers</u>, 861 F.2d at 1028-29.  This Court will follow the Seventh Circuit's decision in <u>World Travel Vacation Brokers</u> and apply the public interest test.

The Plaintiff States seek an injunction under the TCPA 47 U.S.C. § 227(g)(2).  Section 227(g)(2) contains language very similar

to the Permanent Injunction Proviso, "Upon a proper showing, a permanent or temporary injunction . . . shall be granted without bond." 47 U.S.C. § 227(g)(2). Both statutes authorize the government to secure an injunction to in the public interest. The similar language and purpose supports the inference the TCPA authorizes the Plaintiff States to secure an injunction under the public interest test. See Minnesota ex rel. Hatch v. Sunbelt Communications and Marketing, 282 F.Supp.2d 976, 979 (D. Minn. 2002); Bank v. Caribbean Cruise Line, Inc., 2014 WL 1883586, at *1 and cases cited therein (E.D. N.Y. May 12, 2014), vacated on other grounds, 606 Fed.Appx., 28, 29 (2d Cir. 2015).

The public interest test is also the appropriate standard for injunctive relief under California Business & Professions Code §§ 17204 and 17593; North Carolina General Statutes §§ 17-105(a) and 17-14; and Ohio Revised Code § 1345.07(A)(2). See California Service Station & Automobile Repair Association v. Union Oil Co., 282 Cal. Rptr. 279, 285 (Cal. App. 1st Dist. 1991); State ex rel. Morgan v. Dare To Be Great, Inc., 189 S.E.2d 802, 803 (N.C. App. 1972); Ohio Rev. Code § 1345.07(A)(2); Celebrezze v. Hughes, 479

N.E.2d at 888-89; <u>State ex rel. Fisher v. Warren Star Theater</u>, 616 N.E.2d 1192, 1198 (Ohio App. 1992).[81]

The Plaintiffs have established that Dish, its Telemarketing Vendors, and its Order Entry Retailers violated the applicable Do-Not-Call Laws millions and millions of times. The Plaintiffs have also proven millions more violations, although have not proven the specific amount for these additional violations. The additional violations include Dish's Registry Calls in the 2003-2007 Calling Records. Dr. Yoeli found 2,919,321 calls that were both Registry Calls and Internal List Calls after March 25, 2004. Dr. Yoeli assumed all calls in one day on the calling records were one violation. This was a very conservative assumption. Some of those records reflected multiple illegal calls. The additional Do-Not-Call Law violations also include the millions of calls that JSR made between January 1, 2007 and the day Dish terminated it on February 14, 2007. In addition, many Order Entry Retailers made illegal press 1 Abandoned Prerecorded Calls, including Satellite Systems, LA Activations, United Satellite, American Satellite, Vision Satellite, Dish Nation, and Atlas Assets. This evidence shows that

---

[81] The Court does not address the injunctive relief standard in Illinois because Illinois did not establish liability for its Count XI claim.

Dish and its agents made many millions more illegal calls that the specific calls proven. The vast quantity of illegal calls provides substantial proof that a reasonable likelihood of future illegal calls without an injunction.

In many cases, Dish knew Order Entry Retailers were violating the Do-Not-Call Laws and did nothing. Dish knew that Satellite Systems made prerecorded abandoned calls as early as 2002. Dish knew Satellite Systems was making Prerecorded Calls in 2004 and made it an Order Entry Retailers anyway. Dish knew in 2005 that Satellite Systems was continuing to make Prerecorded Calls. Dish knew in August 2005 that United Satellite was making illegal Abandoned Prerecorded Calls in August 2005 and allowed the practice to continue for another year.

Dish's Retail Sales managers showed little concern for compliance with the Do-Not-Call Laws. Prior to 2009, their primary concern was generating activations. Their compensation was tied to activations. They knew that numerous Order Entry Retailers were making illegal Abandoned Prerecorded Calls and did little or nothing about it. Prior to August 2006, they did almost nothing to address these problems. Paralegal Hargen in Dish's Legal

Department in fact noted that the Order Entry Retailers and the Marketing Department tried to get around the rules.

In August 2006, Dish started the Compliance Department to limit Dish's exposure for liability from Retailer practices. The Compliance Department systematically documented complaints and secured responses. The Compliance Department apparently had some success in reducing the use off-shore affiliates to telemarket Dish Network. Dish's actions to discipline Order Entry Retailers for Do-Not-Call Law violations, however, remained ad hoc and inconsistent. By 2009, Dish's Legal Department still considered the Order Entry program to be rife with shady, illegal activity.

Any real changes came in late 2008 and 2009. Dish fired numerous Retailers, cut the number of Order Entry Retailers, and instituted changes in the Quality Assurance program. These changes corresponded with mounting pressure from investigations by the FTC and state consumer protection officials. Ultimately, these investigations led to this suit being filed in March 2009 and Dish settling with the remaining 46 states in July 2009 by entering into the Assurance of Voluntary Compliance with them. This evidence shows that Dish reacted to pressure from law

enforcement.  The evidence supports the conclusion that the pressure needs to be maintained to keep Dish's marketing personnel from reverting to their practice of trying to get around the rules.

The Court is also seriously concerned with the most recent evidence showed that Dish continued to show little or no regard for consumer complaints about Order Entry Retailers' practices.  The Satellite System calling records showed that Satellite Systems made 381,811 Registry Calls in 2010 and 2011.  Dish received so many complaints that the Legal Department prepared a standard go after Satellite Systems letter.  Dish's response to these consumers was essentially: go away, it's not our problem, go after Satellite Systems. Dish's denial of responsibility and lack of regard for consumers are deeply disturbing and support the inference that it is reasonably likely that Dish will allow future illegal calls absent government pressure.

In contrast, Dish's direct marketing channel did not demonstrate such a disregard for the Do-Not-Call Laws.  The direct channel established the Working Group to prepare for the launch of the Registry.  Outbound Operations scrubbed Account Number

Campaigns to avoid Do-Not-Call violations. The scant competent evidence, however, failed to show what Dish's Database Marketing did to ensure that Lead Tracking System and Cold Call calling campaigns complied with the Do-Not-Call Laws. In 2008, PossibleNOW began assisting Dish's direct marketing with Do-Not-Call Law compliance.

The evidence, however, shows that responsible Dish personnel in direct telemarketing channel did not read the TSR or FCC Rule carefully. There is no evidence that the Working Group attempted to establish the necessary documentation to comply with the safe harbor provisions of either the TSR or the FCC Rule. Dish personnel knew that Dish made mistakes, but they did not try to comply with the safe harbor provisions.

Dish personnel also did not read the Established Business Relationship provisions carefully. Dish personnel did not follow the language of the TSR and FCC Rule and calculate Transaction-based Established Business Relationship exceptions from the last date of purchase or other financial transaction. Dish hired PossibleNOW in 2008 and learned that its Transaction-based Established Business Relationship procedures were flawed, but Dish did not correct the

problem for another two years. This lack of care indicates that a reasonable likelihood that future illegal calls will occur without an injunction.

Finally, the Court is convinced that at least some in Dish management do not believe that Dish really did anything wrong or harmed anyone with these millions and millions of illegal calls. Outbound Operations Manager Montano stated that he did not think anyone was really harmed by the millions of illegal calls:

> I wouldn't say that they are harmed. Certainly, if any consumer, regardless of whether it's a current DISH customer or former DISH customer, communicates to DISH that they don't want to receive calls from our organization, we'll absolutely do everything in our power to abide by that.
>
> . . . .
>
> I don't know whether they were harmed or not. All I can say, once again, is I apologize for any inconvenience that may have been caused to the consumer. Certainly, it is not our intention to call any consumer that does not wish to receive a phone call from DISH Network.

T 712: 433-34 (Montano). Dish has even taken the position the evidence did not show that the millions and millions of illegal calls harmed anyone. Dish Network L.L.C's Proposed Conclusions of Law for the Second Phase of Trial (d/e 737), at 37-38. Illegal

telemarketing calls clearly harm consumers. Every unwanted illegal telemarketing call robs individuals of the "time and mental energy, both of which are precious." Patriotic Veterans, 845 F.3d at 303.

True, DeFranco testified that Dish "gets it" and now takes telemarketing laws very seriously. See T 710: 225-26 (DeFranco). The evidence shows that Dish's indirect channel, at least, began taking Do-Not-Call Laws seriously only in response to pressure from consumer complaints and law enforcement investigation before. As late as 2011, Dish still did not "get it" when Dish refused to acknowledge any responsibility for Satellite Systems' illegal practices. Montano's 2017 testimony further demonstrates that some Dish managers do not seem to "get it." Montano did not believe that consumers were harmed by Dish's millions of illegal calls. T 712: 433-34 (Montano). This fundamental lack of understanding is a cause for concern about Dish's future conduct. Absent an injunction, Dish will be reasonably likely to make or cause others to make illegal calls in the future in violation of the Do-Not-Call Laws.

Dish presented extensive evidence and made extensive arguments about the balance of the equities. The arguments, however, address aspects of the Plaintiffs' proposed injunction rather than whether to issue an injunction. The Court must give great weight to the public equities. Congress determined that harassing unwanted telemarketing calls injure consumers. The 15,000,000 Americans who registered numbers on the Registry in the first five days after the Registry opened, and the 40,000,000 who registered numbers in the first two months, agreed with Congress. The 226 million who have registered their telephone numbers also agree. <u>See</u> T 710: 35, 37 (Torok). These equities clearly weigh in favor of some type of injunction to prevent future harm.

The Court may include appropriate prophylactic provisions in an injunction to ensure that future violations will not occur. <u>See</u> <u>Porter v. Warner Holding Co.</u>, 328 U.S. 395, 398 (1946); <u>FTC v. Febre</u>, 128 F.3d 530, 534 (7th Cir. 1997). The prophylactic provisions may bar otherwise legal conduct. <u>See</u> <u>FTC v. Colgate-Palmolive Co.</u>, 380 U.S. 374, 394-95 (1965); <u>United States v. Lowe's, Inc.</u>, 371 U.S. 38, 53 (1962), <u>abrogated in part on other</u>

grounds, <u>Illinois Tool Works, Inc. v. Independent Ink, Inc.</u>, 547

U.S. 28, 42-43 (2006).

The Court will set the parameters of the appropriate

injunction, not the Plaintiffs or Dish.  The injunction must ensure

that the illegal Registry Calls, Internal List Calls, and Prerecorded

Calls will not happen in the future.  The injunction will take into

account Dish's concerns that certain of Plaintiffs' proposed

injunctive provisions will drive Dish or its retailers out of business.

The primary goal of the injunction, however, is preventing future

illegal activity, not saving Dish from incidental or consequential

financial pain to achieve that goal.

The Court will not impose an immediate ban on Dish's

telemarketing as proposed by the Plaintiffs.  Rather, the Court will

require Dish, its Telemarketing Vendors, and major Retailers

(Primary Retailers) to comply with the safe harbor provisions of the

TSR and the FCC Rule.  The Primary Retailers shall consist of every

Dish Retailer that, during the calendar year 2016, or any

subsequent calendar year, has either (1) produced 600 activations

or (2) has directly or indirectly used automatic dialing equipment.

The safe harbor provisions are designed to ensure compliance with

the Do-Not-Call Laws and to allow for inadvertent errors. Requiring compliance with the safe harbor provisions, therefore, will meet the Plaintiffs' justified need for a mechanism to ensure compliance and avoid the potentially dire consequences of a complete telemarketing ban. If Dish cannot demonstrate that Dish, its Telemarketing Vendors, and the Primary Retailer are in compliance with the safe harbor provisions of the TSR and FCC Rule, the Court will bar Dish from accepting activations from the non-complying source.

Limiting the prophylactic aspects of the injunction to Primary Retailers will address Dish's concern that the Injunction Order would affect every Retailer's call to return a customer's call. The prophylactic aspects of the Injunction Order will only affect major Retailers or Retailers who use automatic dialing equipment. The Injunction Order will also prohibit any Retailer from violating the relevant Do-Not-Call Laws.

The Court, further, will not include the Plaintiffs' proposal to require Dish to terminate a Primary Retailer for a single mistake as long as the Primary Retailer is complying with the TSR and FCC Rule safe harbor provisions. Compliance with the safe harbor provisions will minimize errors and, so, meet the Plaintiffs' desire

for future compliance. The Plaintiff United States' counsel indicated that Dish would not need to terminate a Retailer who made a mistake if the retailer was complying with the safe harbor provisions. See T 711: 346-47 (Mills) (Attorney Runkle questioning). Compliance with the safe harbor provisions will also meet the goal of limiting violations while avoiding the uncertainty that could exist if a Retailer knew it would be terminated for one mistake.

The Court further will not include the Plaintiffs' proposed provision that would bar Dish from accepting orders from Retailers that previously used the Axiom system to place orders with Dish. All Retailers have used the Axiom system for several years. The Plaintiffs' proposed ban on accepting orders from any Retailer that used the Axiom system would effectively terminate all Retailers. The Court sees no basis for barring 3,000 TVRO Retailers from placing order with Dish when the Plaintiffs presented no material evidence about their activities.

The Plaintiffs implied that Dish hid the fact that all Retailers now used the Axiom system. See T 711:351-53 (Mills). This is incorrect. Dish informed the Plaintiffs years ago that all Retailers used the Axiom system. See Opinion 445, at 59 (citing DX 224,

<u>Declaration of Michael Mills</u>, dated January 27, 2014.).  The Court will therefore not impose this bar.

The Court will adopt the Plaintiffs' proposed requirement that Dish employ a telemarketing compliance expert to formulate a long-term plan to ensure compliance with the Do-Not-Call Laws and to provide status reports.  The reports will include an updated list of Primary Retailers that made 600 activations in a calendar year or used automatic dialing equipment in a calendar year.  Such Retailers will become Primary Retailers required to comply with the safe harbor provisions of the TSR and FCC Rule.

The Court, however, will not follow the Plaintiffs' suggestion to bar PossibleNOW or CompliancePoint from serving as the telemarketing compliance expert.  PossibleNOW performed services for both sides and PossibleNOW representatives testified for both sides.  The Court is not convinced that these services tainted PossibleNOW to make it unable to serve as a telemarketing compliance expert.  Moreover, the Plaintiff United States' counsel indicated in his cross-examination of Sponsler on this issue that the United States would have no objection if PossibleNOW performed this role as a subcontractor.  <u>T 715: 803-04 (Sponsler)</u>

(Attorney Runkle questioning).  If PossibleNOW can perform this role as a subcontractor, there is no reason it cannot perform this role directly.  The Court will not include a provision that only imposes form over substance.

Lastly, the Court will include a provision that any Plaintiff make unannounced inspections of Dish, its Telemarketing Vendors, or Primary Retailers, but will require a prior ex parte application to this Court and Court approval for such inspection.  An ex parte application to inspect a Dish facility must demonstrate probable cause necessary for administrative warrants to believe that Dish is violating the Injunction Order, the plan developed by the telemarketing compliance expert, the TSR, TCPA, FCC Rule, or any of the State statutes at issue.  An ex parte application to inspect a Telemarketing Vendor or Primary Retailer must demonstrate probable cause necessary for administrative warrants to believe that the subject of the requested inspection is violating the TSR, TCPA, FCC Rule, or any of the State statutes at issue.  The ex parte application must state with reasonable specificity for administrative inspections the location to be inspected and the information sought from the inspection.  Requiring prior application alleviates any

Fourth Amendment concerns, or other concerns, regarding the reasonableness of any inspection. <u>See</u> <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. 307, 324-25 (1978); <u>National-Standard Co. v. Adamkus</u>, 881 F.2d 352, 361-63 (7th Cir. 1989). Requiring an ex parte application and approval also alleviates Dish's concerns about random, abusive searches. The searches will only occur when a Plaintiff can demonstrate probable cause to believe that a violation of law or the Injunction Order.

Dish presented no evidence regarding any other provision in the Plaintiffs' proposed injunctions. The Court has reviewed the provisions and has adopted those provisions that the Court found to be reasonable and appropriate to ensure Dish's ongoing compliance with the Do-Not-Call Laws at issue.

## CONCLUSION

THEREFORE this Court enters judgment in favor of the Plaintiffs United States and the States of California, Illinois, North Carolina, and Ohio and against Defendant Dish Network L.L.C. on Counts I, II, III, V, VI, VII, VIII, IX, X, and XII of the Third Amended Complaint and judgment in favor of Plaintiff United States and against Defendant Dish Network L.L.C. on the claim that Defendant

provided substantial assistance to Star Satellite as alleged in Count IV of the Third Amended Complaint, and judgment in favor of Defendant Dish Network L.L.C. and against the United States on the claim that Dish Network, L.L.C. provided substantial assistance to Dish TV Now as alleged in Count IV of the Third Amended Complaint. The Court enters judgment in favor of Defendant Dish Network L.L.C. and against Plaintiff State of Illinois on Count XI of the Third Amended Complaint.

The Court awards the following monetary relief in favor of the Plaintiffs United States and the States of California, Illinois, North Carolina, and Ohio and against Defendant Dish Network L.L.C.:

1. Dish Network L.L.C. is hereby ordered to pay a civil penalty to the United States in the sum of $168,000,000.00 for Dish's violation of the TSR done with knowledge or knowledge fairly implied, as alleged in Counts I, II, III, and IV.

2. Dish Network L.L.C. is hereby ordered to pay statutory damages in the sum of $84,000,000.00 to the Plaintiff States of California, Illinois, North Carolina, and Ohio in the following sums for violations of the TCPA and FCC Rule as alleged in Counts V and VI, for which Dish shall be jointly and severally

liable to the Plaintiff States of California, Illinois, North Carolina, and Ohio. The statutory damages shall be divided as follows:

   a. California is awarded statutory damages in the sum of $36,456,000.00;

   b. Illinois is awarded statutory damages in the sum of $17,388,000.00;

   c. North Carolina is awarded statutory damages to in the sum of $10,248,000.00; and

   d. Ohio is awarded statutory damages in the sum of $19,908,000,00.

3. Dish Network L.L.C. is hereby ordered to pay a civil penalty to Plaintiff State of California in the sum of $16,800,000.00 for violation of California Business and Professions Code §17200 and 175929(c) as alleged in Counts VII and VIII.

4. Dish Network L.L.C. is hereby ordered to pay a civil penalty to Plaintiff State North Carolina in the sum of $8,400,000.00 for violation of the North Carolina General Statutes §§ 75-102 and 75-104, as alleged in Counts IX and X.

5. Dish Network L.L.C. is hereby ordered to pay a civil penalty to Plaintiff State Ohio in the sum of $2,800,000.00 for violation of Ohio Consumer Sales Protection Act, Ohio Revised Code §§ 1345.02 and 1345.03, as alleged in Count XII.

As additional necessary and appropriate relief, the Court further hereby enters a Permanent Injunction in favor of the Plaintiffs and against Defendant Dish Network, L.L.C. in the manner set forth in the separate Permanent Injunction Order entered herewith.

All pending motions are denied as moot. This case is closed, except to the extent that the Court retains jurisdiction to enforce the Permanent Injunction.

Enter: June 5, 2017

_____/s Sue E. Myerscough_____
UNITED STATES DISTRICT JUDGE